UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| Conservation Law Foundation, Inc., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-00396-WES-LDA |
| | ) | |
| Shell Oil Products US, | ) | |
| Shell Oil Company, | ) | |
| Shell Petroleum Inc., | ) | |
| Shell Trading (US) Company, | ) | |
| Motiva Enterprises LLC, | ) | |
| Triton Terminaling LLC, and | ) | |
| Equilon Enterprises LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S THIRD AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 5

I.    THE PROVIDENCE TERMINAL AND DEFENDANTS' CONNECTION, OR LACK THEREOF, TO THE TERMINAL ................................................... 5

II.    CWA AND RCRA FRAMEWORKS ............................................................... 7

    A.    The CWA ................................................................................................. 7

    B.    RCRA ...................................................................................................... 9

III.    RHODE ISLAND'S ACTIVE ENGAGEMENT TO ADDRESS POTENTIAL INCREASES IN FLOODING AND STORM IMPACTS ................................. 9

LEGAL STANDARD ............................................................................................... 12

ARGUMENT ............................................................................................................ 13

I.    CLF'S ALLEGED INJURY-IN-FACT IS NEITHER IMMINENT NOR FAIRLY TRACEABLE TO THE DEFENDANTS' CONDUCT ..................... 13

II.    CLF'S ADAPTATION CLAIMS ARE NOT RIPE ....................................... 18

III.    CLF'S ADAPTATION CLAIMS FAIL TO STATE A CLAIM UNDER RCRA OR THE CWA ................................................................................... 19

    A.    CLF Has Failed to State a Claim Under RCRA ................................... 21

        1.    CLF Has Not Alleged a Claim Under RCRA's Endangerment Provision .................................................................................. 21

            a.    CLF Has Failed to Allege that Any of the Defendants Have Engaged in Any Activity that is "Contributing To" an Endangerment .................................................................. 21

            b.    CLF Has Failed to Allege Shell Oil Company, Shell Petroleum Inc., and Shell Trading (US) Company Contributed To Any Waste Management at the Terminal ....................................................................... 26

            c.    CLF Has Failed to Allege that Products in the Terminal Infrastructure are "Waste" ....................................... 27

            d.    CLF Has Not Alleged Any Defendant Engaged in "Handling, Storage, Treatment, Transportation, or Disposal" of Waste That Caused Alleged Historic Contamination ....................................... 30

            e.    CLF Has Failed to Allege an "Imminent" Endangerment ............ 32

     2.     CLF Has Failed to Allege a RCRA Regulatory Violation ........................ 35

  B.    CLF Has Failed to State a Claim Under the CWA ................................................. 37

     1.     CLF Inappropriately Seeks to Require Consideration of Impacts Beyond the Life of any Reasonable NPDES Permit.................... 37

     2.     The CWA Does Not Impose Obligations Related to Inundation Caused by Sea Level Rise or Storm Surge ................................................. 39

     3.     The CWA Prohibits CLF's Attempt to Expand the Scope of the Facility's Permitting Obligations in this Lawsuit ...................................... 42

     4.     The TAC Lacks Facts Sufficient to Sustain the CWA Adaptation Claims ............................................................................ 43

         a.     Contents of the SWPPP  (Counts 3, 4, and 5) ............................... 44

         b.     Preparation of SWPPP (Count 2) .................................................... 45

         c.     Certification of SWPPP (Count 1) .................................................. 45

         d.     Amending or Updating the SWPPP (Count 6) ............................. 46

         e.     Operation and Maintenance of Treatment and Control Equipment (Count 7)........................................................................ 47

         f.     Submission of Information to Correct Errors or Omissions in Previous Applications or Reports (Count 9).................................. 48

         g.     Duty to Minimize or Prevent Permit Violations (Count 10) ......... 49

IV.    THE CWA DOES NOT PERMIT THE COURT TO EXERCISE SUBJECT MATTER JURISDICTION OVER THE TERMINAL'S FORMER OWNER/OPERATOR ....................................................................................... 50

V.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER ALLEGED MONITORING VIOLATIONS BASED SOLELY ON THE TERMINAL'S EXPIRED PERMIT. .............................................................. 52

VI.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS CLF'S RCRA AND CWA ADAPTATION CLAIMS UNDER THE DOCTRINES OF ABSTENTION AND PRIMARY JURISDICTION ......................... 53

  A.    The Court Should Defer to the State and Abstain from CLF's CWA Adaptation Claims ............................................................................... 53

  B.    CLF's RCRA Claim Should be Dismissed Under the Doctrine of Primary Jurisdiction.................................................................................. 57

CONCLUSION ................................................................................................ 60

# TABLE OF AUTHORITIES

**FEDERAL COURT CASES**

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
 732 F.3d 77 (1st Cir. 2013)..................................................................12, 20

*ABB Indus. Sys., Inc. v. Prime Tech., Inc. et al.*,
 120 F.3d 351 (2d Cir.1997) ..................................................................22, 31

*Acosta-Ramirez v. Banco Popular de P.R.*,
 712 F.3d 14 (1st Cir. 2013)..................................................................13

*Alt. Energy, Inc. v. St. Paul Fire & Marine Insurance Co.*,
 267 F.3d 30 (1st Cir. 2001)...............................................................passim

*Am. Canoe Ass'n v. D.C. Water & Sewer Auth.*,
 306 F. Supp. 2d 30 (D.D.C. 2004).......................................................47

*Am. Mining Cong. v. U.S. EPA*,
 824 F.2d 1177 (D.C. Cir. 1987)...........................................................28

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*,
 816 F. Supp. 2d 1118 (D.N.M. 2011)....................................................15

*Arkansas v. Oklahoma*,
 503 U.S. 91 (1992) ..........................................................................7, 8

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................................passim

*Auer v. Robbins*,
 519 U.S. 452 (1997) ..........................................................................41

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ......................................................................passim

*Brossman Sales, Inc. v. Broderick*,
 808 F. Supp. 1209 (E.D. Pa. 1992)......................................................51

*Burford v. Sun Oil Co.*,
 319 U.S. 315 (1943) ..........................................................................54

*Campagna v. Mass. Dep't of Envtl. Prot.*,
 334 F.3d 150 (1st Cir. 2003)..................................................................12

*Carrero-Ojeda v. Autoridad de Energia Electrica*,
 755 F.3d 711 (1st Cir. 2014)..................................................................13

*Chicago v. Envtl. Def. Fund*,
 511 U.S. 328 (1994) ..........................................................................9

*Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*,
 633 F.3d 20 (1st Cir. 2011)................................................................33, 54

*Christian Action Network v. Maine*,
 679 F. Supp. 2d 140 (D. Me. 2010)......................................................13

*City of Fall River v. FERC*,
 507 F.3d 1 (1st Cir. 2007)....................................................................18

*City of Mountain Park v. Lakeside at Ansley, LLC*,
 560 F. Supp. 2d 1288 (N.D. Ga. 2008)..................................................51

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ..................................................................13, 14, 16

*Connecticut Coastal Fishermen's Association v. Remington Arms Co.*,
  989 F.2d 1305 (2d Cir. 1993) ...................................................................................28
*Connectu LLC v. Zuckerberg*,
  522 F.3d 82 (1st Cir. 2008) ......................................................................................53
*Conservation Law Foundation, Inc. v. ExxonMobil Corp.*,
  No. 1:16-cv-11950 (MLW), (complaint filed Sept. 29, 2016) ...............................18
*Cox v. City of Dallas, Texas*,
  256 F.3d 281 (5th Cir. 2001) ....................................................................................23
*Craig Lyle Ltd. P'ship v. Land O' Lakes Inc.*,
  877 F. Supp. 476 (D. Minn. 1995) ...........................................................................29
*Crandall v. City & Cty. of Denver*,
  594 F.3d 1231 (10th Cir. 2010) ................................................................................33
*Decker v. Northwest Environmental Def. Ctr.*,
  568 U.S. 597 (2013) ....................................................................................................7
*Delaney v. Town of Carmel*,
  55 F.Supp.2d 237 (S.D.N.Y. 1999) ..........................................................................31
*Ecological Rights Found.v. Pac. Gas and Elec. Co.*,
  713 F.3d 502, 515 (9th Cir. 2013) ...........................................................................29
*E.I. du Pont de Nemours & Co. v. Train*,
  430 U.S. 112 (1977) ..................................................................................................42
*Ellis v. Gallatin Steel*,
  390 F.3d 461 (6th Cir. 2004) ....................................................................................54
*Feliciano-Hernandez v. Pereira-Castillo*,
  663 F.3d 527 (1st Cir. 2011)...........................................................................20, 48, 50
*First San Diego Props. v. Exxon*,
  859 F. Supp. 1313 (S.D. Cal. 1994) .........................................................................31
*Francisco Sanchez v. Esso Standard Oil Co.*,
  572 F.3d 1 (1st Cir. 2009)...........................................................................................9
*Friends of Sakonnet v. Dutra*,
  738 F. Supp. 623 (D.R.I. 1990) ................................................................................51
*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ............................................................................................14, 16
*Grace v. American Central Ins. Co.*,
  109 U.S. 278 (1883) ..................................................................................................14
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) .....................................................................................8, 50, 51, 52
*Hinds Invs., L.P. v. Angioli*,
  654 F.3d 846 (9th Cir. 2011) ..............................................................................22, 24
*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ............23, 24
*Ironshore Specialty Insurance Co. v. United States*,
  871 F.3d 131 (1st Cir. 2017).....................................................................................13
*Kaladish v. Uniroyal Holding, Inc.*,
  No. Civ.A. 300CV854CFD, 2005 WL 2001174 (D. Conn. Aug. 9, 2005).........27, 30
*Labor Relations Div. of Constr. Inds. of Mass., Inc. v. Healey*,
  844 F.3d 318 (1st Cir. 2016).....................................................................................19

iv

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ....................................................................... 14
*Manasola-88 Inc. v. Thomas,*
 799 F.2d 687 (11th Cir. 1986) ...................................................... 38
*Marriott Corp. v. Simkins Indus., Inc.,*
 929 F.Supp. 396 (S.D. Fla. 1996) ................................................ 31
*Maine People's Alliance v. Mallinckrodt, Inc.,*
 471 F.3d 277 (1st Cir. 2006) ......................................................... 32
*Mashpee Tribe v. New Seabury Corp.,*
 592 F.2d 575 (1st Cir.1979) .......................................................... 58
*Mass v. Blackstone Valley Elec. Co.,*
 67 F.3d 981 (1st Cir. 1995) ........................................................... 58
*McInnis-Misenor v. Maine Med. Ctr.,*
 319 F.3d 63 (1st Cir. 2003) ........................................................... 19
*Meghrig v. KFC W., Inc.,*
 516 U.S. 479 (1996) .................................................................. 9, 32
*Menge v. N. Am. Specialty Ins. Co.,*
 905 F. Supp. 2d 414 (D.R.I. 2012) ............................................... 13
*Murphy v. United States,*
 45 F.3d 520 (1st Cir. 1995) .................................................. passim
*N. California River Watch v. Fluor Corp.,*
 No. 10-CV-05105-MEJ, 2014 WL 3385287 (N.D. Cal. July 9, 2014) .................. 34
*Nat. Res. Def. Council v. Outboard Marine, Inc.,*
 702 F. Supp. 690 (E.D. Ill. 1988) ................................................. 43
*Nat. Res. Def. Council, Inc. v. Costle,*
 568 F.2d 1369 (D.C. Cir. 1977) ..................................................... 39
*New Comm Wireless v. Sprintcom, Inc.,*
 213 F. Supp. 2d 61 (D.P.R. 2002) ................................................... 4
*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,*
 491 U.S. 350 (1989) ................................................................ 54, 60
*No Spray Coal, Inc. v. City of New York,*
 252 F.3d 148 (2d Cir. 2001) .......................................................... 29
*Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co.,*
 No. 2:12-3750, 2013 WL 6709957 (S.D.W.V. Dec. 19, 2013) .......... 43
*Paper Recycling, Inc. v. Amoco Oil Co.,*
 856 F. Supp. 671 (N.D. Ga. 1993) ................................................ 29
*Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.,*
 215 F.3d 195 (1st Cir. 2000) ......................................................... 58
*Peñalbert-Rosa v. Fortuño-Burset,*
 631 F.3d 592 (1st Cir. 2011) ......................................................... 21
*PennEnvironment v. PPG Industries,*
 964 F. Supp. 2d 429 (W.D. Pa. 2013) .......................................... 51
*Prisco v. A & D Carting Corp.,*
 168 F.3d 593 (2d Cir. 1999) ..................................................... 27, 30
*Pub. Interest Research Grp. of N.J., Inc. v. Carter-Wallace, Inc.,*
 684 F. Supp. 115 (D.N.J. 1988) ............................................... 52, 53

v

*Pub. Serv. Co. of N.H. v. Patch*,
   167 F.3d 15 (1st Cir. 1998).................................................................................57

*Quackenbush v. Allstate Ins. Co.*,
   517 U.S. 706 (1996) .................................................................................54, 57

*Reddy v. Foster*,
   845 F.3d 493 (1st Cir. 2017)..........................................................................passim

*Roman Catholic Bishop of Springfield v. City of Springfield*,
   724 F.3d 78 (1st Cir. 2013) ...............................................................................18

*Rose Acre Farms, Inc. v. N.C. Dep't of Envt. & Nat. Res.*,
   131 F. Supp. 3d 496 (E.D.N.C. 2015) ...............................................................43

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
   215 F.3d 1246 (Fed. Cir. 2000) .........................................................................24

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ...........................................................................28

*Sanchez v. Pereira-Castillo*,
   590 F.3d 31 (1st Cir. 2009)................................................................................20

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)........................................................................12, 20

*Sepúlveda–Villarini v. Dep't of Educ. of, P.R.*,
   628 F.3d 25 (1st Cir. 2010)................................................................................20

*Sevigny v. Employers Ins. of Wausau*,
   411 F.3d 24 (1st Cir. 2005)................................................................................57

*Shain v. Veneman*,
   376 F.3d 815 (8th Cir. 2004) .......................................................................16, 17

*Sierra Club v. Chesapeake Operating, LLC*,
   248 F.Supp.3d 1194 (W.D. Okla. 2017)............................................................13

*Sierra Club v. ICG Hazard, LLC*,
   781 F.3d 281 (6th Cir. 2015).............................................................................41

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
   699 F.3d 1 (1st Cir. 2012).................................................................................18

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................................................14, 17

*Starlink Logistics, Inc. v. ACC, LLC*,
   No. 1:12-CV-0011, 2013 WL 212641 (M.D. Tenn. 2013) ....................................54

*Sterling Fed. Sys., Inc. v. Goldin*,
   16 F.3d 1177 (Fed. Cir. 2004) ..........................................................................23

*Sycamore Indus. Park Assocs. v. Ericsson, Inc.*,
   546 F.3d 847 (7th Cir. 2008)........................................................................22, 24

*Tech. Mfg. Corp. v. Integrated Dynamics Eng'g, Inc.*,
   183 F. Supp. 2d 339 (D. Mass. 2002)................................................................24

*Tenn. Clean Water Network v. TVA*,
   No. 3:15-cv-00424, 2017 WL 3476069 (M.D. Tenn. Aug. 4, 2017) ................47, 48

*Texas v. U.S.*,
   523 U.S. 296 (1998) .......................................................................................18

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me.*,
   339 F.3d 23 (1st Cir. 2003)........................................................................53, 58

vi

*U.S. v. Union Corp.*,
   259 F. Supp. 2d 356 (E.D. Pa. 2003)..................................................................29
*United States Public Interest Research Grp. v. Atlantic Salmon of Me., LLC*,
   339 F. 3d 23 (1st Cir. 2003)..............................................................................59
*United States v. W. Pac. R.R. Co.*,
   352 U.S. 59 (1956) ......................................................................................57, 58
*Upper Blackstone Water Pollution Abatement Dist. v. EPA*,
   690 F.3d 9 (1st Cir. 2012)......................................................................7, 38, 41
*Villarini v. Dep't of Educ. of P.R.*,
   628 F.3d 25 (1st Cir. 2010)................................................................................27
*Zands v. Nelson*,
   779 F. Supp. 1254 (S.D. Cal. 1991) ..................................................................29

