UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Conservation Law Foundation, Inc., | ) |
| Plaintiff | ) |
| v. | ) No. 1:17-cv-00396-WES-LDA |
| Shell Oil Products US,<br>Shell Oil Company,<br>Shell Petroleum, Inc.,<br>Shell Trading (US) Company,<br>Motiva Enterprises LLC,<br>Triton Terminaling LLC, and<br>Equilon Enterprises LLC, | ) |
| Defendants. | ) |

**DEFENDANTS' RESPONSE TO BRIEF OF AMICI CURIAE
STATE OF RHODE ISLAND AND RHODE ISLAND DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT**

On July 30, 2020, the State of Rhode Island and the Rhode Island Department of Environmental Management ("DEM"), (together, "the State"), submitted a brief as *amici curiae* in this case. ECF No. 49. During the August 13, 2020 oral argument on the pending motion to dismiss Plaintiff's Third Amended Complaint ("TAC"), the Court offered Defendants the opportunity to file a written response to the State's brief. Defendants submit this response addressing points most relevant to the Court's ruling on the pending motion.

1. <u>The Court must define—not interpret—DEM requirements for the first time to decide CLF's claims based on alleged climate change impacts</u>.

The State repeatedly suggests that the Court's task in this case is simple, arguing that "[t]he Court need only evaluate whether accounting for the TAC Section IV.A. factors [regarding alleged climate change impacts] constitutes an industry-standard engineering practice,

and if so, whether Defendants' engineers complied with that standard." *Id*. at 16.  However, there is no way the Court can do this, without determining—*for the first time*—what "that standard" is for the myriad and complex potential impacts of climate change.  Judge Wolf, who stayed nearly identical claims by CLF in a case pending in the U.S. District Court in Massachusetts, recognized this when he explained, correctly, why CLF's claims are not as straightforward as the State contends:

> CLF's allegations in this case involve ambiguous, narrative permit conditions . . . . this case is not a typical CWA or RCRA citizen suit. To decide whether to grant CLF's requested injunctive relief, the court must determine whether, how, and to what extent climatologists believe weather patterns in Boston are changing, and how prudent industrial engineers would respond to such changes. This undertaking implicates scientific and policy issues absent from a typical citizen suit in which the court compares the level of pollutants discharged to the level of pollutants allowed by the permit.

*Conservation Law Foundation, Inc. v. ExxonMobil Corp.,* -- F. Supp.3d --, 2020 WL 1332949, *9 (D. Mass. March 21, 2020); *appeal filed*, Case No. 1:16-cv-11950-MLW (1st Cir. 2020).

The Court would be wading into this immensely complicated area and deciding these questions as matters of first impression.  We know this because the State is currently trying to answer these same questions itself, through the work of numerous agencies—DEM, the Coastal Resources Management Council ("CRMC"), the Division of Planning, etc.—all applying their respective expertise.  *See generally* ECF No. 46-1 at 9-12, 53-59;  *see also* Exhibit 1, Mary E. Kay, DEM, Ltr. to Peter Nightingale (Oct. 5, 2018) ("DEM Letter") at 4 (describing DEM's work to "assess vulnerability of infrastructure to impacts of climate change; . . . develop plans, policies, and solutions based on the latest science to ensure the state continues to have a vibrant coastal economy, including protection of critical infrastructure . . . incorporate climate change adaption into . . . hazard mitigation plans and projects").  The State's policies and decisions on how exactly to regulate these particular risks are still under development.  The State's argument

that CLF's claims require simple open-and-shut interpretation of established standards cannot be reconciled with the State's concession that "the pertinent administrative agencies" have "the responsibility to *create and implement* those state-wide standards." ECF No. 49 at 24 (emphasis added).[1]  The Court cannot interpret and enforce standards that the State is yet to create.

And there are yet more considerations that the Court will need to account for than those listed by Judge Wolf.  As one example, the fuel terminal at issue here is critical energy infrastructure, and as such, the Office of Energy Resources ("OER") has recommended storm vulnerability assessments and planning in light of the need to keep these critical facilities online during and immediately after major storms to alleviate disruptions to fuel supplies to the region, which OER states could result in significant economic damage to the state and potential loss of life.  *See* R.I. Div. of Planning, *Energy 2035: R.I. State Energy Plan* at 128-30 (Oct. 8, 2015).

