**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> EQUILON ENTERPRISES LLC (d/b/a SHELL OIL PRODUCTS US), SHELL OIL COMPANY, SHELL PETROLEUM, INC., SHELL TRADING (US) COMPANY, MOTIVA ENTERPRISES LLC, TRITON TERMINALING LLC, and EQUILON ENTERPRISES LLC, <br><br> *Defendants.* | C.A. No. 1:17-cv-00396-WES-PAS |

## PLAINTIFF CONSERVATION LAW FOUNDATION'S STATEMENT OF ADDITIONAL FACTS NOT IN DISPUTE

Pursuant to Local Rule Civil 56(a)(4), Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") respectfully submits this Statement of Additional Facts Not in Dispute in support of its Opposition to Defendants' Motion for Partial Motion for Summary Judgment on Counts 1–7, 9, and 10 asserted by Plaintiff CLF in its Third Amended Complaint, ECF 45.

### The Individual Stormwater Discharge for the Providence Terminal

1.     On February 14, 2011, the Rhode Island Department of Environmental Management ("RIDEM") through the Rhode Island Pollutant Discharge Elimination System ("RIPDES") issued Defendant Motiva Enterprises LLC ("Motiva") an Individual National Pollutant Discharge Elimination System ("NPDES") Permit that authorized the Providence Terminal ("Terminal") to discharge pollutants into the Providence River under certain conditions (the "2011 Permit"). *See* 2011 Permit, ECF 45-1.

2.      The 2011 Permit became effective on April 1, 2011. *Id.* at 1[1].

3.      Defendant Motiva owned and operated the Terminal since before April 1, 2011, until May 1, 2017.

4.      The 2011 Permit expired on April 1, 2016, and was administratively continued pending the issuance of a new permit. *See* 2019 Permit, ECF 45-12 at 6.

5.      Prior to May 1, 2017, Defendant Motiva was a joint venture between SOPC Holdings East LLC (a directly owned subsidiary of Shell Oil Company at the time) and Saudi Refining, Inc. Ans. ¶ 26 at 8. SOPC Holdings East LLC's interest in Defendant Motiva was separated on May 1, 2017. *Id.*

6.      On May 1, 2017, Triton Terminaling LLC ("Triton Terminaling"), a subsidiary of Shell Oil Company, assumed direct ownership and operational authority over the Providence Terminal and the 2011 Permit, which was still in effect. *See* 2011 Permit.

7.      On January 30, 2019, RIDEM issued a renewed NPDES Permit for the Providence Terminal, which became effective on March 1, 2019 (the "2019 Permit"). 2019 Permit at 6.

8.      The 2019 Permit is issued to Triton Terminaling and names Shell Oil Products US as the owner of the Terminal. 2019 Permit at 6.

9.      The 2019 Permit expired on March 1, 2024, and has been administratively continued pending RIDEM's issuance of a new RIPDES Permit for the Providence Terminal. *See* 2019 Permit.

10.     The Providence Terminal is presently subject to the terms of the 2019 Permit. *See* 2019 Permit.

---

[1] Pin cites to docketed entries and to new exhibits that will be docketed refer to the ECF header page number rather than the printed page.

**Defendants Obligations Under the 2011 and 2019 Permits**

11.     Under the 2011 and 2019 Permits, Defendants are authorized to discharge stormwater associated with industrial activity into the Providence River if they fully comply with every permit term.  2019 Permit at 26; 2011 Permit at 21.

12.     The permits obligate Defendants to develop a Storm Water Pollution Prevention Plan ("SWPPP") that adheres to good engineering practice. The purpose of the SWPPP is to implement Best Management Practices ("BMPs") designed to cut down on or remove pollutants from the Terminal's storm water discharges and to guarantee compliance with the permits.  *See* 2019 Permit at 11;  2011 Permit at 12.

13.     The SWPPP must include the following four elements:

- A description of potential pollution sources at the facility.

- A description of appropriate storm water management controls, which must then be implemented.

- A plan for conducting site inspections.

- Confirmation that the SWPPP is consistent with other relevant plans.

*See* 2019 Permit at 12-16.