## FEDERAL STATUTORY AUTHORITIES

33 U.S.C. § 1251 .......................................................................................................1
33 U.S.C. § 1251(b)..............................................................................................8, 55
33 U.S.C. § 1311(a)......................................................................................................7
33 U.S.C. § 1319...........................................................................................................8
33 U.S.C. § 1342(a)(3)...............................................................................................38
33 U.S.C. § 1342(b)..............................................................................................8, 43
33 U.S.C. § 1342(b)(1)(B)......................................................................................7, 38
33 U.S.C. § 1342(b)(7)..................................................................................................8
33 U.S.C. § 1342(c)......................................................................................................8
33 U.S.C. § 1342(k)....................................................................................................42
33 U.S.C. § 1362(12)....................................................................................................7
33 U.S.C. § 1365 ....................................................................................................8, 42
33 U.S.C. § 1365(a)(1)...............................................................................................51
33 U.S.C. § 1365(f)....................................................................................................52
33 U.S.C. § 1365(f)(6)................................................................................................39
33 U.S.C. § 1369........................................................................................................42
42 U.S.C. § 6901 ..........................................................................................................1
42 U.S.C. § 6903(5)....................................................................................................28
42 U.S.C. § 6903(27)..................................................................................................35
42 U.S.C. § 6972(a)(1)(A)..........................................................................................21
42 U.S.C. § 6972(a)(1)(B)...................................................................................passim
RCRA § 7002(a)(1)(B)........................................................................................passim

## STATE STATUTORY AUTHORITIES

R.I. Gen. Laws § 42-6.2-1 .........................................................................................10
R.I. Gen. Laws § 42-6.2-2(a)(1).................................................................................10
R.I. Gen. Laws § 42-6.2-2.8 ................................................................................10, 59
R.I. Gen. Laws § 42-17.1-2 .................................................................................50, 58
R.I. Gen. Laws § 45-61.2-2 ........................................................................................35
R.I. Gen. Laws § 45-61.2.2 ........................................................................................41

## FEDERAL RULES AND REGULATIONS

40 C.F.R. § 122.6(a) ..............................................................................................7, 38
40 C.F.R. § 122.6(b) ..............................................................................................7, 38

40 C.F.R. § 122.6(d) ...........................................................................................................53
40 C.F.R. § 122.26(b)(13) ...................................................................................................39
40 C.F.R. § 122.26(c)(1) .......................................................................................................7
40 C.F.R. § 122.41(a) ............................................................................................................7
40 C.F.R. § 122.41(d) ....................................................................................................49, 55
40 C.F.R. § 122.41(e) ..........................................................................................................47
40 C.F.R. § 122.41(l)(8) ......................................................................................................48
40 C.F.R. § 122.44 .................................................................................................................7
40 C.F.R. § 122.46(a) ..........................................................................................................38
40 C.F.R. § 122.46(b) ..........................................................................................................38
40 C.F.R. § 122.48 .................................................................................................................7
40 C.F.R. § 262 ....................................................................................................................35
40 C.F.R. § 262.16(b)(8)(i) ..................................................................................................35
40 C.F.R. § 262.251 .............................................................................................................35
40 C.F.R. § 265.31 ...............................................................................................................36
48 Fed. Reg. 39,611 (Sept. 1, 1983) ...................................................................................49
49 Fed. Reg. 39,063 (Oct. 3, 1984) .......................................................................................8
51 Fed. Reg. 10,1046 (March 24, 1986) .............................................................................37
55 Fed. Reg. 47,990 (Nov. 16, 1990) .............................................................................7, 40
Fed. R. Civ. P. 12(b)(6) .......................................................................................................22

**STATE RULES AND REGULATIONS**
250-RICR-140-10-1.1 .................................................................................................9, 35, 36
250-RICR-140-10-1.4 .....................................................................................................5, 35
250-RICR-140-10-1.5(a)(32) ..............................................................................................36
250-RICR-140-25-2.1 ..........................................................................................................16
250-RICR-140-25-2.10 ....................................................................................................5, 16
250-RICR-140-25-2.14 ........................................................................................................17
250-RICR-150-10-1.4.A110 ................................................................................................39
250-RICR-150-10-1.12 ........................................................................................................45
250-RICR-150-10-1.13 .............................................................................................38, 45, 53
250-RICR-150-10-8.5.A.132 ...............................................................................................41
R.I. Code R. 25-15-102:5.13(H)(1) .....................................................................................35
R.I. Code R. 25-15-102:5.13(J) ...........................................................................................35
R.I. Code R. 25-15-102:5.15(G)(1) .....................................................................................35

**OTHER MATERIAL**
EC4, *Annual Report* (Aug. 2017) ...................................................................................11, 55
EC4, *Meeting Minutes* (Sept. 6, 2017) ...............................................................................55
EPA, *Multi-Sector General Permit Sec.* (2015) ...................................................................8
EPA, *Stormwater Management for Industrial Activities – Developing Pollution
    Prevention Plans and Best Management Practices* (Sep. 1992) ...............................40
EPA, *Developing Your Stormwater Pollution Prevention Plan – Guide for Industrial
    Operators* (June 2015) ...............................................................................................40
J. Leo*, RIDEM, Emergency Response Report* (April 5, 2010) ............................................5
McCann, Jennifer, et al., *Rhode Island Ocean Special Area Management Plan,
    OceanSAMP*, (Oct. 19, 2010) ......................................................................................1

Resilient Rhody: An Actionable Vision for Addressing the Impacts of Climate Change
in Rhode Island (July 2018) ...................................................................10, 12, 55, 56, 57

RIDEM & CRMC, *Rhode Island Stormwater Design and Installation Standards Manual*
(Mar. 2015) ...........................................................................................................41

R.I.Climate Change Comm'n, *Adapting to Climate Change in the Ocean State: A
Starting Point* (Nov. 2012)...................................................................................9, 11

R.I. Div. of Planning, *Freight Forward: Planning our Future, Freight and Goods
Movement Plan* (July 2017) ......................................................................................1

R.I. Div. of Planning, *Vulnerability of Transportation Assets to Sea Level Rise*
(Jan. 2015) .............................................................................................................11

R.I. Div. of Planning, *Water Quality 2035 – Rhode Island Water Quality Management
Plan* (Oct. 13, 2016)..........................................................................................12, 56

R.I. Exec. Order No. 17-10 (Sept. 15, 2017)................................................................9

Special House Comm'n to Study Econ. Risk Due to Flooding and Sea Level Rise, *Final
Report* (May 12, 2016)......................................................................................11, 56

*The New Shorter Oxford English Dictionary* (4th ed. 1993)........................................28

ix

## INTRODUCTION

Conservation Law Foundation, Inc. ("CLF") asks this Court to order unprecedented injunctive relief and penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., based on the novel theory that the Defendants have "fail[ed] to adapt" a bulk fuel storage and distribution terminal located at the Port of Providence (the "Terminal") for speculative weather events that the Third Amended Complaint ("TAC") itself states are highly unlikely in the near-term or may come to pass many years in the future. *See* TAC (ECF No. 45) Causes of Action 1-7, 9, 10, 21, and 22 ("Adaptation Claims").  How the Defendants' alleged "failure to adapt" violates the CWA or RCRA is never specified by CLF, as the TAC contains *virtually no factual allegations* concerning how, if at all, the Terminal's infrastructure or permit-related documents are allegedly inadequate.  The only factual basis for these claims alleged by CLF is that the Terminal is located at sea level.  That is not enough.

Notwithstanding the speculative nature of CLF's Adaptation Claims and the absence of specific factual allegations required as a matter of law to show the claims are plausible, CLF seeks sweeping injunctive and other relief, and "if necessary, reloca[tion]" of the largest capacity fuel terminal in the State of Rhode Island[1] from a port that is vital to the energy needs of New England.[2]  TAC ¶ 413.  Congress did not intend that the CWA and RCRA provide relief in such

---

[1] R.I. Div. of Planning, *Freight Forward: Planning our Future, Freight and Goods Movement Plan* at 62 (July 2017) ("The 75-acre site has rail access and 26 tanks that offer the largest amount of storage capacity of any single terminal in the state.").

[2] "The U.S. Energy Information Administration [] recognizes the importance of the Port of Providence as 'a key petroleum products hub for the New England area.  Almost all of the transportation and heating fuel products consumed in Rhode Island, eastern Connecticut, and parts of Massachusetts are supplied via marine shipments through this port.'  The U.S. Department of Homeland Security also recognizes the Port of Providence as a critical port in supplying energy to New England."  McCann, Jennifer, et al., *Rhode Island Ocean Special Area Management Plan, OceanSAMP*, Vol. 1, Chapter 7, Sec. 740.1, 41 (Oct. 19, 2010).

circumstances, and CLF's Adaptation Claims fail on multiple grounds.[3]

First, as a threshold matter, CLF cannot meet the minimum requirements for standing to bring its Adaptation Claims, nor can it show these claims are ripe.  CLF's claimed injury to its recreational and aesthetic interests in nearby waterways and roads is premised on alleged risks of severe precipitation and flooding that are, on the face of the TAC, speculative and remote in time.  Moreover, CLF's injury is based on a classic chain of contingent events of the type courts routinely find fatal to both standing and ripeness.  CLF also lacks standing because its claimed injuries would be due to wholly independent weather events, not the conduct of any Defendant.

Second, the TAC is so lacking in factual support that the Adaptation Claims amount to ipse dixit and fail to state a claim under RCRA or the CWA.  CLF claims an "imminent and substantial endangerment" exists under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), due to the Defendants' alleged failure to adapt to the risk of possible severe precipitation and flooding, but nearly every element of this claim is lacking in factual support.  RCRA's imminent and substantial endangerment provision requires that the defendant engage in *active* conduct to impose liability, and here CLF alleges the opposite—that the Defendants have *failed to act*.  Also, RCRA governs the management of *waste*, but CLF's RCRA allegations concerning tanks and the fuel and other useful products within them have nothing to do with waste.  Similarly, CLF asserts an endangerment may be posed by historic contamination at the Terminal, but does not allege any Defendant handled or disposed of the waste that gave rise to that contamination.  In fact, the documents cited by CLF in the TAC indicate the contamination predates any

---

[3] As stated in the motion to dismiss accompanying this memorandum, Defendant Motiva Enterprises LLC moves to dismiss all causes of action, and Defendants Shell Oil Products US, Shell Oil Company, Shell Petroleum Inc., Shell Trading (US) Company, Triton Terminaling LLC, and Equilon Enterprises LLC move to dismiss Causes of Action 1-7, 9, 10, 21, and 22 in their entirety, and Causes of Action 13-15 to the extent that they are based on allegations concerning Outfall 003A.

Defendant's ownership or operation of the Terminal.  The TAC contains no factual allegations regarding how waste is managed at the Terminal, much less how the management of waste is causing an imminent and substantial endangerment.  CLF's new RCRA regulatory claim is similarly devoid of any factual support.  Even accepting CLF's threadbare allegations as true, CLF has not stated a plausible claim for relief under RCRA.

CLF's Adaptation Claims fail to state a cognizable claim under the CWA because they seek to impose obligations well beyond the fixed five-year term of the Terminal's National Pollutant Discharge Elimination System ("NPDES") permit and for management of sea water inundation that is not within the scope of the NPDES program. CLF's CWA Adaptation Claims also allege the Terminal's stormwater pollution prevention plan ("SWPPP") and other permitting documents fail to address the risks of severe precipitation and flooding, but these causes of action include no factual allegations concerning what these documents say or how specifically they are insufficient.  CLF has ultimately asserted nothing more than the bare and unsupported legal conclusion that the Defendants have "failed to adapt" that does not state a claim under the CWA.

Third, this Court lacks subject matter jurisdiction over all of CLF's CWA claims that impermissibly seek to hold a former operator, Motiva Enterprises LLC ("Motiva"), liable. Former operators are not within the scope of the CWA's grant of jurisdiction and, accordingly, all CWA claims against Motiva should be dismissed.

Fourth, the Court similarly lacks jurisdiction over portions of CLF's CWA claims that allege wholly past violations from an outfall that is no longer regulated by the Terminal's

NPDES permit. The CWA does not grant subject matter jurisdiction in citizen suits over claims—like these—that allege only violations of a defunct permit.

Finally, CLF's RCRA and CWA Adaptation Claims should also be dismissed under the doctrines of abstention and primary jurisdiction. The Court should exercise its discretion to abstain in favor of the State of Rhode Island's comprehensive and ongoing efforts to put in place regulatory measures that it deems may be needed to manage increased stormwater due to climate change—*i.e.*, the very concerns raised by CLF. The Court should also defer to the Rhode Island Department of Environmental Management ("RIDEM"), which is statutorily mandated to account for potential impacts from climate change, in its oversight of the state-approved remediation plan for the historic contamination at the Terminal. CLF has not alleged that these efforts by the state are inadequate in any way and the Court should decline to interfere in those efforts.

CLF's Adaptation Claims, if actionable, would subject virtually all coastal facilities—merely by virtue of their location at sea level—to liability under RCRA and the CWA for "failing to adapt" to address the possibility of risks from severe precipitation and flooding, regardless of whether these risks are speculative or the state agencies responsible for assessing such risks have decided such measures are needed in their jurisdictions, and if so, in what way. Rather than supplement government enforcement of these statutes—Congress' intended purpose of the CWA and RCRA citizen suit provisions—CLF's suit seeks to have this Court act as a super-legislature to impose CLF's policy preferences.

4

**BACKGROUND**

I.  **THE PROVIDENCE TERMINAL AND DEFENDANTS' CONNECTION, OR
    LACK THEREOF, TO THE TERMINAL**

The Providence Terminal is a bulk storage and distribution fuel terminal located at 520 Allens Avenue in Providence, Rhode Island.  TAC ¶ 2.[4]  The Terminal has 26 above ground tanks that store petroleum and other products, and it is the largest capacity fuel terminal in the state.[5]

All of the above ground tanks at the Terminal are "located within a tank dike area or have ring-wall containment."  *Id*. at Ex. L, Statement of Basis at 2 (ECF No. 45-12 at 27).  Drainage valves for diked areas "are kept closed and locked."  *Id*.  These secondary containment structures, *i.e.*, the tank dikes or ring-walls, "must be constructed so that spills of oil and chemical components of oil will not permeate, drain, infiltrate, or otherwise escape to the groundwater or surface water before cleanup can occur."  250-RICR-140-25-2.10.  State law requires that the minimum capacity of the Terminal's secondary containment "be 110 percent of the volume of the tank or 110 percent of the largest tank in a multiple tank containment system."  *Id*.  Tank containment areas "are drained at storms end and only after first determining that the drain waste is free from product or sheen."  TAC, Ex. L, Statement of Basis at 2-3 (ECF No. 45-12 at 27-28).  CLF's TAC does not allege that the secondary containment systems at the Terminal do not meet regulatory requirements, nor does the TAC allege that the Terminal's secondary containment systems have failed during prior storm events, including during the

---

[4] Defendants do not admit to any allegations in the TAC, and state the facts as alleged in the TAC for purposes of this motion only. *See New Comm Wireless* v. *Sprintcom, Inc.*, 213 F. Supp. 2d 61, 64 n.2 (D.P.R. 2002).

[5] *See supra* note 1.

record-setting precipitation and flooding that occurred in late-March 2010.[6]  CLF quotes in the TAC a 2010 Emergency Response Report relating to the March 2010 event that notes sheens near storm drains due to the heavy rains, but CLF omits from its quote the RIDEM investigator's finding that "no further action is needed at the site." *Compare* TAC ¶ 161 *with* Ex. 1 at 2, J. Leo, RIDEM, Emergency Response Report (April 5, 2010).

The Terminal was issued Permit No. RI0001481 under the Rhode Island Pollutant Discharge Elimination System ("RIPDES") Program, *see* TAC, Ex. A (hereafter "2011 RIPDES Permit"), on February 14, 2011. That version of the permit expired on April 1, 2016, and was thereafter administratively continued.  TAC ¶ 71.  On July 20, 2018, CLF submitted public comments to RIDEM on the draft of the new proposed permit.  *See* TAC, Ex. L, ECF. No. 45-12 at 2-5.  In those comments, CLF did not raise with RIDEM any of the concerns it has raised in this case regarding alleged climate change related design and infrastructure deficiencies at the Terminal.  *Id.*  RIDEM issued a new permit on January 30, 2019, and it became effective on March 1, 2019 (hereafter "2019 RIPDES Permit").  TAC ¶ 71 (citing TAC, Ex. L).  The RIPDES Permit authorizes discharges of stormwater to the Providence River in accordance with the terms of the permit.  TAC, Exs. A, L.