The State also attempts to minimize the broad implications of CLF's claims by arguing that the Court "need not—and should not—form a prescriptive judgment about whether accounting for the effects of climate change ought to be a benchmark of 'good engineering practices.'"  ECF No. 49 at 15; *see also id*. at 17. This statement is puzzling.  First, CLF seeks a judgment from the Court for injunctive relief—this is almost the definition of a "prescriptive judgment." Second, any ruling by the Court will, as a matter of law, set the "benchmark" for the standard for engineering for climate change risks at coastal facilities. The practical reach of this

---

[1] Indeed, the State is essentially asking the Court to do what it refused to do when it denied a 2018 petition from an environmental group to promulgate rules to address climate change through greenhouse gas regulation.  Exhibit 2, *Duryea v. R.I. Dept. of Envtl. Mgmt.,* Defs. Mem. In Support of Motion to Dismiss, No. PC-2018-7920 (R.I. Sup. Ct. filed Dec. 11, 2019).  DEM's stated reasons for denying the petition included that the rulemaking actions sought "were not actions [DEM] was prepared to take," and "would be unprecedented." *Id*. at 3.  DEM further explained "the myriad ways that the Department is currently working at a state and regional level to address many of the issues raised by Plaintiffs," and that climate change is an issue "the agency is actively working on each day, across all of its divisions." *Id*.  This Court defining climate change adaptation engineering for regulated coastal facilities for purposes of "best management practices" and "good engineering practices" would be no less unprecedented, and DEM is likewise currently working with CMRC and others to address the issues raised by CLF's claims.

new regulatory standard will extend beyond this facility because the potential risks from climate change are unquestionably not limited to this one terminal, and the State acknowledges that "good engineering practices" and "implementation of BMPs" are standard requirements for DEM permittees.  ECF No. 49 at 23.  The State concedes that "the Court would objectively determine the industry standard for similarly situated facilities." *Id*. at 25.

The existence of these broad and varied interests belies the State's claim that CLF's climate change –related causes of action can be properly resolved by simply weighing the testimony of the parties' experts.  *See* ECF No. 49 at 14, 18, 25, 26.  Here the interests of the parties in this case are far narrower than all the considerations the Court must take into account.  For example, the TAC effectively states that proper engineering may necessitate relocation of the Terminal.  ECF No. 45 ¶¶ 413, 425.  If that is the testimony of CLF's experts, how will the Court account for state and regional interests in ensuring reliable fuel supplies, particularly during times of emergency?  DEM on the other hand, is required to account for and balance these interests, and is, in fact, currently engaged in this policy and regulatory work in coordination with OER, CMRC, and other expert agencies.  *See* Exhibit 1, DEM Letter at 4 (describing "coordinated response" by "key executive agencies" including DEM, CMRC, and OER).[2]

This is exactly the circumstance that the prudential doctrines of primary jurisdiction and *Burford* abstention are intended for.  *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd*., 633 F.3d 20, 30 (1st Cir. 2011) (abstention appropriate when a plaintiff asks the "district court [to] become the regulatory decision-making center") (internal quotations omitted) (quoting *Vaqueria Tres*

---

[2] CLF can and does participate in these state policy and rulemaking efforts through public comments.  *See, e.g*., Tricia Jedele, Conservation Law Foundation, Inc., Public Comments on CMRC Ocean Special Area Management Plan, Global Climate Change Chapter, Record Nos. 383, 407 (June 28, 2010), http://www.crmc.ri.gov/samp_ocean/archive/300_climate_6.28.10.pdf (commenting on "increasing storm intensity" at Port of Providence and that "substantial changes need to be made to the way we permit and zone our coastal areas in the face of sea level rise and storm intensity").

*Manjitas, Inc. v. Irizarry*, 587 F.3d 464, 473 (1st Cir. 2009)); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (*Burford* counsels in favor of abstention in order to "retain[] local control over 'difficult questions of state law bearing on policy problems of substantial public import' …." (citation omitted)). As described below and in Defendants' briefs, the Court has the power to exercise its discretion to defer in favor of these expert agencies, and to the extent the State suggests otherwise, it is wrong as a matter of law.

      2.      <u>Primary jurisdiction and abstention are *prudential* doctrines, not *jurisdictional*</u>.

Primary jurisdiction and abstention are important prudential doctrines that allow federal courts to avoid unnecessarily treading into areas best suited for agency resolution or state policy-making. The State's argument that Congress "insulated" citizen suits from these doctrines is simply wrong under the law.[3] Primary jurisdiction may be applied "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. . . ." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956); *see also Quackenbush*, 517 U.S. at 727 (federal court may abstain "if its adjudication in a federal forum 'would be disruptive to state efforts to establish a coherent policy with respect to a matter of substantial public concern'") (*quoting New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989)). As Judge Wolf found when considering and rejecting the same arguments when made by CLF, "the question is not whether