14.     The permit requires the SWPPP to include a list of minimum "storm water management controls" that must be both described in the plan and implemented at the facility. One of these required controls is specifically titled "Storm Water Management."

Accordingly:

The SWPPP must contain a narrative consideration of the appropriateness of traditional storm water management practices. Based on an assessment of the potential of various sources at the plant to contribute pollutants to storm water discharges associated with industrial activity (see Part C.5.b.2 of this permit), the SWPPP must provide that measures, determined to be reasonable and appropriate, must be implemented and maintained.

*Id*. at 19

15.     RIDEM explained its reasoning for the SWPPP requirements in a document called the Statement of Basis. RIDEM determined that because the facility stores and handles certain toxic or hazardous pollutants (as defined by the Clean Water Act), its operations could cause "significant amounts of these pollutants [to reach] the Providence River." 2019 Permit at 32–33. "To control these activities/operations, [...,] the permit requires this facility to develop a Storm Water Pollution Prevention Plan (SWPPP) containing BMPs appropriate for this specific facility." *Id* at 33.

16.     The purpose of the Terminal's SWPPP is to "identify potential sources of pollution and outline specific management activities designed to minimize the introduction of pollutants into stormwater, including stormwater resulting from the types of severe precipitation and flooding described in Section I.V.(a) of CLF's Third Amended Complaint."  Ex. A, Defs.' Resp. to CLF's First Set of Irrogs. (Aug. 27, 2021) at 15–17 (ROG 6).

17.     Section I.V.(a) of CLF's Third Amended Complaint (ECF 45) references the following types of severe precipitation and flooding:

•       Severe or intense precipitation events.  ¶ 159.

•       Increased annual amount of precipitation in Rhode Island since 1970, which has increased by 6–11 percent over that time.  ¶ 164.

•       The increase in the amount of precipitation falling in the heaviest one percent of all daily events, which is increased by 71 percent in Rhode Island between 1958 and 2012. ¶ 165.

•       A significant increase in flood frequency and flood severity in Rhode Island over the past 80 years. ¶ 176.

- A 1954 weather event in Providence, Rhode Island that saw downtown Providence flooded by 12 feet of water. ¶ 182.

- Wave action that can impact the group of above-ground storage tanks at the Terminal closest to the Providence River. ¶ 189.

- Flooding exacerbated by storms and storm surges and sea level rise. ¶ 190.

- An increase in in tropical cyclone activity in the North Atlantic since 1970. ¶ 193.

- Increasing significant wave heights since at least the mid-1970s. ¶ 195.

- Storm surge associated with nor'easters due to sea level rise. ¶ 196.

- A storm surge of more than 15 feet with wave heights measuring 10 feet above surge levels that Providence experienced in 1938 and which demolished the wharves of the inner harbor. ¶ 201.

- An increase in sea level rise that interacts with tides, heavy precipitation and storm surge.  ¶ 216.

### **Good Engineering Practices**

18.     The 2019 Permit states that a SWPPP must be "maintained and implemented" by Defendants.  2019 Permit (ECF 45-12) at 16, § I.C.1. at 11.

19.     The 2019 Permit requires Defendants to prepare its SWPPP using "good engineering practices." *Id.*

20.     The 2019 Permit requires Defendants' SWPPP to "describe and ensure the implementation of Best Management Practices (BMPs)." *Id.*

21.     The 2019 Permit requires Defendants' BMPs to "reduce or eliminate the pollutants in storm water discharges associated with industrial activity and to assure compliance with the terms and conditions of [the 2019 Permit]." *Id.*

22.     The 2019 Permit states that Defendants "must develop a description of storm water management controls appropriate for the facility and implement such controls." *Id.* at 17, § I.C.5.b.

23.     The 2019 Permit states that "the appropriateness for implementing controls listed in the SWPPP must reflect identified potential sources of pollutants at the facility." *Id.*

24.     Defendants violate the 2019 Permit if they do not use "good engineering practices" to prepare or implement any aspect of the required SWPPP.  2019 Permit at 16, § 1.C.1. pg. 11.