CLF has named seven defendants in its TAC: Motiva, Shell Oil Products US, Shell Oil Company, Shell Petroleum Inc., Shell Trading (US) Company, Triton Terminaling LLC ("Triton"), and Equilon Enterprises LLC ("Equilon").[7]  *See generally* TAC.  Of these seven

---

[6] Nat'l Oceanic and Atmospheric Admin., Nat'l Centers for Environmental Information Storm Events Database, *Event Details for Providence, Rhode Island March 29, 2010 through March 31, 2010*, https://www.ncdc.noaa.gov/stormevents/eventdetails.jsp?id=220234 (noting March 2010 storms in Providence "set record monthly precipitation totals" and describing area-wide flooding).

[7] As the TAC acknowledges, Equilon and Shell Oil Products US are the same entity; Equilon does business as Shell Oil Products US.  *See* TAC ¶ 27.

named defendants, only Motiva, Triton, and Equilon (d/b/a Shell Oil Products US) are alleged to have ever owned or operated the Terminal.  TAC ¶¶ 26, 33.  Motiva was not formed as a corporate entity until 1998.  Ex. 4 (State of Del., Div. of Corporations, stating Motiva Enterprises LLC formed July 1, 1998).  It ceased operation of the Terminal in May 2017.  TAC ¶ 26.  On May 1, 2017, the Terminal's RIPDES permit was transferred from Motiva to Triton.  *See* Ex. 2, Ltr. from Jospeh Haberek, RIDEM, to Kevin Nichols, Triton Terminaling LLC, RE: Transfer of RIPDES Permit for Motiva Enterprises Terminal RIPDES Permit # RI0001481 (May 15, 2017).  Shell Oil Company, Shell Petroleum Inc., and Shell Trading (US) Company are not alleged to have owned or operated the Terminal at any time.

## II.     CWA AND RCRA FRAMEWORKS

### A.     The CWA

The CWA requires that "individuals, corporations, and governments secure NPDES permits before discharging pollution from any point source into the navigable waters of the United States."  *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013) (citing 33 U.S.C. §§ 1311(a), 1362(12) (additional citations omitted)).  NPDES permits impose a variety of requirements, including limits on the quantity or concentration of pollutants that may be discharged and obligations to monitor the quality of effluent.  40 C.F.R. §§ 122.44, 122.48.

NPDES permits last for "fixed terms not exceeding five years." 33 U.S.C. § 1342(b)(1)(B).  Expiring permits may be administratively extended if the permittee timely submits a renewal application and a new permit is not issued before the previous permit's expiration date. 40 C.F.R. § 122.6(a).  Administratively continued permits remain fully effective and enforceable.  *Id*. § 122.6(b).  These five-year terms allow for reevaluation of the terms of the

7

permit in light of any new information or changes since the prior permit was issued.  *See Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 22 (1st Cir. 2012).

In 1990, the U.S. Environmental Protection Agency ("EPA") promulgated rules establishing requirements unique to NPDES permits for discharges of stormwater.  55 Fed. Reg. 47,990 (Nov. 16, 1990).  Industrial stormwater dischargers (subject to limited exclusions) must obtain an individual or general permit and comply with the permit's conditions such as effluent limitations and monitoring requirements.  40 C.F.R. §§ 122.26(c)(1), 122.41(a).  Most permits also require dischargers to develop and implement a SWPPP, which specifies the procedures the discharger will employ to control stormwater pollution and comply with the CWA.  *See, e.g.,* EPA, Multi-Sector General Permit Sec. 5 (2015).

Although it created a federal regulatory scheme, Congress sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."  33 U.S.C. § 1251(b); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) ("The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective . . .").  Thus, states may obtain authorization to administer the NPDES program within their borders, provided that they comply with certain requirements.  33 U.S.C. § 1342(b).  Where a state program is in place, the federal NPDES program is suspended.  *See id.* § 1342(c).

Rhode Island obtained authorization to administer the NPDES program in 1984.  49 Fed. Reg. 39,063 (Oct. 3, 1984).  RIDEM has promulgated its own permitting regulations, which establish the Rhode Island Pollution Discharge Elimination System ("RIPDES").  *See generally*

8

250-RICR-150-10-1.1 *et seq.*   These regulations serve as the basis for the Terminal's 2019 RIPDES Permit.

Violations of a state-issued NPDES permit may be enforced by EPA or the state.   33 U.S.C. §§ 1319, 1342(b)(7).   The CWA also authorizes citizens to bring suit to enforce violations of NPDES permits.   33 U.S.C. § 1365.   However, the statute envisions that the government—not citizens' groups—will bear primary responsibility for enforcing the statute.   The CWA's citizen enforcement provision "is meant to supplement rather than to supplant governmental action."   *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987).

**B.      RCRA**

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous *waste*."   *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (citing *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 33-32 (1994)) (emphasis added).   RCRA provides for citizen enforcement of the statute, including against an entity that has "contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."   42 U.S.C. § 6972(a)(1)(B).   Like with the CWA, Congress intended that citizen suits under RCRA be secondary to the government's primary role in enforcement.   *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 9–10 (1st Cir. 2009).

**III.      RHODE ISLAND'S ACTIVE ENGAGEMENT TO ADDRESS POTENTIAL INCREASES IN FLOODING AND STORM IMPACTS**

Rhode Island's governor has declared it a state priority to address the effects of a changing climate, including "sea-level rise, more intense storms, and flooding."   R.I. Exec. Order

9

No. 17-10 (Sept. 15, 2017).  The last seven years have seen the state's legislative and executive branches (including the state's environmental agencies) work to characterize and prepare for these potential impacts.  Commissions in both branches have extensively studied how a changing climate may affect Rhode Island and started to develop plans to address the potential risks that may be posed to the "health, welfare, and economic well-being" of the state's citizens.  R.I. Climate Change Comm'n, *Adapting to Climate Change in the Ocean State: A Starting Point* at 6 (Nov. 2012) ("*Adapting to Climate Change*").

The state's legislature has put in place measures to coordinate the development of agency action for addressing more intense storms, sea level rise, and flooding.  The most significant of these enactments was the Resilient Rhode Island Act of 2014, which created the Rhode Island Executive Climate Change Coordinating Council ("EC4") to "[a]ssess, integrate, and coordinate climate change efforts throughout state agencies to . . . strengthen the resilience of communities, and prepare for the effects of climate change . . . ."  R.I. Gen. Laws § 42-6.2-2(a)(1).  EC4 counts among its members the Director of RIDEM, the agency charged with administering and enforcing the state's hazardous waste and water pollution laws.  *Id.* § 42-6.2-1.  The Resilient Rhode Island Act also conferred on every state agency the power and duty to "[c]onsider . . . the impacts of climate change" in the discharge of their respective missions.  *Id.* § 42-6.2-2.8.  EC4 leads and coordinates the efforts of an array of agencies currently addressing, among other things, flooding, storms, and inundation.

EC4 is just one of several special-purpose state agencies commissioned to address resiliency.  In September 2017, Governor Raimondo created the position of State Chief Resiliency Officer, who is tasked with developing a comprehensive action plan setting out steps

10

intended to make Rhode Island's "residents, economy, infrastructure, health system, and natural resources more resilient . . . ."  R.I. Exec. Order No. 17-10 at 2.  That action plan—Resilient Rhody: An Actionable Vision for Addressing the Impacts of Climate Change in Rhode Island ("Resilient Rhody")—was published on July 2, 2018. State of Rhode Island, Climate Change, Resilient Rhody, http://climatechange.ri.gov/resiliency/ (last visited Oct. 9, 2019).

Additionally, the Rhode Island House of Representatives established its own commission tasked with studying economic vulnerability to sea level rise and flooding.  The commission issued a report with multiple recommendations relating to the state's economic resiliency.  *See* Special House Comm'n to Study Econ. Risk Due to Flooding and Sea Level Rise ("Special House Comm'n"), *Final Report* (May 12, 2016).

Rhode Island has placed special focus on ensuring that the state's coastal infrastructure— and the Port of Providence in particular—will remain resilient.  The state's Division of Planning conducted an assessment in 2015 that evaluated how each of the state's ports may be impacted by sea level rise.  R.I. Div. of Planning, *Vulnerability of Transportation Assets to Sea Level Rise* (Jan. 2015).  The Special House Commission's 2016 report specifically considered and made recommendations concerning the resiliency of the Port of Providence.  *See* Special House Comm'n, at 7-9.  Having assessed these impacts, the state has also created a special position within the Rhode Island Infrastructure Bank dedicated to investment in the resiliency of coastal infrastructure.  *See* EC4, *Annual Report* at 10 (Aug. 2017).

Particularly relevant to CLF's claims in this case, the state has also made it a priority to develop measures to account for the potential for an increase in water pollution that may result from more storms and flooding.  In 2010, RIDEM and the Rhode Island Coastal Resources

11

Management Council ("CRMC") updated the state's stormwater design manual to, among other things, update precipitation rates and cycles to be used in developing practices to manage increases in stormwater flows at facilities such as the Providence Terminal. *Adapting to Climate Change* at 31. RIDEM has assessed the vulnerability of the state's wastewater treatment plants to climate impacts, including flooding and rising seas, and recommended adaptive strategies to be employed at these facilities. *See* EC4, *Annual Report* at 5. The agency intends to follow these actions with multiple initiatives and actions, including the assessment and development of new stormwater management design standards to account for potential climate change impacts. R.I. Div. of Planning, *Water Quality 2035 – Rhode Island Water Quality Management Plan* at 7-14 (Oct. 13, 2016); *see also* Resilient Rhody at 25 (recommending same).

## LEGAL STANDARD

In order to survive a motion to dismiss, a "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must allege facts supporting "each material element necessary to sustain recovery under some actionable legal theory." *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir. 2003) (citations omitted). When allegations in the complaint "do not permit the court to infer more than the mere possibility of misconduct," a plaintiff has failed to state a claim. *Iqbal*, 556 U.S. at 679; *see also Twombly,* 550 U.S. at 570 (requiring factual allegations in complaint "be enough to raise a right to relief above the speculative level").

This standard does not permit a plaintiff to rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Iqbal*, 556 U.S. at 678. Nor

12

may a plaintiff "camouflage conclusory statements" as factual allegations in order to avoid dismissal of its claims. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013). The Court must ignore "statements in the complaint that simply offer legal labels and conclusions or merely re-hash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

The legal standards for motions to dismiss brought under Rules 12(b)(1) and 12(b)(6) are virtually identical.[8]  *See, e.g.*, *Menge v. N. Am. Specialty Ins. Co.*, 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (citing *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)).  Courts "are obliged to resolve questions pertaining to subject matter jurisdiction before addressing the merits of a case." *Acosta-Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013).

## ARGUMENT

## I.   CLF'S ALLEGED INJURY-IN-FACT IS NEITHER IMMINENT NOR FAIRLY TRACEABLE TO THE DEFENDANTS' CONDUCT

CLF fails to meet the minimum requirements for Article III standing to bring its Adaptation Claims.  Rather than demonstrating that it will suffer from a "certainly impending" or "substantial risk" of injury (as it must), *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013), CLF alleges injuries from potential weather events that are, on the face of the TAC,

---

[8] In considering a motion for a failure to state a claim, the court is permitted to consider "documents—the authenticity of which is not challenged—that are central to plaintiffs' claim or sufficiently referred to in the complaint, even if those documents are not physically attached to the pleading." *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 717 (1st Cir. 2014) (citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).  Courts are also allowed to consider "official public records" in ruling on a 12(b)(6) motion.  *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017).  In deciding a motion to dismiss on abstention and primary jurisdiction grounds, a court may consider documents outside the pleadings. *See Christian Action Network v. Maine*, 679 F. Supp. 2d 140, 143 n.2 (D. Me. 2010) (court considering abstention arguments is "not . . . limited to the facts that the plaintiff pleaded to determine whether comity and federalism counsel against . . . exercise of jurisdiction"); *Sierra Club v. Chesapeake Operating, LLC*, 248 F.Supp.3d 1194, 1199 (W.D. Okla. 2017) (in deciding a motion to dismiss based on abstention and primary jurisdiction "the court may consider materials outside the pleadings in deciding whether to dismiss on these grounds without converting the motion into one for summary judgment.").

highly speculative, remote, or hypothetical.  Rather than show an injury that is "fairly traceable" to the Defendants' conduct (as it must), *id*., CLF's claimed injury flows from severe precipitation and flooding events that are, again, on the face of the TAC, wholly unrelated to any Defendant. As a result, the Court must dismiss CLF's Adaptation Claims.

To demonstrate standing, an association must plead that its members have (1) suffered a particularized and concrete injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547–48 (2016) (citing *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The "first and foremost" concern in a standing analysis is the requirement that the plaintiff establish an injury in fact.  *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citing *Spokeo*, 136 S. Ct. at 1547).  The injury must be "actual or imminent, not conjectural or hypothetical."  *Id.* (citations omitted).  An injury is imminent if it is "certainly impending" or if there is "a substantial risk that harm will occur."  *Reddy,* 845 F.3d at 500.  Claims based on a "speculative chain of possibilities" fail to establish an injury that is imminent or fairly traceable to the challenged conduct of the defendant.  *Clapper*, 568 U.S. at 414 n.5.  "It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Grace v. American Central Ins. Co*., 109 U.S. 278, 284 (1883)).

CLF's claimed injury to aesthetic and recreational uses of waterways and roads is alleged to be due to the following possible future risks: (1) severe precipitation (*see* TAC ¶¶ 159-73); (2) flooding due to storms and storm surge (*see id.* ¶¶ 191-215); (3) flooding due to sea level rise (*see id.* ¶¶ 216-39); and, (4) flooding due to increasing sea temperatures (*see id.* ¶¶ 240-46),

(collectively, "severe precipitation and flooding"). As explained below, the bases for these risks provided in the TAC do not describe an injury that is "certainly impending" or that poses a "substantial risk" of occurring. *Reddy*, 845 F.3d at 500.

With regard to the first alleged risk, severe precipitation, the TAC alleges no facts at all regarding the likelihood of these events occurring. *See* TAC ¶¶ 159-73. For the second alleged risk, flooding due to storms or storm surge, the TAC states the risk of this occurring is between 0.2% (for a 500-year event) and 4% (for a 25-year event) annually, and otherwise cites "worst case scenario" hurricane modeling that depicts the *aggregate inundation impacts of up to 100,000 hypothetical storms* at maximum levels of wind and rain.[9] *See id.* ¶¶ 203-12. A 0.2% to 4% risk is neither "certainly impending" nor "substantial." These percentages are not even unique to Providence. They simply reflect the definition of a 25- or 500-year storm, *i.e.*, a 500-year storm is defined as having 1 in 500, or 0.2%, chance of occurring in a given year.[10] As far as the "worst case scenario" modeling CLF cites that shows the compounded inundation impact of multiple hurricanes, it is, by definition, hypothetical,[11] and does not speak to the risk of an *actual* inundation event occurring. *See id.* ¶¶ 209-12. Turning to the third alleged risk relating to sea level rise, the TAC solely cites sources describing remote end-of-century scenarios— nothing close to "certainly impending." *See id.* ¶¶ 227 (referring to "end-of-century" projections) and 228 (describing "worst case sea level rise" for year 2100); *see also Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1130 (D.N.M. 2011) (climate

---

[9] *See* Nat'l Oceanic and Atmospheric Admin., Nat'l Storm Surge Hazard Maps Version 2, http://www.nhc.noaa.gov/nationalsurge/ ("NOAA SLOSH Modeling Website").

[10] *See* U.S. Geological Service, Floods: Recurrence intervals and 100-year floods, https://waterwww.usgs.gov/edu/100yearflood.html.special-topic/water-science-school/science/100-year-flood?qt-science_center_objects=0#qt-science_center_objects

[11] *See* NOAA SLOSH Modeling Website (stating SLOSH Storm Surge Modeling is "based on "hypothetical hurricanes").

15

change risks in "years or decades" are not imminent).   And finally, CLF's TAC is silent

regarding the likelihood of the fourth alleged risk of flooding due to increasing sea temperatures.

*See* TAC ¶¶ 240-46.