---

[3] The State was also incorrect in stating that primary jurisdiction limits a court to issuing a stay, and prohibits dismissal, citing *Ass'n of Intern. Auto. Mfrs., Inc. v. Commissioner, Mass. Dept. of Environmental Protection,* 196 F.3d 302, 304 (1999) ("*AIAM*"). *See* ECF No. 49 at 9. *AIAM* does not state this. In *Reiter v. Cooper* the Supreme Court held that when a court applies primary jurisdiction it has discretion to retain jurisdiction "or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." 507 U.S. 258, 268–69 (1993). In the current posture, deferral to ongoing state processes and dismissal without prejudice of CLF's climate change – related claims poses no disadvantage to CLF. These claims do not allege any ongoing harm, only future harm. CLF's remaining claims that allege ongoing harm are not subject to the pending motion and CLF can litigate them. The State did not dispute that the Court may dismiss claims subject to *Burford* abstention.

the court <u>must</u> stay litigation, but rather whether the court <u>should</u> stay litigation." *ExxonMobil Corp.,* 2020 WL 1332949 at *10 (emphasis in original).

      3.      <u>The State's abstention and primary jurisdiction analysis is legally and factually flawed</u>.

The State's conclusion that abstention does not apply to CLF's climate change –related claims is undermined by its own admissions, and further, it ignores critical facts known to the State and controlling law.

The State argues that the first *Chico* factor, "the availability of timely and adequate state-court review" is not present for CLF, *see* ECF No. 49 at 22 (*quoting Chico*, 633 F.3d at 32), but conveniently omits the fact that CLF chose not to participate in DEM's public comment process to address its climate change –related concerns, a process which would have provided for state-court review. The chronology of these events bears repeating here. CLF brought this suit alleging violations of the Terminal's Clean Water Act RIPDES permit, issued by DEM. During the June 27, 2018 hearing on Defendant's motion to dismiss, it was stated on the record that DEM had issued a draft permit as part of the Terminal's permit renewal process, the deadline for public comments on the draft permit fell three weeks later on July 20, 2018, and that if CLF requested a hearing it would be granted one because CLF has more than 25 members. Exhibit 3, Hr'g Tr. at 5-6, 22, 74 (June 27, 2018). CLF did timely submit comments to DEM, including on the content of the SWPPP required under the permit. ECF No. 45-12 at 2-4. DEM responded to those comments and sought changes to the Terminal's SWPPP in response. *Id*. *But*, CLF chose not to raise in its comments to DEM the permit issues raised in this case, such allegedly inadequate best management practices. *Id*.

The State acknowledges that if CLF had challenged the adequacy of the permit, and "failed to appeal the Permit under the APA, it is plausible that Plaintiff's failure to avail itself of

6

its APA appeal rights and procedures would weigh in favor of abstention." ECF No. 49 at 22. However, that CLF chose not to take this path is notably absent from the State's discussion. This situation is analogous to *Allstate v. Subbagh*. 603 F.2d 228, 234 (1st Cir. 1979) (affirming dismissal under *Burford* of federal constitutional and civil rights claims regarding insurance rate-setting where plaintiff "elected to bypass the statutory review proceeding" provided under Massachusetts law). There the First Circuit held *Burford* abstention is proper where a claim threatens disruption of a state regulatory scheme, notwithstanding where the plaintiff "made the tactical decision to try to pursue its action in federal court rather than take the case directly to the [state court]." *Id*. at 234. The Court of Appeals recognized in *Sabbagh* that applying abstention in this circumstance might result in the plaintiff being unable to pursue its claim, but stated that responsibility "must lie with the appellant." *Id*.

      The First Circuit's reasoning in *Subbagh* applies squarely here. CLF elected not to utilize state processes intended to address concerns about RIPDES permits and to forgo state court review. The responsibility for that decision lies with CLF and should not be used to undermine the purposes of *Burford* abstention, which is intended to protect the proper functioning of those same state processes. *Id.; see also, Kilroy v. Mayhew*, 841 F. Supp. 2d 414, 421 (D. Me. 2012) ("Instead of filing this action, Plaintiff could have appealed his food assistance benefits determination to the state Superior Court, and, if unsuccessful there, to the Law Court. The Court concludes that Plaintiff's effort to circumvent this timely and adequate state court procedure triggers a fundamental concern of *Burford* abstention—specifically, having the district court become the "regulatory decision-making center" and creating a dual review structure for adjudicating Maine regulatory actions.").

The second and third *Chico* factors favor abstention as well. As discussed above, if the Court will be "determin[ing] the industry standard for similarly situated facilities," ECF No. 49 at 25, and importing that standard into DEM's permit language as it applies to climate change, it will be regulating. Interference with ongoing Rhode Island policymaking and conflict with state proceedings is highly likely. *See supra* § 1.

With regard to primary jurisdiction, Defendants disagree with the State's analysis of that doctrine as well. Judge Wolf also disagreed with largely the same arguments when ruling that every factor favored applying primary jurisdiction to nearly identical claims by CLF. *ExxonMobil Corp.,* 2020 WL 1332949 at *9-*14.