25.     Defendants do not argue that the term "good engineering practice" is without meaning.  *See* ECF 240-1.

26.     Defendants do not offer any interpretation of what the term "good engineering practice" means.  *See* ECF 240-1.

27.     Defendants do not argue the 2019 Permit requirement for preparing a SWPPP for the Terminal using "good engineering practice" is an unenforceable condition of the permit.  *See* ECF 240-1.

28.     Defendants do not argue that the 2019 Permit exempts them from complying with each condition of the permit during severe weather events. *See* ECF 240-1.

29.     Defendants do not argue that the 2019 Permit provides an exception for complying with each condition of the permit during severe weather events. *See* ECF 240-1.

30.     Defendants do not argue that the 2019 Permit exempts them from complying with each condition of the permit when the amount of precipitation experienced at the Terminal substantially exceeds what is normal. *See* ECF 240-1.

31.     Defendants do not argue that the 2019 Permit exempts them from complying with each condition of the permit if the amount of precipitation is greater during the life of the permit than before the permit was issued. *See* ECF 240-1.

32.     Defendants do not argue that the 2019 Permit exempts them from complying with each condition of the permit if the Terminal is inundated due to flooding.  *See* ECF 240-1.

33.     Defendants do not argue the 2019 Permit exempts them from complying with each condition of the permit if the Terminal experiences storm surge. *See* ECF 240-1.

34.     Defendants do not argue the 2019 Permit exempts them from complying with each condition of the permit during a hurricane. *See* ECF 240-1.

35.     Defendants do not argue the 2019 Permit exempts them from complying with each condition of the permit during a nor'easter.  *See* ECF 240-1.

36.     The 2019 Permit requires the permittee to prepare, maintain, and implement the SWPPP for the terminal; not RIDEM. 2019 Permit § I.C.1.

37.     The term "good engineering practice" in the 2019 Permit is not without meaning. *See* ECF 240-1.

38.     The term "good engineering practice" is written in plain language.  *See* ECF 240-1.

39.     The 2019 Permit requirement for preparing a SWPPP for the Terminal using "good engineering practice" is an enforceable condition of the permit.  *See* ECF 240-1.

40.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit during severe weather events. *See* ECF 240-1.

41.     The 2019 Permit does not provide an exception for complying with each condition of the permit during severe weather events. *See* ECF 240-1.

42.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit when the amount of precipitation experienced at the Terminal substantially exceeds what is normal. *See* ECF 240-1.

43.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit if the amount of precipitation is greater during the life of the permit than before the permit was issued. *See* ECF 240-1.

44.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit if the Terminal is inundated due to flooding.  *See* ECF 240-1.

45.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit if the Terminal experiences storm surge. *See* ECF 240-1.

46.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit during a hurricane. *See* ECF 240-1.

47.     The 2019 Permit does not exempt Defendants from complying with each condition of the permit during a nor'easter.  *See* ECF 240-1.

48.     The 2019 Permit requires the permittee to prepare, maintain, and implement the SWPPP for the Terminal; not RIDEM. 2019 Permit § I.C.1.

### Severe Weather and Climate Change Risk Experience and Engineered Mitigation Measures at Terminals

49.     Defendant Motiva owned and operated a bulk fuel storage terminal in Sewaren, New Jersey (hereinafter, the "Sewaren Terminal") in 2012 when Hurricane Sandy impacted the east coast of the United States. Ex. B, Dep. Tr. of M. Sullivan – 30(b)(6) at 39:21-40:2.

50.     Defendant Motiva was a joint venture between a subsidiary of Shell, SOPC Holdings East LLC (a direct owned subsidiary of Shell Oil Company), and a subsidiary of Saudi Aramco. Defs. Answer to Third Am. Compl., ECF 57 at ¶ 26.

51.     During Hurricane Sandy, the Sewaren Terminal was inundated due to flooding. Ex. B, Sullivan 30(b)(6) at 143:6–144:16.

52.    During Hurricane Sandy, the Sewaren Terminal suffered a catastrophic failure of at least one above-ground storage tank that resulted in the discharge of over 300,000 gallons of diesel fuel from that terminal into the surrounding environment. *Id.*

53.    The Sewaren Terminal's structural or other measures in place were not sufficient to prevent the catastrophic tank failure and subsequent release of over 300,000 gallons of diesel fuel from that Terminal into the environment. *Id.* at 146:18–148:14; 159:18-21.