Even read in the light most favorable to CLF, these risks of severe precipitation and

flooding necessary for CLF's claimed injury to occur fall far short of being "substantial" or

"certainly impending."  *Reddy*, 845 F.3d at 500.  At best, CLF has alleged nothing more than a

"possible future injury" that is legally insufficient to establish Article III standing.  *See Clapper,*

568 U.S. at 409 (internal citation omitted); *Shain v. Veneman*, 376 F.3d 815, 818 (8th Cir. 2004)

(holding danger of 100-year flood was itself remote, but "the possibility the flood will occur

while [the plaintiffs] own or occupy the land becomes a matter of sheer speculation").

In addition, CLF's Adaptation Claims fail to satisfy the injury-in-fact and fairly traceable

prongs of standing because they rest on a speculative chain of possibilities that largely lack any

factual support.  *Clapper*, 568 U.S. at 414 n.5 (2013); *FW/PBS*, 493 U.S. at 231 (standing cannot

be inferred merely from averments in the pleadings).  For CLF to be injured as alleged, the

following events must occur: (1) severe precipitation and flooding of a magnitude described in

the TAC must strike the Terminal area; (2) the storm conditions will be such that the Terminal

will be inundated; (3) the petroleum product storage tanks and wastewater treatment systems at

the Terminal will rupture or otherwise fail; (4) secondary spill containment structures (which, by

regulation, must at a minimum hold 110% of the volume of the tank)[12] will be breached or

---

[12] 250-RICR-140-25-2.10 ("A secondary containment system must be installed around any above ground oil storage tank. The secondary containment system must be constructed so that spills of oil and chemical components of oil will not permeate, drain, infiltrate, or otherwise escape to the groundwater or surface water before cleanup can occur. . . . The minimum capacity of the containment system shall be 110 percent of the volume of the tank or 110 percent of the largest tank in a multiple tank containment system.").  The requirements of this chapter are "intended to prevent the discharge, escape or release of oil into the waters of the State and to preserve and protect the quality

16

otherwise fail; (5) spill control and emergency responses (plans for which are mandated by regulation)[13] will be absent or inadequate; and finally (6) pollutants will be released and reach waterways and roads in quantities or concentrations that will injure CLF's members. *See* TAC ¶¶ 122-25, 159-90.

As discussed above, the very first link in the chain—the chance of severe precipitation and flooding occurring as described in the TAC—is highly speculative. So too is it speculation (unadorned by any facts) that the Terminal's tanks, various spill containment structures, and spill and emergency response will all catastrophically fail.[14]

Last, but no less problematic, is the fact that this chain of events flows from independent weather events, and not from *Defendants' challenged conduct*, and thus CLF's Adaptation claims do not meet the second prong of standing either. *Spokeo*, 136 S. Ct. at 1547 (injury must be "fairly traceable to the challenged *conduct of the defendant*") (emphasis added); *see also Shain*, 376 F.3d at 818 ("the defendant's conduct [cannot be] merely an intervening factor that could aggravate an independently occurring natural disaster.").[15]

In sum, the TAC itself establishes that the risk of injury to CLF from severe precipitation and flooding falls far short of satisfying the minimum requirement for Article III standing. On their face, these claims are highly unlikely or remote, based on a speculative chain of possibilities, and, because the alleged injuries CLF complains of are ultimately due to potential

---

of the waters of the State, consistent with the purposes of the Federal Clean Water Act and Rhode Island General Laws, Chapter 46-12." 250-RICR-140-25-2.1.

[13] *See* 250-RICR-140-25-2.14 (requiring all terminals with oil storage tank capacity over 500 gallons to have a spill prevention and emergency plan "readily available at the facility.").

[14] Absent from CLF's TAC are any allegations that prior precipitation events, including the record-setting March 2010 event (*see supra* at note 6), resulted in releases or discharges from the Terminal's tanks or secondary containment structures.

[15] Additionally, CLF's RCRA claim does not satisfy the fairly traceable prong of standing because, as explained *infra* at § III.A.1.d, CLF has failed to allege any Defendant engaged in conduct subject to such a claim, to wit, "handling, storage, treatment, transportation, or disposal" of waste. 42 U.S.C. § 6972(a)(1)(B).

17

weather events, they are not traceable to the Defendants' conduct.   Accordingly, CLF's

Adaptation Claims against all the Defendants must be dismissed for lack of standing.[16]

## II.    CLF'S ADAPTATION CLAIMS ARE NOT RIPE

The Court should also dismiss CLF's Adaptation Claims as unripe.   Like standing,

ripeness draws from Article III considerations and seeks to avoid judicial entanglement in

abstract disagreements.  *City of Fall River v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007).   The ripeness

inquiry involves two prongs: (1) the fitness of the issues for judicial decision and (2) the hardship

to the parties of withholding court consideration.   *Id.*   Under the fitness prong, a "'claim is not

ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or

indeed may not occur at all.'"   *Id.* (quoting *Texas v. U.S.*, 523 U.S. 296, 300 (1998)).   The

hardship prong looks at "whether the challenged action creates a direct and immediate dilemma

for the parties."  *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90

(1st Cir. 2013) (internal citations omitted).   "'Generally, a mere possibility of future injury,

unless it is the cause of some present detriment, does not constitute hardship.'"   *Id.* (quoting

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 9 (1st Cir. 2012).   CLF does

not satisfy either prong here.

CLF's Adaptation Claims are unfit for judicial resolution because, as explained above,

the injury alleged rests on the occurrence of speculative or remote weather events, making CLF's

---

[16] As this Court is aware, CLF has brought a similar action in the U.S. District Court for the District of Massachusetts. *Conservation Law Foundation, Inc. v. ExxonMobil Corp.*, No. 1:16-cv-11950 (MLW), (complaint filed Sept. 29, 2016).  On November 30, 2018, Judge Wolf issued a bench ruling in that case on the defendants' motion to dismiss and found that CLF had standing.  The district court's unpublished ruling is not controlling authority in this Court.  Further, Defendants' standing arguments here differ from those raised in Massachusetts. For example, here Defendants argue that CLF fails to allege any potential harm that is fairly traceable to Defendants' conduct at the terminal; *supra* at 14-15. Moreover, Judge Wolf's ruling did not fully address Defendants' arguments in this motion, including that CLF's TAC fails to connect any alleged future weather events to a risk of future discharge and harm to CLF's members.  *See supra* at 13-15.

alleged injury, by its very nature, a contingent future event.  *See supra* at 13-16.  Accordingly, CLF cannot plausibly plead that its claimed injury will actually occur, or that it is even likely to occur.  *See Reddy*, 845 F.3d at 505 (finding plaintiffs' claims not ripe where court has "no idea whether or when" future event underlying claim will occur).

CLF will not suffer a "direct and immediate dilemma" if the Court withholds judgment on its Adaptation Claims.  Indeed, the First Circuit has repeatedly held that "the conditional nature of [a] claim[ ] strongly counsels against a finding of hardship."  *Labor Relations Div. of Constr. Inds. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (quotation omitted); *see also McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 73 (1st Cir. 2003) (finding "wholly contingent harm[s]" insufficient to satisfy hardship prong).  If a dilemma exists at all for CLF, the allegations show that it is remote in time and not immediate.

## III. CLF'S ADAPTATION CLAIMS FAIL TO STATE A CLAIM UNDER RCRA OR THE CWA

The TAC's 430-plus paragraphs allege remarkably few facts about the actual operations at the Providence Terminal.  In lieu of specific facts, CLF lays out each of its Adaptation Claims using slight variations on a single conclusory theme: the Defendants have allegedly created an imminent and substantial endangerment under RCRA or violated the CWA by failing to "adapt to," "consider," or otherwise address, in some unspecified way, "the factors discussed in Section IV.A" of the TAC, in which CLF describes the (speculative and remote) risks of severe precipitation and flooding.  *See, e.g.*, TAC ¶ 337.[17]

[17] *See also* TAC ¶¶ 282-84 (alleging Shell improperly certified its SWPPP by not basing the document on "the factors discussed in Section IV.A" (Count 1)); *id.* ¶¶ 290-91 (alleging Shell failed to prepare its SWPPP in accordance with good engineering practices by failing to consider "the factors discussed in Section IV.A" (Count 2)); *id.* ¶¶ 298-99 (alleging deficiency in SWPPP based on failure to identify sources of pollution "resulting from the factors discussed in Section IV.A" (Count 3)); *id.* ¶ 304 (alleging SWPPP fails to identify BMPs that address

19

Each of these allegations simply states a legal conclusion consistent with the Defendants' potential liability and is '"not entitled to the presumption of truth."' *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (declining to credit allegation concluding that certain defendants were responsible for ensuring their subordinates would not harm inmates) (quoting *Iqbal*, 556 U.S. at 681). After stripping away these conclusory legal statements, what remains of the Adaptation Claims are threadbare factual allegations that fail to state a claim under RCRA or the CWA.

CLF's Adaptation Claims may not proceed on the basis of ipse dixit alone. *A.G. ex rel. Maddox*, 732 F.3d 77 at 80 (declining to credit "conclusory statement [] presented as an ipse dixit, unadorned by any factual assertions that might lend it plausibility."). Rather, CLF's "combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.). The Court's analysis must take two steps: (1) "isolate and ignore statements . . . that simply offer legal labels and conclusions or rehash cause-of-action elements," and (2) assess "the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts" to "see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 55; *see also Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 534 (1st Cir. 2011) (setting aside as conclusory allegation defendants "failed in their duty to assure adequate monitoring"). A plausible claim "means [that it is]

---

"discharges resulting from the factors discussed in Section IV.A" (Count 4)); *id.* ¶ 309 (alleging SWPPP fails to provide adequate containment "to prevent discharges resulting from the factors discussed in Section IV.A" (Count 5)); *id.* ¶ 314 (alleging failure to update SWPPP based on "the factors discussed in Section IV.A" (Count 6)); *id.* ¶ 320 (alleging failure to consider and act on information about "the factors discussed in Section IV.A" amounted to failure to maintain and operate treatment equipment (Count 7)); *id.* ¶¶ 331-32 (alleging failure to supplement prior submissions to RIDEM with information "regarding the factors discussed in Section IV.A" (Count 9)); *id.* ¶ 337 (alleging broad failure to minimize or prevent pollution resulting from failure to act on "the factors discussed in Section IV.A" (Count 10)); *id.* ¶¶ 413-18, 420-21 (alleging imminent and substantial endangerment caused by failures to address "factors discussed in Section IV.A").

something more than merely possible . . . ." *Id.*  Many allegations, "'while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'"  *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (quoting *Twombly*, 550 U.S. at 557).

### A.  CLF Has Failed to State a Claim Under RCRA

To survive a motion to dismiss a RCRA § 7002(a)(1)(B) citizen-suit claim, a plaintiff must plausibly allege that a defendant has "contributed or [] is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B); *Iqbal*, 556 U.S. at 678.  To establish a citizen-suit claim for a regulatory violation under RCRA § 7002(a)(1)(A), a plaintiff must plausibly allege that a defendant is "in violation of any permit, standard, regulation, condition, requirement, prohibition, or order. . . ." 42 U.S.C. § 6972(a)(1)(A); *Iqbal*, 556 U.S. at 678.  Here, multiple elements of CLF's RCRA claims lack any factual support.  The Court must dismiss Claims 21 and 22 under RCRA in their entirety as a matter of law.

### 1.  CLF Has Not Alleged a Claim Under RCRA's Endangerment Provision

#### a.  CLF Has Failed to Allege that Any of the Defendants Have Engaged in Any Activity that is "Contributing To" an Endangerment

CLF's RCRA claim fails because the TAC identifies no *act* by any Defendant that is "contributing to" the endangerment from severe precipitation and flooding that has been alleged in this case.  *See generally* TAC ¶¶ 406-22.  The vast majority of courts have interpreted "contributing to" to require *active* conduct to impose liability under RCRA § 7002(a)(1)(B).

21

CLF's RCRA claim is plainly not about any act undertaken by the Defendants.  Rather, CLF's complaint is that the Defendants have *failed to act*.  Specifically, CLF claims an endangerment in the form of possible future "discharges and/or releases" due to (1) the risks of severe precipitation and flooding, and (2) the Defendants' alleged "failure to adapt" to those risks.  *Id.* Neither the entirely independent risks of severe precipitation and flooding (which Defendants are not alleged to have a hand in causing) nor an alleged failure to adapt are affirmative acts by any Defendant.  In the absence of any facts alleging active "contributing to" conduct that gives rise to CLF's claimed endangerment, CLF has failed as a matter of law to state a claim under RCRA § 7002(a)(1)(B).  Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 560 (complaint must contain direct allegations respecting all the material elements to sustain a recovery).

Three federal courts of appeal have concluded that RCRA's "contributing to" language speaks in *active* terms about "handling, storage, treatment, transportation, or disposal" of waste. *See Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011) ("handling the waste, storing it, treating it, transporting it, and disposing of it are all *active functions* with a direct connection to the waste itself.") (internal citations omitted); *Sycamore Indus. Park Assocs. v. Ericsson, Inc*., 546 F.3d 847, 854 (7th Cir. 2008) ("A plain reading of the 'has contributed or is contributing' language . . . compels us to find that RCRA requires *active involvement* in handling or storing [] for liability . . . By definition, the phrase 'has contributed or is contributing' requires affirmative action.  The vast majority of courts that have considered this issue read RCRA to require affirmative action rather than merely passive conduct . . . .") (internal citations omitted) (emphasis added); *ABB Indus. Sys., Inc. v. Prime Tech., Inc. et al.,* 120 F.3d 351, 359 (2d Cir.1997) ("[b]ecause ABB cannot show that General Resistance or Zero- Max *spilled* hazardous

22

chemicals or *otherwise contaminated* the site, ABB cannot establish that the defendants have contributed or are contributing to an endangerment") (emphasis added).  *See also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 263 F. Supp. 2d 796, 844 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ("The Court finds that a straightforward reading of RCRA compels a finding that only *active* human involvement with the waste is subject to liability under RCRA § 7002(a)(1)(B) . . . Congress intended to impose liability only where a person is shown to have affirmatively acted as a determining factor over the waste management activities listed in RCRA 7002(a)(1)(B).") (emphasis in original).[18]   Indeed, the district court in *Interfaith* correctly recognized that "[n]o other reading is possible as the phrase 'has contributed or is contributing to' in § 7002(a)(1)(B) modifies the specified waste management activities of 'handling,' 'treatment,' 'transportation,' 'storage' and 'disposal' in that provision." *Id*.; *see also Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1185 (Fed. Cir. 2004) ("language of a section of a statute should not be construed so as to render other language in that section nonsensical") (citing 2A Sutherland Statutory Construction § 46.06 (5th Ed. 1992)).

CLF's claimed endangerment on the other hand is premised on the Defendants' alleged *inaction*.  The endangerment identified by CLF is the risk of "discharges and/or releases" due to the possibility of severe precipitation and flooding at some indeterminate time in the future. TAC ¶¶ 413-18, 420-21.  For the causes of this alleged endangerment, CLF points to various forms of inaction by the Defendants.  *See, e.g.*, TAC ¶ 418 (alleging "failure to adapt" puts facility, public, and environment at risk); *id*. ¶ 422 ("[d]ue to [Defendants'] failure to mitigate

---

[18] The First Circuit has not to date addressed the precise meaning of "contributed to or contributing to" under RCRA § 7002(a)(1)(B).  One circuit court has found a defendant's knowledge that its contractor engaged in illegal dumping and the defendant's lax oversight of that contractor was evidence of "contributing to" liability.  *Cox v. City of Dallas, Texas*, 256 F.3d 281, 296 (5th Cir. 2001).  Here, CLF has not alleged any involvement of any Defendant in improper disposal of any kind.

23

these risks" Defendants have allegedly contributed to an endangerment under RCRA).  CLF's

attempt to assert a claim under § 7002(a)(1)(B) based on acts the Defendants have not

undertaken contradicts the plain meaning of "contributing to" and must be rejected.  *See Hinds*,

654 F.3d at 851 (based on plain reading of statute, affirming dismissal of RCRA claim against

defendant who designed dry cleaning equipment for lack of active involvement in waste disposal

process); *Sycamore*, 546 F.3d at 854 (affirming dismissal of RCRA claim where defendant sold

property containing asbestos for lack of active involvement with waste); *Interfaith*, 263 F. Supp.

2d at 831, 844 (concluding "only active human involvement with waste is subject to liability

under § 7002(a)(1)(B)" and rejecting argument that defendant was liable based on alleged

"studied indifference" to contamination).  Moreover, allowing "contributing to" to mean inaction

would render RCRA's citizen suit provision illogical as "contributing to" modifies the active

terms "handling," "storage," "treatment," "transportation," and "disposal" in the statute.  *Id.*;

*Tech. Mfg. Corp. v. Integrated Dynamics Eng'g, Inc.*, 183 F. Supp. 2d 339, 342 n.3 (D. Mass.