The State's arguments do not lead to a result different here. The State asserts that "enforce[ment]" of DEM standards, and evaluating whether circumstances "constitute an imminent and substantial endangerment to health or the environment" "do not lie at the heart of the permitting agency's tasks." ECF No. 49 at 12, 16 (internal quotations and citations omitted). It is astonishing that the State would say enforcing its regulations and addressing endangerments to health and the environment do not lie at the heart of its mission. The Director of DEM is statutorily mandated under Rhode Island law to do these things, and EPA delegated authority to DEM to administer these programs based on DEM's representation that it would do so. *See* R.I. Gen. Laws §§ 46-12-3; 23-19.1-16; Mem. Of Agreement Between Div. of Water Res. of DEM and Reg. Admin., Reg. 1, U.S. EPA, Regarding the Admin. and Enforcement of the Nat'l Pollutant Discharge Elimination Sys. (NPDES) at 26 (Sept. 17, 1984) ("DWR will ensure that any pollution . . . which is presenting an imminent and substantial danger to the health or welfare of persons, is immediately subjected to appropriate enforcement proceedings."). Despite the arguments made in its brief, DEM cannot absolve itself of these mandated tasks.

Finally, the State does not dispute it has the expertise to address CLF's questions, *see, e.g.,* ECF No. 49 at 18 ("[t]here is no doubt RIDEM possesses the expertise"), and it cannot be disputed that DEM is engaged in ongoing work to address these questions. *See e.g*., R.I. Div. of Planning, *Water Quality 2035 – R.I. Water Quality Mgmt. Plan* at 7-14 (Oct. 13, 2016) (stating DEM and CRMC are developing new stormwater management design standards to account for potential climate change impacts). But DEM tells the Court that it can forgo DEM's expertise and disregard the State's ongoing planning, and instead decide how potential climate change impacts apply to DEM's permits based on extrinsic expert testimony on industry standards for "best management practices" and "good engineering practices." ECF No. 49 at 18. The cases cited by DEM, *NRDC v. Los Angeles*, 725 F.3d 1194, 1205 (9th Cir. 2013), *O'Connor v. Boeing North American, Inc*., 2005 WL 6035255 at *25 (C.D. Cal. 2005); *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 908 (S.D.N.Y. 1995), and *Arkansas River Power Authority v. Babcock & Wilcox Power Co*., 2016 WL 9734684 (D. Colo. 2016), do not support this position.

The Ninth Circuit did not say in *NRDC* that expert evidence was needed to determine industry standards, but rather to assist the court in its obligation in interpreting an NPDES permit to "determine the *intent of the permitting authority*." 725 F.3d at 1207 (*quoting Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD*, 268 F.3d 255, 270 (4th Cir. 2001)). *O'Connor* and *Arkansas River Power Authority* considered expert evidence to determine an applicable duty of care, but those were tort cases. *O'Connor*, 2005 WL 6035255 (personal injury and wrongful death claims); *Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, 2015 WL 2128312 (D. Colo. May 5, 2015) (breach of contract, negligence, misrepresentation, and fraud claims). Finally, *City of New York* considered expert evidence on whether a SWPPP contained "good

9

engineering practices," but specifically to inform a highly detailed set of agency guidelines. 891 F. Supp. at 915. In contrast, here the Court would be stepping into a void with no guideposts from the agency to inform its intent.

Dated: September 10, 2020                   Respectfully submitted,

                                            s/ Bina Reddy

                                            Robert D. Fine (RI Bar # 2447)
                                            Chace, Ruttenberg & Freedman, LLP
                                            One Park Row, Suite 300
                                            Providence, RI 02903
                                            Ph (401) 453-6400
                                            Fax (401) 453-6411
                                            rfine@crfllp.com

                                            John S. Guttmann (admitted *pro hac vice*)
                                            Beveridge & Diamond, P.C.
                                            1350 I Street, NW, Suite 700
                                            Washington, DC 20005
                                            Ph (202) 789-6020
                                            Fax (202) 789-6190
                                            jguttmann@bdlaw.com

                                            Bina Reddy (admitted *pro hac vice*)
                                            Beveridge & Diamond, P.C.
                                            400 W. 15th Street, Suite 1410
                                            Austin, TX 78701
                                            Ph (512) 391-8045
                                            Fax (512) 391-8099
                                            breddy@bdlaw.com

                                            *Counsel for Defendants*

## CERTIFICATE OF SERVICE

    I hereby certify that on September 10, 2020, the foregoing Defendants' Response to Brief of Amici Curiae State of Rhode Island and Rhode Island Department of Environmental Management was filed through the Court's electronic case filing system ("ECF"), by which means the document is available for viewing and downloading from the ECF system for all ECF registered parties.

                                                        s/ Bina Reddy
                                                        Bina Reddy