54.    Defendants did not investigate the cause(s) of the Sewaren Terminal spill that occurred during Hurricane Sandy. *See id.* at 154:19-156:4; Ex. C,  Pl.'s 30(b)(6) Deposition Notice, Topic 6 at 6 (Topic 6 for the Rule 30(b)(6) deposition of Defendants Equilon Enterprises, Triton Terminaling, and Motiva is "The loss of containment event at the Sewaren Terminal during Hurricane Sandy, including investigations or audits about causes or contributing factors to the loss of containment"); *see also* Ex. B at 11:17-21 (designee testifying on behalf of Defendants Equilon Enterprises, Triton Terminaling, and Motiva).

55.    Defendant Motiva did not document any investigation it conducted on the cause(s) of the Sewaren Terminal spill. *Id.*

56.    Following Hurricane Sandy, the New York State Energy Research and Development Authority initiated an assessment to characterize the state of the petroleum terminal system in New York State, including actions taken or underway to harden the terminals against future natural disasters and to improve their resiliency. "New York State Petroleum Terminal Resilience Assessment. Ex. D (the "Terminal Resiliency Assessment") at 15.

57.    In March 2014, ICF International submitted a report to the New York State Energy Research and Development Authority ("NYSERDA") titled "New York State Petroleum Terminal Resiliency Assessment. Ex. D (the "Terminal Resiliency Assessment"). The report focused on the

petroleum systems in New York State and involved two surveys that fifty-five terminals responded

to and visits to 19 terminals. *Id.* at 10–11.

58.    The Terminal Resiliency Assessment states that "Shell (through its joint-venture

Motiva)" is one of two "'supermajors' that own and operate [New York State] terminals." *Id.* 33.

59.    The Terminal Resiliency Assessment states, "Terminals located in low-lying areas

in close proximity to large bodies of water have taken measures to protect their facilities against

flooding, including elevating electrical systems; protecting cabling; and installing berms, levees,

or floodwalls to protect their facilities. All of the terminals that reported taking these measures

were located in Downstate New York, where storm and flood risk is highest. Some terminals made

these investments years ago, while others have made investments as a direct result of their

experiences with Superstorm Sandy. For terminals at vulnerable sites, these measures are essential

because flooding can cause the most severe damage to terminal facilities." *Id.* at 13.

60.    Some terminals in New York have invested in flood protection measures including

installing berms, levees, or floodwalls to protect their facilities from flooding. *Id.*

61.    Some terminals in New York made investments to protect their facilities against

flooding before Superstorm Sandy. *Id.*

62.    Some terminals in New York made investments to protect their facilities against

flooding years before Superstorm Sandy. *Id.*

63.    Terminals in New York located in areas where storm and flood risk is highest have

taken measures to protect their facilities against flooding. *Id.*

64.    Terminals in New York located in areas where storm and flood risk is highest have

taken measures to protect their facilities against flooding because of Superstorm Sandy's impacts.

*Id.*

### Shell's Knowledge of Severe Weather and Climate Change Impacts on its Facilities and Related Engineering Standards and Guidelines

65.     Reports conducted or commissioned by companies within the Shell Group of companies contain information concerning the impacts of climate change on Shell Group facilities. Ex. E, Defs' Resp. to Pl.'s First Req. for Admis., at 35 (RFA 5).

66.     Steps have been taken to adapt certain Shell Group facilities to risks related to climate change. *Id.* at 46 (RFA 7).

67.     There are Shell Design Engineering Practices ("DEPs") referencing climate change that are dated before August 28, 2017. *Id.* at 51 (RFA 8).

68.     The Shell Group of companies has employed people with expertise in aspects of risks and/or impacts related to climate change. *Id.* at 56 (RFA 9).

69.     The Shell Group of companies employs people with expertise in the field of metocean. *Id.* at 61 (RFA 10).

70.     Reports conducted or commissioned by Shell Group companies contain information concerning the impacts of climate change on certain Shell Group facilities. *Id.* at 81 (RFA 14).

71.     Defendants are aware of Shell DEPs that reference risks and/or impacts related to climate change. *Id.* at 96 (RFA 17).