2002) (a statute must be "construed . . . in a manner that does not render any of its provisions

superfluous, contradictory, or illogical.") (quoting *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215

F.3d 1246, 1259 (Fed. Cir. 2000) (Newman, J., concurring)).

　　　　CLF may attempt to argue that the only act it must plead to state a claim is that Shell has

engaged in "handling, storage, treatment, transportation, or disposal."   42 U.S.C. §

6972(a)(1)(B).   This argument is incorrect for at least two reasons.   First, CLF's mere

paraphrasing of the elements of a RCRA claim cannot provide the grounds to withstand a motion

to dismiss.  *Twombly*, 550 U.S. at 555 ("formulaic recitation of the elements of a cause of action

24

will not do."); *see* TAC ¶ 408 (reciting elements of § 7002(a)(1)(B)), ¶ 409 (same), ¶ 411 (same), ¶ 422 (same).

Second, the TAC makes explicit that the alleged discharges and/or releases, *i.e.*, the alleged endangerment under RCRA, are "caus[ed] and/or contribut[ed] to" by severe precipitation and flooding, and *not* Shell's past or present handling, storage, treatment, transportation, or disposal of waste. *See* TAC § IV.A (titled "Factors *Causing and/or Contributing to* . . . Discharges and/or Releases from the Providence Terminal") (emphasis added). In fact, CLF's TAC is devoid of *any* specific allegations regarding the manner in which waste at the Terminal is alleged to be handled, stored, treated, transported or disposed of, much less how (if at all) those activities are presenting any endangerment. CLF merely states that these activities occur "at or near sea level in close proximity to major human population centers, the Providence Harbor, and the Providence River." TAC ¶ 411.

Asserting that the Terminal operates near sea level or populations does not by itself allege an endangerment. Put differently, there is no basis for the Court to even infer an imminent and substantial endangerment is presented by the Defendants' handling, storage, treatment, transportation, or disposal of waste with nothing more than an allegation that these activities occur near sea level and populations. *Iqbal*, 556 U.S. at 678 (complaint must plead adequate factual material to support a reasonable inference that defendant is liable). CLF does allege the Terminal stores fuel products in tanks and manages some waste, but glaring is the omission of any factual allegations explaining how these activities are inadequate or improper (*e.g.*, that the

tanks are made of substandard materials) such that they may present an endangerment.[19]

In sum, CLF's TAC fails to state a claim under RCRA § 7002(a)(1)(B) because the two things alleged to be "contributing to" the endangerment (the risk of discharges and/or releases) are (1) Shell's alleged failure to adapt, and (2) severe precipitation and flooding. Even if these allegations are accepted as true, neither the failure to adapt, nor the independent forces of severe precipitation and flooding are affirmative acts by the Defendants that can create liability for "contributing to" an endangerment under RCRA § 7002(a)(1)(B). CLF cannot evade RCRA's requirement for affirmative conduct that presents an endangerment by simply casting its claim as a "failure to adapt." Any entity can be alleged to have failed to act or consider something in some way. The plain language of the statute shows that Congress did not think that was enough. Under CLF's theory, the scope of liability under § 7002(a)(1)(B) would reach all entities with facilities that manage products or wastes near sea level, regardless of whether their actions are alleged to cause an endangerment. Such a novel and unprecedented use of RCRA is contrary to the meaning of the statute and should be rejected.

>    **b.**   **CLF Has Failed to Allege Shell Oil Company, Shell Petroleum Inc., and Shell Trading (US) Company Contributed To Any Waste Management at the Terminal**

CLF has named seven Defendants in this case, but as to three of the Defendants has alleged no facts even suggesting that those Defendants are "contributing to" waste management at the Terminal in support of its RCRA claim. CLF identifies the Defendants in paragraphs 22 through 33 of the TAC, but thereafter only refers to the Defendants collectively as "Shell." *See*

---

[19] As discussed *infra* at §§ III.A.1.c-d, CLF's RCRA claims additionally must fail because neither the products in the tanks nor the tanks themselves are "wastes" under RCRA § 7002(a)(1)(B), and CLF does not allege that any Defendant handled, stored, treated, transported, or disposed of the waste alleged to have contaminated soil and/or groundwater at the Terminal.

*generally* TAC ¶¶ 22-33.  Only Triton, Motiva and Equilon (d/b/a Shell Oil Products US), are

alleged to have owned or operated the Terminal.  *Id*. ¶¶ 26, 33.  Triton is only alleged to hold the

RIPDES permit for the Terminal.  *Id.* ¶¶ 28, 33.  The remaining Defendants, Shell Oil Company,

Shell Petroleum Inc., and Shell Trading (US) Company are not alleged to have any connection to

the Terminal at all, much less involvement with waste management activities at the Terminal.

*See id*. ¶¶ 23-25.  Failing to allege any facts that movants Shell Oil Company, Shell Petroleum

Inc., and Shell Trading (US) Company contributed to the management of waste—as required by

the statute—CLF's RCRA claim against these Defendants should be dismissed.  *Prisco v. A & D*

*Carting Corp*., 168 F.3d 593, 609 (2d Cir. 1999) (plaintiff must specifically allege each

particular defendant engaged in one of the enumerated statutory activities with respect to the

particular waste at issue); *Kaladish v. Uniroyal Holding, Inc*., No. Civ.A. 300CV854CFD, 2005

WL 2001174, at *5 (D. Conn. Aug. 9, 2005) (same); *Twombly*, 550 U.S. at 560 (complaint must

contain direct allegations respecting all the material elements to sustain a recovery).

### c.    CLF Has Failed to Allege that Products in the Terminal Infrastructure are "Waste"

In addition to failing to allege facts showing any "contributing to" basis for liability under

RCRA, CLF's endangerment claim also fails because its allegations relating to infrastructure

(*e.g*., tanks) and the materials stored within them do not concern "waste."   42 U.S.C. §

6972(a)(1)(B).  The Terminal stores and distributes saleable fuel and other products.  TAC ¶¶ 49,

52-53.  Courts have uniformly held that useful products such as these are not wastes under

RCRA, and as a matter of law cannot provide the basis for liability under § 7002(a)(1)(B).

CLF premises its RCRA claim in part on alleged "infrastructure failures and inadequate

infrastructure design" relating to, among other things, product storage tanks at the Terminal.

27

TAC ¶¶ 51-52, 412.  CLF contends an imminent and substantial endangerment exists under RCRA because severe precipitation and flooding will cause a release from these tanks.  *Id.* ¶¶ 412-13.  CLF's TAC itself acknowledges that these tanks contain various saleable "products." *Id.* ¶¶ 49, 52-53 (stating fuel products at Terminal include "motor gasoline, fuel grade ethanol, fuel oil, jet fuel, fuel additives, and diesel").

These products are not within the definition of "solid waste" as that term is defined under RCRA.[20]  RCRA defines "solid waste" as "garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and *other discarded material . . . .*" 42 U.S.C. § 6903(27) (emphasis added).  The plain meaning of "discard" is to "'cast aside; reject; abandon; give up.'" *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (9th Cir. 2004) (quoting The New Shorter Oxford English Dictionary 684 (4th ed.1993)); *see also Am. Mining Cong. v. U.S. EPA*, 824 F.2d 1177, 1184 (D.C. Cir. 1987) (defining "discarded" as "'disposed of,' 'thrown away' or 'abandoned'") (citation omitted).

The products stored in tanks at the Terminal are sold and distributed in commerce for ultimate use by consumers in the New England area.[21]  As such, they cannot reasonably be considered garbage, refuse, or sludge, and CLF does not allege that they are.  Nor does CLF allege that the products in the tanks are rejected or otherwise abandoned; thus, they are not "discarded."  Numerous courts have recognized that non-leaked or spilled petroleum product does not constitute "solid waste" under RCRA.  *See, e.g.*, *U.S. v. Union Corp.*, 259 F. Supp. 2d 356, 401-402 (E.D. Pa. 2003); *Craig Lyle Ltd. P'ship v. Land O' Lakes Inc.*, 877 F. Supp. 476,

---

[20] "Under RCRA 'hazardous wastes' are a subset of 'solid wastes.'" *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1313 (2d Cir. 1993) (citing 42 U.S.C. § 6903(5) (defining "solid waste")). Thus, if a material is not a solid waste, by definition it is also not a hazardous waste under RCRA.

[21] *See supra* at note 2.

481 (D. Minn. 1995); *Paper Recycling, Inc. v. Amoco Oil Co.*, 856 F. Supp. 671, 675 (N.D. Ga. 1993); *Zands v. Nelson*, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991).

Moreover, useful products are not wastes. Courts have consistently held that where a manufactured or commercial product (such as the fuel stored in the tanks) is capable of being used for its intended purpose and is still wanted by the consumer, it is not a waste. *See, e.g.*, *Ecological Rights Found. v. Pac. Gas and Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013) ("[t]he key to whether a manufactured product is a 'solid waste,' then, is whether that product has served its intended purpose and is no longer wanted by the consumer") (citation omitted); *see also*, *No Spray Coal, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001). CLF has not alleged that the products in the tanks at the Terminal have already served their intended purpose and are not wanted by the consumer. Rather, CLF admits just the opposite. The TAC states that these materials are "products" that are stored for "distribution" and include "saleable gasoline." TAC ¶¶ 52-53.

CLF has failed to state a claim under RCRA with regard to the materials stored in infrastructure at the Terminal because, as CLF's pleading concedes, these materials are useful products and not wastes. The TAC wholly fails to plead any basis for classifying those products as solid waste under RCRA. Accordingly, CLF has failed to state a claim with respect to the material in the tanks under RCRA § 7002(a)(1)(B). Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 560.

29

> **d.    CLF Has Not Alleged Any Defendant Engaged in "Handling, Storage, Treatment, Transportation, or Disposal" of Waste That Caused Alleged Historic Contamination**

Beyond the useful products in the tanks, the only other potential source of releases identified by CLF in its RCRA claim is alleged historic contamination located at certain areas of concern ("AOCs") at the site.  TAC ¶¶ 409-10.  However, nowhere does CLF plausibly allege through specific facts that any Defendant handled, stored, treated, transported, or disposed of the waste leading to the contamination, as is required to state a claim under § 7002(a)(1)(B).  42 U.S.C. § 6972(a)(1)(B).  To the contrary, the documents cited by CLF indicate that the contamination at the AOCs predates any Defendants' alleged operations at the Terminal.  The documents also show that the contamination is being *remediated* under a state monitored and approved plan.

As explained *supra*, to state a claim under RCRA § 7002(a)(1)(B), a plaintiff must plead that a defendant "has contributed or [ ] is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . . ."  42 U.S.C. § 6972(a)(1)(B); *see supra* at 19.  In stating its claim, a plaintiff must specifically allege each particular defendant engaged in one of the enumerated statutory activities with respect to the particular waste at issue.  *Prisco,* 168 F.3d at 609; *Kaladish* , 2005 WL 2001174  at *5.

CLF has offered no facts connecting any particular Defendant to the waste that gave rise to the contamination at the AOCs.  As a preliminary matter, and as discussed above, CLF does not even distinguish among the various Defendants it has named.  *See generally* TAC (referring to all Defendants collectively as "Shell").  CLF has not alleged (beyond a formulaic recital of the cause of action, *see* TAC ¶ 409), that any Defendant handled, stored, treated, transported, or

30

disposed of the waste that created the contamination at the AOCs. *See id.* ¶ 409.  In fact, CLF's TAC alleges that operation of the Terminal was transferred to Triton in May 2017—*18 years* after the AOCs (and the releases leading to them) had already been characterized in the 1999 Site Characterization Report and Remedial Action Plan ("RAP") cited in CLF's TAC.  *See id.* ¶¶ 26 (alleging transfer of Terminal from Motiva occurred in May 2017), 410 (citing Handex of New England, Inc., *Updated Site Characterization Rep. and Remedial Action Plan: Motiva Facility Terminal, 520 Allens Avenue Providence, R.I.* (July 1999) (relevant excerpts attached as Ex. 3)).

Further, the releases that are identified in the RAP cited by CLF all predate the formation of Motiva as a company, and therefore its operation of the Terminal.  *Compare id.* at 5 (listing on-site releases, with latest occurring in March 1998) *with* Ex. 4 (State of Del., Div. of Corporations, stating Motiva Enterprises LLC formed July 1, 1998).  Coming to a property after another party has contaminated it does not give rise to liability under RCRA's imminent and substantial endangerment provision.  *See, e.g.*, *ABB Indus.,*120 F.3d at 359 (dismissing RCRA claim where contamination was preexisting and subsequent owner defendant did not engage in activities listed under statute); *Interfaith*, 263 F.Supp.2d at 844 (same); *Delaney v. Town of Carmel*, 55 F.Supp.2d 237, 255–257 (S.D.N.Y. 1999) (same); *Marriott Corp. v. Simkins Indus., Inc.*, 929 F.Supp. 396, 398 n. 2 (S.D. Fla. 1996) (same); *First San Diego Props. v. Exxon*, 859 F. Supp. 1313 (S.D. Cal. 1994) (same).

The plausibility of CLF's claim that Defendants bear some liability under RCRA for the AOCs is even further strained by the fact that the RAP and addendum indicate that the AOCs are being remediated under a state-approved plan.  *See* TAC ¶ 410; Ex. 5 (Ltr. From Ross Singer, RIDEM, to Anna Turner, Motiva (Oct. 14, 2009) ("RIDEM RAP Approval").  In fact, the only

specific activities alleged in the TAC and the documents cited therein related to the contamination involve remediation efforts to address it.   *See* Ex. 6 (Excerpt from 2009 Addendum to RAP) (describing steps taken to address AOCs and recommending future plans for same).   Unsurprisingly, CLF has not alleged that remediation of the AOCs is presenting an endangerment.

CLF's TAC fails to allege any Defendant engaged in the handling, storage, treatment, transportation, or disposal of waste at the AOCs.   To the extent CLF's RCRA claim is based on waste at the AOCs, it should be dismissed on this basis alone.   *Twombly*, 550 U.S. at 560 (complaint must contain direct allegations respecting all the material elements to sustain a recovery).

### e.      CLF Has Failed to Allege an "Imminent" Endangerment

For the same reasons CLF fails to establish an imminent injury sufficient for standing to pursue its Adaptation Claims, *see supra* § I, CLF has also not plausibly pled an "imminent" and substantial endangerment under RCRA.   "An endangerment can only be 'imminent' if it threatens to occur immediately . . . . [T]here must be a threat which is present now. . . ." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 480 (1996).   Also, an alleged imminent and substantial endangerment cannot be "remote in time, completely speculative in nature, or de minimis in degree."   *Maine People's Alliance v. Mallinckrodt Inc.,* 471 F.3d 277, 289 (1st Cir. 2006) (citation omitted).

As discussed above, CLF has not alleged an endangerment that threatens to occur immediately or is present now.   Far from it.   CLF's TAC alleges an injury that is premised on scenarios occurring at the end of the century, or with a 0.2% to 4% chance of occurring in a

given year.  *See* TAC ¶¶ 209-12; *Mallinckrodt,* 471 F.3d at 289.  CLF's alleged endangerment is also wholly contingent upon a long sequence of events consisting of, *inter alia*, severe precipitation and flooding, multiple containment failures at the Terminal[22], and a release of materials that reaches the Providence River in sufficient quantities or concentrations to cause harm.  But absent that speculative domino effect occurring just as projected, CLF will not be injured.  Without factual allegations that plausibly indicate present conditions may be creating an endangerment, CLF has failed to plead imminence under RCRA.  *See Crandall v. City & Cty. of Denver*, 594 F.3d 1231, 1239 (10th Cir. 2010) ("[N]ot only was there no imminent harm, but there was also no imminent endangerment.  Nothing going on at the airport at the time of trial, or expected in the immediate future, would, even without remedial measures, present a prospect of harm to human health . . . . It is not enough under RCRA that in the future someone may do something with solid waste that, absent protective measures, can injure human health."); *Twombly*, 550 U.S. at 555 (requiring factual allegations in complaint "be enough to raise a right to relief above the speculative level . . . .").