72.     Defendants admit there are reports conducted or commissioned by Shell Group companies which contain information concerning certain recommended engineering practices in place for certain Shell Group facilities that take into consideration risks and/or impacts related to climate change. *Id.* at 116 (RFA 21).

73.     Reports conducted or commissioned by Shell Group companies contain information concerning recommended engineering and/or design practices that take certain aspects

of risks and/or impacts related to climate change at certain Shell Group facilities into consideration. *Id.* at 122 (RFA 22).

74.     Defendants have had the practical ability to obtain Shell DEPs that reference climate change risks since before August 28, 2017. *Id.* at 138–142 (RFA 26).

75.     Defendants have had the practical ability to identify some Shell Group Employees who have subject matter expertise concerning climate change impacts since before August 28, 2017. *Id.* at 143–147 (RFA 27).

76.     Defendants have had the practical ability to identify some DEPs that reference climate change risks since before August 28, 2017. *Id.* at 159–163 (RFA 30).

77.     Defendants have the practical ability to obtain at least some reports conducted or commissioned by Shell Group companies regarding the impacts of climate change on Shell Group facilities. *Id.* at 164–168 (RFA 31).

78.     Defendants were aware of studies indicating climate change made Hurricane Sandy worse before August 28, 2017. *See id.* at 206–2010 (RFA 39).

79.     Defendants are aware of scientific studies that conclude sea level rise driven by anthropogenic climate change contributed to damages from Hurricane Sandy. *Id.* at 214 (RFA 40).

### Shell Design Engineering Practices and Guidelines Addressing Climate Change

80.     Since at least 2010, ███████████████████████████████
███████████████████████████ Ex. F, Water Risks – Climate Change – Tools: a review at 21.

81.     Defendants have a centralized engineering and science team that evaluates hazards and creates engineering requirements for all entities and contractors across the Shell Group as to how facilities must be designed, constructed, operated, and maintained. *See* Ex. G, Defs.' Penny Decl. (May 23, 2023), at 3–5.

82.     These requirements are published in Shell DEP documents, which are comprised of a "Specification" document that lays out requirements and an accompanying "Informative" document that explains the background and context requirements in the Specification. *Id.*

83.     As early as 2011, Defendants' "DEP Informative Metocean[2] Design and Operating Considerations (Endorsement of ISO 19901-1:2005)" ████████████████████████ ████████████████████████████████████████ Shell Global Sols. Int'l B.V., *DEP Informative Metocean Design and Operating Considerations (Endorsement of ISO 19901-1:2005)* (Feb. 2011) ("2011 DEP Informative"), Ex. H.

84.     The 2011 DEP Informative ████████████████████████████████ ██████████████████████ *Id.* at 5. ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ *Id.*

85.     That 2011 DEP Informative ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ *Id.* at 8. ██████████████████████████ ██████████ *Id.* ████████████████████████████████ ██████████████ *Id.* at 9.

86.     The 2011 DEP Informative ████████████████████████████ ████████████████████████████████████████████

---

[2] Metocean is a compound term of meteorological and oceanographic.

███████████████████████████████████████████████████████

████████ *Id.* at 8–9.

87.    Dr. Paul Verlaan, a Senior Metocean Engineer who has been with Shell since 2002,

testified ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ Dep. Tr. of P.

Verlaan, (Mar. 20, 2025), Ex. I at 49:21–50:6.

88.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ 2011 DEP Informative; Dep. Tr. of P.

Verlaan (Mar. 20, 2025), Ex. I at 49:21–50:6.

89.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ Dep. Tr. of P. Verlaan at 152:7–22; *see id.* at 48:1-51:20.

90.    ███████████████████████████████████████████

████████████████████ Ex. J Shell Global Sols. Int'l B.V., *DEP Informative*

*Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption*

*to Climate Change* (Feb. 2015) (hereinafter "2015 Adaptation DEP"). ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ *Id.* at 6.

91.    The 2015 Adaptation DEP Informative ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████ *Id.* at 8.

92.    The 2015 Adaptation DEP Informative ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ *Id.* at 9.

93.    The 2015 Adaptation DEP Informative ████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 12.

94.    The 2015 Adaptation DEP ███████████████████████████████████

██████████████████████████████████████ *Id.* at 16

95.    The 2015 DEP titled "Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption to Climate Change," ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████

Shell Global Sols. Int'l B.V., *DEP Informative Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption to Climate Change* (Feb. 2015), *Id.* at 16.