CLF has also failed to state a plausible claim that an "imminent" endangerment may be present because it does not even suggest the RAP is insufficient to address the contamination at the AOCs—*i.e.*, the only potential source of a waste identified in the TAC (but, as described above, *not* alleged to be created by the Defendants).  The TAC admits that a RAP is in place, and it is a matter of public record that RIDEM has approved the RAP and is the oversight agency.  *See* Ex. 5, RIDEM RAP Approval.  Yet, CLF does not allege that the work under the RAP is

---

[22] CLF has not alleged anywhere in the TAC that the containment systems at the Terminal have failed in the past, including in connection with any one of the significant rain events that have struck the area in recent history.  *See supra* at 5.

inadequate or otherwise deficient, or that any contamination from the AOCs has migrated or is likely to migrate off-site.  In other words, CLF has failed to allege any facts, in light of the admitted state-approved remediation, upon which the Court could infer the AOCs pose an "imminent" endangerment.  *N. California River Watch v. Fluor Corp.*, No. 10-CV-05105-MEJ, 2014 WL 3385287, at *9 (N.D. Cal. July 9, 2014) (plaintiff "has failed to allege that the ongoing [state] and [regional water quality board] remediation plans are insufficient to address the endangerment, such that an imminent threat exists.").

CLF attempts to suggest an endangerment related to the AOCs by plucking a quote out of context from the 2009 addendum to the RAP that states: "[g]roundwaters within this classification may not be suitable for direct human consumption due to waste discharges, spills or leaks of chemical or land use impacts." TAC ¶ 410 (citation omitted).  This quote is misleading.  RIDEM assigns a classification to all groundwater in the state based on its suitability for certain uses.  This quote merely refers to RIDEM's classification of groundwater as GB for the *entire Providence-Warwick area* in which the Terminal is located.[23]  This classification alone says nothing about sources of potential groundwater contamination, and has nothing to do with the Terminal specifically or the Defendants' actions there.  Moreover, per RIDEM's regulations, groundwater classified GB "shall be of a quality which [] does not [t]hreaten public health or the environment."  RIDEM, Groundwater Quality Rule 11.4.1.  In sum, the classification of groundwater as GB in no way supports CLF's claim that an imminent endangerment to human health or the environment exists.

---

[23] Groundwater may be classified as GB in "[h]ighly urbanized areas of the state with dense concentrations of historic industrial and commercial activity, wherein a public water supply is readily available."  RIDEM, Groundwater Quality Rule 9.1.3(A).

## 2.    CLF Has Failed to Allege a RCRA Regulatory Violation

CLF's Claim 22 likewise fails to state a claim under RCRA § 7002(a)(1)(A) for alleged violations of federal and state RCRA regulations that address preparedness for unplanned sudden releases of hazardous wastes.  As an initial matter, this claim fails because it relies in part on inapplicable federal regulations.  CLF alleges that Defendants are in violation of 40 C.F.R. § 262.16(b)(8)(i) (regulation applicable to small quantity generators of hazardous waste), or alternatively, § 262.251 (analogous provision applicable to large quantity generators).   TAC ¶¶ 433-34.  However, Rhode Island has obtained approval to maintain its own waste management program regulating generators of hazardous waste.  *See* 250-RICR-140-10-1.1 *et seq*.  The regulations governing this program operate in lieu of the federal RCRA regulations cited by CLF.  *See* 250-RICR-140-10-1.4 ("These generator regulations apply in lieu of the federal requirements in 40 C.F.R. § 262 . . . .").  For this reason alone, CLF does not and cannot allege a violation of the federal hazardous waste regulations at 40 C.F.R. §§ 262.16(b)(8)(i) and 262.251.

With respect to the analogous Rhode Island hazardous waste regulations, CLF's claim consists of little more than a rote recitation of the regulations' language.  CLF alleges that "Shell is not maintaining and operating the facility in a manner that 'minimizes the possibility of . . . any unplanned spill or release of hazardous waste constituents. . . .'" citing R.I. Code R. 25-15-102:5.13(H)(1), (J), 5.15(G)(1)[24], because it has not accounted for the risks of severe participation and flooding described in section IV of the TAC.  TAC ¶¶ 431-32.  *But there are no facts anywhere in the TAC regarding how hazardous waste is handled at the Terminal to support this claim.*  This type of pleading, which contains no specific supporting facts, cannot provide the

---

[24] Note that as of April 26, 2018, the Rhode Island hazardous waste regulation upon which CLF relies is now located at 250-RICR-140-10-.1.1 *et seq.* and will be cited accordingly throughout the remainder of Defendants' brief.

grounds to withstand a motion to dismiss.  *Twombly*, 550 U.S. at 555 ("formulaic recitation of the elements of a cause of action will not do.").

The allegations that are included in Claim 22 refer to the fuels in the tanks, but neither the fuel nor the tanks are subject to these regulations.  First, as discussed above, these fuels are *products*, not wastes.  *See supra* at 27-29.  Second, the state regulations CLF relies upon are wholly inapplicable to the tanks.  Rhode Island's preparedness and prevention regulations apply only to a "facility," which is defined specifically as land or structures "used for *treating, storing or disposing of hazardous waste or used oil*."  250-RICR-140-10-1.5(A)(32) (emphasis added).  As explained above, the product storage tanks are not alleged to have any relation to operations involving treating, storing, or disposing of waste of any kind, and are therefore not subject to regulation under the Rhode Island hazardous waste regulations cited by CLF.  *See State ex rel. Iowa Dep't of Water, Air & Waste Mgmt. v. Presto-X Co*., 417 N.W.2d 199, 201 (Iowa 1987) ("'facility' refers to an area deliberately designated for handling hazardous waste where such waste is located on an on-going basis") (interpreting Iowa's substantially identical definition).

The federal prevention and preparedness regulations at 40 C.F.R. §§ 265.31 and 265.251 further underscores this.[25]  The language of the Rhode Island regulations at 250-RICR-140-10-1.1 closely tracks the language of the analogous federal regulations at 40 C.F.R. §§ 265.31 and 265.251.  The regulatory history of 40 C.F.R. §§ 265.31 and 265.251 affirmatively shows that these regulations were not promulgated to address the types of facility-wide infrastructure allegations in the TAC; instead, they were intended to apply only to the specific locations within a facility where the hazardous waste is managed:

---

[25] Notwithstanding Rhode Island's hazardous waste regulations operating in lieu of federal RCRA regulations, the Court can look to the federal regulations and related guidance to interpret state regulations that are "substantively identical."  *Chico Serv. Station,* 633 F.3d at 33.

> . . . the preparedness and prevention regulations only require the generator to take those precautions and maintain that equipment necessary to ensure that they are adequately prepared to respond to emergencies *relating to the hazardous waste operations of the facility*. If special equipment or precautions *are not needed for this purpose in areas of a facility where hazardous wastes are not managed, then a generator is not expected to maintain them in those areas*.

51 Fed. Reg. 10,146, 10,164 (Mar. 24, 1986) (emphasis added). As described above, none of CLF's allegations describe or relate to any hazardous waste operations at the Terminal—i.e., the operations specifically addressed by the RCRA prevention and preparedness regulations.  The purported deficiencies identified in the TAC include vague facility-wide references to "inadequate infrastructure design" and an alleged failure "to design or modify the Terminal to address severe precipitation and flooding . . . ." TAC ¶¶ 123-24.  CLF's RCRA regulatory claim at Cause of Action 22 should be dismissed because the conduct actually alleged in the TAC does not apply whatsoever to the hazardous waste regulation at issue.

**B.    CLF Has Failed to State a Claim Under the CWA**

**1.    CLF Inappropriately Seeks to Require Consideration of Impacts Beyond the Life of any Reasonable NPDES Permit**

CLF's CWA Adaptation Claims are, like its RCRA claim, fundamentally at odds with the statute it ostensibly seeks to enforce.  Specifically, CLF's CWA Adaptation Claims ask the Court to ignore how Congress structured the NPDES program to impose long-term planning obligations through the facility's permit.  Each CWA Adaption Claim is premised on some unspecified failure to address "discharges resulting from the factors discussed in Section IV.A" of the TAC.  *E.g.*, TAC ¶ 309.  Thus, CLF seeks to hold the Defendants liable for failing to consider and act upon information concerning sea level rise and concomitant changes in the risks posed by storm surge, flooding, and other inundation that CLF admits are mere possibilities or

37

far off in the future.  *See, e.g*, *id.* ¶ 228 (identifying NOAA's worst-case sea level rise scenario for 2100); *id.* ¶ 238 (citing sea level rise projections for 2030 and 2070).

CLF disregards the basic structure of the NPDES program, which by design imposes short-term compliance obligations.  NPDES permits, including both the previous and current RIPDES permits covering the Terminal, are limited to terms of no more than five years.  33 U.S.C. §§ 1342(a)(3), (b)(1)(B); 40 C.F.R. § 122.46(a); *Manasola-88 Inc. v. Thomas*, 799 F.2d 687, 688 n.1 (11th Cir. 1986) ("NPDES permits are issued for a fixed term not to exceed five years"); 250-RICR-150-10-1.20.[26]  Congress could have opted to make NPDES permits long-term planning documents, but instead sought to provide for periodic "reevaluation of the relevant factors" in order to allow "for the tightening of discharge conditions" in response to new information.  *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 22 (1st Cir. 2012).

CLF's CWA Adaptation Claims allege that the facility's permit requires the Terminal to plan for conditions that may (or may not) exist decades from now.  This is simply not correct; the permit's requirements do not cover such a long time frame.  They apply for a defined period of time.  Moreover, the CWA created a mechanism for dealing with changes to a discharger's conditions over time: the five-year permitting term and the opportunity it provides to evaluate changed conditions.  The Court should not entertain this invitation to set aside the CWA's structure—put in place by Congress—in favor of CLF's policy preferences and agenda.

---

[26] The only exception to this rule is when an application for reissuance has been filed at least 180 days prior to a permit's expiration, in which case the permit is administratively extended to allow sufficient time for the new permit to be issued.  *See* 40 C.F.R. §§ 122.6(a), 122.46(a)-(b); 250-RICR-150-10-1.13.

2.      **The CWA Does Not Impose Obligations Related to Inundation Caused by Sea Level Rise or Storm Surge**

CLF implicitly asks this Court to rewrite the facility's permit and the NPDES stormwater program to serve CLF's purposes.  Six of its claims are premised on the obligation to control stormwater discharges encompassing a supposed requirement to address inundation caused by sea level rise or storm surge.[27]  The Terminal's stormwater obligations do not stretch this far. Neither EPA nor RIDEM impose stormwater obligations that cover inundation caused by these phenomena.  This attempt to hold the Defendants liable for conduct that does not violate the permit involves no violation of "a permit or condition thereof" on which CLF can sustain a citizen suit.  33 U.S.C. § 1365(f)(6).

EPA and RIDEM have consistently defined and interpreted stormwater for purposes of the NPDES program in a manner at odds with CLF's goal of holding the Defendants responsible for the risk of discharges generated by rising waters.  Both agencies define stormwater to mean "storm water runoff, snow melt runoff, and surface runoff and drainage."   40 C.F.R § 122.26(b)(13); 250-RICR-150-10-1.4.A.110.  On its face, the term does not encompass storm surge or inundation from rising seas.  Moreover, neither EPA nor RIDEM interpret this definition to be so capacious as to encompass the inundation events for which CLF now seeks to hold these Defendants liable.

CLF ignores EPA's longstanding position that stormwater is created only by precipitation.  Prior to the existence of the present stormwater program, EPA understood stormwater runoff to consist of "wastewaters generated *by rainfall* that drain over terrain into navigable waters, picking up pollutants along the way."  *Nat. Res. Def. Council, Inc. v. Costle*,

---

[27] These claims are CLF's First through Sixth Causes of Action.  TAC ¶¶ 274-316.

568 F.2d 1369, 1377 (D.C. Cir. 1977) (emphasis added).  The Agency maintained this position when it promulgated the current definition of the term.  EPA rejected suggestions that the definition include rising groundwater and "flows from riparian habitats and wetlands" because these phenomena "are not in any way related to precipitation events."  55 Fed. Reg. at 47995. EPA explicitly rejected the notion—urged by CLF—that rising water or inundation from nearby waters can be classified as stormwater.[28]

EPA guidance spelling out how to comply with stormwater permits similarly limits stormwater to flows caused by precipitation.  The Terminal's previous permit—the basis for all of the past violations of the CWA alleged in the TAC—required compliance with an EPA manual that interprets stormwater as "the rainwater and snowmelt that runs off the earth's surface and enters our Nation's rivers, lakes, streams, and coastal waters."  EPA, *Stormwater Management for Industrial Activities – Developing Pollution Prevention Plans and Best Management Practices* at 1-1 (Sep. 1992) ("*Best Management Practices*"); *see also* RIPDES Permit Condition I.C.1 (incorporating guidance).  This same manual defines "runoff" to mean the "part of precipitation, snow melt, or irrigation water that runs off land . . . ."  *Best Management Practices* at B-6.  More recently, EPA's 2015 guidance on preparing SWPPPs interpreted stormwater to mean "water from rain or snowmelt that . . . flows over or through natural or man-made storage or conveyance systems."  EPA, *Developing Your Stormwater Pollution Prevention Plan – Guide for Industrial Operators* at 1 (June 2015).  These reasonable

---

[28] EPA also explained that the addition of the term "drainage" to the definition was not intended to expand stormwater to reach beyond precipitation. EPA understood drainage simply to be "the flow of runoff into a conveyance." 55 Fed. Reg. at 47996.

interpretations, to which the Court owes deference,[29] limit stormwater to pollution flows caused by falling—not rising—water.

In lockstep with EPA, RIDEM has similarly limited stormwater to mean flows generated by precipitation. RIDEM and CRMC have jointly authored, and update from time to time,[30] a stormwater standards manual. RIDEM & CRMC, *Rhode Island Stormwater Design and Installation Standards Manual* (Mar. 2015). RIDEM uses this manual to define permittees' obligations in several regulatory contexts, including under the state's general permit for construction stormwater discharges. *See* RIPDES Gen. Permit – Stormwater Discharge Associated with Construction Activity Condition III.B. This manual contains multiple references limiting stormwater to precipitation, and nothing more. *See* RIDEM & CRMC, *supra* at 2-1 ("[s]tormwater runoff is precipitation that washes over the land (i.e., runs off) and discharges to nearby . . . waters); *id.* at Glossary-13 (defining stormwater as "water consisting of precipitation runoff or snowmelt"); *see also* 250-RICR-150-10-8.5.A.132 (stormwater defined as "water consisting of precipitation runoff or snowmelt"). Each of these interpretations characterize stormwater as having a single defining characteristic: generation by precipitation.

The sea level rise and storm surge inundation concerns that CLF raises lack this crucial characteristic. Rising seas do not cause inundation from falling rain or snow, and storm surge is a phenomenon caused by wind rather than rain or other precipitation. NOAA, *What is storm surge?*, https://oceanservice.noaa.gov/facts/stormsurge-stormtide.html. EPA chose not to incorporate wastewater generated by phenomena other than precipitation when it defined

---

[29] *See, e.g.*, *Upper Blackstone*, 690 F.3d at 29 ("generally speaking, [EPA's] interpretation [of its regulations] will be 'controlling unless plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (additional internal quotation marks omitted)).

[30] The state agencies' updates of the manual are required by The Smart Development for a Cleaner Bay Act of 2007, R.I. Gen. Laws § 45-61.2-2.

41

stormwater over two decades ago, and CLF cannot now state claims under the CWA that seek to set the agency's choice aside.

###### 3.   The CWA Prohibits CLF's Attempt to Expand the Scope of the Facility's Permitting Obligations in this Lawsuit

The limits on what constitutes stormwater under the CWA—and the Terminal's permit— reveal this suit for what it really is: an attempt to impose novel obligations rather than a citizen enforcement action.  The CWA's text and structure bar CLF's tactic and should be rejected by the Court.

The CWA's permit shield expressly bars CLF's attempt to impose requirements beyond those in the permit.  Under section 402(k) of the Act, "[c]ompliance with a permit issued pursuant to this Section shall be deemed compliance . . . ." with the CWA.  33 U.S.C. § 1342(k). Congress intended this provision to insulate permit holders from "'having to litigate in an enforcement action the question whether their permits are sufficiently strict.'"  *E.g.*, *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 285 (6th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977)).  CLF's suit seeks to achieve this prohibited outcome. Its TAC, stripped of its veneer of an enforcement action, seeks the Defendants to go above and beyond the obligations of the Terminal's RIPDES permit to control pollutants from possible storm surge and sea level rise.