96.    The 2015 Informative ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████  *Id.*

97.    The 2017 DEP titled "Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplement to ISO 19901-1:2015)"

████████████████████████████████████████

████████████████████████████████████████

███████████████  Shell Global Sols. Int'l B.V., *Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplements to ISO 19901-1:2015)* (Feb. 2017), Ex. K.

98.    This 2017 DEP Informative ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████  *Id.* at 5.

99.    Dr. Verlaan ████████████████████████

Verlaan Tr., Ex. I at 52:1–64:5 ████████████████████

██████████ .

100.    These DEPs are accompanied by and explicitly reference other ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *See id.*

at 234:1–259:20 ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████

101.    These documents include:

- A 2014 "Climate Risk Assessment: Pilot Project," Ex. L, ███████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████ Ex. L at 4.

- A 2016 document titled "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 1 Weather Risk Assessment and Mitigation," Ex. M, ███
███████████████████████████████████████████████████ Ex. M at 5.

- A 2016 document titled "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 2 Main Weather-Related Hazards & Considerations by Region," Ex. N, ███████████████████████████████████████
███████████████████████████████████████████████████ Ex. N at 5.

- A 2017 document titled "Metocean Design and Operating Considerations – Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation," Ex. O, ███████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████ Ex. O at 4.

- A 2020 document titled "Climate Change Impact and Adaptation," Ex. P, ███



Ex. P at 41.

102.    Defendants have applied these required Shell-wide practices when analyzing some of their other facilities in the United States, and they have concluded that some of their facilities will be under water due to sea level rise before the end of the facilities' lives. *See* ECF 119-7, Jaramillo, et al., Extreme Coastal Inundation Under Different Climate Scenarios: Fourcon Junction Case Study (2021); Declaration of S. Jaramillo, ECF 139-3.

103.    Defendants have moved some of their facilities to higher ground, including elevating facilities in order to protect them from sea level rise and increased precipitation and storm surge.  Ex. Q, Defendants' 2021 disclosures in SEC filings related to their Port Fourchon facility where climate risks were assessed and the facility's tanks and building were moved and elevated to adapt to sea level rise concerns.

104.    In 2016, Shell completed a two-part guideline titled "Reducing Impact of Weather and Climate Hazards on Operations Shell's Assets" that covered "Weather Risk Assessment and Mitigation" and "Main Weather-Related Hazards and Considerations by Region."  Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 1 (ECF 233-3) and 2 (ECF 233-4) (hereinafter, "Shell Climate Guideline" 1 and 2).



105.    Shell's Climate Guideline 1 was

ECF 233-3 at 4.

106.    Shell's  Climate  Guidelines



ECF 233-3 at 4; ECF 233-4 at 5.

107. ███████████████████████████████████████

███████████████████████████████████████

ECF 233-3 at 5.

108.    Shell's Climate Guideline 1 ███████████████

███████████████████████████████████████

███████████████████████████████████████

ECF 233-3 at 18.

109.    Shell's Climate Guideline 1 ███████████████

███████████████████████████████████████

███████████████████████████████████████

ECF 233-3 at 29, 31.

110.    Shell's Climate Guideline 1 ███████████████

███████████████████████████████████ *Id.* at 31.

111.    Shell's Climate Guideline 1 ███████████████

███████████████████████████████████████

███████████████████████████████████ *Id.* at
53.

112.    Shell's Climate Guideline 1 ███████████████

███████████████████████████████████████

███████████████████████ *Id* at 31.

113.    Shell's Climate Guideline 1 ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *Id* at 54.

114.    In 2017, Shell published ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ ECF 233-5 at 11 ("2017 Adaptation Guideline").

115.    The 2017 Adaptation Guideline ████████████████████████

████████████████████████████████████████████████████████████

████████ *Id.* at 14.