Even if the permit shield did not block CLF's attempt to expand the scope of the Terminal's permit obligations, this Court would lack jurisdiction to hear CLF's claims premised on rising sea levels and storm surge.  Neither the citizen suit provision nor the section of the CWA addressing judicial review permits district courts to hear challenges to the terms of state-issued NPDES permits.  *See* 33 U.S.C. §§ 1365, 1369.  Congress required states administering

42

NPDES permits to have adequate authority to carry out their permit programs and provide for public participation in permitting. *Id.* § 1342(b). Based on this structure, every court to consider the question has concluded that federal courts cannot hear challenges to the terms of state-issued NPDES permits. *E.g.*, *Rose Acre Farms, Inc. v. N.C. Dep't of Envt. & Nat. Res.*, 131 F. Supp. 3d 496, 504-05 (E.D.N.C. 2015) ("Congress chose state courts to be the means by which parties may challenge permitting decisions."); *Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co.,* No. 2:12-3750, 2013 WL 6709957, at * 12 (S.D.W.V. Dec. 19, 2013) (prohibiting collateral attack on state permit); *Nat. Res. Def. Council v. Outboard Marine, Inc.*, 702 F. Supp. 690, 694 (E.D. Ill. 1988) (prohibiting federal review of state NPDES permit in citizen suit). Allowing CLF to attempt to expand the reach of this state permit in federal court "would upset the congressionally-determined balance between state and federal courts . . . ." *Rose Acre Farms*, 131 F. Supp. 3d at 505. For that reason alone, the Court should dismiss CLF's claims to the extent they seek to write into the facility's permit obligations concerning sea level rise and storm surge that RIDEM did not include.

### 4. The TAC Lacks Facts Sufficient to Sustain the CWA Adaptation Claims

CLF's CWA Adaptation Claims also fail to state a claim because they lack sufficient factual allegations for the Court to conclude the claims are plausible. As with the RCRA claim, the CWA Adaptation Claims continue the conclusory refrain that Defendants have allegedly failed to address the potential for severe precipitation and flooding, here with respect to the Terminal's SWPPP and other permitting documents, but allege no facts to substantiate these claims. The TAC lacks allegations regarding what the SWPPP actually says or any other facts from which the Court could infer Defendants did or did not address potential severe precipitation

43

and flooding.  Bare legal conclusions alone do not state a plausible claim for relief.  *Twombly*, 550 U.S. at 555 (factual allegations must "be enough to raise a right to relief above the speculative level").  The Court should dismiss CLF's CWA Adaptation Claims.

### a.    Contents of the SWPPP  (Counts 3, 4, and 5)

The TAC contains no allegations from which the Court can infer deficiencies in the Terminal's SWPPP.  CLF's Third, Fourth, and Fifth Causes of Action allege that the SWPPP failed to adequately:

- "identify potential sources of pollutants, which may be reasonably expected to affect the quality of storm water discharges," 2019 RIPDES Permit Condition I.C.1 (Count 3);[31]

- "[d]escribe and ensure implementation of Best Management Practices (BMPs) . . . to reduce or eliminate the pollutants in storm water discharges," 2019 RIPDES Permit Condition I.C.1 (Count 4); and

- provide "containment" to address "leaks and spills in storage areas . . . and truck loading area(s)," 2019 RIPDES Permit Condition I.B.5 (Count 5).

CLF conjectures that these aspects of the SWPPP violate these requirements because they fail to address sufficiently pollution that CLF claims would result from severe precipitation and flooding discussed at length in the TAC.  *See e.g.*, TAC ¶ 309.

However, the TAC falls short of the plausibility threshold because it is virtually devoid of references to what the SWPPP actually says or what, if anything, has been omitted from the SWPPP.  CLF makes only two references to the SWPPP's contents: (a) two paragraphs citing the same requirement that the Terminal's oil/water separators and stormwater collection ponds be inspected quarterly, TAC ¶¶ 89, 324; and (b) a passing reference to the title of one of the

---

[31] The Third Cause of Action also alleges a violation of Condition I.C.5.a. of the permit, which requires the SWPPP to identify "'potential sources which may be reasonably expected to add significant amounts of pollutants. . . .'" TAC ¶ 297 (quoting permit).  CLF fails to state a claim under this provision for the same reasons, discussed above, that it fails to plead any violation of RIPDES Permit Condition I.C.1.

document's sections.  *See id.* ¶ 308 ("The SWPPP contains a section entitled 'Spill Prevention and Response Procedures.'" (quoting SWPPP at 4-2–4-3)).  CLF alleges no facts concerning any pollutant source (Count 3), BMP (Count 4), or containment (Count 5), that the SWPPP allegedly fails to address.  CLF asks the Court to assume that there are deficiencies in the SWPPP rather than provide well-pled facts from which the Court might infer that the SWPPP in *any* way failed to address the risks of potential severe precipitation and flooding.

### b.      Preparation of SWPPP (Count 2)

CLF's failure to plead facts relating to the SWPPP's contents is also fatal to CLF's claim that the Defendants failed to prepare the document "in accordance with good engineering practices . . . ."  2019 RIPDES Permit Condition I.C.1.  Like the counts discussed above, CLF's allegations hinge on the hypothesis that the Defendants failed to consider the potential for severe precipitation and flooding.  TAC ¶¶ 290-91.  But CLF's pleading contains no allegations concerning information used or assumptions made by the Defendants, or any allegations concerning the SWPPP's content from which the Court might infer that the SWPPP was or was not prepared in accordance with good engineering practices.

### c.      Certification of SWPPP (Count 1)

CLF's SWPPP-related pleading deficiencies also cause its first count to fail.  CLF claims that Defendants violated the requirement to certify that its SWPPP was "true, accurate, and complete," again, because it was not "based on . . . the factors discussed in Section IV.A."  TAC ¶¶ 282-83; 250-RICR-150-10-1.12; 2019 RIPDES Permit Condition I.C.2. (incorporating 250-RICR-150-10-1.12).  As described above, CLF has failed to plead facts sufficient to support any

conclusion with respect to the plausibility of whether the Defendants considered the potential severe precipitation and flooding risks set out in the TAC.

### d.      Amending or Updating the SWPPP (Count 6)

CLF has not alleged a plausible claim that the Defendants failed to uphold the obligation to update the SWPPP because this claim again asks the Court to assume a violation rather than plead facts from which one might be inferred.  A SWPPP must be amended if it "*proves to be ineffective* in achieving the general objectives of controlling pollutants in storm water discharges . . . . ."[32]  RIPDES Permit Condition I.C.4 (emphasis added).  CLF's allegation—stated only as a conclusion—is that the precipitation and flooding risks enumerated in the TAC rendered the SWPPP ineffective.  TAC ¶ 314.

The few well-pled facts in the TAC do not demonstrate this claim is plausible, as opposed to merely possible.  As explained in detail above, the TAC omits any facts concerning the SWPPP itself, which prevents the Court from drawing any inferences concerning whether the SWPPP could be shown to be deficient at any time.  This pleading failure also prevents the Court from assessing the plausibility of CLF's theory that the SWPPP was rendered deficient by a specific cause—the failure to account for risks of severe precipitation and flooding outlined in the TAC. CLF has again merely concluded a violation exists without alleging specific facts to support the existence of one.

---

[32] The permit also requires amendments to the SWPPP under circumstances clearly not implicated by the TAC: (a) "a change in design, construction, operation, or maintenance which has a significant effect o[n] the potential for the discharge of pollutants," or (b) "a release of reportable quantities of hazardous substances and oil."  2019 RIPDES Permit Condition I.C.4.  The TAC alleges no changes to the design, construction, operation, or maintenance of the Terminal.  CLF's theory for Defendants' liability under this provision is also not premised on the release of a hazardous substance or oil in excess of a reportable quantity.  *See* TAC ¶ 314.

### e.   Operation and Maintenance of Treatment and Control Equipment (Count 7)

CLF alleges no facts supporting its theory that the Defendants' alleged failure to account for the risks of severe precipitation and flooding rendered the day-to-day operation and maintenance of the Terminal inadequate.  The permit requires that the facility "properly operate and maintain all facilities and systems of treatment and control . . . used . . . to achieve compliance with the conditions of this permit."  2019 RIPDES Permit Condition II(e).  EPA requires that this language be included in every NPDES permit.  *See* 40 C.F.R. 122.41(e).  The Agency interprets this provision to impose obligations no broader than to require "permittees to maintain equipment in order to comply with other *express* permit provisions."  *Am. Canoe Ass'n v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 46 (D.D.C. 2004) (emphasis in original).  CLF alleges a violation of a provision concerning the "day to day operation and care" of pollution control equipment.  *Tenn. Clean Water Network v. TVA*, No. 3:15-cv-00424, 2017 WL 3476069, at *59 (M.D. Tenn. Aug. 4, 2017).

CLF alleges that Defendants violated this provision by failing to "consider and act upon" a litany of severe precipitation and flooding risks in operating and maintaining the facility—but fails to plead facts that would make this theory plausible.  TAC ¶ 320.  The TAC's references to "outfall pipes being in disrepair" and alleged inattention to oil-water separators and stormwater ponds permit no inferences concerning whether Defendants considered and acted upon the severe precipitation and flooding concerns that CLF raises.  *See id.* ¶¶ 121, 324.

CLF's conclusory allegations concerning the state of the Terminal's physical facilities do not overcome the speculative nature of this claim.  At best, CLF points to its multiple cryptic references to "infrastructure failure" as some reflection of maintenance practices.  *E.g.*, *id.* ¶ 174.

47

However, these allegations simply state the conclusion that infrastructure is failing without any supporting facts, such that the Court need not give them credence.  *See Feliciano-Hernandez*, 663 F.3d at 533 ("'naked assertions' devoid of further factual enhancement are insufficient to support claims.") (citation omitted).  The pleading's remaining references to the adequacy of infrastructure and design are irrelevant to whether Shell has properly maintained and operated the terminal.  *See, e.g.*, TAC ¶ 18 (referencing undersized pipes).  Claims for failure to operate and maintain under this permit provision cannot rest on alleged deficiencies in the design or function of a facility.  *See Tenn. Clean Water Network*, 2017 WL 3476069, at *59.

### f.  Submission of Information to Correct Errors or Omissions in Previous Applications or Reports (Count 9)

The TAC's lack of references to the facility's permit applications and reports dooms CLF's count alleging that the Defendants failed to correct errors or omissions in its filings to RIDEM.  Permit Condition II.(l)(7), which is a standard NPDES permit term,[33] requires a permittee to submit corrections to RIDEM when it becomes aware (a) that "it failed to submit any relevant facts in a permit application," or (b) that it "submitted incorrect information in a permit application or in any report to [RIDEM]."  CLF's pleadings contain no facts to support its theory that Defendants omitted information from any application or report.

As was the case with its claims concerning the SWPPP, CLF alleges none of the contents of any document from which the Court might infer that its theory is plausible.  CLF makes no allegations concerning the contents of any Providence Terminal permit application.  The only "reports" referenced in the TAC are the Terminal's discharge monitoring reports ("DMRs"), which simply present to RIDEM the facility's most recent monitoring results.  2019 RIPDES

---

[33] *See* 40 C.F.R. § 122.41(l)(8).

Permit Condition I.E.2.   Omitting information concerning risks of flooding or severe precipitation—which are, in any event, well known to the state's environmental agency—would not render information in the DMRs "incorrect."  DMRs only allow for reporting information on sampling collection and analysis; they are not a vehicle for reporting on changes in weather or climate conditions.   *See* EPA, NPDES Discharge Monitoring Report (DMR) Form, https://www.epa.gov/sites/production/files/2015-09/documents/dmr.pdf.

### g.   Duty to Minimize or Prevent Permit Violations (Count 10)

CLF's attempt to use the RIPDES Permit's boilerplate "Duty to Mitigate" provision as a catch-all requirement for Defendants to address the speculative risks of potential severe precipitation and flooding fails.  The Permit contains its own version of a standard EPA term, 40 C.F.R. § 122.41(d), which requires a permittee "to take all reasonable steps to minimize or prevent any discharge . . . in violation of this permit . . . ."  RIPDES Permit Condition II(d).  This provision imposes no obligations independent from those codified elsewhere in the permit; it embodies EPA's policy requiring "compliance with [the] permit and . . . mitigation measures *when the permit noncompliance presents a risk of environmental harm*."  48 Fed. Reg. 39,611, 39,614 (Sep. 1, 1983) (emphasis added).

As explained in detail above, CLF has not provided the Court with any facts connecting noncompliance with the permit to a risk of environmental harm due to Defendants' alleged failure to consider and address possible severe precipitation and flooding.  *See* TAC ¶ 337.  CLF alleges that pipes are undersized or in disrepair, oil/water separators and stormwater ponds have been insufficiently cleaned, but there are no other well-pled allegations that connect these isolated facts to any failures to consider information relating to alleged risks posed by severe

49

precipitation and flooding enumerated in the TAC.  *See* TAC ¶¶ 18, 121, 325. The RIDEM Report quoted by CLF regarding sheens after the heavy March 2010 rains did not say mitigation measures were needed.  Ex. 1 at 2; TAC ¶ 161.  Though omitted from CLF's quote, the report in fact stated that "no further action is needed at the site."  Ex. 1 at 3.

Nor does CLF allege facts showing that there are any deficiencies in the facility's SWPPP or its implementation.  The only remaining allegations take the form of bare conclusions that the Court is required to put aside.  The body of the TAC references a series of (i) failures to design the Terminal "in accordance with good engineering practices," *e.g.*, TAC ¶ 123; (ii) "inadequate infrastructure design and infrastructure failure," *e.g.*, *id.* ¶ 174; and (iii) statements that the Terminal "has not been designed or modified" to address various climate phenomena, *e.g.*, *id.* ¶ 124.  CLF does not provide additional facts, however, about the engineering practices, infrastructure, or design features that are at fault, rendering these statements mere assumptions that the Court may not consider.  *See Feliciano-Hernandez*, 663 F.3d at 533.  Lacking even the veneer of fact necessary to state a plausible claim that the Defendants failed to minimize or prevent violations of the permit by not considering the risks of severe precipitation and flooding laid out in the TAC, Count 10 of the TAC must be dismissed.

## IV.   THE CWA DOES NOT PERMIT THE COURT TO EXERCISE SUBJECT MATTER JURISDICTION OVER THE TERMINAL'S FORMER OWNER/OPERATOR

CLF's eagerness to name as many defendants as possible swept in an entity against which it cannot bring claims under the CWA: Motiva, the Terminal's former owner and operator. Citizen suits like this one may only be brought "against any person 'alleged *to be* in violation of' the conditions of either a federal or state NPDES permit."  *Gwaltney,* 484 U.S. at 53 (quoting 33

50

U.S.C. § 1365(a)(1)) (emphasis added).  In *Gwaltney,* the Supreme Court held that the phrase "alleged to be in violation" excludes "wholly past" violations of the CWA from federal courts' ability to exercise subject matter jurisdiction over citizen suits.  *Id*. at 64.  Since *Gwaltney*, courts have concluded that the prohibition on "wholly past violations" extends to former owners and operators who no longer exercise control over their facilities because they are no longer capable of causing present or future violations.  *See Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 632-33 (D.R.I. 1990) ("[t]he phrase 'any person . . . who is alleged to be in violation' is clearly directed to a present violation by the person against whom the citizen suit is brought."); *Brossman Sales, Inc. v. Broderick*, 808 F. Supp. 1209, 1214 (E.D. Pa. 1992) (dismissing CWA claim because "defendants . . . relinquished ownership of the source of the alleged violation and no longer have the control to abate it . . . .").

CLF's claims against Motiva must be dismissed because the company cannot cause a continuing or future violation of the CWA.  Motiva has neither owned nor operated the Terminal since May 1, 2017.  TAC ¶ 26 ("Motiva . . . formerly operated the Providence Terminal."). RIDEM released Motiva from its obligations under the RIPDES Permit and transferred liability and responsibility for compliance to Triton.  Thus, Motiva has retained no permit responsibilities or control over the Terminal that would make the company capable of *being* in violation of the CWA.  *Cf. PennEnvironment v. PPG Industries*, 964 F. Supp. 2d 429, 461 (W.D. Pa. 2013) (finding jurisdiction where entity retained interests in facility); *City of Mountain Park v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1299 (N.D. Ga. 2008) (former owner subject to citizen suit because it remained holder of NPDES permit).  The CWA prevents the Court from exercising subject matter jurisdiction over CLF's CWA claims against Motiva.