116.    The 2017 Adaptation Guideline ████████████████████████

████████████████████████████████████████████ *Id.*

117.    The 2017 Adaptation Guideline ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.*

## DEFENDANTS HAVE NOT ASSESSED THE TERMINAL'S VULNERABILITY TO CLIMATE CHANGE IMPACTS.

118.    Climate change is occurring and warrants urgent action.  ECF 240-1 at 12.

119.    The only analyses Defendants have done of the impacts or potential impacts—including past, current, and future impacts—of climate change on the Terminal are limited to an evaluation of the Terminal's secondary containment areas using a 25-year, 24-hour storm event

for purposes of determining sufficient freeboard. *See* Ex. A, Defs.' Resp. to CLF's First Set of Irrogs. (Aug. 27, 2201) at 7–8 (ROG 2).

120.    Defendants have not made any physical changes to the Terminal to address risks associated with the frequency or severity of storms. *See id.* at 10–13 (ROG 3).

121.    Defendants have not made any physical changes to the Terminal to address risks associated with changes in the quantity of precipitation. *See id.*

122.    Defendants have not made any physical to the Terminal to address risks associated with climate change. *See id.*

123.    Defendants have not made any physical changes to the Terminal to prevent flooding. *See id.* at 10–15 (ROG 3–4).

124.    Defendants did not consider climate change when developing the SWPPP for its Terminal. *See id.* at 8–9 (ROG 2), and 15–17 (ROG 6).

### Rhode Island's New MSGP Permit

125.    On September 1, 2024, RIDEM issued a new multi-sector general permit ("MSGP") for industrial stormwater. *See* Ex. R.

126.    The 2024 RIDEM MSGP requires any person covered by the permit must use "good engineering practices" to minimize pollutant discharges from their facility. ECF 241-4 at 5.

127.    RIDEM issued a Fact Sheet about the 2024 MSGP.  *See* Ex. S.

128.    RIDEM's 2024 MSGP Fact Sheet does not reference the permit term "good engineering practice" as having been changed or modified from the previous MSGP. *See id.*

129.    RIDEM's 2024 MSGP Fact Sheet does not use the term "climate change."  *See id.*

130.    RIDEM's 2024 MSGP Fact Sheet does not reference either the Terminal's 2011 or 2019 RIPDES Permits. *See id.*

131.    RIDEM's 2024 MSGP Fact Sheet does not state RIDEM intended to change the meaning of any terms of any other permit by issuing the 2024 MSGP. *See id.*

132.    An individual permit holder cannot be covered by an otherwise applicable general permit. 40 C.F.R. § 122.28(b)(3)(iv) ("When an individual NPDES permit is issued . . . the applicability of the general permit to the individual NPDES permittee is automatically terminated . . . ."); 250-RICR-150-10-1(1.33)(C)(4) (same).

133.    If a facility covered by an individual permit wishes to be covered by a general permit, they must petition the regulatory agency to revoke the existing individual permit and the agency must agree to revoke the individual permit. 40 C.F.R. § 122.28(b)(3)(v); 250-RICR-150-10-1(1.33)(C)(5).

134.    Revocation of an individual permit cannot occur if there are any pending enforcement actions including citizen suits. 250-RICR-150-10-1(1.25)(B).

### EPA's MSGP

135.    On January 15, 2021, the EPA issued its responses to the public comments that it received regarding its NPDES 2021 MSGP. *See* Ex. T, EPA's Response to Public Comments to EPA NPDES 2021 MSGP, dated Jan. 15, 2021.

136.    In its responses, EPA did not express an opinion on the merits of CLF's interpretation of the 2015 MSGP requirements. *Id.* at 402–07.

137.    Likewise, EPA did not discuss the "good engineering practices" in its Response to Excerpt 4. *Id.* at 406.

138.    In response to CLF's Excerpt 4, EPA stated that because Section 2.1.1.8 was adding a new condition, rather than deleting or changing pre-existing language, it could not be backsliding. *Id.* at 406 ("[a]nti-backsliding simply does not apply to a new condition.")

139.    Additionally, after noting that it "does not agree that permanent, structural control measures are necessary to mitigate risks of pollution from major storm events," EPA further stated:

> However, EPA acknowledges that sometimes treatment devices or constructed/installed controls may be necessary, particularly where a facility might otherwise not meet water quality standards. EPA has added to the 2021 MSGP the following language, "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures will help to minimize impacts from stormwater discharges from major storm events, such as hurricanes, storm surge, extreme precipitation, and historic flood incidents."