51

**V.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER ALLEGED
MONITORING VIOLATIONS BASED SOLELY ON THE TERMINAL'S
EXPIRED PERMIT.**

This Court lacks subject matter jurisdiction over CLF's Thirteenth through Fifteenth

Causes of Action to the extent that they are premised on alleged failures to comply with

monitoring requirements applicable to Outfall 003A.  *See* TAC ¶¶ 357-58, 364-65, 369-70.  The

2011 RIPDES Permit imposed monitoring obligations on four Terminal outfalls:  001A, 002A,

100A, and 003A.  2011 RIPDES Permit at 2-7 (Part I.A.1-3).  When RIDEM issued the 2019

RIPDES Permit, it eliminated Outfall 003A's monitoring requirements.  2019 RIPDES Permit at

2-6 (Part I.A.1-2 (omitting Outfall 003A from effluent limitations and monitoring requirements

conditions)); TAC, Ex. L, Statement of Basis at 4 (RIDEM's explanation that "monitoring at

Outfall 003A will be eliminated from the" Terminal's permit).  Despite RIDEM's decision to

discontinue monitoring requirements at Outfall 003A in the 2019 RIPDES Permit, the TAC

bases a portion of its Thirteenth through Fifteenth Causes of Action on alleged failures to comply

with monitoring requirements applicable to Outfall 003A.  *See* TAC ¶¶ 357-58, 364-65; *id.*, Ex.

G at 6, 18, 26, 29, 33; *id.*, Ex. I at 91-99, 101.

The CWA does not allow CLF to assert claims based on expired permit terms.  Under

*Gwaltney*, jurisdiction over CWA citizen suits is limited to cases in which a plaintiff "make[s] a

good faith allegation of continuous or intermittent violation. . . ." 484 U.S. at 64.  A continuous

or intermittent violation may be alleged "only for . . . a permit limitation 'which is in effect'

under the [CWA]."  *Id.* at 59 (quoting 33 U.S.C. § 1365(f)).  Thus, claims in a CWA citizen suit

cannot be based on those provisions of an expired permit that were not carried over into a new

permit.  *Pub. Interest Research Grp. of N.J., Inc. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121

52

(D.N.J. 1988) (citizen suits may be brought "solely for those conditions of an expired permit which have counterparts in the discharger's present permit . . . ."). Under this standard, the viability of CLF's claims turns on the terms of the permit in effect at the time CLF filed the TAC.[34]

CLF cannot maintain its Thirteenth through Fifteenth Causes of Action over Outfall 003A because these claims are based solely on expired permit terms that did not carry over into the 2019 RIPDES Permit. The 2011 RIPDES Permit—including all of the Outfall 003A monitoring obligations—ceased to have legal effect when the 2019 RIPDES Permit became effective on March 1, 2019.[35] Further, the 2019 RIPDES permit did not carry over the Outfall 003A terms, such that CLF's claims against Outfall 003A are for "wholly past" violations over which the Court lacks subject matter jurisdiction. *See Carter-Wallace*, 684 F. Supp. at 123 (dismissing citizen suit claims based on expired permit terms).

## VI. THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS CLF'S RCRA AND CWA ADAPTATION CLAIMS UNDER THE DOCTRINES OF ABSTENTION AND PRIMARY JURISDICTION

### A. The Court Should Defer to the State and Abstain from CLF's CWA and RCRA Adaptation Claims

CLF's CWA and RCRA regulatory Adaptation Claims require this Court to venture into an arena in which Rhode Island's regulatory agencies are actively evaluating new measures for controlling the flow of stormwater discharges attributable to potential severe precipitation and

---

[34] *See U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., LLC*, 339 F. 3d 23, 33 (1st Cir. 2003) (assessment of subject matter jurisdiction under *Gwaltney* is done by reference to "*the time the suit is brought*" (emphasis in orginal)); *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 95 (1st Cir. 2008) (for purposes of federal question jurisdiction, courts "evaluate an action (including its jurisdictional predicate) by reference to the amended complaint instead of the original complaint.").

[35] 2019 RIPDES Permit at 1; 250-RICR-150-10-1.13 ("The conditions of an expired RIPDES permit shall be continued in force until the effective date of a new RIPDES permit . . . ."); *see also* 40 C.F.R. 122.6(d) (termination of administratively continued state NPDES permits is a matter of state law).

flooding related to climate change, as well as the need for hardening of port fuel terminals while balancing important economic considerations.  Under the abstention doctrine set out in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), a federal court may exercise its discretion to abstain from hearing a case it has jurisdiction over "if its adjudication in a federal forum 'would be disruptive to state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996) (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*")).

In its most recent articulation of the doctrine in *Quackenbush*, the Supreme Court emphasized that there is no "formulaic test" for determining whether *Burford* abstention is appropriate, and that,

> [u]ltimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of the state action," that the State's interests are paramount and the dispute would best be adjudicated in a state forum.

*Id*. at 728-29 (internal citations omitted).  Factors the First Circuit has considered when applying *Burford* include the availability of timely and adequate state-court review, the potential that federal court jurisdiction over the suit will interfere with state administrative policymaking, and whether conflict with state proceedings can be avoided by careful management of the federal case.  *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd*., 633 F.3d 20, 32 (1st Cir. 2011).  Abstention is appropriate where a citizen suit intrudes on a state's "overriding interest in protecting its environment from the effects of contaminated discharges . . . . " *Starlink Logistics, Inc. v. ACC, LLC*, No. 1:12-CV-0011, 2013 WL 212641, at *8 (M.D. Tenn. 2013) (abstaining from RCRA and CWA claims); *see also Ellis v. Gallatin Steel*, 390 F.3d 461, 481 (6th Cir. 2004)

54

(abstaining from Clean Air Act citizen suit that interfered with state permitting program).
Deference to important state interests is consistent with the CWA, in which Congress sought to
"preserve, and protect the primary responsibilities and rights of States to prevent, reduce and
eliminate pollution. . . ."  33 U.S.C. § 1251(b).

This case amply demonstrates the need for and appropriateness of abstention.  CLF seeks
rulings from the Court in an area—regulation concerning the flow of stormwater discharges in
Rhode Island—that the state has identified as one of the chief areas it intends to address in
response to potentially changing climate conditions.  Most recently, the Resilient Rhody report,
published under the direction of the State's Chief Resilience Officer, identified stormwater
resiliency action items for the state such as "[u]pdate the Stormwater Design and Installation
Standards Manual/Rules to reflect changing precipitation patterns," and "[i]dentify existing
stormwater management structures that are subject to frequent coastal and riverine flooding and
take steps to mitigate the impacts of this flooding on stormwater infrastructure and its
performance." Resilient Rhody at 25. The EC4 has also recently devoted an entire meeting to
stormwater resiliency, at which the Director of RIDEM singled out "the necessity of addressing
flooding risks and stormwater challenges proactively."  EC4, *Meeting Minutes* at 1 (Sept. 6,
2017).  The state has appointed a Director of Stormwater and Resiliency, housed within the
Rhode Island Investment Bank, who will lead the agency's "efforts in accelerating and
coordinating infrastructure investment in the stormwater and coastal infrastructure sectors." EC4,
*Annual Report* at 10.

This suit will short-circuit the now-underway process to create a framework to address
any changes in stormwater discharges potentially resulting from climate change.  Rhode Island's

comprehensive water quality plan declares it a policy of the state to "[e]nsure that stormwater programs address climate change impacts." *Water Quality 2035 – Rhode Island Water Quality Management Plan* at 7-14. The plan specifically tasks RIDEM (and the CRMC) with the responsibility to (1) "[e]valuate the impact of climate change on existing stormwater management systems," and (2) "[i]ncorporate new data on climate change into stormwater management design standards, *including projections for increased storm intensities*." *Id.* (emphasis added). CLF seeks rulings from the Court concerning how stormwater dischargers must address potential increases in stormwater flows allegedly resulting from climate change before Rhode Island—entrusted by EPA to administer the NPDES program—has a chance to do so in accordance with the blueprint developed by the state's planning body.[36]

Further, the state has repeatedly recognized the vital economic role of its ports, and accordingly Rhode Island has stated that climate change resiliency efforts at ports should involve "collaborative partnership between the state and port community to understand the economic implications of severe weather events and benefits of storm resilience planning." Special House Comm'n (addressing economic resiliency); Resilient Rhody, at 26. Specifically with regard to fuel terminals, Rhode Island set a state goal of ensuring that terminals have taken "all appropriate hardening and resilience measures to protect their facilities . . . ." specifically to ensure that terminals can operate and continue to provide economic benefit with minimal disruptions from storms. *Id.* at 31. CLF's RCRA and CWA claims in effect sidestep Rhode Island's ongoing efforts to balance economic and environmental resiliency by asking the Court to decide in the first instance how this facility (and others) should account for climate change impacts, without

---

[36] It should be noted that CLF had an opportunity to raise these issues with RIDEM in its July 2018 comments on the Terminal's draft RIPDES Permit, but chose not to. *See* TAC, Ex. L, ECF. No. 45-12 at 2-5.

considering the potentially significant economic impact on the state.[37]   This is squarely a situation where federalism and comity concerns are triggered and abstention warranted.

In sum, the State of Rhode Island is actively engaged in addressing stormwater management at the Port of Providence, and Rhode Island has identified the need to balance economic and environmental resiliency efforts at the Port. The Court should reject CLF's invitation to usurp Rhode Island's efforts to create and implement a coherent plan addressing climate change adaptation.  *See Sevigny v. Employers Ins. of Wausau*, 411 F.3d 24, 29 (1st Cir. 2005) (*Burford* is intended to prevent federal courts from "'resolving issues of state law and policy that are committed in the first instance to expert administrative resolution.'") (quoting *Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 24 (1st Cir. 1998)); *Quackenbush*, 517 U.S. 727.

## B.     CLF's RCRA Endangerment Claim Should be Dismissed Under the Doctrine of Primary Jurisdiction

The Court should also defer to the state with respect to CLF's RCRA § 7003(a)(1)(B) endangerment claim.  To the extent CLF has alleged that contamination in soil and groundwater at the Terminal presents an imminent and substantial endangerment to health or the environment, the Court should decline to make that determination and defer to RIDEM under the doctrine of primary jurisdiction.  The doctrine may be applied "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. . . ."  *United States v. W. Pac. R.R. Co*., 352 U.S. 59, 64 (1956); *see also U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me*., 339 F.3d 23, 34 (1st Cir.

---

[37] CLF's suit also undermines efforts by the City of Providence to act on Rhode Island's goals. The City has set out clear action items to "[s]trengthen storm resilience at the [Terminal] through strategic partnerships and planning," in accord with the Resilient Rhody report. *See* City of Providence, Draft, Strategy for Reducing Risks from Natural, Human-Caused and Technologic Hazards in Providence, Rhode Island: A Multi-Hazard Mitigation Plan at 161 (2019),http://www.providenceri.gov/wp-content/uploads/2019/03/Draft-Providence-Multi-Hazard-Mitigation-Plan-Update-2019.pdf.

2003) ("[T]he primary jurisdiction doctrine permits and occasionally requires a court to stay its

hand while allowing an agency to address issues within its ken."). The doctrine is intended to

"serve[ ] as a means of coordinating administrative and judicial machinery" and to "promote

uniformity and take advantage of agencies' special expertise." *Mashpee Tribe v. New Seabury*

*Corp.*, 592 F.2d 575, 580 (1st Cir.1979). The Supreme Court has said that "[n]o fixed formula

exists for applying the doctrine of primary jurisdiction." *Western Pac.*, 352 U.S. at 64. The First

Circuit relies on three factors to guide the decision on whether to refer an issue to an agency

under the primary jurisdiction doctrine:

> (1) whether the agency determination l[ies] at the heart of the task
> assigned the agency by Congress; (2) whether agency expertise [i]s
> required to unravel intricate, technical facts; and (3) whether,
> though perhaps not determinative, the agency determination would
> materially aid the court.

*Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.*, 215 F.3d 195, 205 (1st Cir. 2000) (quoting

*Mass v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995).

RIDEM is overseeing remediation of the AOCs identified in the TAC, and the agency has

approved the RAP in place. *See* TAC ¶ 410; Ex. 5, RIDEM RAP Approval. Thus, the AOCs at

issue in CLF's TAC are already "within the special competence of an administrative body. . . ."

*W. Pac. R.R. Co.*, 352 U.S. at 64. CLF's RCRA claim regarding alleged dangers posed by soil

and groundwater contamination goes to core RIDEM functions. RIDEM is statutorily tasked

with protecting human health and the environment from such threats. *See* R.I. Gen. Laws § 42-

17.1-2 (vesting RIDEM with power to protect natural resources of state, including water and

aquatic life, and requiring consideration of adverse effects on public health). CLF has not

alleged that RIDEM is failing in its role as the agency overseeing the RAP, or that the RAP is inadequate in any way.

Further, under the Resilient Rhode Island Act of 2014, RIDEM is expressly charged with taking into account the potential impacts of climate change. R.I. Gen. Laws § 42-6.2-8 ("Consideration of the impacts of climate change shall be deemed to be within the powers and duties of all state departments . . . and each shall be deemed to have and to exercise among its purposes in the exercise of its existing authority, the purposes set forth in this chapter pertaining to climate change mitigation, adaption, and resilience in so far as climate change affects the mission, duties, responsibilities, projects, or programs of the entity.")   Thus, the relief CLF seeks—consideration of measures to address the alleged risks presented by climate-related severe precipitation and flooding—is already within the scope of RIDEM's authority as the oversight agency and is in fact a mandated consideration under the Act.  Evaluating those risks (and determining whether the remediation is adequate in light of those risks) involves assessing complex, evolving, and highly technical data regarding climate-related storm risks—an assessment which RIDEM is taking part in through the EC4.[38]  Finally, deferring to RIDEM on this issue would also promote uniformity in how remediation standards are applied in coastal areas of the state which may be more prone to severe precipitation and flooding, the application of which lies at the heart of RIDEM's expertise.

---

[38] *See* State of Rhode Island, EC4 Science & Technical Advisory Board (STAB) webpage (noting RIDEM membership in EC4 board "charged with keeping the EC4 abreast of important developments in scientific and technical information relating to climate change and resiliency"), http://climatechange.ri.gov/state-actions/ec4/ec4-council/stab.php.

**CONCLUSION**

The Court should dismiss CLF's RCRA and CWA Adaptation Claims, and all claims against Motiva.[39]  CLF lacks an imminent injury-in-fact that is traceable to the Defendants' conduct, and, therefore, lacks standing to assert its Adaptation Claims.  CLF's "failure to adapt" theory is fatally lacking in factual support and fails to state a claim under RCRA or the CWA. Additionally, the Court should dismiss these claims in deference to the State of Rhode Island under the doctrines of abstention and primary jurisdiction.  Accepting CLF's novel use of a federal citizen suit here in effect would subject facilities—merely because of their location near sea level—to liability for "failing to adapt" to the complex and uncertain effects of climate change.  Whether and to what extent such measures are necessary are quintessential legislative and administrative determinations, rather than judicial.  CLF's attempt to expand the scope of RCRA and the CWA in this manner should be rejected.


Dated:  October 11, 2019                    Respectfully submitted,



                                            /s/ Bina Reddy

                                            Robert D. Fine (RI Bar # 2447)
                                            Chace, Ruttenberg & Freedman, LLP
                                            One Park Row, Suite 300
                                            Providence, RI 02903
                                            (401) 453-6400
                                            Fax (401) 453-6411
                                            rfine@crfllp.com

---

[39] If the Court grants this motion, all claims against Motiva would be dismissed, and TAC causes of action 8 and 11-20 against Defendants Shell Oil Products US, Shell Oil Company, Shell Petroleum Inc., Shell Trading (US) Company, and Triton Terminaling LLC would remain.

60

John S. Guttmann (admitted *pro hac vice*)
Beveridge & Diamond, P.C.
1350 I Street, NW, Suite 700
Washington, DC 20005
(202) 789-6020
Fax (202) 789-6190
jguttmann@bdlaw.com

Bina Reddy (admitted *pro hac vice*)
Beveridge & Diamond, P.C.
400 West 15th Street, Suite 1410
Austin, Texas 78701
(512) 391-8045
Fax (512) 391-8099
breddy@bdlaw.com

61