*Id.* at 406

140.    In response to CLF's Excerpt 7, EPA stated:

> "EPA acknowledges that the use of 'good engineering practices' to develop control measures should consider flood risks EPA considers the specific provision contained in Part 2.1.1.8 necessary to confirm that operators have expressly considered control measures to mitigate impacts from stormwater discharges from major storm events."

*Id.* at 410.

141.    In response to a different Comment, EPA stated:

> To address the comment that EPA should strengthen the language in Part 2.1.1.8, EPA notes that the following language from Part 2.1 of the MSGP applies to the measures selected under Part 2.1.1.8, "The selection, design, installation, and implementation of control measures to comply with Part 2 must be in accordance with good engineering practices and manufacturer's specifications."

*Id.* at 400.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN THE DISTRICT OF CONNECTICUT

142.    The instant matter has been proceeding in tandem with another action brought by CLF in the United States District Court for the District of Connecticut ("Connecticut District Court") against some of the same defendants in this case.  *See Conservation L. Found., Inc. v. Shell Oil Co. et al*, No. 3:21-cv-00933 (JAM) (D. Conn.) ("Connecticut Matter").

143.    Parties in both cases have stipulated to share certain discovery. Ex. U, CT ECF 527.

144.     In the Connecticut Matter, CLF alleges, among other things, that the defendants have failed to comply with their New Haven terminal's NPDES permit's "best industry practices" requirement by not considering climate change. Ex. V, Mot. for Partial Summ. J. Hearing Tr. ("CT MPSJ Hearing Tr."), CT ECF 305 at 75:18–25 – 76:1–7.

145.     On June 13, 2023, the defendants in the Connecticut Matter moved for summary judgment in that case. *Id*. at 76:8–15

146.     In denying the Connecticut defendants' summary judgment motion from the bench, the late Judge Meyer explained that the term "best industry practice" is not ambiguous but, "[i]nstead, the parties seem to dispute, as a factual matter, whether best industry practice requires consideration of climate change for a facility like the Shell facility that sits adjacent to the New Haven Harbor." *Id*. at 84:17–22.

147.     Judge Meyer continued his reasoning in a written order issued that same day, stating:

> If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors.

Ex. W, *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-CV-00933 (JAM), ECF 302, Order Denying Mot. for Partial Summ. J. (D. Conn. Oct. 19, 2023).

Dated: July 15, 2025                              Respectfully submitted,

                                                  CONSERVATION LAW FOUNDATION,
                                                  Inc., by its attorneys

                                                  */s/ Kenneth J. Rumelt*
                                                  Christopher M. Kilian, Esq.*
                                                  Kenneth J. Rumelt, Esq.*
                                                  Anna Tadio*
                                                  Conservation Law Foundation, Inc.
                                                  15 East State Street, Suite 4

Montpelier, VT 05602
(802) 622-3020
(802) 223-5992 x4015
(802) 779-4621
krumelt@clf.org
ckilian@clf.org
atadio@clf.org

James Crowley, Esq.
RI Bar # 9405
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
(401) 228-1905
jcrowely@clf.org

Ana McMonigle*
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
(203) 298-7692
amcmonigle@clf.org

Chance Raymond*
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
(832) 671-6381
chancethelawyer@gmail.com

Vincent L. Greene (RI Bar # 5971)
Motley Rice LLC
40 Westminster Street, 5th Floor
Providence, RI 02903
(401) 457-7730
vgreene@motleyrice.com

Michael Pendell*
Motley Rice LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 218-2722
mpendell@motleyrice.com

Ridge Mazingo*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9620
rmazingo@motleyrice.com

*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, the foregoing <u>Statement of Additional Facts Not In Dispute</u> was filed through the Court's electronic filing system ("ECF"), through which the document is available for viewing and downloading from the ECF system, and a copy of the filing will be sent electronically to all parties registered with the ECF system.

<u>*/s/ Kenneth J. Rumelt*</u>

Kenneth J. Rumelt