# EXHIBIT Q

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

Form 20-F

(Mark one)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) or (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2021

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 001-32575

# Shell plc

*(Exact name of registrant as specified in its charter)*

England and Wales

*(Jurisdiction of incorporation or organization)*

Shell Centre

London, SE1 7NA

United Kingdom

*(Address of principal executive offices)*

Linda M. Coulter, Company Secretary

Shell Centre

London, SE1 7NA

United Kingdom

Telephone Number: 0044-20-7934-1234

E-mail Address: linda.coulter@shell.com

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered pursuant to Section 12(b) of the Act

| Title of Each Class | Trading Symbols | Name of Each Exchange on Which Registered |
|---|---|---|
| American Depositary Shares representing two ordinary shares of the issuer with a nominal value of €0.07 each | SHEL | New York Stock Exchange |
| 0.375% Guaranteed Notes due 2023 | SHEL/23B | New York Stock Exchange |
| 3.5% Guaranteed Notes due 2023 | SHEL/23 | New York Stock Exchange |
| Floating Rate Guaranteed Notes due 2023 | SHEL/23A | New York Stock Exchange |
| 2% Guaranteed Notes due 2024 | SHEL/24 | New York Stock Exchange |
| 3.25% Guaranteed Notes due 2025 | SHEL/25 | New York Stock Exchange |
| 2.5% Guaranteed Notes due 2026 | SHEL/26 | New York Stock Exchange |
| 2.875% Guaranteed Notes due 2026 | SHEL/26A | New York Stock Exchange |
| 3.875% Guaranteed Notes due 2028 | SHEL/28 | New York Stock Exchange |
| 2.375% Guaranteed Notes due 2029 | SHEL/29 | New York Stock Exchange |
| 2.75% Guaranteed Notes due 2030 | SHEL/30 | New York Stock Exchange |
| 4.125% Guaranteed Notes due 2035 | SHEL/35 | New York Stock Exchange |
| 6.375% Guaranteed Notes due 2038 | SHEL/38 | New York Stock Exchange |
| 5.5% Guaranteed Notes due 2040 | SHEL/40 | New York Stock Exchange |
| 2.875% Guaranteed Notes due 2041 | SHEL/41 | New York Stock Exchange |
| 3.625% Guaranteed Notes due 2042 | SHEL/42 | New York Stock Exchange |
| 4.55% Guaranteed Notes due 2043 | SHEL/43 | New York Stock Exchange |
| 4.375% Guaranteed Notes due 2045 | SHEL/45 | New York Stock Exchange |
| 3.75% Guaranteed Notes due 2046 | SHEL/46 | New York Stock Exchange |
| 4.00% Guaranteed Notes due 2046 | SHEL/46A | New York Stock Exchange |
| 3.125% Guaranteed Notes due 2049 | SHEL/49 | New York Stock Exchange |
| 3.25% Guaranteed Notes due 2050 | SHEL/50 | New York Stock Exchange |
| 3.00% Guaranteed Notes due 2051 | SHEL/51 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: none

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: none

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

Outstanding as of December 31, 2021:

4,101,239,499 A ordinary shares with a nominal value of €0.07 each.

3,582,892,954 B ordinary shares with a nominal value of €0.07 each.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  ☑ Yes  ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  ☐ Yes  ☑ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  ☑ Yes  ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  ☑ Yes  ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company.
See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.

Exhibit Q

† The term "new or revised financial accounting standards" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

| | | | |
|---|---|---|---|
| Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment on the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issues its audit report. | | ☑ | |
| Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing: | | U.S. GAAP | ☐ |
| International Financial Reporting Standards as issued by the International Accounting Standards Board. | | ☑ | Other ☐ |
| If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. | Item 17 | ☐ | Item 18 ☐ |
| If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). | | ☐ Yes | ☑ No |

Copies of notices and communications from the Securities and Exchange Commission should be sent to:

Shell plc

Shell Centre

London, SE1 7NA

United Kingdom

Attn: Linda M. Coulter

Exhibit Q

# TABLE OF CONTENTS

**Cover** 1
**Cross reference to Form 20-F** 7
**Terms and abbreviations** 9
**About this Report** 10
Shell Powering Progress 12
Strategy and outlook 18
Risk factors 23
Summary of results 41
Performance indicators 35
Liquidity and capital resources 37
Market overview 41
Integrated gas 44
Upstream 49
Oil and gas information 56
Oil Products 64
Chemicals 70
Corporate 73
Climate change and energy transition 74
Environment and society 98
Our people 113
The Board of Shell plc 119
Senior Management 126
Governance 128
Governance framework 129
Governance 131
Nomination and Succession Committee 136
Safety, Environment and Sustainability Committee 140
Audit Committee Report 142
Directors' Remuneration Report 156
Annual Report on Remuneration 161
Directors' Remuneration Policy 179
Governance 188
Report of Independent Registered Public Accounting Firm (ID: 13020134) 197
Consolidated Statement of Income 204
Consolidated Statement of Comprehensive Income 204
Consolidated Balance Sheet 205
Consolidated Statement of Changes in Equity 206
Consolidated Statement of Cash Flows 207
Notes to the Consolidated Financial Statements 208
  1. Basis of preparation 208
  2. Significant accounting policies, judgements and estimates 208
  3. Changes to IFRS not yet adopted 217
  4. Climate change and energy transition 219

| | | |
|---|---|---|
| 5. | Segment information | 223 |
| 6. | Interest and other income | 227 |
| 7. | Interest expense | 227 |
| 8. | Intangible assets | 227 |
| 9. | Property, plant and equipment | 228 |
| 10. | Joint ventures and associates | 232 |
| 11. | Investments in securities | 232 |
| 12. | Trade and other receivables | 233 |
| 13. | Inventories | 234 |
| 14. | Cash and cash equivalents | 234 |
| 15. | Debt and lease arrangements | 234 |
| 16. | Trade and other payables | 237 |
| 17. | Taxation | 237 |
| 18. | Retirement benefits | 239 |
| 19. | Decommissioning and other provisions | 245 |
| 20. | Financial instruments | 246 |
| 21. | Share capital | 252 |
| 22. | Share-based compensation plans and shares held in trust | 252 |
| 23. | Other reserves | 253 |
| 24. | Dividends | 255 |
| 25. | Earnings per share | 255 |
| 26. | Legal proceedings and other contingencies | 255 |
| 27. | Employees | 258 |
| 28. | Directors and Senior Management | 258 |
| 29. | Auditor's remuneration | 259 |
| 30. | Non-current assets held for sale | 259 |
| 31. | Emission schemes and related environmental plans | 260 |
| 32. | Post-balance sheet events | 261 |
| **Supplementary information - oil and gas (unaudited)** | | 262 |
| **Supplementary information - EU Taxonomy disclosure** | | 280 |
| **Report of Independent Registered Public Accounting Firm (ID: 13020134)** | | 283 |
| Statement of Income | | 284 |
| Statement of Comprehensive Income | | 284 |
| Balance Sheet | | 284 |
| Statement of Changes in Equity | | 285 |
| Statement of Cash Flows | | 285 |
| **Notes to the RDS Dividend Access Trust Financial Statements** | | 286 |
| 1. | The Trust | 286 |
| 2. | Basis of preparation | 286 |
| 3. | Significant accounting policies | 286 |
| 4. | Unclaimed dividends | 286 |
| 5. | Capital account | 286 |
| 6. | Distributions made | 286 |
| 7. | Related parties | 286 |
| 8. | Auditor's remuneration | 286 |

9.    Subsequent events                                                            286
Shareholder information                                                            287
Section 13(r) of the US Securities Exchange Act of 1934 disclosure                 293
Non-GAAP measures reconciliations                                                  294
Index to the exhibits                                                             298
Signatures                                                                        300
Financial calendar                                                                301

Exhibit Q

# CROSS REFERENCE TO FORM 20-F

Part I

| | | | Pages |
|---|---|---|---|
| Item 1. | Identity of Directors, Senior Management and Advisers | | N/A |
| Item 2. | Offer Statistics and Expected Timetable | | N/A |
| Item 3. | Key Information | | |
| | A. | [Reserved] | |
| | B. | Capitalization and indebtedness | N/A |
| | C. | Reasons for the offer and use of proceeds | N/A |
| | D. | Risk factors | 22-31 |
| Item 4. | Information on the Company | | |
| | A. | History and development of the company | 11,12-13, 16-21, 32-33, 36-39, 43-54, 63-72, 285, 292-296 |
| | B. | Business overview | 12-33, 43-72, 97-111, 261-281, 286 |
| | C. | Organizational structure | 15-17, Exhibit 8.1 |
| | D. | Property, plants and equipment | 15-17, 22-33, 43-72, 97-111, 261-278 |
| Item 4A. | Unresolved Staff Comments | | N/A |
| Item 5. | Operating and Financial Review and Prospects | | |
| | A. | Operating results | 22-39, 43-72, 245-250 |
| | B. | Liquidity and capital resources | 25, 32-33, 36-39, 43-44, 48-49, 63-64, 69-70, 72, 213-214, 231-236, 238-243 |
| | C. | Research and development, patents and licences, etc. | 203, 208 |
| | D. | Trend information | 22-54, 63-67, 69-71, 73-111 |
| | E. | Critical Accounting Estimates | N/A |
| Item 6. | Directors, Senior Management and Employees | | |
| | A. | Directors and senior management | 118-126, 189-191 |
| | B. | Compensation | 161-167, 173, 177, 185-186, 257 |
| | C. | Board practices | 118-177, 188-195 |
| | D. | Employees | 112-117, 257 |
| | E. | Share ownership | 117, 170, 189, 251, 286 |
| Item 7. | Major Shareholders and Related Party Transactions | | |
| | A. | Major shareholders | 287 |
| | B. | Related party transactions | 188, 211, 231, 257, 285 |
| | C. | Interests of experts and counsel | N/A |
| Item 8. | Financial Information | | |
| | A. | Consolidated Statements and Other Financial Information | 36-39, 196-260, 282-285 |
| | B. | Significant Changes | 260, 285 |
| Item 9. | The Offer and Listing | | |
| | A. | Offer and listing details | 188-194, 283-285 |
| | B. | Plan of distribution | N/A |
| | C. | Markets | 286 |
| | D. | Selling shareholders | N/A |
| | E. | Dilution | N/A |

|  | F. | Expenses of the issue | N/A |
| Item 10. |  | Additional Information |  |
|  | A. | Share capital | N/A |
|  | B. | Memorandum and articles of association | 190-195 |
|  | C. | Material contracts | N/A |
|  | D. | Exchange controls | 290 |
|  | E. | Taxation | 290-291 |
|  | F. | Dividends and paying agents | N/A |
|  | G. | Statement by experts | N/A |
|  | H. | Documents on display | 11 |
|  | I. | Subsidiary Information | N/A |
| Item 11. |  | Quantitative and Qualitative Disclosures About Market Risk | 36, 231, 245-250 |
| Item 12. |  | Description of Securities Other than Equity Securities |  |
|  | A. | Debt Securities | Exhibit 2.5 |
|  | B. | Warrants and Rights | N/A |
|  | C. | Other Securities | N/A |
|  | D. | American Depositary Shares | 286, 289-290, Exhibit 2.5 |

Part II

| Item 13. | Defaults, Dividend Arrearages and Delinquencies | N/A |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | N/A |
| Item 15. | Controls and Procedures | 187, 202, 282 |
| Item 16. | [Reserved] |  |
| Item 16A. | Audit committee financial expert | 124, 143, 189 |
| Item 16B. | Code of Ethics | 189 |
| Item 16C. | Principal Accountant Fees and Services | 154, 258, 285 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 189 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 39, 187 |
| Item 16F. | Change in Registrant's Certifying Accountant | N/A |
| Item 16G. | Corporate Governance | 189-195 |
| Item 16H. | Mine Safety Disclosure | N/A |
| Item 16I. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | N/A |

Part III

| Item 17. | Financial Statements | N/A |
| Item 18. | Financial Statements | 196-260, 282-285 |
| Item 19. | Exhibits | 297-298 |

## TERMS AND ABBREVIATIONS

### Currencies

| | |
|---|---|
| $ | US dollar |
| € | euro |
| £ | sterling |

### Units of measurement

| | |
|---|---|
| acre | approximately 0.004 square kilometres |
| b(/d) | barrels (per day) |
| boe(/d) | barrels of oil equivalent (per day); natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel |
| kboe(/d) | thousand barrels of oil equivalent (per day); natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel |
| MMBtu | million British thermal units |
| megajoule | a unit of energy equal to one million joules |
| mtpa | million tonnes per annum |
| per day | volumes are converted into a daily basis using a calendar year |
| scf(/d) | standard cubic feet (per day) |

### Products

| | |
|---|---|
| GTL | gas-to-liquids |
| LNG | liquefied natural gas |
| LPG | liquefied petroleum gas |
| NGL | natural gas liquids |

### Miscellaneous

| | |
|---|---|
| ADS | American Depositary Share |
| AGM | Annual General Meeting |
| API | American Petroleum Institute |
| CCS | carbon capture and storage |
| CCS earnings | earnings on a current cost of supplies basis |
| $CO_2$ | carbon dioxide |
| EMTN | Euro medium-term note |
| EPS | earnings per share |
| FCF | free cash flow |
| FID | final investment decision |
| GAAP | generally accepted accounting principles |
| GHG | greenhouse gas |
| HSSE | health, safety, security and environment |
| IAS | International Accounting Standards |
| IEA | International Energy Agency |
| IFRS | International Financial Reporting Standard(s) |
| IOGP | International Association of Oil & Gas Producers |
| IPIECA | International Petroleum Industry Environmental Conservation Association |
| LTIP | Long-term Incentive Plan |
| OECD | Organisation for Economic Co-operation and Development |
| OML | oil mining lease |
| OPEC | Organization of the Petroleum Exporting Countries |
| OPL | oil prospecting licence |
| PSC | production-sharing contract |
| PSP | Performance Share Plan |
| REMCO | Remuneration Committee |
| SEC | US Securities and Exchange Commission |
| TRCF | total recordable case frequency |
| TSR | total shareholder return |
| WTI | West Texas Intermediate |

## ABOUT THIS REPORT

This Form 20-F as filed with the US Securities and Exchange Commission for the year ended December 31, 2021 (this Report) presents the Consolidated Financial Statements of Shell plc (the Company) and its subsidiaries (collectively referred to as Shell) (pages 204-261) and the Financial Statements of the Royal Dutch Shell Dividend Access Trust (pages 284-286). Except for these Financial Statements, the numbers presented throughout this Report may not sum precisely to the totals provided and percentages may not precisely reflect the absolute figures due to rounding. Cross-references to Form 20-F are set out on pages 7 of this Report.

The Financial Statements contained in this Report have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). IFRS as defined above includes interpretations issued by the IFRS Interpretations Committee. Financial reporting terms used in this Report are in accordance with IFRS.

This Report contains certain forward-looking non-GAAP measures such as cash capital expenditure and divestments. We are unable to provide a reconciliation of these forward-looking non-GAAP measures to the most comparable GAAP financial measures because certain information needed to reconcile those non-GAAP measures to the most comparable GAAP financial measures is dependent on future events some of which are outside the control of the company, such as oil and gas prices, interest rates and exchange rates. Moreover, estimating such GAAP measures with the required precision necessary to provide a meaningful reconciliation is extremely difficult and could not be accomplished without unreasonable effort. Non-GAAP measures in respect of future periods which cannot be reconciled to the most comparable GAAP financial measure are calculated in a manner which is consistent with the accounting policies applied in Shell plc's consolidated financial statements.

The companies in which Shell plc directly or indirectly owns investments are separate legal entities. In addition to the term "Shell", in this Report "Shell Group", "we", "us" and "our" are also used to refer to the Company and its subsidiaries in general or to those who work for them. These terms are also used where no useful purpose is served by identifying the particular entity or entities. "Subsidiaries" and "Shell subsidiaries" refer to those entities over which the Company has control, either directly or indirectly. Entities and unincorporated arrangements over which Shell has joint control are generally referred to as "joint ventures" and "joint operations", respectively. "Joint ventures" and "joint operations" are collectively referred to as "joint arrangements". Entities over which Shell has significant influence but neither control nor joint control are referred to as "associates". The term "Shell interest" is used for convenience to indicate the direct and/or indirect ownership interest held by Shell in an entity or unincorporated joint arrangement, after exclusion of all third-party interest. Shell subsidiaries' data include their interests in joint operations.

As used in this Report, "Accountable" is intended to mean: required or expected to justify actions or decisions. The Accountable person does not necessarily implement the action or decision (implementation is usually carried out by the person who is Responsible) but must organise the implementation and verify that the action has been carried out as required. This includes obtaining requisite assurance from Shell companies that the framework is operating effectively. "Responsible" is intended to mean: required or expected to implement actions or decisions. Each Shell company and Shell-operated venture is responsible for its operational performance and compliance with the Shell General Business Principles, Code of Conduct, Statement on Risk Management and Risk Manual, and Standards and Manuals. This includes responsibility for the operationalisation and implementation of Shell Group strategies and policies.

This Report references Shell's Sky 1.5 scenarios, specifically within the "Climate change and energy transition" section (pages 74-97). Unlike Shell's previously published Mountains and Oceans exploratory scenarios, the Sky scenario is based on the assumption that society reaches the Paris Agreement's goal of holding the rise in global average temperatures this century to well below two degrees Celsius (2°C) above pre-industrial levels. Unlike Shell's Mountains and Oceans scenarios which unfolded in an open-ended way based upon plausible assumptions and quantifications, the Sky scenario was specifically designed to reach the Paris Agreement's goal in a technically possible manner.

Sky 1.5 scenario starts with data from Shell's Sky scenario but is more aggressive and challenging in its assumptions about energy transitions as the pace of change is accelerated. As in Sky, this scenario is normative, meaning we assumed that society achieves the 1.5 degrees Celsius stretch goal of the Paris Agreement, and we worked back in designing how this could occur. Of course, there are many possible paths that society could take to achieve this goal. This will be extremely challenging, but as of today, we believe there is still a technically possible path while maintaining a growing global economy. However, we believe the window for success is quickly closing.

These scenarios are a part of an ongoing process used in Shell for over 40 years to challenge executives' perspectives on the future business environment. They are designed to stretch management to consider even events that may only be remotely possible. Scenarios, therefore, are not intended to be predictions of likely future events or outcomes. Shell's scenarios also are not intended to be projections or forecasts of the future. Shell's scenarios, including the scenarios referenced in this Report, are not Shell's strategy or business plan. When developing Shell's strategy, our scenarios are one of many variables that we consider. Ultimately, whether society meets its goals to decarbonise is not within Shell's control. While we intend to travel this journey in step with society, only governments can create the framework for success.

Shell's operating plan, outlook and budgets are forecasted for a 10-year period and are updated every year. They reflect the current economic environment and what we can reasonably expect to see over the next ten years. Accordingly, they reflect our Scope 1, Scope 2 and NCF targets over the next 10 years. However, Shell's operating plans cannot reflect our 2050 net-zero emissions target and 2035 NCF target, as these targets are currently outside our planning period. In the future, as society moves towards net-zero emissions, we expect Shell's operating plans to reflect this movement.

Shell's "Net Carbon Footprint" or "net carbon intensity" referred to in this Report include Shell's carbon emissions from the production of our energy products, our suppliers' carbon emissions in supplying energy for that production, and our customers' carbon emissions associated with their use of the energy products we sell. Shell only controls its own emissions. The use of the term "Net Carbon Footprint" or "net carbon intensity" is for convenience only and not intended to suggest these emissions are those of Shell or its subsidiaries.

Except where indicated, the figures shown in the tables in this Report are in respect of subsidiaries only, without deduction of any non-controlling interest. However, the term "Shell share" is used for convenience to refer to the volumes of hydrocarbons that are produced, processed or sold through subsidiaries, joint ventures and associates. All of a subsidiary's production, processing or sales volumes (including the share of joint operations) are included in the Shell share, even if Shell owns less than 100% of the subsidiary. In the case of joint ventures and associates, however, Shell-share figures are limited only to Shell's entitlement. In all cases, royalty payments in kind are deducted from the Shell share.

Exhibit Q

Except where indicated, the figures shown in this Report are stated in US dollars. As used herein all references to "dollars" or "$" are to the US currency.

This Report contains forward-looking statements (within the meaning of the US Private Securities Litigation Reform Act of 1995) concerning the financial condition, results of operations and businesses of Shell. All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements. Forward-looking statements are statements of future expectations that are based on management's current expectations and assumptions and involve known and unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in these statements. Forward-looking statements include, among other things, statements concerning the potential exposure of Shell to market risks and statements expressing management's expectations, beliefs, estimates, forecasts, projections and assumptions. These forward-looking statements are identified by their use of terms and phrases such as "aim", "ambition", "anticipate", "believe", "could", "estimate", "expect", "goals", "intend", "may", "milestones", "objectives", "outlook", "plan", "probably", "project", "risks", "schedule", "seek", "should", "target", "will" and similar terms and phrases. There are a number of factors that could affect the future operations of Shell and could cause those results to differ materially from those expressed in the forward-looking statements included in this Report, including (without limitation): (a) price fluctuations in crude oil and natural gas; (b) changes in demand for Shell's products;     (c) currency fluctuations; (d) drilling and production results;     (e) reserves estimates; (f) loss of market share and industry competition; (g) environmental and physical risks; (h) risks associated with the identification of suitable potential acquisition properties and targets, and successful negotiation and completion of such transactions; (i) the risk of doing business in developing countries and countries subject to international sanctions; (j) legislative, judicial, fiscal and regulatory developments including regulatory measures addressing climate change; (k) economic and financial market conditions in various countries and regions; (l) political risks, including the risks of expropriation and renegotiation of the terms of contracts with governmental entities, delays or advancements in the approval of projects and delays in the reimbursement for shared costs; (m) risks associated with the impact of pandemics, such as the COVID-19 (coronavirus) outbreak; and (n) changes in trading conditions. Also see "Risk factors" on pages 23-32 for additional risks and further discussion. No assurance is provided that future dividend payments will match or exceed previous dividend payments. All forward-looking statements contained in this Report are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Readers should not place undue reliance on forward-looking statements. Each forward-looking statement speaks only as of the date of this Report. Neither the Company nor any of its subsidiaries undertake any obligation to publicly update or revise any forward-looking statement as a result of new information, future events or other information. In light of these risks, results could differ materially from those stated, implied or inferred from the forward-looking statements contained in this Report.

Past performance cannot be relied on as a guide to future performance.

This Report contains references to Shell's website, the Shell Sustainability Report, Tax Contribution Report, Industry Associations Climate Review and our report on Payments to Governments. These references are for the readers' convenience only. Shell is not incorporating by reference any Report any information posted on www.shell.com or in the Shell Sustainability Report, Tax Contribution Report, Industry Associations Climate Review or our report on Payments to Governments. The content of any other websites referred to in this Report does not form part of this Report.

With effect from January 29, 2022, Shell's A shares and B shares were assimilated into a single line of ordinary shares. Shell's A and B American Depositary Shares (ADSs) were assimilated into a single line of ADSs on the same date. This Report continues to refer to A shares, B shares, A ADSs and B ADSs when describing the position prior to January 29, 2022.

Shell V-Power and Shell LiveWire are Shell trademarks.

**DOCUMENTS ON DISPLAY**

The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. All of the SEC filings made electronically by Shell are available to the public on the SEC website at www.sec.gov (commission file number 001-32575).

This Report is also available, free of charge, at www.shell.com/investors/financial-reporting/sec-filings or at the offices of Shell in London, United Kingdom and The Hague, the Netherlands. Copies of this Report also may be obtained, free of charge, by mail.

Exhibit Q

SHELL POWERING PROGRESS

# WHO
# WE ARE

### Overview
Shell is a global group of energy and petrochemical companies with 82,000 employees and operations in more than 70 countries.

We use advanced technologies and take an innovative approach to help build a sustainable energy future. Shell is a customer-focused organisation, serving more than 1 million commercial and industrial customers, and around 32 million customers at 46,000 retail service stations daily.

Our strategy is to accelerate the transition of our business to net-zero emissions, purposefully and profitably, in step with society.

### OUR CONTEXT
The rising standard of living of a growing global population is likely to continue to drive demand for energy, including oil and gas, for years to come. At the same time, technological changes and the need to tackle climate change mean there is a transition under way to a lower-carbon, multi-source energy system with increasing customer choice.

Our Powering Progress strategy combines our ambitions under four goals: generating shareholder value, achieving net-zero emissions, powering lives and respecting nature.

This will help accelerate our progress towards becoming a net-zero emissions energy business by 2050, in step with society. We are building a strong resilient business

by putting customers at the centre of our strategy, innovating the products and solutions customers need
on their journey to net zero.

We aim to deliver value through our integrated assets and supply chains, optimising value and managing risk for Shell and our customers as we produce, buy, trade, transport and sell energy products and solutions across the world.

### OUR STAKEHOLDERS
▪ Our investor community
▪ Our customers
▪ Our employees/workforce/pensioners
▪ Our strategic partners/suppliers
▪ Communities
▪ NGOs/civil society stakeholders/academia/think-tanks
▪ Governments/regulators

See "Environment and society", "Our people" and "Governance"

### OUR PURPOSE
We power progress together by providing more and cleaner energy solutions.

See "Strategy and outlook"

### OUR CORE VALUES
▪ Honesty
▪ Integrity
▪ Respect for people

See "Our people"



# OUR
# **PURPOSE**

To power progress together by providing
more and cleaner energy solutions



GENERATING
**SHAREHOLDER
VALUE**

Growing value through
a dynamic portfolio and
disciplined capital allocation

POWERING
**LIVES**

Powering lives
through our products
and activities, and
supporting an
inclusive society

# POWERING
# **PROGRESS**

Our strategy to accelerate the
transition to net-zero emissions,
purposefully and profitably

RESPECTING
**NATURE**

Protecting the environment,
reducing waste and making
a positive contribution
to biodiversity

ACHIEVING
**NET-ZERO
EMISSIONS**

Working with our customers
and sectors to accelerate
the energy transition to
net-zero emissions

13

SHELL POWERING PROGRESS continued

# HOW WE CREATE VALUE

We aim to meet the world's growing need for more and cleaner energy solutions in ways that are economically, environmentally and socially responsible. Our Powering Progress strategy is designed to create value for our shareholders, customers and wider society.

### OUR INPUTS [A]

**Financial capital**

Equity attributable to Shell plc shareholders ($ billion) [B]:
172 2020: 155

Non-current debt ($ billion) [B]:
81 2020: 91

Net debt ($ billion) [B][C]:
53 2020: 75

Average capital employed ($ billion) [B]:
265 2020: 277

Cash capital expenditure ($ billion) [C]:
20 2020: 18

**Operations**

Refining and chemicals availability:
96% 2020: 96%

Oil & gas production available for sale (kboe/d):
3,237 2020: 3,386

LNG liquefaction volumes (million tonnes):
31 2020: 33

**Human capital**

Number of employees (thousands) [B]:
82 2020: 87

Number of training days (thousands):
271 2020: 234

**Relationships**

Customers, joint arrangements,
Government relations, suppliers.
Operating countries [B]
>70 2020: >70

**Intellectual capital**

Research and development expenses ($ million):
815 2020: 907

Number of patents [B]:
8,532 2020: 8,480

**Natural resources**

Proved oil and gas reserves (million boe) [B]:
9,365 2020: 9,124

Energy consumed (million MWh):
223 2020: 241

[A] In 2021 unless stated otherwise
[B] At December 31.
[C] See "Non-GAAP measures reconciliations" on pages 294-297.

### OUR OUTCOMES AND IMPACTS [A]

Cash flow from operating activities ($ billion):
45 2020: 34

Adjusted earnings ($ billion) [C]:
19 2020: 5

Adjusted EBITDA (CCS basis –
$ billion) [C]:
55 2020: 37

Shareholder distributions ($ billion) [C]:
9 2020: 9

Absolute emissions
(Scope 1 and 2 – million tonnes of $CO_2$ equivalent):
68 2020: 72 | 2016: 83

Net carbon intensity
(Scope 1, 2 and 3 – grams of $CO_2$ equivalent per megajoule):
77 2020: 75 | 2016: 79

Women in senior leadership positions [B]:
30% 2020: 28%

Taxes paid and collected
($ billion):
59 2020: 47

Total spend on goods and services ($ billion):
38 2020: 39

Fresh water consumed
in our facilities (million m³):
22 2020: 22 | 2018: 25

Waste disposed (million tonnes):
2 2020: 2



SHELL POWERING PROGRESS continued

# OUR ORGANISATION

## Delivering our Powering Progress strategy

**INTEGRATED GAS, RENEWABLES AND ENERGY SOLUTIONS**

Integrated Gas manages liquefied natural gas (LNG) activities and the conversion of natural gas into gas-to-liquids (GTL) fuels and other products. It includes natural gas exploration and extraction, and the operation of upstream and midstream infrastructure necessary to deliver gas to market.

In Renewables and Energy Solutions (R&ES), we are exploring emerging opportunities and investing in those where we believe sufficient commercial value is available. R&ES includes Shell's production and marketing of hydrogen, nature and environmental solutions as well as our integrated power activities.

**UPSTREAM**

Upstream manages the exploration for and extraction of crude oil, natural gas and natural gas liquids. It also markets and transports oil and gas, and operates infrastructure necessary to deliver them to market.

While the Upstream business delivers the energy of today, it is also funding the energy of tomorrow and will play a fundamental role in supporting Shell's ambitious transformation.

**DOWNSTREAM**

Downstream manages different Oil Products and Chemicals activities as part of an integrated value chain that trades and refines crude oil and other feedstocks into a range of products which are moved and marketed around the world for domestic, industrial and transport use. The products we sell include gasoline, diesel, heating oil, aviation fuel, marine fuel, biofuel, lubricants, bitumen and sulphur. We also produce and sell petrochemicals for industrial use worldwide.

Our Downstream organisation also manages Oil Sands activities (the extraction of bitumen from mined oil sands and its conversion into synthetic crude oil).

**PROJECTS & TECHNOLOGY**

Our Projects & Technology organisation manages the delivery of our major projects and drives research and innovation to develop new technology solutions. It provides technical services and technology capability for our Integrated Gas, Upstream and Downstream activities. It is also responsible for providing functional leadership across Shell in the areas of safety and environment, contracting and procurement, wells activities and greenhouse gas management.

Technology and innovation are essential to our efforts to meet the world's energy needs in a competitive way. If we do not develop the right technology, do not have access to it or do not deploy it effectively, this could have a material adverse effect on the delivery of our strategy and our licence to operate (see "Risk factors" on pages 23-32). Our Chief Technology Officer, who is part of the Projects & Technology organisation, oversees the development and deployment of new and differentiating technologies and innovations across Shell. Our main technology centres are in India, the Netherlands and the USA, with other centres in Brazil, China, Germany, Oman and Qatar. A strong patent portfolio underlies the technology that we employ in our various businesses.

## Segmental reporting

Our reporting segments are Integrated Gas, Upstream, Oil Products, Chemicals and Corporate. Integrated Gas, Upstream, Oil Products and Chemicals include their respective elements of our Projects & Technology organisation. The Corporate segment comprises our holdings and treasury organisation, self-insurance activities, and headquarters and central functions. See Note 5 to the "Consolidated Financial Statements" on pages XX. With effect from 2022, our reporting segments will change to Integrated Gas, Upstream, Marketing, Chemicals and Products, Renewables and Energy Solutions and Corporate, reflecting the way Shell reviews and assesses its performance.



Exhibit Q

Powering Progress:

How we provide customers with the low-carbon products and services they want and need





### BUILDING ONE OF EUROPE'S BIGGEST BIOFUELS FACILITIES

Business customers in the harder-to-abate sectors of road freight
and aviation are increasingly keen to cut their carbon emissions.

Shell and Deloitte's Decarbonising Aviation: Cleared for Take-off report, published in September, found that 90% of aviation executives and experts interviewed said cutting emissions was one of their top priorities. The equivalent figure in the January 2021 report Decarbonising Road Freight: Getting into Gear was more than 70%.

Shell intends to supply our road freight and aviation customers with the low-carbon biofuels they want and need. An important aim of our Powering Progress strategy is to transform refineries into energy and chemicals parks so that we reduce our global production of traditional fuels by 55% by 2030.

At our Energy and Chemicals Park Rotterdam, in the Netherlands, for example, we are building one of Europe's biggest biofuels facilities. It is expected to start production in 2024, making up to 820,000 tonnes of biofuels a year, which Shell will sell as sustainable aviation fuel and biodiesel.

The sales will help Shell make purposeful and profitable progress towards our target of becoming a net-zero emissions energy business by 2050, in step with society. The facility will help us achieve our ambition of producing around 2 million tonnes of sustainable aviation fuel a year by 2025.

### TRANSFORMING OUR REFINERIES INTO ENERGY AND CHEMICALS PARKS

The multinational chemicals corporation Asahi Kasei, a Shell customer, is aiming to become carbon neutral by 2050 and to use more sustainable feedstocks in its supply chain.

We believe we can profitably supply Asahi Kasei and other customers with products that they want and need to achieve their carbon neutrality and sustainability aims. This will play an important part in transforming the Bukom manufacturing site into the Shell Energy and Chemicals Park Singapore, with an increasing focus on customers' low-carbon energy and sustainability needs. In November, we signed an agreement to supply Asahi Kasei with butadiene, a chemical which it will use to make high-performance tyres that can cut vehicle emissions by improving fuel efficiency.

We plan to make the butadiene at Bukom, using a new unit that upgrades the quality of pyrolysis oil made from hard-to-recycle plastic waste that would otherwise go into landfill. We expect the pyrolysis oil upgrader to start production in 2023 and be the largest in Asia.

The pyrolysis oil it produces can be used to make chemicals that go into hundreds of everyday products, so Shell expects many other companies to become customers, especially those with sustainability goals. This will help Shell profitably achieve its aim of processing 1 million tonnes a year of plastic waste in our global chemicals plants by 2025. The transformation of Bukom and at least four other refining sites into energy and chemicals parks will help us achieve our ambition of reducing our global production of traditional fuels by 55% by 2030.

17

STRATEGY AND OUTLOOK

# OUR STRATEGY

**Powering Progress is our strategy to accelerate the transition of our business to net-zero emissions, in step with society.**

## CONTEXT

Climate change is one of the biggest challenges the world faces today, and necessitates a rapid transformation of the energy system to net-zero emissions.

Shell supports the most ambitious goal of the Paris Agreement, which is to limit the rise in global average temperature this century to 1.5 degrees Celsius above pre-industrial levels.

To achieve this, there needs to be urgent action to reduce emissions across power, transport, buildings, and industries like steel and chemicals. Shell must play its part, purposefully and profitably, in helping to make these changes happen.

The energy transition will bring risk and involve confronting complex and difficult obstacles, while at the same time acting on other great challenges such as the COVID-19 pandemic, which is continuing to cause unprecedented levels of disruption.

But the energy transition will also offer great opportunities.

More than 120 countries and over 2,000 companies and organisations have made commitments to get to net-zero emissions by 2050. Shell is taking action, sector by sector. We seek to work with our customers to profitably serve their changing needs, and to help decarbonise the energy system and reach net-zero emissions.

Our approach is to start with the customer or sector and ask: what do they want and need - today, and in future?

By listening to our customers and learning from them, we work out how to profitably provide the low-carbon products and services that they want and need – today and throughout their progress to net-zero emissions.

There will be no single solution that fits all customers. Instead, there will be variations in what customers want and need, with differing approaches and rates of progress across countries, sectors and markets. Shell aims to provide customers with what works best for them in their particular circumstances.

Customers' use of our energy products accounts for the vast majority of energy-related carbon emissions of our products sold. By helping our customers get to net zero, we will also help ourselves get to net zero.

## POWERING PROGRESS

Powering Progress is our strategy to accelerate the transition of our business to net-zero emissions, in step with society's progress towards the goal of the Paris Agreement on climate change.

Powering Progress generates value for our shareholders, customers and wider society. It has four main goals which integrate sustainability with our business strategy. These goals support Shell's purpose, to power progress together by providing more and cleaner energy solutions. We expect our employees at all times to maintain our focus on safety and abide by our core values of honesty, integrity and respect for people.

**Generating shareholder value:** We aim to create the conditions for share price appreciation by preparing our business for the future and seizing the opportunities presented by the energy transition. Shell must take a dynamic approach to its portfolio during the energy transition. This means continuing to provide the energy the world needs today, and increasing our investments in lower-carbon energy products and services. We aim to do this while providing sustainable distributions through our progressive dividend policy. In 2021, we re-based our dividend to $0.24 per share. We announced a share buyback programme of up to $3.5 billion, including $1.5 billion from the sale of our Permian business. The additional shareholder distributions from the Permian sale will eventually total $7 billion, with $5.5 billion distributed in the form of share buybacks in 2022. We aim to maintain a strong balance sheet and a disciplined approach to capital investment, so we remain strong and resilient. In this way, we will achieve our aim of being a compelling investment case for our shareholders.

On December 10, 2021, the shareholders of the company supported the resolution to amend Shell's articles of association to enable the simplification of the Company. The simplification entailed establishing a single line of shares to eliminate the complexity of Shell's A/B share structure. It also involved aligning Shell's tax residence with its country of incorporation in the UK by relocating the CEO, the CFO and the venue of Board and Executive Committee meetings to the UK. As a consequence, we changed the Company's name from Royal Dutch Shell plc to Shell plc.

The simplification was designed to strengthen Shell's competitiveness and accelerate shareholder distributions and the delivery of our strategy to become a net-zero emissions energy business.

**Achieving net-zero emissions:** We have a target to become a net-zero emissions energy business by 2050, in step with society. In 2021, we set a new target to halve the absolute emissions from our operations and the energy we buy to run them by 2030 (our Scope 1 and Scope 2 emissions), compared with 2016 levels on a net basis. We also brought forward our target to eliminate routine gas flaring at our Upstream operated assets from 2030 to 2025.

Exhibit Q



We are transforming our business and finding new opportunities in selling more low-carbon products and services such as biofuels, hydrogen, electricity generated by solar and wind power, and charging for electric vehicles. In 2021, we announced that we are building an 820,000 tonnes-a-year biofuels facility at the Shell Energy and Chemicals Park Rotterdam, in the Netherlands. In Germany, we opened the Refhyne electrolyser at our Energy and Chemicals Park Rheinland. This electrolyser is the largest of its kind in Europe, producing 1,300 tonnes of green hydrogen per year from renewable energy.



We are decarbonising sector by sector, forming alliances and working collaboratively with customers, businesses and governments to make progress in the energy transition and reduce emissions. This includes sectors that are harder to decarbonise, such as aviation, shipping, commercial road freight, power, heating and certain parts of industry. We also support government policies to reduce carbon emissions in the economy, including putting a direct price on carbon emissions.

Powering lives: Shell helps to power lives and livelihoods by providing vital energy for homes, businesses and transport. The supply of affordable, reliable and sustainable energy is crucial for addressing global challenges, including those related to poverty and inequality. Our ambition, by 2030, is to provide reliable electricity to 100 million people in Africa and Asia who do not have it yet. We support livelihoods by providing employment and training in the communities where we operate. We are working to become one of the most diverse and inclusive companies in the world, a place where everyone feels valued and respected. We are focusing on four areas: gender, race and ethnicity, lesbian, gay, bisexual and transgender (LGBT+) and disability. We seek to respect human rights in all parts of our business.



Respecting nature: We are stepping up our environmental ambitions, and shaping them to reflect the UN Sustainable Development Goals. Our environmental ambitions include protecting and enhancing biodiversity. We are also focusing on using water and other resources more efficiently and reusing as much of them as we can. We are reducing waste from our operations and increasing the recycling of plastics. In 2021, we announced that we will build a new pyrolysis oil upgrader unit at our manufacturing site on Pulau Bukom, Singapore. Scheduled to start production in 2023, the upgrader is designed to improve the quality of pyrolysis oil, a liquid made from hard-to-recycle plastic waste that would otherwise have gone into landfill. We are helping to improve air quality by reducing emissions from our operations and providing cleaner ways to power transport and industry.



STRATEGY AND OUTLOOK continued

## BUSINESS PILLARS

Powering Progress is a strategy that combines our financial strength and discipline with a dynamic approach to our portfolio of assets and products, so we can seize the opportunities of the energy transition. Shell is adapting its portfolio of assets and products to better meet the cleaner energy needs of its customers. We are delivering our strategy through three business pillars: Growth, Transition, and Upstream.

Our Growth pillar includes Marketing and Renewables and Energy Solutions businesses, such as Power and Hydrogen. Our Growth businesses increase our returns while helping customers to decarbonise.

Our Transition pillar includes our Integrated Gas and Chemicals and Products businesses. These businesses enable us to accelerate our progress towards net-zero emissions and deliver sustainable cash flow.

Our Upstream pillar delivers value to shareholders, provides vital oil and gas to society and funds the transformation of our portfolio.

Achieving our strategy depends on how we respond to competitive forces. We continually assess the external environment – the markets and the underlying economic, political, social and environmental drivers that shape them – to evaluate changes in competitive forces and business models. We use future scenarios to help inform our strategy. We regularly review the markets where we operate, assessing our competitive position by analysing trends, uncertainties, and the strengths and weaknesses of our traditional and non-traditional competitors.

We maintain business plans that focus on actions and capabilities to create and sustain competitive advantage. We maintain a risk management framework that regularly assesses our response to, and risk appetite for, identified risks.

See "Risk factors" on page 23-32 and "Governance" on page 119.

Our Executive Directors' remuneration is linked to the successful delivery of our strategy, based on performance indicators that are aligned with shareholder interests. Long-term incentives form the majority of the Executive Directors' remuneration for above-target performance. In 2021, the Long-term Incentive Plan (LTIP) included cash generation, capital discipline, value created for shareholders, and an energy transition condition.

See the "Directors' Remuneration Report" on pages 156-160

For more details on how the strategic pillars are embedded into our businesses, see "Shell Powering Progress" on pages 12-17.



20

# OUTLOOK FOR 2022
# AND BEYOND

We believe that our integrated business model is key to driving our strategy. Shell has a competitive portfolio and we are leading our peer group on cash generation. We intend to develop our portfolio of assets and the mix of energy that we sell to meet the cleaner energy needs of our customers, while delivering value for our shareholders.

Delivering our strategy will require clear and deliberate capital allocation choices. We approach capital allocation at three levels: enterprise, portfolio and project. The enterprise level is about how we make choices between increasing distributions to our shareholders, investing in our business and/or strengthening our balance sheet. The portfolio level is about how we allocate capital between our three business pillars – Growth, Transition and Upstream. The project level is about how we evaluate and prioritise investment opportunities.

For cash capital expenditure, the base capex to sustain our strategy is expected to be $19-22 billion per annum. To accelerate our strategy we expect our cash capital expenditure to grow to $23-27 billion per annum, once we have met our priority to distribute 20-30% of cash flow from operations to shareholders. For 2022 we expect our cash capex to be at the lower end of this range. More than half the additional capex (above the base capex) is expected to be spent on our Growth businesses. We remain committed to our progressive dividend policy and focused on targeting AA-equivalent credit metrics through the cycle.

Subject to Board approval, we aim to increase the dividend per share by around 4% every year. We target the distribution of 20-30% of cash flow from operations to shareholders, and may choose to return cash to shareholders through a combination of dividends and share buybacks.

After reaching this level of shareholder distributions, additional surplus cash is expected to be allocated between further disciplined capital investments to accelerate our strategy and further reduce debt to strengthen the balance sheet.

We support the most ambitious goal of the Paris Agreement, which is to limit the rise in global average temperature this century to 1.5 degrees Celsius above pre-industrial levels. We have a long-term target to become a net-zero emissions energy business by 2050, in step with society. To achieve this target, we will have to be net zero on all emissions from the manufacture of all our products and all our customers' emissions from the use of the energy products we sell. This means the target covers our Scope 1 emissions, which come directly from our operations, our Scope 2 emissions, from the energy we buy to run our operations, and our Scope 3 emissions, which include the emissions from our customers' use of the energy products we sell, regardless of whether they are produced by Shell or a third party.

We also have targets to reduce the net carbon intensity of the energy products we sell, as measured by Shell's Net Carbon Footprint, using 2016 as our baseline year. These include short-term targets of a 3-4% reduction by the end of 2022 and 6-8% by 2023. Our medium- and longer-term targets are to reduce by 20% by 2030, by 45% by 2035 and 100% by 2050, in step with society. We achieved our target of a 2-3% reduction by the end of 2021. In October, we set an absolute emissions reduction target of 50% on all Scope 1 and 2 emissions under Shell's operational control by 2030, compared with 2016 levels on a net basis.

We believe that our total carbon emissions from energy sold peaked in 2018 and will stay below 1.7 gigatonnes per annum (Gtpa). Further details are in the "Climate change and energy transition" section on page 74-97.

The statements in this "Strategy and outlook" section, including those related to our growth strategies and our expected or potential future cash flow from operations, organic free cash flow, share buybacks, capital investment, divestments, production and Net Carbon Footprint, are based on management's current expectations and certain material assumptions and, accordingly, involve risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied herein. See "About this Report" on pages 10-11 and "Risk factors" on pages 23-32.

On February 28, 2022, we announced our intention to exit our ventures with Gazprom. On March 8, 2022, we announced our intention to withdraw from our involvement in all Russian hydrocarbons in a phased manner. For more information, see Note 32 on page 261.

21

Exhibit Q



**CAPITAL ALLOCATION: TARGET SHAREHOLDER DISTRIBUTIONS OF 20-30% OF CFFO**

| | Clear capital allocation framework | Putting the framework into operation |
|---|---|---|
| **1st** PRIORITY | **Base cash capex** **Ordinary progressive dividend** | • $19-22 billion cash capex per annum to sustain our strategy – Inorganic capex included in the range • ~4% dividend per share growth annually, subject to Board approval |
| **2nd** PRIORITY | **AA credit metrics through the cycle** | • Net debt level to target AA credit metrics |
| **3rd** PRIORITY | **Additional shareholder distributions** | • Total shareholder distributions of 20-30% of CFFO comprise dividend and share buybacks – Amount based on cash generation, macro-outlook and balance sheet trajectory |
| **4th** PRIORITY | **Additional cash capex** **Continued balance sheet strengthening** | • Measured, disciplined cash capex spend to execute our strategy at pace • Further reduce net debt to achieve firm long-term AA credit metrics |

First cash priority also includes interest paid (CFFF).
Base cash capex includes spend on asset integrity and to sustain and grow value. Additional cash capex includes further growth.

RISK FACTORS

<span style="color:red">The risks discussed below could have a material adverse effect separately, or in combination, on our earnings, cash flows and financial condition. Accordingly, investors should carefully consider these risks.</span>

Further background on each risk is set out in the relevant sections of this Report, indicated by way of cross references under each risk factor.

The Board's responsibility for identifying, evaluating and managing our significant and emerging risks is discussed in "Governance" on pages 188 to 196.

## STRATEGIC RISKS

**We are exposed to macroeconomic risks including fluctuating prices of crude oil, natural gas, oil products and chemicals.**

Risk description

The prices of crude oil, natural gas, oil products and chemicals are affected by supply and demand, both globally and regionally. Macroeconomic, geopolitical and technological uncertainties can also affect production costs and demand for our products. Government actions may also affect the prices of crude oil, natural gas, oil products and chemicals. This could happen, for example, if governments promote the sale of lower-carbon electric vehicles or even prohibit future sales of new diesel or gasoline vehicles, such as the phasing out in the UK that will come into force in 2030. Oil and gas prices can also move independently of each other. Factors that influence supply and demand include operational issues, natural disasters, weather, pandemics such as COVID-19, political instability, conflicts, such as the recent Russian invasion of Ukraine, economic conditions, including inflation, and actions by major oil- and gas-producing countries. In a low oil and gas price environment, we would generate less revenue from our Upstream and Integrated Gas businesses, and parts of those businesses could become less profitable or incur losses. Low oil and gas prices have also resulted and could continue to result in the debooking of proved oil or gas reserves, if they become uneconomic in this type of price environment. Prolonged periods of low oil and gas prices, or rising costs, have resulted and could continue to result in projects being delayed or cancelled. Assets have been impaired in the past, and there could be impairments in the future. Low oil and gas prices have affected and could continue to affect our ability to maintain our long-term capital investment and shareholder distribution programmes. Prolonged periods of low oil and gas prices could adversely affect the financial, fiscal, legal, political and social stability of countries that rely significantly on oil and gas revenue. In a high oil and gas price environment, we could experience sharp increases in costs, and under some production-sharing contracts, our entitlement to proved reserves would be reduced. Higher prices could also reduce demand for our products, which could result in lower profitability, particularly in our Oil Products and Chemicals business. Higher prices can also lead to more capacity being built, potentially resulting in an oversupplied market which would negatively affect our Upstream, Integrated Gas, Oil Products and Chemicals businesses.

Accordingly, price fluctuations could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Market overview" on page 41.

**Our ability to deliver competitive returns and pursue commercial opportunities depends in part on the accuracy of our price assumptions.**

Risk description

We use a range of oil and gas price assumptions, which we review on a periodic basis. These ranges help us to evaluate the robustness of our capital allocation for our evaluation of projects and commercial opportunities. If our assumptions prove to be incorrect, this could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Market overview" on page 42.

**Our ability to achieve our strategic objectives depends on how we react to competitive forces.**

Risk description

We face competition in all our businesses. We seek to differentiate our services and products, though many of our products are competing in commodity-type markets. Accordingly, failure to manage our costs and our operational performance could result in a material adverse effect on our earnings, cash flows and financial condition. We also compete with state-owned hydrocarbon entities and state-backed utility entities with access to financial resources and local markets. Such entities could be motivated by political or other factors in making their business decisions. Accordingly, when bidding on new leases or projects, we could find ourselves at a competitive disadvantage because these state-owned entities may not require a competitive return. If we are unable to obtain competitive returns when bidding on new leases or projects, this could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Strategy and outlook" on page 20.

RISK FACTORS continued

## STRATEGIC RISKS continued

**Rising concerns about climate change and effects of the energy transition could continue to lead to a fall in demand and potentially lower prices for fossil fuels. Climate change could also have a physical impact on our assets and supply chains. This risk may also lead to additional legal and/or regulatory measures, resulting in project delays or cancellations, potential additional litigation, operational restrictions and additional compliance obligations.**

Risk description

Societal demand for urgent action has increased, especially since the Intergovernmental Panel on Climate Change (IPCC) Special Report of 2018 on 1.5°C effectively made the aspirational goal of the Paris Agreement to limit the rise in global average temperature this century to 1.5 degrees Celsius the default target. This increasing focus on climate change and drive for an energy transition have created a risk environment that is changing rapidly, resulting in a wide range of stakeholder actions at global, local and business levels. The potential impact and likelihood of the associated exposure for Shell could vary across different time horizons, depending on the specific components of the risk.

We expect that a growing share of our GHG emissions will be subject to regulation, resulting in increased compliance costs and operational restrictions. Regulators may seek to limit certain oil and gas projects or make it more difficult to obtain required permits. Additionally, climate activists are challenging the grant of new and existing regulatory permits. We expect that these challenges are likely to continue and could delay or prohibit operations in certain cases. Achieving our target of becoming net zero on all emissions from our operations could result in additional costs. We also expect that actions by customers to reduce their emissions will continue to lower demand and potentially affect prices for fossil fuels, as will GHG emissions regulation through taxes, fees and/or other incentives. This could be a factor contributing to additional provisions for our assets and result in lower earnings, cancelled projects and potential impairment of certain assets.

The physical effects of climate change such as, but not limited to, increases in temperature and sea levels and fluctuations in water levels could also adversely affect our operations and supply chains.

Certain investors have decided to divest their investments in fossil fuel companies. If this were to continue, it could have a material adverse effect on the price of our securities and our ability to access capital markets. Stakeholder groups are also putting pressure on commercial and investment banks to stop financing fossil fuel companies. According to press reports, some financial institutions have started to limit their exposure to fossil fuel projects. Accordingly, our ability to use financing for these types of future projects may be adversely affected. This could also adversely affect our potential partners' ability to finance their portion of costs, either through equity or debt.

In some countries, governments, regulators, organisations and individuals have filed lawsuits seeking to hold fossil fuel companies liable for costs associated with climate change. While we believe these lawsuits to be without merit, losing could have a material adverse effect on our earnings, cash flows and financial condition. For example, in May 2021, the District Court in The Hague, Netherlands, ruled that, by 2030, Shell must reduce, from its consolidated subsidiaries, its Scope 1 net emissions by 45% from its 2019 levels and use its best efforts to reduce its Scope 2 and Scope 3 net emissions by 45% from its 2019 levels. In 2019, our Scope 1 emissions from our consolidated subsidiaries were 86 million tonnes carbon dioxide equivalent ($CO_2e$), rounded. We expect to see additional regulatory requirements to provide disclosures related to climate risks and their impact on business performance.

In summary, rising climate change concerns and effects of the energy transition have led and could lead to a decrease in demand and potentially affect prices for fossil fuels. If we are unable to find economically viable, publicly acceptable solutions that reduce our GHG emissions and/or GHG intensity for new and existing projects and for the products we sell, we could experience financial penalties or extra costs, delayed or cancelled projects, potential impairments of our assets, additional provisions and/or reduced production and product sales. This could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: For further explanations of our climate change governance, risk management approach, climate ambition and strategy and our portfolio and performance, please refer to the section "Climate change and energy transition" on pages 74 to 96.

**If we fail to stay in step with the pace and extent of society's changing demands for energy as it transitions to a low-carbon future, we could fail in sustaining and developing our business.**

Risk description

The pace and extent of the energy transition could pose a risk to Shell if our own actions to decarbonise our operations and the energy we sell move at a different speed relative to society. If we are slower than society, customers may prefer a different supplier, which would reduce demand for our products and adversely affect our reputation besides materially affecting our financial results. If we move much faster than society, we risk investing in technologies, markets or low-carbon products that are unsuccessful because there is limited demand for them. This could also have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Strategy and outlook" on page 18 and "Climate change and energy transition" on page 78.

**We seek to execute divestments in pursuing our strategy. We may be unable to divest these assets successfully in line with our strategy.**

Risk description

We may be unable to divest assets at acceptable prices or within the timeline envisaged because of market conditions or credit risk. This would result in increased pressure on our cash position and potential impairments. In some cases, we have also retained certain liabilities following a divestment. Even in cases where we have not expressly retained certain liabilities, we may still be held liable for past acts, failures to act or liabilities that are different from those foreseen. We may also face liabilities if a buyer fails to honour its commitments. Accordingly, if any of the above circumstances arise, this could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Strategy and outlook" on page 21.

## STRATEGIC RISKS continued

**We operate in more than 70 countries that have differing degrees of political, legal and fiscal stability. This exposes us to a wide range of political developments that could result in changes to contractual terms, laws and regulations. We and our joint arrangements and associates also face the risk of litigation and disputes worldwide.**

Risk description

Developments in politics, laws and regulations can and do affect our operations. Potential impacts include: forced divestment of assets; expropriation of property; cancellation or forced renegotiation of contract rights; additional taxes including windfall taxes, restrictions on deductions and retroactive tax claims; antitrust claims; changes to trade compliance regulations; price controls; local content requirements; foreign exchange controls; changes to environmental regulations; changes to regulatory interpretations and enforcement; and changes to disclosure requirements. Tensions between nation states, such as Russia's recent invasion of Ukraine, can also affect our business. Any of these, individually or in aggregate, could have a material adverse effect on our earnings, cash flows and financial condition.

Since 2020, many governments have run deficits to deal with the economic impacts of the COVID-19 pandemic. Given the ongoing nature of the pandemic, there will be uncertain long-term fiscal consequences, with possible subsequent effects on government policies that affect Shell's business interests.

From time to time, social and political factors play a role in unprecedented and unanticipated judicial outcomes that could adversely affect Shell. Non-compliance with policies and regulations could result in regulatory investigations, litigation and, ultimately, sanctions. Certain governments and regulatory bodies have, in Shell's opinion, exceeded their constitutional authority by: attempting unilaterally to amend or cancel existing agreements or arrangements; failing to honour existing contractual commitments; and seeking to adjudicate disputes between private litigants. Certain governments have also adopted laws and regulations that could potentially conflict with other countries' laws and regulations, potentially subjecting us to criminal and civil sanctions. Such developments and outcomes could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 189.

## OPERATIONAL RISKS

**Russia's invasion of Ukraine has affected the safety and security of our people and operations in these and neighbouring countries. The sanctions and export controls and the evolving geopolitical situation have caused wide-ranging challenges to our operations which could continue in the medium to longer-term.**

Risk description

Russia's recent invasion of Ukraine poses wide-ranging challenges to our operations. The immediate impacts include the safety and security of our people and operations in these and neighbouring countries. The subsequent sanctions and export controls imposed by countries around the world could have a material impact on a number of our activities, including supply, trading and treasury activities. More sanctions and export controls are expected.

Given the evolving situation, there are many other unknown factors and events that could materially impact our operations, which may be temporary or more permanent in nature. These risks and future events could impact our supply chain, commodity prices, credit, commodity trading, treasury and legal risks. The tensions also create heightened cyber-security threats to our information technology infrastructure. The geopolitical situation may influence our future investment and financial decisions. Any of these factors, individually or in aggregate, could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Post-Balance Sheet Events" on page 261.

**The estimation of proved oil and gas reserves involves subjective judgements based on available information and the application of complex rules. This means subsequent downward adjustments are possible.**

Risk description

The estimation of proved oil and gas reserves involves subjective judgements and determinations based on available geological, technical, contractual and economic information. Estimates can change over time because of new information from production or drilling activities, changes in economic factors, such as oil and gas prices, alterations in the regulatory policies of host governments, or other events. Estimates also change to reflect acquisitions, divestments, new discoveries, extensions of existing fields and mines, and improved recovery techniques. Published proved oil and gas reserves estimates could also be subject to correction because of errors in the application of published rules and changes in guidance. Downward adjustments could indicate lower future production volumes and could also lead to impairment of assets. This could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Supplementary information - oil and gas (unaudited)" on page 262.

RISK FACTORS continued

## OPERATIONAL RISKS continued

**Our future hydrocarbon production depends on the delivery of large and integrated projects and our ability to replace proved oil and gas reserves.**

**Risk description**

We face numerous challenges in developing capital projects, especially those which are large and integrated. Challenges include: uncertain geology; frontier conditions; the existence and availability of necessary technology and engineering resources; the availability of skilled labour; the existence of transport infrastructure; project delays; the expiration of licences; delays in obtaining required permits; potential cost overruns; and technical, fiscal, regulatory, political and other conditions. These challenges are particularly relevant in developing and emerging-market countries, in frontier areas and in deep-water fields, such as off the coast of Mexico. We may fail to assess or manage these and other risks properly. Such potential obstacles could impair our delivery of these projects, our ability to fulfil the full potential value of the project as assessed when the investment was approved, and our ability to fulfil related contractual commitments. This could lead to impairments and could have a material adverse effect on our earnings, cash flows and financial condition.

Future oil and gas production will depend on our access to new proved reserves through exploration, negotiations with governments and other owners of proved reserves and acquisitions, and through developing and applying new technologies and recovery processes to existing fields. Failure to replace proved reserves could result in an accelerated decrease of future production, potentially having a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Shell Powering Progress" on page 15.

Oil and gas production available for sale

|  | | | Million boe [A] |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Shell subsidiaries | 1,047 | 1,104 | 1,182 |
| Shell share of joint ventures and associates | 134 | 135 | 156 |
| Total | 1,181 | 1,239 | 1,338 |

[A] Natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel.

Proved developed and undeveloped oil and gas reserves [A][B] (at December 31)

|  | | | Million boe [C] |
|---|---|---|---|
|  | Dec 31, 2021 | Dec 31, 2020 | Dec 31, 2019 |
| Shell subsidiaries | 8,456 | 8,222 | 9,980 |
| Shell share of joint ventures and associates | 909 | 902 | 1,116 |
| Total | 9,365 | 9,124 | 11,096 |
| Attributable to non-controlling interest of Shell subsidiaries | 267 | 322 | 304 |

[A] We manage our total proved reserves base without distinguishing between proved reserves from subsidiaries and those from joint ventures and associates.
[B] Includes proved reserves associated with future production that will be consumed in operations.
[C] Natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel.

OPERATIONAL RISKS continued

**The nature of our operations exposes us, and the communities in which we work, to a wide range of health, safety, security and environment risks.**

Risk description

The health, safety, security and environment (HSSE) risks to which we and the communities in which we work are potentially exposed cover a wide spectrum, given the geographical range, operational diversity and technical complexity of our operations. These risks include the effects of natural disasters (including weather events), earthquakes, social unrest, pandemic diseases, criminal actions by external parties, and safety lapses. If a major risk materialises, such as an explosion or hydrocarbon leak or spill, this could result in injuries, loss of life, environmental harm, disruption of business activities, loss of or suspension of permits, loss of our licence to operate and loss of our ability to bid on mineral rights. Accordingly, this could have a material adverse effect on our earnings, cash flows and financial condition.

Our operations are subject to extensive HSSE regulatory requirements that often change and are likely to become more stringent over time. Governments could require operators to adjust their future production plans, as has occurred in the Netherlands, affecting production and costs. We could incur significant extra costs in the future because of the need to comply with such requirements. We could also incur significant extra costs due to violations of or liabilities under laws and regulations that involve elements such as fines, penalties, clean-up costs and third-party claims. If HSSE risks materialise, they could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Environment and society" on page 98.

**A further erosion of the business and operating environment in Nigeria could have a material adverse effect on us.**

Risk description

In our Nigerian operations, we face various risks and adverse conditions. These include: security issues affecting the safety of our people, host communities and operations; sabotage and theft; issues affecting our ability to enforce existing contractual rights; litigation; limited infrastructure; potential legislation that could increase our taxes or operating costs; the challenges presented by limited government and state oil company budgets; and regional instability created by militant activities. Some of these risks and adverse conditions, such as security issues affecting the safety of our people and sabotage and theft have occurred in the past and are likely to continue in the future. These risks or adverse conditions could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Upstream" on page 53.

**An erosion of our business reputation could have a material adverse effect on our brand, our ability to secure new resources or access capital markets, and on our licence to operate.**

Risk description

Our reputation is an important asset. The Shell General Business Principles (Principles) govern how Shell and its individual companies conduct their affairs, and the Shell Code of Conduct tells employees and contract staff how to behave in line with the Principles. Our challenge is to ensure that all employees and contract staff comply with the Principles and the Code of Conduct. Real or perceived failures of governance or regulatory compliance or a perceived lack of understanding of how our activities affect surrounding communities could harm our reputation.

Societal expectations of businesses are increasing, with a focus on business ethics, quality of products, contribution to society, safety and minimising damage to the environment. There is increasing focus on the role of oil and gas in the context of climate change and energy transition. This could negatively affect our brand, reputation and licence to operate, which could limit our ability to deliver our strategy, reduce consumer demand for our branded and non-branded products, harm our ability to secure new resources and contracts, and restrict our ability to access capital markets or attract staff. Many other factors, including the materialisation of other risks discussed in this section, could negatively affect our reputation and could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 189 and "Our people" on page 115.

27

RISK FACTORS continued

<span style="color:red">OPERATIONAL RISKS continued</span>

**We rely heavily on information technology systems in our operations.**

<span style="color:red">Risk description</span>

The operation of many of our business processes depends on reliable information technology (IT) systems. Our IT systems are evolving because of changing business models, our increasing focus on customers, ongoing digitalisation of business processes and migration to the cloud. Our IT systems are increasingly dependent on contractors supporting the delivery of IT services. The COVID-19 pandemic and geopolitical tensions altered the nature of the IT threat, increasing the frequency and ingenuity of malware attacks and increasing the temptation to attack targets for financial gain.

In 2021, Shell was impacted by data security breaches, including one involving a third-party supplier who gained unauthorised access to various files during a limited window of time, some of which contained personal data. Shell contacted the impacted individuals and stakeholders and worked with them to address possible risks. We also informed relevant regulators and authorities.

The factors described above continue to contribute to potential breaches and disruptions of critical IT services. If breaches are not detected early and responded to effectively, they could harm our reputation and have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Corporate" on page 73.

**Our business exposes us to risks of social instability, criminality, civil unrest, terrorism, piracy, cyber disruption and acts of war that could have a material adverse effect on our operations.**

<span style="color:red">Risk description</span>

As seen in recent years, these risks can manifest themselves in the countries where we operate and elsewhere. These risks affect people and assets. Potential risks include: acts of terrorism; acts of criminality including maritime piracy; cyber espionage or disruptive cyber attacks; conflicts including war - such as Russia's recent invasion of Ukraine - malicious acts carried out by individuals within Shell, civil unrest and environmental and climate activism (including disruptions by non-governmental and political organisations).

The above risks can threaten the safe operation of our facilities and the transport of our products. They can harm the well-being of our people, inflict loss of life and injuries, damage the environment and disrupt our operational activities. These risks could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Environment and society" on pages 110.

**Production from the Groningen field in the Netherlands causes earthquakes that affect local communities.**

<span style="color:red">Risk description</span>

Shell and ExxonMobil are 50:50 shareholders in Nederlandse Aardolie Maatschappij B.V. (NAM). An important part of NAM's gas production comes from the onshore Groningen gas field, in which EBN, a Dutch government entity, has a 40% interest and NAM a 60% interest. The gas field is in the process of being closed down owing to earthquakes induced by gas production. Some of these earthquakes have damaged houses and other structures in the region, resulting in complaints and lawsuits from the local community. The government has announced it intends to accelerate the close-down, bringing the end of production forward from 2030 to possibly mid-2022. The exact close-down date depends on security of supply considerations and is still to be decided. While we expect the earlier close-down of the Groningen gas field to further reduce the number and strength of earthquakes in the region, any additional earthquakes could have further adverse effects on our earnings, cash flows and financial condition.

Further information: See "Upstream" on page 51.

OPERATIONAL RISKS continued

We are exposed to treasury and trading risks, including liquidity risk, interest rate risk, foreign exchange risk and credit risk. We are affected by the global macroeconomic environment and the conditions of financial and commodity markets.

Risk description

Our subsidiaries, joint arrangements and associates are subject to differing economic and financial market conditions around the world. Political or economic instability affects such markets.

We use debt instruments, such as bonds and commercial paper, to raise significant amounts of capital. Should our access to debt markets become more difficult, the potential impact on our liquidity could have a material adverse effect on our operations. Our financing costs could also be affected by interest rate fluctuations or any credit rating deterioration.

We are exposed to changes in currency values and to exchange controls as a result of our substantial international operations. Our reporting currency is the US dollar, although, to a material extent, we also hold assets and are exposed to liabilities in other currencies. While we undertake some foreign exchange hedging, we do not do so for all our activities. Even where hedging is in place, it may not function as expected.

Commodity trading is an important component of our Upstream, Integrated Gas, Oil Products and Chemicals businesses. Processing, managing and monitoring many trading transactions across the world, some of them complex, exposes us to operational and market risks, including commodity price risks. We use derivative instruments such as futures and contracts for difference to hedge market risks. We do not hedge all our activities and even where hedging is in place, it may not function as expected.

We are exposed to credit risk; our counterparties could fail or be unable to meet their payment and/or performance obligations under contractual arrangements. Although we do not have significant direct exposure to sovereign debt, it is possible that our partners and customers may have exposure which could impair their ability to meet their obligations. Our pension plans invest in government bonds, so they could be affected by a sovereign debt downgrade or other default.

If any of the above risks materialise, they could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Liquidity and capital resources" on page 36 and Note 20 to the "Consolidated Financial Statements" on pages 246 to 251.

**Our future performance depends on the successful development and deployment of new technologies and new products.**

Risk description

Technology and innovation are essential to our efforts to help meet the world's energy demands competitively. If we fail to effectively develop or deploy new technology and products and services, or fail to make full, effective use of our data in a timely and cost-effective manner, there could be a material adverse effect on the delivery of our strategy and our licence to operate. We operate in environments where advanced technologies are used. In developing new technologies and new products, unknown or unforeseeable technological failures or environmental and health effects could harm our reputation and licence to operate or expose us to litigation or sanctions. The associated costs of new technology are sometimes underestimated. Sometimes the development of new technology is subject to delays. If we are unable to develop the right technology and products in a timely and cost-effective manner, or if we develop technologies and products that harm the environment or people's health, there could be a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Shell Powering Progress" on page 16.

**We have substantial pension commitments, the funding of which is subject to capital market risks and other factors.**

Risk description

Liabilities associated with defined benefit pension plans are significant, and the cash funding requirement of such plans can also involve significant liabilities. They both depend on various assumptions. Volatility in capital markets or government policies could affect investment performance and interest rates, causing significant changes to the funding level of future liabilities. Changes in assumptions for mortality, retirement age or pensionable remuneration at retirement could also cause significant changes to the funding level of future liabilities. We operate a number of defined benefit pension plans and, in case of a shortfall, we could be required to make substantial cash contributions (depending on the applicable local regulations). This could result in a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Liquidity and capital resources" on page 37.

RISK FACTORS continued

OPERATIONAL RISKS continued

**We mainly self-insure our hazard risk exposures. Consequently, we could incur significant financial losses from different types of risks that are not insured with third-party insurers.**

Risk description

Our Group insurance companies (wholly owned subsidiaries) provide insurance coverage to Shell subsidiaries and entities in which Shell has an interest. These subsidiaries and entities may also insure a portion of their risk exposures with third parties, but such external insurance would not provide any material coverage in the event of a large-scale safety or environmental incident. Accordingly, in the event of a material incident, we would have to meet our obligations without access to material proceeds from third-party insurers. We have incurred adverse impacts from events, such as Hurricane Ida in 2021. We may, in the future, incur significant losses from different types of hazard risks that are not insured with third-party insurers, potentially resulting in a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Corporate" on page 73.

**Many of our major projects and operations are conducted in joint arrangements or with associates. This could reduce our degree of control and our ability to identify and manage risks.**

Risk description

When we are not the operator, we have less influence and control over the behaviour, performance and operating costs of joint arrangements or associates. Despite having less control, we could still be exposed to the risks associated with these operations, including reputational, litigation (where joint and several liability could apply) and government sanction risks. For example, our partners or members of a joint arrangement or an associate, (particularly local partners in developing countries), may be unable to meet their financial or other obligations to projects, threatening the viability of a given project. Where we are the operator of a joint arrangement, the other partner(s) could still be able to veto or block certain decisions, which could be to our overall detriment. Accordingly, where we have limited influence, we are exposed to operational risks that could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 191.

CONDUCT AND CULTURE RISKS

**We are exposed to conduct risk in our trading operations.**

Risk description

Commodity trading is an important component of our Upstream, Integrated Gas, Renewables & Energy Solutions, Oil Products and Chemicals businesses. Our commodity trading entities are subject to many regulations including requirements for standards of conduct. The risk of ineffective controls, poor oversight of trading activities, and the risk that traders could deliberately operate outside compliance limits and controls, either individually or as a group, has occurred. This has resulted in losses in the past and may result in further losses in the future. This could have material adverse effects on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 190 and Note 20 to the "Consolidated Financial Statements" on pages 245 to 250.

**Violations of antitrust and competition laws carry fines and expose us and/or our employees to criminal sanctions and civil suits.**

Risk description

Antitrust and competition laws apply to Shell and its joint arrangements and associates in the vast majority of countries where we do business. Shell and its joint arrangements and associates have been fined for violations of antitrust and competition laws in the past. This includes a number of fines by the European Commission Directorate-General for Competition (DG COMP). Because of DG COMP's fining guidelines, any future conviction of Shell or any of its joint arrangements or associates for violation of EU competition law could potentially result in significantly larger fines and have a material adverse effect on us. Violation of antitrust laws is a criminal offence in many countries, and individuals can be imprisoned or fined. In certain circumstances, directors may receive director disqualification orders. It is also now common for persons or corporations allegedly injured by antitrust violations to sue for damages. Any violation of these laws can harm our reputation and could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 190.

**Violations of anti-bribery, tax-evasion and anti-money laundering laws carry fines and expose us and/or our employees to criminal sanctions and civil suits.**

Risk description

Anti-bribery, tax-evasion and anti-money laundering laws apply to Shell, its joint arrangements and associates in all countries where we do business. Shell and its joint arrangements and associates have in the past settled with the US Securities and Exchange Commission regarding violations of the US Foreign Corrupt Practices Act. Any violation of anti-bribery, tax-evasion or anti-money laundering laws, including potential violations associated with Shell Nigeria Exploration and Production Company Limited's investment in Nigerian oil block OPL 245 and the 2011 settlement of litigation pertaining to that block, could harm our reputation or have a material adverse effect on our earnings, cash flows and financial condition. Violations of such laws could also expose us and/or our employees to criminal sanctions, civil suits and other consequences, such as debarment and the revocation of licences.

Further information: See "Our people" on pages 246 to 251, "Governance" on page 190 and Note 26 to the "Consolidated Financial Statements" on pages 255 to 257.

31

Exhibit Q

RISK FACTORS continued

## CONDUCT AND CULTURE RISKS continued

**Violations of data protection laws carry fines and expose us and/or our employees to criminal sanctions and civil suits.**

Risk description

Data protection laws apply to Shell and its joint arrangements and associates in the vast majority of countries where we do business. Since many countries in which we operate have data protection laws and regulations, Shell has adopted Binding Corporate Rules. This means we apply one consistent standard to data protection, across the Group and globally. The EU General Data Protection Regulation (GDPR) forms the basis of our Binding Corporate Rules. With data privacy legislation now in force in the USA, the risk of class actions is increased. Class actions after large-scale data breaches are increasingly common.

Shell companies are increasingly processing large volumes of personal data as we continue to acquire small companies with relatively large amounts of customer data during the energy transition. The COVID-19 pandemic has increased the level of processing of sensitive personal data, for example to confirm the health or vaccination status of our employees and visitors. Some governments require immediate disclosure of personal data, including sensitive personal data. We must be able to update our guidance to employees quickly, so it includes the relevant points of country legislation on COVID-19.

In some countries that are key to Shell's business operations, such as China, relevant legislation continues to be amended or introduced. Shell must be able to adapt dynamically to such legislative changes and be capable of updating our internal programmes if necessary. Many countries require mandatory notification of data breaches in certain situations. In these circumstances we might be required to report to affected individuals and regulators in the relevant countries.

Non-compliance with data protection laws could harm individuals and expose us to regulatory investigations. This could result in: fines, which could be up to 4% of global annual turnover if under GDPR; orders to stop processing certain data; harm to our reputation; and loss of the trust of existing and potential customers, stakeholders, governments, and employees. With regard to data breaches, we notified a number of data privacy regulators in 2021 of personal data breaches, and some investigations are still ongoing. To date, no material fines have been imposed, but no assurance can be provided that future breaches would have similar outcomes. In addition to imposing fines, regulators may also issue orders to stop processing personal data, which could disrupt operations. We could also be subject to litigation from persons or entities allegedly affected by data protection violations.

Violation of data protection laws is a criminal offence in some countries, and individuals can be imprisoned or fined. Any violation of these laws or harm to our reputation could have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 190.

**Violations of trade compliance laws and regulations, including sanctions, carry fines and expose us and our employees to criminal proceedings and civil suits.**

Risk description

We use "trade compliance" as an umbrella term for various national and international laws designed to regulate the movement of items across national boundaries and restrict or prohibit trade and other dealings with certain parties. For example, the EU and the USA continue to impose comprehensive sanctions on countries and territories such as Syria, North Korea and Crimea, and continue to adopt targeted restrictions and prohibitions on certain transactions in countries such as Venezuela and Russia. The USA continues to have comprehensive sanctions against Iran and Cuba. The EU and some nations continue to maintain targeted sanctions against Iran. The EU and the USA introduced sectoral sanctions against Venezuela in 2017, which the USA expanded in 2018 and 2019. The US sanctions primarily target the government of Venezuela and the oil industry.

In 2014, the EU and the USA imposed additional restrictions and controls directed at defined oil and gas activities in Russia. These remain in force. The USA introduced further restrictions regarding Russia in 2017, expanding them in 2018. In February 2022, countries around the world began imposing additional sanctions and export controls against Russia over its invasion of Ukraine including, regional trade bans, designations of entities (including Russian banks and state-owned entities) and individuals as Specially Designated Nationals and Blocked Parties (SDNs), and restrictions on access by Russia to financial systems. Export controls have also been introduced targeting Russian defence, aerospace, and maritime sectors. More sanctions and export controls are expected. A number of countries have also implemented new sanctions against Belarus for its role in the Russian invasion.

Many other nations are also adopting trade compliance programmes similar to those administered by the EU and the USA. Since January 2021, the UK has maintained a legal framework for trade compliance that is separate and distinct from those of the EU and USA.

Abiding by all the laws and regulations on trade compliance and sanctions can sometimes be complex and challenging because of factors such as: the expansion of sanctions; the frequent addition of prohibited parties; the number of markets in which we operate; the risk of differences in how jurisdictions apply sanctions; and the large number of transactions we process. Shell has voluntarily self-disclosed potential violations of sanctions in the past. The COVID-19 pandemic has increased trade compliance risks, because of factors such as growing state involvement in business dealings, the need to maintain and develop business opportunities and cross-border movement of goods and technologies, and the increasing likelihood that competitors will change ownership as the economic crisis continues.

Any violation of sanctions could lead to loss of import or export privileges and significant penalties on or prosecution of Shell or its employees. This could harm our reputation and have a material adverse effect on our earnings, cash flows and financial condition.

Further information: See "Governance" on page 190.

Investors should also consider the following, which could limit shareholder remedies.

## OTHER (generally applicable to an investment in securities)

**The Company's Articles of Association determine the jurisdiction for shareholder disputes. This could limit shareholder remedies.**

Risk description

Our Articles of Association generally require that all disputes between our shareholders in such capacity and the Company or our subsidiaries (or our Directors or former Directors), or between the Company and our Directors or former Directors, be exclusively resolved by arbitration in The Hague, the Netherlands, under the Rules of Arbitration of the International Chamber of Commerce. Our Articles of Association also provide that, if this provision is to be determined invalid or unenforceable for any reason, the dispute could only be brought before the courts of England and Wales. Accordingly, the ability of shareholders to obtain monetary or other relief, including in respect of securities law claims, could be determined in accordance with these provisions.

32

Exhibit Q

SUMMARY OF RESULTS

Key statistics

$ million, except where indicated

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Income/(loss) attributable to Shell plc shareholders | 20,101 | (21,680) | 15,842 |
| Income attributable to non-controlling interest | 529 | 146 | 590 |
| Income/(loss) for the period | 20,630 | (21,534) | 16,432 |
| Current cost of supplies adjustment | (3,148) | 1,833 | (605) |
| Total segment earnings [A][B], of which: | 17,482 | (19,701) | 15,827 |
| Integrated Gas | 6,340 | (6,278) | 8,628 |
| Upstream | 9,694 | (10,785) | 3,855 |
| Oil Products | 2,664 | (494) | 6,139 |
| Chemicals | 1,390 | 808 | 478 |
| Corporate | (2,606) | (2,952) | (3,273) |
| Identified Items [B] | (2,216) | (24,767) | (1,192) |
| Adjusted Earnings [B] | 19,289 | 4,846 | 16,462 |
| Adjusted EBITDA (CCS basis) [B] | 55,004 | 36,533 | 56,644 |
| Capital expenditure | 19,000 | 16,585 | 22,971 |
| Cash capital expenditure [B] | 19,698 | 17,827 | 23,919 |
| Operating expenses [B] | 35,964 | 34,789 | 37,893 |
| Underlying operating expenses [B] | 35,309 | 32,502 | 37,000 |
| Return on average capital employed [B] | 8.8% | (6.8)% | 6.7% |
| Net Debt at December 31 [C] | 52,556 | 75,386 | 79,093 |
| Gearing at December 31 [C] | 23.1% | 32.2% | 29.3% |
| Oil and gas production (thousand boe/d) | 3,237 | 3,386 | 3,665 |
| Proved oil and gas reserves at December 31 (million boe) | 9,365 | 9,124 | 11,096 |

[A] Segment earnings are presented on a current cost of supplies basis. See Note 5 to the "Consolidated Financial Statements" on pages 223-226.
[B] See "Non-GAAP measures reconciliations" on pages 294-297.
[C] See Note 15 "Debt and lease arrangements" on page 234 and "Non-GAAP measures reconciliations" on pages 294-297.

EARNINGS 2021-2020
Income attributable to Shell plc shareholders in 2021 was $20,101 million, compared with a loss of $21,680 million in 2020. With non-controlling interest included, income/(loss) for the period in 2021 was $20,630 million, compared with a loss of $21,534 million in 2020. After current cost of supplies adjustment, total segment earnings in 2021 were $17,482 million, compared with a loss of $19,701 million in 2020.

Earnings on a current cost of supplies basis (CCS earnings) exclude the effect of changes in the oil price on inventory carrying amounts, after making allowance for the tax effect. The purchase price of volumes sold in the period is based on the current cost of supplies during the same period, rather than on the historic cost calculated on a first-in, first-out (FIFO) basis. When oil prices are decreasing, CCS earnings are likely to be higher than earnings calculated on a FIFO basis and, when prices are increasing, CCS earnings are likely to be lower than earnings calculated on a FIFO basis.

Integrated Gas earnings in 2021 were $6,340 million, compared with a loss of $6,278 million in 2020. The increase was mainly driven by lower impairment charges, higher realised prices for oil, LNG and gas, higher gains on sale of assets and favourable tax movements. This was partly offset by higher losses due to the fair value accounting of commodity derivatives and higher operating expenditure. See "Integrated Gas" on pages 43-47.

Upstream earnings in 2021 were $9,694 million, compared with a loss of $10,785 million in 2020. The increase was mainly driven by higher realised oil and gas prices, lower impairment charges and favourable tax movements. This was partly offset by higher losses related to fair value accounting of commodity derivatives. See "Upstream" on pages 48-54.

Oil Products earnings in 2021 were $2,664 million, compared with a loss of $494 million in 2020. The increase was mainly driven by lower impairment charges and higher marketing volumes and oil sands margins. This was partly offset by lower contributions from trading and optimisation, higher operating expenditure and unfavourable tax movements. See "Oil Products" on pages 63-68.

Chemicals earnings in 2021 were $1,390 million, compared with $808 million in 2020. The increase was mainly driven by higher margins in base chemicals and intermediates as well as favourable tax movements. This was partly offset by higher impairment charges and operating expenditure. See "Chemicals" on pages 69-71.

Corporate segment earnings in 2021 were an expense of $2,606 million, compared with $2,952 million in 2020. The lower expense was mainly driven by lower net interest expenses and favourable foreign exchange movements. See "Corporate" on page 73.

33

## PRIOR YEAR EARNINGS SUMMARY

Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 41) and Form 20-F (page 26) for the year ended December 31, 2020, as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

## PRODUCTION AVAILABLE FOR SALE

Oil and gas production available for sale in 2021 was 3,237 thousand boe per day (boe/d), compared with 3,386 thousand boe/d in 2020. This net reduction was mainly driven by divestments, higher maintenance activities, net field declines and production-sharing contract effects.

Oil and gas production available for sale [A]

| | 2021 | 2020 | Thousand boe/d 2019 |
|---|---|---|---|
| Crude oil and natural gas liquids | 1,685 | 1,752 | 1,823 |
| Synthetic crude oil | 54 | 51 | 52 |
| Natural gas [B] | 1,498 | 1,583 | 1,790 |
| Total | 3,237 | 3,386 | 3,665 |
| Of which: | | | |
| Integrated Gas | 942 | 911 | 922 |
| Upstream | 2,240 | 2,424 | 2,691 |
| Oil sands (part of Oil Products) | 54 | 51 | 52 |

[A] See "Oil and gas information" on pages 56-63.
[B] Natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel.

## PROVED RESERVES

The proved oil and gas reserves of Shell subsidiaries and the Shell share of the proved oil and gas reserves of joint ventures and associates are summarised in "Oil and gas information" on pages 56-63 and set out in more detail in "Supplementary information – oil and gas (unaudited)" on pages 262-279.

Before taking production into account, our proved reserves increased by 1,470 million boe in 2021. Total oil and gas production was 1,229 million boe. Accordingly, after taking production into account, our proved reserves increased by 241 million boe in 2021, to 9,365 million boe at December 31, 2021.

## CASH CAPITAL EXPENDITURE AND OTHER INFORMATION

Cash capital expenditure was $19,698 million in 2021, compared with $17,827 million in 2020.

Operating expenses were $35,964 million in 2021, compared with $34,789 million in 2020. Underlying operating expenses were $35,309 million compared with $32,502 million in 2020.

Our return on average capital employed (ROACE) increased to 8.8%, compared with (6.8)% in 2020, mainly driven by higher earnings.

Net debt was $52,556 million at the end of 2021, compared with $75,386 million at the end of 2020, mainly driven by cash flow generation.

Gearing was 23.1% at the end of 2021, compared with 32.2% at the end of 2020, mainly driven by net debt reduction and higher earnings.

## SIGNIFICANT ACCOUNTING ESTIMATES AND JUDGEMENTS

See Note 2 to the "Consolidated Financial Statements" on pages 208-217.

## LEGAL PROCEEDINGS

See Note 26 to the "Consolidated Financial Statements" on pages 255-257.

Exhibit Q

PERFORMANCE INDICATORS

These indicators enable management to evaluate Shell's performance against our strategy and operating plans during the year. These are also used as part of the determination of Executive Directors' remuneration. See "Directors' Remuneration Report" on pages 156-160.

## FINANCIAL DELIVERY

**Cash flow from operating activities ($ million)**

**45,104** 2020: 34,105

Cash flow from operating activities is the total of all the cash receipts and payments associated with our sales of oil, gas, chemicals and other products. The components that provide a reconciliation from income for the period are listed in the "Consolidated Statement of Cash Flows". This indicator reflects our ability to generate cash to service and reduce our debt and for distributions to shareholders and for investments.

See "Liquidity and capital resources" on pages 37-40.

**Free cash flow ($ million)**

**40,343** 2020: 20,828

Free cash flow is the sum of "Cash flow from operating activities" and "Cash flow from investing activities", which are disclosed in the "Consolidated Statement of Cash Flows". This indicator is used to evaluate the cash available for financing activities, including shareholder distributions and debt servicing, after investment in maintaining and growing our business.

See "Non-GAAP measures reconciliations" on pages 294-297.

**Return on average capital employed (%)**

**8.8** 2020: (6.8)

ROACE is defined as income for the period, adjusted for after-tax interest expense, as a percentage of the average capital employed during the year. Capital employed is the sum of total equity and total debt. ROACE measures the efficiency of our utilisation of the capital that we employ and is a common measure of business performance.

See "Summary of results" on pages 33-34 and "Non-GAAP measures reconciliations" on pages 294-297.

**Total shareholder return (%)**

**33.1** 2020: (32.7)

Total shareholder return (TSR) is the difference between the share price at the beginning of the year and the share price at the end of the year (each averaged over 90 days), plus gross dividends delivered during the calendar year (reinvested quarterly), expressed as a percentage of the share price at the beginning of the year (averaged over 90 days). The data used are a weighted average in dollars for A and B shares. The TSRs of major publicly traded oil and gas companies can be compared directly, providing a way to determine how we are performing relative to our industry peers.

## OPERATIONAL EXCELLENCE

**Upstream controllable availability (%)**

**87.8** 2020: 89.2

Upstream controllable availability performance reflects our ability to optimally run our Upstream assets. Reliability issues, turnarounds and maintenance at own-operated or third-party facilities all impact controllable availability, but it excludes the impact of extreme unexpected events that are outside our control such as government restrictions and hurricanes.

**Midstream availability (%)**

**87.3** 2020: 92.3

Midstream availability shows to what extent liquefied natural gas (LNG) assets are ready to process product as a comparison with capacity, considering the impact of planned and unplanned maintenance.

**Refinery and chemical plant availability (%)**

**95.6** 2020: 95.5

Refinery and chemical plant availability is the weighted average of the actual uptime of plants as a percentage of their maximum possible uptime. The weighting is based on the capital employed, adjusted for cash and non-current liabilities. This indicator is a measure of the operational excellence of our refinery and chemical plant facilities.

**Project delivery on schedule (%)**

**87.0** 2020: 48.0

**Project delivery on budget (%)**

**104.0** 2020: 103.9

Project delivery reflects our capability to complete major projects on time and within budget on the basis of the targets set in our annual business plan. Project delivery on schedule measures the percentage of projects delivered on schedule. Project delivery on budget reflects the aggregate cost against the aggregate budget for those projects, where a figure greater than 100% means over budget.

Exhibit Q

## PROGRESS IN ENERGY TRANSITION

**Upstream and Integrated Gas greenhouse gas (GHG) intensity (tonnes of $CO_2$ equivalent/tonne of hydrocarbon production available for sale)**

## 0.172 2020: 0.16

Upstream/midstream GHG intensity is a measure of GHG emissions (direct and indirect GHG emissions associated with imported energy, excluding emissions from exported energy), expressed in metric tonnes of $CO_2$ equivalent emitted into the atmosphere per metric tonne of hydrocarbon production available for sale.

See "Climate change and energy transition" on pages 74-97.

**Refining GHG intensity (tonnes of $CO_2$ equivalent/UEDC[TM])**

## 1.05 2020: 1.05

Refining GHG intensity is a measure of GHG emissions (direct and indirect GHG emissions associated with imported energy, excluding emissions from exported energy), expressed in metric tonnes of $CO_2$ equivalent emitted into the atmosphere per unit of Utilised Equivalent Distillation Capacity (UEDC[TM]). UEDC[TM] is a proprietary metric of Solomon Associates. It is a complexity-weighted normalisation parameter that reflects the operating cost intensity of a refinery based on the size and configuration of its particular mix of process and non-process facilities.

See "Climate change and energy transition" on pages 74-97.

**Chemicals GHG intensity (tonnes of $CO_2$ equivalent/tonne petrochemicals produced)**

## 0.95 2020: 0.98

Chemicals GHG intensity is a measure of GHG emissions (direct and indirect GHG emissions associated with imported energy, excluding emissions from exported energy), expressed in metric tonnes of $CO_2$ equivalent emitted into the atmosphere per metric tonne of steam cracker, high-value petrochemicals production.

See "Climate change and energy transition" on pages 74-97.

**GHG abatements (thousand tonnes of $CO_2$ equivalent)**

## 279 2020: N/A

This is the total mass of GHG emissions reduced by interventions that led to sustained drops in emissions. By sustained drops, we mean that each intervention ensured emissions were lower for the given year, and there was a reasonable expectation that emissions would continue to be lower because of the intervention, all things being equal. This is a new metric for 2021.

See "Climate change and energy transition" on pages 74-97.

## SAFETY

**Serious injury and fatality frequency**
**(cases per 100 million working hours)**

## 6.9 2020: 6.0

Serious Injury and Fatality (SIF) is defined as a serious work-related injury or illness that resulted in fatality or a life-altering event, which is defined as a long-term or permanent injury or illness with significant impact on daily activities.

See "Environment and society" on pages 98-112.

**Number of operational Tier 1 and 2 process safety events**

## 102 2020: 103

A Tier 1 process safety event is an unplanned or uncontrolled release of any material, including non-toxic and non-flammable materials, from a process with the greatest actual consequence resulting in harm to employees, contract staff, or a neighbouring community, damage to equipment, or exceeding a threshold quantity, as defined by the API Recommended Practice 754 and IOGP Standard 456. A Tier 2 process safety event is a release of lesser consequence.

See "Environment and society" on pages 98-112.

Exhibit Q

## LIQUIDITY AND CAPITAL RESOURCES

We manage our businesses to deliver strong cash flows to fund investment for profitable growth. Management's priorities for applying Shell's cash are base capital expenditure to sustain our strategy, progressive dividend growth of around 4% annually, AA credit metrics through the cycle, and additional shareholder distributions (20-30% of cash flow from operations). The fourth priority is disciplined and measured capital expenditure growth and continued balance sheet strengthening.

### FINANCIAL CONDITION AND LIQUIDITY

Shell generated cash flow from operations of $45.1 billion, including a negative impact from working capital of $10.4 billion, and free cash flow of $40.3 billion in 2021, aided by the improving global macro environment and divestments. (For more information on free cash flow see "Non-GAAP measures reconciliations" on page 294-297.) Net debt decreased to $52.6 billion at December 31, 2021, (December 31, 2020: $75.4 billion). Gearing fell to 23.1% at December 31, 2021, compared with 32.2% at December 31, 2020, as increases in equity and cash flow generation reduced net debt. Note 15 to the "Consolidated Financial Statements" on pages 234 provides information on our debt arrangements, including net debt and gearing definitions.

### LIQUIDITY

We satisfy our funding and working capital requirements from the cash generated from our operations, the issuance of debt and divestments. In 2021, access to the international debt capital markets remained strong, with our debt principally financed from these markets through central debt programmes consisting of:
- a $10 billion global commercial paper (CP) programme, with maturities not exceeding 270 days;
- a $10 billion US CP programme, with maturities not exceeding 397 days;
- an unlimited Euro medium-term note (EMTN) programme (also referred to as the Multi-Currency Debt Securities Programme); and
- an unlimited US universal shelf (US shelf) registration.

All these CP, EMTN and US shelf issuances are issued by Shell International Finance B.V., the issuance company for Shell, with its debt being guaranteed by Shell plc (the Company).

We also maintain committed credit facilities. The core facilities were extended in December 2021. Of the $10 billion total facility, $0.08 billion matured in 2021, $1.92 billion matures in 2022, $0.32 billion in 2025 and $7.68 billion in 2026. These core facilities and internally available liquidity provide back-up coverage for our CP programmes. In April 2020, to increase liquidity amid COVID-19-related uncertainties, Shell entered into a dual-currency $7.2 billion and €4.4 billion one-year revolving credit facility, with two six-month extension options at our discretion. This facility remained undrawn and expired at the end of the first year in April 2021. Other than certain borrowing by local subsidiaries, we do not have any other committed credit facilities.

Our total debt decreased by $18.9 billion to $89.1 billion at December 31, 2021. The total debt excluding leases matures as follows: 7% in 2022; 6% in 2023; 7% in 2024; 10% in 2025; and 69% in 2026 and beyond. The portion of debt maturing in 2022 is expected to be repaid from a combination of cash balances, cash generated from operations, divestments and the issuance of new debt.

In 2021, we issued $1.5 billion of bonds under our US shelf registration. All CP outstanding was repaid within the year with no additional issuance. Additionally in 2021, we redeemed $4.5 billion of USD bonds, bringing forward maturities of certain bonds maturing before the end of 2025. We believe our working capital is sufficient for current requirements.

While our subsidiaries are subject to restrictions, such as foreign withholding taxes on the transfer of funds in the form of cash dividends, loans or advances, such restrictions are not expected to have a material impact on our ability to meet our cash obligations.

### MARKET RISK AND CREDIT RISK

We are affected by the global macroeconomic environment as well as financial and commodity market conditions. This exposes us to treasury and trading risks, including liquidity risk, market risk (interest rate risk, foreign exchange risk and commodity price risk) and credit risk. See "Risk factors" on pages 29 and Note 20 to the Consolidated Financial Statements on page 246-251. The size and scope of our businesses require a robust financial control framework and effective management of our various risk exposures.

We use various financial instruments for managing exposure to commodity price, foreign exchange and interest rate movements. Our treasury and trading operations are highly centralised and seek to manage credit exposures associated with our substantial cash, commodity, foreign exchange and interest rate positions. Our portfolio of cash investments is diversified to avoid concentrating risk in any one instrument, country or counterparty. The use of external derivative instruments is confined to specialist trading and central treasury organisations that have appropriate skills, experience, supervision, control and reporting systems. Credit risk policies are in place to ensure that sales of products are made to customers with appropriate creditworthiness, and include credit analysis and monitoring of customers against counterparty credit limits. Where appropriate, netting arrangements, credit insurance, prepayments and collateral are used to manage credit risk. Management believes it has access to sufficient debt funding sources (capital markets) and to undrawn committed borrowing facilities to meet foreseeable requirements.

### PENSION COMMITMENTS

We have substantial pension commitments, the funding of which is subject to capital market risks (see "Risk factors" on page 29). We address key pension risks in a number of ways. Principal among these is the Pensions Forum, chaired by the Chief Financial Officer, which oversees Shell's input to pension strategy, policy and operation. A risk committee supports the forum in reviewing the results of assurance processes in respect of pensions risks. In general, local trustees manage the funded defined benefit pension plans, with contributions paid based on independent actuarial valuations in accordance with local regulations. Our total employer contributions were $0.9 billion in 2021 and are estimated to be $0.9 billion in 2022. See Note 18 to the "Consolidated Financial Statements" on page 239-244.

Capitalisation table

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| | | $ million |
| Equity attributable to Shell plc shareholders | 171,966 | 155,310 |
| Current debt | 8,218 | 16,899 |
| Non-current debt | 80,868 | 91,115 |
| Total debt [A] | 89,086 | 108,014 |
| Total capitalisation | 261,052 | 263,324 |

[A] Of total debt, $61.5 billion (2020: $79.4 billion) was unsecured and $27.6 billion (2020: $28.6 billion) was secured. See Note 15 to the "Consolidated Financial Statements" on pages 234 for further disclosure on debt.

Exhibit Q

**STATEMENT OF CASH FLOWS**

Cash flow from operating activities in 2021 was an inflow of $45.1 billion, compared with $34.1 billion in 2020, mainly due to higher earnings, partly offset by unfavourable working capital movements of $10.4 billion (compared with favourable working capital movements of $4.6 billion in 2020). The decrease in cash flow from operating activities in 2020, compared with $42.2 billion in 2019, was mainly due to lower earnings.

Cash flow from investing activities in 2021 was an outflow of $4.8 billion, compared with an outflow of $13.3 billion in 2020. The decreased cash outflow was mainly due to higher proceeds from sale of property, plant and equipment in 2021, including the divestment of our Permian business in the USA. The decreased cash outflow in 2020 compared with $15.8 billion in 2019 was mainly due to lower capital expenditure in 2020.

Cash flow from financing activities in 2021 was an outflow of $34.6 billion, compared with outflows of $7.2 billion in 2020 and $35.2 billion in 2019, due to net repayment of debt of $19.7 billion (2020: $5.6 billion net issuance; 2019: $3.4 billion net repayment), and higher repurchases of shares of $2.9 billion (2020: $1.7 billion; 2019: $10.2 billion).

Cash and cash equivalents were $37.0 billion at December 31, 2021 (December 31, 2020: $31.8 billion; December 31, 2019: $18.1 billion).

**CASH FLOW FROM OPERATING ACTIVITIES**

The most significant factors affecting our cash flow from operating activities are earnings, which are mainly impacted by: realised prices for crude oil, natural gas and LNG, production levels of crude oil, natural gas and LNG, chemicals, refining and marketing margins; and movements in working capital.

The impact on earnings from changes in market prices depends on: the extent to which contractual arrangements are tied to market prices; the dynamics of production-sharing contracts; the existence of agreements with governments or state-owned oil and gas companies that have limited sensitivity to crude oil and natural gas prices; tax impacts; and the extent to which changes in commodity prices flow through into operating expenses. Changes in benchmark prices of crude oil and natural gas in any particular period provide only a broad indicator of changes in our Integrated Gas and Upstream earnings in that period. Changes in any one of a range of factors, derived from either within the industry or the broader economic environment, can influence refining and marketing margins. The precise impact of any such changes depends on how the oil markets respond to them. The market response is affected by factors such as: whether the change affects all crude oil types or only a specific grade; regional and global crude oil and refined products inventories; and the collective speed of response of refiners and product marketers in adjusting their operations. As a result, margins fluctuate from region to region and from period to period.

Cash flow information [A]

$ billion

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Cash flow from operating activities excluding working capital movements | | | |
| Integrated Gas | 18.3 | 10.8 | 14.8 |
| Upstream | 22.6 | 9.8 | 19.9 |
| Oil Products | 12.0 | 7.0 | 10.7 |
| Chemicals | 3.3 | 1.8 | 1.7 |
| Corporate | (0.7) | 0.1 | (0.3) |
| Total | 55.5 | 29.5 | 47.0 |
| (Increase)/decrease in inventories | (7.3) | 4.5 | (2.6) |
| (Increase)/decrease in current receivables | (20.6) | 9.6 | (0.9) |
| Increase/(decrease) in current payables | 17.5 | (9.5) | (1.2) |
| (Increase)/decrease in working capital | (10.4) | 4.6 | (4.8) |
| Cash flow from operating activities | 45.1 | 34.1 | 42.2 |
| Cash flow from investing activities | (4.8) | (13.3) | (15.8) |
| Cash flow from financing activities | (34.7) | (7.2) | (35.2) |
| Currency translation differences relating to cash and cash equivalents | (0.5) | 0.2 | 0.1 |
| Increase/(decrease) in cash and cash equivalents | 5.1 | 13.8 | (8.7) |
| Cash and cash equivalents at the beginning of the year | 31.8 | 18.1 | 26.7 |
| Cash and cash equivalents at the end of the year | 37.0 | 31.8 | 18.1 |

[A] See the Consolidated Statement of Cash Flows on page 207.

## LIQUIDITY AND CAPITAL RESOURCES continued

### DIVESTMENT AND CASH CAPITAL EXPENDITURE

The levels of divestment proceeds and cash capital expenditure in 2021 and 2020 reflect our discipline and focus on the Powering Progress strategy. See "Non-GAAP measures reconciliations" on page 294-297.

Divestment proceeds

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Integrated Gas | 3,195 | 503 | 723 |
| Upstream | 10,930 | 1,909 | 5,384 |
| Oil Products | 935 | 1,368 | 1,517 |
| Chemicals | 10 | 26 | 22 |
| Corporate | 44 | 205 | 225 |
| Total divestment proceeds | 15,113 | 4,010 | 7,871 |

Cash capital expenditure is used to monitor investing activities on a cash basis, excluding items such as lease additions which do not necessarily result in cash outflows in the period.

Cash capital expenditure

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Integrated Gas | 5,767 | 4,301 | 4,299 |
| Upstream | 6,269 | 7,296 | 10,205 |
| Oil Products | 3,868 | 3,328 | 4,907 |
| Chemicals | 3,573 | 2,640 | 4,090 |
| Corporate | 221 | 262 | 418 |
| Total cash capital expenditure | 19,698 | 17,827 | 23,919 |

### CONTRACTUAL OBLIGATIONS

The table below summarises our principal contractual obligations at December 31, 2021, by expected settlement period. The amounts presented have not been offset by any committed third-party revenue in relation to these obligations.

Contractual obligations

| | | | | | $ billion |
|---|---|---|---|---|---|
| | Less than 1 year | Between 1 and 3 years | Between 3 and 5 years | 5 years and later | Total |
| Debt [A] | 4.1 | 8.2 | 10.3 | 38.4 | 61.0 |
| Leases | 5.8 | 9.1 | 6.8 | 18.3 | 40.0 |
| Purchase obligations [B] | 28.8 | 29.2 | 21.9 | 64.1 | 144.0 |
| Other long-term contractual liabilities [C] | 0.4 | 0.7 | 0.2 | 1.1 | 2.4 |
| Total | 39.1 | 47.2 | 39.2 | 121.9 | 247.4 |

[A] See Note 15 to the "Consolidated Financial Statements" on pages 234. Debt contractual obligations exclude interest, which is estimated to be $1.6 billion payable in less than one year, $3.1 billion between one and three years, $2.7 billion between three and five years, and $15.6 billion in five years and later. For this purpose, we assume that interest rates with respect to variable interest rate debt remain constant at the rates in effect at December 31, 2021, and that there is no change in the aggregate principal amount of debt other than repayment at scheduled maturity as reflected in the table. Leases definition follows IFRS 16, which was implemented as of January 1, 2019. Lease contractual obligations include interest.

[B] Purchase obligations disclosed in the above table exclude commodity purchase obligations that are not fixed or determinable and are principally intended to be resold in a short period of time through sale agreements with third parties. Examples include long-term non-cancellable LNG and natural gas purchase commitments and commitments to purchase refined products or crude oil at market prices. Inclusion of such commitments would not be meaningful in measuring liquidity and cash flow, as the cash outflows generated by these purchases will generally be offset in the same periods by cash received from the related sales transactions.

[C] Includes all obligations included in "Trade and other payables" and provisions related to onerous contracts included in "Decommissioning and other provisions" in "Non-current liabilities" in the "Consolidated Balance Sheet" that are contractually fixed as to timing and amount. In addition to these amounts, Shell has certain obligations that are not contractually fixed as to timing and amount, including contributions to defined benefit pension plans (see Note 18 to the "Consolidated Financial Statements" on pages 239-244) and obligations associated with decommissioning and restoration (see Note 19 to the "Consolidated Financial Statements" on page 245).

### GUARANTEES AND OTHER OFF-BALANCE SHEET ARRANGEMENTS

There were no guarantees and other off-balance sheet arrangements at December 31, 2021, or December 31, 2020, that were reasonably likely to have a material effect on Shell.

### DIVIDENDS

Subject to Board approval, Shell aims to grow the dividend per share by around 4% every year. In total, Shell targets the distribution of 20-30% of its cash flow from operations to shareholders. Shell may choose to return cash to shareholders through a combination of dividends and share buybacks.

When setting the level of shareholder remuneration, the Board looks at a range of factors, including the macro environment, the underlying business earnings and cash flows of Shell Group, the current balance sheet, future investment and divestment plans and existing commitments. We returned $6.3 billion to our shareholders through dividends in 2021.

The fourth quarter 2021 interim dividend of $0.24 per share will be payable to shareholders on the register at February 18, 2022. See Note 24 to the "Consolidated Financial Statements" on page 255. The Board expects that the first quarter 2022 interim dividend will increase by around 4% compared with the fourth quarter 2021 interim dividend, to $0.25 per share.

PURCHASES OF SECURITIES

On July 29, 2021, the Company announced the start of a share buyback programme of $2 billion, which was completed in November 2021. Subsequently, on December 1, 2021, the Company announced the first $1.5 billion tranche of a buyback programme to return $7 billion of proceeds from the divestment of its Permian assets. This tranche was completed in January 2022. In February 2022, share buybacks of $8.5 billion for the first half of 2022 were announced. These included the remaining $5.5 billion of the Permian divestment proceeds that had been allocated for share buybacks.

At December 31, 2021, 126 million B shares with a nominal value of €8.8 million ($10 million) (1.62% of the Company's total issued share capital at December 31, 2020) were purchased and cancelled during 2021 for a total cost of $2.7 billion including expenses, at an average price of $21.60 per share

This was in accordance with the authorities granted by shareholders at the 2021 Annual General Meeting (AGM) for the Company to repurchase up to a maximum of 10% of its issued ordinary shares,

excluding treasury shares (780 million ordinary shares). As at December 31, 2021, 653 million ordinary shares could still be repurchased under the current AGM authority. The purpose of the share repurchases in 2021 was to reduce the issued share capital of the Company.

A new resolution will be proposed at the 2022 AGM to renew the authority for the Company to purchase its own share capital, up to specified limits, for a further year. This proposal will be described in more detail in the 2022 Notice of Annual General Meeting.

Shares are also purchased by the employee share ownership trusts and trust-like entities (see "Governance" on page 190.) to meet delivery commitments under employee share plans. All share purchases are made in open-market transactions.

The table below provides information on purchases of shares in 2021 by the Company and affiliated purchasers. Purchases in euros and sterling are converted into dollars using the exchange rate on each transaction date.

Purchases of equity securities by issuer and affiliated purchasers in 2021 [A]

| | A shares | | | B shares | | | A ADSs [B] |
|---|---|---|---|---|---|---|---|
| Purchase period | Number purchased for employee share plans | Number purchased for cancellation [C] | Weighted average price ($)[D] | Number purchased for employee share plans | Number purchased for cancellation [C] | Weighted average price ($)[D] | Number purchased for employee share plans | Weighted average price ($)[D] |
| January | — | — | — | — | — | — | 1,525,265 | 37.23 |
| February | — | — | — | — | — | — | — | — |
| March | — | — | — | — | — | — | 34,140 | 40.17 |
| April | — | — | — | — | — | — | — | — |
| May | — | — | — | — | — | — | — | — |
| June | 156,668 | — | 20.61 | 91,523 | — | 19.70 | 23,603 | 40.74 |
| July | — | — | — | — | 1,474,422 | 19.95 | — | — |
| August | — | — | — | — | 25,134,113 | 19.81 | — | — |
| September | — | — | — | — | 23,807,741 | 20.27 | 32,670 | 41.01 |
| October | — | — | — | — | 25,200,000 | 23.82 | — | — |
| November | 960,000 | — | 20.93 | 120,000 | 17,217,286 | 22.6 | 233,300 | 41.88 |
| December | 7,185,000 | — | 22.03 | 911,200 | 33,393,418 | 21.75 | 975,299 | 43.66 |
| Total 2021 | 8,301,668 | — | 21.88 | 1,122,723 | 126,226,980 | 21.59 | 2,824,277 | 39.94 |
| January | — | — | — | — | 31,678,192 | 24.43 | 1,106,045 | 46.31 |
| Total 2022 | — | — | — | — | 31,678,192 | 24.43 | 1,106,045 | 46.31 |

[A] Reported as at settlement date
[B] American Depositary Shares
[C] Under the share buyback programme
[D] Includes stamp duty and brokers' commission

FINANCIAL INFORMATION RELATING TO THE ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST

The results of operations and financial position of the Royal Dutch Shell Dividend Access Trust (the Trust) are included in the consolidated results of operations and financial position of Shell. Certain condensed financial information in respect of the Trust is given below. See "Royal Dutch Shell Dividend Access Trust Financial Statements" on pages 284-286.

The Shell Transport and Trading Company Limited and BG Group Limited have each issued a dividend access share to Computershare Trustees (Jersey) Limited (the Trustee). For the years 2021, 2020 and 2019, the Trust recorded income before tax of £2,201 million, £2,777 million and £5,484 million respectively. In each period, this reflected the amount of dividends payable on the dividend access shares. Dividends are also classified as unclaimed where amounts have not cleared recipient bank accounts.

At December 31, 2021, the Trust had total equity of £nil (December 31, 2020: £nil; December 31, 2019: £nil), reflecting assets of £7 million (December 31, 2020: £7 million; December 31, 2019: £3 million) and unclaimed dividends of £7 million (December 31, 2020: £7 million; December 31, 2019: £3 million). The Trust only records a liability for an unclaimed dividend, to the extent that dividend cheque payments have not been presented within 12 months, have expired or have been returned unpresented.

On January 29, 2022, one line of shares was established through assimilation of each A share and each B share into one ordinary share of the Company. This assimilation had no impact on voting rights or dividend entitlements. Dutch withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the ordinary shares following the assimilation.

In relation to the assimilation of the Company's Class A and B shares, the Trust will continue in existence for the foreseeable future to facilitate the payment of unclaimed dividend liabilities for B shareholders, until these are either claimed or forfeited in line with the terms outlined.

## MARKET OVERVIEW

We maintain a large business portfolio across an integrated value chain and are exposed to crude oil, natural gas, hydrocarbon product and chemical prices (see "Risk factors" on page 23). This diversified portfolio helps us mitigate the impact of price volatility. Our annual planning cycle and periodic portfolio reviews aim to ensure that our levels of capital investment and operating expenses are appropriate in the context of a volatile price environment. We test the resilience of our projects and other opportunities against a range of crude oil, natural gas, oil product and chemical prices and costs. We also aim to maintain a strong balance sheet to provide resilience against weak market prices.

### GLOBAL ECONOMIC GROWTH

After a sharp economic deceleration related to the COVID-19 pandemic in 2020, the global economy has experienced a strong but uneven recovery in 2021. In its World Economic Outlook of January 2022, the International Monetary Fund (IMF) estimates that global growth for 2021 has reached 5.9% – its strongest post-recession pace in 80 years. This recovery is uneven and largely reflects sharp rebounds in some major economies, most notably the USA and China, owing to substantial government policy support. In many emerging market and developing economies, inequalities in access to vaccines led to higher infection rates. This combined with a partial withdrawal of policy support have offset some of the benefits of strengthening external demand and rising commodity prices. Early policy support and vaccinations proved effective at mitigating some of the adverse economic and health impacts of COVID-19 during 2021. However, rising energy prices and supply disruptions have also resulted in broad-based inflation in the second half of 2021, notably in the USA and many emerging market and developing economies.

The global economic prospects remain highly uncertain. The world remains vulnerable to COVID-19 and the pandemic is continuing, owing to unequal access to vaccines, the reluctance of some to get vaccinated and the emergence of more infectious new variants such as Omicron. Socioeconomic challenges abound, including rising inflation, subdued employment growth, supply chain problems, setbacks to educational attainment, and climate change.

Confronted with such complex challenges, policy choice is difficult because a sharp increase in global debt levels during the pandemic has left limited room for manoeuvre. There is also an upside, because the pandemic has induced greater automation and workplace transformation, which could accelerate productivity growth. Structural investment plans implemented in Europe and the USA could also lift the growth outlook.

### GLOBAL PRICES, DEMAND AND SUPPLY

The following table provides an overview of the main crude oil and natural gas price markers to which we are exposed:

Oil and gas average industry prices [A]

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Brent ($/b) | 71 | 42 | 64 |
| West Texas Intermediate ($/b) | 68 | 39 | 57 |
| Henry Hub ($/MMBtu) | 4.0 | 2.0 | 2.5 |
| EU TTF ($/MMBtu) | 16 | 3 | 5 |
| Japan Customs-cleared Crude ($/b) - 3 months | 60 | 51 | 70 |

[A] Yearly average prices are based on daily spot prices. The 2021 average price for Japan Customs-cleared Crude is based on available market information up to the end of the period.

### CRUDE OIL

Brent crude oil, an international benchmark, rebounded in 2021, supported by stronger demand and moderate supply growth. Brent traded between $50 per barrel (/b) and $86/b in 2021, ending the year at around $77/b and averaging $71/b for the whole year. This was about 70% higher than in 2020.

Global oil product demand rose by 5.6 million barrels per day (b/d) in 2021 to 97.4 million b/d, after a sharp drop of around 8.5 million b/d in 2020, according to the IEA. The rebound was supported by successful vaccine roll-outs, especially in developed economies such as the USA, UK and EU. Road mobility has largely returned to pre-pandemic levels, with COVID-19 travel restrictions being lifted and more people switching from public transport to cars. Air travel has begun to recover, but is still around 20-30% below pre-pandemic levels. This is probably attributable to remaining cross-border travel restrictions and public hesitancy about air travel during a global pandemic. Mirroring the broad economic recovery, demand for naphtha, LPG and ethane also picked up.

Global oil production has started to rise gradually as demand recovers. Annual growth in 2021 was about 1.5 million b/d, with OPEC+ making up most of the growth. From the second quarter of 2021, OPEC+ has been gradually unwinding the production cuts it implemented in 2020, with full unwinding expected by the second half of 2022. Outside OPEC+, US light tight oil (LTO) has dominated the growth, supported by the rebounding oil price. The number of US rotary oil rigs increased by more than 160% by December 2021, from the record low seen in August 2020. This, though, remained only around 60% of the 2019 average.

The OPEC+ production cuts have enabled a quick rundown of a record global oil inventory. The industry stock of Organisation for Economic Co-operation and Development (OECD) economies, which had reached more than 3,200 million barrels by the middle of 2020, fell to around 2,760 million barrels by the end of 2021, a seven-year low.

The oil price largely followed an upward trend for most of the year. The Brent daily price passed the $70/b mark in June and $80/b in October. The strong price move reflected a tight market balance, resulting from modest supply growth and robust demand recovery. It also reflected the broad inflationary pricing environment for energy commodities such as coal and natural gas, in a period of economic recovery and supply chain challenges.

The price rally was at times interrupted by restrictions introduced in response to new waves of COVID-19, especially those caused by the Delta variant in the summer and Omicron towards the end of the year. In the final few weeks of 2021, the Omicron variant triggered the sharpest sell-off since April 2020, with Brent retreating almost $10/b in a single day at the height of the sell-off. Brent started regaining its strength towards the end of December, as a severe Omicron-induced demand disruption failed to materialise and supply concerns once again prevailed.

Looking forward, demand uncertainties related to the COVID-19 pandemic remain a key uncertainty affecting the recovery of the global crude market. This is particularly so for aviation fuel which has been the most impacted by travel restrictions. But the extent of new COVID-related demand disruption could be moderated by booster programmes and the greater availability of more effective treatments for virus.

At the same time, there has been increasing evidence of supply side risks. Upstream investment worldwide has slowed considerably during the pandemic. As a result, OPEC's excess capacity will be declining. Meanwhile, US light tight oil is expected to be facing continued capital discipline pressures, restraining its growth. These factors will constrain the global fast response supply capacity to manage demand and supply disruptions, which may lead to price upside and volatilities.

### NATURAL GAS

Global demand for natural gas rose by an estimated 4.6% in 2021, after the COVID-19 pandemic caused consumption to decline by around 1.2% in 2020, according to the IEA. The 2021 rate represents a return to around the historical norms of growth for gas, and is roughly the same as the pre-pandemic growth rate of 2019. The revival of economic growth underpinned the industrial uptake of gas, especially in China. Underperformance of hydroelectric output in China and South America as well as weak renewables generation in Europe drove incremental power demand for gas. Colder-than-normal winters and hotter-than-usual summers also produced higher-than-expected demand for gas from commercial and residential users. Reduced supply from a number of sources led to shortages and record high prices for gas and LNG globally.

LNG imports were up 6.0% in 2021 after only a minor increase in 2020. The global LNG supply complex experienced upstream production deficits in 2021. Nigeria, Trinidad and Tobago, Peru and Norway were down a combined 12 million tonnes, or 32%, from 2020. The addition of new liquefaction capacity was also limited in 2021, although utilisation of projects that started in 2020 improved, which provided some support for supply growth.

European gas prices rose to unprecedented levels by the middle of 2021, with the average Dutch Title Transfer Facility (TTF) price more than five times that of 2020. The TTF price reached a peak of almost $60 per million British thermal units (MMBtu). TTF and European spot gas hub prices broke above oil parity by the third quarter and continued well above that level for the rest of the year. Prices were supported by an extended heating season that left gas storage at a deficit coming out of winter and prompted fears of scarcity as indigenous production slumped and pipeline and LNG imports were restrained. Record coal and carbon prices also contributed to the price surge.

Asian spot LNG prices, as reflected by the Japan Korea Marker (JKM), responded to the tight European market conditions with bids at a premium to TTF for most of the year. This was in order to secure LNG supplies for China and South Korea, where demand was higher than expected. Average JKM prices ended the year up more than 300% from 2020 and up more than 200% from 2019. Long-term contracts indexed to oil prices tracked the wider crude complex upward during the year but did not increase at the same rate as spot gas and LNG prices.

Strong Asian and European prices incentivised full US LNG export production. This helped strengthen Henry Hub cash prices to an average of $3.81 per MMBtu for 2021, up more than 90% year-on-year. After trading in a narrow range of around $3 per MMBtu for the first half of 2021, Henry Hub prices rose above $5 per MMBtu by the end of the third quarter. The upstream investment cuts of 2020 continued into 2021. Production did not keep pace with rebounding demand, heightened by a combined 34% increase in LNG and Mexico pipeline exports from a year ago.

Looking ahead, we expect that the high gas prices in North America, Europe and Asia-Pacific will go down to more normal levels. This is because we anticipate that global gas inventories will eventually replenish as production recovers in response to the current elevated price levels. Price developments, though, are highly uncertain.

We believe gas and LNG prices in Europe and Asia will be increasingly influenced by European gas storage levels and by competition with Asia for LNG imports, particularly flexible supply from the USA. Overall LNG supply is expected to recover and increase as new liquefaction capacity is added in the USA in 2022. But the global LNG market will remain structurally tight as a relatively small amount of incremental supply will come to market over the coming years.

In the USA, Henry Hub prices are expected to moderate from 2021 as production increases in response to higher gas prices as well as oil prices (which support associated gas production in the Permian basin). But upward pressures on gas prices are also expected as LNG exports, Mexico pipeline exports and economic growth stimulate demand.

### CRUDE OIL AND NATURAL GAS PRICE ASSUMPTIONS

Our ability to deliver competitive returns and pursue commercial opportunities ultimately depends on the accuracy of our price assumptions (see "Risk factors" on page 23). We use a rigorous assessment of short-, medium- and long-term market uncertainties to determine what ranges of future crude oil and natural gas prices to use in project and portfolio evaluations. Market uncertainties include, for example, future economic conditions, geopolitics, actions by major resource holders, production costs, technological progress and the balance of supply and demand. See also Note 9 to the "Consolidated Financial Statements" on pages 228 to 231.

### REFINING MARGINS

Refining marker average industry gross margins

| | 2021 | 2020 | $/b 2019 |
|---|---|---|---|
| US West Coast | 14.6 | 8.5 | 13.5 |
| US Gulf Coast Coking | 9.8 | 2.3 | 4.9 |
| Rotterdam Complex | 1.9 | 0.4 | 2.3 |
| Singapore | (1.7) | (0.5) | (0.6) |

Gross refining margins improved during 2021, especially during the second and third quarters. This is because demand for oil products recovered significantly as economies rebounded and transport use increased with the easing of COVID-19 travel restrictions. Demand for kerosene for aviation remained below pre-pandemic levels because varying levels of international travel restrictions remained in place in 2021. Despite the Omicron variant of COVID-19, demand recovery continued during the fourth quarter.

Industry utilisation showed some recovery, but in 2021 there were further announcements that refineries would fully or partially close on a permanent basis. Construction of new capacity continued during the year, especially in the Middle East and Asia.

Refining margins for the next few years are expected to be supported by demand returning to pre-pandemic levels in 2022. The continued addition of new refinery capacity, often integrated with chemicals production, will put downward pressure on margins during the next few years.

Exhibit Q

MARKET OVERVIEW continued

PETROCHEMICAL MARGINS

Cracker industry margins [A]

|  | | | $/tonne |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| North East/South East Asia naphtha | 229 | 362 | 302 |
| Western Europe naphtha | 597 | 513 | 528 |
| US ethane | 692 | 433 | 440 |

[A] ICIS data are quoted. Cracker margins have been revised from the fourth quarter of 2019 onwards because of ICIS updating its methods for calculating cracker margins. Further revisions are based on available market information to external industry data provider up to the end of the period.

Cracker margins were volatile in 2021. This was because of supply interruptions and demand increases as COVID-19 lockdown restrictions eased. Overall margins were higher than in 2020, except in Asia. Chinese demand recovered quickly from the pandemic, but petrochemical supply was constrained by power restrictions that affected manufacturing centres, logistics issues within China because of COVID-19, and global logistics issues. Asia cracker margins were down slightly from 2020 because of the balance of supply and demand, and rising prices for energy, crude oil and naphtha feedstock. US ethane cracker margins were supported by disruption due to winter storm Uri in February and March and to a lesser extent by interruptions caused by Hurricane Ida in August and September. West European cracker margins were supported by the US weather events and strong domestic demand, which offset rising crude and natural gas prices for the majority of 2021.

The outlook for petrochemical margins in 2022 and beyond depends on feedstock costs and the balance of supply and demand. Demand for petrochemicals will be affected by the spread of COVID-19 as new variants emerge, and the extent of recovery from the pandemic. Supply of petrochemicals will depend on the net capacity effect of new builds and plant closures (taking into account any delays or cancellations in building new plants or closing old ones). Product prices reflect the prices of raw materials, which are closely linked to crude oil and natural gas prices. The balance of all these factors will drive margins.

The statements in this "Market overview" section, including those related to our price forecasts, are forward-looking statements based on management's current expectations and certain material assumptions and, accordingly, involve risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied herein. See "About this Report" on pages 10 to 11 and "Risk factors" on pages 23 to 32.

Exhibit Q

## INTEGRATED GAS

Key statistics

$ million, except where indicated

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Segment earnings/(loss) | 6,340 | (6,278) | 8,628 |
| Including: | | | |
| Revenue (including inter-segment sales) | 60,289 | 36,697 | 45,602 |
| Share of profit of joint ventures and associates | 1,906 | 562 | 1,791 |
| Interest and other income | 1,787 | 14 | 263 |
| Operating expenses [A] | 7,126 | 6,555 | 6,667 |
| Underlying operating expenses [A] | 6,892 | 5,769 | 6,534 |
| Exploration | 127 | 611 | 281 |
| Depreciation, depletion and amortisation | 6,188 | 17,704 | 6,238 |
| Taxation charge/(credit) | 2,246 | (2,507) | 2,242 |
| Identified Items [A] | (2,417) | (10,661) | (326) |
| Adjusted Earnings [A] | 8,757 | 4,383 | 8,955 |
| Adjusted EBITDA (CCS basis) [A] | 16,421 | 11,668 | 16,719 |
| Capital expenditure | 5,279 | 3,661 | 3,851 |
| Cash capital expenditure [A] | 5,767 | 4,301 | 4,299 |
| Oil and gas production available for sale (thousand boe/d) | 942 | 911 | 922 |
| LNG liquefaction volumes (million tonnes) | 31.0 | 33.2 | 35.6 |
| LNG sales volumes (million tonnes) | 64.2 | 71.9 | 74.5 |

[A] See "Non-GAAP measures reconciliations" on pages 294-297.

### OVERVIEW
Our Integrated Gas segment includes liquefied natural gas (LNG), conversion of natural gas into gas-to-liquids (GTL) fuels and other products, and our Renewables and Energy Solutions activities. The segment includes natural gas and liquids exploration and extraction, and the operation of upstream and midstream infrastructure that delivers gas and liquids to market. It markets and trades natural gas, LNG, power and carbon-emission rights, and LNG as a fuel for heavy-duty vehicles and marine vessels.

### BUSINESS CONDITIONS
Global demand for natural gas rose by an estimated 4.6% in 2021, after the COVID-19 pandemic caused consumption to decline by around 1.2% in 2020, according to the IEA. The 2021 rate represents a return to around the historical norms of growth for gas, and is roughly the same as the pre-pandemic growth rate of 2019. The revival of economic growth underpinned the industrial uptake of gas, especially in China. Underperformance of hydroelectric output in China and South America as well as weak renewables generation in Europe drove incremental power demand for gas. Colder-than-normal winters and hotter-than-usual summers also produced higher-than-expected demand for gas from commercial and residential users. Reduced supply from a number of sources led to shortages and record high prices for gas and LNG globally.

LNG imports were up 6.0% in 2021 after only a minor increase in 2020. The global LNG supply complex experienced upstream production deficits in 2021. Nigeria, Trinidad and Tobago, Peru and Norway were down a combined 12 million tonnes, or 32%, from 2020. The addition of new liquefaction capacity was also limited in 2021, although utilisation of projects that started in 2020 improved, which provided some support for supply growth.

European gas prices rose to unprecedented levels by the middle of 2021, with the average Dutch Title Transfer Facility (TTF) price more than five times that of 2020. The TTF reached a peak of almost $60 per million British thermal units (MMBtu). TTF and European spot gas hub prices broke above oil parity by the third quarter and continued well above that level for the rest of the year. Prices were supported by an extended heating season that left gas storage at a deficit coming out of winter and prompted fears of scarcity as

indigenous production slumped and pipeline and LNG imports were restrained. Record coal and carbon prices also contributed to the price surge.

Asian spot LNG prices, as reflected by the Japan Korea Marker (JKM), responded to the tight European market conditions with bids at a premium to TTF for most of the year. This was in order to secure LNG supplies for China and South Korea, where demand was higher than expected. Average JKM prices ended the year up more than 300% from 2020 and up more than 200% from 2019. Long-term contracts indexed to oil prices tracked the wider crude complex upward during the year but did not increase at the same rate as spot gas and LNG prices.

In the USA, Henry Hub prices are expected to moderate from 2021 as production increases in response to higher gas prices as well as oil prices (which support associated gas production in the Permian basin). But upward pressures on gas prices are also expected as LNG exports, Mexico pipeline exports and economic growth stimulate demand.

See "Market overview" on pages 41-43.

### PRODUCTION AVAILABLE FOR SALE
In 2021, our production was 344 million barrels of oil equivalent (boe) or 942 thousand boe per day (boe/d), compared with 333 million boe, or 911 thousand boe/d in 2020. Natural gas production was 83% of total production in 2021 and 2020. In 2021, natural gas production increased by 3% compared with 2020. This was mainly because of the restart of production at the Prelude floating LNG facility in Australia, and the effects of production-sharing contracts, partly offset by field decline. Liquids production increased by 6% driven mainly by the restart of production at the Prelude facility.

INTEGRATED GAS continued

## LNG LIQUEFACTION VOLUMES

LNG liquefaction volumes were 31.0 million tonnes in 2021 compared with 33.2 million tonnes in 2020. The decrease was mainly due to feedgas constraints and higher maintenance activities, partly offset by the restart of production at the Prelude floating LNG facility.

LNG sales volumes were 64.2 million tonnes in 2021 compared with 71.9 million tonnes in 2020. This decrease was mainly due to lower LNG liquefaction volumes and lower purchases from third parties.

Through our Shell Energy organisation, we market a portion of our share of equity production of LNG and sell and market LNG volumes around the world through our hubs in the UK, UAE and Singapore.

Shell has term sales contracts for the majority of our LNG liquefaction and term purchase contracts. We are able to maximise the income we generate from our LNG cargoes through our shipping network, regasification terminals and ability to purchase and deliver LNG spot cargoes from third parties. For example, if one customer does not need a scheduled cargo, we can deliver it to another customer who is in need. Similarly, if a customer needs an additional cargo not available from our production facilities, we can contract with third parties to deliver the additional cargo. We also conduct paper trades, primarily to manage commodity price risk related to sales and purchase contracts. We also sell LNG for trucks in China, Singapore and Europe.

## INTEGRATED GAS DATA TABLE

LNG liquefaction volumes

| | | | Million tonnes |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Australia | 13.1 | 11.8 | 12.5 |
| Brunei | 1.4 | 1.6 | 1.6 |
| Egypt | 0.3 | 0.2 | 0.4 |
| Nigeria | 4.3 | 5.3 | 5.3 |
| Oman | 2.5 | 2.5 | 2.6 |
| Peru | 0.6 | 0.9 | 0.9 |
| Qatar | 2.4 | 2.4 | 2.5 |
| Russia | 2.8 | 3.1 | 3.0 |
| Trinidad and Tobago | 3.6 | 5.4 | 6.7 |
| Other | — | 0.2 | 0.2 |
| Total | 31.0 | 33.2 | 35.6 |

## EARNINGS 2021-2020

Segment earnings in 2021 were $6,340 million, which included a net charge of $2,417 million. The net charge comprised losses of $2,641 million due to the fair value accounting of commodity derivatives, impairment charges of $594 million and provisions for onerous contracts of $217 million, partly offset by gains on sale of assets of $1,086 million.

Segment earnings in 2020 were a loss of $6,278 million, which included a net charge of $10,661 million. The net charge reflected impairment charges of $9,282 million mainly reflecting revisions to mid- and long-term price outlook assumptions and primarily related to the Queensland Curtis LNG and Prelude floating liquefied natural gas (FLNG) operations in Australia. It also comprised a net charge of $969 million due to the fair value accounting of commodity derivatives and a charge of $607 million related to onerous contract provisions.

Excluding the net charges described above, segment earnings were $8,757 million in 2021 compared with $4,383 million in 2020. The increase was mainly driven by higher realised prices for oil, LNG and gas, favourable tax movements and higher volumes. This was partly offset by higher operating expenditure.

## PRIOR YEAR EARNINGS SUMMARY

Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 47) and Form 20-F (page 31) for the year ended December 31, 2020 as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

## CASH CAPITAL EXPENDITURE

Cash capital expenditure in 2021 was $5,767 million, compared with $4,301 million in 2020. The increase was mainly due to growth in our Renewables and Energy Solutions businesses. Our cash capital expenditure is expected to be around $8 billion in 2022.

## PORTFOLIO AND BUSINESS DEVELOPMENT

Key portfolio events included the following:
• In March 2021, we completed the sale of a 26.25% interest in the Queensland Curtis LNG Common Facilities to Global Infrastructure Partners Australia for $2.5 billion.
• In June 2021, Atlantic Shores Offshore Wind, our 50:50 joint venture with EDF Renewables North America, was awarded rights to provide 1.5 GW of renewable offshore wind power to New Jersey, USA.
• In July 2021, we signed a memorandum of understanding with Deutsche Telekom to advance digital innovation as both companies accelerate their transitions to net-zero emissions.
• In July 2021, we started production in Block 5C in the East Coast Marine Area off the coast of Trinidad and Tobago.
• In December 2021, we completed the acquisition of Savion LLC, a large utility-scale solar and energy storage developer in the USA.
• In December 2021, we signed a gas concession agreement for Block 10 in Oman.
• In January 2022, we announced that Shell and ScottishPower had won bids to develop 5 GW of floating wind power in the UK.
• In January 2022, we started operations at the power-to-hydrogen electrolyser in China.
• In February 2022, we completed the acquisition of online energy retailer Powershop Australia which was announced in November 2021.
• In February 2022, Atlantic Shores Offshore Wind, our 50:50 joint venture with EDF Renewables North America, became the provisional winner of acreage in the New York Bight offshore wind auction, USA.
• In February 2022, we announced our intention to exit our joint ventures with Gazprom and related entities, including our 27.5% interest in Sakhalin-2 and involvement in the Nord Stream 2 pipeline project. For more information, see Note 32 to the "Consolidated Financial Statements" on page 261.

Exhibit Q

BUSINESS AND PROPERTY
Integrated Gas
A complete list of LNG and GTL plants in operation and under construction in which we have an interest is provided below.

LNG liquefaction plants in operation at December 31, 2021 [A]

|  | Asset | Location | Shell interest (%) | 100% capacity (mtpa) [B] | Shell-operated |
|---|---|---|---|---|---|
| **Asia** | | | | | |
| Brunei | Brunei LNG | Lumut | 25 | 7.6 | No |
| Oman | Oman LNG | Sur | 30 | 7.1 | No |
|  | Qalhat LNG | Sur | 11  [C] | 3.7 | No |
| Qatar | Qatargas 4 [D] | Ras Laffan | 30 | 7.8 | No |
| Russia | Sakhalin LNG [D] | Prigorodnoye | 27.5 | 10.9 | No |
| **Oceania** | | | | | |
| Australia | Australia North West Shelf [D] | Karratha | 16.7 | 16.9 | No |
|  | Gorgon LNG [D] | Barrow Island | 25 | 15.6 | No |
|  | Prelude [D] | Browse Basin | 67.5 | 3.6 | Yes |
|  | Queensland Curtis LNG T1 [D] | Curtis Island | 50 | 4.3 | Yes |
|  | Queensland Curtis LNG T2 [D] | Curtis Island | 97.5 | 4.3 | Yes |
| **Africa** | | | | | |
| Egypt [E] | Egyptian LNG T1 | Idku | 35.5 | 3.6 | No |
|  | Egyptian LNG T2 | Idku | 38 | 3.6 | No |
| Nigeria | Nigeria LNG | Bonny | 25.6 | 24.1 | No |
| **South America** | | | | | |
| Peru | Peru LNG | Pampa Melchorita | 20 | 4.5 | No |
| Trinidad and Tobago | Atlantic LNG T1 | Point Fortin | 46 | 3 | No |
|  | Atlantic LNG T2/T3 | Point Fortin | 57.5 | 6.6 | No |
|  | Atlantic LNG T4 | Point Fortin | 51.1 | 5.2 | No |

[A] We have offtake rights via a lease to 100% of the capacity (2.5 mtpa) of the Kinder Morgan-operated Elba Island liquefaction plant in Georgia, USA.
[B] 100% capacity represents the total capacity that all trains can process as reported by the operator.
[C] Interest, or part of the interest, is held via indirect shareholding.
[D] These assets are clustered as integrated assets and have onshore or offshore upstream production.
[E] In January 2014, force majeure notices were issued under the LNG agreements as a result of domestic gas diversions severely restricting volumes available to the Egyptian LNG (ELNG) plant. These notices remain in place.

LNG liquefaction plants under construction at December 31, 2021

|  | Asset | Location | Shell interest (%) | 100% capacity (mtpa) [A] | Shell-operated |
|---|---|---|---|---|---|
| **Africa** | | | | | |
| Nigeria | Train 7 [B] | Bonny | 25.6 | 7.6 | No |
| **North America** | | | | | |
| Canada | LNG Canada T1-2 [C] | Kitimat | 40.0 | 14.0 | No |

[A] 100% capacity represents the total capacity that all trains can process as reported by the operator.
[B] First LNG is expected around the middle of the 2020s.
[C] Construction started in October 2018 and first LNG is expected around the middle of the 2020s.

GTL plants in operation at December 31, 2021

|  | Asset | Location | Shell interest (%) | 100% capacity (b/d) [A] | Shell-operated |
|---|---|---|---|---|---|
| **Asia** | | | | | |
| Malaysia | Shell MDS | Bintulu | 72.0 | 14,700 | Yes |
| Qatar | Pearl | Ras Laffan | 100.0 | 140,000 | Yes |

[A] 100% capacity represents the total capacity of the plant.

Exhibit Q

INTEGRATED GAS continued

We also have interests and rights in the regasification terminals listed below. Extension of leases or rights beyond the periods mentioned below will be reviewed on a case-by-case basis.

LNG regasification terminals

| Project name | Location | Shell capacity rights (mtpa) | Capacity rights period | Shell interest (%) and rights |
|---|---|---|---|---|
| Costa Azul | Baja California, Mexico | 2.7 [A] | 2008–2028 | Capacity rights |
| Cove Point | Lusby, MD, USA | 1.8 | 2003–2023 | Capacity rights |
| Dragon LNG | Milford Haven, UK | 3.1 | 2009–2029 | 50 |
| Elba Island Expansion | Elba Island, GA, USA | 4.2 | 2010–2035 | Leased |
| Elba Island | Elba Island, GA, USA | 2.8 | 2006–2036 | Leased |
| Elba Island | Elba Island, GA, USA | 4.6 | 2003–2027 | Leased |
| GATE (Gas Access to Europe) | Rotterdam, the Netherlands | 1.5 | 2015–2031 | Capacity rights |
| Shell Energy India Pvt Ltd (formerly Hazira) | Gujarat, India | 5 | 2005–2035 | 100 |
| Lake Charles | Lake Charles, LA, USA | 4.4 | 2002–2030 | Leased |
| Lake Charles Expansion | Lake Charles, LA, USA | 8.7 | 2005–2030 | Leased |
| Singapore SGM | SLNG, Singapore | [B] | 2013–2029 | Import rights |
| Singapore SETL | SLNG, Singapore | [B] | 2018–2035 | Import rights |
| Singapore SETL | SLNG, Singapore | up to 1.0 [C] | 2021–2025 | Import rights |
| Shell LNG Gibraltar | Gibraltar | up to 0.04 | 2018–2038 | 51 |

[A] Force majeure declared in May 2020 because of changes in the Firm Storage and Services Agreement (FSSA) General Terms and Conditions.
[B] Licences to import LNG and sell regasified LNG in Singapore with no volume cap.
[C] Exclusive licence to import LNG and sell regasified LNG in Singapore for up to 1.0 mtpa.

### Oil and natural gas production, exploration and development

#### Australia
We operate the Queensland Curtis LNG (QCLNG) venture's natural gas operations, including wells, compression stations and processing plants, in Queensland's Surat Basin. We have interests ranging from 44% to 74% in 25 field compression stations and six central processing plants. Our production of natural gas from the onshore Surat Basin supplies the QCLNG liquefaction plant and the domestic gas market.

We have a 50% interest in Arrow, a Queensland-based joint venture with China National Petroleum Corporation (CNPC). Arrow owns coalbed methane assets and a domestic power business.

We have interests in offshore production, LNG liquefaction and exploration licences in the Browse Basin and in the North West Shelf (NWS) and Greater Gorgon areas of the Carnarvon Basin. Woodside is the operator on behalf of the NWS joint venture (Shell interest 16.7%). We have a 25% interest in the Chevron-operated Gorgon LNG joint venture that includes offshore production.

Our interests in the Browse Basin include joint arrangements, with Shell as the operator, for: the Prelude field (Shell interest 67.5%); the pre-final investment decision Crux gas and condensate field (Shell interest 82%); and other backfill and contingent resources for Prelude FLNG, including the Bratwurst field (Shell interest 100%). Bratwurst, discovered in 2019, is currently under evaluation as a future backfill opportunity.

We are also a partner in the Browse joint arrangement (Shell interest 27%) covering the Brecknock, Calliance and Torosa gas fields, which are under development and operated by Woodside.

#### Bolivia
We hold a 37.5% participating interest in the Caipipendi block where we produce and explore. We also have a 25% interest in the Tarija XX West block where we produce from the Itaú field. We hold a 15% participating interest in the Repsol-operated Iniguazu exploration.

#### China
We jointly develop and produce from the onshore Changbei tight-gas field under a production-sharing contract (PSC) with CNPC. We took the final investment decision on the Changbei II Phase 1 project in 2017, and started drilling activity in early 2019.

#### Colombia
We have 50% interests in three blocks that we operate, and 60% interests in two deep-water blocks where our partner is the operator.

#### Egypt
We have a 25% interest in the Burullus Gas Company (Burullus), a self-operated joint venture which operates the West Delta Deep Marine concession (Shell interest 50%) and supplies gas to the domestic market and the Egyptian LNG plant. We have a 50% interest in the Rashid Petroleum Company (Rashpetco), a self-operated joint venture which operates the Rosetta concession (Shell interest 100%). We have a 30% interest in the El Burg Offshore Company (EBOC), a self-operated joint venture which operates the El Burg offshore concession (Shell interest 60%).
We have participating interests in several exploration concessions in the Mediterranean, Nile Delta, and Red Sea.

#### Indonesia
We have a 35% interest in the INPEX Masela Ltd joint venture which owns and operates the offshore Masela block.

#### Oman
In December 2021, with our partners, OQ and Marsa Liquefied Natural Gas LLC (a joint venture between TotalEnergies and OQ), we signed a concession agreement with the Ministry of Energy and Minerals on behalf of the government of the Sultanate of Oman to develop and produce natural gas from Block 10. We also signed a separate gas sales agreement for gas produced from the block. The two agreements followed an interim upstream agreement that detailed a funding and work programme from 2019 until the end of 2021 to develop gas resources for projects to help meet the Sultanate of Oman's growing need for energy.

#### Qatar
We operate the Pearl GTL plant (Shell interest 100%) in Qatar under a development and PSC with the government. The fully integrated facility has the capacity to produce, process and transport 1.6 billion standard cubic feet per day (scf/d) of gas from Qatar's North Field.
We have a 30% interest in Qatargas 4, which comprises integrated facilities to produce around 1.4 billion scf/d of gas from Qatar's North Field, an onshore gas-processing facility.

**Russia**

We have a 27.5% interest in the Sakhalin-2 joint venture with Gazprom. Sakhalin-2 is an integrated oil and gas project on Sakhalin island, in the far east of Russia.

**Tanzania**

We operate and have a 60% interest in Blocks 1 and 4 off the coast of southern Tanzania. In June 2020, the government granted a four and a half-year licence extension for both blocks. We continue to develop a potential domestic gas and LNG project.

**Trinidad and Tobago**

We have interests in three concessions with producing fields: Central Block (Shell interest 65%), North Coast Marine Area (NCMA) (Shell interest 80.5%), and East Coast Marine Area (Shell interest 100%). The East Coast Marine Area includes Block 5C which started production in July 2021. We also own a 90% interest in Block 22 and 80% interest in NCMA 4 which includes the undeveloped Iris discovery. Our interests range from 35% to 100% in exploration Blocks 5(d), 5(c)REA, 6(d), and Atlantic Area Block 5.

**Renewables and Energy Solutions**

Renewables and Energy Solutions includes Shell's production and marketing of hydrogen, nature and environmental solutions as well as our integrated power activities. Our integrated power activities comprise:
- generating electricity through wind and solar;
- providing electricity storage;
- marketing and trading gas and power;
- selling gas and power to commercial, industrial and retail customers;
- providing electric vehicle charging services; and
- providing customers with digitally enabled solutions.

We are building the Renewables and Energy Solutions portfolio through organic growth and acquisitions. Most of these opportunities are in sectors that are different from Shell's existing oil and gas businesses, but have some similarities or adjacencies to our other business. Shell-controlled Renewables and Energy Solutions companies are subject to the Shell Control Framework. Some are not yet in full compliance with the Shell Control Framework and we are working to bring them into compliance in a fit-for-purpose manner.

In 2021, cash capital expenditure in Renewables and Energy Solutions amounted to $2.4 billion.

**Energy Solutions**

We provide electricity and smart energy solutions to residential, commercial and industrial customers. We do this through direct electricity sales, storage solutions and energy optimisation services.

We sell natural gas and power to more than 1.6 million retail customers. Currently our largest retail market is the UK. We are

expanding our retail business in Australia, Germany, the Netherlands and the USA.

Our largest markets for commercial and industrial customers are Australia and the USA. In Australia we are the second-largest commercial and industrial retailer of electricity, supplying more than 20% of the market.

**Electric mobility**

We sell and install charge points at homes, workplaces, destinations and depots, operating more than 80,000 charge points. We also provide software solutions and access to more than 300,000 public charge points through our roaming networks in Europe, North America, and South-east Asia. We will integrate our electric mobility activities into Marketing, which is currently part of Oil Products, from 2022 onwards.

**Hydrogen**

We are part of joint ventures and alliances that have built hydrogen filling stations for passenger cars and trucks. We have built a 10 MW electrolyser in Germany. This began operating in July 2021 and is now producing green hydrogen, which is hydrogen produced using electricity from renewable sources. In China, we developed a 20 MW renewable power electrolyser and hydrogen refuelling stations in Zhangjiakou City in the Beijing-Tianjin-Hebei region. We started operations in January 2022.

**Nature and Environmental Solutions**

Nature and Environmental Solutions includes our Nature-Based Solutions (NBS) business and the Environmental Products Trading Business (EPTB). NBS conserve, enhance and restore ecosystems – such as forests, grasslands and wetlands – to prevent greenhouse gas emissions or reduce atmospheric $CO_2$ levels.

Through EPTB we develop, offtake, trade and supply environmental products across compliance and voluntary markets, and this includes partnering with other businesses such as LNG or Marketing to provide integrated energy solutions to customers.

**Marketing and trading**

We market and trade natural gas and power from our own assets and from third parties. In North America we are the third-largest power wholesale trader.

**Wind and solar**

We enable renewable power generation by owning and operating wind farms and solar plants and participating in joint ventures. At the end of 2021, our share of renewable generation capacity was 1.2 GW in operation and 5.6 GW in development. Our renewable power capacities are listed below:

Renewable power capacity in operation and in development

| Location | In operation | | In development | |
| --- | --- | --- | --- | --- |
| | 100% capacity (MW) | Shell interest (MW) | 100% capacity (MW) | Shell interest (MW) |
| Asia | 398 | 123 | 1,488 | 1,064 |
| Europe | 923 | 337 | 929 | 756 |
| North America | 1,442 | 764 | 7,510 | 3,684 |
| Australia | | | 120 | 120 |

Exhibit Q

UPSTREAM

Key statistics

|  | | | $ million, except where indicated |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Segment earnings/(loss) | 9,694 | (10,785) | 3,855 |
| Including: | | | |
| Revenue (including inter-segment sales) | 45,487 | 28,330 | 45,217 |
| Share of profit of joint ventures and associates | 632 | (7) | 379 |
| Interest and other income | 4,602 | 542 | 2,180 |
| Operating expenses [A] | 10,604 | 10,983 | 11,582 |
| Underlying operating expenses [A] | 10,362 | 10,227 | 11,284 |
| Exploration | 1,296 | 1,136 | 2,073 |
| Depreciation, depletion and amortisation | 13,539 | 23,119 | 16,881 |
| Taxation charge/(credit) | 6,100 | (467) | 5,878 |
| Identified Items [A] | 1,745 | (7,933) | (598) |
| Adjusted Earnings [A] | 7,950 | (2,852) | 4,452 |
| Adjusted EBITDA (CCS basis) [A] | 27,358 | 13,247 | 27,034 |
| Capital expenditure | 6,378 | 6,911 | 10,003 |
| Cash capital expenditure [A] | 6,269 | 7,296 | 10,205 |
| Oil and gas production available for sale (thousand boe/d) | 2,240 | 2,424 | 2,691 |

[A] See "Non-GAAP measures reconciliations" on pages 294-297.

**OVERVIEW**
Our Upstream business explores for and extracts crude oil, natural gas and natural gas liquids. It also markets and transports oil and gas, and operates infrastructure necessary to deliver them to market.

**BUSINESS CONDITIONS**
Brent crude oil, an international benchmark, rebounded in 2021, supported by stronger demand and moderate supply growth. Brent traded between $50 per barrel (/b) and $86/b in 2021, ending the year at around $77/b and averaging $71/b for the whole year. This was about 70% higher than in 2020.

Global oil product demand rose by 5.6 million barrels per day (b/d) in 2021 to 97.4 million b/d, after a sharp drop of around 8.5 million b/d in 2020, according to the IEA. The rebound was supported by successful vaccine roll-outs, especially in developed economies such as the USA, UK and EU. Road mobility has largely returned to pre-pandemic levels, with COVID-19 travel restrictions being lifted and more people switching from public transport to cars. Air travel has begun to recover, but is still around 20-30% below pre-pandemic levels. This is probably attributable to remaining cross-border travel restrictions and public hesitancy about air travel during a global pandemic. Mirroring the broad economic recovery, demand for naphtha, LPG and ethane also picked up.

Global demand for natural gas rose by an estimated 4.6% in 2021, after the COVID-19 pandemic caused consumption to decline by around 1.2% in 2020, according to the IEA. The 2021 rate represents a return to around the historical norms of growth for gas, and is roughly the same as the pre-pandemic growth rate of 2019. The revival of economic growth underpinned the industrial uptake of gas, especially in China. Underperformance of hydroelectric output in China and South America as well as weak renewables generation in Europe drove incremental power demand for gas. Colder-than-normal winters and hotter-than-usual summers also produced higher-than-expected demand for gas from commercial and residential users. Reduced supply from a number of sources led to shortages and record high prices for gas and LNG globally.

European gas prices rose to unprecedented levels by the middle of 2021, with the average Dutch Title Transfer Facility (TTF) price more than five times that of 2020. The TTF price reached a peak of almost $60 per million British thermal units (MMBtu). TTF and European spot gas hub prices broke above oil parity by the third quarter and continued well above that level for the rest of the year. Prices were supported by an extended heating season that left gas storage at a deficit coming out of winter and prompted fears of scarcity as indigenous production slumped and pipeline and LNG imports were restrained. Record coal and carbon prices also contributed to the price surge.

In the USA, Henry Hub prices are expected to moderate from 2021 as production increases in response to higher gas prices as well as oil prices (which support associated gas production in the Permian basin). But upward pressures on gas prices are also expected as LNG exports, Mexico pipeline exports and economic growth stimulate demand.

**PRODUCTION AVAILABLE FOR SALE**
In 2021, production was 818 million boe, or 2,240 thousand boe/d, compared with 887 million boe, or 2,424 thousand boe/d in 2020. Liquids production decreased by 5% and natural gas production decreased by 13% compared with 2020.

The decrease in production was mainly caused by divestments in Canada, Egypt and the USA, higher maintenance most significantly in Nigeria and the UK, and the effects of production-sharing contracts (PSCs) which were especially notable in Malaysia and Kazakhstan.

Oil production declined by around 8% from 2019 to 2021. Excluding the impact from the Permian divestment, oil production is expected to decrease on average by 1-2% a year until 2030.

See "Market overview" on pages 41-43.

### EARNINGS 2021-2020

Segment earnings in 2021 were $9,694 million, which included a net gain of $3,268 million on sale of assets mainly related to the sale of the Permian business in the USA, partly offset by post-tax impairment charges of $479 million, a net charge of $393 million due to the fair value accounting of commodity derivatives and fourth quarter 2021 legal provisions of $287 million.

Segment earnings in 2020 were a loss of $10,785 million, which included a net charge of $6,447 million related to impairments, primarily in the US Gulf of Mexico, unconventional assets in North America, offshore assets in Brazil and Europe, and a project in Nigeria (OPL245), mainly triggered by revision of Shell's mid- and long-term commodity price and updated Appomattox subsurface understanding. Also included was a net charge of $782 million related to the impact of the weakening Brazilian real on a deferred tax position.

Excluding the net gains described above, segment earnings in 2021 were a profit of $7,950 million, compared with a loss of $2,852 million in 2020. Earnings excluding the net gains were helped by higher oil and gas prices mainly driven by the improved macroeconomic conditions as described in the business condition section and the one-off release of a tax provision in Nigeria of $628 million.

### PRIOR YEAR EARNINGS SUMMARY

Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 54) and Form 20-F (page 37) for the year ended December 31, 2020, as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

### CASH CAPITAL EXPENDITURE

Cash capital expenditure in 2021 was $6.3 billion, compared with $7.3 billion in 2020.

Lower cash capital expenditure in 2021 was mainly driven by deferral and slippage of activities across the portfolio and divestments.

### PORTFOLIO AND BUSINESS DEVELOPMENT

We took the following key portfolio decisions during 2021:
- In Brazil, in August 2021, we announced the final investment decision (FID) taken by the Libra consortium, operated by Petrobras, to contract the Mero-4 floating production, storage and offloading (FPSO) vessel to be deployed at the offshore Mero field in the Santos Basin.
- In Malaysia, in August 2021, we announced the FID on the Timi gas development project.
- In the US Gulf of Mexico, in July 2021, we took the FID for Whale, a deep-water development in the US Gulf of Mexico that features a 99% replicated hull and an 80% replication of the topsides of our Vito project.
- We continue to review positions that are outside our risk appetite, such as Nigeria onshore. In the last decade we have reduced the total number of licences by half and we continue to review the portfolio options for Nigeria onshore oil and gas.

We continued to divest assets during 2021, including:
- in Canada, in April 2021, we completed the sale of our Duvernay light oil position in Alberta. The transaction had an effective date of January 1, 2021;
- in Egypt, in September 2021, we completed the sale of our upstream assets in Egypt's Western Desert;
- in Nigeria, in January 2021, we completed the sale of our 30% interest in oil mining lease (OML) 17 in the Eastern Niger Delta, and associated infrastructure;
- in the Philippines, in May 2021, we agreed to sell our 100% shareholding in Shell Philippines Exploration B.V. (SPEX). We aim to complete the sale in 2022; and
- in the USA, in December 2021, we completed the sale of our Permian business.

As announced on February 28, 2022, Shell intends to exit its joint ventures with Gazprom and related entities, including our 50% interest in Salym Petroleum Development and our 50% interest in Gydan energy venture. For more information see Note 32 on page XX.

### BUSINESS AND PROPERTY

Our subsidiaries, joint ventures and associates are involved in all aspects of upstream activities, including land tenure, entitlement to produced hydrocarbons, production rates, royalties, pricing, environmental protection, social impact, exports, taxes and foreign exchange.

The conditions of the leases, licences and contracts under which oil and gas interests are held vary from country to country. In almost all cases outside North America, legal agreements are generally granted by, or entered into with, a government, state-owned company, government-run oil and gas company or agency. The exploration risk usually rests with the independent oil and gas company. In North America, these agreements may also be with private parties that own mineral rights. Of these agreements, the following are most relevant to our interests:
- Licences (or concessions), which entitle the holder to explore for hydrocarbons and exploit any commercial discoveries. Under a licence, the holder bears the risk of exploration, development and production activities, and is responsible for financing these activities. In principle, the licence holder is entitled to the totality of production less any royalties in kind. The government, state-owned company or government-run oil and gas company may sometimes enter into a joint arrangement as a participant, sharing the rights and obligations of the licence but usually without sharing the exploration risk. In a few cases, the state-owned company, government-run oil and gas company or agency has an option to purchase a certain share of production.
- Lease agreements, which are typically used in North America and are usually governed by terms similar to licences. Participants may include governments or private entities. Royalties are either paid in cash or in kind.
- Production-sharing contracts (PSCs) entered into with a government, state-owned company or government-run oil and gas company. PSCs generally oblige the independent oil and gas company, as contractor, to provide all the financing and bear the risk of exploration, development and production activities in exchange for a share of the production. Usually, the government, state-owned company or government-run oil and gas company may receive a share of the production that is reserved for the recovery of the contractor's cost (cost oil). The remaining production is split with the government, state-owned company or government-run oil and gas company on a fixed or volume/revenue-dependent basis. In some cases, the government, state-owned company or government-run oil and gas company will participate in the rights and obligations of the contractor and will share in the costs of development and production. Such participation can be across the venture or on a field-by-field basis. Additionally, as the price of oil or gas increases above certain predetermined levels, the independent oil and gas company's entitlement share of production normally decreases, and vice versa. Accordingly, its interest in a project may not be the same as its entitlement.

UPSTREAM continued

### Europe

#### Italy

We have a 39% interest in the Val d'Agri producing concession, operated by ENI S.p.A.

We also have a 25% interest in the Tempa Rossa producing concession operated by TotalEnergies EP Italia S.p.A.

#### Netherlands

Shell and ExxonMobil are 50:50 shareholders in Nederlandse Aardolie Maatschappij B.V. (NAM). A significant part of NAM's gas production comes from the onshore Groningen gas field, in which NAM holds a 60% interest. The remaining 40% interest is held by EBN, a Dutch government entity. NAM also has a 60% interest in the Schoonebeek oil field and operates 25 other hydrocarbon production licences.

Production from the Groningen field induces earthquakes that have damaged houses and other buildings and structures in the region. This has led to complaints and claims for compensation for damage from the local community.

Since 2013, the Dutch Minister of Economic Affairs and Climate Policy has set an annual production level for the Groningen field, taking into account all interests, including residents' safety, security of supply in the domestic gas market and supply commitments in EU member states. The production level in the gas year 2021-2022 (ending October 1, 2022) was set as 3.9 billion cubic metres, subject to revision by the Minister.

In June 2018, NAM's shareholders and the Dutch government signed a heads of agreement (HoA) to reduce production from Groningen and to ensure the financial robustness of NAM to fulfil its obligations. In the HoA, NAM's shareholders agreed not to declare dividends for 2018 and 2019. Dividend payments for 2020 and beyond will be made only if a solvency ratio of 25% is reached and maintained, which was not the case for 2021. In September 2018, detailed agreements were signed to further implement the HoA. As part of these agreements, Shell guarantees NAM's payment obligations vis-à-vis the Dutch government in relation to earthquake-related damages and costs of strengthening houses, up to a maximum of 30%. This maximum equates to Shell's indirect interest in the Groningen production system.

In conjunction with the HoA, it was agreed that NAM would cease all involvement in handling damage claims or strengthening buildings to make them safe. The Dutch government has stepped into these two roles and has developed legislation and policies to deal with earthquake-related matters. The Dutch government passes on to NAM the cost of the elements for which NAM is liable. NAM has started arbitration with the Dutch government to have its financial liability determined for certain earthquake costs which the Dutch government compensates to claimants and subsequently recovers from NAM.

In September 2019, the Dutch government issued an update announcing that it was able to reduce Groningen production faster, stopping production in 2022, eight years earlier than initially planned. Discussions have not been concluded between the Dutch government and NAM shareholders regarding the compensation payable by the Dutch government to NAM in order to restore the balance of the package of arrangements laid down in the HoA.

A parliamentary inquiry into production from the Groningen gas field officially started in the spring of 2021. Public hearings are scheduled for the summer of 2022.

On October 26, 2021, NAM announced that it will split up its assets into four new legal entities, with the intent to sell those new entities. This excludes the wider Groningen business, which will remain in the existing NAM legal entity.

#### Norway

We are a partner in 21 production licences on the Norwegian continental shelf. We are the operator in nine of these, of which two are producing: the Knarr field (Shell interest 45%) and the Ormen Lange gas field (Shell interest 17.8%). In 2021, we took the final investment decision on the Phase 3 project for Ormen Lange, adding subsea compression to the field. We hold a non-operated interest in the producing field Troll (operated by Equinor, Shell interest 8.1%) where the Phase 3 gas project came on stream in 2021 adding new production. Decommissioning is planned for Gaupe (cessation of production was in 2018) and Knarr (cessation of production is expected in May 2022).

We have a 33.3% interest in the Northern Lights joint venture, where the other partners are Equinor and TotalEnergies (equal partners). The joint venture is developing a carbon dioxide transportation and storage project.

#### UK

For more than 50 years we have operated a significant number of our interests on the UK continental shelf under a 50:50 joint-venture agreement with ExxonMobil. In the fourth quarter of 2021, ExxonMobil completed the sale of its share of some of these and other UK continental shelf assets to Neo Energy. In addition to our oil and gas production from North Sea fields, we have various interests in the Atlantic Margin area where we are not the operator. These are mainly in the West of Shetland area (Clair, Shell interest 27.97%, and Schiehallion, Shell interest 44.89%).

In 2021, new production came on stream in Arran (Shell interest 44.57%), which is a tie-back to the Shearwater facility. New production also came on stream at new wells in the existing and producing Clair Ridge (Shell interest 27.97%, non-operated). In the fourth quarter of 2021, Shell completed a deal to increase its equity in the Shearwater field (from 28% to 55.5%) by purchasing BP's entire interest in the field. Shell will continue to be the operator of the Shearwater field.

In October 2021, the UK's Offshore Petroleum Regulator for Environment and Decommissioning (OPRED) advised that it was unable to approve the environmental statement consent for the Jackdaw Project. Engagement with OPRED has continued, during which there have been discussions of alternative proposals to address the regulator's concerns.

In 2021, Shell increased its stake in the early-stage Acorn carbon capture, utilisation and storage (CCUS) and blue hydrogen (BH2) project from 25% to 30%. Shell was appointed technical development lead for certain parts of the CCS project and will take up the role at the end of the first quarter of 2022. The UK government selected the Scottish Cluster (of which Acorn is part) as a reserve cluster for track 1 in its CCUS cluster sequencing process. This means that if another cluster selected as track 1 is discontinued the Scottish Cluster may take its place. The UK government has stated that it will prioritise track 1 cluster for accelerated negotiation of terms.

In December 2021, after comprehensive screening, Shell concluded that the economic case for investment in Cambo, considering also the potential for delays, was not strong enough to proceed. Shell continues to work with its co-venturer and the UK government to map out the next steps on Cambo.

Decommissioning of the Heather, Goldeneye and Curlew FPSO assets continued. In September 2021, Heerema's Thialf vessel safely lifted Goldeneye's 3,000-tonne jacket and 1,300-tonne topsides, before transporting them to Norway to be dismantled at the AF Offshore Decom yard in Vats.

In Brent, production ceased after 45 years when on March 31, 2021, we shut down Brent oil and gas field. This is due to become the fourth and final platform to be decommissioned and removed from the Brent oil and gas field. Brent Charlie's topsides are expected to be lifted and removed in 2023, after necessary offshore preparatory works have been completed. The UK regulator OPRED is expected to announce a final decision in the first half of 2022 on the proposed derogations to leave in place the gravity-based concrete structures of Brent Bravo, Brent Charlie and Brent Delta.

### Rest of Europe
We also have interests in Albania, Bulgaria and Germany.

### Asia (including the Middle East and Russia)
### Brunei
Shell and the Brunei government are 50:50 shareholders in Brunei Shell Petroleum Company Sendirian Berhad (BSP). BSP has long-term onshore and offshore oil and gas concession rights, and sells most of its gas production to Brunei LNG Sendirian Berhad (see "Integrated Gas" on pages 43-47), with the remainder (24% in 2021) sold in the domestic market.

In addition to our interest in BSP, we have a non-operating interest in the offshore Block B concession (Shell interest 35%), where gas and condensate are produced from the Maharaja Lela field.

We have a non-operating interest in a gas holding area for deep-water Block CA2 (Shell interest 12.5%), under a production-sharing contract (PSC).

We also operate in the deep-water Block CA1 (Shell interest 86.95%), under a PSC.

### Iraq
We have a 44% interest in the Basrah Gas Company, which gathers, treats and processes associated gas that was previously being flared from the Rumaila, West Qurna 1 and Zubair fields. The processed gas and associated products, such as condensate and LPG, are sold to the domestic market. Any surplus natural and LPG is exported.

### Kazakhstan
We are the joint operator of the onshore Karachaganak oil and condensate field (Shell interest 29.3%). The Karachaganak field is in north-west Kazakhstan and covers an area of more than 280 square kilometres.

We have an interest in the North Caspian Sea production-sharing agreement (Shell interest 16.8%) which includes the Kashagan field in the Kazakh sector of the Caspian Sea. The North Caspian Operating Company is the operator. This shallow-water field covers an area of around 3,400 square kilometres. Phase 1 development of the field led to plateau oil production capacity of around 66 thousand boe/d (Shell interest) in 2021, with the possibility of increases after later phases of development.

We have a 7.4% interest in the Caspian Pipeline Consortium, which owns and operates an oil pipeline running from the Caspian Sea to the Black Sea, across parts of Kazakhstan and Russia.

### Malaysia
We explore for and produce oil and gas offshore Sabah and Sarawak under 16 PSCs, in which our interests range from 20% to 85%.

Offshore Sabah:
- We operate two producing oil fields, the Gumusut-Kakap field (Shell interest 30%) and the Malikai deep-water field (Shell interest 35%).
- We have a 21% interest in the Siakap North-Petai deep-water field and a 30% interest in the Kebabangan field, both operated by third parties. We also have exploration interests.

Offshore Sarawak:
- We are the operator of eight producing gas fields and one producing oil and gas field. Nearly all the gas produced offshore Sarawak is supplied to Malaysia LNG (MLNG) and to our gas-to-liquids plant in Bintulu. See "Integrated Gas" on pages 43-47. The eight producing gas fields and the one producing oil and gas field are:
  - gas fields F6, F23, E8, F13 East and F13 West under the MLNG PSC (Shell interest 40%);
  - gas fields F14 and F28 under the SK308 PSC (Shell interest 50%);
  - gas field Gorek under the SK408 PSC (Shell interest 30%); and
  - producing oil and gas field E6 under the SK-308 PSC (Shell interest 50%).
- We achieved first oil and gas for Phase 2 of the E6 project in March 2021.
- We are the operator for Block SK-318 PSC (Shell interest 75%). This block contains the discovered Rosmari, Marjoram and Timi fields. In August 2021, we took the final investment decision on the Timi gas development project. Situated approximately 200 kilometres off the coast of Sarawak, Timi is a sweet gas field discovered in 2018. The Timi project comprises a wellhead platform powered by a solar and wind hybrid renewable power system, two wells and a pipeline tie-in to the F23 production hub, supporting future growth in the Sarawak Central Luconia area. The proposed Rosmari-Marjoram development is the first phase of the Sarawak Integrated Sour Gas Evacuation System (SISGES) development and comprises an offshore platform and onshore gas treatment plant in Bintulu, Sarawak.
- In July 2021, we signed a new exploration PSC for Block SK-437 (Shell interest 85%).
- In our non-operated portfolio:
  - We took the final investment decision in March 2021 on Jerun, which is part of the Block SK-408 PSC (Shell interest 30%). Jerun is a gas development with an integrated central processing platform. Block SK-408 also contains the producing non-Shell-operated Larak and Bakong fields.
  - We also have a 40% interest in the amended 2011 Baram Delta enhanced oil recovery PSC, and a 50% interest in the SK-307 PSC. In March 2021, Shell announced that it intended to explore options to divest its non-operated interests in Baram Delta and SK-307.

UPSTREAM continued

## Oman

We have a 34% interest in the Block 6 oil concession and its operator Petroleum Development Oman (PDO). The Omani government has a 60% interest through its 100% owned affiliate Energy Development Oman (EDO). PDO is the operator of more than 200 oil fields, mainly located in central and southern Oman.

We have a 50% interest in the Block 42 exploration and production-sharing agreement. Oman Oil (OQ) has the remaining 50% interest. Shell is the operator of Block 42. We have signed an exploration and production-sharing agreement that makes us the operator and gives us a 100% working interest in Block 55.

## Russia

Shell and Gazprom Neft have a joint interest in several ventures in Russia:
- We have a 50% interest in Salym Petroleum Development N.V., which is developing the Salym fields and conducting exploration activities in the Khanty Mansiysk Autonomous District of western Siberia.
- We have a 50% interest in the Khanty-Mansiysk Petroleum Alliance VOF partnership. Through this, Shell is a holder of a 50% interest in the CJSC Khanty-Mansiysk Petroleum Alliance.
- Because regulatory sanctions prohibit certain defined oil and gas activities in Russia since 2014, we have suspended our support to Salym Petroleum Development N.V. and CJSC Khanty-Mansiysk Petroleum Alliance in relation to shale oil activities.
- We have a 50% shareholding in LLC Gydan Energy. The joint venture changed its name from LLC Gazpromneft-Aero Bryansk in September 2021. It holds licences to the Leskinsky and Pukhutsayakhsky onshore blocks in the north-eastern part of the Gydan Peninsula. The joint venture is currently carrying out an exploration programme in these blocks.

As announced on February 28, 2022, Shell intends to exit its joint ventures with Gazprom and related entities, including our 50% interest in Salym Petroleum Development and our 50% interest in Gydan energy venture. For more information see Note 32 on page XX.

## Syria

Shell holds a 65% interest in Syria Shell Petroleum Development B.V. (SSPD), a joint venture between Shell and the China National Petroleum Corporation. SSPD holds a 31.25% interest in Al Furat Petroleum Company, a Syrian joint stock company, whose role was to perform petroleum operations. Shell also holds a 70% interest in two exploration licences via Shell South Syria Exploration B.V. In December 2011, in compliance with international sanctions on Syria, including European Council Decision 2011/782/CFSP, Shell suspended all exploration and production activities in Syria.

## Rest of Asia

We also have interests in Kuwait, the Philippines, Turkey and the United Arab Emirates.

In May 2021, in the Philippines, Shell announced an agreement to sell its shares in Shell Philippines Exploration B.V., which includes its 45% interest in Service Contract 38 (Malampaya), which includes the producing Malampaya gas field, to Malampaya Energy XP Pte. Ltd. Subject to partner and regulatory consent, the transaction is targeted to complete in 2022.

## Africa
### Nigeria

Our share of production, onshore and offshore, in Nigeria was 175 thousand boe/d in 2021, compared with 223 thousand boe/d in 2020. Security issues, sabotage and crude oil theft in the Niger Delta failed to improve and remained significant challenges to our onshore operations in 2021. We will monitor the situation closely and evaluate implications for the integrity of our infrastructure and the sustainability of our current operations.

We announced our intention to reduce our involvement in onshore oil and gas production in Nigeria, in line with our risk appetite. We are in discussion with the Nigerian government and other stakeholders on how this can be best achieved.

In August 2021, Nigeria adopted the Petroleum Industry Act (PIA) that creates a new regulatory framework for the industry. The PIA introduces significant changes, some of which require clarification during the 18-month implementation phase. We are actively engaged to ensure that our operations will comply with any new requirements.

### Onshore

The Shell Petroleum Development Company of Nigeria Limited (SPDC) is the operator of a joint venture (JV) (Shell interest 30%) that, after the completion of the sale of its interest in OML 17 on January 15, 2021, has 16 Niger Delta onshore oil mining leases (OML).

In 2019, OML 11 expired when the Federal Government (FGN) denied an application of SPDC JV for renewal. While SPDC JV is challenging this decision in court, the FGN and SPDC JV are exploring an out-of-court solution. SPDC continues to operate OML 11 pending these discussions.

### Offshore

Our main offshore deep-water activities are carried out by Shell Nigeria Exploration and Production Company Limited (SNEPCO), (Shell interest 100%). SNEPCO has interests in three deep-water blocks that are under PSC terms: the producing assets Bonga (OML 118) and Erha (OML 133) and the non-producing asset Bolia Chota (OML 135). SNEPCO operates OMLs 118 (including the Bonga field floating production, storage and offloading (FPSO) vessel, Shell interest 55%) and 135 (Bolia and Doro, Shell interest 55%) and has a 43.8% non-operating interest in OML 133 (including the Erha FPSO). In May 2021 OML 118 was renewed for 20 years. In 2021, the licence for the offshore oil block OPL 245 expired.

Authorities are investigating our involvement in Nigerian oil block OPL 245 and the 2011 settlement of litigation pertaining to that block. See Note 25 to the "Consolidated Financial Statements" on pages 255-257.

SPDC also has three shallow-water licences (OMLs 74, 77 and 79) and a 40% interest in the non-Shell-operated Sunlink joint venture that has one shallow-water licence (OML 144).

In our Nigerian operations, we face various risks and adverse conditions which could have a significant adverse effect on our operational performance, earnings, cash flows and financial condition (see "Risk factors" on pages 23-32). There are limitations to the extent to which we can mitigate these risks. We carry out regular portfolio assessments so we can maintain our long-term competitiveness in Nigeria. We support the Nigerian government's efforts to improve the efficiency, functionality and domestic benefits of Nigeria's oil and gas industry. We monitor legislative developments and the security situation. We liaise with host communities, governmental and non-governmental organisations (NGOs) to help promote peaceful and safe operations. We continue to be transparent about how we manage and report spills, and how we deploy oil-spill response capability and technology. We implement a maintenance strategy to support sustainable equipment reliability and have begun a multi-year programme to reduce routine flaring of associated gas. See "Climate change and energy transition" on pages 74-97.

### Rest of Africa

We also have interests in Algeria, Egypt, Mauritania, Namibia, São Tomé and Príncipe, South Africa and Tunisia.

On September 23, 2021, Shell Egypt N.V. and an affiliate completed a full divestment of 13 onshore blocks in the Western Desert. Shell Egypt N.V. subsequently filed a notice of final relinquishment of the North East Obaiyed block, which is the only remaining onshore block still held by Shell Egypt N.V.

In 2021, Shell announced plans to hand back to the Government of Tunisia Upstream assets associated with the Miskar and Hasdrubal concessions. Discussions are in progress regarding the terms of the hand-back.

### North America

#### Canada

In Canada, we produce and market natural gas, natural gas liquids and condensate.

We hold mineral acres, primarily in the Montney play in British Columbia and Alberta. We currently operate four natural gas processing area facilities in our Groundbirch asset in British Columbia. In April 2021, we sold our Duvernay shale light oil position in Alberta.

#### USA

We produce oil and gas in deep water in the Gulf of Mexico. We produce heavy oil in California through a 51.8% interest in Aera Energy LLC which operates wells in the San Joaquin Valley. The majority of our oil and gas interests are acquired under leases granted by the owner of the minerals underlying the relevant area, including many leases for federal offshore tracts. Such leases usually run on an initial fixed term that is automatically extended by the establishment of continued production, subject to compliance with the terms of the lease (including, in the case of federal leases, extensive regulations imposed by federal law).

We have sold or relinquished all frontier licences in Alaska and have no plans for frontier exploration off Alaska's coast. We retain two exploration acreage positions in the long-established North Slope area of Alaska. One is a non-operating interest of 50% in 13 federal leases held since 2007 and operated by Eni. The other position consists of 18 state leases in nearby West Harrison Bay that have been held since 2012, which we plan to turn over to an alternative operator.

#### Gulf of Mexico

The Gulf of Mexico is our major production area in the USA. We have an interest in 311 active federal offshore leases.

We are the operator of eight production hubs - Mars, Olympus, Auger, Perdido, Ursa, Enchilada/Salsa, Appomattox and Stones - and the West Delta 143 processing facilities (Shell interests ranging from 33% to 100%). We continue to produce from Coulomb (Shell interest 100%) which ties into the Na Kika platform, where Shell has a 50% non-operating interest.

We continued exploration, development and abandonment activities in the Gulf of Mexico in 2021.

We made discoveries at the Leopard and Blacktip North prospects in the Perdido Corridor. The Leopard well encountered more than 600 feet (183 meters) net oil pay at multiple levels and the Blacktip North well encountered approximately 300 feet net oil pay at multiple levels. Evaluation is ongoing to further define development options. The Leopard and Blacktip North discoveries are opportunities to increase production in the Perdido Corridor, where Shell's Great White, Silvertip and Tobago fields are already producing.

We also took the final investment decision (FID) for Whale, a deep-water development in the Perdido Corridor that features a 99% replicated hull and an 80% replication of the topsides of our Vito project. The Whale development (Shell interest 60%) is currently scheduled to begin production in 2024.

We made progress on the development of Powernap and Vito, which are both in the execution phase. Powernap (Shell interest 100%) is a subsea tie-back to the Olympus production hub, while Vito (Shell interest 63%) is a stand-alone host. Both are expected to achieve first oil in 2022.

The 2021 Atlantic hurricane season adversely impacted production at our US Gulf of Mexico assets. We experienced extended shutdowns at our Mars, Olympus, and Ursa production hubs because of structural damage to our West Delta-143 (WD-143) processing facilities after Hurricane Ida. We safely reinstated production at Olympus on October 1, (33 days after Hurricane Ida), and at Mars and Ursa on November 4, (67 days after Hurricane Ida). This was ahead of estimated timelines.

#### Shales

Our activity in 2021 was focused in the Permian Basin. On December 1, 2021, we completed the sale of Shell's interest in the Permian to ConocoPhillips for a base consideration of $9.5 billion. As a result of this divestment, Shell no longer has shales development in the USA.

### Rest of North America

We also have deep-water licences and one shallow-water licence in Mexico.

### South America

#### Brazil

Our operated portfolio consists of offshore assets in:
- the Bijupirá and Salema fields (Shell interest 80%), which ceased production in December 2021 to begin abandonment operations;
- the BC-10 field (Shell interest 50%) in the Campos Basin;
- the Gato do Mato area in the Santos Basin and the adjacent Sul de Gato do Mato area (Shell interest 50%), subject to unitisation, with development options under evaluation; and
- a total of 22 exploration blocks in the following areas:
  – Barreirinhas Basin (10 blocks with Shell interests ranging from 50% to 100%);
  – Santos Basin (two blocks with Shell interests 45% and 55%);
  – Potiguar Basin (Shell interest 100%); and
  – Campos Basin (three blocks with Shell interest 40% and one block with Shell interest 100%). An additional five blocks were awarded to Shell in the National Petroleum Agency (ANP) permanent offer round in October 2021. Contracts were expected to be signed in the first quarter of 2022.

Exhibit Q

UPSTREAM continued

Our non-operated portfolio consists of the following fields in the offshore Santos Basin:
• Sapinhoá field (Shell interest 30%, operated by Petrobras), straddling the BM-S-9 and Entorno de Sapinhoá blocks, already unitised;
• Lapa field (Shell interest 30%, not subject to unitisation, operated by TotalEnergies) in Block BM-S-9A;
• Berbigão and Sururu fields (Shell interest 25%, subject to ongoing discussions about unitisation agreements, operated by Petrobras) in Block BM-S-11A;
• Atapu field (Shell interest 4%, unitised in September 2019) in Block BM-S-11A. In December, Shell placed a successful bid in the ANP Transfer of Rights round for the acquisition of 25% of Atapu ToR area to increase its participation in the Atapu field from 4.3% to 16.7%. The contract is expected to be signed in the second quarter of 2022;
• Lula field in Block BM-S-11, renamed the Tupi field (subject to unitisation in effect since April 2019, Shell interest 23%, operated by Petrobras);
• Iracema field in Block BM-S-11 (Shell interest 25%, not subject to unitisation, operated by Petrobras); and
• Mero field in the Libra PSC area (Shell interest 20%, unitisation with an adjoining area still subject to government approval, operated by Petrobras).

In addition to the producing assets, we hold interests in two non-operated exploration blocks in the Santos Basin. These are operated by Petrobras with Shell interests of 20% and 40%.

We also hold interests in two non-operated exploration blocks in the Potiguar Basin, operated by Petrobras (Shell interest 40%).

The activities of operated and non-operated fields are currently supported by 17 producing deep-water FPSOs. We expect two additional FPSOs (Mero 1 and Mero 2) to be brought online in 2022-2023. In August 2021, we announced the final investment decision to contract the Mero 4 FPSO vessel to be deployed at the Mero field.

**Rest of South America**
We also have interests in Argentina and Suriname.

**TRADING AND SUPPLY**
We market and trade crude oil from most of our Upstream operations.

OIL AND GAS INFORMATION

Proved developed and undeveloped reserves of Shell subsidiaries and Shell share of joint ventures and associates

| | Crude oil and natural gas liquids (million barrels) | Synthetic crude oil (million barrels) | Bitumen (million barrels) | Natural gas (thousand million scf) | Total (million boe)[A] |
|---|---|---|---|---|---|
| Shell subsidiaries | | | | | |
| Increase/(decrease) in 2021: | | | | | |
| Revisions and reclassifications | 597 | (90) | — | 3,391 | 1,091 |
| Improved recovery | 30 | — | — | 9 | 31 |
| Extensions and discoveries | 175 | — | — | 1,477 | 430 |
| Purchases and sales of minerals in place | (165) | — | — | (383) | (230) |
| Total before taking production into account | 637 | (90) | — | 4,494 | 1,322 |
| Production [B] | (578) | (21) | — | (2,831) | (1,088) |
| Total | 59 | (111) | — | 1,663 | 234 |
| At January 1, 2021 | 3,761 | 644 | — | 22,132 | 8,222 |
| At December 31, 2021 | 3,820 | 533 | — | 23,795 | 8,456 |
| Shell share of joint ventures and associates | | | | | |
| Increase/(decrease) in 2021: | | | | | |
| Revisions and reclassifications | 46 | — | — | 577 | 146 |
| Improved recovery | — | — | — | — | — |
| Extensions and discoveries | 2 | — | — | 2 | 2 |
| Purchases and sales of minerals in place | — | — | — | — | — |
| Total before taking production into account | 48 | — | — | 579 | 148 |
| Production [C] | (36) | — | — | (612) | (141) |
| Total | 12 | — | — | (33) | 7 |
| At January 1, 2021 | 216 | — | — | 3,982 | 902 |
| At December 31, 2021 | 228 | — | — | 3,949 | 909 |
| Total | | | | | |
| Increase/(decrease) before taking production into account | 685 | (90) | — | 5,073 | 1,470 |
| Production | (614) | (21) | — | (3,443) | (1,229) |
| Increase/(decrease) | 71 | (111) | — | 1,630 | 241 |
| At January 1, 2021 | 3,977 | 644 | — | 26,114 | 9,124 |
| At December 31, 2021 | 4,048 | 533 | — | 27,744 | 9,365 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31, 2021 | — | 267 | — | — | 267 |

[A] Natural gas volumes are converted into oil equivalent using a factor of 5,800 standard cubic feet (scf) per barrel.
[B] Included 41 million boe consumed in operations (natural gas: 232 thousand million scf; synthetic crude oil: 1 million barrels).
[C] Included 7 million boe consumed in operations (natural gas: 41 thousand million scf).

OIL AND GAS INFORMATION continued

### PROVED RESERVES

The proved oil and gas reserves of Shell subsidiaries and the Shell share of the proved oil and gas reserves of joint ventures and associates are set out in more detail in "Supplementary Information – Oil and Gas (unaudited)" on pages 262-279.

Before taking production into account, our proved reserves increased by 1,470 million boe in 2021. This consisted of an increase of 1,322 million boe from Shell subsidiaries and an increase of 148 million boe from the Shell share of joint ventures and associates.

After taking production into account, our proved reserves increased by 241 million boe in 2021 to 9,365 million boe at December 31, 2021.

### SHELL SUBSIDIARIES

Before taking production into account, Shell subsidiaries' proved reserves increased by 1,322 million boe in 2021. This consisted of an increase of 637 million barrels of crude oil and natural gas liquids, an increase of 775 million boe (4,494 thousand million scf) of natural gas and a decrease of 90 million barrels of synthetic crude oil. The 1,322 million boe increase was the result of a net increase of 1,091 million boe from revisions and reclassifications, an increase of 430 million boe from extensions and discoveries, an increase of 31 million boe from improved recovery, and a net decrease of 230 million boe related to purchases and sales of minerals in place.

After taking into account production of 1,088 million boe (of which 41 million boe were consumed in operations), Shell subsidiaries' proved reserves increased by 234 million boe in 2021 to 8,456 million boe. In 2021, Shell subsidiaries' proved developed reserves (PD) decreased by 238 million boe to 6,740 million boe, and proved undeveloped reserves (PUD) increased by 472 million boe to 1,716 million boe.

### SHELL SHARE OF JOINT VENTURES AND ASSOCIATES

Before taking production into account, the Shell share of joint ventures and associates' proved reserves increased by 148 million boe in 2021. This consisted of an increase of 48 million barrels of crude oil and natural gas liquids and an increase of 100 million boe (580 thousand million scf) of natural gas. The 148 million boe increase comprised a net increase of 146 million boe from revisions and reclassifications and an increase of 2 million boe from extensions and discoveries.

After taking into account production of 141 million boe (of which 7 million boe were consumed in operations), the Shell share of joint ventures and associates' proved reserves increased by 7 million boe to 909 million boe.

The Shell share of joint ventures and associates' PD increased by 8 million boe to 801 million boe, and PUD decreased by 3 million boe to 108 million boe.

For further information, see "Supplementary Information - oil and gas (unaudited)" on pages 262-279.

### PROVED UNDEVELOPED RESERVES

In 2021, Shell subsidiaries and the Shell share of joint ventures and associates' PUD increased by 469 million boe to 1,824 million boe.

There were decreases of 467 million boe because of maturation to PD, mainly 129 million boe in Troll (Norway), 69 million boe in Tupi (Brazil), and 269 million boe spread across other fields, and a net decrease of 26 million boe due to purchases and sales. These were offset by: increases of 498 million boe due to revisions, an increase of 31 million boe due to improved recovery, and a increase of 432 million boe due to extensions and discoveries. The extensions and discoveries consisted of 107 million boe in Mero, 81 million boe in Whale, and 244 million boe spread across other fields.

In addition to the maturation of 467 million boe from PUD to PD, 51 million boe was matured to PD from contingent resources through PUD as a result of project execution during the year.

PUD held for five years or more (PUD5+) at December 31, 2021, amounted to 238 million boe, an increase of 54 million boe compared with the end of 2020, which was driven mainly by changes in Kolo Creek (Nigeria), Tupi (Brazil) and Groundbirch (Canada).

The fields with the largest PUD5+ on December 31, 2021 were Lunskoye (Russia), Gorgon (Australia), Kolo Creek (Nigeria) and Tupi (Brazil).

These PUD5+ remain undeveloped because development either requires the installation of compression equipment (Russia), and the drilling of additional wells (Brazil) or will take longer than five years because of the complexity and scale of the project (Australia).

During 2021, we spent $5.3 billion on development activities related to PUD maturation.

### DELIVERY COMMITMENTS

We sell crude oil and natural gas from our producing operations under a variety of contractual obligations. Most contracts generally commit us to sell quantities based on production from specified properties, although some natural gas sales contracts specify delivery of fixed and determinable quantities, as discussed below.

In the past three years, we met our contractual delivery commitments, with the notable exceptions of Egypt, Trinidad and Tobago, and Malaysia. In the period 2022-2024, we are contractually committed to deliver to third parties, joint ventures and associates a total of 6,976 billion scf of natural gas from our subsidiaries, joint ventures and associates. The sales contracts contain a mixture of fixed and variable pricing formulae that are generally referenced to the prevailing market price for crude oil, natural gas or other petroleum products at the time of delivery.

In the period 2022-2024, we expect to meet our delivery commitments for almost all the areas in which they are carried, with an estimated 73.2% coming from PD, 5.0% through the delivery of gas that becomes available to us from paying royalties in cash, and 21.8% from the development of PUD as well as other new projects and purchases. The key exceptions are:

- Egypt: The government decision to divert gas from the offshore West Delta Deep Marine fields to domestic use has caused a tangible shortfall of 502 billion scf (84% of the promised gas delivery), expected to continue in the near future leaving LNG gas commitment mostly under force majeure;

- in Trinidad and Tobago (East Coast Marine Area and North Coast Marine Area), we expect to cover 91% of our delivery commitments from existing developed resource volumes and new projects, resulting in an expected true shortfall of some 62 billion scf; and

- in Malaysia, one of the third-party gas supply lines which was under maintenance has not been repaired during 2021. Force majeure has been declared, and no penalties have been incurred, resulting in an expected true shortfall of some 54 billion scf (48% of the promised gas delivery).

Exhibit Q

Summary of proved oil and gas reserves of Shell subsidiaries and Shell share of joint ventures and associates (at December 31, 2021)

Based on average prices for 2021

| | Crude oil and natural gas liquids (million barrels) | Natural gas (thousand million scf) | Synthetic crude oil (million barrels) | Total (million boe)[A] |
|---|---|---|---|---|
| **Proved developed** | | | | |
| Europe | 146 | 2,797 | — | 628 |
| Asia | 1,545 | 11,886 | — | 3,594 |
| Oceania | 71 | 4,162 | — | 789 |
| Africa | 218 | 981 | — | 387 |
| North America | | | | |
|   USA | 397 | 373 | — | 461 |
|   Canada | 2 | 756 | 533 | 667 |
| South America | 790 | 1,306 | — | 1,015 |
| Total proved developed | 3,169 | 22,261 | 533 | 7,541 |
| **Proved undeveloped** | | | | |
| Europe | 68 | 506 | — | 155 |
| Asia | 193 | 1,247 | — | 408 |
| Oceania | 9 | 1,218 | — | 219 |
| Africa | 47 | 1,035 | — | 225 |
| North America | | | | |
|   USA | 213 | 242 | — | 255 |
|   Canada | 3 | 783 | — | 138 |
| South America | 346 | 452 | — | 424 |
| Total proved undeveloped | 879 | 5,483 | — | 1,824 |
| **Total proved developed and undeveloped** | | | | |
| Europe | 214 | 3,303 | — | 783 |
| Asia | 1,738 | 13,133 | — | 4,002 |
| Oceania | 80 | 5,380 | — | 1,008 |
| Africa | 265 | 2,016 | — | 612 |
| North America | | | | |
|   USA | 610 | 615 | — | 716 |
|   Canada | 5 | 1,539 | 533 | 805 |
| South America | 1,136 | 1,758 | — | 1,439 |
| Total | 4,048 | 27,744 | 533 | 9,365 |
| Reserves attributable to non-controlling interest in Shell subsidiaries | — | — | 267 | 267 |

[A] Natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel.

58

OIL AND GAS INFORMATION continued

### EXPLORATION

In 2021, producible hydrocarbons were encountered in the US Gulf of Mexico and Brunei.

### Gulf of Mexico

In 2021, we acquired 19 blocks in the US Gulf of Mexico in Lease Sale 256. We relinquished leases for 22 blocks ahead of expiration.

In August 2021, the Mexican regulator, Comisión Nacional de Hidrocarburos, approved the Shell farm-in transaction with China Offshore Oil Corporation E&P Mexico S.A.P.I. de C.V. into a deep-water licence in the offshore Mexico Perdido (Shell interest 30%).

### Brazil

In June 2021, the Brazilian government ratified a block in Outboard Campos Basin (Shell interest 100%), awarded in the second National Petroleum Agency permanent offer bid round in Brazil.

In October 2021, we secured five Southern Santos blocks in the 17th National Petroleum Agency bid round in Brazil (Shell interest 100% in four of them, 70% in the remaining one, operator in all cases), all of which are awaiting government ratification.

### Malaysia

In July 2021, we signed an exploration production-sharing contract for an offshore Sarawak block (Shell interest 85%).

### UK

In 2021, we purchased exploration licences across multiple plays in the 32nd UK Offshore Licence Round (Shell interest 50-100%).

### New frontiers

In January 2021, we entered into an agreement with Equinor and YPF for an offshore block in the Argentina basin (Shell interest 30%).

In March 2021, we reduced half of our interest, from 90% to 45%, in an exploration block in Namibia.

In August 2021, the South African government approved a farm-in transaction with Impact Africa Limited under which Shell acquired a 50% participating interest and operatorship in two frontier deep-water blocks off the east coast of South Africa.

We also received regulatory approvals and third-party consents for a portfolio transaction with Kosmos for one block in South Africa under which we acquired an additional 45% working interest.

In December 2021, we signed a farm-in agreement into a shallow-water block in Suriname (Shell interest 20%).

For further information, see "Supplementary Information - oil and gas (unaudited)" on pages 262-279

### LOCATION OF OIL AND GAS EXPLORATION AND PRODUCTION ACTIVITIES

Location of oil and gas exploration and production activities [A] (at December 31, 2021)

| | Exploration | Development and/or Production | Shell operator [B] |
|---|---|---|---|
| **Europe** | | | |
| Albania | • | • | • |
| Cyprus | | • | |
| Germany | • | • | |
| Italy | | • | |
| Netherlands | • | • | |
| Norway | • | • | • |
| UK | • | • | • |
| **Asia** | | | |
| Brunei | • | • | • |
| China | | • | • |
| Indonesia | | • | |
| Kazakhstan | • | • | |
| Malaysia | • | • | • |
| Oman | • | • | • |
| Philippines | • | • | • |
| Qatar | | • | • |
| Russia | • | • | |
| Turkey | • | | • |
| **Oceania** | | | |
| Australia | • | • | • |
| **Africa** | | | |
| Egypt | • | • | • |
| Mauritania | • | | • |
| Namibia | • | | • |
| Nigeria | • | • | • |
| Sao Tome and Principe | • | | |
| South Africa | • | | • |
| Tanzania | | • | • |
| Tunisia | | • | • |
| **North America** | | | |
| Mexico | • | | • |
| USA | • | • | • |
| Canada | • | • | • |
| **South America** | | | |
| Argentina | • | • | • |
| Bolivia | | • | |
| Brazil | • | • | • |
| Colombia | • | | • |
| Suriname | • | | • |
| Trinidad & Tobago | • | • | • |
| Uruguay | • | | • |

[A] Includes joint ventures and associates. Where a joint venture or an associate has properties outside its base country, those properties are not shown in this table.
[B] In several countries where "Shell operator" is indicated, Shell is the operator of some but not all exploration and/or production ventures.

Exhibit Q

OIL AND GAS PRODUCTION AVAILABLE FOR SALE

Crude oil and natural gas liquids [A]

Thousand barrels

| | 2021 | | 2020 | | 2019 | |
| | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates |
|---|---|---|---|---|---|---|
| **Europe** | | | | | | |
| Denmark | — | — | — | — | 7,490 | — |
| Italy | 9,677 | — | 11,342 | — | 9,747 | — |
| Norway | 4,878 | — | 6,914 | — | 7,025 | — |
| UK | 25,554 | — | 30,061 | — | 30,677 | — |
| Other [B] | 578 | 1,205 | 609 | 1,084 | 723 | 1,135 |
| Total Europe | 40,687 | 1,205 | 48,926 | 1,084 | 55,662 | 1,135 |
| **Asia** | | | | | | |
| Brunei | 1,076 | 17,894 | 387 | 17,094 | 196 | 20,002 |
| Kazakhstan | 35,592 | — | 37,769 | — | 34,269 | — |
| Malaysia | 17,983 | — | 18,494 | — | 21,993 | — |
| Oman | 78,745 | — | 74,854 | — | 76,493 | — |
| Russia | 21,012 | 7,769 | 20,816 | 9,050 | 22,442 | 9,413 |
| Other [B] | 30,061 | 7,548 | 30,101 | 7,629 | 28,796 | 7,709 |
| Total Asia | 184,469 | 33,211 | 182,421 | 33,773 | 184,189 | 37,124 |
| Total Oceania [B] | 11,844 | — | 7,416 | — | 10,058 | — |
| **Africa** | | | | | | |
| Nigeria | 35,911 | — | 48,620 | — | 56,589 | — |
| Other [B] | 5,540 | — | 8,485 | — | 7,802 | — |
| Total Africa | 41,451 | — | 57,105 | — | 64,391 | — |
| **North America** | | | | | | |
| USA | 164,811 | — | 165,169 | — | 171,204 | — |
| Canada | 2,640 | — | 8,128 | — | 11,506 | — |
| Total North America | 167,451 | — | 173,297 | — | 182,710 | — |
| **South America** | | | | | | |
| Brazil | 126,566 | — | 131,339 | — | 126,366 | — |
| Other [B] | 6,456 | 1,566 | 5,072 | 729 | 3,900 | — |
| Total South America | 133,022 | 1,566 | 136,411 | 729 | 130,266 | — |
| Total | 578,924 | 35,982 | 605,576 | 35,586 | 627,276 | 38,259 |

[A] Reflects 100% of production of subsidiaries except in respect of production-sharing contracts (PSCs), where the figures shown represent the entitlement of the subsidiaries concerned under those contracts.
[B] Comprises countries where 2021 production was lower than 10,100 thousand barrels or where specific disclosures are prohibited.

Synthetic crude oil

Thousand barrels

| | 2021 | 2020 | 2019 |
| | Shell subsidiaries | Shell subsidiaries | Shell subsidiaries |
|---|---|---|---|
| North America - Canada | 19,891 | 18,920 | 19,076 |

60

Exhibit Q

OIL AND GAS INFORMATION continued

Natural gas [A]

Million standard cubic feet

| | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates |
| **Europe** | | | | | | |
| Denmark | — | — | — | — | 24,433 | — |
| Germany | 36,798 | — | 35,918 | — | 41,846 | — |
| Netherlands | — | 159,107 | — | 131,648 | — | 244,286 |
| Norway | 178,577 | — | 187,627 | — | 182,683 | — |
| UK | 49,128 | — | 65,012 | — | 62,174 | — |
| Other [B] | 10,329 | — | 13,005 | — | 15,062 | — |
| Total Europe | 274,832 | 159,107 | 301,562 | 131,648 | 326,198 | 244,286 |
| **Asia** | | | | | | |
| Brunei | 17,989 | 147,865 | 21,025 | 159,846 | 22,185 | 160,648 |
| China | 55,967 | — | 46,750 | — | 44,510 | — |
| Kazakhstan | 72,176 | — | 86,999 | — | 84,499 | — |
| Malaysia | 193,871 | — | 226,791 | — | 226,277 | — |
| Philippines | 34,361 | — | 40,549 | — | 44,374 | — |
| Russia | 4,113 | 125,973 | 4,301 | 142,418 | 4,563 | 134,807 |
| Other [B] | 413,382 | 118,397 | 411,979 | 118,153 | 407,899 | 118,253 |
| Total Asia | 791,859 | 392,235 | 838,394 | 420,417 | 834,307 | 413,708 |
| **Oceania** | | | | | | |
| Australia | 696,562 | 19,272 | 633,580 | 20,646 | 686,956 | 20,840 |
| Total Oceania | 696,562 | 19,272 | 633,580 | 20,646 | 686,956 | 20,840 |
| **Africa** | | | | | | |
| Egypt | 86,348 | — | 104,946 | — | 92,169 | — |
| Nigeria | 161,916 | — | 190,982 | — | 234,332 | — |
| Other [B] | 23,473 | — | 27,438 | — | 30,266 | — |
| Total Africa | 271,737 | — | 323,366 | — | 356,767 | — |
| **North America** | | | | | | |
| USA | 198,578 | — | 255,383 | — | 389,130 | — |
| Canada | 116,423 | — | 164,451 | — | 220,005 | — |
| Total North America | 315,001 | — | 419,834 | — | 609,135 | — |
| **South America** | | | | | | |
| Bolivia | 45,214 | — | 45,015 | — | 48,501 | — |
| Brazil | 72,107 | — | 73,914 | — | 78,526 | — |
| Trinidad and Tobago | 121,411 | — | 141,576 | — | 159,698 | — |
| Other [B] | 11,006 | 393 | 9,609 | 830 | 8,662 | — |
| Total South America | 249,738 | 393 | 270,114 | 830 | 295,387 | — |
| Total | 2,599,729 | 571,007 | 2,786,850 | 573,541 | 3,108,750 | 678,834 |

[A] Reflects 100% of production of subsidiaries except in respect of PSCs, where the figures shown represent the entitlement of the subsidiaries concerned under those contracts.
[B] Comprises countries where 2021 production was lower than 41,795 million scf or where specific disclosures are prohibited.

Exhibit Q

AVERAGE REALISED PRICE BY GEOGRAPHICAL AREA

Crude oil and natural gas liquids

$/barrel

|  | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
|  | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates |
| Europe | 68.30 | 64.18 | 39.51 | 39.05 | 65.11 | 58.08 |
| Asia | 63.82 | 70.09 | 38.73 | 42.51 | 58.16 | 65.25 |
| Oceania | 63.56 | — | 21.29 | — | 51.51 | — |
| Africa | 70.89 | — | 41.23 | — | 65.39 | — |
| North America - USA | 62.75 | — | 34.17 | — | 54.56 | — |
| North America - Canada | 46.58 | — | 27.17 | — | 36.61 | — |
| South America | 64.28 | 56.91 | 36.01 | 37.28 | 56.68 | — |
| Total | 64.28 | 69.34 | 36.72 | 42.31 | 57.56 | 65.05 |

Synthetic crude oil

$/barrel

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
|  | Shell subsidiaries | Shell subsidiaries | Shell subsidiaries |
| North America - Canada | 60.11 | 31.13 | 50.27 |

Natural gas

$/thousand scf

|  | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
|  | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates |
| Europe | 10.71 | 9.86 | 3.66 | 3.76 | 5.59 | 4.95 |
| Asia | 2.54 | 6.91 | 1.88 [A] | 4.19 | 2.66 | 6.34 |
| Oceania | 7.74 | 4.04 | 5.95 [A] | 3.15 | 7.83 [A] | 3.91 |
| Africa | 3.43 | — | 2.55 | — | 2.92 | — |
| North America - USA | 4.40 | — | 1.72 | — | 2.27 | — |
| North America - Canada | 2.70 | — | 1.61 | — | 1.37 | — |
| South America | 4.04 | 1.82 | 1.35 | 1.90 | 2.33 | — |
| Total | 5.39 | 7.60 | 2.99 [A] | 4.06 | 3.95 | 5.80 |

[A] As revised, following a reassessment.

OIL AND GAS INFORMATION continued

AVERAGE PRODUCTION COST BY GEOGRAPHICAL AREA

Crude oil, natural gas liquids and natural gas [A]

$/boe

| | 2021 | | 2020 | | 2019 | |
| | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates | Shell subsidiaries | Shell share of joint ventures and associates |
|---|---|---|---|---|---|---|
| Europe | 21.48 | 8.59 | 20.05 [B] | 11.44 | 14.14 | 5.76 |
| Asia | 5.66 | 7.64 | 5.54 | 6.83 | 6.30 | 6.17 |
| Oceania | 9.26 | 24.68 | 8.92 | 20.23 | 9.17 | 24.49 |
| Africa | 11.47 | — | 9.43 | — | 8.44 | — |
| North America - USA | 10.88 | — | 12.50 | — | 11.78 | — |
| North America - Canada | 10.64 | — | 10.52 | — | 11.88 | — |
| South America | 5.80 | 5.51 | 5.18 [B] | 9.18 [B] | 6.33 [B] | — |
| Total | 9.12 | 8.23 | 9.10 [B] | 8.02 [B] | 8.95 | 6.48 |

[A] Natural gas volumes are converted into oil equivalent using a factor of 5,800 scf per barrel.
[B] As revised, following a reassessment.

Synthetic crude oil

$/barrel

| | 2021 | 2020 | 2019 |
| | Shell subsidiaries | Shell subsidiaries | Shell subsidiaries |
|---|---|---|---|
| North America - Canada | 18.87 | 18.28 | 19.29 |

OIL PRODUCTS

Key statistics

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| | | | $ million, except where indicated |
| Segment earnings/(loss) [A] | 2,664 | (494) | 6,139 |
| Including: | | | |
| Revenue (including inter-segment sales) | 194,734 | 134,930 | 288,279 |
| Share of profit of joint ventures and associates | 765 | 988 | 1,179 |
| Interest and other income | 328 | (93) | 273 |
| Operating expenses [B] | 14,376 | 13,511 | 15,730 |
| Underlying operating expenses [B] | 14,272 | 12,970 | 15,590 |
| Depreciation, depletion and amortisation | 5,657 | 10,473 | 4,461 |
| Taxation charge/(credit) | 751 | (898) | 1,319 |
| Identified Items [B] | (1,280) | (6,489) | (93) |
| Adjusted Earnings [B] | 3,944 | 5,995 | 6,231 |
| Adjusted EBITDA (CCS basis) [B] | 8,821 | 10,421 | 11,779 |
| Capital expenditure | 3,705 | 3,236 | 4,654 |
| Cash capital expenditure [B] | 3,868 | 3,328 | 4,907 |
| Refinery utilisation (%) | 72 | 72 | 78 |
| Refinery processing intake (thousand b/d) | 1,639 | 2,063 | 2,564 |
| Oil Products sales volumes (thousand b/d) | 4,459 | 4,710 | 6,561 |

[A] See Note 5 to the "Consolidated Financial Statements" on pages 223-226. Segment earnings are presented on a current cost of supplies basis.
[B] See "Non-GAAP measures reconciliations" on pages 294-297.

### OVERVIEW
Our Oil Products business is part of an integrated value chain that refines crude oil and other feedstocks into products that are moved and marketed around the world for domestic, industrial and transport use. The products we sell include low-carbon fuels, lubricants, bitumen, sulphur, gasoline, diesel, heating oil, aviation fuel and marine fuel. We provide access to electric vehicle charge points at home, at work and on-the-go, including at our fuel and convenience retail site forecourts and at a range of public locations. We also trade crude oil, oil products and petrochemicals.

Our Oil Products activities comprise Marketing and Refining & Trading. These are sub-segments of Oil Products that are made up of various classes of business. Marketing includes Retail, Lubricants, Business-to-Business (B2B), Low-Carbon Fuels (biofuels and renewable natural gas (RNG)), our interests in the Raizen JV, and Pipelines. In Trading and Supply, we trade crude oil, low-carbon fuels, oil products and petrochemicals to optimise feedstocks for Refining, to supply our Marketing businesses and third parties, and for our own profit. The Oil Products business also manage Oil Sands activities – the extraction of bitumen from mined oil sands and its conversion into synthetic crude oil.

### BUSINESS CONDITIONS
Global oil product demand rose by 5.6 million barrels per day (b/d) in 2021 to 97.4 million b/d, after a sharp drop of around 8.5 million b/d in 2020, according to the IEA. The rebound was supported by successful vaccine roll-outs, especially in developed economies such as the USA, UK and EU. Road mobility has largely returned to pre-pandemic levels, with COVID-19 travel restrictions being lifted and more people switching from public transport to cars. Air travel has begun to recover, but is still around 20-30% below pre-pandemic levels. This is probably attributable to remaining cross-border travel restrictions and public hesitancy about air travel during a global pandemic. Mirroring the broad economic recovery, demand for naphtha, LPG and ethane also picked up.

Gross refining margins improved during 2021, especially during the second and third quarters. This is because demand for oil products recovered significantly as economies rebounded and transport use increased with the easing of COVID-19 travel restrictions. Demand for kerosene for aviation remained below pre-pandemic levels because varying levels of international travel restrictions remained in place in 2021. Despite the Omicron variant of COVID-19, demand recovery continued during the fourth quarter.

Industry utilisation showed some recovery, but in 2021 there were further announcements that refineries would fully or partially close on a permanent basis. Construction of new capacity continued during the year, especially in the Middle East and Asia.

See "Market overview" on pages 41-43.

### REFINERY UTILISATION
Utilisation is defined as the actual usage of the plants as a percentage of the rated capacity.

Utilisation remained at 72%, unchanged from 2020.

### OIL PRODUCTS SALES
Oil Products sales volumes decreased by 5% in 2021 compared with 2020. The decrease was largely driven by lower Trading volumes, partly offset by higher Marketing volumes.

### EARNINGS 2021-2020
Segment earnings in 2021 were $2,664 million, 639% higher than in 2020. Earnings in 2021 included a net charge of $1,280 million, compared with a net charge of $6,489 million in 2020 which is described at the end of this section.

OIL PRODUCTS continued

Excluding the impact of the net charges (described below), earnings in 2021 were $3,944 million, compared with $5,995 million in 2020. Marketing accounted for 106% of these 2021 earnings, Refining for (36)% and Trading and Supply for 30%.

Oil Products earnings, excluding the net charge, decreased by $2,051 million, or 34% compared with 2020. This was driven by lower contributions from trading and optimisation (around $1,100 million), higher operating expenses (around $1,000 million) and other items, mainly unfavourable deferred tax movements (around $1,100 million), partly offset by higher Marketing volumes (around $700 million) and higher Oil Sands margins (around $500 million).

The decrease in earnings of $2,051 million, analysed by sub-segment, was as follows:
- Marketing earnings were $379 million lower than in 2020, mainly driven by higher operating expenses. These were partially offset by higher sales volumes.
- Refining and trading earnings were $1,671 million lower than in 2020, mainly because of lower contributions from trading and optimisation, higher operating expenses and unfavourable deferred tax movements. These were partly offset by higher refining margins, higher Oil Sands margins due to increased average realised prices and lower depreciation.

Segment earnings in 2021 included a net charge of $1,280 million.

This included:
- impairment charges of $1,619 million mainly related to the divestment of Puget Sound and Deer Park refineries in the USA;
- redundancy and restructuring costs of $62 million (mainly the cost of Reshape 2020-2021, partly offset by Bukom transformation provision release); and
- other net charges of $32 million;

These charges were partly offset by:
- net gains from disposal of assets of $291 million mainly related to the dilution of interest in the Raízen joint venture; and
- a net gain of $142 million due to the fair value accounting of commodity derivatives.

Segment earnings in 2020 included a net charge of $6,489 million.

This included:
- impairment charges of $5,530 million across sites, reflecting revisions to medium- and long-term price outlook assumptions in light of: changes in supply and demand fundamentals in the energy market; macroeconomic conditions; the COVID-19 pandemic; impairment and transformation charges at Pulau Bukom; and the shutdown of Convent;
- restructuring costs of $365 million (mainly shutdown of Convent, Pulau Bukom transformation and various initiatives across Oil Products);
- other net charges of $552 million (mainly onerous contract provisions due to shutdown of Convent); and
- a net charge of $101 million due to the fair value accounting of commodity derivatives.

These charges were partly offset by net gains from disposal of assets of $59 million.

PRIOR YEAR EARNINGS SUMMARY
Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 71) and Form 20-F (page 52) for the year ended December 31, 2020, as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

CASH CAPITAL EXPENDITURE
Cash capital expenditure (cash capex) was $3.9 billion in 2021, compared with $3.3 billion in 2020.

Cash capital expenditure in Marketing increased by $0.3 billion mainly because of higher spend in growth projects relating to biofuels and retail. In Refining and trading, cash capital expenditure increased by $0.2 billion due to turnarounds. Our cash capital expenditure is expected to be around $7 billion to $8 billion in 2022.

PORTFOLIO AND BUSINESS DEVELOPMENTS
Significant portfolio and business developments in 2021 included:
- In July 2021, we announced the start-up of Europe's largest polymer electrolyte membrane hydrogen electrolyser at the Shell Energy and Chemicals Park Rheinland, Germany, producing green hydrogen (hydrogen produced from renewable energy sources).
- In July 2021, our subsidiary Shell Deutschland reached an agreement for the sale of its non-operated 37.5% shareholding in the PCK Schwedt Refinery, 120 km north-east of Berlin, Germany.
- In August 2021, trading in shares of Raízen S.A., our joint venture (Shell interest 44%), began on the São Paulo Stock Exchange (B3) in Brazil, after a successful initial public offering.
- In September 2021, we announced a final investment decision to build an 820,000-tonnes-a-year biofuels facility at the Energy and Chemicals Park Rotterdam, the Netherlands, which was formerly known as the Pernis refinery.
- In October 2021, we signed an agreement to acquire the retail gas station network (including gas stations, convenience retail and dealer supply agreements) from the Landmark group of companies, a Texas-based fuel retail and convenience retailing business. Subject to the satisfaction of closing conditions, the deal expected to be completed in the first half of 2022.
- In January 2022, our subsidiary Shell Oil Company completed the sale of its interest in Deer Park Refining Limited Partnership, in Texas, USA. This was a 50:50 joint venture between Shell Oil Company and P.M.I. Norteamerica, S.A. De C.V. (a subsidiary of Petróleos Mexicanos, or Pemex). The transaction transferred Shell's interest in the partnership, and with it full ownership of the refinery, to Pemex. The agreement for sale of its interest was reached in May 2021. Shell Chemical L.P. continues to operate its 100% owned Deer Park Chemicals facility located adjacent to the site.
- In February 2022, we have made a non-binding offer to purchase all remaining common units held by the public representing limited partner interests in Shell Midstream Partners, L.P. for $12.89 per common unit in cash. The proposed transaction is subject to a number of contingencies, including the approval of the board of directors of Shell Midstream Partners, L.P. and the satisfaction of any conditions to the consummation of a transaction set forth in any definitive agreement concerning the transaction.

Exhibit Q

**BUSINESS AND PROPERTY**

**Marketing**

**Mobility**

Shell is the world's largest mobility retailer, by number of sites, with more than 46,000 service stations operating in more than 70 countries at the end of 2021. We operate different models across these sites, from full ownership of retail sites through to brand licensing agreements.

Every day, around 32 million customers visit these sites to buy fuel, convenience items including beverages and fresh food, and services such as lubricant changes and car washes. We offer our business customers Shell Fleet Solutions, through which they can obtain items including fuel cards, road services and carbon-offset offers. At the end of 2021, Shell operated 12,400 convenience stores worldwide and we expect to grow this number to 15,000 by 2025.

We have more than 100 years' experience in fuel development. Aided by our partnership with Scuderia Ferrari, we have concentrated on developing fuels with special formulations designed to clean engines and improve performance. We sold such fuels under the Shell V-Power brand in 66 countries in 2021.

In a growing number of markets, we are offering customers lower-emission products and services, including biofuels, electric vehicle fast charging, hydrogen and various gaseous fuels such as LNG. In eight markets, including the UK and the Netherlands, Shell Mobility provides customers with the opportunity to offset their carbon emissions.

Shell Mobility offers electric vehicle (EV) customers nearly 8,000 public charge points at Shell stations, on-street and at destinations like supermarkets. In addition, Shell Renewables and Energy Solutions operates around 80,000 private charge points and offers customers access to more than 300,000 charge points through its growing roaming networks in Europe, North America and South East Asia.

In 2021, Shell, Waitrose and Partners in the UK, and REWE and Penny supermarkets in Germany, announced the intention to install hundreds of charge points over the coming years. In January 2022, Shell opened its first EV charging hub in the UK in Fulham, London, where petrol and diesel pumps at an existing fuel station have been replaced with charge points. Shell Fulham features nine high-powered, ultra-rapid 175 kW charge points.

In 2021, Shell Mobility introduced a new premium fresh coffee and food offer, called Shell Café. The launch of Shell Café provides a consistent brand for drivers visiting Shell stations and addresses the evolving needs of customers with enhanced customer facilities and new on-site service offerings. By the end of 2021, there were 800 conversions across 14 markets in Europe with plans to expand to other regions in 2022.

We have around 50 hydrogen retail sites in Europe and North America, where drivers can fill up their vehicles with hydrogen fuel.

**Lubricants**

Shell Lubricants has been the number one global finished lubricants supplier in terms of market share for 15 consecutive years, according to Kline & Company data for 2021. Across more than 160 markets, we produce, market and sell technically advanced lubricants for passenger cars, motorcycles, trucks, coaches, and machinery used in manufacturing, mining, power generation, agriculture and construction.

We also make premium lubricants for conventional vehicles and Shell E-fluids for electric vehicles using gas-to-liquids (GTL) base oils that are made from natural gas at our Pearl GTL plant in Qatar (see "Integrated Gas" on pages 44-48).

We have a global lubricants supply chain with a network of four base oil manufacturing plants, 33 lubricant blending plants, eight grease plants and six GTL base oil storage hubs.

Through our marine activities, we primarily provide the shipping and maritime sectors with lubricants. We also provide fuels, chemical products and related technical and digital services. We supply more than 200 grades of fuel to vessels worldwide, ranging from large ocean-going tankers to small fishing boats.

**Business-to-business**

Our Business-to-business (B2B) activities encompass the sale of fuels, speciality products and services to a broad range of commercial customers.

Shell Aviation provides aviation fuel, lubricants and low-carbon solutions globally. In 2021, we took a final investment decision to build a new biofuels facility at the Shell Energy and Chemicals Park Rotterdam. This will be among the largest in Europe producing sustainable aviation fuel (SAF). We announced plans to produce SAF at our energy and chemicals parks in Germany and Singapore. We also invested in LanzaJet, a leading sustainable fuels technology company.

Shell Bitumen supplies customers across 60 markets and provides enough bitumen to resurface 500 kilometres of road lanes every day. It also invests in research and development to create innovative products.

Shell Sulphur Solutions is a business that manages the complete value chain of sulphur, from refining to marketing. The business provides sulphur for use in applications such as fertiliser, mining and chemicals. The business also licenses Shell Thiogro technologies to create innovative and custom sulphur-enhanced fertilisers.

**Low-carbon fuels**

**Biofuels**

In 2021, around 9.1 billion litres of biofuels went into Shell's fuels worldwide, which includes sales made by Raízen, our joint venture in Brazil (Shell interest 44%, not operated by Shell).

Raízen produced around 2.5 billion litres of ethanol and around four million tonnes of sugar from sugar cane in 2021. The cellulosic ethanol plant at Raízen's Costa Pinto mill in Brazil produced 19 million litres of ethanol in 2021.

In February 2021, Raízen announced the acquisition of Biosev, adding a further 50% of production capacity in low-carbon fuels. We believe this will allow Raízen to increase its bioethanol production capacity to 3.75 billion litres a year. The transaction contributes to Shell's target to be a net-zero emissions energy business by 2050, in step with society.

OIL PRODUCTS continued

### RNG

Renewable natural gas (RNG), also known as biogas or biomethane, is gas derived from processing organic waste in a controlled environment until it is fully interchangeable with conventional natural gas.

In September 2021, we opened our first US renewable natural gas production facility in Junction City, Oregon. The plant uses locally sourced cow manure and agricultural residues to produce low-carbon fuel for heavy-duty road transport. We opened our first renewable compressed natural gas (R-CNG) fuelling site in the USA at our products distribution complex in Carson, California. The R-CNG is sourced from Shell's portfolio of anaerobic digestion projects.

In Europe, we are offering liquefied renewable natural gas (bio-LNG) to customers with trucks powered by natural gas. In 2021, in collaboration with Nordsol, we opened our first European bio-LNG plant, in Amsterdam Westpoort, in the Netherlands. This will make us the first fuel provider to offer a blend of bio-LNG throughout the entire LNG network in the Netherlands.

### Midstream

Shell Pipeline Company LP (Shell interest 100%) operates eight tank farms across the USA. It owns all the interest in one tank farm, and has majority-ownership interests in the other seven through its subsidiaries. It transports around 2 billion barrels of crude oil and refined products a year through 6,000 kilometres of pipelines in the Gulf of Mexico and five US states. Our various non-Shell-operated ownership interests provide a further 13,000 kilometres of pipeline.

We carry more than 40 types of crude oil and more than 20 grades of fuel and chemicals, including gasoline, diesel, aviation fuel, chemicals and ethylene.

Shell Midstream Partners, L.P., a master limited partnership that is headquartered in Houston, Texas; owns, operates, develops and acquires pipelines and other midstream and logistics assets. The Partnership's assets include interests in entities that own (a) crude oil and refined products pipelines and terminals that serve as key infrastructure to transport onshore and offshore crude oil production to Gulf Coast and Midwest refining markets and deliver refined products from those markets to major demand centers and (b) storage tanks and financing receivables that are secured by pipelines, storage tanks, docks, truck and rail racks and other infrastructure used to stage and transport intermediate and finished products. The Partnership's assets also include interests in entities that own natural gas and refinery gas pipelines that transport offshore natural gas to market hubs and deliver refinery gas from refineries and plants to chemical sites along the Gulf Coast. Shell controls the General Partner of Shell Midstream Partners.

See "Governance - Related Party Transactions" on page 189 for information on transactions between Shell and Shell Midstream Partners, L.P.

### Refining and trading

#### Refining

We have interests in 10 refineries worldwide, with a capacity to process a total of 1.6 million barrels of crude oil per day. The distribution of our refining capacity is 52% in Europe and Africa, 34% in the Americas and 14% in Asia.

Shell's Refining business is transforming. We are concentrating our refineries portfolio to meet our strategic aims and to capitalise on the strong integration between our customers, trading operations, chemical plants and, increasingly, our low-carbon fuels output. We are transforming our refining sites into five energy and chemicals parks. These are expected to be Rotterdam in the Netherlands, Rheinland in Germany, Pulau Bukom in Singapore, Norco in Louisiana, USA, and Scotford in Alberta, Canada.

Transforming our refinery business will mean developing new facilities and converting or dismantling existing units. We plan to process less crude oil and use more renewable and recycled feedstocks such as hydrogen, biofuels and plastic waste.

In 2021, we completed the sale of the Puget Sound refinery near Anacortes, Washington, USA, to a subsidiary of HollyFrontier Corporation. We also completed the sale of Fredericia refinery, Denmark.

#### Trading and Supply

Through our main trading offices in London, Houston, Singapore and Rotterdam, we trade crude oil, low-carbon fuels, refined products, chemical feedstocks and environmental products. Trading and Supply trades in physical and financial contracts, lease storage and transportation capacities, and manages shipping and wholesale commercial fuel activities globally.

Operating in around 25 countries, with about 130 Shell and joint-venture terminals, we believe our supply and distribution infrastructure is well positioned to make deliveries around the world.

Shipping and Maritime enables the safe delivery of the Shell Trading and Supply contracts. This includes supplying feedstocks for our refineries and chemical plants, and finished products such as gasoline, diesel and aviation fuel to our Marketing businesses and customers.

Shell Wholesale Commercial Fuels provides fuels for transport, industry and heating ranging from reliable main-grade fuels to premium products.

#### Oil Sands

Synthetic crude oil is produced by mining bitumen-saturated sands, extracting the bitumen, and transporting it to a processing facility where hydrogen is added to make a wide range of feedstocks for refineries. The Athabasca Oil Sands Project (AOSP) in Alberta, Canada, includes the Albian Sands mining and extraction operations, the Scotford upgrader and the Quest carbon capture and storage (CCS) project.

We have a 50% interest in 1745844 Alberta Ltd. (formerly known as Marathon Oil Canada Corporation), which holds a 20% interest in the Athabasca Oil Sands Project.

### BUSINESS ACTIVITIES WITH SYRIA AND CUBA

#### Syria

We ceased all operational activities in Syria in 2011.

#### Cuba

We do not have any operational activities in Cuba.

### OIL PRODUCTS DATA TABLES

The tables below reflect Shell subsidiaries and instances where Shell owns the crude oil or feedstocks processed by a refinery. The tables include Fredericia refinery until the date of divestment in June 2021 and Puget Sound refinery until the date of divestment in October 2021. Other joint ventures and associates are only included where explicitly stated.

Exhibit Q

## Oil Products sales volumes [A][B]

| | 2021 | 2020 | Thousand b/d 2019 |
|---|---|---|---|
| **Europe** | | | |
| Retail | 360 | 344 | 410 |
| Lubricants | 17 | 15 | 16 |
| Other Marketing | 120 | 107 | 178 |
| Refining & Trading | 426 | 472 | 1,183 |
| Total | 923 | 938 | 1,787 |
| **Asia** | | | |
| Retail | 512 | 475 | 535 |
| Lubricants | 46 | 35 | 36 |
| Other Marketing | 103 | 106 | 169 |
| Refining & Trading | 870 | 974 | 1,260 |
| Total | 1,531 | 1,590 | 2,000 |
| **Africa** | | | |
| Retail | 45 | 40 | 45 |
| Lubricants | 3 | 3 | 3 |
| Other Marketing | 7 | 7 | 11 |
| Refining & Trading | 47 | 70 | 78 |
| Total | 102 | 120 | 137 |
| **Americas** | | | |
| Retail | 828 | 782 | 924 |
| Lubricants | 25 | 24 | 27 |
| Other Marketing | 367 | 338 | 450 |
| Refining & Trading | 683 | 918 | 1,236 |
| Total | 1,903 | 2,062 | 2,637 |
| **Total product sales [C][D]** | | | |
| Retail | 1,745 | 1,641 | 1,914 |
| Lubricants | 91 | 77 | 82 |
| Other Marketing | 597 | 558 | 808 |
| Refining & Trading | 2,026 | 2,434 | 3,757 |
| Total | 4,459 | 4,710 | 6,561 |

[A] Excludes deliveries to other companies under reciprocal sale and purchase arrangements, that are in the nature of exchanges. Sales of condensate and natural gas liquids are included.
[B] Includes the Shell share of Raizen's sales volumes.
[C] Certain contracts are held for trading purposes and reported net rather than gross. The effect in 2021 was a reduction in oil product sales of approximately 1,127 thousand b/d (2020: 1,284 thousand b/d; 2019: 546 thousand b/d). With effect from January 1, 2020, certain contracts held for trading purposes and reported net for Europe and Asia regions are consolidated in Europe.
[D] Reported volumes include the Shell joint ventures' sales volumes from key countries.

### Branded retail sites [A]

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Europe | 8,178 | 8,071 | 7,978 |
| Asia [B] | 10,753 | 10,387 | 10,138 |
| Oceania [B] | 1,060 | 1,071 | 1,038 |
| Africa | 2,724 | 2,622 | 2,494 |
| Americas [C] | 23,305 | 23,461 | 23,021 |
| Total | 46,020 | 45,612 | 44,669 |

[A] Excludes sites closed for more than six months.
[B] Asia includes Turkey and Russia; Oceania includes French Polynesia, Guam, Palau and New Caledonia.
[C] Includes around 7,500 retail sites operated by Raizen joint venture.

## Oil products - cost of crude oil processed or consumed [A]

| | 2021 | 2020 | $/barrel 2019 |
|---|---|---|---|
| Total | 60.51 | 35.03 | 54.97 |

[A] Includes Upstream and Integrated Gas margins on crude oil supplied by Shell subsidiaries, joint ventures and associates.

### Crude distillation capacity [A]

| | 2021 | 2020 | Thousand b/stream day [B] 2019 |
|---|---|---|---|
| Europe | 1,023 | 1,059 | 1,057 |
| Asia | 307 | 573 | 767 |
| Africa | 90 | 90 | 90 |
| Americas | 729 | 1,028 | 1,171 |
| Total | 2,149 | 2,750 | 3,085 |

[A] Average operating capacity for the year, excluding mothballed capacity.
[B] Stream day capacity is the maximum capacity with no allowance for downtime.

### Oil products - crude oil processed [A]

| | 2021 | 2020 | Thousand b/d 2019 |
|---|---|---|---|
| Europe | 761 | 810 | 829 |
| Asia | 223 | 292 | 498 |
| Africa | 57 | 54 | 55 |
| Americas | 455 | 719 | 1,004 |
| Total | 1,496 | 1,875 | 2,386 |

[A] Includes natural gas liquids, share of joint ventures and associates and processing for others.

### Refinery processing intake [A]

| | 2021 | 2020 | Thousand b/d 2019 |
|---|---|---|---|
| Crude oil | 1,496 | 1,876 | 2,342 |
| Feedstocks | 143 | 187 | 222 |
| Total | 1,639 | 2,063 | 2,564 |
| Europe | 806 | 854 | 875 |
| Asia | 225 | 302 | 517 |
| Africa | 57 | 54 | 55 |
| Americas | 551 | 853 | 1,117 |
| Total | 1,639 | 2,063 | 2,564 |

[A] Includes crude oil, natural gas liquids and feedstocks processed in crude distillation units and in secondary conversion units.

### Refinery processing outturn [A]

| | 2021 | 2020 | Thousand b/d 2019 |
|---|---|---|---|
| Gasolines | 624 | 771 | 952 |
| Kerosines | 141 | 158 | 417 |
| Gas/Diesel oils | 611 | 774 | 818 |
| Fuel oil | 108 | 140 | 223 |
| Other | 258 | 279 | 282 |
| Total | 1,742 | 2,122 | 2,692 |

[A] Excludes own use and products acquired for blending purposes.

OIL PRODUCTS continued

MANUFACTURING PLANTS AT DECEMBER 31, 2021

Refineries in operation

Thousand barrels/stream day, 100% capacity [B]

| | Location | Asset class | Shell interest (%) [A] | Crude distillation capacity | Thermal cracking/ visbreaking/ coking | Catalytic cracking | Hydro- cracking |
|---|---|---|---|---|---|---|---|
| **Europe** | | | | | | | |
| Germany | Miro [C] | | 32 | 313 | 40 | 96 | — |
| | Rheinland | ■• | 100 | 354 | 49 | — | 90 |
| | Schwedt [C] | | 38 | 233 | 45 | 59 | — |
| Netherlands | Pernis | ■• | 100 | 444 | — | 53 | 104 |
| **Asia** | | | | | | | |
| Singapore | Pulau Bukom | ■• | 100 | 307 | 55 | — | 61 |
| **Africa** | | | | | | | |
| South Africa | Durban [C] | ◆ | 36 | 180 | 25 | 37 | — |
| **Americas** | | | | | | | |
| Argentina | Buenos Aires [C] | •◆ | 44 | 108 | 20 | 22 | — |
| Canada | | | | | | | |
| Alberta | Scotford | ◆ | 100 | 100 | — | — | 83 |
| Ontario | Sarnia | ◆ | 100 | 85 | 5 | 21 | 10 |
| USA | | | | | | | |
| Louisiana | Norco | ■ | 100 | 250 | 29 | 119 | 44 |
| Texas | Deer Park [D] | ■• | 50 | 340 | 96 | 75 | 60 |

[A] Shell interest is rounded to the nearest whole percentage point; Shell share of production capacity may differ.
[B] Stream day capacity is the maximum capacity with no allowance for downtime.
[C] Not operated by Shell.
[D] The sale of Deer Park refinery concluded in January 2022.
■ Integrated refinery and chemical complex
• Refinery complex with cogeneration capacity
◆ Refinery complex with chemical unit(s)
O Other

CHEMICALS

Key statistics

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| | | | $ million, except where indicated |
| Segment earnings [A] | 1,390 | 808 | 478 |
| Including: | | | |
| Revenue (including inter-segment sales) | 23,355 | 14,571 | 17,485 |
| Share of profit of joint ventures and associates | 609 | 567 | 546 |
| Interest and other income | (14) | — | (7) |
| Operating expenses [B] | 3,335 | 3,235 | 3,430 |
| Underlying operating expenses [B] | 3,256 | 3,035 | 3,104 |
| Depreciation, depletion and amortisation | 1,520 | 1,116 | 1,074 |
| Taxation charge/(credit) | | 7 | (2) |
| Identified Items [B] | (364) | (154) | (263) |
| Adjusted Earnings [B] | 1,753 | 962 | 741 |
| Adjusted EBITDA (CCS basis) [B] | 2,959 | 2,131 | 1,891 |
| Capital expenditure | 3,504 | 2,608 | 4,068 |
| Cash capital expenditure [B] | 3,573 | 2,640 | 4,090 |
| Chemical plant utilisation (%) | 78 | 80 | 76 |
| Chemicals sales volumes (thousand tonnes) | 14,216 | 15,036 | 15,223 |

[A] See Note 5 to the "Consolidated Financial Statements" on pages 223-226. Segment earnings are presented on a current cost of supplies basis.
[B] See "Non-GAAP measures reconciliations" on pages 294-297

OVERVIEW
Our Chemicals business supplies customers with a range of base and intermediate chemicals to make products that people use every day. We also have major manufacturing plants that are located close to refineries, and our own marketing network.

BUSINESS CONDITIONS
Cracker margins were volatile in 2021. This was because of supply interruptions and demand increases as COVID-19 lockdown restrictions eased. Overall margins were higher than in 2020, except in Asia. Chinese demand recovered quickly from the pandemic, but petrochemical supply was constrained by power restrictions that affected manufacturing centres, logistics issues within China because of COVID-19, and global logistics issues. Asia cracker margins were down slightly from 2020 because of the balance of supply and demand, and rising prices for energy, crude oil and naphtha feedstock. US ethane cracker margins were supported by disruption due to winter storm Uri in February and March and to a lesser extent by interruptions caused by Hurricane Ida in August and September. West European cracker margins were supported by the US weather events and strong domestic demand, which offset rising crude and natural gas prices for the majority of 2021.

The outlook for petrochemical margins in 2022 and beyond depends on feedstock costs and the balance of supply and demand. Demand for petrochemicals will be affected by the spread of COVID-19 as new variants emerge, and the extent of recovery from the pandemic. Supply of petrochemicals will depend on the net capacity effect of new builds and plant closures (taking into account any delays or cancellations in building new plants or closing old ones). Product prices reflect the prices of raw materials, which are closely linked to crude oil and natural gas prices. The balance of all these factors will drive margins.

See "Market overview" on pages 41-43.

CHEMICAL PLANT UTILISATION
Utilisation is defined as the actual usage of the plants as a percentage of the rated capacity.

Chemicals manufacturing plant utilisation was 78% in 2021 compared with 80% in 2020. The change was mainly because of the impact of Hurricane Ida in the USA in 2021 and an extended turnaround.

CHEMICALS SALES
In 2021, Chemicals sales volumes were 14,216 thousand tonnes, which was 5% lower than 2020 sales volumes of 15,036 thousand tonnes, as a result of the impact of Hurricane Ida in the USA.

EARNINGS 2021-2020
Segment earnings in 2021 of $1,390 million were 72% higher than in 2020. Earnings in 2021 included a net charge of $364 million, compared with a net charge in 2020 of $154 million, which is described below.

Excluding the impact of these charges, earnings in 2021 were $1,753 million, compared with $962 million in 2020.

Chemicals earnings, excluding the net charges (described below), increased by $792 million, or 82%, compared with 2020. This was driven by higher margins in base chemicals and intermediates (around $800 million) from a stronger price environment, and favourable deferred tax movements (around $200 million), partly offset by higher operating expenses (around $200 million) driven by the impact of Hurricane Ida.

Segment earnings in 2021 included a net charge of $364 million.

This included:
• impairment charges of $301 million (mainly due to divestment of the Mobile and Deer Park refineries in the USA and the closure of a production unit on Jurong Island, Singapore);
• redundancy and restructuring costs of $21 million;
• other net charges of $38 million (mainly legal provision); and
• net loss from disposal of assets of $12 million.

These charges were partly offset by a net gain from fair value accounting of commodity derivatives of $8 million.

Segment earnings in 2020 included a net charge of $154 million.

CHEMICALS continued

This included:
• impairment charges of $4 million;
• costs related to restructuring of $38 million (various initiatives across Chemicals);
• net loss from disposal of assets of $1 million; and
• other net charges of $115 million (mainly legal provision).

These charges were partly offset by a net gain from fair value accounting of commodity derivatives of $4 million.

## PRIOR YEAR EARNINGS SUMMARY
Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 77) and Form 20-F (page 57) for the year ended December 31, 2020, as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

## CASH CAPITAL EXPENDITURE
Cash capital expenditure (cash capex) was $3.6 billion in 2021, compared with $2.6 billion in 2020.

Cash capital expenditure increased by $1.0 billion, mainly because of spend on the construction of our cracker facilities in Pennsylvania. Our cash capital expenditure is expected to be around $2 billion to $3 billion in 2022.

## BUSINESS AND PROPERTY
### Manufacturing
Our plants produce a range of base chemicals, including ethylene, propylene and aromatics, and intermediate chemicals such as styrene monomer, propylene oxide, solvents, detergent alcohols, ethylene oxide and ethylene glycol. We have the capacity to produce around 6.5 million tonnes of ethylene a year. We are expanding our product portfolio to include sustainable chemicals, more intermediates and performance chemicals such as polyethylene and polycarbonate. We operate chemical plants worldwide and have a global balance of locations, feedstocks and products that allows us to seize commercial opportunities and get through cycles of lower margins.

Shell's Chemicals business is transforming and has integrated further with our Refining business. In addition to our standalone, chemicals-only production sites, we are transforming our refineries into five energy and chemicals parks. We expect this to happen at the following sites: Norco in the USA, Scotford in Canada, Rotterdam in the Netherlands, Rheinland in Germany and Pulau Bukom in Singapore. The energy and chemicals parks are expected to focus more on meeting customers' low-carbon and sustainability needs.

### Marketing
In 2021, we supplied more than 14 million tonnes of petrochemicals to more than 1,000 industrial customers worldwide. Products made from chemicals are used in everyday life in medical equipment, construction, transport, electronics, agriculture and sports. As global demand for chemicals increases, we plan to increase the size of our business, by understanding and responding to our customers' needs.

## BUSINESS ACTIVITIES WITH SYRIA
We ceased supplying polyols, via a Netherlands-based distributor, to private-sector customers in Syria in 2018. Polyols are commonly used for the production of foam in mattresses and soft furnishings.

## CHEMICALS DATA TABLES
The tables below reflect Shell subsidiaries and instances where Shell owns the crude oil or feedstocks processed by a refinery. Other joint ventures and associates are only included where explicitly stated.

Ethylene capacity [A]

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
|  |  | | Thousand tonnes/year |
| Europe | 1,726 | 1,701 | 1,701 |
| Asia | 2,542 | 2,530 | 2,530 |
| Americas | 2,321 | 2,268 | 2,268 |
| Total | 6,589 | 6,499 | 6,499 |

[A] Includes the Shell share of capacity entitlement (offtake rights) of joint ventures and associates, which may be different from nominal equity interest. Nominal capacity is quoted at December 31.

Chemicals sales volumes [A]

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
|  |  | | Thousand tonnes/year |
| **Europe** | | | |
| Base chemicals | 3,883 | 3,490 | 3,666 |
| Intermediates and other chemicals products | 2,076 | 1,990 | 1,872 |
| Total | 5,959 | 5,480 | 5,538 |
| **Asia** | | | |
| Base chemicals | 1,354 | 1,192 | 1,057 |
| Intermediates and other chemicals products | 2,656 | 2,969 | 2,848 |
| Total | 4,010 | 4,161 | 3,905 |
| **Americas** | | | |
| Base chemicals | 1,984 | 2,936 | 3,261 |
| Intermediates and other chemicals products | 2,263 | 2,459 | 2,519 |
| Total | 4,247 | 5,395 | 5,780 |
| **Total product sales** | | | |
| Base chemicals | 7,221 | 7,618 | 7,984 |
| Intermediates and other chemicals products | 6,995 | 7,418 | 7,239 |
| | | | |
| Total | 14,216 | 15,036 | 15,223 |

[A] Excludes feedstock trading and by-products.

Major chemical plants in operation [A]

| | Location | Ethylene | Styrene monomer | Ethylene glycol | Higher olefins [C] | Additional products |
|---|---|---|---|---|---|---|
| | | | | | Thousand tonnes/year, Shell share capacity [B] | |
| **Europe** | | | | | | |
| Germany | Rheinland | 340 | — | — | — | A |
| Netherlands | Moerdijk | 971 | 815 | 153 | — | A, I |
| UK | Mossmorran [D] | 415 | — | — | — | O |
| **Asia** | | | | | | |
| China | Nanhai [D] | 1,100 | 645 | 415 | — | A, I, P |
| Singapore | Jurong Island [E] | 281 | 1,069 | 1,081 | — | A, I, P, O |
| | Pulau Bukom | 1,161 | — | — | — | A, I |
| **Americas** | | | | | | |
| Canada | Scotford | — | 475 | 461 | — | A, I |
| USA | Deer Park | 889 | — | — | — | A, I |
| | Geismar | — | — | 400 | 1,390 | I |
| | Norco | 1,432 | — | — | — | A |
| Total | | 6,589 | 3,004 | 2,510 | 1,390 | |

[A] Major chemical plants are large integrated chemical facilities, typically producing a range of chemical products from an array of feedstocks, and are a core part of our global Chemicals business.
[B] Shell share of capacity of subsidiaries, joint arrangements and associates (Shell- and non-Shell-operated), excluding capacity of the Infineum additives joint ventures.
[C] Higher olefins are linear alpha and internal olefins (products range from C4 to C2024).
[D] Not operated by Shell
[E] The polyethylene, polypropylene and olefins production mentioned refers to Shell share of capacity of our non-operated joint ventures Petchem Corporation of Singapore (PCS) and The Polyolefin Company (TPC) which are on Jurong Island.

A   Aromatics, lower olefins
I    Intermediates
P   Polyethylene, polypropylene
O   Other

Other chemical locations [A]

| | Location | Products |
|---|---|---|
| **Europe** | | |
| Germany | Karlsruhe | A |
| | Schwedt | A |
| Netherlands | Rotterdam | A, I, O |
| **Americas** | | |
| Argentina | Buenos Aires | I |
| Canada | Sarnia | A, I |
| USA | Mobile | A |
| | Puget Sound | I |

[A] Other chemical locations reflect locations with smaller chemical units, typically serving more local markets.

A   Aromatics, lower olefins
I    Intermediates
O   Other

Exhibit Q

CORPORATE

Earnings

| | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Segment earnings | (2,606) | (2,952) | (3,273) |
| Comprising: | | | |
| Net interest [A] | (2,701) | (2,991) | (3,080) |
| Taxation and other [B] | 96 | 39 | (194) |
| Identified Items | 81 | 460 | 109 |
| Adjusted Earnings | (2,686) | (3,412) | (3,383) |

[A] Mainly Shell's interest expense (excluding accretion expense) and interest income.
[B] Other earnings mainly comprise net foreign exchange gains and losses on financing activities, headquarters and central functions' costs not recovered from business segments, and net gains on sale of properties.

## OVERVIEW

The Corporate segment covers the non-operating activities supporting Shell. It comprises Shell's holdings and treasury organisation, self-insurance activities and headquarters and central functions. All finance expense and income and related taxes are included in Corporate segment earnings rather than in the earnings of business segments.

The holdings and treasury organisation manages many of the Corporate entities. It is the point of contact between Shell and external capital markets, conducting a wide range of transactions, such as raising debt instruments and transacting foreign exchange. Treasury centres in London and Singapore support these activities.

Headquarters and central functions provide business support in communications, finance, health, human resources, information technology (IT), legal services, real estate and security. They also provide support for shareholder-related activities. The central functions are supported by business service centres, which process transactions, manage data and produce statutory returns, among other services. Most headquarters and central-function costs are recovered from the business segments. Costs that are not recovered are retained in Corporate.

## EARNINGS 2021-2020

Segment earnings in 2021 were an expense of $2,606 million, compared with $2,952 million in 2020.

Net interest decreased by $289 million in 2021 compared with 2020. This was primarily due to a decrease in interest expense following debt repayments and a reduction in interest expense on lease liabilities, partly offset by a reduction in interest income generated on cash balances.

Taxation and other earnings increased by $58 million in 2021, compared with 2020. This largely reflected a foreign exchange gain arising from favourable exchange rate movements and lower financing expenses from joint ventures and associates, partly offset by unfavourable deferred tax impacts due to the weakening Brazilian real on financing positions.

## PRIOR YEAR EARNINGS SUMMARY

Our earnings summary for the financial year ended December 31, 2020, compared with the financial year ended December 31, 2019, can be found in the Annual Report and Accounts (page 80) and Form 20-F (page 60) for the year ended December 31, 2020, as filed with the Registrar of Companies for England and Wales and the US Securities and Exchange Commission, respectively.

## SELF-INSURANCE

We mainly self-insure our hazard risk exposures. Our Group insurance companies are adequately capitalised to meet self-insurance obligations and respective regulations, though they may transfer risks to third-party insurers where economical, effective and relevant (see "Risk factors" on page 30). We continually assess the safety performance of our operations and make risk mitigation recommendations, where relevant, to minimise the risk of an accident.

## INFORMATION TECHNOLOGY AND CYBER SECURITY

Given our digitalisation efforts and increasing reliance on information technology (IT) systems for our operations, we continually monitor external developments and actively share information on threats and security incidents. Shell employees and contract staff are subject to mandatory courses and regular awareness campaigns aimed at protecting us against cyber threats. We periodically test and adapt cyber-security response processes and seek to enhance our security monitoring capability.

Given our dependence on IT systems for our operations and the increasing role of digital technologies across our organisation, we are aware that cyber-security attacks could cause significant harm to Shell in the form of loss of productivity, loss of intellectual property, regulatory fines and reputational damage. As a result, we continuously measure and, where required, further improve our cyber-security capabilities to reduce the likelihood of successful cyber attacks. Our cyber-security capabilities are embedded into our IT systems, which are protected by various detective and protective technologies. The identification and assessment capabilities are built into our support processes and adhere to industry best practices. The security of IT services, operated by external IT companies, is managed through contractual clauses and additionally through formal supplier assurance reports for critical IT services.

Shell is frequently subjected to cyber attacks and since the COVID-19 pandemic in 2020, we have noticed an increase in such activity. COVID-19 necessitated a switch from office to remote working, which changed and increased the IT systems' exposure to cyber threats. Shell's CyberDefence team responded by enhancing cyber-security controls for remote connectivity, strengthening its monitoring and detection, and taking additional measures to improve cyber awareness.

See "Risk factors" on page 28.

# CLIMATE CHANGE AND ENERGY TRANSITION

Shell has long recognised that greenhouse gas (GHG) emissions from the use of hydrocarbon-based energy are contributing to the warming of the climate system. We support the Paris Agreement's goal to keep the rise in global average temperature this century to well below two degrees Celsius above pre-industrial levels and to pursue efforts to limit the temperature increase even further to 1.5 degrees Celsius.

Shell's Powering Progress strategy is designed to generate shareholder value while meeting our target of becoming a net-zero emissions energy business by 2050, in step with society's progress towards achieving the goals of the Paris Agreement.

Shell has supported the recommendations of the Task Force on Climate-related Financial Disclosures (TCFD) since 2017. The TCFD requires disclosure of qualitative and quantitative information aligned to its core four elements – governance, strategy, risk management, and metrics and targets. The TCFD aims to improve the disclosure of climate-related risks and opportunities and provide stakeholders with the necessary information to undertake robust and consistent analyses of the potential financial impacts of climate change. We recognise the value that the recommendations bring and continue to align and enhance our climate-related disclosures.

We set out below our climate-related financial disclosures consistent with all of the TCFD recommendations and recommended disclosures. By this we mean the four TCFD recommendations and the 11 recommended disclosures set out in Figure 4 of Section C of the report entitled "Recommendations of the Task Force on Climate-related Financial Disclosures" published in June 2017 by the TCFD.

CLIMATE CHANGE AND ENERGY TRANSITION continued

## GOVERNANCE OF CLIMATE-RELATED RISKS AND OPPORTUNITIES

### BOARD OVERSIGHT OF CLIMATE-RELATED RISKS AND OPPORTUNITIES

In 2021, Shell reshaped and restructured our organisation to place our energy transition strategy at the heart of everything we do. Our governance is designed to effectively manage our transition to a net-zero emissions energy business by 2050, in step with society's progress towards achieving the goals of the Paris Agreement.

Our governance begins with the Board's approval of our energy transition strategy and oversight of its implementation and delivery. In 2021, the Board considered climate-related matters throughout the year when reviewing and guiding our energy transition strategy, assessing the risk management policies in place, and challenging and endorsing the business plans and budgets, including overseeing major capital expenditures, acquisitions and divestments. In 2021, the Board convened 12 times and continued to regularly oversee the Powering Progress Strategy and net-zero initiatives, including at the Board Strategy Day in June 2021. Three Board committees provide primary oversight of the delivery of our energy transition strategy: the Safety, Environmental and Sustainability Committee (SESCo), the Audit Committee and the Remuneration Committee. See "Climate change governance organogram" below.

SESCo provides oversight of our technical delivery in driving reduction of our carbon emissions, and the potential impacts and adaptation measures related to the physical risks of climate change. This includes reviewing our Carbon Management Framework and monitoring progress in reducing emissions to meet targets. SESCo met 13 times in 2021 and discussed climate-related matters at nine meetings. After each meeting the SESCo Chair provided updates to the Board directly. For more information on SESCo's activities in 2021, see page 141.

Our Audit Committee provides oversight of the effectiveness of our internal controls and risk management framework to ensure that our

financial statements reflect the risks and opportunities associated with our energy transition strategy and climate change. During 2021, the Audit Committee convened 11 times in total and discussed climate-related matters on at least six occasions.

More information on our Audit Committee's activities in 2021 can be found in the Audit Committee Report on page 142.

The Remuneration Committee sets our remuneration policy and targets designed to challenge and support management to reduce our carbon emissions while maintaining shareholder value. The Remuneration Committee met five times during 2021, with climate-related matters discussed at each meeting.

Find more information on our Remuneration Committee's activities in 2021 in the "Directors' Remuneration Report" on page 157 and the "Annual Report on Remuneration" on page 161.

**Climate performance and remuneration**

Climate-related key performance indicators were considered as part of the 2021 annual bonus scorecard (15% weighting) for almost all of Shell's employees, as well as the 2021 Performance Share Plan (PSP) awards (10% weighting) and the 2021 Long-term Incentive Plan (20% weighting, vesting in 2023) for senior executives.

See "Directors' Remuneration Report" on pages 156-160 for further information.

The importance of our energy transition strategy means that all of these committees are informed about climate-related matters on a frequent basis throughout the year.

Find additional information on the Board's oversight in "Governance framework" on page 129.

## MANAGEMENT'S ROLE IN ASSESSING AND MANAGING CLIMATE-RELATED RISKS AND OPPORTUNITIES



**Climate change management organogram**

The Chief Executive Officer (CEO) has the delegated authority from the Board to manage Shell's actions in relation to the Company's strategy, which includes climate change. The CEO is assisted by a number of senior management positions on climate-related matters to implement Shell's energy transition strategy and ensure that such matters are appropriately monitored.

- The Director of Strategy, Sustainability and Corporate Relations supports the CEO in developing Shell's energy transition strategy, including climate scenarios development, and augmenting the Company's Carbon Management Framework. This framework includes the setting of carbon budgets for our businesses, and the implementation of carbon-related activities.
- The Downstream Director identifies climate-related opportunities while managing and mitigating the climate risks of our existing Downstream businesses. The Sectors and Decarbonisation organisation supports the Downstream Director in implementing the sectoral decarbonisation approach.
- The Integrated Gas, Renewables and Energy Solutions Director is responsible for finding and developing low-carbon solutions and opportunities, including those across our solar, hydrogen and wind businesses, as well as managing and mitigating carbon emissions from our business.
- The Upstream Director is responsible for identifying low-carbon and emission reduction opportunities in our Upstream oil and gas business through managing and mitigating our carbon emissions, for example, by eliminating routine flaring and in some cases by using renewable energy to power our oil and gas extraction activities.
- The Projects & Technology (P&T) Director is responsible for setting emissions, climate, and reporting standards that are applicable to all our businesses. The P&T Director is also responsible for developing new technologies that will help our businesses to deliver net-zero emissions targets through both energy efficiency measures and research and development activities geared towards decarbonisation.
- The Chief Financial Officer (CFO) is responsible for monitoring the effective application of the Shell Control Framework, which provides the basis for managing our material risks including climate-related risks and opportunities, and the assurance over our financial information, carbon emissions and climate-related disclosures.

**Delivering through three strategic pillars**

There are two key supporting management committees, with representatives from across the organisation:
- The Capital Investment Committee (CIC) facilitates the portfolio management discussions to ensure that the climate risks and opportunities are embedded in investment decision-making. This committee is made up of senior executives, including the CEO, CFO, and individual business directors.
- The Carbon Reporting Committee (CRC), which was formed in 2021, is sponsored by the CFO, and includes senior management representatives from business units, Projects & Technology climate-related disciplines and various functions such as Strategy, Finance and Legal. This committee is tasked with ensuring that greenhouse gas (GHG) emissions measures, both absolute emissions and carbon intensity, and associated metrics, comply with all regulatory and legal requirements. The CRC is responsible at Group level for effectively embedding Group-wide training plans, measurement and reporting of GHG emissions metrics, and review and approval of external disclosures.

Our network of country chairs supports the overall governance and development of climate-related opportunities. They set each country's energy transition strategy within our Powering Progress strategy.

**Processes by which management is informed about climate-related issues**

Several processes are employed across the organisation to ensure that management teams can effectively monitor and manage climate-related matters. The management teams are helped by a combination of carbon-management-related standards and frameworks, forums at various levels of the organisation, and capability development programmes. These include our Carbon Management Framework, carbon pricing, and the Greenhouse Gas (GHG) and Energy Management Manual.

**Carbon Management Framework**

In 2021, we worked on augmenting our comprehensive Carbon Management Framework (CMF). The CMF seeks to implement an approach to managing and reducing our emissions that is similar to how we use our financial framework.

This helps to ensure that management considers carbon emissions when making decisions.

The CMF helps set carbon budgets in our operating plan. For the 2021 operating plan cycle, our net carbon intensity (NCI) targets were translated into Scope 1, 2 and 3 (see definition below) carbon budgets for each business. These were used as boundaries for optimising each business' operating plan. As a result, the CMF makes it easier to assess the trade-offs between emitting carbon and generating value. This helps to inform portfolio decisions.

Some examples of how our decarbonisation targets are taken into account in fundamental decisions across the organisation are as follows:

- Our businesses further embedded carbon emissions objectives in their individual business units' Capital, Portfolio and Carbon forums. The forums consist of the most senior business management representatives who are responsible for active portfolio management through evaluation, and delivery of growth and divestment decisions.

- Certain assets are required to identify GHG abatement opportunities and reflect them in their annual business plans.

**Definition – Scope 1, 2 and 3 emissions**

We follow the GHG Protocol's Corporate Accounting and Reporting Standard, which defines three scopes of GHG emissions:

- Scope 1: direct GHG emissions from sources that are owned or controlled by Shell.

- Scope 2: indirect GHG emissions from generation of purchased energy consumed by Shell.

- Scope 3: other indirect GHG emissions, including emissions associated with the use of energy products sold by Shell.

Exhibit Q

CLIMATE CHANGE AND ENERGY TRANSITION continued

## Carbon pricing

To assess the resilience of new projects we consider the potential costs associated with operational GHG emissions. We have developed country-specific short-medium and long-term estimates of future costs of carbon which are reviewed and updated annually. In 2021, we increased the expected cost of carbon, so by 2050, in real terms our cost of carbon estimates for all countries increased to between $125 and $200 per tonne of GHG emissions. The process for developing our cost of carbon estimates uses short-term policy outlooks and long-term scenario forecasts. We believe our estimates appropriately reflect society's current implementation of the Paris Agreement. Unfortunately, however, society is not yet on track to meet the goals of the Paris Agreement. Shell will continue to update the cost of carbon estimates to take account of changes in the economic environment and pace of energy transition.



Shell will continue to update its cost of carbon estimates to take account of changes in the pace of energy transition.

## Greenhouse gas and energy management



Each Shell entity and Shell-operated venture is responsible for the development of their GHG and energy management plans.

In 2021, we updated our Greenhouse Gas and Energy Management standard. It is part of both our health, safety, security, environment, and social performance (HSSE & SP) Control Framework, and Asset Management System. This update streamlines accountabilities for GHG and energy management within businesses, assets and projects, tightening the process for analysing our emissions, benchmarking performance, identifying improvement opportunities, and forecasting future performance.

Shell's GHG and energy management process is integrated into our annual business planning cycles to provide leadership with the robust information required to make decisions on GHG reduction opportunities and portfolio choices required to achieve our decarbonisation targets.

We also created the position of a Global Process Owner for GHG and energy management within our Safety, Environment and Carbon, and Asset Management (SEAM) organisation. The Global Process Owner is responsible for working across Shell businesses to ensure the GHG and energy management requirements are adopted and embedded in business operations, planning, and performance management processes. The Global Process Owner also facilitates the ongoing improvement of processes, tools, communications, and capabilities needed within the businesses to achieve our decarbonisation aspirations.

Our GHG & Energy Management process is integrated into our annual business planning cycle.

Exhibit Q

## ENERGY TRANSITION STRATEGY

In 2021, we announced Powering Progress, our strategy to accelerate our transition to a net-zero emissions energy business, purposefully and profitably. Powering Progress aims to deliver value for our shareholders, for our customers and for wider society.

**Our strategy aims to support the ambitious goal of the Paris Agreement**

Tackling climate change is an urgent challenge. It requires a fundamental transformation of the global economy and the energy system so that society stops adding to the total amount of greenhouse gases in the atmosphere, achieving what is known as net-zero emissions. That is why Shell has set a target to become a net-zero emissions energy business by 2050, in step with society's progress in achieving the goal of the Paris Agreement on climate change.

There is no established standard for aligning an energy supplier's decarbonisation targets with the temperature limit goal of the Paris Agreement. In the absence of a broadly accepted standard, we developed our own approach to demonstrate Paris alignment by setting carbon intensity targets using a pathway derived from the Intergovernmental Panel on Climate Change (IPCC) scenarios aligned with the Paris Agreement's goal. We believe our NCI and absolute emissions targets support the more ambitious goal of the Paris Agreement: to limit the increase in the average global temperature to 1.5 degrees Celsius above pre-industrial levels. It is aligned with the findings of the IPCC which concluded that the world must reach net-zero carbon emissions by around 2050 to limit global warming to 1.5 degrees Celsius and avoid the worst effects of climate change.

We determined our targets using scenarios taken from a database developed for the IPCC Special Report on Global Warming of 1.5°C. We filtered out certain outlying IPCC scenarios to ensure that Shell's targets are aligned with earlier action, and low-overshoot scenarios. Overshoot refers to the extent to which a scenario exceeds an emissions budget and subsequently relies on sinks to compensate for the excess emissions.

Becoming a net-zero emissions energy business means that we are reducing emissions from our operations, and from the fuels and other energy products such as electricity that we sell to our customers. It also means capturing and storing any remaining emissions using technology, protecting natural carbon sinks, and providing high quality nature-based solutions to our customers to offset unavoidable emissions. Increasing numbers of countries and companies have announced targets to achieve net-zero emissions by the middle of the century, and we are starting to see some changes in the demand and supply of energy. Achieving the 1.5 degrees Celsius goal will be challenging and require unprecedented global collaboration. The pace of change will also vary around the world.

See the "Strategy and outlook" for more information on page 18.

## CLIMATE-RELATED RISKS AND OPPORTUNITIES IDENTIFIED BY SHELL OVER THE SHORT, MEDIUM AND LONG TERM

Our target to become a net-zero emissions energy business by 2050, in step with society's progress, requires us to continue enhancing our strategic risk management approach to addressing climate risk. Our energy transition strategy is designed to help us identify and shape how we can assist with decarbonising our customer sectors. This means that our strategy is shaped in response to risks and opportunities identified across the sectors and regions we work in.

There are many teams across Shell involved in this process, to ensure that we make sound strategic decisions.

The process for identifying and assessing climate-related risks and opportunities is set out under "Climate Risk Management" below. Through this process, Shell continues to identify climate change and the associated energy transition as a material risk based on the rapidly evolving societal concerns and developments related to climate change and managing GHG emissions. These developments expose Shell to a variety of factors, which could have an impact on demand for our products, our operational costs, supply chains, markets, regulatory environment, licences to operate and litigation. This risk is composed of a combination of complex elements that affect Shell's overall business value chain. The risks are interrelated, and generally describe a rapidly evolving risk landscape for our asset, product and business portfolio. To achieve our climate ambition, active holistic management of all climate-related risk components is important. The composite risk is broken down into the following sub-components:
- commercial risk;
- regulatory risk;
- societal risk (including litigation risk); and
- physical risk.

In addition to risk, we also continue to identify opportunities for Shell in the energy transition, from our existing position as a leading global energy provider. These risks and opportunities are described below and are also summarised in the strategic risks report section on page 24.

**Time horizons: short, medium and long**

Due to the inherent uncertainty, and the pervasive nature of the risks across our strategy and business model, the climate-related risks and opportunities are monitored across multiple time horizons.
- Short term (up to three years): we develop detailed financial projections and use them to manage performance and expectations on a three-year cycle. These projections incorporate decarbonisation measures required to meet our short-term targets.
- Medium term (generally three to 10 years): embedded within our operating plan, with our continued focus on the customer, the investments and portfolio shifts required in the medium term that will fundamentally reshape Shell's portfolio. At the same time, our existing asset base is expected to provide the cash flow to finance this transition of our revenue in this period.
- Long term (generally beyond 10 years): it is expected that our portfolio and product mix will look very different, addressing the shift from an asset-based approach to a customer-based business model.

Exhibit Q

CLIMATE CHANGE AND ENERGY TRANSITION continued

Transition risks

| CLIMATE-RELATED COMMERCIAL RISK | | Relevant time horizon: |
|---|---|---|
| • The transition to a low-carbon economy may lead to lower sales volumes and/or margins due to a general reduction or elimination of demand for oil and gas products, possibly resulting in under-utilised or stranded oil and gas assets and a failure to secure new opportunities. | | medium and long |
| • Changing preferences of investors and financial institutions could reduce access to and increase the cost of capital. | | |

**Potential material impacts on the organisation**

| Lower demand and margins for oil and gas products | Changing preferences of investors and financial institutions | Remaining in step with the pace and extent of the energy transition |
|---|---|---|
| Changing customer sentiment towards renewable and sustainable energy products may reduce demand for our oil and gas products. An excess of supply over demand could reduce fossil fuel prices. This could be a factor contributing to additional provisions for our assets and result in lower earnings, cancelled projects and potential impairment of certain assets | Financial institutions are increasingly aligning their portfolios to a low-carbon and net-zero world, driven both by regulatory and broader stakeholder pressures. A failure to decarbonise the business portfolios in line with investor and lender expectations could have a material adverse effect on our ability to use financing for these types of future projects. This could also adversely affect our potential partners' ability to finance their portion of costs, either through equity or debt. | The energy transition provides us with significant opportunities, as described in the "Transition opportunities" below. If we fail to stay in step with the pace and extent of change or customer and other stakeholders' demand for low-carbon products, this could adversely affect our reputation and future earnings. If we move much faster than society, we risk investing in technologies, markets or low-carbon products that are unsuccessful, therefore we cannot transition too quickly or we will be trying to sell products that customers do not want. This could also have a material adverse effect on financial results. |
| | | Our short-term remuneration targets are not conditioned by society's progress towards net zero. However, our 2050 net zero target is conditioned by society's progress as there is significant risk that Shell will not be able to meet its net-zero target if society is not net zero. |

| CLIMATE-RELATED REGULATORY RISK | | Relevant time horizon: |
|---|---|---|
| The transition to a low-carbon economy will increase the cost of compliance for our assets and/or products, and may include restrictions on the use of hydrocarbons. The lack of net-zero-aligned global and national policies and frameworks increases the uncertainty around this risk. | | short, medium, and long |

**Potential material impacts on the organisation**

| Increased compliance costs | Restrictions on use of hydrocarbons | Lack of net-zero-aligned global and national policies and frameworks |
|---|---|---|
| Some governments have introduced carbon pricing mechanisms, which we believe can be an effective way to reduce GHG emissions across the economy at the lowest overall cost to society. | With around 90% of the global economy now signed up to net-zero commitments as of January 2022, according to the Energy and Climate Intelligence Unit of the UK, there is an ever-increasing threat that governments set future regulatory frameworks that restrict further exploration and production of hydrocarbons, and bring in controls to limit the use of such products. Failure to replace proved reserves could result in an accelerated decrease of future production, which could have a material adverse effect on our earnings, cash flows and financial condition. | The lack of net-zero-aligned global and national policies and frameworks increases the uncertainty around how carbon pricing and other regulatory mechanisms will be implemented in the future. This makes it harder to determine the appropriate assumptions to be taken into account in our financial planning and investment decision processes. |
| Shell's cost of compliance with the EU Emissions Trading Scheme (ETS) and related schemes was around $331 million in 2021, as recognised in Shell's Consolidated Statement of Income for 2021 (see Note 31 to the "Consolidated Financial Statements"). | | |
| Shell's annual carbon cost exposure is expected to increase over the next decade because of evolving carbon regulations. The forecasted annual cost exposure in 2030 is estimated to be within the range of $1.0-2.5 billion. This estimate is based on a forecast of Shell's equity share of emissions from operated and non-operated assets (including joint ventures and associates), and real-terms carbon cost estimates which range from around $25 to around $200 per tonne of GHG emissions in 2030. This exposure also takes into account the estimated impact of free allowances as relevant to assets based on their location. | | |

Exhibit Q

Transition risks continued

| CLIMATE-RELATED SOCIETAL RISK (INCLUDING LITIGATION RISK)<br>As societal expectations develop around climate change, there is a potential impact on Shell's licence to operate, reputation, brand and competitive position. This is likely to include class action lawsuits or similar litigation. | | Relevant time horizon:<br>short, medium and long |
|---|---|---|
| **Potential material impacts on the organisation** | | |
| Decline in reputation and brand<br>Societal expectations of businesses are increasing, with a focus on business ethics, quality of products, contribution to society, safety and minimising damage to the environment. There is an increasing focus on the role of the oil and gas sector in the context of climate change and the energy transition. This could negatively affect our brand, reputation and licence to operate, which could limit our ability to deliver our strategy, reduce consumer demand for our branded and non-branded products, harm our ability to secure new resources and contracts, and restrict our ability to access capital markets or attract staff. | Deteriorating relationships with key stakeholders<br>Failure to decarbonise Shell's value chain in line with societal, governmental and investor expectations is a material risk to Shell's reputation as a responsible and market-leading energy company. The impact of this risk includes shareholder divestment, greater regulatory scrutiny and potential asset closure resulting from public interest groups' protests. | Class action lawsuits and litigation<br>There is an increasing risk for oil and gas companies from public, private and governmental lawsuits taken to inhibit the exploration, excavation and processing of hydrocarbons as a matter of environmental and societal welfare. Such action may force entities to hand over strategic autonomy in part to regulators, divest from hydrocarbon technologies and pay large compensation packages to the plaintiff.<br><br>In some countries, governments, regulators, organisations and individuals have filed lawsuits seeking to hold oil and gas companies liable for costs associated with climate change. While we believe these lawsuits to be without merit, losing could have a material adverse effect on our earnings, cash flows and financial condition.<br><br>For example, in May 2021, the District Court in The Hague, Netherlands, ruled that, by 2030, Shell must reduce, from its consolidated subsidiaries, its net Scope 1 emissions by 45% and use it best efforts to reduce its net Scope 2 and net Scope 3 emissions by 45%, compared with 2019 levels. In 2019, our Scope 1 emissions from our consolidated subsidiaries were 86 million tonnes of carbon dioxide equivalent ($CO_2$e) (rounded) (financial control basis). |

Physical risks

| CLIMATE-RELATED PHYSICAL RISK<br>The potential physical effects of climate change may impact Shell's assets, operations, supply chains, employees and markets. | | Relevant time horizon:<br>medium and long |
|---|---|---|
| **Potential material impacts on the organisation** | | |
| Mitigation of physical risks, whether or not related to climate change, are considered and embedded in the design and construction of assets. The potential impact of physical changes come from both acute and chronic physical risks.<br>Acute risks, such as flooding and droughts, wildfires and more severe tropical storms, could potentially impact our operations and supply chains. The frequency of these hazards and impacts is expected to increase in certain high-risk locations. Extreme weather events, whether or not related to climate change, could have a negative impact on earnings. Recent examples in 2021 include the Texas winter storm and Hurricane Ida. These had an impact on our operations and an adverse impact on 2021 earnings of around $200 million and around $400 million respectively. | Chronic risks, such as rising temperatures and rising sea levels, could potentially impact the efficiency of our plants, increase equipment corrosion, decrease gas pipeline capacity, and impact our coastal facilities. The assets at highest risk from these impacts are those in coastal locations across refining. We have performed analyses addressing a range of typical climate change features for a select group of assets. We concluded that currently any adaptation costs for those selected assets are not expected to be significant. We recognise that we need to deepen and widen these analyses for a more comprehensive climate resilience assessment. We continue to monitor this and plan to conduct further analysis on other assets as well as assess long-term physical impacts. | Additionally, the impact of physical climate change on our operations is unlikely to be limited to the boundaries of our assets. The overall impact including how supply chains, resource availability and markets may be affected also needs to be considered, for a holistic assessment of this risk. The risk assessment and mitigation actions are based on our current understanding and we continue to track ongoing research on the subject to update our assessment and actions. |

CLIMATE CHANGE AND ENERGY TRANSITION continued

Transition opportunities

| CLIMATE-RELATED OPPORTUNITIES | Relevant time horizon: |
|---|---|
| The transition to a low-carbon economy also brings significant opportunities for us to benefit from changing customer demands, given our position as a leading global energy provider. | short, medium, and long |

Potential material impacts on the organisation

As the global energy mix changes, our current infrastructure, know-how and global footprint put us in an ideal position to service the changing energy demands of the market. Our research and development (R&D) activities are key to achieving our net-zero emissions target.

As we shift from an asset-based to a customer-focused business model our current key focus areas for seizing this opportunity are:

1. Renewables and Energy Solutions
This encompasses our wind, solar, hydrogen, electric vehicle charging, nature-based solutions, and carbon capture and storage businesses. Electricity generated by wind and solar power plays a direct role in reducing emissions in passenger transport and parts of industry. It can also be used to create hydrogen. We expect hydrogen to present a business opportunity for heavy-duty road freight over a shorter time horizon and within shipping, industry and, possibly, aviation, over a longer time horizon. Hydrogen also has the potential to become a material part of Shell's business-to-business (B2B) operations, as heavy industry begins to transition away from energy sourced from hydrocarbons.

2. Biofuels
Shell and our joint venture Raízen (Shell interest 44%, not operated by Shell) are together one of the world's largest blenders and distributors of biofuels. Shell plans to continue to invest in and increase the production of these low-carbon fuels. Our low-carbon fuels projects and operations around the world form part of a wider commitment to provide a range of energy choices for customers. For example, we believe that sustainable aviation fuels (SAF) provide the most effective way of removing emissions within the aviation sector, with wider adoption of SAF enabling us to provide more low-carbon fuels to our customers. Biofuels may also present opportunities in the shipping, road freight and other sectors.

3. Natural gas
Shifting from coal and oil to natural gas is one way for countries to take action as the world moves to a net-zero emissions future. It is a key component of the energy transition. Demand for liquefied natural gas (LNG) is expected to grow and we are a leading LNG supplier, with around 40 million tonnes of equity capacity.

4. Transforming refineries into energy and chemicals parks
An important aim of our Powering Progress strategy is to transform refineries into energy and chemicals parks so that we can sell more low-carbon and sustainable products.

IMPACT OF CLIMATE-RELATED RISKS AND OPPORTUNITIES ON SHELL'S BUSINESSES, STRATEGY AND FINANCIAL PLANNING
The transformation of the energy system to net-zero emissions will require simultaneous action in three areas – an unprecedented improvement in the efficiency with which energy is used, a sharp reduction in the carbon intensity of the energy mix and the mitigation of residual emissions using technology and natural sinks. While it is difficult to predict the exact combination of actions that will deliver the net-zero goal, scenarios help us to understand the direction and pace of the transition needed.

We have been developing scenarios within Shell for almost 50 years, helping Shell leaders to explore ways forward and make better decisions. Shell scenarios are designed to stretch management's thinking in considering events that may be only remotely possible. They help them make crucial choices in times of uncertainty and transition as we grapple with tough energy and environmental issues.

Shell scenarios are aligned to different energy transition pathways and help guide risk and opportunity identification and decision-making. Our energy transformation scenarios – Waves, Islands and Sky 1.5 – are all possible pathways towards the future that have both attractive and challenging features. Out of the three scenarios, Sky 1.5 has a pace and timing for energy decarbonisation that is fast enough to limit global warming to 1.5 degrees Celsius above pre-industrial levels by the end of this century. The full report can be found at www.shell.com/transformationscenarios.

Different socio-economic and technological parameters are used to construct these scenarios, such as:
- sectoral and regional energy demand;
- future trajectory of oil consumption, demand for natural gas;
- renewable electricity demand and the pace of the electrification of the global energy system;
- supply of solar and wind energy;
- pace of uptake of electric vehicles;
- demand for biofuels;
- growth of the hydrogen economy;
- level of carbon capture and storage;
- deployment of lower-carbon energy technologies; and
- global trade of oil and gas.

Management consideration of different climate change outcomes informs a range of areas including, but not limited to, the setting of the long-term strategy, business planning, and investment and divestment decisions. The outcomes considered by management vary in relation to the extent and pace of the energy transition.

81

**Impact on strategic planning**

The application of scenario analysis informs our assessment of the impact of climate-related risks and opportunities on our strategy and business planning, both at the Group and business units' levels. At the Group level, the potential impacts of the energy transition on our business model are discussed and assessed at the Board and the Executive Committee level as part of the annual strategic and business planning cycle. This assessment allows us to challenge accepted ways of thinking, identify material risks and opportunities, and formulate key tensions and trade-offs.

**Key financial and non-financial components of business planning**

The output of our annual business planning process is presented and approved by the Board. The plan contains operational and financial metrics, and its objective is to drive delivery of our Powering Progress strategy.

Decarbonisation targets are key inputs of our business planning process. Each business owner offers viable Scope 1, 2 and 3 reduction opportunities as part of this process, in line with the Carbon Management Framework (CMF) (see page 76).

The business plan is underpinned by assumptions about internal and external parameters. These assumptions are developed with input from our scenarios and internal estimates and outlooks. Some of the key assumptions relate to:
• commodity prices;
• refining margins;
• production levels and product demand;
• exchange rates;
• future carbon costs;
• the schedules of capital investment programmes; and
• risks and opportunities that may have material impacts on free cash flow.

The level of uncertainty around these assumptions increases over longer time horizons.

**Impact on business and financial planning**

There is no one single scenario that underpins Shell's business and financial planning. Generally, our scenarios are designed to stretch management's thinking including considering events that may be only remotely possible. Scenarios are not intended to be predictions of likely future events or outcomes and, therefore, are not the basis for Shell's operating plans and financial statements. Our scenarios help in developing our future oil and gas pricing outlooks. The oil and gas pricing outlooks take account of various factors relating to the energy transition such as potential changes in supply and demand (see details of scenario parameters above). The low, medium and high pricing outlooks are prepared by a team of experts, reviewed by the Shell Executive Committee and approved by the CEO and CFO. The medium pricing outlook represents management's reasonable best estimate and is the basis for Shell's financial statements, operating plans and impairment testing.

Shell's targets to reduce absolute Scope 1 and 2 emissions by 50% by 2030, compared with 2016 levels on a net basis, and 20% reduction of net carbon intensity of Scope 3 emissions by 2030 have been included in Shell's operating plan. Meeting the goals of the Paris Agreement requires the global economy to transform in a number of complex and connected ways, price outlooks and assumptions as it moves towards net-zero emissions by 2050, in step with society..

Meeting the goals of the Paris Agreement requires the global economy to transform in a number of complex and connected ways. We continue to update our analysis and the corresponding price outlooks and business plans, in line with our strategy and in step with society.

As described in "Climate-related risks and opportunities identified by Shell over the short, medium and long term", the low pricing outlooks could result in increased commercial, regulatory and societal risks, as well as transition opportunities. How these risks are prioritised is described in "Shell's processes for identifying and assessing climate-related risks". Given our ambition to become a net-zero emissions energy business by 2050, in step with society, the use of low-pricing outlooks is a part of our resilience testing and resulting actions. Physical risk is expected to be more material in higher temperature scenarios.

**RESILIENCE OF SHELL'S STRATEGY, TAKING INTO CONSIDERATION DIFFERENT CLIMATE-RELATED SCENARIOS, INCLUDING A TWO DEGREES CELSIUS OR LOWER SCENARIO**

Shell's financial strength and access to capital give us the ability to reshape our portfolio as the energy system transforms and demand changes. They also allow us to withstand volatility in oil and gas markets.

We are shifting capital from our Upstream business to our Transition and Growth businesses as the energy transition accelerates and we sell more low-carbon energy products. We aim to find the right balance between managing our Upstream assets – which will produce the returns needed to help us fund the transition – and investing in our Transition and Growth businesses. These businesses are essential to identify, build and scale up profitable projects that offer low-carbon energy solutions for our customers.

## CLIMATE CHANGE AND ENERGY TRANSITION continued

**Cash capital expenditure evolution**



**Operational expenditure evolution**



Key aspects of Shell's financial resilience in the context of climate related impacts is assessed and described in more detail in Note 4 to the "Consolidated Financial Statements". This provides an overarching summary of the key areas where climate change and the energy transition impact Shell's financial statements.

Shell's financial statements are based on reasonable and supportable assumptions that represent management's current best estimate of the range of economic conditions that may exist in the foreseeable future. As referred to above, the medium pricing outlook informed by Shell's scenario planning represents management's best estimate.

Sensitivity analysis using external climate scenarios has been performed for the period covering asset life cycles. If these different price outlooks from external and often normative climate change scenarios were used, this would impact the recoverability of certain assets recognised in the Consolidated Balance Sheet as at December 31, 2021.

Price outlooks have been used as the basis for sensitivity analysis because oil and gas prices are one of the key assumptions that underpin Shell's financial statements. Price outlooks reflect a broad range of factors, including but not limited to future supply and demand and the pace of growth of low-carbon solutions. Sensitivity of asset-carrying amounts to prices are under the assumption that all other factors in the models used to calculate impacts remain unchanged. Changes to prices are applied due to the significant impact on Shell's business.

Sensitivity analysis has been performed using price outlooks from:

1. Average prices from four 1.5-2 degrees Celsius external climate change scenarios. In view of the broad range of price outlooks across the various scenarios, the average of four external price outlooks was taken from IHS Markit/ACCS 2021; Woodmac WM AET 2 degree; IEA NZE50; and IEA SDS.
   Applying these prices to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are $13-16 billion and $14-17 billion lower, respectively, than the carrying amounts as at December 31, 2021.

2. Hybrid Shell Plan and IEA NZE50: for this Shell's mid-price outlook is applied for the next 10 years. Because of the greater uncertainty, the International Energy Agency (IEA) normative Net Zero Emissions scenario is applied for the period after 10 years. This weights less price-risk uncertainty to the first 10 years reflected in the operating plan period and applies more risk to the more uncertain subsequent periods.
   Applying this priceline to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are 10-12 billion and $5-6 billion lower, respectively, than the carrying amounts as at December 31, 2021.

In addition, further sensitivities are provided of -10% or +10% to Shell's medium pricing outlook, as an average percentage over the full period.

Applying -10% to Shell's medium pricing outlook to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are $8-10 billion and $4-5 billion lower, respectively, than the carrying amounts as at December 31, 2021.

Applying +10% to Shell's medium pricing outlook to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are $3-5 billion and $3-4 billion higher, respectively, than the carrying amounts as at December 31, 2021.

Note 4 to the "Consolidated Financial Statements" describes how Shell has considered climate-related impacts in key areas of the financial statements and how this translates into the valuation of assets and measurement of liabilities as Shell makes progress in the energy transition.

Items in Note 4 include: sensitivity analysis on asset-carrying values using price outlooks from external and often normative climate change scenarios; shifting trends in our portfolio, particularly exploration and evaluation, Upstream production and refineries; risks related to stranded assets; resilience of investments for transformation of the refining portfolio into five energy and chemical parks; forecasted taxable profits sufficient to recover deferred tax assets; dividend resilience; and limited risk on timing of decommissioning and restoration activities for Integrated Gas and Upstream.

To ensure the resilience of our Powering Progress strategy, our responses to the risks and opportunities identified are:

- delivering through three strategic pillars – Upstream, Transition and Growth;
- our sectoral decarbonisation approach – recognising that we need to work with our customers to identify low-carbon energy solutions for their energy demand; and
- decarbonising our energy value chains and operations.

### Delivering through three strategic pillars

One of the ways to address the resilience of our portfolio is to continue delivering through our three strategic business pillars: Upstream, Transition and Growth. Shell's financial strength and access to capital give us the ability to reshape our portfolio as the energy system transforms and demand changes. It also allows us to withstand volatility in oil and gas markets. Our financial framework is based on sector-leading cash flow, continued capital discipline, capital flexibility and a strong balance sheet.

- Our Upstream pillar delivers the cash and returns needed to fund our shareholder distributions and the transformation of our portfolio, and provides vital supplies of oil and natural gas which the world needs today.
- Our Transition pillar comprises Integrated Gas, and our Chemicals and Oil Products businesses and it makes the products needed to enable the energy transition. It produces sustainable cash flow and gives us the asset infrastructure to support our investments in our Growth business.
- Our Growth pillar includes our service stations, sales of gasoline and diesel, fuels for business customers, power, hydrogen, biofuels, charging for electric vehicles, nature-based solutions, and carbon capture and storage. It focuses on working with our customers to accelerate the transition to net zero and is the foundation for the future businesses in Shell.

See "Strategy and outlook" for more information on page 20

### Our sectoral decarbonisation approach

Changes to the supply of energy products and decarbonising the energy system require structural changes in the end-use of energy. This requires energy users to improve, update or replace equipment so that they can use carbon-based energy more efficiently, or switch to low- and zero-carbon energy.

For example, in the transport sector, decarbonisation includes replacing internal combustion engine vehicles with electric and hydrogen vehicles. In the industrial sector, replacing oil- and coal-fired furnaces with electrical furnaces would be one solution, carbon capture and storage is another. And in the buildings sector, replacing gas heating systems with electric heating systems would also contribute to decarbonisation.

Such structural changes will help to trigger transitions along the supply chain of individual sectors and across sectors, including the production of energy and emissions over time. The International Energy Agency (IEA) estimates that these changes in the end-use of energy will require substantial investment. Under the IEA's Paris-aligned Sustainable Development Scenario, of the more than $1.5 trillion extra annual spending required on energy-sector investment, 55% will need to be spent on end-use or what is more commonly known as demand-side investment.

Transforming energy demand is the focus of our decarbonisation strategy. To transform demand, we are working with customers sector-by-sector across the energy system. We will change the mix of energy products we sell to our customers as their needs for energy change.

Because emissions resulting from customer use of our energy products make up the greatest percentage of Shell's carbon emissions, this is where we can make the greatest contribution to the energy transition, by increasing sales of low-carbon energy products and services. Today, we sell around 4.6% of final energy consumed in the world and produce around 1.4% of total primary energy. Our share of energy production may decline over the coming decades, but we intend to increase our share of low-carbon energy sales.

We have restructured our company so that we can better identify opportunities and the role that we can play in each sector to help transform demand. We are moving from an approach focused on types of products to one where our customer and account management is focused on sectors.

We have introduced a sector-based approach, so our businesses can help drive the decarbonisation of the sectors they cover such as aviation, commercial road transport, passenger transport, shipping, technology and industry. We will build on our existing relationships across each sector, with consumers, infrastructure owners, other suppliers and policymakers to help to accelerate change.

A key theme running through the whole of our strategic approach to climate change is to work collaboratively. We aim to make strategic alliances with customers, other companies and entire sectors so we and they can make profitable progress towards net zero.

For example, we are working with Swiss food and drinks group Nestlé to reduce emissions across the full cycle of their products, from increasing agricultural yields with high performance fertilisers, to providing renewable energy for the manufacturing process and providing low-carbon fuels for transport.

We continue to engage with the Science Based Targets initiative (SBTi), and we are a member of its Technical Working Group that is currently working to define its methodology to set science-based targets for the oil, gas and integrated energy sector.

As a founding member of the Oil and Gas Climate Initiative (OGCI) we are part of a group of 12 national and international energy companies. OGCI supports the climate goals of the UN Paris Agreement and recognises that collective actions, such as the reduction in methane emissions and accelerating the deployment of carbon capture and storage, will help drive the energy transition.

### Decarbonising our energy value chains and operations

We plan to keep customers at the centre of our strategy as we decarbonise our energy value chains and operations. We will seek to base our actions on a deep understanding of the decarbonisation strategies and plans of the users of our energy products. In accordance with our energy transition strategy, the 10 ways below support our net-zero emissions ambition, including changing our product mix to lower-carbon intensity energy products:

- developing our low-carbon Power business through wind and solar;
- transforming refineries into energy and chemicals parks;
- providing low-carbon fuels;
- producing and selling hydrogen;
- providing electric vehicle charging;
- shifting to natural gas;
- using nature-based solutions;
- developing carbon capture and storage (CCS);
- research and development contributing to decarbonisation; and
- pursuing operational efficiency in our assets.

CLIMATE CHANGE AND ENERGY TRANSITION continued

## CLIMATE RISK MANAGEMENT

### SHELL'S PROCESSES FOR IDENTIFYING AND ASSESSING CLIMATE-RELATED RISKS

**Identifying climate-related risks**

As discussed in "Energy transition strategy", Shell considers climate change and GHG emissions, referred to as "Rising concerns about climate change and effects of energy transition", as a material risk factor. We monitor the risk related to climate change and GHG emissions across four components:

- commercial risks;
- regulatory risks;
- societal risks (including litigation risk); and
- physical risks.

These components are monitored and assessed on an integrated basis, necessitated by the interdependence of the risks and the related actions. The different components pose different kinds of exposures spanning different time horizons. Similarly, the risk responses for the different components of the risk are also planned by taking a holistic view.

For example, the increasing cost of complying with emission limits in some regions is a regulatory risk that may require operational responses in the near term. The reduction in demand for legacy hydrocarbons is a commercial risk that is likely to have a medium- to long-term impact, demanding changes to our strategic portfolio and business models. The risk of physical impacts of climate change is likely to occur in the medium and long term and would require actions to mitigate adverse impacts to our assets and supply chain. As an example, the transformation of our refineries into energy and chemicals parks mitigates our operational emissions exposure risk, medium- to long-term commercial risks and allows us to plan for other future adaptation measures. This highlights our integrated approach to risk management.

These integrated assessments and the resulting changes in our strategy ensure we manage our aggregate climate change risk within our overall risk appetite over different time horizons.

Shell's processes for identifying and assessing risks are part of our Shell Control Framework.

Our risk management procedures that help us identify climate-related risks and opportunities include:

- monitoring external developments, such as the announcements made at COP26 in November 2021;
- evaluating the status of risk indicators, which illustrate how well we are managing each component of the risk related to climate change and GHG emissions; and
- learning from incidents and assurance review findings.

We use these procedures to identify risks relating to climate change and GHG emissions, which in turn enables us to determine their significance, both individually and relative to other risks.

**Assessing climate-related risks**

Processes within the Shell Control Framework that help us assess each identified risk include the evaluation of its impact, likelihood and the level of risk we are willing to accept.

When assessing the likelihood of a risk occurring, we consider factors such as our ability to prevent the risk happening, and whether the risk has materialised in the past.

When assessing the potential impact of a risk, we consider the financial consequences and how it might affect more qualitative aspects, such as our reputation, our ability to comply with regulations, and possible damage to health, safety, our assets and the environment. The impact and hence, materiality of a risk is based on how critical it could be to our business model.

As Shell has operations both onshore and offshore, the potential physical impacts of climate change are also important for us to manage. In this respect, we consider the physical risks to our assets and facilities to ensure they can operate and be accessed safely under extreme weather conditions The physical risks are assessed at an asset level. Metocean (meteorology and oceanography) engineering experts assess and monitor the physical risks and logistical activities for certain of our assets. These studies aim to ensure our operations are safe and that our facilities can be accessed safely under extreme conditions

As we operate in multiple countries globally, societal risks are material as they are directly linked to our licence to operate in these countries.

The impact and likelihood assessment helps us to prioritise risks and determine their relative materiality, based on a comprehensive picture of all significant risks in the context of the objectives of the relevant business.

To support our risk assessments, we also seek to establish our risk appetite, which is the level of risk that we are willing to accept in pursuit of Shell's strategy and objectives. We consider the amount of resources – such as financial resources, people, processes, systems and controls – that we are willing and able to allocate to manage each risk in pursuit of our objectives. We also consider the impact to Shell's overall risk profile, such as the change in our overall risks and returns as we develop our Renewables and Energy Solutions businesses and pivot away from our Upstream business.

The impact and likelihood assessment, combined with risk appetite, determines the type of risk responses, such as controls and assurance activities, that may be required to manage each risk.

Possible responses include:

- accepting the risk without any further action;
- mitigating or reducing the risk with appropriate controls, supported by assurance activities;
- transferring the risk, for example to insurance providers where appropriate; and
- altogether stopping or forgoing the activity that gives rise to the risk.

In determining our risk responses, we always seek to comply with our Code of Conduct and other boundaries, such as our financial framework, which set the aggregate level of risk appetite that could be sustained. The financial framework considers boundaries such as net debt levels and our credit rating.

We note that the majority of our emissions are our Scope 3 customer emissions which are outside of our direct control. In recognition of this, we have put customers at the centre of our Powering Progress strategy, partnering with others to reduce carbon emissions, sector-by-sector.

**Classifications of risks**

We identify and assess risks across the Group in terms of three distinct categories:
• strategic risks: we consider current and future portfolio issues, examining parameters such as country concentration or exposure to higher-risk countries. We also consider long-range developments in order to test key assumptions or beliefs in relation to energy markets.
• operational risks: we consider material operational exposures across Shell's entire value chain which provides a more granular assessment of key risks that the organisation is facing.
• conduct and culture risks: we consider alignment of our policies, practices and behaviours against our purpose and core values.

The four sub-components of risk related to climate change and GHG emissions – commercial, regulatory, societal including litigation, and physical risk – are assessed using the above categories to ensure that we maintain strategic resilience, have robust day-to-day operational risk responses and that responses align with Shell's purpose and core values.

### SHELL'S PROCESSES FOR MANAGING CLIMATE-RELATED RISKS

Our climate-related risk management process is carried out at Group level, at business, function and asset level which includes projects.

We apply the Shell Control Framework to ensure that we effectively manage our climate-related risks at all these levels. The framework includes:
• mandatory risk standards and manuals;
• project-level risk management processes;
• management and Board review;
• internal audits and investigations; and
• annual attestation processes.

### Mandatory risk standards and manuals

We have mandatory standards and manuals which establish the requirements on how to effectively manage material risks including the operation of appropriate controls. Our standards and manuals also provide guidance on how to monitor, communicate and report changes in the risk environment. These documents aim to:
• ensure consistent management and assessment of climate risk across Shell;
• clarify expectations for risk management and reporting, including roles and responsibilities of the risk owners;
• clarify types of assurance activities that may be applicable;
• strengthen decision-making by ensuring that businesses have better awareness and understanding of climate risks (including their likelihood and potential impact) and mitigation plans; and
• enable integration of Shell's reporting.

We periodically review and, if necessary, update our standards and manuals in light of developments in risks associated with climate change. Our approach continues to evolve as we increase our understanding of changing policies and the differing pace of energy transition in different regions.

### Project-level risk management processes

At a project level, assessing climate-related risks is an important part of making initial investment decisions. To support project-level risk management, projects of a certain size or which carry unusual risks are required to follow Shell's Opportunity Realisation Standard, which sets out the rules for managing and delivering opportunities in the organisation. Each project is assisted by experts from our global subject matter groups during their development, implementation and operation.

Projects under development that are expected to have a material greenhouse gas impact must meet our internal carbon performance standards or industry benchmarks. This indicates that they will be able to compete and prosper in a future where society aims to limit overall carbon emissions.

Our performance standards are used for measuring a project's average lifetime GHG-intensity or energy efficiency per asset type. Applying these criteria ensures that our projects can compete and prosper in the energy transition. An exception process is in place to manage specific incidental cases. The reporting year 2021 was the first full year of implementation of performance standards across our Upstream and Transition pillars. The performance standards for the Growth businesses are under development.

The performance standards are approved by the Executive Vice President accountable for implementation in the relevant businesses, and by the Executive Vice President Safety, Environment and Asset Management.

Projects with a material greenhouse gas footprint that meet the performance standards or industry benchmarks will often set more ambitious emissions targets for themselves that then are approved by the Executive Vice President Safety, Environment and Asset Management at certain defined stages. The respective project's GHG abatement plan helps to determine the nature of these targets, and we assess the effects of a project's emissions alongside economic and technical design factors.

We estimate the future GHG emissions of projects in two ways. We apply the performance standards, and we consider the GHG emissions from the use of the products that are to be manufactured. These assessments can lead to projects being stopped or designs being changed.

We expect the performance standards to evolve as our portfolio changes in the energy transition.

### Management and Board reviews

Management and the Board perform regular reviews of the risk of climate change and GHG emissions to ensure awareness of emerging issues that impact our strategy and to ensure the effectiveness of our responses in managing this risk at a more granular, operational level. For example, as part of the annual strategic planning cycle, the Executive Committee and the Board assess how climate and GHG emissions may affect the pace of the energy transition and the long-term implications for Shell's current portfolio.

CLIMATE CHANGE AND ENERGY TRANSITION continued

In addition, at an operational level, each business and function regularly reviews its risk profile, risk responses and assurance activities throughout the year to ensure climate-related risks are managed effectively. These insights are used to provide the Executive Committee and Board with an update twice a year on the operational management of climate change and GHG emissions risks. During these updates, the Executive Committee and Board consider the significance of the climate change and GHG emissions risks relative to other risks on the Group risk profile and review whether our risk responses are effective in addressing the four sub-components of the climate change and GHG emissions risk. Where necessary, Board reviews are further supplemented by additional in-depth reviews with the relevant management teams.

Our management reviews help us to update Shell's forward-looking plans and guide our day-to-day operational decisions such as maintenance schedules and our risk response plans.

**Internal audits and investigations processes**
Shell's Internal Audit and Investigations (SIAI) team provides independent and objective assurance and advises management and the Board on the adequacy and effectiveness of our risk management and internal controls.

For example, in relation to our climate ambitions, SIAI conducted four GHG audits during 2021 to test whether controls are adequately designed and operating effectively to mitigate the identified risks. The controls tested covered GHG emissions measurement and reporting, abatement projects and GHG forecasts. In addition, a SIAI-led Shell Energy audit focused on the reported gas and electricity volumes used for net carbon intensity calculations and reporting.

**Annual attestation processes**
On an annual basis, each business director is required to provide an annual attestation of their business' compliance with our Health, Safety, Security, Environment and Social Performance (HSSE & SP) Control Framework and to report this to Shell's CEO. This includes the assessment of the effectiveness of the internal controls in managing climate-related risks.

**Project-level risk management in action**
During project development stages, we consider ways to reduce GHG emissions and whether to include them in the design. Measures considered and adopted in 2021 included:
• flaring reduction:
  – Gbaran asset, Nigeria: improvement project including flare reduction and improved efficiency of power system;
• CCS capabilities;
• exclusion of high-intensity process equipment;
• using renewable energy; and
• electrification:
  – Timi, Malaysia: financial investment decision (FID) taken on fully electrified wellhead platform for gas production;
  – Linnorm, Norway: plan evolves full electrification of a gas production platform; currently past conceptual design phase and expected to take FID in 2022; and
  – F6 Vlap, Malaysia: conceptual planning completed, aimed at implementing an extension of existing platform with improved power production to reduce GHG intensity. The FID is expected in 2022.
We also include considerations of potential physical climate change risks in the internal Design and Engineering Practice (DEP) requirements for new projects.

**Physical risk management in action**
In addition to the steps we are taking to manage climate-related risks and opportunities, we are also adapting to the changing physical risk environment. An example is:

Port Fourchon Junction, USA, (comprising two Shell-operated ventures, with Shell interest of 75% in the Amberjack Pipeline Company and 71% in Mars Oil Pipeline Company).
The Port Fourchon Junction facilities are located in the Mississippi Delta, one of the world's most vulnerable low-elevation coastal zones. These facilities are highly exposed to storm surge and wave-induced inundation under hurricanes which regularly visit the Gulf of Mexico. Another important factor is that the area experiences one of the largest rates of subsidence in the world, which, combined with sea level rise, could increase the site vulnerability in the coming decades. In 2021, Shell assessed the present and future scenarios of subsidence and sea level rise under extreme metocean conditions induced by hurricanes and their impact on Port Fourchon Junction. This led to a new project involving infrastructure changes. In 2021, it was developed past the conceptual design phase and is expected to take FID in 2022. The scope should allow for continued safe operations and accessibility to the location under different extreme circumstances which involves relocation of assets and raising all equipment as per metocean experts' recommendations.

**INTEGRATION OF THE CLIMATE-RELATED RISK MANAGEMENT PROCESS INTO SHELL'S OVERALL RISK MANAGEMENT**
As described above, our climate-related risk management process follows the approach set out by the Shell Control Framework, ensuring that it is integrated in the overall risk management processes of the Group.

Climate-related risks are considered from a strategic and operational perspective to ensure we maintain a comprehensive view of the different types of climate risks we face and the different time horizons in which they may affect us.

The monitoring and review of risks is a key risk management process in Shell. The Executive Committee and the Board regularly review climate-related risks against the Group's operational and strategic risk profile. This allows management to take a holistic view and to optimise risk mitigation responses, to ensure that climate-related risk responses are properly integrated into the relevant businesses' and functions' activities.

Exhibit Q

## CLIMATE-RELATED METRICS AND TARGETS

**METRICS USED BY SHELL TO ASSESS CLIMATE-RELATED RISKS AND OPPORTUNITIES IN LINE WITH ITS STRATEGY AND RISK MANAGEMENT PROCESS**

This section describes our energy product and carbon emissions performance and metrics linked to our material climate transition risks and opportunities.

We must decarbonise our portfolio and operations in order to mitigate climate risks and seize opportunities in the energy transition. Key metrics we use to track progress against our energy transition strategy are the net carbon intensity of our portfolio and our absolute emissions.

The other material climate-related risk relates to Shell's physical risk exposure. Currently, this response is managed at an asset level. We are continuing to establish a structured process for managing the physical risk of climate change across the Group. The process may include consideration of additional metrics and targets to monitor physical risk exposure.

Our overall climate target is to become a net-zero emissions energy business by 2050, in step with society. It includes net-zero emissions from our operations (Scope 1 and 2 emissions), as well as net-zero emissions from the end-use of all the energy products we sell (scope 3 emissions). We have set short, medium and long-term targets to track our performance against our overall climate target over time.

We believe our total absolute emissions peaked in 2018 at 1.73 gigatonnes of carbon dioxide equivalent ($GtCO_2e$) and our overall climate target means we will have to bring that down to absolute net-zero emissions by 2050, in step with society.

In October 2021, in support of our 2050 net-zero emissions target, we set a target to reduce Scope 1 and 2 absolute emissions from assets and activities under our operational control (including divestments) by 50% by 2030 compared with 2016 levels on a net basis. We monitor our progress against these targets using the key metrics described below.



**Climate-related targets summary**

| | REFERENCE YEAR AND TARGET TYPE | 2021 ACTUAL PERFORMANCE | 2022 – 2024 | 2025 | 2030 | 2035 | 2050 |
|---|---|---|---|---|---|---|---|
| Net Carbon Intensity [A] | 2016 intensity | 2.5% reduction | 3-4% by 2022 6-8% by 2023 9-12% by 2024 | | 20% | 45% [E] | |
| Absolute emission Scope 1 & 2 [B] | 2016 absolute | 18% reduction | | | 50% | | Net zero [E] |
| Routine flaring | absolute emissions | 0.2 million tonnes hydrocarbons flared | | eliminated | | | |
| Methane emissions [C] | intensity | 0.06% | | below 0.2% | | | |
| Scope 3 [D] | 2016 absolute | 1,299 million tonnes CO₂e | | | | | |

[A] Our total emissions (Scope 1, 2 and 3 equity boundary) peaked in 2018 at around 1.73 gigatonnes of carbon dioxide equivalent ($GtCO_2e$) per annum.
[B] Operational control boundary.
[C] Overall methane emissions intensity for facilities with marketing gas.
[D] Indirect GHG emissions (Scope 3) based on the energy product sales included in Net Carbon Intensity (NCI) using equity boundary.
[E] We aim to achieve these targets in step with society.

CLIMATE CHANGE AND ENERGY TRANSITION continued

**Net carbon intensity**

Shell's net carbon intensity is the average intensity, weighted by sales volume, of the energy products sold by Shell. It is tracked, measured and reported using the Net Carbon Footprint (NCF) methodology.

We have received third-party limited assurance on our carbon intensity, measured and reported using the Net Carbon Footprint methodology, for the period 2016 to 2021.



## Performance – net carbon intensity (NCI)

In 2021, Shell's NCI was 77 grams of carbon dioxide equivalent per megajoule of energy (gCO₂e/MJ), a 2.7% increase from the previous year and a 2.5% reduction compared with 2016, the reference year. The increase in Shell's NCI in 2021 was largely due to the introduction of an improved approach for the estimation of the emissions intensity of power sold by Shell. The new approach is based on categorising power sales as certified renewable, own generation or power purchased from the grid. The new approach involves a power purchase agreement, or power purchased from the grid. Intensities are then assigned to each power sales category, allowing a better estimate of the overall intensity of power sold by Shell.

| NCI reference year: 2016 (equity control boundary) | | 2021 | 2020 | 2019 | 2016 |
|---|---|---|---|---|---|
| NCI [E] | gCO2e/MJ | 77 | 75 | 78 | 79 |
| Estimated total energy delivered by Shell [A] | trillion (10^12) MJ | 17.89 | 18.40 | 21.05 | 20.93 |
| Estimated total GHG emissions included in NCI (net) [B] | million tonnes CO₂e | 1,375 | 1,384 | 1,646 | 1,645 |
| Carbon credits | million tonnes CO₂e | 5.1 | 3.9 | 2.2 | 0.0 |
| Estimated total GHG emissions (gross) [C][D] | million tonnes CO₂e | 1,381 | 1,388 | 1,648 | 1,645 |

[A] The NCI calculation uses Shell's energy product sales volume data, as disclosed in the Annual Report and Sustainability Report. This excludes certain contracts held for trading purposes and reported net rather than gross. Business-specific methodologies to net volumes have been applied in oil products and pipeline gas and power. Paper trades that do not result in physical product delivery are excluded. Retail sales volumes from markets where Shell operates under trademark licensing agreements are also excluded from the scope of Shell's carbon intensity metric.
[B] These numbers include well-to-wheel emissions associated with energy products sold by Shell, on an equity boundary; they also include the well-to-tank emissions associated with the manufacturing of energy products by others that are sold by Shell. Emissions associated with the manufacturing and use of non-energy products are excluded.
[C] All figures are disclosed without significant decimal places, and hence include rounding.
[D] While the NCI is an intensity measure and not an inventory of absolute emissions, a notional estimate of the amount of GHG emissions covered by the scope of the NCI calculation can be derived from the final NCI value for any year. Similarly, a fossil-equivalent estimate of the total amount of energy sold included in the calculation can also be determined.
[E] Acquisitions and divestments are included in the actual performance tracking with the target and baseline year unchanged. Note that acquisitions and divestments could have a material impact on meeting the targets.

As we implement our Powering Progress strategy, we are increasing the share of lower-carbon products in our energy product sales, which should result in a reduction in our NCI.

Our ability to change the emissions intensity of each energy product varies depending on the product type:
• For hydrocarbon fuels, emissions from end-use by customers are by far the biggest contributors to the carbon intensity of the product. As a result, the emissions intensity of hydrocarbon fuels is expected to stay relatively unchanged over time. This is why we are focused on helping our customers decarbonise.
• This contrasts with the emissions intensity of power, which can be highly variable depending on how it has been generated. To a lesser extent, there is also a contrast between hydrocarbon fuels and biofuels, which can vary significantly in intensity depending on the feedstock and production process used.
• The proportion of our renewable power sales and the generation mix in countries where we sell power to the market both affect Shell's overall power mix and its resulting emissions intensity.

The biggest driver for reducing our NCI is increasing the share of lower-carbon products in our energy product sales.

## SCOPE 1, SCOPE 2, AND SCOPE 3 GREENHOUSE GAS (GHG) EMISSIONS, AND THE RELATED RISKS

Shell's target is to be a net-zero energy business by 2050, in step with society. This means we must therefore report our performance against our operational Scope 1 and 2, and Scope 3 emissions. Scope 1, 2 and 3 emissions are among the metrics we use to mitigate climate risks and seize opportunities in the energy transition, as described in the section above.

### Shell's absolute emissions in 2021

In 2021, our total combined Scope 1 and 2 absolute GHG emissions (from assets and activities under our operational control) were 68 million tonnes on a CO₂ equivalent basis, a 4% reduction compared with 2020, and an 18% reduction compared with 2016, the base year. Our Scope 3 emissions from energy products included in our net carbon intensity metric were 1,299 million tonnes CO₂e.

| | Absolute emissions [D], [F] million tonnes of CO₂e | | | | Targets [E] | |
|---|---|---|---|---|---|---|
| Scope | 2016 | 2019 | 2020 | 2021 | Target 2030 | Target 2050 |
| Scope 1 [A] | 72 | 70 | 63 | 60 | 50% reduction compared with 2016 levels on a net basis | 0 |
| Scope 2 [B] | 11 | 10 | 8 | 8 | | 0 |
| Scope 3 [C] | 1,545 | 1,551 | 1,305 | 1,299 | No target | 0 |

[A] Total direct (Scope 1) GHG emissions from assets and activities under our operational control. It includes emissions from production of energy and non-energy products.
[B] Total indirect GHG emissions from imported energy (Scope 2) from assets and activities under our operational control using the market-based method. It includes imported energy used for production of energy and non-energy products. We have restated our 2020 emissions from 9 to 8 million tonnes CO₂e following a correction of an efficiency factor for steam at one of our assets and a revision to how internal energy transfers of steam and electricity were accounted for at several of our assets to remove double-counting between Scopes 1 and 2.
[C] Indirect GHG emissions (Scope 3) based on the energy product sales included in Net Carbon Intensity (NCI) using equity boundary. The NCI calculation uses Shell's energy product sales volume data, as disclosed in the Annual Report and Sustainability Report. This excludes certain contracts held for trading purposes and reported net rather than gross. Business-specific methodologies to net volumes have been applied in oil products and pipeline gas and power. Paper trades that do not result in physical product delivery are excluded. Retail sales volumes from markets where Shell operates under trademark licensing agreements are also excluded from the scope of Shell's carbon intensity metric.
[D] Carbon credits are not included in the total emissions.
[E] Our 2030 and 2050 targets are on the net basis (i.e., including carbon credits). Acquisitions and divestments have been included in the actual performance tracking with the target unchanged. Note that acquisition and divestments could have a material impact on meeting the targets.
[F] Oil and gas industry guidelines from the International Petroleum Industry Environmental Conservation Association (IPIECA) indicate that several sources of uncertainty can contribute to the overall uncertainty of a corporate emissions inventory. We have estimated the overall uncertainty for our direct GHG emissions (scope 1) to be around 4% and for our energy indirect GHG emissions (scope 2) to be around 6% for 2021 (same for location and market-based methods). IPIECA also note that due to the diversity of scope 3 emissions, sources and the fact that these emissions occur outside the company's boundaries, the emissions estimates may be less accurate or may have high uncertainty.

The Scope 3 emissions from the energy products we sell account for the majority of our total emissions. When we calculate our emissions, we include emissions not only from the products that we produce ourselves but also from the oil and gas that others produce and resell as products to our customers. Altogether, we sell more than three times more oil and gas products than the oil and gas we extract ourselves. Therefore, to account for Shell's full effect, we have to include everything we sell in the measurement of our carbon emissions as shown in the charts on page 89.

Exhibit Q

## CLIMATE CHANGE AND ENERGY TRANSITION continued

### Scopes 1 & 2 – performance [A]



Scope 1 & 2
**68m tonnes CO₂e**

a **56%**
b **25%**
c **18%**
d **1%**

- a Downstream
- b Integrated Gas and Renewables and Energy Solutions
- c Upstream    d Other

[A] Total direct (Scope 1) and energy indirect (Scope 2) GHG emissions from assets and activities under operational control boundary. It includes emissions from production of energy and non-energy products. For Scope 2, we used the market-based method.

### Share of energy delivered per energy product type [A]-[F]



| | 2016 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| e | 7% | 9% | 12% | 12% |
| d | 1% | 1% | 1% | 1% |
| c | 14% | 18% | 19% | 18% |
| b | 24% | 17% | 21% | 25% |
| a | 54% | 56% | 47% | 45% |

- a Oil products and gas-to-liquids (GTL) (carbon intensity in 2021 was 91 gCO₂e/MJ)
- b Gas (carbon intensity in 2021 was 66 gCO₂e/MJ)
- c Liquefied natural gas (LNG) (carbon intensity in 2021 was 70 gCO₂e/MJ)
- d Biofuels (carbon intensity in 2021 was 41 gCO₂e/MJ)
- e Power (carbon intensity in 2021 was 66 gCO₂e/MJ)

[A] Percentage of delivered energy may not add up to 100% because of rounding.
[B] Total volume of energy products sold by Shell, aggregated on an energy basis, with electricity represented as fossil equivalents. This value is derived from energy product sales figures disclosed by Shell in the Annual Report, Form 20-F and the Sustainability Report.
[C] Lower heating values are used for the energy content of the different products and a fossil-equivalence approach is used to account for electrical energy, so that it is assessed on the same basis as our other energy products.
[D] The NCI calculation uses Shell's energy product sales volume data, as disclosed in the Annual Report and Sustainability Report. This excludes certain contracts held for trading purposes and reported net rather than gross. Business specific methodologies to net volumes have been applied in oil products and pipeline gas and power. Paper trades that do not result in physical product delivery are excluded. Retail sales volumes from markets where Shell operates under trademark licensing agreements are also excluded from the scope of Shell´s carbon intensity metric.
[E] In 2021, emissions included in carbon intensity of power have been calculated using the market-based method.
[F] The carbon intensity of biofuels provided in the graph "Share of energy delivered per energy product type" reflects the global average for biofuels sold by Shell for 2021.

We undertake external verification of our GHG emissions annually. Our Scope 1 and 2 GHG emissions from assets and activities under our operational control and Scope 3 emissions included in our NCI have been verified to a level of limited assurance.

Drivers of absolute Scope 1 and 2 emissions change in 2021

### Scope 1 and Scope 2 GHG emissions changes from 2020 to 2021
million tonnes carbon dioxide equivalent (CO₂e)



| 2020 | b 0.0 | c (4.0) | d 2.7 | e (2.2) | 2021 |
|---|---|---|---|---|---|
| 71 | | | | | 68 |

- a Emissions [A] [B]
- b Acquisitions
- c Reduction and purchased renewable electricity [C] [D]
- d Change in output
- e Divestments and other reasons

[A] Total Scope 1 and Scope 2 emissions, rounded to the closes million tonnes. Scope 2 emissions were calculated using the market-based method.
[B] We have restated our 2020 emissions from 9 to 8 million tonnes CO₂e following a correction of an efficiency factor for steam at one of our assets and a revision to how internal energy transfers of steam and electricity were accounted for at several of our assets to remove double-counting between Scopes 1 and 2.
[C] In addition to reductions from GHG abatement and energy efficiency this category also includes reductions from permanent shutdown of Convent and Tabangao refineries and the impact of transformational activities at our Shell Energy and Chemicals Park in Singapore.
[D] Excludes 1.05 million tonnes of CO₂ captured and sequestered by our Quest CCS project in Canada in 2021.

Our direct GHG emissions (Scope 1) (consolidated using the operational control boundary) decreased from 63 million tonnes of carbon dioxide equivalent (CO₂e) in 2020 to 60 million tonnes CO₂e in 2021, driven by several factors including:
- the shutdown of the Convent refinery, USA, in late 2020;
- downtime at the Norco site, USA, due to impacts from Hurricane Ida;
- divestments in 2020 and 2021 (e.g. the Martinez and Puget Sound refineries in the USA, and the Fredericia refinery in Denmark);
- sustained emissions reductions (performance against our scorecard and additional reductions as discussed below (page 93); and
- reductions in methane emissions.

These decreases were partly offset by higher emissions due to the restart of the Prelude FLNG facility in Australia and increased flaring in facilities operated by Shell Nigeria Exploration and Production Company Limited (SNEPCo) in Nigeria.

Total routine hydrocarbons flaring reduced from 0.3 to 0.2 million tonnes of hydrocarbon flared from 2020 to 2021.

Around 60% of flaring in our Upstream and Integrated Gas facilities in 2021 occurred in assets operated by the Shell Petroleum Development Company of Nigeria Limited (SPDC) and SNEPCo. We will continue to work in close collaboration with joint-venture partners and the Federal Government of Nigeria to make progress towards the objective of ending the continuous flaring of associated gas.

Our target to keep methane emissions intensity below 0.2% was met in 2021 with Shell's overall methane emissions intensity at 0.06% for facilities with marketing gas and 0.01% for facilities without marketing gas. We believe our methane emissions are calculated using the best methods currently available. This target covers all Shell-operated oil and gas assets in our Upstream and Integrated Gas businesses. Methane emissions include those from unintentional leaks, venting and incomplete combustion, for example in flares and turbines

Our indirect GHG emissions associated with imported energy (Scope 2) (consolidated using the operational control boundary) were 8 million tonnes CO₂e in 2021, (using the market-based method), the same as in 2020.

Exhibit Q

### Drivers of absolute Scope 3 emissions change in 2021

Emissions associated with the use of our energy products, Scope 3 emissions, account for the vast majority of our carbon emissions related to energy products. Our total Scope 3 emissions from energy products are largely unchanged from last year. The decrease in 2020 from 2019 mainly relates to a decrease in demand for oil products given market conditions in 2020, and a decrease related to volumes associated with additional contracts being classified as held for trading purposes with effect from January 2020.

Our strategy is based on working with our customers, sector-by-sector, to address the emissions from the use of our products and to help them find ways to reduce their emissions and overall carbon footprint to net zero by 2050.

### TARGETS USED BY SHELL TO MANAGE CLIMATE-RELATED RISKS AND OPPORTUNITIES AND PERFORMANCE AGAINST TARGETS

Shell's material climate-related risks and opportunities are set out in the "Climate-related risks and opportunities identified by Shell over the short, medium and long term" section. Our response to the transition risk focuses on decarbonising our value chain. Our climate targets are focused on reducing our net carbon intensity as well as our absolute emissions.

### NCI target-setting

Tackling climate change is an urgent challenge. But only a transformation of the global economy and the energy system that supports it will stop the world adding to the total amount of greenhouse gases in the atmosphere, achieving what is known as net-zero emissions. That is why, for our part, Shell has set a target to become a net-zero emissions energy business by 2050, in step with society's progress in achieving the goal of the Paris Agreement on climate change.

We believe our targets support the more ambitious goal of the Paris Agreement: to limit the increase in the global average temperature to 1.5°C above pre-industrial levels. Our net-zero target is aligned with the findings of the Intergovernmental Panel on Climate Change (IPCC).

which concluded that the world must reach net-zero carbon emissions by around 2050 to limit global warming to 1.5°C and avoid the worst effects of climate change.

As there is no established standard for aligning an energy supplier's decarbonisation targets with the temperature goal of the Paris Agreement, we have developed our own approach to demonstrate that our carbon intensity targets are aligned with the 1.5°C goal. We set our targets using scenarios taken from a database developed for the IPCC Special Report on Global Warming of 1.5°C. We started with the complete range of IPCC 1.5°C scenarios, then chose scenarios that focused on earlier action and placed less reliance on the use of carbon sinks. We then calculated the carbon intensity of each of the selected scenarios and, after removing outlying values, used the resulting range of intensities to produce the final 1.5°C pathways used to set our targets.

To become a net-zero emissions energy business, we must reduce emissions from our operations, and from the fuels and other energy products such as electricity that we sell to our customers. We must also capture and store remaining emissions using either technology or natural carbon sinks.

Shell will work with our customers to help them accelerate their transition by providing low- and zero-carbon energy products and services. If they are not able to accelerate their transition, we will help our customers in other ways by providing high-quality, nature-based solutions to offset any unavoidable emissions. We know that even though we offer this service, our customers may choose to source offsets from other companies.

Today, it is not possible for energy companies and their customers to jointly account for actions to reduce emissions. We will work with partners towards changing accounting and reporting protocols and developing new systems for suppliers and users of energy to exchange information about steps they are taking to reduce their emissions. These changes will take time to put into practice, and we reflect this in our targets which before 2035 include only mitigation actions directly involving Shell.

### Working to reduce our absolute Scope 1 and 2 emissions

Scope 1-2 emissions in million tonnes per annum [A],[B]



[A] This chart assumes no adjustments to the base year
[B] Operational control boundary

CLIMATE CHANGE AND ENERGY TRANSITION continued

**Linking Shell's emissions targets to remuneration policies**

We have established remuneration policies which are designed to support us in achieving our short-term climate targets:

• remuneration linked to net carbon intensity targets;
• remuneration included in the 2021 annual scorecard against Scope 1 and 2 GHG intensity targets; and
• remuneration included in the 2021 annual scorecard linked to sustained absolute emission reductions from GHG abatement projects.

See also "Directors' Remuneration Report on page 157.

**Remuneration linked to net carbon intensity targets**

We have linked our target to reduce the carbon intensity of our energy products to our 2021 LTIP awards for Executive Directors and senior executives and our Performance Share Plan awards made to around 16,500 employees globally.

2021 equity control basis

| | 2021 Target | 2021 Performance | 2021 Status |
|---|---|---|---|
| NCI reduction against 2016 reference year value of 79 grams of carbon dioxide equivalent per megajoule (gCO₂e/MJ) | 2-3% | 77 | achieved |

The reduction of Shell's NCI from 79 gCO₂e/MJ in 2016 to 77gCO₂e/MJ in 2021 means that we have achieved our first short-term target of a 2-3% reduction in NCI by the end of 2021. The reduction of Shell's NCI over this period has largely been driven by a reduction in oil product sales combined with growth in power sales.

| | 2021 Target | 2021 Performance | 2021 Status |
|---|---|---|---|
| Growing a material power business | | | |
| New market entries for direct power sales to end customers | 2 | 1 | not achieved |
| Secure renewable power generation capacity options | | | |
| Options created for generation capacity | 5-10 GW | 25.6 GW | achieved |
| Post-FID capacity | 2 - 4 GW | 2.6 GW | achieved |
| Investment in energy access customers | $200m | $69m | not achieved |
| Commercialise advanced biofuels technology | | | |
| Technologies at TRL8 or Shell investment in a commercial scale advanced biofuels project | 1 | 2 | achieved |
| Develop emissions sinks | | | |
| FID on NBS origination projects verified by recognised carbon credit standards | 4-8 | 9 | achieved |
| FID on Carbon capture, utilisation and storage | 1 | 1 | achieved |

**Remuneration included in 2021 annual scorecard against Scope 1 and 2 GHG intensity targets**

Our annual bonus scorecard for senior management also affects remuneration for almost all of Shell's employees. Our 2021 scorecard included three GHG intensity metrics covering over 75% of Shell's Scope 1 and 2 GHG emissions under operational control. They are summarised below.

2021 Scorecard: Scope 1 and 2 GHG intensity targets - operational control

| | 2021 Target | 2021 Performance | 2021 Status |
|---|---|---|---|
| Upstream and Integrated Gas | | | |
| tonnes CO₂e/tonne of oil and gas available for sale (excluding Prelude floating liquefied natural gas (FLNG) facility) [A] | 0.152 | 0.17 | not achieved |
| Refining | | | |
| tonnes CO₂e as per Solomon's Utilised Equivalent Distillation Capacity (UEDC™) [A] | 1.03 | 1.05 | not achieved |
| Chemicals | | | |
| tonnes CO₂e/tonne of high value chemicals [A] | 0.97 | 0.95 | achieved |

[A] Acquisitions and divestments are included in the actual performance tracking with the target unchanged. Note that acquisition and divestments could have a material impact on meeting the targets set for the scorecard.

We successfully reduced our chemicals emissions intensity to below target intensity, from 0.98 in 2020 to 0.95 in 2021. This was in part driven by sustained good reliability at our Bukom chemical plant in Singapore.

Upstream and Integrated Gas emissions intensity increased from 0.16 in 2020 to 0.17 in 2021. This was partly due to below-plan production at several of our assets. The intensity number for 2021 excludes the Prelude floating liquefied natural gas (FLNG) facility. Refining emissions intensity remained unchanged at 1.05 in 2020 and 2021. The Refining GHG emission intensity was below target partly due to the impact of the February winter freeze and Hurricane Ida on our refineries in the USA. We are taking steps to continue working on measures to drive reductions in GHG intensity.

**Remuneration included in 2021 annual scorecard linked to sustained absolute emissions reductions from GHG abatement projects**

There was one main absolute target linked to remuneration. This was set out in our 2021 annual scorecard which included a target of 224 thousand tonnes of carbon dioxide equivalent (ktCO₂e) sustained emissions reductions from GHG abatement projects. This was included in our annual scorecard to further emphasise the importance of achieving progress in the energy transition in our own operations.

See also "Annual Report on Remuneration" on page 164

2021 scorecard: Scope 1 sustained emissions reductions - operational control

| | 2021 Target | 2021 Performance | 2021 Status |
|---|---|---|---|
| Sustained emissions reductions from delivered GHG abatement projects in ktCO$_2$e | 224 | 279 | achieved |

We have exceeded this target with 279 ktCO$_2$e of sustained emissions reductions, by implementing projects across a range of assets that we operate. We have also delivered around 3.6 million tonnes of other GHG reductions (not included in the scorecard). These reductions include GHG abatement projects and emissions reductions from permanent shutdowns and conversions of our facilities. Examples include flaring reduction and energy efficiency projects. The above reductions do not include 1.05 million tonnes of CO$_2$ captured and sequestered by our Quest CCS project in Canada in 2021.

**Basis of preparation – net carbon intensity**
Shell's net carbon intensity (NCI) provides an annual measure of the life-cycle emissions intensity of the portfolio of energy products sold. The intended use of the NCI metric is to track progress in reducing the overall carbon intensity of the energy products sold by Shell, as described in Shell's climate target. The NCI is calculated on a life-cycle basis and as such includes GHG emissions – on an equity basis – from several sources, including:
• direct GHG emissions from Shell operations;
• indirect GHG emissions from generation of energy consumed by Shell; and
• indirect GHG emissions from the use of the products we sell.

Emissions from other parts of the product life cycle are also included, such as those from the extraction, transport and processing of crude oil, gas or other feedstocks and the distribution of these products to our customers.

Also included are emissions from parts of this life cycle not owned by Shell, such as the extraction of oil and gas processed by Shell but not produced by Shell; or from the production of oil products and electricity marketed by Shell that have not been processed or generated at a Shell facility.

Emissions offset through various measures, such as by working with nature to create carbon sinks – including forests and wetlands – or mitigated by using CCS technology are also taken into account.

**Refer to scope of NCI on page 89 for details of the supply chains and steps in the product life cycles that are included in the Net Carbon Footprint methodology:**

The following GHG emissions are not included in the net carbon intensity (NCI):
• emissions from production, processing, use and end-of-life treatment of non-energy products, such as chemicals and lubricants;
• emissions from third-party processing of sold intermediate products, such as the manufacture of plastics from feedstocks sold by Shell;
• emissions associated with the construction and decommissioning of production and manufacturing facilities;
• emissions associated with the production of fuels purchased to generate energy on site at a Shell facility;
• other indirect emissions from waste generated in operations, business travel, employee commuting, transmission and distribution losses associated with imported electricity, franchises and investments;
• emissions from capital goods, defined by the GHG Protocol as including fixed assets or property, plant and equipment (PP&E), and other goods and services not related to purchased energy feedstocks sourced from third parties or energy products manufactured by third parties and sold by Shell.

The NCI calculation uses Shell's energy product sales volume data, as disclosed in the Annual Report and Sustainability Report. This excludes certain sales volumes such as:
• certain contracts held for trading purposes reported net rather than gross. Business-specific methodologies to net volumes have been applied in oil products and pipeline gas and power. Paper trades that do not result in physical product delivery are excluded; and
• retail sales volumes from markets where Shell operates under trademark licensing agreements.

**Important notes on the Net Carbon Footprint methodology**
1. The Net Carbon Footprint is not a mathematical derivation of total emissions divided by total energy, nor is it an inventory of absolute emissions.
2. It is a weighted average of the life-cycle CO$_2$ intensities of different energy products, normalising them to the same point relative to their final end-use. The use of a consistent functional unit, grams of carbon dioxide equivalent per megajoule (gCO$_2$e/MJ), allows like-for-like comparisons and the aggregation of individual life-cycle intensities for a range of energy products including renewables.

**For further information see our detailed NCF methodology documentation.**

**Basis of preparation – absolute Scope 1, 2 and 3 emissions**
We follow the GHG Protocol's Corporate Accounting and Reporting Standard, which defines three scopes of GHG emissions:
• Scope 1: direct GHG emissions from sources that are owned or controlled by Shell.
• Scope 2: indirect GHG emissions from generation of purchased energy consumed by Shell.
• Scope 3: other indirect GHG emissions, including emissions associated with the use of energy products sold by Shell.

GHG emissions comprise carbon dioxide (CO$_2$), methane (CH$_4$), nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulphur hexafluoride and nitrogen trifluoride, with carbon dioxide and methane being the most significant contributors. Our GHG inventory was prepared in line with the requirement outlined in the ISO 14064-1:2018 Specification with Guidance at the Organisational Level for Quantification and Reporting of Greenhouse Gas Emissions and Removals and the GHG Protocol's Corporate Accounting and Reporting Standard.

In line with external standards, Shell aggregates its emissions of greenhouse gases into tonnes of CO$_2$ equivalent by applying global warming potential (GWP) factors to each greenhouse gas. The GWP factors used for converting the mass of individual gases to their CO$_2$ equivalents are shown in the consolidated statement of GHG emissions. These factors are taken from the Intergovernmental Panel on Climate Change (IPCC) Fourth Assessment Report (AR4) over a 100-year time horizon, in line with the UK Government GHG Conversion Factors for Company Reporting.

GHG emissions were aggregated using a bottom-up approach: emission source -> asset -> operating unit -> business -> Group. GHG emissions in this Report include emissions from Upstream, Integrated Gas, Renewables and Energy Solutions, Downstream, Projects & Technology businesses and functions (mainly offices). All operated assets were included in the GHG inventory in the reporting period.

Exhibit Q

CLIMATE CHANGE AND ENERGY TRANSITION continued

**Basis of preparation – Scope 1 emissions**
Sources included in Scope 1 emissions comprised:
- combustion of carbon-containing fuels in stationary equipment (e.g., boilers, gas turbines) for energy generation;
- combustion of carbon-containing fuels in mobile equipment (e.g., trucks, vessels, mobile rigs);
- flares;
- venting and emissions from industrial processes (e.g., hydrogen plants, catalytic cracking units); and
- fugitive emissions, including piping and equipment leaks and non-routine events.

**Scope 1 emissions – exclusions**
Carbon dioxide emissions from biogenic sources (for example, biofuels, biomass) were excluded from our Scope 1 emissions; instead, they were captured separately. Methane and nitrous oxide emissions from biogenic sources were included in our Scope 1 emissions.

Captured carbon dioxide that was subsequently sold or otherwise transferred to third parties was excluded from our Scope 1 emissions.

Carbon dioxide captured and sequestered using CCS technologies was excluded from our Scope 1 emissions. But the emissions from operating CCS were included in our Scope 1 and 2 emissions.

Carbon offset credits were excluded from our Scope 1 GHG emissions.

No material sources were excluded from the Scope 1 inventory.

**Basis of preparation – Scope 2 emissions**
Sources included in Scope 2 emissions comprised indirect emissions from purchased and consumed electricity, steam and heat. We did not identify any assets with imported cooling or compressed air used for energy purposes.

Scope 2 emissions were calculated using the market- and location-based methods separately as defined by the GHG Protocol Scope 2 Guidance.

No material sources were excluded from our inventory.

**Basis of preparation - Scope 3 emissions**
This report provides Scope 3 emissions included in our net carbon intensity (NCI). They were consolidated using the equity boundary approach. Under this approach, we reported Shell share of emissions from energy products sold by Shell, including those sourced from third parties. Scope 3 categories included in the total number in this Report include following:

**Scope 3, category 1: purchased goods and services**
This category includes well-to-tank emissions from purchased third-party unfinished and finished energy products excluding electricity (which was reported separately under Category 3: Fuel and energy-related activities (not included in Scope 1 or Scope 2)).

Emissions in this category were estimated using well-to-tank emission factors for crude oil, natural gas, refined oil products (such as gasoline, and diesel), LNG and biofuels. Because the emission factors includes transport, we did not estimate emissions from transport of purchased third-party products separately.

Emissions from purchased non-energy products were not included in this Report.

**Scope 3, category 3: fuel and energy-related activities (not included in Scope 1 and 2)**
This category includes purchased third-party electricity sold by Shell, calculated using the market-based method. Emissions were not adjusted for any potential double-counting of sold natural gas that may have been used for generating this electricity.

This category does not include:
- indirect emissions from generation of imported energy (steam, heat or electricity consumed by our assets). These emissions were reported separately as Scope 2 emissions; and
- well-to-tank emissions from purchased electricity, steam and heat consumed by our assets (i.e. Scope 3 emissions from extraction, refining and transport of primary fuels before their use in the generation of electricity or steam).

**Scope 3, category 9: downstream transport and distribution**
This category includes estimated emissions from transport and distribution of energy products produced or refined by Shell. It does not include the emissions associated with transporting third-party products, which are included in Scope 3, Category 1. In order to avoid double counting the emissions from transport, Scope 1 and 2 emissions from transport included in our equity emissions were subtracted from the total in this category.

**Scope 3, category 11: use of sold products**
This category includes estimated emissions from the use-phase of sold energy products, such as LNG, GTL, pipeline gas, refined oil products and biofuels. The emissions consist of two separate sub-categories: products manufactured and sold by Shell and third-party products sold by Shell.

This category does not include non-energy products that may have been combusted during the use-phase (for example, lubricants).

**Biogenic $CO_2$ emissions from combustion of sold biofuels**
Biogenic $CO_2$ from combustion of sold biofuels were estimated and reported separately outside of scopes. Methane and nitrous oxide have been included in Scope 3, Category 11 in line with the ISO 14064-1:2018 and GHG Protocol requirements.

We did not estimate $CO_2$ from combustion of biogenic emissions in other Scope 3 categories. It is assumed that the presence of biogenic emissions in other categories is negligible at present.

**Other Scope 3 categories**
As noted above, this Report only covers Scope 3 GHG emissions included in our net carbon intensity metric. Other Scope 3 GHG emissions can be found on our website: www.shell.com/ghg.

## OTHER REGULATORY DISCLOSURES

**GHG EMISSIONS AND ENERGY CONSUMPTION DATA – INFORMATION PROVIDED IN ACCORDANCE WITH UK REGULATIONS**

Data in this section are consolidated using the operational control approach. Under this approach, we account for 100% of the GHG emissions and energy consumption in respect of activities where we are the operator, irrespective of our ownership percentage.

Reporting on this operational control basis differs from that applied for financial reporting purposes in the "Consolidated Financial Statements". We acknowledge the strong preference of the UK's Financial Reporting Council (FRC) for companies to report the GHG emissions and energy consumption data using the financial consolidation boundary and take account of including the data and information on this boundary in our Annual Report in the future.

See Basis of preparation – absolute emissions on page 94.

Greenhouse gas emissions in million tonnes of $CO_2$ equivalent

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Total global direct (Scope 1) [A] | 60 | 63 | 70 |
| UK including offshore area [B] | 1.7 | 2 | 2.1 |
| Market-based | | | |
| Total global energy indirect (Scope 2) [C] | 8 | 8 | 10 |
| UK including offshore area | 0 | 0 | 0 |
| Location-based | | | |
| Total global energy indirect (Scope 2) [D] | 9 | 10 | 11 |
| UK including offshore area | 0.05 | 0.06 | 0.06 |
| Intensity ratio in tonnes per tonne | | | |
| Intensity ratio of all facilities [E] | 0.27 | 0.25 | 0.24 |

[A] Emissions from the combustion of fuel and the operation of our facilities globally, calculated using global warming potentials from the IPCC's Fourth Assessment Report.
[B] Emissions from the combustion of fuels and the operation of our facilities in the UK and its offshore area, calculated using global warming potentials from the IPCC's Fourth Assessment Report.
[C] Emissions from the purchase of electricity, heat, steam and cooling for our own use globally, calculated using a market-based method as defined by the GHG Protocol Corporate Accounting and Reporting Standard. We have restated our 2020 emissions from 9 to 8 million tonnes $CO_2$e following a correction of an efficiency factor for steam at one of our assets and a revision to how internal energy transfers of steam and electricity were accounted for at several of our assets to remove double-counting between Scopes 1 and 2.
[D] Emissions from the purchase of electricity, heat, steam and cooling for our own use globally, calculated using a location-based method as defined by the GHG Protocol Corporate Accounting and Reporting Standard. We have restated our 2020 emissions from 11 to 10 million tonnes $CO_2$e following a correction of an efficiency factor for steam at one of our assets and a revision to how internal energy transfers of steam and electricity were accounted for at several of our assets to remove double-counting between Scopes 1 and 2.
[E] In tonnes of total direct and energy indirect GHG emissions per tonne of crude oil and feedstocks processed and petrochemicals produced in downstream manufacturing, oil and gas available for sale, LNG and GTL production in Integrated Gas and Upstream. For an additional breakdown by segment, see Scope 1 and 2 GHG intensity by segment section below.

The activity data used to calculate GHG intensity ratios at a portfolio level shown in the table above is reported on an operational control basis. As a result, it is not directly comparable with the production data reported elsewhere in this Report, which is reported on a financial control basis. The table below shows the numbers used in the calculation of the intensity:

Inputs used for calculating the GHG emissions intensity ratio

| | | 2021 | 2020 | 2019 |
|---|---|---|---|---|
| A | 8.1 Scope 1 - Direct GHG emissions [A] | 60 | 63 | 70 |
| B | 8.2 Scope 2 - Energy Indirect GHG emissions [A] | 8 | 8 | 10 |
| C=A+B | Total Scope 1 and 2 GHG emissions [A] | 68 | 71 | 80 |
| D | 6.5 Total oil and gas production available for sale [B] | 128 | 149 | 166 |
| E | 6.6 Refinery crude and feedstock processed [B] | 84 | 99 | 124 |
| F | 6.3 Chemicals total production [B] | 25 | 26 | 24 |
| G | 6.4 LNG production [B] | 10 | 8 | 9 |
| H | 6.6 GTL production [B] | 6 | 6 | 6 |
| I=D+E+F+G+H | Total Upstream, Integrated Gas and Downstream activity [B] | 253 | 288 | 329 |
| J=C/I | GHG intensity ratio [C] | 0.27 | 0.25 | 0.24 |

[A] In million tonnes $CO_2$ equivalent.
[B] In million metric tonnes of production.
[C] In tonnes of $CO_2$ equivalent per tonne of production.

**Energy use in our operations**

The energy consumption data provided below comprise own energy, generated and consumed by our facilities, and supplied energy (electricity, steam and heat) purchased by our facilities for our own use.

Energy consumption data reflect primary (thermal) energy (e.g. the energy content of fuels used to generate electricity, steam, heat, mechanical energy etc.). This includes energy from renewable and non-renewable sources. Own energy generated was calculated by multiplying the volumes of fuels consumed for energy purposes by their respective lower heating values. Own energy generated that was exported to third-party assets or to the power grid is excluded. Thermal energy for purchased and consumed electricity was calculated using actual electricity purchased multiplied by country-specific electricity generation efficiency factors (from IEA statistics). Thermal energy for purchased and consumed steam and heat was calculated from actual steam/heat purchased multiplied by a supplier-specific conversion efficiency, or a generic efficiency factor where supplier-specific data were not available.

## CLIMATE CHANGE AND ENERGY TRANSITION continued

Our energy consumption decreased from 241 billion kilowatt-hours (kWh) in 2020 to 223 billion kWh in 2021, in line with the decrease in our Scope 1 and 2 GHG emissions. Around 1% of the energy we used in 2021 for our operations came from low-carbon and renewable sources.

Energy consumption in billion kilowatt-hours

| | 2021 | 2020 [A] | 2019 |
|---|---|---|---|
| Own energy generated and consumed | | | |
| Total energy generated and consumed | 189 | 205 | 220 |
| UK including offshore area | 6.2 | 7.6 | 7.6 |
| Purchased and consumed energy | | | |
| Total purchased and consumed energy | 33 | 36 | 44 |
| UK including offshore area | 0.2 | 0.2 | 0.2 |
| Energy consumption | | | |
| Total energy consumed | 223 | 241 | 264 |
| UK including offshore area | 6.4 | 7.8 | 7.8 |

[A] We have restated our 2020 energy use figures following a correction of an efficiency factor for steam at one of our assets and a revision to how internal energy transfers of steam and electricity were accounted for at several of our assets to remove double-counting between Scopes 1 and 2.

In 2021, we implemented a variety of measures to reduce the energy use and increase the energy efficiency of our operations.

Examples of some of the principal measures taken in 2021 are listed below (with estimated total savings of around 675 million kWh in 2021):
- At our Scotford upgrader facility in Canada, we completed several projects to minimise energy use and improve efficiency, for example by installing new equipment and making changes to how some equipment operates.
- At our Gannet asset in the UK, we completed a project to enhance the efficiency of the fuel gas compressors by fine-tuning their performance to the specific needs of the platform.
- At our Jurong Island site in Singapore, we installed a second stage flash vessel to recover the heat for reuse in other equipment, and completed a project to minimise power consumption by one of the incinerators.
- At our Rheinland site in Germany, we completed several projects to reduce energy use and improve efficiency, for example, by installing more efficient equipment and changing maintenance schedules to improve efficiency.
- At our Bukom site in Singapore, we completed a project to reduce the consumption of natural gas in flare purge.
- At our Scotford refinery and chemical site in Canada, we completed several projects to reduce energy use and improve efficiency, for example, by enabling the reduction of steam usage.
- At our QGC operations in Australia, we implemented a project to reduce power requirements for gas compression.

Examples of some of the principal measures taken in 2020 are listed below (with estimated total savings of around 385 million kWh in 2020):
- At our Clipper facility in the UK, we completed a project to optimise the use of compressors.
- At our Bukom facility in Singapore, we completed two projects to minimise energy loss from steam.
- At our Scotford upgrader facility in Canada, we completed several projects to minimise energy use and improve efficiency, for example by removing equipment from service or replacing it with more efficient equipment.
- At our Geismar facility in the USA, we improved flare staging and temperature control which resulted in lower levels of natural gas consumption.
- At our Mobile facility in the USA, we installed new equipment to increase heat transfer between heat exchangers to improve the energy efficiency of the units.
- At our GTL facility in Qatar, we completed several projects to reduce energy use and improve efficiency, for example by minimising the generation of excess steam and converting excess energy into electricity for export to the public grid.
- In Brazil, we reduced fuel usage of vessels by optimising how they operate in dynamic position, stand-by and navigation modes.

The targets in this "Climate change and energy transition" section, including those relating to the net carbon intensity targets, are forward-looking targets based on management's current expectations and certain material assumptions and, accordingly, involve risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied herein.

### EU TAXONOMY REGULATION
The EU Taxonomy Regulation, adopted by the European Union in 2020, is designed to encourage investment in an environmentally sustainable economy by creating uniform definitions of sustainability for investors. Although as a UK company Shell is not currently subject to the regulation, we have prepared a voluntary disclosure in accordance with its requirements. For further information, see "Supplementary Information - EU Taxonomy Disclosure" on pages 280-282.

ENVIRONMENT AND SOCIETY

# OUR APPROACH
# TO SUSTAINABILITY

Our commitment to contribute to sustainable development has been part of the Shell General Business Principles since 1997. These principles, together with our Code of Conduct, apply to the way we do business and to our conduct with the communities where we operate.

We have worked to embed this sustainability commitment into our strategy, our business processes and decision-making.

We aim to provide more and cleaner energy solutions in a responsible manner – in a way that balances short- and long-term interests, and that integrates economic, environmental and social considerations.

### Our strategy

Today, we continue to build on these foundations while driving change across the organisation to help society meet its most pressing challenges, including those related to climate change, the environment, diversity and inclusion, and human rights.

We seek the views of various groups and individuals about the role of an organisation like Shell in addressing these challenges. Our efforts are informed by major international agreements and initiatives, such as the Paris Agreement and the UN's Sustainable Development Goals.

In February 2021, we announced Powering Progress, our strategy to accelerate the transition of our business to net-zero emissions, in step with society. Powering Progress is designed to integrate sustainability with our business strategy. Powering Progress has four main goals in support of our purpose, to power progress together by providing more and cleaner energy solutions:

• generating shareholder value: increasing value through a dynamic portfolio and disciplined capital allocation;
• achieving net-zero emissions: working with our customers and across sectors to accelerate the transition to net-zero emissions;
• powering lives: powering lives through our products and activities, and by supporting an inclusive society; and
• respecting nature: protecting the environment, reducing waste and making a positive contribution to biodiversity.

Powering Progress is underpinned by our focus on safety and our core values of honesty, integrity and respect for people. This means we have a commitment to do business in an ethical and transparent way.

For more information on our Powering Progress strategy, see page 18.

98

ENVIRONMENT AND SOCIETY continued

### Sustainability reporting boundary and guidelines

Data in this section are reported on a 100% basis in respect of activities where a Shell company is the operator (unless noted otherwise). Reporting on an operational control basis differs from that applied for financial reporting purposes in the "Consolidated Financial Statements" on page 208.

Additional data on our 2021 environmental and social performance are expected to be published in the Shell Sustainability Report in April 2022.

We use certain guidelines to inform our reporting on sustainability issues:
- As a member of the World Business Council for Sustainable Development, we support the organisation's updated criteria for membership from 2022, which include requirements for corporate transparency.
- We report in line with guidelines developed by IPIECA, the global oil and gas association for advancing environmental and social performance across the energy transition.
- In January 2021, we agreed to adopt the Stakeholder Capitalism Metrics, a set of environmental, social and governance metrics released by the World Economic Forum and its International Business Council.
- We map our disclosures against the Sustainability Accounting Standards Board's (SASB) Oil & Gas - Exploration & Production Standard.
- In the "Climate change and energy transition" section of this Report, we set out our climate-related financial disclosures consistent with all of the recommendations and recommended disclosures of the Task Force on Climate-related Financial Disclosures (TCFD).

### IMPACT OF THE COVID-19 PANDEMIC - HELPING COLLEAGUES, CUSTOMERS AND COMMUNITIES

The COVID-19 pandemic continues to have a serious impact on people's health and livelihoods in most parts of the world, including communities where we work. Shell is working hard to assist in the global fight against the virus, and to support recovery efforts.

See our website shell.com for information on the steps we took to provide support to our staff and others.



Shell staff and contractors worked hard to assist in the global fight against the virus, and to support recovery efforts.

### UNITED NATIONS SUSTAINABLE DEVELOPMENT GOALS

The UN's 17 Sustainable Development Goals (SDGs) seek to address the world's biggest challenges, including ending poverty, improving health and education, making cities sustainable and tackling climate change.

Governments are responsible for prioritising and implementing approaches that meet the SDGs, but achieving these tasks will require unprecedented collaboration and collective action across businesses, governments and civil society.

We will play our part in helping governments and societies to achieve the SDGs. The goals were one of the considerations in the development of our Powering Progress strategy. The actions we take as part of our Powering Progress strategy can help directly contribute to 13 of the SDGs, while indirectly contributing to others.

See our website shell.com for information on how Shell is contributing to the SDGs.

### BOARD OVERSIGHT FOR SUSTAINABILITY

We describe Shell's overall governance framework on page 129. It provides information on the roles of the Board, its committees, and the Executive Committee. The Safety, Environment and Sustainability Committee (SESCo) advises the Board on safety, the environment including climate change and broader sustainability. More information on SESCo's role and activities in 2021 is provided on pages 140-141.

The Annual Report on Remuneration (see page 164) provides details of how the Shell scorecard captures key performance indicators for safety, environment and climate.

### SHELL GENERAL BUSINESS PRINCIPLES

The Shell General Business Principles set out our responsibilities to shareholders, customers, employees, business partners and society. They set the standards for how we conduct business with integrity, care and respect for people, while seeking to protect the environment and establish mutually beneficial relationships with communities. All ventures that a Shell company operates must conduct their activities in line with our business principles.

### HSSE & SP CONTROL FRAMEWORK

In Shell, health, safety, security, environment, and social performance (HSSE & SP) are vitally important to generating value. They are indispensable elements of our organisation. The Shell HSSE & SP Control Framework (CF) consists of mandatory standards and manuals, which align with the Shell Commitment and Policy on HSSE & SP. Guidance documents, assurance protocols, and training materials support implementation of the standards and manuals.

The HSSE & SP CF applies to every Shell entity and Shell-operated venture, including all employees and contract staff. The HSSE & SP CF defines requirements and accountabilities at each organisational level and sets out processes and procedures. We aim to ensure that all significant HSSE & SP risks associated with our business activities are assessed and managed to minimise them as far as reasonably practicable. Our HSSE & SP functions provide expert advice and support businesses to improve HSSE & SP performance.

We aim to minimise the environmental impact of new projects and existing operations. Shell conducts an environmental, social and health impact assessment for every major project. We engage with local communities and non-governmental organisations (NGOs) in order to understand and respond to their concerns in a timely and suitable manner.



**Assurance**

The Process Safety and HSSE & SP Assurance team provides assurance to the Board on the effectiveness of the HSSE & SP CF through an audit programme. The full Shell portfolio comprises about 200 organisational groups covered by this programme. Audits are performed with a frequency of between three and five years, depending on the overall risk and complexity of a particular facility or organisational group. The Board approves an annual audit plan. On average, the assurance team conducts about 50 audits on a variety of subject areas per year. The scope of the audits is designed to test risk areas as defined in the HSSE & SP CF. This includes the overall HSSE & SP management system and specific requirements for areas such as personal safety, environment and contractor management. Based on audit outcomes, the audit frequency for an entity may be increased. The relevant business documents the audit findings, records any action items and tracks them to completion.

We expect joint ventures not operated by Shell to apply standards and principles substantially equivalent to our own. We support these joint ventures in implementing such standards and principles. We also offer to help them review the effectiveness of their implementation. Even if such a review is not conducted, we periodically evaluate HSSE & SP risks faced by the ventures that we do not operate. If a joint venture does not meet our HSSE & SP expectations, we seek to improve performance by working with our partners to develop and implement remedial action plans.

From August 2021, we integrated the Process Safety and HSSE & SP Assurance team and the related HSSE & SP assurance programme into the Shell Internal Audit & Investigations (SIAI) team to form a single independent assurance organisation within Shell. Within SIAI, the HSSE & SP and Asset Management Assurance team continues to provide assurance to the Board on the effectiveness of the HSSE & SP CF as outlined above.

Shell aims to work with suppliers that behave in a safe, economically, environmentally and socially responsible manner. Our approach to suppliers is set out in our Shell General Business Principles and Shell Supplier Principles. These cover expectations in areas such as business integrity, health and safety, environment, and human rights.

Exhibit Q

ENVIRONMENT AND SOCIETY continued

### Divestments

Responsible divestments are a key part of transitioning our portfolio to deliver our Powering Progress strategy.

When considering divestments, we collaborate with in-house and external experts, where appropriate, to conduct checks and examine key attributes of potential buyers. These attributes may include their financial strength; operating culture; health, safety, security and environment (HSSE) policies; and approach to ethics and compliance. We also consider risk- and people-management processes and standards; community liaison practices; and social performance programmes.

Applicable attributes are assessed against Shell's policies and the requirements of relevant local regulations. Divestments are often subject to the approval of regulatory authorities, which may in part depend on potential buyers' HSSE capacity, compliance record, and asset-stewardship capabilities.

### SAFETY

Shell's Powering Progress strategy is underpinned by our focus on safety. We aim to do no harm to people and to have no leaks across our operations. We call this our Goal Zero ambition.

We seek to improve safety by focusing on the three areas where the safety risks associated with our activities are highest: personal, process and transport. We strive to reduce risks and to minimise the potential impact of any incident, with a particular emphasis on the risks with the most serious consequences if something goes wrong. In 2021, we introduced a new measure to report on our personal safety performance, known as Serious Injury and Fatality Frequency (SIF-F).

This new measure is one example of how we have updated our thinking about safety, how we learn from incidents with potential to cause life-altering injuries, and how leaders should respond. In 2020, we started a multi-year process of refreshing our approach to safety for all employees and contractors. Our updated approach to safety is rooted in a consistent focus on human performance, by which we mean the way people, culture, equipment, work systems and processes all interact. The majority of our fatalities over the last five years were down to the interaction between these elements.

We aim to better understand the gap between how we anticipate work will be done safely and how the work is actually carried out. We continue to work to prevent incidents by maintaining safety barriers and providing training. We acknowledge that people make mistakes and not all incidents may be preventable. We continue to focus more on installing adequate controls to create capacity to fail safely. With that, we believe that we will enhance our safeguards and reduce the likelihood of serious injuries.

We recognise that people are key to executing complex tasks and to finding solutions to problems. We aim to apply a learner mindset, by which we mean the belief that we can always improve, enhance individual capabilities, learn from mistakes and successes, and speak up without being punished. We seek to create conditions that encourage employees and contractors to share ideas and concerns without fear of rejection or punishment.

We work with the large number of our contractors and suppliers so they understand our safety requirements. Together we seek to improve safety performance by building skills and expertise, and by creating an inclusive and safe work environment. We strive to help improve safety throughout the energy industry by sharing our safety standards and experience with other operators, contractors and professional organisations, such as the Energy Institute, the London-based global professional body for the energy sector; IPIECA, the global oil and gas association for advancing environmental and social performance across the energy transition; and IOGP, the international association of the upstream oil and gas industry.

Shell also continues to use technology and digital solutions to help keep people and our operations safe. Drones, remote sensing technologies, robots and other technologies, such as augmented reality, help us keep people out of harm's way. For example, we use drones and robots to conduct inspections, reducing the need for human inspectors to enter hazardous environments. We also use various technologies and devices to help frontline employees stay safe and react quickly should an incident occur.

### Personal safety

We continue to strengthen the safety culture and leadership among our employees and contractor staff. This aligns with our focus on caring for people.

We expect everyone to consider two aspects of their tasks: the hazards that could potentially cause serious harm, and the effectiveness of the barriers in place to avoid serious harm if something does happen. We have ongoing safety awareness programmes, and hold an annual global Safety Day to give employees and contractors time to reflect on how to prevent incidents and how we can work together to improve performance.

In September, during Safety Day 2021, we began the transition to a new set of nine industry Life-Saving Rules which came into effect from January 2022. All our staff and contractors were given time to reflect on how these rules apply to everyday activities, and how to put them into practice applying the human performance and learner mindset guidelines. Introducing the industry Life-Saving Rules has been an opportunity to strengthen the way we learn from adverse incidents and to simplify and standardise processes and procedures. Safety Day marked the start of a series of engagements. We encouraged team leaders to hold additional conversations with their team to help further understanding of the nine industry Life-Saving Rules and together create the conditions to enable these rules to be followed. This is particularly important with the new line of fire rule. This states that people must ensure that they and others are out of the way of potential pressure releases, vehicles that might move, or objects that could fall, drop or move. Analysis of safety incidents at Shell-operated ventures showed that many of our most serious events related to the line of fire rule. By the end of 2021, more than 90,000 of our employees and contractors had already completed the mandatory updated training for the Life-Saving Rules.

See our website shell.com for more information on Life-Saving Rules guidance for contractors.

Exhibit Q



**Transitioning to industry Life-Saving Rules**

Despite an improving trend, we still experience serious injuries

Recordable fatalities, TRCF and SIF-F

**80%**
of incidents are related to
industry Life-Saving
Rules risk areas

**20%**
of fatalities since
2014 related to
new line of fire rule

From → To
Prescriptive
Do's and
don'ts
I statements
that create
ownership

Chart chart corresponds to Shell-operated ventures.

**Process safety**

Process safety management is about keeping hazardous substances inside pipes, tanks and vessels, and ensuring that well construction and well intervention so that they do not harm people or the environment. It starts at the design and construction stage of projects and continues throughout the life cycle of facilities to ensure they are safely operated, well maintained and regularly inspected.

For example, we embedded safety in the design and construction of the Falcon Ethane Pipeline System in the USA, which was commissioned in 2021. We used pipe with thicker walls and buried it deeper than required by regulations. We used ultrasound and X-ray equipment to test welds before use. The pipeline is designed to withstand almost twice the normal operating pressure.

Our global standards and operating procedures define our expectations for the controls and physical barriers required to reduce the risks of incidents. For example, offshore wells must be designed with at least two independent barriers in the direction of flow, in order to reduce the risk of an uncontrolled release of hydrocarbons. We regularly inspect, test and maintain these barriers to ensure they meet our standards. For example, at the West Delta Deep Marine joint venture assets (Shell interest 50%, not operated by Shell), off the coast of Egypt, more than 750 kilometres of hydrocarbon-carrying pipelines were inspected for their integrity using a technique based on screening pipelines by electro-magnetic waves. Since 2017, until end of 2021, 540 kilometres were confirmed safe. We expect to check the remaining 210 kilometres of concrete-coated pipe in 2022 using a method that helps to inspect pipelines by analysing their magnetic field.

We strive to learn not only from leaks that happened, but also from potential events that were prevented by our barriers. Spending time monitoring and learning from high-potential events - avoided leaks which would have caused significant harm to assets and people - is necessary as our industry moves towards risk-based classification of leaks. In the event of a loss of containment such as a spill or a leak, our standards require the use of independent recovery measures to stop the release from becoming catastrophic. We have embedded a set of process safety fundamentals in order to strengthen barriers relating to critical safety tasks performed by frontline staff. These fundamentals provide guidelines for good operating practices to prevent unplanned releases.

We routinely prepare and practise our emergency response to potential incidents such as a spill or a fire. This involves working closely with local services and regulatory agencies to jointly test our plans and procedures. These tests continually improve our readiness to respond. If an incident does occur, we have procedures to reduce the impact on people and the environment.

In August and September 2021, Hurricane Ida posed a potential safety risk to millions of people across the Gulf Coast region. Thousands of Shell employees, contractors, and their families were affected. Hurricane Ida also threatened Shell's onshore and offshore assets in the region. Years of planning and learning through exercises enabled Shell's emergency response teams to efficiently take care of employees and minimise the disruption of our business. We conducted extensive training at our sites between May and July 2021, so that our teams were ready to react when the hurricane hit.

Exhibit Q

ENVIRONMENT AND SOCIETY continued

Shell helped with disaster response and recovery efforts in the aftermath of Hurricane Ida, playing our part in assisting employees and neighbours in the communities where we work. We supported employees and communities in the Gulf Coast region and also in Pennsylvania, New York and New Jersey. For example, we distributed assistance packages to more than 400 employees in need. We also established base camps in the Gulf Coast region at Shell's Norco and Convent sites in Louisiana. These hosted more than 700 displaced individuals, employees required to remain on site, and electrical linemen working to restore power to communities. Shell had around 3,000 employees in the Gulf Coast region, and about 2,200 of them found themselves in an area that qualified as a natural disaster zone.

**Transport safety**

Transporting large numbers of people, products and equipment by road, rail, sea and air poses safety risks. We seek to reduce these risks by developing best-practice standards within Shell. We also work with specialist contractors, industry bodies, NGOs and governments to find ways of reducing transport safety risks.

In 2021, Shell employees and contractors drove around 470 million kilometres on business in more than 50 countries. There were no fatalities related to road transport in activities under the operational control of a Shell company in 2021. By the end of December, we recorded more than 1.2 billion kilometres with no fatalities in almost two-and-a-half years.

We continually take steps to improve our road safety performance. For example, we implement best practice, encourage safe behaviour, and call for safe vehicle design. We run road safety programmes including our online defensive driving course that teaches safe techniques and behaviours and is mandatory for all who drive on public roads while on Shell business. In 2021, around 11,000 Shell employees and contractors completed some form of in-vehicle or virtual defensive driving training.

Falling asleep behind the wheel or being distracted while driving can lead to serious road accidents around the world. Our road transport fleets have begun deploying devices that detect signs of microsleeps, fatigue and distraction, and respond by warning drivers so they can take action to stay alert.

This deployment started in 2020, at the Shell-operated QGC facility in Queensland, Australia, where we worked with four universities and eight contracting companies to evaluate fatigue detection devices and to find the one that performed best in testing. The basis for this project was a scientific study commissioned by Shell, BP, TotalEnergies, and Chevron to review more than 100 commercially available technological systems that purported to detect fatigue or distraction in drivers.

We are adopting a phased approach to deploying the devices and ensuring drivers know how to use them. We will start in countries identified as high-risk locations: Australia, India, Malaysia, Mexico, Pakistan, Russia, South Africa, Thailand, Turkey and the Philippines.

In 2021, the UN General Assembly's status report on road safety globally recognised Shell as being among the very few private-sector companies that have funded road safety projects and activities. We believe that collaboration is key to achieving the UN's target to halve global traffic deaths by 2030, based on their estimations for incidents between 2021 and 2020. This is considered part of Sustainable Development Goal 3: ensure healthy lives and promote well-being for all at all ages. We remain determined to play our part in helping to achieve this, including through organisations such as the Global Road Safety Partnership. Shell has been a founding member of this partnership between businesses, development agencies, governments and civil-society organisations which took on the role to create and support multi-sector road safety partnerships that are engaged with frontline good practice road safety interventions in countries and communities throughout the world.



In 2021, Shell employees and contractors drove around 470 million kilometres on business in more than 50 countries.

Exhibit Q

**Contractor safety**

Executives from Shell and our major contractor companies have been collaborating on Shell's contractor safety leadership (CSL) programme since 2014. The programme seeks to identify strategies and practical ways to improve a shared safety culture and achieve our Goal Zero ambition of no harm and no leaks.



We have worked with contractors on standardisation and simplification, and collaborated to develop a contractor safety leadership initiative called Declared Future. We believe these efforts have helped to align our organisations at all levels and improve frontline safety.

Our transition to the industry Life-Saving Rules also brings us closer to the standard shared by most of the main contractor companies in our CSL programme. This was something they had requested of us.

ENVIRONMENT AND SOCIETY continued

### Safety performance

Regrettably, in 2021, eight of our contractor colleagues in Shell-operated ventures lost their lives in the course of their work for Shell. So did a police officer who was with our colleagues in Nigeria. The Shell organisation feels these losses deeply. We are determined to learn from these incidents and spread the lessons from them throughout our organisation so we can do everything possible to prevent anything similar recurring.

The fatal incidents were as follows:

In Nigeria, six people working for an engineering contractor and a police officer lost their lives when gunmen attacked a convoy of buses transporting people to the Assa North Gas development project site. The Shell Petroleum Development Company of Nigeria (SPDC) worked with the contractor and supported the police during the investigation of the incident.

In Pakistan, a contractor colleague died after a fire at a dealer-operated retail site. Another contractor lost his life when a wall fell over during demolition work at a retail site in Indonesia.

Several industry safety leadership groups confirm that serious and high-potential incidents often have different root causes than most lower-consequence events. To improve insights from incident investigations and data analysis, we are changing how we report incidents. From 2021 onwards, we measure the number of serious injuries and fatalities per 100 million working hours, instead of the Total Recordable Case Frequency, which measured cases per million working hours. The new measure, known as Serious Injury and Fatality Frequency (SIF-F), allows us to focus our investigations on the most serious incidents. The aim is to collect and analyse relevant, high-quality data that can help us improve our efforts to prevent serious injuries and fatalities.

In 2021, the SIF-F was 6.9 injuries and illnesses per 100 million working hours, compared with 6.0 in 2020.

There were 102 operational Tier 1 and 2 process safety events in 2021, compared with 103 in 2020.

For reporting on process safety, in this Report, we combine Tier 1 and 2 events. A Tier 1 event is an unplanned or uncontrolled release of any material from a process, including non-toxic and non-flammable materials, with the greatest actual consequence resulting in harm to employees, contract staff or a neighbouring community, damage to equipment, or exceeding a defined threshold quantity. A Tier 2 process safety event is a release of lesser consequence.

As part of Shell's learner mindset approach, we investigate all serious incidents so we can understand the underlying causes, including technical, behavioural, organisational and human factors. We share what we learn widely, including with contractors. We implement mitigations at the site and in the country and business where the incident occurred. We seek to turn incident findings into improved standards or better ways of working that can be applied widely across similar facilities.

*Additional information on our 2021 safety performance is expected to be published in the Shell Sustainability Report in April 2022.*

### ENVIRONMENT

In 2021, as part of our Powering Progress strategy, we launched our Respecting Nature goal, which sets out our environmental ambitions around biodiversity, water, circular economy and waste, and air quality. Our Respecting Nature commitments step up our approach to managing the impacts of our operations on the environment. They also aim to extend our approach with our supply chain, for example, with commitments around plastics and circular economy.

We adopted short-term goals and also set environmental ambitions for 2030 and later. We have been working to embed these new requirements into our systems and processes. Accountability for delivery of the Respecting Nature goal lies with our Executive Committee. We have restructured and resourced our organisation to add specialists on biodiversity and circularity and are building capability with the help of external partners.

We have included our new commitments in our performance management and reporting systems and are defining the baselines for each of the commitments and setting 2022 targets across our businesses. We are working with external environmental partners to develop new approaches that aim to show the extent of the progress we are making towards our environmental goals.

We will continue to seek opportunities to go further. Our environmental ambitions will be underpinned by collaboration with our supply chains and transparent reporting.

### Environmental standards

Shell's global environmental standards as set in our HSSE & SP Control Framework cover our environmental performance. They include details of how to manage emissions of greenhouse gases (GHG), consume energy more efficiently, reduce gas flaring and control air quality, prevent spills and leaks of hazardous materials, use less fresh water and conserve biodiversity. We seek to apply our global environmental standards wherever we operate. When planning new major projects, we conduct detailed environmental, social and health impact assessments. We help inform our approach by drawing on external standards and guidelines, such as those developed by the World Bank and the International Finance Corporation.

The Shell HSSE & SP Standards require that we certify our major installations against an internationally recognised independent environmental management system standard if they have significant environmental risks. Major installations are crude oil and natural gas terminals, gas plants, manned offshore and onshore production platforms or flow stations, floating production and storage vessels, refineries, chemicals manufacturing facilities, mines or upgraders. For the purpose of this Report, we did not count each major installation in Upstream and Integrated Gas separately. They were aggregated into their respective operating unit or operating company, such as Shell Upstream UK or Nederlandse Aardolie Maatschappij (NAM), in line with the scope of their certifications. At the end of 2021, 98% of major installations within that scope and operated by Shell were certified against the ISO 14001:2015 Environmental Management System or were in compliance with equivalent environmental frameworks required by local regulations. At the end of 2021, there was one operating unit without active environmental certification because of late changes with key auditing contractors and the impact of COVID-19. Actions have been taken to have their certification renewed in 2022. In addition, many installations that are not classified major, such as lubricant plants or Supply terminals, are also certified against ISO 14001 but are not included in the data above. The total also excludes major installations for which divestments were completed in 2021 or are expected to be completed in 2022.

*See also "Control Framework" on page 131 and "Climate change and energy transition" on page 76 for more information on how we manage our GHG emissions.*

**Biodiversity**

We have adopted an ambition to have a positive impact on biodiversity. This involves three new commitments:

- From 2021, our new projects in areas rich in biodiversity – critical habitats – will have a net-positive impact on biodiversity.
- From 2021, our nature-based solutions projects, which protect, transform or restore land, will have a net-positive impact on biodiversity.
- From 2022, we will replant forests, achieving net-zero deforestation from new activities, while maintaining biodiversity and conservation value.

We aim to minimise the impact of our projects on biodiversity and ecosystems by applying the mitigation hierarchy. This is a decision-making framework that involves a sequence of four key actions: avoid, minimise, restore and offset. We assess the potential impact of projects on biodiversity as part of our Impact Assessment process. In 2003, we committed not to explore for, or develop, oil and gas resources in natural and mixed World Heritage Sites.

If we decide to go ahead with a project that is in a critical habitat, we develop a biodiversity action plan. This sets out what we should do to follow the mitigation hierarchy. If there is an impact on biodiversity, the plan outlines the action required to achieve a net-positive outcome for biodiversity. For example, in Australia, the Shell-operated QGC natural gas project manages the 10,000-hectare Valkyrie property as part of its strategy to offset impacts on biodiversity. In 2021, QGC completed the final steps to secure further hectares of habitat for three threatened species: koala, south-eastern long-eared bat and greater glider.

**Circular economy and waste**

We are working to reduce waste, improve our waste management processes and apply the principles of a circular economy, where materials are recycled and reused, across our businesses and supply chains. Our ambition is to use resources and materials efficiently and to increase reuse and recycling.

We are aiming for zero waste by reducing waste generated and increasing reuse and recycling in our businesses and supply chains. In 2021, we conducted pilot assessments to develop and test a methodology that we could use across a number of businesses in 2022 to gather options to set goals for 2023+ relating to circular economy and waste management.

Some of our sites and businesses are already starting to take a more circular approach. For example, our Mobility business has made the commitment that all Shell-owned service stations will reduce, reuse and repurpose waste by 2025. By 2025, we also aim to remove unnecessary single-use plastic, such as bags, straws and cutlery from our service station shops. We will make it easier for customers to recycle and are looking for ways to repurpose plastic waste.

We have also set commitments to work with our suppliers and contractors to help end plastic waste in the environment:

- By 2030, we will increase the amount of recycled plastic in our packaging to 30% and ensure that the packaging we use for our products is reusable or recyclable.
- We will increase the amount of recycled materials used to make our products, starting with plastics. Our ambition is to use 1 million tonnes of plastic waste a year in our global chemical plants by 2025.

**Water**

Managing our impacts on water and ensuring the availability of fresh water for our operations is a growing challenge in some parts of the world. Increasing demand for water resources, growing stakeholder expectations and concerns, and water-related legislation may reduce our access to water.

We manage water use carefully, and tailor our use of fresh water to local conditions and requirements. We sometimes use alternatives to fresh water in our operations. These include water that has been recycled from our operations, processed sewage water and desalinated water. We require that all Shell facilities and projects are assessed to see what risks they might pose to water availability. In places where water is scarce, we develop water-management action plans for using less fresh water, increasing water recycling and closely monitoring water use.

In 2021, we set a measurable target for fresh-water use: we will reduce the amount of fresh water consumed in our facilities. This will start with reducing our consumption of fresh water by 15% by 2025 compared with 2018 levels in water-stressed areas, which are places where there is high pressure on fresh-water resources.

At the end of 2021, four of our major facilities were in areas where there is a high level of water stress, based on analysis using references such as the World Resources Institute's Aqueduct Water Risk Atlas and information specific to the local environment. These four facilities are the Pearl GTL (gas-to-liquids) plant in Qatar, the Shell Energy and Chemicals Park in Singapore, the Shell Jurong Island chemical plant, also in Singapore, and the Tabangao Import Terminal in the Philippines. In 2021, these four facilities consumed 22 million cubic metres of fresh water, compared with their baseline of 25 million cubic metres in 2018.

We have also stated that, by the end of 2022, we will have assessed options for further goals related to reducing our use of fresh water.

In 2021, we conducted a pilot assessment of circular approaches towards fresh-water consumption. This helped us to develop a methodology that will be used to assess businesses' performance in 2022. We believe that this will help deepen our understanding of how to improve water efficiency and help us set further goals by the end of 2022. The assessments involve desktop analysis and detailed site evaluations conducted with external organisations.

In 2021, our overall intake of fresh water decreased to 166 million cubic metres, compared with 171 million cubic metres in 2020 mainly driven by the shutdown of the Shell Convent Refinery (USA) in December 2020.

Around 90% of our intake of fresh water was used for manufacturing oil products and chemicals, with the rest mainly used for oil and gas production. Around 35% of our fresh-water intake was from public utilities, such as municipal water supplies. The rest was taken from surface water such as rivers and lakes (around 55%) and groundwater (around 10%).

*Additional information on our 2021 environmental performance is expected to be published in the Shell Sustainability Report in April 2022.*

ENVIRONMENT AND SOCIETY continued

## Air quality

We are helping to improve air quality by reducing emissions from our operations and providing cleaner ways to power transport and industry. We take steps to manage airborne pollutants in our oil and gas production and processing, such as nitrogen oxides, sulphur oxides and volatile organic compounds.

See our website shell.com for more information about our approach to biodiversity, circular economy and plastic waste, and water.

Respecting Nature

Shell's new commitments from 2021

### Biodiversity

• Our new projects in areas rich in biodiversity – critical habitats – will have a net positive impact on biodiversity, starting implementation in 2021.
• Our nature-based solutions projects, which protect, transform or restore land, will have a net positive impact on biodiversity, starting implementation in 2021.
• We will support forests, achieving net-zero deforestation from new activities, while maintaining biodiversity and conservation value, starting implementation in 2022.

### Circular economy and waste

We are aiming for zero waste by reducing waste generated and increasing reuse and recycling in our businesses and supply chains. We will set goals for waste reduction, reuse and recycling by the end of 2022.

We will work with our suppliers and contractors to help end plastic waste in the environment:
• By 2030, we will increase the amount of recycled plastic in our packaging to 30% and ensure that the packaging we use for our products is reusable or recyclable.
• We will increase the amount of recycled materials used to make our products, starting with plastics. Our ambition is to use one million tonnes of plastic waste a year in our global chemicals plants by 2025.

### Water

• We will reduce the amount of fresh water consumed in our facilities, starting by reducing fresh-water consumption by 15% by 2025 compared with 2018 levels in areas where there is high pressure on fresh-water resources.
• 25 million cubic metres of fresh water were consumed by our facilities in highly water-stressed areas in 2018.
• We will also assess options for further reduction goals by the end of 2022.

### Air quality

We are helping to improve air quality by reducing emissions from our operations and providing cleaner ways to power transport and industry.

### Collaboration and reporting

• Supply chain: We will reinforce requirements in our purchasing policies to reflect our environmental framework, and take the energy efficiency, material efficiency and sustainability of products into consideration in our purchases.
• External partnerships: We will ensure external partnerships inform key areas of development and delivery of our ambitions.
• External reporting: We will transparently report performance in our annual Sustainability Report.

## SPILLS

Large spills of crude oil, oil products and chemicals associated with our operations can harm the environment, and result in major clean-up costs, fines and other damages. They can also affect our licence to operate and harm our reputation.

We have requirements and procedures designed to prevent spills. We design, operate and maintain our facilities with the intention of avoiding spills. To further reduce the risk of spills, Shell has routine programmes to reduce failures and maintain the reliability of facilities and pipelines. Our business units are responsible for organising and executing spill responses in line with Shell guidelines and relevant legal and regulatory requirements. Our offshore installations have spill response plans for when an incident occurs. These plans set out response strategies and techniques, available equipment, and trained personnel and contracts. We can engage specialist contracted services for oil spill response, including vessels, aircraft or other equipment and resources, if required, for large spills. We conduct regular exercises that seek to ensure these plans remain effective and fit for purpose.

We have further developed our ability to respond to spills to water. We have a worldwide network of trained staff to help with this. We also have a global oil spill expertise centre, which tests local capability and maintains our ability to respond to a significant spill into a marine environment.

We are involved in several industry consortia formed to improve well-containment capabilities. Shell Offshore Response Company LLC is a founding member of the Marine Well Containment Company, a non-profit industry consortium providing a well-containment response system for the Gulf of Mexico. Shell Response Limited was a founding member of the Subsea Well Response Project, an industry co-operative effort to enhance global well-containment capabilities, which has since become Oil Spill Response Limited, an industry consortium.

We maintain site-specific emergency response plans in case there is an onshore spill. Like the offshore response plans, these are designed to meet Shell guidelines and relevant local legal and regulatory requirements. The onshore response plans also provide for the initial assessment of incidents and the mobilisation of resources to manage them. In the event of spills on land, businesses are supported by our global Soil & Groundwater team which reviews and implements appropriate remedies. The Soil & Groundwater team is engaged throughout the life cycle of our assets. For example, during acquisition and divestment of assets, the team conducts due diligence to identify land contamination liabilities. Through research and development initiatives, the team collaborates with regulators in developing, modifying, and applying sustainable remediation techniques.

Spills still occur for reasons such as operational failure, accidents or unusual corrosion. In 2021, there were 42 operational spills of more than 100 kilograms compared with 70 in 2020. The weight of operational spills of oil and oil products in 2021 was 0.05 thousand tonnes, compared with 0.4 thousand tonnes in 2020.

Exhibit Q

### Spills in Nigeria

In the Niger Delta, over the last 11 years, the total number of operational hydrocarbon spills and the volume of oil spilled from them into the environment have been significantly reduced.

Most oil spills in the Niger Delta region continue to be caused by crude oil theft, the sabotage of oil and gas production facilities, and illegal oil refining, including the distribution of illegally refined products.

In 2021, the Shell Petroleum Development Company of Nigeria Limited (SPDC) reported 10 operational spill incidents of more than 100 kilograms of crude oil, fewer than the 12 reported in 2020. The volume of around 0.03 thousand tonnes remained on the same level.

SPDC has an ongoing work programme to appraise, maintain and replace key sections of pipelines and flow lines, in order to reduce the number of operational spills. Over the last 11 years, around 1,410 kilometres of pipelines and flow lines have been replaced. This work is organised through a pipeline and flow line integrity management system that proactively addresses pipeline integrity. It installs barriers where necessary, and recommends when and where pipeline sections should be replaced to prevent failures. In 2018, this integrity management system was enhanced to manage threats arising from frequent pipeline sabotage or vandalism.

### Spills caused by sabotage in 2021

In 2021, more than 90% of the oil spills of more than 100 kilograms from the SPDC joint venture's facilities were caused by the illegal activities of third parties. In 2021, the volume of crude oil spills of more than 100 kilograms caused by sabotage was around 3.3 thousand tonnes (107 incidents), compared with around 1.5 thousand tonnes (122 incidents) in 2020. We believe that the number of incidents in 2021 continued to decrease because of improved security and surveillance. The doubling of the volume was mainly because of one incident which alone accounted for around 2.3 thousand tonnes of crude oil which was contained and could be recovered.

SPDC continues to undertake initiatives to prevent and reduce spills caused by theft from or sabotage of its facilities in the Niger Delta. In 2021, SPDC continued on-ground surveillance at its areas of operation, including its pipeline network, to mitigate third-party interference and ensure that spills are detected and responded to as quickly as possible.

There are daily overflights of the most vulnerable segments of the pipeline network to identify any new spills or illegal activity. SPDC has introduced anti-theft protection mechanisms for key infrastructure such as wellheads and manifolds. The programme to protect wellheads with steel cages continues to help deter theft.

By the end of 2021, a total of 283 cages had been installed, including 62 that had been upgraded with CCTV. This compared with a total of 364 installed cages at the end of 2020. This year-on-year reduction was because of the 2021 divestment of the OML-17 licence. In 2021, 29 breaches were successful out of 1,700 registered attempts.

### Faster response and remediation

Irrespective of the cause, SPDC works to clean up and remediate areas affected by spills originating from its facilities. In 2021, the time that SPDC needed to complete the recovery of free-phase oil – oil that forms a separate layer and is not mixed with water or soil – remained at around one week compared to 2020. This is the average time it takes to safely access a damaged site to start joint investigation visits with regulators, affected communities, and in some cases with NGOs, to clean up oil not mixed with water or soil.

Clean-up activities include bio-remediation which stimulates micro-organisms that naturally break down and use carbon-rich oil as a source of food and energy, effectively removing it. Once clean-up and remediation operations are completed, the work is inspected and, if satisfactory, approved and certified by the Nigerian regulators. With operational spills, SPDC also pays compensation to affected people and communities.

SPDC has been working with the International Union for Conservation of Nature (IUCN) since 2012 to enhance remediation techniques and protect biodiversity at sites affected by oil spills in SPDC's areas of operation in the Niger Delta. Based on this collaboration, SPDC has launched further initiatives to help strengthen its remediation and restoration efforts. In 2021, SPDC, IUCN, the Nigerian Conservation Foundation, and Wetlands International worked together on the Niger Delta Biodiversity Technical Advisory Group, which continues to monitor biodiversity recovery at remediated sites.

SPDC also works with a range of stakeholders in the Niger Delta to build greater trust in spill response and clean-up processes. Local communities participate in remediation work for operational spills. The restrictions of COVID-19 meant there were fewer opportunities to collaborate, but the engagement and partnership with communities continued. Various NGOs have sometimes gone on joint investigation visits with SPDC, government regulators, and members of affected communities to establish the cause and volume of oil spills.

SPDC has implemented programmes to raise awareness of and counter the negative effects of crude oil theft and illegal oil refining. Examples include community-based pipeline surveillance, and promoting alternative livelihoods through Shell LiveWIRE, Shell's flagship youth entrepreneurship programme.

### Bodo clean-up process

In 2015, SPDC, on behalf of the SPDC joint venture and the Bodo community, signed a memorandum of understanding (MOU) granting SPDC access to begin cleaning up areas affected by two operational spills that occurred in 2008. The MOU also provided for the selection of two international contractors to conduct the clean-up under the oversight of an independent project director. The clean-up project was delayed in 2016 and for most of 2017 because of access challenges from the community. Engagement with the Bodo community and other stakeholders began in September 2015 and was managed by the Bodo Mediation Initiative.

After two years of engagement, in September 2017, it was possible to start the first phase of clean-up and remediation activities. The clean-up consists of three phases:
1) removal of oil from shoreline surfaces and mud flat beds;
2) remediation of soil and sediments; and
3) planting mangroves and monitoring.

The first phase was completed in August 2018. The contract procurement process for phase two was completed in 2019. Remediation activities in the field started in November 2019. During 2020, work had to be put on hold because of COVID-19 restrictions. By November 2020, controls were in place to mitigate impacts from COVID-19 for the workers on site and the remediation work resumed.

In 2021, the remediation of the soil and sediments at the Bodo project site continued. By the end of 2021, remediation work was completed on more than 60% of around 1,000 hectares that have been designated for clean-up. Almost 2,000 community workers have been trained and engaged in the clean-up. Remediation is expected to be completed by the end of the second quarter of 2023.

The planting of mangrove seedlings (phase 3) started in 2021. Around two million mangrove seedlings need to be planted and survive to 2025 to fulfil the project's goal. By the end of 2021, about 300,000 seedlings had been planted.

ENVIRONMENT AND SOCIETY continued

### Ogoniland: commitment to the United Nations Environment Programme

SPDC remains committed to the implementation of the 2011 United Nations Environment Programme (UNEP) Report on Ogoniland which assessed contamination from oil operations in the region and recommended actions to clean it up. Over the last 10 years, SPDC has acted on all and completed most of the UNEP recommendations that were specifically addressed to it as the operator of the joint venture.

The clean-up efforts are led by the Hydrocarbon Pollution and Remediation Project (HYPREP), an agency established by the federal government. In 2018, HYPREP awarded contracts for the first set of remediation projects. In 2019, 21 contractors started operations on 21 lots which add up to 12 of the 67 polluted sites recorded in the UNEP report. Of those 67 sites, 50 were waste sites without hydrocarbon pollution. In January 2020, HYPREP awarded 29 contracts for remediation on 29 lots covering eight polluted sites. The contractors began remediation activities in the fourth quarter of 2020. In 2021, remediation work was completed on nine sites which have been certified by the National Oil Spill Detection and Response Agency (NOSDRA), the Nigerian government agency responsible for monitoring of and responding to oil spills. Remediation continues on 11 sites. Although remediation works continue to make progress, challenges remain. These include re-pollution, lack of contractor funding, land disputes, environmental issues such as flooding caused by excessive rainfall, and security issues in Ogoniland.

The UNEP report recommended creating an Ogoni Trust Fund (OTF) with $1 billion capital, to be co-funded by the Nigerian government, the SPDC joint venture and other operators in the area. The SPDC joint venture remains fully committed to contributing $900 million to the fund as its share over five years. SPDC joint-venture partners contributed the first instalment of $180 million for the clean-up by July 2018, and released the second instalment of $180 million in 2019. HYPREP did not request the release of any funds in 2020. In 2021, HYPREP requested the release of funds for 2020 and 2021. The SPDC joint venture partners agreed to only pay the 2021 instalment of $180 million because of a delayed use of funds by HYPREP, which only spent around $70 million of the fund. The request for the 2021 payment is being processed. Once the payment is made the total contribution by the SPDC joint venture will be $540 million.

The UNEP continues to monitor the progress of the clean-up through its observer status at HYPREP's Governing Council and the Ogoni Trust Fund. UN agencies such as the United Nations Development Programme and the United Nations Institute for Training and Research provide services to HYPREP in the areas of livelihood programmes, training and project services.

### HYDRAULIC FRACTURING
#### Onshore Operating Principles

We use five aspirational operating principles which focus on safety, environmental safeguards, and engagement with nearby communities to address concerns and help develop local economies. We are working towards making all of our Shell-operated onshore projects where hydraulic fracturing is used to produce gas and oil from tight sandstone or shale, consistent with these principles.

We consider each project – from the geology to the surrounding environment and communities – and design our activities using technology and innovative approaches best suited to local conditions. We also support government regulations consistent with these principles that are designed to reduce risks to the environment and keep those living near operations safe.

We review the Onshore Operating Principles annually and update them as new technologies, challenges and regulatory requirements emerge.

### Water

The availability and quality of water, local environmental conditions and regulatory requirements vary from basin to basin.

We aim to minimise water usage in our shale assets by developing a water management strategy specific to the area. Depending on local hydro-geological conditions, our shale assets typically use a combination of fresh water, brackish groundwater, produced water and waste water. We work to limit, and ideally eliminate, our use of fresh water in drilling and hydraulic fracturing operations by increasing recycling capacity and using municipal water.

Chemical additives are needed in hydraulic fracturing fluid to carry sand, reduce friction and prevent the growth of bacteria. Hydraulic fracturing involves pumping fluid that is typically 99.9% water and sand and around 0.1% chemical additives into tight sand or shale rock at high pressure. This creates threadlike fissures - typically the diameter of a human hair - in the rock, making space through which the hydrocarbons can flow more easily.

### Greenhouse gas

Shell's shale assets implement greenhouse gas management plans including robust leak detection and repair programmes using the latest technologies, such as infrared cameras and drones. We also seek to minimise routine gas flaring at shale assets.

Shell sold its stake in the Permian Basin, USA, with effect from December 1, 2021. Between the beginning of 2017 and the end of 2021, we reduced our greenhouse gas and methane intensity of the Permian assets by around 80%. At the same time, production increased at the Shell-operated assets by nearly 120%.

### Operational footprint

Our Shales assets use technology, local knowledge and management strategies to minimise potential impacts such as high traffic volumes, noise, and effects on supplies of drinking water.

### Communities

We build relationships and engage with a broad range of stakeholders across the entire project life cycle. Our stakeholders include residents, local communities – including indigenous populations – government officials, NGOs, civil-society groups, academia and industry. We focus our engagement on understanding local social and economic conditions and proactively identifying and responding to those concerns.

See our website shell.com for more information on our Onshore Operating Principles.

### SEISMICITY

Overall, we believe it is relatively unlikely that hydraulic fracturing or well operations for disposal of produced water will induce seismicity that is felt on the surface. We would also expect any such impact to be limited to a relatively small area. The geology of some places, though, does increase the risk of inducing seismicity that can be felt on the surface. Shell assesses the risk profile of each basin before entering and manages operations accordingly, often beyond regulatory requirements. We assess the subsurface formation and surface environment around our operations and have developed appropriate mitigation plans to follow if needed.

See our website shell.com for more information about our induced seismicity management practices, such as the "Onshore Operating Principles in Action: Induced Seismicity Fact Sheet".

For information on the Groningen onshore gas field in the Netherlands, see "Upstream" on page 51.

**ENVIRONMENTAL COSTS**

We are subject to a variety of environmental laws, regulations and reporting requirements in the countries where we operate. Infringing any of these laws, regulations and requirements could harm our reputation and ability to do business, and result in significant costs, including clean-up costs, fines, sanctions and third-party claims.

Ongoing operating expenses include the costs of preventing unauthorised discharges into the air and water, and the safe disposal and handling of waste.

We place a premium on developing effective technologies that are also safe for the environment. But when operating at the forefront of technology, there is always the possibility that a new technology has environmental impacts that were not assessed, foreseen or determined to be harmful when originally implemented. While we believe we take reasonable precautions to limit these risks, we could be subject to additional remedial, environmental and litigation costs as a result of unknown and unforeseen impacts of operations on the environment. Although these costs have so far not been material to us, no assurance can be given that this will always be the case.

**SECURITY**

Our operations expose us to criminality, civil unrest, activism, terrorism, cyber-disruption and acts of war that could have a material adverse effect on our business (see "Risk factors" on page 28). We seek to obtain the best possible information to enable us to assess threats and risks. To help us understand the threats, we build strong and open relationships with government, law enforcement, armed forces, industry peers and specialist security information providers. On the basis of these threat assessments, we identify security risks to staff, assets including information technology equipment, and operations. We then seek to manage the risks so they are as low as reasonably practicable. Risk mitigation includes strengthening the security of sites, reducing our exposure to threats as appropriate, journey management, information risk management and cyber-defence operations, crisis management and business continuity measures. We conduct training and awareness campaigns for staff, and provide them with travel advice and access to 24/7 assistance while travelling. We consistently verify the identity of our employees and contract staff, we control physical access to our sites and activities, and we document access with digital tools.

We take steps to have clear and planned responses to security incidents, so that we are able to react quickly and effectively if they occur.

Shell is a member of the Voluntary Principles on Security and Human Rights initiative. This is a multi-stakeholder initiative of governments, extractive sector industries and NGOs that gives guidance on how to respect human rights while providing security for business operations. Shell implements this guidance across its companies, concentrating on countries where the risks of working with state and private security forces are greatest.

The Board's Safety, Environment and Sustainability Committee (SESCo) has oversight of Shell's security risk management activities. In the Executive Committee, accountability for security matters sits with the Chief Human Resources and Corporate Officer.

**CONTRIBUTION TO SOCIETY**

Shell's businesses are part of society and contribute to it by buying and selling goods and services in many countries. Our employees, suppliers and contractors are part of the local communities where Shell operates.

In 2021, Shell paid $58.7 billion to governments (2020: $47.3 billion). We paid $6.0 billion in corporate income taxes and $6.6 billion in government royalties, and collected $46.1 billion in excise duties, sales taxes and similar levies on our fuel and other products on behalf of governments. In 2021, Shell spent $37.5 billion (2020: $39.3 billion) on goods and services from more than 24,000 suppliers globally.

For more information about our approach to tax and transparency, see Shell's Tax Contribution Report, available via our website shell.com.

**Social and economic impacts**

We are assessing our social and economic impacts in a number of countries and regions. To do this, we have enlisted the help of the company Oxford Economics using its Global Sustainability Model to assess social, environmental and economic impacts.

In 2021, Shell published its first report based on 2019 social and economic performance data. It details the impacts of our activities in five countries: the Netherlands, UK, USA, Nigeria and India. These countries were chosen because we have significant and wide-ranging operations in them.

The report provides performance data on Shell's contribution to in-country gross domestic product, job numbers, tax payments to governments, and our spending on social and educational programmes. The report also provides details of our operations in each country and our procurement of goods and services. We intend to expand this work to include more European countries.

**Supply chain engagement**

Our suppliers are critical to our ability to run our businesses. They are involved in almost every step of our operations. They often play an important part in Shell having a positive impact on local communities and achieving business success. Shell aims to work with suppliers, including contractors, that behave in an economically, environmentally and socially responsible manner, as set out in our Shell General Business Principles and Shell Supplier Principles.

The way we engage with our contractors and suppliers is based on our Shell Supplier Principles, which are embedded in contracts. They require contractors and suppliers:
• to commit to protect the environment in compliance with all applicable environmental laws and regulations;
• to use energy and natural resources efficiently; and
• to continually look for ways to minimise waste, emissions and discharge from their operations, products and services.

We also work with our partners and industry peers to include worker welfare in industry standards, guidance, and best practice. This helps raise expectations and levels of consistency across the industry. We achieve results in this area partly by participating in organisations such as:
• the Building Responsibly group of engineering and construction companies working together to raise the bar in promoting the rights and welfare of workers across the industry;
• the Joint Qualification System, an initiative of BP, Equinor, Shell and TotalEnergies, aimed at creating a collaborative approach to human rights supplier assessments;
• the International Association of Oil and Gas Producers (IOGP); and
• the IPIECA, the global oil and gas industry association for advancing environmental and social performance across the energy transition.

We also work closely with our key contractors. As a result, 23 of our biggest contractors have signed up to the Building Responsibly principles, which cover more than 1 million workers.

ENVIRONMENT AND SOCIETY continued

Helping our suppliers decarbonise

We continually work with our suppliers to find ways to reduce greenhouse gas emissions across our supply chains.

In 2020, Shell and 50 of our major suppliers piloted a new digital platform, the Shell Supplier Energy Transition Hub. This platform enables suppliers to set emission targets and track performance, share best practice and exchange emissions data with their own supply chains. In 2021, we rolled out the platform free of charge to the rest of our supply chain and any other interested companies.

See our website shell.com for more information about how we engage with contractors and suppliers.

NEIGHBOURING COMMUNITIES

Engaging with communities is part of our approach to managing human rights and providing access to remedy. Shell's HSSE & SP Control Framework helps to ensure that we operate responsibly and avoid or minimise the negative social impacts of our operations. The requirements set out in the framework also help us to maximise benefits arising from our presence, such as local employment and contractual opportunities. When we divest assets or exit areas, we use well-established processes, applied in a systematic way, to guide our assessment of risks in divestments.

Our requirements set rules, supplemented by guidance, for how we engage with communities that may be affected by our operations. Major projects and facilities that Shell operates have a social performance plan setting out how to manage potential negative impacts and maximise benefits. These plans typically begin with defining the social environment, with a particular focus on people who may be especially vulnerable to the potential impacts of our operations. Another important component is an effective community feedback mechanism for listening and responding to questions and resolving complaints in a timely manner. We have specific requirements to avoid, minimise or mitigate potential impacts on the traditional lifestyles and cultural heritage of indigenous peoples. We also have specific requirements to avoid, minimise or mitigate their involuntary resettlement.

We use our online community feedback tool, launched in 2020, to track and respond to all questions, complaints and feedback that we receive. It allows our network of about 100 community liaison officers (CLOs) to document feedback and outcomes.

The CLOs act as a bridge between local communities and our businesses. In 2021, travel restrictions and lockdowns due to the COVID-19 pandemic continued to limit our face-to-face engagement with members of communities. In response, our CLOs moved engagements online to maintain relationships virtually.

As part of our ongoing effort to improve community engagement, we developed an assessment tool in 2019, to measure the effectiveness of our community feedback mechanisms at 32 priority sites. The assessment is based on criteria set out in the UN Guiding Principles on Business and Human Rights. It has helped 18 priority sites to improve their community feedback mechanisms in the following areas:
- promoting public access to and transparency of the sites' community feedback mechanisms;
- improving written procedures so they are better aligned with global good practice and more reflective of local circumstances;
- providing clear steps for recognising alternative options for communities to seek remedy; and
- respecting people's anonymity and data privacy.

By the end of 2021, 10 sites updated their community feedback mechanisms so procedures are better aligned with the UN Guiding Principles on Business and Human Rights. Five sites have improved access and transparency by publishing the procedures for their community feedback mechanisms. We are working to improve community feedback mechanisms at 20 sites.

In 2020, we developed a guide to help sites improve the effectiveness of their community feedback mechanisms. In 2021, we simplified this guide so it could be applied to a wider range of operations. In 2022, we plan to improve the methods for tracking how feedback is resolved.

See our website shell.com for more information about our work with communities.

Exhibit Q

**HUMAN RIGHTS**

Human rights are fundamental to Shell's core values of honesty, integrity and respect for people. Respect for human rights is embedded in the Shell General Business Principles and our Code of Conduct. Our approach is informed by the UN Guiding Principles on Business and Human Rights.

We work closely with other companies and organisations to improve how we apply these UN guiding principles. We focus on four priority areas where respect for human rights is critical to how we operate: communities, security, labour rights, and supply chain. For each of these areas, we have systems to identify potential impacts and to avoid and mitigate them. For example, Shell's HSSE & SP Control Framework contains mandatory standards and manuals that set out how we identify, assess, and manage our impacts on communities where we operate, including any impact on human rights. Our joint-venture partners are expected to implement our control framework or an equivalent.

The Shell Supplier Principles outline how we expect our contractors and suppliers to respect the human rights of their workforce, and to manage the social impacts of their activities on Shell's neighbouring communities.

In 2021, we published Shell's Approach to Human Rights, which increases transparency by providing our staff and external stakeholders with important information about our approach and commitment to human rights. The publication includes Shell's position on respecting and promoting worker welfare. It also contains information on how we provide access to remedy.

In 2021, we launched an updated human rights training course which is mandatory for staff working in areas with the greatest risk of infringement, such as social performance, human resources, and contracting. We encourage all staff to do the course, regardless of their role, to build greater understanding of human rights across Shell.

An internal Human Rights Working Group consisting of experts from different functions guides Shell businesses on the best ways to implement and review our approach to human rights. The group includes an external adviser to provide an outside view and help us to improve our approach. A steering committee composed of senior executives supports the work of the Human Rights Working Group.

Our approach to due diligence is informed by the UN Guiding Principles on Business and Human Rights and is supported by experts working in our focus areas procurement, social performance, human resources, and security. Due diligence helps us to act on our commitment to respect human rights. For example, in our supply chains, where contractors and suppliers are considered to be at risk of having issues with labour rights, we engage with them to assess their management systems, before deciding whether to award a contract. Results of these supplier assessments are evaluated, and where gaps are found, we may work with suppliers and contractors to help them implement corrective actions. We may also conduct on-site audits or consider terminating contracts if serious or persistent shortcomings are found.

The most common shortcomings found during our supplier assessments typically relate to policy gaps rather than performance in the following areas:

• freely chosen employment;
• avoiding child labour;
• working hours, wages and benefits;
• dormitory, housing and working conditions;
• equal opportunities and freedom of association; and
• supply chain and performance management.

The Shell Supplier Principles include specific labour and human rights expectations for contractors and suppliers. Shell companies use a joint industry supplier capability assessment that is delivered in collaboration with other operators. This sharing mechanism is intended to support the improvement of working conditions in the participating companies' supply chains.

See our website shell.com for more information about our approach to human rights.

Exhibit Q

# DELIVERING ENERGY RESPONSIBLY AND SAFELY

Performing competitively in the evolving energy system requires competent and empowered people working safely together across Shell.

Our people are essential to the successful delivery of Shell's strategy and to sustaining business performance over the long term. Strong engagement helps us to accelerate our people's development, enhance our leadership capabilities and improve employee performance.

### In 2021



**Employees**
82,000
employees at December 31, 2021



**Regions**
>70
countries in which we operate



**Training**
271,000
formal training days for employees
and joint venture partners



**Female employees**
33%
female employees



**Directors**
50%
women on the Board of Directors



**Executive Committee**
25%
women on the Executive Committee



**Senior leaders**
29.5%
women in senior leadership positions



**Experienced hires**
1,292
experienced people joined Shell (34% female)



**Operations centre hires**
2,742
recruited for Shell Business Operations
centres (51% female)



**Graduate hires**
155
graduate hires (47% female)

[A] All metrics except the employees metric exclude the employees in certain
Upstream, Renewables and Energy Solutions and Downstream companies that
maintain their own HR systems.

## EMPLOYEE OVERVIEW

The employee numbers presented here are the full-time equivalent number of people employed by Shell on a full- or part-time basis, working in Shell subsidiaries, Shell-operated joint operations, seconded to non-Shell-operated joint operations, or joint ventures and associates.

At December 31, 2021, there were a total of 82,000 employees at Shell. This total consisted of employees at Shell and employees at certain Upstream, Downstream and Renewables and Energy Solutions companies that operate more autonomously than other Shell subsidiaries and maintain their own HR systems. There were a total of 87,000 employees at December 31, 2020, and December 31, 2019.

In August, we launched our new organisational structure as part of the Reshape initiative. This new structure was created with the aim of reducing costs and making us a more competitive organisation that is agile and better able to respond to customers.

The Reshape initiative in 2021 involved job reductions in line with our expectation that around 8,000 jobs will be reduced by the end of 2022. As a result of different notice periods in various markets, people are continuing to leave until the end of 2022. In certain markets, we provided the opportunity for selected voluntary severance (SVS), in order to reduce the number of enforced redundancies. We have around 3,000 people that are leaving on SVS.

We have sought at all times to conduct the job reductions process in accordance with our core values of honesty, integrity and respect for people. We have constantly sought to show care for anyone losing their role.

Throughout the Reshape process, we have aimed to support those facing job reductions by helping them to find and engage with internal and external opportunities to reskill and upskill. We introduced a global minimum standard for outplacement. This ensured that all employees who were leaving Shell had access to an independent professional career coach who could offer individualised support.

The proportion of voluntary resignations in Shell was 4.4% in 2021 compared with 2.6% in 2020. The rate is low across a range of industries.

The table below shows actual employee numbers by geographical area. Note 27 to the "Consolidated Financial Statements" on page 258 provides the average number of employees by business segment.

Actual number of employees by geographical area

|  | | | Thousand |
| --- | --- | --- | --- |
|  | 2021 | 2020 | 2019 |
| Europe | 26 | 27 | 27 |
| Asia | 30 | 31 | 31 |
| Oceania | 2 | 3 | 2 |
| Africa | 4 | 4 | 4 |
| North America | 18 | 20 | 21 |
| South America | 1 | 2 | 2 |
| Total | 82 | 87 | 87 |

OUR PEOPLE continued

In 2021, a total of 271,000 formal training days were provided for employees and joint-venture partners, compared with 234,000 in 2020 and 373,000 in 2019. The increase was caused by the rise in the availability of virtual courses as we rapidly digitalised, enabling people to attend virtually. This allowed us to continue to invest in people and capabilities, while maintaining our focus on safety.

We have migrated to virtual courses and their uptake has increased from 2020, when people were still new to the virtual ecosystem. In 2021, learners embraced the virtual courses. This shows in the increase in the number of completions and the corresponding rise in training person days (TPD) of 37,000 compared with 2020.

EMPLOYEE COMMUNICATION AND INVOLVEMENT

Management regularly engages with our employees, including internally elected employee representatives, through a range of formal and informal channels. These include webcasts and all-staff messages from our Chief Executive Officer (CEO) Ben van Beurden, senior leader webcasts, town halls, team meetings, virtual coffee/chai connects, interviews with Senior Management, and online publications via our intranet. In 2021 Board members had virtual staff engagements and visited some sites such as Qatar, Shell Pernis, and Pennsylvanian Chemicals park to direct engagement with staff.

For further information on stakeholder engagement, see "Governance" on pages 128

The Shell People Survey is one of the principal tools used to measure employee engagement, motivation, affiliation and commitment to Shell. It provides insights into employees' views and has had a consistently high response rate. In 2021, the response rate was 83%, a decrease of 3.1 percentage points compared with 2020. This decrease was probably because of the timing of the survey, as many employees who were invited to take part were on a notice period before exiting Shell because of the Reshape reorganisation. Employees who are about to leave typically have a lower response rate than those who plan to stay with a company. The average employee engagement score was 75 points out of 100. This is a decrease of three points compared with 2020 but still reflects the resilience of our people in a year of change. This result gives Shell one of the leading employee engagement scores across a range of industries. The employee engagement score is based on a well-researched and validated model that combines satisfaction, motivation, affiliation, loyalty and dedication.

We provide our people with what they need to work in our offices and other locations, with flexibility for staff based on their reasonable business and personal needs. We also seek to provide what they need if they are working remotely. We enable, develop and improve their leadership abilities through global learning programmes, short- and long-term international assignments, and offering the possibility of moving between roles in different parts of the organisation. We help to increase the appeal of working for Shell through flexible working options, supportive policies such as a global minimum maternity leave of 16 weeks, regular engagements between management and employees, and career development tools such as individual development plans, coaching and formal training.

In 2021, we continued to support our people and assist in the fight against COVID-19. We continued our home-working ergonomics programme, providing funding for proper office equipment for home use for 5,000 employees in addition to the 50,000 we assisted in 2020. This included offering funding to new joiners for home-use office equipment. We also provided tips on setting up and maintaining good ergonomics, working with others virtually and maintaining productivity. Our Real Estate teams developed guidance on returning to site safely for all of our locations.

During and before the pandemic, we invested in the mental well-being of our employees through programmes such as World Mental Health Day, I'm Not Okay and the One Thing Wall. We also provided resources for our employees under the Care-for-Self programme.

Shell is one of more than 800 companies to have signed the Neptune Declaration, an international agreement sponsored by the Global Maritime Forum, promising to support seafarers during the COVID-19 pandemic. The support has included providing access to vaccines.

DIVERSITY, EQUITY AND INCLUSION

Our ambition is to become one of the most diverse and inclusive organisations in the world, a place where everyone – including employees, customers, partners and suppliers – feels valued and respected and has a strong sense of belonging. We believe that by achieving this ambition, we will contribute to a better and more equal world. We will also become a stronger organisation, with a richness of experience and views to guide us.

Living by our values

Our approach starts with living up to our core values of honesty, integrity and respect for people. These standards are set out in our Shell General Business Principles and our Code of Conduct. We want everyone to have a strong sense of belonging, irrespective of our differences. We launched two mandatory training courses for all staff in 2021: Respect in the Workplace and Conscious Inclusion. These will help us to continue to embed inclusive behaviours in our culture.

Powering lives DE&I commitments

We are focusing on removing barriers and creating equality of opportunity in four strategic priority areas: gender; race and ethnicity; lesbian, gay, bisexual and transgender (LGBT+); and enablement and disabilities inclusion, as set out in our powering lives commitments to diversity and inclusion.

Shell is working towards achieving 35% representation of women in our senior leadership positions by 2025 and 40% by 2030.

We aim to increase racial and ethnic representation across our workforce so that we better reflect the communities in which we work and live.

At Shell, we seek to provide a safe, caring and inclusive environment for LGBT+ and PWD (people with disabilities) staff so that they can be themselves and reach their full potential.

Gender

Our CEO Ben van Beurden is a Catalyst CEO Champion for Change. Like more than 70 other CEOs he has made an organisational and personal commitment to accelerate the advancement of women, including women of colour, into senior leadership and board positions. Shell also endorsed the World Economic Forum Call to Action on closing the gender gap in the oil and gas sector.

We aim to meet or exceed the target set by the external, UK-based Hampton-Alexander Review of having 33% female Board membership, progressing towards 50% or more representation. We have achieved this target. Currently six out of 12 of our Board members are women.

In an industry where women have been traditionally underrepresented, three of our five largest energy-trading divisions are led by women.

# Exhibit Q

In October, Zoë Yujnovich was appointed Upstream Director, joining Jessica Uhl, the Chief Financial Officer as the second woman on the eight-person Executive Committee.

In 2021, 47% of our graduate recruits were female, compared with 49% in 2020. As of December 31, 2021, the proportion of women in senior leadership positions was 29.5% (this value includes leavers still in the HR System). This was just short of our ambition to have 30% representation of women in our senior leadership positions by 2021, but it was also an increase of 1.7 percentage points compared with the end of 2020. "Senior leadership positions" comprises our top 1,250 leaders and is a Shell measure based on salary group levels and is distinct from the term "senior manager" in the statutory disclosures in the table below.

Gender diversity data (at December 31, 2021)

| Gender diversity data | | Men | | Women |
|---|---|---|---|---|
| Directors of the Company | 6 | 50% | 6 | 50% |
| Senior managers [A] | 619 | 71% | 254 | 29% |
| Employees (thousand) | 55 | 67% | 27 | 33% |

[A] Senior manager is defined in section 414C(9) of the Companies Act 2006 and, accordingly, the number disclosed comprises the Executive Committee members who were not Directors of the Company, and other directors of Shell subsidiaries.

## Race and ethnicity

We are working to address racial inequity. We seek to ensure everyone at Shell has equal opportunities and feels included. In 2020, we created the Shell Diversity and Inclusion (D&I) Council for Race, supported by a 20-member Employee Advisory Board composed of members from a diverse mix of racial and ethnic backgrounds. Sponsored by our CEO Ben van Beurden, Integrated Gas, Renewables and Energy Solutions Director Wael Sawan and Legal Director Donny Ching, the council aims to advance diversity in our workforce so that it better reflects communities where we work and from which we draw talent. Externally, in the USA, we work closely with the civil rights organisation National Urban League. In the UK, Shell was one of the first signatories to the Race at Work Charter of the Business in The Community organisation. We are part of Black Representation in Marketing (BRiM), a UK initiative to improve the representation of black people in marketing.

As of December 31, 2021, 8% of our Board members were from an ethnic minority.

In the USA:
- In 2021, 65% of our US employees were white; 33.2% were people of colour, with 13% Asian, 11.8% Hispanic/Latino, 8.4% black, and 1.8% in the Other category.
- We are launching mandatory anti-racism training for all US staff.

In the UK:
- In 2021, 78.5% of our UK employees identified as white and 21.5% were from an ethnic minority background. Our ethnic minority employees identified as Asian (13.1%), black (3.4%), mixed (2.4%) or another ethnic background (2.6%). As ethnicity declaration is voluntary, our ethnicity declaration rate is not 100% and all calculations are based on a declaration rate of 81%. The 19% of our workforce who have not provided data or have chosen not to declare their ethnicity were not included in our calculations.
- We have set a recruitment ambition to have 8% black representation in our graduate and experienced hires by 2025, to increase representation in line with UK society through actions such as mentoring and outreach.

- We co-sponsored the UK 2021 Race at Work survey conducted by the membership organisation Business in the Community.
- Shell in the UK was one of the first FTSE 100 companies to voluntarily publish ethnicity pay gap data in November 2020.

In the Netherlands, we began implementing our first Ethnic Inclusion action plan and established an employee sounding board to support this process.

We are focusing on the USA, UK and Netherlands because these are the Shell hubs where we see the most significant opportunities for representation and inclusion of minority staff.

## LGBT+

We are working to advance LGBT+ inclusion within Shell. We promote equal opportunity and create an environment where people feel included, regardless of sexual orientation or gender identity. Our approach reinforces respect for people and provides psychological safety for our LGBT+ employees in line with our core values. Most of our work around LGBT+ inclusion happens at a country level in line with local policies, laws and regulations. Shell is active in external organisations and activities that advance LGBT+ inclusion.

We benchmark ourselves externally, with consistent top-tier results. In 2021, in the USA we earned a perfect score of 100 points in the Human Rights Campaign Foundation's Corporate Equality Index, a recognition we have earned annually since 2016. Shell was rated as a top employer in the Workplace Pride Global Benchmark 2021 survey, with a score of 92.4%. We have also pledged support for the UN Standards of Conduct for Business that aim to eliminate discrimination against lesbian, gay, bisexual, transgender and intersex (LGBTI) people.

Shell has a global LGBT+ forum consisting of LGBT+ colleagues and allies. The forum now has 14 chapters globally. The LGBT+ focus area is sponsored by Chief Financial Officer Jessica Uhl. Jessica Uhl was included in the OUTstanding 2021 Ally Executives Role Model List, which recognises business leaders who help create more inclusive workplaces. Two of our LGBT+ colleagues were featured in the OUTstanding 2021 LGBT+ Future Leaders List.

## Enablement and disability inclusion

We are creating an environment where people with disabilities can excel. We provide support and make adjustments for people with disabilities during the recruitment process and throughout their careers with Shell. This includes equal access to valuable educational resources, training programmes, and emphasis on personal and professional development. In the UK, we partnered with PurpleSpace to launch a personal development programme called "Empowered and enABLED" to support employees with disabilities to build inner confidence, develop a sense of community and advocate for any adjustments or accommodations they require. In December 2021, we also launched a LinkedIn learning path called "Spotlight - Disability Inclusion: A Guide for Line Managers." This collection of learning resources helps Shell line managers to become more confident about issues relating to disability inclusion.

Our workplace accessibility (WPA) service currently serves 86 locations globally. Supported by functions such as Shell Health, HR, Real Estate and IT, WPA is designed to ensure that all employees have access to reasonable physical workplace or other adjustments so that they can work effectively and productively. We combined the home-working ergonomics programme with WPA to help all employees including those with disabilities to work from home effectively during the COVID-19 pandemic.

OUR PEOPLE continued

To further support staff with disabilities, we have created internal employee resource groups, including the enABLE networks that support and highlight the work of disabled employees in Shell. First launched in the UK in 2005, we now have 14 enABLE networks globally. In 2021, we formed the Global enABLEMENT Coalition, an internal forum bringing together enABLE networks and functions to create an inclusive, accessible and psychologically safe workplace for people with disabilities. The Enablement and disability inclusion focus area is sponsored by Harry Brekelmans, Projects & Technology Director and Huibert Vigeveno, Downstream Director.

Shell is a member of The Valuable 500, a global business group which seeks to eliminate the exclusion of disabled people and ensure that disability remains a priority for company leaders. Shell belongs to the Business Disability Forum. This is a membership organisation that brings business leaders, disabled people, and government together to understand how to improve the life opportunities and experiences of disabled people in employment, the economy and wider society. We belong to PurpleSpace, a networking and professional development hub for disabled employees, employee network leads and allies from all sectors and trades.

**Other diversity and inclusion targets: local national coverage**
We track local national coverage. This is the percentage of senior local nationals (those working in their respective base country and those expatriated) against the total number of senior leadership positions in their base country.

Local national coverage (at December 31) [A]

| | Number of selected key business countries | | |
| --- | --- | --- | --- |
| | December 31, 2021 | December 31, 2020 | December 31, 2019 |
| Greater than 80% | 13 | 10 | 12 |
| Less than 80% | 7 | 10 | 8 |
| Total | 20 | 20 | 20 |

[A] These numbers exclude those in companies with their own HR systems.

**CODE OF CONDUCT**
In line with the UN Global Compact Principle 10 (businesses should work against corruption in all its forms, including extortion and bribery), we maintain a global anti-bribery and corruption/anti-money laundering (ABC/AML) programme designed to prevent, detect, remediate and learn from potential violations. The programme is underpinned by our commitment to prohibit bribery, money laundering and tax evasion, and to conduct business in line with our Shell General Business Principles and Code of Conduct.

We do not tolerate the direct or indirect offer, payment, solicitation or acceptance of bribes in any form. Facilitation payments are also prohibited. The Shell Code of Conduct includes specific guidance for Shell staff (which comprises employees and contract staff), on requirements to avoid or declare actual, potential or perceived conflicts of interest, and on offering or accepting gifts and hospitality.

Regular communications from our leaders emphasise the importance of these commitments and compliance with requirements. These are reinforced with both global and targeted messages to ensure that Shell staff are kept reminded of their obligations. To support the Code of Conduct, we have mandatory risk-based procedures and controls that address a range of compliance risks and ensure that we focus resources, reporting and attention appropriately. By making a

commitment to our core values of honesty, integrity and respect for people, and by following the Code of Conduct, we protect Shell's reputation.

In 2021, the continuing COVID-19 pandemic brought additional focus on conduct risk, which arises from human behaviour, influenced by factors in the external environment. Our core values are undermined if decisions are taken which fall short of the expected standards of ethical behaviour and compliance. Our response to the pandemic remains to reiterate and emphasise that adherence to Shell's compliance rules (including the Code of Conduct) remains essential to protecting our business and helping us to make the right decisions for the future. While maintaining this basic position, pragmatic, risk-based mitigations have been implemented where appropriate to increase response speed and efficiency without undermining the intended purpose of our controls.

Our ethics and compliance requirements are articulated through our policies, standards and procedures and supported by the Ethical Decision-Making Framework, a tool to help staff think through and discuss, in a structured way, the legal, ethical and external consequences of decisions. They are communicated to Shell employees and contract staff and, where necessary and appropriate, to agents and business partners. We monitor and report internally on adherence to select ethics and compliance requirements, such as mandatory training completion and due diligence screening. We pay particular attention to our due diligence procedures when dealing with third parties. We also make our requirements clear to third parties through a variety of measures such as standard contract clauses. We offer a good practice anti-bribery and corruption e-learning course to third parties that may not have a training programme in place. We publish our Ethics and Compliance Manual on shell.com to demonstrate our commitment in this area.

The Shell Ethics and Compliance Office helps the businesses and functions to implement the ABC/AML and other programmes, assess risks and monitors and reports on progress. Legal counsel provides legal advice globally and supports the implementation of programmes. The Shell Ethics and Compliance Office regularly reviews and revises all ethics and compliance programmes to ensure they remain up to date with applicable laws, regulations and best practices. This includes incorporating results from relevant internal audits, reviews and investigations, and periodically commissioning external reviews and benchmarking.

We investigate all good-faith allegations of breaches of the Code of Conduct, however they are raised. We are committed to ensuring that all such incidents are investigated by specialists in accordance with our Investigation Principles. Allegations may be raised confidentially and anonymously through several channels, including the Shell Global Helpline operated by an independent provider.

Allegations of breaches of the Code of Conduct may be raised confidentially and anonymously through several channels, including the Shell Global Helpline, which is operated by an independent provider. In 2021, there were 1,479 entries to the Shell Global Helpline: 1,177 allegations and 302 inquiries. The Business Integrity Department is a specialist investigative unit within Shell Internal Audit that is responsible for managing the Shell Global Helpline and the Group level incident management procedures. The Board has delegated the oversight of the functioning of the Shell Global Helpline to the Audit Committee. The Audit Committee is also authorised to establish and monitor the implementation of procedures for the receipt, retention, proportionate and independent investigation and follow-up action of reported matters.

Violation of the Code of Conduct or its policies can result in disciplinary action, up to and including contract termination or dismissal. In some cases, we may report a violation to the relevant authorities, which could lead to legal action, fines or imprisonment.

Internal investigations confirmed 181 substantiated breaches of the Code of Conduct in 2021. As a result, we dismissed or terminated the contracts of a total of 67 employees and contract staff.

**EMPLOYEE SHARE PLANS**

We have a number of share plans designed to align employees' interests with our performance through share ownership. For information on the share-based compensation plans for Executive Directors, see the "Directors' Remuneration Report" on pages 156-160.

**PERFORMANCE SHARE PLAN, LONG-TERM INCENTIVE PLAN AND EXCHANGED AWARDS UNDER THE BG LONG-TERM INCENTIVE PLAN**

Under the Performance Share Plan (PSP), 50% of the award is linked to certain indicators described in "Performance indicators" on pages 35-36, averaged over the performance period. For 2018 to 2019, 12.5% of the award was linked to free cash flow (FCF) and the remaining 37.5% was linked to a comparative performance condition which involves a comparison with four of our main competitors over the performance period, based on three performance measures. For 2020, 11.25% of the award was linked to the FCF measure and 5% was linked to an energy transition measure. The remaining 33.75% was linked to the comparative performance condition. From 2021, 10% of the award is linked to the FCF measure and 10% is linked to an energy transition measure. The remaining 30% is linked to the comparative performance condition.

Under the Long-term Incentive Plan (LTIP) awards made in 2018, 25% of the award is linked to the FCF measure and the remaining 75% is linked to the comparative performance conditions mentioned above. For 2019 and 2020, 22.5% of the award is linked to the FCF measure and 10% is linked to an energy transition measure. The remaining 67.5% is linked to the comparative performance condition mentioned above. From 2021, 20% of the award is linked to the FCF measure and 20% is linked to an energy transition measure. The remaining 60% is linked to the comparative performance condition.

Separately, following the BG acquisition, certain employee share awards made in 2015 under BG's Long-term Incentive Plan were automatically exchanged for equivalent awards over shares in the Company. The outstanding awards take the form of nil-cost options.

Under all plans, all shares that vest are increased by an amount equal to the notional dividends accrued on those shares during the period from the award date to the vesting date. In certain circumstances, awards may be adjusted before delivery or subject to clawback after delivery. None of the awards result in beneficial ownership until the shares vest.

See Note 22 to the "Consolidated Financial Statements" on page 252..

**RESTRICTED SHARE PLAN**

Under the Restricted Share Plan, awards are made on a highly selective basis to senior staff. Shares are awarded subject to a three-year retention period. All shares that vest are increased by an amount equal to the notional dividends accrued on those shares during the period from the award date to the vesting date. In certain circumstances, awards may be adjusted before delivery or subject to clawback after delivery.

**GLOBAL EMPLOYEE SHARE PURCHASE PLAN**

Eligible employees in participating countries may participate in the Global Employee Share Purchase Plan. This plan enables them to make contributions from net pay towards the purchase of the Company's shares at a 15% discount to the market price, either at the start or at the end of an annual cycle, whichever date offers the lower market price.

**UK SHELL ALL EMPLOYEE SHARE OWNERSHIP PLAN**

Eligible employees of participating Shell companies in the UK may participate in the Shell All Employee Share Ownership Plan, under which monthly contributions from gross pay are made towards the purchase of the Company's shares. For every six shares purchased by the employee, one matching share is provided at no cost to the employee.

**UK SHARESAVE SCHEME**

Eligible employees of participating Shell companies in the UK have been able to participate in the UK Sharesave Scheme. Options have been granted over the Company's shares at market value on the invitation date. These options are normally exercisable after completion of a three-year or five-year contractual savings period. From 2017 no further grants were made under this plan.

Separately, following the acquisition of BG, certain participants in the BG Sharesave Scheme chose to roll over their outstanding BG share options into options over the Company's shares. The BG option price (at a discount of 20% to market value) was converted into an equivalent Company option price at a ratio agreed with HM Revenue and Customs. These options are normally exercisable after completion of a three-year contractual savings period. As of December 31, 2021, there are no outstanding UK Sharesave or BG Sharesave options.

**POWERING PROGRESS SHARE AWARD**

This was a one-off share award granted to all eligible employees of Shell on June 18, 2021. This award supports employee engagement in the Powering Progress strategy. These awards vest at the end of a one-year period. All shares that vest are increased by an amount equal to the notional dividends accrued on those shares during the period from the award date to the vesting date.

Exhibit Q

THE BOARD OF SHELL PLC



**SIR ANDREW MACKENZIE**
Chair

**Tenure**
Chair - Nine months (appointed Chair May 18, 2021)
On Board - one year and five months (appointed October 1, 2020)

**Board committee membership**
Chair of the Nomination and Succession Committee

**Outside interests/commitments**
Fellow of the Royal Society (FRS)
Chair of UK Research and Innovation (UKRI)

**Age**
65

**Nationality**
British

**Career**

Sir Andrew Mackenzie was appointed Chair of the Board of Shell plc with effect from May 18, 2021. Sir Andrew joined BHP, the world's largest mining company, in 2008, and served as Group CEO from 2013 to 2019, when he systematically simplified and strengthened the business, and created options for the future. He also made BHP the first miner to pledge to tackle emissions caused when customers use its products.

From 2004 to 2007 at Rio Tinto, he was Head of Industrial Minerals, then Head of Industrial Minerals and Diamonds. Prior to this, Sir Andrew spent 22 years with BP, joining in 1982 in research and development, followed by international operations and technology roles across most business streams and functions – principally in exploration and production, and petrochemicals, including as Chief Reservoir Engineer and Chief Technology Officer. Latterly he was Group Vice President for Chemicals in the Americas, then Olefins and Polymers globally.

From 2005 to 2013 Sir Andrew served as a Non-executive Director of Centrica. He has also served on many not-for-profit boards, including public policy think-tanks in the UK and Australia. He was knighted in 2020 for services to business, science, technology and UK-Australia relations.

**Relevant skills and experience**

Sir Andrew is a highly experienced leader who has managed major international FTSE 100 businesses, and has more than 30 years' experience in the oil and gas, petrochemicals and minerals industry. Following early academic distinction, Sir Andrew made important contributions to geochemistry, including groundbreaking methods for oil exploration and recovery. He was recognised as "one of the world's most influential earth scientists" and made a Fellow of the Royal Society in 2014.

Having lived and worked on five continents, Sir Andrew has applied his deep understanding of the energy business and geopolitical outlook to create public-private partnerships and advise governments around the world. As an earth scientist, Sir Andrew has consistently pursued sustainable action on climate change in the interests of access to affordable energy and global development. Sir Andrew has brought the wealth of his experience and insights to Shell, where his expertise has been helping Shell navigate the energy transition. Sir Andrew is also a committed champion of gender balance, the rights of indigenous peoples, and of the power of large companies to support social change – all of which align closely with Shell's purpose, strategy and values.

In June 2021, Sir Andrew was appointed the chair of UK Research and Innovation. Sir Andrew has been tasked with driving forward the government's ambitious research and innovation agenda.



**EULEEN GOH**
Deputy Chair and Senior Independent Director

**Tenure**
Seven years and six months (appointed September 1, 2014).
Euleen was appointed Deputy Chair and Senior Independent Director on May 20, 2020.

**Board committee membership**
Member of the Nomination and Succession Committee and member of the Remuneration Committee

**Outside interests/commitments**
Chair of SATS Ltd. Trustee of the Singapore Institute of International Affairs Endowment Fund. Chair of the Singapore Institute of Management Pte Ltd and Non-executive Director of Singapore Health Services Pte Ltd, both of which are not-for-profit organisations. Euleen was appointed as a Member of the Singapore Public Service Commission on April 1, 2021.

**Age**
66

**Nationality**
Singaporean

**Career**

Euleen is an Associate of the Institute of Chartered Accountants in England and Wales, a Fellow of the Singapore Institute of Chartered Accountants, and has professional qualifications in banking and taxation. She has held various senior management positions within Standard Chartered Bank and was Chief Executive Officer of Standard Chartered Bank, Singapore, from 2001 until 2006. She is also a Fellow of the Singapore Institute of Directors.

She has also held non-executive appointments on various boards including Aviva plc, MediaCorp Pte Ltd, Singapore Airlines Ltd, Singapore Exchange Ltd, Standard Chartered Bank Malaysia Berhad, Standard Chartered Bank Thai plc, CapitaLand Ltd, Temasek Trustees Pte Ltd, DBS Bank Ltd and DBS Group Holdings Ltd. She was previously Non-executive Chair of the Singapore International Foundation, and Chair of International Enterprise Singapore and the Accounting Standards Council, Singapore.

**Relevant skills and experience**

Euleen's current roles as chair of the board of directors of various international organisations provide significant experience in the area of strategy development and international businesses. She is highly regarded both externally and within Shell as a champion of diversity. She consistently, but constructively challenges the Board and management to continue to progress in this area.

Based in Singapore and having been Chair of the Risk Committee of the largest bank in Southeast Asia, Euleen is close to key emerging/growth markets for our business. Euleen's risk management expertise has elevated the Board's deep deliberations around risk governance, and her voice is regularly heard on discussions regarding appropriate risk appetite. Her extensive travel around the world through her various executive and non-executive roles, has equipped her with broad geopolitical insight and significant knowledge of operating in the Asian markets.

Euleen uses her financial acumen and advocacy for diversity to pose probing and insightful questions, both in and beyond the boardroom. This contributes to well-rounded, incisive and inclusive Board discussions.

THE BOARD OF SHELL PLC continued



**BEN VAN BEURDEN**
Chief Executive Officer
**Tenure**
Eight years and two months (appointed January 1, 2014)

**Board committee membership**
N/A

**Outside interests/commitments**
Ben joined the Supervisory Board of Daimler AG as a Non-executive Director in April 2021.

**Age**
63
**Nationality**
Dutch

**Career**
Ben was Downstream Director from January to September 2013. Before that, he was Executive Vice President Chemicals from 2006 to 2012. In this period, he also served on the boards of a number of leading industry associations, including the International Council of Chemicals Associations and the European Chemical Industry Council. Previously, he held a number of operational and commercial roles in Upstream and Downstream, including Vice President Manufacturing Excellence. He joined Shell in 1983, after graduating with a master's degree in chemical engineering from Delft University of Technology, the Netherlands.

**Relevant skills and experience**
Ben has more than 38 years' experience of working for Shell. He has built a deep understanding of the industry and has proven management experience in technical and commercial roles.

Ben has led Shell to build resilience and deliver strong financial results. In 2016, he steered the Company through the acquisition and integration of the BG Group, which accelerated Shell's business strategy and led to a streamlining divestment programme of $30 billion of non-core assets.

Under his leadership, Shell has positioned itself to help tackle climate change. Shell has set a target of becoming a net-zero emissions energy business by 2050, in step with society.

In 2020, in the unprecedented circumstances of the COVID-19 pandemic, Shell took decisive action to maintain its financial resilience. Ben also led plans for a strategic reorganisation, which took effect in August 2021. This was aimed at setting Shell up to succeed in the energy transition by making the business nimbler and better able to respond to customers. In February 2021, Shell set out Powering Progress, a detailed strategy which describes our commitments under four goals: generating shareholder value, achieving net-zero emissions, powering lives and respecting nature.

In November 2021, the Company announced a simplification of its structure. As a result, Ben has relocated to the UK.



**JESSICA UHL**
Chief Financial Officer
**Tenure**
Five years (appointed March 9, 2017)

In November 2021, the Company announced a simplification of its structure. As a result, Jessica has relocated to the UK. However, due to family circumstances a long-term relocation to the UK is not sustainable and as a result Jessica will step down from her role on March 31, 2022. Jessica will be available to assist Sinead Gorman, who will become CFO effective April 1, 2022, and the Board with transition matters until June 30, 2022. She will then leave Shell.

**Board committee membership**
N/A

**Outside interests/commitments**
Jessica joined the Board of Goldman Sachs Group as Non-executive Director on July 1, 2021.

**Age**
54
**Nationality**
US citizen

**Career**
Jessica was Executive Vice President Finance (EVP) for the Integrated Gas business from January 2016 to March 2017. Previously, she was EVP Finance for Upstream Americas from 2014 to 2015, Vice President Finance for Upstream Americas Unconventionals from 2013 to 2014, VP Controller for Upstream and Projects & Technology from 2010 to 2012, VP Finance for the global Lubricants business from 2009 to 2010, and Head of External Reporting from 2007 to 2009. She joined Shell in 2004 in finance and business development, supporting the Renewables business.

Before joining Shell, Jessica worked for Enron in the USA and Panama from 1997 to 2003 and for Citibank in San Francisco, USA, from 1990 to 1996. She obtained a BA from UC Berkeley in 1989 and an MBA at INSEAD in 1997.

**Relevant skills and experience**
Jessica is a highly regarded executive with a track record of delivering key business objectives, from cost leadership in complex operations to mergers and acquisitions. Jessica's professional background combines an external perspective with more than 17 years of Shell experience. She has held finance leadership roles in Europe and the USA, in Shell's Upstream, Integrated Gas and Downstream businesses, and in Projects & Technology and Corporate.

Jessica was appointed CFO in the year following the BG acquisition, when Shell's debt, gearing and development costs were high and when the oil price was still recovering from the lower levels of 2016. Jessica responded to these challenging conditions with enthusiasm, clarity and discipline and has overseen Shell's delivery of industry-leading cash flow from operating activities.

Jessica drove decisive counter measures to protect the long-term financial health of the organisation, strengthen its balance sheet and preserve cash while ensuring the safe continuity of the business.

Jessica has also been a leading voice for transparency in the energy industry, including on taxes and climate change. Under her tenure, Shell has continued to expand and enhance disclosures related to climate change in line with the principles of the Task Force on Climate-Related Financial Disclosures. Under her guidance, from 2019, Shell began publishing an annual Tax Contribution Report. This includes country-by-country report data, a standard set by the Organisation for Economic Co-operation and Development (OECD).



**DICK BOER**
Independent Non-executive Director
**Tenure**
One year and nine months (appointed May 20, 2020)

**Board committee membership**
Member of the Audit Committee and member of the Nomination and Succession Committee

**Outside interests/commitments**
Non-executive Director of Nestlé and SHV Holdings; Chair of the Advisory Board for G-Star RAW; Chair of the Supervisory Board of Royal Concertgebouw; Chair of Rijksmuseum Fonds

**Age**
64

**Nationality**
Dutch

**Career**
Dick was President and Chief Executive Officer of Ahold Delhaize from 2016 to 2018. Prior to the merger between Ahold and Delhaize, he served as President and CEO of Royal Ahold from 2011 to 2016. From 2006 to 2011 he was a member of the Executive Board of Ahold and served as Chief Operating Officer of Ahold Europe from 2006 to 2011.

Dick joined Ahold in 1998 as CEO of Ahold Czech Republic and was appointed President and CEO of Albert Heijn in 2000. In 2003, he also became President and CEO of Ahold's Dutch businesses.

Prior to joining Ahold, Dick spent more than 17 years in various retail positions, for SHV Holdings N.V. in the Netherlands and abroad, and for Unigro N.V.

**Relevant skills and experience**
Dick is a highly regarded, recently retired chief executive, who has a deep understanding of brands and consumers, and extensive knowledge of the US and European markets, from his time leading one of the world's largest food retail groups. He brings a career's worth of experience at the forefront of retailing and customer service, which extended in more recent years to e-commerce and the digital arena. This experience is most timely as Shell focuses on the growth of our marketing businesses and increasing consumer choices in energy products.

Dick is a balanced leader with sound business judgement and a proven track record in strategic delivery, evidenced by the combination of Ahold and Delhaize. He also has a passion for sustainability and is well aware of the importance of the various stakeholder interests in this area.



**NEIL CARSON OBE**
Independent Non-executive Director
**Tenure**
Two years and nine months (appointed June 1, 2019)

**Board committee membership**
Chair of the Remuneration Committee and member of the Safety, Environment and Sustainability Committee

**Outside interests/commitments**
Non-executive Chair of Oxford Instruments plc

**Age**
64

**Nationality**
British

**Career**
Neil is a former FTSE 100 chief executive. After completing an engineering degree, Neil joined Johnson Matthey in 1980 where he held several senior management positions in the UK and the USA, before being appointed Chief Executive Officer in 2004. Since retiring from Johnson Matthey in 2014, Neil has focused his time on his non-executive roles. He was Chair of TT Electronics plc from 2015 until May 6, 2020.

**Relevant skills and experience**
Neil is highly experienced, has a broad industrial outlook and a highly commercial approach with a practical perspective on businesses. He brings a track record of strong operational exposure, familiarity with capital-intensive business and a first-class international perspective on driving value in complex environments. Neil was awarded an OBE for services to the chemical industry in 2016. Neil uses his current and past experience in non-executive positions to bring fresh insight and industry understanding to Board discussions. He has also provided valuable insight based on his former executive position and operational experience. Neil was appointed Chair of the Remuneration Committee on May 20, 2020.

Exhibit Q

THE BOARD OF SHELL PLC continued



**ANN GODBEHERE**
Independent Non-executive Director
*Tenure*
Three years and nine months (appointed May 23, 2018)

*Board committee membership*
Chair of the Audit Committee, and member of the Nomination and Succession Committee

*Outside interests/commitments*
Non-executive Director and audit committee chair of Stellantis N.V., Fellow of the Institute of Chartered Professional Accountants and a Fellow of the Certified General Accountants Association of Canada.

*Age*
66

*Nationality*
Canadian and British

**Career**
Ann started her career with Sun Life of Canada in 1976 in Montreal, Canada. She joined M&G Group in 1981, where she served as Senior Vice President and Controller for both life and health, and property and casualty businesses throughout North America. She joined Swiss Re in 1996, after it acquired the M&G Group, and served as Chief Financial Officer from 2003 to 2007. From 2008 to 2009, she was interim Chief Financial Officer and an Executive Director of Northern Rock bank in the initial period following its nationalisation.

Ann has also held several non-executive positions at Prudential plc, British American Tobacco plc, UBS AG, and UBS Group AG. Ann served as a non-executive director of Rio Tinto plc and Rio Tinto Limited until May 2019, and she was also Senior Independent Director of Rio Tinto plc. In January 2021, Ann joined the Board of the newly formed Stellantis NV, and she chairs its Audit Committee.

**Relevant skills and experience**
Ann is a former CFO, a Fellow of the Institute of Chartered Professional Accountants, and has more than 25 years of experience in the financial services sector. She has worked her entire career in international business and has lived in or served on boards in nine countries. Ann makes significant contributions and adds exceptional value by bringing both her extensive experience and a global perspective to Board discussions.

Ann's long and varied international business career powered by her financial acumen is reflected in the insights and constructive challenges she brings to the boardroom. As Audit Committee Chair, Ann leverages her background to ensure robust discussions are consistently held as the Audit Committee delivers its remit.



**JANE HOLL LUTE**
Independent Non-executive Director
*Tenure*
Nine months (appointed May 19, 2021)

*Board committee membership*
Member of the Audit Committee

On March 9, 2022, the Board announced that Jane would step down from her role on the Audit Committee and had been appointed a member of the Safety, Environment and Sustainability Committee, with effect from the conclusion of the 2022 Annual General Meeting (AGM).

*Outside interests/commitments*
Non-executive Director of Marsh and McLennen and the Union Pacific Corporation

*Age*
65

*Nationality*
US citizen

**Career**
Jane was President and Chief Executive Officer of the North American operations of SICPA security inks from 2017 to 2021, when she assumed the role of Non-executive strategic director. From 2018 to 2021, Jane was a Non-executive Director of Atlas Air Worldwide Holdings Inc. In 2013 Jane established and led the Council on CyberSecurity, an independent, expert not-for-profit organisation with a global scope, committed to the security of an open internet. From 2015 to 2016 Jane held the role of Chief Executive Officer of the Center for Internet Security, an independent not-for-profit organisation that works to improve cyber security worldwide.

Before this, from 2009 to 2013 Jane served as Deputy Secretary of the US Department of Homeland Security, functioning as the Chief Operating Officer for the third-largest US Federal department. From 2003 to 2009 she held various roles at the United Nations, including Acting Under-Secretary and Assistant Secretary-General for Peacekeeping, Field Support and Peacebuilding. She also served as Executive Vice President and Chief Operating Officer of the United Nations Foundation and Better World Fund. In recent years, Jane has returned to working with the United Nations, serving as a Special Adviser to the Secretary-General.

Jane started her career in the US Army in 1978, serving in Berlin during the Cold War, on the US Central Command Staff during Operation Desert Storm, and on the National Security Council Staff under Presidents George H.W. Bush and William J. Clinton. After retiring from the Army in 1994, she joined the Carnegie Corporation as an Executive Director of its Commission on Preventing Deadly Conflict.

**Relevant skills and experience**
Jane is a proven and effective leader, who has held significant leadership roles in public service, the military and the private sector. She brings a wealth of expertise in matters of public policy, cyber security and risk management to our Board. She has also made significant contributions to strategic discussions and overseeing the day-to-day business and management of a significant public security department.

Jane is an experienced board director, having served on the boards of large-market-capitalisation companies since 2016. These appointments have provided her with wide business perspectives across different sectors and geographical regions. She has also served on various committees including those which focus on audit, environmental and sustainability, nomination and governance issues.

Exhibit Q



### CATHERINE J. HUGHES
Independent Non-executive Director

**Tenure**
Four years and nine months (appointed June 1, 2017)

**Board committee membership**
Chair of the Safety, Environment and Sustainability Committee and member of the Remuneration Committee

**Outside interests/commitments**
—

**Age**
59

**Nationality**
Canadian and French

### Career
Catherine was Executive Vice President International at Nexen Inc. from January 2012 until her retirement in April 2013, where she was responsible for all oil and gas activities including exploration, production, development and project activities outside Canada. She joined Nexen in 2009 as Vice President Operational Services, Technology and Human Resources.

Prior to joining Nexen Inc., she was Vice President Oil Sands at Husky Oil from 2007 to 2009 and Vice President Exploration & Production Services, from 2005 to 2007. She started her career with Schlumberger in 1986 and held key positions in various countries, including France, Italy, Nigeria, the UK and the USA, and was President of Schlumberger Canada Ltd for five years.

Catherine has also held several non-executive director positions at SNC-Lavalin Group Inc, Statoil ASA and Precision Drilling Inc.

### Relevant skills and experience
Catherine contributes through her knowledge of industry and the ease with which she engages with other Directors and managers in the boardroom. With over 30 years of oil and gas sector experience, she brings a geopolitical outlook and deep understanding of the industry. An engineer by training, she has also spent a significant part of her career working in senior human resources roles. The Board highly regards her perspectives on our industry and our most important asset, our people.

Catherine has a strong track record of executing operational discipline with a focus on performance metrics and a continual drive for excellence. Her knowledge of the technology underpinning oil and gas operations, logistics, procurement and supply chains benefits the Board greatly as it considers various projects and investment or divestment proposals.

She also uses her industry knowledge – combined with her commitment to the highest standards of corporate governance and safety, ethics and compliance – in her role as Chair of our Safety, Environment and Sustainability Committee, while using her human resources experience in her membership of the Remuneration Committee.



### MARTINA HUND-MEJEAN
Independent Non-executive Director

**Tenure**
One year and nine months (appointed May 20, 2020)

**Board committee membership**
Member of the Audit Committee

**Outside interests/commitments**
Non-executive Director of Prudential Financial Inc., Colgate-Palmolive Company, and Truata Ltd.

**Age**
61

**Nationality**
German and US citizen

### Career
Martina was Chief Financial Officer of Mastercard Inc. from 2007 to 2019. From 2002 to 2007 she was Senior Vice President, Corporate Treasurer at Tyco International Ltd. and from 2000 to 2002 she was Senior Vice President, Treasurer at Lucent Technologies.

Prior to this, Martina spent 12 years with General Motors, undertaking a number of senior roles within their finance operations.

### Relevant skills and experience
Originally from Germany, Martina has spent 30 years in the USA and is an experienced global executive. Her financial and operational leadership of technology-focused companies is extremely relevant as Shell explores new technology-enabled business models. Martina also brings diverse sector experience to the Board, most recently from operating at a large global organisation in the highly regulated finance industry.

Martina is known for her straightforward and direct approach. She maintains the highest standards of leadership, strategic thinking and financial stewardship. She also has a strong track record as a mentor and in promoting diversity.

Martina's deep financial knowledge and unique perspective also enable her to make robust, demanding and constructive challenges to our investment considerations to help ensure that our projects are aligned with our strategic intent.

123

THE BOARD OF SHELL PLC continued



**ABRAHAM SCHOT**
Independent Non-executive Director

**Tenure**
One year and five months (appointed October 1, 2020)

**Board committee membership**
Member of the Safety, Environment and Sustainability Committee

On March 9, 2022, the Board announced that Bram would be appointed a member of the Remuneration Committee, with effect from the conclusion of the 2022 Annual General Meeting (AGM).

**Outside interests/commitments**
The Board of Signify N.V. has proposed to its shareholders that Bram join its supervisory board. Signify shareholders are scheduled to vote on this proposal at its AGM scheduled to be held on May 17, 2022.

**Age**
60

**Nationality**
Dutch

**Career**
Bram has been a member of the group Board of Volkswagen AG, responsible for the Premium Car Group, CEO of Audi AG, Chair of Lamborghini and Ducati, responsible for the VW group Commercial Operations and Vice-Chair of Porsche Holding Salzburg.

From 2011 to 2016 he was a Member of the Board of Volkswagen CV, Executive Vice President responsible for Global Marketing, Sales & Services, New Business Models. In 2017 he became a member of the Board of Audi AG. From 2006 to 2011 Bram was President & CEO of Daimler/Mercedes-Benz Italia & Holding S.p.A. From 2003 to 2006 he was President & CEO of DaimlerChrysler in the Netherlands.

Prior to this, Bram held a number of Director and senior leadership roles within Mercedes-Benz in the Netherlands, having joined the business in 1987 on an executive management programme.

**Relevant skills and experience**
Bram has over 30 years' experience working in the automotive industry at all levels of the business.

He gained a wealth of knowledge on far-reaching cost optimisation programmes at Audi AG. These helped transform the car company into a provider of electric vehicles that could offer sustainable mobility and succeed in the energy transition. He is well placed to leverage this knowledge in the Shell boardroom as Shell navigates its own transformation and pathway through the energy transition.

Bram has strong principles and regards integrity and compliance as the basis for doing business.

His studies have encompassed innovation and organisational effectiveness, geopolitical environments, shareholder value, corporate social responsibility and risk management, in several countries, which are all highly valued management tools and are evident in the questions he raises in the boardroom.



**GERRIT ZALM**
Independent Non-executive Director

**Tenure**
Nine years and two months (appointed January 1, 2013)

On March 9, 2022, the Board announced that Gerrit Zalm would not be seeking re-election at the 2022 AGM and would be stepping down from the Board of Shell plc.

**Board committee membership**
Member of the Audit Committee and member of the Remuneration Committee

**Outside interests/commitments**
Director of Moody's Corporation Inc. and Danske Bank A/S

**Age**
69

**Nationality**
Dutch

**Career**
Gerrit was an adviser to PricewaterhouseCoopers during 2007, Chair of the Trustees of the International Accounting Standards Board from 2007 to 2010, and an adviser to Permira from 2007 to 2008. He was Chief Economist of DSB Bank from July 2007 to January 2008, Chief Financial Officer from January 2008 to December 2008, and Chair of the Managing Board of ABN AMRO Bank N.V. from 2010 to 2016. He was Minister of Finance of the Netherlands, twice, from 1994 to 2002 and from 2003 to 2007. In between, he was Chair of the parliamentary party of the VVD.

Prior to 1994, he was head of the Netherlands Bureau for Economic Policy Analysis, a professor at Vrije Universiteit Amsterdam, and held various positions at the Ministry of Finance and the Ministry of Economic Affairs. He studied general economics at Vrije Universiteit Amsterdam, from where he also received an honorary doctorate in economics.

**Relevant skills and experience**
An economist by background, Gerrit's distinguished 12-year service as the Minister of Finance of the Netherlands, and his experience gained from his time with ABN AMRO Bank, bring a deep and valuable understanding of Dutch politics and financial markets to the Board. His international financial management expertise and strategic development experience also benefit the Audit Committee.

A highly regarded and seasoned leader in both the public and private spheres, his significant experience in analysing financial commitments from a wider public stakeholder and a global business standpoint serves the Board well, particularly when considering investment proposals. Gerrit consistently and concisely articulates the logic and reasoning behind his views, which he regularly and directly provides to the benefit of the Board and management. His questions often trigger other analytical questions from fellow Directors, deepening and widening Board discussions.

Exhibit Q



**LINDA M. COULTER**
Company Secretary

**Tenure**
Five years and two months (appointed January 1, 2017)

**Age**
54

**Nationality**
US citizen

**Career**
Linda was General Counsel of the Upstream Americas business and Head of Legal US, based in the USA, from 2014 to 2016. Previously, she was Group Chief Ethics and Compliance Officer, based in the Netherlands, from 2011 to 2014. Since joining Shell in 1995, she has also held a variety of legal positions in the Shell Oil Company in the USA, including Chemicals Legal Managing Counsel and other senior roles in employment, litigation, and commercial practice.

**Relevant skills and experience**
Linda is our Company Secretary and plays an important role as Shell's General Counsel Corporate, overseeing corporate legal teams in Canada, the Netherlands, the UK and the USA.

The various legal roles Linda has undertaken at our headquarters, and in supporting both the Upstream and Downstream businesses, have provided her with a strong understanding of our global operations and people. Her experience of engaging with the Board in previous roles, coupled with her broad understanding and engagement across Shell's businesses and functions, helps to ensure that the right matters come to the Board at the right time.

**ATTENDANCE**

The Board met 12 times during 2021. One meeting was held physically in The Hague, the Netherlands and one meeting was held in London, United Kingdom. The remainder were held via videoconference in the context of COVID-19 circumstances. Attendance during 2021 for all Board meetings is given in the table below [A].

[A] For attendance at Committee meetings during the year, please refer to individual Committee Reports.
[B] Charles O. Holliday retired from the Board following the AGM in May 2021.
[C] Jane Holl Lute joined the Board in May 2021.
[D] Sir Nigel Sheinwald retired from the Board following the AGM in May 2021.
[E] Jessica Uhl was unable to join an ad hoc Board meeting connected to the Simplification due to a family medical emergency.

| Board member | Meetings attended |
|---|---|
| Ben van Beurden | 12/12 |
| Dick Boer | 12/12 |
| Neil Carson | 12/12 |
| Ann Godbehere | 12/12 |
| Euleen Goh | 12/12 |
| Charles O. Holliday [B] | 3/3 |
| Jane Holl Lute [C] | 9/9 |
| Catherine J. Hughes | 12/12 |
| Martina Hund-Mejean | 12/12 |
| Sir Andrew Mackenzie | 12/12 |
| Bram Schot | 12/12 |
| Sir Nigel Sheinwald [D] | 3/3 |
| Jessica Uhl [E] | 11/12 |
| Gerrit Zalm | 12/12 |

**DIRECTOR INDEPENDENCE**
All the Non-executive Directors are considered by the Board to be independent in character and judgement. The Chair is not subject to the Code's independence test other than on appointment.

Exhibit Q

SENIOR MANAGEMENT

The Senior Management of the Company comprises the Executive Directors, Ben van Beurden and Jessica Uhl, and those listed below. All are members of the Executive Committee (see "Governance Framework" on page 120).



**HARRY BREKELMANS**
Projects & Technology Director

Tenure
Seven years and five months (appointed October 2014)

Age
56

Nationality
Dutch

Career
Harry was previously Executive Vice President Upstream International Operated, based in the Netherlands. He joined Shell in 1990 and has held various management positions in Exploration and Production, Internal Audit, and Group Strategy and Planning. From 2011 to 2013, he was Country Chair Russia and Executive Vice President for Russia and the Caspian region. In November 2021, Harry played a key role in the partnership of Shell with energy technology firm Baker Hughes Co., in an effort to help the partnership achieve their targets of net-zero carbon emissions.



**RONAN CASSIDY**
Chief Human Resources and Corporate Officer

Tenure
Six years and two months (appointed January 2016)

Age
55

Nationality
British

Career
Ronan previously served as EVP HR for both the Downstream and Upstream International businesses in turn. He joined Shell in 1988 and has held various HR positions across the Shell value chain, including regional roles in Europe and NE Asia/China, and global roles in HR Strategy & Regional Coordination, Retail and LPG.



**DONNY CHING**
Legal Director

Tenure
Eight years and one month (appointed February 2014)

Nationality
Malaysian

Career
Donny was previously General Counsel for Projects & Technology, based in the Netherlands. He joined Shell in 1988 based in Australia and then moved to Hong Kong and later to London. In 2008, he was appointed Head of Legal at Shell Singapore, having served as Associate General Counsel for Gas & Power in Asia-Pacific.



**ED DANIELS**
Strategy, Sustainability and Corporate Relations Director

Tenure
One month (appointed February 2022)

Age
56

Nationality
British

Career
Ed was previously Executive Vice President Strategy, Portfolio & Sustainability. He joined Shell in 1988 and has held roles in Shell's Upstream, Integrated Gas, and Downstream businesses and our Projects & Technology organisation. He previously served as Shell's UK Country Chair.

Exhibit Q

SENIOR MANAGEMENT continued



**WAEL SAWAN**
Integrated Gas, Renewables and Energy Solutions Director

Tenure
Two years and eight months (appointed July 2019)

Age
47

Nationality
Lebanese and Canadian

Career
On October 25, 2021, Wael succeeded Maarten Wetselaar as Integrated Gas, Renewables and Energy Solutions Director.

Wael was previously the Upstream Director and a member of the Executive Committee. Before that, he was Executive Vice President Deep Water and a member of the Upstream Leadership Team. He joined Shell in 1997 and worked in a variety of roles in each of Shell's core business units: Upstream, Integrated Gas and Downstream.



**ZOË YUJNOVICH**
Upstream Director

Tenure
Five months (appointed October 2021)

Age
46

Nationality
Australian

Career
On October 25, 2021, Zoë succeeded Wael Sawan as Upstream Director and was appointed to the Executive Committee.

Zoë has held various management positions in Downstream, Integrated Gas and Upstream. Most recently, she served as Executive Vice President Conventional Oil & Gas and was previously Chair and Executive Vice President Shell Australia Pty Ltd. She joined Shell from Rio Tinto in 2014 to lead the company's Oil Sands business in Canada.



**HUIBERT VIGEVENO**
Downstream Director

Tenure
Two years and two months (appointed January 2020)

Age
52

Nationality
Dutch

Career
Huibert was previously Executive Vice President Global Commercial. He joined Shell in 1995 as a business analyst and led many Downstream businesses across Shell in Europe, Africa, North and South America as well as Asia. In 2009, Huibert was appointed Vice President Supply & Distribution, Europe and Africa. In 2012 he became Executive Chair of Shell in China, and in 2016 led the integration of BG Group.

**SINEAD GORMAN**
EVP Finance Upstream

Age
44

Nationality
British

Career
As announced on March 1, 2022, Sinead is to be appointed Chief Financial Officer of Shell plc, effective April 1, 2022. She will become a member of Shell's Executive Committee and the Board of Directors.

Since joining Shell in 1999, Sinead has held key leadership roles in Finance across Shell. She started her Shell career in Trading, working in the Shell International Trading and Shipping Company (STATSCO) based in London, UK, and the Coral Energy joint venture, in Houston, Texas, USA. She worked in Mergers and Acquisitions and Treasury, based in the Netherlands before moving back to Houston as the VP Finance Shales. She served as the Executive Vice President Finance for Projects & Technology, and then became the Executive Vice President Finance for Integrated Gas and New Energies. Sinead is currently Executive Vice President Finance for Upstream based in the Netherlands.

Sinead holds a Masters in Engineering, Economics and Management from the University of Oxford and an MSc in Finance from London Business School.

GOVERNANCE

**MANAGEMENT AND DIRECTORS**

The Company has a single-tier Board of Directors headed by a Chair, with management led by a CEO. See "The Board of Shell plc" on page 119 to 125 and Senior Management on page 126.

**EXECUTIVE COMMITTEE**

The current composition of the Executive Committee is as follows:

Executive Committee

| | |
|---|---|
| Ben van Beurden | CEO [A] [B] |
| Jessica Uhl | CFO [A] [B] |
| Harry Brekelmans | Projects & Technology Director [B] |
| Ronan Cassidy | Chief Human Resources & Corporate Officer [B] |
| Donny Ching | Legal Director [B] |
| Ed Daniels | Strategy, Sustainability and Corporate Relations Director [B] |
| Wael Sawan | Integrated Gas, Renewables and Energy Solutions Director [B] |
| Huibert Vigeveno | Downstream Director [B] |
| Zoë Yujnovich | Upstream Director [B] |

[A] Director of the Company.
[B] Designated an Executive Officer pursuant to US Exchange Act Rule 3b-7.Beneficially owns less than 1% of outstanding classes of securities.

**Corporate governance requirements outside the UK**

In addition to complying with applicable corporate governance requirements in the UK, the Company complies with the rules of Euronext Amsterdam as well as Dutch securities laws because of its listing on that exchange. The Company likewise adheres to US securities laws and the New York Stock Exchange (NYSE) rules and regulations because its securities are registered in the USA and listed on the NYSE.

**BOARD ACTIVITIES**

A rolling Board agenda is reviewed at Board meetings, enabling effective forward management of meetings and focused discussions. Forthcoming Board agenda items are categorised as: Strategy & Portfolio, Delivery & Performance, External Environment, Corporate & Miscellaneous or Standard items. Of the standard items, Board agendas regularly include reports from the Chief Executive Officer, the Chief Financial Officer and each Board committee. Core values moments and Shell Hero stories featured in early 2021 while updates continued throughout the year from various businesses and key functions, including Investor Relations; Health and Safety, Security and Environment; Information Technology; Human Resources; and Legal, as well as the Company Secretary. The Board also considers and approves the quarterly, half-year and full-year financial results, shareholder distributions and the associated announcements, and, at most meetings, considers investment, divestment and/or financing proposals. To enable purposeful debates and focus on particular aspects of agenda topics, Directors have an opportunity to specify information they require to be provided in advance of Board meetings. Finally, given the number of new Non-executive Directors over 2020 and 2021 in a continued virtual environment, virtual break-out sessions were held to try to nurture relationship-building while promoting focused discussions on discrete topics.

During the year, where possible, certain Non-executive Directors conducted site visits. These visits were predominantly virtual, as a result of continued COVID-19 restrictions. The visits were designed to provide Directors with a deeper insight into certain business operations. Directors also held various virtual workforce engagements, as well as virtual external stakeholder engagements.

**June strategy days**

As in 2020 and in lieu of the traditional physical June Strategy off-site meetings or Board's Strategy Day, virtual meetings were held over the course of three days in June 2021. Effort was again invested into making the virtual sessions as engaging and interactive as possible, including break-out sessions and staff engagements. Directors shared the feedback obtained during the staff engagements on topics such as staff views on Shell strategy (including acceleration of Shell's energy transition strategy), Project Reshape, pride in the Shell brand, diversity, and pride and concerns regarding Shell's future.

Strategy Day 2021 marked the start of the roll-out of Shell's Powering Progress strategy. The agenda focused on implementing this strategy and the critical enablers. Delivering the Powering Progress strategy requires us to transform Shell. The challenge is to navigate how we move from the certainty of familiar and proven business models to the uncertainty of a new energy environment, which is still evolving at variable pace in different sectors and regions. The Board Strategy Day agenda was built on the theme of Powering Progress in an Accelerating World, explored the topics which pose strategic risk or opportunity for Shell. The Board also reviewed areas where the strategy is already in action as implementation is under way and new businesses are developing. The Board Strategy Days included discussions on various topics including :

- energy transition and commitment to net zero emissions;
- simplification of Shell's equity capital and corporate structure;
- review of Upstream strategy;
- review of Power strategy;
- update on Financial Framework and financing the energy transition; and
- deep dive on electric vehicle charging
  .

GOVERNANCE FRAMEWORK

## BOARD OF DIRECTORS

The Company has a single-tier Board of Directors headed by a Chair, with executive management led by the Chief Executive Officer. The names of the Directors that held office during the year can be found on pages 118-124. Information on the Directors who are seeking appointment or reappointment is included in the Notice of Annual General Meeting.

There is no fixed amount of times that the Board may meet in one year. During 2020, the Board met 12 times. During 2021, the Board also met 12 times and, as detailed throughout our Strategic Report, including the Section 172 statement and activities undertaken throughout the year, worked hard to promote the long-term sustainable success of the Company, generating value for shareholders and contributing to wider society. Further information on the Board's work and assessments in relation to strategy, culture, engagement with stakeholders and its workforce can be found as follows:

The Board's responsibilities are governed by a formal schedule of matters reserved to it and include:
* Approval of overall strategy and oversight of management;
* Changes to the corporate and capital structure;
* Approval of financial reporting and controls (including approval of the Annual Report and Accounts, approval of the Annual Report on Form 20-F, and interim dividends);
* Oversight of risk management and internal control;
* Approval of significant contracts;
* Determining succession planning and new Board appointments;
* Remuneration for the Chair and Executive Directors; and
* Corporate governance matters.

### Board Committees

**Audit Committee**
* Carries out certain oversight functions on behalf of the Board; and
* Assists the Board in fulfilling its responsibilities in relation to internal control and financial reporting.

**Safety, Environment and Sustainability Committee**
* Carries out certain oversight functions on behalf of the Board; and
* Advises the Board on safety, the environment including climate change, and Shell's overall sustainability performance.

**Nomination and Succession Committee**
* Leads the process for appointments to the Board;
* Recommends Board appointments and re-appointments;
* Reviews and makes recommendations on succession planning; and
* Reviews and makes recommendations on corporate governance guidelines.

**Remuneration Committee**
* Determines and agrees with the Board the remuneration policy for the Chair, Executive Directors and Senior Management of the Company;
* Within the terms of such agreed policy, determines individual remuneration packages for the Chair, and Executive Directors; and
* Monitors and makes recommendations regarding the structures and levels of remuneration structures and levels for other senior executives, if appropriate.

More information on the composition of each of the Board Committees, their roles and activities during the year is provided on the following pages:

| | | | |
|---|---|---|---|
| Audit Committee | 141-154 | Safety, Environment and Sustainability Committee | 139-140 |
| Nomination and Succession Committee | 135-138 | Remuneration Committee | 154-159 |

### Other ad-hoc Committees
The Nigeria Special Litigation Committee is an ad-hoc Committee which was formed to monitor the status of the OPL 245 litigation and investigations. Its members are Euleen Goh (Chair), Sir Andrew Mackenzie and Ann Godbehere.

Exhibit Q

GOVERNANCE FRAMEWORK continued

## BOARD OF DIRECTORS continued

### Division of responsibilities

The roles of the Chair, a non-executive role, and the CEO are separate and clearly defined. The Board has agreed on their respective responsibilities and set these out in writing. These are available on request from the Company Secretary.

### Chair

- Responsible for ensuring that the Board and its Committees function effectively. One way in which this is achieved is by ensuring Directors receive accurate, timely and clear information; and
- Responsible for making sure that there is an adequate induction and training programme followed by all Directors (see page 137 below), with assistance from the Company Secretary.

### Deputy Chair/Senior Independent Director

- Sounding board for the Chair;
- Serves as an intermediary for the other Directors and shareholders; and
- Leads the annual appraisal of the Chair's performance.

### Non-executive Directors

- Appointed by the Board or by shareholders at general meetings and, in accordance with the Code, seek re-election by shareholders on an annual basis;
- Letters of appointment refer to a specific term of office, the provisions of the Code and the Company's Articles of Association;
- Upon appointment, Non-executive Directors confirm they are able to allocate sufficient time to meet the expectations of the role. Appointments are subject to a minimum of three months' notice of termination, and there is no compensation provision for early termination;
- The Non-executive Directors bring a wide range and balance of skills and international business experience. Through their contribution to the Board and Board Committee meetings, respectively, they are expected to challenge and help develop proposals on strategy and bring independent judgement on issues of performance and risk; and
- At every Board meeting, time is set aside for the Chair and Non-executive Directors to meet without the Executive Directors being present. The Non-executive Directors discuss, among other matters, the performance of individual Executive Directors. A number of Non-executive Directors also meet major shareholders over the course of the year.

## EXECUTIVE MANAGEMENT

### Chief Executive Officer

- Has overall responsibility for the implementation, by the Executive Committee, of the overall strategy approved by the Board, the operational management of the Company and the business enterprise connected with it; and
- Is supported in this by the Executive Committee that he chairs.

### Executive Committee

- Operates under the direction of the Chief Executive Officer (CEO) in support of his responsibility for the overall management of Shell's business. The CEO has final authority in all matters of management that are not within the duties and authorities of the Board or of the shareholders' general meeting; and
- Executive Committee members are listed in the Senior Management biographies on page 125.

## GOVERNANCE DOCUMENTS AVAILABLE ON WWW.SHELL.COM/INVESTOR:

- Articles of Association
- Matters Reserved for the Board
- Board Committee Terms of Reference
- Modern Slavery Act Statement
- Shell General Business Principles
- Shell Code of Conduct
- Code of Ethics for Executive Directors and Senior Financial Officers

Exhibit Q

GOVERNANCE

### Senior Succession and Resourcing Review

The annual Senior Succession and Resourcing Review focused on the strength of senior leadership and plans for its development and succession, while highlighting the breadth, depth and diversity of its pipeline, the developing profile of the leadership cadre, and recruitment and attrition levels.

The Nomination and Succession Committee noted the effectiveness of succession planning, the impact of its associated execution, and the professional, data-driven, integrated approach to leadership and leadership development. It welcomed the continued focus on performance management, proactive management of Shell's talent pipeline, and the focus on advancing Shell's diversity agenda with increased attention on gender, race, LGBT+ and disabilities. This year's insights provided a deeper understanding of the interplay between culture, identity, leadership talent and employee engagement across Shell.



[A] ■ The **foundation** elements of the Shell Control Framework define the principles that underpin the Shell Group's activities.

[B] ■ The **management processes** define activities critical to an effective control framework.

[C] ■ The **structural** component defines how businesses and functions facilitate achievement of the Shell Group's overall business objectives, while respecting the separate legal identity of the individual Shell companies that implement them.

[D] ■ A **foundation** element of the Shell Control Framework and a key enabler of many of its **management processes**.

### RISK MANAGEMENT AND CONTROLS

The Board is responsible for maintaining a sound system of risk management and internal control, and for regularly reviewing its effectiveness.

A single overall control framework exists for the Company and its subsidiaries. This is designed to manage rather than eliminate the risk of failure to achieve our business objectives. It provides reasonable, but not absolute assurance against material misstatement or loss.

The Control Framework (see diagram) encompasses the key components – "foundation elements", "management processes" and "structural" – that together establish the structure and context within which Shell companies operate. "Foundation elements" consist of the principles and rules that underpin and establish boundaries for Shell activities. "Management processes" define our critical processes. These include how strategy, planning and appraisal are used to improve performance and how risks are to be managed, such as through the application of effective controls and assurance. The "structural" component defines the organisational structures and key governance principles that are applied to facilitate the achievement of the Shell Group's overall business objectives.

### Risk management

The "Statement on Risk Management" is a foundation element of the Shell Control Framework and a key enabler of many of its management processes.

### Risk identification

We identify and define risks across the Shell Group from three distinct perspectives:

• Strategic risks: we consider current and future portfolio issues, examining parameters such as country concentration or exposure to higher-risk countries. We also consider long-range developments in order to test key assumptions or beliefs in relation to energy markets.

• Operational risks: we consider material operational exposures across Shell's entire value chain which provide a more granular assessment of key risks facing the organisation.

• Conduct and culture risks: we consider how our policies and practices align with our purpose, core values and desired mindset and behaviours.

These perspectives help us to maintain a comprehensive view of the different types of risks we face and the different time horizons in which they may affect us.

Shell's risk factors are described on page 23-32.

### Risk assessment

To further understand the risks we face, we evaluate the impact and likelihood of each risk.

When assessing the potential impact of a risk, we consider the possible financial consequences. We also look at more qualitative issues such as the impacts on our reputation, our ability to comply with external regulations and impacts on health, safety and the environment.

When assessing the likelihood of a risk occurring, we consider several factors, such as the level of risk exposure, our ability to prevent the risk happening and whether the risk has materialised in the past.

To support risk assessments, we also seek to establish and articulate our risk appetite, which is the level of risk that we are willing to accept in pursuit of Shell's strategy and objectives. There are risks that Shell accepts, or does not seek to fully mitigate. The financial framework sets an overarching boundary condition for risk appetite. This is because Shell's financial resilience informs the aggregate level of risk appetite that could be sustained.

The impact and likelihood assessment, combined with risk appetite, determine the type of risk responses, such as controls and assurance activities, that may be required to manage each risk. The impact and likelihood assessments also help us to prioritise risks.

### Risk response

A key foundation of the Shell Control Framework is Shell's standards and manuals, including the Code of Conduct. These establish requirements and guidance that help management design and develop controls to manage risks consistently across the Group.

During the year, management regularly reviews the principal risks and associated risk responses, implementing further remedial actions as appropriate. The Executive Committee and the Board regularly consider Group-level risks. They frame them in terms of strategic,

operational or conduct and culture risks, and assess them alongside the relevant control mechanisms and risk responses. These periodic reviews are supplemented by dedicated reviews of specific risks, as needed.

In 2021, we continued to pay attention to our response to the COVID-19 pandemic and its varied impacts (see "Responding to the COVID-19 Pandemic" on page 133).

**Examples of how some principal risks are managed**
We operate in more than 70 countries that have differing degrees of political, legal and economic stability. This exposes us to a wide range of political developments that could cause changes to contractual terms, laws and regulations. We and our joint arrangements and associates also face the risk of litigation and disputes worldwide (see "Risk Factors" on page 23). We continually monitor geopolitical developments and societal issues relevant to our interests. Employees who engage with government officials are subject to specific training programmes, procedures and regular communications, as well as the Shell General Business Principles and Shell Code of Conduct. We are prepared to exit a country if we believe we can no longer operate there in accordance with our standards and applicable law, and we have done so in the past.

Many of our major projects and operations are conducted in joint arrangements or with associates, which may reduce our level of control and ability to identify and manage risks (see "Risk Factors" on page 23). In each case, Shell appoints a representative to manage its interests. This representative seeks to ensure that the projects operate under standards that are equivalent to Shell's for certain critical areas.

Climate change and risks resulting from greenhouse gas emissions are significant risk factors for Shell. They are monitored, like other significant risks, by the Executive Committee and the Board. Shell has a climate change risk management structure which is supported by standards, policies and controls (see "Risk factors" on page 23 and "Climate change and energy transition" on pages 74 to 97).

The system of risk management and internal control over financial reporting is an integral part of the Shell Control Framework. Regular reviews are performed to identify the significant risks to financial reporting and the key controls designed to address them. These controls are documented, responsibility is assigned, and they are monitored for design and operating effectiveness. Controls found to be ineffective are remediated.

**Emerging risks**
Management and the Board also consider emerging risks, defined as risks where the scope, impact and likelihood are still uncertain, but which could have a significant effect on achieving Shell's strategy and objectives in the future. These risks are identified through the monitoring of external developments, the status of risk indicators, learnings from incidents and assurance findings, and the appraisal of Shell's forward-looking plans. Once identified, we undertake activities to monitor, prepare for and reduce the future impact, where possible, should such emerging risks materialise.

**Board review of principal and emerging risks**
The Board confirms it has carried out a robust assessment of Shell's principal risks, including a robust process for identifying, evaluating and managing Shell's principal risks. The Board also confirms it has carried out a robust assessment of Shell's emerging risks. These assessments have been in place throughout 2021 and up to the date of this Report, are regularly reviewed by the Board and accords with the Financial Reporting Council guidance on risk management, internal control and related financial and business reporting.

**Review of the effectiveness of the system of risk management and internal control**
The Board has delegated authority to the Audit Committee to assist it in fulfilling its responsibilities in relation to the effectiveness of the risk management and internal control system, the integrity of financial reporting, and consideration of compliance matters (see "Audit Committee Report" on pages 142).

The Audit Committee receives regular reports from the Chief Internal Auditor on notable internal audits and those with a significant impact on the effectiveness of controls. The Committee reviews significant incidents involving financial, business and compliance controls and receives regular reports on business integrity issues. The Audit Committee also requests updates on specific financial, operational and compliance control issues throughout the year. The Audit Committee Chair provides an update to the Board after every Audit Committee meeting.

During and after such sessions, the Board has the opportunity to request further information and ask clarifying questions. The Chairs of the Safety, Environment and Sustainability Committee (SESCo) and the Nigeria Special Litigation Committee, an ad hoc Board committee, provide regular updates after each of their meetings. These updates cover, among other matters, the respective aspects of controls that they monitor in accordance with their Terms of Reference. The Board receives the approved minutes of the Audit Committee and SESCo minutes. They are incorporated into the Board minutes so all Directors can read and review them. This helps the Board with its ongoing monitoring and annual review of material controls. The Board is also helped with its monitoring and review responsibilities by the reports of:

• the Executive Vice President Taxation and Controller;
• the Chief Internal Auditor;
• the External Auditors;
• the Chairs of the Disclosure Committee and the Financial Reporting Control Committee;
• the Chief Ethics & Compliance Officer;

as well as summaries of the Annual Proved Reserves Disclosure.

The Executive Committee and the Audit Committee conduct an annual review of the effectiveness of the system of risk management and internal control. This is based on their own insights and experience during the year and the outcomes of the Group-level risk reviews and the Group Assurance Letter process. In the Group Assurance Letter process, each Executive Director conducts a structured internal assessment of compliance with legal and ethical requirements and the Shell Control Framework.

As part of their annual review, the Executive Committee and Audit Committee also consider input from the Chief Internal Auditor, Chief Ethics and Compliance Officer and the External Auditor. The Board reviews and discusses the insights and conclusions from this annual assessment.

The Board confirms that it has conducted its annual review of the effectiveness of Shell's system of risk management and internal control in respect of 2021, and that this review covered all material controls, including financial, operational and compliance controls.

Exhibit Q

**Responding to the COVID-19 pandemic**

Although recovery is under way in many parts of the world, the COVID-19 pandemic continues to affect people's lives, government policies, markets and businesses. In 2020, Shell implemented a broad, structured response to the pandemic. This aimed to ensure we supported our colleagues, suppliers, customers and the communities where we work. It also sought to maintain resilience in our day-to-day operations and our overall financial framework. Many of these responses remained in place throughout 2021 and were embedded in our day-to-day operational activities. For example:

- We took many steps to protect the health of our colleagues, including requiring or encouraging office-based staff to work from home, depending on the advice of local authorities. We provided support to ensure all our colleagues can work remotely each day. We maintained comprehensive return-to-site approaches for Shell's offices and these were reviewed and updated as necessary.
- We continued to enforce social distancing at our offshore platforms and onshore facilities. We conducted health screening and implemented procedures to allow the safe evacuation of any suspected cases of COVID-19 from our offshore platforms or onshore facilities.
- In our global network of retail stations, we enforced social distancing and carry out deeper cleaning. We also used other protective measures, such as screens for till operators.
- Management at all levels continued to engage with staff to understand and respond to the stresses placed on them by the pandemic. A confidential counselling service was made available to help colleagues experiencing the psychological impact of the pandemic. We provided extra online resources to help people manage their physical and mental well-being.
- To sustain our operations and supply chains, which in turn support our suppliers and customers, we ensured business continuity plans were in place for all our businesses, functions and operating sites.
- We accelerated the adoption of digital technology (including the use of drones and robots) to monitor offshore and manufacturing equipment remotely.
- We strengthened our global web content filtering capability in response to the switch from office to remote working and added new measures to improve cyber-awareness.
- We continued to reiterate Shell's compliance rules (including the Code of Conduct) and the importance of adhering to them. The Crisis Management Standard was used to guide our operational risk responses.
- Our country chair network addressed specific challenges that arose at local levels.

As governments and society continue to adjust and recover from the pandemic, we monitor the changing external environment and emerging risks across Shell's entire operations. In this way, we seek to ensure we remain resilient and ready and able to respond to developments.

For more detailed information about the impact of the pandemic on Shell's principal risks see pages 23-32.

**Risks**

The Board reviews reports on strategic risks annually, and considers reports on operational risks twice a year. These reports assess current business activities against risk appetite.

**Chief Ethics and Compliance Officer Report**

Data and insights include information from the Global Helpline, the Shell Ethics and Compliance organisation and the Shell People Survey. SESCo continues to strongly support the work of the Chief Ethics and Compliance Officer, including the efforts to ensure a safe working environment where staff feel confident to raise any concerns in good faith.

The Audit Committee is kept updated when matters highlighted through the Global Helpline are investigated. The Audit Committee is also informed about the associated remediation. For more information see page 152 of the Audit Committee Report.

**Assurance activities**

Assurance activities, including items raised by businesses and functions (through the Group Assurance Letters process) and assurance (from Internal Audit, HSSE, Ethics and Compliance, Reserves Assurance and Reporting), provide additional evidence to the Board of the commitment to high standards of risk management and internal control. The assurance activities ensure that work can be done safely, within regulatory frameworks.

The information provided within these reports further supports the Board's annual review of the effectiveness of the Group's system of risk management and internal control and feeds into the Group scorecard, against which staff bonuses are calculated.

Exhibit Q

BOARD EVALUATION

**Board evaluation**

The 2021 Board evaluation was facilitated internally, led by the Nomination and Succession Committee (NOMCo) and managed by the Company Secretary.

NOMCo reviewed questionnaires for in-house Board and committee performance evaluation.

Questionnaires made available for Directors and Executive Committee (EC) members to complete online via a secure web-based system operated by Linstock [A].

Board reviewed evaluation reports of Board and each committee [B].

A separate report was also produced in relation to the evaluation of the Chair and made available to the Deputy Chair only.

✓ ACTION PLAN AGREED

[A] Linstock, a London-based corporate advisory firm previously used by Shell for Board performance evaluations
[B] Separate reports were provided for the responses from the Board and the Executive Committee. The reports in relation to the Audit Committee, Nomination and Succession, Safety, Environment and Sustainability Committee and Remuneration Committee were sent to the respective committee chairs.

**Insight**

The feedback from the Board Directors was positive throughout their responses to the evaluation. Views were provided on what additional expertise or experience might benefit Board composition through the energy transition. These views were actively considered, along with other factors, in Nomination and Succession Committee discussions.

Board dynamics – The Non-executive Directors' engagement, support and challenge of management was rated very highly, with the quality of the interaction and the openness of the Executive team being commended.

Board oversight – The Board's oversight of the Powering Progress strategy was rated highly overall, as was the understanding of the capacity of the Company to deliver the strategy. Some recommendations for further enhancement were received in this area. Board oversight of monitoring various external forces was also highly rated, although the Board noted an appetite for improved oversight of new technologies and digitalisation. The Board viewed its oversight of various specific aspects of risk positively and suggested further enhancements to improve risk discussions between the Board and management. The Board's oversight of the Company's processes for managing and developing senior executive talent was rated very highly, with a focus on the work in progress on further improving the ethnic diversity of senior talent.

Management and focus of meetings – Themes included: Board papers (a common topic for many corporates), which would still benefit from further simplification; and a desire to return to physical meetings when circumstances permit. The support available to the Board in terms of the induction/onboarding, Company Secretarial support and access to external advice was rated positively overall, although the Board indicated interest in further enhancing its oversight in this area, particularly as the Company transforms through the energy transition.

**Delivery against the 2021 ambitions**

The COVID-19 pandemic continued to impact both the near- and long-term business outlook. Although government restrictions in many countries loosened as vaccinations increased, resulting in some regions starting to return to offices, international travel continued to present

challenges well into the fourth quarter of 2021 and into 2022. Through the use of additional meetings, the Board balanced its focus on short-term operational matters and long-term strategy. However, delivery of some of the Board's ambitions were affected by the need to focus attention and resources on other key events, such as the completion of Reshape, Shell's company-wide reorganisation, and the simplification announced towards the end of 2021.

The Board progressed and supported significant projects throughout the year. These efforts were made throughout 2021 alongside numerous sessions to monitor and support management in implementing strategy. Management sought the Board's input and support on the proposed announcements for Strategy Day 2021, the presentations on stakeholder feedback from Strategy Day 2021, and the Board's review, and approval of Shell's energy transition strategy.

The Board continued to monitor the Reshape reorganisation and had regular engagements on culture and workforce engagement through various sources. Because information on culture is dispersed across various reports and activities, and because of timeliness after launching Powering Progress and finalising Reshape, a discussion was originally planned for the latter part of 2021 to determine how best to address this topic in a unified and pragmatic way. Subsequently this was deferred to early 2022 because of the other pressing Board agenda topics that arose in the second half of 2021.

Other 2021 ambitions were: Chair succession, which has received positive reviews from the Chair succession; and enhancements for the greater oversight of litigation, which were also implemented. Further optimisation of the Non-executive Director onboarding programme was largely completed (except for items still impacted by travel restrictions, such as sharing Board travel). The plan to enhance ongoing training and explore pragmatic ways to further improve Board materials was impacted by the prioritisation of resources towards other significant projects.

**Planned enhancements for 2022**

The 2021 Board evaluation findings provided areas of focus or priorities for 2022. There was strong agreement between the Board and Executive Committee around:
• building on the "monitoring execution and strategic implementation" focus area from the 2020 evaluation, (including ensuring continued alignment on the Financial Framework). Directors' suggestions were relayed to appropriate individuals for incorporation into the Strategy Agenda for 2022;
• clarifying the need for, and how best to obtain, wider external stakeholder views in feasible and relevant ways; and
• enhancing the risk management dialogue between management and the Board.

Exhibit Q

**Powering Progress strategy/strategic direction/energy transition**

This is very important for the years ahead. The Board and Executive Committee will continue to oversee the strategic execution as a priority (particularly Powering Progress, and the net zero/Carbon Management Framework).

**External engagement**

Enhancing interactions and/or obtaining the views of relevant external stakeholders, including external experts, customers, partners and society, was highlighted within the evaluation. The Board began discussions on this objective at its February 2022 meeting, considering how it could best be accomplished, and the informational scope that would be most relevant from various stakeholder groups. The Board plans to explore this topic further in 2022.

**Financial framework**

Capital investment allocation and operating expense are key to achieving the Company's 2030 net-zero goals and intermediate actions. Alignment on the distribution policy/strategy and on the long-term financial framework will also be areas of focus.

**Chair**

The Chair was very highly rated as having made a strong start under difficult circumstances, with the COVID-19 pandemic limiting opportunities for face-to-face interaction. It was noted that his relationship with the CEO is balanced and positive. Transparency and good alignment between the Chair and the Non-executive Directors was highlighted. Directors praised his clear communication skills, noting only minor areas for improvement. The Chair's management of the individual input of Directors both inside and outside Board meetings was highly rated, and his availability to individual Directors was valued and appreciated. The Board also praised his ability to keep agendas focused with sufficient time for full discussion.

The Deputy Chair communicated the feedback to the Chair, along with requests to:

- consider feasible and reasonable improvements in reducing Board materials and meetings; and
- continue to apply his industry experience and expertise as relevant in Board discussions, which adds strong contextual perspectives.


The Chair fully accepted the feedback, agreed to reflect and act upon it, and offered additional development points not identified that he was working on.

Exhibit Q

NOMINATION AND SUCCESSION COMMITTEE

### Focus areas for 2021

- Discussions about Non-executive Director and Executive Committee succession
- Discussions on talent engagements with key staff and succession candidates
- In-depth examinations of the Shell People Strategy and culture, with an increased focus on diversity, equity and inclusion and end-to-end talent management

### Priorities for 2022

- Non-executive Director and Executive Committee succession
- Continued talent engagements with key staff and succession candidates
- Maintain proactive oversight over Shell's ambition to become one of the most diverse and inclusive organisations in the world

### SIR ANDREW MACKENZIE

Chair of the Nomination and Succession Committee



### COMMITTEE MEMBERSHIP AND ATTENDANCE FOR 2021

 Sir Andrew Mackenzie     Dick Boer

 Euleen Goh     Ann Godbehere

| Committee member | Member since | Maximum possible meetings | Number of meetings attended | % of meetings attended |
|---|---|---|---|---|
| Sir Andrew Mackenzie (Chair of the Committee from May 18, 2021) | Oct 1, 2020 | 5 | 5 | 100% |
| Dick Boer | May 19, 2021 | 3 | 3 | 100% |
| Ann Godbehere | October 27, 2021 | 1 | 1 | 100% |
| Euleen Goh | July 1, 2019 | 5 | 5 | 100% |
| Chad Holliday [A] | May 19, 2015 | 2 | 2 | 100% |
| Sir Nigel Sheinwald [A] | May 20, 2020 | 2 | 2 | 100% |

[A] Chad Holliday and Sir Nigel Sheinwald retired from the Board following the 2021 Annual General Meeting, held on May 18, 2021.

### PURPOSE

The Nomination and Succession Committee (the "Committee") leads the process for appointments to the Board and Senior Management [A] positions, ensures plans are in place for orderly, well-planned succession, and oversees the development of a diverse succession pipeline of candidates. It also reviews the Company's policy and strategy on diversity, equity and inclusion (DE&I), and monitors the effectiveness of these initiatives. It makes recommendations to the Board on corporate governance guidelines, as referred to in the Chair's statement.

[A] "Senior Management" refers to the Executive Committee and the Company Secretary.

### TALENT MANAGEMENT AND SUCCESSION

The Committee is fully engaged with the end-to-end talent management and senior succession planning approach that is deployed within Shell. It plays a key role in senior succession and resourcing. Retaining in-depth knowledge of the individuals within the talent pipeline is a Committee priority. The Committee makes time to personally meet and engage with numerous individuals within the pipeline. The Committee's oversight and input extend from recruitment to leadership identification and from leadership development to leadership appointment, all of which are underpinned by clearly articulated talent priorities and a commitment to advancing diversity, equity and inclusion across Shell.

The Committee manages Board and Senior Management succession under a structured, proactive methodology. The processes have clear and agreed selection principles for short-, medium- and long-term succession and are aligned with Shell's strategic priorities.

NOMINATION AND SUCCESSION COMMITTEE continued

For Non-executive Director succession, the Committee continues to follow its Principles for the Strategic Composition of the Board, adding factors as they evolve. These principles function much like a policy and include both quantitative and qualitative principles, considering:

- the overall aspired Board composition and diversity of gender, race and ethnicity, nationality, background, experience and desired skill sets that align with the Company's strategy and purpose; and
- the values, attitudes, and behaviours expected of Directors.

For Senior Management succession, the selection principles include process-specific elements, such as a clear and proactive approach to identifying and developing succession candidates. The principles also outline the long-term implications of the succession planning process. There is also great focus on ensuring that the principles reflect the leadership qualities required for future business success and that they advance the progress of diversity in all its forms.

Senior Management principles feature in the Committee's review of the succession plans which occurs in every Committee meeting. Using the principles, the Committee implements any changes through a well-defined and diligent process with overall Board engagement. The Committee agrees candidate profiles and meets prospective candidates well ahead of any selection decision being necessary. It also engages the Board early in the process to ensure all Directors have an opportunity to meet and assess prospective candidates. Consequently, some of the leaders whom the Committee and Board have engaged with extensively in the past are now members of the Board or the Executive Committee.

In 2021, the Committee undertook its annual in-depth look at the succession plans for Senior Management across Shell and reviewed the talent pipeline in line with the business outlook. The engagement focused on the organisational health of our workforce following Project Reshape; the introduction of a single integrated and global Diversity, Equity & Inclusion plan aligned to our strategy and purpose, the depth and breadth of the senior executive leadership pipeline including good progress in enhancing diversity, the skills, behaviours and development support required for future success, and an evolving outlook on senior executive roles. Following the Committee's review, the findings were reported to the Board.

DIVERSITY OF LEADERSHIP
The Committee recognises that continuing to improve all types of diversity at each level of the Shell Group is crucial. Shell aims to be an inclusive workplace where everyone feels valued and respected and has a strong sense of belonging. The Committee's review of diversity objectives and strategies for the Shell Group as a whole also monitors the impact of diversity and inclusion initiatives.

In February 2021, Shell published its aspirations for diversity, equity and inclusion as part of its strategic update. The focus will continue to be on gender and nationality diversity, and is broadening and deepening to the areas of race and ethnicity, enablement and LGBT+. When looking at our progress against our ambitions, female representation has steadily improved in recent years. Among experienced recruitment in 2021, Shell companies recruited 34% females, and among graduates 47%. Female representation in the top 1,250 roles ("Senior Leadership" positions) has strengthened by 1.7 percentage points during 2021 to 29.5%, and we continue to progress towards our aim of achieving 35% female senior leadership representation by 2025. Nationality diversity, such as Asian and American talent, continues to be managed in accordance with the business outlook and we have a strong focus on progressing race and ethnic minority representation, beginning in the UK and the USA and followed by the Netherlands. The representation of people of colour among Shell's senior leaders in the USA has been actively tracked for many years. It stood at 26.1% at the end of 2021, compared with 17.3% in 2016. In the UK, race and ethnicity representation among senior leaders was 16.5% [A].

[A] As ethnicity declaration is voluntary, our ethnicity declaration rate is not 100% and all calculations are based on a declaration rate of 81%. The 19% of our workforce who have not provided data or chosen not to declare their ethnicity were not included in our calculations.

Senior Leadership is a Shell-specific measure and different from that which we are required to report under the Code, being female representation in Senior Management and their direct reports, where the percentage is 28.4%.

Although the Committee monitors Shell's organisational diversity, equity and inclusion strategies and initiatives, it also holds itself accountable for the Board's own diversity and inclusion. By the end of 2020, the Board's diverse composition met the Hampton Alexander and Parker Reviews' objectives by reflecting 38.46% female representation with one person meeting BAME criteria. Gender representation was down slightly from May 2020 (when the Board's composition included 42% female representation) as a result of the departure of three Non-executive Directors (one female, two males) and the appointment later in the year of four new Non-executive Directors (one female, three males). However, following the 2021 AGM, for the first time in Shell's history, the Board reached gender parity with 50% female representation.

More information on diversity, equity and inclusion in Shell is provided in the Our people section on page 113.

The People Strategy and culture and identity
During the year, the Committee initiated an in-depth examination into our approach on diversity, equity and inclusion. This will follow the format of the examination of the Shell People Strategy that the Committee undertook in 2020, which placed particular emphasis on our aspired culture and identity. Powering Lives is a foundational element of our Powering Progress strategy. The Committee will be conducting further engagements in 2022 to maintain proactive oversight over Shells ambition to become one of the most diverse and inclusive organisations in the world, where everyone feels valued, respected, with a focus on four areas of gender, race and ethnicity, LGBT+ and disability.

Committee activity
In addition to its considerations regarding succession, the Committee made recommendations on corporate governance guidelines, monitored compliance with corporate governance requirements and made recommendations on corporate governance-related disclosures. The Committee continues to monitor and review this area, considering whether and how current Company governance matters should be strengthened. Further insight on some of the Committee's areas of consideration in 2021 is provided below.

Exhibit Q

| Succession [A] | Topic of discussion/example of Board activity |
|---|---|
| Recommendation | • Appointment of Sir Andrew Mackenzie and Jane Holl Lute to the Board.<br>• Changes to the composition of the Board committees. |
| Review and oversight | • Shell Senior Succession and Resourcing Review and ongoing succession planning. |
| Oversight | • Shell diversity, equity and inclusion.<br>• End-to-end talent management in Shell. |
| Engagement | • Talent engagements. |
| Governance | Topic of discussion/example of Board activity |
| Governing the Board and its committees | • Reviewed its Terms of Reference, and the terms of reference for other Board committees and the matters reserved to the Board. |
| Regulation, legislation and other governance-related guidance | • Key governance matters affecting the Company's external reporting.<br>• Other governance and regulatory changes agreed or proposed and their impact or potential impact on the Company, its processes and its reporting. |
| Shell plc matters | • Considered any potential conflicts of interest and the independence of the Non-executive Directors.<br>• Review of additional external appointments requested by Directors, with specific focus on the time allocated to all commitments. For Executive Directors, the benefit/relevance to the business of the Director undertaking the additional role is also a key consideration.<br>• Determined the process for the 2021 internal Board Evaluation. |
| Board membership and other appointments | Topic of discussion/example of Board activity |
| Directors' tenure, external commitments, conflicts of interests and succession planning | • Non-executive Director appointments and changes to Committee membership. |
| Talent overview and senior succession review | Topic of discussion/example of Board activity |
| Shell Senior Succession and Resourcing Review covering Executive Director and Executive Committee (EC) succession, EC direct reports, the senior executive group and the overall talent pipeline | • Enhanced insight on Shell talent and future leaders.<br>• Assurance of robust succession and contingency plans. |

[A] The Committee was assisted during the year by Russell Reynolds Associates ("Russell Reynolds"), an external global search company whose main role was to propose suitable candidates. Russell Reynolds does not have any connection with the Company other than that of search consultants. The Chair does not participate in discussions regarding his own succession. Russell Reynolds is a signatory to The Voluntary Code of Conduct for Executive Search Firms, which aims to improve board diversity.

### Director induction and training

After being appointed to the Board, Directors receive a comprehensive induction tailored to their individual needs. This normally includes site visits and meetings with Senior Management to enable them to build up a detailed understanding of Shell's business and strategy, and the key risks and issues that Shell faces. Existing Directors are also able to join these visits to keep abreast of business developments and progress. With the abnormal COVID-19 circumstances in 2020 and 2021, the induction programme was quickly adapted to a completely virtual induction.

Onboarding is phased and prioritised based on forthcoming Board agenda items to help ensure the new Non-executive Directors hit the ground running. In 2020 and 2021, digital onboarding books were provided for each new Non-executive Director. These onboarding books complemented the existing digital Directors' Handbook and featured:

• overviews of scheduled briefing meetings customised to the Non-executive Directors' needs and linked to upcoming Board agenda items;
• hyperlinks to key Shell publications (external and internal);
• lists of common Shell acronyms;
• key current materials on:
  – Shell's safety and core values;
  – Board governance;
  – Group strategy and portfolio;
  – key businesses and functions; and
  – climate change and energy transition;
• biographies of key executives.
• Other elements of the onboarding programme for Non-executive Directors included:
  – arranging briefing meetings with key executives (both business and functional) customised to Non-executive Directors' needs and phased based on forthcoming Board agenda items;
  – where feasible, pairing up new Non-executive Directors in onboarding briefings to optimise learning while also providing opportunities for collegial relationship-building and increasing efficiencies for the executives; and
  – where possible, arranging virtual site visits (either specifically for onboarding or by inviting the new Directors to committees' virtual site visits).

Supported by the benefits of the global vaccination programme, we are now seeing COVID-19-related restrictions starting to ease in many countries. As a result, we envisage Directors being able to increase their face-to-face engagement with our teams at our sites in 2022 and to enhance ongoing Director training.

NOMINATION AND SUCCESSION COMMITTEE continued

CHAIR SUCCESSION

Message from Euleen Goh

In early 2018, the process of selecting the next Chair of the Board of Shell plc (at the time known as Royal Dutch Shell plc) began in response to the proposed limit on Chair tenure, outlined in the then draft version of the Code. The Nomination and Succession Committee (NOMCo) created a subcommittee, drew up a potential succession timeline, and initiated an internal and external search process. Hans Wijers, the Senior Independent Director at the time, led the subcommittee and the search process. Chad Holliday, the current Chair, was not a member of the subcommittee.

My predecessor Gerard Kleisterlee took over from Hans in May 2018 and refined the selection criteria and succession timeline. The subcommittee agreed what qualities the successful candidate should have, and determined the functional focus elements of the new Chair's role. Accordingly, the subcommittee considered and interviewed multiple candidates.

After Gerard retired from the Board at the 2020 AGM, I assumed leadership of the subcommittee and we further reviewed the required qualities and functional focus elements of the role in the context of the current environment. The subcommittee also examined the main trends and factors affecting the long-term success and future viability of Shell, and the organisation's strategic priorities, consulting on these with the wider Board. One-on-one discussions were held with each Board member. The review and the discussions helped us to refine our search process with a clear and updated understanding of the qualities, skills and attributes that the future Chair should possess.

We engaged with some of our larger investors, as appropriate, seeking input on the skills, attributes and sector knowledge that they considered important for the Chair candidate profile. These discussions were very valuable. They helped inform our search and selection of the most appropriate individual for the role.

After this thorough and robust search process, the Board agreed unanimously at its March 2021 meeting that Sir Andrew Mackenzie should be appointed Chair of the Board with effect from the conclusion of Shell's 2021 Annual General Meeting, which was held on May 18, 2021.

When reviewing candidates, our preferred qualities and functional focus elements included a strong requirement for a candidate who has experience in leading large, complex, international organisations. The candidate would have had significant experience in capital discipline. He/she should have an ability to balance the transformational changes that Shell needs to make against the timing of these changes as it navigates the energy transition. The successful candidate should have demonstrated sustainable actions with respect to the climate change agenda. An understanding of the energy market was essential, without it being necessary for the candidate to have spent their entire career working in the oil and gas sector.

In Andrew we believe that we have found the required qualities and more. Andrew is a lifelong learner with a collaborative, agile mindset and he is a champion of good governance. His strategic vision has helped operations and companies under his leadership to transform. His leadership performance in the areas of environmental, social and governance (ESG) and climate action are outstanding. He was recently knighted by the Queen of the United Kingdom for his services to business, science and technology. Andrew firmly believes that business can be a force for good, for shareholders and society alike.

Since joining the Board in October 2020, Andrew has dedicated significant time to familiarising himself with the business, the people, and the Powering Progress strategy which he and the Board fully support and are committed to delivering together with management.

His broad experience, strategic vision, scientific curiosity and commercial acumen made him the ideal candidate to lead the Board of Shell plc.

Exhibit Q

SAFETY, ENVIRONMENT AND SUSTAINABILITY COMMITTEE

FOCUS AREAS FOR 2021

- Safety and environmental performance
- Assurance programme
- Shell's climate targets
- Non-financial elements of Shell's strategy
- Sustainability metrics for remuneration

PRIORITIES FOR 2022

- Process safety and personal safety
- Environmental performance
- Emerging safety and non-financial risks
- Progress against energy transition targets
- Broader sustainability performance

"SESCo focused on Shell's safety and environmental performance and assurance programme in 2021, as well as targets for the energy transition and sustainability elements of Shell's Powering Progress strategy."

CATHERINE J. HUGHES
Chair of the Safety, Environment and Sustainability Committee



COMMITTEE MEMBERSHIP AND ATTENDANCE FOR 2021

 **Catherine J. Hughes**      **Neil Carson OBE**

 **Bram Schot**

| Committee Member | Member since | Maximum possible meetings | Number of meetings attended | % of meetings attended |
|---|---|---|---|---|
| Catherine J. Hughes (Chair of the Committee since May 19, 2021) | November 1, 2017 | 5 | 5 | 100% |
| Neil Carson OBE | June 1, 2019 | 5 | 5 | 100% |
| Bram Schot | October 1, 2020 | 5 | 5 | 100% |
| Sir Nigel Sheinwald (Chair of the Committee until May 18, 2021) [A] | July 1, 2012 | 2 | 2 | 100% |
| Ann Godbehere [B] | May 20, 2020 | 4 | 4 | 100% |

[A] Sir Nigel Sheinwald retired from the Board following the 2021 Annual General Meeting, held on May 18, 2021.
[B] Ann Godbehere stepped down from her role on the Committee on October 27, 2021 when she became a member of the Nomination and Succession Committee.

PURPOSE
The Safety, Environment and Sustainability Committee (SESCo) assists the Board in reviewing the policies, practices, targets and performance of Shell, primarily with respect to safety, environment including climate change, and broader sustainability.

OVERVIEW
The Committee meets regularly to review and discuss a wide range of important topics. These include the safe condition and responsible operation of Shell's assets and facilities, environmental protection and greenhouse gas emissions, any major incidents that impact or had the potential to impact safety, environmental performance, and progress towards meeting Shell's energy transition targets.

The Committee also endorses the annual Shell assurance plan for Health, Security, Safety, Environment and Social Performance (HSSE & SP) and Asset Management, and reviews the execution of the plan and audit outcomes.

The Committee assesses Shell's overall sustainability performance and provides input to Shell's annual reporting and disclosures on sustainability. It also advises the Remuneration Committee on metrics relating to safety and energy transition that apply to the Executive Committee annual scorecard and Long-term Incentive Plan.

## SAFETY, ENVIRONMENT AND SUSTAINABILITY COMMITTEE continued

The Committee reviews and considers external stakeholder perspectives in relation to Shell's business, and how Shell addresses issues of public concern that could affect its reputation and licence to operate.

In line with the strategic importance of the Committee's agenda, the Chair of the Board of Directors and the Chief Executive Officer of Shell plc regularly attend Committee meetings for discussions on specific topics.

Shell's Chief Executive Officer and the Executive Committee hold overall accountability for sustainability within Shell. In February 2022, Shell announced a newly created role of Strategy, Sustainability and Corporate Relations Director. The new director is a member of Shell's Executive Committee.

### ACTIVITIES
During 2021, the Committee focused on the areas of greatest operational and strategic importance to Shell, in line with its Terms of Reference. This allowed the Committee to oversee effectively and thoroughly the practices and performance of the Company with respect to safety, environment including climate change, and broader sustainability.

The topics discussed in particular depth by the Committee included personal and process safety, a range of environmental topics, Shell's energy transition targets, and remuneration metrics. The Committee also reviewed in detail Shell companies' operations and the challenges faced in Nigeria.

The Committee supported and contributed to the announcement of Shell's Powering Progress strategy in 2021. This included a series of targets and commitments under the goals of achieving net-zero emissions, respecting nature, and powering lives. The Committee believes the Powering Progress strategy further demonstrates Shell's determination to play its full role in the energy transition. The Committee has conducted in-depth discussions with senior management about how Shell's energy transition targets for the near-term, medium-term and longer-term will be met through a combination of developing low-carbon energy businesses, transforming existing assets to energy and chemicals parks, carbon abatement programmes, portfolio actions,

the use of nature-based solutions, and the development of carbon capture, utilisation, and storage (CCUS).

Following the Committee's review of remuneration with management, the safety and energy transition metrics have been further enhanced for the 2022 Executive Committee annual scorecard and the 2022-24 Long-Term Incentive Plan in order to drive further performance improvements.

Together with the Audit Committee, the Committee reviewed the controls and procedures for managing contracting and procurement activities. The Committee Chair held several meetings with senior leaders to discuss specific topics, including reducing carbon emissions and enhanced assurance protocols. Committee members also held a series of individual engagements with business directors to discuss their reflections on emerging risks.

The Committee also reviewed wider matters of public concern during 2021 such as plastic waste, methane emissions, human rights, diversity and inclusion, and access to energy in low- and middle-income countries. The Committee engaged with external stakeholders on the topic of plastic waste and undertook a feedback session on how Shell's energy transition strategy and targets are perceived.

The Committee continued to closely monitor and strongly support Shell's response to the COVID-19 pandemic in 2021 in terms of care for staff and the safe management of operations.

For further details on SESCo and how Shell manages sustainability see www.shell.com

### SITE VISITS
The Committee postponed its planned site visits for 2021 because of the COVID-19 pandemic. The Committee instead conducted a virtual site visit to the Qatar Gas-to-Liquids facility via videoconference. The visit focused on safety and environmental performance and broader sustainability issues. The Committee Chair also held a follow-up engagement with the Rheinland Refinery in Germany to review safety performance and progress with the planned transformation of the site into an energy and chemicals park.

| Activities performed | Frequency |
|---|---|
| Review Shell's practices and performance relating to safety, including the safe condition and responsible operation of Shell's assets (Shell-operated ventures and non-Shell-operated ventures), with a focus on both employees and contractors | Every meeting |
| Review Shell's practices and performance relating to environment, including in particular environmental protection and greenhouse gas emissions | Every meeting |
| Review any major incidents that impact, or had the potential to impact, Shell's safety and environmental performance | As necessary |
| Review progress towards meeting Shell's Powering Progress ambitions, including its near-term and longer term energy transition targets for net carbon intensity and becoming a net-zero emissions energy business, in step with society | Most meetings |
| Endorse Shell's annual assurance plan for Health, Security, Safety, Environment and Social Performance (HSSE & SP) and Asset Management | Annually |
| Review execution of Shell's HSSE & SP assurance plan and audit outcomes, and review relevant findings from Shell's broader internal audit programme | Most meetings |
| Assess Shell's overall sustainability performance and provide input to Shell's annual reporting and disclosures regarding sustainability | Annually |
| Review how Shell addresses other major issues of public concern that could affect Shell's reputation and licence to operate | Most meetings |
| Review and consider external stakeholder perspectives in relation to Shell's business | Periodically |
| Advise the Remuneration Committee on metrics relating to safety and energy transition | Annually |

AUDIT COMMITTEE REPORT

Dear Shareholders,

I am pleased to present our Audit Committee Report for 2021.

I begin this report by welcoming Jane Holl Lute to the Audit Committee (AC). Jane joined the AC in July 2021 and her insights are a valuable addition to the AC.

The primary role of the AC is to assist the Board in fulfilling its oversight responsibilities in areas such as the integrity of financial reporting, the effectiveness of the risk management framework and system of internal controls as well as consideration of ethics and compliance matters. We are responsible for assessing the quality of the audit performed by, and the independence and objectivity of, the external auditor. The AC also makes a recommendation to the Board on the appointment or reappointment of the external auditor. In addition, we oversee the work and quality of the internal audit function.

The AC's work programme over the course of a year focuses on a variety of matters that involve either a high degree of judgement and/or are significant to Shell's consolidated financial statements. Topics addressed during 2021 included the potential impact of climate change on Shell's consolidated financial statements, redundancy and restructuring charges related to Reshape, deferred taxes and tax exposures, significant portfolio acquisitions and divestments, third-party credit exposure, litigation, including the Dutch climate court case ruling, discount rates used for impairment testing, decommissioning and other provisions, impairment trigger assessments, charges and reversals, accounting for complex contracts, dividend distribution capacity and marked-to-market derivatives accounting.

The AC reviewed with management areas which required significant judgement, the sources of estimation uncertainty and other key assumptions in light of economic and market uncertainty, climate risk and the energy transition, and evolving stakeholder expectations. In addition, the AC discussed with management the robustness of the risk and internal control management framework, results of internal control testing performed throughout the year and remediation activities.

These discussions also covered how risks to controls stemming from the organisational restructuring aspects of Reshape were managed. The AC also received briefings from the Chief Internal Auditor on the effectiveness of Shell's risk management and internal control system and on the outcomes of significant audits and notable control matters.

The impacts of climate change and the energy transition touch on many aspects of the AC's work. The AC's focus areas for 2021 included a number of discussions on the financial statement impacts of climate change and energy transition and the increasing calls for expanded climate-related information. Non-financial reporting was one such topic and included discussions on planned enhanced disclosures related to climate change reporting and other ESG information. The AC reviewed the pricing methodology for oil and gas and discussed with management how the impact of climate change was reflected in the methodology. This topic provided greater insights to the AC as to how macroeconomic conditions, major trends in the industry, and geopolitical factors, including carbon pricing and long-term demand for oil and gas, are considered in developing the outlook for commodity prices and refining margin assumptions, which are important considerations in business planning, asset impairment analyses, and investment and divestment decisions. Further, the quarterly reports reviewed by the AC from Ernst and Young LLP (EY), our external auditor, and the Chief Internal Auditor, also included specific steps they have taken to incorporate climate change considerations into all facets of their work.

The AC reviewed the additional disclosures in relation to the potential financial impacts of climate change. The AC, recognising the evolving nature of climate change risks and responses, concluded that climate change has been appropriately considered by management in key judgements and estimates and agreed with the disclosure made by management.



<span style="color:red">"The primary role of the AC is to assist the Board in fulfilling its oversight responsibilities in areas such as the integrity of financial reporting, the effectiveness of the risk management framework and system of internal controls as well as consideration of ethics and compliance matters."</span>

The AC reviewed the governance and controls related to Renewables and Energy Solutions (R&ES) new business models and ventures and was briefed on the new proposed business re-segmentation for 2022. Other focus topics for 2021 included pensions, trading and supply, and contracting and procurement, all of which represent significant financial activities and obligations.

As part of its oversight of compliance with applicable legal and regulatory requirements, including monitoring ethics and compliance risks, the AC discussed with the Chief Ethics and Compliance Officer activities undertaken in the ethics and compliance programme related to conduct risks stemming from the continued effects of COVID-19 as well as Reshape, and steps taken to manage those risks.

Due to continued COVID-19 travel restrictions, the AC conducted virtual visits to Shell's Energy Transition Campus in Amsterdam and Shell's Houston offices. As part of its virtual visit to the US, the AC also toured virtually the Shell Geismar Chemicals facility in Baton Rouge, Louisiana. These site visits deepen the AC's understanding of the risks and opportunities arising in key markets as well as of how the Company's Powering Progress strategy is being implemented in those locations. The visits also provide the opportunity for the AC to engage with a diverse range of Shell staff in each location and to hear directly from them.

On a final note, the AC acknowledges the financial reporting team's substantial work during 2021. While continuing under a remote work environment, the team has demonstrated resilience and continued focus on enhancements in reporting while working to maintain a robust control environment. The AC conveys its gratitude and appreciation for their strong commitment and dedication.

**ANN GODBEHERE**
Chair of the Audit Committee
March 9, 2022

## Focus areas for 2021

- Non-financial reporting (including enhanced disclosures related to climate change)
- Oil and gas pricing methodology (including carbon pricing and long-term demand for oil and gas)
- New business models and ventures
- Contracting and procurement
- Trading and Supply
- Pensions

## Priorities for 2022

- Non-operated ventures controls and governance
- Update on regulatory developments (including in relation to climate change and energy transition)
- Portfolio activities (refineries) and managing post-completion rights and obligations
- Asset Management System
- GHG reporting and assurance framework

## COMMITTEE MEMBERSHIP AND ATTENDANCE FOR 2021

 **Ann Godbehere**     **Dick Boer**

 **Martina Hund-Mejean**     **Gerrit Zalm**

 **Jane Holl Lute**

During 2021, the members and meeting attendance of the AC were as follows:

| Committee Member | Member since | Maximum possible meetings | Number of meetings attended [A] | % of meetings attended |
|---|---|---|---|---|
| Ann Godbehere (Chair) | May 23, 2018 | 6 | 6 | 100% |
| Dick Boer | May 20, 2020 | 6 | 6 | 100% |
| Jane Holl Lute [B] | July 28, 2021 | 2 | 2 | 100% |
| Martina Hund-Mejean | May 20, 2020 | 6 | 6 | 100% |
| Gerrit Zalm | March 8, 2017 | 6 | 6 | 100% |

[A] In addition to the six meetings, the AC conducted three deep-dive sessions and two virtual site visits as part of its activities.
[B] Ms Lute was appointed to the Board with effect May 19, 2021 and the AC with effect from July 28, 2021.

Exhibit Q

All AC members are financially literate, independent Non-executive Directors. In respect of the year ended December 31, 2021, for the purposes of the UK Corporate Governance Code, Ann Godbehere and Martina Hund-Mejean both qualify as: a person with "recent and relevant financial experience" and competence in accounting, and, for the purposes of US securities laws, an "audit committee financial expert".

The experience of the AC members outlined on pages 119 to 125 demonstrates that the AC as a whole has competence relevant to the sector in which Shell operates, and the necessary commercial, regulatory, financial and audit expertise required to fulfil its responsibilities. The AC members have gained further knowledge and experience of the sector as a result of their Board membership and through various in-person and virtual site visits since their respective appointments.

The AC invites the Chief Financial Officer, the Legal Director, the Chief Internal Auditor, the Executive Vice President (EVP) Taxation and Controller, the Vice President Group Reporting and the external auditor to attend each meeting. The Chief Executive Officer attends each meeting where the quarterly, half-year and year-end financial results are discussed. The Chair of the Board also regularly attends AC meetings. Other members of management attend when requested on specific topics or to provide input on more detailed technical matters that may arise. The AC regularly holds private sessions separately with the Chief Internal Auditor and the external auditor without members of management, except for the Legal Director, being present. Outside of the formal AC meetings the AC Chair meets regularly with each of the Chief Financial Officer, EVP Taxation and Controller, the Chief Internal Auditor, the external auditor, and the Chief Information Officer (CIO).

**AC REMIT**

The roles and responsibilities of the AC, as set out in its Terms of Reference, are reviewed annually taking into account relevant regulatory changes and recommended best practice. The key responsibilities of the AC include, but are not limited to:

**Risk Management and Internal Control**

• evaluating the effectiveness of the system of risk management and internal control;

**Financial Reporting**

• reviewing the integrity of the financial statements, including annual reports, half-year reports, and quarterly financial statements;
• reviewing the potential impact on the consolidated financial statements of the implementation of the Company's strategy, climate change and the energy transition;
• advising the Board whether, in the AC's view, the Annual Report taken as a whole is fair, balanced and understandable and provides the information necessary for shareholders to assess Shell's position and performance, business model and strategy;
• reviewing and discussing with management the appropriateness of judgements involving the application of accounting principles and disclosure rules;

Compliance and Governance

• reviewing the functioning of the Shell Global Helpline and reports arising from its operation;
• overseeing compliance with applicable legal and regulatory requirements, including monitoring ethics and compliance risks;

**Internal Audit**

• monitoring the qualifications, expertise, resources and independence of the internal audit function;
• approving the internal audit function's remit and the annual internal audit plan to ensure alignment with the key risks of the business;
• reviewing the significant matters arising from internal audits with the Chief Internal Auditor and assessing management's response to significant internal audit findings and notable control weaknesses. This includes discussing with management potential improvements and agreed actions;
• assessing internal audit's performance and effectiveness each year; and

**External Audit**

• reviewing and monitoring the qualifications, expertise, resources and independence and objectivity of the external auditor;
• considering the annual external audit plan and approving related remuneration, including fees for audit and non-audit services;
• assessing the performance and effectiveness of the external auditor and the audit process, including an assessment of the quality of the audit; and
• recommending to the Board for it to put to the Company's shareholders for approval at the Annual General Meeting (AGM) to appoint, reappoint, or remove the external auditor.

AUDIT COMMITTEE REPORT continued

These responsibilities form the basis of the AC's annual work plan, which is adjusted throughout the year as necessary. In addition, the AC annually identifies certain business and function areas to focus on during that year. The focus areas generally encompass aspects of risk management and internal control, financial reporting and compliance. The AC is authorised to seek any information it requires from management and external parties and to investigate issues or concerns as it deems appropriate. The AC may also obtain independent professional advice at the Company's expense. No such independent advice was requested in 2021.

The AC keeps the Board informed of its activities and recommendations, and the Chair of the AC provides an update to the Board after every AC meeting. The AC discusses with the Board if it is not satisfied with or believes that action or improvement is required concerning any aspect of financial reporting, risk management and internal control, compliance or audit-related activities.

A copy of the AC's Terms of Reference, which was updated to reflect the amended New York Stock Exchange rule regarding the AC's oversight for related party transactions and AC's role regarding the impact of Shell's strategy, climate change and energy transition on the financial statements of the Company and with respect to non-financial reporting relating to climate change and energy transition metrics, can be found at www.shell.com

**AC TOPIC COVERAGE IN 2021**
The pie chart below shows the percentage of time the AC spent on various activities during 2021.



**FOCUS AREAS FOR 2021**
23% of AC time and activities

Senior leaders from various business and function areas briefed the AC on the adequacy, design and operational effectiveness of risk management and controls related to the critical activities carried out by their respective business or function. The discussions included information on any enhancements to strengthen controls and how areas identified for improvement had been addressed, monitoring activities around key risks, and steps being taken to identify new or emerging risk areas.

In addition to the significant accounting and reporting considerations discussed on page 149, the business and function areas reviewed by the AC in 2021 included the following:

- Non-Financial Reporting (NFR) – The AC was briefed on the increasing pace of change in external regulatory and voluntary frameworks in non-financial reporting, which includes ESG reporting. The AC and management discussed the key shifts in the external landscape and in particular requests for expanded disclosure regarding: (i) a company's resilience to climate-related financial impacts, (ii) quantification of climate risks likelihood and impacts (including physical risks), (iii) explanations on emissions methodologies, (iv) further granularity on targets, and (v) details on low-carbon activities such as capital expenditure, revenues and research and development. The AC noted that Shell's NFR and ESG disclosures are included in Shell publications such as the Annual Report, the Sustainability Report, the Shell Energy Transition Strategy and Shell's website. The AC was informed of key regulatory and ESG frameworks and Shell advocacy activities in this area. The AC and management also discussed planned climate-related disclosure enhancements in Shell's reporting in line with the framework of the Task Force on Climate-Related Financial Disclosures (TCFD) and guidance from regulators. The AC and management discussed the expanded disclosures around governance, strategy, risk management, and targets and metrics and how to describe these elements and demonstrate the interdependencies that exist in practice between them. Management and the AC discussed the scenarios included in the expanded disclosure to assist stakeholders to understand the robustness of Shell's forward-looking strategy and plans across a range of possible future states. The AC and management also discussed a new note to the financial statements which summarises key areas where climate related risks are considered and the related impact on the financial statements.
- Oil and gas pricing methodology – The AC reviewed the process, methodology and approach to price assumptions used in Shell for such purposes as business planning, accounting (for example, impairment and deferred tax assessments) and investment and divestment decisions. The AC considered the overall governance framework, how the key principles of independence, expertise, consistency and stability are applied and management's oversight responsibilities. The AC also reviewed how factors such as supply and demand outlooks, the pace and extent of energy transition in different energy sources and markets, and macroeconomic conditions are considered when developing Shell's short and long-term price assumptions. The AC also discussed with the external auditor its independent analysis of price assumptions and external benchmarks for price assumptions.
- New business models and ventures – The AC received a briefing from management regarding the governance approach to new business models and ventures, including R&ES portfolio companies. The AC and management discussed the activities in 2021 to govern the implementation of the Shell Control Framework in the R&ES portfolio companies and the status of such activities. Management also provided the AC with an overview of recent internal audit results. The AC reviewed with management the challenges and risks related to the R&ES businesses and the learnings and planned governance improvements to support the R&ES ambitions.
- Contracting and Procurement (C&P) – As part of a joint session with the Safety, Environment and Sustainability Committee (SESCo), the AC was briefed on Shell's C&P programme. This included an

overview of how (i) C&P and business lines work together to procure services and goods, (ii) C&P digital tools are designed to ensure that potential risks relating to procurement procedures, such as credit risks, regulatory requirements and ethics and compliance matters, are appropriately addressed at individual and Group level, and (iii) through its procurement activities, Shell manages stakeholders' expectations that Shell will positively influence third parties in environmental and social issues; such as climate change, conserving natural resources and biodiversity, and promoting human rights, worker welfare, safety, and diversity. C&P leaders, the AC and SESCo discussed efforts to ensure continued competitive performance and resilience amid increasing volatility, rising inflation and supply chain disruption.

- Trading and Supply's (T&S) control framework – Noting the continued regulatory demands in this area, the AC met with T&S leaders, including the Risk Officer, to gain a deeper understanding of the controls and processes enhancements undertaken in 2021. The AC was briefed on the Integrated Risk Management Framework being developed and the capabilities and systems improvements identified through the market risk road map. The AC and T&S leaders discussed the progress on strengthening IT general controls, front and mid-office controls and compliance functions. T&S leaders briefed the AC on the structural organisational changes being made to enable effective implementation of systems and processes enhancement while managing the risks arising from a volatile commodity price environment and the impact of Reshape.

- Pensions - Treasury leaders provided the AC with an overview of Shell's pension plans which cover around 230,000 current and past employees in 46 countries. The AC reviewed the governance arrangements and operating model for Shell's pension plans that result from their independent trust structures in different jurisdictions. The AC was briefed on pension risks and risk management governance, actuarial and investment management, operational oversight, and assurance activities undertaken by two centres of expertise which support Shell's pension plans. The AC gained insights into the control framework, standards, modelling and guidelines that are designed to ensure appropriate measurement and reporting of pension liabilities, assets, and annual payments.

In January 2022, the AC conducted a virtual visit to Shell's Houston, Texas offices. As part of this visit, the AC received briefings on how the US businesses are implementing Shell's Powering Progress strategy through an overview of various energy transition projects and initiatives. The AC also was informed of the initiatives under the Racial DEI Plan, which focuses on inclusion, representation and outreach, and planned activities focused on issues of race, ethnicity, which also include diversity, equity, and inclusion as it relates to gender, LGBT+, and people with disabilities. The AC also gained insight into the cyber-security defence and risk operations; the regional advancement of the energy transition in the USA; the integrated Power approach between Trading and Supply and R&ES businesses; and engaged with staff on how Shell is powering lives. The AC also conducted a virtual visit to Shell's Geismar chemicals facility in Baton Rouge, Louisiana, which is the centre of a suite of potential projects that are focused on infrastructure and emissions mitigations to deliver low-carbon products to its customers. As part of this virtual visit, the AC reviewed incident management through the deep-water Gulf of Mexico lens of dealing with COVID-19, rapid and significant oil price declines and Hurricane Ida.

In February 2022, the AC undertook a virtual visit to Shell's Energy Transition Campus in Amsterdam. As part of this visit, the AC and Project and Technology (P&T) leaders discussed P&T's business risk management and risk matrix. The AC was also provided with an overview of P&T's portfolio, including those that support the energy transition and Shell's net-zero emissions target, and was briefed on a current P&T project.

As part of its review of new business models and ventures, the AC had intended to visit one of Shell's new ventures in 2021. Due to COVID-19 travel restrictions, this visit has now been rescheduled to take place in 2022.

Site visits are a welcome addition to the AC's annual work plan, as they provide the opportunity for the AC to gain a deeper understanding of the various businesses and functions at each location, the local external environment within which those activities take place and how they contribute to Shell achieving its strategic ambitions. In addition to in-depth examinations of specific business areas, these visits enable the AC members to interact with a diverse group of staff and learn about their experiences, challenges they face and their opportunities for career development. The AC is also briefed on the impact of the energy transition at a local level, how risks associated with climate change are managed, and the results of the Shell People Survey.

**RISK MANAGEMENT AND INTERNAL CONTROL**
24% of AC time and activities

The AC assists the Board in fulfilling its responsibilities in relation to risk management and internal control. In order to monitor the effectiveness of the procedures for internal control over financial reporting, compliance and operational matters, the AC reviews reports on risks, controls and assurance, including the annual assessment of the system of risk management and internal control. This annual assessment includes the AC's review of outcomes from the Group Assurance Letter process. The Group Assurance Letter process involves each Executive Director conducting a structured internal assessment of compliance with legal and ethical requirements and the Shell Control Framework. The AC also reviews the Company's evaluation of the internal control over financial reporting as required under Section 404 of the Sarbanes-Oxley Act (SOX 404). The AC updated the Board on compliance with internal controls across the Shell Group and on any major matters for which action or improvement was recommended.

| Activities performed | Frequency |
|---|---|
| **Risk Management and Internal Control** | |
| Review the policies and practices and monitor the effectiveness relating to Shell's risk management and internal control system. | P |
| Receive briefings on regulatory developments. | P |
| Review management's SOX 404 assessment. | A |
| Discuss significant matters arising from completed internal audits with the Chief Internal Auditor, management and the external auditors. | Q |
| Assess management's responses to significant audit findings, recommendations and notable control weaknesses, including potential improvements and agreed actions. | P |
| Review significant legal matters with Shell's Legal Director. | Q |
| Review the oil and gas reserves control framework. | A |
| Review Shell's information risk management. | P |
| Review Shell's tax function, key tax risks and Shell's approach to the evolving area of tax transparency. | P |

A = Annually, Q = Quarterly, P = Periodically

Throughout the year, the AC and management discuss the Company's overall approach to risk management and internal control, including compliance, tax, and information risk management matters and the adequacy of disclosure controls and procedures. The AC receives quarterly reports from the EVP Taxation and Controller on the status of actions to address control weaknesses identified via business control incidents and the trends in other measures used to monitor the robustness of the risk management framework and internal control systems. The AC is also briefed on litigation matters (see "Governance" on page 188 and Note 26 to the "Consolidated Financial Statements" on pages 255 to 257.

The AC regularly reviews the status of management's SOX 404 testing of controls and remediation actions to address any identified weaknesses. Similar to 2020, for 2021, these reviews included consideration of how the COVID-19 pandemic affected the controls and assurance landscape, including the financial reporting process. The AC and management discussed the steps taken to maintain an effective control environment, to demonstrate "management in control" during the pandemic and to address any new or emerging risks due to the working-from-home setting. The AC was also briefed on how management was monitoring and addressing any impacts on the control environment from the organisational restructuring from Reshape.

It is important that the AC monitor and learn about evolving external developments in a timely fashion. Accordingly, the AC was informed of developments in the legal, regulatory and financial reporting landscape that could affect the Company. The AC's briefings in this area were supplemented by the overview of the ESG reporting landscape provided as part of its non-financial reporting focus topic for 2021.

In 2021, the AC dedicated time to the following topics:

• Tax risks – In addition to the regular review of Shell's tax provisions, the AC and management discussed the Tax function's operational performance and key developments and challenges for a global company like Shell operating across many differing tax jurisdictions. The AC was briefed on the tax integrated assurance model which is designed to ensure compliance with applicable tax, disclosure and accounting requirements. Management outlined for the AC the potential implications of the current external tax environment and increasing demand for scrutiny and transparency. These included expected higher compliance burden, increased risk of double taxation, tax challenges arising from the digitalisation of the economy, and potential upward pressures on effective tax rates.
• Information risk management –The CIO briefed the AC on the diverse risk landscape and the steps being taken to manage the increased external threats observed. The AC was informed of the investments made to build a robust cyber-security framework over the last decade with enhanced cyber-incident detection, response and recovery capabilities, and expanded monitoring and data protection. The AC and CIO also discussed the transformation occurring in Shell's IT systems as part of the Powering Progress strategy, reflecting the evolving portfolio of businesses and the greater number of digital products for customers.
• Oil and gas reserves control framework – The AC annually reviews the framework that supports Shell's internal reporting and external disclosures of oil and gas reserves. The AC also reviews the processes and controls that prevent and/or mitigate the risks of non-compliance with regulatory reporting requirements. This annual review of Shell's oil and gas reserves control framework supports the AC's review of Shell's reported proved oil and gas reserves discussed later in this report.

In addition to the above, the AC also had quarterly discussions with the Chief Internal Auditor regarding the Company's risk management and internal control system, significant matters arising from the internal audit assurance programme and management's response to significant audit findings and notable control weaknesses, including planned improvements and agreed actions.

The AC similarly holds discussions on EY on a quarterly basis regarding how risks to audit quality are addressed, key accounting and audit judgements, results from audit procedures and management's response to any significant audit findings and any material communications between EY and management.

AUDIT COMMITTEE REPORT continued

FINANCIAL REPORTING
24% of AC time and activities

The AC receives comprehensive reports from management and the external auditor on quarterly financial reporting, accounting policies and significant judgements and reporting matters.

| Activities performed | Frequency |
|---|---|
| **Financial Reporting** | |
| Review Shell's accounting policies and practices, including compliance with accounting and reporting standards. | Q |
| Assess the appropriateness of key judgements and the interpretation and application of accounting principles. | Q |
| Review the potential impact on the consolidated financial statements of the implementation of the Company's strategy, climate change and the energy transition | Q |
| Consider the integrity of the year-end financial statements and recommend to the Board whether the audited financial statements should be included in the Annual and statutory reports. | A |
| Consider the integrity of the half-yearly report and quarterly financial statements. | Q |
| Review management's assessment of going concern and longer-term viability. | Q |
| Review Shell's policies with respect to earnings releases; financial and non-financial performance information and earnings guidance; and significant financial reporting matters. | Q |
| Review Shell's policies with respect to oil and gas reserves accounting and reporting including the outcome of the oil and gas reserves booking/debooking process. | A |
| Review the internal controls for financial reporting. | P |
| Advise the Board of the AC's view on whether, taken as a whole, the Annual Report is fair, balanced and understandable and provides the information necessary for shareholders to assess Shell's position, business model and strategy. | A |

A = Annually, Q = Quarterly, P = Periodically

The AC reviewed the Company's 2021 quarterly unaudited interim financial statements, half-yearly report and Annual Report with management and the external auditor.

Shell uses alternative performance measures (APMs) to provide greater insights into its financial and operating results. The AC regularly considers the APMs used in Shell's reporting, the reconciliations to IFRS financial statements and explanations for changes from the previous quarter. The AC reviews the overall presentation of APMs with management to ensure they are not given undue prominence. The AC discusses adjusting items with management including any changes to methodology.

In 2021, the AC was briefed on a new APM: Adjusted EBITDA on a FIFO and CCS basis. The APMs disclosed by Shell are subject to the same internal controls process as for other financial reporting.

The AC discussed the audited financial statements with management and the external auditor. The AC advised the Board that in its view the 2021 Form 20-F including the financial statements for the year ended December 31, 2021, taken as a whole, provides the information necessary for shareholders to assess Shell's position and performance, business model and strategy. The AC also advised the Board that in its view, the inclusion of the audited financial statements in the 2021 Form 20-F is appropriate. To reach this conclusion, the AC critically assessed drafts of the 2021 Form 20-F including the financial statements and reviewed with management the process for ensuring compliance with applicable requirements. This process included: verifying that the contents of the 2021 Form 20-F are consistent with the information shared with the Board during the year to support their assessment of Shell's position and performance; ensuring that consistent materiality thresholds are applied for favourable and unfavourable items; considering comments from the external auditor; and receiving assurance from the Executive Committee (EC). The AC also reviewed and considered the Directors' half-year and full-year statements with respect to the going concern basis of accounting. The AC and the external auditor also discussed matters regarding the audit and the quality of the accounting judgements employed by management.

Exhibit Q

**SIGNIFICANT ACCOUNTING AND REPORTING CONSIDERATIONS**

The AC assessed the following significant accounting and reporting areas, including those related to Shell's 2021 Consolidated Financial Statements. The AC was satisfied with how each of the areas below was addressed. As part of this assessment, the AC received reports, requested and received clarifications from management, and sought assurance and received input from the internal and external auditors.

| Issue | AC activity and outcome |
|---|---|
| **Climate change and energy transition** | |
| Climate change and energy transition related risks are continually monitored to ensure impacts are reflected within Shell's financial statements. After a claim by Milieudefensie (Friends of the Earth Netherlands), other NGOs and a group of private individuals, in May 2021 the District Court in The Hague ruled that Shell must reduce its global net carbon emissions by 45% by 2030 compared with 2019 levels. The external landscape related to non-financial disclosures continues to change at unprecedented speed. In the absence of one global standard for climate related reporting there are growing demands from various regulatory and voluntary bodies all with their own expectations for disclosures. | The AC was briefed on key regulatory requirements including (but not limited to) the FRC, SEC and EU disclosure requirements and their implications for Shell's external disclosures. The AC reviewed the new Note 4 of the financial statements summarising the key climate risks impacts on the Financial Statements as well as the new impairment sensitivity disclosures using price outlooks based on different climate change scenarios, including external scenarios. See Note 4 to the "Consolidated Financial Statements" on pages 218 to 223. The AC has considered the impact of the Dutch climate court case ruling on financial reporting. As at the second quarter of 2021 it agreed with management's conclusion that the outcome of the case had no impact on the 2021 interim financial statements. In the third quarter 2021 Shell announced absolute GHG emissions reduction target of 50% on all Scope 1 and 2 emissions under Shell's operational control by 2030, compared to 2016 levels on a net basis. This target has been reflected in the operating plan as reviewed by the Board. The AC sought assurance from management that assumptions used for the preparation of the consolidated financial statements are consistent with the operating plan. The AC was briefed on the non-financial reporting external landscape developments and regulatory requirements. In doing so, the AC considered the potential implications required for Shell's external disclosures going forward (see Shell Powering Progress on pages 12 to 17). The AC reviewed the TCFD disclosure in the Energy Transition and Climate Change section and other non-financial disclosures as part of the Annual Report review and was briefed on the new EU taxonomy voluntary disclosures included as supplementary information to the Annual Report. Updates regarding climate change and energy transition have been included in the risk factors section on pages 23 to 32. |
| **Impairment and impairment reversals** | |
| The carrying amount of an asset should be tested for impairment or impairment reversal whenever events or changes in circumstances indicate that the carrying amount for that asset may have changed, for example if there is a change in the outlook for commodity prices or refining margin assumptions, or revisions to future activity plans and developments. On classification as held for sale, the carrying amounts of property, plant and equipment (PP&E) and intangible assets must also be reviewed. | The AC reviewed the impairment assessments that were performed each quarter, and the methodology applied in conducting impairment assessments. The AC reviewed the changed estimation technique to determine the value in use for impairment testing, including the change to a post-tax WACC based methodology and the appropriateness of the resulting new discount rate applied. The AC considered the updated oil and gas price and refining margin outlooks against market developments and benchmarks. The 2022 short term oil and gas price assumptions have been updated to reflect the current market environment. Notwithstanding the current buoyant oil and gas commodity markets, the long-term oil and gas price assumptions have not materially changed and therefore there have been no impairment or impairment reversal triggers. The AC also reviewed other impairment triggers, including for exploration and evaluation assets, held-for-sale classification for asset disposals (e.g. Puget Sound and Deer Park) and plans to convert refineries into energy and chemicals parks. The AC review of impairments covered a significant proportion of the balance sheet. See Notes 2, 8, 9 and 10 to the "Consolidated Financial Statements" on pages 208 to 217 and 227 to 232. |

Exhibit Q

| Issue | AC activity and outcome |
|-------|-------------------------|
| **Taxation** | |
| The determination of tax assets and liabilities requires the application of judgement as to the ultimate outcome, which can change over time. In particular, tax exposures and the recognition of deferred tax assets require management to make assumptions regarding future profitability. As a result they are inherently uncertain. | The AC considered the uncertain tax positions and discussed management's assumptions of future taxable profits, including the impact of foregone future profits due to disposals. The AC also evaluated the appropriateness of the recognition of deferred tax assets and tax liabilities. The AC acknowledged that assumptions regarding future taxable profits are inherently uncertain because they involve assessing factors such as the pace of economic recovery in different countries and the potential impacts of climate change and energy transition. The AC deemed the assessments of uncertain tax exposures and the recognition of deferred tax assets and tax liabilities to be reasonable. The AC also assessed the accounting judgments made regarding the treatment of tax provision releases relating to Nigeria. The AC also reviewed the impact on tax balances and disclosures as a result of the simplification of Shell's structure in 2021 and aligning Shell's tax residence with its country of incorporation in the UK. See Notes 2 and 17 to the "Consolidated Financial Statements" on pages 208 to 217 and 237 to 239. |
| **Portfolio activities** | |
| In implementing the Powering Progress strategy, several portfolio developments occurred in 2021. In particular, there was rationalisation of the refinery portfolio, divestment of Upstream assets and investments in Renewables and Energy Solutions. | The AC discussed the accounting implications of these decisions and the recognition of: (i) decommissioning and restoration provisions; (ii) deferred tax balances; (iii) impairment; and (iv) assets held for sale. The AC also considered the complex accounting treatments associated with some of the new business arrangements, such as the Amazon transaction and Hollandse Kust Noord CrossWind. The AC provided support for projects to develop detailed accounting guidance for these types of transaction. See Notes 2 and 19 to the "Consolidated Financial Statements" on pages 208 - 217 and 245. |
| **Reshape restructuring provisions** | |
| A comprehensive portfolio and organisational review, Reshape, was implemented during 2021 with related redundancy provisions, pension curtailments and charges recognised in the 2021 Consolidated Financial Statements. | During Q1 2021 the AC considered the accounting implications and whether the criteria to recognise a restructuring provision as per IAS 37.72 were fulfilled. The AC concurred with management that the criteria had been met by March 31, 2021 and that it was appropriate to recognise the restructuring provision. The AC considered the effect of Reshape, received updates and reviewed associated accounting implications as Reshape activities progressed throughout the year. See Notes 2 and 19 to the "Consolidated Financial Statements" on pages 208 - 217 and 245. |
| **Decommissioning and restoration provisions** | |
| Decommissioning and restoration provisions are one of the main components of both balance sheet liabilities. The quantification of these provisions requires judgements on input parameters which include, but are not limited to, estimated future decommissioning and restoration costs and discount rates. | Following the AC's 2020 review of the decommissioning and restoration process, in 2021 the AC reviewed the input parameter assumptions and judgements used in arriving at the provisions. The AC reviewed the appropriateness of updates to the discount rate for provisions in Q4 2021 and shorter expected average duration of decommissioning and restoration outflows. See Note 19 to the "Consolidated Financial Statements" on page 245. |
| **Retirement benefit obligations** | |
| Retirement benefits are an important component of both balance sheet assets and liabilities. The quantification of these assets and liabilities requires judgements on input parameters which include, but are not limited to, actuarial assumptions and discount rates. | The AC was briefed on the management and risks in relation to retirement benefits in 2021, including financial, operational, and regulatory developments. The AC reviewed the key assumptions and sensitivities as part of the Annual Report review and the enhanced disclosures made in the 2021 Annual Report. See Note 18 to the "Consolidated Financial Statements" on pages 239 to 244. |

Exhibit Q

| Issue | AC activity and outcome |
|---|---|
| **Trading and Supply, derivatives accounting and expected credit losses** | |
| External events during the year such as the Texas winter storm and developments in gas and power markets in the second half of 2021 affected trading activities. The impacts on financial outcomes of Integrated Gas and Renewable and Energy Solutions included, for example, expected credit losses in the first quarter, and mark-to-market fluctuations and derivative cash flows in the third and fourth quarters. | The AC was briefed on Trading and Supply activities and developments. The AC reviewed the expected credit losses in Q1 relating to the Texas winter storm. In Q3 and Q4 the AC reviewed the impact of volatile gas and power markets including the impact on mark-to-market valuation of derivatives, IFRS and Adjusted Earnings, as well as the resulting cash flows movements. |
| **New reporting segments 2022** | |
| To align external disclosures with the Powering Progress strategy and the way Shell's CEO reviews and assesses performance, management reassessed Shell's segment reporting. Starting on January 1, 2022, Shell's reportable segments will consist of Marketing, Renewables and Energy Solutions, Chemicals and Products, Integrated Gas, Upstream and Corporate. | The AC assessed the appropriateness of the planned reportable segments for 2022 and received updates on implementation readiness to ensure the integrity of the reportable segments in Q1 2022. The AC also discussed with management implications for future impairment testing of the cash generating units including testing of goodwill relative to the new reportable segments. |
| **Alternative performance measures (APMs) and improved financial disclosures** | |
| The use of APMs is reviewed throughout the year to consider attributes such as usefulness to stakeholders, how easy they are to understand and reconciliation transparency. | The AC undertook its regular monitoring and assessment in the use of APMs, for example Adjusted Earnings (including identified items during the quarters and the identified items policy update in Q1 2021), CFFO excluding working capital, and Net Debt and Gearing. |
| To further improve the quality of insights provided by Shell's financial disclosures, improvements were made during the year for example around enhanced data disclosures and the disclosure of assets held for sale on the balance sheet. | The AC reviewed the appropriateness of the financial disclosure improvements made during Q1 2021 including the changes to the MD&A in the Quarterly Results Announcement, the enhance disclosures in the Quarterly Date Book, and the introduction of adjusted EBITDA on a CCS and FIFO basis as APMs. |
| | As a result of the Permian sale announcement in Q3 2021, the AC reviewed the appropriateness of the Asset Held for Sale classification in the balance sheet. |

**Other matters**

The AC reviewed: the year-end reported proved oil and gas reserves, including management judgements and adjustments made to reflect changes in geological, technical, contractual and economic information (including yearly average price assumptions) and the effectiveness of financial controls.

On February 28, 2022, Shell announced its intention to exit its ventures in Russia with Gazprom and related entities. Subsequently, on March 8, 2022, Shell announced its intention to withdraw from its involvement in all Russian hydrocarbons in a phased manner, including shut its service stations, aviation fuels, and lubricant operations in Russia. These announcements have been included as non-adjusting post balance sheet events (PBSE) in the Consolidated Financial Statements and have been reviewed by the AC (see note 32 on pages 261).

**COMPLIANCE AND GOVERNANCE**
8% of AC time and activities

| Activities performed | Frequency |
|---|---|
| **Compliance and Governance** | |
| Monitor the receipt, retention, investigation and follow-up actions of complaints received, including those from the Shell Global Helpline. | P |
| Review with the Chief Ethics and Compliance Officer the implementation and effectiveness of the ethics and compliance programme and function. | A |
| Discuss compliance with applicable external legal and regulatory requirements. | P |
| Perform an evaluation of the AC's performance and effectiveness and report the results to the Board. | A |
| Review and update the AC's Terms of Reference. | A |
| Review the Chief Financial Officer's significant business and investment transactions for potential conflicts or related party transactions. | A |
| Assess the Chief Financial Officer's performance. | A |

A = Annually, Q = Quarterly, P = Periodically

**Ethics and compliance**

In 2021, the AC received an update from the Chief Ethics and Compliance Officer on how a range of macro factors and external trends and developments, the continued effect of COVID-19 and changes as a result of Reshape were affecting conduct risk at Shell. The Chief Ethics and Compliance Officer summarised the specific emerging conduct risks and management's actions to manage and mitigate them. The Chief Ethics and Compliance Officer briefed the AC on communications to staff from both senior leaders and mid-level management reinforcing the importance of adherence to and
affirming Shell's commitment to the Ethics and Compliance framework and Code of Conduct throughout the pandemic.

With staff returning to the workplace and the roll-out of the Future of Work initiative, the AC and the Chief Ethics and Compliance Officer discussed the potential challenges of hybrid work environments. These included the risk of employees feeling disadvantaged by working remotely and the possible loss of the informal learning and development that occurs when employees are together in the workplace. The Chief Ethics and Compliance Officer informed the AC of management's considerations to address these challenges, which include using digital technology, novel approaches to training, and developing bite-sized and focused training to give staff targeted information.

As part of the annual assessment of the system of risk management and internal control, the AC discussed with the Chief Ethics and Compliance Officer his annual report on compliance matters. The report included an overview of the effectiveness of the Shell ethics and compliance programme in managing ethics and compliance risk in Shell's business activities, regulatory developments and compliance activities. The AC also discussed investigations of cases involving ethics and compliance concerns. The AC discussed management's findings in such cases to satisfy itself that a rigorous process had been followed, and that appropriate disciplinary action had been taken where necessary and management had embedded learnings into Shell's systems and controls.

**Whistleblowing investigations**

The AC is responsible for establishing and monitoring the implementation of procedures for the receipt, retention, investigation and follow-up actions of complaints received, including those from the Shell Global Helpline. The AC reviewed whistleblowing reports and internal audit reports and considered management's responses to the findings in these reports.

**Regulatory developments**

The AC was briefed on regulatory developments in areas including sustainable finance (in particular management's work on the EU Sustainable Finance Taxonomy); non-financial reporting (in particular management's assessment of the EU Non-Financial Reporting Directive Revision); accounting and reporting; environmental liabilities and treasury activities.

In March 2021, the UK Government's Department for Business, Energy & Industrial Strategy (BEIS) launched a consultation paper entitle "Restoring trust in audit and corporate governance". This paper contained wide ranging proposed reforms to strengthen the UK's audit and corporate governance regime. The AC and management discussed the proposed reforms, including implications for the Company, the Board and the AC. The AC reviewed management's proposed responses to certain topics in the consultation paper. The AC supports the Company's response to BEIS.

**AC annual evaluation**

The AC undertakes an annual evaluation of its performance and effectiveness. Consistent with the Board's annual performance evaluation for 2021, the AC's performance evaluation was facilitated by Lintstock Limited, a London-based corporate advisory firm. Each AC member responded to a confidential questionnaire about the AC's performance with questions on: the management of the AC in areas such as the annual cycle of work, agenda for meetings and time and input in meetings; the quality of the information provided to the AC; the value of the briefings provided to the AC on specific topics; the effectiveness of the AC's oversight in areas such as financial reporting, risk management and internal control, compliance and governance and the work of internal and external audit; rating the AC's performance in reviewing and assessing significant accounting and reporting judgements; and how to improve the AC's performance.

In assessing its progress against 2020 goals, the AC concluded it had achieved the 2021 priorities identified in the 2020 evaluation discussion (including the planned visits to Shell's Houston offices and to Shell's Energy Transition Campus in Amsterdam, reviews related to pensions, new business models and ventures, non-financial reporting, oil and gas pricing methodology, regulatory developments, C&P, and integrated risk management). The AC discussed the outcome of this review as part of its annual evaluation. The AC concluded that its performance in 2021 had been effective and that it had fulfilled its role in accordance with its Terms of Reference.

In preparing its workplan for 2022, the AC has agreed to the following focus areas in addition to the standing items: joint venture and non-operated ventures controls and governance; update on regulatory developments (including in relation to climate change and energy transition); portfolio activities (refineries) and managing post-completion rights and obligations; the GHG reporting and assurance framework; and the Asset Management System. As noted earlier, the AC also plans to visit one of Shell's new ventures in 2022 as a continuation of its focus on new business models and ventures in 2021.

AUDIT COMMITTEE REPORT continued

### INTERNAL AUDIT
9% of AC time and activities

| Activities performed | Frequency |
|---|---|
| **Internal Audit** | |
| Evaluate the quality, efficiency and effectiveness of the internal audit function including the competence, qualifications, expertise, compensation and budget. | A |
| Review and approve the internal audit function's remit, charter and audit plan. | A |
| Assess the performance of the Chief Internal Auditor. | A |

A = Annually, Q = Quarterly, P = Periodically

Quarterly, the AC discusses with the Chief Internal Auditor the Company's risk management and internal control system, any significant matters arising from the internal audit assurance programme and management's response to significant audit findings and notable control weaknesses including planned improvements and agreed actions. The AC also regularly holds private sessions separately with the Chief Internal Auditor without members of management, except for the Legal Director, being present. The AC's time for these activities is included in Risk Management and Internal Control described earlier in this report. Outside of the formal AC meetings, the AC Chair meets regularly with the Chief Internal Auditor.

#### Internal audit remit
The internal audit function is an independent assurance function which supports Shell's continuous efforts to improve its overall control framework. The internal audit function contributes to the maintenance of a systematic and disciplined approach to evaluate and improve the design and effectiveness of Shell's risk management, control and governance processes. The primary role of the internal audit function's assurance and investigation activities is to safeguard value by protecting Shell's assets, reputation and sustainability in relation to the organisation's defined goals and objectives.

The AC defines the responsibility and scope of the internal audit function and approves its annual plan. The Chief Internal Auditor reports functionally to the Chair of the AC and administratively to the Chief Financial Officer. The Chair of the AC approves, in consultation with the Chief Financial Officer, all decisions regarding the performance evaluation, appointment or removal of the Chief Internal Auditor.

#### Annual internal audit plan and assessment of internal audit's effectiveness
The AC considered and approved the internal audit function's annual audit plan, including focus areas for 2021 consisting of:
• talent and capability (professional audit development and technical capabilities);
• quality (developing first-line staff competence and clarity on self-verification and supervisory controls);
• alignment (improved integration of risk management and alignment of assurance processes across Shell); and
• engagement (mainly in the area of keeping staff and Shell stakeholders engaged and informed on effective risk management and internal control).

Beginning August 2021, audits of the Health, Safety, Security, Environment and Social Performance Control Framework were added to internal audit's remit, creating a unified internal audit function. Recognising that 2021 was a transition year for internal audit due to Reshape, the Chief Internal Auditor updated the AC quarterly on the approved 2021 internal audit plan and discussed whether the plan remained fit for purpose in addressing the most critical areas of risk in a year of transition. The AC assessed the performance of the internal audit function as effective. The AC also assessed the performance of the Chief Internal Auditor as effective.

The Chief Internal Auditor periodically assesses whether the purpose, authority and responsibilities of the internal audit function continue to enable it to accomplish its objectives. The results of this periodic assessment are communicated to the EC and AC. The Chief Internal Auditor maintains an internal quality assurance and improvement programme. This covers all aspects of internal audit's activities and evaluates whether they conform with the standards of the Chartered Institute of Internal Auditors. The Chief Internal Auditor conducts an annual assessment of the efficiency and effectiveness of internal audit's activities, identifying opportunities for improvement. The Chief Internal Auditor discusses the results of this annual assessment with the EC and AC. The Chief Internal Auditor also confirms to the AC of the continued validity of the charter of the internal audit function or puts forward proposals for updates to it. At least every five years, the effectiveness and quality of the internal audit function are independently assessed externally, and the Chief Internal Auditor reviews the report with the AC. An independent assessment of internal audit was conducted in 2018. The next such external assessment is planned to take place in 2022, one year ahead of the five-year review cycle.

## EXTERNAL AUDITOR

12% of AC time and activities

| Activities performed | Frequency |
|---|---|
| **External Audit** | |
| Review and approve the engagement letter for EY's annual audit of the Company's consolidated and parent company financial statements | A |
| Approve the remuneration for audit and non-audit services, including pre-approval of permissible non-audit services. | Q |
| Consider the annual external audit plan and monitor the execution and results of the audit. | P |
| Monitor the qualifications, expertise, resources and independence of EY. | A |
| Review the Company's representation letter prior to signing by management. | A |
| Assess the performance, objectivity and effectiveness of EY, the audit process, the quality of the audit, EY's handling of key judgements, and EY's response to questions from the AC. | P |
| Recommend to the Board that the reappointment of EY be put to the Company's shareholders for approval at the AGM. | A |

A = Annually, Q = Quarterly, P = Periodically

### Annual external audit plan and assessment of external audit's effectiveness

EY reviewed with the AC its audit strategy, scope and plan for the 2021 audit, highlighting any areas which would receive special consideration. In particular, the AC and EY discussed how the audit would take into consideration risks associated with:
- the uncertainties from climate change and energy transition;
- the organisational restructuring aspects of Reshape; and
- Shell's Powering Progress strategy.

The AC considered the annual audit plan, which included assessing whether the planned materiality levels and proposed resources to execute the audit plan were consistent with the scope of the audit.

EY regularly updated the AC on the status of their procedures and preliminary findings, providing an opportunity for the AC to monitor the execution and results of the audit. The AC and EY discussed how risks to audit quality were addressed, key accounting and audit judgements, material communications between EY and management and any issues arising from them. Quarterly, the AC met privately with EY representatives without management being present in order to encourage open and transparent feedback from both parties. In addition, the AC Chair meets separately with the external auditor on a regular basis.

As part of its oversight of the external auditor, the AC annually assesses the performance and effectiveness of the external auditor and the audit process. This includes assessing the quality of the audit, how the auditor handled key judgements, and the auditor's response to the AC's questions. The assessment also involves the AC evaluating the objectivity and independence of EY and the quality and effectiveness of the external audit process.

The AC's evaluation of the performance and effectiveness of the external auditor and the audit process includes the following key criteria:
- professionalism in areas including competence, integrity and objectivity;
- EY's quality assurance procedures and internal quality control procedures;
- audit quality priorities and actions taken as part of maintaining a sustainable audit quality programme;
- constructive challenge of management and key judgements;
- efficiency, covering aspects such as service level and innovation in the audit process, use of data analytical and digital audit tools, and opportunities for improvement;
- the orderly transition of the recent partner rotation;
- the most recent EY Transparency Report;
- thought leadership and actions, especially in the areas of climate change, and value added; and
- compliance with relevant legislative, regulatory and professional requirements.

In addition to reflecting on its own experiences, including interactions with the external auditor throughout the year, the AC considered and discussed the results of management's internal survey relating to EY's performance over the financial year 2021, which reflected a broadly comparable performance to 2020 and the views and recommendations from management and the Chief Internal Auditor.

Taking into account the above, the AC is satisfied that EY has continued to provide a high-quality and effective audit in its sixth year as auditor and has maintained its independence and objectivity. As required under UK and US auditing standards, EY received a letter from EY confirming its independence. As required by applicable regulations, EY also informed the AC in writing and discussed with the AC any significant relationships and matters that may reasonably be thought to affect its objectivity and independence.

In July 2021, the AC was informed by EY that non-audit services prohibited by the FRC's Ethical Standard were provided to a Shell subsidiary in Denmark in May 2021. The services involved the provision of XBRL tagging services for local statutory 2020 accounts, and were performed by EY Denmark personnel that are not part of the audit engagement team and represented less than two hours of work. EY did not charge any fees to Shell for the performed services. The Shell subsidiary in Denmark was subsequently disposed of in July 2021. Based on the facts presented and discussion with EY, the AC noted that the provision of such services did not create a mutual or conflicting interest between EY and Shell; place EY in a position of auditing its own work; result in EY acting as management or an employee of Shell; or place EY in a position of being an advocate for Shell. Accordingly, the AC determined that EY continued to be able to exercise objective and impartial judgment on all issues encompassed within the audit engagement. This breach of the FRC's Ethical Standard is reported by EY in its UK audit report issued pursuant to International Standards on Auditing (UK) and applicable law.

During 2021, there was no review of EY's audits of Shell's Consolidated Financial Statements by the Audit Quality Review (AQR) team of the FRC.

### Reappointment

The AC is responsible for considering whether there should be a rotation of the independent registered public accounting firm in order to ensure continuing auditor quality and/or independence, including consideration of the advisability and potential impact of conducting a tender process for the appointment of a different independent public accounting firm. The AC is also responsible for recommending to the Board whether it should ask the Company's shareholders to appoint, reappoint or remove the external auditor at the AGM.

Exhibit Q

## EXTERNAL AUDITOR
continued

At the AGM in May 2021, the shareholders approved a resolution to reappoint EY as external auditor until the conclusion of the next AGM. EY was first appointed at the AGM in May 2016 after a competitive tender process. This means that 2021 represents EY's sixth year as the Company's external auditor. Under UK legal requirements, the Company may retain EY as its external auditor for 20 years. For the 2021 financial year, the Company has complied with The Statutory Audit Services for Large Companies Market Investigation (Mandatory Use of Competitive Tender Processes and Audit Committee Responsibilities) Order 2014.

In its oversight of the external audit, the AC considered whether it would be appropriate to conduct an audit tender at this time. The AC took into account:
- its continued satisfaction with the quality and independence of EY's audit;
- any new external auditor would need a transition period to develop sufficient understanding of the business given Shell's size and complexity;
- frequent changes of external auditor would be inefficient and could lead to increased risk and the loss of cumulative knowledge;
- a change in auditor would be expected to have a significant impact on Shell, including on the Finance function; and
- any change in auditor should be scheduled to limit operational disruption.

The AC also considered the orderly rotation to Mr Gary Donald as the new audit partner for the 2021 audit and EY's leadership and activities in the area of climate change.

After due consideration the AC determined that it would not be appropriate to re-tender for the external audit at this time. The AC has recommended to the Board that at the 2022 AGM the Board should propose that EY be reappointed as the external auditor of the Company for the year ending December 31, 2022. The AC's recommendation is free from third-party influence and there are no contractual obligations that restrict the AC's ability to make such a recommendation.

The AC acknowledges the UK legal requirements relating to mandatory audit rotation (maximum 20-year engagement) and audit tendering under which the Company will be required to tender for the audit no later than the financial year 2026. The AC regularly reviews auditor performance and may decide to conduct the tender earlier than the financial year 2026 if it considers this to be in the interests of the Company's shareholders.

## NON-AUDIT SERVICES

The AC maintains an auditor independence policy (AIP) in respect of the provision of services by the external auditor. The AC regularly reviews this policy for necessary changes in response to changes in related standards and regulatory requirements.

This policy is designed to safeguard auditor objectivity and independence. It includes rules on the provision of audit services, audit-related services and other non-audit services and stipulates which services require specific prior approval by the AC.

The policy also defines prohibited services that are not to be provided by the auditor because they represent a risk to the external auditor's independence. Prohibited services are any that relate to management decision-taking or any other service that could compromise auditor independence or be perceived to compromise auditor independence. These prohibited services include all services listed as prohibited in the UK and US auditor independence rules. For certain services that are not prohibited, because of the knowledge and experience of the external auditor and/or for reasons of confidentiality, it can be more efficient or prudent to engage the external auditor rather than another party. This is particularly the case with audit-related assurance services that are closely connected to the audit function where the external auditor has the benefit of knowledge gained from work already performed as part of the audit.

Under the AIP, the AC will only approve services to be carried out by the external auditor or its affiliates where such services do not present a conflict of interest risk in fact or in appearance. The AC reviews quarterly reports from management on the audit and non-audit services reported in accordance with the policy or for which specific prior approval from the AC is being sought. To the extent that the fee value of an additional audit service contract does not individually exceed $500,000, no prior approval of the AC is required. All non-audit services where the fee for an individual contract exceeds $100,000, including audit-related services, require individual prior approval by the AC. In each case where the audit or non-audit service contract does not exceed the relevant threshold, the matter is approved by management by delegated authority from the AC and is subsequently presented for approval by the AC at the next quarterly AC meeting. The AC is mindful of the overall proportion of fees for audit and non-audit services in determining whether to approve such services.

## FEES

After due consideration, the AC approved the auditor's remuneration, satisfying itself that the level of fees payable in respect of the audit and non-audit services provided was appropriate and that an effective, high-quality audit could be conducted for such fees.

The total auditor's remuneration of $63 million (2020: $58 million, 2019: $54 million) is categorised as follows: audit $59 million (2020: $56 million, 2019: $52 million); audit-related $3 million (2020: $nil, 2019: $1 million); and all other fees $1 million (2020: $2 million, 2019: $1 million).

## "It has been a year of impressive financial performance and strong strategic progress."

---

**Pay outcomes for Executive Directors**

Annual bonus: €2,560,000 CEO and €1,600,000 CFO (129% of target).

Long-term Incentive Plan (LTIP): below-target vesting of 49% based on three-year performance.

Single-figure outcome: €7.4m (26% increase from 2020) for the CEO and €4.6m (24% increase from 2020) for the CFO.

**NEIL CARSON**
Chair of the Remuneration Committee



**THIS REPORT**

This Directors' Remuneration Report for 2021 has been prepared in accordance with relevant UK corporate governance and legal requirements, in particular Schedule 8 of The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 (as amended). The Board has approved this report. This report consists of two further sections:

• the Annual Report on Remuneration (describing 2021 remuneration and the planned implementation of the Directors' Remuneration Policy in 2022); and
• the Directors' Remuneration Policy, which was approved by shareholders at the 2020 AGM.

Dear Shareholders,

It has been a year of impressive financial performance and strong strategic progress.

Shell delivered a very strong set of financial results in 2021, generating more than $45 billion of cash flow from operations (CFFO) including working capital and $40 billion of free cash flow (FCF). This reflects the strength of Shell's integrated business and the ongoing development of a strong and resilient portfolio. Together with robust operational performance in 2021, this enabled Shell to capitalise on dynamic energy markets and improved prices in the second half of the year. The strong financial performance in 2021 allowed Shell to reduce net debt, increase our quarterly dividend and start share buybacks again. The remaining $5.5 billion of proceeds from the divestment of our US Permian business that have been allocated for share buybacks will be distributed to shareholders in the first half of 2022.

Over the year, Shell also delivered a number of key strategic milestones to accelerate the transition to being a net-zero emissions business, including:

• launching of our updated strategy, Powering Progress in February 2021;
• being the first energy company to ask shareholders to cast an advisory vote on its energy transition strategy, achieving support of 88.74% votes cast in May 2021;
• implementing a simpler, more cost-effective organisation needed to support delivery of our strategic ambitions under Powering Progress, in August 2021;
• setting a new target, in October 2021, for Shell to halve the absolute emissions from our operations and the energy it uses to run them by 2030, compared with 2016 levels on a net basis;
• proposing to simplify the share structure and increase the speed and flexibility of capital and portfolio actions. In December 2021, 99.77% of shareholder votes cast were in support of amending the required Articles of Association of Shell plc (then named Royal Dutch Shell plc) to enable the changes. The alignment of Shell's tax residence with its country of incorporation took place in December 2021, including relocating the Chief Executive Officer (CEO) and Chief Financial Officer (CFO) to the UK. The corporate name change and implementation of a single line of shares, eliminating the complex A/B share structure, occurred in early 2022.

Among this success, however, we were also deeply saddened by a number of tragic deaths that occurred as the result of three separate incidents during the year. Six contractor colleagues working under Shell operational control were deliberately killed in an attack by gunmen in Nigeria. In Pakistan, a lorry driver died during a refuelling accident, and in Indonesia, a contractor died following a construction accident. Later in this letter, I will share the REMCO's assessment of these incidents and how we have reflected on them in determining the final pay outcomes.

I also reflect on REMCO's assessment of Shell's wider performance and its progress in adapting to the energy transition, when considering the pay outcomes for 2021 and the year ahead.

## 2021 PERFORMANCE AND REMUNERATION DECISIONS

### Annual bonus

Summary of scorecard outcome: the overall mathematical outcome of the annual bonus scorecard was above target, at 1.32. But after reflecting on safety performance, in particular the number of fatalities, the REMCO used downwards discretion to determine the final outcome for Executive Directors to be 1.29. Taking into account the impact of the fatalities on the formulaic outcome and the discretionary adjustment, the total reduction in bonus outcome as a result of the fatalities was equal to 10% of base salary.

This brings our 10-year average scorecard outcome to 1.03.

The complete scorecard with all targets, ranges and weightings is set out on page 164.

Financial delivery (35%): robust operational performance and a strong portfolio have led to very strong cash generation. CFFO (including working capital) of $45.1 billion exceeded our outstanding performance threshold of $34 billion, leading to a maximum outcome on this measure.

It is worth repeating that the REMCO has long had a policy of not adjusting remuneration measures to take account of changes in energy prices and currency fluctuations. This means Senior Management also experience the ups and downs of the macroeconomic environment that affect our business and shareholders. In engagements with our largest shareholders, many have appreciated the transparency that this brings.

Operational excellence (35%): Powering Progress emphasises operational excellence and the delivery of value over volume. In 2021, the REMCO updated the scorecard to reflect this by removing measures based on hydrocarbon production. The focus now is on ensuring Shell operates its assets efficiently and to plan, and that material projects are delivered on time and on budget. Performance was mixed across the segments. Downstream availability was better than plan, as was delivery of projects against schedule. But Upstream and midstream availability was lower than plan, and aggregated project costs exceeded budget. Overall, the outcome was below target.

Progress in the energy transition (15%): Powering Progress sets out a strategy to accelerate our transition to net-zero emissions. We linked this to the scorecard in 2021 by focusing on our operational emissions. The outcome was broadly on target.

- On greenhouse gas (GHG) emissions intensity, performance has been mixed. Intensities from the Chemicals business were better than target, partly because of higher utilisation at Bukom and Deer Park. But shutdowns in the Gulf of Mexico from Hurricane Ida and operational difficulties in Nigeria led to a below-threshold result for the combined Upstream and Integrated Gas intensity measure. Refining intensities were also below target due to the impact of Hurricane Ida and the February freeze on our refineries in the USA.
- GHG abatement tracks the implementation of identified projects that will reduce absolute GHG emissions. Shell made excellent progress in 2021, with a score that was close to outstanding, reflecting the cumulative effect of a wide range of actions taken across the portfolio to reduce absolute emissions, including abatement projects in QGC Australia and Pearl GTL in Qatar.

Safety (15%): overall, the outcome on safety was slightly above target.

- Process safety continues to be measured through the number of Tier 1 and 2 operational safety incidents and was above target for 2021, meaning a better than expected safety performance was achieved.
- In 2021, Serious Injury and Fatality Frequency (SIF-F) was introduced as the measure of personal safety performance which focuses on the incidents with the most serious consequences. The outcome was consistent with our expectations based on the number of serious incidents experienced across our businesses in recent years, but not our aspirations.

### REMCO reflections on safety

Safety is Shell's number one priority. The Powering Progress strategy is underpinned by our focus on safety, and it is critical that our day-to-day operations run safely, and the well-being of all our people is ensured. As a result, the REMCO and the Safety, Environment and Sustainability Committee (SESCo) have carefully considered the fatalities which occurred in the year, paying attention to both the nature of the incidents and Shell's wider progress on safety.

Nigeria is a high-risk country, in which we review our larger contractors' safety plans, including those for moving personnel to sites in the Delta. These plans are then implemented by the contractors. At times, there have been up to around 4,500 escorted personnel movements per month for Shell companies in Nigeria. The number is significantly larger for our contractor movements. Existing safety protocols have been effective in supporting these movements. The 2021 incident in Nigeria was unprecedented. The attack on a routine personnel transport was perpetrated by a criminal group which operates for extortion. The criminal group's leader has been arrested and has admitted responsibility. The extreme violence of the attack has been shocking to Shell and the local community. A review is ongoing, which given the deteriorating security situation in Nigeria, may lead to some changes.

Sadly, two contractors also died following separate incidents at retail sites in Pakistan and in Indonesia. In Pakistan, a contractor colleague died after a fire at a dealer-operated retail site. Another contractor lost his life when a wall fell over during demolition work at a retail site in Indonesia.

In addition to reflecting on these tragedies, the REMCO also considered safety performance as a whole over the year. The REMCO noted that, in an industry where road safety continues to present one of the single most material risk areas, we passed 1 billion kilometres of road journeys without a recordable fatality in our operated assets. The REMCO also noted that in 2021, the ongoing transition of the Safety refresh programme reached full implementation, creating the bedrock for the changes aimed at eradicating fatalities and life-changing incidents from Shell's business. Our updated approach to safety is rooted in a consistent focus on human performance, and the way people, culture, equipment, work systems and processes all interact. People are key to completing complex tasks and to finding solutions to problems. To deliver the Safety refresh, Shell aims to apply a learner mindset, believing people can always improve, enhance their capabilities, learn from mistakes and successes, and speak up freely. The REMCO acknowledges the commitment and contributions of the Executive Directors in embracing a learner mindset and driving this cultural change across the organisation. The Safety refresh also included the introduction of the Serious Injury and Fatality Frequency (SIF-F) metric designed to ensure we focus on those incidents with the potential to cause most harm. This metric ensures a heavy weighting is given to fatalities in determining the scorecard outcome, in a manner that was not captured by Total Recordable Case Frequency (TRCF) metrics.

The REMCO carefully considered the fatalities in the context of Shell's overall safety performance in 2021. It took account of the impact the fatalities had on the formulaic outcome. Without the fatalities, the overall scorecard outcome would have been 1.37, not 1.32, reflecting the heavy emphasis that SIF-F rightly gives to serious incidents. The REMCO determined that the overall scorecard outcome should be further adjusted downwards to 1.29. *The overall reduction in the bonus outcome for the CEO and CFO as a result of fatalities is equal to 10% of their base salary.*

DIRECTORS' REMUNERATION REPORT continued

Exhibit Q

### Vesting of the 2019 LTIP awards

Overall LTIP vesting outcome: Overall, the mathematical outcome of the LTIP was 49%. For the avoidance of doubt, no LTIP targets were adjusted as a result of the COVID-19 pandemic or any other reason.

CFFO (22.5%): In absolute terms, 2021 performance was very strong with CFFO at $45 billion, including working capital. The LTIP, though, does not consider the absolute value of CFFO. Instead, it looks at growth from a base year, in this case 2018, when Shell's CFFO performance was also exceptional with more than $50 billion generated. The LTIP compares the growth of Shell's CFFO with the increases in CFFO of the other energy majors (BP, Chevron, Exxon and TotalEnergies). On this basis, Shell ranked third, resulting in a nil vesting for this measure.

Total shareholder return (TSR) (22.5%): Over the performance period, Shell returned more than $43 billion to shareholders in the form of dividends and share buybacks. However, similarly to CFFO, TSR is measured on a relative basis, compared with the other energy majors. On this basis, Shell ranked fourth, resulting in a nil vesting for this measure.

Return on average capital employed (ROACE) (22.5%): Shell's absolute 2021 ROACE for LTIP purposes was 7.8% (note ROACE for the LTIP calculation is based on disclosed net income and is not adjusted for the after tax interest expense and therefore differs on disclosed ROACE). Again performance is measured on a relative basis against the 2018 base year when Shell had ROACE (for LTIP purposes) of 8.3% and on growth Shell ranked fifth, resulting in a nil vesting.

FCF (22.5%): Performance is assessed on an absolute basis over the three-year performance period. Strong performance in 2021 has more than offset the impacts of the COVID-19 pandemic, with FCF of $87.5 billion generated over the three years, above the target of $82 billion. This resulted in a 137% vesting outcome on this measure.

Energy transition (10%): The vesting of the 2019 LTIP also marks the first time that we have vested an element on the LTIP energy transition performance condition.

Shell was the first major energy company, that we are aware of, to include such a comprehensive metric, which measures progress in transforming Shell's businesses for a lower-carbon future, within long-term pay frameworks. This is a broad metric that assesses performance against a range of strategic business developments, as well as measuring our ultimate success in reducing the net carbon intensity of all energy products sold.

The first set of metrics were focused on laying the foundations for Shell's future growth, building the customer base and developing the organisational capability to deliver against the key strategic ways of decarbonising Shell's business: growing a power business, developing lower-carbon energy products and developing emission sinks. The REMCO has been pleased with the tangible progress shown over the performance cycle, with management demonstrating that it can create a pipeline of new business opportunities and mature projects through to investment. This includes reaching new customers through our growing power business, with acquisitions like ERM in Australia, developing renewables projects such as CrossWind, and investment in ventures such as Enerkem Varennes, which will produce low-carbon fuels and renewable chemicals products from non-recyclable waste, and LanzaJet, which converts ethanol from waste materials into low-carbon jet fuel. While many of these projects are small in comparison to some of Shell's existing businesses, they lay the foundations for future growth.

The REMCO paid particular attention to the metric of net carbon intensity of all energy products sold. This provides a concrete marker of Shell's success in decarbonising, with Shell the only major energy producer which has sought to connect executive pay with an intensity reduction target based on the full Scope 1, 2 and 3 emissions from all energy products sold. The REMCO noted that the target for this had also been met with a reduction of 2.5% against the target range of 2-3%. The REMCO is pleased to see this target met over the performance period.

Taking everything into account, the REMCO determined that the final vesting outcome of the element of the 2019 LTIP weighted to the energy transition should vest at 180%.

Based on the above outcomes, the overall LTIP vesting outcome was 49%. This brings the ten-year average vesting outcome to 97%. This is broadly aligned with our target grant, although there have been a number of high and low-vesting outcomes over the last 10 years. The REMCO believes this illustrates the fundamental effectiveness of the LTIP and the close alignment between pay and performance the structure has provided over time.

### Finalising the 2021 pay outcomes

In finalising pay outcomes, the REMCO considered the wider performance of Shell during 2021 and the LTIP performance period. It paid particular attention to:

- safety performance, in particular the eight fatalities within Shell's operational control which occurred in three incidents and the downward adjustment to the annual bonus scorecard resulting in an overall bonus reduction equivalent to 10% of base salary of the Executive Directors;
- the strong financial and operational performance in 2021, with more than $45 billion of CFFO, including working capital, and $40 billion of FCF generated in the year;
- the work to accelerate Shell's progress in the energy transition, including setting out our Powering Progress strategy, reshaping the organisation, simplifying the share structure, aligning Shell's tax residence with its country of incorporation and setting targets for reducing absolute emissions;
- the shareholder experience, including the decline and extent of recovery in the share price over the LTIP performance period, as well as shareholder feedback provided during my engagements with major shareholders during March and April 2021;
- the reduction in net debt, which has supported the restart of share buybacks in 2021, and the progressive dividend policy;
- the employee experience, where the REMCO noted that the Group scorecard for all employees was set at 1.50 following an upwards management adjustment in recognition and appreciation of the extraordinary contributions made by our employees over a challenging period, and the Performance Share Plan, used to make discretionary share awards below senior executive level, which vested at 67%;
- the year-on-year comparison between single figure outcomes in 2020 and 2021, noting that the REMCO had decided there would be no 2020 annual bonuses for Executive Directors and Senior Management and year-on-year increases are primarily as a result of a 2021 bonus being awarded; and
- the ten-year average outcomes of the annual bonus scorecard (1.0) and LTIP (97%), which demonstrate the effectiveness of the current reward structures in aligning pay outcomes with targets over the longer term.

This resulted in a single-figure outcome of €7.4m for the CEO, an increase of 26% from 2020. The CFO's single-figure outcome was €4.6m, a 24% increase from 2020. The REMCO was satisfied that the remuneration policies had operated as intended, and these outcomes were appropriate in the context of Company performance and the target pay opportunity under the shareholder-approved Remuneration Policy.

## 2021 pay outcomes summary



### 2021 pay compared with policy [A]

CEO (€m)

2021 realised pay
2020 policy target
2020 policy maximum

0    4    8    12    16
a    b    c

CFO (€m)

2021 realised pay
2020 policy target
2020 policy maximum

0    2    4    6    8    10    12    14

a Fixed pay    b Bonus    c LTIP

### ten-year LTIP vesting

200
150
100
50
0

10/12  11/13  12/14  13/15  14/16  15/17  16/18  17/19  18/20  19/21

a TSR
b EPS/FCF
c CFO
d Production/ROACE
e Energy transition

Target
10 year average: 97% of target

### ten-year CEO single figure outcomes

30,000
25,000
20,000
15,000
10,000
5,000
0

2012  2013  2014  2015  2016  2017  2018  2019  2020  2021

a Base salary and benefits
b Bonus
c LTI
d Pension and tax equalisation

CEO target pay [A]

[A] Policy target and maximum based on the scenarios as published on page 184

## UPDATING REMUNERATION IN LINE WITH OUR DEVELOPING STRATEGY

### Relocation of the CEO and CFO to London

The CEO and CFO relocated to the UK, effective from December 31, 2021. Their transition to the UK is being supported in line with our existing shareholder-approved Directors' Remuneration Policy, including the Group's international mobility policies:

- There is no change to the target pay opportunity as a percentage of base salary. Base salaries have been converted from euros to pounds sterling using a 12-month average exchange rate.
- Target annual bonus and long-term incentive awards are unchanged.
- The CEO has moved from his Dutch pension plan to the standard UK Shell pension. This provides a contribution level of up to 20% of base salary, which is the same as that available to the general Shell employee population in the UK. This is less than the benefits provided under the CEO's Dutch arrangements.
- The CFO will remain within her existing US pension arrangements. The REMCO manages this membership prudently as the annual bonus continues to be not pensionable for the CFO while it is for other US employees.
- The CEO and CFO will be responsible for their own taxes in the UK, except for some limited benefits such as relocation.
- In line with our Group-wide International Mobility policies, the CEO and CFO will receive support with temporary commuting costs such as travel and accommodation for the first six months, while their families remain in the Netherlands as their children complete their

respective school years. The CEO will receive relocation benefits for his family's move to the UK in due course.

- The CEO will receive a gross housing allowance for a time-limited period of 24 months from when his family relocates. This is a reduced benefit as Shell's International Mobility policy would normally provide for housing throughout the overseas position where the employee is asked to move at the Company's request.
- The approach the REMCO has taken is within the confines and provisions of the existing approved remuneration policy and the REMCO has taken a prudent approach in applying elements of Shell's International Mobility policies.

### Appointment of new CFO

On March 1, 2022 Shell announced that Sinead Gorman will replace Jessica Uhl as CFO with effect from April 1, 2022. Mrs Gorman will be based in London and will receive an annual base salary of £900,000 from appointment as CFO. There will be no change to the current target bonus and LTIP awards for the CFO of 120% (annual bonus) and 270% (LTIP). Mrs Gorman's pension provision is aligned with the standard UK pension arrangement for new employees in the UK, with an employer contribution of 20% which she has elected to receive as a cash allowance. A further announcement regarding the terms of Mrs Uhl's departure will be made in due course.

**Other changes to 2022 remuneration**

To ensure that Shell's remuneration structures continue to be closely aligned with strategy, we will make the following changes to the 2022 annual bonus scorecard:

- The progress in the energy transition measure has to date focused on managing and reducing our operational emissions. However, succeeding in the energy transition requires us to change what we sell. To date, this has been reflected in pay through the LTIP's energy transition performance condition. Starting in 2022, we will widen the scope of the progress in the energy transition measure on the annual bonus scorecard, to be based on three key themes:
  - Selling lower-carbon products - as an energy supplier, we help customers to reduce their emissions by supplying lower-carbon products. We will measure our success at this according to the earnings share of our Marketing business from low- and no-carbon products.
  - Reducing our emissions - as an energy user, our target is to achieve a 50% reduction by 2030; and this measure will be based on reducing our Scope 1 and 2 operational emissions.
  - Partnering to decarbonise - as a partner, we work with our customers to help them reduce their emissions. In 2022, we will measure success in this area in terms of our progress in rolling out our electric vehicle charging network.
- Powering Progress emphasises the importance of building on our strong customer relationships to help transform Shell in the energy transition. To emphasise the importance of becoming increasingly customer-led, we will introduce a new customer excellence measure for 2022 under operational excellence. This will be based on our customer satisfaction scores, and the extent to which people prefer Shell over competitor brands, measured via brand preference scores. The customer excellence measure will combine elements of business-to-business and business-to-customer performance.

**LOOKING AHEAD**

The year ahead promises to be another busy one, as the REMCO continues to make changes that will help Shell succeed in the energy transition and finalises proposals for the 2023 Directors' Remuneration Policy, ahead of a vote at the 2023 AGM. I look forward to ongoing dialogue with our shareholders in the coming months.

**NEIL CARSON**

Chair of the Remuneration Committee

March 9, 2022

## ANNUAL REPORT ON REMUNERATION

The Annual Report on Remuneration sets out:

the REMCO's responsibilities and activities, page 161;
remuneration at a glance, page 162;
Directors' remuneration for 2021, page 163; and
the statement of the planned implementation of policy in 2022, page 176.

The base currency in this Annual Report on Remuneration is the euro, as this is the currency of the base salary of the Executive Directors to December 30, 2021. From December 31, 2021, base salaries and Non-executive Director fees are given in British pound sterling (GBP). Where amounts are shown in other currencies, an average exchange rate for the relevant year is used, unless a specific date is stated, in which case the average exchange rate for the specific date is used.

### REMUNERATION COMMITTEE

 **Neil Carson**

 **Euleen Goh**

 **Catherine Hughes**

 **Gerrit Zalm**

Biographies are given on pages 119-125; and the REMCO meeting attendance is set out below:

| Committee Member | Member since | Maximum possible meetings | Number of meetings attended | % of meetings attended |
|---|---|---|---|---|
| Neil Carson (Chair) | June 1, 2019 | 8 | 8 | 100 % |
| Euleen Goh | May 20, 2020 | 8 | 8 | 100 % |
| Catherine Hughes | July 26, 2017 | 8 | 8 | 100 % |
| Gerrit Zalm [A] | May 21, 2014 | 8 | 7 | 88 % |

[A] Mr Zalm was unable to attend one meeting due to the short notice with which it had been scheduled.

The REMCO's key responsibilities include determining:

| | | Senior Management | |
|---|---|---|---|
| | Executive Directors | Executive Committee | Company Secretary and EVP Taxation and Controller |
| Performance framework | P | O | O |
| Remuneration policy | P | P | O |
| Actual remuneration and benefits | P | P | P |
| Annual bonus and long-term incentive measures and targets | P | P | P |

The REMCO is also responsible for determining the Chair of the Board's remuneration. The REMCO monitors the level and structure of remuneration for senior executives below Senior Management and makes recommendations if appropriate to ensure consistency and alignment with Shell's remuneration objectives. When setting the policy for Executive Director remuneration, the REMCO reviews and considers workforce remuneration and related policies, and how pay and benefits align with culture.

In exercising its responsibilities, the REMCO takes into account a variety of stakeholder considerations.

The REMCO operates within its Terms of Reference, which are reviewed annually. They were last updated on December 7, 2021, and are available on www.shell.com.

Advice from within Shell was provided by:
- Ben van Beurden, Chief Executive Officer (CEO);
- Ronan Cassidy, Chief Human Resources and Corporate Officer and Secretary to the REMCO; and
- Stephanie Boyde, Executive Vice President Performance and Reward.

The Chair of the Board was consulted on remuneration proposals affecting the CEO. The CEO was consulted on proposals relating to the Chief Financial Officer (CFO) and Senior Management.

The REMCO met eight times in 2021 and its activities included:
- determining vesting of the 2018 Long-term Incentive Plan (LTIP) award for Senior Management;
- determining 2021 target bonuses and 2021 LTIP awards for Senior Management;
- approving the 2020 Directors' Remuneration Report;
- setting 2021 annual bonus and LTIP performance measures and targets;
- considering matters relating to the updated strategy and the transition of our business to net-zero emissions, and the potential implications for the 2022 annual bonus and LTIP performance measures and targets;
- setting exit and appointment remuneration for changes in the Executive Committee;
- setting terms for the relocation, and pay arrangements of the Executive Directors from the Hague to London; and
- monitoring external developments and assessing their impact on the Directors' Remuneration Policy.

After a competitive tender process, in 2021 Deloitte was chosen to provide external advice on Shell's remuneration structures and developments in market practice around remuneration. The choice was based on ability to assess the risk profile of policies, knowledge of investors' expectations and familiarity with international market practices. Deloitte is a member of the Remuneration Consultants Group and operates according to the group's code of conduct when advising clients. REMCO is satisfied that the advice provided was objective and independent. The total fees in relation to the advice were £55,000 (excluding value-added tax). Deloitte provided other consultancy and accountancy services to Shell during the year, but the REMCO is satisfied that this did not compromise the independence of the advice on executive remuneration. The REMCO also reviewed benchmarking data and analysis prepared by Shell's internal HR function on market developments in executive pay.

### PRINCIPLES

The principles that underpin the REMCO's approach to executive remuneration are set out on page 179.

The REMCO considered the provisions of the UK Corporate Governance Code when deciding 2021 pay outcomes. It also sought to reflect the principles of clarity, simplicity, risk management, predictability, proportionality and alignment with culture.

Shell has a consistent global reward and performance philosophy that sets clear expectations of employees. The annual bonus scorecard and LTIP are designed to ensure that remuneration is clearly aligned with Shell's operating plan and strategic ambitions. The same measures apply to Executive Directors and Senior Management and to a significantly broader employee base. This provides alignment throughout the organisation with Shell's culture and strategy. The annual operating plan translates into targets on the annual bonus scorecard, and a quarterly update on performance against scorecard targets is provided to employees. The LTIP is largely based on outperforming the competition. Employees receive regular updates on Shell's performance against competitors. To assist in the mitigation of reputational risk and to ensure proportionality, the REMCO will use discretion to ensure the highest pay outcomes are delivered only for outstanding performance.

Exhibit Q

ANNUAL REPORT ON REMUNERATION continued



## REMUNERATION AT A GLANCE

### 2021

**FIXED PAY AND SHAREHOLDING**

**Base salary**
€1,588,000 (CEO)   €1,035,000 (Jessica Uhl (CFO))
Ben van Beurden (CEO)

**Pension**
Executive Directors participate in the same home-country pension arrangements as other employees

**Benefits**
Typically include car allowance, transport between home and office, and medical insurance

**Shareholding**
Target levels, % of base salary at December 31, 2021
700% CEO   500% CFO
Actual levels, % of base salary at December 31, 2021
972% CEO   555% CFO

**ANNUAL BONUS**

**2021 annual bonus**
€2,560,000 CEO   €1,600,000 CFO

**2021 bonus scorecard outcome**
**Mathematical outcome**
1.32
Given the eight fatalities in 2021, this was reduced to:
1.29
No individual performance factor used in bonus calculation

**Bonus Delivery**
50% delivered in cash   50% delivered in shares
Shares are subject to a three-year holding period which extends beyond an Executive Director's tenure

**LONG-TERM INCENTIVE PLAN**

**2019 – 2021 LTIP vesting outcome**
€2,812,302 CEO   $1,539,732 CFO

**Vesting outcome**

| Measures | Outcome | Vesting |
|---|---|---|
| TSR | | 0% |
| CFFO | | 0% |
| ROACE | | 0% |
| FCF | | 31% |
| Energy transition | | 18% |
| | | 49% |

(out of a 200% maximum)

Shares are subject to a three-year holding period which extends beyond an Executive Director's tenure

### 2022

**FIXED PAY AND SHAREHOLDING**

**Base salary**
£1,420,000 (Ben van Beurden) ↑ 3.5%   £921,000 (Jessica Uhl) ↑ 3%   £900,000 (Sinead Gorman)

**Pension**
Following his relocation to the UK, the CEO's pension was aligned to the standard UK pension offered to all new employees with an employer contribution of 20%. Sinead Gorman was offered participation in the same arrangement. Both have elected to receive this as a cash allowance. There was no change to Jessica Uhl's pension provision from 2021.

**Benefits**
Following relocation to the UK, the CEO and CFO will receive support with temporary commuting costs such as travel and accommodation for the first six months while their families complete the school year. The CEO will also receive relocation support for his family's move to the UK in due course, and a housing allowance for a time-limited period of 24 months.

**Shareholding**
Target levels, % of base salary 2021
700% CEO   500% CFO
Actual levels, % of base salary March 4, 2022
904% CEO   693% CFO

**ANNUAL BONUS**

**Target % of base salary**
Target
125% CEO   120% CFO
Maximum
250% CEO   240% CFO

**Scorecard architecture**
15% / 35% / 35% / 15%

a ■ **Cash flow from operations** (weighted 35%)
b ■ **Operational excellence** (Asset management excellence 15%, project delivery excellence 10%, customer excellence 10%)
c ■ **Progress in the energy transition** (Selling no/low-carbon products 5%, operational emissions reduction 5%, partnering to decarbonise 5%)
d ■ **Safety** (SIF-F 7.5%, Tier 1 and 2 process safety 7.5%)

**LONG-TERM INCENTIVE PLAN**

**Target awards % of base salary**
Target – policy
300% CEO   270% CFO
Maximum
600% CEO   540% CFO

**Performance conditions**
20% / 20% / 20% / 20% / 20%

a ■ TSR   d ■ FCF
b ■ ROACE   e ■ Energy transition
c ■ CFFO

162

Exhibit Q

DIRECTORS' REMUNERATION FOR 2021

Single total figure of remuneration for Non-executive Directors (audited)

€ thousand

| | Fees | | Taxable benefits [A] | | Total | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 | 2021 | 2020 |
| Dick Boer [B] | 167 | 98 | – | – | 167 | 98 |
| Neil Carson | 192 | 184 | – | – | 192 | 184 |
| Ann Godbehere | 212 | 206 | 1 | – | 213 | 206 |
| Euleen Goh | 224 | 201 | 1 | – | 225 | 201 |
| Charles O. Holliday [C] | 324 | 850 | 61 | 69 | 385 | 919 |
| Catherine J. Hughes | 185 | 180 | 1 | – | 186 | 180 |
| Martina Hund-Mejean [D] | 165 | 98 | 1 | – | 166 | 98 |
| Jane Holl Lute [E] | 99 | – | 1 | – | 100 | – |
| Sir Andrew Mackenzie [F] | 582 | 37 | 17 | – | 599 | 37 |
| Abraham Schot [G] | 152 | 38 | – | – | 152 | 38 |
| Sir Nigel Sheinwald [H] | 69 | 184 | – | – | 69 | 184 |
| Gerrit Zalm | 177 | 177 | – | – | 177 | 177 |

[A] UK regulations require the inclusion of benefits where these would be taxable in the UK, on the assumption that Directors are tax residents in the UK. On this premise, the taxable benefits include the cost of a Non-executive Director's occasional business-required partner travel. Shell also pays for travel between home and the head office, where Board and committee meetings are typically held, and related hotel and subsistence costs. For consistency, business expenses for travel between home and the head office are not reported as taxable benefits because for most Non-executive Directors this is international travel and hence would not be taxable in the UK.
[B] Appointed as a Director with effect from May 20, 2020.
[C] Stepped down as a Director with effect from May 18, 2021. Benefits include the use of a Shell-provided apartment while in The Hague (2021: €27,848, 2020: €68,942).
[D] Appointed as a Director with effect from May 20, 2020.
[E] Appointed as a Director with effect from May 19, 2021.
[F] Appointed as a Director with effect from October 1, 2020, and as Chair with effect from May 18, 2021.
[G] Appointed as a Director with effect from October 1, 2020.
[H] Stepped down as a Director with effect from May 18, 2021.

Single total figure of remuneration for Executive Directors (audited)

€ thousand

| | Ben van Beurden | | Jessica Uhl | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Salaries [A] | 1,588 | 1,588 | 1,035 | 1,035 |
| Taxable benefits [B] | 17 | 16 | 323 | 418 |
| Pension [C] | 402 | 540 | 281 | 288 |
| Total fixed remuneration | 2,007 | 2,144 | 1,639 | 1,741 |
| Annual bonus [D] | 2,560 | — | 1,600 | — |
| Total variable remuneration | 5,372 | 3,698 | 2,988 | 1,993 |
| LTIP [E] | 2,812 | 3,698 | 1,388 | 1,993 |
| Total remuneration | 7,380 | 5,841 | 4,627 | 3,734 |
| in dollars | 8,728 | 6,671 | 5,473 | 4,264 |
| in sterling | 6,344 | 5,197 | 3,978 | 3,322 |

[A] As disclosed in the 2020 Directors' Remuneration Report, the REMCO maintained Ben van Beurden's base salary for 2021 at €1,588,000 (+0.0% compared with 2020), and Jessica Uhl's base salary at €1,035,000 (+0.0% compared with 2020).
[B] For Ben van Beurden these include motoring allowance (€14,400) and transport between home and the office (€2,494). Jessica Uhl's benefits include tax equalisation (€292,334), medical insurance and risk benefits (€17,047), transport between home and the office (€10,051) and international mobility benefits (€3,391). Jessica Uhl's benefits include tax equalisation of pension contributions to foreign pension plan(s), when they are taxable above a certain pensionable salary threshold or once a double tax treaty exemption ceases, under Dutch law. Tax equalisation is applied for the loss of pension relief for members of a foreign pension plan(s) in their host country. Jessica Uhl's benefits also include tax equalisation of employer contributions to benefits and certain US social taxes that are taxable in the Netherlands.
[C] For Ben van Beurden, the amount reported for pension consists of a net pay-defined contribution amount of €402,311. The amount to be reported for his defined benefit pension accrual is 0 calculated in accordance with UK reporting requirements. For Jessica Uhl, the amount reported for pension consists of a defined contribution amount of €99,816 and a defined benefit pension amount €181,363.
[D] The full value of the bonus, comprising both the 50% delivered in cash and 50% delivered in shares. For 2021, the market price of shares on February 21, 2022 for Amsterdam listed shares (€23.34) and on February 24, 2022 for London listed shares (£19.528), was used to determine the number of shares delivered, resulting in 29,677 ordinary shares for Ben van Beurden and 18,551 ordinary shares for Jessica Uhl, net of tax. This was split between the Netherlands and UK due to the relocation of the Directors on December 31, 2021.
[E] Remuneration for performance periods of more than one year, comprising the value of released LTIP awards. The amounts reported for 2021 relate to the 2019 LTIP award, which vested on March 3, 2022, at the market price of €24.79 and $52.85 for ordinary shares and ADSs respectively. The value in respect of the LTIP is calculated as the product of: the number of shares of the original award multiplied by the vesting percentage; plus accrued dividend shares; and the market price of ordinary shares or ADSs at the vesting date. The market price of ADSs is converted into euros using the exchange rate on the respective date. Share price depreciation accounted for -€229,832 for Ben van Beurden and -$244,395 for Jessica Uhl.

163

ANNUAL REPORT ON REMUNERATION continued

**Notes to the table: Single total figure of remuneration for Executive Directors (audited)**
**Annual bonus**

As disclosed on pages 180-181, the annual bonus is intended to reward delivery of short-term operational targets.

All targets are derived from Shell's annual operating plan.

**Determination of the 2021 annual bonus**

The table below summarises the 2021 annual bonus scorecard measures including their weightings, targets and outcomes. The mathematical scorecard outcome for 2021 was 1.32. This was adjusted downwards by the REMCO to reflect the number of fatalities in the year to 1.29. Please refer to pages 156-157 for a commentary on the scorecard outcome.

### 2021 annual bonus scorecard measures and weightings

| Performance Measures | | Weighting | Unit | Threshold | Target | Outstanding | Outcome | Score |
|---|---|---|---|---|---|---|---|---|
| **Financial delivery** 35% | Cash flow from operations [A] | 35% | $ – bn | 22 | 28 | 34 | 45 | 2.00 |
| **Operational excellence** 35% | Asset management excellence [B] | 25% | Availability – % | | See note B | | | 0.77 |
| | Project delivery excellence [C] | 10% | Projects delivered on schedule and budget – % | 30/110 | 65/103 | 100/96 | 87/104 | 1.24 |
| **Progress in the energy transition** 15% | Greenhouse gas emissions intensity [D] | 10% | Tonne CO₂e intensity | | See note D | | | 0.48 |
| | Greenhouse gas abatement | 5% | Thousand Tonne CO₂e | 168 | 224 | 280 | 279 | 1.98 |
| **Safety** 15% | Personal safety | 7.5% | Serious Injury & Fatality Frequency (SIF-F) cases per 100 million working hours | 9.7 | 6.9 | 4.1 | 6.9 | 1.00 |
| | Process safety | 7.5% | Number of events | 130 | 105 | 80 | 102 | 1.12 |
| | | | Mathematical performance outcome | | | | | 1.32 |
| | | | **Adjusted outcome** | | | | | **1.29** |

[A] Including working capital adjustments.
[B] Upstream controllable availability: Target: 88.1% (Threshold 86.1%, Outstanding 90.1%), midstream availability: 89.2% (87.2%/91.2%), Downstream (Refining and Chemicals) availability: 95.2% (94.2%/96.2%). Full-year outcomes were 87.8%, 87.3% and 95.6% respectively. Performance assessment is equally weighted between Upstream, midstream and Downstream availability.
[C] Performance assessment is equally weighted between project schedule and budget.
[D] Upstream/midstream (Tonne CO₂ equivalent per Tonne of hydrocarbon production available for sale): Target 0.152 (0.160/0.144); Refining GHG (Tonne CO₂ equivalent per Solomon's Utilised Equivalent Distillation Capacity): Target 1.03 (1.08/0.98); Chemicals (tonne CO₂ equivalent per tonne of steam cracker high-value chemicals production): Target 0.97 (1.07/0.87). Full-year outcomes were: 0.172, 1.05 and 0.95 respectively. Performance assessment is split 4% Upstream/midstream, 4% Refining and 2% Chemicals.

Accordingly, the REMCO decided the final bonus outcome for the CEO should be €2,560,000, which is 129% of target and 64% of maximum. The REMCO decided the final bonus outcome for the CFO should be €1,600,000, which is 129% of target and 64% of maximum.

### 2021 bonus outcome calculation



**Ben van Beurden**

Target bonus:
€1,588,000 (base salary)
x 125% = **€1,985,000**

✖ 2021 scorecard result 1.29

€2,560,000 [A]

**Jessica Uhl**

Target bonus:
€1,035,000 (base salary)
x 120% = **€1,242,000**

✖ 2021 scorecard result 1.29

€1,600,000 [A]

[A] Rounded down to the nearest €5,000. Half was delivered in shares subject to a three-year holding period which extends beyond the Executive Director's tenure.

**LTIP Vesting**

In 2019, Ben van Beurden was granted a conditional LTIP award of 340% (maximum 680%) of base salary and Jessica Uhl an award of 270% (maximum 540%), excluding share price movement and dividends.

In making the vesting decision, the REMCO considered Shell's performance over the three-year vesting period. On the relative measures, Shell ranked fourth on total shareholder return (TSR), and fifth on cash flow from operations (CFFO) and return on average capital employed (ROACE), leading to a nil vesting outcome on each of the relative measures. On the absolute measures, Shell exceeded the free cash flow (FCF) target of $82 billion, generating $87.5 billion over the performance period, and substantively met all of the four energy transition performance targets. (See below for more details.)

The REMCO also noted the impact of the decline in share price between award and vesting on the overall outcome. The REMCO further reflected on the overall single outcome for the CEO. The REMCO decided that the outcome was consistent with the target opportunity and intended operation of the plan under the remuneration policy and no adjustment to the vesting outcomes was required.

Accordingly, the REMCO decided that the LTIP should vest at 49% without the use of discretion. This is illustrated below.

See page 158 for more detail.

---

**2019 LTIP vesting outcomes – performance measures**

CFFO **0%** + TSR **0%** + ROACE **0%** + FCF **31%** + Energy transition **18%** → Total formulaic vesting outcome **49%**

| Performance Measures | | Weighting | Threshold performance | Maximum performance | Outcome (out of the maximum 200%) | |
|---|---|---|---|---|---|---|
| **Relative**<br>Performance ranked against the other energy majors: BP, Chevron, ExxonMobil and TotalEnergies | CFFO | 22.5% | Third | First | Fifth | 0% |
| | TSR | 22.5% | Third | First | Fourth | 0% |
| | ROACE | 22.5% | Third | First | Fifth | 0% |
| **Absolute**<br>Performance assessed against internal financial and strategic targets | FCF | 22.5% | $73bn | $97bn | $87.5bn | 137% |
| | Energy transition | 10% | 1/4 target areas | 4/4 target areas | | 180% |

Formulaic vesting outcome **49%** → The REMCO reviewed Shell's performance over the vesting period, considering financial and safety performance, whether there had been any breaches of ethics and compliance standards or other events that might damage Shell's reputation, and individual performance. The REMCO decided that the LTIP outcome was a fair reflection of performance and should vest without discretionary adjustment. → Final vesting outcome **49%**

---

**Vesting of the energy transition performance condition**

The energy transition condition supports delivery of Shell's net carbon intensity (NCI) target (measured by Shell's Net Carbon Footprint (NCF) methodology). This is a broad metric which consists of a mix of strategic measures that set the foundations for Shell achieving our longer-term ambitions in the energy transition, as well as Shell's success in reducing the NCI of all energy products sold. The outcome was intended to be determined holistically by the REMCO, after taking advice from the Safety, Environment and Sustainability Committee (SESCo), taking account of performance against quantifiable targets but also with regard to Shell's wider progress in the energy transition beyond the defined measures.

The metrics for the first LTIP cycle (2019-2021) were focused on laying the foundations for Shell's future growth, building the customer base and developing the organisational capability to deliver against the key strategic ways of decarbonising Shell's business: growing a power business, developing lower-carbon energy products and developing emission sinks.

Exhibit Q

ANNUAL REPORT ON REMUNERATION continued

Build a material Power business: The first cycle of the LTIP was orientated toward creating the foundations on which a material power business can be built: entering new markets to access customers, and developing new commercial pathways by creating a funnel of renewable power capacity options and then converting those options to realised investments. The REMCO considered that this target had substantively being met. Noting the movement into new markets for direct power sales to end customers through acquisitions such as ERM in Australia (now trading as Shell Energy), and the expansion of the North American renewables power business with the acquisition of Inspire. Strong progress has also been made on renewables, with a funnel of installed renewable capacity and pipeline of options ahead of what was expected in 2019 following the acquisition of solar and energy storage developer, Savion. Demonstrable progress was made on converting those options into the renewable energy projects that a lower-carbon energy future will require, for example with the CrossWinds joint venture in the Netherlands.

Advanced biofuels technology: Biofuels are expected to play an important role in energy transition, providing a key decarbonisation lever for sectors that will continue to need to use liquid fuels. This element of the LTIP measure reflects our strategy, which is to prove multiple technology platforms that can be subsequently replicated at pace, with performance assessed based on Shell developing or taking an equity position in commercial scale biofuels projects. The initial target was focussed on taking the first steps to implement this strategy, and the REMCO considered this had been met in full through Enerkem Varennes, a biofuels plant in Québec, Canada, that will produce low-carbon fuel and chemicals from non-recyclable waste, and LanzaJet, which will produce jet fuel from ethanol from a plant in Georgia in the US.

Developing emissions sinks: The development of systems that capture and absorb carbon are required as part of the global response to climate change. The target for the first LTIP cycle was based on setting the foundations to develop future commercial value chains and REMCO considered this element of the LTIP measure had been met in full. This was through the Northern Lights project in Norway, with the REMCO noting that this project provided the opportunity to build the commercial knowledge and organisational capacity for future carbon capture projects. The REMCO also took account of the significant progress made on investment in the nature based solutions (NBS), which will make a big contribution to Shell reaching net-zero emissions, with nine investments in NBS projects that are verified by recognised carbon credit standards over the performance period.

Net carbon intensity: Finally, the REMCO paid particular attention to the outcome on the metric based on the NCI reduction. This is a comprehensive metric covering the Scope 1, 2 and 3 emissions from all energy products sold by Shell and provides a concrete marker of Shell's success in decarbonising. The REMCO believes that Shell remains the only major energy company to set a target for reducing the Scope 1, 2 and 3 emissions intensity from the sale of all energy products. The outcome of this metric is a reduction of 2.5% against a target range of 2-3%. This target has evolved over time to reflect the decarbonisation actions necessary to meet our longer-term NCI targets (NCI reduction targets for later LTIP cycles are 2020-2022: 3-4%, 2021-2023: 6-8%, 2022-2024 9-12%, compared to the 2016 base year).

Further detail is available on page 93.

The REMCO considered the alignment to the financial statements and the enhancement of the quality of our emissions data when making their decision.

After taking advice from the SESCo REMCO decided the energy transition performance condition should vest at 180%.

The overall vesting outcome, including an illustration of the impact of share price movement and accrued dividends, is set out below. The CEO and CFO's vested awards are subject to a further three-year holding period which extends beyond their tenure as Executive Director.

**2019 LTIP vesting outcome**



CEO

Vesting outcome: [A]
194,625 x 49% =
95,366 Ordinary shares
€2,593,955

Change in share price: [B]
95,366 x -€2.41
-€229,832

Accrued dividends: [C]
18,079 Ordinary shares
€448,178

Total LTIP Vesting: [C][D]
113,445 Ordinary shares
€2,812,302

CFO

Vesting outcome: [A]
49,927 x 49% =
24,464 ADS
$1,537,318

Change in share price: [B]
24,464 x -$9.99
-$244,395

Accrued dividends: [C]
4,670 ADS
$246,810

Total LTIP Vesting: [C][D]
29,134 ADS
$1,539,732

[A] Based on the share price at award of €27.20 for CEO and $62.84 for CFO.
[B] Calculated based on the opening share price March 3, 2022 minus the share price at the date of award for CEO €24.79 - €27.20 = €2.41 and for CFO: $52.85 - $62.84 = -$9.99.
[C] Based on the opening share price on March 3, 2022 of €24.79 for CEO and $52.85 for CFO.
[D] Vested shares are subject to a three-year holding period, which extends beyond tenure as an Executive Director.

Exhibit Q

In determining the final pay outcomes, the REMCO also considered the personal performance of the Executive Directors.

**Personal performance 2019 – 2021**

It has been a challenging period for business as the world has grappled with the challenges of the COVID-19 pandemic and, for the energy sector in particular, as society accelerates towards a future of cleaner energy. Responding to these challenges has demanded strong leadership which both the CEO and CFO have provided. The REMCO acknowledges the exceptional personal contributions made by both the CEO and CFO in delivering a very strong set of financial results, coupled with a number of key strategic and organisational developments in 2021. This includes an updated strategy, Powering Progress, the first shareholder advisory vote on Shell's Energy Transition Report and the implementation of a new organisational structure (Project Reshape). This culminated with the simplification, an important step, which the Board believes will strengthen Shell's competitiveness and accelerate both shareholder distributions and delivery of its strategy to become a net-zero emissions energy business.

| Ben van Beurden | Jessica Uhl |
|---|---|
| Against a backdrop of transformational strategic and organisational change, the strength of Shell integrated business, quality of portfolio and operational delivery allowed Shell to capitalise on improved prices to deliver adjusted earnings of $19.3bn and generated an outstanding $45.1bn of CFFO (including working capital). The work has also continued to reshape Shell's portfolio with the delivery of divestment proceeds of $15.1bn in 2021, far beyond target. These operating cash flows and divestment proceeds significantly contributed to reducing net debt to $52.6 billion at the end 2021, down from $75.4 billion at the end of 2020. This strong financial performance has enabled Shell to deliver on our commitment to increase shareholder distributions in keeping with our successful net debt reduction. Starting from Q2 2021, we rebased our quarterly dividend to 24 US cents per share and started share buybacks. The REMCO acknowledges the fundamental role the CEO's strategic and operational leadership has played in enabling these financial outcomes and delivery of shareholder returns. | The REMCO recognises the leadership of the CFO in delivering a number of key enterprise initiatives over the course of 2021. Notably this included the successful delivery of the simplification of Shell plc. This was a complex and challenging undertaking that involved the establishment of a single line of shares to eliminate the complexity of Shell's A/B share structure and aligning Shell's tax residence with its country of incorporation in the UK. |
| Tackling climate change is an urgent challenge. This is why Shell has set a target to become a net-zero emissions energy business by 2050, in step with society and our customers. The CEO has led the development of Shell's updated strategy, Powering Progress, which sets out a comprehensive strategy on how Shell intends to decarbonise energy customers while running legacy businesses for value rather than volume, integrating business and investment decisions with Shell's longer-term ambitions. This was supported by the implementation of the new organisation (Project Reshape) necessary to support this updated strategy, which was completed in August 2021 without operational disruption.. | Shell's strong financial results were underpinned by discipline on capital, operating and lease expenditure and by the delivery of a divestment programme in excess of $15 billion. This enabled a reduction in net debt by $23 billion over the course of 2021. Dividends were increased twice in the year and share buybacks commenced, accelerating the pace of shareholder distributions. The CFO played a critical role in guiding the company through the implementation of an updated capital allocation framework to balance growth and shareholder distributions. |
| | To support ongoing transparency for shareholders, the CFO led the introduction of significantly improved external financial and operational quarterly disclosures in 2021 with positive feedback from the market. |
| Externally, the CEO has played a leading role in the energy transition debate through such initiatives as the first joint statement with institutional shareholders, encouraging other companies to adopt the net carbon intensity methodology. He has been instrumental in galvanising coalitions to start action on sectoral decarbonisation. His personal role, for example in the Aviation Clean Skies Initiative, is recognised by both customers and external stakeholders. His interventions have helped in shifting the climate agenda towards the practical measures that will be needed for creating sustained demand for lower-carbon products. | Over the performance period, the CFO has made significant progress maturing the internal management systems relating to carbon dioxide ($CO_2$) and ensuring these are reflected in decisions about portfolio, planning and resource allocation. In 2021, this included the delivery of carbon budgets within the annual business planning cycle for the first time. From the 2021 Annual Report, improved disclosure in the Annual Report. |
| The refreshed safety programme was rolled out and a new personal safety measure designed to focus attention on the most serious incidents was introduced. To deliver the safety refresh Shell aims to apply a learner mindset, believing people can always improve, enhance their capabilities, learn from mistakes and successes, and speak up freely. The REMCO recognise the work across the business at Shell, from the CEO down, in embracing a learner mindset and driving this across the organisation. | The CFO led the delivery of the Shell Energy Transition Strategy publication, which is part of our continuing work to implement the recommendations of the Task Force on Climate-related Financial Disclosures (TCFD). The report sets out how Shell plans to be resilient to expected changes in the energy system and how its strategy helps is to thrive as the world transitions to lower-carbon energy culminating in the first shareholder advisory vote at the 2021 AGM in May (88.74% of votes cast were in favour). |

---

The REMCO considered the single-figure outcomes for the CEO and CFO. It noted that the overall remuneration outcomes were higher than in 2020, by 26% for the CEO and 24% for the CFO. The REMCO was satisfied that these single-figure outcomes represented a fair level of remuneration.

In finalising its remuneration decisions for 2021, the REMCO considered a range of factors, including:
- Shell's performance in 2021 and over the LTIP performance period 2019-2021;
- The impact of the fatalities on the formulaic scorecard outcome, and further downwards adjustment applied by the REMCO on the bonus scorecard;
- the ongoing leadership shown by the CEO and CFO in continuing to set out a clear strategic direction for Shell in the energy transition and delivering the organisational redesign necessary to deliver on those strategic promises;
- a range of other factors taking account of Shell's performance beyond the formulaic outcomes of defined pay architecture,

including safety, ethics and compliance, and feedback from the Audit Committee and the Safety, Environment and Sustainability Committee (SESCo);
- the final LTIP vesting outcome;
- the CEO's and CFO's remuneration compared with the variable pay outcomes for the general workforce;
- the alignment of the CEO and CFO with the shareholder experience through their high shareholding requirements; and
- the personal performance of the Executive Directors.

After reflecting on the above factors, the REMCO was satisfied that the remuneration policies had operated as intended.

ANNUAL REPORT ON REMUNERATION continued

**Pension**

In 2021, Ben van Beurden's pension arrangements comprised a defined benefit plan with a maximum pensionable salary of €100,861; and a net pay defined contribution pension plan with a 2021 employer contribution of 27% of salary in excess of €100,861. He has the option of taking cash as an alternative to pension contributions (in either case subject to income tax). He elected to take his benefit in the form of contributions up to and including November 2021.

The employer contribution levels were in line with those applicable to other Netherlands-based employees. Under the Dutch pension regulations applicable to the pension arrangement in which the CEO participates, the contribution rate increases with age and is shown below. At December 31, 2021, the average employer contribution rate for Netherlands employees who participate in the net pay defined contribution pension arrangement on the same terms as Ben van Beurden was 22%.

After relocating to the UK, from December 31, 2021, the CEO is eligible to participate in the UK Shell Pension Plan, with a contribution rate of 20%, or to take this as a pension cash alternative. The UK Shell Pension Plan and associated pension cash alternative are available to new employees in the UK at the same contribution levels and currently around half of the UK employees participate in these arrangements. The majority of the remainder participate in a legacy defined benefit plan which closed to new members from March 2013.

Jessica Uhl is a member of the Shell US retirement benefit arrangements, which include the Shell Pension Plan (a defined benefit plan), and a defined contribution plan where she receives an employer contribution of 10% of salary. This is the same as the average employer contribution rate for US employees, which was 10%. As for all other pre-2013 members of the Shell Pension Plan, she has an annual choice of two accrual formulas with different forms of benefits, one in the form of a lifetime annuity and the other allowing for a lump-sum payment. She elected to accrue benefits for 2021 under the former. Around 9,000 out of 15,000 Shell US employees have the option of choosing between the two formulas. These arrangements are the same for all employees who joined Shell US at the same time as Jessica Uhl. The difference in Jessica Uhl's pension provision, compared with other employees who joined before 2013, is that because she is an Executive Director her bonus is not pensionable. For other relevant US employees the bonus is pensionable. She also has a deferred Dutch defined benefit pension plan, as a result of a previous Shell assignment on local Dutch terms and conditions.

The REMCO believes these arrangements are aligned with corporate governance developments in the UK which emphasise the desirability of Executive Directors' pension arrangements being the same as those for the general employee population.

**Shell Netherlands Pension Stichting net pay defined contribution ladder**



| Age | Employer contribution |
|---|---|
| 15 – 19 | 6.30% |
| 20 – 24 | 7.54% |
| 25 – 29 | 8.99% |
| 30 – 34 | 10.44% |
| 35 – 39 | 12.31% |
| 40 – 44 | 14.38% |
| 45 – 49 | 17.07% |
| 50 – 54 | 19.77% |
| 55 – 59 | 23.29% |
| 60 – 64 | (2021 rate for Ben van Beurden) 27.02% |
| 65 – 67 | 30.13% |

**Scheme interests awarded in 2021**

Scheme interests awarded to Executive Directors in 2021 (audited)

| Scheme interest type | Type of interest awarded | End of performance period | Target award [A] | Minimum performance (% of shares awarded) [B] | Maximum performance (% of shares of the target award) [A] |
|---|---|---|---|---|---|
| | | | | Potential amount vesting | |
| LTIP | Performance shares | December 31, 2023 | Ben van Beurden: 231,679 A shares, equivalent to 2.645 x base salary or €4,200,344. Jessica Uhl: 69,972 A ADS shares, equivalent to 2.485 x base salary or €2,572,119 | 0% | Maximum number of shares vesting is 200% of the shares awarded, before dividends. |

[A] The award for Ben van Beurden was based on the closing market price on the date of grant, March 5, 2021, for A shares of €18.13. The award for Jessica Uhl was based on the closing market price on the date of grant, March 5, 2021, for A ADSs of $43.85.
[B] Minimum performance relates to the lowest level of achievement, for which no reward is given.

Exhibit Q

The measures and weightings applying to LTIP awards made in 2021 were: energy transition (20%), FCF (20%), TSR (20%), ROACE growth (20%) and growth in cash flow from operating activities (20%).

**Absolute measures**
Energy transition
The energy transition condition supports the delivery of Shell's net carbon intensity (NCI) target (calculated using Shell's Net Carbon Footprint (NCF) methodology).

The condition consists of a mix of leading and lagging measures that help establish the basis for achieving Shell's longer-term strategic ambitions. They are as follows:

Lagging measure – a measure of our progress in meeting our ambition:
• Reducing the carbon intensity of all energy products Shell sells (a carbon intensity measure that takes into account the full life-cycle emissions of products, including customers' emissions associated with using them).

Leading measures – Shell will use these to reduce our NCI in the future:
• The growth of our Power business: all scenarios recognise that one of the main ways to cut greenhouse gas emissions is to use more electricity, produced via lower-carbon means such as renewables and gas-fired power generation. Our ambition is to expand our Power business through selective investments in generation and by reselling power generated by others.
• Offer more lower-carbon energy products: biofuels are expected to play a valuable role in the changing energy mix. They are likely to be one of the main ways to reduce carbon emissions in sectors that need to keep using liquid fuels for a significant number of years, such as some segments of transport and industry.

• The development of systems to capture and absorb carbon: carbon capture usage and storage (CCUS) and carbon sinks, such as nature-based solutions, need to be part of the global response to climate change.

Shell has set targets for each element. Progress in the energy transition is not expected to be linear because it will reflect the pace of change of society as a whole and the speed at which Shell makes progress with its strategic business objectives. As a result, targets have been set as ranges. These targets are commercially sensitive, so they will not be disclosed until the end of the performance period (or until they are no longer considered commercially sensitive). An update on our performance in relation to the measures set for the 2019 LTIP is provided on page 170.

The vesting outcome for the part of the LTIP weighted to the energy transition condition ranges from 0% to 200% of award. The REMCO, at its sole discretion, will determine vesting outcomes after considering achievement against the target ranges and feedback from the SESCo. The REMCO will consider, in relation to each element, progress over the performance period relative to short-term aims that encourage progress towards Shell's long-term NCI ambition. The starting point for determining the vesting outcome will be how many of the targets have been met for each of the four areas. One out of four will equal 40%, two will equal 100%, three will equal 150%, and 200% will be awarded for scoring four out of four. It is important to note that performance against these elements will serve simply as a starting point for the REMCO, which will also take into account any other considerations it deems appropriate, including (without limitation) the relative importance of these elements in meeting the long-term ambition announced by Shell. For example, the REMCO may decide to allocate a greater importance to overall performance in relation to the NCI than the other three elements. The REMCO believes this approach is appropriate, given the uncertainties around the speed and direction of progress in the energy transition. The REMCO will fully disclose and explain the application of any discretion.

**2021 energy transition performance condition – measures**

Performance is assessed based on our reduction in the carbon intensity of all energy products sold and progress on the key strategic means of achieving decarbonisation:



**Reducing the carbon intensity of all energy products sold**
• Reduction in net carbon intensity vs. base year measured by Net Carbon Footprint



**Build a material Power business**
• Total power sales
• Reduce the carbon intensity of the Power portfolio
• Renewable power generation capacity



**Grow new lower-carbon energy product offerings**
• Electric vehicle charging network
• Advanced biofuels
• Deployment of low-carbon fuels
• Hydrogen business development



**Develop emission sinks**
• Nature-based solutions
• Carbon capture, utilisation and storage

Quantitative targets are set for each metric. Vesting will be based on how many of the four targets are met. 1/4 equals 40%, 2/4 equals 100%, 3/4 equals 150% and 4/4 equals 200%. The REMCO will apply judgement in determining the final outcome after taking advice from the SESCo.

ANNUAL REPORT ON REMUNERATION continued

FCF

The FCF performance condition supports the delivery of our cash flow priorities, which are to service and reduce debt, pay dividends, buy back shares and make future capital investments.

The target for FCF, along with the ranges for threshold and outstanding performance, will be set by reference to Shell's annual operating plans, being the aggregate of our plan FCF targets over the three-year performance period. Given that FCF is heavily influenced by the volatility of oil and gas prices, the annual operating plans are updated each year to set an annual target to reflect a changing oil price premise. As a result, FCF targets are set annually for each annual operating plan and will only be disclosed in aggregate retrospectively after the three-year period. The REMCO has considered setting a three-year target at the outset, but it believes such an approach would require adjustments for the oil and gas price premise and other matters at the end of the period, given the unpredictability and volatility in oil and gas prices. The REMCO has a long-standing no-adjustments policy which leads it to believe that a more appropriate approach is to set the target based on the aggregation of the annual operating plans.

The amounts payable under this measure will range from 20% of the available maximum, for threshold performance, to full vesting for outstanding performance. A straight-line vesting schedule will apply for performance between threshold and outstanding.

Relative measures

The relative measures are based on our performance on a number of key financial measures against the our closest comparators.

For relative measures, we rank growth based on the data points at the end of the performance period compared with those at the beginning of the period, using publicly reported data.
• TSR, calculated in US dollars using a 90-day averaging period, 45 days either side of the start and end of the performance period;
• ROACE growth. For this purpose, to facilitate the comparison, the calculation of ROACE differs from that described in "Performance indicators" on page 35 because there is no adjustment for after-tax interest expense; and
• growth in cash flow from operating activities.

Each relative measure affects vesting independently, with the amounts payable ranging from 0% to 200%, in accordance with the following vesting schedule:
• ranking first equals 200% vesting for the LTIP element weighted to that measure;
• ranking second equals 150% vesting for the LTIP element weighted to that measure;
• ranking third equals 80% vesting for the LTIP element weighted to that measure; and
• ranking fourth or fifth equals 0% vesting for the LTIP element weighted to that measure.

TSR Underpin

If the TSR ranking is fourth or fifth, the level of the award that can vest on the basis of the other measures will be capped at 50% of the maximum.

Performance update on FCF

2020 LTIP award

At December 31, 2021, FCF performance is above target, with a below-threshold outcome for 2020 of $20.8 billion (target $38 billion) balanced by a strong performance in 2021 of $40.3 billion (target $9 billion). As one year of FCF performance remains, and 77.5% of the award is subject to relative and energy transition performance conditions, this does not reflect the potential vesting of the award.

2021 LTIP award

At December 31, 2021, FCF performance, $40.3 billion for 2021, is above target ($9 billion). As two years of FCF performance remain, and 80% of the award is subject to relative and energy transition performance conditions, this does not reflect the potential vesting of the award.

Statement of Directors' shareholding and share interests (audited)

Shareholding guidelines

The REMCO believes that Executive Directors should align their interests with those of shareholders by holding shares in Shell plc (the Company). The CEO is expected to build a shareholding with a value of 700% of base salary, and the CFO 500%. The shareholding requirement extends post employment, such that Executive Directors will be required to maintain their shareholding requirement, or the number of shares actually held if this is less than the shareholding requirement, for a period of two years post employment. There is a Company-sponsored nominee account which allows for restrictions to be applied on the sale or transfer of shares that are subject to holding periods and individual shareholding requirements. The restrictions remain in force beyond the Executive Director's employment.

Only unfettered shares count. Shares delivered that are subject to holding requirements also count towards the guidelines. The values of shares counting towards the shareholding guideline (as a percentage of base salary) were 904% for the CEO and 693% for the CFO at March 4, 2022.

Executive Directors' shareholding (audited)

| | Shareholding guideline (% of base salary) | Value of shares counting towards guideline (% of base salary at December 31, 2021) [A] |
|---|---|---|
| Ben van Beurden | 700% | 972% |
| Jessica Uhl | 500% | 555% |

[A] Following the sale of 190,000 ordinary shares by Ben van Beurden on February 7, 2022, the delivery of half the 2021 annual bonus in shares and the vesting of the 2019 LTIP on March 4, 2022, their respective holdings are Ben van Beurden 904% and Jessica Uhl 693%.

Non-executive Directors are encouraged to hold shares with a value equivalent to 100% of their fixed annual fee and to maintain that holding during their tenure.

<span style="color:red">Directors' share interests</span>

The interests, in shares of the Company or calculated equivalents, of the Directors of office during 2021, including any interests of their connected persons, are set out in the table below.

Directors' share interests (audited)

| | January 1, 2021 | | December 31, 2021 | |
|---|---|---|---|---|
| | A shares | B shares | A shares | B shares |
| **Executive Directors [A]** | | | | |
| Ben van Beurden | 866,433 [B] | – | 973,533 | |
| Jessica Uhl | 240,557 [C] | – | 299,283 [D] | |
| **Non-executive Directors** | | | | |
| Dick Boer | 10,000 | – | 10,000 | – |
| Neil Carson | 16,000 | – | 16,000 | – |
| Ann Godbehere | – | 10,000 [E] | – | 10,000 [E] |
| Euleen Goh | – | 12,895 | – | 12,895 |
| Charles O. Holliday | – | 50,000 [F] | – | 50,000 [G] |
| Catherine J. Hughes | 4,080 | 51,904 [H] | 4,080 | 51,904 [H] |
| Martina Hund-Mejean | – | 20,000 [I] | – | 20,000 [I] |
| Jane Holl Lute | – | [J] | – | 5,002 [K] |
| Sir Andrew Mackenzie | – | 20,732 | – | 27,623 |
| Abraham Schot [L] | – | – | – | – |
| Sir Nigel Sheinwald | – | 1,124 | – | 1,124 [M] |
| Gerrit Zalm | 2,026 | – | 2,026 | – |

[A] Includes vested LTIP awards subject to holding conditions. Excludes unvested interests in shares awarded under the LTIP.
[B] Includes 174,000 RDS A shares pledged with Van Lanschot N.V.
[C] Held as 26,590 RDS A shares and 44,789 ADS (RDS.A ADS). Each RDS.A represents two A shares.
[D] Held as 35,201 RDS A shares and 132,041 ADS (RDS.A ADS). Each RDS.A represents two A shares.
[E] Held as 5,000 ADSs (RDS.B ADS). Each RDS.B represents two B shares.
[F] Held as 25,000 ADSs (RDS.B. ADS). Each RDS.B represents two B shares.
[G] Interests at May 18, 2021, when he stood down as a Director. Held as 25,000 ADS (RDS.B. ADS). Each RDS.B represents two B shares
[H] Held as 46,904 RDS.B shares and 2,500 ADS (RDS.B. ADS). Each RDS.B represents two B shares
[I] Held as 10,000 ADSs (RDS.B ADS). Each RDS.B represents two B shares.
[J] Interests at May 19, 2021, when she was appointed as a Director.
[K] Held as 2,501 ADSs (RDS.B ADS). Each RDS.B represents two B shares
[L] On August 17, 2020, Bram Schot purchased 5,500 certificates Shell Turbo Long 7.5 BNP Paribas Markets (previously called: Royal Dutch Shell A Turbo Long 8.2 BNP Paribas Markets) (ISIN: NL0009558519) at a price of €5.37 per certificate. These certificates are cash settlement instruments the value of which is linked to the share price of Shell Shares (until January 29, 2022, RDS A Shares). In this case, the ratio of the turbo is 1:1 and accordingly 5,500 certificates represent 5,500 Shell shares. As of February 23, 2022, the leverage is 1.42 but fluctuates depending on the share price. If the share price increases, the leverage will decrease. The finance level is 6.91 and the stop-loss level is 7.5. The finance level is adjusted on the 15th of every month. Finance costs are 2.45% on an annual basis. With a turbo long, there is a finance level and a stop-loss level. If the underlying share price drops below the stop-loss level, the turbo long is terminated. The investor then receives the value of the difference between the finance level and the level on which the counterparty, in this case BNP Paribas, can close the turbo. Take for example a turbo with a stop-loss level of 10 and a finance level of 8. When the underlying share price drops below 10, which is the stop-loss level, the buyer will still receive the amount 10-8=2. But if the share price would suddenly drop to 8 or below, the buyer will receive nothing and the total investment is lost. In most cases, the turbo would be terminated at the stop-loss level, and the buyer receives the amount of the difference between the finance level and the stop-loss level. The actual amount will be determined by BNP. In addition, on August 27, 2020, Bram Schot purchased 100 Leonteq Express Euro Denominated Certificates on ING, Shell, Unilever (previously called: Leonteq Express Euro Denominated Certificates on ING, Royal Dutch Shell, Unilever) (ISIN: CH0470808913), with a nominal value of €1,000 each at a price of €515 per certificate. These certificates are cash settlement instruments of which payment of a conditional coupon depends for 1/3 on the development of the price of the Shell Shares on Euronext Amsterdam and, as such, is a financial instrument linked to the Shell Shares. Both transactions took place before Bram Schot became a Director

---

of the Company. On February 12, 2021, Bram Schot purchased (i) an additional 2,500 certificates Shell Turbo Long 7.5 BNP Paribas Markets (ISIN: NL0009558519) at a price of €7.69 per certificate; and (ii) an additional 50 Leonteq Express Euro Denominated Certificates on ING, Shell, Unilever (ISIN: CH0470808913), with a nominal value of €1,000 each at price of €715 per certificate
[M] Interests at May 19, 2020, when he stood down as a Director.

The Directors share interests converted into ordinary shares or ADS, as appropriate, following the assimilation of Shell's A and B shares into a single class of share on January 29, 2022.

The changes to Directors' shareholdings as at March 4, 2022 are that Ben van Beurden sold 190,000 ordinary shares on February 7, 2022, and after the delivery of half the 2021 annual bonus in shares and the vesting of the 2019 LTIP award, Ben van Beurden's share interests increased by 90,998 ordinary shares, and Jessica Uhl's by 15,096 ADS and 18,551 ordinary shares. Jane Lute purchased 903 ADS on February 11, 2022.

At March 4, 2022, the Directors and Senior Management (pages 119-126) of the Company beneficially owned, individually and in aggregate (including shares under option), less than 1% of Company shares. These shareholdings are not considered sufficient to affect the independence of the Directors.

<span style="color:red">Directors' scheme interests</span>

The table below shows the aggregate position for Directors' interests under share schemes at December 31, 2021. These are RDS A shares for Ben van Beurden and RDS.A ADS for Jessica Uhl. During the period from December 31, 2021, to March 4, 2022, scheme interests have changed as a result of the vesting of the 2019 LTIP on March 3, 2022, and because of the 2022 LTIP awards made on February 4, 2022, as described on pages 166 and 168 respectively.

Directors' scheme interests (audited)

| | Share plan interests [A] | |
|---|---|---|
| | LTIP subject to performance conditions [B] | |
| | 2021 | 2020 |
| Ben van Beurden [C] | 691,227 | 662,751 |
| Jessica Uhl [D] | 196,751 | 179,565 |

[A] Includes unvested long-term incentive awards and notional dividend shares accrued at December 31. Interests are shown on the basis of the original awards. The shares subject to performance conditions can vest at between 0% and 200%. Dividend shares accumulate each year on an assumed notional LTIP award. Such dividend shares are disclosed and recorded on the basis of the number of shares conditionally awarded but, when an award vests, dividend shares will be awarded only in relation to vested shares as if the vested shares were held from the award date. Shares released during the year are included in the 'Directors' share interests' table.
[B] Total number of unvested LTIP shares at December 31, 2021, including dividend shares accrued on the original LTIP award.
[C] Ordinary shares.
[D] ADS.

<span style="color:red">Dilution</span>

In any 10-year period, no more than 5% of the issued ordinary share capital of the Company may be issued or issuable under executive (discretionary) share plans adopted by the Company, or 10% when aggregated with awards under any other employee share plan operated by the Company. To date, no shareholder dilution has resulted from these plans, although it is permitted under the rules of the plans, subject to these limits.

<span style="color:red">Payments to past Directors (audited)</span>

No payments to past Directors were made in 2021.

Payments below €5,000 are not reported as they are considered de minimis.

ANNUAL REPORT ON REMUNERATION continued

**TSR performance and CEO pay**
Performance graphs
The graphs compare the TSR performance of Shell plc over the past 10 financial years with that of the companies comprising the Euronext 100 and the FTSE 100 share indices. The Board regards these indices as appropriate broad market equity indices for comparison, because they are the leading market indices in Shell plc's home markets. Data shown is for the performance of RDS A and RDS B shares prior to the assimilation of Shell's shares to a single line of ordinary shares on January 29, 2022.

**Historical TSR performance (RDSA)**
Value of hypothetical €100 holding



**Historical TSR performance (RDSB)**
Value of hypothetical £100 holding



**CEO pay outcomes**
The following table sets out the single total figure of remuneration, the annual bonus payment and long-term incentive (LTI) vesting rates compared with the respective maximum opportunity, for the CEO for the past 10 years.

CEO pay outcomes

| Year | CEO | Single total figure of remuneration (€000) | Annual bonus award against maximum opportunity | LTI vesting against maximum opportunity |
|------|-----|-------------------------------------------:|------------------------------------------------:|-----------------------------------------:|
| 2021 | Ben van Beurden | 7,380 | 64% | 25% |
| 2020 | Ben van Beurden | 5,841 | 0% | 45% |
| 2019 | Ben van Beurden | 9,963 | 21% | 74% |
| 2018 | Ben van Beurden | 20,138 | 79% | 95% |
| 2017 | Ben van Beurden | 8,909 | 81% | 35% |
| 2016 | Ben van Beurden | 8,593 | 66% | 42% |
| 2015 | Ben van Beurden | 5,576 | 98% | 8% |
| 2014 | Ben van Beurden [A] | 24,198 | 94% | 49% |
| 2013 | Peter Voser | 8,456 | 44% | 30% |
| 2012 | Peter Voser | 18,246 | 83% | 88% |

[A] Ben van Beurden's single total figure for 2014 was impacted by the increase in pension accrual (€10.695 million) calculated under the UK reporting regulations and tax equalisation (€7.905 million) as a result of his promotion and prior assignment to the UK.

Exhibit Q

**Percentage change in remuneration of Directors and employees**

As Shell plc does not have any direct employees, the table below compares the remuneration of the Directors of Shell plc with an employee comparator group consisting of local employees in the Netherlands, the UK and the USA. The local employee population of these countries is considered to be a suitable employee comparator group because: these are countries with a significant Shell employee base; a large proportion of senior managers come from these countries; and the REMCO considers remuneration levels in these countries when

setting base salaries for Executive Directors. For the purposes of comparison, the change in employee remuneration is calculated by reference to the change in salary scale, benefits and annual bonus for a notional employee in each of the base countries, not by reference to the actual change in pay for a group of employees.

Taxable benefits are those that align with the definition of taxable benefits applying in the respective country. In line with the "Single total figure of remuneration for Executive Directors" table, the annual bonus is applied in the year in which it was earned.

Percentage change in remuneration of Directors and employees [A]

| | | 2020-2021 | 2019-2020 |
|---|---|---|---|
| **Employees [B]** | | | |
| UK, USA and the Netherlands | Salaries/fees | 0.6% | 3.0% |
| | Benefits | —% | —% |
| | Bonus | N/A | (100.0)% |
| **Executive Directors** | | | |
| CEO | Salaries/fees | —% | 2.0% |
| | Benefits | 8.6% | (23.7)% |
| | Bonus | N/A | (100.0)% |
| CFO | Salaries/fees | —% | 2.0% |
| | Benefits | (22.8)% | 28.1% |
| | Bonus | N/A | (100.0)% |
| **Non-executive Directors [C]** | | | |
| Dick Boer | Salaries/fees | 70.4% | N/A |
| | Benefits | —% | N/A |
| Neil Carson | Salaries/fees | 4.3% | 85.6% |
| | Benefits | —% | —% |
| Ann Godbehere | Salaries/fees | 2.9% | 15.8% |
| | Benefits | N/A | —% |
| Euleen Goh | Salaries/fees | 11.4% | 0.2% |
| | Benefits | N/A | —% |
| Jane Holl Lute | Salaries/fees | N/A | N/A |
| | Benefits | N/A | N/A |
| Charles O. Holliday | Salaries/fees | (61.9)% | —% |
| | Benefits | (11.6)% | (2.4)% |
| Catherine J. Hughes | Salaries/fees | 2.8% | (10.0)% |
| | Benefits | N/A | —% |
| Martina Hund Mejean | Salaries/fees | 68.4% | N/A |
| | Benefits | N/A | N/A |
| Sir Andrew Mackenzie | Salaries/fees | 1473.0% | N/A |
| | Benefits | N/A | N/A |
| Abraham Schot | Salaries/fees | 300.0% | N/A |
| | Benefits | N/A | N/A |
| Sir Nigel Sheinwald | Salaries/fees | (62.5)% | (1.7)% |
| | Benefits | N/A | (100.0)% |
| Gerrit Zalm | Salaries/fees | —% | —% |
| | Benefits | N/A | —% |

[A] In a number of instances the value for the preceding year was zero. In these cases, N/A is recorded.
[B] As Shell plc does not have any employees, the change in pay for an employee comparator group from the UK, USA and the Netherlands is shown.
[C] Non-executive directors do not receive any short-term incentives.

ANNUAL REPORT ON REMUNERATION continued

**Relative importance of spend on pay**

The table below sets out distributions to shareholders by way of dividends and share buybacks, and remuneration paid to or receivable by employees for the last five years, together with annual percentage changes.

Relative importance of spend on pay

| Year | Dividends and share buybacks [A] | | Spend on pay (all employees) [B] | |
|---|---|---|---|---|
| | $ billion | Annual change | $ billion | Annual change |
| 2021 | 9.1 | —% | 12.1 | —% |
| 2020 | 9.1 | -64% | 12.1 | -8% |
| 2019 | 25.4 | 26% | 13.2 | -1% |
| 2018 | 20.2 | 29% | 13.4 | -6% |
| 2017 | 15.6 | 4% | 14.3 | -9% |

[A] Dividends paid, which includes the dividends settled in shares via our Scrip Dividend Programme and repurchases of shares as reported in the "Consolidated Statement of Changes in Equity".
[B] Employee costs, excluding redundancy costs, as reported in Note 26 to the "Consolidated Financial Statements".

Spend on pay can be compared with the major costs associated with generating income by referring to the "Consolidated Statement of Income". Over the last five years, the average spend on pay was 5% of the major costs of generating income. These costs are considered to be the sum of: purchases; production and manufacturing expenses; selling, distribution and administrative expenses; research and development; exploration; and depreciation, depletion and amortisation.

**Total pension entitlements (audited)**

During 2021, Ben van Beurden and Jessica Uhl accrued retirement benefits under defined benefit plans. The pensions accrued under these plans at December 31, 2021, are set out below. The exchange rates used for conversion into euros and dollars are at December 31, 2021.

Accrued pension (audited)

| Thousand | Local | € | $ |
|---|---|---|---|
| Ben van Beurden [A] | 1,189 | 1,189 | 1,345 |
| Jessica Uhl [B] | 1,247 | 1,102 | 1,247 |

[A] The accrued benefits are disclosed on a per annum basis. Note that in 2021, Ben van Beurden entered into a pension sharing agreement with his former spouse, the amount disclosed reflects Mr van Beurden's entitlements after that agreement.
[B] Jessica Uhl has an annual choice between two accrual formulas with different forms of benefit. One is in the form of a lifetime annuity and the other allows for a lump-sum payment. She elected to accrue benefits up to 2018 under the arrangement for a lump-sum payment, and the remaining lump-sum benefit is shown. From 2019, she elected to accrue benefits as a lifetime annuity. The value of this accrued benefit at December 31, 2021, was $12,430 per annum plus a lump sum of $361,413. She also has a deferred Dutch defined benefit pension plan, as a result of a prior Shell assignment on local Dutch terms and conditions. The age at which Jessica Uhl can receive any pension benefit without an actuarial reduction under this Dutch plan is 60. The value of the deferred pension benefit is €3,427 per annum.

The age at which Ben van Beurden can receive any pension benefit without an actuarial reduction is 68. It is 65 for Jessica Uhl under her US pension plan. Any pension benefits on early retirement are reduced using actuarial factors to reflect early payment. No payments were made in 2021 regarding early retirement or in lieu of retirement benefits.

Please refer to page 168 for further details (Pension).

**External appointments**

Ben van Beurden joined the Supervisory Board of Daimler AG as a Non-executive Director in April 2021. Jessica Uhl joined the Board of Goldman Sachs Group as Non-executive Director in July 2021.

**Statement of voting at 2021 AGM**

Shell's 2021 AGM was held on May 18, 2021, in the Netherlands. The result of the poll in respect of Directors' remuneration was as follows:

Approval of Directors' Remuneration Report

| Votes | Number | Percentage |
|---|---|---|
| For | 3,567,342,830 | 95.86% |
| Against | 153,872,670 | 4.14% |
| Total cast | 3,721,215,500 [A] | 100.00% |
| Withheld [B] | 54,753,918 | |

[A] Representing 47.66% of issued share capital.
[B] A vote withheld is not a vote under English law and is not counted in the calculation of the proportion of the votes for and against a resolution.

The result of the poll in respect of the Directors' Remuneration Policy last approved at the 2020 AGM was as follows:

Approval of Directors' Remuneration Policy

| Votes | Number | Percentage |
|---|---|---|
| For | 3,705,707,055 | 92.91% |
| Against | 282,966,810 | 7.09% |
| Total cast | 3,988,673,865 [A] | 100.00% |
| Withheld [B] | 24,979,832 | |

[A] Representing 51.09% of issued share capital.
[B] A vote withheld is not a vote under English law and is not counted in the calculation of the proportion of the votes for and against a resolution.

**Directors' employment arrangements and letters of appointment**

Executive Directors are employed for an indefinite period. Non-executive Directors, including the Chair, have letters of appointment. Details of Executive Directors' employment arrangements can be found in the Directors' Remuneration Policy on page 185.

Further details of Non-executive Directors' terms of appointment can be found in the "Other Regulatory and Statutory Information" on page 188. and the "Governance framework" report on page 129.

**Compensation of Directors and Senior Management**

During the year ended December 31, 2021, Shell paid and/or accrued compensation totalling $48 million (2020: $36 million) to Directors and Senior Management for services in all capacities while serving as a Director or member of Senior Management, including $3 million (2020: $3 million) accrued to provide pension, retirement and similar benefits. The amounts stated are those recognised in Shell's income on an IFRS basis. See Note 28 to the "Consolidated Financial Statements". Personal loans or guarantees were not provided to Directors or Senior Management.

Exhibit Q

## CEO pay ratio

| | Option | 25th percentile pay ratio | Median pay ratio | 75th percentile pay ratio |
|---|---|---|---|---|
| 2021 | A | 97:1 | 57:1 | 37:1 |
| Total pay and benefits: Salary: | | £65,123 £43,550 | £111,912 £68,238 | £170,289 £101,000 |
| 2020 | A | 93:1 | 57:1 | 38:1 |
| Total pay and benefits: Salary: | | £55,584 £49,117 | £90,972 £75,365 | £136,007 £118,291 |
| 2019 | A | 147:1 | 87:1 | 54:1 |
| Total pay and benefits: Salary: | | £59,419 £40,417 | £100,755 £56,721 | £161,717 £79,991 |
| 2018 | A | 202:1 | 143:1 | 92:1 |
| Total pay and benefits: Salary: | | £88,112 £53,528 | £124,459 £80,407 | £193,027 £96,074 |

Shell has chosen to use option A to calculate the CEO pay ratio in accordance with guidance from the UK government that this is the preferred approach and the most statistically accurate method for identifying the ratios. Under option A, a comparable single total figure for all UK employees has been calculated in order to identify the employees whose pay and benefits are at the 25th, 50th (median) and 75th percentiles for comparison with the CEO. Employee pay has been calculated based on the total pay and benefits paid in respect of 2021 for all employees who were employed on December 31, 2021. For part-time workers and joiners in the year, pay and benefits have been annualised based on the proportion of their working time in the UK during the year. This is calculated with an approach consistent with the methodology for determining annual bonuses. The REMCO believes that this provides a fair and reasonable calculation of the pay ratios for Shell employees in the UK.

The ratio of the CEO's pay to the median UK worker is 57. The global pay ratio, calculated by comparing the CEO's single figure with the average employee headcount cost, is 64. The ratio at median is unchanged for 2021 from that reported for 2020. This follows a decline in the ratios since 2018, this is due to a decrease in the variable pay outcomes for the CEO. The pay and benefits for the 25th, 50th and 75th percentile employees have increased in relation to 2020, primarily because there was a strong bonus outcome for all employees in 2021 and employees also did not receive an annual bonus for 2020. The REMCO believes this outcome is appropriate and consistent with Shell's philosophy of pay for performance.

## Workforce engagement

The REMCO bases its decisions about remuneration on a wide range of factors including a careful consideration of the pay and conditions of the general workforce. In 2021, the REMCO considered factors that included the following:

- The one-off award of Shell shares to all eligible employees globally under the Powering Progress Share Award plan. Powering Progress provides a blueprint for generating value at Shell, but it is our employees who will deliver this strategy. To support engagement with our Powering Progress strategy and to help employees benefit from its successful delivery, all eligible employees, regardless of job grade or location, were granted $1,000 of Shell shares in June 2021 (for the avoidance of doubt, the CEO and CFO did not receive this award also).
- Remuneration markers such as the CEO pay ratio and gender pay reporting under the UK Equality Act 2010 (Gender Pay Gap Information) Regulations, and voluntary ethnicity pay reporting in the UK narrowed slightly in 2021 to 17.8% from 18% in 2020, continuing the positive trend since 2017 (22.2%). This is due to a continued upward trend in the proportion of women in our upper and upper middle pay quartiles. The REMCO has confidence in Shell policies that aim to increase the representation of women at all levels in the organisation.
- The planned general employee salary increases in the UK, USA and the Netherlands (when the REMCO was reviewing 2022 base salaries and target remuneration packages).
- The scorecard and Performance Share Plan (PSP) outcomes for employees (when the REMCO was determining the 2021 variable pay outcomes for Executive Directors). In particular, the REMCO noted the decision by management to adjust upwards the annual bonus scorecard for employees in recognition and appreciation of the extraordinary contributions made by our employees over a challenging period.

Executive remuneration structures in Shell are strongly aligned with Shell's broader policy on pay:

- In recent years the Group scorecard architecture has been identical to the Executive Committee and Senior Executive scorecard in terms of measures, weightings and targets.
- Executive Directors and Executive Committee members participate in the LTIP. Around 150 senior executives participate in the same plan. The measures and metrics for that plan also apply to 50% of the PSP awarded to around 16,500 employees.
- All employees in the Group participate in the relevant pension plan for their country based on their date of joining. Shell does not operate separate executive pension arrangements.

This consistency means that less explanation of executive remuneration structures is required than in companies where alignment is not the default practice. Employee engagements aimed to create an ongoing dialogue about how pay outcomes for all employees are linked to delivering the Powering Progress strategy. As part of this process, articles on Shell's internal intranet explored the Powering Progress Share Award and how the refreshed bonus scorecard connects with Shell's strategy and priorities. These articles generated a high level of interest among employees. Engagement scores, as measured by the number of page views, comments, likes and shares, were well above the average for Shell's intranet.

ANNUAL REPORT ON REMUNERATION continued

**STATEMENT OF PLANNED IMPLEMENTATION OF POLICY IN 2022**
The Directors' Remuneration Policy as detailed on pages 179-187 took effect from May 19, 2020, after it was approved by shareholders at the 2020 AGM. It will be effective until the 2023 AGM, unless a further policy is proposed by Shell and approved by shareholders before then. This section describes elements of the policy that will apply for 2022.

**Executive Directors**
**Salaries**
No salary increases were made for 2021. Effective from December 31, 2021, the date at which they transferred to UK employment, the base salaries were set at £1,420,000 for Ben van Beurden and at £921,000 for Jessica Uhl. Both base salaries were set in accordance with the shareholder-approved 2020 Remuneration Policy and included a 3.5% increase for the CEO and 3% for the CFO. The REMCO decided these salary increases in acknowledgement of the significant personal contributions made by the CEO and CFO to the Shell Group in delivering the strategic progress over 2021. In particular, the simplification of Shell, which entailed establishing a single line of shares to eliminate the complexity of Shell's A/B share structure and aligning Shell's tax residence with its country of incorporation in the UK. These are measures which the Board believes will strengthen Shell's competitiveness and accelerate both shareholder distributions and delivery of its strategy, and the salary increases are consistent with the principles for managing the development of employee remuneration across the Group in cases where individuals make significant personal contributions in the year. The REMCO also paid close attention to the benchmarking analysis from the defined comparator groups. No specific benchmark position is defined, but the REMCO were satisfied that the positioning was appropriate against the benchmark groups following the increases. Finally, the REMCO noted that the salary increases were broadly consistent with the increases provided to the general workforce in the key markets of the UK, USA, and Netherlands (average 2.4%).

Sinead Gorman's base salary will be set at £900,000 on appointment as CFO, effective April 1, 2022.

**Annual bonus**
To ensure the scorecard remains well aligned with our strategic and operational priorities, the REMCO has reviewed the structure of the 2022 scorecard. The REMCO will continue to focus on four key areas: financial delivery, operational excellence, progress in the energy transition, and safety.

Cash flow from operations (CFFO) remains the measure we will use to judge financial delivery. CFFO reflects our ability to generate the cash necessary to fund investment in our future business and distributions to shareholders.

Reflecting the ongoing importance of operational delivery, performance will be assessed on the basis of three measures:
• asset management excellence: measures the availability of Upstream, midstream and Downstream facilities, each equally weighted, so we maintain a strong focus on operating assets to plan, delivering scheduled downtime activities on time and minimising unscheduled shutdowns;
• project delivery excellence: our ability to successfully deliver large and complex projects remains essential, and we will continue measuring the delivery of material projects on time and to budget; and
• customer excellence: Powering Progress emphasises the importance of our customer relationships, and from the start of 2022 we will measure performance in this area using scores for customer satisfaction and brand preference.

Succeeding in the energy transition and accelerating our transition to net-zero emissions means updating our business models and changing what we sell. From the start of 2022, we will reflect these ambitions in the progress in the energy transition section of the scorecard, using three measures:

• selling lower-carbon products - based on the share of earnings from our marketing business that can be attributed to low- and no-carbon products;
• reducing our emissions - an absolute emissions reduction target; and
• partnering to decarbonise - measured against progress towards an annual target for the global number of EV charging points.

Our commitment to safety remains at the heart of everything we do. The measures relating to safety are as follows:
• personal safety: Serious Injury and Fatality Frequency (SIF-F), which ensures we focus our attention and learning on those incidents with the potential to cause the most serious harm; and
• process safety: based on the number of Tier 1 and 2 operational safety incidents.

The performance measures, weightings and link to strategy for the 2022 performance year are set out below:



2022 annual bonus scorecard measures and weightings

| Performance measure | Weighting |
|---|---|
| Financial | 35% |
| Operational excellence | 35% |
| Progress in the energy transition | 15% |
| Safety | 15% |

| | Link to strategy |
|---|---|
| **Financial**<br>■ Cash flow from operating activities | Aligned with our financial priorities, reflecting our ability to generate cash to service and reduce debt, pay dividends and repurchase shares and fund capital investment. |
| **Operational excellence**<br>■ Asset management excellence<br>■ Project delivery excellence<br>■ Customer excellence | These measures show the effectiveness with which we operate our assets and serve our customers. This operational performance underpins the successful delivery of our financial framework and contributes to progress in the energy transition. |
| **Progress in the energy transition**<br>■ Selling lower-carbon products<br>■ Reducing our emissions<br>■ Partnering to decarbonise | These measures focus on the business transformations necessary to succeed in the energy transition and deliver the ambitions of Powering Progress. |
| **Safety**<br>■ Serious Injury and Fatality Frequency<br>■ Tier 1 and 2 process safety | These metrics are designed to ensure an ongoing focus on personal and operational safety. |

Annual bonus scorecard targets are not disclosed prospectively because to do so in a meaningful manner would require the disclosure of commercially sensitive information. Scorecard targets will be disclosed in the subsequent Directors' Remuneration Report when they are no longer deemed to be commercially sensitive.

**Long-term Incentive Plan**
On February 4, 2022, a conditional award of performance shares under the LTIP was made to the Executive Directors resulting in 209,131 Shell plc shares being conditionally awarded to Ben van Beurden and 61,242 Shell plc American Depositary Shares (ADSs) being conditionally awarded to Jessica Uhl. The award had a face value of 300% (maximum performance outcome 600%) of the base salary for the CEO and 270% (maximum performance outcome 540%) of the base salary for the CFO, excluding potential share price appreciation and dividends.

For LTIP awards made in 2022, performance will be assessed over a three-year period based on four financial measures and an energy transition condition, each equally weighted.

The target for the FCF measure over the three-year performance period will be based on the annual operating plan and shareholder guidance. These targets are considered commercially sensitive and will be disclosed retrospectively, with annual updates on progress.

For the energy transition performance condition, the NCI target range for the 2022-2024 LTIP grant is set as a 9-12% reduction from the 2016 NCF of 79 grams of $CO_2$ equivalent per megajoule. For the leading indicators, we will assess performance according to three sets of measures:
• establishing the foundations of a material Power business;
• offering more lower-carbon energy products; and
• developing emissions sinks.

The targets for these leading energy transition measures are commercially sensitive, and will be disclosed retrospectively where possible. It is also important to note that performance against these elements will serve simply as a starting point for the REMCO, which will also take into account any other considerations it deems appropriate.



**2022 LTIP measures and vesting schedule**

| | | | | | Vesting schedule (% of initial LTIP award) |
|---|---|---|---|---|---|
| Energy transition | 20% | | | | |
| Free cash flow | 20% | | | | |
| TSR | | 20% | | | |
| ROACE growth | | | 20% | | |
| CFFO growth | | | | 20% | |

☐ Absolute measures ☐ Relative measures

**Link to strategy**

**Energy transition**
Measures focused on the strategic business transformations that will seek to enable long-term success in the energy transition.

Measures:
a. NCI reduction target
b. Build the foundation of a material Power business
c. Grow new lower-carbon energy product offerings
d. Develop emission sinks

Vesting based on how many targets are achieved:
1/4 = 40%    3/4 = 150%
2/4 = 100%   4/4 = 200%

REMCO may take into account other appropriate considerations.

**Free cash flow**
Recognition of the importance of generating cash after net capital expenditure to service and reduce debt, pay dividends, buy back shares and make future capital investments.

Maximum – 200%
Target – 100%
Threshold – 40%
Below threshold – 0%

**TSR**
Assessment of actual value created for shareholders.

**ROACE growth**
Indicator of capital discipline.

**CFFO growth**
Source of capital expenditure commitments which support sustainable growth based on portfolio and cost management.

1st – 200%
2nd – 150%
3rd – 80%
4th or 5th – nil

**TSR underpin**
If TSR is in fourth or fifth, vesting is capped at 50% of maximum.

**Holding period**
Three years post vesting, which remains in force post tenure.

**Discretion, adjustment (malus) and recovery (clawback)**
Variable-pay elements are subject to adjustment (malus) and recovery (clawback) provisions. The REMCO may adjust an award, for example by lapsing part or all of it, reducing the number of shares which would otherwise vest, by imposing additional conditions on it, or imposing a new holding period or applying clawback.

Please refer to the policy section on pages 179, 181, 183 for a full description of the circumstances under which discretion, malus and clawback might be applied to a variable pay award.

**Pension**
After his relocation to the UK on December 31, 2021, Ben van Beurden no longer participates in the Dutch retirement benefit plans. Instead, he was offered participation in the UK Shell Pension Plan. This is the same pension arrangement as offered to all new employees in the UK. It is a defined contribution pension scheme which provides an employer contribution of up to 20% of salary. Sinead Gorman was also offered participation in the same plan. Employees who may potentially exceed the UK fiscal limits on pension contribution (the annual allowance and/or the lifetime allowance) may voluntarily opt to receive a cash allowance in lieu of a contribution to the pension plan at the same rate. Ben van Beurden and Sinead Gorman have both chosen to receive a cash allowance.

Jessica Uhl's US retirement benefit arrangements include the Shell Pension Plan, a defined benefit plan, and a defined contribution plan with an employer contribution of 10% of salary. She also has a deferred Dutch defined benefit pension plan, as a result of a prior Shell assignment on local Dutch terms and conditions.

Further details of Executive Director pension arrangements can be found on page 168.

**Benefits**
In line with our Group-wide international mobility policies, the CEO and CFO will receive support with temporary commuting costs such as travel and accommodation for up-to six months from their date of relocation to the UK while their families remain in the Netherlands to complete their respective school years. The CEO will receive relocation benefits for his family's move to the UK in due course, and he will also receive a gross housing allowance for a time-limited period of 24 months from when their families relocate.

Executive Directors are provided with a chauffeured car for business travel, including home to office commuting. Other benefits, such as medical and other risk-benefits are in-line with those provided to the general workforce (including in some cases benefits provided to employees working outside their home country).

ANNUAL REPORT ON REMUNERATION continued

### Non-executive Directors' fees

Non-executive Directors' fees 2022

| | £ |
|---|---|
| Chair of the Board | 785,000 |
| Non-executive Director | 120,000 |
| Senior Independent Director | 49,000 |
| Audit Committee | |
| Chair [A] | 53,000 |
| Member | 22,000 |
| Safety, Environment and Sustainability Committee | |
| Chair [A] | 31,000 |
| Member | 15,000 |
| Nomination and Succession Committee | |
| Chair [A] | 22,000 |
| Member | 11,000 |
| Remuneration Committee | |
| Chair [A] | 36,000 |
| Member | 15,000 |

**Other fees**

Non-executive Directors receive an additional fee of £4,000 for any Board meeting involving intercontinental travel – except for one meeting a year held in a location other than London.

[A] The chair of a committee does not receive an additional fee for membership of that committee.

REMCO reviewed the competitive positioning of the Chair's fee, and for 2022 set this at £785,000, a 1.3% increase. This is the first increase since 2015 and recognises the positioning of the fee relative to other major FTSE and European companies. The Chair of the Board does not receive any additional fee for chairing the Nomination and Succession Committee or attending any other Board committee meeting.

The Non-executive Directors receive a basic fee. There are additional fees for the Senior Independent Director, a Board committee chair or a Board committee member. Non-executive Directors receive an additional fee of £4,000 for most Board meetings involving intercontinental travel. Business expenses (including transport between home and office and occasional business-required partner travel) and associated tax are paid or reimbursed by Shell.

The Board reviews Non-executive Directors' fees periodically to ensure that they are aligned with those of other major listed companies. During these reviews the Board uses the largest 30 companies by market capitalisation listed on the FTSE and the European comparator group as its primary points of reference. The last general review was in 2021. Other than the adjustment to the Chair's fee, fees will remain unchanged for 2022. Following the relocation of Shell's headquarters from the Netherlands to the UK, Non-executive directors fees have been converted from euros to pounds sterling, using the average EUR/GBP exchange rate for 2020 (this rate was chosen as the data used by the Board to review the competitive positioning was largely sourced from 2020 pay disclosures), rounded downwards to the nearest £1,000.

DIRECTORS' REMUNERATION POLICY

> **The Directors' Remuneration Policy sets out:**
>
> • A summary of proposed changes to the Directors' Remuneration Policy, page 179;
> • Executive Directors' Remuneration Policy, pages 180-186; and
> • Non-executive Directors' Remuneration Policy, pages 186-187.

This section describes the Directors' Remuneration Policy (Policy) which, following shareholder approval at the 2020 Annual General Meeting (AGM), came into effect from May 19, 2020, and will be effective until the 2023 AGM, unless a further policy is proposed by Shell plc (the Company) and approved by shareholders in the meantime.

The principles underpinning the REMCO's approach to executive remuneration are the foundation for everything we do, and are:
• Alignment with Shell's strategy: the Executive Directors' compensation package should be strongly linked to the achievement of stretching targets that are seen as indicators of the execution of Shell's strategy;
• Pay for performance: the majority of the Executive Directors' compensation, (excluding benefits and pensions), should be linked directly to Shell's performance through variable pay instruments;
• Competitiveness: remuneration levels should be determined by reference internally against Shell's Senior Management and externally against companies of comparable size, complexity and global scope;
• Long-term creation of shareholder value: Executive Directors should align their interests with those of shareholders by holding shares in Shell;
• Consistency: the remuneration structure for Executive Directors should generally be consistent with the remuneration structure for Shell's Senior Management. This consistency builds a culture of alignment with Shell's purpose and a common approach to sharing in Shell's success;

• Compliance: decisions should be made in the context of the Shell General Business Principles and Code of Conduct. The REMCO also seeks to ensure compliance with applicable laws and corporate governance requirements when designing and implementing policies and plans; and
• Risk assessment: the remuneration structures and rewards should meet risk-assessment tests to ensure that shareholder's interests are safeguarded and that inappropriate actions are avoided.

The Executive Directors' remuneration structure is made up of a fixed element of basic pay and two variable elements: the annual bonus (50% delivered in shares) and the Long-term Incentive Plan (LTIP). Variable pay outcomes are conditional on the successful execution of the operating plan in the short term and the delivery of strategic goals and financial outperformance over the longer term. The award of shares under the bonus and LTIP, along with significant shareholding requirements, are intended to ensure executives have a sizeable shareholding in Royal Dutch Shell plc (the Company) and experience the same outcomes as shareholders.

During 2018 and 2019, the REMCO reviewed the Remuneration Policy to ensure that the Policy continues to be aligned with Shell's strategy, including delivery of shareholder returns. REMCO determined that while the current policy remains appropriate in many respects, certain changes will support the REMCO to simplify remuneration structures and address the management of quantum. For each area of the policy, the REMCO has considered market practice, the corporate governance environment and feedback from shareholders. The Safety, Environment and Sustainability Committee (SESCo) has provided input to the development of the sustainable development and energy transition metrics. Any potential conflict of interest is mitigated by the independence of the REMCO members and the REMCO Terms of Reference.

A summary of the main changes to the Policy for the Executive Directors is outlined below. No significant changes were made to the Policy for Non-executive Directors.

| Remuneration element | Proposed Changes to Policy | Rationale for the change |
|---|---|---|
| Annual Bonus | • Reduction of the CEO's target bonus from 150% to 125%; and<br>• Removal of the individual performance factor for Executive Directors. | • Simplification: the asymmetry in the CEO's bonus structure and the inclusion of individual performance factors were creating undue complexity; and<br>• Transparency: The annual bonus is now solely linked to the performance of Shell to support clarity and transparency of outcomes. |
| Long-Term Incentive Plan | • Reduction of the target LTIP grant from 400% to 300% of base salary; and<br>• Inclusion of an energy transition metric. | • Management of Quantum: To moderate the quantum of pay and assist the REMCO in managing the range of outcomes; and<br>• Alignment to Strategy: Inclusion of the energy transition metric strengthens the LTIP's alignment to the strategy and purpose. |
| Discretion, Malus and Clawback | • After reviewing the single figure outcomes for the year, the REMCO will consider an adjustment for the purposes of managing remuneration quantum, taking into account performance, the operation of the remuneration structures and any other relevant considerations. An explanation of any discretionary adjustment would be set out in the relevant Director's Remuneration Report;<br>• Alignment of malus and clawback provisions so that these are the same. Inclusion of corporate failure as an adjustment event; and<br>• Amendment of provisions in the share plan such that for future grants, awards may be adjusted for any reason. | • Corporate Governance: Assist the REMCO in managing the risks from behavioural-based incentive schemes; and<br>• Management of Quantum: To assist the REMCO in managing the range of outcomes. |
| Pension | • New Executive Directors who are members of a defined benefit pension arrangement will have their pensionable salary capped at the salary applicable immediately prior to appointment, with the exception of existing US base country participants who will have the bonus removed from the definition of pensionable base salary instead. The Executive Director will join a defined contribution scheme in their base country for contributions made in respect of salary above the defined benefit pensionable salary, or in exceptional circumstances, receive a cash allowance equivalent to the contribution above the cap; and<br>• For recruitment: Explicit confirmation that new appointees, whether internally promoted or newly hired, will be provided with a pension in line with the wider workforce in their base country. | • Management of Quantum: To moderate the quantum of pay and assist the REMCO in managing the range of outcomes; and<br>• Corporate Governance: To adopt best practice in line with external guidelines. |
| Shareholding Requirement | • CFO requirement increased to 500% of base salary; and<br>• Extended so it applies for a period of two years post-employment (at the lower of the shareholding requirement or the number of shares held at departure). | • Alignment with Shareholders: Further aligns executives with the long-term interests of shareholders. |

Exhibit Q

DIRECTORS' REMUNERATION POLICY continued

**EXECUTIVE DIRECTORS**

Executive Directors' remuneration policy table

| Purpose and link to strategy | Maximum opportunity | Operation and performance management |
|---|---|---|
| **Salary and pensionable base salary** | | |
| Provides a fixed level of earnings to attract and retain Executive Directors. | €2,000,000 | Reviewed annually with adjustments effective from January 1.

In making salary determinations, the REMCO will consider:
• the market positioning of the compensation packages;
• comparison with Senior Management salaries;
• the employee context, and planned average salary increase for other employees across the Netherlands, the UK and the USA;
• the experience, skills and performance of the Executive Director, or any change in the scope and responsibility of their role;
• general economic conditions, Shell's financial performance, and governance trends; and
• the impact of salary increases on pension benefits and other elements of the package.

For Executive Directors employed outside their home country, euro base salaries are translated into their home currency for pension purposes. Pensionable base salaries are maintained in line with euro base salaries taking into account exchange rate fluctuations and other factors as determined by the REMCO. |
| **Benefits** | | |
| Provides benefits, in line with those applicable to the wider workforce, in order to attract and retain Executive Directors. | The maximum opportunity is the cost of providing the benefit under Shell's standard policy. These costs can vary.

For certain benefits, for example, relocation and tax equalisation, the maximum opportunity will be the grossed-up cost of meeting the specific Executive Director's costs. | Typical benefits include car allowances and home-to-office transport, risk benefits (for example ill-health, disability or death-in-service), security provision, and employer contributions to insurance plans (such as medical). Precise benefits will depend on the Executive Director's specific circumstances. Post-retirement benefits such as healthcare and ongoing security provision may be applicable. Shell's mobility policies may apply, such as for relocation and tax return preparation support, as may tax equalisation related to expatriate employment prior to Board appointment, or in other limited circumstances to offset double taxation. The REMCO may adjust the range and scope of the benefits offered in the context of developments for other employees in relevant countries. Personal loans or guarantees are not provided to Executive Directors. |
| **Annual bonus** | | |
| Rewards the delivery of short-term operational targets as derived from Shell's operating plan.

To reinforce alignment with shareholder interests, 50% is delivered in cash and 50% is delivered in shares. The shares are subject to a three-year holding period, which applies beyond an Executive Director's tenure. | Maximum bonus (as a percentage of base salary):
• Chief Executive Officer (CEO): 250%
• Chief Financial Officer (CFO): 240%

Target levels (as a percentage of base salary):
• CEO: 125%
• CFO: 120% | • The bonus is determined by reference to performance from January 1 to December 31 each year;
• Annual bonus = base salary x target bonus % x scorecard result (0–2);
• Taking the Shell operating plan into consideration, REMCO sets stretching scorecard targets and weightings which support the delivery of the strategy. Measures are related to financial performance, operational excellence and sustainable development. Indicative weightings are 30%, 50% and 20% respectively. This balance ensures that the achievement of short-term financial performance does not undermine future shareholder value creation;
• Scorecard targets will be disclosed in a subsequent Directors' Remuneration Report when they are no longer deemed to be commercially sensitive;
• There are no prescribed thresholds or minimum levels of performance that equate to a prescribed payment under the Policy and this structure can result in no bonus being awarded;
• The annual bonus is subject to malus provisions before it is delivered and to clawback provisions thereafter;
• The REMCO retains the ability to adjust performance measure targets and weightings year-by-year within the overall target and maximum payouts approved in the Policy; and
• In the event that another Executive Director joins the Board, the REMCO will determine their target and maximum bonus, which will not exceed the target and maximum for the CEO. |

Executive Directors' remuneration policy table continued

| Purpose and link to strategy | Maximum opportunity | Operation and performance management |
|---|---|---|
| **Long-term Incentive Plan (LTIP)** | | |
| Rewards longer-term value creation linked to Shell's strategy. The measures predominantly focus on financial growth and increases in value compared with the other oil majors, supported by measures focused on the achievement of Shell's ambitions in the energy transition. To reinforce alignment with shareholder interests, shares delivered from vested LTIP awards are subject to a three-year holding period, which applies beyond an Executive Director's tenure. | Target award of 300% base salary. Awards may vest at up to 200% of the shares originally awarded, plus dividends. | • Award levels are determined annually by the REMCO within the approved policy maximum; <br>• Awards may vest between 0% and 200% of the initial award, depending on Shell's performance assessed on either an absolute basis against strategic targets or on a relative basis against the other oil majors; <br>• Performance metrics and targets are set by the REMCO at the beginning of the relative performance period. When setting performance targets, the REMCO allocates weightings to each metric as it considers appropriate, taking into account strategic priorities; <br>• For 2020, performance is assessed over three years based 90% on financial metrics (TSR, ROACE, FCF and CFFO) which support our strategic ambition to provide a world-class investment case and 10% on a measure focused on thriving in the energy transition; <br>• Additional shares are released representing the value of dividends payable on the vested shares, as if these had been owned from the award date; <br>• LTIP awards (net of tax) must be held for a further three years to align with Shell's longer-term time horizon and strategy; <br>• The LTIP award is subject to malus provisions before it is delivered and to clawback provisions thereafter; <br>• The REMCO may adjust or change the LTIP measures, targets and weightings to ensure continued alignment with Shell's strategy; and <br>• In the event that another Executive Director joins the Board, the REMCO will determine their award level. |
| **Discretion, Malus and Clawback** | | |
| Enables the management of risks from behavioural-based incentive schemes and the REMCO to manage the range of pay outcomes. | Adjustment events exist for the purposes of applying malus and clawback. The REMCO retains discretion to adjust pay outcomes. | The REMCO retains the discretion to adjust mathematical outcomes of the annual bonus scorecard and / or LTIP vesting for any Executive Director if and to the extent that it considers this appropriate at their sole discretion. The use of any discretion will be disclosed and explained. The REMCO may adjust pay outcomes for the purposes of managing quantum. This would be done at the REMCO's discretion after considering single figure outcome for the year, taking into account Shell's performance, the operation of the remuneration structures and any other relevant considerations. Please refer to page 183 for a summary of the defined adjustment events. |
| **Pension** | | |
| Provides a competitive retirement provision under the individual's base country benefits policy, to attract and retain Executive Directors. | Determined by the rules of the base country pension plan of which the Executive Director is a member. | Executive Directors' retirement benefits are maintained in line with those of the wider workforce in their base country. Only base salary is pensionable, unless country plan regulations specify otherwise and cannot legally be disapplied. The rules of the relevant plans detail the pension benefits which members can receive. The REMCO retains the right to amend the form of any Executive Director's pension arrangements where appropriate, for example in response to changes in legislation to ensure the original objective of this element of remuneration is preserved. New Executive Directors, whether internal appointees or external hires, will be provided with a retirement benefit in line with the wider workforce in their base country. For individuals who are members of a defined benefit pension arrangement: <br>• The pensionable salary will be capped at the salary applicable immediately prior to appointment, with the exception of existing US base country participants who will have the bonus removed from the definition of pensionable base salary instead; and <br>• The Executive Director will join a defined contribution scheme in their base country for contributions made in respect of salary above the defined benefit pensionable salary, or in exceptional circumstances, receive a cash allowance equivalent to the contribution above the cap. |
| **Shareholding requirement** | | |
| Aligns interests of Executive Directors with those of shareholders by creating a connection between individual wealth and Shell's long-term performance. | Shareholding (% of base salary): <br>• CEO: 700% <br>• CFO: 500% | Executive Directors are expected to build up their shareholding to the required level over a period of five years from appointment and, once reached, to maintain this level for the full period of their appointment. The intention is for the shareholding guideline to be reached through retention of vested shares from share plans. The REMCO will monitor individual progress and retains the ability to adjust the guideline in special circumstances on an individual basis. The Executive Director will be required to maintain their shareholding requirement (or existing shareholding if lower) for a period of two years from the date they cease to be an employee. In the event that another Executive Director joins the Board the REMCO will determine their Shareholding requirement level, which will not be less than 200% in line with corporate governance best practice. |

DIRECTORS' REMUNERATION POLICY continued

**Notes to the Executive Directors' remuneration policy table**
**Comparator group**
The benchmarking comparator group consists of the other oil majors (BP, Chevron, ExxonMobil, and Total) and a selection of major Europe-based companies.

The comparator companies are reviewed by the REMCO as part of the Remuneration Policy review every three years. The last review took place in 2019 in preparation for the 2020 Directors' Remuneration Policy vote. No changes to the comparator group are proposed.

The other oil majors are included in the comparator group as these represent our closest direct competitors operating in similar market conditions. The Europe-based companies are selected based on their size, complexity and global reach. The REMCO uses benchmark data from these companies only as a guide to the competitiveness of the remuneration packages. We do not seek to position our remuneration at any defined point against the benchmarked positions.

The REMCO retains the right to alter the comparator group as it sees fit in order to ensure it remains an appropriate and relevant benchmark.

2020 European comparator group

| | | |
|---|---|---|
| Allianz | Daimler | Rio Tinto |
| AstraZeneca | Diageo | Roche |
| BAT | GlaxoSmithKline | Siemens |
| Bayer | Nestle | Unilever |
| BHP Billiton | Novartis | Vodafone |

**Benefits**
Benefits for Executive Directors deemed taxable in the UK are included as taxable benefits in the single total figure of remuneration table. These elements may include transport to and from home and office, the provision of home security, and occasional business-required partner travel, which are generally considered legitimate business expenses rather than components of remuneration.

**Annual bonus**
For the 2020 performance year, the scorecard framework will consist of cash flow from operating activities (30% weight), operational excellence (50% weight) and sustainable development (20% weight). Targets are derived from the annual business plan. These measures are designed to drive focus on the financial and operational performance critical to our success as a world-class investment case and to maintain a strong licence to operate, underpinned by our commitment to safety and journey to thrive in the energy transition. The REMCO believes it is important for annual variable pay to remain balanced, with operational and environmental components, complementing the LTIP's focus on longer-term financial and strategic outcomes. The same annual bonus scorecard applies to the majority of group employees, supporting consistency of remuneration and alignment of objective across employees and senior management.

For future years, the specific measures and weightings for the annual bonus scorecard will be reviewed annually by the REMCO and adjusted accordingly to evolve with Shell's strategy and circumstances. The annual review will also consider the scorecard target and outcome history over a decade to ensure that the targets set remain stretching but realistic.

The REMCO retains the right to exercise its judgement to adjust the mathematical bonus scorecard outcome to ensure that the bonus scorecard outcome for Executive Directors reflects other aspects of Shell's performance which the REMCO deems appropriate for the reported year.



Annual bonus – time horizon

| Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|

50% delivered in cash
50% delivered in shares
Performance period
Net of tax shares held for three years
Bonus delivered
three-year holding period ends

**Long-term Incentive Plan**
The LTIP rewards longer-term performance linked to Shell's strategy, which includes cash generation, capital discipline, value created for shareholders as well as progress towards meeting our ambition to thrive in the energy transition.

For 2020, the absolute measures will be FCF and energy transition, and relative growth compared with our peers will be based on: TSR, ROACE and CFFO. The relative measures, which focus on outperforming our closest competitors on key financial metrics, are supported by the absolute FCF metric which provides cash to service and repay debt, make shareholder distributions and fund capital investment. These are aligned with our strategic ambition to be a world-class investment case, and are supported by an energy transition measure focused on thriving in the energy transition and delivering our NCF target.

For the relative measures, 200% vests for first position, 150% for second, 80% for third and 0% for ranking fourth or fifth. The comparator group consists of four of the strongest companies in our industry (BP, Chevron, ExxonMobil and Total). Outperforming Shell's closest competitors on key financial metrics is challenging. A vesting outcome of 80% for median performance (40% of maximum) in a small comparator group is considered appropriate for the REMCO. The REMCO is aware that vesting for median performance is generally set at a limit of 25% of maximum for other UK companies. However, these are typically applied against a larger comparator group.

The REMCO will regularly review the measures, weightings and comparator group, and retains the right to adjust these to ensure that the LTIP continues to serve its intended purpose with a stretching level of challenge. If the REMCO was to propose any material changes to the LTIP performance metrics, it would consult with major shareholders.

**TSR underpin**
If the TSR position is fourth or fifth, the level of the award that can vest on the basis of the other measures will be capped at 50% of the maximum payout for the LTIP.

The detailed weightings and metrics applicable to the 2021 bonus scorecard are set out on page 164.

The detailed weightings and metrics applicable to the 2021 grant are set out on page 168-170.

Exhibit Q

**Performance Period**
LTIP performance is assessed over a three-year period. Vested shares from the LTIP are subject to a further three-year holding period post-vesting. This holding period commences on the date of vesting and remains in force beyond an Executive Director's tenure. This time horizon is deemed to be suitable for incentive purposes but is recognised as short relative to some of Shell's operations. However, the REMCO believes that it provides broad alignment with shareholder interests when coupled with significant shareholding requirements.



LTIP time horizon

| Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 | Yr 6 |

Performance period

100% delivered in shares

Net of tax shares held for three years

three-year holding period ends

**Discretion, malus and clawback**
Variable pay awards may be made subject to adjustment events. At the discretion of REMCO, such an award may be adjusted before delivery (malus) or reclaimed after delivery (clawback) if an adjustment event occurs.

Adjustment events will be specified in award documentation and it is intended that they will, for example, relate to restatement of financial statements due to material non-compliance with a financial reporting requirement; misconduct by an Executive Director or misconduct through their direction or non-direction; any material breach of health and safety or environment regulations; serious reputational damage to Shell; material failure of risk management; corporate failure; or other exceptional events as determined at the discretion of the REMCO. The REMCO retains the right to alter the list of adjustment events in respect of future awards.

In addition, the REMCO retains the discretion to adjust mathematical outcomes if and to the extent that it considers this appropriate. This power to adjust the outcomes is broad and includes adjusting the outcomes to zero. For example, an adjustment might be made if the REMCO considers:
• The mathematical outcomes do not reflect the wider financial or non-financial performance of RDS or the participant over the performance period;
• The LTIP vesting percentage is not appropriate in the context of circumstances that were unexpected or unforeseen at award; and
• There is any other reason why an adjustment is appropriate.

It is not anticipated that discretion would be used for upwards adjustment. If, in exceptional circumstances, it was considered, this would be done only after consultation with major shareholders.

Performance outcomes and/or share price appreciation make it difficult to predict the final amounts delivered under the LTIP at the time of award. In years where the vesting outcome makes the total remuneration inappropriate for any Executive Director, the REMCO will consider an adjustment to the annual bonus outcome or the LTIP vesting outcome for the purposes of managing remuneration quantum. In making any adjustment to the annual bonus or LTIP vesting outcome for this purpose REMCO will consider the overall level of remuneration for the Executive Director, the operation of the annual bonus, the operation of the LTIP, the wider performance of Shell over the performance periods, as well as the internal context for other employees.

An explanation of any discretionary adjustment would be set out in the relevant Directors' Remuneration Report.

**Treatment of outstanding awards**
Awards granted prior to the approval and implementation of this Policy and/or prior to an individual becoming an Executive Director will continue to vest and be delivered in accordance with the terms of the original award even if this is not consistent with the terms of this Policy.

As at March 10, 2020, this applies to Executive Directors Ben van Beurden and Jessica Uhl who each have outstanding awards under the LTIP.

**Shareholding**
The REMCO believes significant shareholding by Executive Directors is an important way of ensuring that shareholders and Executive Directors share the same priorities. Shareholding is one of Shell's core remuneration principles as it creates a balanced connection between individual wealth and Shell's long-term performance. This will support effective governance and an ownership mindset. Significant shareholding requirements reflect the performance timescales of Shell and are aligned with absolute shareholder return.

The CEO is expected to build up a shareholding of seven times their base salary over five years from appointment. The CFO is expected to build up a shareholding of five times their base salary over the same period. In the event of an increase to the guideline multiple of salary, for every additional multiple of salary required, the director will have one extra year to reach the increased guideline, subject to a maximum of five years from the date of the change.

Executive Directors will be required to maintain their shareholding requirement (or their existing shareholding if less than the guideline) for a period of two years post-employment.

The holding periods for LTIP vested shares and shares delivered as part of the annual bonus continue to apply after Executive Directors leave employment.

**Differences for Executive Directors from other employees**
The remuneration structure and approach to setting remuneration levels is consistent across Shell, with consideration given to location, seniority and responsibilities. However, a higher proportion of total remuneration is tied to variable pay for Executive Directors and members of Senior Management.

The salary for each Executive Director is determined based on the indicators in the "Executive Directors' remuneration policy table", which reflect the international nature of the Executive Directors' labour market. The salary for other employees is normally set on a country basis.

DIRECTORS' REMUNERATION POLICY continued

Executive Directors are eligible to receive the standard benefits and allowances provided to other employees. The provisions which are not generally available for other employees are described in "Benefits".

The methodology used for determining the annual bonus for Executive Directors is broadly consistent with the approach for Shell employees generally. However, bonuses for the majority of Shell employees are determined taking into account individual and business performance, whereas bonuses for Executive Directors are based solely on business performance. Although the makeup and weightings scorecard used for the majority of Shell employees is currently aligned with the scorecard, these scorecards may differ if required to support the achievement of business objectives. All Executive Directors and Executive Committee members receive 50% of their annual bonus in shares, which are subject to a three-year holding period.

Executive Directors are not eligible to receive new awards under employee share plans other than the LTIP, although awards previously granted will continue to vest in accordance with the terms of the original award. Selected employees participate in the Performance Share Plan (PSP). The operation of the PSP is similar to the LTIP, but currently differs, for example, in some performance measures and their relative weightings. As at March 2020, around 51,000 employees participate in one or more of Shell's global share plans and/or incentive plans, further supporting alignment with shareholder interests.

Executive Directors' retirement benefits are maintained in line with those of the wider workforce in their base country.

**Illustration of potential remuneration outcomes**

The charts on this page represent estimates under four performance scenarios ("Minimum", "On-target", "Maximum" and "Maximum, assuming a 50% share price appreciation between award and vest") of the potential remuneration outcomes for each Executive Director resulting from the application of 2020 base salaries to awards made in accordance with the proposed Policy. The majority of Executive Directors' remuneration is delivered through variable pay elements, which are conditional on the achievement of stretching targets.

The REMCO will review the formulaic Single Figure outcome relative to the quality of performance outcomes and adjust these, taking into account Shell's performance, shareholder presence, the operation of the remuneration structures and any other relevant factors, to ensure that the highest variable pay outcomes are only achieved in years with the highest quality performance.

The scenario charts are based on future Policy award levels and are combined with projected single total figures of remuneration. The pay scenarios are forward-looking and only serve to illustrate the future Policy. For simplicity, the minimum, on-target and maximum scenarios assume no share price movement and exclude dividend accrual, for the portion of the bonus paid in shares and the LTIP, although dividend accrual during the performance and holding period applies. The scenarios are based on the current CEO (Ben van Beurden) and CFO (Jessica Uhl) roles.



| Performance scenarios | | | |
|---|---|---|---|
| | Minimum | Target | Maximum[A] |
| Base salary [2020] | ✓ | ✓ | ✓ |
| Benefits (2019 actual) | ✓ | ✓ | ✓ |
| Pension (2020 estimate) | ✓ | ✓ | ✓ |
| Bonus | NIL | 125% CEO | 250% CEO |
| | | 120% CFO | 240% CFO |
| LTIP | NIL | 300% CEO | 600% CEO |
| | | 270% CFO | 540% CFO |

[A] Maximum assuming 50% share price appreciation.

**Recruitment**

The REMCO determines the remuneration package for new Executive Director appointments. These appointments may involve external or internal recruitment or reflect a change in role of a current Executive Director.

When determining remuneration packages for new Executive Directors, the REMCO will seek a balanced outcome which allows Shell to:
- attract and motivate candidates of the right quality;
- take into account the individual's current remuneration package and other contractual entitlements;
- seek a competitive pay position relative to our comparator group, without overpaying;
- encourage relocation if required; and
- honour entitlements (for example, variable remuneration) of internal candidates before their promotion to the Board. The REMCO will follow the approach set out in the table below when determining the remuneration package for a new Executive Director.

Exhibit Q

Recruitment – Remuneration package

| Component | Approach | Maximum |
|---|---|---|
| Ongoing remuneration | The salary, benefits, annual bonus, long-term incentives and pension benefits will be positioned and delivered within the framework of the Executive Directors' remuneration policy. | As stated in the "Executive Directors' remuneration policy table". |
| Compensation for the forfeiture of any awards under variable remuneration arrangements | To facilitate external recruitment, one-off compensation in consideration for forfeited awards under variable remuneration arrangements entered into with a previous employer may be required. The REMCO will use its judgement to determine the appropriate level of compensation by matching the value of any lost awards under variable remuneration arrangements with the candidate's previous employer. This compensation may take the form of a one-off cash payment or an additional award under the LTIP. The compensation can alternatively be based on a newly created long-term incentive plan arrangement where the only participant is the new director. The intention is that any such compensation would, as far as possible, align to the duration and structure of the award being forfeited. | An amount equal to the value of the forfeited variable remuneration awards, as assessed by the REMCO. Consideration will be given to appropriate performance conditions, performance periods and clawback arrangements. |
| Replacement of forfeited entitlements other than any awards under variable remuneration arrangements | There may also be a need to compensate a new Executive Director in respect of forfeited entitlements other than any awards under variable remuneration arrangements. This could include, for example, pension or contractual entitlements, or other benefits. On recruitment, these entitlements may be replicated within the Executive Directors' remuneration policy or valued by the REMCO and compensated in cash.<br><br>In cases of internal promotion to the Board, any commitments made which cannot be effectively replaced within the Executive Directors' remuneration policy may, at the REMCO's discretion, continue to be honoured. | An amount equal to the value of the forfeited entitlements, as assessed by the REMCO. |
| Exceptional recruitment incentive | Apart from the ongoing annual remuneration package and any compensation in respect of the replacement of forfeited entitlements, there may be circumstances in which the REMCO needs to offer a one-off recruitment incentive in the form of cash or shares to ensure the right external candidate is attracted (e.g. to the industry). The REMCO recognises the importance of internal succession planning but it must also have the ability to compete for talent with other global companies. The necessity and level of this incentive will depend on the individual's circumstances. The intention will be that this is only used in genuinely exceptional circumstances. | Subject to the limits set out in the "Executive Directors' remuneration policy table". |
| Pension | New appointees will be provided with a pension in line with the wider workforce in their base country. For defined benefit members:<br>• The pensionable salary is capped at executive committee level pay for defined benefit purposes (with the exception of participants in the US plan where the bonus is removed from the definition of pensionable pay; and<br>• The member joins an appropriate base country defined contribution mechanism in excess of the cap, or exceptionally a pension cash allowance equivalent to the defined contribution level is payable in excess of the cap. | In accordance with the pension provision applicable to the wider workforce in the base country. |

### Executive Directors' employment arrangements and letters of appointment

The Dutch Executive Directors are employed for an indefinite period. Executive Directors with the Netherlands as their base country will be employed on the basis of a contract of employment governed by Dutch employment law. For Executive Directors with a base country other than the Netherlands, REMCO will determine their employment arrangements based on a number of considerations, including Dutch immigration requirements and base country retirement benefits. Executive Directors' employment arrangements are available for inspection at the AGM or on request. For further details on appointment and re-appointment of Directors, see the "Governance Framework" on page 129 and "Governance" on page 191.

### End of employment

#### Notice period

Employment arrangements of Executive Directors can generally end by either the employee or the employer providing one month's notice, or the applicable statutory notice period. For example, under Dutch law, the statutory notice period for the employer will vary in line with the length of service, with the maximum being four months' notice. Under Dutch law, termination payments are not linked to the contract's notice period.

#### The Netherlands statutory end-of-employment compensation

With effect from July 1, 2015, employment legislation in the Netherlands introduced statutory end-of-employment compensation. Under this legislation, every termination (other than following retirement or for cause) of a Dutch employment contract that has continued for a minimum of two years will give rise to an obligation to pay the departing employee transition compensation ("transitievergoeding"). The statutory compensation is capped at one times the annual salary, which is deemed to include variable pay such as the annual bonus. Executive Directors are expected not to claim transition compensation or any other applicable statutory compensation over and above the agreed compensation for loss of office as set out in the "End of employment" table on page 185.

#### Outstanding entitlements

In cases of resignation or dismissal for cause, fixed remuneration (base salary, benefits, and employer pension contributions) will cease on the last day of employment, variable remuneration elements will generally lapse and the Executive Director is not eligible for compensation for loss of office.

The information, on page 185, generally applies to termination of employment by Shell giving notice, by mutual agreement, or in situations where the employment terminates because of retirement with Shell consent at a date other than the normal retirement date, redundancy or in other similar circumstances at the REMCO's discretion.

Exhibit Q

DIRECTORS' REMUNERATION POLICY continued

End of employment

| Provision | Policy |
|---|---|
| Compensation for loss of office | For Executive Directors appointed between January 1, 2011 and December 31, 2016, employment contracts include a cap on termination payments of one times annual pay (base salary plus target bonus). Delivery of compensation is mitigated by a contractual obligation for the Executive Director to seek alternative employment and Shell's ability to implement phased payment terms. |
| | For Executive Directors appointed on or after January 1, 2017, the REMCO may offer a termination payment of up to one times base salary (target bonus will not be included). However, REMCO may be obligated to pay statutory compensation over and above the compensation for loss of office to a departing Executive Director who asserts a statutory claim thereto. Delivery of compensation is mitigated by a contractual obligation for the Executive Director to seek alternative employment and Shell's ability to implement phased payment terms. |
| | The provision of standard end-of-employment benefits such as repatriation costs, security provision and outplacement support may also be included, as deemed reasonable by the REMCO. |
| | The REMCO may adjust the termination payment for any situation where a full payment is inappropriate, taking into consideration applicable law, corporate governance provisions, the applicability of any statutory compensation and the best interests of Shell and shareholders as a whole. |
| Annual bonus | Any annual bonus in the year of departure is prorated based on service. Depending on the timing of the departure, the REMCO may consider the latest scorecard position or defer payment until the full-year scorecard result is known. |
| | Bonuses delivered in shares represent the bonus which a participant has already earned and carry no further performance conditions; therefore, these shares will be unrestricted at the conclusion of the normal deferral or holding period respectively and no proration will apply. |
| LTIP | Outstanding awards are prorated on a monthly basis, by reference to the Executive Director's service within the performance period. They will generally survive the end of employment and will remain subject to the same vesting performance conditions, and malus and clawback provisions, as if the Executive Director had remained in employment. The three-year holding period will also remain in force for any awards made on or after January 1, 2017. If the participant dies before the end of the performance period, the award will vest at the target level on the date of death. In case of death after the end of the performance period, the award will vest as described in this Policy. |

<span style="color:red">NON-EXECUTIVE DIRECTORS</span>

Non-executive Directors' remuneration policy table

| Fee structure | Approach to setting fees | Other remuneration |
|---|---|---|
| Non-executive Directors (NEDs) receive a fixed annual fee for their directorship. The size of the fee will differ based on the position on the Board: Chair of the Board fee or standard Non-executive Director fee.<br><br>Additional annual fee(s) are payable to any Director who serves as Senior Independent Director, a Board committee chair, or a Board committee member.<br><br>A NED receives either a chair or member fee for each committee. This means that a chair of a committee does not receive both fees.<br><br>NEDs receive an additional fee for any Board meeting involving intercontinental travel – except for one meeting a year held in a location other than The Hague. | The Chair's fee is determined by the REMCO. The Board determines the fees payable to NEDs. The maximum aggregate annual fees will be within the limit specified by the Articles of Association and in accordance with the NEDs' responsibilities and time commitments.<br><br>The Board reviews NED fees periodically to ensure that they are aligned with those of other major listed companies. | Business expenses incurred in respect of the performance of their duties as a NED will be paid or reimbursed by Shell. Such expenses could include transport between home and office and occasional business-required partner travel. NEDs may receive a token of recognition on retirement from the board. The maximum value for this is €300. Where required, the Chair is offered Shell-provided accommodation in The Hague. The REMCO has the discretion to offer other benefits to the Chair as appropriate to their circumstances. Where business expenses or benefits create a personal tax liability to the Director, Shell may cover the associated tax.<br><br>The Chair and the other NEDs cannot receive awards under any incentive or performance-based remuneration plans, and personal loans or guarantees are not granted to them.<br><br>NEDs do not accrue any retirement benefits as a result of their non-executive directorships with Shell.<br><br>NEDs are encouraged to hold shares with a value equivalent to 100% of their fixed annual fee and maintain that holding during their tenure. |

**Non-executive Directors' letters of appointment**

NEDs, including the Chair, have letters of appointment. NEDs' letters of appointment are available for inspection at the AGM or on request. For further details on appointment and re-appointment of Directors, see the "Governance Framework" on page 129 and "Governance" on page 191.

**Non-executive Director recruitment**

The REMCO's approach to setting the remuneration package for NEDs is to offer fee levels and specific benefits (where appropriate) in line with the "Non-executive Directors' remuneration policy table" and subject to the Articles of Association. NEDs are not offered variable remuneration or retention awards.

When determining the benefits for a new Chair, the individual circumstances of the future Chair will be taken into account.

**Non-executive Director termination of office**

No payments for loss of office will be made to NEDs.

**Consideration of overall pay and employment conditions**

When setting the Policy, no specific employee groups were consulted. However, Shell seeks to promote and maintain good relations with employee representative bodies as part of its employee engagement performance as required.

When determining Executive Directors' remuneration structure and outcomes, the REMCO reviews a set of information, including relevant reference points and trends, which includes internal data on employee remuneration (for example, employee relations matters in respect of remuneration and average salary increases applying in the Netherlands, UK and the USA). During the Policy review, pay and employment conditions of the wider Shell employee population were taken into account by adhering to the same performance, rewards and benefits philosophy for the Executive Directors, as well as overall benchmarking principles. Furthermore, any potential differences from other employees (see "Differences for Executive Directors from other employees") were taken into account when providing the REMCO with advice in the formation of this Policy.

Dialogue between management and employees is important, with the annual Shell People Survey being one of the principal means of gathering employee views on a range of matters. The Shell People Survey includes questions inviting employees' views on their pay and benefit arrangements. Shell also encourages share ownership among employees, and many are shareholders who are able to participate in the vote on the Policy at the AGM.

The REMCO is kept informed by the CEO, the Chief Human Resources & Corporate Officer and the Executive Vice President Remuneration and HR Operations on the bonus scorecard and any relevant remuneration matters affecting other senior executives, extending to multiple levels below the Board and Executive Committee.

**Consideration of shareholder views**

The REMCO engages with major shareholders on a regular basis throughout the year and this allows it to hear views on Shell's remuneration approach and test proposals when developing or evolving the Policy. Recent examples of the REMCO responding to shareholder views include: considering the quantum of executive pay and the use of alternative reward structures; introducing the Energy Transition metric to the LTIP in line with our strategic ambitions; removing the individual performance modifier from the calculation of annual bonus outcomes to make remuneration structures simpler and more transparent to shareholders; reducing the CEO's target bonus from 150% to 125%; reducing the CEO's LTIP grant; and enabling the broader use of discretion to manage remuneration outcomes.

The REMCO will review the Policy regularly to ensure it continues to reinforce Shell's long-term strategy and remains closely aligned with shareholders' interests.

**Additional policy statement**

The REMCO reserves the right to make payments outside the Policy in limited exceptional circumstances, such as for regulatory, tax or administrative purposes or to take account of a change in legislation or exchange controls, and only where the REMCO considers such payments are necessary to give effect to the intent of the Policy.

Signed on behalf of the Board

/s/ Linda M. Coulter

LINDA M. COULTER
Company Secretary
March 9, 2022

GOVERNANCE

### MANAGEMENT'S EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES OF SHELL

Shell's CEO and CFO have evaluated the effectiveness of Shell's disclosure controls and procedures at December 31, 2021. Based on that evaluation, they concluded that Shell's disclosure controls and procedures are effective.

### MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING OF SHELL

Management, including the CEO and CFO, is responsible for establishing and maintaining adequate internal control over Shell's financial reporting and the preparation of the "Consolidated Financial Statements". It conducted an evaluation of the effectiveness of Shell's internal control over financial reporting and the preparation of the "Consolidated Financial Statements" based on the Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). On the basis of this evaluation, management concluded that, at December 31, 2021, the Company's internal control over financial reporting and the preparation of the "Consolidated Financial Statements" was effective.

### THE TRUSTEE'S AND MANAGEMENT'S EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES FOR THE ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST

The Trustee of the Royal Dutch Shell Dividend Access Trust (the Trustee) and Shell's CEO and CFO have evaluated the effectiveness of the disclosure controls and procedures in respect of the Dividend Access Trust (the Trust) at December 31, 2021. On the basis of this evaluation, these officers have concluded that the disclosure controls and procedures of the Trust are effective.

### THE TRUSTEE'S AND MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING OF THE ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST

The Trustee and the Company's management are responsible for establishing and maintaining adequate internal control over the Trust's financial reporting. The Trustee and the Company's management conducted an evaluation of the effectiveness of internal control over financial reporting based on the Internal Control - Integrated Framework (2013) issued by COSO. On the basis of this evaluation, the Trustee and management concluded that, at December 31, 2021, the Trust's internal control over financial reporting was effective.

### CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There has not been any change in the internal control over financial reporting of Shell or the Trust that occurred during the period covered by this Report that has materially affected, or is reasonably likely to materially affect, the internal control over financial reporting of Shell or the Trust. Material financial information of the Trust is included in the "Consolidated Financial Statements" and is therefore subject to the same disclosure controls and procedures as Shell. See the "Royal Dutch Shell Dividend Access Trust Financial Statements" on pages 284 to 286 for additional information.

### FINANCIAL STATEMENTS, DIVIDENDS AND DIVIDEND POLICY

The "Consolidated Statement of Income" and "Consolidated Balance Sheet" can be found on pages 204 and 205 respectively.

Subject to Board approval, Shell aims to grow the dividend per share by around 4% every year, and Shell will target the distribution of 20-30% of its cash flow from operations to shareholders. The Board may choose to return cash to shareholders through a combination of dividends and share buybacks. When setting the level of shareholder remuneration, the Board looks at a range of factors, including the macro environment, the underlying business earnings and cash flow of the Shell Group, the current balance sheet, future investment and divestment plans, and existing commitments.

Interim dividends are currently declared by the Board and paid on a quarterly basis. Shell does not currently pay a "final" dividend, which

would need to be voted on by shareholders, requiring the introduction of a resolution at the AGM. This would delay the payment of the fourth quarter dividend (currently paid in late March) until after the AGM, which is towards the end of May, a delay of around seven weeks. Our approach to dividend payments is not uncommon for companies distributing returns to shareholders on a quarterly basis.

Shell pays its dividend in USD, EUR or GBP fully electronically either in CREST or via interbank transfers.

The Directors have announced a fourth quarter interim dividend payable on March 28, 2022, to shareholders on the Register of Members at the close of business on February 18, 2022. The closing date for dividend currency elections was March 4, 2022 [A] and the euro and sterling equivalents announcement date is March 14, 2022.

[A] A different dividend currency election date may apply to shareholders holding shares in a securities account with a bank or financial institution ultimately through Euroclear Nederland. This may also apply to other shareholders who do not hold their shares either directly on the Register of Members or in the corporate sponsored nominee arrangement. Such shareholders can contact their broker, financial intermediary, bank or financial institution for the election deadline that applies.

### REPURCHASES OF SHARES

As announced on July 7, 2021, Shell will target the distribution of 20-30% of its cash flow from operations to shareholders. The Board may choose to return cash to shareholders through a combination of dividends and share buybacks. As part of this framework, Shell announced the distribution of $2 billion worth of capital to shareholders via share buybacks on July 29, 2021, which were completed on November 19, 2021.

In addition, Shell announced on September 20, 2021, that after the Shell Group's divestment of the Permian assets, it would distribute $7 billion worth of capital to shareholders. This was subsequently confirmed to be via share buybacks and at pace. The first tranche of up to $1.5 billion was announced on December 2, 2021, and completed on January 28, 2022. On February 3, 2022, Shell announced an additional buyback programme of $8.5 billion, comprising the additional $5.5 billion of Permian divestment proceeds and $3.0 billion as part of the Company's capital allocation framework. In the first tranche of this programme the Company has entered into an irrevocable, non-discretionary arrangement for the purchase of up to $4.0 billion of shares in the period up to and including May 4, 2022.

To ensure that the Company had the necessary authority to continue to buy back its shares when the time is considered appropriate, at the 2021 AGM, shareholders granted an authority for the Company to repurchase up to a maximum of 780 million of its shares (excluding purchases for employee share plans). This authority expires on the earlier of the close of business on August 18, 2022, or the end of the 2022 AGM. This means that, as at close of February 10, 2022, 589 million further shares could still be repurchased under the current AGM authority.

The Board continues to regard the ability to repurchase issued shares in suitable circumstances as an important part of Shell's financial management. A new resolution will be proposed at the 2022 AGM to renew the authority for the Company to purchase its own share capital, up to specified limits, for a further year. This proposal will be described in more detail in the 2022 Notice of Annual General Meeting.

### SIMPLIFICATION

At a General Meeting, on December 10, 2021, the shareholders of the Company supported a resolution to amend Shell's Articles of Association (Articles) to enable the simplification of the Company. The simplification entailed establishing a single line of shares to eliminate the complexity of Shell's A/B share structure; and aligning the Company's tax residence with its country of incorporation in the UK; and consequently, changing the Company's name from Royal Dutch Shell plc to Shell plc.

On December 20, 2021, the Board decided to proceed with the simplification. The alignment of the Company's tax residence with its

Exhibit Q

country of incorporation in the UK resulted in recognition in 2021 of a taxable deemed disposal gain fully offset by taxable losses in the Netherlands.

On December 31, 2021, at a Board meeting held in the UK the Board approved the key steps required to move the Company's tax residence to the UK.

On January 21, 2022, the Company changed its name from Royal Dutch Shell plc to Shell plc.

On January 29, 2022, one line of shares was assimilation through assimilation of each A share and each B share into one single line of ordinary shares of the Company. This assimilation had no impact on voting rights or dividend entitlements.

As stated in the Notice of Meeting and Circular and subsequent announcements, the Board believes the simplification will strengthen Shell's competitiveness and accelerate both shareholder distributions and delivery of its strategy to become a net-zero emissions energy business.

#### QUALIFYING THIRD-PARTY INDEMNITIES

The Company has entered into a Deed of Indemnity (Deed) with each Director of the Company who served during the year. The terms of each of these Deeds are identical and they reflect the statutory provisions on indemnities contained in the Companies Act 2006 (CA 2006). Under the terms of each Deed, the Company has agreed to indemnify the Director, to the fullest extent permitted by the CA 2006, against any loss, liability or damage, howsoever caused (including in respect of a Director's own negligence), suffered or incurred by a Director in respect of their acts or omissions while or in the course of acting as a Director or employee of the Company, any associated company or affiliate (within the meaning of the CA 2006). In addition, the Company shall lend funds to Directors as required to meet reasonable costs and

expenses incurred or to be incurred by them in defending any criminal or civil proceedings brought against them in their capacity as a Director or employee of the Company, associated company or affiliate, or, in connection with certain applications brought under the CA 2006. The provisions in the Company's Articles relating to arbitration and exclusive jurisdiction are incorporated, mutatis mutandis, into the Deeds entered into by each Director and the Company.

The Company has provided both indemnities and Directors' and officers' insurance to the Directors in connection with the performance of their responsibilities. Copies of these indemnities and the Directors' and officers' insurance policies are open to inspection. A copy of the form of these indemnities has been previously filed with the US Securities and Exchange Commission.

#### RELATED PARTY TRANSACTIONS

In addition to the disclosures given in Notes 10 and 28 to the "Consolidated Financial Statements" on pages 232 and 258, the following related party transactions took place between Shell and Shell Midstream Partners, L.P.

On February 11, 2022, Shell Pipeline Company LP, a subsidiary of the Company, announced that it made a non-binding offer to purchase all remaining common units held by the public representing limited partner interests in Shell Midstream Partners, L.P. (Shell interest 68.5%)(SHLX) for $12.89 per common unit in cash. The proposed transaction is subject to a number of contingencies, including the approval of the board of directors of SHLX and the satisfaction of any conditions to the consummation of a transaction set forth in any definitive agreement concerning the transaction. No definitive documentation has yet been executed.

#### Credit Facilities

We have entered into the following credit facilities with the Partnership (borrower):

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  | $ million |
|  |  |  |  |  | December 31, 2021 |
|  | Maturity Date | Interest Rate | Outstanding Balance | Total Capacity | Available Capacity |
| 2021 Ten Year Fixed Facility | March 16, 2031 | 2.96 % | $ 600 | $ 600 | $ — |
| Ten Year Fixed Facility | June 4, 2029 | 4.18 % | $ 600 | $ 600 | $ — |
| Seven Year Fixed Facility | July 31, 2025 | 4.06 % | $ 600 | $ 600 | $ — |
| Five Year Revolver | July 31, 2023 | 1.28 % | $ 494 | $ 760 | $ 266 |
| Five Year Revolver | December 1, 2022 | 1.47 % | $ 400 | $ 1,000 | $ 600 |
| Total |  |  | $2,694 | $ 3,560 | $ 866 |

#### POLITICAL CONTRIBUTIONS

No donations were made to the Company or any of its subsidiaries to political parties or organisations during the year. Shell USA, Inc. administers the non-partisan Shell Oil Company Employees' Political Awareness Committee (SEPAC), a political action committee registered with the US Federal Election Commission. Eligible employees may make voluntary personal contributions to the SEPAC. All employees' contributions comply with federal and state law and are publicly reported in accordance with US election laws. Shell USA, Inc. does not exercise control over SEPAC's funding decisions.

#### RECENT DEVELOPMENTS AND POST-BALANCE SHEET EVENTS

See Note 32 to the "Consolidated Financial Statements" on page 261.

#### SHARE CAPITAL

The Company's issued share capital at December 31, 2021, is set out in Note 21 to the "Consolidated Financial Statements" on pages 252. The percentage of the total issued share capital represented by each class of share is given below. On January 29, 2022, an assimilation of the Company's A and B shares was effected. More information on how

this has impacted the share capital of the Company can be found on page 188.

Share capital percentage as at December 31, 2021

| Share class | % |
|---|---|
| A | 53.37 |
| B | 46.63 |
| Sterling deferred | de minimis |

#### TRANSFER OF SECURITIES

There are no restrictions on transfer or limitations on the holding of the ordinary shares other than under the Articles, restrictions imposed by law or regulation (for example, insider trading laws) or pursuant to the Company's Share Dealing Code.

#### SHARE OWNERSHIP TRUSTS AND TRUST-LIKE ENTITIES

Shell has three primary employee share ownership trusts and trust-like entities: a Dutch foundation (stichting) and two US Rabbi Trusts. The shares held by the Dutch foundation are voted by its Board and the shares in the US Rabbi Trusts are voted by the Voting Trustee, Newport Trust Company. Both the Board of the Dutch foundation and the Voting Trustee are independent of Shell.

The UK Shell All Employee Share Ownership Plan has a separate related share ownership trust. Shares held by the trust are voted by its trustee, Computershare Trustees Limited, as directed by the participants.

### AUDITOR
A resolution relating to the appointment of Ernst & Young LLP as auditor for the financial year 2022 will be proposed at the 2022 AGM.

### ANNUAL GENERAL MEETING
The AGM will be held on May 24, 2022, at Central Hall Westminster, Storey's Gate, Westminster, London, SW1H 9NH, United Kingdom. The Notice of Annual General Meeting will include details of the business to be put to shareholders at the AGM.

### CONFLICTS OF INTEREST
In accordance with the Act and the Company's Articles, the Board may authorise any matter that otherwise may involve any Directors breaching their duty to avoid conflicts of interest. The Board has adopted a procedure to address these requirements. Detailed conflict of interest questionnaires are reviewed by the Board and, if considered appropriate, authorised. Conflicts of interest as well as any gifts and hospitality received by and provided by Directors are kept under review by the Board. Further information relating to conflicts of interest can be found in the Articles, available on the Shell website.

### SHELL GENERAL BUSINESS PRINCIPLES
The Shell General Business Principles define how Shell subsidiaries are expected to conduct their affairs and are underpinned by the Shell core values of honesty, integrity and respect for people. These principles include, among other things, Shell's commitment to support fundamental human rights in line with the legitimate role of business and to contribute to sustainable development. They are designed to mitigate the risk of damage to our business reputation and to prevent violations of local and international legislation. They can be found at www.shell.com/sgbp. See "Risk factors" on pages 23 to 32.

### SHELL CODE OF CONDUCT
Shell staff, officers, employees and contract staff are required to comply with the Shell Code of Conduct, which instructs them on how to behave in line with the Shell General Business Principles. This Code clarifies the basic rules and standards they are expected to follow and the behaviour expected of them. These individuals must also complete mandatory Code of Conduct training.

Designated individuals are required to complete additional mandatory training on antitrust and competition laws, anti-bribery, anti-corruption and anti-money laundering laws, financial crime, data protection laws and trade compliance requirements (see "Risk factors" on page 23 to 32). The Shell Code of Conduct can be found at www.shell.com/codeofconduct.

### CODE OF ETHICS
Executive Directors and Senior Financial Officers of Shell must also comply with the Code of Ethics. This Code is specifically intended to meet the requirements of Section 406 of the Sarbanes-Oxley Act. It can be found at www.shell.com/codeofethics.

### INDEPENDENT PROFESSIONAL ADVICE
All Directors may seek independent professional advice in connection with their role as a Director. All Directors have access to the advice and services of the Company Secretary. The Company has provided both indemnities and Directors' and officers' insurance to the Directors in connection with the performance of their responsibilities. Copies of these indemnities and the Directors' and officers' insurance policies are open to inspection. A copy of the form of these indemnities has been previously filed with the US Securities and Exchange Commission.

### DIRECTORS' SHAREHOLDING QUALIFICATION
While the Articles do not require Directors to hold shares in the Company, the Remuneration Committee believes that Executive

Directors should align their interests with those of shareholders by holding shares in the Company. The CEO is expected to build up a shareholding of seven times base salary over five years from appointment and the CFO is expected to build up a shareholding of five times base salary over the same period. In the event that another Executive Director joins the Board, the Remuneration Committee will determine their shareholding requirement, which will not be less than 200% of their base salary.

Executive Directors will be required to maintain their requirement (or existing shareholding if less than the guideline) for a period of two years post employment. Non-executive Directors are encouraged to hold shares with a value equivalent to 100% of their fixed annual fee and to maintain that holding during their tenure. Information on the Directors with shares in the Company can be found in the "Directors' Remuneration Report" on pages 156 to 160.

### NON-EXECUTIVE DIRECTOR INDEPENDENCE
The Board follows the provisions of the Code in determining Non-executive Director independence, which states that at least half of the Board, excluding the Chair, should comprise Non-executive Directors determined by the Board to be independent. In the case of the Company, the Board has determined that all the Non-executive Directors at the end of 2021 are independent.

### NOMINATING/CORPORATE GOVERNANCE COMMITTEE AND COMPENSATION COMMITTEE
The NYSE listing standards require that a listed company maintain a nominating/corporate governance committee and a compensation committee, both composed entirely of independent directors and with certain specific responsibilities. The Company's Nomination and Succession Committee and Remuneration Committee both comply with these requirements, except that the terms of reference of the Nomination and Succession Committee require only a majority of the committee members to be independent.

### AUDIT COMMITTEE
As required by NYSE listing standards, the Company maintains an Audit Committee for the purpose of assisting the Board's oversight of its financial statements, its internal audit function and its independent auditors. The Company's Audit Committee is in full compliance with US Exchange Act Rule 10A-3 and Section 303A.06 of the NYSE Listed Company Manual.

The Company's Audit Committee is not directly responsible for the appointment of independent auditors. However, the Company's Audit Committee makes recommendations to the Board on the appointment or reappointment of the external auditor to put to shareholders for approval in the Annual General Meetings. UK legislation provides that it is for shareholders to agree the appointment, reappointment and removal of the Company's independent auditors.

### SHAREHOLDER APPROVAL OF SHARE-BASED COMPENSATION PLANS
The Company complies with the Listing Rules published by the Financial Conduct Authority (FCA), which require shareholder approval for the adoption of share-based compensation plans which are either long-term incentive plans in which one or more Directors can participate or plans which involve or may involve the issue of new shares or the transfer of treasury shares. Under the FCA rules, such plans cannot be changed to the advantage of participants without shareholder approval, except for certain minor amendments, such as to benefit the administration of the plan or to take account of tax benefits. The rules on the requirements to seek shareholder approval for share-based compensation plans, including those in respect of material revisions to such plans, may deviate from the NYSE listing standards.

### CHANGE OF CONTROL
There are no provisions in the Articles that would delay, defer or prevent a change of control.

### NYSE GOVERNANCE STANDARDS
In accordance with the NYSE rules for foreign private issuers, the Company follows home-country practice in relation to corporate governance. However, foreign private issuers are required to have an audit committee that satisfies the requirements of the US Exchange Act

Rule 10A-3. The Company's Audit Committee satisfies such requirements. The NYSE also requires a foreign private issuer to provide certain affirmations and notices to the NYSE, as well as a summary of the significant ways in which its corporate governance practices differ from those followed by domestic US companies under NYSE listing standards (see Section 303A.11 of the NYSE Listed Company Manual). The Company's summary of its corporate governance differences is given below and can be found at www.shell.com/investor.

### APPOINTMENT AND RETIREMENT OF DIRECTORS

The Company's Articles, the Corporate Governance Code and the Companies Act 2006 govern the appointment and retirement of Directors. Board membership and biographical details of the Directors are provided on pages 119 to 125. However, Directors follow the direction laid out in the Code and stand for re-election annually.

On May 18, 2021, following the conclusion of the AGM, Chad Holliday stepped down from the Board after more than 10 years' service as a Director, six years of which were as Chair of the Company. Sir Andrew Mackenzie succeeded him as Chair on the same day.

On May 19, 2021, Jane Holl Lute was appointed to the Board. On May 18, 2021, following the conclusion of the AGM, Sir Nigel Sheinwald stood down from the Board.

### ARTICLES OF ASSOCIATION

The Company's Articles were adopted on December 20, 2021. The Articles may only be amended by a special resolution of the shareholders in a general meeting. A full version of the Company's Articles can be found at www.shell.com/investors.

At a General Meeting, on December 10, 2021, the shareholders of the Company supported a resolution to amend Shell's Articles to enable the Simplification of the Company. The Simplification entailed establishing a single line of shares to eliminate the complexity of Shell's A/B share structure; and aligning the Company's tax residence with its country of incorporation in the UK; and consequently, changing the Company's name from Royal Dutch Shell plc to Shell plc.

The following summarises certain provisions of the Articles [A] and of the applicable corporate legislation, including the Act (the legislation). This summary is qualified in its entirety by reference to the Articles and the Act. The information provided under this section is applicable to the Articles, which were in effect during the 2021 financial year to which this Report relates.

    A.   A copy of the Articles has been previously filed with the SEC and is incorporated by reference as an exhibit to this Report. It can also be found at www.shell.com/investors.

### Number of Directors

The Articles provide that the Company must have a minimum of three and can have a maximum of 20 Directors (disregarding alternate directors), but these restrictions can be changed by the Board.

### Appointment of Directors

The Company can, by passing an ordinary resolution, appoint any willing person to be a Director. The Board can appoint any willing person to be a Director. Any Director appointed in this way may retire from office at the first AGM after his appointment. A Director who retires in this way is then eligible for reappointment. At the general meeting at which a Director retires, shareholders can pass an ordinary resolution to reappoint the Director or to appoint some other eligible person in their place.

The only people who can be appointed as Directors at a general meeting are the following: (i) Directors retiring at the meeting; (ii) anyone recommended by a resolution of the Board; and (iii) anyone nominated by a shareholder (not being a person to be nominated), where the shareholder is entitled to vote at the meeting and delivers to the Company's registered office, not less than six but not more than 21 days before the day of the meeting, a letter stating that he intends to nominate another person for appointment as a Director and written confirmation from that person that he is willing to be appointed.

### Retirement of Directors

At every AGM, the following Directors shall retire from office: (i) any Director who has been appointed by the Board since the last AGM; (ii) any Director who held office at the time of the two preceding AGMs and who did not retire at either of them; and (iii) any Director who has been in office, other than as a Director holding an executive position, for a continuous period of nine years or more at the date of the meeting.

Notwithstanding the Articles, the Company complies with the Code which contains, among other matters, provisions regarding the composition of the Board and re-election of the Directors. As a result, the Company's current policy is that Directors are subject to annual re-election by shareholders. Any Director who retires at an AGM may offer themselves for reappointment by the shareholders.

### Removal of Directors

In addition to any power to remove Directors conferred by the legislation, the Company can pass a special resolution to remove a Director from office, even though his time in office has not ended, and can (subject to the Articles) appoint a person to replace a Director who has been removed in this way by passing an ordinary resolution.

### Vacation of office by Directors

Any Director automatically stops being a Director if: (i) he gives the Company a written notice of resignation; (ii) he gives the Company a written notice in which he offers to resign and the Board decides to accept this offer; (iii) all of the other Directors (who must comprise at least three people) pass a resolution or sign a written notice requiring the Director to resign; (iv) he is or has been suffering from mental or physical ill-health and the Board passes a resolution removing the Director from office; (v) he has missed Directors' meetings (whether or not an alternate director appointed by him attends those meetings) for a continuous period of six months without permission from the Board and the Board passes a resolution removing the Director from office; (vi) a bankruptcy order is made against him or he makes any arrangement or composition with his creditors generally; (vii) he is prohibited from being a Director under the legislation; or (viii) he ceases to be a Director under the legislation or he is removed from office under the Articles. If a Director stops being a Director for any reason, he will also automatically cease to be a member of any committee or sub-committee of the Board.

### Alternate directors

Any Director can appoint any person (including another Director) to act in his place as an alternate director. That appointment requires the approval of the Board, unless previously approved by the Board or unless the appointee is another Director.

### Proceedings of the Board

The Board may decide in each case when to have meetings and how they will be conducted. The Board can also adjourn its meetings. If no other quorum is fixed by the Board, two Directors are a quorum. A Directors' meeting at which a quorum is present can exercise all the powers and discretions of the Board.

All or any of the Directors can take part in a meeting of the Directors by way of a conference telephone or any communication equipment which allows everybody to take part in the meeting by being able to hear each of the other people at the meeting and by being able to speak to all of them at the same time. A person taking part in this way will be treated as being present at the meeting and will be entitled to vote and be counted in the quorum. Any such meeting will be deemed to take place where the largest group of Directors participating is assembled or, if there is no such group, where the Chair of the meeting is located.

The Board can appoint any Director as Chair or as Deputy Chair and can remove him or her from that office at any time. Matters to be decided at a Directors' meeting will be decided by a majority vote. If votes are equal, the Chair of the meeting has a second, casting vote.

The Board will manage the Company's business. It can use all the Company's powers, except where the Articles or the legislation say that powers can only be used by shareholders voting to do so at a general meeting. The Board is, however, subject to the provisions of the legislation, the requirements of the Articles and any regulations laid

down by the shareholders by passing a special resolution at a general meeting.

The Board can exercise the Company's powers: (i) to borrow money; (ii) to guarantee; (iii) to indemnify; (iv) to mortgage or charge all or any of the Company's undertaking, property and assets (present and future) and uncalled capital; (v) to issue debentures and other securities; and (vi) to give security, either outright or as collateral security, for any debt, liability or obligation of the Company or of any third party. The Board must limit the borrowings of the Company and exercise all voting and other rights or powers of control exercisable by the Company in relation to its subsidiary undertakings so as to ensure that no money is borrowed if the total amount of the group's borrowings (as defined in the Articles) then exceeds, or would as a result of such borrowing exceed, two times the Company's adjusted capital and reserves (as defined in the Articles). Shareholders may pass an ordinary resolution allowing borrowings to exceed such limit.

The Board can delegate any of its powers or discretions to committees of one or more persons. Any committee must comply with any regulations laid down by the Board. These regulations can require or allow people who are not Directors to be members of the committee, and can give voting rights to such people but there must be more Directors on a committee than persons who are not Directors and a resolution of the committee is only effective if a majority of the members of the committee present at the time of the resolution were Directors.

### Fees

The total fees paid to all the Directors (excluding any payments made under any other provision of the Articles) must not exceed €4,000,000 a year or any higher sum decided on by an ordinary resolution at a general meeting. It is for the Board to decide how much to pay each Director by way of fees. The Board, or any committee authorised by the Board, can award extra fees to any Director who, in its view, performs any special or extra services for the Company. The extra fees can take the form of salary, commission, profit-sharing or other benefits (and can be paid partly in one way and partly in another).

The Company can pay the reasonable travel, hotel and incidental expenses of each Director incurred in attending and returning from general meetings, meetings of the Board or committees of the Board or any other meetings which, as a Director, he is entitled to attend. The Company will pay all other expenses properly and reasonably incurred by each Director in connection with the Company's business or in the performance of his duties as a Director. The Company can also fund a Director's or former Director's expenditure and that of a Director or former Director of any holding company of the Company for the purposes permitted by the legislation and can do anything to enable a Director or former Director of the Company or any holding company of the Company to avoid incurring such expenditure all as provided in the legislation.

### Pensions and gratuities

The Board or any committee authorised by the Board can decide whether to provide pensions, annual payments or other benefits to any Director or former Director, or any relation or dependant of, or person connected to, such a person. The Board can also decide to contribute to a scheme or fund or to pay premiums to a third party for these purposes. The Company can only provide pensions and other benefits to people who are or were Directors but who have not been employed by or held an office or executive position in the Company or any of its subsidiary undertakings or former subsidiary undertakings or any predecessor in business of the Company or such other company or to relations or dependants of, or persons connected to, those Directors or former Directors if the shareholders approve this by passing an ordinary resolution.

### Directors' interests
### Conflicts of interest requiring authorisation by Directors

The Board may, subject to the relevant quorum and voting requirements, authorise any matter which would otherwise involve a Director breaching his or her duty under the legislation to avoid conflicts of interest. A Director seeking authorisation in respect of such a conflict of interest must tell the Board the nature and extent of his or her interest in the conflict of interest as soon as possible.

The Director must give the Board sufficient details of the relevant matter to enable it to decide how to address the conflict of interest, together

with any additional information which it may request. Any Director (including the relevant Director) may propose that the relevant Director be authorised in relation to any matter which is the subject of such a conflict of interest. Such proposal and any authority given by the Board in relation to it shall be effected in the same way as any other matter may be proposed to or resolved upon by the Board except that: (i) the relevant Director and any other Director with a similar interest will not count in the quorum and will not vote on a resolution giving such authority; and (ii) the conflicted Director and any other Director with a similar interest may, if the other members of the Board so decide, be excluded from any meeting of the Board while the conflict of interest is under consideration.

Where the Board gives authority in relation to a conflict of interest or where any of the situations described in (i) to (v) of "Other conflicts of interest" below applies in relation to a Director: (i) the Board may (whether at the relevant time or subsequently) (a) require that the relevant Director is excluded from the receipt of information, the participation in discussion and/or the making of decisions related to the conflict or the situation and (b) impose upon the relevant Director such other terms for the purpose of dealing with the conflict or situation as they think fit; (ii) the relevant Director will be obliged to conduct himself in accordance with any terms imposed by the Board in relation to the conflict or situation; (iii) the Board may also provide that, where the relevant Director obtains (other than through his position as a Director of the Company) information that is confidential to a third party, the Director will not be obliged to disclose that information to the Company, or to use or apply the information in relation to the Company's affairs, where to do so would amount to a breach of that confidence; (iv) the terms of the authority shall be recorded in writing (but the authority shall be effective whether or not the terms are so recorded); and (v) the Board may revoke or vary such authority at any time but this will not affect anything done by the relevant Director prior to such revocation in accordance with the terms of such authority.

### Other conflicts of interest

If a Director knows that he or she is in any way directly or indirectly interested in a proposed contract with the Company or a contract that has been entered into by the Company, they must tell the other Directors of the nature and extent of that interest in accordance with the legislation. If the Director has so disclosed the nature and extent of his interest, a Director can do one or more of the following: (i) have any kind of interest in a contract with or involving the Company or another company in which the Company has an interest; (ii) hold any other office or place of profit with the Company (except that of auditor) in conjunction with his office of Director for such period and upon such terms, including as to remuneration, as the Board may decide; (iii) alone, or through a firm with which he is associated, do paid professional work for the Company or another company in which the Company has an interest (other than as auditor); (iv) be or become a Director or other officer of, or employed by a party to a transaction or (iv) arrangement with, or otherwise be interested in, any holding company or subsidiary company of the Company or any other company in which the Company does not have an interest and which cannot reasonably be regarded as giving rise to a conflict of interest at the time of his appointment as a Director of that other company.

### Benefits

A Director does not have to hand over to the Company any benefit he or she receives or profit that he makes as a result of any matter which would otherwise involve a direct breach of his or her duty under the legislation to avoid conflicts of interest but which has been authorised or anything allowed under (i) to (v) of "Other conflicts of interest" above, nor is any type of contract so authorised or so allowed liable to be avoided.

### Quorum and voting requirements

A Director cannot vote or be counted in the quorum on a resolution of the Board relating to appointing that Director to a position with the Company or a company in which the Company has an interest or the terms or the termination of the appointment and a Director cannot vote or be counted in the quorum on a resolution of the Board about a contract in which he has an interest and, if he does vote, his vote will not be counted.

192

Exhibit Q

The Company can, by ordinary resolution, suspend or relax the provisions of the relevant article in the Articles to any extent or ratify any contract which has not been properly authorised in accordance with that relevant article.

### Directors' indemnities

As far as the legislation allows this, the Company can indemnify any Director or former Director of the Company, of any associated company or of any affiliate against any liability and can purchase and maintain insurance against any liability for any Director or former Director of the Company, of any associated company or of any affiliate. A Director or former Director of the Company, of any associated company or of any affiliate will not be accountable to the Company or the shareholders for any benefit so provided. Anyone receiving such a benefit will not be disqualified from being or becoming a Director of the Company.

### RIGHTS ATTACHING TO SHARES

The Company can issue shares with any rights or restrictions attached to them as long as this is not restricted by any rights attached to existing shares. These rights or restrictions can be decided either by an ordinary resolution passed by the shareholders or by the Board as long as there is no conflict with any resolution passed by the shareholders.

### Dividends

Currently, only ordinary shares are entitled to a dividend.

Under the legislation, dividends are payable only out of profits available for distribution, as determined in accordance with the Act and under IFRS. Subject to the Act, if the Directors consider that the Company's financial position justifies the payment of a dividend, the Company can pay a fixed or other dividend on any class of shares on the dates prescribed for the payments of those dividends and pay interim dividends on shares of any class of any amounts and on any dates and for any periods which it decides. Shareholders can declare dividends in accordance with the rights of shareholders by passing an ordinary resolution, although such dividends cannot exceed the amount recommended by the Board.

Dividends are payable to persons registered as the holder(s) of shares, or to anyone entitled in any other way, at a particular time on a particular day selected by the Board. All dividends will be declared and paid in proportions based on the amounts paid up on the relevant shares during any period for which that dividend is paid.

Any dividend or other money payable in cash relating to a share can be paid: (i) by inter-bank transfer or by other electronic means (including payment through CREST) directly to an account with a bank or other financial institution (or other organisations operating deposit accounts if allowed by the Company) named in a written instruction from the persons entitled to receive the payment under the Articles, such an account must be an account in the UK, unless the share on which the payment is to be made is held by Euroclear Nederland and the Dutch Securities Giro Act (Wet giraal effectenverkeer) applies to such share; (ii) by sending a cheque, warrant or similar financial instrument payable to the shareholder who is entitled to it by post addressed to his registered address; (iii) by sending a cheque, warrant or similar financial instrument payable to someone else named in a written instruction from the shareholder (or all joint shareholders) and sent by post to the address specified in that instruction; or (iv) in some other way if requested in writing by the shareholder (or all joint shareholders) and agreed with the Company. In respect of the payment of any dividend or other money, the Directors can decide and notify shareholders that: (i) one or more of the payment means described in paragraph above will be used for payment and, where more than one means will be used, a shareholder (or all joint shareholders) may elect to receive payment by one of the means so notified in the manner prescribed by the directors; (ii) one or more of such means will be used for the payment unless a shareholder (or all joint shareholders) elects for another means of payment in the manner prescribed by the Directors; or (iii)one or more of such means will be used for the payment and that shareholders will not be able to elect to receive the payment by any other means.

And for these purposes the Directors can decide that different means of payment will apply to different shareholders or groups of shareholders. If: (i) a shareholder (or all joint shareholders) does not specify an address, or does not (i) specify an account of a type prescribed by the

Directors, or does not specify other details, and in each case that information is necessary in order to make a payment of a dividend or other money in the way in which under this Article the directors have decided that the payment is to be made or by which the shareholder (or all joint shareholders) has validly elected to receive the payment; or (ii) payment cannot be made by the company using the information provided by the shareholder (or all joint shareholders), then the dividend or other money will be treated as unclaimed for the purposes of these articles.

The Company will not be responsible for a payment which is lost or delayed. Unless the rights attached to any shares, the terms of any shares or the Articles say otherwise, a dividend or any other money payable in respect of a share can be declared and paid in whatever currency or currencies the Board decides using an exchange rate or exchange rates selected by the Board for any currency conversions required. The Board can also decide how any costs relating to the choice of currency will be met. The Board can offer shareholders the choice to receive dividends and other money payable in respect of their shares in alternative currencies on such terms and conditions as the Board may prescribe from time to time. Where any dividends or other amounts payable on a share have not been claimed, the Board can invest them or use them in any other way for the Company's benefit until they are claimed. The Company will not be a trustee of the money and will not be liable to pay interest on it. If a dividend or other money has not been claimed for 12 years after being declared or becoming due for payment, it will be forfeited and go back to the Company, unless the Board decides otherwise.

Prior to January 29, 2022, dividends in respect of B shares were paid under the dividend access mechanism described below. The Articles provide that if any amount paid by way of dividend by a subsidiary of the Company was received by the dividend access trustee on behalf of any holder of B shares and paid by the dividend access trustee to such holder, the entitlement of such holder of B shares to be paid any dividend declared pursuant to the Articles and the entitlement of any holder of B shares to be paid his pro rata share of such dividend was not fully extinguished on the relevant payment date by virtue of a payment made by the dividend access trustee, the Company has a full and unconditional obligation to make payment in respect of the outstanding part of such dividend entitlement immediately. Where amounts are paid by the dividend access trustee in one currency and a dividend was declared by the Company in another currency, the amounts so paid by the dividend access trustee was, for the purposes of the comparison required by the two immediately preceding sentences, converted into the currency in which the Company declared the dividend at such rate as the Board considered appropriate. For the purposes of the provisions referred to in this paragraph, the amount that the dividend access trustee has paid to any holder of B shares in respect of any particular dividend paid by a subsidiary of the Company (a "specified dividend") will be deemed to include: (i) any amount that the dividend access trustee may be compelled by law to withhold; (ii) a pro rata share of any tax that the subsidiary paying the specified dividend is obliged to withhold or to deduct from the same; and (iii) a pro rata share of any tax that is payable by the dividend access trustee in respect of the specified dividend.

The Board can offer shareholders of ordinary shares (excluding any shareholder holding shares as treasury shares) the right to choose to receive extra ordinary shares, which are credited as fully paid up, instead of some or all of their cash dividend. Before the Board can do this, shareholders must have passed an ordinary resolution authorising the Board to make this offer.

### Dividend access mechanism for B shares
### General

On January 29, 2022 one line of shares was established through assimilation of each A share and each B share into one ordinary share of the Company. This assimilation had no impact on voting rights or dividend entitlements. Dutch withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the ordinary shares following the assimilation. Prior to January 29, 2022, our A and B shares were identical, except for the dividend access mechanism, which only applied to B shares.

In relation to the assimilation of the Company's Class A and B shares, the Royal Dutch Shell Dividend Access Trust will continue in existence for the foreseeable future to facilitate the payment of unclaimed dividend liabilities for B shareholders, until these are either claimed or forfeited in line with the terms outlined in Note 4 to the Royal Dutch Shell Dividend Access Trust financial statements on page 286. The discussion below describes the dividend access mechanism as it applied to B shares prior to January 29, 2022.

Prior to January 29, 2022, it was the expectation and the intention, although there could be no certainty, that holders of B shares would receive dividends through the dividend access mechanism. Any dividends paid on the dividend access shares would have a UK source for UK and Dutch tax purposes. There would be no Dutch withholding tax on such dividends. For further details regarding the tax treatment of dividends paid, refer to "Shareholder information".

### Description of dividend access mechanism

The "Shell" Transport and Trading Company, p.l.c., now The Shell Transport and Trading Company Limited (Shell Transport), and BG Group plc, now BG Group Limited (BG), have each issued a dividend access share to Computershare Trustees (Jersey) Limited as Trustee. Pursuant to a declaration of trust, the Trustee will hold any dividends paid in respect of the dividend access shares on trust for the holders of B shares and will arrange for prompt disbursement of such dividends to such holders. Interest and other income earned on unclaimed dividends will be for the account of Shell Transport and BG and any dividends which are unclaimed after 12 years will revert to Shell Transport and BG, as appropriate. Holders of B shares will not have any interest in either dividend access share and will not have any rights against Shell Transport and BG as issuers of the dividend access shares. The only assets held on trust for the benefit of these holders will be dividends paid to the Trustee in respect of the dividend access shares.

The declaration and payment of dividends on the dividend access shares will require board action by Shell Transport and BG (as applicable) and will be subject to any applicable limitations in law or in the Shell Transport or BG (as appropriate) articles of association in effect. In no event will the aggregate amount of the dividend paid by Shell Transport and BG under the dividend access mechanism for a particular period exceed the aggregate of the dividend paid by the Board of the Company on B shares in respect of the same period (after giving effect to currency conversions).

In particular, under their respective articles of association, Shell Transport and BG are each only able to pay a dividend on their respective dividend access share which represents a proportional amount of the aggregate of any dividend announced by the Company on the B shares in respect of the relevant period, where such proportions are calculated by reference to, in the case of Shell Transport, the number of B shares in existence prior to completion of the Company's acquisition of BG (the Acquisition) and, in the case of BG, the number of B shares issued as part of the Acquisition, in each case as against the total number of B shares in issue immediately following completion of the Acquisition.

### Operation of the dividend access mechanism

If, in connection with the announcement of any dividend by the Company on B shares, the Board of Shell Transport and/or the Board of BG elects to declare and pay a dividend on their respective dividend access shares to the Trustee, the holders of B shares will be beneficially entitled to receive their share of those dividends pursuant to the declaration of trust (and arrangements will be made to ensure that the dividend is paid in the same currency in which they would have received a dividend from the Company).

If any amount is paid by Shell Transport or BG by way of a dividend on the dividend access shares and paid by the Trustee to any holder of B shares, the dividend which the Company would otherwise pay on B shares will be reduced by an amount equal to the amount paid to such holders of B shares by the Trustee.

The Company will have a full and unconditional obligation, in the event that the Trustee does not pay an amount to holders of B shares on a cash dividend payment date (even if that amount has been paid to the Trustee), to pay immediately the dividend announced on B shares. The right of holders of B shares to receive distributions from the Trustee will be reduced by an amount equal to the amount of any payment actually

made by the Company on account of any dividend on B shares. If for any reason no dividend is paid on the dividend access shares, holders of B shares will only receive dividends from the Company directly. Any payment by the Company to holders of B shares will be subject to Dutch withholding tax (unless an exemption is obtained under Dutch law or under the provisions of an applicable tax treaty).

The Dutch tax treatment of dividends paid under the dividend access mechanism has been confirmed by the Dutch Revenue Service in an agreement (vaststellingsovereenkomst) with the Company and N.V. Koninklijke Nederlandsche Petroleum Maatschappij (Royal Dutch Petroleum Company) dated October 26, 2004, as supplemented and amended in connection with the Acquisition by an agreement between the same parties dated April 25, 2005, and a final settlement agreement in connection with the Acquisition dated November 9, 2015. The agreements state, among other things, that dividend distributions on the dividend access shares by Shell Transport and/or BG will not be subject to Dutch withholding tax provided that the dividend access mechanism is structured and operated substantially as set out above.

The daily operations of the Trust are administered on behalf of the Company by the Trustee. Material financial information of the Trust is included in the "Consolidated Financial Statements" and is therefore subject to the same disclosure controls and procedures as Shell.

### Pre-emption rights

Subject to the Act and the Listing Rules published by the UK's Financial Conduct Authority (FCA), any equity securities allotted by the Company for cash must first be offered to shareholders in proportion to their holdings. The Act and the Listing Rules allow for the disapplication of pre-emption rights which may be waived by a special resolution of the shareholders, either generally or specifically.

### VOTING

Subject to applicable law and the Articles, the ordinary shares have voting rights on all matters that are subject to shareholder approval including the election of directors. Currently, the voting rights of each ordinary share carry one vote at a general meeting of the Company.

Major shareholders have no differing voting rights.

### Changing the rights attached to the shares

The Act provides that the Articles can be amended by a special resolution.

The Articles provide that, if the legislation allows this, the rights attached to any class of shares can be changed if this is approved either in writing by shareholders holding at least three-quarters of the issued shares of that class (excluding any shares of that class held as treasury shares) or by a special resolution passed at a separate meeting of the relevant shareholders. At each such separate meeting, all of the provisions of the Articles relating to proceedings at a general meeting apply, except that: (i) a quorum will be present if at least one shareholder who is entitled to vote is present in person or by proxy who owns at least one-third in amount of the issued shares of the relevant class; (ii) any shareholder who is present in person or by proxy and entitled to vote can demand a poll; and (iii) at an adjourned meeting, one person entitled to vote and who holds shares of that class, or his proxy, will be a quorum. These provisions are not more restrictive than required by law in England.

If new shares are created or issued which rank equally with any other existing shares, or if the company purchases or redeems any of its own shares, the rights of the existing shares will not be regarded as changed or abrogated unless the terms of the existing shares expressly say otherwise.

### Redemption provisions

The Company's shares are not subject to any redemption provisions.

### Rights attaching to the sterling deferred shares

The sterling deferred shares are not ordinary shares and, therefore, they have different rights and restrictions. The sterling deferred shares have

194

the following rights and restrictions: (i) on a distribution of assets of the Company among its shareholders on winding-up, the holders of the sterling deferred shares will be entitled (such entitlement ranking in priority to the rights of holders of ordinary shares) to receive an amount equal to the aggregate of the capital paid up or credited as paid up on each sterling deferred share; (ii) save as provided in (i), the holders of the sterling deferred shares will not be entitled to any participation in the profits or assets of the Company; (iii) the holders of sterling deferred shares will not be entitled to receive notice of or to attend and/or speak or vote (whether on a show of hands or on a poll) at general meetings of the Company; (iv) the written consent of the holders of three quarters in nominal value of the issued sterling deferred shares or the sanction of a special resolution passed at a separate general meeting of the holders of the sterling deferred shares is required if the special rights and privileges attaching to the sterling deferred shares are to be abrogated, or adversely varied or otherwise directly adversely affected in any way (the creation, allotment or issue of shares or securities which rank in priority to or equally with the sterling deferred shares, or of any right to call for the allotment or issue of such shares or securities, is for these purposes deemed not to be an abrogation or variation or to have an effect on the rights and privileges attaching to the sterling deferred shares); (v) all provisions of the Articles relating to general meetings of the Company will apply, with necessary modifications, to every general meeting of the holders of the sterling deferred shares; (vi) subject to the legislation, the Company will have the right at any time to redeem any such sterling deferred shares (provided that it is credited as fully paid) at a price not exceeding £1 for all the sterling deferred shares redeemed at any one time (to be paid on such date as the Board shall select as the date of redemption to such one of the holders, if more than one, as may be selected by lot) without the requirement to give notice to the holder(s) of the sterling deferred shares; (vii) if any holder of a sterling deferred share to be redeemed fails or refuses to surrender the share certificate(s) or indemnity for such sterling deferred share or if the holder selected by lot to receive the redemption monies fails or refuses to accept the redemption monies payable in respect of it, such sterling deferred share will, notwithstanding the foregoing, be redeemed and cancelled by the Company and, in the event of a failure or refusal to accept the redemption monies, the Company will retain such money and hold it on trust for the selected holder without interest, and, in each case, the Company will have no further obligation whatsoever to the holder of such sterling deferred share; and (viii) no sterling deferred share will be redeemed otherwise than out of distributable profits or the proceeds of a fresh issue of shares made for the purposes of the redemption or out of capital to the extent permitted by the legislation.

### Calls on shares

The Board can call on shareholders to pay any money which has not yet been paid to the Company for their shares. This includes the nominal value of the shares and any premium which may be payable on those shares. The Board can also make calls on people who are entitled to shares by law.

### Winding-up of the Company

If the Company is voluntarily wound up, the liquidator can distribute to shareholders any assets remaining after the liquidator's fees and expenses have been paid and all sums due to prior-ranking creditors (as defined under the laws of England) have been paid.

### Sinking fund provisions

The shares are not subject to any sinking fund provision under the Articles or as a matter of the laws of England.

### Discriminating provisions

There are no provisions in the Articles discriminating against a shareholder because of his ownership of a particular number of shares.

### Limitations on rights to own shares

There are no limitations imposed by the Articles or the legislation on the rights to own shares, including the right of non-residents or foreign persons to hold or vote shares, other than limitations that would generally apply to all shareholders.

### Transfer of shares

There are no significant restrictions on the transfer of shares.

Except as set out below, any shareholder can transfer some or all of his certificated shares to another person. A transfer of certificated shares must be made in writing and either in the usual standard form or in any other form approved by the Board. Except as set out below, any shareholder can transfer some or all of his CREST shares to another person. A transfer of CREST shares must be made through CREST and must comply with the uncertificated securities rules.

The Board can refuse to register the transfer of any shares which are not fully paid. Further rights to decline registration are as follows:

### Certificated shares

A share transfer form cannot be used to transfer more than one class of share. Each class needs a separate form. Transfers cannot be in favour of more than four joint holders. The share transfer form must be properly stamped to show payment of any applicable stamp duty or certified or otherwise shown to the satisfaction of the Board to be exempt from stamp duty and must be delivered to the Company's registered office, or any other place decided on by the Board. The transfer form must be accompanied by the share certificate relating to the share being transferred, unless the transfer is being made by a person to whom the Company was not required to, and did not send, a certificate. The Board can also ask (acting reasonably) for any other evidence to show that the person wishing to transfer the shares is entitled to do so and, if the share transfer form is signed by another person on behalf of the person making the transfer, evidence of the authority of that person to do so.

### CREST shares

Registration of a transfer of CREST shares can be refused in the circumstances set out in the uncertificated securities rules. Transfers cannot be in favour of more than four joint holders. Where a share has not yet been entered on the register, the Board can recognise a renunciation by that person of his right to the share in favour of some other person. Such renunciation will be treated as a transfer and the Board has the same powers of refusing to give effect to such a renunciation as if it were a transfer.

### Partly paid shares

If a shareholder fails to pay the Company any amount due on his partly paid shares, the Board can enforce the Company's lien by selling all or any of the partly paid shares in any way they decide (subject to certain conditions).

### Capital changes

The conditions imposed by the Articles for changes in capital are not more stringent than those required by the applicable laws of England.

The tribunal shall consist of three arbitrators to be appointed in accordance with the ICC rules. The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practise in a common-law jurisdiction which is within the Commonwealth (as constituted on May 12, 2005) and each other arbitrator must have at least 20 years' experience as a qualified lawyer. The place of arbitration must be The Hague, the Netherlands; and the language of the arbitration must be English.

Pursuant to the exclusive jurisdiction provision in the Articles, if a court or other competent authority in any jurisdiction determines that the arbitration requirement described above is invalid or unenforceable in relation to any particular dispute in that jurisdiction, then that dispute may only be brought in the courts of England and Wales, as is the case with any derivative claim brought under the Act. The governing law of the Articles is the substantive law of England.

Disputes relating to the Company's failure or alleged failure to pay all or part of a dividend which has been announced and which has fallen due for payment will not be subject to the arbitration and exclusive jurisdiction provisions of the Articles. Any derivative claim brought under the Act will not be subject to the arbitration provisions of the Articles.

Pursuant to the depositary agreement, each holder of ADSs is bound by the arbitration and exclusive jurisdiction provisions contained in the relevant depositary agreement, which are substantially similar to the Articles as described in this section as if that holder were a shareholder.

### GENERAL MEETINGS

Under the applicable laws of England, the Company is required in each year to hold an AGM of shareholders in addition to any other meeting of shareholders that may be held. Each AGM must be held in the period six months from the date following the Company's accounting reference date.

Additionally, shareholders may submit resolutions in accordance with Section 338 of the Act.

Directors have the power to convene a general meeting of shareholders at any time. In addition, Directors are required to call a general meeting once requests to do so have been received by the Company from shareholders representing at least 5% of such paid-up capital of the Company as carries voting rights at general meetings of the Company (excluding any paid-up capital held as treasury shares) pursuant to Section 303 of the Act. A request for a general meeting must state the general nature of the business to be dealt with at the meeting and must be authenticated by the requesting shareholders. If Directors fail to call such a meeting within 21 days from receipt of such requests, and on a date not more than 28 days after the date of the notice convening the meeting, the shareholders that requested the meeting, or any of them representing more than half the total voting rights of all shareholders that requested the meeting, may themselves convene a general meeting which must be called for a date not more than three months after the date upon which the Directors became subject to the requirement to call a general meeting. Any such meeting must be convened in the same manner, as nearly as possible, as that in which meetings are required to be convened by the Directors of the Company.

Under the Act, the Company is required to give at least 21 clear days' notice of any AGM or, except where the conditions in Section 307A of the Act apply, any other general meeting of the Company. In addition, the Company complies with the Code which currently states that notices of AGMs should be sent to shareholders at least 20 working days before the meeting.

The Articles require that, in addition to any requirements under the legislation, the notice for any general meeting must state where the meeting is to be held (the principal meeting place) and the location of any satellite meeting place, which shall be identified as such in the notice as well as details of any arrangements made for those persons not entitled to attend a general meeting to be able to view and hear the proceedings (making it clear that participation in those arrangements will not amount to attendance at the meeting to which the notice relates). At the same time that notice is given for any general meeting, an announcement of the date, time and place of that meeting will, if practical, be published in a national newspaper in the Netherlands.

A shareholder is entitled to appoint a proxy (who is not required to be another shareholder) to represent and vote on behalf of the shareholder at any general meeting of shareholders, including the AGM, if a duly completed form of proxy has been received by the Company within the relevant deadlines (in general, where a poll is not demanded, 48 hours (or such shorter time as the Board decides) before the meeting).

Before a general meeting starts to do business, there must be a quorum present. Save as in relation to adjourned meetings, a quorum for all purposes is two people who are entitled to vote. They can be shareholders who are personally present, proxies for shareholders, or a combination of both. If a quorum is not present, a chairman of the meeting can still be chosen and this will not be treated as part of the business of the meeting. If a quorum is not present within five minutes of the time fixed for a general meeting to start or within any longer period not exceeding one hour which the chairman of the meeting can decide, or if a quorum ceases to be present during a general meeting: (i) if the meeting was called by shareholders, it will be cancelled; (ii) any other meeting will be adjourned to a day (being not less than 10 days later, excluding the day on which it is adjourned and the day for which it is reconvened) with the time and place decided upon by the chairman of

the meeting; and (iii) one shareholder present in person or by proxy and entitled to vote will constitute a quorum at any such adjourned general meeting and any notice of such adjourned meeting will say this.

### DEEMED DELIVERY OF DOCUMENTS

Under the Articles, if any notice, document or other information is given, sent or supplied by the Company by inland post, it is treated as being received the day after it was posted if first class post was used (or a service similar to first class post) was used, or 72 hours after it was posted if first class post (or a service similar to first class post) was not used. If a notice or document is sent by the Company by airmail, it is treated as being received 72 hours after it was posted. Any notice, document or other information left at a shareholder's registered address or a postal address notified to the Company in accordance with the Articles by a shareholder or a person entitled to a share by law is treated as being received on the day on which it was left.

### THRESHOLD FOR DISCLOSURE OF SHARE OWNERSHIP

The Articles provide that, when a person receives a statutory notice, he has 14 days to comply with it. If he does not do so or if he makes a statement in response to the notice which is false or inadequate in some important way, the Company can decide to restrict the rights relating to the identified shares and send out a further notice to the shareholder, known as a restriction notice, which will take effect when delivered. The restriction notice will state that the identified shares no longer give the shareholder any right to attend or vote either personally or by proxy at a shareholders' meeting or to exercise any right in relation to shareholders' meetings. Where the identified shares make up 0.25% or more (in amount or in number) of the existing shares of a class at the date of delivery of the restriction notice, the restriction notice can also contain the following further restrictions: (i) the Board can withhold any dividend or part of a dividend (including scrip dividend) or other money which would otherwise be payable in respect of the identified shares without any liability to pay interest when such money is finally paid to the shareholder; and (ii) the Board can refuse to register a transfer of any of the identified shares which are certificated shares unless the Board is satisfied that they have been sold outright to an independent third party (as specified in the Articles). Once a restriction notice has been given, the Board is free to cancel it or exclude any shares from it at any time the Board thinks fit. In addition, the Board must cancel the restriction notice within seven days of being satisfied that all of the information requested in the statutory notice has been given. Also, where any of the identified shares are sold and the Board is satisfied that they were sold outright to an independent third party, it must cancel the restriction notice within seven days of receipt of notification of the sale. The Articles do not restrict in any way the provision of the legislation which applies to failures to comply with notices under the legislation.

The UK City Code on Takeovers and Mergers (the Takeover Code) imposes disclosure obligations on parties subject to the Takeover Code's disclosure regime. The Takeover Code requires an opening position disclosure be made by: (i) an offeree company after the announcement that first identifies it as an offeror or after the announcement that first identifies a competing securities exchange offeror; and (ii) an offeree company after the commencement of an offer period and, if later, after the announcement that first identifies any securities exchange offeror. An opening position disclosure must be made by any person that is interested in 1% or more of any class of relevant securities of the offeree company or any securities exchange offeror. The Takeover Code also requires any person who is, or becomes, interested in 1% or more of any class of relevant securities of an offeree company or any securities exchange offeror to make a dealing disclosure if the person deals in any relevant securities of the offeree company or any securities exchange offeror during an offer period. Where two or more persons act together pursuant to an agreement or understanding, whether formal or informal, to acquire or control an interest in relevant securities, they will normally be deemed to be a single person for the purpose of the relevant provisions of the Takeover Code.

Rule 13d-1 of the US Securities Exchange Act of 1934 requires that a person or group that acquires beneficial ownership of more than 5% of equity securities registered under the US Securities Exchange Act, and that is not eligible to file a short-form report, disclose such information to the SEC within 10 days after the acquisition.

Exhibit Q

Report of Independent Registered Public Accounting Firm

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF SHELL PLC**
**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Shell plc (Shell or the Company) as of December 31, 2021 and 2020, the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the Consolidated Financial Statements). In our opinion, the Consolidated Financial Statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB) and in conformity with UK adopted international accounting standards.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated March 9, 2022, expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission (SEC) and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the Audit Committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgements. The communication of critical audit matters does not alter in any way our opinion on the Consolidated Financial Statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

Exhibit Q

THE ESTIMATION OF OIL AND GAS RESERVES

Description of the matter

As described in Note 9 to the Consolidated Financial Statements, at December 31, 2021, production assets amounted to $118.4 billion and had an associated depreciation, depletion and amortisation (DD&A) charge of $15.8 billion. Also, as described in Note 9, exploration and evaluation (E&E) assets amounted to $7.1 billion at December 31, 2021. As further described in Note 9, impairment charges of $1.5 billion of production and E&E assets were recorded during the year. As described in Note 19 to the Consolidated Financial Statements, decommissioning and restoration (D&R) provisions amounted to $22.1 billion.

Oil and gas reserves estimates are used in the calculation of DD&A, impairment testing and in the estimation of D&R provisions. The risk is the inappropriate recognition of proved reserves that impacts these accounting estimates.

As stated in Note 4 to the Consolidated Financial Statements, in 2021 Shell launched their Powering Progress strategy to accelerate the transition of their business to net-zero emissions, including targets to reduce the carbon intensity of energy products they sell (scope 1, 2 and 3 emissions) by 6-8% by 2023, 20% by 2030, 45% by 2035 and 100% by 2050. Further in October 2021, Shell announced their target to reduce absolute scope 1 and scope 2 emissions by 50% by 2030, compared to 2016 levels. There is therefore a risk that Shell recognises oil and gas reserves that are not ultimately produced. If proved reserves are recognised that are not ultimately produced, depreciation will be understated, and the recoverable amount of assets may be overstated.

Auditing the estimation of oil and gas reserves is complex, as there is significant estimation uncertainty in assessing the quantities of reserves and resources in place. Estimated reserves and resources in place are based on significant assumptions such as production curves and certain other inputs, including forecast production volumes, future capital and operating cost assumptions and life of field assumptions, all of which are inputs used by reserves experts to estimate oil and gas reserves. Estimation uncertainty is further elevated given the transition to a low-carbon economy which could impact life-of-field assumptions and increase the risk of underutilised or stranded oil and gas assets.

How we addressed the matter in our audit

We obtained an understanding of the controls over Shell's oil and gas reserves' estimation process. We then evaluated the design of these controls and tested their operating effectiveness. For example, we tested management's controls over review of changes to year-on-year estimated oil and gas reserves volumes.

We involved professionals with substantial oil and gas reserves audit experience to assist us in evaluating the key assumptions and methodologies applied by management.

Our procedures included, amongst others, testing that significant additions or reductions in reserves had been made in the period in which new information became available, and assessing whether they were in compliance with Shell's reserves and resources guidance. We evaluated the professional qualifications and objectivity of management's reserves experts who performed the preparation of the reserve estimates and who are primarily responsible for providing independent review and challenge, and ultimately endorsement of, the reserve estimates.

We also evaluated the completeness and accuracy of the inputs used by management in estimating the oil and gas reserves by agreeing the inputs to source documentation and we performed backtesting of historical data to identify indications of estimation bias over time. We evaluated management's development plan for compliance with SEC rules that undrilled locations must be scheduled to be drilled within five years, unless specific circumstances justify a longer period. This evaluation was made by assessing the consistency of the development projections with Shell's development plans and capital allocation framework. Where reserves are recognised beyond current licence terms, we assessed the assumption around licence renewal.

In order to determine whether there is a risk that reserves recognised will not be produced, among other procedures, we estimated the carbon intensity of Shell's Upstream and Integrated Gas fields, focussing on the most carbon intensive assets. We also analysed those assets that are currently forecast to be producing beyond 2030 and estimated the carbon intensity of the most significant fields that are expected to be producing after 2030. We analysed further the carbon intensity per barrel of those fields. For the assets where forecast emissions were highest, we evaluated whether Shell's operating plan assumptions included planned actions and associated expenditures to reduce the carbon emissions of these projects. We gave specific consideration to whether the economic limit test incorporated Shell's estimate of future carbon costs to reflect the potential impact of climate change and the energy transition. The economic limit is management's estimation of the point at which the operating cash flow from a project becomes negative, and drives the Company's life of field assumption. Once the economic limit becomes negative, the fields would be decommissioned.

Exhibit Q

**IMPAIRMENT OF PROPERTY, PLANT AND EQUIPMENT AND JOINT VENTURE AND ASSOCIATES (JVA)**

Description of the matter

As described in Notes 9 and 10 to the Consolidated Financial Statements, at December 31, 2021 Shell recognised $118.4 billion of production assets, $49.1 billion of manufacturing, supply and distribution assets (refineries) (collectively, PP&E) and $23.4 billion of joint ventures and associates (JVAs). As disclosed in Note 9, Shell recognised $0.3 billion of impairment charges relating to production assets and $2.3 billion relating to manufacturing, supply and distribution assets. As discussed in Note 10, Shell recognised impairment charges of $0.0 billion relating to JVAs.

The carrying values of PP&E and JVAs are sensitive to small changes in key assumptions, which increases the risk of indicators of impairment or impairment reversal not being identified. Our audit effort has therefore focused on the completeness and timely identification of indicators of impairment charges or impairment reversals.

Auditing the impairment of PP&E and JVAs is subjective due to the significant amount of judgement involved in determining whether indicators of impairment or impairment reversal exist, particularly for longer term assets.

Key judgements in determining whether indicators of impairment or impairment reversal exist include changes in forecast commodity price and refining margin assumptions, forecast carbon prices, movements in oil and gas reserves, changes in asset performance and future development plans and the expected useful lives of assets. The estimation of forecast commodity prices, refining margins, forecast carbon prices and expected useful lives of assets assumptions are particularly judgmental because of, among other factors, increased demand uncertainty and pace of decarbonisation due to climate change and the energy transition.

How we addressed the matter in our audit

We obtained an understanding of the controls over Shell's asset impairment process. We then evaluated the design of these controls and tested their operating effectiveness. For example, we tested the controls over management's identification of indicators of impairment and reversals of impairment and the approval of oil and gas prices and refining margins.

We evaluated Shell's assessment of impairment and impairment reversal triggers, including changes in the forecast commodity price assumptions, movements in oil and gas reserves (see oil and gas reserves critical audit matter), changes in asset performance and changes in Shell's business and operating plan assumptions. We further considered assets with high carbon intensity as a potential indicator of impairment, given Shell's carbon emissions reductions targets.

To test Shell's commodity price assumptions, amongst other procedures, we compared future short and long-term oil and gas prices to an independently developed reasonable range of forecasts based on consensus analysts' forecasts and those adopted by other international oil companies. To evaluate the impact of energy transition on Shell's commodity price forecasts applied in the preparation of the financial statements, we also compared Shell's oil and gas price scenarios to the IEA's Net Zero Emissions 2050 (NZE) and the IEA's Announced Pledges Scenario (APS) price assumptions. We evaluated the reasonableness of Shell's refining margin assumptions by comparing these to independent market and consultant forecasts. We also involved our oil and gas valuations specialists to assess the reasonableness of Shell's refining margin estimation methodology and assumptions, including evaluating long-run demand forecasts, incorporating the impacts of the energy transition, supply dynamics, and the speed of the industry's response to changing demand through either constructing new refineries or closing older refineries.Given the continued improvement in commodity prices and short-term refining margins, we assessed whether these higher price markers represented a trigger for impairment reversal and performed benchmarking to determine whether Shell's oil and gas company peers reflected changes in oil and gas price and refining margin assumptions as indicators of impairment or impairment reversal.

To test Shell's forecast carbon price assumptions, we involved professionals with substantial climate change experience to review the methodology adopted and the reasonableness of the carbon prices applied in 25 different jurisdictions or regions, including 10 jurisdictions with the highest forecast carbon costs, by independently determining our view of a range of acceptable forecast carbon price assumptions. We also tested the carbon pricing included in the forecast cash flows and performed sensitivity analysis by using a range of carbon prices, such as those disclosed in the IEA Net Zero Emissions by 2050 scenario. Where carbon price assumptions were outside of our range, we carried out sensitivity analysis to assess if the impacts were material.

To evaluate the accuracy of significant assumptions we performed a lookback by comparing actual performance of assets to the forecasts made in the prior year. We also assessed potential operational changes that have or are expected to have a significant adverse effect on an asset and whether such unplanned shutdowns should be considered as impairment triggers. In conjunction with our evaluation of the operating plan, we performed procedures to understand how management intend to achieve their planned Scope 1 and 2 and Net Carbon Footprint reductions and whether these actions have been reflected in Shell's operating plan, which impact Shell's financial statements and disclosures, specifically in impairment of PP&E, E&E assets, D&R provisions, and recognition of DTAs. Also, we assessed the operating and capital expenditure assumptions that were estimated necessary to achieve the emission reductions. This also involved assessing assumptions on acquisitions, divestments, investments in CCS technologies and Nature Based Solutions.

199

**IMPAIRMENT OF PROPERTY, PLANT AND EQUIPMENT AND JOINT VENTURE AND ASSOCIATES (JVA) (continued)**

We considered potential impairment triggers related to climate change and energy transition by estimating the carbon intensity of Shell's Upstream and Integrated Gas fields and identifying the most carbon intensive assets. We assessed management's plans to reduce the carbon intensity of these assets in the future to determine whether there is a material risk that reserves recognised will not be produced or if the carbon intensity limited the expected useful lives of the assets. We assessed consistency of Shell's plans to reduce the carbon intensity of these assets with their carbon emissions reductions targets. In addition, we considered contradictory evidence, such as the results of comparable market transactions by other energy companies in jurisdictions with similar environmental and regulatory focus that could indicate a significant increase or decrease in the recoverable amount of Shell's assets. We also considered public comments or commitments made by Shell in relation to the Powering Progress strategy and whether these could impact the future potential value of any assets.

We assessed the appropriateness of Shell's disclosure of information about the assumptions Shell makes that could, in the future, have a significant risk of material adjustments to the carrying amounts of assets and liabilities, including sensitivity disclosures. This included evaluating the sensitivity disclosures in Note 4 of the carrying value of Shell's Upstream and Integrated Gas PP&E assets against a range of future oil and gas price assumptions, reflecting reduced demand scenarios due to climate change and the energy transition, including the IEA Net Zero Emissions by 2050 scenario.

EXPLORATION AND EVALUATION ASSETS

Description of the matter

As described in Note 9 to the Consolidated Financial Statements, at December 31, 2021, Shell recognised $7.1 billion of E&E assets. During the year, management recorded $1.8 billion of E&E write offs and impairments.

In assessing whether to test E&E assets for impairment, the judgements to consider include, whether a licence is expected to be renewed, whether sufficient data exists to indicate that the carrying amount of E&E assets is likely to be recovered and whether or not commercially viable quantities of resources exist. Auditing impairment assessments of E&E assets is inherently judgemental given the exploration for and evaluation of the resources has not always reached a stage at which information sufficient to estimate future cash flows is available. Given the current environment, and the capital allocation and emissions reductions decisions that Shell intend to take through the energy transition, there is a heightened risk that projects will no longer proceed, in which case they may need to be written off or impaired.

As a result of these factors, there is significant auditor judgement relating to the risk that certain E&E costs are not written off in the appropriate reporting period.

How we addressed the matter in our audit

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over Shell's E&E impairment assessment process. For example, we tested controls over management's review of E&E assets for write off and impairment.

To test the completeness and appropriateness of the E&E asset write off and impairment charges recorded, our procedures included, amongst others, assessing each significant licence area against the impairment criteria within IFRS 6 with a particular focus on those assets that were expected to be developed over the medium and long term, those assets where the dominant commodity that will be produced is oil, or highly carbon intensive projects. Through this analysis, we independently identified the assets that we considered most at risk of not being developed by Shell or being divested as a consequence of the Company's emissions reductions targets. We evaluated the likelihood of management progressing the E&E assets, including the strategic fit of the assets, carbon intensity of the developments, planned capex and project economics and the expectation that sufficient cash resources will be available to fund the expected development of assets. For example, in evaluating the strategic fit of carbon intensive assets, we considered the inclusion of actions within Shell's operating plan to achieve target Scope 1 and 2 and Net Carbon Footprint reductions, and that these were reflected in the asset-level forecasts.

We assessed key internal and external evidence relevant to Shell's assessment of whether to continue to carry or write off assets in the group's E&E portfolio, including analysing evidence of further activity being included in Shell's operating plan and any contra evidence that suggests government or regulatory approvals will not be provided. In respect of E&E write offs and impairments recorded during the year, we considered whether evidence about current project activity, forecast future expenditure and operational plans was consistent with the decisions taken by management to write off or impair these assets. We also considered the disclosure of E&E asset write offs and impairments.

Exhibit Q

**THE ESTIMATION OF DECOMMISSIONING AND RESTORATION PROVISIONS**

Description of the matter

As described in Note 19 to the Consolidated Financial Statements, at December 31, 2021 Shell recognised $22.1 billion in D&R provisions. Auditing D&R provisions is complex because management's estimation of future cash outflows involves significant judgement. As explained in Note 2 to the Consolidated Financial Statements, the estimate is based on current legal and constructive obligations, technology and price levels. However, the extent of the actual outflows incurred in the future may differ due to changes in laws, regulations, public expectations, technology, prices and conditions at the time of decommissioning, and can take place many years in the future.

The timing of estimated future decommissioning activity is also a key judgement with the energy transition increasing the risk that oil and gas fields will be decommissioned earlier than anticipated. The key factor in determining the timing of decommissioning for Upstream and Integrated Gas assets will be the life of field assumptions, which is discussed in our oil and gas reserves critical audit matter.

In respect of Oil Products and Chemicals operations, there is significant complexity in evaluating management's judgements on the expected useful lives of manufacturing and production assets and, where decommissioning is expected to be generally more than 50 years into the future, that it is not possible to make an estimate of the obligation that is sufficiently reliable to use in recognising a D&R provision.

How we addressed the matter in our audit

We obtained an understanding of the controls over Shell's process for the estimation of D&R provisions. We then evaluated the design of, and tested the operating effectiveness of, controls over the estimation of the D&R provision. For example, we tested controls over the review of the estimation and completeness of cost estimates.

Our audit procedures included, amongst others, assessing changes in D&R cost estimates, and whether they reflected the latest regulatory requirements and technical developments. We audited cost assumptions relating to labour rates, rig type and rates, number of wells, well durations, and any contingencies applied by, amongst other procedures, inspecting contracts. We also evaluated whether the nature of the costs expected to be incurred were in accordance with the requirements of IAS 37.

We evaluated management's estimated life-of-field assumptions that determine the timing of decommissioning in Upstream and Integrated Gas as described in the estimation of oil and gas reserves critical audit matter. Also as described in the estimation of oil and gas reserves critical audit matter, we evaluated the estimated carbon intensity of the post 2030 production of Shell's assets, in order to identify assets where there may be a higher risk of the reserves not ultimately being produced as this may impact the estimated cessation of production date for these assets.

We tested the D&R accounting models and assumptions therein, including discount rates, and inflation rates. We validated the assumptions to external data sources and reconciled the assumptions with those used in other areas of measurement, such as impairment assessment. We evaluated the timing of recognition of D&R liabilities related to contingent liabilities and D&R liabilities arising from assets previously disposed of, including assessing the counterparty risk associated with those disposals.

We also evaluated management's assessment of the useful lives of manufacturing assets in the Oil Products and Chemicals portfolio. In particular, we evaluated whether D&R provisions were required for certain refineries and petrochemical facilities based on actions within Shell's operating plan, including rationalisation of their manufacturing portfolio and plans to convert or dismantle existing units. This included assessing management's ability to repurpose the units to increase production capabilities of refined products with lower carbon intensity.

We assessed the disclosure of D&R provisions and contingent liabilities in the financial statements. We also evaluated management's re-assessment of the need for contingent liability disclosures in respect of certain manufacturing assets.

Exhibit Q

**THE RECOGNITION AND MEASUREMENT OF DEFERRED TAX ASSETS (DTAs)**

Description of the matter

As described in Note 17 to the Consolidated Financial Statements, at December 31, 2021 Shell recognised gross DTAs of $29.4 billion.

Auditing the recognition and measurement of DTA balances is subjective because the estimation requires significant judgement, including the timing of reversals of DTLs and the availability of future profits against which tax deductions represented by the DTA can be offset. In addition, auditing the recognition of DTA balances that are supported by the expectation of future taxable profits arising beyond Shell's 10-year planning horizon required significant audit judgement, which was of heightened complexity given the future demand and price uncertainty due to climate change and the energy transition.

There is greater uncertainty regarding future taxable profits that exist outside the 10-year planning period and where future taxable profits relate to new and emerging businesses with less history and therefore greater forecasting uncertainty.

How we addressed the matter in our audit

We obtained an understanding of the controls over Shell's processes for the recognition and measurement of DTAs. We then evaluated the design of these controls and tested their operating effectiveness. For example, we tested controls over projections of future taxable income and the deferred tax calculations that support the recognition of DTAs.

Amongst other procedures, we assessed management's determination of the expected timing of utilisation of the DTAs, including the application of relevant tax laws that apply to the utilisation of tax losses. We tested management's forecasted timing of the reversal of taxable temporary differences by evaluating the projected sources of taxable income and considered the nature of the temporary differences and the relevant tax law.

We performed sensitivity analyses over Shell's risk-weighted future taxable profits by jurisdiction, which take into account potential costs of decarbonisation, and specific risking applied to profits forecast through Shell's operating plan process to be generated through new and growing business activities, including biofuels and Electric Vehicle (EV) charging. We reconciled the forecast to that used in other areas of analysis, such as impairment. Our testing also included evaluating management's negative stress test to assess the tolerance of the estimation uncertainty to further risking. We involved professionals with experience in auditing renewable businesses, including EV charging, in challenging management's assumptions and the outcome of the stress testing performed.

**REVENUE RECOGNITION: THE MEASUREMENT OF UNREALISED TRADING GAINS AND LOSSES**

Description of the matter

As described in Note 5 of the Consolidated Financial Statements, at December 31, 2021 Shell recognised $262 billion of revenue. As described in Note 20, Shell recognised derivative financial instrument assets of $12.2 billion and derivative financial instrument liabilities of $17.2 billion.

Shell's trading and supply function is integrated within the Oil Products, Chemicals, Integrated Gas and Upstream segments and is spread across multiple regions. Auditing the measurement of unrealised trading gains and losses was complex because of the significant judgement used in determining the key assumptions used in valuing the trades, the risk of error, of unauthorised trading activity or of deliberate misstatement of Shell's trading positions. Also, trading is not always carried out in active markets where prices are readily available, increasing subjectivity used in determining the pricing curve and volatility assumptions, which are key inputs to valuing the trades. Identifying unrealised trading gains and losses is also complex due to the significant volume of transactions entered into by Shell and the lack of market transparency of executed deals.

The deliberate misstatement of Shell's trading positions or mismarking of positions could result in understated trading losses, overstated trading profits and/or individual bonuses being manipulated through inappropriate inter-period profit/loss allocations.

How we addressed the matter in our audit

We obtained an understanding of the controls over Shell's process for the recognition of revenue relating to unrealised trading gains and losses, including controls over management's processes around complex deal valuations. We then evaluated the design of these controls and tested their operating effectiveness. For example, we tested controls around the review of pricing curve and volatility assumptions applied in the valuation models. We involved audit professionals with significant experience auditing large commodity trading organisations. We assessed Shell's valuation methodology against market practice and analysed whether a consistent framework was applied across the business and assessed the consistency of inputs used in deal valuations and other assumptions. We tested the pricing curve and volatility assumptions in management's valuation models, including by comparing these to external broker quotes, market consensus providers, and our independent assessments. We involved EV valuation specialists to assist us in performing independent testing of the valuation models of Level 3 contracts, including the valuation of long-dated offtake contracts and those with illiquid tenor or price components. Our valuations were established using independently sourced inputs, where available. We evaluated contract terms and key assumptions against independent market information, including assessing complex deals for the existence of non-standard contractual terms or features. To audit the measurement and valuation of open trading positions, we focused specifically on over the counter (OTC) physical and financial transactions. Amongst other procedures, we obtained external confirmation of a sample of open trading positions with brokers and counterparties and, where deemed necessary, tested the existence of the position by agreement to signed contracts. We performed additional confirmation testing by obtaining confirmations from key counterparties who had open positions in the prior trading year, but no reported trading positions in the current year. We also performed procedures to identify unrecorded liabilities by comparing sales to trade receivables and purchases to trade payables that occurred near the end of the financial year to evaluate whether or not the transactions had been recorded appropriately and in the correct period. We assessed the Level 3 disclosures included in the consolidated financial statements.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2016.
London, United Kingdom
March 9, 2022

Exhibit Q

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF SHELL PLC**
**Opinion on Internal Control over Financial Reporting**

We have audited Shell plc's (the Company) internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Consolidated Financial Statements of the Company, and our report dated March 9, 2022, expressed an unqualified opinion thereon.

**Basis for Opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting as set out on page 188. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorisations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorised acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP
London, United Kingdom
March 9, 2022

Exhibit Q

CONSOLIDATED STATEMENT OF INCOME

| | Notes | 2021 | 2020 | $ million 2019 |
|---|---|---|---|---|
| Revenue | 5 | 261,504 | 180,543 | 344,877 |
| Share of profit of joint ventures and associates | 10 | 4,097 | 1,783 | 3,604 |
| Interest and other income | 6 | 7,056 | 869 | 3,625 |
| Total revenue and other income | | 272,657 | 183,195 | 352,106 |
| Purchases | | 174,912 | 117,093 | 252,983 |
| Production and manufacturing expenses | 5 | 23,822 | 24,001 | 26,438 |
| Selling, distribution and administrative expenses | 5 | 11,328 | 9,881 | 10,493 |
| Research and development | 5 | 815 | 907 | 962 |
| Exploration | 5 | 1,423 | 1,747 | 2,354 |
| Depreciation, depletion and amortisation | 5 | 26,921 | 52,444 | 28,701 |
| Interest expense | 7 | 3,607 | 4,089 | 4,690 |
| Total expenditure | | 242,828 | 210,162 | 326,621 |
| Income/(loss) before taxation | | 29,829 | (26,967) | 25,485 |
| Taxation charge/(credit) | 17 | 9,199 | (5,433) | 9,053 |
| Income/(loss) for the period | 5 | 20,630 | (21,534) | 16,432 |
| Income attributable to non-controlling interest | 5 | 529 | 146 | 590 |
| Income/(loss) attributable to Shell plc shareholders | 5 | 20,101 | (21,680) | 15,842 |
| Basic earnings per share ($) | 25 | 2.59 | (2.78) | 1.97 |
| Diluted earnings per share ($) | 25 | 2.57 | (2.78) | 1.95 |

CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

| | Notes | 2021 | 2020 | $ million 2019 |
|---|---|---|---|---|
| Income/(loss) for the period | 5 | 20,630 | (21,534) | 16,432 |
| Other comprehensive income/(loss) net of tax | | | | |
| Items that may be reclassified to income in later periods: | | | | |
| Currency translation differences | 23 | (1,413) | 1,179 | 344 |
| Debt instruments remeasurements | 23 | (28) | 23 | 29 |
| Cash flow hedging gains/(losses) | 23 | 21 | (160) | (276) |
| Net investment hedging gains/(losses) | 23 | 295 | (423) | 9 |
| Deferred cost of hedging | 23 | (39) | 100 | 66 |
| Share of other comprehensive loss of joint ventures and associates | 10 | (109) | (42) | (76) |
| Total | | (1,273) | 677 | 96 |
| Items that are not reclassified to income in later periods: | | | | |
| Retirement benefits remeasurements | | 7,198 | (2,702) | (2,102) |
| Equity instruments remeasurements | | 145 | 64 | (30) |
| Share of other comprehensive income of joint ventures and associates | 10 | 3 | 119 | 2 |
| Total | | 7,346 | (2,519) | (2,130) |
| Other comprehensive income/(loss) for the period | | 6,073 | (1,842) | (2,034) |
| Comprehensive income/(loss) for the period | | 26,703 | (23,376) | 14,398 |
| Comprehensive income attributable to non-controlling interest | | 468 | 136 | 625 |
| Comprehensive income/(loss) attributable to Shell plc shareholders | | 26,235 | (23,512) | 13,773 |

Exhibit Q

CONSOLIDATED FINANCIAL STATEMENTS continued

CONSOLIDATED BALANCE SHEET

| | Notes | Dec 31, 2021 | $ million Dec 31, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Non-current assets | | | |
| Intangible assets | 8 | 24,693 | 22,710 |
| Property, plant and equipment | 9 | 194,932 | 209,700 |
| Joint ventures and associates | 10 | 23,415 | 22,451 |
| Investments in securities | 11 | 3,797 | 3,222 |
| Deferred tax | 17 | 12,426 | 16,311 |
| Retirement benefits | 18 | 8,471 | 2,474 |
| Trade and other receivables | 12 | 7,065 | 7,641 |
| Derivative financial instruments | 20 | 815 | 2,805 |
| | | 275,614 | 287,314 |
| Current assets | | | |
| Inventories | 13 | 25,258 | 19,457 |
| Trade and other receivables | 12 | 53,208 | 33,625 |
| Derivative financial instruments | 20 | 11,369 | 5,783 |
| Cash and cash equivalents | 14 | 36,970 | 31,830 |
| | | 126,805 | 90,695 |
| Assets classified as held for sale | 30 | 1,960 | 1,259 |
| | | 128,765 | 91,954 |
| **Total assets** | | 404,379 | 379,268 |
| **Liabilities** | | | |
| Non-current liabilities | | | |
| Debt | 15 | 80,868 | 91,115 |
| Trade and other payables | 16 | 2,075 | 2,304 |
| Derivative financial instruments | 20 | 887 | 420 |
| Deferred tax | 17 | 12,547 | 10,463 |
| Retirement benefits [A] | 18 | 11,325 | 15,605 |
| Decommissioning and other provisions | 19 | 25,804 | 27,116 |
| | | 133,506 | 147,023 |
| Current liabilities | | | |
| Debt | 15 | 8,218 | 16,899 |
| Trade and other payables [A] | 16 | 63,173 | 44,572 |
| Derivative financial instruments | 20 | 16,311 | 5,308 |
| Income taxes payable [A] | | 3,254 | 3,111 |
| Decommissioning and other provisions | 19 | 3,338 | 3,622 |
| | | 94,294 | 73,512 |
| Liabilities directly associated with assets classified as held for sale | 30 | 1,253 | 196 |
| | | 95,547 | 73,708 |
| **Total liabilities** | | 229,053 | 220,731 |
| **Equity** | | | |
| Share capital | 21 | 641 | 651 |
| Shares held in trust | | (610) | (709) |
| Other reserves | | 18,909 | 12,752 |
| Retained earnings | 23 | 153,026 | 142,616 |
| **Equity attributable to Shell plc shareholders** | | 171,966 | 155,310 |
| Non-controlling interest | | 3,360 | 3,227 |
| **Total equity** | | 175,326 | 158,537 |
| **Total liabilities and equity** | | 404,379 | 379,268 |

[A] As from January 1, 2021, the current "Retirement benefits" liability has been classified under non-current liabilities (previously separately presented within current liabilities) (see Note 18) and taxes payable not related to income tax are presented within "Trade and other payables" (previously "Taxes payable") (see Note 17). Prior period comparatives have been revised to conform with current year presentation.

Signed on behalf of the Board

/s/ Jessica Uhl

Jessica Uhl
Chief Financial Officer
March 9, 2022

Exhibit Q

CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

$ million

| | Share capital (see Note 21) | Shares held in trust | Other reserves (see Note 23) | Retained earnings | Total | Non-controlling interest | Total equity |
|---|---|---|---|---|---|---|---|
| | | | | Equity attributable to Shell plc shareholders | | | |
| At January 1, 2021 | 651 | (709) | 12,752 | 142,616 | 155,310 | 3,227 | 158,537 |
| Comprehensive income for the period | — | — | 6,134 | 20,101 | 26,235 | 468 | 26,703 |
| Transfer from other comprehensive income | — | — | (45) | 45 | — | — | — |
| Dividends (see Note 24) | — | — | — | (6,321) | (6,321) | (348) | (6,669) |
| Repurchases of shares [A] | (10) | — | 10 | (3,513) | (3,513) | — | (3,513) |
| Share-based compensation | — | 99 | 58 | 93 | 250 | — | 250 |
| Other changes in non-controlling interest | — | — | — | 5 | 5 | 13 | 18 |
| At December 31, 2021 | 641 | (610) | 18,909 | 153,026 | 171,966 | 3,360 | 175,326 |
| At January 1, 2020 | 657 | (1,063) | 14,451 | 172,431 | 186,476 | 3,987 | 190,463 |
| Comprehensive (loss)/income for the period | — | — | (1,832) | (21,397) | (23,229) | 136 | (23,093) |
| Transfer from other comprehensive income | — | — | 270 | (270) | — | — | — |
| Dividends (see Note 24) | — | — | — | (7,270) | (7,270) | (311) | (7,581) |
| Repurchases of shares | (6) | — | 6 | (1,214) | (1,214) | — | (1,214) |
| Share-based compensation | — | 354 | (143) | (230) | (19) | — | (19) |
| Other changes in non-controlling interest | — | — | — | 566 | 566 | (585) | (19) |
| At December 31, 2020 | 651 | (709) | 12,752 | 142,616 | 155,310 | 3,227 | 158,537 |
| At January 1, 2019 | 685 | (1,260) | 16,615 | 182,610 | 198,650 | 3,888 | 202,538 |
| Comprehensive income/(loss) for the period | — | — | (2,069) | 15,842 | 13,773 | 625 | 14,398 |
| Transfer from other comprehensive income | — | — | (74) | 74 | — | — | — |
| Dividends (see Note 24) | — | — | — | (15,198) | (15,198) | (537) | (15,735) |
| Repurchases of shares [A] | (28) | — | 28 | (10,286) | (10,286) | — | (10,286) |
| Share-based compensation | — | 197 | (49) | (613) | (465) | — | (465) |
| Other changes in non-controlling interest | — | — | — | 2 | 2 | 11 | 13 |
| At December 31, 2019 | 657 | (1,063) | 14,451 | 172,431 | 186,476 | 3,987 | 190,463 |

[A] Includes shares committed to repurchase under an irrevocable contract and repurchases subject to settlement at the end of the year. (See Note 21)

Exhibit Q

CONSOLIDATED FINANCIAL STATEMENTS continued

CONSOLIDATED STATEMENT OF CASH FLOWS

$ million

| | Notes | 2021 | 2020 | 2019 |
|---|---|---|---|---|
| Income/(loss) before taxation for the period | | 29,829 | (26,967) | 25,485 |
| Adjustment for: | | | | |
| Interest expense (net) | | 3,096 | 3,316 | 3,705 |
| Depreciation, depletion and amortisation | | 26,921 | 52,444 | 28,701 |
| Exploration well write-offs | 9 | 639 | 815 | 1,218 |
| Net gains on sale and revaluation of non-current assets and businesses | | (5,995) | (286) | (2,519) |
| Share of profit of joint ventures and associates | | (4,097) | (1,783) | (3,604) |
| Dividends received from joint ventures and associates | | 3,929 | 2,591 | 4,139 |
| (Increase)/decrease in inventories | | (7,319) | 4,477 | (2,635) |
| (Increase)/decrease in current receivables | | (20,567) | 9,625 | (921) |
| Increase/(decrease) in current payables | | 17,519 | (9,494) | (1,223) |
| Derivative financial instruments | | 5,882 | 977 | (1,484) |
| Retirement benefits | | 16 | 568 | (365) |
| Decommissioning and other provisions | | (76) | 1,104 | (686) |
| Other | | 803 | 8 | (28) |
| Tax paid | | (5,476) | (3,290) | (7,605) |
| **Cash flow from operating activities** | | 45,104 | 34,105 | 42,178 |
| Capital expenditure | | (19,000) | (16,585) | (22,971) |
| Investments in joint ventures and associates | | (479) | (1,024) | (743) |
| Investment in equity securities | | (218) | (218) | (205) |
| Proceeds from sale of property, plant and equipment and businesses | | 14,233 | 2,489 | 4,803 |
| Proceeds from joint ventures and associates from sale, capital reduction and repayment of long-term loans [A] | | 584 | 1,240 | 2,599 |
| Proceeds from sale of equity securities | | 296 | 281 | 469 |
| Interest received | | 423 | 532 | 911 |
| Other investing cash inflows | | 2,928 | 3,239 | 2,921 |
| Other investing cash outflows | | (3,528) | (3,232) | (3,563) |
| **Cash flow from investing activities** | | (4,761) | (13,278) | (15,779) |
| Net increase/(decrease) in debt with maturity period within three months | 14 | 14 | (63) | (308) |
| Other debt: | | | | |
| New borrowings | | 1,791 | 23,033 | 11,185 |
| Repayments | | (21,534) | (17,385) | (14,292) |
| Interest paid | | (4,014) | (4,105) | (4,649) |
| Derivative financial instruments | | (1,165) | 1,157 | (48) |
| Change in non-controlling interest | | 19 | (42) | — |
| Cash dividends paid to: | | | | |
| Shell plc shareholders [B] | | (6,253) | (7,424) | (15,198) |
| Non-controlling interest | | (348) | (311) | (537) |
| Repurchases of shares | | (2,889) | (1,702) | (10,188) |
| Shares held in trust: net purchases and dividends received | | (285) | (382) | (1,174) |
| **Cash flow from financing activities** | | (34,664) | (7,224) | (35,209) |
| Effects of exchange rate changes on cash and cash equivalents | | (539) | 172 | 124 |
| Increase/(decrease) in cash and cash equivalents | | 5,140 | 13,775 | (8,686) |
| Cash and cash equivalents at beginning of year | | 31,830 | 18,055 | 26,741 |
| **Cash and cash equivalents at end of year** | 14 | 36,970 | 31,830 | 18,055 |

[A] As from 2021, renamed from "Proceeds from sale of joint ventures and associates".
[B] Cash dividends paid represents the payment of net dividends (after deduction of withholding taxes where applicable) and payment of withholding taxes on dividends paid in the previous quarter.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### 1 – BASIS OF PREPARATION

The Consolidated Financial Statements of Shell plc (formerly Royal Dutch Shell plc) (the "Company") and its subsidiaries (collectively referred to as "Shell") have been prepared in accordance with international accounting standards in conformity with the requirements of the UK Companies Act 2006 (the "Act"), and therefore in accordance with UK-adopted international accounting standards. As applied to Shell, there are no material differences from International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB); therefore, the Consolidated Financial Statements have been prepared in accordance with IFRS as issued by the IASB.

As described in the accounting policies in Note 2, the Consolidated Financial Statements have been prepared under the historical cost convention except for certain items measured at fair value. Those accounting policies have been applied consistently in all periods.

The Consolidated Financial Statements were approved and authorised for issue by the Board of Directors on March 9, 2022.

#### Simplification of share structure
On December 10, 2021, the shareholders of the Company supported the resolution to amend Shell's Articles of Association to enable the simplification of the Company. The simplification entailed the assimilation of the Company's shares in a single line, the alignment of the Company's tax residence with its country of incorporation in the UK and granting the Board the power to change the Company's name. On December 20, 2021, the Board decided to proceed with the proposal.

### 2 – SIGNIFICANT ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES

This Note describes Shell's significant accounting policies, which are those relevant to an understanding of the Consolidated Financial Statements. It includes the measurement bases used in preparing the Consolidated Financial Statements. It allows an understanding as to how transactions, other events and conditions are reported. It also describes: (a) judgements, apart from those involving estimates, that management makes in applying the policies that have the most significant effect on the amounts recognised in the Consolidated Financial Statements; and (b) estimations, including assumptions about the future, that management makes in applying the policies. The sources of estimation uncertainty that have a significant risk of a material adjustment to the carrying amounts of assets and liabilities within the next financial year are specifically identified as a significant estimate.

The accounting policies applied are consistent with those of the previous financial year except for the adoption as from January 1, 2021, of amendments to IFRS 9 *Financial Instruments* (IFRS 9), IFRS 7 *Financial Instruments: Disclosures* (IFRS 7) and IFRS 16 *Leases* (IFRS 16).

The transition to the accounting pronouncements as listed below has no material impact.

#### IFRS 9 *Financial Instruments*, IFRS 7 *Financial Instruments: Disclosures* and IFRS 16 *Leases*
#### Inter-Bank Offered Rate (IBOR) Reform - Phase 2
Amendments to IFRS 9, IFRS 7, and IFRS 16 complement those amendments effective from January 1, 2020, (IBOR Reform - Phase 1) and focus on the effects of the IBOR reform on a company's financial statements that arise when, for example, an IBOR used to calculate interest on a financial asset is replaced with an alternative benchmark rate.

In this phase the IASB amended requirements relating to: changes in the basis for determining contractual cash flows of financial assets, financial liabilities and lease liabilities; hedge accounting; and disclosures. These amendments apply only to changes required by the IBOR reform to financial instruments and hedging relationships.

The derivatives hedging Shell's fixed-rate debt will be affected by the market-wide replacement of the London Inter-Bank Offered Rate (LIBOR) with alternative risk-free reference rates, most significantly by reform of US dollar LIBOR.

Shell has established a Group-wide IBOR Transition Project, with oversight from the Group Treasurer. The project spans all business lines and has cross-functional senior governance which includes Legal, IT and Finance, including treasury, tax and accounting experts. During 2021, Shell has put in place detailed plans, processes and procedures to support the transition of the affected portfolio including making changes to systems, processes and risk management, as well as related tax and accounting implications. Shell is confident that it has the operational capability to process the transitions to risk-free rates for those interest rate benchmarks such as USD LIBOR that will cease to be available after 30 June 2023.

#### Nature of the Consolidated Financial Statements
The Consolidated Financial Statements are presented in US dollars (dollars) and comprise the financial statements of the Company and its subsidiaries, being those entities over which the Company has control, either directly or indirectly, through exposure or rights to their variable returns and the ability to affect those returns through its power over the entities. Information about subsidiaries at December 31, 2021, can be found in Exhibit 8.1: Significant Subsidiaries and Other Related Undertakings.

Subsidiaries are consolidated from the date on which control is obtained until the date that such control ceases, using consistent accounting policies. All inter-company balances and transactions, including unrealised profits arising from such transactions, are eliminated. Unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Non-controlling interest represents the proportion of income, other comprehensive income and net assets in subsidiaries that is not attributable to the Company's shareholders.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**2 – SIGNIFICANT ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES continued**

**Currency translation**

Foreign currency transactions are translated using the exchange rate at the dates of the transactions or valuation where items are remeasured. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at quarter-end exchange rates of monetary assets and liabilities denominated in foreign currencies (including those in respect of inter-company balances, unless related to loans of a long-term investment nature) are recognised in income unless when recognised in other comprehensive income in respect of cash flow or net investment hedges. Foreign exchange gains and losses in income are presented within interest and other income or within purchases where not related to financing. Share capital issued in currencies other than the dollar is translated at the exchange rate at date of issue.

On consolidation, assets and liabilities of non-dollar entities are translated to dollars at year-end rates of exchange, while their statements of income, other comprehensive income and cash flows are translated at quarterly average rates. The resulting translation differences are recognised as currency translation differences within other comprehensive income. Upon sale of all or part of an interest in, or upon liquidation of, an entity, the appropriate portion of cumulative currency translation differences related to that entity is generally recognised in income.

**Revenue recognition**

Revenue from sales of oil, natural gas, chemicals and other products is recognised at the transaction price to which Shell expects to be entitled, after deducting sales taxes, excise duties and similar levies. For contracts that contain separate performance obligations, the transaction price is allocated to those separate performance obligations by reference to their relative stand-alone selling prices.

Revenue is recognised when control of the products has been transferred to the customer. For sales by Integrated Gas and Upstream operations, this generally occurs when the product is physically transferred into a vessel, pipe or other delivery mechanism; for sales by refining operations, it is either when the product is placed onboard a vessel or offloaded from the vessel, depending on the contractually agreed terms; and for sales of oil products and chemicals, it is either at the point of delivery or the point of receipt, depending on contractual conditions.

Revenue resulting from hydrocarbon production from properties in which Shell has an interest with partners in joint arrangements is recognised on the basis of Shell's volumes lifted and sold. Revenue resulting from the production of oil and natural gas under production-sharing contracts (PSCs) is recognised for those amounts relating to Shell's cost recoveries and Shell's share of the remaining production. Gains and losses on derivative contracts and the revenue and costs associated with other contracts that are classified as held primarily for the purpose of being traded are reported on a net basis in the Consolidated Statement of Income. Purchases and sales of hydrocarbons under exchange contracts that are necessary to obtain or reposition feedstocks for oil products manufacturing facility operations are presented net in the Consolidated Statement of Income.

Revenue resulting from arrangements that are not considered contracts with customers is presented as revenue from other sources.

**Research and development**

Development costs that are expected to generate probable future economic benefits are capitalised as intangible assets. All other research and development expenditure is recognised in income as incurred.

**Exploration costs**

Hydrocarbon exploration costs are accounted for under the successful efforts method: exploration costs are recognised in income when incurred, except that exploratory drilling costs, including in respect of the recapitalisation of the depreciation, are included in property, plant and equipment pending determination of proved reserves. Exploration costs capitalised in respect of exploration wells that are more than 12 months old are written off unless: (a) proved reserves are booked; or (b) (i) they have found commercially producible quantities of reserves and (ii) they are subject to further exploration or appraisal activity in that either drilling of additional exploratory wells is under way or firmly planned for the near future or other activities are being undertaken to sufficiently progress the assessing of reserves and the economic and operating viability of the project.

**Property, plant and equipment and intangible assets**

**Recognition**

Property, plant and equipment comprise assets owned by Shell, assets held by Shell under lease contracts, and assets operated by Shell as contractor in PSCs. They include rights and concessions in respect of properties with proved reserves ("proved properties") and with no proved reserves ("unproved properties"). Property, plant and equipment, including expenditure on major inspections, and intangible assets are initially recognised in the Consolidated Balance Sheet at cost where it is probable that they will generate future economic benefits. This includes capitalisation of decommissioning and restoration costs associated with provisions for asset retirement (see "provisions"), certain development costs (see "research and development") and the effects of associated cash flow hedges (see "financial instruments") as applicable. Interest is capitalised as an increase in property, plant and equipment, on major capital projects during construction. The accounting for exploration costs is described separately (see "exploration costs"). Intangible assets include goodwill, liquefied natural gas (LNG) off-take and sales contracts obtained through acquisition, environmental certificates, software costs and trademarks.

Property, plant and equipment and intangible assets are subsequently carried at cost less accumulated depreciation, depletion and amortisation (including any impairment). Gains and losses on sale of assets are determined by comparing the proceeds with the carrying amounts of assets sold and are recognised in income, within interest and other income.

An asset is classified as held for sale if its carrying amount will be recovered principally through sale rather than through continuing use, which is when the sale is highly probable, and it is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets. Assets classified as held for sale are measured at the lower of the carrying amount upon classification and the fair value less costs to sell. Assets classified as held for sale and the associated liabilities are presented separately from other assets and liabilities in the Consolidated Balance Sheet. Once assets are classified as held for sale, property, plant and equipment and intangible assets are no longer subject to depreciation or amortisation.

### Depreciation, depletion and amortisation

Property, plant and equipment related to hydrocarbon production activities are in principle depreciated on a unit-of-production basis over the proved developed reserves of the field concerned, other than assets whose useful lives differ from the lifetime of the field which are depreciated applying the straight-line method. However, for certain Integrated Gas and Upstream assets, the use for this purpose of proved developed reserves, which are determined using the SEC-mandated yearly average oil and gas prices, would result in depreciation charges for these assets which do not reflect the pattern in which their future economic benefits are expected to be consumed as, for example, it may result in assets with long-term expected lives having accelerated or being fully depreciated within one year. Therefore, in these instances, other approaches are applied to determine the reserves base for the purpose of calculating depreciation, such as using management's expectations of future oil and gas prices rather than yearly average prices, or total proved reserves to provide a phasing of periodic depreciation charges that more appropriately reflects the expected utilisation of the assets concerned. (See Note 9)

Rights and concessions in respect of proved properties are depleted on the unit-of-production basis over the total proved reserves of the relevant area. Where individually insignificant, unproved properties may be grouped and depreciated based on factors such as the average concession term and past experience of recognising proved reserves.

Property, plant and equipment held under lease contracts and capitalised LNG off-take and sales contracts are depreciated or amortised over the term of the respective contract. Other property, plant and equipment and intangible assets are depreciated or amortised on a straight-line basis over their estimated useful lives, except for goodwill, which is not amortised. They include oil products manufacturing facilities and chemical plants (for which the useful life is generally 20 years), retail service stations (15 years), and major inspection costs, which are depreciated over the estimated period before the next planned major inspection (three to five years).

On classification of an asset as held for sale, depreciation ceases.

Estimates of the useful lives and residual values of property, plant and equipment and intangible assets are reviewed annually and adjusted if appropriate.

### Impairment

The carrying amount of goodwill is tested for impairment annually; in addition, assets other than unproved properties (see "exploration costs") are tested for impairment whenever events or changes in circumstances indicate that the carrying amounts for those assets may not be recoverable. If any such indication of impairment exists, the carrying amounts of those assets are written down to their recoverable amount, which is the higher of fair value less costs of disposal (see "fair value measurements") and value in use.

Value in use is determined as the amount of estimated risk-adjusted discounted future cash flows. For this purpose, assets are grouped into cash-generating units based on separately identifiable and largely independent cash inflows. Estimates of future cash flows used in the evaluation of impairment of assets are made using management's forecasts of commodity prices, market supply and demand, potential costs associated with operational greenhouse gas (GHG) emissions, mainly related to CO$_2$, and forecast product and refining margins. In addition, management takes into consideration the expected useful lives of the manufacturing facilities, exploration and production assets, and expected production volumes. The latter takes into account assessments of field and reservoir performance and includes expectations about both proved reserves and volumes that are expected to constitute proved reserves in the future (unproved volumes), which are risk-weighted utilising geological, production, recovery and economic projections. Cash flow projections are based on management's most recent operating plan that represents management's best estimate and are risked as appropriate. The discount rate is based on a nominal post-tax weighted average cost of capital (WACC). Prior to 2021, cash flow estimates were discounted at a rate based on Shell's marginal cost of debt. The change in discount rate to a nominal post-tax WACC has been reflected in a commensurate manner in the risk adjustments to cash flow projections. Using a post-tax discount rate to calculate value in use does not result in a materially different outcome than using a pre-tax discount rate. (See Note 9)

Impairments, except those related to goodwill, are reversed as applicable to the extent that the events or circumstances that triggered the original impairment have changed.

Impairment losses and reversals are reported within depreciation, depletion and amortisation.

Upon classification of an asset as held for sale, the carrying amount is impaired if this exceeds the fair value less costs to sell.

### Judgements and estimates

**Proved oil and gas reserves**

Unit-of-production depreciation, depletion and amortisation charges are principally measured based on management's estimates of proved developed oil and gas reserves. Also, exploration drilling costs are capitalised pending the results of further exploration or appraisal activity, which may take several years to complete, and before any related proved reserves can be booked.

Proved reserves are estimated by reference to available geological and engineering data and only include volumes for which access to market is assured with reasonable certainty. Yearly average oil and gas prices are applied in the determination of proved reserves. Estimates of proved reserves are inherently imprecise, require the application of judgement and are subject to regular revision, either upward or downward, based on new information such as from the drilling of additional wells, observation of long-term reservoir performance under producing conditions and changes in economic factors, including product prices, contract terms, legislation or development plans.

Changes to estimates of proved developed reserves affect prospectively the amounts of depreciation, depletion and amortisation charged and, consequently, the carrying amounts of exploration and production assets. Generally, in the normal course of business the diversity of the asset portfolio will limit the net effect of such revisions. The outcome of, or assessment of plans for, exploration or appraisal activity may result in the related capitalised exploration drilling costs being recognised in income in that period.

Judgement is involved in determining when to use an alternative reserves base in order to appropriately reflect the expected utilisation of the assets concerned (see "depreciation, depletion and amortisation").

Information about the carrying amounts of exploration and production assets and the amounts charged to income, including depreciation, depletion and amortisation and the quantitative impact of the use of an alternative reserves base, is presented in Note 9.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

2 – SIGNIFICANT ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES continued

**Judgements and estimates continued**

Impairment

For the purposes of determining whether impairment of assets has occurred, and the extent of any impairment loss or its reversal, the key assumptions management uses in estimating risk-adjusted future cash flows for value in use measures are future oil and gas prices and refining margins. In addition, management uses other assumptions such as potential costs associated with operational GHG emissions and expected production volumes appropriate to the local circumstances and environment. These assumptions and the judgements of management that are based on them are subject to change as new information becomes available. Changes in assumptions could affect the carrying amounts of assets, and any impairment losses and reversals will affect income. Changes in economic conditions can affect the rate used to discount future cash flow estimates or the risk-adjustment in the future cash flows. Judgement is applied to conclude whether changes in assumptions or economic conditions are an indicator that an asset may be impaired or that an impairment loss recognised in prior periods may no longer exist, or may have decreased.

Expected production volumes, which comprise proved reserves and unproved volumes, are used for impairment testing because management believes this to be the most appropriate indicator of expected future cash flows. As discussed in "Proved oil and gas reserves" above, reserves estimates are inherently imprecise. Furthermore, projections about unproved volumes are based on information that is necessarily less robust than that available for mature reservoirs.

Estimation is involved with respect to the expected life of oil products manufacturing facilities and chemicals plants, and also including management's view on the future development of refining margins.

The determination of cash-generating units requires judgement. Changes in this determination could impact the calculation of value in use and therefore the conclusion on the recoverability of assets' carrying amounts when performing an impairment test.

Judgement, which is subject to change as new information becomes available, can be required in determining when an asset is classified as held for sale. A change in that judgement could result in impairment charges affecting income, depending on whether classification requires a write-down of the asset to its fair value less costs to sell.

In assessing the value in use, the estimated risk-adjusted future post-tax cash flows are discounted to their present value using a post-tax discount rate that reflects Shell's post-tax WACC. The discount rate applied does not reflect asset-specific risks for which future cash flow estimates have been adjusted.

**Significant estimates**

Future commodity price assumptions used in the impairment testing in Integrated Gas and Upstream (see Note 9) are regularly assessed by management, noting that management does not necessarily consider short-term increases or decreases in prices as being indicative of long-term levels.

Until 2019, management's estimate of longer-term refining margins used in the impairment testing in Oil Products was based on the reversion to mean methodology, unless a fundamental shift in markets had been identified, over the life of the oil products manufacturing facilities. Under this approach, it was assumed that refining margins would revert to historical averages over time. As from 2020, a different price methodology applies, based on Shell management's understanding and interpretation of demand and supply fundamentals in the near term and taking into account various other factors such as industry rationalisation and energy transition in the long term.

Future commodity prices and refining margins used in impairment testing provide a source of estimation uncertainty as referred to in paragraph 125 of IAS 1 Presentation of Financial Statements (IAS 1.125).

Information about the carrying amounts of assets and impairments and their sensitivity to changes in significant estimates is presented in Notes 8 and 9.

**Leases**

A contract, or part of a contract, that conveys the right to control the use of an identified asset for a period of time in exchange for payments to be made to the owners (lessors) is accounted for as a lease. Contracts are assessed to determine whether a contract is, or contains, a lease at the inception of a contract or when the terms and conditions of a contract are significantly changed. The lease term is the non-cancellable period of a lease, together with contractual options to extend or to terminate the lease early, where it is reasonably certain that an extension option will be exercised or a termination option will not be exercised.

At the commencement of a lease contract, a right-of-use asset and a corresponding lease liability are recognised, unless the lease term is 12 months or less. The commencement date of a lease is the date on which the underlying asset is made available for use. The lease liability is measured at an amount equal to the present value of the lease payments during the lease term that are not paid at that date. The lease liability includes contingent rentals and variable lease payments that depend on an index, rate, or where they are fixed payments in substance. The lease liability is remeasured when the contractual cash flows of variable lease payments change due to a change in an index or rate when the lease term changes following a reassessment.

Lease payments are discounted using the interest rate implicit in the lease. If that rate is not readily available, the incremental borrowing rate is applied. The incremental borrowing rate reflects the rate of interest that the lessee would have to pay to borrow over a similar term, with a similar security, the funds necessary to obtain an asset of a similar nature and value to the right-of-use asset in a similar economic environment.

In general, a corresponding right-of-use asset is recognised for an amount equal to each lease liability, adjusted by the amount of any pre-paid lease payment relating to the specific lease contract. The depreciation on right-of-use assets is recognised in income unless capitalised as exploration drilling cost (see "exploration cost") or capitalised when the right-of-use asset is used to construct another asset.

Where Shell is the lessor in a lease arrangement at inception, the lease arrangement will be classified as a finance lease or an operating lease. Classification is based on the extent to which the risks and rewards incidental to ownership of the underlying asset lie with the lessor or the lessee.

Where Shell, usually in its capacity as operator, has entered into a lease contract on behalf of a joint arrangement, a lease liability is recognised to the extent that Shell has primary responsibility for the lease liability. A finance sublease is subsequently recognised if the related right-of-use asset is subleased to the joint arrangement. This is usually the case when the joint arrangement has the right to direct the use and obtains substantially all of the economic benefits from using the asset.

**Impairment of the right-of-use asset**

Right-of-use assets are subject to existing impairment requirements as set out in "property, plant and equipment" (see Note 9).

**Judgements and estimates**

A lease term includes optional lease periods where it is reasonably certain Shell will exercise the option to extend or not exercise the option to terminate the lease. Determination of the lease term is subject to judgement and has an impact on the measurement of the lease liability and related right-of-use asset. When assessing the lease term at the commencement date, Shell takes into consideration the broader economics of the contract. Reassessment of the lease term is performed upon changes in circumstances that may affect the probability that an option to extend or to terminate the lease will be exercised.

Where the rate implicit in the lease is not readily available, an incremental borrowing rate is applied. This incremental borrowing rate reflects the rate of interest that the lessee would have to pay to borrow over a similar term, with a similar security, the funds necessary to obtain an asset of a similar nature and value to the right-of-use asset in a similar economic environment. Determination of the incremental borrowing rate requires estimation.

**Joint arrangements and associates**

Arrangements under which Shell has contractually agreed to share control (see "Nature of the Consolidated Financial Statements" for the definition of control) with another party or parties are joint ventures where the parties have rights to the net assets of the arrangement, or joint operations where the parties have rights to the assets and obligations for the liabilities relating to the arrangement. Investments in entities over which Shell has the right to exercise significant influence but neither control nor joint control are classified as associates. Information about incorporated joint arrangements and associates at December 31, 2021, can be found in Exhibit 8.1: Significant Subsidiaries and Other Related Undertakings.

Investments in joint ventures and associates are accounted for using the equity method, under which the investment is initially recognised at cost and subsequently adjusted for the Shell share of post-acquisition income less dividends received and the Shell share of other comprehensive income and other movements in equity, together with any loans of a long-term investment nature. Where necessary, adjustments are made to the financial statements of joint ventures and associates to bring the accounting policies used into line with those of Shell. In an exchange of assets and liabilities for an interest in a joint venture, the non-Shell share of any excess of the fair value of the assets and liabilities transferred over the pre-exchange carrying amounts is recognised in income. Unrealised gains on other transactions between Shell and its joint ventures and associates are eliminated to the extent of Shell's interest in them; unrealised losses are treated similarly but may also result in an assessment of whether the asset transferred is impaired.

Shell recognises its assets and liabilities relating to its interests in joint operations, including its share of assets held jointly and liabilities incurred jointly with other partners.

**Inventories**

Inventories are stated at cost or net realisable value, whichever is lower. Cost comprises direct purchase costs (including transportation), and associated costs incurred in bringing inventories to their present condition and location, and is determined using the first-in, first-out (FIFO) method for oil, gas and chemicals and by the weighted average cost method for materials.

**Taxation**

The charge for current tax is calculated based on the income reported by the Company and its subsidiaries, as adjusted for items that are non-taxable or disallowed and using rates that have been enacted or substantively enacted by the balance sheet date.

Deferred tax is determined, on the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the Consolidated Balance Sheet and on unused tax losses and credits carried forward.

Deferred tax assets and liabilities are calculated using the enacted or substantively enacted rates that are expected to apply when an asset is realised or a liability is settled. They are not recognised where they arise from the initial recognition of goodwill or of an asset or liability in a transaction (other than in a business combination) that, at the time of the transaction, affects neither accounting nor taxable profit, or in respect of taxable temporary differences associated with subsidiaries, joint ventures and associates where the reversal of the respective temporary difference can be controlled by Shell and it is probable that it will not reverse in the foreseeable future.

Deferred tax assets are recognised to the extent that it is probable that future taxable profits will be available against which the deductible temporary differences, unused tax losses and credits carried forward can be utilised.

Income tax receivables and payables as well as deferred tax assets and liabilities include provisions for uncertain income tax positions/treatments.

Income taxes are recognised in income except when they relate to items recognised in other comprehensive income, in which case the tax is recognised in other comprehensive income. Income tax assets and liabilities are presented separately in the Consolidated Balance Sheet except where there is a right of offset within fiscal jurisdictions and an intention to settle such balances on a net basis.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

2 – SIGNIFICANT ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES continued

**Judgements and estimates**

Tax liabilities are recognised when it is considered probable that there will be a future outflow of funds to a taxing authority. In such cases, provision is made for the amount that is expected to be settled, where this can be reasonably estimated. Provisions for uncertain income tax positions/treatments are measured at the most likely amount or the expected value, whichever method is more appropriate. Generally, uncertain tax treatments are assessed on an individual basis, except where they are expected to be settled collectively. It is assumed that taxing authorities will examine positions taken if they have the right to do so and that they have full knowledge of the relevant information. A change in estimate of the likelihood of a future outflow and/or in the expected amount to be settled would be recognised in income in the period in which the change occurs. This requires the application of judgement as to the ultimate outcome, which can change over time depending on facts and circumstances. Judgements mainly relate to transfer pricing, including inter-company PSCs, expenditure deductible for tax purposes and taxation arising on disposal.

Deferred tax assets are recognised only to the extent it is considered probable that those assets will be recoverable. This involves an assessment of when those assets are likely to reverse, and a judgement as to whether or not there will be sufficient taxable profits available to offset the assets when they do reverse. This requires assumptions regarding future profitability and is therefore inherently uncertain. To the extent assumptions regarding future profitability change, there can be an increase or decrease in the amounts recognised in respect of deferred tax assets as well as in the amounts recognised in income in the period in which the change occurs.

Taxation information, including charges and deferred tax assets and liabilities, is presented in Note 17. Income taxes include taxes at higher rates levied on income from certain Integrated Gas and Upstream activities.

**Retirement benefits**

Benefits in the form of retirement pensions and health care and life insurance are provided to certain employees and retirees under defined benefit and defined contribution plans.

Obligations under defined benefit plans are calculated annually by independent actuaries using the projected unit credit method, which takes into account employees' years of service and, for pensions, average or final pensionable remuneration, and are discounted to their present value using interest rates of high-quality corporate bonds denominated in the currency in which the benefits will be paid and of a duration consistent with the plan obligations. Where plans are funded, payments are made to independently managed trusts; assets held by those trusts are measured at fair value. Defined benefit plan surpluses are recognised as assets to the extent that they are considered recoverable, which is generally by way of a refund or lower future employer contributions.

The amounts recognised in income in respect of defined benefit plans mainly comprise service cost and net interest. Service cost comprises principally the increase in the present value of the obligation for benefits resulting from employee service during the period (current service cost) and also amounts relating to past service and settlements or amendments of plans. Plan amendments are changes to benefits and are generally recognised when all legal and regulatory approvals have been received and the effects have been communicated to members. Net interest is calculated using the net defined benefit liability or asset matched against the discount rate yield curve at the beginning of each year for each plan. Remeasurements of the net defined benefit liability or asset resulting from actuarial gains and losses, and the return on plan assets excluding the amount recognised in income, are recognised in other comprehensive income.

For defined contribution plans, pension expense represents the amount of employer contributions payable for the period.

**Significant judgements and estimates**

Defined benefit obligations and plan assets, and the resulting liabilities and assets that are recognised, require significant estimation as these are subject to volatility as (actuarial) assumptions regarding future outcomes and market values change. Substantial judgement is required in determining the actuarial assumptions, which vary for the different plans to reflect local conditions but are determined under a common process in consultation with independent actuaries. The assumptions applied in respect of each plan are reviewed annually and adjusted where necessary to reflect changes in experience and actuarial recommendations.

Actuarial assumptions applied in determining defined benefit obligations provide a source of estimation uncertainty as referred to in IAS 1.125.

Information about the amounts reported in respect of defined benefit pension plans, assumptions applicable to the principal plans and their sensitivity to changes in significant estimates is presented in Note 18.

**Provisions**

Provisions are recognised at the balance sheet date at management's best estimate of the expenditure required to settle the present obligation. Non-current amounts are discounted at a rate intended to reflect the time value of money. The carrying amounts of provisions and the discount rate applied are regularly reviewed and adjusted for new facts or changes in law, technology or financial markets.

Provisions for decommissioning and restoration costs, which arise principally in connection with hydrocarbon production facilities, oil products manufacturing facilities and pipelines, are measured on the basis of current requirements, technology and price levels; the present value is calculated using amounts discounted over the useful economic life of the assets. The liability is recognised (together with a corresponding amount as part of the related property, plant and equipment) once a legal or constructive obligation arises to dismantle an item of property, plant and equipment and to restore the site on which it is located and when a reasonable estimate can be made. The effects of changes resulting from revisions to the timing or the amount of the original estimate of the provision are reflected on a prospective basis, generally by adjustment to the carrying amount of the related property, plant and equipment. However, where there is no related asset, or the change reduces the carrying amount to nil, the effect, or the amount in excess of the reduction in the related asset to nil, is recognised in income.

Shell reviews its oil products manufacturing facilities and chemical plants on a regular basis to determine whether any changes in assumptions, including expected life, trigger the need to recognise a provision for decommissioning and restoration.

Redundancy provisions are recognised when a detailed formal plan identifies the business or part of the business concerned, the location and number of employees affected, a detailed estimate of the associated costs and an appropriate timeline, and the employees affected have been notified of the plan's main features.

An onerous contract provision is recognised when the unavoidable cost of meeting the obligations under the contract exceeds the economic benefits expected to be received under it. The unavoidable cost under a contract is the lower of the cost of fulfilling the contract and any compensation or penalties arising from failure to fulfil it. The cost of fulfilling a contract comprises the costs that relate directly to the contract. Before an onerous provision is recognised Shell first recognises any impairment loss that has occurred on assets dedicated to that contract.

Other provisions are recognised in income in the period in which an obligation arises and the amount can be reasonably estimated. Provisions are measured based on current legal requirements and existing technology where applicable. Recognition of any joint and several liability is based on management's best estimate of the final pro rata share of the liability. Provisions are determined independently of expected insurance recoveries. Recoveries are recognised when virtually certain of realisation.

### Estimates

Estimates of provisions for future decommissioning and restoration costs are recognised and based on current legal and constructive requirements, technology and price levels. Because actual cash outflows can differ from estimates due to changes in laws, regulations, public expectations, technology, prices and conditions, and can take place many years in the future, the carrying amounts of provisions are regularly reviewed and adjusted to take account of such changes.

### Significant estimate

The discount rate applied to reflect the time value of money in the carrying amount of provisions requires estimation. The discount rate applied is reviewed regularly and adjusted following changes in market rates.

The discount rate applied to determine the carrying amount of provisions provides a source of estimation uncertainty as referred to in IAS 1.125.

Information about decommissioning and restoration provisions and their sensitivity to changes in estimates is presented in Note 19.

### Financial instruments

Financial assets and liabilities are presented separately in the Consolidated Balance Sheet except where there is a legally enforceable right of offset and Shell has the intention to settle on a net basis or realise the asset and settle the liability simultaneously.

### Financial Assets

Financial assets are classified at initial recognition and subsequently measured at amortised cost, fair value through other comprehensive income or fair value through profit or loss. The classification of financial assets is determined by the contractual cash flows and where applicable the business model for managing the financial assets.

Debt instruments are measured at amortised cost, if the objective of the business model is to hold the financial asset in order to collect contractual cash flows and the contractual terms give rise to cash flows that are solely payments of principal and interest. It is initially recognised at fair value plus or minus transaction costs that are directly attributable to the acquisition or issue of the financial asset. Subsequently the financial asset is measured using the effective interest method less any impairment. Gains and losses are recognised in profit or loss when the asset is derecognised, modified or impaired.

All equity instruments and other debt instruments are recognised at fair value. For equity instruments, on initial recognition, an irrevocable election (on an instrument-by-instrument basis) can be made to designate these as at fair value through other comprehensive income instead of fair value through profit or loss. Dividends received on equity instruments are recognised as other income in profit or loss when the right of payment has been established, except when Shell benefits from such proceeds as a recovery of part of the cost of the financial asset, in which case such gains are recorded in other comprehensive income.

### Investments in securities

Investments in securities ("securities") comprise equity and debt securities. Equity securities are carried at fair value. Generally, unrealised holding gains and losses are recognised in other comprehensive income. On sale, net gains and losses previously accumulated in other comprehensive income are transferred to retained earnings. Debt securities are generally carried at fair value with unrealised holding gains and losses recognised in other comprehensive income. On sale, net gains and losses previously accumulated in other comprehensive income are recognised in income.

### Impairment of financial assets

The expected credit loss model is applied for recognition and measurement of impairments in financial assets measured at amortised cost or at fair value through other comprehensive income. The expected credit loss model is also applied for financial guarantee contracts to which IFRS 9 applies and which are not accounted for at fair value through profit or loss. The loss allowance for the financial asset is measured at an amount equal to the 12-month expected credit losses. If the credit risk on the financial asset has increased significantly since initial recognition, the loss allowance for the financial asset is measured at an amount equal to the lifetime expected credit losses. Changes in loss allowances are recognised in profit or loss. For trade receivables, a simplified measurement approach is applied recognising expected lifetime losses from initial recognition.

### Cash and cash equivalents

Cash and cash equivalents comprise cash at bank and in hand, including offsetting bank overdrafts, short-term bank deposits, money market funds, reverse repos and similar instruments that generally have a maturity of three months or less at the date of purchase.

### Financial Liabilities

Financial liabilities are recognised at amortised cost, unless they are required to be measured at fair value through profit or loss, such as instruments held for trading, or Shell has opted to measure them at fair value through profit or loss. Debt and trade payables are recognised initially at fair value based on amounts exchanged, net of transaction costs, and subsequently at amortised cost except for fixed rate debt subject to fair value hedging which is remeasured for the hedged risk (see below). Interest expense on debt is accounted for using the effective interest method, and other than interest capitalised, is recognised in income. For financial liabilities that are measured under the fair value option, the change in the fair value related to own credit risk is recognised in other comprehensive income. The remaining fair value change is recognised at fair value through profit or loss.

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

2 – SIGNIFICANT ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES continued

Derivative contracts and hedges

Derivative contracts are used in the management of interest rate risk, foreign exchange risk, commodity price risk, and foreign currency cash balances. Derivatives that are not closely related to the host contract in terms of economic characteristics and risks and the host contract of which is not a financial asset are separated from their host contract and recognised at fair value with the associated gains and losses recognised in income.

Contracts to buy or sell a non-financial item that can be settled net in cash are accounted for as financial instruments, with the exception of those contracts that were entered into and continue to be held for the purpose of the receipt or delivery of a non-financial item in accordance with Shell's expected purchase, sale or usage requirements. Gains or losses arising from changes in the fair value of derivatives that are not designated as effective hedging instruments are recognised in income.

Certain derivative contracts qualify and are designated either: as a fair value hedge of the change in fair value of a recognised asset or liability or an unrecognised firm commitment; or as a cash flow hedge for the change in cash flows to be received or paid relating to a recognised asset or liability or a highly probable forecast transaction; or as a net investment hedge of the change in foreign exchange rates associated with net investments in foreign operations with a different functional currency than Shell's functional currency.

A change in the fair value of a hedging instrument designated as a fair value hedge is recognised in income, together with the consequential adjustment to the carrying amount of the hedged item. The effective portion of a change in fair value of a derivative contract designated as a cash flow hedge is recognised in other comprehensive income until the hedged transaction occurs; any ineffective portion is recognised in income. Where the hedged item is a non-financial asset or liability, the amount in accumulated other comprehensive income is transferred to the initial carrying amount of the asset or liability (reclassified to the balance sheet); a net investment hedge is accounted for similarly to a cash flow hedge. Gains or losses on the hedging instrument relating to the effective portion of the hedge are recognised in other comprehensive income while any gains or losses relating to the ineffective portion are recognised in the income statements. On disposal of the foreign operation, the cumulative value of any such gains or losses recorded in other comprehensive income is reclassified to the income statement.

The effective portion of a change due to retranslation at quarter-end exchange rates in the carrying amount of debt and the principal amount of derivative contracts used to hedge net investments in foreign operations is recognised in other comprehensive income until the related investment is sold or liquidated; any ineffective portion is recognised in income.

All relationships between hedging instruments and hedged items are documented, as well as risk management objectives and strategies for undertaking hedge transactions. The effectiveness of hedges is also continually assessed and hedge accounting is discontinued when there is a change in the risk management strategy.

Unless designated as hedging instruments, contracts to sell or purchase non-financial items that can be settled net as if the contracts were financial instruments and that do not meet expected own-use requirements (typically, forward sale and purchase contracts for commodities in trading operations), and contracts that are or contain written options, are recognised at fair value; associated gains and losses are recognised in income.

Derivatives that are held primarily for the purpose of trading are presented as current in the Consolidated Balance Sheet.

Judgements

Judgement is required to determine whether contracts to buy or sell LNG are capable of being settled on a net basis. Due to the limited liquidity in the LNG market and the lack of net settlement history, contracts to buy or sell LNG are not considered capable of being settled on a net basis. As a result, these contracts are accounted for on an accrual basis and not as a financial instrument.

Fair value measurements

Fair value measurements are estimates of the amounts for which assets or liabilities could be transferred at the measurement date, based on the assumption that such transfers take place between participants in principal markets and, where applicable, taking highest and best use into account.

Where available, fair value measurements are derived from prices quoted in active markets for identical assets or liabilities. In the absence of such information, other observable inputs are used to estimate fair value. Inputs derived from external sources are corroborated or otherwise verified, as appropriate. In the absence of publicly available information, fair value is determined using estimation techniques that take into account market perspectives relevant to the asset or liability, in as far as they can reasonably be ascertained, based on predominantly unobservable inputs. For derivative contracts where publicly available information is not available, fair value estimations are generally determined using models and other valuation methods, the key inputs for which include future prices, volatility, price correlation, counterparty credit risk and market liquidity, as appropriate; for other assets and liabilities, fair value estimations are generally based on the net present value of expected future cash flows.

Share-based compensation plans

The fair value of share-based compensation expense arising from the Performance Share Plan (PSP) and the Long-term Incentive Plan (LTIP) - Shell's main equity-settled plans - is estimated using a Monte Carlo option pricing model and is recognised in income from the date of grant over the vesting period with a corresponding increase directly in equity. The model projects and averages the results for a range of potential outcomes for the vesting conditions, the principal assumptions for which are the share price volatility and dividend yields for Shell and four of its main competitors over the last three years and the last 10 years.

Shares held in trust

Shares in the Company, which are held by employee share ownership trusts and trust-like entities, are not included in assets but are reflected at cost as a deduction from equity as shares held in trust.

**Acquisitions and sales of interests in a business**

Assets acquired and liabilities assumed when control is obtained over a business, and when an interest or an additional interest is acquired in a joint operation which is a business, are recognised at their fair value at the date of the acquisition; the amount of the purchase consideration above this value is recognised as goodwill. When control is obtained, any non-controlling interest is recognised as the proportionate share of the identifiable net assets. The acquisition of a non-controlling interest in a subsidiary and the sale of an interest while retaining control are accounted for as transactions within equity. The difference between the purchase consideration or sale proceeds after tax and the relevant proportion of the non-controlling interest, measured by reference to the carrying amount of the interest's net assets at the date of acquisition or sale, is recognised in retained earnings as a movement in equity attributable to Shell plc shareholders.

**Emission schemes and related environmental programmes**

Emission certificates, biofuel certificates and renewable power certificates (together "environmental certificates") held for trading purposes are recognised at cost or net realisable value, whichever is lower, and classified under inventory.

**Emission trading schemes**

Emission certificates acquired for compliance purposes are initially recognised at cost and classified under intangible assets. In the schemes where a cap is set for emissions, the associated emission certificates granted are recognised at cost, which may be zero. An emission liability is recognised under other liabilities when actual emissions occur that give rise to an obligation. To the extent the liability is covered by emission certificates held for compliance purposes, the liability is measured with reference to the value of these emission certificates held and for the remaining uncovered portion at market value. The associated expense is presented under "production and manufacturing expenses". Both the emission certificates and the emission liability are derecognised upon settling the liability with the respective regulator.

**Biofuel programmes**

Biofuel certificates acquired that are held for compliance purposes are initially recognised at cost under intangible assets. Self-generated biofuel certificates are recognised at nil value, as they primarily offset the obligation. A biofuel liability is recognised under other liabilities when the obligation arises under local regulations. To the extent covered by biofuel certificates held for compliance purposes, the liability is measured with reference to the value of these certificates held and for the remaining uncovered portion at market value. Biofuel certificates and the biofuel liability are both derecognised upon settling the liability with the respective regulator.

**Renewable power programmes**

Renewable power certificates acquired for compliance purposes are initially recognised at cost as an intangible asset. Self-generated renewable power certificates are generally transferred to the customer upon sales of electricity. A renewable power liability is recognised under other liabilities when electricity sales take place that give rise to an obligation to retire renewable power certificates. The associated cost is recognised in "Purchases" in the income statement. If the obligation relates to power consumed in business operations, it is presented in other liabilities with cost reflected in "Production and manufacturing expenses". To the extent covered by renewable power certificates held for compliance purposes, the liability is measured with reference to the value of these renewable power certificates and for the remaining uncovered portion at market value. Renewable power certificates and the renewable power liability are derecognised upon settling the liability with the respective regulator.

**Consolidated Statement of Income presentation**

Purchases reflect all costs related to the acquisition of inventories and the effects of the changes therein, and include associated costs incurred in conversion into finished or intermediate products. Production and manufacturing expenses are the costs of operating, maintaining and managing production and manufacturing assets. Selling, distribution and administrative expenses include direct and indirect costs of marketing and selling products.

**3 – CHANGES TO IFRS NOT YET ADOPTED**

**Property, Plant and Equipment: Proceeds before Intended Use (Amendments to IAS 16 *Property, plant and equipment* (IAS 16))**

From January 1, 2022, any proceeds and related costs from selling items produced while bringing property, plant and equipment classified as assets under construction to the location and condition necessary for it to be capable of operating in the manner intended by management are recognised in the Consolidated Statement of Income in accordance with applicable accounting policies.

These amendments are applied retrospectively, but only to items of property, plant and equipment on or after the beginning of the earliest period presented in the financial statements in which the entity first applies the amendments.

Based on the assessment performed, this accounting policy change has no material impact.

**Deferred Tax related to Assets and Liabilities arising from a Single Transaction (Amendments to IAS 12 *Income taxes* (IAS 12))**

In May 2021, amendments to IAS 12 were published to require companies to recognise deferred tax on particular transactions that, on initial recognition, give rise to equal amounts of taxable and deductible temporary differences. The amendments will typically apply to transactions where assets and liabilities are recognised in a single transaction, such as leases and decommissioning and restoration obligations.

The amendments are effective for annual reporting periods beginning on or after January 1, 2023, and should be applied on a modified retrospective basis.

Shell is in the process of evaluating the impact of these amendments. They are not expected to have a significant effect on future financial reporting.

**Onerous Contracts — Cost of Fulfilling a Contract (Amendments to IAS 37, Provisions, Contingent Liabilities and Contingent Assets (IAS 37))**

The amendments to IAS 37 add additional clarity on which costs an entity includes when assessing whether a contract is onerous. The amendments specify that the cost of fulfilling a contract comprises the costs that relate directly to the contract. Those costs include both incremental costs and an allocation of other costs as long as these relate directly to fulfilling a contract.

Exhibit Q

The amendments are effective from January 1, 2022, and apply to all contracts within the scope of IAS 37. These amendments have no material impact.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**3 – CHANGES TO IFRS NOT YET ADOPTED continued**
**IFRS 17 Insurance contracts (IFRS 17)**
IFRS 17 was issued in 2017, with amendments published in 2020 and 2021, and is required to be adopted for annual reporting periods beginning on or after January 1, 2023. The IFRS 17 model combines a current balance sheet measurement of insurance contracts with recognition of profit over the period that services are provided. The general model in the standard requires insurance contract liabilities to be measured using probability-weighted current estimates of future cash flows, an adjustment for risk, and a contractual service margin representing the profit expected from fulfilling the contracts. Effects of changes in the estimates of future cash flows and the risk adjustment relating to future services are recognised over the period services are provided rather than immediately in profit or loss. Shell is in the process of evaluating the initial impact of this standard.

**4 – CLIMATE CHANGE AND ENERGY TRANSITION**
In 2021, Shell launched its Powering Progress strategy to accelerate the transition of its business to net-zero emissions, including targets to reduce the carbon intensity of energy products sold (Scope 1, 2 and 3 emissions) by 6-8% by 2023, 20% by 2030, 45% by 2035, and 100% by 2050, in step with society. In October 2021, Shell announced a new target to halve the absolute emissions from its operations and the energy it buys to run them by 2030, compared with 2016 levels on a net basis. This additional target will help Shell to step up the pace of change to become a net-zero emissions energy business.

This note describes how Shell has considered climate-related impacts in some key areas of the financial statements and how this translates into the valuation of assets and measurement of liabilities as Shell makes progress in the energy transition.

Note 2 Significant accounting policies, judgements and estimates describes uncertainties, including those that have the potential to have a material effect on the Consolidated Balance Sheet in the next 12 months. This note describes the key areas of climate impacts that potentially have short- and longer-term effects on amounts recognised in the Consolidated Balance Sheet at December 31, 2021. Where relevant, this note contains references to other notes to the Consolidated Financial Statements and aims to provide an overarching summary.

**Financial planning and assumptions**
This section provides an overview of how key assumptions that underpin these financial statements interact with scenarios. Subsequently, the sensitivity of carrying amounts to commodity prices, if different assumptions were applied, is described.

There is no one single scenario that underpins the financial statements. Shell's scenarios are designed to challenge management's perspectives on the future business environment and stretch management to consider even events that may be only remotely possible. As a result, scenarios are not intended to be predictions of likely future events or outcomes and are not the basis for Shell's financial statements and operating plans.

Shell scenarios (see "About this Report" on page 10) and the range of possible outcomes inform the development of Shell's strategy and Shell's view on future oil and gas price outlooks. These oil and gas price outlooks are one of the key assumptions that underpin Shell's financial statements. Shell's scenarios inform high-, mid- and low-price outlooks. The mid-price outlook represents management's reasonable best estimate and is the basis for Shell's financial statements, operating plans and impairment testing.

Shell's targets to reduce absolute Scope 1 and 2 emissions by 50% by 2030, compared with 2016 levels on a net basis, and 20% reduction of net carbon intensity of Scope 3 emissions by 2030, have been included in Shell's operating plan. The operating plan also includes expected cost for evolving carbon regulations based on a forecast of Shell's equity share of emissions from operated and non-operated assets also taking into account the estimated impact of free allowances. Carbon cost estimates are forecasted on a country-by-country basis and range from around $25 to around $200 per tonne of GHG emissions in 2030.

The financial statements are based on reasonable and supportable assumptions that represent management's current best estimate of the range of economic conditions that may exist in the foreseeable future. Shell will continue to update its operating plan, pricing outlooks and assumptions that it uses, to take account of changes in the economic environment and the pace of the energy transition.

**Property, plant and equipment and joint ventures and associates**
**Price sensitivities using climate pricelines**
As noted, in accordance with IFRS, Shell's financial statements are based on reasonable and supportable assumptions that represent management's current best estimate of the range of economic conditions that may exist in the foreseeable future. The mid-price outlook informed by Shell's scenario planning represents management's best estimate. Impairment sensitivities of -10% or +10% to the mid-price outlook, as an average percentage over the full period are provided in Note 9 Property, plant and equipment. They would result in around $12-15 billion impairment or around $6-9 billion impairment reversal respectively in Integrated Gas and Upstream.

The energy transition is expected to bring volatility and there is large uncertainty as to how commodity prices will develop over the next decades. Some price lines see a structural lower price during the transition period, while other price lines see structural higher commodity prices as a result of changes in both supply and demand. As the risk of stranded assets is prevalent with downside price risk in energy transition scenarios, sensitivities have only been undertaken for such downside scenarios. If different price outlooks from external and often normative climate change scenarios were used, this would impact the recoverability of certain assets recognised in the Consolidated Balance Sheet as at December 31, 2021. These external scenarios are not representative of management's mid-price reasonable best estimate.

Sensitivity of carrying amounts to prices described below is under the assumption that all other factors in the models used to calculate impairments remain unchanged. Changes to prices are applied because of the significant impact on Shell's business. It should be noted that a significant decrease in long-term forecasted prices would probably lead to further changes, such as in portfolio choices and cost levels.

Priceline 1 - Average prices from four 1.5-2 degrees Celsius external climate change scenarios: in view of the broad range of price outlooks across the various scenarios, the average of four external price outlooks was taken:
- IHS Markit / ACCS 2021 – under this scenario oil prices (real terms 2021 (RT21)) gradually decrease towards $20 per barrel (/b) in 2039, recovering to $46/b in 2046 and decreasing again towards $40/b in 2050. Gas prices (RT21) gradually increase towards 2050 to some $3 per million British thermal units (/MMBtu) for Henry Hub and $6/MMBtu for Asia and Europe.

# Exhibit Q

- Woodmac WM AET-2 degree – under this scenario oil prices (RT21) gradually decrease towards $10/b in 2050. Gas prices (RT 21) gradually increase towards 2050 to some $4/MMBtu for Henry Hub. For Asia and Europe, gas prices (RT21) increase to some $8/MMBtu around 2040, gradually decreasing towards 2050 to $6/MMBtu for Asia and $5/MMBtu for Europe.
- IEA NZE50 – under this scenario oil prices (RT21) gradually decrease towards $25/b in 2050. Gas prices (RT21) are around $2/MMBtu for Henry Hub. For Asia and Europe gas prices (RT21) decrease to some $4/MMBtu around 2040, with further slight decreases towards 2050.
- IEA SDS – under this scenario oil prices (RT21) gradually increase towards $56/b in 2030, and gradually decrease to $50/b in 2050. Gas prices (RT21) are around $2/MMBtu for Henry Hub. For Asia gas prices (RT21) decrease to around $5/MMBtu in 2050. For Europe gas prices (RT21) are slightly above $4/MMBtu for the whole period.

This priceline provides an external view of the development of commodity prices under under 1.5-2 degrees Celsius external climate change scenarios over the whole period under review.

Applying this priceline to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are $13-16 billion and $14-17 billion lower, respectively, than the carrying amounts as at December 31, 2021.

Priceline 2 - Hybrid Shell Plan and IEA NZE50: this priceline applies Shell's mid-price outlook for the next 10 years (see Note 9). Because of the greater uncertainty, the International Energy Agency (IEA) normative Net Zero Emissions scenario for the period after 10 years is applied. This weights less price-risk uncertainty to the first 10 years reflected in the operating plan period and applies more risk to the more uncertain subsequent periods.

Applying this priceline to Integrated Gas assets of $65 billion and Upstream assets of $89 billion as at December 31, 2021, shows recoverable amounts that are $10-12 billion and $5-6 billion lower, respectively, than the carrying amounts as at December 31, 2021.

**Oil price assumptions**



a — Monthly average price (actual on money of the day basis)    b — Monthly average price (actual on real terms basis using US CPI all urban consumers)    c — NGFS GCAM NZE 2050 [A]
d — IEA APS    e — Shell mid-price    f — Average prices from four 1.5-2 degrees Celsius external climate change scenarios    g — IEA NZE50

[A] The Network for Greening the Financial System (NGFS) is a group of 65 central banks and supervisors and 83 observers committed to sharing best practices, contributing to the development of climate– and environment-related risk management in the financial sector and mobilising mainstream finance to support the transition toward a sustainable economy. This scenario results from the NGFS GCAM model. This model embodies certain assumptions on the relationships between economic and energy output and climate interactions. This NGFS scenario shows a decline in world oil demand relative to the current policies baseline, in part a response to substitution away from fossil fuels. At the same time prices increase due to supply constraints.
[B] All figures are presented on real-term 2021 basis unless noted differently.

| | 2022 | 2025 | 2030 | 2035 | RT21 $/b 2040 |
|---|---|---|---|---|---|
| Shell mid-price | 59 | 58 | 60 | 60 | 60 |
| Average prices from four 1.5-2 degrees Celsius external climate change scenarios | 45 | 43 | 46 | 41 | 38 |
| IEA NZE50 | 38 | 37 | 36 | 33 | 29 |
| NGFS GCAM NZE 2050 | 89 | 92 | 94 | 99 | 102 |
| IEA APS | 48 | 56 | 69 | 68 | 68 |

The graph above shows the oil pricelines on a real-terms basis applied for the period until 2040 for Shell's mid-price outlook in comparison with the IEA Net Zero Emissions by 2050 scenario (IEA NZE50), the IEA announced pledges (IEA APS) scenario, the NGFS GCAM NZE 2050 scenario and the average prices from four 1.5-2 degrees Celsius external climate change scenarios (Priceline 1, above). The development of future oil prices is uncertain and oil prices have been subject to significant volatility in the past. Future oil prices may be impacted by future changes in macroeconomic factors, available supply, demand, geopolitical and other factors. The pricelines as per the scenarios NGFS GCAM NZE 2050, IEA NZE50 and the average prices from four 1.5-2 degrees Celsius external climate change scenarios differ from Shell's best estimate and view of the future oil price.

Sensitivity +10% to the mid-price outlook

| | | | $ billion |
|---|---|---|---|
| | Carrying amount | Sensitivity | |
| Integrated Gas | 65 | 3 | 5 |
| Upstream | 89 | 3 | 4 |
| Total | 154 | 6 | 9 |

Average prices from four 1.5-2 degrees Celsius external climate change scenarios

| | | | $ billion |
|---|---|---|---|
| | Carrying amount | Sensitivity | |
| Integrated Gas | 65 | (13) | (16) |

| | | | |
|---|---|---|---|
| Upstream | 89 | (14) | (17) |
| Total | 154 | (27) | (33) |

Sensitivity - 10% to the mid-price outlook

| | | | $ billion |
|---|---|---|---|
| | Carrying amount | | Sensitivity |
| Integrated Gas | 65 | (8) | (10) |
| Upstream | 89 | (4) | (5) |
| Total | 154 | (12) | (15) |

Sensitivity Hybrid Shell Plan + IEA NZE50

| | | | $ billion |
|---|---|---|---|
| | Carrying amount | | Sensitivity |
| Integrated Gas | 65 | (10) | (12) |
| Upstream | 89 | (5) | (6) |
| Total | 154 | (15) | (18) |

**Carrying value of Oil Products and Chemicals assets**

Refineries in the Oil Products segment (carrying amount as at December 31, 2021, $6 billion of which $5 billion related to refineries in the five energy and chemicals parks, excluding refineries classified as held for sale) may be impacted under a below-two-degrees-Celsius external climate scenario. In line with Shell's strategy, Shell's refining footprint is being transformed into five energy and chemicals parks that will provide feedstocks for the chemicals and lubricants business, as well as other low-carbon energy products, including biofuels and hydrogen. This transformation will involve investments in assets that are expected to be resilient in the energy transition, and hence may have stable or increasing carrying amounts.

Assets in the Chemicals segment and Marketing assets in the Oil Products segment are also resilient to the energy transition with products in chemicals, lubricants, biofuels, bitumen, electric vehicle charging and convenience retail having no or low Scope 3 emissions. The demand for these products is also expected to be increasing in many markets and as a result are not expected to be impacted by lower commodity price scenarios.

**Portfolio changes**

Since 2016, the carrying amount of production assets in Integrated Gas and Upstream decreased from $169 billion as at December 31, 2016, to $118 billion as at December 31, 2021. Over this period, depreciation was higher than additions for each year, and disposals of property, plant and equipment with a carrying amount of some $25 billion occurred. Since 2016, the carrying amount of joint ventures and associates decreased from $33 billion as at December 31, 2016, to $23 billion as at December 31, 2021. The carrying amount of capitalised exploration and evaluation expenses decreased from $19 billion as at December 31, 2016, to $7 billion at December 31, 2021. This is the result of final investment decisions and reclassifications to production assets and amounts charged to expenses exceeding additions (specifically significantly lower additions since 2020).

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

4 – CLIMATE CHANGE AND ENERGY TRANSITION continued

**Carrying amount of exploration and evaluation assets**
$ billion as at December 31



[A] In 2017 two refineries were acquired following dissolution of the Motiva joint venture in the USA.

**Carrying amount of production assets**
$ billion as at December 31



[A] Including right-of-use assets for the implementation of IFRS 16 Leases in 2019.

**Carrying amount of refineries**
$ billion as at December 31



[A] In 2017 two refineries were acquired following dissolution of the Motiva joint venture in the USA.
[B] Includes refineries held for sale ($1.5 billion).

Carrying amount of exploration and evaluation assets

| | 2016 | 2017 | 2018 | 2019 | 2020 | $ billion 2021 |
|---|---|---|---|---|---|---|
| At December 31 | 19 | 19 | 18 | 15 | 9 | 7 |

Carrying amount of production assets

| | 2016 | 2017 | 2018 | 2019 | 2020 | $ billion 2021 |
|---|---|---|---|---|---|---|
| At December 31 | 169 | 154 | 149 | 141 | 125 | 112 |
| Impact of IFRS 16 | | | | 9 | 7 | 6 |
| Total at December 31 | 169 | 154 | 149 | 150 | 132 | 118 |

Carrying amount of refineries

| | 2016 | 2017 | 2018 | 2019 | 2020 | $ billion 2021 |
|---|---|---|---|---|---|---|
| At December 31 | 10 | 14 | 14 | 13 | 7 | 6 |
| Assets classified as held for sale | | | | | | 1 |
| Total at December 31 | 10 | 14 | 14 | 13 | 7 | 7 |

Since 2016, Shell's Oil Products portfolio has evolved, shifting from 15 refineries at the end of 2016 towards five energy and chemicals parks. During that period Shell assumed the sole ownership of two refineries through the dissolution of the Motiva joint venture, and disposed of, converted or closed nine refineries (two of which are held for sale as at December 31, 2021). The carrying amount of refineries decreased from $10 billion as at December 31, 2016, to $6 billion as at December 31, 2021, (excluding refineries classified as held for sale). It is anticipated that Shell will continue to invest in the transformation of its refining portfolio into five energy and chemicals parks which produce chemicals and low- or no-carbon products.

Long term, it is expected that the current Shell portfolio will change and evolve with the energy transition. Decision-making on the future portfolio is guided by the pace of society's progress and the aim of being in step with society as it moves towards the goals of the Paris Agreement. Getting the energy system on a path to net-zero emissions will require unprecedented, coordinated action between energy providers, consumers and, crucially, governments. Shell has set out its strategy of how it will achieve its target to be a net-zero emissions energy business by 2050, in step with society.

Impact on remaining life of assets
The energy transition and the pace at which it progresses may impact the remaining life of assets. Integrated Gas and Upstream assets are generally depreciated using a unit-of-production methodology where depreciation depends on production of Securities and Exchange Commission (SEC) proved reserves (see Note 2). Based on production plans of existing assets, some 29%, 3% and 0% of SEC proved reserves as at December 31, 2021, would currently be left by 2030, 2040 and 2050, respectively. An analysis of Integrated Gas and Upstream production assets of $118

Exhibit Q

billion as at December 31, 2021, based on planned reserves depletion shows that these assets would be significantly further depreciated under the unit-of-production method by 2030 and fully depreciated by 2050, providing a further perspective on the risk of stranded assets carried in the Consolidated Balance Sheet as at December 31, 2021. For refineries in Oil Products, depreciation of assets is on a straight-line basis over the life of the assets over a period of 20 years (see Note 2). Over the course of the energy transition, the current carrying amount of refineries will be fully depreciated, offset by anticipated investments in assets that are expected to be resilient in the energy transition as described above.

<span style="color:red">Deferred tax assets</span>

In general, it is expected that sufficient deferred tax liabilities and forecasted taxable profits within the planning period of 10 years are available for recovery of the deferred tax assets recognised at December 31, 2021. Integrated Gas and Upstream deferred tax assets recognised are expected to be recovered within the period of production of each asset. For deferred tax assets of $711 million as at December 31, 2021, mainly related to Brazil, Malaysia and Australia, this period extends beyond 10 years. Deferred tax assets in Oil Products to be recovered in more than 10 years are limited to $854 million as at December 31, 2021, and mainly relate to retail operations in Germany and France. In the light of the potential impact of the accelerated energy transition in Oil Products, cash flows in Oil Products beyond 10 years (for a maximum of an additional 10 years) were further risked to determine recoverability of deferred tax assets beyond 10 years (see Note 17).

<span style="color:red">Decommissioning and other provisions</span>

The energy transition may result in decommissioning and restoration occurring earlier than expected. The risk on the timing of decommissioning and restoration activities for Integrated Gas and Upstream fields is limited, supported by production plans in the foreseeable future (see "Impact on remaining life of assets" above). Acceleration of decommissioning and restoration activities has also been reflected in the assessment of the appropriate discount rate. In 2021, the discount rate has been revised from a 30-year to a 20-year term in line with the average remaining life of Integrated Gas and Upstream assets.

Also, the discount rate applied for calculating provisions (see Note 19) is equal to the inflation rate applied in estimation of provisions. As a result, a potential acceleration of decommissioning and restoration activities would have no time value of money impact for the decommissioning and restoration provision.

In Oil Products, it was industry practice not to recognise decommissioning and restoration provisions associated with manufacturing facilities in Oil Products and Chemicals. This was on the basis that these assets were considered to have indefinite lives, so it was considered remote that an outflow of economic benefits would be required. In 2020, Shell considered the changed macroeconomic fundamentals, together with Shell's plans to rationalise the Group's manufacturing portfolio. Shell also reconsidered whether it remained appropriate not to recognise decommissioning and restoration provisions for manufacturing facilities. In 2020, provisions of $899 million were recognised for certain shorter-lived manufacturing facilities (see Notes 19 and 26). The remaining five energy and chemicals parks are considered longer-lived facilities that are expected to be resilient in the energy transition, and decommissioning would generally be more than 50 years away.

<span style="color:red">Onerous contracts</span>

Closure or early termination of activities may lead to supply contracts becoming onerous. Onerous contract provisions (see Note 19) have been recognised as at December 31, 2021, to reflect changes in expected future utilisation of certain assets. These include contracts in relation to unused terminals and refineries.

<span style="color:red">Dividend resilience</span>

External stakeholders have requested disclosures on how climate change affects dividend-paying capacity. If a further impairment had been recognised in 2021 using any of the climate change scenarios described above, this would not have impacted the ability to pay dividends in this financial year because of the strong cash flow generation and financial reserves.

A forward-looking statement regarding future dividend-paying capacity cannot be provided because of unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in these statements.

<span style="color:red">Physical risks</span>

Mitigation of physical risks, whether or not related to climate change, are considered and embedded in the design and construction of assets and the associated costs are included in the initial recognition of assets in the Consolidated Balance Sheet. Over the past few years Shell has conducted studies aimed at expanding the understanding of physical risks. Shell continues to develop its understanding of all relevant aspects of climate resilience. Analyses have been performed addressing a range of typical climate change features for a select group of assets and it was concluded that currently any adaptation costs for those selected assets is not expected to be significant. Shell recognises the need to deepen and widen these analyses for a more comprehensive climate resilience assessment. Shell continues to monitor this and plans to conduct further analysis on other assets as well as assess long-term physical impacts.

Acute risks, such as flooding and droughts, wildfires and more severe tropical storms, could potentially impact Shell's operations and supply chains. The frequency of these hazards and impacts is expected to increase in certain high-risk locations. The physical risks are assessed at an asset level. Metocean (meteorology and oceanography) engineering experts assess and monitor the physical risks and logistic activities for certain of Shell's assets. These studies aim to ensure Shell's operations are safe and that Shell's facilities can be accessed safely under extreme conditions.

Extreme weather events could have a negative impact on earnings. Recent examples in 2021 include the Texas winter storm and Hurricane Ida. These had an impact on Shell's operations and an adverse impact on 2021 earnings of around $200 million and $400 million respectively.

<span style="color:red">5 – SEGMENT INFORMATION</span>
<span style="color:red">General information</span>

Shell is an international energy company engaged in the principal aspects of the oil and gas industry and reports its business through segments: Integrated Gas, Upstream, Oil Products, Chemicals and Corporate, reflecting the way Shell revenue and assesses its performance.

The Integrated Gas segment manages liquefied natural gas (LNG) activities and the conversion of natural gas into gas-to-liquids (GTL) fuels and other products, as well as the New Energies portfolio. It includes natural gas and liquids exploration and extraction, and the operation of the upstream and midstream infrastructure necessary to deliver gas and liquids to market. It markets and trades natural gas, LNG, electricity and carbon-emission rights, and also markets and sells LNG as a fuel for heavy-duty vehicles and marine vessels.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**5 – SEGMENT INFORMATION** continued

The Upstream segment explores for and extracts crude oil, natural gas and natural gas liquids. It also markets and transports oil and gas, and operates the infrastructure necessary to deliver them to market.

The Oil Products segment comprises the Refining and Trading, and Marketing classes of business. The Refining and Trading class of business turns crude oil and other feedstocks into a range of oil products which are moved and marketed around the world for domestic, industrial and transport use. The Marketing class of business includes the Retail, Lubricants, Business-to-Business (B2B), Pipelines and Biofuels businesses.

The Chemicals segment operates manufacturing plants and its own marketing network.

The Corporate segment covers the non-operating activities supporting Shell, comprising Shell's holdings and treasury organisation, its self-insurance activities and its headquarters and central functions.

This note is presented on the basis of segments defined until December 31, 2021, and therefore does not reflect the revised segments effective from January 1, 2022.

**Basis of segmental reporting**

Sales between segments are based on prices generally equivalent to commercially available prices. Third-party revenue and non-current assets information by geographical area are based on the country of operation of the Group subsidiaries that report this information. Separate disclosure is provided for the UK as this is the Company's country of domicile.

Segment earnings are presented on a current cost of supplies basis (CCS earnings). On this basis, the purchase price of volumes sold during the period is based on the current cost of supplies during the same period after making allowance for the tax effect. CCS earnings therefore exclude the effect of changes in the oil price on inventory carrying amounts. CCS earnings attributable to Shell plc shareholders is the earnings measure used by the Chief Executive Officer for the purposes of making decisions about allocating resources and assessing performance.

Finance expense and income related to core financing activities, as well as related taxes, are included in the Corporate segment earnings rather than in the earnings of the business segments.

Information by segment on a current cost of supplies basis is as follows:

2021

$ million

| | Integrated Gas | Upstream | Oil Products | Chemicals | Corporate | Total |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Third-party | 52,407 | 9,162 | 182,899 | 16,993 | 43 | 261,504 [A] |
| Inter-segment | 7,883 | 36,325 | 11,835 | 6,362 | — | 62,405 |
| Share of profit of joint ventures and associates (CCS basis) | 1,906 | 632 | 765 | 609 | 1 | 3,913 [B] |
| Interest and other income, of which: | 1,787 | 4,602 | 328 | (14) | 353 | 7,056 |
| Interest income | 4 | 37 | 39 | — | 431 | 511 |
| Net gains on sale and revaluation of non-current assets and businesses | 1,595 | 4,140 | 277 | (17) | — | 5,995 |
| Other | 188 | 425 | 12 | 3 | (78) | 550 |
| Third-party and inter-segment purchases (CCS basis) | 41,888 | 9,152 | 172,314 | 17,740 | (5) | 241,089 |
| Production and manufacturing expenses | 6,042 | 10,068 | 5,665 | 2,079 | (32) | 23,822 |
| Selling, distribution and administrative expenses | 926 | 197 | 8,499 | 1,150 | 556 | 11,328 |
| Research and development expenses | 158 | 339 | 212 | 106 | — | 815 |
| Exploration expenses | 127 | 1,296 | — | — | — | 1,423 |
| Depreciation, depletion and amortisation charge, of which: | 6,188 | 13,539 | 5,657 | 1,520 | 17 | 26,921 |
| Impairment losses | 768 | 920 | 1,995 | 382 | — | 4,065 [C] |
| Impairment reversals | — | (213) | (1) | — | — | (214) [D] |
| Interest expense | 68 | 336 | 65 | 6 | 3,132 | 3,607 |
| Taxation charge/(credit) (CCS basis) | 2,246 | 6,100 | 751 | (41) | (665) | 8,391 |
| CCS earnings | 6,340 | 9,694 | 2,664 | 1,390 | (2,606) | 17,482 |

[A] Includes $126 million of revenue from sources other than from contracts with customers, which mainly comprises the impact of fair value accounting of commodity derivatives. This amount includes both the reversal of prior losses of $4,824 million related to sales contracts and prior gains of $4,692 million related to purchase contracts that were previously recognised and where physical settlement has taken place during 2021.
[B] With effect from 2021, finance expense and income reported under Shell's share of earnings of joint ventures and associates are included in the earnings of the business segments. Prior period comparatives have not been revised on grounds of materiality.
[C] Impairment losses comprise Property, plant and equipment ($3,894 million) and Intangible assets ($171 million).
[D] See Note 9.

Exhibit Q

2020

$ million

| | Integrated Gas | Upstream | Oil Products | Chemicals | Corporate | Total |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Third-party | 33,287 | 6,767 | 128,717 | 11,721 | 51 | 180,543 [A] |
| Inter-segment | 3,410 | 21,564 | 6,213 | 2,850 | — | 34,037 |
| Share of profit/(loss) of joint ventures and associates (CCS basis) | 562 | (7) | 988 | 567 | (268) | 1,842 |
| Interest and other income, of which: | 14 | 542 | (93) | — | 406 | 869 |
| Interest income | 6 | 56 | 28 | — | 589 | 679 |
| Net gains on sale and revaluation of non-current assets and businesses | 218 | 55 | (9) | (2) | 24 | 286 |
| Other | (210) | 431 | (112) | 2 | (207) | (96) |
| Third-party and inter-segment purchases (CCS basis) | 21,112 | 4,505 | 113,177 | 9,969 | 8 | 148,771 |
| Production and manufacturing expenses | 5,723 | 10,521 | 5,942 | 1,787 | 28 | 24,001 |
| Selling, distribution and administrative expenses | 729 | (23) | 7,360 | 1,339 | 476 | 9,881 |
| Research and development expenses | 103 | 486 | 209 | 109 | — | 907 |
| Exploration expenses | 611 | 1,136 | — | — | — | 1,747 |
| Depreciation, depletion and amortisation charge, of which: | 17,704 | 23,119 | 10,473 | 1,116 | 32 | 52,444 |
| Impairment losses | 12,221 | 8,697 | 6,531 | 5 | 9 | 27,463 [B] |
| Interest expense | 76 | 374 | 56 | 3 | 3,580 | 4,089 |
| Taxation (credit)/charge (CCS basis) | (2,507) | (467) | (898) | 7 | (983) | (4,848) |
| CCS earnings | (6,278) | (10,785) | (494) | 808 | (2,952) | (19,701) |

[A] Includes $10,008 million of revenue from sources other than from contracts with customers, which mainly comprises the impact of fair value accounting of commodity derivatives. This amount includes both the reversal of prior gains of $1,136 million related to sales contracts and prior losses of $529 million related to purchase contracts that were previously recognised and where physical settlement had taken place during 2020.
[B] Impairment losses comprise Property, plant and equipment ($26,676 million) and Intangible assets ($787 million).

2019

$ million

| | Integrated Gas | Upstream | Oil Products | Chemicals | Corporate | Total |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Third-party | 41,322 | 9,482 | 280,460 | 13,568 | 45 | 344,877 [A] |
| Inter-segment | 4,280 | 35,735 | 7,819 | 3,917 | — | 51,751 |
| Share of profit/(loss) of joint ventures and associates (CCS basis) | 1,791 | 379 | 1,179 | 546 | (307) | 3,588 |
| Interest and other income, of which: | 263 | 2,180 | 273 | (7) | 916 | 3,625 |
| Interest income | — | — | — | — | 899 | 899 |
| Net gains on sale and revaluation of non-current assets and businesses | 282 | 1,888 | 305 | (8) | 52 | 2,519 |
| Other | (19) | 292 | (32) | 1 | (35) | 207 |
| Third-party and inter-segment purchases (CCS basis) | 23,498 | 6,982 | 262,004 | 13,039 | (6) | 305,517 |
| Production and manufacturing expenses | 5,768 | 11,102 | 7,536 | 1,995 | 37 | 26,438 |
| Selling, distribution and administrative expenses | 716 | 29 | 7,976 | 1,323 | 449 | 10,493 |
| Research and development expenses | 181 | 450 | 219 | 112 | — | 962 |
| Exploration expenses | 281 | 2,073 | — | — | — | 2,354 |
| Depreciation, depletion and amortisation charge, of which: | 6,238 | 16,881 | 4,461 | 1,074 | 47 | 28,701 |
| Impairment losses | 579 | 2,576 | 622 | 5 | — | 3,782 [B] |
| Impairment reversals | — | — | (190) | — | — | (190) [C] |
| Interest expense | 104 | 526 | 77 | 5 | 3,978 | 4,690 |
| Taxation charge/(credit) (CCS basis) | 2,242 | 5,878 | 1,319 | (2) | (578) | 8,859 |
| CCS earnings | 8,628 | 3,855 | 6,139 | 478 | (3,273) | 15,827 |

[A] Includes $3,760 million of revenue from sources other than from contracts with customers, which mainly comprises the impact of fair value accounting of commodity derivatives.
[B] Impairment losses comprise Property, plant and equipment ($3,639 million) and Intangible assets ($143 million).
[C] See Note 9.

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

5 – SEGMENT INFORMATION continued

Reconciliation of CCS earnings to income for the period

| | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Income/(loss) attributable to Shell plc shareholders | 20,101 | (21,680) | 15,842 |
| Income attributable to non-controlling interest | 529 | 146 | 590 |
| Income/(loss) for the period | 20,630 | (21,534) | 16,432 |
| Current cost of supplies adjustment: | | | |
| Purchases | (3,772) | 2,359 | (784) |
| Taxation | 808 | (585) | 194 |
| Share of profit of joint ventures and associates | (184) | 59 | (15) |
| Current cost of supplies adjustment | (3,148) | 1,833 | (605) |
| Of which: | | | |
| Attributable to Shell plc shareholders | (3,029) | 1,759 | (572) |
| Attributable to non-controlling interest | (119) | 74 | (33) |
| CCS earnings | 17,482 | (19,701) | 15,827 |
| Of which: | | | |
| CCS earnings attributable to Shell plc shareholders | 17,072 | (19,921) | 15,270 |
| CCS earnings attributable to non-controlling interest | 410 | 220 | 557 |

Information by geographical area is as follows:

2021

| | Europe | Asia, Oceania, Africa | USA | Other Americas | $ million Total |
|---|---|---|---|---|---|
| Third-party revenue, by origin | 78,549 [A] | 87,070 | 73,647 | 22,238 | 261,504 |
| Intangible assets, property, plant and equipment, joint ventures and associates at December 31 | 38,881 [B] | 97,278 | 58,286 | 48,595 | 243,040 |

[A] Includes $21,846 million that originated from the UK.
[B] Includes $21,974 million located in the UK.

2020

| | Europe | Asia, Oceania, Africa | USA | Other Americas | $ million Total |
|---|---|---|---|---|---|
| Third-party revenue, by origin | 50,138 [A] | 65,139 | 50,856 | 14,410 | 180,543 |
| Intangible assets, property, plant and equipment, joint ventures and associates at December 31 | 38,785 [B] | 103,191 | 62,976 | 49,909 | 254,861 [C] |

[A] Includes $12,958 million that originated from the UK.
[B] Includes $23,302 million located in the UK.
[C] As from 2021, assets classified as held for sale are presented separately. Prior period comparatives have been revised to conform with current year presentation. (See Note 30)

2019

| | Europe | Asia, Oceania, Africa | USA | Other Americas | $ million Total |
|---|---|---|---|---|---|
| Third-party revenue, by origin | 98,455 [A] | 139,916 | 83,212 | 23,294 | 344,877 |
| Intangible assets, property, plant and equipment, joint ventures and associates at December 31 | 43,262 [B] | 119,684 | 65,966 | 54,347 | 283,259 [C] |

[A] Includes $41,094 million that originated from the UK.
[B] Includes $24,696 million located in the UK.
[C] As from 2021, assets classified as held for sale are presented separately. Prior period comparatives have been revised to conform with current year presentation.

Exhibit Q

## 6 – INTEREST AND OTHER INCOME

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Interest income | 511 | 679 | 899 |
| Dividend income (from investments in equity securities) | 91 | 22 | 23 |
| Net gains on sale and revaluation of non-current assets and businesses | 5,995 | 286 | 2,519 |
| Net foreign exchange gains/(losses) on financing activities | 118 | (391) | 5 |
| Other | 341 | 273 | 179 |
| Total | 7,056 | 869 | 3,625 |

In 2021, net gains on sale of non-current assets and businesses arose mainly in respect of gains on the sale of Integrated Gas assets in Australia and Norway, and Upstream assets in the USA and Nigeria.

In 2021 and 2020, "Other" income mainly related to amounts recognised in respect of sublease income from partners in joint operations.

In 2019, net gains on sale of non-current assets and businesses arose mainly in respect of gains on the sale of Integrated Gas assets in Australia, Upstream assets in the USA and Denmark, as well as Oil Products assets in Saudi Arabia and China.

## 7 – INTEREST EXPENSE

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Interest incurred and similar charges | 2,086 | 2,174 | 2,406 |
| Interest expense related to leases | 1,987 | 2,185 | 2,186 |
| Less: interest capitalised | (917) | (799) | (752) |
| Other net losses on fair value and cash flow hedges of debt | 1 | 32 | 132 |
| Accretion expense | 450 | 497 | 718 |
| Total | 3,607 | 4,089 | 4,690 |

The rate applied in determining the amount of interest capitalised in 2021 was 4.0% (2020: 4.5%; 2019: 4.5%).

## 8 – INTANGIBLE ASSETS

2021

| | | | | $ million |
|---|---|---|---|---|
| | Goodwill | LNG off-take and sales contracts | Other | Total |
| Cost | | | | |
| At January 1 [A] | 15,101 | 10,030 | 7,927 | 33,058 |
| Additions | 1,546 | — | 3,674 | 5,220 |
| Sales, retirements and other movements [A] | (464) | (197) | (1,978) | (2,639) |
| Currency translation differences | (66) | — | (197) | (263) |
| At December 31 [A] | 16,117 | 9,833 | 9,426 | 35,376 |
| Depreciation, depletion and amortisation, including impairments | | | | |
| At January 1 | 1,062 | 4,668 | 4,618 | 10,348 |
| Charge for the year | 167 | 796 | 368 | 1,331 |
| Sales, retirements and other movements | (23) | (197) | (670) | (890) |
| Currency translation differences | (9) | — | (97) | (106) |
| At December 31 | 1,197 | 5,267 | 4,219 | 10,683 |
| Carrying amount at December 31 [A] | 14,920 | 4,566 | 5,207 [B] | 24,693 |

[A] As from 2021, assets classified as held for sale are presented separately and upon reclassification included in "Sales, retirements and other movements". Prior period comparatives have been revised to conform with current year presentation. (See Note 30)
[B] Includes $2,747 million related to environmental certificates held for compliance purposes (see Note 31) and $456 million related to software.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

8 – INTANGIBLE ASSETS continued

2020

$ million

| | Goodwill | LNG off-take and sales contracts | Other | | Total |
|---|---|---|---|---|---|
| Cost | | | | | |
| At January 1 | 14,973 | 10,211 | 6,866 | | 32,050 |
| Additions | 247 | — | 1,581 | | 1,828 |
| Sales, retirements and other movements [A] | (176) | (181) | (714) | | (1,071) |
| Currency translation differences | 57 | — | 194 | | 251 |
| At December 31 [A] | 15,101 | 10,030 | 7,927 | | 33,058 |
| Depreciation, depletion and amortisation, including impairments | | | | | |
| At January 1 | 768 | 4,014 | 3,782 | | 8,564 |
| Charge for the year [B] | 276 | 835 | 851 | | 1,962 |
| Sales, retirements and other movements | — | (181) | (120) | | (301) |
| Currency translation differences | 18 | — | 105 | | 123 |
| At December 31 | 1,062 | 4,668 | 4,618 | | 10,348 |
| Carrying amount at December 31 [A] | 14,039 | 5,362 | 3,309 | [C] | 22,710 |

[A] As from 2021, assets classified as held for sale are presented separately and upon reclassification included in "Sales, retirements and other movements". Prior period comparatives have been revised to conform with current year presentation. (See Note 30)
[B] Includes $787 million related to impairments, of which $472 million in "Other" related to Integrated Gas. (See Note 9)
[C] Includes $1,013 million related to environmental certificates held for compliance purposes (see Note 31) and $487 million related to software.

Goodwill at December 31, 2021, related principally to the acquisition of BG Group plc in 2016, allocated to Integrated Gas ($4,780 million) and Upstream ($5,525 million) at the operating segment level, and to Pennzoil-Quaker State Company ($1,612 million), a lubricants business in the Oil Products segment based largely in North America.

Additions to goodwill in 2021, ($1,546 million) related to a number of business acquisitions that Shell undertook for a total consideration of $2,300 million. This includes provisional goodwill of $1,167 million owing to the limited period since the acquisition date. The final amount will be reassessed in 2022 following the purchase price adjustments.

9 – PROPERTY, PLANT AND EQUIPMENT

2021

$ million

| | Exploration and production | | Manufacturing, supply and distribution | Other | Total |
|---|---|---|---|---|---|
| | Exploration and evaluation | Production | | | |
| Cost | | | | | |
| At January 1 [A] | 14,484 | 298,882 | 107,876 | 32,402 | 453,644 |
| Additions | 1,216 | 8,942 | 7,917 | 3,644 | 21,719 |
| Sales, retirements and other movements [A] | (3,014) | (20,005) | (9,607) | (455) | (33,081) |
| Currency translation differences | (7) | (1,916) | (2,004) | (1,586) | (5,513) |
| At December 31 | 12,679 | 285,903 | 104,182 | 34,005 | 436,769 |
| Depreciation, depletion and amortisation, including impairments | | | | | |
| At January 1 [A] | 5,258 | 167,711 | 58,242 | 12,733 | 243,944 |
| Charge for the year | 1,311 | 15,800 | 7,112 | 1,770 | 25,993 |
| Sales, retirements and other movements [A] | (999) | (14,590) | (8,624) | (240) | (24,453) |
| Currency translation differences | 10 | (1,391) | (1,599) | (667) | (3,647) |
| At December 31 | 5,580 | 167,530 | 55,131 | 13,596 | 241,837 |
| Carrying amount at December 31 | 7,099 | 118,373 | 49,051 | 20,409 | 194,932 |

[A] As from 2021, assets classified as held for sale are presented separately and upon reclassification included in "Sales, retirements and other movements". Prior period comparatives have been revised to conform with current year presentation. (See Note 30)

Exhibit Q

2020

$ million

| | Exploration and production | | Manufacturing, supply and distribution | Other | Total |
|---|---|---|---|---|---|
| | Exploration and evaluation | Production | | | |
| Cost | | | | | |
| At January 1 [A] | 18,399 | 286,666 | 101,379 | 29,081 | 435,525 |
| Additions | 1,728 | 9,659 | 6,287 | 3,460 | 21,134 |
| Sales, retirements and other movements [A] | (5,735) | (1,075) | (2,072) | (1,109) | (9,991) |
| Currency translation differences | 92 | 3,632 | 2,282 | 970 | 6,976 |
| At December 31 | 14,484 | 298,882 | 107,876 | 32,402 | 453,644 |
| Depreciation, depletion and amortisation, including impairments | | | | | |
| At January 1 [A] | 4,010 | 136,300 | 46,621 | 11,629 | 198,560 |
| Charge for the year [B] | 3,336 | 34,209 | 11,680 | 1,693 | 50,918 |
| Sales, retirements and other movements [A] | (2,152) | (5,603) | (1,878) | (1,091) | (10,724) |
| Currency translation differences | 64 | 2,805 | 1,819 | 502 | 5,190 |
| At December 31 | 5,258 | 167,711 | 58,242 | 12,733 | 243,944 |
| Carrying amount at December 31 | 9,226 | 131,171 | 49,634 | 19,669 | 209,700 |

[A] As from 2021, assets classified as held for sale are presented separately and upon reclassification included in "Sales, retirements and other movements". Prior period comparatives have been revised to conform with current year presentation. (See Note 30)
[B] Includes $26,676 million relating to impairment losses (see table "Impairments" below).

The carrying amount of property, plant and equipment at December 31, 2021, included $37,006 million (2020: $31,611 million) of assets under construction. This amount excludes exploration and evaluation assets.

The carrying amount of exploration and production assets at December 31, 2021, included rights and concessions in respect of proved and unproved properties of $8,849 million (2020: $11,485 million). Exploration and evaluation assets principally comprise rights and concessions in respect of unproved properties and capitalised exploration drilling costs.

The carrying amount of assets at December 31, 2021, for which an alternative reserves base was applied in the calculation of the depreciation charge (see Note 2), was $1,634 million (2020: $1,707 million). If no alternative reserves base had been used, the pre-tax depreciation charge for the year ended December 31, 2021, would have been $1,184 million higher (2020: $1,012 million, 2019: $77 million).

Contractual commitments for the purchase and lease of property, plant and equipment at December 31, 2021, amounted to $5,984 million (2020: $5,699 million).

<span style="color:red">Right-of-use assets</span>
Within property, plant and equipment the following amounts relate to leases:

2021

$ million

| | Exploration and production | | Manufacturing, supply and distribution | Other | Total |
|---|---|---|---|---|---|
| | Exploration and evaluation | Production | | | |
| Cost | | | | | |
| At January 1 | 5 | 14,440 | 14,526 | 7,384 | 36,355 |
| Additions | — | 311 | 2,149 | 1,420 | 3,880 |
| Sales, retirements and other movements | — | (365) | (868) | (259) | (1,492) |
| Currency translation differences | — | (64) | (59) | (514) | (637) |
| At December 31 | 5 | 14,322 | 15,748 | 8,031 | 38,106 |
| Depreciation, depletion and amortisation, including impairments | | | | | |
| At January 1 | — | 6,997 | 5,013 | 1,793 | 13,803 |
| Charge for the year | — | 1,373 | 2,060 | 783 | 4,216 |
| Sales, retirements and other movements | — | (400) | (1,093) | (157) | (1,650) |
| Currency translation differences | — | (35) | (34) | (146) | (215) |
| At December 31 | — | 7,935 | 5,946 | 2,273 | 16,154 |
| Carrying amount at December 31 | 5 | 6,387 | 9,802 | 5,758 | 21,952 |

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

9 – PROPERTY, PLANT AND EQUIPMENT continued

2020

$ million

| | Exploration and production | | Manufacturing, supply and distribution | Other | Total |
|---|---|---|---|---|---|
| | Exploration and evaluation | Production | | | |
| **Cost** | | | | | |
| At January 1 [A] | 5 | 15,213 | 13,478 | 5,759 | 34,455 |
| Additions | — | 502 | 1,570 | 1,580 | 3,652 |
| Sales, retirements and other movements [A] | — | (1,370) | (579) | (75) | (2,024) |
| Currency translation differences | — | 95 | 57 | 120 | 272 |
| At December 31 | 5 | 14,440 | 14,526 | 7,384 | 36,355 |
| **Depreciation, depletion and amortisation, including impairments** | | | | | |
| At January 1 [A] | — | 5,761 | 2,907 | 1,164 | 9,832 |
| Charge for the year | — | 1,898 | 2,675 | 760 | 5,333 |
| Sales, retirements and other movements [A] | — | (712) | (598) | (158) | (1,468) |
| Currency translation differences | — | 50 | 29 | 27 | 106 |
| At December 31 [A] | — | 6,997 | 5,013 | 1,793 | 13,803 |
| Carrying amount at December 31 [A] | 5 | 7,443 | 9,513 | 5,591 | 22,552 |

[A] As from 2021, assets classified as held for sale are presented separately and upon reclassification included in "Sales, retirements and other movements". Prior period comparatives have been revised to conform with current year presentation. (See Note 30)

Impairments

$ million

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Impairment losses** | | | |
| Exploration and production | 1,533 | 20,155 | 2,983 |
| Manufacturing, supply and distribution | 2,340 | 6,490 | 654 |
| Other | 21 | 31 | 2 |
| Total [A] | 3,894 | 26,676 | 3,639 |
| **Impairment reversals** | | | |
| Exploration and production | 213 | — | — |
| Manufacturing, supply and distribution | — | — | 190 |
| Other | 1 | — | — |
| Total [A] | 214 | — | 190 |

[A] See Note 5.

Impairment losses in 2021 were predominantly triggered by reclassifications of asset held for sale, portfolio developments or end of field life. They are mainly related to two refineries in the USA within Oil Products impaired on classification as held for sale ($1,357 million), exploration and evaluation assets both within Integrated Gas ($600 million) and Upstream ($373 million) and one site in the USA within Chemicals impaired on classification as held for sale ($180 million). Only one asset (in Upstream) was impaired because of an asset-specific trigger for which the recoverable amount was determined through value in use and an impairment of $97 million was recognised.

Impairment losses in 2020 were mainly triggered by Shell's revision of the mid- and long-term commodity price and refining margin outlook reflecting the expected effects of the macroeconomic environment and the COVID-19 pandemic as well as energy market demand and supply fundamentals. The impairment losses for exploration and production assets related primarily to Integrated Gas ($11,539 million), including the Queensland Curtis LNG and Prelude floating LNG operations, and Upstream ($8,629 million), including assets in the Gulf of Mexico, unconventional assets in North America, offshore assets in Brazil and Europe and a project in Nigeria (OPL 245). The impairment losses for manufacturing, supply and distribution related primarily to Oil Products ($6,493 million), including assets in Europe and the shutdown of the Convent oil products manufacturing facility in the USA.

Impairment losses in 2019 were mainly triggered by the revision to Shell's long-term oil and gas price outlook and change to future capital expenditure plans. The impairment losses related primarily to Upstream shale and deep-water properties in North and South America, in Integrated Gas to properties in Australia and in Oil Products to the refining portfolio.

For impairment testing purposes, the respective carrying amounts of property, plant and equipment and intangible assets were compared with their value in use. Cash flow projections used in the determination of value in use were made using management's forecasts of commodity prices, market supply and demand, potential costs associated with operational GHG emissions, product margins including forecast refining margins and expected production volumes (see Note 2).

230

Exhibit Q

In 2021, Shell changed its estimation technique to determine the value in use for impairment testing purposes. A key element is the update of the discount rate, which is now based on a nominal post-tax weighted average cost of capital (WACC) of 5% for Power activities and a nominal post-tax WACC of 6.5% for all other businesses. Prior to 2021 the rate used by Shell was the same for all activities and was based on a pre-tax discount rate reflecting the marginal cost of debt, current market assessments of the time value of money and residual risk (2021: 6%; 2020: 6%; 2019: 6%). The change in discount rate to a nominal post-tax WACC has been reflected in a commensurate manner in the risk adjustments to post-tax cash flow projections. The impact of the change in impairment valuation technique is not material to the impairment assessments performed in 2021 and it is not expected to result in a materially different outcome in future periods. The pre-tax discount rate used for goodwill testing ranged between 7-11%.

Oil and gas price assumptions applied for impairment testing are reviewed and, where necessary, adjusted on a periodic basis. Reviews include comparison with available market data and forecasts that reflect developments in demand such as global economic growth, technology efficiency, policy measures and, in supply, consideration of investment and resource potential, cost of development of new supply, and behaviour of major resource holders. The near-term commodity price assumptions applied in impairment testing in 2021 were as follows:

Commodity price assumptions [A]

|  | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| Brent crude oil ($/b) | 60 | 60 | 60 | 63 |
| Henry Hub natural gas ($/MMBtu) | 2.75 | 2.75 | 2.75 | 3.00 |

[A] Money of the day.

For periods after 2025, the real-term price assumptions applied were $60 per barrel (/b) (2020: $60/b) for Brent crude oil and $3.00 per million British thermal units (/MMBtu) (2020: $3.00/MMBtu) for Henry Hub natural gas.

Until 2019, management's estimate of longer-term refining margins in Oil Products was based on the reversion to mean methodology, unless a fundamental shift in markets had been identified, over the life of the oil products manufacturing facilities. Under this approach, it was assumed that refining margins will revert to historical averages over time. As from 2020, a different price methodology has been applied, based on management's understanding and interpretation of demand and supply fundamentals in the near term and taking into account various other factors such as industry rationalisation and energy transition in the long term. This resulted in a downward revision of average long-term refining margins by around 30% from previous assumptions applied.

The main sensitivities in relation to impairment are the commodity price assumptions in Integrated Gas and Upstream and refining margins in Oil Products. A change of -10% or +10% in the commodity price assumptions over the entire cash flow projection period would ceteris paribus result in some $12-15 billion impairment or some $6-9 billion impairment reversal, respectively, in Integrated Gas and Upstream. A change of -10% or +10% in long-term refining margins over the entire cash flow projection period would ceteris paribus result in some $1-3 billion impairment or up to $2 billion impairment reversal, respectively, in Oil Products.

Capitalised exploration drilling costs

|  |  |  | $ million |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| At January 1 | 3,654 | 5,668 | 6,629 |
| Additions pending determination of proved reserves | 1,024 | 1,016 | 2,036 |
| Amounts charged to expense | (639) | (815) | (1,218) |
| Reclassifications to productive wells on determination of proved reserves | (577) | (1,385) | (1,655) |
| Other movements | (447) [A] | (830) | (124) |
| At December 31 | 3,015 | 3,654 | 5,668 |

[A] Includes $290 million disposal and $116 million impairment of capitalised exploration drilling costs.

|  | Projects | | Wells | |
|---|---|---|---|---|
|  | Number | $ million | Number | $ million |
| Between 1 and 5 years | 17 | 1,189 | 33 | 821 |
| Between 6 and 10 years | 14 | 961 | 38 | 1,110 |
| Between 11 and 15 years | 5 | 184 | 21 | 366 |
| Between 16 and 20 years | 1 | 28 | 4 | 65 |
| Total | 37 | 2,362 | 96 | 2,362 |

Exploration drilling costs capitalised for periods greater than one year at December 31, 2021, analysed according to the most recent year of activity, are presented in the table above. These comprise $727 million relating to eight projects where drilling activities were under way or firmly planned for the future, and $1,635 million relating to 29 projects awaiting development concepts.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

## 10 – JOINT VENTURES AND ASSOCIATES

Shell share of comprehensive income of joint ventures and associates

| | | | | | | | | | $ million |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2021 | | | 2020 | | | 2019 |
| | Joint ventures | Associates | Total [A] | Joint ventures | Associates | Total | Joint ventures | Associates | Total |
| Income for the period | 1,955 | 2,142 | 4,097 [A] | 629 | 1,154 | 1,783 | 1,121 | 2,483 | 3,604 |
| Other comprehensive (loss)/income for the period | (106) | — | (106) | 76 | 1 | 77 | (82) | 8 | (74) |
| Comprehensive income for the period | 1,849 | 2,142 | 3,991 | 705 | 1,155 | 1,860 | 1,039 | 2,491 | 3,530 |

Carrying amount of interests in joint ventures and associates

| | | | | | | $ million |
|---|---|---|---|---|---|---|
| | | Dec 31, 2021 | | | Dec 31, 2020 | |
| | Joint ventures | Associates | Total | Joint ventures | Associates | Total |
| Net assets | 15,767 | 7,648 | 23,415 | 14,406 | 8,045 | 22,451 |

Transactions with joint ventures and associates

| | | | $ million |
|---|---|---|---|
| | 2021 [A] | 2020 | 2019 |
| Sales and charges to joint ventures and associates | 8,509 | 5,426 | 7,748 |
| Purchases and charges from joint ventures and associates | 13,584 | 8,262 | 11,581 |

[A] Includes 26% of sales and 16% purchases of transactions with one joint venture operating in the oil trading business.

These transactions principally comprise sales and purchases of goods and services in the ordinary course of business. Related balances outstanding at December 31, 2021, and 2020, are presented in Notes 12 and 16.

Other arrangements in respect of joint ventures and associates

| | | $ million |
|---|---|---|
| | Dec 31, 2021 | Dec 31, 2020 |
| Commitments to make purchases from joint ventures and associates [A] | 1,437 | 1,674 |
| Commitments to provide debt or equity funding to joint ventures and associates | 533 | 900 |

[A] Commitments to make purchases from joint ventures and associates mainly relate to contracts associated with LNG processing fees and transportation capacity. Shell has other purchase obligations related to joint ventures and associates that are not fixed or determinable and are principally intended to be resold in a short period of time through sales agreements with third parties. These include long-term LNG and natural gas purchase commitments and commitments to purchase refined products or crude oil at market prices.

## 11 – INVESTMENTS IN SECURITIES

Investments in securities

| | | $ million |
|---|---|---|
| | Dec 31, 2021 | Dec 31, 2020 |
| Equity securities: | 1,710 | 1,396 |
| Equity securities at fair value through other comprehensive income | 1,710 | 1,396 |
| Debt securities: | 2,087 | 1,826 |
| Debt securities at amortised cost | 4 | 12 |
| Debt securities at fair value through other comprehensive income | 1,306 | 1,165 |
| Debt securities at fair value through profit or loss | 777 | 649 |
| Total | 3,797 | 3,222 |
| At fair value | | |
| Measured by reference to prices in active markets for identical assets | 1,909 | 1,637 |
| Measured by reference to other observable inputs | 177 | 68 |
| Measured using predominantly unobservable inputs | 1,707 | 1,505 |
| Total | 3,793 | 3,210 |
| At cost | 4 | 12 |
| Total | 3,797 | 3,222 |

As at December 31, 2021, investments included equity securities comprising interests in which Shell has no significant influence, debt securities principally comprising a portfolio required to be held by the Company's internal insurance entities as security for their activities, and assets held in escrow in relation to the Group's UK pension arrangements.

Exhibit Q

Investments in securities measured using predominantly unobservable inputs [A]

| | $ million | |
| --- | --- | --- |
| | 2021 | 2020 |
| At January 1 | 1,505 | 1,253 |
| Gains recognised in other comprehensive income | 44 | 45 |
| Purchases | 299 | 329 |
| Sales | (17) | (60) |
| Other movements | (124) | (62) |
| At December 31 | 1,707 | 1,505 |

[A] Based on expected dividend flows, adjusted for country and other risks as appropriate and discounted to their present value.

## 12 – TRADE AND OTHER RECEIVABLES

| | Dec 31, 2021 | | Dec 31, 2020 | $ million |
| --- | --- | --- | --- | --- |
| | Current | Non-current | Current | Non-current |
| Trade receivables | 34,717 | — | 21,781 | — |
| Lease receivables | 228 | 1,285 | 186 | 1,380 |
| Other receivables [A] | 8,240 | 3,761 | 7,251 | 4,109 |
| Amounts due from joint ventures and associates | 1,048 | 499 | 726 | 829 |
| Prepayments and deferred charges | 8,975 | 1,520 | 3,681 | 1,323 |
| Total | 53,208 | 7,065 | 33,625 | 7,641 |

[A] "Other receivables" at December 31, 2021, included current income tax receivables of $550 million and non-current income tax receivables of $366 million (2020: current income tax receivables $412 million, non-current income tax receivables $882 million).

The fair value of financial assets included above approximates the carrying amount and was determined from predominantly unobservable inputs.

Other receivables at December 31, 2021, include receivables from certain governments in their capacity as joint arrangement partners of $1,225 million (2020: $1,357 million), after provisions for impairments, that are overdue in part or in full. Recoverability and timing thereof are subject to uncertainty, however, the ultimate risk of default on the carrying amount is considered to be low.

Provisions for impairments deducted from trade and other receivables amounted to $1,497 million at December 31, 2021 (2020: $968 million).

Allowance for expected credit losses - trade receivables
Shell uses a provision matrix to calculate expected credit losses (ECLs) for trade receivables. The provision matrix is initially based on Shell's historical observed default rates. Shell calculates the ECL to adjust the historical credit loss experienced with forward-looking information. The ECL at December 31, 2021, is $155 million (2020: $112 million), which represents 0.45-0.51% (2020: 0.27-0.51%) of all trade receivables.

A loss allowance provision of $876 million (2020: $349 million) was established, in addition to all other impairments to trade receivables as at December 31, 2021, that are outside of the provision matrix calculations.

Lease receivables
Lease contracts where Shell is the lessor are classified as finance leases or operating leases. Receivables for lease contracts classified as finance leases are as follows:

| | Dec 31, 2021 | Dec 31, 2020 | $ million |
| --- | --- | --- | --- |
| Less than one year | 278 | 262 | |
| Between 1 and 5 years | 852 | 859 | |
| 5 years and later | 715 | 852 | |
| Total undiscounted lease payments receivable | 1,845 | 1,973 | |
| Unearned finance income | 339 | 407 | |
| Net investment in leases | 1,506 | 1,566 | |

In addition, at December 31, 2021, Shell is entitled to contractual payments under operating leases of $431 million (2020: $248 million).

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

### 13 – INVENTORIES

|  | $ million |  |
| --- | --- | --- |
|  | Dec 31, 2021 | Dec 31, 2020 |
| Oil, gas and chemicals [A] | 22,145 | 16,710 |
| Environmental certificates [A] | 1,727 | 1,300 |
| Materials [A] | 1,386 | 1,447 |
| Total | 25,258 | 19,457 |

[A] As revised, following the reclassification of environmental certificates from "Oil, gas and chemicals" and "Materials". (See Note 31)

Inventories at December 31, 2021, include write-downs to net realisable value of $592 million (2020: $239 million).

### 14 – CASH AND CASH EQUIVALENTS

|  | $ million |  |
| --- | --- | --- |
|  | Dec 31, 2021 | Dec 31, 2020 |
| Cash | 5,849 | 4,831 |
| Short-term bank deposits | 4,416 | 2,220 |
| Money market funds, reverse repos and other cash equivalents | 26,705 | 24,779 |
| Total | 36,970 | 31,830 |

In 2021, cash continued to be invested with an emphasis on capital preservation. Information about credit risk is presented in Note 20. Included in cash and cash equivalents at December 31, 2021, were amounts totalling $113 million (2020: $65 million) subject to currency controls or other legal restrictions.

### 15 – DEBT AND LEASE ARRANGEMENTS

Debt

|  | Dec 31, 2021 | | | Dec 31, 2020 | | $ million |
| --- | --- | --- | --- | --- | --- | --- |
|  | Debt (excluding lease liabilities) | Lease liabilities | Total | Debt (excluding lease liabilities) | Lease liabilities | Total |
| Current debt: | 4,080 | 4,138 | 8,218 | 12,756 | 4,143 | 16,899 |
| Short-term debt | 515 | — | 515 | 7,535 | — | 7,535 |
| Long-term debt due within 1 year | 3,565 | 4,138 | 7,703 | 5,221 | 4,143 | 9,364 |
| Non-current debt | 57,499 | 23,369 | 80,868 | 66,838 | 24,277 | 91,115 |
| Total | 61,579 | 27,507 | 89,086 | 79,594 | 28,420 | 108,014 |

Net debt

|  | Current debt | | Non-current debt | | Derivative financial instruments | Cash and cash equivalents (see Note 14) | $ million (Asset)/liability Net debt |
| --- | --- | --- | --- | --- | --- | --- | --- |
| At January 1, 2021 | 16,899 | | 91,115 | | (798) | (31,830) | 75,386 |
| Cash flow | (17,887) | | (1,842) | [B] | (1,165) | (5,679) | (26,573) |
| Lease additions | 899 | | 2,889 | | | | 3,788 |
| Other movements | 8,655 | [A] | (9,034) | [A] | 688 | — | 309 |
| Currency translation differences and foreign exchange (gains)/losses | (348) | | (2,260) | | 1,715 | 539 | (354) |
| At December 31, 2021 | 8,218 | | 80,868 | | 440 | (36,970) | 52,556 |
| At January 1, 2020 [A] | 15,058 | | 81,294 | | 724 | (18,055) | 79,021 |
| Cash flow | (7,536) | | 13,121 | | 1,157 | (13,603) | (6,861) |
| Lease additions | 870 | | 2,268 | | | | 3,138 |
| Other movements | 8,386 | [A] | (8,288) | [A] | (524) | — | (426) |
| Currency translation differences and foreign exchange losses/(gains) | 121 | | 2,720 | | (2,155) | (172) | 514 |
| At December 31, 2020 | 16,899 | | 91,115 | | (798) | (31,830) | 75,386 |

[A] As from 2021, liabilities associated with assets classified as held for sale are presented separately. Prior period comparatives have been revised to conform with current year presentation. (See Note 30)
[B] Includes $3,500 million of early repayment of non-current debt.

Exhibit Q

**Capital management**

In 2020, management announced its target to reduce net debt to $65 billion. This target was achieved in 2021. Management's current priorities for applying Shell's cash are, in order:
• Base cash capex and ordinary progressive dividend: $19-22 billion cash capex per annum to sustain our strategy, with approximately 4% dividend per share growth annually, subject to Board approval;
• AA credit metrics through the cycle: a net debt level to target AA credit metrics;
• Additional shareholder distributions: total shareholder distributions of 20–30% of CFFO comprise dividends and share buybacks; and
• Additional cash capex and continued balance sheet strengthening: measured, disciplined cash capex spend to execute our strategy at pace and further reduce net debt to achieve firm long-term AA credit metrics.

Gearing

| | | $ million, except where indicated |
|---|---|---|
| | Dec 31, 2021 | Dec 31, 2020 |
| Net debt | 52,556 | 75,386 |
| Total equity | 175,326 | 158,537 |
| Total capital | 227,882 | 233,923 |
| Gearing | 23.1% | 32.2% |

Gearing is a measure of Shell's capital structure and is defined as net debt (total debt less cash and cash equivalents) as a percentage of total capital (net debt plus total equity).

Shell has access to international debt capital markets via two commercial paper (CP) programmes, a Euro medium-term note (EMTN) programme and a US universal shelf (US shelf) registration. Issuances under the CP programmes are supported by a committed credit facility and cash.

Borrowing facilities and amounts undrawn

| | | | | $ million |
|---|---|---|---|---|
| | | Facility | | Amount undrawn |
| | Dec 31, 2021 | Dec 31, 2020 | Dec 31, 2021 | Dec 31, 2020 |
| CP programmes | 20,000 | 20,000 | 20,000 | 13,254 |
| EMTN programme | unlimited | unlimited | N/A | N/A |
| US shelf registration | unlimited | — | N/A | N/A |
| Committed credit facilities | 9,920 | 22,651 | 9,920 | 22,651 |

Under the CP programmes, Shell can issue debt of up to $10 billion with maturities not exceeding 270 days and $10 billion with maturities not exceeding 397 days.

The EMTN programme is updated each year, most recently in August 2021. In 2021, no debt was issued under this programme (2020: $6,734 million).

The US shelf registration provides Shell with the flexibility to issue debt securities, ordinary shares, preferred shares and warrants. The registration is updated every three years and was last updated in March 2021. During 2021, debt totalling $1,500 million (2020: $6,250 million) was issued under the US shelf registration.

On December 13, 2019, Shell refinanced its revolving credit facilities, which are linked to the new Secured Overnight Financing Rate ("SOFR"). The committed credit facilities are available at pre-agreed margins, with $1.92 billion expiring in 2022 (2020: expiring in 2021), $320 million expiring in 2025 and $7.68 billion expiring in 2026 (2020: expiring in 2025). The terms and availability are not conditional on Shell's financial ratios nor its financial credit ratings. The interest and fees paid on these facilities are linked to Shell's progress towards reaching its short-term Net Carbon Footprint intensity target.

The following tables compare contractual cash flows for debt excluding lease liabilities at December 31 with the carrying amount in the Consolidated Balance Sheet. Contractual amounts reflect the effects of changes in foreign exchange rates; differences from carrying amounts reflect the effects of discounting, premiums and, where fair value hedge accounting is applied, fair value adjustments. Interest is estimated assuming interest rates applicable to variable-rate debt remain constant and there is no change in aggregate principal amounts of debt other than repayment at scheduled maturity, as reflected in the table.

2021

| | | | | | | | | | $ million |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Contractual payments | | | |
| | Less than 1 year | Between 1 and 2 years | Between 2 and 3 years | Between 3 and 4 years | Between 4 and 5 years | 5 years and later | Total | Difference from carrying amount | Carrying amount |
| Bonds | 3,423 | 3,376 | 4,362 | 6,310 | 3,882 | 38,327 | 59,680 | 578 | 60,258 |
| Bank and other borrowings | 646 | 452 | 36 | 9 | 143 | 35 | 1,321 | — | 1,321 |
| Total (excluding interest) | 4,069 | 3,828 | 4,398 | 6,319 | 4,025 | 38,362 | 61,001 | 578 | 61,579 |
| Interest | 1,637 | 1,587 | 1,524 | 1,416 | 1,268 | 15,642 | 23,074 | | |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

15 – DEBT AND LEASE ARRANGEMENTS continued

2020

$ million

| | Less than 1 year | Between 1 and 2 years | Between 2 and 3 years | Between 3 and 4 years | Between 4 and 5 years | 5 years and later | Total | Difference from carrying amount | Carrying amount |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Contractual payments | | | |
| Commercial paper | 6,746 | — | — | — | — | — | 6,746 | (15) | 6,731 |
| Bonds | 5,080 | 4,720 | 5,408 | 4,633 | 8,043 | 41,853 | 69,737 | 1,308 | 71,045 |
| Bank and other borrowings | 944 | 162 | 33 | 215 | 47 | 417 | 1,818 | — | 1,818 |
| Total (excluding interest) | 12,770 | 4,882 | 5,441 | 4,848 | 8,090 | 42,270 | 78,301 | 1,293 | 79,594 |
| Interest | 1,834 | 1,707 | 1,630 | 1,527 | 1,412 | 15,985 | 24,095 | | |

Interest rate swaps have been entered into against certain fixed rate debt affecting the effective interest rate on these balances (see Note 20). The fair value of debt excluding lease liabilities at December 31, 2021, was $67,066 million (2020: $88,294 million), mainly determined from the prices quoted for those securities.

Lease arrangements

Lease liabilities are secured on the leased assets. Shell has lease contracts in Integrated Gas and Upstream, principally for floating production storage and offloading units, subsea equipment, power generation, for drilling and ancillary equipment, service vessels, LNG vessels and land and buildings; in Oil Products, principally for tankers, storage capacity and retail sites; in Chemicals, principally for plant pipeline and machinery and in Corporate, principally for land and buildings.

Lease expenses not included in the measurement of lease liability

$ million

| | 2021 | 2020 |
|---|---|---|
| Expense relating to short-term leases | 644 | 1,156 |
| Expense relating to variable lease payments not included in the lease liabilities | 1,172 | 1,209 |

The total cash outflow in respect of leases representing repayment of principal and payment of interest in 2021 was $6,777 million (2020: $6,891 million), recognised in the Consolidated Statement of Cash Flows from financing activities.

The future lease payments under lease contracts and the carrying amounts at December 31, by payment date are as follows:

2021

$ million

| | Contractual lease payments | | Interest | Lease liabilities |
|---|---|---|---|---|
| Less than 1 year | 5,805 | | 1,667 | 4,138 |
| Between 1 and 5 years | 15,889 | | 4,972 | 10,917 |
| 5 years and later | 18,309 | | 5,857 | 12,452 |
| Total | 40,003 | [A] | 12,496 | 27,507 |

[A] Future cash outflows in respect of leases may differ from lease liabilities recognised due to future decisions that may be taken by Shell in respect of the use of leased assets. These decisions may result in variable lease payments being made. In addition, Shell may reconsider whether it will exercise extension options or termination options, where future reconsideration is not reflected in the lease liabilities. There is no exposure to these potential additional payments in excess of the recognised lease liabilities until these decisions have been taken by Shell.

2020

$ million

| | Contractual lease payments | Interest | Lease liabilities |
|---|---|---|---|
| Less than 1 year | 6,059 | 1,916 | 4,143 |
| Between 1 and 5 years | 16,681 | 5,617 | 11,064 |
| 5 years and later | 19,999 | 6,786 | 13,213 |
| Total | 42,739 | 14,319 | 28,420 |

**16 – TRADE AND OTHER PAYABLES**

|  | Dec 31, 2021 | | Dec 31, 2020 | $ million |
|---|---|---|---|---|
|  | Current | Non-current | Current | Non-current |
| Trade payables | 34,136 | — | 22,664 | — |
| Other payables [A] | 9,617 | 1,675 | 6,941 | 1,843 |
| Sales taxes, excise duties and similar levies | 3,522 | — | 2,895 | — |
| Amounts due to joint ventures and associates | 4,793 | 36 | 3,281 | 39 |
| Accruals and deferred income | 11,105 | 364 | 8,791 | 422 |
| Total | 63,173 | 2,075 | 44,572 | 2,304 |

[A] Includes obligations under environmental compliance schemes of $4,016 million as at December 31, 2021 (2020: $2,053 million). (See Note 31)

The fair value of financial liabilities included above approximates the carrying amount and was determined from predominantly unobservable inputs.

Other payables include amounts due to joint arrangement partners and in respect of other project-related items.

Information about offsetting, collateral and liquidity risk is presented in Note 20.

**17 – TAXATION**

Taxation charge

|  | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Current tax: |  |  |  |
| Charge in respect of current period | 7,254 | 3,272 | 7,597 |
| Adjustments in respect of prior periods | (719) | (56) | (1) |
| Total | 6,535 | 3,216 | 7,596 |
| Deferred tax: |  |  |  |
| Relating to the origination and reversal of temporary differences, tax losses and credits | 2,971 | (9,063) | 1,377 |
| Relating to changes in tax rates and legislation | 10 | (16) | (67) |
| Adjustments in respect of prior periods | (317) | 430 | 147 |
| Total | 2,664 | (8,649) | 1,457 |
| Total taxation charge/(credit) | 9,199 | (5,433) | 9,053 |

Adjustments in respect of prior periods relate to events in the current period and reflect the effects of changes in rules, facts or other factors compared with those used in establishing the current tax position or deferred tax balance in prior periods. In 2021, this included a one-off release of a tax provision in Nigeria of $628 million.

Reconciliation of applicable tax charge at statutory tax rates to taxation charge

|  | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Income/(loss) before taxation | 29,829 | (26,967) | 25,485 |
| Less: share of profit of joint ventures and associates | (4,097) | (1,783) | (3,604) |
| Income/(loss) before taxation and share of profit of joint ventures and associates | 25,732 | (28,750) | 21,881 |
| Applicable tax charge/(credit) at standard statutory tax rates | 10,097 | (8,330) | 7,214 |
| Adjustments in respect of prior periods | (1,036) | 374 | 146 |
| Tax effects of: |  |  |  |
| Expenses not deductible for tax purposes | 893 | 1,239 | 1,493 |
| Incentives for investment and development | (467) | (557) | (757) |
| (Recognition)/derecognition of deferred tax assets | (328) | (34) | (235) |
| Disposals | (113) | 1,458 | 846 |
| Income not subject to tax at standard statutory rates | 90 | 6 | 159 |
| Exchange rate differences | 53 | 339 | (34) |
| Changes in tax rates and legislation | 10 | (16) | (67) |
| Other reconciling items | — | 88 | 288 |
| Taxation charge/(credit) | 9,199 | (5,433) | 9,053 |

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**17 – TAXATION continued**

The weighted average of statutory tax rates was 39% in 2021 (2020: 29%; 2019: 33%). Compared with 2020, the increase in the rate reflects a higher proportion of earnings in the Upstream and Integrated Gas segments subject to relatively higher tax rates. In addition, the weighted average of statutory tax rates in 2020 was significantly impacted by asset impairments.

2021 – Deferred tax

$ million

| Deferred tax asset | Decommissioning and other provisions | Property, plant and equipment | Tax losses and credits carried forward | Retirement benefits | Other | Total |
|---|---|---|---|---|---|---|
| At January 1, 2021 | 6,567 | 5,232 | 12,496 | 3,774 | 5,084 | 33,153 |
| (Charge)/credit to income | 63 | (163) | (1,669) | (537) | (395) | (2,701) |
| Currency translation differences | (64) | (75) | (252) | (72) | (46) | (509) |
| Other comprehensive income | (3) | — | 64 | (435) | (74) | (448) |
| Other | (1) | (1) | (121) | 14 | (24) | (133) |
| At December 31, 2021 | 6,562 | 4,993 | 10,518 | 2,744 | 4,545 | 29,362 |
| **Deferred tax liability** | | | | | | |
| At January 1, 2021 | | (23,801) | | (673) | (2,831) | (27,305) |
| Credit/(charge) to income | | 566 | | 319 | (848) | 37 |
| Currency translation differences | | 71 | | 114 | 48 | 233 |
| Other comprehensive income | | (18) | | (2,481) | 4 | (2,495) |
| Other | | 38 | | (15) | 24 | 47 |
| At December 31, 2021 | | (23,144) | | (2,736) | (3,603) | (29,483) |
| **Net deferred tax liability at December 31, 2021** | | | | | | (121) |
| Deferred tax asset/liability as presented in the balance sheet at December 31, 2021 | | | | | | |
| Deferred tax asset | | | | | | 12,426 |
| Deferred tax liability | | | | | | (12,547) |

2020 – Deferred tax

$ million

| Deferred tax asset | Decommissioning and other provisions | Property, plant and equipment | Tax losses and credits carried forward | Retirement benefits | Other | Total |
|---|---|---|---|---|---|---|
| At January 1, 2020 | 5,380 | 3,014 | 11,629 | 3,660 | 4,361 | 28,044 |
| Credit/(charge) to income | 1,057 | 1,975 | 685 | (250) | 605 | 4,072 |
| Currency translation differences | 140 | 163 | 286 | 122 | 58 | 769 |
| Other comprehensive income | — | — | 9 | 242 | (12) | 239 |
| Other | (10) | 80 | (113) | — | 72 | 29 |
| At December 31, 2020 | 6,567 | 5,232 | 12,496 | 3,774 | 5,084 | 33,153 |
| **Deferred tax liability** | | | | | | |
| At January 1, 2020 | | (28,040) | | (1,093) | (2,909) | (32,042) |
| Credit to income | | 4,355 | | 4 | 218 | 4,577 |
| Currency translation differences | | (143) | | (2) | (39) | (184) |
| Other comprehensive income | | (1) | | 511 | — | 510 |
| Other | | 28 | | (93) | (101) | (166) |
| At December 31, 2020 | | (23,801) | | (673) | (2,831) | (27,305) |
| **Net deferred tax asset at December 31, 2020** | | | | | | 5,848 |
| Deferred tax asset/liability as presented in the balance sheet at December 31, 2020 | | | | | | |
| Deferred tax asset | | | | | | 16,311 |
| Deferred tax liability | | | | | | (10,463) |

238

Exhibit Q

The presentation in the balance sheet takes into consideration the offsetting of deferred tax assets and deferred tax liabilities within the same tax jurisdiction, where this is permitted. The overall deferred tax position in a particular tax jurisdiction determines if a deferred tax balance related to that jurisdiction is presented within deferred tax assets or deferred tax liabilities.

Other movements in deferred tax assets and liabilities principally relate to acquisitions, sales of non-current assets and businesses, and amounts recognised in other comprehensive income.

The deferred tax category "Other" primarily includes deferred tax positions in respect of leases, financial assets and liabilities, inventories, intangible assets and investments in subsidiaries, joint ventures and associates.

The deferred tax category "Plant, property and equipment" includes deferred tax positions in respect of tangible fixed assets and investments in partnerships in the USA which are considered pass-through entities by its parent for tax purposes.

Deferred tax assets of $12,426 million (2020: $16,311 million) are recognised only to the extent it is considered probable that those assets will be recoverable. This involves an assessment of when those assets are likely to be recovered, and a judgement as to whether or not there will be sufficient taxable profits available to offset the assets. It is considered probable based on business forecasts that such taxable profits will be available. For Oil Products, additional judgement is required; in some European jurisdictions the assessment of forecasted taxable profits resulting in deferred tax asset recognition of $854 million (2020: $778 million) extends for an additional 10-years beyond Shell's regular 10 years planning horizon. In those situations, additional risking has been applied to the forecast of taxable profits. For Integrated Gas and Upstream, deferred tax assets recognised are expected to be recovered within the period of production of each asset. For deferred tax assets of $711 million as at December 31, 2021, mainly related to Brazil, Malaysia and Australia, this period extends beyond 10 years.

The amount of deferred tax assets which are dependent on future taxable profits not arising from the reversal of existing deferred tax liabilities, and which relate to tax jurisdictions where Shell has suffered a loss in the current or preceding year, was $10,195 million at December 31, 2021 (2020: $12,759 million). The decrease compared with 2020 is primarily attributable to the utilisation of deferred tax assets in 2021 and a higher number of entities which have generated profit in both the current and preceding year.

Unrecognised taxable temporary differences associated with undistributed retained earnings of investments in subsidiaries, joint ventures and associates amounted to $5,680 million at December 31, 2021 (2020: $6,705 million). These retained earnings are subject to withholding tax upon distribution.

Unrecognised deductible temporary differences, unused tax losses and credits carried forward amounted to $37,410 million at December 31, 2021 (2020: $42,836 million), including amounts of $31,349 million (2020: $31,873 million) that are subject to time limits for utilisation of five years or later, or are not time limited.

Furthermore, there are unrecognised losses for Petroleum Resource Rent Tax (PRRT) in Australia which due to the annual augmentation increased to $42,511 million as at the end of the most recent PRRT fiscal year, June 30, 2021 (June 30, 2020: $39,402 million).

The alignment of the Company's tax residence with its country of incorporation in the UK resulted in recognition in 2021 of a taxable deemed disposal gain fully offset by taxable losses in the Netherlands. (See Note 1)

## 18 – RETIREMENT BENEFITS

Retirement benefits are provided in most of the countries where Shell has operational activities. Shell offers these benefits through funded and unfunded defined benefit plans and defined contribution plans. The most significant pensions plans are in the Netherlands, UK and USA.

Other post-employment benefits (OPEB) comprised of retirement health care and life insurance are also provided in certain countries. The most significant OPEB plan is in the USA.

Financial position

|  | | $ million |
|---|---|---|
|  | Dec 31, 2021 | Dec 31, 2020 |
| Obligations | (107,336) | (115,792) |
| Plan assets | 104,495 | 102,678 |
| Asset ceilings | (13) | (17) |
| Deficit | (2,854) | (13,131) |
| Retirement benefits in the Consolidated Balance Sheet: | | |
| Non-current assets | 8,471 | 2,474 |
| Non-current liabilities: | (11,325) | (15,605) |
| Non-current liabilities - Pensions | (6,458) | (10,237) |
| Non-current liabilities - OPEB | (4,867) | (5,368) |
| Total | (2,854) | (13,131) |

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**18 – RETIREMENT BENEFITS continued**

Retirement benefit expense

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Defined benefit plans: | | | |
| Current service cost, net of plan participants' contributions | 1,385 | 1,359 | 1,127 |
| Interest expense on defined pension benefit obligations | 1,223 | 1,683 | 2,192 |
| Interest income on plan assets | (1,160) | (1,657) | (2,253) |
| Interest expense on OPEB obligations | 128 | 145 | 172 |
| Current OPEB service cost | 60 | 72 | 61 |
| Other [A] | (343) | (174) | 26 |
| Total | 1,293 | **1,428** | 1,325 |
| Defined contribution plans | 403 | 423 | 428 |
| Total retirement benefit expense | 1,696 | 1,851 | 1,753 |

[A] Mainly related to plan amendments and curtailments on pensions and OPEB plans.

Retirement benefit expense is presented principally within production and manufacturing expenses and selling, distribution and administrative expenses in the Consolidated Statement of Income. Interest income on plan assets is calculated using the same rate as that applied to the related defined benefit obligations for each plan to determine interest expense.

Remeasurements

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Actuarial gains/(losses) on obligations: | | | |
| Due to changes in financial assumptions on pensions [A] | 1,915 | (9,500) | (10,913) |
| Due to changes in financial assumptions on OPEB [A] | 59 | (650) | (798) |
| Due to experience adjustments on pensions [B] | 136 | 616 | 96 |
| Due to experience adjustments on OPEB [B] | 322 | 188 | 136 |
| Due to changes in demographic assumptions on pensions [C] | (320) | 1,310 | (4) |
| Due to changes in demographic assumptions on OPEB [C] | (111) | 65 | (71) |
| Total | 2,001 | (7,971) | (11,554) |
| Return on plan assets in excess of interest income | 8,185 | 4,509 | 8,460 |
| Other movements | 5 | 7 | (12) |
| Total remeasurements | 10,191 | (3,455) | (3,106) |

[A] Mainly relates to changes in the discount rate and inflation assumptions.
[B] Experience adjustments arise from differences between the actuarial assumptions made in respect of the year and actual outcomes.
[C] Mainly relates to updates in mortality assumptions.

Exhibit Q

Defined benefit plan obligations

2021

$ million, except where indicated

| | | | Pension benefits | | Other post-employment benefits | |
| --- | --- | --- | --- | --- | --- | --- |
| | The Netherlands | UK | USA | Rest of the world [A] | OPEB [B] | Total |
| At January 1 | 37,268 | 32,269 | 20,367 | 20,520 | 5,368 | 115,792 |
| Current service cost | 377 | 323 | 339 | 339 | 60 | 1,438 |
| Interest expense | 155 | 376 | 357 | 335 | 128 | 1,351 |
| Actuarial (gains)/losses | 1,477 | (1,418) | (695) | (1,095) | (270) | (2,001) |
| Benefit payments | (979) | (1,306) | (1,220) | (870) | (200) | (4,575) |
| Other movements | (27) | 3 | (145) | (167) | (187) | (523) |
| Currency translation differences | (2,931) | (334) | — | (849) | (32) | (4,146) |
| At December 31 [C] | 35,340 | 29,913 | 19,003 | 18,213 | 4,867 | 107,336 |
| Comprising: | | | | | | |
| Funded pension plans | 35,340 | 29,440 | 17,874 | 15,341 | | 97,995 |
| Weighted average duration | 19 years | 19 years | 12 years | 17 years | | 18 years |
| Unfunded pension plans | | 473 | 1,129 | 2,872 | | 4,474 |
| Weighted average duration | | 18 years | 9 years | 14 years | | 13 years |
| Unfunded OPEB plans | | | | | 4,867 | 4,867 |
| Weighted average duration | | | | | 14 years | 14 years |

[A] Includes pension plans in Germany ($4,988 million) and Canada ($4,740 million) as the largest pension plans in the rest of the world.
[B] Mainly related to post-retirement medical benefits in the USA.
[C] As from 2021, liabilities associated with assets classified as held for sale are presented separately. (See Note 30)

2020

$ million, except where indicated

| | | | Pension benefits | | Other post-employment benefits | |
| --- | --- | --- | --- | --- | --- | --- |
| | The Netherlands | UK | USA | Rest of the world [A] | OPEB [B] | Total |
| At January 1 | 32,696 | 28,397 | 19,090 | 18,337 | 5,025 | 103,545 |
| Current service cost | 352 | 300 | 398 | 313 | 72 | 1,435 |
| Interest expense | 295 | 491 | 489 | 408 | 145 | 1,828 |
| Actuarial losses | 1,720 | 2,897 | 1,611 | 1,346 | 397 | 7,971 |
| Benefit payments | (925) | (1,119) | (1,024) | (808) | (183) | (4,059) |
| Other movements | (21) | (162) | (197) | (65) | 1 | (444) |
| Currency translation differences | 3,151 | 1,465 | — | 989 | (89) | 5,516 |
| At December 31 | 37,268 | 32,269 | 20,367 | 20,520 | 5,368 | 115,792 |
| Comprising: | | | | | | |
| Funded pension plans | 37,268 | 31,839 | 18,892 | 17,339 | | 105,338 |
| Weighted average duration | 19 years | 19 years | 13 years | 18 years | | 18 years |
| Unfunded pension plans | | 430 | 1,475 | 3,181 | | 5,086 |
| Weighted average duration | | 19 years | 8 years | 15 years | | 13 years |
| Unfunded OPEB plans | | | | | 5,368 | 5,368 |
| Weighted average duration | | | | | 15 years | 15 years |

[A] Includes pension plans in Germany ($5,432 million) and Canada ($5,066 million) as the largest pension plans in rest of the world.
[B] Mainly related to post-retirement medical benefits in the USA.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

18 – RETIREMENT BENEFITS continued
Defined benefit plan assets

2021

$ million, except where indicated

| | | | Pension benefits | | |
|---|---|---|---|---|---|
| | The Netherlands | UK | USA | Rest of the world [A] | Total |
| At January 1 | 37,673 | 32,193 | 17,046 | 15,766 | 102,678 |
| Return on plan assets in excess of interest income | 3,199 | 2,575 | 1,377 | 1,034 | 8,185 |
| Interest income | 158 | 376 | 308 | 318 | 1,160 |
| Employer contributions | 170 | 266 | 559 | (58) [B] | 937 |
| Plan participants' contributions | 13 | 19 | — | 7 | 39 |
| Benefit payments | (979) | (1,306) | (1,220) | (821) | (4,326) |
| Other movements | (6) | (13) | (15) | (13) | (47) |
| Currency translation differences | (3,132) | (390) | — | (609) | (4,131) |
| At December 31 | 37,096 | 33,720 | 18,055 | 15,624 | 104,495 |

[A] Includes pension plans in Germany ($3,282 million) and Canada ($4,325 million) as the largest pension plans in the rest of the world.
[B] Includes the netted amount of $294 million received from the captive structure in relation to the pension plans reinsured in the rest of the world.

2020

$ million, except where indicated

| | | | Pension benefits | | |
|---|---|---|---|---|---|
| | The Netherlands | UK | USA | Rest of the world [A] | Total |
| At January 1 | 33,863 | 30,260 | 16,042 | 14,661 | 94,826 |
| Return on plan assets in excess of interest income | 1,001 | 1,302 | 1,545 | 661 | 4,509 |
| Interest income | 307 | 523 | 404 | 423 | 1,657 |
| Employer contributions | 218 | 73 | 129 | 194 [B] | 614 |
| Plan participants' contributions | 15 | 21 | — | 6 | 42 |
| Benefit payments | (925) | (1,119) | (1,024) | (775) | (3,843) |
| Other movements | (5) | (173) | (50) | (53) | (281) |
| Currency translation differences | 3,199 | 1,306 | — | 649 | 5,154 |
| At December 31 | 37,673 | 32,193 | 17,046 | 15,766 | 102,678 |

[A] Includes pension plans in Germany ($3,346 million) and Canada ($4,025 million) as the largest pension plans in the rest of the world.
[B] Includes the netted amount of $41 million received from the captive structure in relation to the pension plans reinsured in rest of the world.

Type of pension assets

| | 2021 | 2020 |
|---|---|---|
| Quoted in active markets: | | |
| Equities | 22% | 25% |
| Debt securities | 53% | 52% |
| Real estate | 1% | 0% |
| Other: | | |
| Equities | 10% | 8% |
| Debt securities | 4% | 5% |
| Real estate | 6% | 6% |
| Investment funds | 3% | 3% |
| Cash | 1% | 1% |

Employer contributions to defined benefit pension plans are based on actuarial valuations in accordance with local regulations and are estimated to be $900 million in 2022.

Exhibit Q

**Characteristics of significant defined benefit and defined contribution plans and regulatory framework**
**The Netherlands**
The principal defined benefit pension plan in the Netherlands is a funded career-averaged pension arrangement with retired employees drawing benefits as an annuity, with a surplus of $1,756 million reported as at December 31, 2021, (2020: $405 million surplus). Whilst the plan was closed to employees hired or retired after July 1, 2013, it is currently remains open for ongoing accrual for existing active members. 26% (2020: 31%) of the overall defined benefit liability in the Netherlands relates to active members. From July 1, 2013, onwards new employees in the Netherlands are entitled to membership of a defined contribution pension plan.

In line with Dutch regulations, the defined benefit pension plan has a joint Trustee Board with trustee representatives nominated by the company, the Central Staff Council and retired members. The defined benefit pension plan also has an Accountability Council comprised of members nominated by the company, the Central Staff Council and retired members. Furthermore, there is a Supervisory Committee which includes external experts from the pension industry to oversee management, compliance and operations of the fund. The defined contribution pension plan has a one-tier Trustee Board with an independent chairperson, and trustee representatives nominated by the company and the Central Staff Council (currently no retired members in the fund to act as trustee) as well as two executive board members. The defined contribution fund also has an Accountability Council comprised of members nominated by the company and the Central Staff Council.

The Dutch government is currently drafting a new regulatory framework for pensions in the Netherlands. The development of new regulations by the government was postponed in 2021 to January 2023 with subsequent implementation by January 2027. It is expected that these regulatory changes will have an impact on both the defined benefit pension plan and the defined contribution pension plan. The proposed changes will have to be submitted for consent with the Central Staff Council.

**UK**
The three largest defined benefit pension plans for employees in the UK are funded final salary pension arrangements with retired employees mainly drawing benefits as an annuity with the option to take a portion as a lump sum. The three plans are separate and independent plans and cannot be netted against each other. In total, the plans reported a surplus of $3,807 million as at December 31, 2021 (2020: deficit of $76 million), which is after netting of unfunded plans of $473 million which are reported as non-current liabilities on the balance sheet. All three plans were closed to new employees hired or rehired, however, two plans currently remain open for ongoing accrual for existing active members. 20% (2020: 23%) of the overall defined liability in the UK relates to active members. From March 1, 2013 onwards new employees in the UK are entitled to membership of a defined contribution pension plan.

In line with UK regulations, the principal defined benefit pension plan is governed by a corporate trustee whose board is comprised of four trustee directors nominated by the company including the chair and four member-nominated trustee directors. The defined contribution pension plan is governed by a corporate trustee whose board is comprised of three company-nominated directors including the chair and two member-nominated trustee directors. The trustees are responsible for administering the plans in line with the Trust Deed and Regulations, including setting the investment strategy for the pension plans' assets and paying member benefits, and are required to act in the best interests of the members of the pension plans.

**USA**
The principal defined benefit pension plan in the USA is a funded final average pay pension plan with a surplus of $182 million reported as at December 31, 2021 (2020: $1,846 million deficit). After retirement, all retirees can choose to draw their benefits as an annuity, whereas others also have the choice to take their benefit in a lump sum. There is also an unfunded defined benefit pension plan with a deficit of $1,129 million (2020: $1,475 million deficit). The benefits under this plan are taken primarily in a lump sum. In addition, the company provides a defined contribution benefit plan. The funded defined benefit, unfunded defined benefit and defined contribution pension plans are subject to the provisions of the Employee Retirement Income Security Act (ERISA). 24% (2020: 25%) of the overall defined liability of the funded defined benefit plan in the USA relates to active members.

Both the funded defined benefit pension plan and the defined contribution pension plan are governed by trustees who are appointed by the Plan Sponsor and are named fiduciaries with respect to the plans. The trustees are generally responsible for investment-related matters, appointing the Plan Administrator, maintaining general oversight and deciding appeals of participants.

**USA OPEB**
The company also sponsors "other post-retirement employee benefits" (OPEB) mainly in the USA. The OPEB plans in the USA provide medical, dental, and vision benefits as well as life insurance benefits to eligible retired employees. The plans are unfunded, and the company and retirees share the costs with a deficit of $4,067 million reported as at December 31, 2021 (2020: $4,497 million deficit). The plan that provides post-retirement medical benefits in the USA is closed to employees hired or rehired on or after January 1, 2017. Certain life insurance benefits are paid by the company.

**Significant funding requirements:**
- Additional contributions to the Dutch defined benefit pension plan would be required if the 12-month rolling average local funding percentage falls below 105% for six months or more. At the most recent (2021) funding valuation the local funding percentage was above this level;
- There are no net minimum statutory funding requirements for the UK plans. A professional qualified independent actuary, appointed by the trustee board, undertakes a local funding valuation typically every three years. The most recent completed funding valuation for the principal defined benefit plan was undertaken as at December 31, 2020 and revealed a funding ratio of 103% and therefore no sponsor contributions (except for salary sacrifice contributions) were payable under the schedule of contributions.
- Under the Pension Protection Act, US pension plans are subject to minimum required contribution levels based on the funding position. No contributions are required based on the most recent funding valuation.

**Associated risks to which retirement benefits are exposed**
There are inherent risks associated with defined benefit pension and OPEB plans. These risks are related to various assumptions made on valuation of the liabilities and the cash funding requirement of the underlying plans. Volatility in capital markets or government policies, and the resulting consequences for investment performance, interest and inflation rates, as well as changes in assumptions for mortality, retirement age or pensionable remuneration at retirement, could result in significant changes to the funding level of future liabilities, and in case of a shortfall, there could be a requirement to make substantial cash contributions (depending on the applicable local regulations).

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**18 – RETIREMENT BENEFITS continued**

These inherent risks are managed by a pension forum, chaired by the Chief Financial Officer, which oversees Shell's pension strategy, policy and operations. The forum is supported by a risk committee in reviewing the results of the assurance process with respect to the pension risk.

**Investment strategies**

Long-term investment strategies of plans are generally determined by the relevant pension plan trustees using a structured asset/liability modelling approach to define the asset mix that best meets the objectives of optimising returns within agreed risk levels while maintaining adequate funding levels.

**Principal and actuarial assumptions**

The principal assumptions applied in determining the present value of defined benefit obligations and their bases were as follows:
• rates of increase in pensionable remuneration, pensions in payment and health-care costs: historical experience and management's long-term expectation;
• discount rates: prevailing long-term AA corporate bond yields, chosen to match the currency and duration of the relevant obligation; and
• mortality rates: published standard mortality tables for the individual countries concerned adjusted for Shell experience where statistically significant.

The weighted averages for those assumptions and related sensitivity information at December 31 are presented below. Sensitivity information indicates by how much the defined benefit obligations would increase or decrease if a given assumption were to increase or decrease with no change in other assumptions. The sensitivity analyses may not be representative of an actual change in the defined benefit obligation as it is unlikely that changes in assumptions would occur in isolation from one another. The weighted averages are at nominal terms and based on market expectations at December 31, 2021.

$ million, except where indicated

| | Assumptions used at nominal rates | | Effect of using alternative assumptions | | | |
| | | | Increase/(decrease) in defined benefit obligations | | | |
| | Dec 31, 2021 | Dec 31, 2020 | Range of assumptions | Dec 31, 2021 | | Dec 31, 2020 | |
|---|---|---|---|---|---|---|---|
| Rate of increase in pensionable remuneration [A] | 3.4 % | 3.9% | -1% to +1% | (1,519) | 1,672 | (1,780) | 1,948 |
| of which The Netherlands | 2.8 % | 3.5% | | | | | |
| of which UK | 3.6 % | 3.6% | | | | | |
| of which USA | 4.1 % | 4.9% | | | | | |
| Rate of increase in pensions in payment | 2.0 % | 1.6% | -1% to +1% | (9,908) | 12,171 | (10,937) | 13,523 |
| of which The Netherlands | 2.2 % | 1.5% | | | | | |
| of which UK | 3.0 % | 2.7% | | | | | |
| of which USA | — % | —% | | | | | |
| Discount rate for pension plans | 2.0 % | 1.5% | -1% to +1% | 18,954 | (14,599) | 21,463 | (16,382) |
| of which The Netherlands | 1.2 % | 0.7% | | | | | |
| of which UK | 1.9 % | 1.5% | | | | | |
| of which USA | 2.9 % | 2.6% | | | | | |
| Inflation rate for defined benefit obligation [B] | 2.1 % | 1.7% | -1% to +1% | (10,691) | 13,325 | (11,514) | 14,414 |
| of which The Netherlands | 2.2 % | 1.5% | | | | | |
| of which UK | 3.2 % | 2.8% | | | | | |
| Expected age at death for persons aged 60: | | | | | | | |
| Men | 87 years | 87 years | -1 year to +1 year | (1,946) | 1,937 | (2,022) | 2,112 |
| of which The Netherlands | 88 years | 88 years | | | | | |
| of which UK | 88 years | 88 years | | | | | |
| of which USA | 85 years | 85 years | | | | | |
| Women | 89 years | 88 years | -1 year to +1 year | (1,863) | 1,972 | (1,985) | 2,070 |
| of which The Netherlands | 89 years | 89 years | | | | | |
| of which UK | 90 years | 90 years | | | | | |
| of which USA | 86 years | 86 years | | | | | |
| Rate of increase in health-care costs [C] | 6.2 % | 6.0% | -1% to +1% | (513) | 630 | (605) | 751 |
| Discount rate for health-care plans [C] | 2.9 % | 2.6% | -1% to +1% | 678 | (539) | 791 | (624) |

[A] Based on active members.
[B] Excluding US funds in the weighted average inflation rate, because of the insignificant impact on the defined benefit obligation.
[C] Mainly related to post-retirement medical benefits in the USA.

Exhibit Q

## 19 – DECOMMISSIONING AND OTHER PROVISIONS

$ million

| | Decommissioning and restoration | | Onerous contracts | Legal | Environmental | Redundancy | Other | Total |
|---|---|---|---|---|---|---|---|---|
| **At January 1, 2021** | | | | | | | | |
| Current [A] | 900 | | 532 | 521 | 273 | 673 | 723 | 3,622 |
| Non-current [A] | 22,081 | | 1,207 | 1,229 | 952 | 265 | 1,382 | 27,116 |
| | 22,981 | | 1,739 | 1,750 | 1,225 | 938 | 2,105 | 30,738 |
| Additions | 1,040 | [B] | 229 | 197 | 153 | 991 | 752 | 3,362 |
| Amounts charged against provisions | (662) | | (264) | (340) | (154) | (733) | (292) | (2,445) |
| Accretion expense | 405 | | 14 | 11 | 9 | 1 | 10 | 450 |
| Disposals and liabilities classified as held for sale [A] | (819) | | — | (5) | (17) | (1) | (27) | (869) |
| Remeasurements and other movements [C] | (609) | | (36) | (196) | (11) | (512) | (339) | (1,703) |
| Currency translation differences | (252) | | — | (6) | (26) | (39) | (68) | (391) |
| | (897) | | (57) | (339) | (46) | (293) | 36 | (1,596) |
| **At December 31, 2021** | | | | | | | | |
| Current | 871 | | 653 | 270 | 332 | 410 | 802 | 3,338 |
| Non-current | 21,213 | | 1,029 | 1,141 | 847 | 235 | 1,339 | 25,804 |
| | 22,084 | | 1,682 | 1,411 | 1,179 | 645 | 2,141 | 29,142 |
| **At January 1, 2020** | | | | | | | | |
| Current | 755 | | 79 | 626 | 263 | 295 | 793 | 2,811 |
| Non-current | 18,264 | | 17 | 1,185 | 934 | 220 | 1,179 | 21,799 |
| | 19,019 | | 96 | 1,811 | 1,197 | 515 | 1,972 | 24,610 |
| Additions | 1,697 | [B] | 1,722 | 502 | 199 | 986 | 664 | 5,770 |
| Amounts charged against provisions | (433) | | (71) | (522) | (138) | (375) | (317) | (1,856) |
| Accretion expense | 448 | | 3 | 17 | 21 | 1 | 7 | 497 |
| Disposals and liabilities classified as held for sale [A] | (348) | | (11) | — | (7) | — | (9) | (375) |
| Remeasurements and other movements [C] | 2,090 | | — | (59) | (73) | (241) | (265) | 1,452 |
| Currency translation differences | 508 | | — | 1 | 26 | 52 | 53 | 640 |
| | 3,962 | | 1,643 | (61) | 28 | 423 | 133 | 6,128 |
| **At December 31, 2020** | | | | | | | | |
| Current [A] | 900 | | 532 | 521 | 273 | 673 | 723 | 3,622 |
| Non-current [A] | 22,081 | | 1,207 | 1,229 | 952 | 265 | 1,382 | 27,116 |
| | 22,981 | | 1,739 | 1,750 | 1,225 | 938 | 2,105 | 30,738 |

[A] As from 2021, liabilities associated with assets classified as held for sale are presented separately. Prior period comparatives have been revised to conform with current year presentation. (See Note 30)
[B] Includes $823 million (2020: $798 million) additions for the recognition of decommissioning and restoration provisions in Integrated Gas and $217 million (2020: $899 million) for the recognition of decommissioning and restoration provisions for manufacturing facilities in Oil Products and Chemicals.
[C] Includes the reversal of $1,095 million (2020: $528 million) of unused provisions.

The amount and timing of settlement in respect of these provisions are uncertain and dependent on various factors that are not always within management's control. Reviews of estimated future decommissioning and restoration costs and the discount rate applied are carried out regularly. The discount rate applied at December 31, 2021, was 2% (2020: 1.75%). An increase of 0.5% or a decrease of 0.5% in the discount rate could result in a decrease of $1.5 billion (2020: $1.7 billion) or an increase of $1.7 billion (2020: $2.2 billion) of decommissioning and restoration provisions, respectively. Such increase or decrease will be reflected in the carrying amount of the related asset. Where applicable that carrying amount is tested for impairment.

In 2021, there was a decrease of around $700 million (2020: increase of $3,999 million) in the decommissioning and restoration provision as a result of the change in the discount rate, partly offset by an increase in the provision resulting from changes in cost estimates of around $140 million (2020: decrease of $1,909 million), reported within remeasurements and other movements.

Of the decommissioning and restoration provision at December 31, 2021, an estimated $3,863 million is expected to be utilised within one to five years, $3,584 million within six to 10 years, and the remainder in later periods.

Legal provisions at December 31, 2021, include legal proceedings in Integrated Gas at $669 million, Upstream $94 million, Oil Products $255 million and Chemicals $393 million.

Other provisions at December 31, 2021, include amounts recognised in respect of employee benefits.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

### 20 – FINANCIAL INSTRUMENTS

Financial instruments in the Consolidated Balance Sheet include investments in securities (see Note 11), cash and cash equivalents (see Note 14), debt (see Note 15) and derivative contracts.

#### Risks

In the normal course of business, financial instruments of various kinds are used for the purposes of managing exposure to interest rate, foreign exchange and commodity price movements.

Treasury standards are applicable to all subsidiaries and each subsidiary is required to adopt a treasury policy consistent with these standards. These policies cover: financing structure; interest rate and foreign exchange risk management; insurance; counterparty risk management; and use of derivative contracts. Wherever possible, treasury operations are carried out through specialist regional organisations without removing from each subsidiary the responsibility to formulate and implement appropriate treasury policies.

Apart from forward foreign exchange contracts to meet known commitments, the use of derivative contracts by most subsidiaries is not permitted by their treasury policy.

Other than in exceptional cases, the use of external derivative contracts is confined to specialist trading and central treasury organisations that have appropriate skills, experience, supervision, control and reporting systems.

Shell's operations expose it to market, credit and liquidity risk, as described below.

#### Market risk

Market risk is the possibility that changes in interest rates, foreign exchange rates or the prices of crude oil, natural gas, LNG, refined products, chemical feedstocks, power and carbon-emission rights will adversely affect the value of assets, liabilities or expected future cash flows.

#### Interest rate risk

Most debt is raised from central borrowing programmes. Shell's policy continues to be to have debt principally denominated in dollars and to maintain a largely floating interest rate exposure profile; however, Shell has issued a significant amount of fixed rate debt in recent years, taking advantage of historically low interest rates available in debt markets. As a result, the majority of the debt portfolio at December 31, 2021, is at fixed rates and this reduces Shell's adverse exposure to rising floating dollar interest rates (see Note 2).

The financing of most subsidiaries is structured on a floating-rate basis, and any further interest rate risk management is only applied under exceptional circumstances.

On the basis of the floating-rate net cash position at December 31, 2021, (both issued and hedged), and assuming other factors (principally foreign exchange rates and commodity prices) remained constant and that no further interest rate management action was taken, an increase in interest rates of 1% would have increased 2021 income before taxation by $174 million (2020: $62 million increase, based on the floating rate net cash position at December 31, 2020).

The carrying amounts and maturities of debt and borrowing facilities are presented in Note 15. Interest expense is presented in Note 7.

#### Foreign exchange risk

Many of the markets in which Shell operates are priced, directly or indirectly, in dollars. As a result, the functional currency of most Integrated Gas and Upstream entities and those with significant cross-border business is the dollar. For Oil Products and Chemicals entities, the functional currency is typically the local currency. Consequently, Shell is exposed to varying levels of foreign exchange risk when an entity enters into transactions that are not denominated in its functional currency, when foreign currency monetary assets and liabilities are translated at the balance sheet date and as a result of holding investments in operations that are not dollar-functional. Each entity is required to adopt treasury policies that are designed to measure and manage its foreign exchange exposures by reference to its functional currency.

Foreign exchange gains and losses arise in the normal course of business from the recognition of receivables and payables and other monetary items in currencies other than an entity's functional currency. Foreign exchange risk may also arise in connection with capital expenditure. For major projects, an assessment is made at the final investment decision stage of whether to hedge any resulting exposure.

Assuming other factors (principally interest rates and commodity prices) remained constant and that no further foreign exchange risk management action were taken, a 10% appreciation against the dollar at December 31 of the main currencies to which Shell is exposed would have the following effects:

|  | | | | $ million |
|---|---|---|---|---|
|  | Increase/(decrease) in income before taxation | | Increase in net assets | |
|  | 2021 | 2020 | 2021 | 2020 |
| 10% appreciation against the dollar of: | | | | |
| Euro | (123) | (263) | 601 | 451 |
| Malaysian ringgit | 119 | 255 | 399 | 270 |
| Australian dollar | (3) | 179 | 591 | 598 |
| Sterling | (180) | (166) | 738 | 328 |
| Canadian dollar | (44) | 1 | 1,439 | 1,299 |

246

The above sensitivity information was calculated by reference to carrying amounts of assets and liabilities at December 31 only. The effect on income before taxation arises in connection with monetary balances denominated in currencies other than an entity's functional currency; the effect on net assets arises principally from the translation of assets and liabilities of entities that are not dollar-functional.

Foreign exchange gains and losses included in income are presented in Note 6.

**Commodity price risk**

Certain subsidiaries have a mandate to trade crude oil, natural gas, LNG, refined products, chemical feedstocks, power and environmental certificates, and to use commodity derivative contracts (forwards, futures, swaps and options) as a means of managing price and timing risks arising from this trading activity. In effecting these transactions, the entities concerned operate within procedures and policies designed to ensure that risks, including those relating to the default of counterparties, are managed within authorised limits.

Value-at-risk (VAR) techniques based on variance/covariance or Monte Carlo simulation models are used to make a statistical assessment of the market risk arising from possible future changes in market values over a 1-day holding period and within a 95% confidence level. The calculation of potential changes in fair value takes into account positions, the history of price movements and the correlation of these price movements. Models are regularly reviewed against actual fair value movements to ensure integrity is maintained. The VAR average and year-end positions in respect of commodities traded in active markets, which are presented in the table below, are calculated on a diversified basis in order to reflect the effect of offsetting risk within combined portfolios.

Value-at-risk (pre-tax)

|  | | | | $ million |
|---|---|---|---|---|
|  | 2021 | | 2020 | |
|  | Average | Year-end | Average | Year-end |
| Global oil | 26 | 30 | 32 | 24 |
| North America gas and power | 12 | 15 | 11 | 14 |
| Europe gas and power | 11 | 13 | 8 | 11 |
| Environmental certificates | 8 | 10 | 6 | 7 |

Furthermore, commodity derivative hedge contracts are used to partially mitigate price volatility on future LNG sales and purchases.

As the underlying physical commodity LNG is accounted for an accrual basis (see Note 2) and commodity derivatives are accounted for on a fair-value basis, this creates an accounting mismatch over periods. The fair value accounting of commodity derivatives can result in gains or losses in the income statement, which for adjusted earnings are part of identified items.

These derivative contracts are based on a mix of European and North American gas price indices, global crude price indices and Asian LNG price indices. Shell has seen high volatility in these gas price markets in 2021. On that basis a sensitivity analysis has been performed for a 50% price increase or decrease of this basket of derivative contracts at year-end 2021, which would result in a gain or loss of $0.3 billion (pre-tax) in the income statement.

**Credit risk**

Policies are in place to ensure that sales of products are made to customers with appropriate creditworthiness. These policies include credit analysis and monitoring of trading partners against counterparty credit limits. Credit information is regularly shared between business and finance functions, with dedicated teams in place to quickly identify and respond to cases of credit deterioration. Mitigation measures are defined and implemented for higher-risk business partners and customers, and include shortened payment terms, collateral or other security posting and vigorous collections. In addition, policies limit the amount of credit exposure to any individual financial institution. There are no material concentrations of credit risk, with individual customers or geographically.

Surplus cash is invested in a range of short-dated, secure and liquid instruments including short-term bank deposits, money market funds, reverse repos and similar instruments. The portfolio of these investments is diversified to avoid concentrating risk in any one instrument, country or counterparty. Management monitors the investments regularly and adjusts the investment portfolio in light of new market information where necessary to ensure credit risk is effectively diversified.

In commodity trading, counterparty credit risk is managed within a framework of credit limits with utilisation being regularly reviewed. Credit risk exposure is monitored and the acceptable level of credit exposure is determined by a credit committee. Credit checks are performed by a department independent of traders, and are undertaken before contractual commitment. Where appropriate, netting arrangements, credit insurance, prepayments and collateral are used to manage specific risks.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

20 – FINANCIAL INSTRUMENTS continued

Shell routinely enters into offsetting, master netting and similar arrangements with trading and other counterparties to manage credit risk. Where there is a legally enforceable right of offset under such arrangements and Shell has the intention to settle on a net basis or realise the asset and settle the liability simultaneously, the net asset or liability is recognised in the Consolidated Balance Sheet, otherwise assets and liabilities are presented gross. These amounts, as presented net and gross within trade and other receivables, trade and other payables and derivative financial instruments in the Consolidated Balance Sheet at December 31, were as follows:

2021

$ million

| | | | Amounts offset | | Amounts not offset | | |
| | Gross amounts before offset | Amounts offset | Net amounts as presented | Cash collateral received/pledged | Other offsetting instruments | Net amounts |
|---|---|---|---|---|---|---|
| Assets: | | | | | | |
| Within trade receivables | 20,561 | 11,937 | 8,624 | 164 | 283 | 8,177 |
| Within derivative financial instruments | 48,813 | 39,819 | 8,994 | 902 | 3,098 | 4,994 |
| Liabilities: | | | | | | |
| Within trade payables | 19,347 | 11,935 | 7,412 | 61 | 283 | 7,068 |
| Within derivative financial instruments | 54,534 | 40,350 | 14,184 | 697 | 3,109 | 10,378 |

2020

$ million

| | | | Amounts offset | | Amounts not offset | | |
| | Gross amounts before offset | Amounts offset | Net amounts as presented | Cash collateral received/pledged | Other offsetting instruments | Net amounts |
|---|---|---|---|---|---|---|
| Assets: | | | | | | |
| Within trade receivables | 10,658 | 6,470 | 4,188 | 14 | 79 | 4,095 |
| Within derivative financial instruments | 12,798 | 6,125 | 6,673 | 1,573 | 1,750 | 3,350 |
| Liabilities: | | | | | | |
| Within trade payables | 10,580 | 6,467 | 4,113 | 1 | 79 | 4,033 |
| Within derivative financial instruments | 10,502 | 5,893 | 4,609 | 797 | 1,761 | 2,051 |

Amounts not offset principally relate to contracts where the intention to settle on a net basis was not clearly established at December 31.

The carrying amount of financial assets pledged as collateral for liabilities or contingent liabilities at December 31, 2021, presented within trade and other receivables, was $6,968 million (2020: $1,909 million). The carrying amount of collateral held at December 31, 2021, presented within trade and other payables, was $1,909 million (2020: $1,675 million). Collateral mainly relates to initial margins held with commodity exchanges and over-the-counter counterparty variation margins. Some derivative contracts are fully cash collateralised, thereby eliminating both counterparty risk and the Group's own non-performance risk.

Liquidity risk

Liquidity risk is the risk that suitable sources of funding for Shell's business activities may not be available. Management believes that it has access to sufficient debt funding sources (capital markets) and to undrawn committed borrowing facilities to meet foreseeable requirements. Information about borrowing facilities is presented in Note 15.

Interbank Offered Rate (IBOR) reform

USD London Interbank Offered Rate (LIBOR) is the most significant IBOR for Shell. USD LIBOR will transition immediately after June 30, 2023. Significant IBOR exposures, disaggregated by tenure at December 31, 2021, are as follows:

$ million
December 31, 2021

| | Non-derivative financial assets - carrying value | Non-derivative financial liabilities - carrying value | Derivatives - Nominal amount |
|---|---|---|---|
| USD LIBOR (1 month) | 62 | — | |
| USD LIBOR (3 months) | 1,155 | 1,200 | 5,828 |
| USD LIBOR (6 months) | 75 | | |
| **Cross-currency interest rate swaps:** | | | |
| EUR Fixed to USD LIBOR (3 months) | | | 8,311 |
| GBP Fixed to USD LIBOR (3 months) | | | 1,227 |
| CHF Fixed to USD LIBOR (3 months) | | | 1,359 |
| MYR LIBOR (3 months) to USD LIBOR (3 months) | | | 360 |
| Total | 1,292 | 1,200 | 17,085 |

**Derivative contracts and hedges**

Derivative contracts are used principally as hedging instruments, however, because hedge accounting is not always applied, movements in the carrying amounts of derivative contracts that are recognised in income are not always matched in the same period by the recognition of the income effects of the related hedged items.

**Carrying amounts, maturities and hedges**

The carrying amounts of derivative contracts at December 31, designated and not designated as hedging instruments for hedge accounting purposes, were as follows:

2021

$ million

| | Assets | | | Liabilities | | | |
| | Designated | Not designated | Total | Designated | Not designated | Total | Net |
|---|---|---|---|---|---|---|---|
| Interest rate swaps | 237 | — | 237 | 24 | 14 | 38 | 199 |
| Forward foreign exchange contracts | — | 456 | 456 | — | 280 | 280 | 176 |
| Currency swaps and options | 277 | 22 | 299 | 860 | 33 | 893 | (594) |
| Commodity derivatives | 12 | 10,979 | 10,991 | — | 15,732 | 15,732 | (4,741) |
| Other contracts | — | 201 | 201 | — | 255 | 255 | (54) |
| Total | 526 | 11,658 | 12,184 | 884 | 16,314 | 17,198 | (5,014) |

2020

$ million

| | Assets | | | Liabilities | | | |
| | Designated | Not designated | Total | Designated | Not designated | Total | Net |
|---|---|---|---|---|---|---|---|
| Interest rate swaps | 451 | — | 451 | 26 | 22 | 48 | 403 |
| Forward foreign exchange contracts | — | 276 | 276 | — | 651 | 651 | (375) |
| Currency swaps and options | 1,890 | 13 | 1,903 | 280 | 63 | 343 | 1,560 |
| Commodity derivatives | — | 5,534 | 5,534 | 92 | 4,565 | 4,657 | 877 |
| Other contracts | — | 424 | 424 | — | 29 | 29 | 395 |
| Total | 2,341 | 6,247 | 8,588 | 398 | 5,330 | 5,728 | 2,860 |

Net losses before tax on derivative contracts, excluding those accounted for as hedges, were $8,377 million in 2021 (2020: $3,295 million gains; 2019: $2,004 million losses). As part of Shell's normal business, commodity derivative hedge contracts are entered into for mitigation of future purchases, sales and inventory. The losses in the current year are mainly related to gas and power trading in Europe to hedge supply and purchase contracts as well as inventory and to physical global LNG sales that are partially hedged through paper derivative positions. As from 2020, what is reported includes realised gains and losses on physical commodity derivatives (arising up to the point of settlement), resulting in what is reported includes $807 million of realised losses in 2021 (2020: $2,216 million gains). As from 2021, the disclosure applies the International Financial Reporting Interpretation Committee (IFRIC) guidance concerning the physical settlement of a contract to buy or sell a non-financial item, irrespective of whether the sales and purchases are presented on a gross or net basis. Comparative numbers have been revised to conform with the current year presentation. In 2020, the disclosure of net gains of $3,295 million (of which realised gains and losses on physical commodity contracts was $2,216 million) applied the IFRIC guidance only to physical derivatives where the subsequent sales and purchases were presented on a gross basis. The $2,216 million comparative was disclosed on its net basis of $597 million related to the aforementioned IFRIC guidance.

Certain contracts, mainly to hedge price risk relating to forecast commodity transactions, were designated in cash flow hedging relationships and are presented after the offset of related margin balances with exchanges. Contracts to hedge foreign exchange risks were also designated in cash flow hedging relationships and the net carrying amount of these contracts at December 31, 2021, was a liability of $173 million (2020: $556 million asset). See Note 23 for the accumulated balance recognised within other comprehensive income.

Certain interest rate and currency swaps were designated in fair value hedges, principally in respect of debt for which the net carrying amount of the related derivative contracts, net of accrued interest, at December 31, 2021, was a liability of $250 million (2020: $1,422 million asset).

In 2021, €3 billion (2020: €3 billion) of debt instruments were designated as hedges of net investments in foreign operations, relating to the foreign exchange risk arising between certain intermediate holding companies and their subsidiaries. See Note 23 for the accumulated balance recognised within other comprehensive income.

In the course of trading operations, certain contracts are entered into for delivery of commodities that are accounted for as derivatives. The resulting price exposures are managed by entering into related derivative contracts. These contracts are managed on a fair value basis and the maximum exposure to liquidity risk is the undiscounted fair value of derivative liabilities.

For a minority of commodity derivatives contracts, carrying amounts cannot be derived from quoted market prices or other observable inputs, in which case fair value is estimated using valuation techniques such as Black-Scholes, option spread models and extrapolation using quoted spreads with assumptions developed internally based on observable market activity.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**20 – FINANCIAL INSTRUMENTS continued**

Other contracts include certain contracts that are held to sell or purchase commodities and others containing embedded derivatives, which are required to be recognised at fair value because of pricing or delivery conditions, even though they were entered into to meet operational requirements. These contracts are expected to mature in 2022-2025, with certain contracts having early termination rights (for either party). Valuations are derived from quoted market prices.

The contractual maturities of derivative liabilities at December 31 compare with their carrying amounts in the Consolidated Balance Sheet as follows:

2021

$ million

| | Less than 1 year | Between 1 and 2 years | Between 2 and 3 years | Between 3 and 4 years | Between 4 and 5 years | 5 years and later | Total | Difference from carrying amount [A] | Carrying amount |
|---|---|---|---|---|---|---|---|---|---|
| Interest rate swaps | 13 | 13 | 5 | 4 | 3 | 4 | 42 | (4) | 38 |
| Forward foreign exchange contracts | 170 | 40 | 114 | — | — | — | 324 | (44) | 280 |
| Currency swaps and options | 321 | 150 | 159 | 287 | 356 | 808 | 2,081 | (1,188) | 893 |
| Commodity derivatives | 12,614 | 1,401 | 783 | 274 | 158 | 531 | 15,761 | (29) | 15,732 |
| Other contracts | 222 | 34 | — | — | — | — | 256 | (1) | 255 |
| Total | 13,340 | 1,638 | 1,061 | 565 | 517 | 1,343 | 18,464 | (1,266) | 17,198 |

[A] Mainly related to the effect of discounting.

2020

$ million

| | Less than 1 year | Between 1 and 2 years | Between 2 and 3 years | Between 3 and 4 years | Between 4 and 5 years | 5 years and later | Total | Difference from carrying amount [A] | Carrying amount |
|---|---|---|---|---|---|---|---|---|---|
| Interest rate swaps | 12 | 10 | 9 | 7 | 5 | 6 | 49 | (1) | 48 |
| Forward foreign exchange contracts | 504 | 56 | 22 | 38 | — | — | 620 | 31 | 651 |
| Currency swaps and options | 174 | 13 | 28 | — | 159 | — | 374 | (31) | 343 |
| Commodity derivatives | 2,990 | 743 | 265 | 174 | 115 | 391 | 4,678 | (21) | 4,657 |
| Other contracts | 15 | 15 | — | — | — | — | 30 | (1) | 29 |
| Total | 3,695 | 837 | 324 | 219 | 279 | 397 | 5,751 | (23) | 5,728 |

[A] Mainly related to the effect of discounting.

**Fair value measurements**

The net carrying amounts of derivative contracts held at December 31, categorised according to the predominant source and nature of inputs used in determining the fair value of each contract, were as follows:

2021

$ million

| | Prices in active markets for identical assets/liabilities | Other observable inputs | Unobservable inputs | Total |
|---|---|---|---|---|
| Interest rate swaps | — | 199 | — | 199 |
| Forward foreign exchange contracts | — | 176 | — | 176 |
| Currency swaps and options | — | (594) | — | (594) |
| Commodity derivatives | 41 | (5,171) | 389 | (4,741) |
| Other contracts | 6 | (60) | — | (54) |
| Total | 47 | (5,450) | 389 | (5,014) |

Exhibit Q

2020

$ million

| | Prices in active markets for identical assets/liabilities | Other observable inputs | Unobservable inputs | Total |
|---|---|---|---|---|
| Interest rate swaps | — | 403 | — | 403 |
| Forward foreign exchange contracts | — | (375) | — | (375) |
| Currency swaps and options | — | 1,560 | — | 1,560 |
| Commodity derivatives | 37 | (237) | 1,077 | 877 |
| Other contracts | 20 | 375 | — | 395 |
| Total | 57 | 1,726 | 1,077 | 2,860 |

Net carrying amounts of derivative contracts measured using predominantly unobservable inputs

$ million

| | 2021 | 2020 |
|---|---|---|
| At January 1 | 1,077 | 754 |
| Net (losses)/gains recognised in revenue | (569) | 564 |
| Purchases | 440 | 217 |
| Sales | (442) | (450) |
| Settlements | (32) | (9) |
| Recategorisations (net) | (87) | (12) |
| Currency translation differences | 2 | 13 |
| At December 31 | 389 | 1,077 |

Included in net (losses)/gains recognised in revenue in 2021 were unrealised net losses totalling $175 million relating to assets and liabilities held at December 31, 2021 (2020: $743 million gains).

Unrecognised day one gains or losses
Certain long-term commodity purchase contracts extend to periods where observable pricing data are limited and so their value may include estimates for a portion of the value. Where this is more than an insignificant part of the overall contract valuation, any gains or losses will be deferred. Valuation techniques are further described in Note 2. The unrecognised gains on these derivative contracts at December 31, 2021, were as follows:

$ million

| | 2021 | 2020 |
|---|---|---|
| At January 1 | 968 | 929 |
| Movements | 56 | 39 |
| At December 31 | 1,024 | 968 |

251

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

## 21 – SHARE CAPITAL

Issued and fully paid ordinary shares of €0.07 each [A]

| | Number of shares | | Nominal value ($ million) | | |
|---|---|---|---|---|---|
| | A | B | A | B | Total |
| At January 1, 2021 | 4,101,239,499 | 3,706,183,836 | 345 | 306 | 651 |
| Repurchases of shares | — | (123,290,882) | — | (10) | (10) |
| At December 31, 2021 | 4,101,239,499 | 3,582,892,954 | 345 | 296 | 641 |
| At January 1, 2020 | 4,151,787,517 | 3,729,407,107 | 349 | 308 | 657 |
| Repurchases of shares | (50,548,018) | (23,223,271) | (4) | (2) | (6) |
| At December 31, 2020 | 4,101,239,499 | 3,706,183,836 | 345 | 306 | 651 |

[A] Share capital at December 31, 2021, and 2020, also included 50,000 issued and fully paid sterling deferred shares of £1 each.

At the Company's Annual General Meeting (AGM) on May 18, 2021, the Board was authorised to allot ordinary shares in the Company, and to grant rights to subscribe for or to convert any security into ordinary shares in the Company, up to an aggregate nominal amount of €182.1 million (representing 2,602 million ordinary shares of €0.07 each), and to list such shares or rights on any stock exchange. This authority expires at the earlier of the close of business on August 18, 2022, and the end of the AGM to be held in 2022, unless previously renewed, revoked or varied by the Company in a general meeting.

At the May 18, 2021, AGM, shareholders granted the Company the authority to repurchase up to 780 million ordinary shares (excluding any treasury shares), renewing the authority granted by the shareholders at previous AGMs. The authority will expire at the earlier of the close of business on August 18, 2022, and the end of the AGM of the Company to be held in 2022. Ordinary shares purchased by the Company pursuant to this authority will either be cancelled or held in treasury. Treasury shares are shares in the Company which are owned by the Company itself. The minimum price, exclusive of expenses, which may be paid for an ordinary share is €0.07. The maximum price, exclusive of expenses, which may be paid for an ordinary share is the higher of: (i) an amount equal to 5% above the average market value for an ordinary share for the five business days immediately preceding the date of the purchase; and (ii) the higher of the price of the last independent trade and the highest current independent bid on the trading venues where the purchase is carried out.

Subsequent to the balance sheet date, one line of shares was established through assimilation of A shares and B shares into a single line of ordinary shares of the Company. This assimilation had no impact on voting rights or dividend entitlements. (See Note 32)

## 22 – SHARE-BASED COMPENSATION PLANS AND SHARES HELD IN TRUST

Share-based compensation expense

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Equity-settled [A] | 539 | 359 | 537 |
| Total | 539 | 359 | 537 |

[A] On an incidental basis awards may be cash-settled, where an equity settlement is not possible under local regulations.

The principal share-based employee compensation plans are the PSP and LTIP. Awards of shares and American Depositary Shares (ADS) of the Company under the PSP and LTIP are granted upon certain conditions to eligible employees. The actual amount of shares that may vest ranges from 0% to 200% of the awards, depending on the outcomes of prescribed performance conditions over a three-year period beginning on January 1 of the award year. On June 18, 2021, the Company granted all eligible employees a single Powering Progress shares award with vesting date in June 2022. Shares and ADSs vest for nil consideration.

Share awards

| | Number of A shares (million) | Number of B shares (million) | Number of A ADSs (million) | Weighted Average remaining contractual life (years) |
|---|---|---|---|---|
| At January 1, 2021 | 29 | 10 | 8 | 1.0 |
| Granted | 20 | 6 | 4 | |
| Vested | (9) | (3) | (2) | |
| Forfeited | (2) | (1) | (1) | |
| At December 31, 2021 | 38 | 12 | 9 | 1.2 |
| At January 1, 2020 | 29 | 10 | 8 | 1.0 |
| Granted | 10 | 4 | 3 | |
| Vested | (9) | (4) | (3) | |
| Forfeited | (1) | — | — | |
| At December 31, 2020 | 29 | 10 | 8 | 1.0 |

Exhibit Q

Other plans offer eligible employees opportunities to acquire shares and ADSs of the Company or receive cash benefits measured by reference to the Company's share price.

Shell employee share ownership trusts and trust-like entities purchase the Company's shares in the open market to meet delivery commitments under employee share plans. At December 31, 2021, they held 15.6 million A shares (2020: 14.3 million), 4.5 million B shares (2020: 5.2 million) and 4.5 million A ADSs (2020: 5.1 million).

23 – OTHER RESERVES

Other reserves attributable to Shell plc shareholders

$ million

| | Merger reserve | Share premium reserve | Capital redemption reserve | Share plan reserve | Accumulated other comprehensive income | Total |
|---|---|---|---|---|---|---|
| At January 1, 2021 | 37,298 | 154 | 129 | 906 | (25,735) | 12,752 |
| Other comprehensive income attributable to Shell plc shareholders | — | — | — | — | 6,134 | 6,134 |
| Transfer from other comprehensive income | — | — | — | — | (45) | (45) |
| Repurchases of shares | — | — | 10 | — | — | 10 |
| Share-based compensation | — | — | — | 58 | — | 58 |
| At December 31, 2021 | 37,298 | 154 | 139 | 964 | (19,646) | 18,909 |
| At January 1, 2020 | 37,298 | 154 | 123 | 1,049 | (24,173) | 14,451 |
| Other comprehensive loss attributable to Shell plc shareholders | — | — | — | — | (1,832) | (1,832) |
| Transfer from other comprehensive income | — | — | — | — | 270 | 270 |
| Repurchases of shares | — | — | 6 | — | — | 6 |
| Share-based compensation | — | — | — | (143) | — | (143) |
| At December 31, 2020 | 37,298 | 154 | 129 | 906 | (25,735) | 12,752 |
| At January 1, 2019 | 37,298 | 154 | 95 | 1,098 | (22,030) | 16,615 |
| Other comprehensive income attributable to Shell plc shareholders | — | — | — | — | (2,069) | (2,069) |
| Transfer from other comprehensive income | — | — | — | — | (74) | (74) |
| Repurchases of shares | — | — | 28 | — | — | 28 |
| Share-based compensation | — | — | — | (49) | — | (49) |
| At December 31, 2019 | 37,298 | 154 | 123 | 1,049 | (24,173) | 14,451 |

The merger reserve and share premium reserve were established as a consequence of the Company becoming the single parent company of Royal Dutch Petroleum Company and The "Shell" Transport and Trading Company, plc, now The Shell Transport and Trading Company Limited, in 2005. The merger reserve increased in 2016 following the issuance of shares for the acquisition of BG Group plc.

The capital redemption reserve was established in connection with repurchases of shares of the Company.

The share plan reserve is in respect of equity-settled share-based compensation plans (see Note 22). The movement comprises the net of the charge for the year and the release as a result of vested awards.

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**23 – OTHER RESERVES continued**
Accumulated other comprehensive income comprises the following:

Accumulated other comprehensive income attributable to Shell plc shareholders

$ million

| | Currency translation differences | Equity instruments remeasurements | Debt instruments remeasurements | Cash flow hedging (losses)/gains | Net investment hedging (losses)/gains | Deferred cost of hedging | Retirement benefits remeasurements | Total |
|---|---|---|---|---|---|---|---|---|
| At January 1, 2021 | (8,175) | 1,144 | 31 | (485) | (2,439) | (187) | (15,624) | (25,735) |
| Recognised in other comprehensive income | (1,841) | 180 | (23) | 88 | 295 | (145) | 10,191 | 8,745 |
| Reclassified to income | 368 | — | (5) | (38) | — | 92 | — | 417 |
| Reclassified to the balance sheet | — | — | — | (13) | — | — | — | (13) |
| Reclassified to retained earnings | — | (45) | — | — | — | — | — | (45) |
| Tax on amounts recognised/reclassified | 60 | (35) | — | (16) | — | 14 | (2,993) | (2,970) |
| Total, net of tax | (1,413) | 100 | (28) | 21 | 295 | (39) | 7,198 | 6,134 |
| Share of joint ventures and associates | (36) | 50 | — | (72) | — | — | (48) | (106) |
| Other comprehensive income/(loss) for the period | (1,449) | 150 | (28) | (51) | 295 | (39) | 7,150 | 6,028 |
| Less: non-controlling interest | 61 | — | — | — | — | — | — | 61 |
| Attributable to Shell plc shareholders | (1,388) | 150 | (28) | (51) | 295 | (39) | 7,150 | 6,089 |
| At December 31, 2021 | (9,563) | 1,294 | 3 | (536) | (2,144) | (226) | (8,474) | (19,646) |
| January 1, 2020 | (9,415) | 793 | 8 | (233) | (2,016) | (287) | (13,023) | (24,173) |
| Recognised in other comprehensive income | 1,204 | 68 | 31 | (9) | (423) | 17 | (3,455) | (2,567) |
| Reclassified to income | (28) | — | (8) | (173) | — | 94 | — | (115) |
| Reclassified to the balance sheet | — | — | — | 16 | — | — | — | 16 |
| Reclassified to retained earnings | — | 169 | — | — | — | — | 101 | 270 |
| Tax on amounts recognised/reclassified | 3 | (4) | — | 6 | — | (11) | 753 | 747 |
| Total, net of tax | 1,179 | 233 | 23 | (160) | (423) | 100 | (2,601) | (1,649) |
| Share of joint ventures and associates | 51 | 118 | — | (92) | — | — | — | 77 |
| Other comprehensive loss for the period | 1,230 | 351 | 23 | (252) | (423) | 100 | (2,601) | (1,572) |
| Less: non-controlling interest | 10 | — | — | — | — | — | — | 10 |
| Attributable to Shell plc shareholders | 1,240 | 351 | 23 | (252) | (423) | 100 | (2,601) | (1,562) |
| At December 31, 2020 | (8,175) | 1,144 | 31 | (485) | (2,439) | (187) | (15,624) | (25,735) |
| At January 1, 2019 | (9,722) | 906 | (21) | 117 | (2,025) | (353) | (10,932) | (22,030) |
| Recognised in other comprehensive income | 302 | (17) | 24 | (592) | 13 | 9 | (3,106) | (3,367) |
| Reclassified to income | 38 | — | 5 | 268 | — | 86 | — | 397 |
| Reclassified to the balance sheet | — | — | — | 11 | — | — | — | 11 |
| Reclassified to retained earnings | — | (85) | — | — | — | — | 11 | (74) |
| Tax on amounts recognised/reclassified | 4 | (13) | — | 37 | (4) | (29) | 1,004 | 999 |
| Total, net of tax | 344 | (115) | 29 | (276) | 9 | 66 | (2,091) | (2,034) |
| Share of joint ventures and associates | (2) | 2 | — | (74) | — | — | — | (74) |
| Other comprehensive loss/income for the period | 342 | (113) | 29 | (350) | 9 | 66 | (2,091) | (2,108) |
| Less: non-controlling interest | (35) | — | — | — | — | — | — | (35) |
| Attributable to Shell plc shareholders | 307 | (113) | 29 | (350) | 9 | 66 | (2,091) | (2,143) |
| At December 31, 2019 | (9,415) | 793 | 8 | (233) | (2,016) | (287) | (13,023) | (24,173) |

## 24 – DIVIDENDS

Interim dividends

| | $ per share | | | $ million | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 | 2019 |
| A shares: | | | | | | |
| Cash: | | | | | | |
| March | 0.1665 | 0.47 | 0.47 | 677 | 1,862 | 2,100 |
| June | 0.1735 | 0.16 | 0.47 | 698 | 653 | 2,062 |
| September | 0.24 | 0.16 | 0.47 | 974 | 654 | 2,007 |
| December | 0.24 | 0.1665 | 0.47 | 981 | 691 | 1,978 |
| Total - A shares | 0.82 | 0.9565 | 1.88 | 3,330 | 3,860 | 8,147 |
| B shares: | | | | | | |
| Cash: | | | | | | |
| March | 0.1665 | 0.47 | 0.47 | 613 | 1,620 | 1,775 |
| June | 0.1735 | 0.16 | 0.47 | 633 | 586 | 1,762 |
| September | 0.24 | 0.16 | 0.47 | 880 | 582 | 1,765 |
| December | 0.24 | 0.1665 | 0.47 | 865 | 622 | 1,749 |
| Total - B shares | 0.82 | 0.9565 | 1.88 | 2,991 | 3,410 | 7,051 |
| Total | | | | 6,321 | 7,270 | 15,198 |

In addition, on February 3, 2022, the Directors announced a further interim dividend in respect of 2021 of $0.24 per ordinary share. The total dividend is estimated to be $1,830 million and is payable on March 28, 2022, to shareholders on the register at February 18, 2022.

Shareholders will be able to elect to receive their dividends in US dollars, euros or pounds sterling.

## 25 – EARNINGS PER SHARE

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Income/(loss) attributable to Shell plc shareholders ($ million) | 20,101 | (21,680) | 15,842 |
| | | | |
| Weighted average number of A and B shares used as the basis for determining: | | | |
| Basic earnings per share (million of shares) | 7,761.7 | 7,795.6 | 8,058.3 |
| Diluted earnings per share (million of shares) | 7,806.8 | 7,795.6 | 8,112.5 |

Basic earnings per share are calculated by dividing the income attributable to Shell plc shareholders for the year by the weighted average number of A and B shares outstanding during the year. The weighted average number of shares outstanding excludes shares held in trust.

Diluted earnings per share are based on the same income figures. The weighted average number of shares outstanding during the year is increased by dilutive shares related to share-based compensation plans. If the inclusion of potentially issuable shares could decrease diluted loss per share, the potentially issuable shares are excluded from the weighted average number of shares outstanding used to calculate diluted earnings per share.

Earnings per share are identical for A and B shares.

## 26 – LEGAL PROCEEDINGS AND OTHER CONTINGENCIES

### General

In the ordinary course of business, Shell subsidiaries are subject to a number of contingencies arising from litigation and claims brought by governmental authorities, including tax authorities, and private parties. The operations and earnings of Shell subsidiaries continue, from time to time, to be affected by varying degrees by political, legislative, fiscal and regulatory developments, including those relating to the protection of the environment and indigenous groups in the countries in which they operate. The industries in which Shell subsidiaries are engaged are also subject to physical risks of various types.

The amounts claimed in relation to such events and, if such claims against Shell were successful, the costs of implementing the remedies sought in the various cases could be substantial. Based on information available to date and taking into account that in some cases it is not practicable to estimate the possible magnitude or timing of any resultant payments, management believes that the foregoing are not expected to have a material adverse impact on Shell's Consolidated Financial Statements. However, there remains a high degree of uncertainty around these contingencies, as well as their potential effect on future operations, earnings, cash flows and Shell's financial condition.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**26 – LEGAL PROCEEDINGS AND OTHER CONTINGENCIES continued**

In certain divestment transactions, liabilities related to decommissioning and restoration are de-recognised upon transfer of these obligations to the buyer. For certain of these obligations, Shell has issued guarantees to third parties and continues to be liable in case the primary obligor is not able to meet its obligation. These potential obligations arising from issuance of these guarantees are assessed to be remote.

**Decommissioning and restoration of manufacturing facilities**

Industry practice had been not to recognise decommissioning and restoration provisions associated with manufacturing facilities in Oil Products and Chemicals. This was on the basis that these assets were considered to have indefinite lives and, therefore, that it was considered remote that an outflow of economic benefits would be required.

In 2020, the changed macroeconomic fundamentals were considered, together with Shell's plans to rationalise the Group's manufacturing portfolio. It was also reconsidered whether it remained appropriate not to recognise decommissioning and restoration provisions for manufacturing facilities.

It was concluded that the assumption of indefinite lives for manufacturing facilities is no longer appropriate, and the need for either recognition of decommissioning and restoration provisions or contingent liability disclosure was reviewed. In 2020, provisions had been recognised for certain shorter-lived manufacturing facilities (see Note 19). For the remaining longer-lived facilities, where decommissioning would generally be more than 50 years away, it was concluded that, while there is a present obligation that has arisen from past events, the amount of the obligation cannot be measured with sufficient reliability. This conclusion was reached on the basis that the settlement dates are indeterminate; and that other estimates, such as extremely long-term discount rates for which there is no observable measure, are not reliable. Consequently, a decommissioning and restoration obligation exists that cannot be recognised or quantified and that is disclosed as a contingent liability.

**Pesticide litigation**

Shell Oil Company (SOC), along with another agricultural chemical pesticide manufacturer and several distributors, has been sued by public and quasi-public water purveyors, water storage districts, and private landowners alleging responsibility for groundwater contamination caused by applications of chemical pesticides. There are approximately 37 such cases currently pending, seven claims made but not yet filed, and an active subpoena for records. These matters assert various theories of strict liability and negligence, seeking to recover actual damages, including drinking well treatment and remediation costs. Most assert claims for punitive damages. While the Company continues to vigorously defend these actions, in January 2018 an environmental regulatory standard became effective in the State of California, where a majority of the suits are pending. The 2018 standard requires public water systems state-wide to perform quarterly or monthly sampling of their drinking water sources for a chemical contained in certain pesticides. Water systems deemed out of compliance with the regulatory standard must take corrective action to resolve the exceedance or take the potable water source out of service. In response to this regulatory standard, the Company monitors the sampling results to determine the number of wells potentially impacted. Based on the claims asserted and SOC's history with regard to amounts paid to resolve varying actions, management does not expect the outcome of the matters pending at December 31, 2021, to have a material adverse impact on Shell. However, there remains a high degree of uncertainty regarding the potential outcome of some of these pending lawsuits, as well as their potential effects on future operations, earnings, cash flows and Shell's financial condition.

**Climate change litigation**

In the USA, 21 lawsuits filed by several municipalities and/or states against oil and gas companies, including Shell plc, are pending as of December 31, 2021. The plaintiffs seek damages for a variety of claims including harm to their public and private infrastructure from rising sea levels and other alleged impacts of climate change caused by the defendants' fossil fuel products. A similar suit has been filed by a crab-fishing industry group claiming harm to their fisheries as a result of alleged ocean-related impacts of climate change. In the Netherlands, in a case against Shell brought by a group of environmental non-governmental organisations (eNGOs) and individual claimants, the Court found that while Shell is not currently acting unlawfully, Shell must reduce the aggregate annual volume of $CO_2$ emissions of Shell Group operations and energy-carrying products sold across Scopes 1, 2 and 3 by 45% (net) by the end of 2030 relative to its 2019 emissions levels. For Scopes 2 and 3, this is a significant best efforts obligation. Shell has appealed that ruling. Management believes the outcome of these matters should be resolved in a manner favourable to Shell, but there remains a high degree of uncertainty regarding the ultimate outcome of these lawsuits, as well as their potential effect on future operations, earnings, cash flows and Shell's financial condition.

**Louisiana coast litigation**

The State of Louisiana and multiple local governments have initiated 43 lawsuits against more than 200 oil and gas companies, claiming either current or historical oil and gas operations caused or contributed to contamination, land loss and the erosion of the Louisiana coastline. Shell entities are named in 14 of the suits. Although the State and local parishes fail to claim specified amounts, these claims represent potentially material matters. The cases are of first impression, arise out of an untested 1980 Louisiana statute and represent a novel attempt to render illegal operations that federal and state agencies permitted and authorised at the time. Management believes the outcome of these matters should ultimately be resolved in a manner favourable to Shell; there remains a high degree of uncertainty, however, concerning the scope of the claims and the ultimate outcomes, as well as their potential effects on future operations, earnings, cash flows, reputation and Shell's financial condition. The cases continue to go through jurisdictional challenges with respect to whether the cases should be tried in federal court or state court.

**NAM (Groningen gas field) litigation**

Since 1963 NAM – a joint venture between Shell and ExxonMobil (50:50) – has been producing gas from the Groningen field, the largest gas field in Western Europe. After smaller tremors in the 1990s and the late 2000s, an earthquake measuring 3.6 on the Richter scale occurred in 2012, causing damage to properties in the affected area, and the area continues to experience tremor/earthquake-type events. NAM has received more than 100,000 claims for physical damage to property – the majority of which have been successfully settled. The Dutch State has taken over the damage-claim-handling from NAM for all claim categories (strengthening, physical damage to property, housing value loss, emotional damages and loss of living enjoyment) while NAM remains financially responsible. In February 2022 NAM commenced arbitral proceedings against the State to get clarity on these financial responsibilities. NAM still faces claims in civil litigation from claimants who elect not to use the government arrangement or from claims pre-dating the governmental arrangements. These claims include, but are not limited to:

- housing claims where NAM was found liable for value loss;
- emotional damages and loss of living enjoyment, around 5,000 claimants; and
- other civil litigation matters.

There remains a high degree of uncertainty concerning the ultimate outcomes and their potential effects on future operations, earnings, cash flows, reputation and Shell's financial condition.

Exhibit Q

### Nigerian litigation

Shell subsidiaries and associates operating in Nigeria are parties to various environmental and contractual disputes brought in the courts of Nigeria, England and the Netherlands. These disputes are at different stages in litigation, including at the appellate stage, where judgements have been rendered against Shell entities. If taken at face value, the aggregate amount of these judgements could be seen as material. Management, however, believes that the outcomes of these matters will ultimately be resolved in a manner favourable to Shell. However, there remains a high degree of uncertainty regarding these cases, as well as their potential effect on future operations, earnings, cash flows and Shell's financial condition.

### OPL 245

Authorities are investigating Shell Nigeria Exploration and Production Company Ltd.'s (SNEPCO's) investment in Nigerian oil block OPL 245 and the 2011 settlement of litigation pertaining to that block with regard to potential anti-bribery and anti-corruption laws.

On January 27, 2017, the Nigeria Federal High Court issued an Interim Order of Attachment for Oil Prospecting Licence 245 (OPL 245), pending the conclusion of the investigation. SNEPCO applied for and was granted a discharge of this order on constitutional and procedural grounds. Also in Nigeria, in March 2017, criminal charges alleging official corruption and conspiracy to commit official corruption were filed against SNEPCO, one current Shell employee and third parties including ENI SpA and one of its subsidiaries. Those proceedings are in abeyance. In January 2020, criminal charges alleging disobeying direction of law related to tax waivers were filed in Nigeria against Shell Nigeria Ultra Deep Ltd., SNEPCO, and third parties including Nigeria Agip Exploration Limited (NAE). Those proceedings are ongoing. In March 2017, parties alleging to be shareholders of Malabu Oil and Gas Company Limited. (Malabu) filed two actions to challenge the 2011 settlement and the award of OPL 245 to SNEPCO and an ENI SpA subsidiary by the Federal Government of Nigeria. Both actions are currently stayed awaiting the outcome of appeals filed against procedural decisions. Those appeal proceedings are ongoing. On May 8, 2018, Human Environmental Development Agenda (HEDA) sought permission from the Federal High Court of Nigeria to apply for an order to direct the Attorney General of the Federation to revoke OPL 245 on grounds that the entire Malabu transaction in relation to the OPL is unconstitutional, illegal and void as it was obtained through fraudulent and corrupt practice. On July 3, 2019, the Nigerian Federal High Court upheld objections from SNEPCO and NAE and struck the lawsuit filed by HEDA. The suit was struck because of the statute of limitations and lack of jurisdiction to hear the matter. HEDA has appealed the judgement, which is ongoing.

On December 12, 2018, the Federal Republic of Nigeria (FRN) issued a claim form in the UK against Shell and six of its subsidiaries, ENI SpA and two of its subsidiaries, Malabu as well as two other entities for the amount of $1,092 million plus damages for having participated in a fraudulent and corrupt scheme leading to the acquisition by Shell and ENI corporate defendants in 2011 of OPL 245. The Shell entities were served with proceedings in April and May 2019, following which they, and other defendants, challenged the jurisdiction of the English courts. Following a hearing in April 2020, the English High Court rendered judgement in May 2020, dismissing the claims in England and refusing the FRN's request for permission to appeal. In September 2020, the UK Court of Appeal also refused the FRN's permission to appeal, meaning the case is now concluded.

On February 14, 2017, Shell plc received a notice of request for indictment from the Milan public prosecutor with respect to this matter. On December 20, 2017, Shell plc and four former Shell employees including one former executive were remanded to trial in Milan. On May 14, 2018, a trial commenced in the Court of Milan. The FRN was admitted as a civil claimant by a court decision on July 20, 2018. On September 18, 2018, Shell was joined to the proceedings as the civilly responsible party for the damages caused by the alleged illegal acts of the four former Shell employees. Three other Shell entities (Shell UK Ltd, Shell Petroleum Development Company of Nigeria Ltd. and Shell Exploration and Production Africa Ltd.) also joined the proceedings as responsible civile for their respective former employees at that phase of the proceedings. On March 17, 2021, the Court of Milan acquitted the Shell entities and four former Shell employees of all charges on the grounds that there was no case to answer. The Court of Milan published the full grounds for its decision on June 9, 2021. The decision is under appeal.

On September 20, 2018, a guilty judgement was filed by the Milan Judge of the Preliminary Hearing in a separate OPL 245 fast-track trial of two individuals, neither of whom worked for or on behalf of Shell. That decision was appealed to the Court of Appeal which rendered its judgement on June 24, 2021, acquitting both individuals. Separate OPL 245 pre-trial criminal proceedings are pending against another individual who also did not work for or on behalf of Shell.

In February 2019, we were informed by the Dutch Public Prosecutor's Office (DPP) that they were nearing the conclusion of their investigation and preparing to prosecute Shell plc for criminal charges directly or indirectly related to the 2011 settlement of disputes over OPL 245 in Nigeria. On October 2, 2019, the US Department of Justice (DOJ) informed Shell that it was closing its inquiry into Shell in relation to OPL 245. We understand that the decision was based on the facts available to the DOJ, including ongoing legal proceedings in Europe. On April 22, 2020, the United States Securities and Exchange Commission notified us that it had also closed its inquiry into OPL 245. There remains a high degree of uncertainty around the OPL 245 matters and contingencies discussed above, as well as their potential effect on future operations, earnings, cash flows and Shell's financial condition. Accordingly, at this time, it is not practicable to estimate the magnitude and timing of any possible obligations or payments. Any violation of anti-bribery, anti-corruption or anti-money laundering legislation could have a material adverse effect on Shell plc's earnings, cash flows and financial condition.

### Simplification of share structure

On December 20, 2021, the Board decided to proceed with the simplification (as outlined in Note 1). Preceding this decision, a proposed bill on the Dutch dividend withholding tax (DWT) exit tax charge and subsequent amendments were submitted to the Dutch Parliament imposing a DWT exit tax charge on any company that transfers its tax residence to a country that does not levy dividend withholding tax, such as the UK. The amended bill was submitted to the Dutch Council of State for advice and is at an early stage of discussion in the Dutch Parliament. Having considered a range of factors including legal advice, following the transfer of the Company's share residence it is expected that the Company will ultimately not incur any DWT exit tax cost.

Exhibit Q

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

27 – EMPLOYEES

Employee costs

|  |  |  | $ million |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Remuneration | 9,038 | 9,128 | 10,075 |
| Social security contributions | 819 | 793 | 844 |
| Retirement benefits (see Note 18) | 1,696 | 1,851 | 1,753 |
| Share-based compensation (see Note 22) | 539 | 359 | 537 |
| Total [A] | 12,092 | 12,131 | 13,209 |

[A] Excludes employees seconded to joint ventures and associates.

Average employee numbers

|  |  |  | Thousand |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Integrated Gas | 11 | 11 | 10 |
| Upstream | 12 | 14 | 14 |
| Oil Products | 30 | 34 | 32 |
| Chemicals | 2 | 2 | 4 |
| Corporate [A] | 27 | 25 | 23 |
| Total [B] | 82 | 86 | 83 |

[A] Includes all employees working in business service centres irrespective of the segment they support.
[B] Excludes employees seconded to joint ventures and associates (2021: 2,000 employees; 2020: 2,000 employees; 2019: 3,000 employees).

28 – DIRECTORS AND SENIOR MANAGEMENT

Remuneration of Directors of the Company

|  |  |  | $ million |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Emoluments | 12 | 6 | 8 |
| Value of released awards under long-term incentive plans | 5 | 6 | 12 |
| Employer contributions to pension plans | 1 | 1 | 1 |

Emoluments comprise salaries and fees, annual bonuses (for the period for which performance is assessed) and other benefits. The value of released awards under long-term incentive plans for the period is in respect of the performance period ending in that year. In 2021 retirement benefits were accrued in respect of qualifying services under defined benefit plans by two Directors.

Further information on the remuneration of the Directors can be found in the Directors' Remuneration Report on pages 156-160.

Directors and Senior Management expense

|  |  |  | $ million |
|---|---|---|---|
|  | 2021 | 2020 | 2019 |
| Short-term benefits | 27 | 14 | 18 |
| Retirement benefits | 3 | 3 | 3 |
| Share-based compensation | 16 | 17 | 15 |
| Termination and related amounts | 2 | 2 | 2 |
| Total | 48 | 36 | 38 |

Directors and Senior Management comprise members of the Executive Committee and the Non-executive Directors of the Company.

Short-term benefits comprise salaries and fees, annual bonuses delivered in cash and shares (for the period for which performance is assessed), other benefits and employer social security contributions.

### 29 – AUDITOR'S REMUNERATION

$ million

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Fees in respect of the audit of the Consolidated and Parent Company Financial Statements, including audit of consolidation returns | 39 | 36 | 32 |
| Other audit fees, principally in respect of audits of accounts of subsidiaries | 18 | 17 | 18 |
| Total audit fees | 57 | 53 | 50 |
| Audit-related fees | 3 | 3 | 4 |
| Fees in respect of other non-audit services | 3 | 2 | — |
| Total | 63 | 58 | 54 |

In addition, the auditor provided audit services to retirement benefit plans for employees of subsidiaries. Remuneration paid by those benefit plans amounted to $1 million in 2021 (2020: $1 million; 2019: $1 million).

### 30 - ASSETS HELD FOR SALE

$ million

| | Current | Non-current | Total | Current | Non-current | 2020 Total |
|---|---|---|---|---|---|---|
| Intangible assets | — | 116 | 116 | — | 112 | 112 |
| Property, plant and equipment | — | 896 | 896 | — | 1,147 | 1,147 |
| Trade and other receivables | 349 | 71 | 420 | — | — | — |
| Inventories | 528 | — | 528 | — | — | — |
| Assets classified as held for sale | 877 | 1,083 | 1,960 | — | 1,259 | 1,259 |
| Debt | 257 | 199 | 456 | — | — | — |
| Trade and other payables | 235 | 140 | 375 | — | — | — |
| Deferred tax | — | 41 | 41 | — | — | — |
| Retirement benefits | — | 108 | 108 | — | — | — |
| Decommissioning and other provisions | 10 | 219 | 229 | 2 | 194 | 196 |
| Income taxes payable | 44 | — | 44 | — | — | — |
| Liabilities directly associated with assets classified as held for sale | 546 | 707 | 1,253 | 2 | 194 | 196 |

The carrying amount of assets classified as held for sale at December 31, 2021, is $1,960 million (2020: $1,259 million), with liabilities directly associated with assets classified as held for sale of $1,253 million (2020: $196 million).

At December 31, 2021, assets held for sale mainly referred to Shell's interest in two refineries within Oil Products. All transactions that resulted in the reclassification of assets held for sale at December 31, 2021, are either already completed in 2022 or are expected to be completed during the course of 2022.

At December 31, 2020, assets held for sale mainly referred to Integrated Gas. All transactions that resulted in assets held for sale reclassification at December 31, 2020, were completed in the first quarter of 2021.

### 31 – EMISSION SCHEMES AND RELATED ENVIRONMENTAL PROGRAMMES

**Emission trading and related schemes**

Generally, emission trading schemes (ETS) are mandated governmental schemes to control emission levels and enhance clean energy transition, allowing for the trading of emission certificates. In most ETS, governments set an emission cap for one or more sectors. Generally, entities in scope of the scheme are allowed to buy emission certificates to cover shortages or sell surplus emission certificates. In certain countries emissions are priced through a carbon tax. For Shell, the most significant carbon pricing mechanisms are established in Europe, North America, and Singapore.

**Biofuel programmes**

Biofuel programmes are mandated schemes that set binding national targets on the share of renewables in fuel consumption or measures on reducing GHG emissions by fuel suppliers. Biofuels are blended with existing fuels such as gasoline and diesel to reduce net emissions. The share of biofuel in the total sales mix of fuel is used to comply with regulatory requirements. This can be achieved by the blending of biofuels in refineries and/or distribution depots (self-blending), through import of biofuels (for jurisdictions that grant biofuels certificates at the point of import) or by the purchasing of certificates from third parties (for jurisdictions that have a tradable biofuel certificates mechanism). Biofuel programmes include also regulatory requirements to pay a levy for the combustion of fossil fuels, based on $CO_2$ emitted – mainly represented by the German Fuel Emissions Trading Act (BEHG) applying since January 1, 2021.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS continued

**31 – EMISSION SCHEMES AND RELATED ENVIRONMENTAL PROGRAMMES continued**
**Renewable power programmes**
Renewable power programmes create a financial incentive to consume power that is sourced from renewable origins or require that a minimum percentage of power sold meets the green definition of the relevant standard. These regulations are typically accompanied by schemes supporting investments in the renewable technology. Renewable power programmes generally use certificates to monitor compliance, where renewable power certificates are granted for each MWh of energy generated that meets the predefined renewable criteria. Shell's compliance obligation under renewable power programmes comes primarily from energy supply and results from regulations applying in Europe, North America and Australia.

Cost of emission schemes and related environmental programmes recognised in the Consolidated Statement of Income

| | | | $ million |
|---|---|---|---|
| | | 2021 | 2020 |
| ETS and related schemes | | 331 | 150 |
| Biofuels [A] | | 2,609 [B] | 1,137 |
| Renewable power | | 455 | 364 |
| Total | | 3,395 | 1,651 |

[A] Represents the cost of biofuel certificates required for compliance purposes over and above those generated from self-blending activities.
[B] Includes the cost under the German Fuel Emissions Trading Act (BEHG) applying since January 1, 2021.

Purchased environmental certificates (presented under Other Intangible assets, See Note 8) [A]

| | ETS and related schemes | Biofuels | Renewable power | $ million Total |
|---|---|---|---|---|
| At January 1, 2021 | 157 | 780 | 76 | 1,013 |
| Additions | 292 | 2,450 | 405 | 3,147 |
| Settlements | (115) | (754) | (355) | (1,224) |
| Other movements | (50) | (114) | (25) | (189) |
| At December 31, 2021 | 284 | 2,362 | 101 | 2,747 |

[A] Includes environmental certificates held for compliance purposes.

Obligation (presented under Other payables, see Note 16)

| | ETS and related schemes | Biofuels [B] | Renewable power | $ million Total |
|---|---|---|---|---|
| At January 1, 2021 | | | | |
| Current | (154) | (1,549) | (290) | (1,993) |
| Non-current | — | (54) | (6) | (60) |
| | (154) | (1,603) | (296) | (2,053) |
| Additions | (781) | (2,756) | (487) | (4,024) |
| Additions covered by government grants | 456 [A] | | | 456 |
| Settlements | 150 | 755 | 491 | 1,396 |
| Other movements | 59 | 160 | (10) | 209 |
| | (116) | (1,841) | (6) | (1,963) |
| | | | | |
| At December 31, 2021 | | | | |
| Current | (270) | (3,262) | (273) | (3,805) |
| Non-current | — | (182) | (29) | (211) |
| | (270) | (3,444) | (302) | (4,016) |

[A] Emission certificates that were allocated free of charge at an equivalent fair value at grant date.
[B] Includes the liability under the German Fuel Emissions Trading Act (BEHG) applying since January 1, 2021.

Environmental certificates acquired that are held for compliance purposes are recognised at cost under intangible assets. In addition, a portfolio of environmental certificates is held for trading purposes and classified under inventory (see Note 2 and Note 13). Environmental certificates held for trading purposes can be redesignated for compliance purposes and then settle compliance obligations.

Cost recognised in the Consolidated Statement of Income represents the compliance cost associated with emissions or with products sold during the year. The liability at year-end represents the compliance cost recognised over current and past compliance periods to the extent not settled to date. Liabilities are settled in line with compliance periods, which depend on the scheme and may not coincide with the calendar year.

The figures present compliance schemes only, excluding voluntary activities.

### 32 – POST-BALANCE SHEET EVENTS

On January 20, 2022, Shell completed the sale of its interest in Deer Park Refining Limited Partnership, a 50:50 joint venture between Shell Oil Company and P.M.I. Norteamerica, S.A. De C.V. (a subsidiary of Petroleos Mexicanos) for a total of $596 million, consisting of a combination of cash and debt.

On January 21, 2022, the Company changed its name from Royal Dutch Shell plc to Shell plc.

On January 29, 2022, one line of shares was established through assimilation of A shares and B shares into a single line of ordinary shares of the Company. This assimilation had no impact on voting rights or dividend entitlements. Dutch withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the ordinary shares following assimilation.

On February 3, 2022, Shell announced the commencement of $8.5 billion of share buybacks for the first half of 2022. This comprises the remaining $5.5 billion of Permian divestment proceeds and $3.0 billion as part of the Company's capital allocation framework, which includes shareholder distributions in the range of 20-30% of cash flow from operations. In the first tranche of this buyback programme, the Company has entered into an irrevocable, non-discretionary arrangement with a broker to enable the purchase of ordinary shares for a period up to and including May 4, 2022. The aggregate maximum consideration for the purchase of ordinary shares under the initial programme is $4.0 billion. All shares repurchased as part of this arrangement will be cancelled.

On February 11, 2022, Shell Pipeline Company LP announced it had made a non-binding offer to purchase all remaining common units held by the public representing limited partner interests in Shell Midstream Partners, L.P. ("SHLX") for $12.89 per common unit in cash. At the date of the announcement, Shell and its affiliates owned approximately 68.5% of SHLX common units. The proposed transaction is subject to a number of contingencies, including the approval of the board of directors of SHLX and the satisfaction of any conditions to the consummation of a transaction set forth in any definitive agreement concerning the transaction. There can be no assurance that such definitive documentation will be executed or that any transaction will materialise on the terms described above or at all.

Russia's recent invasion of Ukraine poses wide-ranging challenges. Given the evolving situation, there are many unknown factors and events that could materially impact our operations. These events have and continue to impact commodity prices, our supply chain, credit risks including those related to receivables, commodity trading, treasury and other factors. Any of these factors, individually or in aggregate, could have a material effect on our earnings, cash flows and financial condition.

On February 28, 2022, following Russia's invasion in Ukraine, Shell announced its intention to exit its ventures in Russia with Gazprom and related entities, and to end its involvement in the Nord Stream 2 pipeline project.

Subsequently, on March 8, 2022, Shell announced its intent to withdraw from its involvement in all Russian hydrocarbons, including crude oil, petroleum products, gas and LNG in a phased manner, aligned with new government guidance. As an immediate first step, Shell will stop all spot purchases of Russian crude oil. It will also shut its service stations, aviation fuels and lubricants operations in Russia. At the end of 2021, Shell had around $0.4 billion in non-current assets in its downstream operations in Russia.

It is expected that these decisions to start the process of exiting ventures with Gazprom and related entities, to end the involvement in the Nord Stream 2 pipeline project and to shut down its service stations, aviation fuels and lubricants operations in Russia will impact the carrying value of the related assets and lead to recognition of impairments in 2022. Details of Shell's interest in the respective ventures and operations are as follows.

- Sakhalin-2: Shell has a 27.5% interest in Sakhalin-2, an integrated oil and gas project located on Sakhalin island, accounted for as an associate. Other ownership interests are Gazprom 50%, Mitsui 12.5%, Mitsubishi 10%.

- Salym: Shell has a 50% interest in Salym Petroleum Development N.V., a joint operation with Gazprom Neft that is developing the Salym fields in the Khanty Mansiysk Autonomous District of western Siberia.

- Gydan: A joint operation with Gazprom Neft (Shell interest 50%) to explore and develop blocks in the Gydan peninsula, in north-western Siberia. The project is in the exploration phase, with no production.

- Nord Stream 2: Shell is one of five energy companies which have each committed to provide financing and guarantees for up to 10% of the total cost of the project, which is accounted for as a long-term loan.

- Shell's downstream operations in Russia: Shell owns 100% of its downstream operations in Russia which consist of service stations, aviation fuels and lubricants operations.

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED)

### ABOUT THIS SECTION

The purpose of this section is to comply with the requirements of the Financial Accounting Standards Board (FASB) "Extractive Activities – Oil and Gas (Topic 932)". Extractive activities for this purpose include exploration and production activities to extract oil, condensates, natural gas liquids, oil sands and natural gas from their natural reservoirs.

In Shell, extractive activities, or oil and gas exploration and production activities, are undertaken within the Upstream segment, Integrated Gas segment and Oil Products segment (oil sands). Shell's extractive activities do not represent the full extent of the Upstream, Integrated Gas and Oil Products activities and exclude downstream GTL, some LNG activities, Marketing business in Oil Products, Power and New Energies, trading and optimisation, as well as other non-extractive activities. As a result, the information in this extractive activities section is not suitable for modelling Shell's integrated businesses, for which we refer to the segment information. Full segment information to the Consolidated Financial Statements is available on pages 223-226.

The information set out on pages 263-279 is referred to as "unaudited" as a means of clarifying that it is not covered by the audit opinion of the independent registered public accounting firm that has audited and reported on the Consolidated Financial Statements.

### PROVED RESERVES

Proved reserves estimates are calculated pursuant to the US Securities and Exchange Commission (SEC) Rules and the FASB's Topic 932. Proved reserves can be either developed or undeveloped. The definitions used are in accordance with the SEC Rule 4–10 (a) of Regulation S-X. We include proved reserves associated with future production that will be consumed in operations.

Proved reserves shown are net of any quantities of crude oil or natural gas that are expected to be (or could be) taken as royalties in kind. Proved reserves outside North America include quantities that will be settled as royalties in cash. Proved reserves include certain quantities of crude oil or natural gas that will be produced under arrangements that involve Shell subsidiaries, joint ventures and associates in risks and rewards but do not transfer title of the product to those entities.

Subsidiaries' proved reserves at December 31, 2021, were divided into 80% developed and 20% undeveloped on a barrel of oil equivalent basis. For the Shell share of joint ventures and associates, the proved reserves at December 31, 2021, were divided into 88% developed and 12% undeveloped on a barrel of oil equivalent basis.

Proved reserves are recognised under various forms of contractual agreements. Shell's proved reserves volumes at December 31, 2021, present in agreements such as production-sharing contracts (PSC), tax/variable royalty contracts or other forms of economic entitlement contracts, where the Shell share of reserves can vary with commodity prices, were 1,835 million barrels of crude oil and natural gas liquids, and 12,804 thousand million standard cubic feet (scf) of natural gas.

Proved reserves cannot be measured exactly because estimation of reserves involves subjective judgement (see "Risk factors" on page 25 and our "Proved reserves assurance process" below). These estimates remain subject to revision and are unaudited supplementary information.

### PROVED RESERVES ASSURANCE PROCESS

A central group of reserves experts, who on average have around 25 years' experience in the oil and gas industry, undertake the primary assurance of the proved reserves bookings. This group of experts is part of the Resources Assurance and Reporting (RAR) organisation within Shell. A Vice President with 36 years' experience in the oil and gas industry currently heads the RAR organisation. He is a member of the Society of Petroleum Engineers, Society of Petroleum Evaluation Engineers and holds a BA in mathematics from Oxford University and an MEng in Petroleum Engineering from Heriot-Watt University. The RAR organisation reports directly to an Executive Vice President of Finance, who is a member of the Upstream Reserves Committee (URC). The URC is a multidisciplinary committee consisting of senior

representatives from the Finance, Legal, Integrated Gas and Upstream organisations. The URC reviews and endorses all major (larger than 20 million barrels of oil equivalent) proved reserves bookings and debookings and endorses the total aggregated proved reserves. Final approval of all proved reserves bookings remains with Shell's CEO, and all proved reserves bookings are reviewed by Shell's Audit Committee. The Internal Audit function also provides secondary assurance through audits of the control framework.

### CRUDE OIL, NATURAL GAS LIQUIDS, SYNTHETIC CRUDE OIL AND BITUMEN

Shell subsidiaries' proved reserves of crude oil, natural gas liquids (NGLs), synthetic crude oil and bitumen at the end of the year; their share of the proved reserves of joint ventures and associates at the end of the year; and the changes in such reserves during the year are set out on pages 263-265. Significant changes in these proved reserves are discussed below, where "revisions and reclassifications" are changes based on new information that resulted from development drilling, production history, and changes in economic factors.

### PROVED RESERVES 2021–2020

#### Shell subsidiaries

**Asia**

The net increase of 121 million barrels in revisions and reclassifications was mainly in Kashagan and Upper Salym.

**USA**

The net increase of 119 million barrels in revisions and reclassifications was mainly in Mars and Stones.

The decrease of 136 million barrels in sales in place was in Permian.

The increase of 55 million barrels in extensions and discoveries was mainly in Whale Dev.

**Canada**

The net increase of 90 million barrels in revisions and reclassifications was mainly in Jackpine Mine and Muskeg River mine.

**South America**

The net increase of 325 million barrels in revisions and reclassifications half of which was mainly in Mero.

The increase of 103 million barrels in extensions and discoveries was mainly in Mero.

**Europe**

The increase of 67 million barrels in revisions and reclassifications was mainly in Schiehallion and Val d'Agri.

**Africa**

The increase of 53 million barrels in revisions and reclassifications was mainly in Nigeria.

### PROVED RESERVES 2020–2019

#### Shell subsidiaries

**Asia**

The net increase of 181 million barrels in revisions and reclassifications was mainly in Kazakhstan and Oman.

**USA**

The net decrease of 116 million barrels in revisions and reclassifications of which half was mainly in Permian and Belridge Light Oil.

**Canada**

The net increase of 55 million barrels in revisions and reclassifications was mainly in Jackpine Mine and Muskeg River mine.

**South America**

The net decrease of 82 million barrels in revisions and reclassifications was mainly in Brazil.

Exhibit Q

**Proved developed and undeveloped reserves 2021**

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 178 | 1,573 | 73 | 379 | 728 | 15 | 644 | — | 815 | 3,761 | 644 | — | 4,405 |
| Revisions and reclassifications | 67 | 121 | 18 | (53) | 119 | — | (90) | — | 325 | 597 | (90) | — | 507 |
| Improved recovery | — | — | — | — | 9 | — | — | — | 21 | 30 | — | — | 30 |
| Extensions and discoveries | 4 | 11 | — | 1 | 55 | 1 | — | — | 103 | 175 | — | — | 175 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | (21) | (136) | (8) | — | — | — | (165) | — | — | (165) |
| Production [A] | (41) | (184) | (11) | (41) | (165) | (3) | (21) | — | (133) | (578) | (21) | — | (599) |
| At December 31 | 208 | 1,521 | 80 | 265 | 610 | 5 | 533 | — | 1,131 | 3,820 | 533 | — | 4,353 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 6 | 210 | — | — | — | — | — | — | — | 216 | — | — | 216 |
| Revisions and reclassifications | 2 | 40 | — | — | — | — | — | — | 4 | 46 | — | — | 46 |
| Improved recovery | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | — | — | — | — | — | — | — | 2 | 2 | — | — | 2 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Production | (1) | (33) | — | — | — | — | — | — | (2) | (36) | — | — | (36) |
| At December 31 | 7 | 217 | — | — | — | — | — | — | 4 | 228 | — | — | 228 |
| Total [B] | 215 | 1,738 | 80 | 265 | 610 | 5 | 533 | — | 1,135 | 4,048 | 533 | — | 4,581 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31 | — | — | — | — | — | — | 267 | — | — | — | 267 | — | 267 |

[A] Includes 1 million barrels consumed in operations for synthetic crude oil.

[B] As announced on February 28, 2022, Shell intends to exit its joint ventures with Gazprom and related entities, including our 27.5% interest in Sakhalin-2, our 50% interest in Salym Petroleum Development and our Gydan energy venture. As of December 31, 2021, we had proved reserves of 93 million barrels in oil and gas. For more information See Note 32 on page 261.

**Proved developed reserves 2021**

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 103 | 1,417 | 69 | 316 | 539 | 12 | 644 | — | 674 | 3,130 | 644 | — | 3,774 |
| At December 31 | 140 | 1,348 | 71 | 218 | 397 | 2 | 533 | — | 786 | 2,962 | 533 | — | 3,495 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 6 | 192 | — | — | — | — | — | — | 1 | 199 | — | — | 199 |
| At December 31 | 7 | 197 | — | — | — | — | — | — | 4 | 208 | — | — | 208 |

**Proved undeveloped reserves 2021**

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 76 | 156 | 5 | 63 | 189 | 3 | — | — | 141 | 633 | — | — | 633 |
| At December 31 | 68 | 173 | 9 | 47 | 213 | 3 | — | — | 345 | 858 | — | — | 858 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | — | 18 | — | — | — | — | — | — | — | 18 | — | — | 18 |
| At December 31 | — | 20 | — | — | — | — | — | — | — | 20 | — | — | 20 |

Exhibit Q

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

Proved developed and undeveloped reserves 2020

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 274 | 1,551 | 121 | 395 | 982 | 18 | 607 | — | 1,033 | 4,374 | 607 | — | 4,981 |
| Revisions and reclassifications | (46) | 181 | (41) | 42 | (116) | (2) | 57 | — | (82) | (63) | 57 | — | (6) |
| Improved recovery | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | 14 | — | — | 27 | 7 | — | — | — | 48 | — | — | 48 |
| Purchases of minerals in place | — | 9 | — | — | — | — | — | — | — | 9 | — | — | 9 |
| Sales of minerals in place | (1) | — | — | — | — | — | — | — | — | (1) | — | — | (1) |
| Production [A] | (49) | (182) | (7) | (58) | (165) | (9) | (20) | — | (136) | (606) | (20) | — | (626) |
| At December 31 | 178 | 1,573 | 73 | 379 | 728 | 15 | 644 | — | 815 | 3,761 | 644 | — | 4,405 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 12 | 271 | — | — | — | — | — | — | — | 283 | — | — | 283 |
| Revisions and reclassifications | (5) | (27) | — | — | — | — | — | — | — | (32) | — | — | (32) |
| Improved recovery | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | — | — | — | — | — | — | — | 1 | 1 | — | — | 1 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Production | (1) | (34) | — | — | — | — | — | — | (1) | (36) | — | — | (36) |
| At December 31 | 6 | 210 | — | — | — | — | — | — | 1 | 216 | — | — | 216 |
| Total | 184 | 1,783 | 73 | 379 | 728 | 15 | 644 | — | 815 | 3,977 | 644 | — | 4,621 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31 | — | — | — | — | — | — | 322 | — | — | — | 322 | — | 322 |

[A] Includes 1 million barrels consumed in operations for synthetic crude oil.

Proved developed reserves 2020

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 156 | 1,403 | 106 | 314 | 641 | 15 | 607 | — | 675 | 3,310 | 607 | — | 3,917 |
| At December 31 | 103 | 1,417 | 69 | 316 | 539 | 12 | 644 | — | 674 | 3,130 | 644 | — | 3,774 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 11 | 240 | — | — | — | — | — | — | — | 251 | — | — | 251 |
| At December 31 | 6 | 192 | — | — | — | — | — | — | 1 | 199 | — | — | 199 |

Proved undeveloped reserves 2020

Million barrels

| | Europe | Asia | Oceania | Africa | USA | North America — Canada | | | South America | Total | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 118 | 149 | 15 | 80 | 341 | 3 | — | — | 358 | 1,064 | — | — | 1,064 |
| At December 31 | 76 | 156 | 5 | 63 | 189 | 3 | — | — | 141 | 633 | — | — | 633 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 1 | 31 | — | — | — | — | — | — | — | 32 | — | — | 32 |
| At December 31 | — | 18 | — | — | — | — | — | — | — | 18 | — | — | 18 |

Exhibit Q

Proved developed and undeveloped reserves 2019

Million barrels

| | Europe | Asia | Oceania | Africa | USA | | | Canada | South America | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 368 | 1,502 | 129 | 420 | 1,017 | 23 | 661 | — | 1,027 | 4,486 | 661 | — | 5,147 |
| Revisions and reclassifications | 27 | 226 | 2 | 33 | 86 | (2) | (34) | — | 72 | 444 | (34) | — | 410 |
| Improved recovery | — | — | — | — | — | — | — | — | 4 | 4 | — | — | 4 |
| Extensions and discoveries | — | 7 | — | 6 | 74 | 11 | — | — | 60 | 158 | — | — | 158 |
| Purchases of minerals in place | — | — | — | — | 5 | — | — | — | — | 5 | — | — | 5 |
| Sales of minerals in place | (65) | — | — | — | (29) | (2) | — | — | — | (96) | — | — | (96) |
| Production [A] | (56) | (184) | (10) | (64) | (171) | (12) | (20) | — | (130) | (627) | (20) | — | (647) |
| At December 31 | 274 | 1,551 | 121 | 395 | 982 | 18 | 607 | — | 1,033 | 4,374 | 607 | — | 4,981 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 9 | 281 | — | — | — | — | — | — | — | 290 | — | — | 290 |
| Revisions and reclassifications | 4 | 21 | — | — | — | — | — | — | — | 25 | — | — | 25 |
| Improved recovery | — | 4 | — | — | — | — | — | — | — | 4 | — | — | 4 |
| Extensions and discoveries | — | 2 | — | — | — | — | — | — | — | 2 | — | — | 2 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Production | (1) | (37) | — | — | — | — | — | — | — | (38) | — | — | (38) |
| At December 31 | 12 | 271 | — | — | — | — | — | — | — | 283 | — | — | 283 |
| Total | 286 | 1,822 | 121 | 395 | 982 | 18 | 607 | — | 1,033 | 4,657 | 607 | — | 5,264 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31 | — | — | — | — | — | — | 304 | — | — | — | 304 | — | 304 |

[A] Includes 1 million barrels consumed in operations for synthetic crude oil.

Proved developed reserves 2019

Million barrels

| | Europe | Asia | Oceania | Africa | USA | | Canada | | South America | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 243 | 1,318 | 108 | 335 | 629 | 21 | 661 | — | 634 | 3,288 | 661 | — | 3,949 |
| At December 31 | 156 | 1,403 | 106 | 314 | 641 | 15 | 607 | — | 675 | 3,310 | 607 | — | 3,917 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 8 | 251 | — | — | — | — | — | — | — | 259 | — | — | 259 |
| At December 31 | 11 | 240 | — | — | — | — | — | — | — | 251 | — | — | 251 |

Proved undeveloped reserves 2019

Million barrels

| | Europe | Asia | Oceania | Africa | USA | | | Canada | South America | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | Oil and NGL | Oil and NGL | Synthetic crude oil | Bitumen | All products |
| **Shell subsidiaries** | | | | | | | | | | | | | |
| At January 1 | 124 | 185 | 21 | 85 | 388 | 2 | — | — | 394 | 1,199 | — | — | 1,199 |
| At December 31 | 118 | 149 | 15 | 80 | 341 | 3 | — | — | 358 | 1,064 | — | — | 1,064 |
| **Shell share of joint ventures and associates** | | | | | | | | | | | | | |
| At January 1 | 1 | 30 | — | — | — | — | — | — | — | 31 | — | — | 31 |
| At December 31 | 1 | 31 | — | — | — | — | — | — | — | 32 | — | — | 32 |

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

### NATURAL GAS

Shell subsidiaries' proved reserves of natural gas at the end of the year, their share of the proved reserves of joint ventures and associates at the end of the year, and the changes in such reserves during the years are set out on pages 267-269. Significant changes in these proved reserves are discussed below. Volumes are not adjusted to standard heat content. Apart from integrated projects, volumes of gas are reported on an as-sold basis. The price used to calculate future revenue and cash flows from proved gas reserves is the contract price or the 12-month average on as-sold volumes. Volumes associated with integrated projects are those measured at a designated transfer point between the upstream and downstream portions of the integrated project. Natural gas volumes are converted into oil equivalent using a factor of 5,800 standard cubic feet (scf) per barrel.

### PROVED RESERVES 2021–2020

#### Shell subsidiaries

##### Asia

The increase of 559 thousand million scf in extensions and discoveries was mainly in Jerun and Timi.

##### Oceania

The increase of 1,905 thousand million scf in revisions and reclassifications was mainly in Surat QGC, JanzIo and Prelude.

##### Europe

The increase of 838 thousand million scf in revisions and reclassifications was mainly in Ormen Lange.

##### South America

The increase of 535 thousand million scf in revisions and reclassifications mainly in Dolphin, Starfish and Mero.

The increase of 357 thousand million scf in extensions and discoveries was mainly in Cassra and Bounty.

#### Shell share of joint ventures and associates

##### Asia

The increase of 313 thousand million scf in revisions and reclassifications was mainly in South West Ampa.

### PROVED RESERVES 2020–2019

#### Shell subsidiaries

##### Oceania

The net decrease of 3,512 thousand million scf in revisions and reclassifications was mainly in Gorgon, Jansz-Io and Surat QGC.

##### USA

The net decrease of 319 thousand million scf in revisions and reclassifications was mainly in Permian. The 542 thousand million scf of Sales of minerals in place was mainly in Tioga.

Proved developed and undeveloped reserves 2021

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
| | | | | | USA | Canada | | |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 2,442 | 9,927 | 4,176 | 2,363 | 801 | 1,295 | 1,128 | 22,132 |
| Revisions and reclassifications | 838 | (37) | 1,905 | (63) | 90 | 123 | 535 | 3,391 |
| Improved recovery | — | — | — | — | 5 | — | 4 | 9 |
| Extensions and discoveries | 1 | 559 | — | 126 | 158 | 277 | 357 | 1,477 |
| Purchases of minerals in place | 1 | — | — | — | — | — | — | 1 |
| Sales of minerals in place | — | — | — | (122) | (225) | (37) | — | (384) |
| Production [A] | (291) | (876) | (774) | (288) | (214) | (118) | (271) | (2,831) |
| At December 31 | 2,991 | 9,573 | 5,307 | 2,016 | 615 | 1,540 | 1,753 | 23,795 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 262 | 3,678 | 41 | — | — | — | 1 | 3,982 |
| Revisions and reclassifications | 210 | 313 | 51 | — | — | — | 3 | 577 |
| Improved recovery | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | — | — | — | — | — | 2 | 2 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — |
| Production [B] | (160) | (431) | (21) | — | — | — | — | (612) |
| At December 31 | 312 | 3,560 | 71 | — | — | — | 6 | 3,949 |
| Total [C] | 3,303 | 13,133 | 5,378 | 2,016 | 615 | 1,540 | 1,759 | 27,744 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31 | — | — | — | — | — | — | — | — |

[A] Includes 232 thousand million standard cubic feet consumed in operations.
[B] Includes 41 thousand million standard cubic feet consumed in operations.
[C] As announced on February 28, 2022, Shell intends to exit its joint ventures with Gazprom and related entities, including our 27.5% interest in Sakhalin-2, our 50% interest in Salym Petroleum Development and our Gydan energy venture. As of December 31, 2021, we had proved reserves of 980 thousand million cubic feet in natural gas. For more information See Note 32 on page 261 .

Proved developed reserves 2021

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
| | | | | | USA | Canada | | |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 1,590 | 9,675 | 3,656 | 1,341 | 670 | 720 | 924 | 18,576 |
| At December 31 | 2,532 | 8,789 | 4,089 | 981 | 373 | 757 | 1,301 | 18,822 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 227 | 3,175 | 42 | — | — | — | 1 | 3,445 |
| At December 31 | 265 | 3,097 | 71 | — | — | — | 6 | 3,439 |

Proved undeveloped reserves 2021

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
| | | | | | USA | Canada | | |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 852 | 252 | 520 | 1,022 | 132 | 575 | 203 | 3,556 |
| At December 31 | 459 | 784 | 1,218 | 1,035 | 242 | 783 | 452 | 4,973 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 35 | 502 | — | — | — | — | — | 537 |
| At December 31 | 47 | 463 | — | — | — | — | — | 510 |

Exhibit Q

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

Proved developed and undeveloped reserves 2020

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America USA | Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 2,998 | 10,618 | 8,360 | 2,608 | 1,868 | 1,281 | 1,259 | 28,992 |
| Revisions and reclassifications | (209) | 249 | (3,512) | 93 | (319) | 59 | 162 | (3,477) |
| Improved recovery | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | 2 | 33 | 5 | 66 | 122 | — | 228 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — |
| Sales of minerals in place | (28) | (29) | — | — | (542) | — | — | (599) |
| Production [A] | (319) | (913) | (705) | (343) | (272) | (167) | (293) | (3,012) |
| At December 31 | 2,442 | 9,927 | 4,176 | 2,363 | 801 | 1,295 | 1,128 | 22,132 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 595 | 4,198 | 36 | — | — | — | — | 4,829 |
| Revisions and reclassifications | (200) | (62) | 27 | — | — | — | 1 | (234) |
| Improved recovery | — | — | — | — | — | — | — | — |
| Extensions and discoveries | — | 1 | — | — | — | — | 1 | 2 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — |
| Production [B] | (133) | (459) | (22) | — | — | — | (1) | (615) |
| At December 31 | 262 | 3,678 | 41 | — | — | — | 1 | 3,982 |
| Total | 2,703 | 13,605 | 4,219 | 2,363 | 801 | 1,295 | 1,128 | 26,114 |
| **Reserves attributable to non-controlling interest in Shell subsidiaries at December 31** | — | — | — | — | — | — | — | — |

[A] Includes 225 thousand million standard cubic feet consumed in operations.
[B] Includes 42 thousand million standard cubic feet consumed in operations.

Proved developed reserves 2020

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America USA | Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 2,060 | 10,091 | 5,769 | 1,523 | 1,615 | 781 | 968 | 22,807 |
| At December 31 | 1,590 | 9,675 | 3,656 | 1,341 | 670 | 720 | 924 | 18,576 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 555 | 3,519 | 36 | — | — | — | — | 4,110 |
| At December 31 | 227 | 3,175 | 42 | — | — | — | 1 | 3,445 |

Proved undeveloped reserves 2020

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America USA | Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| **Shell subsidiaries** | | | | | | | | |
| At January 1 | 937 | 528 | 2,591 | 1,085 | 254 | 499 | 291 | 6,185 |
| At December 31 | 852 | 252 | 520 | 1,022 | 132 | 575 | 203 | 3,556 |
| **Shell share of joint ventures and associates** | | | | | | | | |
| At January 1 | 39 | 680 | — | — | — | — | — | 719 |
| At December 31 | 35 | 502 | — | — | — | — | — | 537 |

Exhibit Q

Proved developed and undeveloped reserves 2019

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | USA | Canada | | |
| Shell subsidiaries | | | | | | | | |
| At January 1 | 3,600 | 10,631 | 8,427 | 2,544 | 2,147 | 989 | 1,509 | 29,847 |
| Revisions and reclassifications | (46) | 859 | 699 | 290 | 114 | 235 | 29 | 2,180 |
| Improved recovery | — | — | — | — | — | — | 3 | 3 |
| Extensions and discoveries | — | 36 | — | 152 | 142 | 317 | 37 | 684 |
| Purchases of minerals in place | — | — | — | — | 5 | — | — | 5 |
| Sales of minerals in place | (210) | — | — | — | (132) | (30) | — | (372) |
| Production [A] | (346) | (908) | (766) | (378) | (408) | (230) | (319) | (3,355) |
| At December 31 | 2,998 | 10,618 | 8,360 | 2,608 | 1,868 | 1,281 | 1,259 | 28,992 |
| Shell share of joint ventures and associates | | | | | | | | |
| At January 1 | 1,163 | 4,581 | 24 | — | — | — | — | 5,768 |
| Revisions and reclassifications | (322) | 64 | 34 | — | — | — | — | (224) |
| Improved recovery | — | 1 | — | — | — | — | — | 1 |
| Extensions and discoveries | — | 5 | — | — | — | — | — | 5 |
| Purchases of minerals in place | — | — | — | — | — | — | — | — |
| Sales of minerals in place | — | — | — | — | — | — | — | — |
| Production [B] | (246) | (453) | (22) | — | — | — | — | (721) |
| At December 31 | 595 | 4,198 | 36 | — | — | — | — | 4,829 |
| Total | 3,593 | 14,816 | 8,396 | 2,608 | 1,868 | 1,281 | 1,259 | 33,821 |
| Reserves attributable to non-controlling interest in Shell subsidiaries at December 31 | — | — | — | — | — | — | — | — |

[A] Includes 247 thousand million standard cubic feet consumed in operations.
[B] Includes 42 thousand million standard cubic feet consumed in operations.

Proved developed reserves 2019

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | USA | Canada | | |
| Shell subsidiaries | | | | | | | | |
| At January 1 | 2,658 | 10,092 | 5,820 | 1,573 | 1,706 | 721 | 1,238 | 23,808 |
| At December 31 | 2,060 | 10,091 | 5,769 | 1,523 | 1,615 | 781 | 968 | 22,807 |
| Shell share of joint ventures and associates | | | | | | | | |
| At January 1 | 1,136 | 3,938 | 24 | — | — | — | — | 5,099 |
| At December 31 | 555 | 3,519 | 36 | — | — | — | — | 4,110 |

Proved undeveloped reserves 2019

Thousand million standard cubic feet

| | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | USA | Canada | | |
| Shell subsidiaries | | | | | | | | |
| At January 1 | 942 | 539 | 2,607 | 971 | 441 | 268 | 271 | 6,039 |
| At December 31 | 937 | 528 | 2,591 | 1,085 | 254 | 499 | 291 | 6,185 |
| Shell share of joint ventures and associates | | | | | | | | |
| At January 1 | 27 | 643 | — | — | — | — | — | 670 |
| At December 31 | 39 | 680 | — | — | — | — | — | 719 |

Exhibit Q

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

**STANDARDISED MEASURE OF DISCOUNTED FUTURE CASH FLOWS**

The SEC Form 20-F requires the disclosure of a standardised measure of discounted future net cash flows, relating to proved reserves quantities and based on a 12-month unweighted arithmetic average sales price, calculated on a first-day-of-the-month basis, with cost factors based on those at the end of each year, currently enacted tax rates and a 10% annual discount factor. In our view, the information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity with another because the assumptions used cannot reflect the varying circumstances within each entity. In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

**STANDARDISED MEASURE OF DISCOUNTED FUTURE CASH FLOWS RELATING TO PROVED RESERVES AT DECEMBER 31**

2021 – Shell subsidiaries

$ million

| | | | | | North America | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Europe | Asia | Oceania | Africa | USA | Canada | South America | Total |
| Future cash inflows | 37,801 | 115,068 | 37,462 | 22,663 | 41,431 | 34,835 | 81,239 | 370,499 |
| Future production costs | 11,977 | 30,567 | 13,446 | 8,742 | 23,314 | 15,565 | 35,787 | 139,398 |
| Future development costs | 5,347 | 12,989 | 6,718 | 3,078 | 7,787 | 4,063 | 16,130 | 56,112 |
| Future tax expenses | 12,311 | 28,834 | 2,206 | 7,584 | 1,572 | 3,153 | 7,829 | 63,489 |
| Future net cash flows | 8,166 | 42,678 | 15,092 | 3,259 | 8,758 | 12,054 | 21,493 | 111,500 |
| Effect of discounting cash flows at 10% | 1,754 | 18,771 | 4,205 | 497 | 1,207 | 7,331 | 7,270 | 41,035 |
| Standardised measure of discounted future net cash flows | 6,412 | 23,907 | 10,887 | 2,762 | 7,551 | 4,723 | 14,223 | 70,465 |
| Non-controlling Interest Included | — | — | — | — | — | 1,906 | — | 1,906 |

2021 – Shell share of joint ventures and associates

$ million

| | | | | | North America | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Europe | Asia | Oceania | Africa | USA | Canada | South America | Total |
| Future cash inflows | 4,006 | 36,365 | 326 | — | — | — | 283 | 40,980 |
| Future production costs | 2,869 | 15,653 | 245 | — | — | — | 128 | 18,895 |
| Future development costs | 931 | 6,819 | 82 | — | — | — | 15 | 7,847 |
| Future tax expenses | 1,623 | 6,229 | — | — | — | — | 9 | 7,861 |
| Future net cash flows | -1,417 | 7,664 | -1 | — | — | — | 131 | 6,377 |
| Effect of discounting cash flows at 10% | -316 | 1,630 | -29 | — | — | — | 34 | 1,319 |
| Standardised measure of discounted future net cash flows | -1,101[A] | 6,034 | 28 | — | — | — | 97 | 5,058 |

[A] While proved reserves are economically producible at the 2021 yearly average price, the standardised measure of discounted future net cash flows was negative for those proved reserves at December 31, 2021, due to addition of overhead, tax and abandonment costs and ongoing commitments post production of proved reserves.

2020 – Shell subsidiaries

$ million

| | | | | | North America | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Europe | Asia | Oceania | Africa | USA | Canada | South America | Total |
| Future cash inflows | 16,581 | 75,128 | 23,787 | 19,743 | 27,891 | 22,447 | 34,502 | 220,079 |
| Future production costs | 6,776 | 26,896 | 10,240 | 9,837 | 20,341 | 15,475 | 19,137 | 108,702 |
| Future development costs | 4,352 | 12,416 | 7,441 | 3,354 | 7,274 | 4,559 | 7,440 | 46,836 |
| Future tax expenses | 4,525 | 12,585 | 254 | 4,713 | 54 | 407 | 1,847 | 24,385 |
| Future net cash flows | 928 | 23,231 | 5,852 | 1,838 | 222 | 2,006 | 6,079 | 40,156 |
| Effect of discounting cash flows at 10% | 338 | 9,792 | 493 | -50 | -1,469 | 1,231 | 1,369 | 11,704 |
| Standardised measure of discounted future net cash flows | 590 | 13,440 | 5,359[A] | 1,889 | 1,691 | 775 | 4,709 | 28,452[B] |
| Non-controlling interest included | — | — | — | — | — | 398 | — | 398 |

2020 SMOG value has been corrected. [A] Corrected from 6,719 and [B] Corrected from 29,813

Exhibit Q

2020 – Shell share of joint ventures and associates

$ million

| | Europe | Asia | Oceania | Africa | North America USA | North America Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Future cash inflows | 1,209 | 22,209 | 139 | — | — | — | 21 | 23,578 |
| Future production costs | 2,801 | 11,472 | 136 | — | — | — | 17 | 14,426 |
| Future development costs | 948 | 5,165 | 111 | — | — | — | 2 | 6,226 |
| Future tax expenses | — | 3,026 | — | — | — | — | — | 3,026 |
| Future net cash flows | (2,540) | 2,546 | (108) | — | — | — | 2 | (100) |
| Effect of discounting cash flows at 10% | (583) | 412 | (35) | — | — | — | — | (206) |
| Standardised measure of discounted future net cash flows | (1,957)[A] | 2,134 | (73) | — | — | — | 2 | 106 |

[A] While proved reserves are economically producible at the 2020 yearly average price, the standardised measure of discounted future net cash flows was negative for those proved reserves at December 31, 2020, due to addition of overhead, tax and abandonment costs and ongoing commitments post production of proved reserves.

2019 – Shell subsidiaries

$ million

| | Europe | Asia | Oceania | Africa | North America USA | North America Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Future cash inflows | 33,762 | 111,802 | 71,775 | 31,046 | 55,800 | 31,522 | 64,957 | 400,664 |
| Future production costs | 11,818 | 32,581 | 21,589 | 12,158 | 30,139 | 16,651 | 32,362 | 157,298 |
| Future development costs | 6,047 | 13,449 | 10,103 | 4,081 | 11,137 | 4,603 | 13,219 | 62,639 |
| Future tax expenses | 9,285 | 25,938 | 7,016 | 10,542 | 2,397 | 2,313 | 5,429 | 62,920 |
| Future net cash flows | 6,612 | 39,834 | 33,067 | 4,265 | 12,127 | 7,955 | 13,947 | 117,807 |
| Standardised measure of discounted future net cash flows | 1,917 | 17,851 | 13,328 | 377 | 1,815 | 5,571 | 4,094 | 44,953 |
| Effect of discounting cash flows at 10% | 4,695 | 21,983 | 19,739 | 3,888 | 10,312 | 2,384 | 9,853 | 72,854 |
| Non-controlling interest included | — | — | — | — | — | 1,371 | — | 1,371 |

2019 – Shell share of joint ventures and associates

$ million

| | Europe | Asia | Oceania | Africa | North America USA | North America Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Future cash inflows | 3,615 | 38,099 | 122 | — | — | — | — | 41,836 |
| Future production costs | 2,810 | 18,336 | 81 | — | — | — | — | 21,227 |
| Future development costs | 935 | 6,946 | 36 | — | — | — | — | 7,917 |
| Future tax expenses | 718 | 6,160 | 4 | — | — | — | — | 6,882 |
| Future net cash flows | (848) | 6,657 | 1 | — | — | — | — | 5,812 |
| Effect of discounting cash flows at 10% | (266) | 1,190 | (7) | — | — | — | — | 917 |
| Standardised measure of discounted future net cash flows | (582) [A] | 5,467 | 8 | — | — | — | — | 4,893 |

[A] While proved reserves are economically producible at the 2019 yearly average price, the standardised measure of discounted future net cash flows was negative for those proved reserves at December 31, 2019, due to addition of overhead, tax and abandonment costs and ongoing commitments post production of proved reserves.

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

CHANGE IN STANDARDISED MEASURE OF DISCOUNTED FUTURE NET CASH FLOWS RELATING TO PROVED RESERVES

2021

$ million

|  | Shell subsidiaries | Shell share of joint ventures and associates | Total |
|---|---|---|---|
| At January 1 | 28,452 | 106 | 28,558 |
| Net changes in prices and production costs | 74,896 | 9,188 | 84,084 |
| Revisions of previous reserves estimates | 19,435 | 3,253 | 22,688 |
| Extensions, discoveries and improved recovery | 5,631 | 60 | 5,691 |
| Purchases and sales of minerals in place | (880) | — | (880) |
| Development cost related to future production | (10,652) | (982) | (11,634) |
| Sales and transfers of oil and gas, net of production costs | (35,754) | (4,455) | (40,209) |
| Development cost incurred during the year | 8,594 | 969 | 9,563 |
| Accretion of discount | 3,832 | 170 | 4,002 |
| Net change in income tax | (23,089) | (3,251) | (26,340) |
| At December 31 | 70,465 | 5,058 | 75,523 |

2020

$ million

|  | Shell subsidiaries | Shell share of joint ventures and associates | Total |
|---|---|---|---|
| At January 1 | 72,854 | 4,893 | 77,747 |
| Net changes in prices and production costs | (71,184) | (6,097) | (77,281) |
| Revisions of previous reserves estimates | 574 | (459) | 115 |
| Extensions, discoveries and improved recovery | 691 | 17 | 709 |
| Purchases and sales of minerals in place | (540) | — | (540) |
| Development cost related to future production | 2,906 | (426) | 2,480 |
| Sales and transfers of oil and gas, net of production costs | (16,990) | (1,954) | (18,944) |
| Development cost incurred during the year | 8,197 | 759 | 8,956 |
| Accretion of discount | 9,881 | 832 | 10,713 |
| Net change in income tax | 22,063 | 2,541 | 24,604 |
| At December 31 | 28,452 [A] | 106 | 28,558 [B] |

2020 SMOG value has been corrected. [A] Corrected from 29,813 and [B]Corrected from 29,919

2019

$ million

|  | Shell subsidiaries | Shell share of joint ventures and associates | Total |
|---|---|---|---|
| At January 1 | 89,845 | 7,229 | 97,074 |
| Net changes in prices and production costs | (18,759) | (1,017) | (19,776) |
| Revisions of previous reserves estimates | 13,777 | (293) | 13,484 |
| Extensions, discoveries and improved recovery | 5,193 | 93 | 5,286 |
| Purchases and sales of minerals in place | (2,831) | — | (2,831) |
| Development cost related to future production | (9,417) | (2) | (9,419) |
| Sales and transfers of oil and gas, net of production costs | (33,319) | (3,918) | (37,237) |
| Development cost incurred during the year | 10,430 | 702 | 11,132 |
| Accretion of discount | 12,004 | 1,133 | 13,137 |
| Net change in income tax | 5,931 | 966 | 6,897 |
| At December 31 | 72,854 | 4,893 | 77,747 |

Exhibit Q

OIL AND GAS EXPLORATION AND PRODUCTION ACTIVITIES CAPITALISED COSTS

The aggregate amount of property, plant and equipment and intangible assets, excluding goodwill, relating to oil and gas exploration and production activities, and the aggregate amount of the related depreciation, depletion and amortisation at December 31, are shown in the tables below.

Shell subsidiaries

| | | $ million |
|---|---|---|
| | 2021 | 2020 |
| Cost | | |
| Proved properties [A] [B] | 261,085 | 276,239 |
| Unproved properties | 12,754 | 14,563 |
| Support equipment and facilities [B] | 11,067 | 10,741 |
| | 284,906 | 301,543 |
| Depreciation, depletion and amortisation | | |
| Proved properties [A] [B] | 156,554 | 157,844 |
| Unproved properties | 5,660 | 5,342 |
| Support equipment and facilities [B] | 5,891 | 4,990 |
| | 168,105 | 168,176 |
| Net capitalised costs | 116,801 | 133,367 |

[A] Includes capitalised asset decommissioning and restoration costs and related depreciation.
[B] As of 2021, assets held for sale have been excluded from scope of this note and presented under a separate disclosure within Note 30 – Assets held for sale. Prior period comparatives have also been revised to conform with current year.

Shell share of joint ventures and associates

| | | $ million |
|---|---|---|
| | 2021 | 2020 |
| Cost | | |
| Proved properties [A] | 52,762 | 50,644 [C] |
| Unproved properties | 1,853 | 2,512 |
| Support equipment and facilities | 4,982 | 5,037 |
| | 59,597 | 58,193 [C] |
| Depreciation, depletion and amortisation | | |
| Proved properties [A] | 38,844 | 36,994 [C] |
| Unproved properties [B] | 452 | 473 |
| Support equipment and facilities | 3,182 | 3,070 |
| | 42,478 | 40,537 [C] |
| Net capitalised costs | 17,119 | 17,656 [C] |

[A] Includes capitalised asset decommissioning and restoration costs and related depreciation.
[B] The major part of this cost consists of an impairment charge taken in 2020.
[C] As revised, following a reassessment.

OIL AND GAS EXPLORATION AND PRODUCTION ACTIVITIES COSTS INCURRED

Costs incurred during the year in oil and gas property acquisition, exploration and development activities, whether capitalised or charged to income currently, are shown in the tables below. As a result of the adoption of IFRS 16 *Leases* as of January 1, 2019, leases are included in all years shown below. Development costs include capitalised asset decommissioning and restoration costs (including increases or decreases arising from changes to cost estimates or to the discount rate applied to the obligations) and exclude costs of acquiring support equipment and facilities, but include depreciation thereon.

Shell subsidiaries

2021

| | | | | | North America | | | | $ million |
|---|---|---|---|---|---|---|---|---|---|
| | Europe | Asia | Oceania | Africa | USA | Other [A] | South America | Total | |
| Acquisition of properties | | | | | | | | | |
| Proved | 2 | — | — | 246 | — | — | — | 247 | |
| Unproved | — | — | — | 2 | 26 | 34 | 42 | 103 | |
| Exploration | 301 | 103 | 26 | 136 | 920 | 217 | 170 | 1,873 | [B] |
| Development | 996 | 693 | 600 | 166 | 3,116 | 106 | 1,436 | 7,113 | |

[A] Comprises Canada and Mexico.
[B] Includes $336 million of Shales-related exploration activities. Shell did not have any exploratory wells with proved reserves allocated at the end of 2021 due to divestment activities.

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

2020

$ million

|  | Europe | Asia | Oceania | Africa | North America USA | North America Other [A] | South America | Total |  |
|---|---|---|---|---|---|---|---|---|---|
| Acquisition of properties |  |  |  |  |  |  |  |  |  |
| Proved | 4 | 156 | — | 5 | — | — | — | 165 |  |
| Unproved | 115 | 19 | — | 48 | 80 | 6 | 180 | 448 |  |
| Exploration | 287 | 102 | 33 | 168 | 951 | 275 | 390 | 2,206 | [B] |
| Development | 1,612 | 1,018 | 1,465 | 807 | 4,186 | 325 | 1,930 | 11,343 |  |

[A] Comprises Canada and Mexico.
[B] Includes $504 million of Shales-related exploration activities. In 2020, we participated in 161 Shales productive exploratory wells with proved reserves allocated (Shell share: 77 wells).

2019

$ million

|  | Europe | Asia | Oceania | Africa | North America USA | North America Other [A] | South America | Total |  |
|---|---|---|---|---|---|---|---|---|---|
| Acquisition of properties |  |  |  |  |  |  |  |  |  |
| Proved | 3 | 105 | — | 10 | — | — | — | 118 |  |
| Unproved | — | 11 | — | 67 | 118 | 5 | 3 | 204 |  |
| Exploration | 428 | 165 | 117 | 253 | 1,723 | 402 | 500 | 3,588 | [B] |
| Development | 2,054 | 1,434 | 1,225 | 1,480 | 4,455 | 287 | 2,418 | 13,353 |  |

[A] Comprises Canada and Mexico.
[B] Includes $1,195 million of Shales-related exploration activities. In 2019, we participated in 231 Shales productive exploratory wells with proved reserves allocated (Shell share: 117 wells).

**Shell share of joint ventures and associates**
Joint ventures and associates did not incur costs in the acquisition of oil and gas properties in 2021 and 2019.

2021

$ million

|  | Europe | Asia | Oceania | Africa | North America USA | North America Other | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Exploration | — | 69 | 1 | — | — | — | 41 | 111 |
| Development | 101 | 1,648 | 205 | — | — | — | 49 | 2,002 |

2020

$ million

|  | Europe | Asia | Oceania | Africa | North America USA | North America Other | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Acquisition of properties |  |  |  |  |  |  |  |  |
| Unproved | — | — | — | — | — | — | 128 | 128 |
| Exploration | — | 94 | 10 | — | — | — | 105 | 209 |
| Development | 124 | 2,225 [A] | 67 | — | — | — | 2 | 2,418 [A] |

[A] As revised, following a reassessment.

2019

$ million

|  | Europe | Asia | Oceania | Africa | North America USA | North America Other | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Exploration | 1 | 116 | 12 | — | — | — | — | 129 |
| Development | 94 | 1,400 | 65 | — | — | — | — | 1,559 |

Exhibit Q

OIL AND GAS EXPLORATION AND PRODUCTION ACTIVITIES EARNINGS

In Shell, extractive activities, or oil and gas exploration and production activities, are undertaken within the Integrated Gas segment, the Upstream segment and the Oil Products segment. Shell's extractive activities do not represent the full extent of Integrated Gas, Upstream and Oil Products activities, and exclude downstream GTL, some LNG activities, Marketing business in Oil Products, Power and New Energies, trading and optimisation, as well as other non-extractive activities.

The earnings disclosed in this "extractive activities" section are only a subset of Shell's total earnings and as a result are not suitable for modelling Shell's integrated businesses, for which we refer to the full segment earnings and descriptions of the Integrated Gas, Upstream and Oil Products businesses. These are available on pages 44, 49 and 64 respectively. The earnings disclosed in this "extractive activities" section are not adjusted for items such as impairment charges, restructuring charges and charges for onerous contract provisions. Full segment information for the Consolidated Financial Statements is available on pages 223-226.

The results of operations for oil and gas producing activities are shown in the tables below. Taxes other than income tax include cash-paid royalties to governments outside North America.

Shell subsidiaries

2021

$ million

| | Europe | Asia | Oceania | Africa | USA | North America Other [A] | South America | Total |
|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | |
| Third parties | 1,502 | 3,089 | 681 | 1,849 | 3,411 | 816 | 1,224 | 12,572 |
| Sales between businesses | 5,524 | 11,107 | 5,256 | 2,214 | 8,009 | 1,815 | 8,249 | 42,174 |
| Total | 7,026 | 14,196 | 5,937 | 4,063 | 11,420 | 2,631 | 9,473 | 54,746 |
| Production costs excluding taxes | 1,892 | 1,817 | 1,222 | 1,013 | 2,165 | 679 | 1,045 | 9,833 |
| Taxes other than income tax | 77 | 863 | 234 | 250 | 120 | — | 2,904 | 4,448 |
| Exploration | 242 | 70 | 21 | 133 | 616 | 191 | 150 | 1,423 |
| Depreciation, depletion and amortisation | 1,342 | 2,817 | 1,805 | 1,227 | 5,201 | 181 | 3,973 | 16,546 |
| Other costs/(income) | 3,867 | 1,210 | (155) | (349) | (2,550) | 1,045 | 233 | 3,301 |
| Earnings before taxation | (394) | 7,419 | 2,810 | 1,789 | 5,868 | 535 | 1,168 | 19,195 |
| Taxation charge/(credit) | 473 | 4,473 | 831 | 35 | 1,268 | 180 | 256 | 7,516 |
| Earnings after taxation | (867) | 2,946 | 1,979 | 1,754 | 4,600 | 355 | 912 | 11,679 |

[A] Comprises Canada and Mexico.

2020

$ million

| | Europe | Asia | | Oceania | | Africa | USA | North America Other [A] | South America | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | | | |
| Third parties | 767 | 2,104 | | 589 | | 1,540 | 1,008 | 753 | 567 | 7,328 |
| Sales between businesses | 2,879 | 6,792 | [B] | 3,366 | [B] | 1,816 | 5,239 | 943 | 4,656 | 25,691 |
| Total | 3,646 | 8,896 | | 3,955 | | 3,356 | 6,247 | 1,696 | 5,223 | 33,019 |
| Production costs excluding taxes | 2,023 | 1,811 | | 1,040 | | 1,064 | 2,615 | 735 | 936 | 10,224 |
| Taxes other than income tax | 64 | 389 | | 93 | | 202 | 64 | — | 1,494 | 2,349 |
| Exploration | 256 | 149 | | 234 | | 202 | 325 | 108 | 473 | 1,747 |
| Depreciation, depletion and amortisation | 3,618 | 2,120 | | 10,178 | | 2,589 | 7,927 | 2,147 | 6,282 | 34,861 |
| Other costs/(income) | 553 | 1,559 | [B] | 314 | [B] | 645 | 230 | 631 | 161 | 4,093 |
| Earnings before taxation | (2,868) | 2,868 | | (7,904) | [B] | (1,389) | (4,914) | (1,925) | (4,123) | (20,255) |
| Taxation charge/(credit) | (423) | 1,854 | | (3,175) | | (104) | (790) | (449) | (300) | (3,387) |
| Earnings after taxation | (2,445) | 1,014 | | (4,729) | [B] | (1,285) | (4,124) | (1,476) | (3,823) | (16,868) |

[A] Comprises Canada and Mexico.
[B] As revised, following a reassessment.

Exhibit Q

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

2019

$ million

|  | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | USA | Other [A] |  |  |
| Revenue |  |  |  |  |  |  |  |  |
| Third parties | 1,257 | 3,065 | 931 | 1,936 | 2,638 | 632 | 844 | 11,303 |
| Sales between businesses | 4,911 | 10,526 | 4,918 [B] | 3,289 | 7,786 | 1,936 | 7,647 | 41,013 |
| Total | 6,168 | 13,591 | 5,849 [B] | 5,225 | 10,424 | 2,568 | 8,491 | 52,316 |
| Production costs excluding taxes | 1,582 | 2,065 | 1,178 | 1,062 | 2,807 | 983 | 1,135 | 10,812 |
| Taxes other than income tax | 94 | 749 | 136 | 370 | 103 | — | 2,613 | 4,065 |
| Exploration | 619 | 583 | 107 | 187 | 411 | 159 | 288 | 2,354 |
| Depreciation, depletion and amortisation | 2,604 | 2,130 | 1,957 | 1,354 | 6,932 | 858 | 3,929 | 19,764 |
| Other costs/(income) | (20) | 1,599 | (105) | 121 | (575) | 818 | 1,379 | 3,217 |
| Earnings before taxation | 1,289 | 6,465 | 2,576 [B] | 2,131 | 746 | (250) | (853) | 12,104 |
| Taxation charge/(credit) | 848 | 4,013 | 1,094 | 1,431 | 154 | (110) | (78) | 7,352 |
| Earnings after taxation | 441 | 2,452 | 1,482 [B] | 700 | 592 | (140) | (775) | 4,752 |

[A] Comprises Canada, Honduras and Mexico.
[B] As revised, following a reassessment.

Shell share of joint ventures and associates

2021

$ million

|  | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | USA | Canada |  |  |
| Third-party revenue | 1,632 | 5,473 | 78 | — | — | — | 102 | 7,285 |
| Total | 1,632 | 5,473 | 78 | — | — | — | 102 | 7,285 |
| Production costs excluding taxes | 246 | 770 | 82 | — | — | — | 9 | 1,107 |
| Taxes other than income tax | 48 | 900 | 7 | — | — | — | 12 | 967 |
| Exploration | 2 | 27 | — | — | — | — | — | 29 |
| Depreciation, depletion and amortisation | 254 | 1,262 | 32 | — | — | — | 38 | 1,586 |
| Other costs/(income) | 732 | 355 | (22) | — | (8) | — | 11 | 1,068 |
| Earnings before taxation | 350 | 2,159 | (21) | — | 8 | — | 32 | 2,528 |
| Taxation charge | 62 | 877 | — | — | 2 | — | (2) | 939 |
| Earnings after taxation | 288 | 1,282 | (21) | — | 6 | — | 34 | 1,589 |

2020

$ million

|  | Europe | Asia | Oceania | Africa | North America | | South America | Total |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | USA | Canada |  |  |
| Third-party revenue | 514 | 3,464 | 65 | — | — | — | 32 | 4,075 |
| Total | 514 | 3,464 | 65 | — | — | — | 32 | 4,075 |
| Production costs excluding taxes | 272 | 726 | 72 | — | — | — | 8 | 1,078 |
| Taxes other than income tax | 22 | 423 | 5 | — | — | — | 4 | 454 |
| Exploration | 2 | 97 | — | — | — | — | — | 99 |
| Depreciation, depletion and amortisation | 366 | 1,219 | 270 | — | (7) | — | 23 | 1,871 |
| Other costs/(income) | 296 | 365 | (14) | — | (1) | — | 12 | 658 |
| Earnings before taxation | (444) | 634 | (268) | — | 8 | — | (15) | (85) |
| Taxation charge | (281) | 162 | — | — | 2 | — | (9) | (126) |
| Earnings after taxation | (163) | 472 | (268) | — | 6 | — | (6) | 41 |

276

Exhibit Q

2019

$ million

| | Europe | Asia | Oceania | Africa | USA | Canada | South America | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | North America | | | |
| Third-party revenue | 1,233 | 5,475 | 81 | — | — | — | — | 6,789 |
| Total | 1,233 | 5,475 | 81 | — | — | — | — | 6,789 |
| Production costs excluding taxes | 249 | 669 | 88 | — | — | — | — | 1,006 |
| Taxes other than income tax | 75 | 1,037 | 6 | — | — | — | — | 1,118 |
| Exploration | 4 | 51 | — | — | — | — | — | 55 |
| Depreciation, depletion and amortisation | 217 | 949 | 415 | — | — | — | — | 1,581 |
| Other costs/(income) | 547 | 622 | (18) | — | 1 | 1 | — | 1,153 |
| Earnings before taxation | 141 | 2,147 | (410) | — | (1) | (1) | — | 1,876 |
| Taxation charge | 39 | 957 | — | — | — | — | — | 996 |
| Earnings after taxation | 102 | 1,190 | (410) | — | (1) | (1) | — | 880 |

**ACREAGE AND WELLS**

The tables below reflect acreage and wells of Shell subsidiaries, joint ventures and associates. The term "gross" refers to the total activity in which Shell subsidiaries, joint ventures and associates have an interest. The term "net" refers to the sum of the fractional interests owned by Shell subsidiaries plus the Shell share of joint ventures and associates' fractional interests. Data below are rounded to the nearest whole number.

Oil and gas acreage (at December 31)

Thousand Acres

| | 2021 | | | | 2020 | | | | 2019 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Developed | | Undeveloped | | Developed | | Undeveloped | | Developed | | Undeveloped | |
| | Gross | Net | Gross | Net | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
| Europe | 6,009 | 1,875 | 8,090 | 3,833 | 6,075 | 1,900 | 13,399 | 5,663 | 6,278 | 1,910 | 13,844 | 6,077 |
| Asia | 21,360 | 7,651 | 31,620 | 17,022 | 21,360 | 7,651 | 34,545 | 18,003 | 21,387 | 7,672 | 31,486 | 14,880 |
| Oceania | 2,485 | 947 | 9,577 | 5,132 | 2,653 [A] | 993 [A] | 9,654 [B] | 5,256 [B] | 2,563 [C] | 949 [C] | 12,182 [D] | 6,525 [D] |
| Africa | 3,937 | 1,457 | 71,398 | 35,633 | 4,764 | 1,996 | 67,197 [E] | 36,944 [E] | 4,663 | 1,938 | 60,968 [F] | 31,765 [F] |
| North America - USA | 487 | 286 | 2,049 | 1,555 | 1,145 | 728 | 1,916 | 1,408 | 1,346 | 906 | 2,483 | 1,911 |
| North America - Mexico | — | — | 5,407 | 3,335 | | | 5,178 | 3,291 | | | 5,178 | 3,291 |
| North America - Canada | 359 | 206 | 1,334 | 823 | 490 | 336 | 1,689 | 1,177 | 483 | 329 | 1,783 | 1,265 |
| South America | 1,463 | 616 | 23,467 | 12,629 | 1,449 | 609 | 20,037 [G] | 11,709 [G] | 1,393 | 595 | 16,336 [H] | 10,192 [H] |
| Total | 36,100 | 13,038 | 152,942 | 79,962 | 37,936 | 14,213 | 153,615 | 83,451 | 38,113 | 14,299 | 144,260 | 75,906 |

[A] Corrected from 3,151 Gross (1,275 Net).
[B] Corrected from 9,156 Gross (4,974 Net).
[C] Corrected from 3,105 Gross (1,315 Net).
[D] Corrected from 11,720 Gross (6,260 Net).
[E] Corrected from 69,194 Gross (37,743 Net).
[F] Corrected from 62,965 Gross (32,564 Net).
[G] Corrected from 20,147 Gross (11,731 Net).
[H] Corrected from 16,446 Gross (10,214 Net).

Number of productive wells [A] (at December 31)

| | 2021 | | | | 2020 | | | | 2019 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil | | Gas | | Oil | | Gas | | Oil | | Gas | |
| | Gross | Net | Gross | Net | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
| Europe | 796 | 193 | 1,021 | 324 | 814 | 197 | 1,047 [B] | 335 [B] | 894 | 217 | 1,095 | 345 |
| Asia | 8,819 | 3,219 | 364 | 210 | 8,505 | 3,105 | 342 | 193 | 7,860 | 2,874 | 336 | 193 |
| Oceania | — | — | 3,398 | 1,974 | — | — | 3,369 [C] | 1,920 [C] | — | — | 3,348 | 1,891 |
| Africa | 391 | 126 | 114 | 56 | 567 | 235 | 209 | 141 | 514 | 206 | 202 | 139 |
| North America – USA | 13,042 | 6,627 | 28 | 20 | 14,505 | 7,402 | 401 | 223 | 14,953 | 7,650 | 824 | 518 |
| North America – Canada | — | — | 510 | 440 | — | — | 757 | 684 | — | — | 748 | 676 |
| South America | 229 | 112 | 67 | 39 | 179 | 82 | 63 | 37 | 137 | 63 | 58 | 36 |
| Total | 23,277 | 10,277 | 5,502 | 3,063 | 24,570 | 11,021 | 6,188 | 3,533 | 24,358 | 11,010 | 6,611 | 3,798 |

Exhibit Q

[A] The number of productive wells with multiple completions at December 31, 2021, was 956 Gross (427 Net) ; December 31, 2020: 956 Gross (416 Net); December 31, 2019: 950 Gross (418 Net)
[B] Corrected from 1,055 Gross (336 Net)
[C] Corrected from 3,394 Gross (1,927 Net)

Number of net productive wells and dry holes drilled

| | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| | Productive | Dry | Productive | Dry | Productive | Dry |
| Exploratory [A] | | | | | | |
| Europe | — | — | — | 1 | — | 4 |
| Asia | 5 | 10 | 10 | 8 | 25 | 17 |
| Oceania | — | 2 | — | 6 | — | 2 |
| Africa | — | 11 | 5 | 7 | 8 | 8 |
| North America - USA | 3 | 39 | 57 | 81 | 89 | 9 |
| North America - Canada | — | 15 | 17 | 1 | 24 | — |
| South America | 5 | 1 | 5 | 3 | 8 | 1 |
| Total | 13 | 78 | 94 | 107 | 154 | 41 |
| Development | | | | | | |
| Europe | 3 | 1 | 5 [B] | — | 4 | 1 |
| Asia | 218 | — | 169 | — | 182 | — |
| Oceania | 7 | — | 20 [C] | — | 16 | — |
| Africa | 6 [D] | — | 19 | — | 34 | — |
| North America - USA | 46 [E] | — | 110 | — | 280 | 5 |
| North America - Canada | — | — | — | — | 6 | — |
| South America | 31 | — | 14 | — | 10 | 1 |
| Total | 311 | 1 | 337 | — | 532 | 7 |

[A] Productive wells are wells with proved reserves allocated. Wells in the process of drilling are excluded and presented separately below.
[B] Corrected from 6.
[C] Corrected from 22.
[D] Includes 5 development productive wells in Shell Egypt that were divested in 2021.
[E] Includes 26 development productive wells in SEPCo USA that were divested in 2021.

SUPPLEMENTARY INFORMATION – OIL AND GAS (UNAUDITED) continued

Number of wells in the process of exploratory drilling [A]

2021

| | At January 1 | | Wells in the process of drilling at January 1 and allocated proved reserves during the year | | Wells in the process of drilling at January 1 and determined as dry during the year | | New wells in the process of drilling at December 31 | | At December 31 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net | Gross | Net | Gross | Net |
| Europe | 12 | 8 [B] | — | — | — | — | 1 | — | 13 | 8 |
| Asia | 56 | 21 | 6 | 2 | 10 | 4 | 15 | 6 | 55 | 21 |
| Oceania | 32 | 11 | — | — | 9 | 2 | 45 | 21 | 68 | 30 |
| Africa | 28 | 19 | — | — | 10 [C] | 10 [C] | 1 | 1 | 19 | 10 |
| North America - USA | 92 | 43 | 4 | 3 | 79 [D] | 35 [D] | 2 | 1 | 11 | 8 |
| North America - Canada | 15 | 15 | — | — | 15 [E] | 15 [E] | — | — | — | — |
| South America | 35 | 13 | 17 | 5 | 2 | 1 | 13 | 5 | 29 | 11 |
| Total | 270 | 130 | 27 | 10 | 125 | 67 | 77 | 34 | 195 | 88 |

[A] Wells in the process of exploratory drilling includes wells pending further evaluation.
[B] Corrected from 7
[C] Includes 10 Gross (10 Net) wells in Shell Egypt that were divested
[D] Includes 78 Gross (34 Net) wells in Permian that were divested
[E] Includes 15 Gross (15 Net) wells in Fox Creek that were divested

Number of wells in the process of development drilling

2021

| | At January 1 | | At December 31 | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Europe | 12 [A] | 2 | 1 | 1 |
| Asia | 41 | 24 | 38 | 20 |
| Oceania | 191 | 124 | 181 | 111 |
| Africa | 4 | 1 | 5 | 2 |
| North America - USA | 30 | 20 | 9 | 6 |
| North America - Canada | — | — | 6 | 5 |
| South America | 30 | 21 | 46 | 30 |
| Total | 308 | 192 | 286 | 175 |

[A] Corrected from 7

In addition to the present activities mentioned above, the following recovery methods are operational in the following countries: water flooding (Brazil (including water alternating gas), Brunei, Malaysia, Nigeria, Norway, Oman, Russia, the UK and the USA); gas injection (Brazil, Brunei, Kazakhstan, Malaysia, Nigeria and Oman); steam injection (the Netherlands, Oman and the USA), and polymer flooding (Oman).

Exhibit Q

SUPPLEMENTARY INFORMATION - EU TAXONOMY DISCLOSURE

**OVERVIEW**

The EU Taxonomy Regulation, adopted by the European Union (EU) in 2020, is designed to encourage investment in an environmentally sustainable economy by creating uniform definitions of sustainability for investors. Shell supports the EU's ambition to achieve climate neutrality by 2050 and welcomes measures to increase transparency and mobilise capital towards the energy transition.

The Taxonomy requires the disclosure of financial information about qualifying activities according to detailed criteria. Shell has followed these rules in preparing our disclosure. But in our view the resulting information does not provide a complete picture of our low-carbon activities because it excludes our interests in equity accounted joint ventures and associates, integrated value chains and spending on early-stage businesses. We encourage efforts to improve the Taxonomy so that it enables a full understanding of how companies in transition are adapting to the needs of their customers, who are progressing towards a low-carbon future at different speeds and via different pathways.

Shell supports efforts to develop sustainable finance tools that enable transitional and low-carbon projects to advance the energy transition. Such systems should be workable and inclusive, with all sectors and technologies encouraged to be part of the solution. We see these tools as a complement to energy and sectoral policies that create market incentives for businesses to innovate and invest in low-carbon solutions.

*For more on our energy transition strategy, see "Climate Change and Energy Transition" on pages 74-97.*

**The Taxonomy framework**

As a UK company, Shell is not currently subject to the EU Taxonomy Regulation. We comply with its disclosure requirements on a voluntary basis and expect to come into scope following the adoption of the EU's proposed Corporate Sustainability Reporting Directive, which would extend the reporting obligation to third-country issuers like Shell that list on European exchanges.

The Taxonomy establishes technical criteria for sustainability across more than 90 economic activities and six environmental objectives. So far, criteria have been approved for the first two objectives, climate change mitigation and climate change adaptation. These form the basis of our 2021 reporting. Criteria for the four remaining objectives – water, circular economy, pollution control and biodiversity – are expected to be adopted by the EU in 2022.

An activity is "Taxonomy-eligible" if it is described in the regulation, irrespective of whether it complies with the technical screening criteria. An activity is "Taxonomy-aligned" if it contributes substantially to one or more environmental objectives, does no significant harm to any of the other objectives, is carried out in compliance with minimum social safeguards and complies with the technical screening criteria.

For 2021, companies are required to disclose the share of eligible and non-eligible activities in their total turnover, capital expenditure (capex) and operating expenditure (opex). Starting in 2022, companies are required to assess their eligible activities against the technical screening criteria and provide breakdowns of their aligned and non-aligned turnover, capex and opex.



| Scope of Taxonomy-eligible activities | | | ✅ Taxonomy-eligible   ❌ Taxonomy non-eligible |
|---|---|---|---|
| 3.14 Manufacture of chemicals<br>3.17 Manufacture of plastics | ❌ Associates | Manufacturing | ❌ Non-eligible products |  ❌ Trading |
| 4.1 Electricity from solar<br>4.3 Electricity from wind | ❌ Associates | ✅ Power generation | ❌ Trading | ✅ B2B/B2C solutions |
| 7.6 Installation of renewable energy technologies | ✅ B2C solutions | | | |
| 3.10 Manufacture of hydrogen<br>4.13 Manufacture of biogas and biofuels | ❌ Associates | ✅ Feasibility | ✅ Manufacturing | ❌ Trading |
| 1.4 Conservation forestry | ✅ Projects | ❌ Non-eligible NBS projects | ❌ Trading | |
| 5.11 Transport of CO2<br>5.12 Storage of CO2 | ✅ Feasibility | ✅ Transport and storage | | |
| 6.15 Infrastructure enabling low-carbon road transport<br>7.4 Installation of EV charging in buildings and parking spaces | ❌ Retail power | ✅ Infrastructure | ❌ B2B/B2C solutions | |

NBS = Nature-Based Solutions    B2B = Business-to-Business    B2C = Business-to-Consumer

## Our EU Taxonomy eligibility

EU Taxonomy eligibility 2021

| | Turnover | Capex | Opex |
|---|---|---|---|
| | | $ million, except where indicated | |
| Eligible | 14,984 | 4,548 | 820 |
| Non-Eligible | 246,520 | 20,845 | 4,479 |
| Total | 261,504 | 25,393 | 5,299 |
| Eligible % of total | 6% | 18% | 15% |
| Non-eligible % of total | 94% | 82% | 85% |

In 2021, Shell's Taxonomy-eligible turnover was $15 billion, capex was $4.5 billion, and opex was $0.8 billion. Chemicals and renewable power contributed the largest share of eligible activity, followed by biofuels and low-carbon transport. Our fossil fuel businesses are currently non-eligible under the regulation.

In addition, Shell engages in low-carbon activities that are outside the scope of the Taxonomy and therefore not included in our reporting. For example, our interests in equity accounted joint ventures and associates are out of scope, which has the effect of understating our participation in businesses such as renewable power and biofuels. The Taxonomy's definition of opex excludes early-stage spending on activities such as hydrogen and CCS, where we incur significant feasibility expenses prior to a final investment decision. It also excludes our purchases of low-carbon energy and investments in Nature-Based Solutions.

We believe the Taxonomy could be improved by allowing greater recognition of the role of integrated value chains in enabling decarbonisation at a sector level. For example, our renewable power business develops low-carbon solutions for businesses and residential customers by leveraging our portfolio of renewable generation, trading and retail assets. But under current rules, only the generation component is eligible. Similarly, our investments in sustainable aviation fuel rely on refineries to host biofuels facilities, distribution networks, access to airports and other assets. Presently, only the biofuels manufacturing activity is eligible.

The Taxonomy recognises activities and environmental performance levels consistent with the EU's environmental goals. According to the European Commission, early studies suggest many companies will have low levels of Taxonomy eligibility and alignment in the initial years of reporting. As a provider of energy and chemical products to customers who are also transitioning to a low-carbon future, Shell expects its Taxonomy-eligible activities to evolve in line with the sectors we serve.

The EU has stated that the Taxonomy will develop over time. The fact that an activity is not recognised does not necessarily mean that it is not sustainable. In addition, not all activities with the potential to make a substantial contribution to the environmental objectives are yet included.

## Accounting policies
The Taxonomy is still evolving and remains subject to interpretation in some areas. The EU has indicated that further guidance will be issued on the application of the reporting requirement. Shell has consulted externally in developing our reporting framework and will update our approach as appropriate.

For 2021, Shell's reporting method for the Taxonomy follows a systematic process to identify economic activities in scope for reporting and calculate eligible turnover, capex and opex.

Shell has assessed its business against the economic activities qualifying for the climate mitigation and climate adaptation objectives. Activities are treated as in scope for reporting if they correspond to products or services offered by Shell. For 2021, this resulted in a total of 12 activities, all of which address the climate mitigation objective.

Taxonomy eligibility is expressed as a share of revenue, capex and opex. The scope of each of these measures is defined by the regulation, with the eligible part consisting of amounts derived from products or services associated with Taxonomy-eligible activities. The reporting scope covers Shell's global business, not just activities in Europe.

The turnover measure comprises the Revenue line from the Consolidated Statement of Income.

The capex measure comprises the Additions line from Note 8 - Intangible Assets and the Additions line from Note 9 - Property, Plant and Equipment to the Consolidated Financial Statements. As the treatment of goodwill under the Taxonomy is uncertain, we exclude it from the capex measure. This measure is reconciled as follows.

EU Taxonomy capex

| | $ million |
|---|---|
| | 2021 |
| Additions to property, plant and equipment | 21,719 |
| Additions to intangible assets | 5,220 |
| Less: Goodwill | 1,546 |
| Total EU Taxonomy capex | 25,393 |

Under the Taxonomy, opex is defined as costs associated with maintenance and repair, research and development, and short-term leases. This results in a total opex figure of $5.3 billion. The limited scope of the Taxonomy's opex measure differs from Shell's definition of operating expenses, and does not allow us to recognise all of our spending on otherwise eligible activities. This measure is reconciled as follows.

EU Taxonomy opex

| | $ million |
|---|---|
| | 2021 |
| Production and manufacturing expenses | 23,822 |
| Selling, distribution and administrative expenses | 11,328 |
| Research and development | 815 |
| Total operating expenses | 35,964 |
| Less: Non-maintenance expenses | 19,981 |
| Less: Selling, distribution and administrative expenses | 11,328 |
| Add: Expenses relating to short-term leases | 644 |
| Total EU Taxonomy opex | 5,299 |

SUPPLEMENTARY INFORMATION - EU TAXONOMY DISCLOSURE continued

Taxonomy eligibility is calculated on an activity-by-activity basis. Because the activity boundaries defined in the regulation differ from our existing value chains, certain adjustments are necessary to calculate the allowed figures. For example, we exclude sales of third-party products, as well as trading and retailing as discrete activities. These are significant for Shell's integrated business model but are not eligible under the Taxonomy. Although intra-group sales are out of scope, sales to our trading and marketing business are used in certain circumstances to calculate the revenue attributable to Taxonomy-eligible parts of the value chain.

When a reporting entity contains eligible and non-eligible activity, an allocation method is applied so that only the eligible part is counted. A

reconciliation has been made to total revenue, capex and opex to avoid double counting.

Data for Taxonomy-eligible turnover, capex and opex are calculated in accordance with the requirements of the EU Taxonomy Regulation. Reporting on this basis differs from that applied for financial reporting purposes in the "Consolidated Financial Statements" on pages 204-261 and elsewhere in this Report.

In addition to the required information provided in this section, Shell makes an additional disclosure in the table below to provide further insight into our Taxonomy-eligible activities. The amounts shown represent the aggregated total for the activities listed in each group.

EU Taxonomy-eligible activities 2021

$ million

| No | Activity Description | Turnover | Capex | Opex | Notes |
|----|----------------------|----------|-------|------|-------|
| 3.14 | Manufacture of organic basic chemicals | | | | |
| 3.17 | Manufacture of plastics in primary form | 14,672 | 3,854 | 715 | [A], [B], [C], [D] |
| 4.1 | Electricity generation using solar photovoltaic energy | | | | |
| 4.3 | Electricity generation from wind power | | | | |
| 7.6 | Installation, maintenance and repair of renewable energy technologies | 228 | 288 | 9 | [A], [B], [C], [E], [F], [G] |
| 3.10 | Manufacture of hydrogen | | | | |
| 4.13 | Manufacture of biogas and biofuels for use in transport and of bioliquids | 0 | 284 | 82 | [A], [B], [C], [E] |
| 1.4 | Conservation forestry | | | | |
| 5.11 | Transport of $CO_2$ | | | | |
| 5.12 | Underground permanent geological storage of $CO_2$ | 13 | 4 | 8 | [A], [B], [H], [I] |
| 6.15 | Infrastructure enabling low-carbon road transport and public transport | | | | |
| 7.4 | Installation, maintenance and repair of charging stations for electric vehicles in buildings (and parking spaces attached to buildings) | 71 | 118 | 7 | [A], [F] |
| | Total | 14,984 | 4,548 | 820 | |

[A] Excludes interests in equity-accounted associates.
[B] Excludes trading activity.
[C] Excludes sales of third-party products.
[D] Includes only Taxonomy-eligible organic basic chemical products.
[E] Excludes feasibility expenses incurred prior to final investment decision.
[F] Excludes B2B/B2C electricity retailing.
[G] Excludes purchases of low-carbon power.
[H] Includes only Nature-Based Solutions projects that meet the criteria for conservation forestry and generate capital assets.
[I] For integrated CCS projects where it not possible to distinguish carbon transport and storage, the "Storage of $CO_2$" activity is used.

Exhibit Q

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**TO COMPUTERSHARE TRUSTEES (JERSEY) LIMITED AS TRUSTEE OF ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST AND THE BOARD OF DIRECTORS AND SHAREHOLDERS OF SHELL PLC**

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Royal Dutch Shell Dividend Access Trust (the Trust) as of December 31, 2021 and 2020, the related statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the 'Financial Statements'). In our opinion, the Financial Statements present fairly, in all material respects, the financial position of the Trust at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in accordance with International Financial Standards as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Trust's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated March 9, 2022, expressed an unqualified opinion thereon.

**Basis for Opinion**

These Financial Statements are the responsibility of the trustee of the Trust (the Trustee) and the management of Shell plc. Our responsibility is to express an opinion on the Trust's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Trust in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the Financial Statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the Financial Statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the Financial Statements. Our audits also included evaluating the accounting principles used and significant estimates made by the Trustee and the management of Shell plc, as well as evaluating the overall presentation of the Financial Statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

Critical audit matters are matters arising from the current period audit of the Financial Statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the Financial Statements and (2) involved our especially challenging, subjective, or complex judgements. We determined that there are no critical audit matters.

/s/ Ernst & Young LLP

We have served as the Trust's auditor since 2016.

London, United Kingdom
March 9, 2022

**TO COMPUTERSHARE TRUSTEES (JERSEY) LIMITED AS TRUSTEE OF ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST AND THE BOARD OF DIRECTORS AND SHAREHOLDERS OF SHELL PLC**

**Opinion on Internal Control over Financial Reporting**

We have audited Royal Dutch Shell Dividend Access Trust's (the Trust) internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, the Trust maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Financial Statements of the Trust, and our report dated March 9, 2022, expressed an unqualified opinion thereon.

**Basis for Opinion**

The trustee of the Trust (the Trustee) and the management of Shell plc (the Management) are responsible for maintaining effective internal control over financial reporting and for their assessment of the effectiveness of internal control over financial reporting included in the accompanying Trustee's and Management's Report on Internal Control over Financial Reporting set out on page 188. Our responsibility is to express an opinion on the Trust's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Trust in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP
London, United Kingdom
March 9, 2022

Exhibit Q

STATEMENT OF INCOME

£ million

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Dividend income | 2,201 | 2,777 | 5,484 |
| Income before taxation and for the period | 2,201 | 2,777 | 5,484 |

STATEMENT OF COMPREHENSIVE INCOME

£ million

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Income for the period | 2,201 | 2,777 | 5,484 |
| Comprehensive income for the period | 2,201 | 2,777 | 5,484 |

BALANCE SHEET

£ million

| | Notes | Dec 31, 2021 | Dec 31, 2020 |
|---|---|---|---|
| Assets | | | |
| Other current assets | | 7 | 7 |
| Cash and cash equivalents | | — | — |
| Total assets | | 7 | 7 |
| Liabilities | | | |
| Unclaimed dividends | 4 | 7 | 7 |
| Total liabilities | | 7 | 7 |
| Equity | | | |
| Capital account | 5 | — | — |
| Revenue account | | — | — |
| Total equity | | — | — |
| Total liabilities and equity | | 7 | 7 |

Signed on behalf of Computershare Trustees (Jersey) Limited as Trustee of the Royal Dutch Shell Dividend Access Trust

/s/ John Le Marquand                                                                 /s/ Martin Fish

John Le Marquand                                                                     Martin Fish
March 9, 2022

284

ROYAL DUTCH SHELL DIVIDEND ACCESS
TRUST FINANCIAL STATEMENTS continued

STATEMENT OF CHANGES IN EQUITY

| | Notes | Capital account | Revenue account | £ million Total equity |
|---|---|---|---|---|
| At January 1, 2021 | | — | — | — |
| Comprehensive income for the period | | — | 2,201 | 2,201 |
| Distributions made | 6 | — | (2,201) | (2,201) |
| At December 31, 2021 | | — | — | — |
| At January 1, 2020 | | — | — | — |
| Comprehensive income for the period | | — | 2,777 | 2,777 |
| Distributions made | 6 | — | (2,777) | (2,777) |
| At December 31, 2020 | | — | — | — |
| At January 1, 2019 | | — | — | — |
| Comprehensive income for the period | | — | 5,484 | 5,484 |
| Distributions made | 6 | — | (5,484) | (5,484) |
| At December 31, 2019 | | — | — | — |

STATEMENT OF CASH FLOWS

| | 2021 | 2020 | £ million 2019 |
|---|---|---|---|
| Income for the period | 2,201 | 2,777 | 5,484 |
| Adjustment for: | | | |
| Dividends received | (2,201) | (2,777) | (5,484) |
| Cash flow from operating activities | — | — | — |
| Dividends received | 2,200 | 2,772 | 5,484 |
| Cash flow from investing activities | 2,200 | 2,772 | 5,484 |
| Cash distributions made | (2,200) | (2,775) | (5,484) |
| Cash flow from financing activities | (2,200) | (2,775) | (5,484) |
| Change in cash and cash equivalents | — | (3) | — |
| Cash and cash equivalents at January 1 | — | 3 | 3 |
| Cash and cash equivalents at December 31 | — | — | 3 |

285

NOTES TO THE ROYAL DUTCH SHELL DIVIDEND ACCESS TRUST FINANCIAL STATEMENTS

**1 THE TRUST**

The Royal Dutch Shell Dividend Access Trust (the "Trust") was established on May 19, 2005, by The "Shell" Transport and Trading Company, p.l.c., now The Shell Transport and Trading Company Limited (Shell Transport), and Royal Dutch Shell plc, now Shell plc (the "Company"). The Trust is governed by the applicable laws of England and Wales and is resident and domiciled in Jersey. The Trust is not subject to taxation. The Trustee of the Trust is Computershare Trustees (Jersey) Limited, registration number 92182 (the "Trustee"), 13 Castle Street, St Helier, Jersey, JE1 1ES. The Trust was established as part of a dividend access mechanism.

Shell Transport and BG Group Limited (BG) have each issued a dividend access share to the Trustee. Following the announcement of a dividend by the Company on the B shares, Shell Transport and BG may declare a dividend on their dividend access shares. Subsequent to the balance sheet date, it is expected that no further dividends will be declared on the dividend access share (see Note 9).

The primary purposes of the Trust are to receive, on behalf of the B shareholders of the Company and in accordance with their respective holdings of B shares in the Company, any amounts paid by way of dividend on the dividend access shares and to pay such amounts to the B shareholders on the same pro rata basis. The Trust is not subject to significant market risk, credit risk or liquidity risk.

The Trust shall not endure for a period in excess of 80 years from May 19, 2005, being the date on which the Trust Deed was executed.

**2 BASIS OF PREPARATION**

The Financial Statements of the Trust have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

The Financial Statements have been prepared under the historical cost convention and on a going concern basis (see Note 9). The accounting policies described in Note 3 have been applied consistently in all periods presented.

The Financial Statements were approved and authorised for issue by the Trustee on March 9, 2022.

The financial results of the Trust are included in the Consolidated Financial Statements on pages 204-261 .

**3 SIGNIFICANT ACCOUNTING POLICIES**

The Trust's accounting policies follow those of Shell as set out in Note 2 to the Consolidated Financial Statements (see pages 208-217). The following are Trust-specific policies.

**Presentation and functional currency**

The Trust's presentation and functional currency is sterling. The Trust's dividend income and dividends paid are principally in sterling.

**Dividend income**

Dividends on the dividend access shares are recognised on a paid basis unless the dividend has been confirmed by a general meeting of Shell Transport or BG, in which case income is recognised on the date on which receipt is deemed virtually certain. Dividend income includes amounts receivable from Shell Transport and BG in respect of dividends declared but unclaimed (see Note 4).

**Distributions made**

Amounts are recorded as distributed once a payment is made in the appropriate currency using various electronic transfer methods, or an unconditional payment obligation is established. Shell Transport or BG (as appropriate) may, each at their respective discretion, withhold any part of the funding relating to an unpayable dividend until such time as the relevant B shareholder provides accurate or complete details for payment of any such dividend.

**4 UNCLAIMED DIVIDENDS**

Unclaimed dividends of £7 million (2020: £7 million) include any pre-electronic transfer dividend cheque payments that have not been presented, have expired or have been returned unpresented. Dividends are also classified as unclaimed where amounts have been withheld due to incomplete or incorrect electronic payment details. Dividends which are unclaimed after 12 years will unconditionally revert to Shell Transport and BG once forfeited.

**5 CAPITAL ACCOUNT**

The capital account is represented by the dividend access share of 25 pence settled in the Trust by Shell Transport and the dividend access share of 10 pence settled in the Trust by BG. There have been no changes in the capital account in the current or prior year.

**6 DISTRIBUTIONS MADE**

Distributions are made to the B shareholders of the Company in accordance with the Trust Deed. See Note 24 to the Consolidated Financial Statements (see page 255) for information about dividends per share.

**7 RELATED PARTIES**

The Trust recognised dividend income of £1,437 million (2020: £1,805 million; 2019: £3,573 million) in respect of the dividend access share from Shell Transport and £764 million (2020: £972 million; 2019: £1,911 million) in respect of the dividend access share from BG. The Trust made distributions of £2,201 million (2020: £2,777 million; 2019: £5,484 million) to the B shareholders of the Company.

As at December 31, 2021, the Trust recorded amounts due from Shell Transport of £5 million and BG of £2 million relating to unclaimed dividends (see Note 4).

The Company pays the general and administrative expenses of the Trust, including the auditor's remuneration.

**8 AUDITOR'S REMUNERATION**

Auditor's remuneration for 2021 audit services was £33,750 (2020: £33,750; 2019: £33,750).

**9 POST-BALANCE SHEET EVENTS**

On January 29, 2022, one line of shares was established through assimilation of A shares and B shares into a single line of ordinary shares of the Company. This assimilation had no impact on voting rights or dividend entitlements. Dutch withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the ordinary shares following assimilation.

In relation to the assimilation of the Company's Class A and B shares, the Trust will continue in existence for the foreseeable future to facilitate the payment of unclaimed dividend liabilities for B shareholders, until these are either claimed or forfeited in line with the terms outlined (see Note 4).

As these unclaimed dividends relate to dividends that were announced by the Company during the period the Company was still named Royal Dutch Shell plc, and it is expected that the Company will not announce any further dividends on the dividend access shares, the Trust continues to be named The Royal Dutch Shell Dividend Access Trust.

## SHAREHOLDER INFORMATION

Shell plc (the Company) was incorporated in England and Wales on February 5, 2002, as a private company under the Companies Act 1985, as amended. On October 27, 2004, the Company was re-registered as a public company limited by shares and changed its name from Forthdeal Limited to Royal Dutch Shell plc. On January 21, 2022, the Company changed its name from Royal Dutch Shell plc to Shell plc. The Company is registered at Companies House, Cardiff, under company number 4366849. The Legal Entity Identifier (LEI) issued by the London Stock Exchange is 21380068P1DRHMJ8KU70. The business address for the Directors and Senior Management is Shell Centre, London, SE1 7NA.

On December 31, 2021, the Company became tax resident in the United Kingdom. Its primary objective is to carry on the business of a holding company. It is not directly or indirectly owned or controlled by another corporation or by any government and does not know of any arrangements that may result in a change of control of the Company.

### NATURE OF TRADING MARKET
Effective from January 29, 2022, the Company has one single line of ordinary shares, each having a nominal value €0.07. All shares are listed and able to trade at Euronext Amsterdam and the London Stock Exchange. Furthermore, all shares are transferable between these two markets. This makes both these exchanges primary exchanges for the ordinary shares.

Ordinary shares are traded in registered form.

The Company's American Depositary Shares (ADSs) are listed on the New York Stock Exchange [A]. A depositary receipt is a certificate that evidences ADSs. Depositary receipts are issued, cancelled and exchanged at the office of JP Morgan Chase Bank, N.A., 383 Madison Avenue, New York, New York 10179, USA, as depositary (the Depositary), under a deposit agreement between the Company, the Depositary and the holders of ADSs. Each ADS is equivalent to two ordinary shares of Shell plc deposited under the agreement. All ordinary shares are capable of being deposited with the Depositary in exchange for the corresponding amount of ADSs which may be traded at the New York Stock Exchange. This makes the New York Stock Exchange the primary exchange for the Company's ADRs. More information relating to ADSs is given on pages 287 to 292.

[A] At February 21, 2022, 574,568,365 ADSs were outstanding, representing 15.076% of the ordinary share capital, held by holders of record with an address in the USA. In addition to holders of ADSs, at February 21, 2022, 943,329 ordinary shares of €0.07 each were outstanding, representing 0.012% of the ordinary share capital, held by 3,052 holders of record registered with an address in the USA.

Listing information

| Identifiers | Euronext Amsterdam | London Stock Exchange | NYSE |
|---|---|---|---|
| | Ordinary share | Ordinary share | ADS [*] |
| Market | Primary | Primary | Primary |
| Ticker symbol | SHELL | SHEL | SHEL |
| ISIN | GB00BP6MXD84 | GB00BP6MXD84 | US7802593050 |
| SEDOL | BP6MXT4 | BP6MXD8 | BPK3CG3 |
| CUSIP | G80827 101 | G80827 101 | 780259 305 |
| Index weight at 31/12/21 | AEX: 12.9% (**) | FTSE: 7.39% | - |

(*) Each ADS represents two ordinary shares of €0.07 each
(**) This has taken former A Shares into account. The reweight is based upon all ordinary shares and will become effective on March 21, 2022

### SHARE CAPITAL
On January 29, 2022 as part of the Simplification announced on 20 December 2021, the Company's share capital was assimilated from ordinary A shares and ordinary B shares, into a single line of ordinary shares. Below we provide information on our share capital both before and after the assimilation.

Share capital as at December 31, 2021
The issued and fully paid share capital of the Company at December 31, 2021, was as follows:

| | | Issued and fully paid |
|---|---|---|
| | Number | Nominal value |
| Ordinary shares of €0.07 each | | |
| A Shares | 4,101,239,499.00 | 287,086,764.93 |
| B Shares | 3,582,892,954.00 | 250,802,506.78 |
| Sterling deferred shares of £1 each | 50,000 | £50,000 |

Share capital as at February 21, 2022
The issued and fully paid share capital of the Company at February 21, 2022, was as follows:

| | | Issued and fully paid |
|---|---|---|
| | Number | Nominal value |
| Ordinary shares of €0.07 each | 7,622,217,098 | €533,555,196.86 |
| Sterling deferred shares of £1 each | 50,000 | £50,000 |

The Directors may only allot new ordinary shares if they have authority from shareholders to do so. The Company seeks to renew this authority annually at its AGM. Under the resolution passed at the Company's 2021 AGM, the Directors were granted authority to allot ordinary shares up to an aggregate nominal amount equivalent to approximately one-third of the issued ordinary share capital of the Company (in line with the guidelines issued by institutional investors).

The following is a summary of the material terms of the Company's ordinary shares, including brief descriptions of the provisions contained in the Articles of Association (the Articles) and applicable laws of England and Wales in effect on the date of this document. This summary does not purport to include complete statements of these provisions:

- upon issuance, the ordinary shares are fully paid and free from all liens, equities, charges, encumbrances and other interest of the Company and not subject to calls of any kind;
- all ordinary shares rank equally for all dividends and distributions on ordinary share capital; and
- all ordinary shares are admitted to the Official List of the UK Financial Conduct Authority and to trading on the market for listed securities of the London Stock Exchange. Ordinary shares are also admitted to trading on Euronext Amsterdam. ADSs are listed on the New York Stock Exchange.

At December 31, 2021, trusts and trust-like entities holding shares for the benefit of employee share plans of Shell held (directly and indirectly) 25 million shares of the Company with an aggregate market value of $636 million and an aggregate nominal value of €2 million.

### SIGNIFICANT SHAREHOLDINGS
The Company's ordinary shares have voting rights on all matters that are subject to shareholder approval, including the election of directors. The Company's major shareholders do not have different voting rights.

# Exhibit Q

### Significant shareholdings

Interests of investors with 3% or more of the Company's ordinary shares at February 21, 2022 are provided below. The information provided includes the percentage of issued share capital as at February 21,2022.

| | A Shares | | B Shares | | Ordinary Shares | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| BlackRock, Inc. [A] | 299,354,761 | 3.9 | 286,618,332 | 3.8 | 585,973,093 | 7.7 |
| Norges Bank [B] | — | — | 237,637,302 | 3.1 | 237,637,302 | 3.1 |

[A] Information presented per Schedules 13G filed on February 7, 2022 and Schedule 13G/A filed on February 8, 2022. The information contained in the Schedule 13G and Schedule 13G/A reflected the share information prior to the assimilation of the A and B shares effected on January 29, 2022. The figures in the table above reflect the position which were presented on the Schedule 13G and Schedule 13G/A as filed, however, the shares will now have been assimilated, as shown under the "Ordinary shares" column.
[B] Information presented per Schedules 13G/A filed on February 9, 2022. The information contained in the Schedule 13G/A reflected the share information prior to the assimilation of the A and B shares effected on January 29, 2022. The figures in the table above reflect the position which were presented on the Schedule 13G/A as filed, however, the shares will now have been assimilated, as shown under the "Ordinary shares" column.

### Designation of the Netherlands as EU Home Member State for regulatory purposes

Following the exit of the UK from the EU and the end of the transition period, the Company announced that the EU Home Member State of the Company for the purposes of the EU Transparency Directive would be the Netherlands as from January 1, 2021. As a consequence, the Company files Transparency Directive and Market Abuse Regulation-related regulatory information with the Netherlands Authority for the Financial Markets (Autoriteit Financiële Markten, or AFM). Major shareholders are required to report substantial holdings in Shell to the AFM in accordance with applicable Dutch law, in addition to their ongoing disclosure obligations under the UK Disclosure Guidance and Transparency Rules (DTR).

### DIVIDENDS

The following tables show the dividends on each class of share and each class of ADS for the years 2017-2021.

The Q4 2021 dividend was declared following the simplification and will be paid on Ordinary shares.

A and B shares

| | 2021 | 2020 | 2019 | 2018 | $ 2017 |
|---|---|---|---|---|---|
| Q1 | 0.17 | 0.16 | 0.47 | 0.47 | 0.47 |
| Q2 | 0.24 | 0.16 | 0.47 | 0.47 | 0.47 |
| Q3 | 0.24 | 0.17 | 0.47 | 0.47 | 0.47 |
| Q4 | 0.24 | 0.17 | 0.47 | 0.47 | 0.47 |
| Total announced in respect of the year | 0.89 | 0.65 | 1.88 | 1.88 | 1.88 |

A shares [A]

| | 2021 | 2020 | 2019 | 2018 | € [B] 2017 |
|---|---|---|---|---|---|
| Q1 | 0.14 | 0.14 | 0.42 | 0.4 | 0.42 |
| Q2 | 0.20 | 0.14 | 0.43 | 0.4 | 0.39 |
| Q3 | 0.21 | 0.14 | 0.42 | 0.41 | 0.4 |
| Q4 [C] | TBA | 0.14 | 0.42 | 0.42 | 0.38 |
| Total announced in respect of the year [C] | TBA | 0.56 | 1.68 | 1.64 | 1.59 |
| Amount paid during the year | 0.97 | 0.84 | 1.68 | 1.6 | 1.65 |

[A] On January 29, 2022, the A and B ordinary shares were assimilated into a single line of ordinary shares of the Company.
[B] Euro equivalent, rounded to the nearest euro cent.
[C] Q4 2021 euro equivalent will be announced on March 14,2022.

B shares [A]

| | 2021 | 2020 | 2019 | 2018 | Pence [B] 2017 |
|---|---|---|---|---|---|
| Q1 | 12.26 | 12.68 | 36.97 | 35.18 | 37.12 |
| Q2 | 17.38 | 12.09 | 38.01 | 36.5 | 36.28 |
| Q3 | 18.06 | 12.48 | 35.73 | 36.77 | 35.02 |
| Q4 [C] | TBA | 11.96 | 36.4 | 35.94 | 33.91 |
| Total announced in respect of the year [C] | TBA | 49.21 | 147.11 | 144.39 | 142.33 |
| Amount paid during the year | 59.66 | 73.65 | 146.65 | 142.36 | 147.06 |

[A] On January 29, 2022, the A and B ordinary shares were assimilated into a single line of ordinary shares of the Company.
[B] Sterling equivalent.
[C] Q4 2021 sterling equivalent will be announced on March 14, 2022

A and B ADSs

| | 2021 | 2020 | 2019 | 2018 | 2017 $ |
|---|---|---|---|---|---|
| Q1 | 0.34 | 0.32 | 0.94 | 0.94 | 0.94 |
| Q2 | 0.48 | 0.32 | 0.94 | 0.94 | 0.94 |
| Q3 | 0.48 | 0.333 | 0.94 | 0.94 | 0.94 |
| Q4 | 0.48 | 0.333 | 0.94 | 0.94 | 0.94 |
| Total announced in respect of the year | 1.78 | 1.306 | 3.76 | 3.76 | 3.76 |
| Amount paid during the year | 1.63 | 1.913 | 3.76 | 3.76 | 3.76 |

### METHOD OF HOLDING SHARES OR AN INTEREST IN SHARES

There are various ways in which Shell plc registered shares or an interest in these shares can be held, including:
- directly as registered shares either in uncertificated form or in certificated form in a shareholder's own name;
- indirectly through Euroclear Nederland (in respect of which the Dutch Securities Giro Act (Wet giraal effectenverkeer) is applicable);
- through the Shell Corporate Nominee Service;
- through another third-party nominee or intermediary company; and
- as a direct or indirect holder of either ADS with the Depositary.

### AMERICAN DEPOSITARY SHARES

The Depositary is the registered shareholder of the shares underlying the ADSs and enjoys the rights of a shareholder under the Articles. Holders of ADSs will not have shareholder rights. The rights of the holder of an ADS are specified in the Deposit Agreement with the Depositary and are summarised below.

The Depositary will receive all cash dividends and other cash distributions made on the deposited shares underlying the ADSs and, where possible and on a reasonable basis, will distribute such dividends and distributions to holders of ADSs. Rights to purchase additional shares will also be made available to the Depositary who may make such rights available to holders of ADSs. All other distributions made on the Company's shares will be distributed by the Depositary in any means that the Depositary thinks is equitable and practical. The Depositary may deduct its fees and expenses and the amount of any taxes owed from any payments to holders and it may sell a holder's deposited shares to pay any taxes owed. The Depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to holders of ADSs.

The Depositary will notify holders of ADSs of shareholders' meetings of the Company and will arrange to deliver voting materials to such holders of ADSs if requested by the Company. Upon request by a holder, the Depositary will endeavour to appoint such holder as proxy in respect of such holder's deposited shares entitling such holder to attend and vote at shareholders' meetings. Holders of ADSs may also instruct the Depositary to vote their deposited securities and the Depositary will try, as far as practical and lawful, to vote deposited shares in accordance with such instructions. The Company cannot ensure that holders will receive voting materials or otherwise learn of an upcoming shareholders' meeting in time to ensure that holders can instruct the Depositary to vote their shares.

Upon payment of appropriate fees, expenses and taxes: (i) shareholders may deposit their shares with the Depositary and receive the corresponding class and amount of ADSs; and (ii) holders of ADSs may surrender their ADSs to the Depositary and have the corresponding class and amount of shares credited to their account.

Further, subject to certain limitations, holders may, at any time, cancel ADSs and withdraw their underlying shares or have the corresponding class and amount of shares credited to their account.

### FEES PAID BY HOLDERS OF ADSs

The Depositary collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The Depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The Depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. See page 287.

### PAYMENTS BY DEPOSITARY TO THE COMPANY

J.P. Morgan Chase Bank, N.A., as Depositary, has agreed to share with the Company portions of certain fees collected, less ADS programme expenses paid by the Depositary. For example, these expenses include the Depositary's annual programme fees, transfer agency fees, custody fees, legal expenses, postage and envelopes for mailing annual and interim financial reports, printing and distributing dividend cheques, electronic filing of US federal tax information, mailing required tax forms, stationery, postage, facsimile and telephone calls and the standard out-of-pocket maintenance costs for the ADSs. From January 1, 2021, to February 21, 2022, the Company received $2,500,542.19 from the Depositary.

Exhibit Q

| Persons depositing or withdrawing shares must pay: | For: |
|---|---|
| $5.00 or less per 100 ADSs (or portion of 100 ADSs) | Issuance of ADSs, including those resulting from a distribution of shares, rights or other property; Cancellation of ADSs for the purpose of their withdrawal, including if the deposit agreement terminates; and Distribution of securities to holders of deposited securities by the Depositary to ADS registered holders. |
| Registration and transfer fees | Registration and transfer of shares on the share register to or from the name of the Depositary or its agent when they deposit or withdraw shares. |
| Expenses of the Depositary | Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement); and Converting foreign currency into dollars. |
| Taxes and other governmental charges the Depositary or the custodian has to pay on any ADS or share underlying an ADS, for example, share transfer taxes, stamp duty or withholding taxes | As necessary. |

### DIVIDEND REINVESTMENT PLAN

Equiniti Financial Services Limited, part of the same group of companies as the Company's Registrar, Equiniti Limited, operates a Dividend Reinvestment Plan (DRIP) which enables Shell plc shareholders to elect to have their dividend payments used to purchase Shell plc ordinary shares. More information can be found at www.shareview.co.uk/info/drip or by contacting Equiniti.

ABN AMRO Bank N.V. and JP Morgan Chase Bank N.A. also operate dividend reinvestment options. More information can be found by contacting the relevant provider.

In addition to the above, the Depositary may charge: (i) a dividend fee of $5.00 or less per 100 ADSs (or portion of 100 ADSs) for cash dividends or issuance of ADSs resulting from share dividends and (ii) an administrative fee of $5.00 or less per 100 ADSs (or portion of 100 ADSs) per calendar year. The Company and Depositary have agreed not to charge these fees at this time.

### EXCHANGE CONTROLS AND OTHER LIMITATIONS AFFECTING SECURITY HOLDERS

Other than restrictions affecting those individuals, entities, government bodies, corporations, or activities that are targeted by European Union (EU) or UK sanctions for example, regarding Syria, Russia or North Korea, and the general EU prohibition to transfer funds to and from for example, North Korea or Syria, we are not aware of any other legislative or other legal provision currently in force in the UK, the Netherlands, the EU or arising under the Articles restricting remittances to holders of the Company's ordinary shares who are non-residents of the UK, or affecting the import or export of capital.

### TAXATION

#### General

The Company is incorporated in England and Wales and was tax-resident in the Netherlands up to 31 December 2021. The Company's tax residence was moved to the UK with effect from 31 December 2021.

As a tax resident of the Netherlands, it is generally required by Dutch law to withhold tax at a rate of 15% on dividends on its ordinary shares and ADSs, subject to the provisions of any applicable tax convention or domestic law. Depending on their particular circumstances, non-Dutch tax-resident holders may be entitled to a full or partial refund of Dutch withholding tax. The following sets forth the operation of other provisions on dividends on the Company's various ordinary shares and ADSs to UK and US holders, as well as certain other tax rules pertinent to holders for the 2021 financial year. Holders should consult their own tax adviser if they are uncertain as to the tax treatment of any dividend.

#### Dividends paid on the dividend access shares

As part of the Simplification, the A ordinary shares and B ordinary shares were assimilated in to one single line of ordinary shares. Prior to the assimilation, there was no Dutch withholding tax on dividends on B shares or B ADSs, provided that such dividends are paid on the dividend access shares pursuant to the dividend access mechanism (see "Dividend access mechanism for B shares" on page 286). Dividends paid on the dividend access shares are treated as UK-source for tax purposes and there is no UK withholding tax on them.

In 2021, all dividends with respect to B shares and B ADSs were paid on the dividend access shares pursuant to the dividend access mechanism.

#### Dutch withholding tax

On January 29, 2022, one line of shares was established through assimilation of each A share and each B share into one single line of ordinary shares of the Company. This assimilation had no impact on voting rights or dividend entitlements. Dutch dividend withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the now assimilated ordinary shares following move of Company's tax residence to the UK.

The following applies to dividends paid in the 2021 and prior financial years:

When Dutch withholding tax applies on dividends paid to a US holder (that is, dividends on A shares or A ADSs, or on B shares or B ADSs that are not paid on the dividend access shares pursuant to the dividend access mechanism), the US holder will be subject to Dutch withholding tax at the rate of 15%. A US holder who is entitled to the benefits of the 1992 Double Taxation Convention (the Convention) between the USA and the Netherlands as amended by the protocol signed on March 8, 2004, will be entitled to a reduction in the Dutch withholding tax, either by way of a full

or a partial exemption at source or by way of a partial refund or a credit as follows:

- if the US holder is an exempt pension trust as described in article 35 of the Convention, or an exempt organisation as described in article 36 thereof, the US holder will be exempt from Dutch withholding tax; or
- if the US holder is a company that holds directly at least 10% of the voting power in the Company, the US holder will be subject to Dutch withholding tax at a rate not exceeding 5%.

In general, the entire dividend (including any amount withheld) will be dividend income to the US holder and the withholding tax will be treated as a foreign income tax that is eligible for credit against the US holder's income tax liability or a deduction subject to certain limitations. A "US holder" includes, but is not limited to, a citizen or resident of the USA, or a corporation or other entity organised under the laws of the USA or any of its political subdivisions.

When Dutch withholding tax applies on dividends paid to UK tax-resident holders (that is, dividends on A shares or A ADSs, or on B shares or B ADSs that are not paid on the dividend access shares pursuant to the dividend access mechanism), the dividend will typically be subject to withholding tax at a rate of 15%. Such UK tax-resident holder may be entitled to a credit (not repayable) for withholding tax against their UK tax liability. However, certain corporate shareholders are, subject to conditions, exempt from UK tax on dividends. Withholding tax suffered cannot be offset against such exempt dividends. UK tax-resident holders should also be entitled to claim a refund of one-third of the Dutch withholding tax from the Dutch tax authorities in reliance on the tax convention between the Netherlands and the UK. Pension plans meeting certain defined criteria can, however, be entitled to claim a full refund or exemption at source of the dividend tax withheld. Also, UK tax-resident corporate shareholders holding at least a 5% shareholding and meeting other defined criteria are exempted at source from dividend tax.

For holders who are tax-resident in any other country, the availability of a whole or partial exemption or refund of Dutch withholding tax is governed by Dutch tax law and/or the tax convention, if any, between the Netherlands and the country of the holder's residence.

There may be other grounds on which holders who are tax-resident in the UK, the USA or any other country can obtain a full or partial refund of the Dutch withholding tax, depending on their particular circumstances; see "Taxation: General" above.

### Dutch capital gains taxation

Capital gains on the sale of shares of a Dutch tax-resident company by a US holder are generally not subject to taxation by the Netherlands unless the US holder has a permanent establishment therein and the capital gain is derived from the sale of shares that are part of the business property of the permanent establishment.

### Dutch succession duty and gift taxes

Shares of a Dutch tax-resident company held by an individual who is not a resident or a deemed resident of the Netherlands will generally not be subject to succession duty in the Netherlands on the individual's death.

A gift of shares of a Dutch tax-resident company by an individual who is not a resident or a deemed resident of the Netherlands is generally not subject to Dutch gift tax.

### UK stamp duty and stamp duty reserve tax

Sales or transfers of the Company's ordinary shares within a clearance service (such as Euroclear Nederland) or of the Company's ADSs within the ADS depositary receipts system will not give rise to a stamp duty reserve tax (SDRT) liability and should not in practice require the payment of UK stamp duty.

The transfer of the Company's ordinary shares to a clearance service (such as Euroclear Nederland) or to an issuer of depositary shares (such as ADSs) will generally give rise to a UK stamp duty or SDRT liability at the rate of 1.5% of consideration given or, if none, of the value of the shares. A sale of the Company's ordinary shares that are not held within a clearance service (for example, settled through the UK's CREST system of paperless transfers) will generally be subject to UK stamp duty or SDRT at the rate of 0.5% of the amount of the consideration, normally paid by the purchaser.

## Capital gains tax

For the purposes of UK capital gains tax, the market values [A] of the shares of the former public parent companies of the Shell Group at the relevant dates were:

| | March 31, 1982 | July 20, 2005 £ |
|---|---|---|
| Royal Dutch Petroleum Company (N.V. Koninklijke Nederlandsche Petroleum Maatschappij) which ceased to exist on December 21, 2005 | 1.1349 | 17.6625 |
| The "Shell" Transport and Trading Company, p.l.c. which delisted on July 19, 2005 | 1.4502 | Not applicable |

[A] Restated where applicable to reflect all capitalisation issues since the relevant date. This includes the change in the capital structure in 2005, when Shell plc (at the time known as Royal Dutch Shell plc) became the single parent company of Royal Dutch Petroleum Company and of The "Shell" Transport and Trading Company, p.l.c., now The Shell Transport and Trading Company Limited, and one share in Royal Dutch Petroleum Company was exchanged for two Royal Dutch Shell plc A shares and one share in The "Shell" Transport and Trading Company, p.l.c. was exchanged for 0.287333066 Royal Dutch Shell plc B shares.

Exhibit Q

# SECTION 13(r) OF THE US SECURITIES EXCHANGE ACT OF 1934 DISCLOSURE

In accordance with our General Business Principles and Code of Conduct, Shell seeks to comply with all applicable international trade laws, including applicable sanctions and embargoes.

The activities listed below have been conducted outside the USA by non-US affiliates of Shell plc. None of the payments disclosed below were made in US dollars, nor are any of the balances disclosed below held in US dollars; however, for disclosure purposes, all have been converted into US dollars at the appropriate exchange rate. We do not believe that any of the transactions or activities listed below violated US sanctions.

In 2021, Saba & Co. Intellectual Property s.a.l (Offshore) (Saba & Co.) paid $2,288 for trademark registration fees in Iran on our behalf to the Iranian Intellectual Property Office (IIPO). In addition, Saba & Co. billed us $4,540 for professional, translation and publication services related to our trademark registration. There was no gross revenue or net profit associated with these transactions.
During 2021, we paid $3,639 for the clearance of overflight permits for Shell aircraft over Iranian airspace to Civil Aviation Organisation (Iran). There was no gross revenue or net profit associated with these transactions. On occasion, our aircraft may be routed over Iran and therefore these payments may continue in the future.

We maintain accounts with Karafarin Bank, where our cash deposits (balance of $5,628,256 at December 31, 2021) generated non-taxable interest income of $249,542 in 2021 and we paid $1 in bank charges in 2021. As the accounts with Karafarin Bank will be maintained for the foreseeable future, we expect that receipt of non-taxable interest income and payment of bank charges to continue in the future.

Exhibit Q

NON-GAAP MEASURES RECONCILIATIONS

These non-GAAP measures, also known as alternative performance measures, are financial measures other than those defined in International Financial Reporting Standards, which Shell considers provide useful information.

**EARNINGS ON A CURRENT COST OF SUPPLIES BASIS**

Segment earnings are presented on a current cost of supplies basis (CCS earnings), which is the earnings measure used by the Chief Executive Officer for the purposes of making decisions about allocating resources and assessing performance. On this basis, the purchase price of volumes sold during the period is based on the current cost of supplies during the same period after making allowance for the tax effect. CCS earnings therefore reflect the effect of changes in the oil price on inventory carrying amounts. The current cost of supplies adjustment does not impact cash flow from operating activities in the "Consolidated Statement of Cash Flows".

Reconciliation of income for the period to CCS earnings

| | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Income/(loss) attributable to Shell plc shareholders | 20,101 | (21,680) | 15,842 |
| Income/(loss) attributable to non-controlling interest | 529 | 146 | 590 |
| Income/(loss) for the period | 20,630 | (21,534) | 16,432 |
| Current cost of supplies adjustment | (3,148) | 1,833 | (605) |
| Of which: | | | |
| Attributable to Shell plc shareholders | (3,029) | 1,759 | (572) |
| Attributable to non-controlling interest | (119) | 74 | (33) |
| CCS earnings | 17,482 | (19,701) | 15,827 |
| Of which: | | | |
| Attributable to Shell plc shareholders | 17,072 | (19,921) | 15,270 |
| Attributable to non-controlling interest | 410 | 220 | 557 |

**ADJUSTED EARNINGS AND ADJUSTED EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION AND AMORTISATION (EBITDA)**

The "Adjusted Earnings" measure aims to facilitate a comparative understanding of Shell's financial performance from period to period by removing the effects of oil price changes on inventory carrying amounts and removing the effects of identified items. These items are in some cases driven by external factors and may, either individually or collectively, hinder the comparative understanding of Shell's financial results from period to period.

The "Adjusted EBITDA (CCS basis)" and "Adjusted EBITDA (FIFO basis)" measures are introduced with effect from January 1, 2021. Management uses both measures to evaluate Shell's performance in the period and over time. We define "Adjusted EBITDA (CCS basis)" as "Income/(loss) for the period" adjusted for current cost of supplies; identified items; tax charge/(credit); depreciation, amortisation and depletion; exploration well write-offs and net interest expense. All items include the non-controlling interest component. We define "Adjusted EBITDA (FIFO basis)" as "Income/(loss) for the period adjusted for identified items; tax charge/(credit); depreciation, amortisation and depletion; exploration well write-offs and net interest expense. All items include the non-controlling interest component.

**Adjusted Earnings**

| | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Income/(loss) attributable to Shell PLC shareholders | 20,101 | (21,680) | 15,842 |
| Add: Current cost of supplies adjustment attributable to Shell plc shareholders | (3,029) | 1,759 | (572) |
| Less: Identified items attributable to Shell plc shareholders | (2,216) | (24,767) | (1,192) |
| **Adjusted Earnings** | 19,289 | 4,846 | 16,462 |
| Of which: | | | |
| Integrated Gas | 8,757 | 4,383 | 8,955 |
| Upstream | 7,950 | (2,852) | 4,452 |
| Oil Products | 3,944 | 5,995 | 6,231 |
| Chemicals | 1,753 | 962 | 741 |
| Corporate | (2,686) | (3,412) | (3,383) |
| less: Non-controlling interest | (429) | (230) | (535) |

**Adjusted EBITDA**

| | 2021 | 2020 | $ million 2019 |
|---|---|---|---|
| Adjusted Earnings | 19,289 | 4,846 | 16,462 |
| Add: Non-controlling interest | 429 | 230 | 535 |
| Add: Taxation charge/(credit) excluding tax impact of identified items | 8,482 | 2,252 | 9,533 |
| Add: Depreciation, depletion and amortisation excluding impairments | 23,071 | 24,981 | 25,108 |
| Add: Exploration well write-offs | 639 | 815 | 1,218 |
| Add: Interest expense excluding identified items | 3,607 | 4,088 | 4,687 |
| Less: Interest income | 510 | 679 | 899 |
| Adjusted EBITDA (CCS basis) | 55,004 | 36,533 | 56,644 |
| Of which: | | | |
| Integrated Gas | 16,421 | 11,668 | 16,719 |
| Upstream | 27,358 | 13,247 | 27,034 |
| Oil Products | 8,821 | 10,421 | 11,779 |
| Chemicals | 2,959 | 2,131 | 1,891 |
| Corporate | (554) | (933) | (780) |
| Less: Current cost of supplies adjustment | (3,148) | 1,833 | (605) |
| Add: Current cost of supplies adjustment to taxation charge/(credit) | 808 | (585) | 194 |
| Adjusted EBITDA (FIFO basis) | 58,960 | 34,114 | 57,443 |
| Of which: | | | |
| Integrated Gas | 16,421 | 11,668 | 16,719 |
| Upstream | 27,358 | 13,247 | 27,034 |
| Oil Products | 12,267 | 8,288 | 12,674 |
| Chemicals | 3,470 | 1,847 | 1,796 |
| Corporate | (554) | (933) | (780) |

Exhibit Q

### Identified Items

The objective of identified items is to remove material impacts on net income/loss arising from transactions which are generally uncontrollable and unusual (infrequent or non-recurring) in nature or giving rise to a mismatch of accounting and economic results, or certain transactions that are generally excluded from underlying results in the industry.

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Identified items before tax | | | |
| Of which: | | | |
| Divestment gains/(losses) | 5,996 | 316 | 2,611 |
| Impairments | (3,884) | (28,061) | (4,155) |
| Redundancy and restructuring | (227) | (883) | (132) |
| Provisions for onerous contracts | (340) | (1,392) | — |
| Fair value accounting of commodity derivatives and certain gas contracts | (3,249) | (1,151) | 602 |
| Other | (621) | (706) | (770) |
| Total identified items before tax | (2,326) | (31,877) | (1,844) |
| Tax impact | 91 | 7,100 | 674 |
| Identified items after tax | (2,235) | (24,777) | (1,170) |
| Of which: | | | |
| Divestment gains/(losses) | 4,632 | 4 | 2,170 |
| Impairments | (2,993) | (21,267) | (3,162) |
| Redundancy and restructuring | (140) | (644) | (89) |
| Provisions for onerous contracts | (299) | (1,120) | — |
| Fair value accounting of commodity derivatives and certain gas contracts | (2,764) | (1,034) | 650 |
| Impact of exchange rate movements on tax balances | (128) | (240) | (69) |
| Other | (543) | (475) | (670) |
| Impact on CCS earnings | (2,235) | (24,777) | (1,170) |
| Of which: | | | |
| Integrated Gas | (2,417) | (10,661) | (326) |
| Upstream | 1,745 | (7,933) | (598) |
| Oil Products | (1,280) | (6,489) | (93) |
| Chemicals | (364) | (154) | (263) |
| Corporate | 81 | 460 | 109 |
| Identified items attributable to Shell plc shareholders | (2,216) | (24,767) | (1,192) |
| Identified items attributable to Non-controlling interest | (19) | (10) | 22 |

### CASH CAPITAL EXPENDITURE

Cash capital expenditure monitors investing activities on a cash basis, excluding items such as lease additions which do not necessarily result in cash outflows in the period. The measure comprises the following lines from the Consolidated Statement of Cash flows: Capital expenditure, Investments in joint ventures and associates and Investments in equity securities.

The reconciliation of "Capital expenditure" to "Cash capital expenditure" is as follows.

Cash capital expenditure

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Capital expenditure [A] | 19,000 | 16,585 | 22,971 |
| Investments in joint ventures and associates [A] | 479 | 1,024 | 743 |
| Investments in equity securities [A] | 218 | 218 | 205 |
| Cash capital expenditure | 19,698 | 17,827 | 23,919 |
| Of which: | | | |
| Integrated Gas | 5,767 | 4,301 | 4,299 |
| Upstream | 6,269 | 7,296 | 10,205 |
| Oil Products | 3,868 | 3,328 | 4,907 |
| Chemicals | 3,573 | 2,640 | 4,090 |
| Corporate | 221 | 262 | 418 |

[A] Included within Cash flow from investing activities in the "Consolidated Statement of Cash Flows".

### OPERATING EXPENSES AND UNDERLYING OPERATING EXPENSES

Operating expenses is a measure of Shell's cost management performance, comprising the following items from the "Consolidated Statement of Income": production and manufacturing expenses; selling, distribution and administrative expenses; and research and development expenses.

Underlying operating expenses is a measure aimed at facilitating a comparative understanding of performance from period to period by removing the effects of identified items, which, either individually or collectively, can cause volatility, in some cases driven by external factors.

NON-GAAP MEASURES RECONCILIATIONS continued

**Operating expenses and underlying operating expenses**

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Production and manufacturing expenses | 23,822 | 24,001 | 26,438 |
| Selling, distribution and administrative expenses | 11,328 | 9,881 | 10,493 |
| Research and development | 815 | 907 | 962 |
| Total | 35,964 | 34,789 | 37,893 |
| Of which: | | | |
| Integrated Gas | 7,126 | 6,555 | 6,667 |
| Upstream | 10,604 | 10,983 | 11,582 |
| Oil Products | 14,376 | 13,511 | 15,730 |
| Chemicals | 3,335 | 3,235 | 3,430 |
| Corporate | 524 | 505 | 486 |
| Identified items, of which: | | | |
| Redundancy and restructuring (charges)/reversal | (226) | (872) | (123) |
| (Provisions)/reversal | (254) | (1,415) | (639) |
| Other | (175) | — | (131) |
| Underlying operating expenses | 35,309 | 32,502 | 37,000 |
| Of which: | | | |
| Integrated Gas | 6,892 | 5,769 | 6,534 |
| Upstream | 10,362 | 10,227 | 11,284 |
| Oil Products | 14,272 | 12,970 | 15,590 |
| Chemicals | 3,256 | 3,035 | 3,104 |
| Corporate | 527 | 501 | 488 |

**RETURN ON AVERAGE CAPITAL EMPLOYED**

Return on average capital employed (ROACE) measures the efficiency of our utilisation of the capital that we employ. In this calculation, ROACE is defined as income for the period, adjusted for after-tax interest expense, as a percentage of the average capital employed for the period. Capital employed consists of total equity, current debt and non-current debt.

Calculation of return on average capital employed

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Income for the period | 20,630 | (21,534) | 16,432 |
| Interest expense after tax | 2,741 | 2,822 | 3,024 |
| Income before interest expense | 23,371 | (18,712) | 19,456 |
| Capital employed - opening | 266,551 | 286,887 | 295,398 |
| Capital employed - closing | 264,413 | 266,551 | 286,887 |
| Capital employed - average | 265,482 | 276,719 | 291,142 |
| ROACE | 8.8% | (6.8)% | 6.7% |

**NET DEBT AND GEARING**

Net debt is defined as the sum of current and non-current debt, less cash and cash equivalents, adjusted for the fair value of derivative financial instruments used to hedge foreign exchange and interest rate risk relating to debt, and associated collateral balances.

Gearing is a measure of Shell's capital structure and is defined as net debt (total debt less cash and cash equivalents) as a percentage of total capital (net debt plus total equity).

Also refer to Note 15 to the Consolidated Financial Statements on page 234.

**FREE CASH FLOW AND ORGANIC FREE CASH FLOW**

Free cash flow is used to evaluate cash available for financing activities, including shareholder distributions and debt servicing, after investment in maintaining and growing our business.

Organic free cash flow is defined as Free cash flow excluding the cash flows from acquisition and divestment activities. It is a measure used by management to evaluate generation of cash flow without these activities.

Free cash flow and Organic free cash flow

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Cash flow from operating activities | 45,104 | 34,105 | 42,178 |
| Cash flow from investing activities | (4,761) | (13,278) | (15,779) |
| Free cash flow | 40,343 | 20,828 | 26,399 |
| Less: Cash inflows related to divestments [A] | 15,113 | 4,010 | 7,871 |
| Add: Tax paid on divestments | 188 | — | 187 |
| Add: Cash outflows related to inorganic capital expenditure [B] | 1,658 | 817 | 1,400 |
| Organic free cash flow | 27,076 | 17,634 | 20,116 |

[A] Cash inflows related to divestments includes Proceeds from sale of property, plant and equipment and businesses, Proceeds from joint ventures and associates from sale, capital reduction and repayment of long-term loans, and Proceeds from sale of equity securities as reported in the "Consolidated Statement of Cash Flows".
[B] Cash outflows related to inorganic capital expenditure includes portfolio actions which expand Shell's activities through acquisitions and restructuring activities as reported in capital expenditure lines in the "Consolidated Statement of Cash Flows".

Exhibit Q

## SHAREHOLDER DISTRIBUTION

Shareholder distribution is used to evaluate the level of cash distribution to shareholders. It is defined as the sum of Cash dividends paid to Shell plc shareholders and Repurchases of shares, both of which are reported in the Consolidated Statement of Cash Flows.

Calculation of shareholder distribution

| | $ million | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Cash dividends paid to Shell plc shareholders | (6,253) | (7,424) | (15,198) |
| Repurchases of shares | (2,889) | (1,702) | (10,188) |
| Shareholder distribution | (9,142) | (9,126) | (25,386) |

## DIVESTMENT PROCEEDS

Divestment proceeds represent cash received from divestment activities in the period. Management regularly monitors this measure as a key lever to deliver sustainable cash flow.

Calculation of Divestment proceeds

| | | | $ million |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| Proceeds from sale of property, plant and equipment and businesses | 14,233 | 2,489 | 4,803 |
| Proceeds from joint ventures and associates from sale, capital reduction and repayment of long-term loans [A] | 584 | 1,240 | 2,599 |
| Proceeds from sale of equity securities | 296 | 281 | 469 |
| Divestment proceeds | 15,113 | 4,010 | 7,871 |
| Of which: | | | |
| Integrated Gas | 3,195 | 503 | 723 |
| Upstream | 10,930 | 1,909 | 5,384 |
| Oil Products | 935 | 1,368 | 1,517 |
| Chemicals | 10 | 26 | 22 |
| Corporate | 44 | 205 | 225 |

[A] includes $322 million (2020: $313 million) of long-term loan repayments received from joint ventures and associates.

Exhibit Q

Index to the Exhibits

| Exhibit No. | Description |
|---|---|
| 1.1 | Memorandum of Association of Royal Dutch Shell plc, together with a special resolution of Royal Dutch Shell plc dated May 18, 2010, (incorporated by reference to Exhibit 4.12 to the Registration Statement on Form F-3 (File No. 333-177588) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on October 28, 2011). |
| 1.2 | Articles of Association of Shell plc, dated December 20, 2021 (incorporated by reference to Exhibit 2 to the Form 8-A (File No. 001-32575) of Shell plc filed with the US Securities and Exchange Commission on January 25, 2022). |
| 2.1 | Amended and Restated Dividend Access Trust Deed, dated March 12, 2020 between Royal Dutch Shell plc, BG Group Limited, Computershare Trustees (Jersey) Limited and the Shell Transport and Trading Company Limited (incorporated by reference to Exhibit 2.1 to the Annual Report for the fiscal year ended December 31, 2020, on Form 20-F (File No. 001-32575) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on March 11, 2021). |
| 2.2 | Senior Debt Securities Indenture among Shell International Finance B.V., as issuer, Royal Dutch Shell plc, as guarantor, and Deutsche Bank Trust Company Americas, as trustee, dated June 27, 2006, (incorporated by reference to Exhibit 4.3 to the Registration Statement on Form F-3ASR (No. 333-222005; 333-222005-01) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on December 12, 2017). |
| 2.3 | Second Amended and Restated Deposit Agreement among Shell plc, JPMorgan Chase Bank, N.A., as depositary, and Holders and Beneficial Owners of American Depositary Receipts, dated as of January 31, 2022. |
| 2.4 | Form of American Depositary Receipts representing Shell plc American Depositary Shares each evidencing the right to receive two ordinary shares of Shell plc (included as Exhibit A to Exhibit 2.3 herein). |
| 2.5 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934. |
| 4.1 | Shell Provident Fund Regulations and Trust Agreement, as amended to reflect all amendments through September 25, 2020. |
| 4.2 | Form of Director Indemnity Agreement (incorporated by reference to Exhibit 4.3 to the Annual Report for the fiscal year ended December 31, 2005, on Form 20-F (File No. 001-32575) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on March 13, 2006). |
| 4.3 | Form of contract of employment for Executive Directors (incorporated by reference to Exhibit 4.5 to the Annual Report for fiscal year ended December 31, 2013, on Form 20-F (File No. 001-32575) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on March 13, 2014). |
| 4.4 | Form of Letter of appointment for Non-executive Directors (incorporated by reference to Exhibit 4.4 to the Annual Report for the fiscal year ended December 31, 2018, on Form 20-F (File No. 001-32575) of Royal Dutch Shell plc filed with the US Securities and Exchange Commission on March 14, 2019). |
| 4.5 | Amendment to form of letter of appointment for Non-executive Directors |
| 4.6 | Rules of the Global Employee Share Purchase Plan, amended on January 29, 2022. |
| 4.7 | Rules of the Shell Share Plan 2014, amended January 29, 2022. |
| 4.8 | Free Share Schedule. |
| 8.1 | Significant Shell subsidiaries at December 31, 2021. |

Exhibit Q

| 12.1 | Section 302 Certification of Shell plc. |
| 12.2 | Section 302 Certification of Shell plc. |
| 13.1 | Section 906 Certification of Shell plc. |
| 99.1 | Consent of Ernst & Young LLP, London, United Kingdom. |
| 99.2 | Consent of Ernst & Young LLP, London, United Kingdom, relating to the Royal Dutch Shell Dividend Access Trust. |
| 101 | Inline Interactive data files. |
| 104 | Cover page inline interactive data file (formatted as Inline XBRL and contained in Exhibit 101). |

Exhibit Q

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorised the undersigned to sign this annual report on its behalf.

Shell plc

/s/ Ben van Beurden

Ben van Beurden
Chief Executive Officer
March 9, 2022

# Exhibit Q

## FINANCIAL CALENDAR IN 2022

The Annual General Meeting will be held on May 24, 2022.

| | 2021 Fourth quarter [A] | 2022 First quarter [B] | 2022 Second quarter [B] | 2022 Third quarter [B] |
|---|---|---|---|---|
| Results announcements | February 3 | May 5 | July 28 | October 27 |
| Interim dividend timetable | | | | |
| Announcement date | February 3 [C] | May 5 | July 28 | October 27 |
| Ex-dividend date for SHEL ADS [D] | February 17 | May 19 | August 11 | November 9 |
| Ex-dividend date for SHEL ordinary shares | February 17 | May 19 | August 11 | November 10 |
| Record date | February 18 | May 20 | August 12 | November 11 |
| Closing of currency election date [E] | March 4 | June 7 | August 26 | November 25 |
| Pounds sterling and euro equivalents announcement date | March 14 | June 13 | September 5 | December 5 |
| Payment date | March 28 | June 27 | September 19 | December 19 |

[A]   In respect of the financial year ended December 31, 2021.
[B]   In respect of the financial year ended December 31, 2022.
[C]   The Directors do not propose to recommend any further distribution in respect of 2021.
[D]   The New York Stock Exchange (NYSE), with effect from September 5, 2017, reduced the standard settlement cycle in accordance with the SEC amendments to Exchange Act 15c6-1(a). Under these rules, regular settlement will occur on a T+2 basis for trades occurring on or after the SEC's implementation date of September 5, 2017. As a result RDS A ADSs and RDS B ADSs traded on the NYSE markets will now settle in line with RDS A shares and RDS B shares traded on European markets, who moved to a T+2 settlement basis for trades in 2014, resulting in the same ex-dividend date for RDS A shares, RDS B shares, RDS A ADSs and RDS B ADSs. Record dates will not change. The timings of these are detailed above.
[E]   A different currency election date may apply to shareholders holding shares in a securities account with a bank or financial institution ultimately through Euroclear Nederland. This may also apply to other shareholders who do not hold their shares either directly on the Register of Members or in the corporate sponsored nominee arrangement. Shareholders can contact their broker, financial intermediary, bank or financial institution for the election deadline that applies.

## CONTACT US

The best way to get in touch is via the "Contact us" section of the Shell website www.shell.com/investors. From here questions are properly directed to the Shell team that can assist. In addition, we have introduced an automated question response tool to assist with the most popular questions that we receive and reviewed and updated the "Frequently asked Questions" section of our website to provide the most time efficient information for our investors.

| REGISTERED OFFICE | SHAREHOLDER RELATIONS | INVESTOR RELATIONS |
|---|---|---|
| Shell plc<br>Shell Centre<br>London SE1 7NA<br>United Kingdom | Shell plc<br>Carel van Bylandtlaan 30<br>2596 HR The Hague<br>The Netherlands | Shell plc<br>PO Box 162<br>2501 AN The Hague<br>The Netherlands |
| Registered in England and Wales<br>Company number 4366849<br>Registered with the Dutch Trade Register<br>under number 34179503 | or<br><br>Shell plc<br>Shell Centre<br>London SE1 7NA<br>United Kingdom<br>www.shell.com/investors | or<br><br>Shell Oil Company<br>Investor Relations<br>150 N Dairy Ashford<br>Houston, TX 77079<br>USA<br>www.shell.com/investors |
| HEADQUARTERS<br>Shell plc<br>Shell Centre<br>London SE1 7NA<br>United Kingdom | | |

| SHARE REGISTRATION | AMERICAN DEPOSITARY SHARES (ADSS) | REPORT ORDERING |
|---|---|---|
| Equiniti<br>Aspect House<br>Spencer Road<br>Lancing<br>West Sussex BN99 6DA<br>United Kingdom<br>0800 169 1679<br>customer@equiniti.com | JPMorgan Chase Bank, N.A.<br>Shareowner Services<br>P.O. Box 64504<br>St. Paul, MN 55164-0504<br>USA | www.shell.com/order<br>Annual Report/20-F service for<br>US residents<br>+1 888 301 0504 |
| For online information about your holding<br>and to change the way you receive your<br>company documents:<br>www.shareview.co.uk | Overnight correspondence to:<br>Shareowner Services<br>1110 Centre Pointe Curve, Suite 101<br>Mendota Heights, MN 55120-4100<br>USA<br>+1 800 990 1135 (USA only)<br>+1 651 453 2128 (International)<br>Email: https://www.shareowneronline.com/informational/contact-us/<br>www.adr.com/shareholder | |

**EXECUTION VERSION**

SECOND AMENDED AND RESTATED DEPOSIT
AGREEMENT AMONG
SHELL PLC,
JPMORGAN CHASE BANK, N.A., AS
DEPOSITARY,
AND
HOLDERS AND BENEFICIAL OWNERS OF
AMERICAN DEPOSITARY RECEIPTS



104296247.1

J.P.Morgan

# J.P.Morgan

## TABLE OF CONTENTS

Page

PARTIES ........................................................................................................ 1
RECITALS ..................................................................................................... 1
Section 1.    Certain Definitions
   (a)    ADR Register ......................................................................... 2
   (b)    ADRs; Direct Registration ADRs .............................................. 2
   (c)    ADS ...................................................................................... 2
   (d)    Articles ................................................................................. 2
   (e)    Beneficial Owner .................................................................... 3
   (f)    Custodian .............................................................................. 3
   (g)    Deliver, execute, issue et al. .................................................... 3
   (h)    Delivery Order ....................................................................... 3
   (i)    Deposited Securities ............................................................... 3
   (j)    Direct Registration System ....................................................... 3
   (k)    Holder ................................................................................... 4
   (l)    Securities Act of 1933 ............................................................ 4
   (m)    Securities Exchange Act of 1934 .............................................. 4
   (n)    Shares ................................................................................... 4
   (o)    Transfer Office ....................................................................... 4
   (p)    Withdrawal Order .................................................................... 4
Section 2.    Form of ADRs ............................................................................. 4
Section 3.    Deposit of Shares ........................................................................ 5
Section 4.    Issue of ADRs ............................................................................. 6
Section 5.    Distributions on Deposited Securities .............................................. 6
Section 6.    Withdrawal of Deposited Securities ................................................. 7
Section 7.    Substitution of ADRs .................................................................... 7
Section 8.    Cancellation and Destruction of ADRs; Maintenance of Records ............ 7
Section 9.    The Custodian ............................................................................. 8
Section 10.    Lists of Holders .......................................................................... 9
Section 11.    Depositary's Agents ..................................................................... 9
Section 12.    Resignation and Removal of the Depositary; Appointment of Successor
             Depositary .................................................................................. 9
Section 13.    Reports .................................................................................... 10
Section 14.    Additional Shares ....................................................................... 10
Section 15.    Indemnification .......................................................................... 11
Section 16.    Notices ..................................................................................... 13
Section 17.    Counterparts ............................................................................. 15
Section 18.    No Third-Party Beneficiaries; Holders and Beneficial Owners as Parties; Binding
             Effect ....................................................................................... 15
Section 19.    Severability .............................................................................. 15
Section 20.    Governing Law; Consent to Jurisdiction .......................................... 15
Section 21.    Agent for Service ....................................................................... 20
Section 22.    Waiver of Immunities .................................................................. 21
Section 23.    Waiver of Jury Trial .................................................................... 21
Section 24.    Amendment and Restatement of Prior Deposit Agreement .................... 22
TESTIMONIUM ............................................................................................. 23
SIGNATURES ............................................................................................... 23

104296247.1

# J.P.Morgan

### EXHIBIT A

|  |  | Page |
|---|---|---|
| FORM OF FACE OF ADR | | A-1 |
| Introductory Paragraph | | A-1 |
| (1) | Issuance of ADSs | A-2 |
| (2) | Withdrawal of Deposited Securities | A-3 |
| (3) | Transfers, Split-Ups and Combinations of ADRs | A-4 |
| (4) | Certain Limitations to Registration, Transfer etc. | A-5 |
| (5) | Liability of Holder or Beneficial Owner for Taxes, Duties and Other Charges | A-6 |
| (6) | Disclosure of Interests | A-7 |
| (7) | Charges of Depositary | A-9 |
| (8) | Available Information | A-12 |
| (9) | Execution | A-13 |
| Signature of Depositary | | A-13 |
| Address of Depositary's Office | | A-13 |
| FORM OF REVERSE OF ADR | | A-14 |
| (10) | Distributions on Deposited Securities | A-14 |
| (11) | Record Dates | A-15 |
| (12) | Voting of Deposited Securities | A-15 |
| (13) | Changes Affecting Deposited Securities | A-17 |
| (14) | Exoneration | A-18 |
| (15) | Resignation and Removal of Depositary; the Custodian | A-24 |
| (16) | Amendment | A-25 |
| (17) | Termination | A-26 |
| (18) | Appointment; Acknowledgements and Agreements | A-26 |
| (19) | Waiver | A-27 |
| (20) | Elective Distributions in Cash or Shares | A-28 |

J.P.Morgan

SECOND AMENDED AND RESTATED DEPOSIT AGREEMENT, dated as of January 31, 2022 (the "Deposit Agreement"), among SHELL PLC (formerly known as Royal Dutch Shell plc), a public limited company incorporated under the laws of England and Wales, and its successors (the "Company"), JPMORGAN CHASE BANK, N.A., a national banking association organized under the laws of the United States of America, as depositary hereunder (the "Depositary"), and all Holders (as defined below) and Beneficial Owners (as defined below) from time to time of American Depositary Receipts issued hereunder evidencing American Depositary Shares ("ADSs") representing deposited Shares (as defined below). The Company hereby appoints the Depositary as depositary for the Deposited Securities (as defined below) and hereby authorizes and directs the Depositary to act in accordance with the terms set forth in this Deposit Agreement. All capitalized terms used herein have the meanings ascribed to them in Section 1 or elsewhere in this Deposit Agreement.

WHEREAS, the Company and the Depositary entered into an Amended and Restated Deposit Agreement, dated as of November 1, 2018, as amended by Amendment No. 1, dated as of April 15, 2021 (as previously amended, the "Prior Deposit Agreement"), for the purposes set forth therein, for the creation of (a) ADSs (the "Class A Share ADSs") representing the Company's Class A ordinary shares (the "Class A Shares") so deposited and for the execution and delivery of ADRs in the form attached as Exhibit A to the Prior Deposit Agreement (the "Class A Receipts") evidencing the Class A Share ADSs and (b) ADSs (the "Class B Share ADSs") representing the Company's Class B ordinary shares (the "Class B Shares") so deposited and for the execution and delivery of ADRs in the form attached as Exhibit B to the Prior Deposit Agreement (the "Class B Receipts" and, together with the Class A Receipts, the "Pre-assimilation Form of Receipts") evidencing the Class B Share ADSs;

WHEREAS, at a General Meeting of the Company on December 10, 2021, the Company's shareholders approved a Special Resolution to amend the Company's Articles of Association to, among other things, enable the Simplification (as that term is defined in the Company's Shareholder Circular and Notice of General Meeting, dated 15 November 2021) of the Company's capital structure. Subsequent thereto, on 20 December 2021, the Company's Board of Directors approved a resolution to proceed with the Simplification, pursuant to which, among other things, the Company's Class A Shares and Class B Shares are being assimilated into a single line of ordinary shares for listing and trading purposes (the "Assimilation") on January 29, 2022 (the "Assimilation Effective Date");

WHEREAS, the Assimilation constitutes a "unification" and/or "consolidation" of the Class A Shares and Class B Shares as a result of which the Class B Shares form one uniform class with the Class A Shares ranking pari passu in all respects pursuant to article 5(E) of the Company's Articles;

WHEREAS, as provided in the Prior Deposit Agreement, and in particular

104296247.1

1

J.P.Morgan

Paragraph (13) of each of the Pre-assimilation Form of Receipts, from the Assimilation Effective Date, the uniform class of Shares shall immediately after the Assimilation (without any action on the part of the Company, the Depositary or the Holders) constitute the Share class represented by any and all outstanding ADSs (regardless of whether previously designated Class A Share ADSs or Class B Share ADSs) as a result of the Assimilation;

WHEREAS, in connection with the Simplification and pursuant to the terms of the Prior Deposit Agreement, the Company and the Depositary wish to amend and restate the Prior Deposit Agreement and the Pre-assimilation Form of Receipts, effective as of the Assimilation Effective Date, to (a) reflect the Assimilation by eliminating the references in the Prior Deposit Agreement to the prior dual class structure of the Company's Shares, ADSs and ADRs that will not be applicable to the outstanding ADSs and ADRs as a result of the Assimilation so that immediately following the Assimilation the Class A Share ADSs and Class B Share ADSs shall all be known as ADSs and shall all constitute a uniform class of ADSs without further distinction, and (b) make such other changes and amendments as are provided herein;

NOW THEREFORE, in consideration of the premises, subject to Section 24 hereof, the parties hereto hereby amend and restate the Prior Deposit Agreement and the Prior Receipts in their entirety as follows:

1. Certain Definitions.

(a)     "ADR Register" is defined in paragraph (3) of the form of ADR (Transfers, Split-Ups and Combinations of ADRs).

(b)     "ADRs" mean the American Depositary Receipts executed and delivered hereunder. ADRs may be either in physical certificated form or Direct Registration ADRs (as hereinafter defined). ADRs in physical certificated form, and the terms and conditions governing the Direct Registration ADRs, shall be substantially in the form of Exhibit A annexed hereto (the "form of ADR"). The term "Direct Registration ADR" means an ADR, the ownership of which is recorded on the Direct Registration System. References to "ADRs" shall include certificated ADRs and Direct Registration ADRs, unless the context otherwise requires. The form of ADR is hereby incorporated herein and made a part hereof; the provisions of the form of ADR shall be binding upon the parties hereto.

(c)     Subject to paragraph (13) of the form of ADR (Changes Affecting Deposited Securities), each "ADS" evidenced by an ADR represents the right to receive, and to exercise the beneficial ownership interests in, the number of Shares specified in the form of ADR attached hereto as Exhibit A (as amended from time to time) that are on deposit with the Depositary and/or the Custodian and a pro rata share in any other Deposited Securities, subject, in each case, to the terms of this Deposit Agreement and the ADSs. The ADS(s)-to-Share(s) ratio is subject to

J.P.Morgan

amendment as provided in the form of ADR (which may give rise to fees contemplated in paragraph (7) thereof (Charges of Depositary)).

(d)    "Articles" means the memorandum and articles of association from time to time of the Company. All cross-references contained herein to sections of the Articles will automatically be updated and amended without the further action of any party hereto in the event the Articles themselves are renumbered.

(e)    "Beneficial Owner" means as to any ADS, any person or entity having a beneficial ownership interest in such ADS. A Beneficial Owner need not be the Holder of the ADR evidencing such ADS. If a Beneficial Owner of ADSs is not a Holder, it must rely on the Holder of the ADR(s) evidencing such ADSs in order to assert any rights or receive any benefits under this Deposit Agreement. The arrangements between a Beneficial Owner of ADSs and the Holder of the corresponding ADRs may affect the Beneficial Owner's ability to exercise any rights it may have.

(f)    "Custodian" means the agent or agents of the Depositary (singly or collectively, as the context requires) and any additional or substitute Custodian appointed pursuant to Section 9.

(g)    The terms "deliver," "execute," "issue," "register," "surrender," "transfer" or "cancel," when used with respect to (i) Shares refers, where the context requires, to an entry or entries or an electronic transfer or transfers in an account or accounts maintained by institutions authorized under applicable law to effect transfers of securities (which may include CREST and Euroclear Nederland) and not to the physical transfer of certificates representing the Shares and (ii) Direct Registration ADRs, shall refer to an entry or entries or an electronic transfer or transfers in the Direct Registration System, and, when used with respect to ADRs in physical certificated form, shall refer to the physical delivery, execution, issuance, registration, surrender, transfer or cancellation of certificates representing the ADRs.

(h)    "Delivery Order" is defined in Section 3.

(i)    "Deposited Securities" as of any time means all Shares at such time deposited under this Deposit Agreement and any and all other Shares, securities, property and cash at such time held by the Depositary or the Custodian in respect or in lieu of such deposited Shares and other Shares, securities, property and cash. Deposited Securities are not intended to, and shall not, constitute proprietary assets of the Depositary, the Custodian or their nominees. Beneficial ownership in Deposited Securities is intended to be, and shall at all times during the term of the Deposit Agreement continue to be, vested in the Beneficial Owners of the ADSs representing such Deposited Securities.

(j)    "Direct Registration System" means the system for the uncertificated registration of ownership of securities established by The Depository Trust Company

104296247.1

3

J.P.Morgan

("DTC") and utilized by the Depositary pursuant to which the Depositary may record the ownership of ADRs without the issuance of a certificate, which ownership shall be evidenced by periodic statements issued by the Depositary to the Holders entitled thereto. For purposes hereof, the Direct Registration System shall include access to the Profile Modification System maintained by DTC, which provides for automated transfer of ownership between DTC and the Depositary.

(k)    "Holder" means the person or persons in whose name an ADR is registered on the ADR Register.    For all purposes under the Deposit Agreement and the ADRs, a Holder shall be deemed to have all requisite authority to act on behalf of any and all Beneficial Owners of the ADSs evidenced by the ADR(s) registered in such Holder's name.

(l)    "Securities Act of 1933" means the United States Securities Act of 1933, as from time to time amended.

(m)    "Securities Exchange Act of 1934" means the United States Securities Exchange Act of 1934, as from time to time amended.

(n)    "Shares" mean the single class of ordinary shares of the Company immediately following the Assimilation as a result of the Assimilation from and after the Assimilation Effective Date, and shall include the rights to receive Shares specified in paragraph (1) of the form of ADR  (Issuance of ADSs). Subject to the provisions of the forms of ADRs, including, without limitations paragraphs (13) and (14) thereof, should there occur any change in nominal value, a change in par value, a split-up, consolidation, cancellation or any other reclassification or, upon the occurrence of an event described in paragraph (13)(a) of a form of ADR (Changes Affected Deposited Securities), an exchange or conversion in respect of the Shares of the Company, the term "Shares" shall thereafter also mean the successor securities resulting from such change in nominal value, par value, split-up, consolidation, cancellation or such other reclassification or such exchange or conversion. Shares may be certificated or uncertificated.

(o)    "Transfer Office" is defined in paragraph (3) of the form of ADR (Transfers, Split-Ups and Combinations of ADRs).

(p)    "Withdrawal Order" is defined in Section 6.

2. Form of ADRs.

(a)    Direct Registration ADRs. Notwithstanding anything in this Deposit Agreement or in the form of ADR to the contrary, ADSs shall be evidenced by Direct Registration ADRs, unless certificated ADRs are specifically requested by the Holder.

(b)    Certificated ADRs.  ADRs in certificated form shall be printed or

104296247.1

4

J.P.Morgan

otherwise reproduced at the discretion of the Depositary in accordance with its customary practices in its American depositary receipt business, or at the request of the Company typewritten and photocopied on plain or safety paper, and shall be substantially in the form set forth in the form of ADR, with such changes as may be required by the Depositary or the Company to comply with their obligations hereunder, any applicable law, regulation or usage or to indicate any special limitations or restrictions to which any particular ADRs are subject. ADRs may be issued in denominations of any number of ADSs. ADRs in certificated form shall be executed by the Depositary by the manual, electronic or facsimile signature of a duly authorized officer of the Depositary. ADRs in certificated form bearing the facsimile signature of anyone who was at the time of execution a duly authorized officer of the Depositary shall bind the Depositary, notwithstanding that such officer has ceased to hold such office prior to the delivery of such ADRs.

(c)    Binding Effect. Holders of ADRs, and the Beneficial Owners of the ADSs evidenced by such ADRs, shall each be bound by the terms and conditions of this Deposit Agreement and of the form of ADR, regardless of whether such ADRs are Direct Registration ADRs or certificated ADRs.

3. Deposit of Shares.

(a)    Requirements. In connection with the deposit of Shares hereunder, the Depositary or the Custodian may require the following in a form satisfactory to it:

(i)    a written order directing the Depositary to issue to, or upon the written order of, the person or persons designated in such order a Direct Registration ADR or ADRs evidencing the number of ADSs representing such deposited Shares (a "Delivery Order");

(ii)    proper endorsements or duly executed instruments of transfer in respect of such deposited Shares;

(iii)    instruments assigning to the Depositary, the Custodian or a nominee of either any distribution on or in respect of such deposited Shares or indemnity therefor; and

(iv)    proxies entitling the Custodian to vote such deposited Shares.

(b)    Registration of Deposited Securities. As soon as practicable after the Custodian receives Deposited Securities pursuant to any such deposit or pursuant to paragraph (10) (Distributions on Deposited Securities) or (13) (Changes Affecting Deposited Securities) of the form of ADR, the Custodian shall present such Deposited Securities for registration of transfer into the name of the Depositary, the Custodian or a nominee of either, in each case for the benefit of Holders, to the extent such registration is practicable, at the cost and expense of the person making such deposit

J.P.Morgan

(or for whose benefit such deposit is made) and shall obtain evidence satisfactory to it of such registration. Deposited Securities shall be held by the Custodian for the account and to the order of the Depositary for the benefit of Holders of ADRs (to the extent not prohibited by law) at such place or places and in such manner as the Depositary shall determine. Notwithstanding anything else contained herein, in the form of ADR and/or in any outstanding ADSs, the Depositary, the Custodian and their respective nominees are intended to be, and shall at all times during the term of the Deposit Agreement be, the record holder(s) only of the Deposited Securities represented by the ADSs for the benefit of the Holders. The Depositary, on its own behalf and on behalf of the Custodian and their respective nominees, disclaims any beneficial ownership interest in the Deposited Securities held on behalf of the Holders.

(c)    Delivery of Deposited Securities. Deposited Securities may be delivered by the Custodian to any person only under the circumstances expressly contemplated in this Deposit Agreement. To the extent that the provisions of or governing the Shares make delivery of certificates therefor impracticable, Shares may be deposited hereunder by such delivery thereof as the Depositary or the Custodian may reasonably accept, including, without limitation, by causing them to be credited to an account maintained by the Custodian for such purpose with the Company or an accredited intermediary, such as a bank, acting as a registrar for the Shares, together with delivery of the documents, payments and Delivery Order referred to herein to the Custodian or the Depositary.

4. Issue of ADRs. After any such deposit of Shares, the Custodian shall notify the Depositary of such deposit and of the information contained in any related Delivery Order by letter, first class airmail postage prepaid, or, at the request, risk and expense of the person making the deposit, by SWIFT, cable, telex or facsimile transmission. After receiving such notice from the Custodian, the Depositary, subject to this Deposit Agreement, shall properly issue at the Transfer Office, to or upon the order of any person named in such notice, an ADR or ADRs registered as requested and evidencing the aggregate ADSs to which such person is entitled.

5. Distributions on Deposited Securities. To the extent that the Depositary determines in its discretion that any distribution pursuant to paragraph (10) of the form of ADR (Distributions on Deposited Securities) is not practicable with respect to any Holder, the Depositary, after consultation with the Company (to the extent reasonably practicable), may make such distribution as it so deems practicable, including the distribution of foreign currency, securities or property (or appropriate documents evidencing the right to receive foreign currency, securities or property) or the retention thereof as Deposited Securities with respect to such Holder's ADRs (without liability for interest thereon or the investment thereof).

6. Withdrawal of Deposited Securities. In connection with any surrender of an ADR for withdrawal of the Deposited Securities represented by the ADSs evidenced

J.P.Morgan

thereby, the Depositary may require proper endorsement in blank of such ADR (or duly executed instruments of transfer thereof in blank) and the Holder's written order directing the Depositary to cause the Deposited Securities represented by the ADSs evidenced by such ADR to be withdrawn and delivered to, or upon the written order of, any person designated in such order (a "Withdrawal Order"). Directions from the Depositary to the Custodian to deliver Deposited Securities shall be given by letter, first class airmail postage prepaid, or, at the request, risk and expense of the Holder, by SWIFT, cable, telex or facsimile transmission. Delivery of Deposited Securities may be made by the delivery of certificates (which, if required by law shall be properly endorsed or accompanied by properly executed instruments of transfer or, if such certificates may be registered, registered in the name of such Holder or as ordered by such Holder in any Withdrawal Order) or by such other means as the Depositary may deem practicable, including, without limitation, by transfer of record ownership thereof to an account designated in the Withdrawal Order maintained either by the Company or an accredited intermediary, such as a bank, acting as a registrar for the Deposited Securities. The Company agrees to cooperate with the Depositary and to take all actions, and to instruct and cause any registrar of the Deposited Securities to take all such actions, as may be reasonably requested by the Depositary, or are otherwise necessary or required, to effectuate the withdrawal and transfer of the Deposited Securities upon any cancellation of ADRs by Holders and/or Beneficial Owners thereof.

7. Substitution of ADRs. The Depositary shall execute and deliver a new Direct Registration ADR in exchange and substitution for any mutilated certificated ADR upon cancellation thereof or in lieu of and in substitution for such destroyed, lost or stolen certificated ADR, unless the Depositary has notice that such ADR has been acquired by a bona fide purchaser, upon the Holder thereof filing with the Depositary a request for such execution and delivery and a sufficient indemnity bond and satisfying any other reasonable requirements imposed by the Depositary.

8. Cancellation and Destruction of ADRs; Maintenance of Records. All ADRs surrendered to the Depositary shall be cancelled by the Depositary. The Depositary is authorized to destroy ADRs in certificated form so cancelled in accordance with its customary practices. The Depositary agrees to maintain or cause its agents to maintain records of all ADRs surrendered and Deposited Securities withdrawn under Section 6 hereof and paragraph (2) of the form of ADR (Withdrawal of Deposited Securities), substitute ADRs delivered under Section 7 hereof, and canceled or destroyed ADRs under this Section 8, in keeping with the procedures ordinarily followed by stock transfer agents located in the United States or as required by the laws or regulations governing the Depositary.

9. The Custodian.

(a)    Rights of the Depositary. Any Custodian in acting hereunder shall be subject to the directions of the Depositary and shall be responsible solely to it. The

104296247.1

7

J.P.Morgan

Depositary reserves the right to add, replace or remove a Custodian. The Depositary will consult with the Company , if practicable, prior to taking any such action, and will give prompt notice of any such action, which will be advance notice if practicable. The Depositary, after consultation with the Company if practicable, may discharge any Custodian at any time upon notice to the Custodian being discharged.

(b)    Rights of the Custodian. Any Custodian may resign from its duties hereunder by providing at least 30 days' prior written notice to the Depositary. Promptly after the receipt of such written notice the Depositary will endeavor to appoint a substitute custodian or custodians, if and to the extent the Depositary determines, after consultation with the Company, if practicable, that a new and/or separate Custodian is required, each of which shall be a Custodian hereunder upon the effectiveness of such resignation. Any Custodian ceasing to act hereunder as Custodian shall deliver, upon the instruction of the Depositary, all Deposited Securities held by it to a Custodian continuing to act.

(c)    Notwithstanding anything to the contrary contained in this Deposit Agreement (including the ADRs) and, subject to the further limitations set forth in clause (o) of paragraph (14) of the form of ADR (Exoneration), the Depositary shall not be responsible for, and shall incur no liability in connection with or arising from, any act or omission to act on the part of the Custodian except to the extent that any Holder has incurred liability directly as a result of the Custodian having (i) committed fraud or willful misconduct in the provision of custodial services to the Depositary or (ii) failed to use reasonable care in the provision of custodial services to the Depositary as determined in accordance with the standards prevailing in the jurisdiction in which the Custodian is located.

(d)    To the extent the Custodian is JPMorgan Chase Bank, N.A.; or any subsidiary of the Depositary, the Depositary shall be responsible for the acts and omissions to act on the part of the Custodian as if the Depositary were acting as Custodian hereunder.

10. Lists of Holders.  The Company shall have the right to inspect transfer records of the Depositary and its agents and the ADR Register, take copies thereof and require the Depositary and its agents to supply copies of such portions of such records as the Company may request.  The Depositary or its agents shall furnish to the Company promptly upon the written request of the Company, a list of the names, addresses and holdings of ADSs by all Holders as of a date within five (5) business days of the Depositary's receipt of such request.

11. Depositary's Agents.  The Depositary may perform its obligations under this Deposit Agreement through any agent appointed by it, provided that the Depositary shall notify the Company of such appointment and shall remain responsible for the performance of such obligations as if no agent were appointed, subject to paragraph (14) of the form of ADR (Exoneration).

J.P.Morgan

12. Resignation and Removal of the Depositary; Appointment of Successor
Depositary.

(a)    Resignation of the Depositary. The Depositary may at any time resign as
Depositary hereunder by written notice of its election to do so delivered to the
Company, such resignation to take effect upon the appointment of a successor
depositary and its acceptance of such appointment as hereinafter provided.

(b)    Removal of the Depositary. The Depositary may at any time be removed
by the Company by providing no less than 60 days' prior written notice of such
removal to the Depositary, such removal to take effect on the later of (i) the 60th day
after such notice of removal is first provided and (ii) the appointment of a successor
depositary and its acceptance of such appointment as hereinafter provided.
Notwithstanding the foregoing, if upon the resignation or removal of the Depositary a
successor depositary is not appointed within the applicable 60-day period as specified
in paragraph (17) of the form of ADR (Termination), then the Depositary may elect to
terminate this Deposit Agreement and the ADR and the provisions of said paragraph
(17) shall thereafter govern the Depositary's obligations hereunder.

(c)    Appointment of Successor Depositary. In case at any time the Depositary
acting hereunder shall resign or be removed, the Company shall use its commercially
reasonable efforts to appoint a successor depositary, which shall be a bank or trust
company having an office in the Borough of Manhattan, The City of New York. Every
successor depositary shall execute and deliver to its predecessor and to the Company
an instrument in writing accepting its appointment hereunder, and thereupon such
successor depositary, without any further act or deed, shall become fully vested with
all the rights, powers, duties and obligations of its predecessor. The predecessor
depositary, only upon payment of all sums due to it and on the written request of the
Company, shall (i) execute and deliver an instrument transferring to such successor all
rights and powers of such predecessor hereunder (other than its rights to
indemnification and fees owing, each of which shall survive any such removal and/or
resignation), (ii) duly assign, transfer and deliver all right, title and interest to the
Deposited Securities to such successor, and (iii) deliver to such successor a list of the
Holders of all outstanding ADRs. Any such successor depositary shall promptly mail
notice of its appointment to such Holders. Any bank or trust company into or with
which the Depositary may be merged or consolidated, or to which the Depositary shall
transfer substantially all its American depositary receipt business, shall be the
successor of the Depositary without the execution or filing of any document or any
further act.

13. Reports. On or before the first date on which the Company gives any
notice of any meeting of owners of Shares or of taking any action in respect of any
cash or other distributions of any rights available to holders of Deposited Securities or
makes any communication that reasonably could require the Depositary to take, or

J.P.Morgan

plan to take, action under this Deposit Agreement, by publication or otherwise, the Company shall transmit to the Depositary a copy thereof in English or with an English translation or summary. The Company has delivered to the Depositary, the Custodian and any Transfer Office, a copy of all provisions of or governing the Shares and any other Deposited Securities issued by the Company or any affiliate of the Company and, promptly upon any change thereto, the Company shall deliver to the Depositary, the Custodian and any Transfer Office, a copy (in English or with an English translation) of such provisions as so changed. The Depositary and its agents may rely upon the Company's delivery of all such communications, information and provisions for all purposes of this Deposit Agreement and the Depositary shall have no liability for the accuracy or completeness of any thereof. If requested by the Company, the Depositary will arrange for the mailing, at the Company's expense, of copies of notices, reports and communications provided by the Company for such purpose to all Holders. The Company will timely provide the Depositary with the quantity of such notices, reports, and other communications, as reasonably requested by the Depositary from time to time, as are necessary in order for the Depositary to effect such mailings.

14. Additional Shares. The Company agrees with the Depositary that neither the Company nor any company controlling, controlled by or under common control with the Company shall (a) issue (i) additional Shares, (ii) rights to subscribe for Shares, (iii) securities convertible into or exchangeable for Shares or (iv) rights to subscribe for any such securities or (b) deposit any Shares under this Deposit Agreement, except, in each case, under circumstances complying in all respects with the Securities Act of 1933. If the Company or any affiliate of the Company determines at its sole discretion to issue or distribute (i) additional Shares, (ii) rights to subscribe for Shares, (iii) securities convertible into or exchangeable for Shares or (iv) rights to subscribe for any such securities, the Company shall notify the Depositary and at the reasonable request of the Depositary provided in writing, the Company will furnish the Depositary with (i) a written opinion from U.S. counsel for the Company that is reasonably satisfactory to the Depositary, stating whether or not the issuance or distribution requires, or, if made in the United States, would require, registration under the Securities Act of 1933, and dealing with such other issues reasonably requested by the Depositary and (ii) a written opinion from English counsel for the Company dealing with such issues reasonably requested by the Depositary. If, in the opinion of such U.S. counsel, such issuance or distribution requires, or, if made in the United States, would require, registration under the Securities Act of 1933, that counsel shall furnish to the Depositary a written opinion as to whether or not there is a registration statement under the Securities Act of 1933 in effect that will cover that issuance or distribution. Notwithstanding the preceding two sentences, no such written opinion from U.S. counsel regarding the existence of a registration statement with respect to such issuance or distribution under the Securities Act of 1933 need be furnished to the Depositary in the event that the Company provides proof reasonably satisfactory to the Depositary that a registration statement is in effect as to such issuance or distribution under the Securities Act of 1933 and has remained effective

J.P.Morgan

through the date of the relevant transaction. The Depositary will not knowingly accept for deposit hereunder any Shares required to be registered under the Securities Act of 1933 unless a registration statement under the Securities Act of 1933 is in effect as to such Shares and will use reasonable efforts to comply with written instructions of the Company not to accept for deposit hereunder any Shares identified in such instructions at such times and under such circumstances as may reasonably be specified in such instructions in order to facilitate the Company's compliance with the requirements of the securities laws, rules and regulations in the United States.

15. Indemnification.

(a)    Indemnification by the Company. Subject to the limitations provided for in Section 15(c) below, the Company shall indemnify, defend and save harmless each of the Depositary and its directors, officers, employees, agents and affiliates against any direct loss, liability or expense (including reasonable fees and expenses of counsel) which may arise out of acts performed or omitted, in connection with the provisions of this Deposit Agreement and of the ADRs, as the same may be amended, modified or supplemented from time to time in accordance herewith (i) by either the Depositary or its directors, officers, employees, agents and affiliates, except for any loss, liability or expense directly arising out of the negligence, or willful misconduct of the Depositary or its directors, officers, employees, agents or affiliates acting in their capacities as such hereunder or (ii) by the Company or any of its directors, officers, employees, agents and affiliates.

The indemnities set forth in the preceding paragraph shall also apply to any liability or expense which may arise out of any misstatement or alleged misstatement or omission or alleged omission in any registration statement, proxy statement, prospectus (or placement memorandum), or preliminary prospectus (or preliminary placement memorandum) of the Company or an affiliate thereof relating to the offer, issuance, withdrawal or sale of ADSs or the deposit of Shares in connection therewith, except to the extent any such liability or expense arises out of (i) information relating to the Depositary or its agents (other than the Company), as applicable, furnished in writing by the Depositary expressly for use in any of the foregoing documents and not changed or altered by the Company or (ii) if such information is provided, the failure to state a material fact necessary to make the information provided, in light of the circumstances under which made or provided, not misleading.

The Company agrees that the indemnification provided in this Section 15(a) shall apply to the Depositary's implementation of the Direct Registration System and that, to the extent the relevant transfer is performed in connection with and in accordance with the arrangements and procedures related to the Direct Registration System generally in effect, reliance by the Depositary upon information, or compliance with directions, it receives from a DTC participant claiming to act on behalf of a Holder of Direct Registration ADRs to register a transfer of ADSs to DTC or its nominee or to deliver ADSs to the DTC account of that DTC participant, without

Exhibit Q

J.P.Morgan

receipt by the Depositary of prior authorization from the Holder to register such transfer or make such delivery (unless such prior authorization is required by the Profile Modification System), shall not be deemed negligence or willful misconduct by the Depositary within the meaning of this Section 15 (a), unless the Depositary had actual knowledge, or had reason to know (despite the absence of any investigation by it), that such directions were not authorized or were otherwise invalid.

(b)    Indemnification by the Depositary. Subject to the limitations provided for in Sections 9(c) and 15(c) below, the Depositary shall indemnify, defend and save harmless the Company and its directors, officers, employees, agents and affiliates acting on the Company's behalf hereunder against any direct loss, liability or expense (including reasonable fees and expenses of counsel) incurred by the Company in respect of this Deposit Agreement to the extent such loss, liability or expense is due to the negligence or willful misconduct of the Depositary or its directors, officers, employees, agents or affiliates acting in their capacities as such hereunder on behalf of the Depositary.

(c)    Damages or Lost Profits. Notwithstanding any other provision of this Deposit Agreement or the ADRs to the contrary, neither the Company nor the Depositary, nor any of their agents, shall be liable to the other for any indirect, special, punitive or consequential damages (collectively "Special Damages") except (i) to the extent such Special Damages arise from the gross negligence or willful misconduct of the party from whom indemnification is sought or (ii) to the extent Special Damages arise from or out of a claim brought by a third party (including, without limitation, Holders) against the Depositary or its agents, except to the extent such Special Damages arise out of the gross negligence or willful misconduct of the party seeking indemnification hereunder.

(d)    Notification. Any person seeking indemnification hereunder (an "indemnified person") shall notify the person from whom it is seeking indemnification (the "indemnifying person") of the commencement of any indemnifiable action or claim as promptly as reasonably practical after such indemnified person becomes aware of such commencement (provided that the failure to make such notification shall not affect such indemnified person's rights to indemnification under this Section 15 except and only to the limited extent the indemnifying person is materially prejudiced by such failure through the forfeiture of substantive rights or defenses by such failure; and provided, further, that the failure to notify the indemnifying party shall not relieve the indemnifying party from any liability that it may have to an indemnified party otherwise than under this Section 15). No indemnifying person shall be liable for any settlement of any proceeding effected without its written consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with such indemnifying person's written consent or if there is a final and non-appealable judgment by a court of competent jurisdiction in any such proceeding, the indemnifying person agrees to indemnify and hold harmless each indemnified person from and against any and all losses, claims, damages, liabilities

104296247.1

12

J.P.Morgan

and reasonable legal and other out-of-pocket expenses by reason of such settlement or judgment. No indemnifying person shall, without the prior written consent of any indemnified person (which consent shall not unreasonably be withheld, conditioned or delayed), effect any settlement of any pending or threatened proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (i) includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability or claims that are the subject matter of such proceedings and (ii) does not include any statement as to or any admission of fault, culpability, wrong doing or a failure to act by or on behalf of any indemnified person.

(e)     Survival. The obligations set forth in this Section 15 shall survive the termination of this Deposit Agreement and the succession or substitution of any indemnified person.

16. Notices.

(a)     Notice to Holders. Notice to any Holder shall be deemed given when first mailed, first class postage prepaid, or otherwise disseminated in a manner consented to by such Holder, to the address (physical or electronic or otherwise, as the case may be) of such Holder on the ADR Register or received by such Holder. Failure to notify a Holder or any defect in the notification to a Holder shall not affect the sufficiency of notification to other Holders or to the Beneficial Owners of the ADSs evidenced by the ADRs held by such other Holders.     The Depositary's only notification obligations under this Deposit Agreement and the ADRs shall be to Holders. Notice to a Holder shall be deemed, for all purposes of the Deposit Agreement and the ADRs, to constitute notice to any and all Beneficial Owners of the ADSs evidenced by such Holder's ADRs.

(b)     Notice to the Depositary or the Company. Notice to the Depositary or the Company shall be deemed given when first received by it at the address or by electronic transmission to the e-mail address set forth in (i) or (ii), respectively, or at such other address or email address provided by the Depositary or the Company to the other, respectively, in the same manner as notices are required to be provided in this Section 16:

> (i)     JPMorgan Chase Bank, N.A.
> 383 Madison Avenue, Floor 11
> New York, New York, 10179
> Attention: Depositary Receipts Group
> E-mail Address: DR_Global_CSM@jpmorgan.com

> (ii)     Shell plc
> Shell Centre
> London, SE1 7NA United Kingdom

# J.P.Morgan

Attention: Linda M. Coulter, Company Secretary  E-mail Address:  linda.coulter@shell.com

With courtesy copies (which shall not be required for any notice hereunder to be effective) to:

Shell plc
Shell Centre
London, SE1 7NA United Kingdom
Attention:  Company Secretary Office
E-mail Address:  anthony.clarke@shell.com

and

Shell Oil Company
150 North Dairy Ashford Road
Houston, TX 77079
United States of America
Attn: Investor Relations
Email address:  ir-usa@shell.com

Delivery of a notice by means of electronic messaging shall be deemed to be effective at the time of the initiation of the transmission by the sender (as shown on the sender's records) to the email address set forth above, notwithstanding that the intended recipient retrieves the message at a later date, fails to retrieve such message, or fails to receive such notice on account of its failure to maintain the designated e-mail address, its failure to designate a substitute e-mail address or for any other reason.

17. Counterparts. This Deposit Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one instrument. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

18. No Third-Party Beneficiaries; Holders and Beneficial Owners as Parties; Binding Effect. This Deposit Agreement is for the exclusive benefit of the Company, the Depositary and the Holders and their respective successors hereunder, and, except to the extent specifically set forth in Section 15 of this Deposit Agreement, shall not give any legal or equitable right, remedy or claim whatsoever to any other person. The Holders and Beneficial Owners from time to time shall be parties to this Deposit Agreement and shall be bound by all of the provisions hereof. A Beneficial

104296247.1

14

J.P.Morgan

Owner shall only be able to exercise any right or receive any benefit hereunder solely through the Holder of the ADR(s) evidencing the ADSs owned by such Beneficial Owner.

19. Severability. If any provision contained in this Deposit Agreement or in the ADRs is, or becomes, invalid, illegal or unenforceable in any respect, the remaining provisions contained herein and therein shall in no way be affected thereby.

20. Governing Law; Arbitration of Disputes; Consent to Jurisdiction.

(a) The Deposit Agreement, the ADSs and the ADRs shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the application of the conflict of law principles thereof, except that the provisions of Section 20(b) below and paragraph 14(r) of the Form of ADR and the provisions incorporated by reference into that Section and paragraph of the Form of ADR shall be governed by the laws of England to the limited extent provided in said Section 20(b) and Paragraph 14(r).

(b) The Company, the Depositary and each Holder shall be bound by the arbitration and exclusive jurisdiction provisions set forth in this subsection (b) in connection with any Share Dispute, as that term is defined in this Section 20(b):

(i) The term "Share Dispute" is defined as any action, dispute, controversy, claim or cause of action (a) between the Company and Holders and/or owners of interests in ADSs or (b) between the Company, the Depositary and one or more Holders and/or owners of interests in ADSs, in each case arising out of, or relating to, this Deposit Agreement, the ADSs or the ADRs or the transactions contemplated hereby or thereby (whether in tort, in contract, under statute, including for the avoidance of doubt, any derivative claim thereunder, or otherwise), including any question regarding existence, validity, interpretation, breach or termination of the Deposit Agreement and any alleged violation of the U.S. federal securities laws.

(ii) Any and all Share Disputes shall be finally and exclusively resolved by arbitration under the Rules of Arbitration rules of the International Chamber of Commerce ("ICC") (the "ICC Rules"), as amended from time to time, which ICC Rules are deemed to be incorporated by reference into this Deposit Agreement.

(iii) The arbitral tribunal (the "Tribunal") shall consist of three arbitrators, to be appointed in accordance with the ICC Rules. The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practise in a common law jurisdiction within the Commonwealth (as

J.P.Morgan

constituted on 12 May 2005), and each other arbitrator must have at least 20 years' experience as a qualified lawyer.

(iv)     If any Share Dispute raises issues which are substantially the same as or connected with issues raised in a Share Dispute which has already been referred to arbitration (an "Existing Share Dispute") or arises out of substantially the same facts as are the subject of an Existing Share Dispute (a "Related Share Dispute"), then the Tribunal appointed or to be appointed in respect of any such Existing Share Dispute shall also be appointed as the Tribunal in respect of any Related Share Dispute, save where the Tribunal considers such appointment would be inappropriate.

(v)     Where, pursuant to the above provisions, the same Tribunal has been appointed in relation to two or more Related Share Disputes, the Tribunal may order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the Tribunal thinks fit.

(vi)     The Tribunal shall have power to make such directions and any interim, partial or final awards as it considers just and desirable. The Tribunal, upon the request of a party to a Share Dispute, or another party which itself wishes to be joined in any reference to arbitration commenced in accordance with this Clause, may join any party to the reference to arbitration proceedings and may make a single, final award determining all Share Disputes between them.

(vii)     Each of the parties to this Deposit Agreement hereby agrees to be joined to any reference to arbitration proceedings in relation to any Share Dispute at the request of a party to that Share Dispute, and to accept the joinder of a party requesting to be joined pursuant to this Section 20.

(viii)     The place of the arbitration shall be The Hague, The Netherlands. The language of the arbitration shall be English.

(ix)     Each person hereby waives, as far as permitted by law: (a) any right under the laws of any jurisdiction to apply to any court of law or other judicial authority to determine any preliminary point of law, and/or (b) any right he or she may otherwise have under the laws of any jurisdiction to appeal or otherwise challenge the award, ruling or decision of the tribunal.

(x)     The governing law applicable to such Share Dispute, including the submission to arbitration and written arbitration agreement contained in or evidenced by the Articles, shall be the substantive law of England.

(xi)     If any court of competent jurisdiction or other competent authority including for the avoidance of doubt, a court or authority in any

J.P.Morgan

jurisdiction which is not a signatory to the New York Convention in any jurisdiction determines that this arbitration provision is invalid or unenforceable in relation to any Share Dispute, the Company and the Holder or owner of interests in ADSs, in each case, irrevocably agree that any related proceeding, suit or action can only be brought in the courts of England and Wales and the governing law applicable to such proceedings shall be the substantive law of England.

(c)     Nothing in this Deposit Agreement shall be construed to change or alter the Articles. The Company will make a copy of the Articles available to Holders upon request.

(d)     By holding an ADS or an interest therein, Holders and owners of interests in ADSs each acknowledge and agree that (i) such Holders and owners of interests in ADSs are not shareholders of the Company and have no direct rights of a shareholder against the Company, and that the rights attaching to the Shares represented by the ADSs, and the rights of the Company with respect to the Shares, are governed exclusively by the Articles and the laws of England, (ii) in connection with any matters against the Company, such Holders and owners of interests in ADSs shall be and are bound by the arbitration and exclusive jurisdiction provisions set out in this Section 20, (iii) any legal suit, action or proceeding instituted by Holders or owners of interests in ADSs against or involving the Depositary that does not include the Company as a co-defendant or other party, arising out of or based upon this Deposit Agreement, the ADSs or the transactions contemplated herein or therein including any alleged violation of the U.S. federal securities laws, may only be instituted in a state or federal court in New York, New York, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding, and (iv) the Depositary may institute any legal suit, action or proceeding against the Holders and/or owners of interests in ADSs in any state or federal court in New York, New York or any other court having jurisdiction, provided the Company is not included as a co-defendant or other party to such proceeding, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of any and all such courts in any such suit, action or proceeding.

(e)     Legal Proceedings between the Depositary and the Company. The Depositary and the Company agree that any action, dispute, controversy, claim or cause of action arising out of, or relating to, this Deposit Agreement or the ADRs (whether in tort, contract, under statute, including for the avoidance of doubt, any derivative claim thereunder, or otherwise), including any question regarding existence, validity, interpretation, breach or termination of the Deposit Agreement and any alleged violation of the U.S. federal securities laws ("Dispute") between the Company and the Depositary shall be finally and exclusively resolved by arbitration

J.P.Morgan

under the arbitration rules of the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules"), as amended from time to time, which AAA Rules are deemed to be incorporated by reference into this Deposit Agreement. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(i)     The arbitral tribunal (the "AAA Tribunal") shall consist of three arbitrators appointed in accordance with the AAA Rules and each of whom shall be disinterested in the dispute or controversy and shall have no connection with any party thereto.

(ii)     Should a vacancy arise because any arbitrator dies, resigns, refuses to act or becomes incapable of performing his functions, the vacancy shall be filled by the method by which the arbitrator was originally appointed. When a vacancy is filled, the newly established AAA Tribunal shall have sole discretion to determine whether any hearings shall be repeated, save that if the chairman is replaced, any hearings held previously shall be repeated.

(iii)     If any Dispute raises issues which are substantially the same as or connected with issues raised in a Dispute which has already been referred to arbitration under any Related Agreements (an "Existing Dispute") or arises out of substantially the same facts as are the subject of an Existing Dispute (a "Related Dispute"), then the AAA Tribunal appointed or to be appointed in respect of any such Existing Dispute shall also be appointed as the AAA Tribunal in respect of any Related Dispute, save where the AAA Tribunal considers such appointment would be inappropriate.

(iv)     Where, pursuant to the above provisions, the same AAA Tribunal has been appointed in relation to two or more Related Disputes, the AAA Tribunal may order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the AAA Tribunal thinks fit.

(v)     The AAA Tribunal shall have power to make such directions and any interim, partial or final awards as it considers just and desirable. Notwithstanding anything herein to the contrary, the AAA Tribunal shall have no authority to award damages against any party not measured by the prevailing party's actual damages.

(vi)     Save to the extent required by law or a regulator with jurisdiction over the Depositary's business, no aspect of the proceedings, documentation, or any (partial or final) award or order or any other matter connected with the arbitration shall be disclosed to any other person by either party or its counsel, agents, corporate parents, affiliates or subsidiaries without the prior written consent of the other party; provided, however, disclosure may be made by the Depositary or the Company to their respective affiliates thereof and to their

104296247.1

18

J.P.Morgan

respective employees, auditors, external counsel, accountants, affiliates and/or agents thereof, who need such information and/or documentation in connection with their provision of services to the Depositary or the Company or their respective affiliates and who shall be bound by appropriate nondisclosure obligations.

(vii)    The seat of the arbitration shall be in City of New York, State of New York, United States of America.

(viii)   The language of the arbitration shall be English.

(ix)    Nothing in this Clause shall be construed as preventing any party from seeking conservatory or similar interim relief from any court of competent jurisdiction or the arbitration panel.

(x)    Any award of the AAA Tribunal shall be made in writing and shall be final and binding on the parties.  The parties undertake to carry out the award without delay.

(xi)    The International Bar Association (IBA) Rules on the Taking of Evidence in International Arbitration shall apply to the arbitration.

21.  Agent for Service.

(a)    Appointment. The Company has appointed C T Corporation System, 111 Eighth Avenue, New York, New York, as its authorized agent (the "Authorized Agent") upon which process may be served in any such suit, action or proceeding arising out of or based on this Deposit Agreement, the ADSs, the ADRs or the transactions contemplated herein, therein, hereby or thereby which may be instituted in any state or federal court in New York, New York by the Depositary or any Holder, and waives any other requirements of or objections to personal jurisdiction with respect thereto. Subject to the Company's rights to replace the Authorized Agent with another entity in the manner required were the Authorized Agent to have resigned, such appointment shall be irrevocable.

(b)    Agent for Service of Process. The Company represents and warrants that the Authorized Agent has agreed to act as said agent for service of process, and the Company agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid. The Company further hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents in any suit, action or proceeding against the Company, by service by mail of a copy thereof upon the Authorized Agent (whether or not the appointment of such Authorized Agent shall for any reason prove to be ineffective or such Authorized Agent shall fail to accept or acknowledge such service), with a copy mailed to the

Exhibit Q

J.P.Morgan

Company by registered or certified air mail, postage prepaid, to its address provided in Section 16(b) hereof. The Company agrees that the failure of the Authorized Agent to give any notice of such service to it shall not impair or affect in any way the validity of such service or any judgment or award rendered in any suit, action or proceeding based thereon. If, for any reason, the Authorized Agent named above or its successor shall no longer serve as agent of the Company to receive service of process, notice or papers in New York, the Company shall promptly appoint a successor that is a legal entity with offices in New York, New York, so as to serve and will promptly advise the Depositary thereof.

(c)     Waiver of Personal Service of Process. In the event the Company fails to continue such designation and appointment in full force and effect, the Company hereby waives personal service of process upon it and consents that any such service of process may be made by certified or registered mail, return receipt requested, directed to the Company at its address last specified for notices hereunder, and service so made shall be deemed completed five (5) days after the same shall have been so mailed.

22.  Waiver of Immunities. To the extent that the Company or any of its properties, assets or revenues may have or may hereafter be entitled to, or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, including any arbitration, from the giving of any relief in any respect thereof, from setoff or counterclaim, from the jurisdiction of any court, from service of process, from attachment upon or prior to judgment, from attachment in aid of execution or judgment, or from execution of judgment, or other legal process or proceeding for the giving of any relief or for the enforcement of any judgment or arbitration award, in any jurisdiction in which proceedings may at any time be commenced, with respect to its obligations, liabilities or other matters under or arising out of or in connection with the Shares or Deposited Securities, the ADSs, the ADRs or this Deposit Agreement, the Company, to the fullest extent permitted by law, hereby irrevocably and unconditionally waives, and agrees not to plead or claim, any such immunity and consents to such relief and enforcement.

23.  Waiver of Jury Trial. EACH PARTY TO THIS DEPOSIT AGREEMENT (INCLUDING, FOR AVOIDANCE OF DOUBT, EACH HOLDER AND BENEFICIAL OWNER OF, AND/OR HOLDER OF INTERESTS IN, ADSS OR ADRS) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING AGAINST THE DEPOSITARY AND/OR THE COMPANY DIRECTLY OR INDIRECTLY ARISING OUT OF, BASED ON OR RELATING IN ANY WAY TO THE SHARES OR OTHER DEPOSITED SECURITIES, THE ADSs OR THE ADRs, THE DEPOSIT AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREIN OR THEREIN, OR THE BREACH HEREOF OR THEREOF (WHETHER BASED ON CONTRACT, TORT, COMMON LAW OR ANY OTHER THEORY), INCLUDING, WITHOUT LIMITATION, ANY SUIT, ACTION, CLAIM OR PROCEEDING UNDER THE UNITED STATES FEDERAL SECURITIES LAWS. No provision of this Deposit Agreement or any ADR is

104296247.1

Exhibit Q

J.P.Morgan

intended to constitute a waiver or limitation of any rights which a Holder or any Beneficial Owner may have under the Securities Act of 1933 or the Securities Exchange Act of 1934, to the extent applicable.

24. Amendment and Restatement of Prior Deposit Agreement. The Deposit Agreement amends and restates the Prior Deposit Agreement in its entirety to consist exclusively of the Deposit Agreement, and each Prior Receipt is hereby deemed amended and restated to substantially conform to the form of ADR set forth in Exhibit A annexed hereto, except that, to the extent any portion of such amendment and restatement impose or increase any fees or charges different from those set forth herein (other than charges in connection with foreign exchange control regulations, and taxes and other governmental charges, delivery and other such expenses), or otherwise materially prejudice any substantial existing right of Holders of Prior Receipts or Beneficial Owners of ADSs evidenced by such Prior Receipt, such portion shall not become effective as to such Holders or Beneficial Owners with respect to such Prior Receipt until 30 days after such Holders or Beneficial Owners shall have received notice thereof, such notice to be conclusively deemed given upon the mailing to such Holders or Beneficial Owners of notice of such amendment and restatement which notice contains a provision whereby such Holders or Beneficial Owners can receive a copy of the form of ADR.

[Signature page follows]

DocuSign Envelope ID: E19264D5-5D98-4F28-9782-562B6C490F72

J.P.Morgan

IN WITNESS WHEREOF, SHELL PLC and JPMORGAN CHASE BANK, N.A. have duly executed this Deposit Agreement as of the day and year first above set forth and all Holders and Beneficial Owners shall become parties hereto upon acceptance by them of ADSs issued in accordance with the terms hereof, or upon acquisition of any beneficial interest therein.

SHELL PLC

By:     _____

Name:  Jessica Uhl
Title:  Chief Financial Officer

JPMORGAN CHASE BANK, N.A.

By:     _____

Name:
Title:

103587588.15

[*Signature Page to Deposit Agreement*]

J.P.Morgan

        IN WITNESS WHEREOF, SHELL PLC and JPMORGAN CHASE BANK, N.A. have duly executed this Deposit Agreement as of the day and year first above set forth and all Holders and Beneficial Owners shall become parties hereto upon acceptance by them of ADSs issued in accordance with the terms hereof, or upon acquisition of any beneficial interest therein.

SHELL PLC

By:     _____

       Name:
       Title:

JPMORGAN CHASE BANK, N.A.

By:     _____

       Name:  Timothy E. Green
       Title:   Vice President

[*Signature Page to Deposit Agreement*]

Exhibit Q

# J.P.Morgan

EXHIBIT A
ANNEXED TO AND INCORPORATED IN
DEPOSIT AGREEMENT

[FORM OF FACE OF ADR]

____
Number

No. of ADSs:

Each ADS represents
TWO (2) Shares

CUSIP:

AMERICAN DEPOSITARY RECEIPT

evidencing

AMERICAN DEPOSITARY SHARES

representing

ORDINARY SHARES

of

SHELL PLC

(Incorporated under the laws of England and Wales)

JPMORGAN CHASE BANK, N.A., a national banking association organized under the laws of the United States of America, as depositary hereunder (the "Depositary"), hereby certifies that _____ is the registered owner (a "Holder") of _____ American Depositary Shares ("ADSs"), each (subject to paragraph (13) (Changes Affecting Deposited Securities)) representing two (2) ordinary shares (including the rights to receive Shares described in paragraph (1) (Issuance of ADSs), "Shares" and, together with any other securities, cash or property from time to time held by the Depositary in respect or in lieu of deposited Shares, the "Deposited Securities"), of Shell PLC, a public limited company incorporated under the laws of England and Wales (the "Company"), deposited under the Second Amended and Restated Deposit Agreement, dated as of January 31, 2022 (as amended from time to time, the "Deposit Agreement"), among the Company, the Depositary and all Holders and Beneficial Owners from time to time of American Depositary

104296247.1

J.P.Morgan

Receipts issued thereunder ("ADRs"), each of whom by accepting an ADR becomes a party thereto. The Deposit Agreement and this ADR (which includes the provisions set forth on the reverse hereof) shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the application of the conflict of law principles thereof. All capitalized terms used herein, and not defined herein, shall have the meanings ascribed to such terms in the Deposit Agreement.

(1) Issuance of ADSs.

(a) Issuance. This ADR is one of the ADRs issued under the Deposit Agreement. Subject to the other provisions hereof, the Depositary may so issue ADRs for delivery at the Transfer Office (as hereinafter defined) only against deposit of: (i) Shares in a form satisfactory to the Custodian; or (ii) rights to receive Shares from the Company or any registrar, transfer agent, clearing agent or other entity recording Share ownership or transactions. At the request, risk and expense of the person depositing Shares, the Depositary may accept deposits for forwarding to the Custodian and may deliver ADRs at a place other than its office. Shares or evidence of rights to receive Shares may be deposited through (x) electronic transfer of such Shares to the account maintained by the Custodian for such purpose at CREST and/or Euroclear Nederland, (y) evidence satisfactory to the Custodian of irrevocable instructions to cause such Shares to be transferred to such account or (z) delivery of the certificates representing such Shares. If use of the CREST or Euroclear Nederland book-entry system in connection with the Shares is discontinued at any time for any reason, the Company shall make other book-entry arrangements (if any) that it determines, after consultation with the Depositary, are reasonable.

(b) Lending. In its capacity as Depositary, the Depositary shall not lend Shares or ADSs.

(c) Representations and Warranties of Depositors. Every person depositing Shares under the Deposit Agreement represents and warrants that:

(i)     such Shares and the certificates therefor are duly authorized, validly issued and outstanding, fully paid, nonassessable and legally obtained by such person,

(ii)    all pre-emptive and comparable rights, if any, with respect to such Shares have been validly waived or exercised,

(iii)   the person making such deposit is duly authorized so to do,

(iv)    the Shares presented for deposit are free and clear of any lien, encumbrance, security interest, charge, mortgage or adverse claim and

104296247.1

A-2

J.P.Morgan

      (v)    such Shares (A) are not "restricted securities" as such term is
defined in Rule 144 under the Securities Act of 1933 ("Restricted
Securities") unless at the time of deposit the requirements of
paragraphs (c), (e), (f) and (h) of Rule 144 shall not apply and
such Shares may be freely transferred and may otherwise be
offered and sold freely in the United States or (B) have been
registered under the Securities Act of 1933.  To the extent the
person depositing Shares is an "affiliate" of the Company as such
term is defined in Rule 144, the person also represents and
warrants that upon the sale of the ADSs, all of the provisions of
Rule 144 that enable the Shares to be freely sold (in the form of
ADSs) will be fully complied with and, as a result thereof, all of
the ADSs issued in respect of such Shares will not be on the sale
thereof, Restricted Securities.

      Such representations and warranties shall survive the deposit and
withdrawal of Shares and the issuance and cancellation of ADSs in respect thereof and
the transfer of such ADSs.

      (d)  The Depositary may refuse to accept for such deposit any Shares
identified by the Company in order to facilitate compliance with the requirements of
the securities laws, rules and regulations of the United States, including, without
limitation, the Securities Act of 1933 and the rules and regulations made thereunder.

      (2)  Withdrawal of Deposited Securities.  Subject to paragraphs (4) (Certain
Limitations to Registration, Transfer etc.) and (5) (Liability of Holder or Beneficial
Owner for Taxes, Duties and Other Charges), upon surrender of (a) a certificated ADR
in a form satisfactory to the Depositary at the Transfer Office or (b) proper
instructions and documentation in the case of a Direct Registration ADR, the Holder
hereof is entitled to delivery at, or to the extent in dematerialized form from, the
Custodian's office of the Deposited Securities at the time represented by the ADSs
evidenced by this ADR. At the request, risk and expense of the Holder hereof, the
Depositary may deliver such Deposited Securities at such other place as may have
been requested by the Holder. Delivery of Deposited Securities may be made by (a)
the delivery of certificates (which, if required by law shall be properly endorsed or
accompanied by properly executed instruments of transfer or, if such certificates may
be registered, registered in the name of such Holder or as ordered by such Holder in
any Withdrawal Order), (b) the delivery of any Deposited Securities eligible for
settlement through CREST or Euroclear Nederland or its successor ("Euroclear
Nederland") to an account designated by such Holder with CREST or Euroclear
Nederland or an institution that maintains accounts with CREST or Euroclear
Nederland, or (c) by such other means as the Depositary may deem practicable,
including, without limitation, by transfer of record ownership thereof to an account
designated in the Withdrawal Order maintained either by the Company or an

104296247.1

A-3

J.P.Morgan

accredited intermediary, such as a bank, acting as a registrar for the Deposited Securities. Notwithstanding any other provision of the Deposit Agreement or this ADR, the withdrawal of Deposited Securities may be restricted only for the reasons set forth in General Instruction I.A.(1) of Form F-6 (as such instructions may be amended from time to time) under the Securities Act of 1933.

To the extent applicable, the Holder requesting delivery of Deposited Securities upon surrender of ADRs shall have the sole responsibility for ensuring that such Holder has a valid account with Euroclear Nederland or an institution that maintains accounts with Euroclear Nederland and that the information required for transfer to such account is accurately and promptly provided to the Depositary.

(3) Transfers, Split-Ups and Combinations of ADRs. The Depositary or its agent will keep, at a designated transfer office (the "Transfer Office"), (a) a register (the "ADR Register") for the registration, registration of transfer, combination and split-up of ADRs, and, in the case of Direct Registration ADRs, shall include the Direct Registration System, which at all reasonable times will be open for inspection by Holders and the Company for the purpose of communicating with Holders in the interest of the business of the Company or a matter relating to the Deposit Agreement and (b) facilities for the delivery and receipt of ADRs. The term ADR Register includes the Direct Registration System. Title to this ADR (and to the Deposited Securities represented by the ADSs evidenced hereby), when properly endorsed (in the case of ADRs in certificated form) or upon delivery to the Depositary of proper instruments of transfer, is transferable by delivery with the same effect as in the case of negotiable instruments under the laws of the State of New York; provided that the Depositary, notwithstanding any notice to the contrary, may treat the person in whose name this ADR is registered on the ADR Register as the absolute owner hereof for all purposes and neither the Depositary nor the Company will have any obligation or be subject to any liability under the Deposit Agreement or any ADR to any Beneficial Owner, unless such Beneficial Owner is the Holder hereof. Subject to paragraphs (4) and (5), this ADR is transferable on the ADR Register and may be split into other ADRs or combined with other ADRs into one ADR, evidencing the aggregate number of ADSs surrendered for split-up or combination, by the Holder hereof or by duly authorized attorney upon surrender of this ADR at the Transfer Office properly endorsed (in the case of ADRs in certificated form) or upon delivery to the Depositary of proper instruments of transfer and duly stamped as may be required by applicable law; provided that the Depositary may close the ADR Register at any time or from time to time when deemed expedient by it or, in the case of the issuance book portion of the ADR Register, when reasonably requested by the Company solely in order to enable the Company to comply with applicable law. At the request of a Holder, the Depositary shall, for the purpose of substituting a certificated ADR with a Direct Registration ADR, or vice versa, execute and deliver a certificated ADR or a Direct Registration ADR, as the case may be, for any authorized number of ADSs requested, evidencing the same aggregate number of ADSs as those evidenced by the certificated ADR or Direct Registration ADR, as the case may be, substituted.

104296247.1

A-4

Exhibit Q

J.P.Morgan

(4)  Certain Limitations to Registration, Transfer, etc.  Prior to the issue, registration, registration of transfer, split-up or combination of any ADR, the delivery of any distribution in respect thereof, or, subject to the last sentence of paragraph (2) (Withdrawal of Deposited Securities), the withdrawal of any Deposited Securities, and from time to time in the case of clause (b)(ii) of this paragraph (4), the Company, the Depositary or the Custodian may require:

(a)  payment with respect thereto of (i) any stock transfer or other tax or other governmental charge, (ii) any stock transfer or registration fees in effect for the registration of transfers of Shares or other Deposited Securities upon any applicable register and (iii) any applicable charges as provided in paragraph (7) (Charges of Depositary) of this ADR;

(b)  the production of proof satisfactory to it of (i) the identity of any signatory and genuineness of any signature and (ii) such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial or other ownership of, or interest in, any securities, compliance with applicable law, regulations, provisions of or governing Deposited Securities and terms of the Deposit Agreement and this ADR, as it may deem necessary or proper; and

(c)  compliance with such regulations as the Depositary may establish consistent with the Deposit Agreement.

The issuance of ADRs, the acceptance of deposits of Shares, the registration, registration of transfer, split-up or combination of ADRs or, subject to the last sentence of paragraph (2) (Withdrawal of Deposited Securities), the withdrawal of Deposited Securities may be suspended, generally or in particular instances, when the ADR Register or any register for Deposited Securities is closed or when any such action is deemed advisable by the Depositary.

(5)  Liability of Holder or Beneficial Owner for Taxes, Duties and Other Charges.

(a)     Liability for Taxes. If any tax or other governmental charges (including any penalties and/or interest) shall become payable by or on behalf of the Custodian or the Depositary with respect to this ADR, any Deposited Securities represented by the ADSs evidenced hereby or any distribution thereon, such tax or other governmental charge shall be paid by the Holder hereof to the Depositary and by holding or owning, or having held or owned, this ADR or any ADSs evidenced hereby, the Holder and all Beneficial Owners hereof and thereof, and all prior Holders and Beneficial Owners hereof and thereof, jointly and severally, agree to indemnify, defend and save harmless each of the Depositary and its agents in respect of such tax or other governmental charge.  Neither the Company nor the Depositary, nor any of their

104296247.1

A-5

# J.P.Morgan

respective agents, shall be liable to Holders or Beneficial Owners of the ADSs and ADRs for failure of any of them to comply with applicable tax laws, rules and/or regulations. Notwithstanding the Depositary's right to seek payment from current and former Beneficial Owners, by holding or owning, or having held or owned, an ADR, the Holder hereof (and prior Holder hereof) acknowledges and agrees that the Depositary has no obligation to seek payment of amounts owing under this paragraph (5) from any current or former Beneficial Owner. The Depositary may refuse to effect any registration, registration of transfer, split-up or combination hereof or, subject to the last sentence of paragraph (2) (Withdrawal of Deposited Securities), any withdrawal of such Deposited Securities until such payment is made. The Depositary may also deduct from any distributions on or in respect of Deposited Securities, or may sell by public or private sale for the account of the Holder hereof any part or all of such Deposited Securities, and may apply such deduction or the proceeds of any such sale in payment of such tax or other governmental charge, the Holder hereof remaining liable for any deficiency, and shall reduce the number of ADSs evidenced hereby to reflect any such sales of Shares. In connection with any distribution to Holders, the Company or its agents will remit to the appropriate governmental authority or agency all amounts (if any) required to be withheld and owing to such authority or agency by the Company; and the Depositary and the Custodian will remit to the appropriate governmental authority or agency all amounts (if any) required to be withheld and owing to such authority or agency by the Depositary or the Custodian. If the Depositary determines that any distribution in property other than cash (including Shares or rights) on Deposited Securities is subject to any tax that the Depositary or the Custodian is obligated to withhold, the Depositary may dispose of all or a portion of such property in such amounts and in such manner as the Depositary deems necessary and practicable to pay such taxes, by public or private sale, and the Depositary shall distribute the net proceeds of any such sale or the balance of any such property after deduction of such taxes to the Holders entitled thereto.

(b)     Indemnifications Related to Taxes. Each Holder and Beneficial Owner agrees to indemnify the Depositary, the Company, the Custodian and any of their respective officers, directors, employees, agents and affiliates against, and hold each of them harmless from, any claims by any governmental authority with respect to taxes, additions to tax, penalties or interest arising out of any refund of taxes, reduced rate of withholding at source or other tax benefit obtained which obligations shall survive any transfer or surrender of ADSs or the termination of the Deposit Agreement.

(6) Disclosure of Interests.

(a) General. To the extent that the provisions of or governing any Deposited Securities (including the Articles and applicable English law) may require disclosure of or impose limits on beneficial or other ownership of, or interest in, Deposited Securities, other Shares and other securities and may provide for blocking transfer, voting or other rights to enforce such disclosure or limits, Holders and Beneficial Owners agree to comply with all such disclosure requirements and

J.P.Morgan

ownership limitations and to comply with any reasonable Company instructions in respect thereof. The Company reserves the right to instruct Holders to (i) provide information (a) as to the capacity in which such Holders own or owned ADSs, (b) regarding the identity of any other persons then or previously owning interests in such ADSs and (c) regarding the nature of such interest and various other matters pursuant to applicable law or the Articles or such other corporate document of the Company, all as if such ADSs were to the extent practicable the underlying Shares. Each Holder agrees to provide any information requested by or on behalf of the Company pursuant to this paragraph 6 (a) whether or not such person is still a Holder at the time of the request, and (ii) deliver their ADSs for cancellation and withdrawal of the Deposited Securities so as to permit the Company to deal directly with the Holder thereof as a holder of Shares and Holders agree to comply with such instructions. The Depositary agrees to (i) cooperate with the Company in its efforts to inform Holders of the Company's exercise of its rights under this paragraph and agrees to forward to the Company any responses to such requests received by the Depositary and (ii) consult with, and provide reasonable assistance without risk, liability or expense on the part of the Depositary, to the Company on the manner or manners in which the Company may implement such requirements with respect to any Holder.

      (b) Jurisdiction Specific.

      Notwithstanding any provision of the Deposit Agreement or of the ADRs and without limiting the foregoing, by being a Holder, each such Holder agrees to provide such information as the Company may request in a disclosure notice (a "Disclosure Notice") given pursuant to the United Kingdom Companies Act 2006 (as amended from time to time and including any statutory modification or re-enactment thereof, the "Companies Act") or the Articles. By accepting or holding an ADR, each Holder acknowledges that it understands that failure to comply with a Disclosure Notice may result in the imposition of sanctions against the holder of the Shares in respect of which the non-complying person is or was, or appears to be or has been, interested as provided in the Companies Act and the Articles which currently include, the withdrawal of the voting rights of such Shares and the imposition of restrictions on the rights to receive dividends on and to transfer such Shares. In addition, by accepting or holding an ADR, each Holder agrees to comply with the provisions of the United Kingdom Disclosure and Transparency Rules (as amended from time to time, the "DTRs") with regard to the notification to the Company of interests in Shares and certain financial instruments, which currently provide, inter alia, that a Holder must notify the Company of the percentage of its voting rights he holds as shareholder or holds or is deemed to hold through his direct or indirect holding of certain financial instruments (or a combination of such holdings) if the percentage of those voting rights (i) reaches, exceeds or falls below 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10% and each 1% threshold thereafter up to 100% as a result of an acquisition or disposal of Shares or certain financial instruments, or (ii) reaches, exceeds or falls below such applicable thresholds as a result of events changing the breakdown of voting rights and on the basis of information disclosed by the Company in accordance with the DTRs. The

104296247.1

A-7

J.P.Morgan

notification must be effected as soon as possible, but not later than two trading days after the Holder (a) learns of the acquisition or disposal or of the possibility of exercising voting rights, or on which, having regard to the circumstances, should have learned of it, regardless of the date on which the acquisition, disposal or possibility of exercising voting rights takes effect, or (b) is informed of the event mentioned in (ii) above.

Any summary of the laws and regulations of the United Kingdom and of the terms of the Company's constituent documents has been provided by the Company solely for the convenience of Holders, Beneficial Owners and the Depositary. While such summaries are believed by the Company to be accurate as of the date of the Deposit Agreement, they are (i) summaries and as such may not include all aspects of the materials summarized as applicable to a Holder or Beneficial Owner, and (ii) provided by the Company as of the date of the Deposit Agreement. The Holder or Beneficial Owner acknowledges that these laws and regulations and the Company's constituent documents may change after the date of the Deposit Agreement. Neither the Depositary nor the Company has any obligation to update any such summaries.

(7) Charges of Depositary.

(a) Rights of the Depositary. The Depositary may charge, and collect from, (i) each person to whom ADSs are issued, including, without limitation, issuances against deposits of Shares, issuances in respect of Share Distributions, Rights and Other Distributions (as such terms are defined in paragraph (10) (Distributions on Deposited Securities)), issuances pursuant to a stock dividend or stock split declared by the Company, or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or the Deposited Securities, and (ii) each person surrendering ADSs for withdrawal of Deposited Securities or whose ADSs are cancelled or reduced for any other reason, U.S.\$5.00 for each 100 ADSs (or portion thereof) issued, exchanged, delivered, reduced, cancelled or surrendered, or upon which a Share Distribution or elective distribution is made or offered (as the case may be). The Depositary may sell (by public or private sale) sufficient securities and property received in respect of Share Distributions, Rights and Other Distributions prior to such deposit to pay such charge.

(b) Additional fees, charges and expenses by the Depositary. The following additional fees, charges and expenses shall also be incurred by the Holders, the Beneficial Owners, by any party depositing or withdrawing Shares or by any party surrendering ADSs and/or to whom ADSs are issued (including, without limitation, issuances pursuant to a stock dividend or stock split declared by the Company or an exchange of stock regarding the ADSs or the Deposited Securities or a distribution of ADSs pursuant to paragraph (10) (Distributions on Deposited Securities)), whichever is applicable:

(i)    a fee of U.S.\$0.05 or less per ADS held for any Cash distribution

104296247.1

A-8

J.P.Morgan

made, or for any elective cash/stock dividend offered, pursuant to the Deposit Agreement,

(ii)    a fee for the distribution or sale of securities pursuant to paragraph (10) hereof, such fee being in an amount equal to the fee for the execution and delivery of ADSs referred to above which would have been charged as a result of the deposit of such securities (for purposes of this paragraph (7) treating all such securities as if they were Shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the Depositary to Holders entitled thereto,

(iii)    an aggregate fee of U.S.$0.05 or less per ADS per calendar year (or portion thereof) for services performed by the Depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against Holders as of the record date or record dates set by the Depositary during each calendar year and shall be payable at the sole discretion of the Depositary by billing such Holders or by deducting such charge from one or more cash dividends or other cash distributions), and

(iv)    an amount for the reimbursement of such charges and expenses as are incurred by the Depositary and/or any of its agents (including, without limitation, the Custodian and charges and expenses incurred on behalf of Holders in connection with compliance with foreign exchange control regulations or any law or regulation relating to foreign investment) in connection with the servicing of the Shares or other Deposited Securities, the sale of securities (including, without limitation, Deposited Securities), the delivery of Deposited Securities or otherwise in connection with the Depositary's or its Custodian's compliance with applicable law, rule or regulation (which charges and expenses may be assessed on a proportionate basis against Holders as of the record date or dates set by the Depositary and shall be payable at the sole discretion of the Depositary by billing such Holders or by deducting such charge or expense from one or more cash dividends or other cash distributions).

(c) Other Obligations, Fees, Charges and Expenses. The Company will pay all other fees, charges and expenses of the Depositary and any agent of the Depositary (except the Custodian) pursuant to agreements from time to time between the Company and the Depositary, except:

(i)    stock transfer or other taxes and other governmental charges

104296247.1

A-9

J.P.Morgan

(which are payable by Holders or persons depositing Shares);

(ii)     cable (including SWIFT, telex and facsimile transmission) fees and delivery expenses incurred at the request of persons depositing, or Holders delivering Shares, ADRs or Deposited Securities as disclosed on the "Disclosures" page (or successor page) of www.adr.com (as updated by the Depositary from time to time, "ADR.com") (which are payable by such persons or Holders); and

(iii)    transfer or registration expenses for the registration or transfer of Deposited Securities on any applicable register in connection with the deposit or withdrawal of Deposited Securities (which are payable by persons depositing Shares or Holders withdrawing Deposited Securities).

(d)    Foreign Exchange Related Matters. To facilitate the administration of various depositary receipt transactions, including disbursement of dividends or other cash distributions and other corporate actions, the Depositary may engage the foreign exchange desk within JPMorgan Chase Bank, N.A. (the "Bank") and/or its affiliates in order to enter into spot foreign exchange transactions to convert foreign currency into U.S. dollars ("FX Transactions"). For certain currencies, FX Transactions are entered into with the Bank or an affiliate, as the case may be, acting in a principal capacity. For other currencies, FX Transactions are routed directly to and managed by an unaffiliated local custodian (or other third-party local liquidity provider), and neither the Bank nor any of its affiliates is a party to such FX Transactions.

The foreign exchange rate applied to an FX Transaction will be either (i) a published benchmark rate, or (ii) a rate determined by a third-party local liquidity provider, in each case plus or minus a spread, as applicable. The Depositary will disclose which foreign exchange rate and spread, if any, apply to such currency on the "Disclosures" page (or successor page) of ADR.com. Such applicable foreign exchange rate and spread may (and neither the Depositary, the Bank nor any of their affiliates is under any obligation to ensure that such rate does not) differ from rates and spreads at which comparable transactions are entered into with other customers or the range of foreign exchange rates and spreads at which the Bank or any of its affiliates enters into foreign exchange transactions in the relevant currency pair on the date of the FX Transaction. Additionally, the timing of execution of an FX Transaction varies according to local market dynamics, which may include regulatory requirements, market hours and liquidity in the foreign exchange market or other factors. Furthermore, the Bank and its affiliates may manage the associated risks of their position in the market in a manner they deem appropriate without regard to the impact of such activities on the Company, the Depositary, Holders or Beneficial Owners. The spread applied does not reflect any gains or losses that may be earned

104296247.1

J.P.Morgan

or incurred by the Bank and its affiliates as a result of risk management or other hedging related activity.

Notwithstanding the foregoing, to the extent the Company provides U.S. dollars to the Depositary, neither the Bank nor any of its affiliates will execute an FX Transaction as set forth herein. In such case, the Depositary will distribute the U.S. dollars received from the Company.

Further details relating to the applicable foreign exchange rate, the applicable spread and the execution of FX Transactions will be provided by the Depositary on ADR.com. The Company, Holders and Beneficial Owners each acknowledge and agree that the terms applicable to FX Transactions disclosed from time to time on ADR.com will apply to any FX Transaction executed pursuant to the Deposit Agreement.

(e) The right of the Depositary to receive payment of fees, charges and expenses as provided above shall survive the termination of the Deposit Agreement. As to any Depositary, upon the resignation or removal of such Depositary, such right shall extend for those fees, charges and expenses incurred prior to the effectiveness of such resignation or removal.

(f) Disclosure of Potential Depositary Payments. The Depositary anticipates reimbursing the Company for certain expenses incurred by the Company that are related to the establishment and maintenance of the ADR program upon such terms and conditions as the Company and the Depositary may agree from time to time. The Depositary may make available to the Company a set amount or a portion of the Depositary fees charged in respect of the ADR program or otherwise upon such terms and conditions as the Company and the Depositary may agree from time to time.

(8) Available Information. The Deposit Agreement, the provisions of or governing Deposited Securities and any written communications from the Company, which are both received by the Custodian or its nominee as a holder of Deposited Securities and made generally available to the holders of Deposited Securities, are available for inspection by Holders at the offices of the Depositary and the Custodian, at the Transfer Office, on the Internet Website of the Securities and Exchange Commission ("Commission") (www.sec.gov), or upon request from the Depositary (which request may be refused by the Depositary at its discretion).

The Company is subject to the periodic reporting requirements of the Securities Exchange Act of 1934 and accordingly files certain reports with the Commission. These reports can be inspected and retrieved by Holders and Beneficial Owners through the EDGAR system on the Commission's Internet Website at www.sec.gov and can be inspected and copied at the public reference facilities maintained by the Commission, currently located at 100 F Street, N.E., Washington,

J.P.Morgan

D.C. 20549.

(9) Execution. This ADR shall not be valid for any purpose unless executed by the Depositary by the manual or facsimile signature of a duly authorized officer of the Depositary.

Dated:

JPMORGAN CHASE BANK, N.A., as Depositary

By .................................................
Authorized Officer

The Depositary's office is located at 383 Madison Avenue, Floor 11, New York, New York 10179.

J.P.Morgan

[FORM OF REVERSE OF ADR]

(10) Distributions on Deposited Securities. Subject to paragraphs (4) (Certain Limitations to Registration, Transfer etc.) and (5) (Liability of Holder or Beneficial Owner for Taxes, Duties and other Charges), to the extent practicable, the Depositary will distribute to each Holder entitled thereto on the record date set by the Depositary therefor at such Holder's address shown on the ADR Register, in proportion to the number of Deposited Securities (on which the following distributions on Deposited Securities are received by the Custodian) represented by ADSs evidenced by such Holder's ADRs:

(a) Cash. Any U.S. dollars available to the Depositary resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof authorized in this paragraph (10) ("Cash"), on an averaged or other practicable basis, subject to (i) appropriate adjustments for taxes withheld, (ii) such distribution being impermissible or impracticable with respect to certain Holders, and (iii) deduction of the Depositary's and/or its agents' fees and expenses in (1) converting any foreign currency to U.S. dollars by sale or in such other manner as the Depositary may determine to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the United States by such means as the Depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4) making any sale by public or private means in any commercially reasonable manner.

(b) Shares. (i) Additional ADRs evidencing whole ADSs representing any Shares available to the Depositary resulting from a dividend or free distribution on Deposited Securities consisting of Shares (a "Share Distribution") and (ii) U.S. dollars available to it resulting from the net proceeds of sales of Shares received in a Share Distribution, which Shares would give rise to fractional ADSs if additional ADRs were issued therefor, as in the case of Cash.

(c) Rights. (i) Warrants or other instruments in the discretion of the Depositary representing rights to acquire additional ADRs in respect of any rights to subscribe for additional Shares or rights of any nature available to the Depositary as a result of a distribution on Deposited Securities ("Rights"), to the extent that the Company timely furnishes to the Depositary evidence satisfactory to the Depositary that the Depositary may lawfully distribute the same (the Company has no obligation to so furnish such evidence), or (ii) to the extent the Company does not so furnish such evidence and sales of Rights are practicable, any U.S. dollars available to the Depositary from the net proceeds of sales of Rights as in the case of Cash, or (iii) to the extent the Company does not so furnish such evidence and such sales cannot practicably be accomplished by reason of the nontransferability of the Rights, limited

J.P.Morgan

markets therefor, their short duration or otherwise, nothing (and any Rights may lapse).

(d) Other Distributions. (i) Securities or property available to the Depositary resulting from any distribution on Deposited Securities other than Cash, Share Distributions and Rights ("Other Distributions"), by any means that the Depositary may deem equitable and practicable, or (ii) to the extent the Depositary deems distribution of such securities or property not to be equitable and practicable, any U.S. dollars available to the Depositary from the net proceeds of sales of Other Distributions as in the case of Cash.

The Depositary reserves the right to utilize a division, branch or affiliate of JPMorgan Chase Bank, N.A. to direct, manage and/or execute any public and/or private sale of securities hereunder. Such division, branch and/or affiliate may charge the Depositary a fee in connection with such sales, which fee is considered an expense of the Depositary contemplated above and/or under paragraph (7) (Charges of Depositary). Any U.S. dollars available will be distributed by checks drawn on a bank in the United States for whole dollars and cents. Fractional cents will be withheld without liability and dealt with by the Depositary in accordance with its then current practices. All purchases and sales of securities will be handled by the Depositary in accordance with its then current policies, which are currently set forth on the "Disclosures" page (or successor page) of ADR.com, the location and contents of which the Depositary shall be solely responsible for.

(11) Record Dates. The Depositary may, after consultation with the Company if practicable, fix a record date (which, to the extent applicable, shall be as near as practicable to any corresponding record date set by the Company) for the determination of the Holders who shall be responsible for the fee assessed by the Depositary for administration of the ADR program and for any expenses provided for in paragraph (7) hereof as well as for the determination of the Holders who shall be entitled to receive any distribution on or in respect of Deposited Securities, to give instructions for the exercise of any voting rights, to receive any notice or to act in respect of other matters and only such Holders shall be so entitled or obligated.

(12) Voting of Deposited Securities.

(a) Notice of any Meeting or Solicitation. Subject to the next sentence, as soon as practicable after receipt of notice of any meeting at which the holders of Shares are entitled to vote, or of solicitation of consents or proxies from holders of Shares or other Deposited Securities, the Depositary shall fix the ADS record date in accordance with paragraph (11) above in respect of such meeting or solicitation of consent or proxy. The Depositary shall, if requested by the Company in writing in a timely manner (the Depositary having no obligation to take any further action if the request shall not have been received by the Depositary at least 30 days prior to the date of such vote or meeting) and at the Company's expense and provided no legal

J.P.Morgan

prohibitions exist, distribute to Holders a notice, after consulting the Company as to the form of such notice to the extent practicable, stating (i) such information as is contained in such notice and any solicitation materials, (ii) that each Holder on the record date set by the Depositary therefor will, subject to any applicable provisions of English law, the Articles and the provisions of or governing Deposited Securities, be entitled to either (A) use the voting instruction card prepared by the Depositary, after consulting the Company as to the form of such card to the extent practicable, to request the Depositary, its Custodian or nominee (as appropriate) to appoint the Holder its proxy to attend and vote with respect to the number of Shares or other Deposited Securities represented by ADSs evidenced by such Holder's ADRs or (B) instruct the Depositary as to the exercise of the voting rights, if any, pertaining to the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs and (iii) the manner in which such instructions may be given, including instructions to give a discretionary proxy to a person designated by the Company. There is no guarantee that Holders generally or any Holder in particular will receive the notice described above with sufficient time to enable such Holder to return any voting instructions to the Depositary in a timely manner.

(b) Voting of Deposited Securities.  Upon actual receipt by the ADR department of the Depositary of instructions of a Holder on such record date in the manner and on or before the time established by the Depositary for such purpose, the Depositary shall endeavor insofar as practicable and permitted under the provisions of or governing Deposited Securities to cause the appointment (or, if the Deposited Securities are registered in the name of or held by its Custodian or a nominee, the Depositary shall endeavor to procure that the Custodian or its nominee shall cause the appointment), subject to the Articles, of that Holder as a proxy in respect of that meeting (including any adjournment of that meeting) to attend and vote the number of Deposited Securities represented by the ADSs evidenced by that ADR or, if the Holder has not requested a proxy to attend the meeting in person, vote or cause to be voted the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs in accordance with such instructions. The Depositary will not itself exercise any voting discretion in respect of any Deposited Securities.

(c) Alternative Methods of Distributing Materials.  Notwithstanding anything contained in the Deposit Agreement or any ADR, the Depositary may, to the extent not prohibited by any law, rule or regulation or by the rules, regulations or requirements of the stock exchange on which the ADSs are listed, in lieu of distribution of the materials provided to the Depositary in connection with any meeting of or solicitation of consents or proxies from holders of Deposited Securities, distribute to the Holders a notice, after consulting the Company as to the form of such notice to the extent practicable, that provides Holders with or otherwise publicizes to Holders instructions on how to retrieve such materials or receive such materials upon request (i.e., by reference to a website containing the materials for retrieval or a contact for requesting copies of the materials).  Holders are strongly encouraged to forward their voting instructions as soon as possible.  Voting

J.P.Morgan

instructions will not be deemed received until such time as the ADR department responsible for proxies and voting has received such instructions, notwithstanding that such instructions may have been physically received by JPMorgan Chase Bank, N.A., as Depositary, prior to such time.

    (13)  Changes Affecting Deposited Securities.

          (a)  Subject to paragraphs (4) (Certain Limitations to Registration, Transfer etc.) and (5) (Liability of Holder or Beneficial Owner for Taxes, Duties and Other Charges), the Depositary may, in its discretion, and shall if reasonably requested by the Company, amend this ADR or distribute additional or amended ADRs (with or without calling this ADR for exchange) or cash, securities or property on the record date set by the Depositary therefor to reflect any change in par value, split-up, consolidation, cancellation or other reclassification of Deposited Securities, any Share Distribution or Other Distribution not distributed to Holders or any cash, securities or property available to the Depositary in respect of Deposited Securities from (and the Depositary is hereby authorized to surrender any Deposited Securities to any person and, irrespective of whether such Deposited Securities are surrendered or otherwise cancelled by operation of law, rule, regulation or otherwise, to sell by public or private sale any property received in connection with) any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all the assets of the Company.

          (b)  To the extent the Depositary does not so amend this ADR or make a distribution to Holders to reflect any of the foregoing, or the net proceeds thereof, whatever cash, securities or property results from any of the foregoing shall constitute Deposited Securities and each ADS evidenced by this ADR shall automatically represent its pro rata interest in the Deposited Securities as then constituted.

          (c)  Promptly upon the occurrence of any of the aforementioned changes affecting Deposited Securities, the Company shall notify the Depositary in writing of such occurrence and as soon as practicable after receipt of such notice from the Company, may instruct the Depositary to give notice thereof, at the Company's expense, to Holders in accordance with the provisions hereof. Upon receipt of such instruction, the Depositary shall give notice to the Holders in accordance with the terms thereof, as soon as reasonably practicable.

    (14)  Exoneration.

          (a)  The Depositary, the Company, and each of their respective directors, officers, employees, agents and affiliates and each of them shall: (i) incur or assume no liability (including, without limitation, to Holders or Beneficial Owners) (A) if any present or future law, rule, regulation, fiat, order or decree of the United Kingdom, the United States or any other country or jurisdiction, or of any

104296247.1

A-16

Exhibit Q

J.P.Morgan

governmental or regulatory authority or any securities exchange or market or automated quotation system, the provisions of or governing any Deposited Securities or any securities issued or distributed by the Company or any offering or distribution thereof, any present or future provision of the Articles, any act of God, war, terrorism, epidemic, pandemic, nationalization, expropriation, currency restrictions, work stoppage, strike, civil unrest, revolutions, rebellions, explosions, cyber, ransomware or malware attack, computer failure or circumstance beyond its direct and immediate control shall prevent, forbid or delay, or shall cause any of them to be subject to any civil or criminal penalty in connection with, any act which the Deposit Agreement or this ADR provides shall be done or performed by it or them (including, without limitation, voting pursuant to paragraph (12) hereof), or (B) by reason of any non-performance or delay, caused as aforesaid, in the performance of any act or things which by the terms of the Deposit Agreement it is provided shall or may be done or performed or any exercise or failure to exercise any discretion given it in the Deposit Agreement or this ADR (including, without limitation, any failure to determine that any distribution or action may be lawful or reasonably practicable); (ii) incur or assume no liability (including, without limitation, to Holders or Beneficial Owners) except to perform its obligations to the extent they are specifically set forth in this ADR and the Deposit Agreement without gross negligence or willful misconduct and the Depositary shall not be a fiduciary or have any fiduciary duty to Holders or Beneficial Owners; (iii) in the case of the Depositary and its agents, be under no obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any Deposited Securities, the ADSs or this ADR; (iv) in the case of the Company and its agents hereunder be under no obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any Deposited Securities, the ADSs or this ADR, which in its opinion may involve it in expense or liability, unless indemnity satisfactory to it against all expense (including fees and disbursements of counsel) and liability be furnished as often as may be required; and (v) not be liable (including, without limitation, to Holders or Beneficial Owners) for any action or inaction by it in reliance upon the advice of or information from any legal counsel, any accountant, any person presenting Shares for deposit, any Holder, or any other person believed by it to be competent to give such advice or information and/or, in the case of the Depositary, the Company, and/or in the case of the Company, the Depositary. The Depositary shall not be liable for the acts or omissions made by, or the insolvency of, any securities depository, clearing agency or settlement system.

(b) The Depositary. The Depositary shall not be responsible for, and shall incur no liability in connection with or arising from, the insolvency of any Custodian that is not a branch or affiliate of JPMorgan Chase Bank, N.A. The Depositary shall not have any liability for the price received in connection with any sale of securities, the timing thereof or any delay in action or omission to act nor shall it be responsible for any error or delay in action, omission to act, default or negligence on the part of the party so retained in connection with any such sale or proposed sale. Notwithstanding anything to the contrary contained in the Deposit Agreement (including the ADRs) and, subject to the further limitations set forth in

104296247.1

A-17

J.P.Morgan

clause (o) of this paragraph (14), the Depositary shall not be responsible for, and shall incur no liability in connection with or arising from, any act or omission to act on the part of the Custodian except to the extent that any Holder has incurred liability directly as a result of the Custodian having (i) committed fraud or willful misconduct in the provision of custodial services to the Depositary or (ii) failed to use reasonable care in the provision of custodial services to the Depositary as determined in accordance with the standards prevailing in the jurisdiction in which the Custodian is located.

(c) The Depositary, its agents and the Company may rely and shall be protected in acting upon any written notice, request, direction, instruction or document believed by them to be genuine and to have been signed, presented or given by the proper party or parties.

(d) The Depositary shall be under no obligation to inform Holders or Beneficial Owners about the requirements of the laws, rules or regulations or any changes therein or thereto of the United Kingdom, the United States or any other country or jurisdiction or of any governmental or regulatory authority or any securities exchange or market or automated quotation system.

(e) The Depositary and its agents will not be responsible for any failure to carry out any instructions to vote any of the Deposited Securities, for the manner in which any voting instructions are given, including instructions to give a discretionary proxy to a person designated by the Company, for the manner in which any vote is cast, including, without limitation, any vote cast by a person to whom the Depositary is instructed to grant a discretionary proxy pursuant to paragraph (12) hereof, or for the effect of any such vote.

(f) The Depositary may rely upon instructions from the Company or its counsel in respect of any approval or license required for any currency conversion, transfer or distribution.

(g) The Depositary and its agents may own and deal in any class of securities of the Company and its affiliates and in ADRs.

(h) Notwithstanding anything to the contrary set forth in the Deposit Agreement or an ADR, the Depositary and its agents may fully respond to any and all demands or requests for information maintained by or on its behalf in connection with the Deposit Agreement, any Holder or Holders, any ADR or ADRs or otherwise related hereto or thereto to the extent such information is requested or required by or pursuant to any lawful authority, including without limitation laws, rules, regulations, administrative or judicial process, banking, securities or other regulators.

(i) None of the Depositary, the Custodian or the Company, or any of their respective directors, officers, employees, agents or affiliates shall be liable for

104296247.1

A-18

J.P.Morgan

the failure by any Holder or Beneficial Owner to obtain the benefits of credits or refunds of non-U.S. tax paid against such Holder's or Beneficial Owner's income tax liability.

(j)    The Depositary is under no obligation to provide the Holders and Beneficial Owners, or any of them, with any information about the tax status of the Company. None of the Depositary, the Custodian or the Company, or any of their respective directors, officers, employees, agents and affiliates, shall incur any liability for any tax or tax consequences that may be incurred by Holders or Beneficial Owners on account of their ownership or disposition of the ADRs or ADSs.

(k)    The Depositary shall not incur any liability for the content of any information submitted to it by or on behalf of the Company for distribution to the Holders or for any inaccuracy of any translation thereof, for any investment risk associated with acquiring an interest in the Deposited Securities, for the validity or worth of the Deposited Securities, for the credit-worthiness of any third party, for allowing any rights to lapse upon the terms of the Deposit Agreement or for the failure or timeliness of any notice from the Company.

(l)    Notwithstanding anything herein or in the Deposit Agreement to the contrary, the Depositary and the Custodian(s) may use third-party delivery services and providers of information regarding matters such as, but not limited to, pricing, proxy voting, corporate actions, class action litigation and other services in connection herewith and the Deposit Agreement, and use local agents to provide services such as, but not limited to, attendance at any meetings of security holders. Although the Depositary and the Custodian will use reasonable care (and cause their agents to use reasonable care) in the selection and retention of such third-party providers and local agents, they will not be responsible for any errors or omissions made by them in providing the relevant information or services.

(m)    The Depositary shall not be liable for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the Depositary or in connection with any matter arising wholly after the removal or resignation of the Depositary.

(n)    By holding an ADS or an interest therein, Holders and Beneficial Owners each acknowledge and agree that (i) such Holders and Beneficial Owners are not shareholders of the Company and have no direct rights of a shareholder against the Company, and that the rights attaching to the Shares represented by the ADSs, and the rights of the Company with respect to the Shares, are governed exclusively by the Articles and the laws of England, (ii) in connection with any matters against the Company, such Holders and Beneficial Owners shall be and are bound by the arbitration and exclusive jurisdiction provisions set out in Section 20 of the Deposit Agreement (as summarized in subparagraph (s) below), (iii) any legal suit, action or proceeding instituted by Holders or Beneficial Owners against or involving the

104296247.1

A-19

J.P.Morgan

Depositary that does not include the Company as a codefendant or other party, arising out of or based upon this Deposit Agreement, the ADSs or the transactions contemplated herein or therein including any alleged violation of the U.S. federal securities laws, may only be instituted in a state or federal court in New York, New York, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding, and (iv) the Depositary may institute any legal suit, action or proceeding against the Holders and/or Beneficial Owners in any state or federal court in New York, New York or any other court having jurisdiction, provided the Company is not included as a co-defendant or other party to such proceeding, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of any and all such courts in any such suit, action or proceeding.

(o)  The Company has agreed to indemnify the Depositary and its agents under certain circumstances and the Depositary has agreed to indemnify the Company under certain circumstances.

(p)  Neither the Company, the Depositary nor any of their respective agents shall be liable to Holders or beneficial owners of interests in ADSs for any indirect, special, punitive or consequential damages (including, without limitation, legal fees and expenses) or lost profits, in each case of any form incurred by any person or entity, whether or not foreseeable and regardless of the type of action in which such a claim may be brought.

(q)  No provision of the Deposit Agreement or this ADR is intended to constitute a waiver or limitation of any rights which Holders or Beneficial Owners may have under the Securities Act of 1933 or the Securities Exchange Act of 1934, to the extent applicable.

(r)  Arbitration. The Company, the Depositary and each Holder shall be bound by the arbitration and exclusive jurisdiction provisions set forth in this subsection (b) in connection with any Share Dispute, as that term is defined in this paragraph 14(s):

(i)  The term "Share Dispute" is defined as any action, dispute, controversy, claim or cause of action (a) between the Company and Holders and/or owners of interests in ADSs or (b) between and directly involving as named parties each of the Company, the Depositary and one or more Holders and/or owners of interests in ADSs, in each case arising out of, or relating to, this Deposit Agreement, the ADSs or the ADRs or the transactions contemplated hereby

J.P.Morgan

or thereby (whether in tort, in contract, under statute, including for the avoidance of doubt, any derivative claim thereunder, or otherwise), including any question regarding existence, validity, interpretation, breach or termination of the Deposit Agreement and any alleged violation of the U.S. federal securities laws.

(ii) Any and all Share Disputes shall be finally and exclusively resolved by arbitration under the Rules of Arbitration rules of the International Chamber of Commerce ("ICC") (the "ICC Rules"), as amended from time to time, which ICC Rules are deemed to be incorporated by reference into this Deposit Agreement.

(iii) The arbitral tribunal (the "Tribunal") shall consist of three arbitrators, to be appointed in accordance with the ICC Rules. The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practise in a common law jurisdiction within the Commonwealth (as constituted on 12 May 2005), and each other arbitrator must have at least 20 years' experience as a qualified lawyer.

(iv) If any Share Dispute raises issues which are substantially the same as or connected with issues raised in a Share Dispute which has already been referred to arbitration (an "Existing Share Dispute") or arises out of substantially the same facts as are the subject of an Existing Share Dispute (a "Related Share Dispute"), then the Tribunal appointed or to be appointed in respect of any such Existing Share Dispute shall also be appointed as the Tribunal in respect of any Related Share Dispute, save where the Tribunal considers such appointment would be inappropriate.

(v) Where, pursuant to the above provisions, the same Tribunal has been appointed in relation to two or more Related Share Disputes, the Tribunal may order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the Tribunal thinks fit.

(vi) The Tribunal shall have power to make such directions and any interim, partial or final awards as it considers just and desirable. The Tribunal, upon the request of a party to a Share Dispute, or another party which itself wishes to be joined in any reference to arbitration commenced in

104296247.1

A-21

J.P.Morgan

accordance with this Clause, may join any party to the
reference to arbitration proceedings and may make a
single, final award determining all Share Disputes between
them.

(vii)   Each of the parties to the Deposit Agreement hereby agrees
to be joined to any reference to arbitration proceedings in
relation to any Share Dispute at the request of a party to
that Share Dispute, and to accept the joinder of a party
requesting to be joined pursuant to this paragraph (14).

(viii)  The place of the arbitration shall be The Hague, The
Netherlands. The language of the arbitration shall be
English.

(ix)    Each person hereby waives, as far as permitted by law: (a)
any right under the laws of any jurisdiction to apply to any
court of law or other judicial authority to determine any
preliminary point of law, and/or (b) any right he or she
may otherwise have under the laws of any jurisdiction to
appeal or otherwise challenge the award, ruling or decision
of the tribunal.

(x)     The governing law applicable to such Share Dispute,
including the submission to arbitration and written
arbitration agreement contained in or evidenced by the
Articles, shall be the substantive law of England.

(xi)    If any court of competent jurisdiction or other competent
authority including for the avoidance of doubt, a court or
authority in any jurisdiction which is not a signatory to the
New York Convention in any jurisdiction determines that
this arbitration provision is invalid or unenforceable in
relation to any Share Dispute, the Company and the Holder
or owner of interests in ADSs, in each case, irrevocably
agree that any related proceeding, suit or action can only
be brought in the courts of England and Wales and the
governing law applicable to such proceedings shall be the
substantive law of England.

(t)  Nothing in the Deposit Agreement or any ADR shall be construed to
change or alter the Articles. The Company will make a copy of the Articles available
to Holders upon request.

(15) Resignation and Removal of Depositary; the Custodian.

104296247.1

A-22

J.P.Morgan

(a) Resignation. The Depositary may resign as Depositary by written notice of its election to do so delivered to the Company, such resignation to take effect upon the appointment of a successor depositary and its acceptance of such appointment as provided in the Deposit Agreement.

(b) Removal. The Depositary may at any time be removed by the Company by no less than 60 days' prior written notice of such removal, to become effective upon the later of (i) the 60th day after delivery of the notice to the Depositary and (ii) the appointment of a successor depositary and its acceptance of such appointment as provided in the Deposit Agreement.

(c) The Custodian. The Depositary may appoint substitute or additional Custodians and the term "Custodian" refers to each Custodian or all Custodians as the context requires.

(16) Amendment. Subject to the last sentence of paragraph (2) (Withdrawal of Deposited Securities), the ADRs and the Deposit Agreement may be amended by the Company and the Depositary, provided that any amendment that imposes or increases any fees, charges or expenses (other than stock transfer or other taxes and other governmental charges, transfer or registration fees, cable (including SWIFT, telex or facsimile transmission) costs, delivery costs or other such fees, charges or expenses), or that shall otherwise prejudice any substantial existing right of Holders or Beneficial Owners, shall become effective 30 days after notice of such amendment shall have been given to the Holders. Every Holder and Beneficial Owner at the time any amendment to the Deposit Agreement so becomes effective shall be deemed, by continuing to hold such ADR, to consent and agree to such amendment and to be bound by the Deposit Agreement as amended thereby. In no event shall any amendment impair the right of the Holder of any ADR to surrender such ADR and receive the Deposited Securities represented thereby, except in order to comply with mandatory provisions of applicable law. Any amendments or supplements that (i) are reasonably necessary (as agreed by the Company and the Depositary) in order for (a) the ADSs to be registered on Form F-6 under the Securities Act of 1933 or (b) the ADSs or Shares to be traded solely in electronic book-entry form and (ii) do not in either such case impose or increase any fees or charges to be borne by Holders, shall be deemed not to prejudice any substantial rights of Holders or Beneficial Owners. Notwithstanding the foregoing, if any governmental body or regulatory body should adopt new laws, rules or regulations or should there be changes to the Articles which would require amendment or supplement of the Deposit Agreement or the form of ADR to ensure compliance therewith, the Company and the Depositary may amend or supplement the Deposit Agreement and the ADR at any time in accordance with such changed laws, rules or regulations. Such amendment or supplement to the Deposit Agreement in such circumstances may become effective before a notice of such amendment or supplement is given to Holders or within any other period of time as required for compliance. Notice of any amendment to the Deposit Agreement or form

J.P.Morgan

of ADRs shall not need to describe in detail the specific amendments effectuated thereby, and failure to describe the specific amendments in any such notice shall not render such notice invalid, provided, however, that, in each such case, the notice given to the Holders identifies a means for Holders and Beneficial Owners to retrieve or receive the text of such amendment (i.e., upon retrieval from the Commission's, the Depositary's or the Company's website or upon request from the Depositary).

(17) Termination. The Depositary may, and shall at the written direction of the Company, terminate the Deposit Agreement and this ADR by mailing notice of such termination to the Holders at least 30 days prior to the date fixed in such notice for such termination; provided, however, if the Depositary shall have (i) resigned as Depositary hereunder, notice of such termination by the Depositary shall not be provided to Holders unless a successor depositary shall not be operating hereunder within 60 days of the date of such resignation, or (ii) been removed as Depositary hereunder, notice of such termination by the Depositary shall not be provided to Holders unless a successor depositary shall not be operating hereunder on the 60th day after the Company's notice of removal was first provided to the Depositary. Notwithstanding anything to the contrary herein, the Depositary may terminate the Deposit Agreement without notice to the Company, but subject to giving 30 days' notice to the Holders, under the following circumstances: (i) in the event of the Company's bankruptcy or insolvency, (ii) if the Shares cease to be listed on an internationally recognized stock exchange, (iii) if the Company effects (or will effect) a redemption of all or substantially all of the Deposited Securities, or a cash or share distribution representing a return of all or substantially all of the value of the Deposited Securities, or (iv) there occurs a merger, consolidation, sale of assets or other transaction as a result of which securities or other property are delivered in exchange for or in lieu of Deposited Securities.

After the date so fixed for termination, the Depositary and its agents will perform no further acts under the Deposit Agreement and this ADR, except to receive and hold (or sell) distributions on Deposited Securities and deliver Deposited Securities being withdrawn. As soon as practicable after the date so fixed for termination, the Depositary shall use its reasonable efforts to sell the Deposited Securities and shall thereafter (as long as it may lawfully do so) hold in an account (which may be a segregated or unsegregated account) the net proceeds of such sales, together with any other cash then held by it under the Deposit Agreement, without liability for interest, in trust for the pro rata benefit of the Holders of ADRs not theretofore surrendered. After making such sale, the Depositary shall be discharged from all obligations in respect of the Deposit Agreement and this ADR, except to account for such net proceeds and other cash. After the date so fixed for termination, the Company shall be discharged from all obligations under the Deposit Agreement except for its obligations to the Depositary and its agents.

(18) Appointment; Acknowledgements and Agreements. Each Holder and each Beneficial Owner, upon acceptance of any ADSs or ADRs (or any interest in any

of them) issued in accordance with the terms and conditions of the Deposit Agreement shall be deemed for all purposes to (a) be a party to and bound by the terms of the Deposit Agreement and the applicable ADR(s), (b) appoint the Depositary its attorney-in-fact, with full power to delegate, to act on its behalf and to take any and all actions contemplated in the Deposit Agreement and the applicable ADR(s), to adopt any and all procedures necessary to comply with applicable law and to take such action as the Depositary in its sole discretion may deem necessary or appropriate to carry out the purposes of the Deposit Agreement and the applicable ADR(s), the taking of such actions to be the conclusive determinant of the necessity and appropriateness thereof, and (c) acknowledge and agree that (i) nothing in the Deposit Agreement or any ADR shall give rise to a partnership or joint venture among the parties thereto nor establish a fiduciary or similar relationship among such parties, (ii) the Depositary, its divisions, branches and affiliates, and their respective agents, may from time to time be in the possession of non-public information about the Company, Holders, Beneficial Owners and/or their respective affiliates, (iii) the Depositary and its divisions, branches and affiliates may at any time have multiple banking relationships with the Company, Holders, Beneficial Owners and/or the affiliates of any of them, (iv) the Depositary and its divisions, branches and affiliates may, from time to time, be engaged in transactions in which parties adverse to the Company or the Holders or Beneficial Owners and/or their respective affiliates may have interests, (v) nothing contained in the Deposit Agreement or any ADR(s) shall (A) preclude the Depositary or any of its divisions, branches or affiliates from engaging in such transactions or establishing or maintaining such relationships, or (B) obligate the Depositary or any of its divisions, branches or affiliates to disclose such transactions or relationships or to account for any profit made or payment received in such transactions or relationships, (vi) the Depositary shall not be deemed to have knowledge of any information held by any branch, division or affiliate of the Depositary, and (vii) notice to a Holder shall be deemed, for all purposes of the Deposit Agreement and this ADR, to constitute notice to any and all Beneficial Owners of the ADSs evidenced by such Holder's ADRs. For all purposes under the Deposit Agreement and this ADR, the Holder hereof shall be deemed to have all requisite authority to act on behalf of any and all Beneficial Owners of the ADSs evidenced by this ADR.

(19) Waiver. EACH PARTY TO THE DEPOSIT AGREEMENT (INCLUDING, FOR AVOIDANCE OF DOUBT, EACH HOLDER AND BENEFICIAL OWNER OF, AND/OR HOLDER OF INTERESTS IN, ADSS OR ADRS) HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING AGAINST THE DEPOSITARY AND/OR THE COMPANY DIRECTLY OR INDIRECTLY ARISING OUT OF, BASED ON OR RELATING IN ANY WAY TO THE SHARES OR OTHER DEPOSITED SECURITIES, THE ADSs OR THE ADRs, THE DEPOSIT AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREIN OR THEREIN, OR THE BREACH HEREOF OR THEREOF (WHETHER BASED ON CONTRACT, TORT, COMMON LAW OR ANY OTHER THEORY), INCLUDING, WITHOUT LIMITATION, ANY SUIT, ACTION, CLAIM OR PROCEEDING UNDER THE UNITED STATES FEDERAL SECURITIES LAWS. No

104296247.1

J.P.Morgan

provision of the Deposit Agreement or this ADR is intended to constitute a waiver or limitation of any rights which a Holder or any Beneficial Owner may have under the Securities Act of 1933 or the Securities Exchange Act of 1934, to the extent applicable.

(20) Elective Distributions in Cash or Shares. Whenever the Company shall declare a dividend to be payable at the election of the holders of Shares in cash or in additional Shares (each an "Elective Distribution"), the Company and the Depositary agree to consult with each other to determine if it is reasonably practicable to extend such Elective Distribution to Holders and on the terms and procedures thereof. In connection with each Elective Distribution, the Company shall furnish an opinion of U.S. counsel to the Company, which counsel and opinion shall be reasonably acceptable to the Depositary, to the effect that the Company may make the Elective Distribution available to Holders and the Depositary may extend such Elective Distribution to Holders in each case without registration under the Securities Act of 1933 of the Shares issued pursuant to such Elective Distribution, or, if such opinion has been previously furnished, a letter from such counsel stating that the opinion previously provided may be relied upon by the Depositary as if such opinion were dated and delivered to the Depositary as of the date of such letter. If the Company and the Depositary have agreed that it is reasonably practicable to extend the Elective Distribution to Holders and on the terms and procedures thereof, the Depositary shall, if the Company shall request in writing, make such Elective Distribution available to Holders on the terms and following such procedures as agreed with the Company. If an Elective Distribution is not extended to Holders, the Depositary shall, to the extent permitted by law, distribute to the Holders, on the basis of the same determination as is made in the local market in respect of the Shares for which no election is made, either (x) cash or (y) additional ADSs representing such additional Shares, in each case upon the terms described in paragraph (10) hereof. If an Elective Distribution is extended to Holders, the Depositary shall establish a record date in the manner described in paragraph (11) hereof and inform Holders of the procedures necessary to permit them to participate in such Elective Distribution. Unless otherwise agreed in writing by the Company and the Depositary, to the extent a Holder shall make an election with respect to an Elective Distribution, such election shall remain in full force and effect until such time as a notice revoking such election is received from such Holder (in which case the Holder will be treated as having elected to receive the default consideration) or a further election is received from such Holder or the Depositary notifies such Holder that the election previously received from such Holder ceases to be valid for further Elective Distributions. The Company shall assist the Depositary in establishing such procedures to the extent reasonably necessary. Subject to paragraph (7) hereof, if a Holder elects to receive the proposed dividend in cash or ADSs, the dividend shall be distributed upon the terms described in paragraph (10) hereof.

If, at any time after an Elective Distribution, a Holder's account is solely comprised of a fraction of an ADS, the Company may instruct the Depositary to sell or

104296247.1

A-26

J.P.Morgan

dispose of such fractional ADS (or the Deposited Securities represented thereby) and to handle the net proceeds from such disposition and/or sale (after deduction of the costs and expenses of such sale) in the manner instructed by the Company, which may involve not delivering such net proceeds to the Holder. Holders are strongly encouraged to review the terms of the Elective Distribution and to consult with their tax advisors prior to taking any action which may result in their account solely comprising of a fractional ADS.

Exhibit Q

# Exhibit 2.5

**Description of Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934**

As of December 31, 2021, Shell plc (formerly Royal Dutch Shell plc, "Shell," "the Company", "we", "us" and "our") had three classes of securities registered under Section 12(b) of the Securities Exchange Act of 1934, as amended: the Company's A American Depositary Shares ("A ADSs") representing two A ordinary shares, with a nominal value of €0.07 each, the Company's B American Depositary Shares ("B ADSs") representing two B ordinary shares, with a nominal value of €0.07 each, and Senior Debt Securities.

Capitalized terms used herein and not otherwise defined herein, shall have the meaning ascribed to them in the amended and restated deposit agreement among the Company, JPMorgan Chase Bank, N.A. and the Holders from time to time of ADRs, dated November 1, 2018 (the "Deposit Agreement"), amendment No. 1 to the Deposit Agreement, dated April 15, 2021, and the Senior Debt Securities Indenture among Shell International Finance B.V., as issuer, the Company, as guarantor, and Deutsche Bank Trust Company Americas, as trustee, dated June 27, 2006 (the "2006 Indenture").

On December 10, 2021, the shareholders of the Company approved changes to the Articles of Association of the Company which permitted the Company to simplify its share structure through the establishment of a single line of shares and alignment of the Company's tax residence with its country of incorporation by relocating Board and Executive Committee meetings, and the CEO and CFO, to the UK and granted the Board the power to change the Company's name. On December 20, 2021, the Board decided to proceed with the proposal. On January 21, 2022, the Company changed its name from Royal Dutch Shell plc to Shell plc and on January 29, 2022 one line of shares was established through assimilation of each A share and each B share into one ordinary share of the Company each. This assimilation had no impact on voting rights or dividend entitlements. Dutch withholding tax, applied previously on dividends on A shares, no longer applies on dividends paid on the ordinary shares following the assimilation. The Company also entered into a Second Amended and Restated Deposit Agreement with JPMorgan Chase Bank, N.A., and Holders and Beneficial owners of American Depositary Receipts, dated as of January 31, 2022 (filed as Exhibit 2.3 to this Annual Report on Form 20-F), which set out the general terms and provisions of the ordinary share ADRs.

**Description of A and B American Depositary Shares**

The summary below describes some of the general terms and provisions of our A ADSs and B ADSs (collectively, "ADSs") and is subject to, and qualified in its entirety by reference to the Deposit Agreement, filed as exhibit 4.13 with the Registration Statement on Form F-3 (File No. 333-254137) on March 11, 2021 and amendment No. 1 to the Deposit Agreement, filed as exhibit 99.A(2) to the post-effective amendment to Form F-6 filed on April 15, 2021 (File No. 333-227891), which are incorporated by reference, including the exhibits thereto.

### General

American Depositary Receipts ("ADRs") evidencing ADSs are issuable pursuant to the Deposit Agreement. Each A ADS represents the right to receive two A ordinary shares of the Company and each B ADS represents the right to receive two B ordinary shares of the Company. An ADR may evidence any number of ADSs. Holders and owners of interests in ADSs are not shareholders of the Company and have no direct rights of a shareholder against the Company.

JPMorgan Chase Bank, N.A., as depositary (the "Depositary"), is the registered shareholder of the shares underlying the A or B ADSs and enjoys the rights of a shareholder under our Articles of Association ("Articles"). Holders of ADSs do not have shareholder rights. The rights of the holder of an A or a B ADS are specified in the Deposit Agreement with the Depositary and are summarised below. The address of the Depositary's principal executive offices is 383 Madison Avenue, Floor 11, New York, New York 10179.

In the following description, a "Holder" is the person in whose name an ADR is registered on the ADR Register.

### Voting

Upon request by the Company, the Depositary will notify Holders of ADSs of shareholders' meetings of the Company or of solicitation of consents or proxies from Holders and will arrange to deliver voting materials to such holders of ADSs.

Upon request by a Holder, the Depositary will endeavour to appoint such holder as proxy in respect of such Holder's deposited shares entitling such Holder to attend and vote at shareholders' meetings. Holders of ADSs may also instruct the Depositary to vote their deposited securities and the Depositary will try, as far as practical and lawful, to vote deposited shares in accordance with such instructions.

### Collecting and distributing dividends

The Depositary will receive all cash dividends and other cash distributions made on the deposited shares underlying the ADSs and, where possible and on a reasonable basis, will distribute such dividends and distributions to Holders of ADSs in proportion to their holdings of ADSs. All other distributions made on the Company's shares will be distributed by the Depositary in any means that the Depositary thinks is equitable and practical.

The Depositary may deduct its fees and expenses and the amount of any taxes owed from any payments to Holders and it may sell a Holder's deposited shares to pay any taxes owed. The Depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to Holders of ADSs.

### Transmission of notices, reports and proxy soliciting material

In addition to the procedures for transmitting notices discussed above under "*Voting*," the Depositary and custodian shall make available for inspection by Holders, at their offices and at any designated transfer offices, any reports and communications, including any proxy material, received from the Company which are both (i) received by the Depositary or the custodian or the nominee of either of them as the Holder of the ordinary shares and (ii) made generally available to the Company to the Holders of such ordinary shares. If requested in writing by the Company, the

Exhibit Q

Depositary shall arrange for the transmittal or mailing of such notices, and any other reports or communications made generally available to Holders of the ordinary shares, to all Holders.

### Sale or exercise of rights

If the Company makes a distribution of warrants or other instruments representing rights to acquire additional ADSs in respect of any rights to subscribe for additional ordinary shares or shares of any nature and offers such rights to Holders of deposited securities, the Depositary, in its discretion, may distribute to Holders, in each case in proportion of their holdings of ADSs (i) the same, (ii) the net proceeds of sales of rights, or (iii) nothing provided that the sale of rights cannot practicably be accomplished by reason of the nontransferability of the Rights, limited markets therefor, their short duration or otherwise (and any rights may lapse).

If a Holder wishes to sell any rights issued by the Company, the Holder may be required (i) pay any applicable fees, taxes and charges, including governmental charges, associated with the sale transaction. Further, the Holder may be asked to provide proof satisfactory to the Depositary of the identity of any signatory, genuineness of any signature and such other information, that the Depositary may deem necessary.

### Deposit or sale of securities resulting from dividends, splits or plans of reorganization

If the Company makes a distribution payable at the election of the Holders of A or B ordinary shares in additional A or B ordinary shares and notifies the Depositary in writing of such occurrence, to the extent practicable, the Depositary will, upon request from the Company, distribute to each Holder, in proportion to the number of deposited securities represented by ADSs evidenced by such Holder's ADRs, additional ADRs evidencing whole ADSs representing any shares available to the Depositary resulting from a dividend or free distribution on deposited securities consisting of shares and (ii) cash representing the net proceeds of sales of shares received that would give rise to fractional ADSs.

The Depositary in its discretion will, if reasonably requested by the Company, amend the ADR or distribute additional or amended ADRs (with or without calling this ADR for exchange) or cash, securities or property to reflect any change in par value, split-up, consolidation, unification cancellation or other reclassification of deposited securities, any distribution of shares or other distributions not distributed to Holders.

The Depositary in its discretion will, if reasonably requested by the Company, amend the ADR or distribute any additional available cash, securities or property in respect of deposited securities from any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all the assets of the Company. Without derogation of the foregoing, if pursuant to article 5(E) of the Articles or otherwise, the Company undergoes a unification and/or consolidation of the A and B ordinary shares and as a result, the B ordinary shares form one uniform class with the A ordinary shares ranking *pari passu* in all respect, from the effective date of such unification and/or consolidation, such uniform class of ordinary shares of the Company shall immediately thereafter, without any action on the part of the Company, the Depositary or the Holders, constitute the share class represented by any and all outstanding ADSs (regardless of whether previously designated A ADSs or ADSs).

If the Depositary does not so amend the ADR or make a distribution to Holders to reflect any of the foregoing, or the net proceeds thereof, whatever cash, securities or property results from any of the foregoing shall constitute deposited securities and each ADS evidenced by this ADR shall automatically represent its pro rata interest in the deposited securities as then constituted.

Prior to the issue, registration, split-up or combination of any ADR, the delivery of any distribution in respect thereof, the Company, the Depositary or the Custodian may require from the Holder:

(A)     Payment of (i) any stock transfer, tax or other governmental charge, (ii) registration fees in effect for the registration of transfers of the underlying shares or other deposited securities, and (iii) any applicable depositary fees,

(B)     The production of proof satisfactory to the Depositor as to the identity of the signatory and genuineness of any signature,

(C)     Such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial ownership of any securities, compliance with applicable law, regulations, provisions of or governing deposited securities and terms of the Deposit Agreement and the ADR as may be necessary or proper, and

(D)     Compliance with such regulations as the Depositary may establish consistent with the Deposit Agreement.

The issuance of ADRs, the acceptance of deposits of shares, the registration, split-up or combination of ADRs may be suspended, generally or in particular instances, when the ADR Register or any register for deposited securities is closed or when any such action is deemed advisable by the Depositary.

### Amendment, extension or termination of the Deposit Agreement

The form of ADRs evidencing ADSs and the Deposit Agreement may be amended by agreement between the Company and the Depositary, without the consent of the Holders. Any amendment that imposes or increases any fees or charges, other than taxes and other governmental charges, transfer or registration fees, transmission costs, delivery costs or other such expenses, or that otherwise prejudices any substantial existing right of the Holders, will not take effect as to any ADRs until 30 days after notice of the amendment has been given to the Holders. Every Holder of any ADR, at the time an amendment becomes effective, will be deemed to continue to hold the ADR and to consent and agree to the amendment and to be bound by the Deposit Agreement. No amendment may impair the right of any Holder to surrender ADRs and receive in return the deposited securities ordinary shares represented by the ADSs, except in order to comply with mandatory provisions of applicable law.

Any amendments which are reasonably necessary in order for (a the ADSs to be registered on Form F-6 under the Securities Act of 1933 or (b) the ADSs or shares to be traded solely in electronic book-entry form and (ii) do not in either such case impose or increase any fees or charges to be borne by the Holders, shall be deemed not to prejudice any substantial rights of Holders. However, if any governmental body or regulatory body adopts new laws, rules or regulations or should there be changes to the Articles which would require amendment or supplement of the Deposit Agreement or the form of ADR to ensure compliance therewith, the Company and the Depositary may amend or supplement the Deposit Agreement and the ADR at any time in accordance with such changed laws, rules or regulations. Such amendment or supplement to the Deposit Agreement in such circumstances may become effective before a notice of such amendment or supplement is given to Holders or within any other period of time as required for compliance.

Exhibit Q

Notice of any amendment to the Deposit Agreement or form of ADRs is not required to describe in detail the specific amendments and failure to describe the specific amendments in any such notice shall not render such notice invalid, provided that the notice given to the Holders identifies a means for Holders to retrieve or receive the text of such amendment from, for example, the U.S. Securities and Exchange Commission, the Depositary's or the Company's website or upon request from the Depositary.

At the written direction of the Company, the Depositary has agreed to terminate the Deposit Agreement and the ADRs evidencing ADSs by mailing a notice of such termination to the Holders then outstanding at least 30 days before the date fixed in the notice of termination. The Depositary may likewise resign or be removed as Depositary. However, in such cases, a notice of such resignation or termination by the Depositary shall not be provided to Holders unless a successor depositary will not be operating within 60 days of the date of the Depositary's resignation or notice of removal was provided by the Company to the Depositary

Further, in the event of (i) the Company's bankruptcy or insolvency, (ii) the Company's ordinary shares ceasing to be listed on an internationally recognized stock exchange, (iii) the Company effects or will effect a redemption of all or substantially all of the deposited securities, or a cash or share distribution representing a return of all or substantially all of the value of the deposited securities, or (iv) a merger, consolidation, sale of assets or other transaction as a result of which securities or other property are delivered in exchange for or in lieu of deposited securities, the Depositary may terminate the Deposit Agreement without notice to the Company. Nonetheless, the Depositary will still be required to give 30 days' notice to the Holders.

After the date of termination of the Depositary Agreement, the Depositary will perform no further acts except to receive and hold (or sell) distributions on Deposited Securities and deliver deposited securities being withdrawn. As soon as practicable after such termination date, the Depositary will use its reasonable efforts to sell the deposited securities and lawfully hold in an account the net proceeds of such sales, together with any other cash then held by it under the Deposit Agreement, without liability for interest, in trust for the pro rata benefit of the Holders of ADRs that have not previously been surrendered. Following such sale, the Depositary is discharged from all obligations under the Deposit Agreement, with the exception of accounting for such net proceeds and other cash. After the termination of the Deposit Agreement, the Company is discharged from all obligations under the Deposit Agreement except for its obligations to the Depositary.

### *Rights of Holders of ADRs to inspect the transfer books of the Depositary and the list of Holders of ADRs*

The Depositary will keep a register for the registration, transfer, combination and split-up of ADRs. These books will be open for inspection by Holders at all reasonable times.

The Depositary may close the ADR Register at any time or from time to time when deemed expedient by it and it may also close the issuance book portion of the ADR Register when reasonably requested by the Company solely in order to enable the Company to comply with applicable law.

### *Restrictions upon the right to transfer or withdraw the underlying securities*

Subject to certain limitations described below, Holders may, at any time, cancel ADSs and withdraw their underlying shares, have the corresponding class and number of ordinary shares credited to their account, or request a registration of transfer.

Prior to acting upon the request for withdrawal of deposited securities or registration of transfer, the Depositary may request the following:

(A)     Proper endorsement in blank of such ADR (or duly executed instruments of transfer thereof in blank) and the Holder's written order directing the Depositary to cause the Deposited Securities represented by the ADSs evidenced by such ADR to be withdrawn and delivered to, or upon the written order of, any person designated in such order.
(B)     Payment from the depositor of ADSs or the presenter of the ADRs of a sum sufficient to reimburse it for (i) any stock transfer, tax or other governmental charge, (ii) registration fees in effect for the registration of transfers of the underlying shares or other deposited securities, and (iii) any applicable depositary fees,
(C)     The production of proof satisfactory to the Depositor as to the identity of the signatory and genuineness of any signature,
(D)     Such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial ownership of any securities, compliance with applicable law, regulations, provisions of or governing deposited securities and terms of the Deposit Agreement and the ADR as may be necessary or proper, and
(E)     Compliance with such regulations as the Depositary may establish consistent with the Deposit Agreement.

Upon surrender of a certificated ADR in a form satisfactory to the Depositary or proper instructions and documentation, the Depositary will deliver to the Custodian's office the deposited securities at the time represented by the ADSs evidenced by the ADR. If requested, the Depositary may deliver such deposited securities at such other place as requested by the Holder, but such delivery is at risk and expense of the Holder.

The withdrawal of deposited securities may be suspended, generally or in particular instances, when the ADR Register or any register for deposited securities is closed or when any such action is deemed advisable by the Depositary.

Notwithstanding any other provision of the Deposit Agreement or the ADR, the withdrawal of deposited securities or the registration of transfer of outstanding ADRs generally may be suspended due to (i) temporary delays caused by closing transfer books of the Depositary or the Company of the deposited securities or the deposit of shares in connection with voting at a shareholders' meeting, or the payment of dividends, (ii) the payment of fees, taxes, and similar charges, and (iii) compliance with any laws or governmental regulations relating to ADRs or to the withdrawal of deposited securities. Without limitation of the foregoing, the Depositary will not knowingly accept for deposit any shares required to be registered under the provisions of the Securities Act of 1933, unless a registration statement is in effect as to such shares.

The delivery of ADRs against deposits of ADSs generally or against deposits of particular ADSs may be suspended, or the transfer of ADRs in particular instances may be refused, or the registration of transfer of outstanding ADRs generally may be suspended, during any period when the transfer books of the Depositary or those maintained by the foreign registrar are closed, or if any such action is deemed necessary or advisable by the Depositary at any time or from time to time because of any requirement of law or of any government or governmental body or commission, or under any provision of the Deposit Agreement, or, as long as it would be permitted under the transfer agency rules applicable to the Depositary, for any other reason.

Exhibit Q

*Limitation upon the liability of the Depositary*

The Depositary and the Company are not liable to Holders or beneficial owners of ADSs (A) if any present or future law, rule, regulation, fiat, order or decree of the United States, England, the Netherlands or any other country or jurisdiction, or of any governmental or regulatory authority or any securities exchange or market or automated quotation system, the provisions of or governing any deposited securities or any securities issued or distributed by the Company or any offering or distribution thereof, any present or future provision of the Articles, any act of God, war, terrorism, nationalization, expropriation, currency restrictions, work stoppage, strike, civil unrest, revolutions, rebellions, explosions, computer failure or circumstance beyond its direct and immediate control shall prevent, forbid or delay, or shall cause any of them to be subject to any civil or criminal penalty in connection with, any act which the Deposit Agreement or this ADR provides shall be done or performed by it or them (including, without limitation, voting), or (B) by reason of any non-performance or non-performance as aforesaid, in the performance of any act or things which by the terms of the Deposit Agreement it is provided shall or may be done or performed or any exercise or failure to exercise any discretion given it in the Deposit Agreement or this ADR (including, without limitation, any failure to determine that any distribution or action may be lawful or reasonably practicable) (C) not be liable to Holders or beneficial owners of ADSs for any action or inaction by it in reliance upon the advice of or information from legal counsel, accountants, any person presenting shares for deposit, any Holder, or any other person believed by it to be competent to give such advice or information. The Depositary shall not be liable for the acts or omissions made by, or the insolvency of, any securities depository, clearing agency or settlement system.

The Depositary and the Company assume no liability to Holders or beneficial owners of ADSs except to perform their obligations to the extent they are specifically set forth in the ADR and the Deposit Agreement without gross negligence or willful misconduct.

The Depositary and its agents are under no obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or this ADR. The Company and its agents also are under no obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or this ADR, which in its opinion may involve it in expense or liability, unless indemnity satisfactory to it in its sole discretion against all expense (including fees and disbursements of counsel) and liability is furnished as often as may be required.

The Depositary is not liable in connection with or arising from the insolvency of any Custodian that is not a branch or affiliate of JPMorgan Chase Bank, N.A. The Depositary are not liable for the price received in connection with any sale of securities, the timing thereof or any delay in action or omission to act nor is it responsible for any error or delay in action, omission to act, default or negligence on the part of the party so retained in connection with any such sale or proposed sale. The Depositary shall not be responsible for, and shall incur no liability in connection with or arising from, any act or omission to act on the part of the Custodian except to the extent that any Holder has incurred liability directly as a result of the Custodian having (i) committed fraud or willful misconduct in the provision of custodial services to the Depositary or (ii) failed to use reasonable care in the provision of custodial services to the Depositary as determined in accordance with the standards prevailing in the jurisdiction in which the Custodian is located.

The Depositary and its agents are not be responsible for any failure to carry out any instructions to vote any of the deposited securities, for the manner in which any such vote is cast, or for the effect of any such vote.

The Depositary is not liable for the content of any information submitted to it by or on behalf of the Company for distribution to the Holders or for any inaccuracy of any translation thereof, for any investment risk associated with acquiring an interest in the deposited securities, for the validity or worth of the deposited securities, for the credit-worthiness of any third party, for allowing any rights to lapse upon the terms of the Deposit Agreement or for the failure or timeliness of any notice from the Company.

The Depositary and the Custodian are not responsible for any errors or omissions made by any selected third party delivery services and local agents providing the relevant information or services.

The Depositary shall not be liable for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the Depositary or in connection with any matter arising wholly after the removal or resignation of the Depositary.

The Company has agreed to indemnify the Depositary and its agents under certain circumstances and the Depositary has agreed to indemnify the Company under certain circumstances.

Neither the Company, the Depositary nor any of their respective agents shall be liable to Holders or beneficial owners of interests in ADSs for any indirect, special, punitive or consequential damages (including, without limitation, legal fees and expenses) or lost profits, in each case of any form incurred by any person or entity, whether or not foreseeable and regardless of the type of action in which such a claim may be brought.

No disclaimer of liability under the Securities Act of 1933 or the Securities Exchange Act of 1934, to the extent applicable, is intended by any provision thereof.

*Arbitration*

The Company, the Depositary and each Holder shall be bound by the arbitration and exclusive jurisdiction provisions set forth below in connection with any Share Dispute, as that term is defined below:

(i)    The term "Share Dispute" is defined as any action, dispute, controversy, claim or cause of action (a) between the Company and Holders and/or owners of interests in ADSs or (b) between and directly involving as named parties each of the Company, the Depositary and one or more Holders and/or owners of interests in ADSs, in each case arising out of, or relating to, this Deposit Agreement, the ADSs or the ADRs or the transactions contemplated hereby or thereby (whether in tort, in contract, under statute, including for the avoidance of doubt, any derivative claim thereunder, or otherwise), including any question regarding existence, validity, interpretation, breach or termination of the Deposit Agreement and any alleged violation of the U.S. federal securities laws.

(ii) Any and all Share Disputes shall be finally and exclusively resolved by arbitration under the Rules of Arbitration rules of the International Chamber of Commerce ("ICC") (the "ICC Rules"), as amended from time to time, which ICC Rules are deemed to be incorporated by reference into this Deposit Agreement.

(iii) The arbitral tribunal (the "Tribunal") shall consist of three arbitrators, to be appointed in accordance with the ICC Rules. The chairman of the tribunal must have at least 20 years' experience as a lawyer qualified to practise in a common law jurisdiction within the Commonwealth (as constituted on 12 May 2005), and each other arbitrator must have at least 20 years' experience as a qualified lawyer.

(iv) If any Share Dispute raises issues which are substantially the same as or connected with issues raised in a Share Dispute which has already been referred to arbitration (an "Existing Share Dispute") or arises out of substantially the same facts as are the subject of an Existing Share Dispute (a "Related Share Dispute"), then the Tribunal appointed or to be appointed in respect of any such Existing Share Dispute shall also be appointed as the Tribunal in respect of any Related Share Dispute, save where the Tribunal considers such appointment would be inappropriate.

(v) Where, pursuant to the above provisions, the same Tribunal has been appointed in relation to two or more Related Share Disputes, the Tribunal may order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the Tribunal thinks fit.

(vi) The Tribunal shall have power to make such directions and any interim, partial or final awards as it considers just and desirable. The Tribunal, upon the request of a party to a Share Dispute, or another party which itself wishes to be joined in any reference to arbitration commenced in accordance with this Clause, may join any party to the reference to arbitration proceedings and may make a single, final award determining all Share Disputes between them.

(vii) Each of the parties to the Deposit Agreement hereby agrees to be joined to any reference to arbitration proceedings in relation to any Share Dispute at the request of a party to that Share Dispute, and to accept the joinder of a party requesting to be joined pursuant to this paragraph (14).

(viii) The place of the arbitration shall be The Hague, The Netherlands. The language of the arbitration shall be English.

(ix) Each person hereby waives, as far as permitted by law: (a) any right under the laws of any jurisdiction to apply to any court of law or other judicial authority to determine any preliminary point of law, and/or (b) any right he or she may otherwise have under the laws of any jurisdiction to appeal or otherwise challenge the award, ruling or decision of the Tribunal.

(x) The governing law applicable to such Share Dispute, including the submission to arbitration and written arbitration agreement contained in or evidenced by the Articles, shall be the substantive law of England.

(xi) If any court of competent jurisdiction or other competent authority including for the avoidance of doubt, a court or authority in any jurisdiction which is not a signatory to the New York Convention in any jurisdiction determines that this arbitration provision is invalid or unenforceable in relation to any Share Dispute, the Company and the Holder or owner of interests in ADSs, in each case, irrevocably agree that any related proceeding, suit or action can only be brought in the courts of England and Wales and the governing law applicable to such proceedings shall be the substantive law of England.

**Description of Senior Debt Securities**

As of December 31, 2021, Shell International Finance B.V. ("Shell Finance") had the following series of senior debt securities (the "Senior Debt Securities") registered pursuant to Section 12(b) of the Securities Exchange Act and listed on the New York Stock Exchange, all of which are guaranteed by the Company. The following series of Senior Debt Securities were issued under the 2006 Indenture:

Exhibit Q

| Series of Senior Debt Securities (interest rate) | Principal | Interest Payment Dates (in arrear) | Date of Issuance | Maturity Date | Prospectus Supplement |
|---|---|---|---|---|---|
| 0.375% Guaranteed Notes due 2023 | $1,000,000,000 | March 15 and September 15 of each year | September 15, 2020 | September 15, 2023 | Prospectus Supplement dated September 10, 2020 |
| 3.5% Guaranteed Notes due 2023 | $1,000,000,000 | May 13 and November 13 of each year* | November 13, 2018 | November 13, 2023 | Prospectus Supplement dated November 7, 2018 |
| Floating Rate Guaranteed Notes due 2023 | $500,000,000 | February 13, May 13, August 13 and November 13 of each year* | November 13, 2018 | November 13, 2023 | Prospectus Supplement dated November 7, 2018 |
| 2% Guaranteed Notes due 2024 | $1,250,000,000 | May 7 and November 7 of each year* | November 7, 2019 | November 7, 2024 | Prospectus Supplement dated November 4, 2019 |
| 3.25% Guaranteed Notes due 2025 | $2,750,000,000 | May 11 and November 11 of each year* | May 11, 2015 | May 11, 2025 | Prospectus Supplement dated May 6, 2015 |
| 2.5% Guaranteed Notes due 2026 | $1,000,000,000 | March 12 and September 12 of each year* | September 12, 2016 | September 12, 2026 | Prospectus Supplement dated September 7, 2016 |
| 2.875% Guaranteed Notes due 2026 | $1,750,000,000 | May 10 and November 10 of each year* | May 10, 2016 | May 10, 2026 | Prospectus Supplement dated May 5, 2016 |
| 3.875% Guaranteed Notes due 2028 | $1,500,000,000 | May 13 and November 13 of each year* | November 13, 2018 | November 13, 2028 | Prospectus Supplement dated November 7, 2018 |
| 2.375% Guaranteed Notes due 2029 | $1,500,000,000 | May 7 and November 7 of each year* | November 7, 2019 | November 7, 2029 | Prospectus Supplement dated November 4, 2019 |
| 2.75% Guaranteed Notes due 2030 | $1,000,000,000 | April 6 and October 6 of each year | April 6, 2020 | April 6, 2030 | Prospectus Supplement dated April 1, 2020 |
| 2.75% Guaranteed Notes due 2030 | $750,000,000 | April 6 and October 6 of each year | September 15, 2020 | April 6, 2030 | Prospectus Supplement dated September 10, 2020 |
| 4.125% Guaranteed Notes due 2035 | $1,000,000,000 | May 11 and November 11 of each year* | May 11, 2015 | May 11, 2035 | Prospectus Supplement dated May 6, 2015 |
| 6.375% Guaranteed Notes due 2038 | $2,750,000,000 | June 15 and December 15 | December 11, 2008 | December 15, 2038 | Prospectus Supplement dated December 8, 2008 |
| 5.5% Guaranteed Notes due 2040 | $1,000,000,000 | March 25 and September 25 of each year* | March 25, 2010 | March 25, 2040 | Prospectus Supplement dated March 18, 2010 |
| 2.875% Guaranteed Notes due 2041 | $500,000,000 | May 26 and November 26 of each year | November 26, 2021 | November 26, 2041 | Prospectus Supplement dated November 22, 2022 |
| 3.625% Guaranteed Notes due 2042 | $1,500,000,000 | February 21 and August 21 of each year* | August 21, 2012 | August 21, 2042 | Prospectus Supplement dated August 14, 2012 |
| 4.55% Guaranteed Notes due 2043 | $1,250,000,000 | February 12 and August 12 of each year | August 12, 2013 | August 12, 2043 | Prospectus Supplement dated August 7, 2013 |
| 4.375% Guaranteed Notes due 2045 | $3,000,000,000 | May 11 and November 11 of each year* | May 11, 2015 | May 11, 2045 | Prospectus Supplement dated May 6, 2015 |
| 3.75% Guaranteed Notes due 2046 | $1,250,000,000 | March 12 and September 12 of each year* | September 12, 2016 | September 12, 2046 | Prospectus Supplement dated September 7, 2016 |
| 4.00% Guaranteed Notes due 2046 | $2,250,000,000 | May 10 and November 10 of each year* | May 10, 2016 | May 10, 2046 | Prospectus Supplement dated May 5, 2016 |
| 3.125% Guaranteed Notes due 2049 | $1,250,000,000 | May 7 and November 7 of each year* | November 7, 2019 | November 7, 2049 | Prospectus Supplement dated November 4, 2019 |
| 3.25% Guaranteed Notes dues 2050 | $1,250,000,000 | April 6 and October 6 of each year | April 6, 2020 | April 6, 2050 | Prospectus Supplement dated April 1, 2020 |
| 3.00% Guaranteed Notes due 2051 | $1,000,000,000 | May 26 and November 26 of each year | November 26, 2021 | November 26, 2051 | Prospectus Supplement dated November 22, 2022 |

* Subject to the Day Count Convention.

Each of the Senior Debt Securities listed above constitutes a separate series of Senior Debt Securities under the 2006 Indenture. The Senior Debt Securities listed in the table above were issued pursuant to an effective registration statement and a related prospectus and prospectus supplement setting forth the terms of the respective Senior Debt Securities.

### Description of Certain Provisions contained in the Senior Debt Securities

The terms of the Senior Debt Securities include those stated in the 2006 Indenture, the applicable form of debt security and those terms made part of the 2006 Indenture by reference to the U.S. Trust Indenture Act of 1939, as amended. The summary below describes some of the general terms and provisions of our Senior Debt Securities and is subject to, and qualified in its entirety by reference to the 2006 Indenture filed as Exhibit 4.3 to the Registration Statement on Form F-3ASR, filed with the Securities and Exchange Commission on December 12, 2017 (File No. 333-222005), the prospectus supplement (as listed in the table above) relating to each Senior Debt Security and the form of the instrument representing each Senior Debt Security. Certain terms, unless otherwise defined here, have the same meaning given to them in the 2006 Indenture.

### General

The 2006 Indenture does not limit the amount of future Senior Debt Securities that may be issued under the indenture, the amount of other unsecured debt or other securities the Company or the Issuer may issue. The Senior Debt Securities are not secured by any assets or property of the Company or any of its subsidiaries or affiliates.

### Interest

### Payment

Payments of principal and interest on the Senior Debt Securities are made in U.S. dollars at the office of the trustee and any paying agent. At the option of the Company or Shell Finance, as applicable, however, payments may be made by wire transfer for global debt securities or by check mailed to the address of the person entitled to the payment as it appears in the security register.

Interest payments are made to the person in whose name the Senior Debt Security is registered at the close of business on the record date for the interest payment.

If the principal of or any premium or interest on or additional amounts with respect to a series of Senior Debt Securities is payable on a day that is not a business day, the payment will be made on the following business day.

### Floating Rate Interest - LIBOR

The interest rate for the two series of floating rate notes is reset quarterly on the first day of each interest period *at the* U.S. dollar *London Interbank Offered Rate ("LIBOR"), or,* in the case of the 2023 notes, any Alternative Rate or Successor Rate, plus a fixed percentage or an Adjustment Spread.

Deutsche Bank Trust Company Americas, acting as Calculation Agent, determines the floating interest rate for each floating rate interest period by reference to the then-current three -month LIBOR on the applicable interest determination date.

All calculations made by Deutsche Bank Trust Company Americas for the purposes of calculating the Interest Rate on the floating notes shall be conclusive and binding on the holders of the floating notes, the Company, Shell International Finance B.V. and the trustee, Deutsche Bank Trust Company Americas, absent manifest error.

### Calculation of LIBOR

With respect to any Interest Determination Date, the U.S. dollar LIBOR will be the rate for deposits in U.S. dollars having a maturity of three months commencing on the Interest Reset Date that appears on the designated LIBOR page as of 11:00 a.m., London time, on that Interest Determination Date. If no rate appears, U.S. dollar LIBOR, in respect of that Interest Determination Date, will be determined as follows: the Calculation Agent will request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Calculation Agent (after consultation with us), to provide the Calculation Agent with its offered quotation for deposits in U.S. dollars for the period of three months, commencing on the Interest Reset Date, to prime banks in the London interbank market at approximately 11:00 a.m., London time, on that Interest Determination Date and in a principal amount that is representative for a single transaction in U.S. dollars in that market at that time. If at least two quotations are provided, then U.S. dollar LIBOR on that Interest Determination Date will be the arithmetic mean of those quotations. If fewer than two quotations are provided, then U.S. dollar LIBOR on the Interest Determination Date will be the arithmetic mean of the rates quoted at approximately 11:00 a.m., New York City time, on the Interest Determination Date by three major banks in The City of New York selected by the Calculation Agent (after consultation with us) for loans in U.S. dollars to leading European banks, having a three-month maturity and in a principal amount that is representative for a single transaction in U.S. dollars in that market at that time; provided, however, that if the banks selected by the Calculation Agent are not providing quotations in the manner described by this sentence, U.S. dollar LIBOR determined as of that Interest Determination Date will be U.S. dollar LIBOR in effect on that Interest Determination Date.

The designated LIBOR page is the Reuters screen "LIBOR01", or any successor service for the purpose of displaying the London interbank rates of major banks for U.S. dollars. The Reuters screen "LIBOR01" is the display designated as the Reuters screen "LIBOR01", or such other page as may replace the Reuters screen "LIBOR01" on that service or such other service or services as may be denominated by the ICE Benchmark Administration Limited (the "IBA") (or any successor administrator of LIBOR) for the purpose of displaying London interbank offered rates for U.S. dollar deposits.

### Successor or Alternative Rate, With Respect to 2023 Floating Rate Notes

For purposes of the 2023 floating rate notes, if Shell Finance determines in its sole discretion that a Benchmark Event has occurred in relation to U.S. dollar LIBOR when any rate of interest (or any component part thereof) remains to be determined by reference to U.S. dollar LIBOR, then Shell Finance will use its commercially reasonable efforts to appoint and consult with an Independent Adviser, as soon as reasonably practicable, with a view to Shell Finance's determining a Successor Rate or, if none, an Alternative Rate and, in either case, any Adjustment Spread and any Benchmark

Exhibit Q

Amendments. An Independent Adviser appointed in such circumstances will act in good faith as an expert and (in the absence of bad faith or fraud) shall have no liability whatsoever to Shell Finance, the Calculation Agent, the trustee, the paying agents or the holders of the 2023 floating rate notes for any determination made by it or for any advice given to Shell Finance in connection with any determination made by Shell Finance, pursuant to these provisions.

If Shell Finance, following consultation with the Independent Adviser and acting in good faith and in a commercially reasonable manner, determines that (i) there is a Successor Rate, then such Successor Rate shall (subject to adjustment as provided below) subsequently be used in place of U.S. dollar LIBOR to determine the rate of interest (or the relevant component part thereof) for all future payments of interest on the 2023 floating rate notes (subject to these LIBOR discontinuation provisions); or (ii) there is no Successor Rate but that there is an Alternative Rate, then such Alternative Rate shall (subject to adjustment as provided below) subsequently be used in place of U.S. dollar LIBOR to determine the rate of interest (or the relevant component part thereof) for all future payments of interest on the 2023 floating rate notes (subject to these LIBOR discontinuation provisions). If Shell Finance is unable to appoint an Independent Adviser, or the Independent Adviser appointed by Shell Finance is unable to advise Shell Finance in connection with its determination of a Successor Rate or an Alternative Rate, Shell Finance (acting in good faith and in a commercially reasonable manner) may determine a Successor Rate or, if there is no Successor Rate, an Alternative Rate.

If Shell Finance, following consultation with the Independent Adviser, determines in its sole discretion (i) that an Adjustment Spread is required to be applied to the Successor Rate or the Alternative Rate (as the case may be) and (ii) the quantum of, or a formula or methodology for determining, such Adjustment Spread, then such Adjustment Spread shall be applied to the Successor Rate or the Alternative Rate (as the case may be). If Shell Finance, following consultation with the Independent Adviser, is unable to determine (acting in good faith and in a commercially reasonable manner) the quantum of, or a formula or methodology for determining, such Adjustment Spread, then such Successor Rate or Alternative Rate (as applicable) will apply without an Adjustment Spread.

If any Successor Rate, Alternative Rate or Adjustment Spread is determined in accordance with the terms of the 2023 floating rate notes or the 2006 Indenture and Shell Finance, following consultation with the Independent Adviser, determines (i) that amendments to the terms of the 2023 floating rate notes or the 2006 Indenture are necessary to ensure the proper operation of such Successor Rate, Alternative Rate and/or Adjustment Spread (such amendments, the "Benchmark Amendments") and (ii) the terms of the Benchmark Amendments, then Shell Finance shall, subject to giving notice thereof to the trustee, the Calculation Agent and the holders of the 2023 floating rate notes, in each case, as provided in the 2006 Indenture, without any requirement for the consent or approval of holders of the 2023 floating rate notes, amend the terms of, the 2023 floating rate notes and/or the 2006 Indenture to give effect to such Benchmark Amendments with effect from the date specified in such notice. In connection with any such amendment in accordance with these provisions, Shell Finance shall comply with the rules of the New York Stock Exchange or any stock exchange on which the Notes are then-listed or admitted to trading.

Shell Finance will promptly provide notice to the Calculation Agent, the trustee, the paying agents and, in accordance with notice requirements set forth in the 2006 Indenture, the holders of the 2023 floating rate notes of any Successor Rate, Alternative Rate, Adjustment Spread and the specific terms of any Benchmark Amendments, determined pursuant to the terms of the 2023 floating rate notes and the 2006 Indenture. Such notice shall be irrevocable and shall specify the effective date of the Benchmark Amendments, if any.

### Consolidation, Merger and Sale of Assets; Assumption

The 2006 Indenture generally permits a consolidation, merger or similar transaction involving the Company or Shell Finance. It also permits the Company or Shell Finance, as applicable, to transfer or dispose of all or substantially all of their assets. Each of the Company and Shell Finance has agreed, however, that it will not consolidate with or merge into any entity (other than, with respect to Shell Finance, the Company) or transfer or dispose of all or substantially all of its assets to any entity (other than, with respect to Shell Finance, the Company) if, immediately after giving effect to such transaction or transactions, an event of default, or an event that, after notice or lapse of time or both, would become an event of default, has occurred and is continuing; and unless:

> it is the continuing corporation; or

> if it is not the continuing corporation, the resulting entity or transferee assumes the performance of its covenants and obligations under the 2006 Indenture and, in the case of the Company or Shell Finance as issuer, the due and punctual payments on the Senior Debt Securities or, in the case of the Company with respect to the Senior Debt Securities of Shell Finance, the performance of the related guarantee.

Additionally, in the event that any entity shall become the owner of 100% of the voting stock of the Company, such entity may, but is not obligated to, assume the performance of the Company's covenants and obligations under the 2006 Indenture, either as issuer and/or as guarantor for the Senior Debt Securities of Shell Finance (a "Voluntary Assumption").

Upon any such consolidation, merger or similar transaction or asset transfer or disposition involving the Company or Shell Finance, or any such Voluntary Assumption, the resulting entity, transferee or assuming entity, as applicable, will be substituted for the Company or Shell Finance, as applicable, under the 2006 Indenture and Senior Debt Securities. The Company or Shell Finance, as applicable, will thereupon be released from the 2006 Indenture.

### Events of Default

The following are events of default with respect to each series of Senior Debt Securities:

> failure to pay interest or any additional amounts on that series of Senior Debt Securities for 30 days when due;

> failure to pay principal of or any premium on that series of Senior Debt Securities for 14 days when due;

> failure to redeem or purchase Senior Debt Securities of that series for 14 days when required;

failure to comply with any covenant or agreement in that series of Senior Debt Securities for 90 days after written notice by the trustee or by the holders of at least 25% in principal amount of the outstanding Senior Debt Securities issued under that indenture that are affected by that failure;

specified events involving bankruptcy, insolvency or reorganization of the Company and, with respect to Shell Finance's Senior Debt Securities, the Company or Shell Finance; and

any other event of default provided for that series of Senior Debt Securities in the applicable prospectus supplement.

A default under one series of Senior Debt Securities or any other agreement to which the Company or Shell Finance is a party will not be a default under another series of Senior Debt Securities.

If an event of default for any series of Senior Debt Securities occurs and is continuing, Deutsche Bank Trust Company Americas or the holders of at least 25% in principal amount of the outstanding Senior Debt Securities of the series affected by the default may declare the principal of and all accrued and unpaid interest on those Senior Debt Securities to be due and payable. The holders of a majority in principal amount of the outstanding Senior Debt Securities of the series affected by the default may in some cases rescind this accelerated payment requirement.

A holder of a Senior Debt Security of any series may pursue any remedy only if:

the holder gives the trustee written notice of a continuing event of default for that series;

the holders of at least 25% in principal amount of the outstanding Senior Debt Securities of that series make a written request to Deutsche Bank Trust Company Americas to pursue the remedy;

the holders offer to Deutsche Bank Trust Company Americas indemnity satisfactory to it;

Deutsche Bank Trust Company Americas fails to act for a period of 60 days after receipt of the request and offer of indemnity; and

during that 60-day period, the holders of a majority in principal amount of the Senior Debt Securities of that series do not give the trustee a direction inconsistent with the request.

This provision does not, however, affect the right of a holder of a Senior Debt Security to sue for enforcement of any overdue payment.

Holders of a majority in principal amount of the outstanding Senior Debt Securities may direct the time, method and place of:

conducting any proceeding for any remedy available to Deutsche Bank Trust Company Americas; and

exercising any trust or power conferred on Deutsche Bank Trust Company Americas relating to or arising as a result of an event of default.

The 2006 Indenture requires the Company and Shell Finance to file each year with Deutsche Bank Trust Company Americas a written statement as to their compliance with the covenants contained in the indenture.

***Modification and Waiver***

The 2006 Indenture may be amended or supplemented if the holders of a majority in principal amount of the outstanding Senior Debt Securities of all series issued that are affected by the amendment or supplement (acting as one class) consent to it. Without the consent of the holder of each Senior Debt Security affected, however, no modification may:

reduce the amount of Senior Debt Securities whose holders must consent to an amendment, supplement or waiver;

reduce the rate of or change the time for payment of interest on the Senior Debt Security;

reduce the principal of the Senior Debt Security or change its stated maturity;

reduce any premium payable on the redemption of the Senior Debt Security or change the time at which the Senior Debt Security may or must be redeemed;

change any obligation to pay additional amounts on the Senior Debt Security;

make payments on or with respect to the Senior Debt Security payable in currency other than as originally stated in the Senior Debt Security, except as permitted under "Redenomination" below;

impair the holder's right to institute suit for the enforcement of any payment on or with respect to the Senior Debt Security;

make any change in the percentage of principal amount of Senior Debt Securities necessary to waive compliance with certain provisions of the 2006 Indenture or to make any change in the provision related to modification;

modify the provisions relating to the subordination of any of the Senior Debt Securities in a manner adverse to the rights of holder of that security in any material respect; or

waive a continuing default or event of default regarding any payment on or with respect to the Senior Debt Securities.

Any provision of the 2006 Indenture may be amended without the consent of any holders of Senior Debt Securities in certain circumstances, including:

> to cure any ambiguity, omission, defect or inconsistency;

> to comply with the sections of the 2006 Indenture governing when the Company or Shell Finance may merge (or consummate a similar transaction), transfer their assets or substitute obligors, including any assumption of the obligations of Shell Finance under any series of Senior Debt Securities by the Company or any other subsidiary of the Company or any Voluntary Assumption;

> to provide for uncertificated Senior Debt Securities in addition to or in place of certificated Senior Debt Securities; provided, however, that the uncertificated Senior Debt Securities are issued in a registered form for purposes of Section 163(f) of the Internal Revenue Code of 1986, as amended (the "Code") or in such a manner that such uncertificated Senior Debt Securities are described in Section 163(f)(2)(B) of the Code;

> to provide any security for, any guarantees of or any additional obligors on any series of Senior Debt Securities or the related guarantees;

> to comply with any requirement to effect or maintain the qualification of the 2006 Indenture under the Trust Indenture Act of 1939, as amended;

> to add covenants that would benefit the holders of any Senior Debt Securities or to surrender any rights the Company or Shell Finance have under the 2006 Indenture;

> to add events of default with respect to any Senior Debt Securities;

> to establish the form or terms of securities of any series as permitted by the 2006 Indenture;

> to supplement any of the provisions of the 2006 Indenture to such extent as shall be necessary to permit or facilitate the defeasance and discharge of any series of securities pursuant to the indenture; provided, however, that any such action shall not adversely affect the interest of the holders of securities of such series or any other series of securities in any material respect;

> to provide for the appointment of a successor trustee with respect to the securities of one or more series or to provide for the administration of the trusts under the 2006 Indenture by more than one trustee; and

> to make any change that does not adversely affect the rights of holders of any outstanding Senior Debt Securities of any series issued under that indenture.

The holders of a majority in principal amount of the outstanding Senior Debt Securities of any series (or, in some cases, all Senior Debt Securities issued under the 2006 Indenture that are affected, voting as one class) may waive any existing or past default or event of default with respect to those Senior Debt Securities. Those holders may not, however, waive any default or event of default in any payment on any Senior Debt Security or compliance with a provision that cannot be amended or supplemented without the consent of each holder affected.

*Defeasance*

If any combination of funds or government securities are deposited with the trustee under an indenture sufficient, in the opinion of an independent firm of certified public accountants, to make payments on the Senior Debt Securities of a series issued under the 2006 Indenture on the dates those payments are due and payable, then, at the option of the Company or Shell Finance, as applicable, either of the following will occur:

> The Company and Shell Finance will be discharged from its or their obligations with respect to the Senior Debt Securities of that series and, if applicable, the related guarantees ("legal defeasance"); or

> The Company and Shell Finance will no longer have any obligation to comply with the merger covenant and other specified covenants under the 2006 Indenture, and the related events of default will no longer apply ("covenant defeasance").

If a series of Senior Debt Securities is defeased, the holders of the Senior Debt Securities of the series affected will not be entitled to the benefits of the 2006 Indenture, except for obligations to register the transfer or exchange of Senior Debt Securities, replace stolen, lost or mutilated Senior Debt Securities or maintain paying agencies and hold moneys for payment in trust. In the case of covenant defeasance, the obligation of the Company or Shell Finance to pay principal, premium and interest on the Senior Debt Securities and, if applicable, the Company guarantees of the payments will also survive.

Unless such defeasance occurs within one year of when the securities would be due and payable or called for redemption, we will be required to deliver to the trustee an opinion of counsel that the deposit and related defeasance would not cause the holders of the Senior Debt Securities to recognize income, gain or loss for U.S. federal income tax purposes. If we elect legal defeasance, that opinion of counsel must be based upon a ruling from the U.S. Internal Revenue Service or a change in law to that effect.

*Substitution of Shell Finance as Issuer*

We may at our option at any time, without the consent of any holders of Senior Debt Securities, cause the Company or any other subsidiary of the Company to assume the obligations of Shell Finance under any series of Senior Debt Securities, provided that the new obligor executes a supplemental indenture in which it agrees to be bound by the terms of those Senior Debt Securities and the relevant indenture. To the extent that the Company is not itself the new obligor, its guarantee shall remain in place after the substitution unless another entity assumes the role of a guarantor in respect of the Senior Debt Securities of Shell Finance following a Voluntary Assumption.

Exhibit Q

*Form, Exchange, Registration and Transfer*

There will be no service charge for any registration of transfer or exchange of the Senior Debt Securities. However, payment of any transfer tax or similar governmental charge payable for that registration may be required.

The Senior Debt Securities of any series are exchangeable for other Senior Debt Securities of the same series, the same total principal amount and the same terms but in different authorized denominations in accordance with the 2006 Indenture. Holders may present Senior Debt Securities for registration of transfer at the office of the Deutsche Bank Trust Company Americas, or any transfer agent the Company or Shell Finance, as applicable, designates. Deutsche Bank Trust Company Americas or the transfer agent will effect the transfer or exchange if its requirements and the requirements of the 2006 Indenture are met.

*Redemption*

*Optional Redemption*

Each series of Senior Debt Securities is redeemable in whole or in part, at the option of Shell Finance at any time or from time to time (or, in the case of the 2023 and 2028 notes, prior to the applicable Par Call Date), at a redemption price equal to the greater of (i) 100% of the principal amount of the series notes being redeemed and (ii) the sum of the present values of the remaining scheduled payments of principal and interest thereon (exclusive of interest accrued and unpaid to the date of redemption) discounted to the redemption date on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus a specified premium for each series of Senior Debt Securities, plus accrued and unpaid interest thereon to the date of redemption.

In the case of the 2023 and 2028 notes, on or after the applicable Par Call Date, each series note will be redeemable in whole or in part, at the option of Shell Finance at any time or from time to time at a redemption price equal to 100% of the principal amount of the series note being redeemed, plus accrued and unpaid interest thereon to the date of redemption.

Notice of any redemption will be mailed at least 30 days but not more than 60 days before the redemption date to each holder of notes to be redeemed.

Unless Shell Finance defaults in payment of the redemption price, and the Company defaults in payment under its guarantee of the notes, on and after the applicable redemption date, interest will cease to accrue on the notes or portions thereof called for redemption.

*Optional Tax Redemption.*

The Company may have the option to redeem the Senior Debt Securities in the two situations described below.

The first situation is where, as a result of a change in, execution of or amendment to any laws or treaties or the official application or interpretation of any laws or treaties, either:

> The Company or Shell Finance are required to pay additional amounts as described later under "Payment of Additional Amounts"; or

> The Company or any of its subsidiaries would have to deduct or withhold tax on any payment to any of the issuers to enable them to make a payment of principal or interest on a Senior Debt Security.

In this case, the Company and Shell Finance can call all, but not less than all, of each individual series of Senior Debt Securities for redemption and early payment. Holders have no right to require the Company and Shell Finance to call any individual series of Senior Debt Securities. If a series of Senior Debt Securities is called, the Company and Shell Finance must pay 100% of the principal amount, any accrued interest, and any additional amounts, if an interest payment through the redemption has not been paid.

Notice of any redemption will be mailed at least 15 days but not more than 60 days before the redemption date to each holder of notes to be redeemed.

This call right applies only in the case of changes, executions or amendments that occur on or after the date specified in the prospectus supplement for the applicable series of Senior Debt Securities.

The Company and Shell Finance do not have the option to redeem if the payment of additional amounts or the deduction or withholding can be avoided by using reasonable measures available.

The second situation is where a person assumes the obligations of the Company or Shell Finance, as described above under "Consolidation, Merger, Sale of Assets, Assumptions" and "Substitution of Shell Finance as Issuer" and is required to pay additional amounts. The Company and Shell Finance have the option to redeem the Senior Debt Securities even if required to pay additional amounts immediately after such assumption (except in the case of a Voluntary Assumption). Additionally, the Company and Shell Finance are not required to use reasonable measures to avoid the obligation to pay additional amounts in this situation. However, the Company and Shell Finance has the option to redeem the securities in the circumstances described above only if a change in, execution of or amendment to any laws or treaties or official application of any law or treaty occurs after such assumption.

*Payment of Additional Amounts*

The government of any jurisdiction where the Company or Shell Finance is resident may require the Company or Shell Finance to withhold amounts from payments on the principal or interest on the notes or any amounts to be paid under the guarantee, as the case may be, for taxes or any other

governmental charges. If a withholding of this type is required, the Company or Shell Finance, as the case may be, may be required to pay a holder an additional amount so that the net amount received will be the amount specified in the note to which the holder is entitled. This also applies to any taxes or governmental charges imposed by any jurisdiction in which a successor to the Company or Shell Finance is resident.

In order for a holder to be entitled to receive the additional amount, the holder must not be resident in the jurisdiction that requires the withholding or deduction. The Company or Shell Finance will not have to pay additional amounts under certain circumstances described in the 2006 Indenture.

### Redenomination

The Company or Shell Finance, as applicable, may without your consent elect that, on the "Redenomination Date" specified in a notice to the trustee, a series of Senior Debt Securities may be redenominated in euro.

### Ranking

The notes and the guarantees constitute unsecured and unsubordinated indebtedness of Shell Finance and the Company, respectively, and rank equally with all other unsecured and unsubordinated indebtedness from time to time outstanding of Shell Finance and the Company, respectively. Because the Company is a holding company, the guarantee effectively ranks junior to any indebtedness of its subsidiaries.

### Guarantee of Shell Finance Senior Debt Securities

The Company fully and unconditionally guarantees on a senior unsecured basis the full and prompt payment of the principal of, any premium and interest on, and any additional amounts which may be payable in respect of each series of Senior Debt Securities when and as the payment becomes due and payable, whether at maturity, upon redemption or declaration of acceleration, or otherwise.

The guarantees provide that in the event of a default in the payment of principal of, any premium and interest on, and any additional amounts which become payable by Shell Finance in respect of a Senior Debt Security, the holder of that Senior Debt Security may institute legal proceedings directly against the Company to enforce the guarantee without first proceeding against Shell Finance. The guarantee of the notes is unsecured and unsubordinated indebtedness of the Company and rank equally with all of its other unsecured and unsubordinated indebtedness from time to time outstanding.

### The Trustee and Paying Agent

Deutsche Bank Trust Company Americas, 60 Wall Street, 16th Floor, New York, New York 10005, Attention: Global Transaction Banking, Trust and Securities Services, act as the Trustee and principal paying agent under the prospectus supplements for each series of Senior Debt Securities and the 2006 Indenture. The Company or Shell Finance, as applicable, may at any time designate additional paying agents or rescind the designation of any paying agent or approve a change in the office through which any paying agent acts.

The Company and Shell Finance may appoint another trustee or a substitute trustee under the 2006 Indenture or appoint an entity qualified under the Trust Indenture Act of 1939 to serve as trustee under the indenture. Deutsche Bank Trust Company Americas has served as trustee, paying agent, auction agent, exchange agent and in similar capacities in transactions involving entities in the Shell Group or relating to the debt or long-term payment obligations of members of the Shell Group. Additionally, Deutsche Bank Trust Company Americas and its affiliates perform certain commercial banking services for us for which they receive customary fees and are lenders under various outstanding credit facilities of subsidiaries of the Company.

If an event of default occurs under the 2006 Indenture and is continuing, the trustee under the indenture will be required to use the degree of care and skill of a prudent person in the conduct of that person's own affairs. The trustee will become obligated to exercise any of its powers under the 2006 Indenture at the request of any of the holders of any Senior Debt Securities issued under that indenture only after those holders have offered the trustee indemnity satisfactory to it.

The 2006 Indenture contains limitations on the right of the trustee, if it becomes a creditor of the Company or, if applicable, the Company or Shell Finance, to obtain payment of claims or to realize on certain property received for any such claim, as security or otherwise. The trustee is permitted to engage in other transactions with the Company and, if applicable, the Company and Shell Finance. If, however, it acquires any conflicting interest, it must eliminate that conflict within 90 days after ascertaining that it has a conflicting interest and after the occurrence of a default under the 2006 Indenture, unless the default has been cured, waived or otherwise eliminated within the 90-day period.

### Governing Law

New York law governs the 2006 Indenture, the Senior Debt Securities and guarantee provided by the Company.

**SHELL PROVIDENT FUND**

**REGULATIONS**

**AND**

**TRUST AGREEMENT**

**Dated as of September 1, 1939**

**REGULATIONS**

**Reflects All Amendments Adopted
Through September 25, 2020**

**TRUST AGREEMENT**

**Reflects All Amendments Adopted
Through September 25, 2020**

**Includes Amendments:**

**PROV 20-1**

PROV 20-1 Restatement FINAL

**SHELL PROVIDENT FUND**

*Index*

**REGULATIONS**

Page

| | | |
|---|---|---:|
| **PREAMBLE** | | **1** |
| | | |
| **REGULATIONS** | | **2** |
| | | |
| **ARTICLE 1** | | **2** |
| GENERAL PROVISIONS | | 2 |
| 1.1 | Fund Name. | 2 |
| 1.2 | Object of Fund. | 2 |
| 1.3 | Section 404(c) Plan. | 2 |
| 1.4 | Due Diligence Responsibility. | 2 |
| 1.5 | Administration. | 2 |
| 1.6 | Remuneration. | 2 |
| 1.7 | Derivation of Assets of the Fund. | 2 |
| | | |
| **ARTICLE 2** | | **2** |
| DEFINITIONS AND CONSTRUCTION | | 2 |
| 2.1 | Definitions. | 2 |
| 2.2 | Affiliated Company Defined. | 21 |
| 2.3 | Headings and References. | 22 |
| 2.4 | Number and Gender. | 22 |
| 2.5 | Construction. | 22 |
| | | |
| **ARTICLE 3** | | **22** |
| MEMBERSHIP PROVISIONS | | 22 |
| 3.1 | Admission to Membership in General. | 22 |
| 3.2 | Termination of Employment; Reemployment. | 22 |
| 3.3 | Member as a Beneficiary. | 22 |
| 3.4 | No Contract of Employment. | 22 |
| | | |
| **ARTICLE 4** | | **22** |
| SERVICE CREDITING | | 22 |
| 4.1 | General Service Crediting Rules. | 22 |
| 4.2 | Service Records; Certain Predecessor Employers. | 23 |
| 4.3 | Service with 1% and 25% Affiliated Companies. | 24 |
| 4.4 | Participation Service Credit for Service with 80% Affiliated Companies. | 24 |
| 4.5 | Service Credit Related to Certain Business Transactions. | 24 |
| 4.6 | Provisions Applicable to Former Leased Employees. | 25 |
| | | |
| **ARTICLE 5** | | **25** |
| MEMBER CONTRIBUTIONS | | 25 |
| 5.1 | Member Contributions in General; Changes to Contributions. | 25 |
| 5.2 | Automatic Contribution Arrangement. | 26 |
| 5.3 | Testing Limitations on Contributions. | 26 |
| 5.4 | Limitations Related to Hardship Withdrawals. | 26 |
| 5.5 | Annual Limits on Member Elective Deferrals and Member After-Tax Contributions. | 26 |
| 5.6 | Timing of Member Contributions; Correction of Delayed Member Contributions and Repayments. | 27 |
| 5.7 | Catch-Up Contributions. | 27 |

**ARTICLE 6**                                                                           **27**
COMPANY CONTRIBUTIONS                                                                    27
  6.1   Company Contributions in General.                       27
  6.2   Contribution Additions for Administration Expenses.     27
  6.3   No Earnings or Profits Required.                        28
  6.4   Deductibility of Contributions.                         28
  6.5   Use of Certain Forfeitures.                             28
  6.6   Contributions to Satisfy Nondiscrimination Requirements. 28
  6.7   Correction of Delayed Company Contributions.            29

**ARTICLE 7**                                                                           **29**
LIMITATION ON CONTRIBUTIONS                                                              29
  7.1   Excess Deferral Limit.                                  29
  7.2   Distribution of Excess Deferral Amounts.                29
  7.3   Annual Additions Limit.                                 30
  7.4   Excess Annual Additions.                                30
  7.5   Notice of Limitation issue.                             30
  7.6   Aggregation of Plans.                                   30

**ARTICLE 8**                                                                           **31**
INVESTMENT FUNDS                                                                         31
  8.1   Authority to Establish Investment Offerings.            31
  8.2   Investment Funds.                                       31
  8.4   Valuation and Accounting.                               31
  8.5   Investment Manager.                                     32
  8.6   Distributions In-Kind.                                  32
  8.7   Managed Accounts.                                       32
  8.8   Brokerage Window.                                       33

**ARTICLE 9**                                                                           **33**
MEMBER DIRECTIONS                                                                        33
  9.1   Investment Directions.                                  33
  9.2   Investment Transfers; Default Funds.                    34
  9.3   Conditions.                                             35
  9.4   Responsibility for Following-up on Investment Direction Execution. 35

**ARTICLE 10**                                                                          **35**
MEMBER WITHDRAWALS                                                                       35
  10.1  General Withdrawal Restrictions and Provisions.               35
  10.2  Withdrawals of Member After-Tax Contributions.                36
  10.3  Age 59½ Withdrawals.                                         36
  10.4  Withdrawals of Prior Plan Vested Match.                       36
  10.5  Withdrawals of Prior Plan Employer Contributions.             36
  10.6  Hardship Withdrawals.                                        36

**ARTICLE 11**                                                                          **38**
LOANS                                                                                    38
  11.1  Eligible Borrowers.                                          38
  11.2  Requests for Loans to the Plan Administrator.                 38
  11.3  Administration of the Loan Program.                          38
  11.4  Late or missed payments.                                     41
  11.5  Status.                                                      42
  11.6  Discontinued Payroll Deduction Due to Hardship.               42

**ARTICLE 12**                                                                          **42**
DISTRIBUTIONS AND DESIGNATION OF BENEFICIARY                                             42

12.1    Beneficiary Designation.                                                    42
12.2    Effective Date of Beneficiary Designation.                                  43
12.3    Beneficiary Designation and Spousal Consent.                               43
12.4    Distribution after Termination of Service.                                  44
12.5    Normal Form of Benefit.                                                     44
12.6    Deferrals and VPOs.                                                         44
12.7    QDROs.                                                                      46
12.8    Legal Disability.                                                           46

**ARTICLE 13**                                                                      **46**
DIRECT ROLLOVERS                                                                    46
13.1    Rollovers from the Fund.                                                    46
13.2    Rollovers to the Fund.                                                      46
13.3    Representations.                                                            47

**ARTICLE 14**                                                                      **47**
TRANSFERRED ASSETS                                                                  47
14.1    Right to Transfer Assets to this Fund.                                      47
14.2    Transferred Asset Accounts.                                                 47

**ARTICLE 15**                                                                      **48**
STATEMENT OF ACCOUNT                                                                48
15.1    Periodic Statements.                                                        48
15.2    Amounts Standing to the Credit of a Participant.                            48

**ARTICLE 16**                                                                      **48**
COMMUNICATIONS                                                                      48

**ARTICLE 17**                                                                      **49**
CESSATION OF MEMBER COMPANY PARTICIPATION                                           49

**ARTICLE 18**                                                                      **49**
AMENDMENTS TO TRUST AGREEMENT AND REGULATIONS                                       49

**ARTICLE 19**                                                                      **49**
MEMBER'S NONFORFEITABLE INTEREST                                                    49

**ARTICLE 20**                                                                      **49**
CLAIMS PROCEDURE                                                                    49
20.1    Claim for Benefits.                                                         49
20.2    Appeals.                                                                    50
20.3    Review Board.                                                               50
20.4    Extension for Providing Necessary Information.                              50
20.5    Validating Representative of Claimant.                                      51
20.6    Mandatory Use of Claims Procedure; Waiver of Claims; Forum and Venue.       51
20.7    Plan Administrator.                                                         51

**ARTICLE 21**                                                                      **51**
PLAN ADMINISTRATOR - APPOINTMENT & DUTIES                                           51
21.1    Trustees and Plan Administrator.                                            51
21.2    Allocation of Fiduciary Responsibilities.                                   51
21.3    Powers and Duties of the Plan Administrator.                                52
21.4    No Bond Required.                                                           52
21.5    Delegation of Authorities.                                                  52
21.6    Authorities and Responsibilities of Shell Oil Company.                      53
21.7    Authorities and Responsibilities of the Trustees.                          53

| | | |
|---|---|---:|
| 21.8 | Discretion with Respect to Awards and Settlements. | 53 |
| 21.9 | Scrivener's Error. | 53 |

**ARTICLE 22** | | **53**
TOP-HEAVY RULES | | 53
22.1 | Operation of Article. | 53
22.2 | Determination of Top-Heavy Status. | 53
22.3 | Annual Compensation Limit. | 54
22.4 | Top-Heavy Contribution. | 54
22.5 | Modification of Top-Heavy Rules. | 54

**ARTICLE 23** | | **54**
NONDISCRIMINATION TEST FOR MEMBER CONTRIBUTIONS | | 54
23.1 | ADP Limit. | 54
23.2 | Reduction of Member Elective Deferrals to Comply with ADP Limit. | 55
23.3 | Distribution of Excess Contributions. | 55
23.4 | ACP Limit. | 56
23.5 | Reduction of Member After-Tax Contributions to Comply with ACP Limit. | 57
23.6 | Distribution of Excess Aggregate Contributions. | 57
23.7 | General 401(a)(4) Test. | 58

**ARTICLE 24** | | **58**
MILITARY SERVICE AND HEART ACT REQUIREMENTS | | 58

**ARTICLE 25** | | **59**
MINIMUM DISTRIBUTION REQUIREMENTS | | 59
25.1 | General Rules. | 59
25.2 | Time and Manner of Distribution. | 59
25.3 | Required Minimum Distributions During Participant's Lifetime. | 60
25.4 | Required Minimum Distributions After Participant's Death. | 60
25.5 | Required Minimum Distributions during Distribution Calendar Years. | 61
25.6 | Election to Allow Designated Beneficiaries to Elect 5-Year Rule. | 61
25.7 | Election to Allow Designated Beneficiary Receiving Distributions Under the 5-Year Rule to Elect Life Expectancy Distributions. | 61
25.8 | Special Rules for MRD Suspension in 2009. | 61

**ARTICLE 26** | | **62**
RECOUPMENT | | 62
26.1 | Mistakes in Calculation and/or Payment. | 62
26.2 | Obligation to Cooperate Fully. | 62
26.3 | Offset Authority. | 62
26.4 | Exceptions to Recoupment Efforts. | 62

**ARTICLE 27** | | **62**
ROTH ELECTIVE DEFERRALS | | 62
27.1 | General Application. | 62
27.2 | Separate Accounting. | 63

**ARTICLE 28** | | **63**
ROTH IN-PLAN CONVERSION | | 63
28.1 | Roth-In Plan Conversion in General. | 63
28.2 | Crediting of Roth-In Plan Conversion Amounts. | 63
28.3 | Separate Accounting. | 64
28.4 | Withdrawal Rights. | 64
28.5 | Investment of Roth In-Plan Conversion Amounts. | 64

**SCHEDULE A**                                                                     65
CONTRIBUTING COMPANIES                                                              65

**SCHEDULE B**                                                                     66
SPECIAL RULES APPLICABLE TO CERTAIN GROUPS OF PARTICIPANTS                          66

**SCHEDULE B-1**                                                                   67
TRANSFER OF FUNDS FROM THE SHELL EMPLOYEE STOCK OWNERSHIP PLAN                      67

**SCHEDULE B-2**                                                                   68
ROLLOVER OF DISTRIBUTED FUNDS FROM KERNRIDGE SAVINGS PLAN                           68

**SCHEDULE B-3**                                                                   69
ASSETS TRANSFERRED FROM THE SIEMENS SAVINGS PLAN                                    69

**SCHEDULE B-4**                                                                   70
MERGER OF CRI GROUP SAVINGS AND PROFIT SHARING PLANS                                70

**SCHEDULE B-5**                                                                   71
GRANT OF PAST SERVICE CREDIT TO WILLOW ISLAND EMPLOYEES                             71

**SCHEDULE B-6**                                                                   72
GRANT OF PAST SERVICE CREDIT TO ALLIANCE COMPANY EMPLOYEES                          72

**SCHEDULE B-7**                                                                   73
ASSETS TRANSFERRED FROM THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND
INVESTMENT PLAN AND THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND INVESTMENT
PLAN FOR HOURLY EMPLOYEES                                                           73

**SCHEDULE B-8**                                                                   74
MERGER OF SHELL TRADING SAVINGS PLAN                                                74

**SCHEDULE B-9**                                                                   75
GRANT OF PAST SERVICE CREDIT TO PQS COMPANY EMPLOYEES AND JLI COMPANY
EMPLOYEES                                                                          75

**SCHEDULE B-10**                                                                  76
MERGER OF SHELL PAY DEFERRAL INVESTMENT FUND                                        76

**SCHEDULE B-11**                                                                  77
MERGER OF THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND INVESTMENT PLAN             77

**SCHEDULE B-12**                                                                  78
GRANT OF PAST SERVICE CREDIT TO EAST RESOURCES MANAGEMENT, LLC EMPLOYEES            78

**SCHEDULE B-13**                                                                  79
MERGER OF THE EAST RESOURCES RETIREMENT SAVINGS PLAN                                79

**SCHEDULE B-14**                                                                  80
GRANT OF PAST SERVICE CREDIT TO CHESAPEAKE EXPLORATION, L.L.C. EMPLOYEES            80

**SCHEDULE B-15**                                                                  81
BG Group plc Acquisition and Merger of the BG US Services, Inc. Savings and Investment Plan    81

**SCHEDULE B-16**                                                                  82

| Motiva Joint Venture Separation and Trust-to-Trust Transfer | 82 |
|---|---|
| **SCHEDULE C** | **83** |
| [RESERVED] | 83 |
| **SCHEDULE D** | **84** |
| SPECIAL VESTING PROVISIONS | 84 |
| **SCHEDULE E** | **87** |
| SPECIAL COMPENSATION RULES | 87 |
| **SCHEDULE F** | **88** |
| Part One | 88 |
| Part Two | 88 |
| **SCHEDULE G** | **89** |
| Part One | 89 |
| Part Two | 89 |
| **SHELL PROVIDENT FUND** | **90** |
| TRUST AGREEMENT | 90 |
| **SECTION I** | **90** |
| ADOPTION OF THE PLAN, CREATION OF THE TRUST,  AND DESIGNATION OF THE TRUSTEES | 90 |
| **SECTION II** | **91** |
| ACCEPTANCE OF THE TRUST | 91 |
| **SECTION III** | **91** |
| ADMINISTRATION | 91 |
| **SECTION IV** | **91** |
| CONTRIBUTIONS TO THE FUND | 91 |
| **SECTION V** | **91** |
| DISPOSITION OF FUNDS | 91 |
| **SECTION VI** | **92** |
| INVESTMENT OF FUNDS | 92 |
| **SECTION VII** | **93** |
| DELEGATION OF POWERS | 93 |
| **SECTION VIII** | **93** |
| BORROWING MONEY | 93 |
| **SECTION IX** | **94** |
| COMPENSATION AND EXPENSES | 94 |
| **SECTION X** | **94** |
| DISCHARGE OF DUTIES BY TRUSTEES | 94 |
| **SECTION XI** | **95** |
| COMPROMISE OF CLAIMS | 95 |

**SECTION XII**                                                          **96**
INTERPRETATION OF PROVISIONS:  DETERMINATION OF CONTROVERSIES            96

**SECTION XIII**                                                         **96**
ADDITIONAL COMPANIES                                                     96

**SECTION XIV**                                                          **96**
RESIGNATION OR REMOVAL OF TRUSTEES                                       96

**SECTION XV**                                                           **97**
TERMINATION OF PARTICIPATION IN THE FUND                                 97

**SECTION XVI**                                                          **97**
DISPOSITION OF CORPUS OR INCOME:  DURATION                               97

**SECTION XVII**                                                         **97**
AMENDMENT OF TRUST AGREEMENT AND REGULATIONS                             97

**SECTION XVIII**                                                        **97**
NON-ALIENATION OF RIGHTS                                                 97

**SECTION XIX**                                                          **98**
MERGER OR CONSOLIDATION OF FUND                                          98

**SECTION XX**                                                           **98**
EXECUTION, DELIVERY, AND INVALIDITY                                      98

# SHELL PROVIDENT FUND

## PREAMBLE

The Shell Provident Fund was established by a Trust Agreement dated as of September 1, 1939, and as amended through September 25, 2020, between the Contributing Companies listed in Schedule A to the Regulations and the Trustees designated in the Trust Agreement. Except as otherwise noted, the effective date of the Fund is the date recited in this Preamble, that being the date on which the provisions of these amended Regulations are effective. The provisions of the amended Regulations shall apply to any Participants and Beneficiaries, and to any benefits accruing, on or after such effective date. Benefits which accrued prior to the effective date are as reflected in prior versions of the Regulations, but they shall continue to be subject to the limits contained herein.

# REGULATIONS

## ARTICLE 1

### GENERAL PROVISIONS

**1.1**    **Fund Name.**  The Fund bears the name SHELL PROVIDENT FUND.

**1.2**    **Object of Fund.**  The object of the Fund is to accumulate for the benefit of the Employees who become Members, as hereinafter provided, certain sums primarily as a provision for themselves after retirement from service.

**1.3**    **Section 404(c) Plan.**  The Fund is intended to constitute a plan described in section 404(c) of the Employee Retirement Income Security Act of 1974, as amended, and Title 29 of the Code of Federal Regulations Section 2550.404c-1.  The Fiduciaries of the Fund may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by Participants and Beneficiaries.

**1.4**    **Due Diligence Responsibility.**  The Contributing Companies shall have no responsibility for overseeing or monitoring the Investment Offerings.  The Trustees shall have responsibility for overseeing and monitoring the Investment Offerings which are "designated investment alternatives" under the Plan, within the meaning of Section 404(c) of ERISA and the applicable regulations and other guidance of general applicability issued thereunder.  The Trustees shall have no responsibility for overseeing or monitoring investments that are available through a brokerage window or similar structure or that are otherwise not such "designated investment alternatives."  Each Participant and each Beneficiary shall have the sole responsibility for deciding to buy, sell, or hold Investment Offerings for his or her Account and the sole responsibility for determining whether any Investment Offerings in said Account provide acceptable risk and return characteristics and are otherwise consistent with his or her investment objectives.  Participants and Beneficiaries who fail to give timely investment directions may be deemed to have given directions to invest in the Default Fund in accordance with the further provisions of these Regulations.

**1.5**    **Administration.**  The Fund is a trust administered by Trustees designated by Shell Oil Company and the Plan Administrator designated by the Trustees of the Fund, but the Trustees may act through an Investment Manager when action by an Investment Manager is permitted or specified by these Regulations or by the Trust Agreement.

**1.6**    **Remuneration.**  The Trustees and the Plan Administrator shall not receive any remuneration from the Fund.

**1.7**    **Derivation of Assets of the Fund.**  The assets of the Fund shall be derived from:  (a) the contributions of the Contributing Companies and the payments of the Participants (including rollovers and trust-to-trust transfers) in accordance with the Regulations; and (b) interest, dividends, and other income.

## ARTICLE 2

### DEFINITIONS AND CONSTRUCTION

**2.1**    **Definitions.**  The following terms, as used in the Regulations and Trust Agreement, shall have the meanings set forth below, except that terms used in the Schedules to the Regulations shall have the meanings set forth in the respective Schedules unless the context clearly indicates otherwise.

"**1% Affiliated Company**" shall mean the same as Affiliated Company in Section 2.2 of the Regulations, except that the phrase "more than 1 percent" shall be substituted for the phrase "more than 50 percent."

"**25% Affiliated Company**" shall mean the same as Affiliated Company in Section 2.2 of the Regulations, except that the phrase "more than 25 percent" shall be substituted for the phrase "more than 50 percent."

"**415 Compensation**"

  (a)    shall include:

     (1)    The Member's wages, salaries, fees for professional services and other amounts received for personal services actually rendered in the course of employment with an Employing Company or Affiliated Company to the extent that the amounts are includible in gross income (or to the extent amounts would have been received and includible in gross income but for an election under Sections 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457(b) of the Code (including, but not limited to, commissions paid to salespersons, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, and bonuses);

     (2)    For purposes of (1) above, earned income from sources outside the United States (as defined in Section 911(b) of the Code), whether or not excludable from gross income under Section 911 of the Code or deductible under Section 913 of the Code;

     (3)    Amounts described in Sections 104(a)(3), 105(a), and 105(h) of the Code, but only to the extent that these amounts are includable in the gross income of the Member;

     (4)    Amounts paid or reimbursed by an Employing Company or Affiliated Company for moving expenses incurred by a Member, but only to the extent that these amounts are not deductible by the Member under Section 217 of the Code;

     (5)    The value of a non-qualified stock option (which is an option other than a statutory option as defined in Section 1.421-1(b) of the Treasury Regulations) granted to a Member by the Employing Company or Affiliated Company, but only to the extent that the value of the option is includable in the gross income of the Member for the taxable year in which granted;

     (6)    The amount includable in the gross income of an Member upon making the election described in Section 83(b) of the Code; and

     (7)    Amounts that are includible in the gross income of the Member under the rules of Section 409A of the Code or because the amounts are constructively received by the Member.

  (b)    415 Compensation shall not include items such as:

     (1)    Contributions (other than elective contributions described in Sections 402(e)(3), 408(k)(6), 408(p)(2)(A)(i), or 457(b) of the Code) made by an Employing Company or Affiliated Company to a plan of deferred compensation to the extent that, before the application of the limitations of Section 415 of the Code to that plan, the contributions are not includable in the gross income of the Member for the taxable year in which contributed;

     (2)    Any distributions from a plan of deferred compensation, regardless of whether such amounts are includable in the gross income of the Member when distributed,

with the exception of any amounts received by a Member pursuant to an unfunded non-qualified plan, which amounts may be considered as compensation in the year such amounts are includable in the gross income of the Member;

(3)    Amounts realized from the exercise of a nonstatutory option (which is an option other than statutory option as defined in Section 1.421-1(b) of the Treasury Regulations), or when restricted stock (or property) held by a Member either becomes freely transferable or is no longer subject to a substantial risk of forfeiture as defined within the meaning of Section 83 of the Code and the regulations thereunder;

(4)    Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option;

(5)    Other amounts which receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includable in the gross income of the Member and are not salary reduction amounts that are described in Section 125 of the Code); and

(6)    Other items of remuneration that are similar to items 1 through 4 listed directly above.

(c)    415 Compensation shall not include amounts otherwise includible pursuant to the above but paid after the Member's severance from employment with the Employing Company or Affiliated Company.  Notwithstanding the above, 415 Compensation does not exclude amounts paid to a Member that does not currently perform services for the Employing Company or Affiliated Company because of qualified military service, nor amounts paid as compensation to a Member that is permanently and totally disabled provided that such compensation is continued for a determinable or fixed period for all such disabled Members. Moreover, 415 Compensation shall include payments made after the Member's severance from employment with the Employing Company or Affiliated Company but by the later of 2½ months after the Member's severance from employment with the Employing Company or Affiliated Company, or the end of the year that includes the date of the Member's severance from employment with the Employing Company or Affiliated Company, which are attributable to any of the following:

(1)    payments for services during or outside of the Member's regular working hours (such as overtime pay, commissions, bonuses, or other similar payments) that would have been paid to the Member prior to a severance from employment if the Member had continued in employment with the Employing Company or Affiliated Company;

(2)    payments of unused accrued bona fide sick, vacation, or other leave, that the Member would have been able to use if employment had continued with the Employing Company or Affiliated Company; or

(3)    payments received by a Member pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid to the Member at the same time if the Member had continued employment with the Employing Company or Affiliated Company and only to the extent that the payment is includible in the Member's gross income.

(d)    415 Compensation for a year shall not exceed the limit under Section 401(a)(17) of the Code that applies to such year.

Exhibit Q

"**Account**" shall mean the sum of assets credited to a Participant or an Alternate Payee or other Present Interest Beneficiary in Investment Offerings held in the Fund under the terms of the Regulations.

"**Accountholder**," with respect to an Account, shall mean a Participant or an Alternate Payee or other Present Interest Beneficiary with rights of possession over assets in the Account.

"**Accredited Service**" shall mean the period of service described in Article 4 of the Regulations.

"**Active Employee**" shall mean an active Employee of a Contributing Company.

"**Actual Contribution Percentage**," for each Plan Year for a given Eligible Employee, shall mean the ratio (expressed as a percentage) of (a) the amount of Member After-Tax Contributions (excluding amounts as determined under Treasury Regulation 1.401(m)-2(a)(5)) by the Eligible Employee for the Plan Year, to (b) the Eligible Employee's Testing Compensation for such Plan Year.

"**Actual Deferral Percentage**," for each Plan Year for a given Eligible Employee, shall mean the ratio (expressed as a percentage) of (a) the amount of Member Elective Deferrals (excluding amounts as determined under Treasury Regulation 1.401(k)-2(a)(5)) paid to the Fund on behalf of the Eligible Employee for the Plan Year, to (b) the Eligible Employee's Testing Compensation for such Plan Year.

"**ACP Limit**" shall mean the Average Actual Contribution Percentage limitation under Section 23.4 of the Regulations.

"**ADP Limit**" shall mean the Average Actual Deferral Percentage limitation under Section 23.1 of the Regulations.

"**Affiliated Company**" shall have the meaning set out in Section 2.2 of the Regulations.

"**After-Tax Rollover Subaccount**" shall mean that portion of an Account consisting of: (a)(1) after-tax contributions transferred to the Fund in a rollover transaction from one or more Eligible Retirement Plans (other than individual retirement accounts); and (2) after-tax rollover contributions under one or more qualified Eligible Retirement Plans (other than individual retirement accounts) merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Alternate Payee**" shall mean: (a) an "alternate payee," within the meaning of Section 206(d)(3)(K) of ERISA, who is the spouse or former spouse of a Participant; or (b) an individual (1) who would be an "alternate payee," within the meaning of Section 206(d)(3)(K) of ERISA, of a Beneficiary if the Beneficiary were a Participant, and (2) who is the spouse or former spouse of that Beneficiary.

"**Annual Additions**" shall mean the sum for any Plan Year of Contributions to the Fund and employer contributions and employee contributions to other defined contribution plans of the Affiliated Companies; however, it shall not include Restorative Payments allocated to a Member's account.

"**Annual Compensation Limit**" for Plan Years beginning after December 31, 2014, shall mean $265,000 as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code.

"**Automatic Enrollment Date**" shall mean the 45th day following the Member's date of hire or rehire, or such later day that is at least 40 days from the date that the notice for newly hired and rehired Members described in Section 5.2 of the Regulations is generated to such Member.

"**Average Actual Contribution Percentage**" shall mean for a specified group of Eligible Employees, for each Plan Year, the average of the Actual Contribution Percentages calculated separately for each Eligible Employee in such group.

"**Average Actual Deferral Percentage**" shall mean for a specified group of Eligible Employees, for each Plan Year, the average of the Actual Deferral Percentages calculated separately for each Eligible Employee in such group.

"**Base Pay**" shall mean that portion of a Member's Compensation that is not attributable to a variable pay program or an incentive compensation program established and maintained by a Contributing Company.

"**Beneficiary**" shall mean a person who is or may become entitled to all or a portion of an Account by virtue of being (a) designated by the Participant, Alternate Payee, or Present Interest Beneficiary who is the Accountholder and who, in the case of a Participant's designating a non-spousal beneficiary, has obtained the consent of the surviving spouse; (b) the surviving spouse of the Accountholder if there is no person designated by the Participant, Alternate Payee, or Present Interest Beneficiary who is the Accountholder, or if the surviving spouse of a Participant fails to consent to the Participant's designation of a non-spousal beneficiary in the manner provided in Article 12; (c) the estate if there is no person designated by, and no surviving spouse of, the Participant, Alternate Payee, or Present Interest Beneficiary who is the Accountholder; or (d) Alternate Payee of a Participant, Alternate Payee, or Present Interest Beneficiary who is the Accountholder; *provided, however*, that the only Beneficiaries entitled to give investment directions during the life of an Accountholder are Alternate Payees of that Accountholder.

"**Beneficiary Borrower**" shall have the meaning set out in Section 11.4 of the Regulations.

"**Borrowers**" shall mean Participants and Present Interest Beneficiaries eligible to make a loan under the terms of Article 11 of the Regulations.

"**Brokerage Window**" shall mean the self-directed brokerage window or similar structure Investment Offering selected by the Trustees, if any.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company Contributions**" shall mean contributions made to the Fund by the Employing Companies pursuant to Article 6 of the Regulations.

"**Company Contribution Subaccount**" shall mean that portion of a Member's Account consisting of: (a)(1) Company Contributions; (2) company contributions transferred to the Fund in a trust-to-trust transfer from one or more qualified plans that do not allow for in-service distribution of such assets before the Member attains age 59½; (3) company contributions under one or more qualified plans merged into the Fund which plans do not allow for in-service distributions of such assets before the Member attains age 59½; and (b) such Subaccount's allocable portion of net gains and losses.

"**Compensation**" shall mean, with respect to a Member, his net compensation (without taking into account: overtime; extended work week; premium remuneration, including premiums that a Member may receive, if any, as a result of a temporary assignment to a foreign work location; any amounts of host country base salary a Member receives while on an assignment to a foreign work location that are in excess of the Member's U.S./pensionable base salary maintained in the records of the Member's Employing Company; bonuses; special allowances for living expenses, dwelling, medical assistance, or the like; or any transition payment made in connection with the Contributing Companies' 1994-1995 salary programs) and, compensation shall include contributions made by a Contributing Company (or on its behalf by an affiliated corporation as defined within the meaning of Section 1504 of the Code), to a Member's account pursuant to such Member's designation or salary deferral election, with a plan which satisfies the requirements of Section 125, Section 132(f), or Section 401(k) of the Code which plan the Contributing Company may adopt, to the extent such amounts, if not so designated or elected by the Member, would be included in his compensation. Compensation shall not include:

(a)     any amount paid under the Pennzoil-Quaker State Company Change in Control Retention/Severance Plan;

(b)     any amount of severance pay or payments for accrued vacation received after a Member separates from service from the Employer (and any Affiliated Company); or

(c)     any amount of severance pay or payments for accrued vacation received as, or before, a Member separates from service from the Employer (and any Affiliated Company) if such amount is not paid for a period of approved absence from work;

and any such amounts shall be disregarded for all purposes under this Plan. Notwithstanding anything in this Article to the contrary, Compensation of a Member shall include amounts for certain groups of Members as set forth in Schedule E, payments made after December 31, 1994, and prior to January 1, 2003, under the incentive compensation plans as listed in Part One of Schedule G and payments made on or after January 1, 2003, under a variable pay program (sometimes also referred to as an incentive compensation program) established and maintained by a Contributing Company and not listed on Part Two of Schedule G, *provided* the payments were either received before termination of service from all Affiliated Companies or, in the case of payments made on or after September 30, 2003, recorded as soon as administratively feasible following such termination of service, and *provided, further* the payments were not deferred from a prior year. For purposes of the preceding sentence, "**Affiliated Company**" shall be as defined in Section 2.2 of the Regulations without regard to the second sentence of that definition. Compensation shall also include payments for hours in excess of forty hours per week, which payments are related to the 2002 plan year incentive compensation programs of Equilon Enterprises LLC d/b/a Shell Oil Products US (SOPUS), including Equilon Pipeline Company LLC, and Motiva Enterprises LLC, paid in March 2003 to hourly Employees employed by SOPUS, Shell Pipeline Company LP, or Motiva Company, but only to the extent such payments are not otherwise already included as Compensation. Compensation shall also include payments for hours in excess of forty hours per week where such hours are part of an established normal work schedule of more than forty hours per week, paid in March 2004 to hourly Employees then employed at the Port Arthur, Texas and Delaware City, Delaware refineries and related to the 2003 plan year incentive compensation program of Motiva Company, but only to the extent such payments are not otherwise already included in Compensation. Commissions shall be considered a part of a Member's compensation when paid in addition to a fixed basic wage or salary. The compensation of a Member shall also include payments made to him under a disability benefit plan of a Contributing Company, and Contributions shall be based on an amount equivalent to the disability benefit payments the Member would have received had there been no reduction for amounts received under a worker's compensation, or similar law (which, under the terms of any such disability benefit plan, are deducted from the benefit payments under such plan) to the extent permitted by law. Compensation shall not exceed the following: the sum of 415 Compensation and any amount which is contributed by the Contributing Company pursuant to a salary reduction agreement and which is not includable in a Member's gross income by reason of the application of Section 125 of the Code relating to cafeteria plans, Section 132(f)(4) of the Code relating to qualified transportation fringe benefits, or Section 402(e)(3) of the Code relating to cash or deferred arrangements. Compensation, for purposes of determining contributions by or on behalf of a Member whose hourly rate of pay is established at a specified rate solely by reason of being assigned to an established normal work schedule that includes hours in excess of eight (8) hours per workday, shall be determined by application of a factor that will result in such Member's compensation (for such purposes) being the same as if his hourly rate had not been so established. In addition to other applicable limitations set forth in the Fund, and notwithstanding any other provision of the Fund to the contrary, for Plan Years beginning on or after January 1, 1994, the Compensation of each Member taken into account under the Fund for a Plan Year shall not exceed the Annual Compensation Limit for that Plan Year. For purposes of applying the Annual Compensation Limit, payments of Compensation made to a Member during the portion of the Plan Year that such Member was qualified to participate in the Fund are accumulated beginning with the earliest payments of Compensation made, and Member Contributions and Employer Contributions into the Fund will cease at the time that the Annual Compensation Limit is reached for the remainder of the Plan Year.

Exhibit Q

"**Conduit IRA**" shall mean an individual retirement account described in Section 408(a) of the Code, provided that all amounts in said individual retirement account (including earnings) are attributable to rollover contributions received from the Fund or another qualified plan sponsored by an employer that also sponsored the Fund or the Coral Energy Services, LLC Savings Plan at the time the rollover contributions were received by the individual retirement account.

"**Contributing Company**" shall mean Shell Oil Company and the other Contributing Companies that have joined the Fund in accordance with the provisions of the Trust Agreement and the Regulations and, subject to the approval of the Trustees, other Affiliated Companies that may join the Fund.

"**Contribution Addition**" shall mean a contribution to reimburse the Fund for administration expenses where the Plan Administrator, based on all relevant facts and circumstances, requests reimbursement, and the Contributing Company determines the administration expenses are not appropriate for recovery from certain Accounts.

"**Contributions**" shall mean Company Contributions and Member Contributions.

"**Controlled Group Company**" shall mean:  (a) a corporation, with the exception of the Contributing Company, which is a member of a controlled group of corporations (within the meaning of Section 1563(a) of the Code, determined without regard to Sections 1563(a)(4) and (e)(3)(C) thereof) which includes the Contributing Company; (b) any trade or business (whether or not incorporated), with the exception of the Contributing Company, which is under common control (as defined in Section 414(c), as modified by Section 415(h), of the Code and regulations thereunder) with such Contributing Company; (c) any organization (whether or not incorporated), with the exception of the Contributing Company, which is a member of an affiliated service group (as defined in Section 414(m) of the Code) which includes the Contributing Company; and (d) any other entity required to be aggregated with the Contributing Company pursuant to regulations under Section 414(o) of the Code.

"**Cure Period**" shall have the meaning set out in Section 11.4 of the Regulations.

"**Default Fund**," with respect to each Participant who fails to make a valid investment direction or who has no valid investment direction on file, shall mean, except as provided hereinbelow, the Investment Offering in which Contributions, rollovers to the Fund, loan repayments, and restored forfeitures shall be invested based on the Participant's date of birth as designated by the Trustees;  *provided, however,* that (a) the Trustees shall designate an Investment Offering as the Default Fund in the event that a Participant's date of birth is not reflected in the records of the Plan Administrator or is not a credible date of birth and (b) with respect to a Participant with investments in an Investment Offering that merges with a successor fund that is an Investment Offering, the Participant shall be deemed to have a valid investment direction to such successor fund.  Notwithstanding the foregoing, where a court of law or governmental body directs that proceeds from the prosecution or settlement of class action, ERISA, shareholder, or securities litigation or enforcement activities be invested in a certain Investment Offering, that Investment Offering shall be the Default Fund.  Solely for purposes of this definition and the application of the default rules, in the absence of any such direction from a court of law or governmental body, any litigation or enforcement proceeds which are allocated to an Impacted Person

   (*y*) who has taken a total distribution of his account, or

   (*z*) who is a Beneficiary entitled to immediate possession of an account

shall be invested in the Default Fund that corresponds to the Impacted Person's date of birth, unless the Impacted Person is not an individual in which case the proceeds shall be invested in the Default Fund that corresponds to the Participant's date of birth.

"**Derivative Account**" shall mean an Account such as an Alternate Payee's Account or a Beneficiary's Account that is derived from a Participant's Account.

"**Designated Beneficiary**" shall mean the individual who is designated as a Qualified Beneficiary pursuant to Article 12 of the Regulations and is the designated beneficiary under Section 401(a)(9) of the Code and Section 1.401(a)(9)-1, Q&A-4, of the Treasury Regulations.

"**Designated Roth Subaccounts**" shall mean the Member Roth 401(k) Subaccount, Roth Conversion Member Pre-Tax Sources Subaccount, Roth Conversion Restricted Sources Subaccount, Roth Conversion Unrestricted Sources Subaccount, and Roth Rollover Subaccount.

"**Determination Date**" shall mean with respect to any Plan Year, the last day of the preceding Plan Year.

"**Disability Leave**" shall mean a period consisting of a number of consecutive days beginning on the first day of an employer-authorized unpaid leave of absence by reason of disability, as defined by Shell Oil Company.

"**Distributee**" shall mean a Participant; the Participant's surviving spouse; or the Participant's spouse or former spouse who is the Alternate Payee with regard to the interest of the spouse or former spouse, respectively.

"**Distribution Calendar Year**" shall mean a calendar year for which a minimum distribution is required. For distributions beginning before the Member's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Member's required beginning date. For distributions beginning after the Member's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under Section 25.2 of the Regulations.

"**Eligible Employee**" shall mean an Employee who satisfies the eligibility requirements of Section 3.1 of the Regulations, whether or not he participates in the Fund.

"**Eligible Retirement Plan**" shall mean: (a) an individual retirement account described in section 408(a) of the Code; (b) an individual retirement annuity described in section 408(b) of the Code (other than an endowment contract); (c) a qualified trust described in section 401(a) of the Code; (d) an annuity plan described in section 403(a) of the Code; (e) an annuity contract described in Section 403(b) of the Code; or (f) an eligible plan under section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan. The definition of Eligible Retirement Plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the Alternate Payee under a qualified domestic relation order, as defined in Section 414(p) of the Code. For calendar years beginning on and after January 1, 2008, the definition of Eligible Retirement Plan shall also include a Roth IRA. If any portion of an Eligible Rollover Distribution is attributable to withdrawals or distributions from a designated Roth account as defined in Section 402A of the Code, an Eligible Retirement Plan with respect to such portion shall include only another designated Roth account and/or a Roth IRA.

"**Eligible Rollover Distribution**" shall mean any distribution or withdrawal of all or any portion of the balance to the credit of the Distributee or Non-Spousal Beneficiary, except that an Eligible Rollover Distribution does not include: (a) any distribution or withdrawal that is one of a series of substantially equal periodic payments (not less frequently than annually) either made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; (b) any distribution or withdrawal to the extent such distribution or withdrawal is required under section 401(a)(9) of the Code; (c) any distribution or withdrawal which is made upon the hardship of the Distributee; (d) the portion of any distribution or withdrawal that is not includable in gross income for federal income tax purposes (determined without regard to the exclusion for net unrealized appreciation with respect to employer

securities); or (e) any other portion of a distribution or withdrawal to the extent so identified by section 1.402(c)-2 of the Treasury Regulations.   Notwithstanding the above, a portion of a distribution or withdrawal shall not fail to be an Eligible Rollover Distribution merely because the portion consists of after-tax employee contributions that are not includible in gross income; however, such portion may be transferred only to an individual retirement account or annuity described in section 408(a) or (b) of the Code (including a Roth IRA), or to a qualified trust described in Section 401(a) of the Code or an annuity contract described 403(b) of the Code, that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution or withdrawal which is includible in gross income and the portion of such distribution or withdrawal which is not so includible.   Notwithstanding the above, a portion of a distribution or withdrawal from a Designated Roth Subaccount shall be considered an Eligible Rollover Distribution if made to a designated Roth account under an applicable retirement plan described in Section 402A(e)(1) of the Code or to a Roth IRA described in Section 408A of the Code, and only to the extent that the rollover is permitted under the rules of Section 402(c) of the Code.

"**Employee**," except as set forth hereinbelow, shall mean any person in the service of any of the Contributing Companies who receives a regular and stated compensation (other than a retainer) directly from such Contributing Company, *provided, however,* that, Employees shall not include any person employed by any corporation or business entity that is not a Contributing Company hereunder which is merged or liquidated into, or whose assets are acquired by any Contributing Company, unless the Contributing Company, with the consent of Shell Oil Company, designates the employees of such corporation or other business entity, as the case may be, as Employees under the Fund pursuant to written resolutions adopted by such Contributing Company at any time prior to or after such liquidation, merger, or asset acquisition.

The term "Employee" shall not include: (a) a person whose compensation is paid solely in the form of commissions; (b) a non-resident alien; (c) a person who is temporarily employed by a Contributing Company because of a transfer from a foreign Affiliated Company which is not a Contributing Company; (d) a person who is a Leased Employee; (e) a person whose contract of employment or engagement letter or contract for services explicitly states or implicitly provides that the person is not entitled to participate in this Fund, in particular, or the employee benefit plans of one or more Contributing Companies, in general; or (f) a person designated by the relevant Contributing Company as an independent contractor.   In addition to the foregoing, and notwithstanding anything herein to the contrary, a person shall not be treated as an Employee eligible to, among other things, make Member Contributions and receive Company Contributions under the Fund (even if such person is determined to be a common law employee of the Employing Company entitled to service credits for eligibility purposes under the Fund) before the date the Employing Company is required to withhold federal income taxes from the person's pay. "Affiliated Company" for purposes of this paragraph shall be as defined in Section 2.2, except that the phrase "more than 25 percent" shall be substituted for the phrase "more than 50 percent."   In addition to the foregoing, and notwithstanding anything herein to the contrary, the term "Employee" shall not mean any person during any period or periods of time that such person does, or may, actively participate in the Shell Chemical Company Employee Savings Plan for Bargaining Unit Employees (the "Pt Pleasant Plan"); *provided, however,* that the term "Employee" shall include such person from the date his employing Contributing Company reclassifies him as a staff employee up to and including June 1, 2000, so long as he no longer participates actively in such Pt Pleasant Plan during that time, and otherwise meets the definition of Employee.   In addition to the foregoing, and notwithstanding anything herein to the contrary, the term "Employee" shall not mean any person during any period or periods of time that such person is represented by one of those certain bargaining units commonly known as: the Brotherhood of Teamsters, Auto Truck Drivers, Line Drivers, Car Haulers and Helpers, Local No. 70 of Alameda County, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 397 (North East, PA Distribution Center Drivers); Teamsters Local Union #416, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Blue Coral, Cleveland); or Truck Drivers & Chauffeurs Union, Local No. 478, International

Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL (Whippany, NY); or any successors to any of these unions under a collective bargaining agreement with Pennzoil-Quaker State Company d/b/a SOPUS Products or a successor.

An Employee shall cease to be such under this Fund upon termination of his service for any cause whatsoever, *provided, however*, that an Employee shall continue to be treated as such under this Fund during all periods of leave of absence (u) with pay (1) not exceeding one year or (2) in excess of one year where such leave is granted in connection with the Pennzoil-Quaker State Company Change in Control Retention/Severance Plan, (v) without pay due to sickness or disability, (x) due to war or national emergency, (y) in accordance with the military leave policy of his Employing Company, and (z) other Contributing Company authorized leaves of absence.

"**Employer**" shall mean the group of companies comprising an Employing Company and each company which would be a Controlled Group Company with respect to that Employing Company.

"**Employing Company**" shall mean, with respect to a Member, the Contributing Company that employs such Member.

"**Employment Commencement Date**" shall mean the date an individual first performs an Hour of Service for one of the Contributing Companies.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Excess Aggregate Contributions**" shall mean, with respect to any Plan Year, the excess of (a) the aggregate amount of Member After-Tax Contributions actually made by Highly Compensated Employees for such Plan Year, over (b) the maximum amount of such Member After-Tax Contributions permitted under the ACP Limit.

"**Excess Contributions**" shall mean, with respect to any Plan Year, the excess of (a) the aggregate amount of Member Elective Deferrals (excluding Member Catch-Up Contributions) actually made by Highly Compensated Employees for such Plan Year, over (b) the maximum amount of such Member Elective Deferrals permitted under the ADP Limit.

"**Excess Deferral Amount**" shall mean the amount of Member Elective Deferrals that the Participant allocated to the Fund that exceeds the annual limit imposed on the Participant by Section 5.5(a) of the Regulations.

"**Fiduciary**" shall mean each Trustee, the Plan Administrator, and other Employees (except for Members and Beneficiaries to the extent they direct investments in their own Accounts) deemed to be fiduciaries as to this Fund.

"**First Service Spanning Rule**" shall mean the Service Spanning Rule set forth in Section 4.1(e)(1) of the Regulations.

"**Former Member**" shall mean a former Employee who was a Member of the Fund before he terminated his employment and who is still a participant; or, where the context permits, a former Employee who becomes a Participant by electing to have a Valid Direct Rollover Contribution contributed directly to the Fund.

"**Fund**" shall mean the Shell Provident Fund.

"**Hardship Withdrawal**" shall mean a distribution from the Member Roth 401(k) Subaccount, Roth Conversion Member Pre-Tax Sources Subaccount, Member Pre-Tax Subaccount, or Member Catch-Up Subaccount of a Member in accordance with Section 10.6 made on account of an immediate and heavy financial need of the Member that is necessary to satisfy the financial need.

"**Highly Compensated Employee**" shall mean an employee of the Employing Company who was a five-percent owner, as defined in Section 416(i)(1) of the Code, at any time during the "determination year" or the "look-back year;" or had "compensation" from an Employing Company during the look-back year in excess of \$120,000 (as adjusted pursuant to Section 415(d) of the Code) and, if the Employing Company so elects, was in the top-paid group of employees for the look-back year.

The determination of who is a Highly Compensated Employee hereunder, including determinations as to the number and identity of employees in the top-paid group and the compensation considered, shall be made in accordance with the provisions of Section 414(q) of the Code and regulations issued thereunder. An employee is in the top-paid group of employees for any year if such employee is in the group consisting of the top 20 percent of the employees when ranked on the basis of compensation paid during such year. For purposes of determining the number of employees in the top-paid group, employees described in Section 414(q)(5) of the Code and Q&A 9(b) of Section 1.414(q)-1T of the Treasury Regulations are excluded. Employers aggregated under Section 414(b), (c), (m), or (o) of the Code are treated as a single employer. For purposes of this definition, the following terms have the following meanings:

(a)    The "**determination year**" means the Plan Year for which the determination of who is a Highly Compensated Employee is being made.

(b)    The "**look-back year**" means the 12-month period immediately preceding the determination year or, if the Employer so elects in the Plan, the calendar year beginning with or within such 12-month period.

(c)    For purposes of this definition, the term "**compensation**" has the meaning set forth in Section 415(c)(3) of the Code.

The identification of Highly Compensated Employees is subject to further provisions of Section 414(q) of the Code and applicable Department of Treasury regulations. The term "Highly Compensated Employee" shall not include any employee who is a nonresident alien and who receives no earned U.S. source income from the Employer.

"**Hour of Service**" shall mean an hour for which an individual is paid or entitled to payment by the Contributing Companies for the performance of duties (or for which back pay is awarded) provided such hour has not previously been taken into account, except an hour for which a premium rate is paid because such hour is in excess of the maximum workweek applicable to an employee under Section 7(a) of the Fair Labor Standards Act of 1938, as amended, or because such hour is in excess of a bona fide standard workweek or workday. An Hour of Service is performed on the day an Employee Terminates, but not on the first day of a leave of absence.

"**Impacted Persons**," with respect to Investment Offerings or securities in the Royal Dutch Shell Stock Fund which are the subject of class action, ERISA, shareholder, or securities litigation or enforcement activities, shall mean persons who are class members impacted by the allegations giving rise to the litigation or enforcement activity.

"**Inherited IRA**" shall mean an individual retirement plan described in Section 408(a) or (b) of the Code that is established for the purpose of receiving a direct rollover on behalf of a Non-Spousal Beneficiary pursuant to Section 402(c)(11) of the Code. For calendar years beginning on and after January 1, 2009, the definition of Inherited IRA shall also include a Roth IRA that is established for the purpose of receiving a direct rollover on behalf of a Non-Spousal Beneficiary pursuant to Section 402(c)(11) of the Code.

"**Investment Manager**" shall mean a fiduciary (a) who has the power to manage, acquire, or dispose of any assets of the Fund or a portion thereof; (b) who (1) is registered as an investment adviser under the

Investment Advisers Act of 1940, as amended, or under state law, (2) is a bank as defined in that Act, or (3) is an insurance company qualified to perform services described in (a) above under the laws of more than one state; and (c) who acknowledges in writing that he is a fiduciary with respect to this Fund. An Investment Manager shall qualify as such by delivering a written acceptance to the Trustees, and shall be subject to the further conditions of Section VII of the Trust Agreement.

"**Investment Offerings**" shall mean the investment alternatives in which assets of the Fund may be invested.

"**Key Employee**" shall mean shall mean an Employee or former Employee (including any deceased employee) who at any time during the Plan Year that includes the determination date was an officer of the Employer having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for Plan Years beginning after December 31, 2001), a 5-percent owner of the Employer, or a 1-percent owner of the Employer having annual compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code. The determination of who is a key employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

"**Labor Dispute Period**" shall mean a number of consecutive days beginning on the first day, as determined by Shell Oil Company, of a strike, a lockout, or any other similar labor dispute, and ending on the date that the strike, lockout, or any other similar labor dispute is resolved as determined by Shell Oil Company.

"**Leased Employee**" shall mean an individual who satisfies the definition of a leased employee in Section 414(n)(2) of the Code. For this purpose, an individual who has performed services for an Affiliated Company for at least 750 hours during a 12-consecutive-month period which begins on the date the leased employee first completes an Hour of Service with a Contributing Company will be considered to have performed services on a substantially full-time basis for a period of at least one year.

"**Life Expectancy**" shall mean the life expectancy as computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Treasury Regulations.

"**Member**" shall mean an Employee qualified to participate in the Fund pursuant to Section 3.1 or 3.2.

"**Member's Account Balance**," for purposes of the minimum required distribution rules, shall mean the Account balance as of the last valuation date in the calendar year immediately preceding the Distribution Calendar Year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Account balance as of dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The Account balance for the valuation calendar year includes any amounts rolled over or transferred to the Fund either in the valuation calendar year or in the Distribution Calendar Year if distributed or transferred in the valuation calendar year.

"**Member After-Tax Base Pay Election**" shall mean an election to contribute 1% to 25% of Base Pay, in ½% increments, as a Member After-Tax Contribution.

"**Member After-Tax Contributions**" shall mean after-tax contributions other than Roth Elective Deferrals made to the Fund at the election of a Member which contributions represent a percentage of the Compensation the Member earns as a Member in the employ of a Contributing Company during a payroll period; or, where the context so suggests, the accumulated contributions so made to the Fund.

"**Member After-Tax Subaccount**" shall mean that portion of an Account consisting of: (a)(1) Member After-Tax Contributions; (2) participant after-tax contributions transferred to the Fund in a trust-to-trust transfer from one or more qualified plans; and (3) participant after-tax contributions under one

or more qualified plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Member After-Tax Variable Pay Election**" shall mean an election to contribute from 1% to 25% of Variable Pay, in ½% increments, as a Member After-Tax Contribution.

"**Member Catch-Up Contributions**" shall mean Member Elective Deferrals --- in accordance with, and subject to the limitations of, Section 414(v) of the Code --- made to the Fund at the election of a Member who is eligible to make Member Elective Deferrals hereunder and who will attain at least age 50 before the close of the Plan Year. Such contributions shall not be taken into account for purposes of the provisions of the Regulations implementing the required limitations of Sections 402(g) and 415 of the Code.

"**Member Catch-Up Election**" shall mean an election to contribute from 1% to 50% of Base Pay and Variable Pay, in ½% increments, as a Member Catch-Up Contribution; *provided, however*, this election shall only be available to a Member who will attain at least age 50 before the close of the Plan Year. A Member Catch-Up Election will no longer be available as an election under the Fund for any pay period that begins on or after January 1, 2015.

"**Member Catch-Up Subaccount**" shall mean that portion of an Account consisting of: (a)(1) Member Catch-Up Contributions made to the Fund pursuant to a Member Catch-Up Election, (2) catch-up contributions transferred to the Fund in a trust-to-trust transfer from one or more qualified plans, and (3) catch-up contributions under one or more qualified plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Member Contributions**" shall mean Member Elective Deferrals and Member After-Tax Contributions.

"**Member Elective Deferrals**" shall mean Member Pre-Tax Contributions and Member Roth 401(k) Contributions.

"**Member Pre-Tax Base Pay Election**" shall mean an election to contribute from 1% to 50% of Base Pay, in ½% increments, as a Member Pre-Tax Contribution.

"**Member Pre-Tax Contributions**" shall mean pre-tax elective deferrals made to the Fund at the election of a Member which elective deferrals represent a percentage of the Compensation the Member earns as a Member in the employ of a Contributing Company during a payroll period; or, where the context so suggests, the accumulated pre-tax elective deferrals so made to the Fund.

"**Member Pre-Tax Subaccount**" shall mean that portion of an Account consisting of: (a)(1) Member Pre-Tax Contributions; (2) qualified non-elective contributions made to the Fund before June 26, 2009; (3) elective deferrals transferred to the Fund in a trust-to-trust transfer from one or more qualified plans; and (4) elective deferrals under one or more qualified plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Member Pre-Tax Variable Pay Election**" shall mean an election to contribute from 1% to 50% of Variable Pay, in ½% increments, as a Member Pre-Tax Contribution.

"**Member Roth 401(k) Base Pay Election**" shall mean an election to contribute from 1% to 50% of Base Pay, in ½% increments, as a Member Roth 401(k) Contribution.

"**Member Roth 401(k) Contributions**" shall mean Roth Elective Deferrals made to the Fund at the election of a Member which Roth Elective Deferrals represent a percentage of the Compensation the Member earns as a Member in the employ of a Contributing Company during a payroll period; or, where the context so suggests, the accumulated Roth Elective Deferrals so made to the Fund.

"**Member Roth 401(k) Subaccount**" shall mean that portion of an Account consisting of: (a)(1) Member Roth 401(k) Contributions; (2) Roth Elective Deferrals transferred to the Fund in a trust to trust transfer from one or more qualified plans; and (3) Roth Elective Deferrals under one or more qualified plans merged into the Fund including assets transferred into the Fund in connection with the merger of the East Resources Retirement Savings Plan into the Fund on or about November 30, 2012, that were attributable to the "Roth Deferral Account" in the East Resources Retirement Savings Plan; and (b) such Subaccount's allocable portion of net gains and losses.  Prior to January 1, 2015, the Member Roth 401(k) Subaccount was known as Prior Plan ROTH 401(k) Subaccount and meant that portion of the Account consisting of: assets transferred into the Fund in connection with the merger of the East Resources Retirement Savings Plan into the Fund on or about November 30, 2012, that were attributable to the "Roth Deferral Account" in the East Resources Retirement Savings Plan; and such Subaccount's allocable portion of net gains and losses.

"**Member Roth 401(k) Variable Pay Election**" shall mean an election to contribute from 1% to 50% of Variable Pay, in ½% increments, as a Member Roth 401(k) Contribution.

"**Member Secondary Election**" shall mean an election to contribute from 1% to 25% of Base Pay, in ½% increments, or a deemed election of 0% that will apply as provided in Section 5.5(b).  A Member Secondary Election will no longer be available as an election under the Fund for any pay period that begins on or after January 1, 2015.

"**Non-Contributing Company**" shall mean any corporation, trade, or business that is not a Contributing Company.

"**Nonhighly Compensated Employee**" shall mean an employee of a Controlled Group Company who is not a Highly Compensated Employee.  The identification of Nonhighly Compensated Employees is subject to further provisions of Section 414(q) of the Code and applicable Department of Treasury regulations.  The term "Nonhighly Compensated Employee" shall not include any employee who is a nonresident alien and who receives no earned U.S. source income from the employing Controlled Group Company.

"**Non-Key Employee**" shall mean an Employee who is not a Key Employee.

"**Non-Spousal Beneficiary**" shall mean a Qualified Beneficiary, other than an Alternate Payee or the surviving spouse of the Participant, except that a Non-Spousal Beneficiary shall also mean an individual that has not attained 18 years of age but would otherwise meet the requirements of a Qualified Beneficiary.

"**Participant**" shall mean a Member or Former Member.

"**Participation Service**" shall mean a period of service generally used for determining eligibility to receive a Company Contribution of 2.5% (or of 3% for former members of The Alliance Savings Plan) for periods prior to January 1, 2015.  After December 31, 2014, Participation Service shall be used for purposes of Schedule D and such other limited purposes as may be described herein.

"**Payroll Closing Date**" shall mean the last business day of that pay period on which changes that affect the amount of the Employee's paycheck for that pay period, or the credits and debits appearing on the Employee's pay advice for that pay period, can be accepted for processing.

"**Period of Absence**" shall mean a number of consecutive days beginning on the first day of an absence from service from the Contributing Companies (with or without pay) for any reason other than Termination or disability, such as leave of absence (other than disability), vacation, or holiday.

"**Period of Service**" shall mean each period of an individual's Service commencing on his Employment Commencement Date or a Reemployment Commencement Date, if any, and ending on a Severance

from Service Date. For the sole purpose of Participation Service, the Period of Severance shall be treated as a Period of Service if the Service Spanning Rules apply. A Period of Service shall also include any period required to be credited as a Period of Service by federal law, but only under the conditions and to the extent so required by such federal law. Moreover, for purposes of determining the Period of Service, the following applies:

(a)     Except as provided in paragraph (b) below, an individual shall be credited with one month of Service for each calendar month in which he is credited with one or more Hours of Service.

(b)     The crediting method described in paragraph (a) above shall not apply in determining whether or not the Service Spanning Rules apply, and it shall not apply in determining Participation Service.

"**Period of Severance**" shall mean each period of time commencing on an individual's Severance from Service Date and ending on a Reemployment Commencement Date.

"**Permissive Aggregation Group**" shall mean the Required Aggregation Group of plans plus any other qualified plan or plans of the Employer which, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Sections 401(a) and 410 of the Code.

"**Plan**" shall mean the Regulations of the Shell Provident Fund.

"**Plan Administrator**" shall mean the "administrator," within the meaning of Section 3(16)(A)(i) of ERISA, designated by the Trustees pursuant to the Regulations and Trust Agreement.

"**Plan Year**" shall be the calendar year.

"**Preceding Employee**" shall mean an Employee whose most recent prior employer during the Qualifying Period is a 25% Affiliated Company at the time he becomes an Employee of a Contributing Company.

"**Present Interest Beneficiary**" is a surviving spouse, an individual beneficiary at least 18 years of age, or an Alternate Payee, in each case, entitled to immediate possession of all or a part of a Participant's Account as a consequence of the death or divorce of the Member, or entitled to immediate possession of all or a part of a Derivative Account as a consequence of the death or divorce of an individual (other than a Participant) who at the time of such event had a present interest in the Derivative Account.

"**Pre-Tax Rollover Subaccount**" shall mean that portion of an Account consisting of: (a)(1) pre-tax contributions transferred to the Fund in a rollover transaction from one or more Eligible Retirement Plans; and (2) pre-tax rollover contributions under one or more Eligible Retirement Plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Previously Distributed Subaccount**" shall mean that portion of an Account consisting of assets transferred into the Fund in connection with the merger of the Pennzoil-Quaker State Company Savings and Investment Plan into the Fund on or about June 26, 2009, that were attributable to the "Uncashed Checks Account" in the Pennzoil-Quaker State Company Savings and Investment Plan.

"**Prior Plan Company Contribution Subaccount**" shall mean that portion of an Account consisting of: (a)(1) company contributions transferred to the Fund in a trust-to-trust transfer from one or more qualified plans that allow for in-service distributions of such company contributions before the Member attains age 59½; and (2) company contributions under one or more qualified plans merged

into the Fund which plans allow for in-service distributions of such company contributions before the Member attains age 59½ ; and (b) such Subaccount's allocable portion of net gains and losses.

"**Prior Plan Fully Vested Match Subaccount**" shall mean that portion of an Account consisting of: (a)(1) employer matching contributions not subject to a vesting schedule which employer matching contributions were transferred to the Fund in a trust-to-trust transfer from one or more qualified plans; and (2) employer matching contributions not subject to a vesting schedule under one or more qualified plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Prior Plan Scheduled Vesting Match Subaccount**" shall mean that portion of an Account consisting of: (a)(1) employer matching contributions subject to a vesting schedule which employer matching contributions were transferred to the Fund in a trust-to-trust transfer from one or more qualified plans; and (2) employer matching contributions subject to a vesting schedule under one or more qualified plans merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**QNEC Subaccount**" shall mean that portion of an Account consisting of: (a)(1) qualified non-elective contributions made to the Fund on or after June 26, 2009; (2) qualified non-elective contributions transferred to the Fund in a trust-to-trust transfer on or after June 26, 2009, from one or more qualified plans; and (3) qualified non-elective contributions under one or more qualified plans merged into the Fund on or after June 26, 2009; and (b) such Subaccount's allocable portion of net gains and losses.

"**Qualified Beneficiary**" shall mean:

    (a)    an individual who:

        (1)    is named by a Participant as his beneficiary pursuant to Article 12 and is at least 18 years of age (or will attain at least 18 years of age before said beneficiary's respective share of the Participant's account is distributed from the Fund), and is entitled to receive distribution of all or any part of the amount standing to the credit of the Participant upon the death of the Participant; or

        (2)    is the surviving spouse of a deceased Participant; or

        (3)    is an alternate payee, within the meaning of Section 206(d)(3)(K) of ERISA, who is the spouse or former spouse of a Participant; or

    (b)    a private trust that meets all of the following requirements:

        (1)    is valid under state law, or would be but for the fact that there is no corpus;

        (2)    is irrevocable or will, by its terms, become irrevocable upon the death of the Participant;

        (3)    the beneficiary or beneficiaries of the trust are identifiable individuals from the trust instrument; and

        (4)    the beneficiary designation made by the Participant is made in such form as the Plan Administrator may require and the Participant provides such additional information as the Plan Administrator may require, provided that,

            (A)    for any calendar year up to and including the calendar year of the Participant's death, in order to establish that the Participant's spouse is

the sole beneficiary under the trust for purposes of Article 25, the Participant must: (i) provide to the Plan Administrator a list of all of the beneficiaries of the trust (including contingent and remainderman beneficiaries with a description of the conditions of their entitlement) sufficient to establish that the Participant's spouse is the sole beneficiary); (ii) certify that, to the best of the Participant's knowledge, the list of beneficiaries is correct and complete and that the requirements of paragraphs (b)(1), (2) and (3) above are satisfied; (iii) agree to provide corrected certifications to the extent that an amendment changes any information previously certified; and (iv) agree to provide a copy of the trust instrument to the Plan Administrator upon demand;

(B)    for calendar years following the calendar year of the Participant's death, the trustee of the trust instrument, no later than October 31 of the calendar year immediately following the calendar year of the Participant's death, must (i) provide the Plan Administrator with a final list of all of the beneficiaries of the trust (including contingent and remainderman beneficiaries with a description of the conditions on their entitlement) as of September 30 of the calendar year immediately following the calendar year of the Participant's death; (ii) certify that, to the best of the trustee's knowledge, the list of beneficiaries is correct and complete and that the requirements of paragraphs (b)(1), (2), and (3) above are satisfied and (iii) agree to provide a copy of the trust instrument to the Plan Administrator upon demand.

When applying the requirements of paragraph (b)(3) above, the trust instrument need not name the individuals by name so long as the individuals who are to be the beneficiaries are identifiable under the trust instrument. The members of a class of beneficiaries capable of expansion or contraction will be treated as being identifiable if it is possible to identify the class member with the shortest life expectancy.

Nothing in this provision shall be construed to mean that a Qualified Charitable Organization can be a Qualified Beneficiary.

"**Qualified Charitable Organization**" shall have the meaning set forth in Section 12.1 of the Regulations.

"**Qualified Plan**" shall mean a plan other than this Fund that is qualified under section 401(a) of the Code based on the opinion of tax counsel.

"**Qualifying Period**" shall mean the period of time before the Employee became an Employee of a Contributing Company when the Employee was an employee of a 1% Affiliated Company.

"**RDS ADRs**" shall mean Class A American Depositary Receipts of Royal Dutch Shell plc.

"**Reemployment Commencement Date**" shall mean the first date an individual performs an Hour of Service following a Severance from Service Date.

"**Regulations**" shall mean the plan instrument of the Fund.

"**Relevant Rate Group**" shall mean an applicable rate group under Treasury Regulations Section 1.401(a)(4)-8 with the closest rate lower than the rate group for which an adjustment is needed under such regulations.

"**Required Aggregation Group**" shall mean (a) each qualified plan of the Employer in which at least one Key Employee participates, and (b) any other qualified plan of the Employer which enables a plan described in (a) above to meet the requirements of Sections 401(a)(4) or 410 of the Code.

"**Required Beginning Date**," for any Member, shall mean April 1 of the calendar year following the later of: (a) the calendar year in which the Member attains age 70-1/2; or (b) the calendar year in which the Member retires provided that the Member is not a 5-percent owner with respect to the Plan Year ending in the calendar year in which the Member attains age 70-1/2.

"**Restorative Payment**" shall mean payments allocated to a Member's account to restore losses resulting from action (or a failure to act) by a fiduciary that creates a reasonable risk of liability for breach of fiduciary duty under Title I of ERISA or other applicable federal or state law.

"**Roth Conversion Member Pre-Tax Sources Subaccount**" shall mean that portion of an Account consisting of amounts that were part of a Roth In-Plan Conversion pursuant to Article 28 of the Regulations and attributable to amounts distributed from the Subaccounts identified under Section 28.2(c) of the Regulations.

"**Roth Conversion Restricted Sources Subaccount**" shall mean that portion of an Account consisting of amounts that were part of a Roth In-Plan Conversion pursuant to Article 28 of the Regulations and attributable to amounts distributed from the Subaccounts identified under Section 28.2(b) of the Regulations.

"**Roth Conversion Unrestricted Sources Subaccount**" shall mean that portion of an Account consisting of amounts that were part of a Roth In-Plan Conversion pursuant to Article 28 of the Regulations and attributable to amounts distributed from the Subaccounts identified under Section 28.2(a) of the Regulations.

"**Roth Elective Deferral**" shall mean an elective deferral that is (a) designated irrevocably by a participant at the time of the cash or deferred election as a Roth elective deferral that is being made in lieu of all or a portion of the pre-tax elective deferrals the participant is otherwise eligible to make to a qualified retirement plan; and (b) treated by the participant's employer as includible in the participant's income at the time the participant would have received that amount in cash if the participant had not made a cash or deferred election.

"**Roth In-Plan Conversion**" shall mean a distribution from the Distributee's Account (except from the Distributee's Designated Roth Subaccounts) that is directly rolled over to one or more of the Distributee's Designated Roth Subaccounts in the Fund pursuant to Section 402A(c)(4) of the Code and as provided under Article 28 of the Regulations.

"**Roth IRA**" shall mean an individual retirement account that has been designated as a "Roth IRA" as described in Section 408A(b) of the Code.

"**Roth Rollover Subaccount**" shall mean that portion of an Account consisting of: (a)(1) amounts from a designated Roth account as defined in Section 402A of the Code transferred to the Fund in a rollover transaction from one or more Eligible Retirement Plans; and (2) rollover amounts from a designated Roth account as defined in Section 402A of the Code merged into the Fund; and (b) such Subaccount's allocable portion of net gains and losses.

"**Royal Dutch Shell Stock Fund**" shall mean a non-diversified, unitized fund consisting primarily of RDS ADRs and short-term instruments.

"**Second Service Spanning Rule**" shall mean the Service Spanning Rule set forth in Section 4.1(e)(2) of the Regulations.

"**Service**" shall mean the period of an individual's employment as an Employee with a Contributing Company.

"**Service Spanning Rules**" shall mean the First Service Spanning Rule or the Second Service Spanning Rule, whichever is applicable, used for determining when a Period of Severance is treated as a Period of Service, solely for purposes of calculating Participation Service.

"**Severance from Service Date**" shall mean the earliest of the following dates:

    (a)    The first date an individual Terminates his Service following his Employment Commencement Date or following his most recent Reemployment Commencement Date, if any.

    (b)    The 31st day of a number of days (whether or not consecutive) of one or more Labor Dispute Periods during which Period or Periods an individual, who has not incurred a Termination, is absent from service from the Contributing Companies (with or without pay) due to his participation in such labor dispute or disputes.

    (c)    The last day of the first 12 months of a Period of Absence during which period an individual, who has not incurred a Termination, remains absent from service from the Contributing Companies (with or without pay).

    (d)    The last day of the first 12 months of Disability Leave during which Disability Leave an individual who has not incurred a Termination, remains absent from service from the Contributing Companies without pay.

"**Shell Pay Deferral Investment Fund**" shall mean the tax-qualified cash-or-deferred arrangement established on August 1, 1984, and merged into this Fund on or about June 18, 2007.

"**Shell Savings Group Trust**" shall mean the master trust, if any, in which the assets of the Fund are invested.

"**Shell Trading Savings Plan**" shall mean the tax-qualified defined contribution plan established on January 1, 1996, by Affiliated Companies of Shell Oil Company and merged on December 29, 2004, into both this Fund and the Shell Pay Deferral Investment Fund, which plan was formerly known as the "Coral Energy Services, LLC Savings Plan" and the "Coral Energy Resources Services Company Savings Plan."

"**Subaccounts**" shall mean the subaccounts described in Section 8.3 of the Regulations.

"**Terminates**" shall mean resigns, retires, or is discharged from all Contributing Companies, or dies.

"**Termination**" shall mean resignation, retirement, or discharge from all Contributing Companies, or death.

"**Tested Plan Year**" shall mean the Plan Year for which the requirements of Code Section 401(a)(4) are being tested.

"**Testing Compensation**" shall mean 415 Compensation, but excluding any amount in excess of the Annual Compensation Limit.

"**Thrift Fund**" shall mean a fund that invests in high quality, short-term, U.S. dollar-denominated money market securities of domestic and foreign issuers and repurchase agreements.

"**Transferred Assets**" shall mean those assets which are transferred from a Qualified Plan directly to the Fund by the trustee or trustees of the Qualified Plan on behalf of a Member, *provided* that the Qualified Plan from which the assets are transferred provides benefits protected under Section

411(d)(6) of the Code which are also protected by this Fund, or the transfer satisfies one of the exceptions set forth in the Treasury Regulations under Section 411(d)(6) of the Code.

"**Trust Agreement**" shall mean the Trust Agreement between the Trustees and Shell Oil Company and the other Contributing Companies, dated as of the 1st day of September 1939, and as amended from time to time.

"**Trustees**" shall mean the individuals whose names are listed in the Trust Agreement and their successors.

"**Valid Direct Rollover Contribution**" shall mean a direct rollover of an Eligible Rollover Contribution within the meaning of Treasury Regulation Section 1.402(c)-2 and from: (a) a qualified plan described in Section 401(a) or 403(a) of the Code, including after-tax employee contributions; (b) an annuity contract described in Section 403(b) of the Code, including after-tax employee contributions; (c) an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state; and (d) the portion of a distribution from an individual retirement account or annuity described in Section 408(a) or 408(b) of the Code that is eligible to be rolled over and would otherwise be includible in gross income. A Valid Direct Rollover Contribution shall exclude amounts from a Roth IRA account described in Section 408A of the Code; and from a SIMPLE IRA, a Coverdell Education IRA, or a Simplified Employee Pension Plan (SEPP), as described in Section 408 of the Code.

"**Valuation Date**"

      (a)      for purposes of the Top-Heavy rules, shall mean the most recent Valuation Date occurring within a 12-month period ending on the applicable Determination Date; and

      (b)      for all other purposes, shall mean a date on which Accounts under the Fund are valued. On and after June 1, 1996, a Valuation Date shall be any day, other than a Saturday, a Sunday, or a legal holiday, on which the New York Stock Exchange is open for trading, and/or such other dates as may be required by the Trustees. In the case of purchases, redemptions, and/or valuations during periods of extreme market conditions, market closures, or illiquidity, the Valuation Date may be delayed until the later of the day all securities markets resume normal trading or the day sufficient liquidity returns, in the judgment of the Investment Manager.

"**Valuation Period**," on and after June 1, 1996, shall mean each calendar month with Participants' or Beneficiaries' Thrift Accounts to be credited or debited, as the case may be, as of the last Valuation Date of each such month or, if there is no Valuation Date during such month, the last Valuation Date in the month or months immediately prior to such month.

"**Variable Pay**" shall mean that portion of a Member's Compensation that is attributable to a variable pay program or incentive compensation program established and maintained by a Contributing Company.

      **2.2**      **Affiliated Company Defined.** "**Affiliated Company**" shall mean (a) a corporation which is a member of a controlled group of corporations (within the meaning of Section 1563(a) of the Code or any successor statute, determined without regard to Sections 1563(a)(4) and (e)(3)(C) thereof) which includes the Contributing Company, and (b) any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c)) with such Contributing Company. However, for purposes of (a) and (b) in the preceding sentence,

the phrase "more than 50 percent" shall be substituted for the phrase "at least 80 percent" in Section 1563(a)(1) of the Code, including where Section 1563(a) is incorporated in Sections 414(b) and (c) of the Code.

      **2.3**    **Headings and References.**  The headings of Articles and Sections herein are included solely for convenience.  If there is any conflict between such headings and the text of these Regulations, the text shall control.  Unless the context suggest otherwise, Article and Section references are references to these Regulations.

      **2.4**    **Number and Gender.**  Wherever appropriate, words used in the singular shall be considered to include the plural, and words used in the plural shall be considered to include the singular.  Where appearing in the Regulations and Trust Agreement, the masculine gender shall be deemed to include the feminine gender, and the feminine gender shall be deemed to include the masculine gender.

      **2.5**    **Construction.**  It is intended that the Regulations be qualified within the meaning of Sections 401(a), 401(k), and 401(m) of the Code and that the Fund be tax-exempt under Section 501(a) of the Code.  All provisions in the Regulations and Trust Agreement shall be construed in accordance with such intent.

## ARTICLE 3

### MEMBERSHIP PROVISIONS

      **3.1**    **Admission to Membership in General.**  An Employee shall be admitted as a Member on the first day on which the Employee completes his first Hour of Service with a Contributing Company.

      **3.2**    **Termination of Employment; Reemployment.**  An individual who has been admitted as a Member shall, except as otherwise provided, remain a Member until Termination.  Upon reemployment as an Employee, an individual shall be readmitted as a Member on the day on which he completes his first Hour of Service of reemployment with a Contributing Company.

      **3.3**    **Member as a Beneficiary.**  A Participant may also be a Beneficiary.  In such an event, the account the Participant holds as a Beneficiary shall be governed by the rules that apply to Beneficiary accounts.

      **3.4**    **No Contract of Employment.**  The adoption and maintenance of the Fund shall not be deemed to constitute a contract between any of the Contributing Companies and any Member or to be a consideration for, or an inducement or condition of, the employment of any Member.  Nothing herein contained shall be deemed to give any Member the right to be retained in the Service of any of the Contributing Companies or to interfere with the rights of any Employing Company to discharge any Member at any time.

## ARTICLE 4

### SERVICE CREDITING

      **4.1**    **General Service Crediting Rules.**  Subject to the transition rules described below in this Section 4.1, Service after December 31, 2002, will be credited under this Article 4 for purposes of determining Participation Service and Accredited Service except as otherwise expressly provided.  The following rules shall apply:

      (a)    For purposes of determining Participation Service and Accredited Service, an individual shall be credited in an amount equal to his aggregate Periods of Service whether or not such Periods of Service are completed consecutively.

      (b)    If a fractional year within a Period of Service occurs, credit for such fractional year is based as follows:

        (1)     for Accredited Service, on the number of calendar months of Service in such fractional year, taking into account paragraph (a) of the definition of Period of Service, unless such method would result in duplication of service credit or the absence of otherwise allowable service credit, in which case such fractional year is based on the number of full calendar months and any additional days of Service in such fractional year;

        (2)     for Participation Service, only on the number of full calendar months and any additional days of Service in such fractional year,

        (3)     for purposes of this Section 4.1(b), additional days totaling 30 or more shall constitute a full calendar month.

        (c)     There is credit for a one-year Period of Service for each 12-month segment of Period of Service, which begins on the Employment Commencement Date or the most recent Reemployment Commencement Date, if any. A one-year Period of Service shall have the same effect as one year of service with respect to applicable benefits.

        (d)     Except as specifically provided herein, a Member shall not be credited with a year of Accredited Service (or fractions thereof) for service prior to his becoming an Employee of a Contributing Company.

        (e)     For purposes of determining Participation Service, a Period of Severance shall be treated as a Period of Service if either the First Service Spanning Rule or the Second Service Spanning Rule applies.

        (1)     The First Service Spanning Rule applies if an individual Terminates his Service (at a time other than during an absence for any reason other than Termination) and then returns to Service, and his Reemployment Commencement Date is within 12 months of his Severance from Service Date.

        (2)     The Second Service Spanning Rule applies if:

            (A)     an individual is absent from Service for 12 months or less for any reason other than Termination;

            (B)     during such absence the individual Terminates;

            (C)     the individual subsequently returns to Service; and

            (D)     his Reemployment Commencement Date is within 12 months from the day he was first absent from Service for such reason other than Termination, referred to in Section 4.1(e)(2)(A) above.

        **4.2**     **Service Records; Certain Predecessor Employers.** In case of an Employee who is an Employee of a Contributing Company after December 31, 1975, service (whether Accredited or Participation) shall be determined under the rules herein from available Affiliated Company or Contributing Company records. In any case in which a Contributing Company maintains a plan of a predecessor employer, service for such predecessor shall be treated as service for the Contributing Company. In any case in which the Contributing Company maintains a plan which is not the plan maintained by a predecessor employer, service for such predecessor shall, to the extent required

by regulations prescribed by the Secretary of the Treasury, Secretary of Labor, or their delegates, be treated as service for the Contributing Company.

**4.3**     **Service with 1% and 25% Affiliated Companies.** In addition to the service crediting rules set out above, the service crediting rules of this Section 4.3 shall apply.

    (a)     If an Employee is a Preceding Employee, prior service with a 1% Affiliated Company shall be credited to an Employee as Participation Service and Accredited Service, *provided* that a Contributing Company has employed the Employee pursuant to an agreement with the Affiliated Company, and such grant of prior service as Participation Service and as Accredited Service meets the requirements of Treasury Regulation section 1.401(a)(4)-11(d).

    (b)     If an Employee is not a Preceding Employee, prior service with a 25% Affiliated Company shall be credited to an Employee as Participation Service and Accredited Service, *provided* that a Contributing Company has employed the Employee pursuant to an agreement with the Affiliated Company, and such grant of prior service as Participation Service and as Accredited Service meets the requirements of Treasury Regulation section 1.401(a)(4)-11(d).

    (c)     For purposes of this Section 4.3, unless otherwise provided, the ownership level to determine a 25% Affiliated Company and 1% Affiliated Company is based on the time services are provided.

    (d)     This Section 4.3 shall not apply to service performed as a Leased Employee.

**4.4**     **Participation Service Credit for Service with 80% Affiliated Companies.** Service with an Affiliated Company shall be accredited to an Employee as Participation Service; *provided, however*, that for purposes of this Section 4.4, "Affiliated Company" shall be as defined in Section 2.2 without regard to the second sentence thereof which substitutes the phrase "more than 50 percent" for the phrase "at least 80 percent."

**4.5**     **Service Credit Related to Certain Business Transactions.**

    (a)     Where an employee of a Non-Contributing Company becomes an Employee of a Contributing Company after December 31, 1990, as a result of an asset or stock acquisition, merger, reorganization or other similar transaction, prior service credit may be granted pursuant to an agreement between one or more Contributing Companies and the Non-Contributing Company, as follows:

    (1)     a maximum of five (5) years prior service with the Non-Contributing Company shall be credited to an Employee as Participation Service and Accredited Service only where the following conditions are satisfied:

    (A)     a Contributing Company has employed the Employee pursuant to an agreement with the Non-Contributing Company;

    (B)     with respect to each separate acquisition, merger, reorganization or other similar transaction, prior service credit is uniformly granted to all individuals becoming Employees pursuant to this sentence; and

    (C)     the prior service credit granted is otherwise allowed by law; or

    (2)     pursuant to an amendment to these Regulations adopted after 1990.

    (b)     If a business entity listed on Part One of Schedule F becomes a Contributing Company in connection with a stock or asset divestiture, then each person who is an employee of the business entity on the day as of which it adopts this Plan, shall be granted

(1)     the lesser of two years of service, or the actual number of years of service, with the business entity as Participation Service; and

(2)     the lesser of five years of service, or the actual number of years of service, with the business entity as Accredited Service,

*provided* such grant of past service credit is otherwise allowed by law.

(c)     If a Contributing Company acquires the stock or assets of a business entity listed on Part Two of Schedule F and, in connection with that acquisition, agrees or resolves to grant past service credit hereunder to an employee of the entity who, within a period of time specified in the agreement or resolution, becomes an Employee of the Contributing Company, then the lesser of two years of service, or the actual number of years of service, with the acquired entity shall be credited to the Employee as Participation Service and as Accredited Service, *provided* such grant of past service credit is otherwise allowed by law.

**4.6     Provisions Applicable to Former Leased Employees.**  Notwithstanding anything in this Article to the contrary, in the event an individual performs hours of service as a Leased Employee, such individual becomes an Employee under the terms of the Plan, and, within the one-year period beginning when such individual becomes an Employee, such individual requests service credit to, and presents the service records required by the, Plan Administrator, such individual shall be credited with one year of Participation Service for each period of service that would be a one-year Period of Service if his service performed as a Leased Employee had been Service performed as an Employee of a Contributing Company.

# ARTICLE 5

## MEMBER CONTRIBUTIONS

**5.1     Member Contributions in General; Changes to Contributions.**

(a)     Only Active Employees may make Member Contributions.

(1)     Each Active Employee who is a Member may elect to contribute to the Fund by making: a Member Pre-Tax Base Pay Election; a Member Pre-Tax Variable Pay Election; a Member After-Tax Base Pay Election; a Member After-Tax Variable Pay Election; a Member Roth 401(k) Base Pay Election; and/or a Member Roth 401(k) Variable Pay Election.  In the event that a Member does not have sufficient Compensation to effect in full these elections after payroll deductions (including deductions pursuant to such elections), the Plan Administrator shall reduce such elections in accordance with the payroll deduction hierarchy established pursuant to the Regulations.

(2)     To establish annual increases to his Member Pre-Tax Contributions, any Member may automatically change his Member Pre-Tax Base Pay Election by enrolling in the employee pre-approved annual increase program and electing an annual increase amount.  Such enrollment and the amount elected for annual increases shall be made in the manner prescribed by the Plan Administrator.  Enrollment in the program, the elected annual increase amount, and any election changes shall become effective as of the first day of the first payroll period following the first Payroll Closing Date after the Plan Administrator receives the applicable election or shall become effective as of such other date as may be required by the Plan Administrator.

(b)     Any Member may elect to cease making any or all Member Contributions into the Fund and may thereafter elect to resume making any or all of such contributions.  Any election to make or resume making Member Contributions shall be effective until the Member's termination of employment or until changed by the Member's giving notice of such change to the Plan Administrator.  Any election or change thereto shall become effective as of the first day of a payroll period provided the Plan Administrator receives the election or change on or before the Payroll Closing Date for such payroll period or on or before such other date as may be required by the Plan Administrator.  The Member shall be un-enrolled from the employee pre-approved annual increase program and future annual increases shall cease if (1) the Member affirmatively un-enrolls from the program, (2) the Member

affirmatively elects to cease all Member Pre-Tax Base Pay Elections, or (3) the Member Terminates. In the event the Member's Pre-Tax Contributions are suspended pursuant to Section 5.4 or Section 24.4, the Member Pre-Tax Base Pay Election shall be set to zero, and any future annual increases elected under the pre-approved annual increase program will recommence once the Member resumes Member Contributions by making a new Member Pre-Tax Base Pay Election.

(c)     No benefits provided by the Employing Company or a Controlled Group Company shall be conditioned directly or indirectly upon the Member's making or not making Member Elective Deferrals hereunder.

**5.2     Automatic Contribution Arrangement.**  The Fund shall implement an automatic contribution arrangement for individuals who are hired or rehired by a Contributing Company and become Members on or after June 18, 2007.  Under the arrangement, such Members shall be deemed to have made, as of the Automatic Enrollment Date, a Member Pre-Tax Base Pay Election of 3%.  The Plan Administrator shall provide notice of the arrangement to Members who may be covered by the arrangement at such time as shall afford such Members a reasonable opportunity to elect out of the arrangement before the Automatic Enrollment Date.  A Member may elect out of the arrangement before the Automatic Enrollment Date by electing to make no Member Pre-Tax Contributions or by making any affirmative election available to the Member under Section 5.1.  A Member may also prospectively elect out of the arrangement any time after the Automatic Enrollment Date in the same fashion.  Elections under this Section 5.2 (including the deemed election, if applicable) shall become effective as provided in Section 5.1(b).  The Plan Administrator shall, within a reasonable period before each Plan Year, provide to each Member to whom the arrangement applies for such Plan Year, notice of such Member's rights and obligations under the arrangement.

**5.3     Testing Limitations on Contributions.**  Member Contributions, other than Member Catch-Up Contributions, are subject to the limitations and provisions of Article 23 of the Regulations and are subject to reduction by the Plan Administrator as provided in Article 23 of the Regulations.

**5.4     Limitations Related to Hardship Withdrawals.**  If a Member receives a Hardship Withdrawal or any other hardship withdrawal from another qualified plan of a Controlled Group Company, such Member shall not be entitled to make any Member Contributions under this Plan for a period of at least 6 months after receipt of such hardship withdrawal; provided, however, that effective January 1, 2019, this Section 5.4 shall cease to apply and any suspension imposed pursuant to this Section 5.4 attributable to a hardship withdrawal prior to January 1, 2019, shall be removed and cease to apply.

**5.5     Annual Limits on Member Elective Deferrals and Member After-Tax Contributions.**

(a)     Except to the extent permitted under Section 5.7 of the Regulations, a Member shall not be permitted to make Member Elective Deferrals during any taxable year of such Member in excess of $18,000 or such other amount as may be prescribed by Section 402(g) of the Code and as adjusted by the Secretary of the Treasury pursuant thereto.  Unless a different operational practice is established by the Plan Administrator, if Member Elective Deferrals would be curtailed by this limitation, Member Roth 401(k) Contributions shall be reduced prior to reducing Member Pre-Tax Contributions for the pay period in which this limitation of Section 5.5(a) is reached.

(b)     If the Member does not make a Member Secondary Election as provided in Section 5.1(a), the Member will be deemed to have made a Member Secondary Election of 0%.  In the pay period in which the limit described in Section 5.5(a) is reached, the lesser of the curtailed Member Pre-Tax Contributions of the Member that would have been made for that pay period or the Member After-Tax Contributions elected in the Member Secondary Election of the Member will be contributed to the Fund.  Following such pay period, such Member Secondary Election shall supersede any Member After-Tax Base Pay Election of the Member for the remainder of the Plan Year.  This Section 5.5(b) shall no longer be applicable for any pay period that begins on or after January 1, 2015.

(c)     A Member shall not be permitted to make Member After-Tax Contributions during any taxable year of such Member in excess of $8,500 or such other amount calculated for each Plan Year as the Annual Additions Limit under Section 7.3 minus both the maximum Company Contributions as described in Section 6.1(c) ($26,500 for 2015) and the annual limit on Member Elective Deferrals as may be prescribed by Section 402(g) of the Code and as adjusted by the Secretary of the Treasury pursuant thereto.

**5.6** **Timing of Member Contributions; Correction of Delayed Member Contributions and Repayments.**

(a)    Member Contributions shall be paid into the Fund as of the first Valuation Date on or after the date the Compensation is due the Member; *provided, however*, where a regulatory body closes a principal securities exchange on which securities are traded, the posting of Member Contributions may be delayed until normal trading resumes in all securities markets.

(b)    To the maximum extent permitted by applicable law, the Plan Administrator shall cause the Employing Company to correct Member Contributions and repayments that are not made as of the earliest date on which contributions can reasonably be segregated from the Employing Company's general assets.

**5.7**    **Catch-Up Contributions.**  The Fund shall not be treated as failing to satisfy the provisions of the Fund implementing the requirements of Sections 401(k)(3), 401(k)(11), 401(k)(12), 410(b), or 416 of the Code, as applicable, by reason of the making of Member Catch-Up Contributions. Member Catch-Up Contributions will not be made to the Fund pursuant to a Member Catch-Up Election for any pay period that begins on or after January 1, 2015. For any pay period that begins on or after January 1, 2015, Member Catch-Up Contributions will be made to the Fund pursuant to Member Elective Deferrals.

# ARTICLE 6

## COMPANY CONTRIBUTIONS

**6.1**    **Company Contributions in General.**  Effective for pay periods commencing on and after January 1, 2015, except as otherwise provided, each Employing Company shall pay into the Fund on behalf of each Member in its employ a percentage of such Member's Compensation, determined in accordance with the following schedule:

(a)    During the first, second, third, fourth, fifth, and sixth years of the Member's Accredited Service – 2½%, *provided, however*, the Employing Company shall make contributions of 3% of such Member's Compensation during the remaining period of such Member's second, third, fourth, fifth, and sixth years of Accredited Service if such Member was eligible to participate in the Alliance Savings Plan on December 31, 2002, and on that date was eligible to receive company contributions of 3% thereunder; and

(b)    During the seventh, eighth and ninth years of Accredited Service - 5%, and

(c)    During the tenth and succeeding years of Accredited Service - 10%,

as of the first Valuation Date after such compensation is due the Member.  Unless an Employee becomes a Member on the first day of a pay period, Company Contributions shall commence as of the first day of the next full pay period. For the purpose of determining when increases in the percentage of Company Contributions should occur, an Employee whose service date (or adjusted service date, if applicable) coincides with the first day of any pay period which is applicable to such Employee's job classification shall be eligible for increases in the percentage of Company Contributions as of the first day of the full pay period in which such Employee completes the required period of Accredited Service for any such percentage increase.  All other Employees shall be eligible for increases in the percentage of Company Contributions as of the first day of the first full pay period following such Employee's completion of the required period of Accredited Service for any such percentage increase.

**6.2**    **Contribution Additions for Administration Expenses.**  Any Contributing Company may make a Contribution Addition to the Fund for a Plan Year that it may determine is appropriate.  Each Contribution Addition shall be with respect to the Plan Year and shall be allocated to the Accounts of Members that are affected by the administration expenses for which the Fund is being reimbursed by the contribution. Consistent with the preceding sentence, the Plan Administrator shall periodically notify the Trustees of the Contribution Additions which shall be paid to the Fund no later than the time prescribed by law for filing the federal income tax return of the Contribution Company, including extensions thereof.  For purposes of the limitations under Article 7, each Contribution Addition

shall be allocated to the Accounts of Members that are affected by the administration expenses for which the Trust is being reimbursed by the contribution.

**6.3    No Earnings or Profits Required.**  If any Contributing Company forming, together with one or more other Contributing Companies, an affiliated group within the meaning of Section 1504 of the Code is prevented from making a contribution which it would otherwise have made under this Article 6 by reason of having no current or accumulated earnings or profits or because such earnings or profits are less than the contributions which it would otherwise have made, then so much of the contribution which such Contributing Company was so prevented from making may be made, for the benefit of the employees of such Contributing Company, by the other Contributing Companies forming such affiliated group, to the extent of current or accumulated earnings or profits, except that such contribution by each such other Contributing Company shall be limited, where such group does not file a consolidated return, to that proportion of its total current and accumulated earnings or profits remaining after adjustment for its contribution made without regard to this sentence which the total prevented contribution bears to the total current and accumulated earnings or profits of all the Members of such group remaining after adjustment for all contributions made without regard to this sentence.  On and after January 1, 1988, payment into the Fund by each Contributing Company shall be made without regard to current or accumulated earnings or profits, unless a Contributing Company elects otherwise with respect to its Members.  Notwithstanding the elimination of the profits requirement, this Fund is designed to be a profit-sharing plan.

**6.4    Deductibility of Contributions.**  Unless a Contributing Company directs otherwise, a Contributing Company's contributions to the Fund are conditioned upon their being deductible for such Contributing Company's taxable year under Section 404 of the Code, and such Contributing Company contributions shall not exceed such deductible amounts.

**6.5    Use of Certain Forfeitures.**  Forfeitures resulting from Section 19.2, Schedule D, or any other provision, including as a result of another plan with a forfeiture account being merged with this Fund, may be used to reduce Contributing Company contributions as well as pay for administrative expenses that may be paid from assets of the Fund as provided in Section IX of the Trust Agreement.  Restored forfeitures shall be invested in accordance with the Default Fund rules.

**6.6    Contributions to Satisfy Nondiscrimination Requirements.**  Where it has been determined by Shell Oil Company that Contributions do not satisfy the nondiscrimination requirements of Section 401(a)(4) of the Code and regulations issued thereunder for a Tested Plan Year, additional Contributions may be made until Contributions satisfy such requirements.  Where additional Contributions are credited to a Member's Account pursuant to this Section 6.6, earnings shall be credited at the greater of zero percent or the actual positive rate of return on the Member's Account for each of the Tested Plan Years and any subsequent Plan Year or any portion thereof in which the additional Contribution is made.  Any such additional Contributions, and any earnings thereon, shall be provided only for individuals who:

  (a)    are Nonhighly Compensated Employees for such Tested Plan Year;

  (b)    are Employees at the time such additional Contributions are made;

  (c)    are in a Relevant Rate Group;

  (d)    have the highest equivalent accrual rates of Nonhighly Compensated Employees, as determined by Shell Oil Company when testing the Plan for such Tested Plan Year under Treasury Regulations Section 1.401(a)(4)-8, in the order of such rates beginning with the highest; and

  (e)    also have the highest performance code in such Relevant Rate Group at the time such additional Contributions are made, in order of such performance codes beginning with the highest, effective for a Tested Plan Year commencing on or after January 1, 2001, where the conditions set forth in subparagraphs (a) through (d) hereinabove result in an over-inclusion of employees eligible for any additional Contributions.

**6.7      Correction of Delayed Company Contributions.** To the maximum extent permitted by applicable law, the Plan Administrator shall cause the employing Contributing Company to correct delayed contributions in accordance with this Section 6.7. For delayed Company Contributions that are corrected within two payroll periods, the Contributing Company shall restore to the Member's Account only the principal amount. For delayed Company Contributions that are not corrected within two payroll periods, the Contributing Company shall restore to the Member's Account the principal amount adjusted to reflect the actual rate of return that would have been credited to the Member's Account but for the error; provided, however, for the sake of administrative convenience, the Plan Administrator shall have the option of using, in lieu of the actual rate, such rate of return as shall be reasonably prudent under the circumstances.

## ARTICLE 7

### LIMITATION ON CONTRIBUTIONS

**7.1      Excess Deferral Limit.** A Participant shall not be permitted to have Member Elective Deferrals made under this Fund, or any other qualified plan maintained by the Employer, during any taxable year in excess of the limit set out in Section 5.5(a), except that to the extent permitted under Section 414(v) of the Code Participants may make Member Catch-up Contributions.

**7.2      Distribution of Excess Deferral Amounts.**

(a)      Notwithstanding any other provision of these Regulations, the Excess Deferral Amount made by a Participant and any income allocable thereto, shall be distributed to the Participant claiming such Excess Deferral Amount under this Fund no later than the first April 15 following the close of the Participant's taxable year in which the Excess Deferral Amount arose or as soon as administratively feasible after an Excess Deferral Amount is detected by any monitoring system maintained by a Contributing Company. For the 2007 year, the income allocable to any Excess Deferral Amount must include the allocable income for the Participant's taxable year in which the Excess Deferral Amount arose and the allocable income for the period between the end of the Participant's taxable year in which the Excess Deferral Amount arose and the date of the distribution of the Excess Deferral Amount. For years after 2007, the income allocable to any Excess Deferral Amount is determined only through the end of Participant's taxable year in which the Excess Deferral Amount arose.

(b)      The Participant's claim shall be in writing, shall be submitted to the Plan Administrator no later than the first April 1 following the close of the Participant's taxable year in which the Excess Deferral Amount arose, shall specify the Participant's Excess Deferral Amount for such taxable year, and shall be accompanied by the Participant's written statement that if such amounts are not distributed, then such Member Elective Deferrals --- together with amounts deferred pursuant to other qualified cash or deferred arrangements under Section 401(k) of the Code, simplified employee pension plans under Section 408(k) of the Code, and tax-sheltered annuity contracts under Section 403(b) of the Code --- exceed the limit imposed on the Participant by Section 7.1 for the taxable year in which the Member Elective Deferrals occurred.

(c)      In the case of any Excess Deferral Amounts which arise under this Fund by virtue of the failure of any monitoring system maintained by a Contributing Company, the Plan Administrator shall be empowered to submit a claim on behalf of, and in the name of, the Participant, and such claim shall be deemed to be the claim of such Participant for all intents and purposes. The Plan Administrator shall be entitled to assume that a Participant's taxable year is the calendar year unless the Participant has previously advised the Plan Administrator otherwise, in writing.

(d)      The Excess Deferral Amount for the taxable year which would otherwise be distributed to the Participant shall be reduced, in accordance with Department of Treasury Regulations, by the Excess Contributions previously distributed to the Participant for the Plan Year beginning in that taxable year. Also, corrective distribution of any Excess Deferral Amount shall be satisfied from Member Roth 401(k) Contributions before any Member Pre-Tax Contributions.

**7.3**    **Annual Additions Limit.**

(a)    Except to the extent permitted with respect to Member Catch-up Contributions and Section 414(v) of the Code, the Annual Additions that may be contributed or allocated to a Member's Account under the Fund for any limitation year shall not exceed the lesser of: (1) $53,000, as adjusted for increases in the cost-of-living under section 415(d) of the Code, or (2) 100 percent of the Member's 415 Compensation, for the limitation year.

(b)    To the extent the Annual Additions with respect to the Fund and other defined contribution plans of the Contributing Companies or Affiliated Companies would otherwise exceed the limitations of Section 7.3(a), amounts permitted to be credited to a Member's Account shall be reduced in the following order:

(1)    Contributions by or on behalf of a Member to other defined contribution plans of the Contributing Companies or Affiliated Companies;

(2)    Company Contributions of any Contributing Company on behalf of a Member to the Fund;

(3)    Member After-Tax Contributions by a Member to the Fund;

(4)    Member Roth 401(k) Contributions on behalf of a Member to the Fund; and

(5)    Member Pre-Tax Contributions on behalf of a Member to the Fund.

**7.4**    **Excess Annual Additions.**

(a)    If and to the extent it is determined that any contribution of any Contributing Company is in excess of the limitations imposed by Section 7.3, and provided that such contribution was made by a good faith mistake of fact, then such excess shall be returned to the Contributing Company within one year after payment of the contribution.

(b)    If, due to a reasonable error in estimating a Member's annual Compensation, a reasonable error in determining the amount of Member Elective Deferrals that may be made with respect to any individual under the limits of Section 415 of the Code, or due to such other facts and circumstances as may justify the availability of this special rule, the Annual Additions to the Member's Account under this Fund and under any other defined contribution plans of the Contributing and Affiliated Companies exceed the limitations set forth in Section 7.3(a), then the excess Annual Additions in a Member's account, if any, shall be treated in accordance with a correction method permitted under the Employee Plan Compliance Resolution System as set forth in Revenue Procedure 2013-12 and any subsequent update thereto.

If the treatment described in this Section 7.4(b) is necessary, such treatment shall be performed on other defined contribution plans of the Contributing Companies or Affiliated Companies before applying to this Fund.

**7.5**    **Notice of Limitation issue.**    The Employing Company shall notify a Member and the Plan Administrator if the limitation on contributions or allocation or reallocation of Contributions to his Account for any calendar year is affected by the limitations set forth in this Article.

**7.6**    **Aggregation of Plans.**    For purposes of Section 7.3 and Section 7.4, all defined contribution plans (whether or not terminated) of the Contributing and Affiliated Companies shall be treated as one defined contribution plan.

## ARTICLE 8

### INVESTMENT FUNDS

**8.1** **Authority to Establish Investment Offerings.**

(a)     Selecting Investment Offerings is a fiduciary act that is the responsibility of the Trustees. Except as set forth in this Section 8.1, the Trustees shall have the discretionary authority to establish Investment Offerings and investment tiers and to allot Investment Offerings among any such tiers.

(b)     The Royal Dutch Shell Stock Fund shall be a permanent Investment Offering under these Regulations. Members and Beneficiaries---and not the Trustees nor the Investment Manager of the Royal Dutch Shell Stock Fund---shall have discretionary authority and control with respect to buying, selling, and holding units in the Royal Dutch Shell Stock Fund. In the absence of any Member or Beneficiary direction to buy, sell, or hold units of the Royal Dutch Shell Stock Fund for his Account, the Trustees and the Investment Manager of the Royal Dutch Shell Stock Fund shall not buy, sell, or hold shares of RDS ADRs for that Account; *provided, however,* that the Trustees shall liquidate, or cause the Investment Manager of the Royal Dutch Shell Stock Fund to liquidate, RDS ADRs in the Royal Dutch Shell Stock Fund only in the event of the imminent bankruptcy of Royal Dutch Shell plc. In the event of any such liquidation, the Trustees shall invest the resulting cash in the Thrift Fund.

**8.2** **Investment Funds.** At the direction of a Member or a Beneficiary, the assets of such person's Account shall be invested in one or more Investment Offerings.

**8.3** **Separate Subaccounts**. In general, each Account shall be divided between Company Contribution Subaccount, Member After-Tax Subaccount, Member Catch-Up Subaccount, Member Pre-Tax Subaccount, QNEC Subaccount, Previously Distributed Subaccount, After-Tax Rollover Subaccount, Prior Plan Company Contribution Subaccount, Prior Plan Fully Vested Match Subaccount, Prior Plan Scheduled Vesting Match Subaccount, the Pre-Tax Rollover Subaccount, Member Roth 401(k) Subaccount, Roth Conversion Member Pre-Tax Sources Subaccount, Roth Conversion Restricted Sources Subaccount, Roth Conversion Unrestricted Sources Subaccount, and the Roth Rollover Subaccount.

**8.4** **Valuation and Accounting.**

(a)     The assets of each Investment Offering or associated underlying investments  shall be valued in accordance with applicable prospectus and/or governing documents and applicable law. Generally and where applicable, any Investment Manager shall value assets in good faith in accordance with the best available information, accepted accounting practices, and applicable laws and regulations so as to provide uniform and consistent methods of valuation.

(b)     The Thrift Fund shall be valued consistent with the investment management agreement or other governing document. In the event any such investment management agreement or governing document is silent, the Thrift Fund shall be valued as follows:  All interest, dividends, and other income accrued during each Valuation Period and any profits realized during each Valuation Period by the Thrift Fund shall be credited to an income account for the Thrift Fund, and certain expenses incurred (in accordance with Section IX of the Trust Agreement) and any losses realized by the Thrift Fund during each Valuation Period shall be debited to that account for the Thrift Fund. As of the end of each Valuation Period, the balance of the account shall be allocated among the Members and Present Interest Beneficiaries in proportion to their balances in the Thrift Fund during the Valuation Period. If the income account shows a net deficit for the Valuation Period, such deficiency shall be provided for to the extent necessary from the Members' and Present Interest Beneficiaries' Thrift Fund balance, debits shall be in proportion to their balances during the Valuation Period.

(c)     The Royal Dutch Shell Stock Fund shall be valued consistent with the investment management agreement. In the event any such investment management agreement is silent, the Royal Dutch Shell Stock Fund shall be valued as follows:  Valuation of RDS ADRs held in the Royal Dutch Shell Stock Fund shall be based upon the closing price of the ordinary shares of RDS ADRs on the principal national domestic securities exchange on which the RDS ADRs are traded or, if unavailable, the latest available price as reported by the principal national domestic securities exchange on which the RDS ADRs are traded or, if neither is available, the price determined in good faith by the Investment Manager

of the Royal Dutch Shell Stock Fund. The net asset value of the Royal Dutch Shell Stock Fund will be calculated by (1) adding the market value of the RDS ADRs, the market value of any money market fund or other mutual fund or commingled money market pool contained in the Royal Dutch Shell Stock Fund, any payables including the cost of RDS ADRs purchased, principal and interest obligations, if any, and other expenses that the Investment Manager accrues or pays from the Royal Dutch Shell Stock Fund and any receivables including the proceeds of RDS ADRs sold, interest, and dividends and (2) dividing the sum by the total number of units in the Royal Dutch Shell Stock Fund outstanding at the end of the day in issue.

(d) Dividends in the form of cash, RDS ADRs, or RDS class "A" ordinary share dividends, and the proceeds of any other distributions received by the Investment Manager in respect of RDS ADRs shall be credited to such Accounts on the date of payment thereof if received on a Valuation Date before the New York Stock Exchange closes for trading or on the Valuation Date next succeeding the date on which the payment is received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading; *provided, however,* that if a person entitled to provide Account investment directions under the Plan affirmatively elects to have amounts representing such dividends and other proceeds invested in accordance with such person's investment election in effect for contributions and loan repayments to the Fund, such amounts shall be so invested. An election under this Section 8.4(d) shall be made subject to the conditions of Section 9.3 and Article 16, shall become effective as provided under Section 9.1(a), and shall remain effective until canceled.

(e) Charges and expenses of an Investment Offering or associated underlying investments shall be charged to the same in accordance with applicable prospectus and/or governing documents and applicable law, including brokerage commissions, transfer taxes, or other charges and expenses. Other taxes, charges, and expenses of the Shell Provident Fund shall be charged to the Accounts of Accountholders in accordance with Section IX of the Trust Agreement.

### 8.5    Investment Manager.

(a) To the extent the Shell Provident Fund shall invest its assets with the Shell Savings Group Trust, the Trust Agreement of the Shell Savings Group Trust, rather than these Regulations, shall determine the rights, powers, duties, and responsibilities of the investment managers thereof.

(b) An Investment Option may be under the management and control of one or more Investment Managers appointed by the Trustees. Each Investment Manager in its discretion shall individually invest and reinvest principal and income in accordance with applicable governing documents and applicable law.

(c) The Investment Manager of the Royal Dutch Shell Stock Fund may, in its discretion, retain in cash, including investment in any short-term collective or common trust funds as provided in Section VI of the Trust Agreement, such part of the assets of the Royal Dutch Shell Stock Fund as it shall deem necessary or desirable for the proper administration thereof, including for purposes of the payment of expenses or other anticipated distributions or pending the purchase of longer term investments suitable therefor.

(d) The Investment Manager of the Royal Dutch Shell Stock Fund shall have the right to close the Royal Dutch Shell Stock Fund to purchases and redemptions whenever trading in RDS ADRs is suspended or whenever, in the judgment of the Investment Manager, substantial purchase and sales orders for RDS ADRs are pending but not executed.

### 8.6    Distributions In-Kind.
Distributions shall normally be made in cash. After the commencement of trading of RDS ADRs on the New York Stock Exchange, when a Member's Account is paid out pursuant to Sections 12.3, 12.4, and 12.6 upon his termination of service or pursuant to Section 10.3 upon his age 59½ withdrawal, the value of a Member's Royal Dutch Shell Stock Fund Account shall be distributed in cash, unless the Member shall affirmatively elect to take a distribution in the form of whole RDS ADRs and residual cash.

### 8.7    Managed Accounts.
The Trustees may appoint an Investment Manager to provide discretionary and non-discretionary investment management services to Accountholders. If an Accountholder affirmatively elects to use any such discretionary services, then during the term of the arrangement for such services, such Investment

Manager rather than the Accountholder shall have the full authority of the Accountholder to invest Contributions and to invest and reinvest assets of the Account. The fees arising from the discretionary investment management services of the Investment Manager shall be deducted from the Account of the Accountholder electing to use such discretionary services.

8.8    **Brokerage Window.**

(a)    A Participant or Present Interest Beneficiary may invest up to 100% of his vested Account in the Brokerage Window, if any, and may direct Contributions and loan repayments to such Brokerage Window in accordance with procedures established by the Plan Administrator.

(b)    Withdrawals, minimum required distributions, installment payments under Section 12.6(c), and de minimis distributions will be processed from the Participant's or Present Interest Beneficiary's balances in the Investment Offerings in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window.

(c)    If the Accountholder dies leaving a balance in a Brokerage Window, his Present Interest Beneficiary shall have the right to continue the Brokerage Window provided the Present Interest Beneficiary satisfies such administrative procedures as may be then in effect; otherwise the Brokerage Window assets payable to such Present Interest Beneficiary will be liquidated and transferred out of the Brokerage Window to the Thrift Fund.

(d)    The Brokerage Window, if any, shall be subject to such minimum investment, trading and investments restrictions, and settlement periods as the service provider of such Brokerage Window shall impose.

## ARTICLE 9

### MEMBER DIRECTIONS

9.1    **Investment Directions.** Each Member shall direct the investment of his Account among one or more of the Investment Offerings offered under the Plan in multiples of one percent (1%) as follows:

(a)    On and after June 1, 1996, a direction shall be effective: (1) on the day it is actually received provided it is received on a Valuation Date before the New York Stock Exchange closes for trading; or (2) on the Valuation Date next succeeding the day on which it is actually received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading. An investment direction, once given, shall remain effective until changed by a subsequent direction.

(b)    Notwithstanding anything to the contrary contained herein, Shell Oil Company in its discretion may, at any time, fix a uniform upper percent limitation on the part of Company Contributions which Members and Beneficiaries may direct be invested in the Royal Dutch Shell Stock Fund. While any such limitation is effective, all directions, whether made prior or subsequent thereto, shall be effective only to the extent permissible under the limitation.

(c)    Company Contributions, rollover amounts, Member Contributions, loan repayments, and restored forfeitures as to which no valid investment direction is in effect shall be placed in the Default Fund. To the extent that a Participant or a Beneficiary entitled to immediate possession of an account has a valid investment direction to an Investment Offering that terminates or withdraws from the Fund or merges with a successor fund that is not an Investment Offering, he shall be treated as having no valid investment direction from the time the Investment Offering terminates or withdraws from the Fund or merges into a successor fund that is not an Investment Offering. Where by virtue of the summary plan description or otherwise, the Participant or such Beneficiary is informed or otherwise aware that he has a right to direct Company Contributions, rollovers, Member Contributions, loan repayments, and restored forfeitures, as applicable, to Investment Offerings and otherwise allocate his Account among Investment Offerings and, moreover, that his failure to make a valid investment direction shall be treated as a direction to invest in the Default Fund, then the Participant's or Beneficiary's failure to direct shall be deemed an exercise of the Participant's or Beneficiary's control and discretion to invest in the Default Fund. Where a Participant attempts to allocate to the Investment Offerings more than

100 percent of the amount the Participant rolls over into the Fund, the entire rollover amount shall be returned to the Participant.

   **9.2**  <u>**Investment Transfers; Default Funds.**</u> Each Participant and each Beneficiary may direct that any portion of his Account shall be transferred between Investment Offerings by giving directions to the Plan Administrator as follows:

   (a)  Each direction shall indicate the amount or percentage to be transferred, the Investment Offering from which the transfer is to be made, and each Investment Offering to which the amount or percentage is to be transferred.

   (b)  Directions as to a transfer to any Investment Offering shall be effective on the first Valuation Date on or after July 12, 1996, on which the Plan Administrator receives such direction. For purposes of this Section 9.2, the Plan Administrator shall be deemed to have received a transfer direction: (1) on the day it is actually received provided it is received on a Valuation Date before the New York Stock Exchange closes for trading; or (2) on the Valuation Date next succeeding the day on which it is actually received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading. A transfer direction, once given, shall remain effective unless canceled in a timely manner; *provided, however*, that no such transfer direction may be canceled or modified, and no proceeds from any such exchange can be redirected, after the close of the Valuation Date on which the exchange direction takes effect.

   (c)  Notwithstanding anything to the contrary contained herein, Shell Oil Company in its discretion may, at any time, fix a uniform upper percent limitation on the part of Company Contributions which Participants and Beneficiaries may direct be transferred to the Royal Dutch Shell Stock Fund. While any such limitation is effective, all directions, whether made prior or subsequent thereto, shall be effective only to the extent permissible under the limitation.

   (d)  A Participant or Beneficiary may lose exchange privileges under an Investment Offering, consistent with the prospectus or governing document thereof, for trading that the Investment Manager determines is excessive or that adversely impacts effective management of an Investment Offering in accordance with its stated investment objectives and policies or that would otherwise potentially be adverse to the interests of Participants and Beneficiaries who are long-term investors.

   (e)  Where an Investment Offering terminates or withdraws from the Fund or merges with a successor fund that is not an Investment Offering, a Participant (or Present Interest Beneficiary) who has a balance in such Investment Offering shall redirect that balance among the remaining Investment Offerings. Where the Participant (or Present Interest Beneficiary) fails to make a valid investment redirection, such balance shall be placed in the Default Fund. Where by virtue of the summary plan description or otherwise, the Participant ( or Present Interest Beneficiary) is informed or otherwise aware that he has a right to redirect a balance from a terminated or withdrawn or merged Investment Offering among the remaining Investment Offerings and, moreover, that his failure to make a valid investment redirection shall be treated as a direction to reinvest such balance in the Default Fund, then any failure to redirect the balance from a terminated or withdrawn or merged Investment Offering shall be deemed an exercise of the Participant's  (or Present Interest Beneficiary's) control and discretion to invest such balance in the Default Fund.

   (f)  The Member may specify an Investment Offering within the relevant Subaccounts from which the transfer shall be made. If the Member does not specify an Investment Offering or if further allocation of the amount of the transfer is necessary, the amount or remaining amount, as the case may be, shall be distributed from the Member's Investment Offerings in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window. Where by virtue of the summary plan description or otherwise, the Member is informed or otherwise aware that a Member has a right to allocate transfers to the Member's Investment Offerings and moreover, that the failure to make a valid allocation shall be treated as a direction to allocate the transfers in accordance with procedures established by the Plan Administrator, then the Member's failure to allocate transfers properly shall be deemed an exercise of the Member's control and discretion to allocate the transfer to the Member's Investment Offerings in accordance with such procedures.

**9.3**     **Conditions.** Investment directions and redirections shall be made subject to the conditions of Article 16. In order to facilitate compliance with securities laws, investment directions and redirections to the Royal Dutch Shell Stock Fund shall be made subject to compliance with the Royal Dutch Shell plc Securities Dealing Code.

**9.4**     **Responsibility for Following-up on Investment Direction Execution.** A Participant or Beneficiary shall be responsible for following up in order to ensure that his or her investment directions and redirections were acted upon and were carried out in accordance with his or her express instructions, and that, in the case of a Participant, any contributions related to a suspended direction were redirected in accordance with the Participant's standing investment direction once the conditions that precipitated the suspension were resolved.

## ARTICLE 10

## MEMBER WITHDRAWALS

**10.1**     **General Withdrawal Restrictions and Provisions.**

(a)     A Member shall have no right to receive the amounts standing to his credit in his Account, or any part thereof, except as may be permitted by this Article 10, Article 11, Section 12.4, Section 13.2(c), and Article 17 of the Regulations.

(b)     Whenever a Member shall direct a withdrawal from any of his Investment Offerings, there shall be redeemed (as of the next succeeding Valuation Date following receipt of such direction by the Fund or on the receipt date of such direction if such direction is received on a Valuation Date prior to the time the New York Stock Exchange closes for trading) so much of such Member's interest as may be necessary to provide the cash to be withdrawn.

(c)     Notwithstanding the foregoing provision, however, no withdrawal shall be permitted from a Member's Account in excess of the value (as of the next succeeding Valuation Date following receipt of such direction by the Fund or on the receipt date of such direction if such direction is received on a Valuation Date prior to the time the New York Stock Exchange closes for trading) of all amounts standing to his credit in his Investment Offerings. The value of the Account or relevant Subaccounts will be determined as of the next succeeding Valuation Date following receipt of such direction by the Fund or on the receipt date of such direction if such direction is received on a Valuation Date prior to the time the New York Stock Exchange closes for trading.

(d)     During periods of extreme market conditions or market closures, a withdrawal direction may not become effective until normal trading resumes in all securities markets. Similarly whenever the Investment Manager closes the Royal Dutch Shell Stock Fund to redemptions or whenever, in the judgment of the Investment Manager, liquidity in the Royal Dutch Shell Stock Fund is insufficient to honor in the aggregate all loan, withdrawal, and distribution requests involving redemptions from the Royal Dutch Shell Stock Fund, then withdrawal directions to redeem units of the Royal Dutch Shell Stock Fund and/or withdrawal directions to redeem other Investment Offerings units which redemptions are dependent in whole or in part upon redemptions of Royal Dutch Shell Stock Fund units shall not become effective until the Royal Dutch Shell Stock Fund reopens and/or, in the judgment of the Investment Manager, liquidity in the Royal Dutch Shell Stock Fund is sufficient to honor in the aggregate all loans, withdrawals, and distributions involving redemptions from the Royal Dutch Shell Stock Fund. In such event, the Valuation Date shall be likewise delayed. In order to facilitate compliance with securities laws, withdrawals from the Royal Dutch Shell Stock Fund shall be made subject to compliance with the Royal Dutch Shell plc Securities Dealing Code.

(e)     Notwithstanding any other provision of this Article 10, a Member shall not be permitted to withdraw any amount subject to a qualified domestic relations order as defined under ERISA and the Code.

(f)     The Member may specify an Investment Offering within the relevant Subaccounts from which the withdrawal shall be made. If the Member does not specify an Investment Offering or if further allocation of the amount of the withdrawal is necessary, the amount or remaining amount, as the case may be, shall be distributed from the Member's Investment Offerings in accordance with procedures established by the Plan Administrator which

may contain rules specific to the Brokerage Window. Where by virtue of the summary plan description or otherwise, the Member is informed or otherwise aware that a Member has a right to allocate withdrawals to the Member's Investment Offerings and moreover, that the failure to make a valid allocation shall be treated as a direction to allocate the withdrawals to the Investment Offerings in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window, then the Member's failure to allocate withdrawals properly shall be deemed an exercise of the Member's control and discretion to allocate the withdrawal to the Member's Investment Offerings in accordance with such procedures.

**10.2** **Withdrawals of Member After-Tax Contributions.** Any Member may by written direction to the Fund withdraw up to one hundred percent (100%) of the value of his Member After-Tax Subaccount. The right to make such a withdrawal is personal to such Member and cannot be transferred or pledged, whether by voluntary act or by operation of law, and any such attempted transfer or pledge shall be void.

**10.3** **Age 59½ Withdrawals.** Notwithstanding anything in these Regulations to the contrary, any Member who attains age 59½ even though he has not terminated service and is still in the service of an Employer may, by direction to the Plan Administrator, withdraw all or a portion of the amount standing to his credit.

**10.4** **Withdrawals of Prior Plan Vested Match.** Any Member who has amounts credited to a Prior Plan Fully Vested Match Subaccount may, by direction to the Plan Administrator, withdraw all or a portion of the amount standing to his credit in such Prior Plan Fully Vested Match Subaccount.

**10.5** **Withdrawals of Prior Plan Employer Contributions.** Any Member who has amounts credited to the Prior Plan Company Contribution Subaccount may, by direction to the Plan Administrator, withdraw once in every twelve-month period all or a portion of the amount standing to his or her credit in his or her Prior Plan Company Contribution Subaccount. Except as may be permitted by Section 10.3, this Section 10.5 shall not apply to a Member until the Member has at least five years of participation in the Fund. For purposes of this Section 10.5, "participation in the Fund" shall include, in addition to participation in this Fund, participation in the Alliance Savings Plan, the Star Enterprise Thrift Plan, the Star Enterprise Savings Plan, and any other plan from which a Member's Account was transferred in a direct trust-to-trust transfer to the Alliance Savings Plan. For purposes of this paragraph, "**participation in the Fund**" shall also include, in addition to participation in this Fund, participation in the Pennzoil-Quaker State Company Savings and Investment Plan and the Pennzoil-Quaker State Company Savings and Investment Plan for Hourly Employees.

**10.6** **Hardship Withdrawals.**

(a)     Hardship Withdrawals will be available under the terms of these Regulations for Members.

(b)     Applications for Hardship Withdrawals must be submitted to the Plan Administrator. The Plan Administrator will consider such applications and requests at least once a month. Members shall pre-qualify for Hardship Withdrawals in accordance with the procedures established by the Plan Administrator. Hardship Withdrawals, when the Plan Administrator has pre-qualified the Member, will be made effective (unless denied): on the date the Hardship Withdrawal applications actually received provided it is received on a Valuation Date before the New York Stock Exchange closes for trading; or on the Valuation Date next succeeding the day on which it is actually received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading.

(c)     A Member may withdraw such amounts as are needed to satisfy such Member's immediate and heavy financial need, in accordance with and subject to the following conditions:

(1)     A distribution will be deemed to be made on account of an immediate and heavy financial need if the distribution is on account of:

(A)     Payment of tuition and related educational fees as specified by the Commissioner of the Internal Revenue Service for the next 12 months or portion thereof of post-secondary education for the Member, such Member's spouse, child or children, or dependents (as defined in Section

152 of the Code, and, for taxable years beginning on or after January 1, 2005, without regard to Section 152(b)(1), (b)(2) and (d)(1)(B) of the Code);

(B)   Purchase (excluding mortgage payments) of a principal residence of the Member;

(C)   Medical and dental expenses described in Section 213(d) of the Code previously incurred by the Member, such Member's spouse, or any dependents of the Member, within the meaning of Section 152 of the Code (consistent with the definition of dependent as used in the application of Sections 105 and 106 of the Code), or necessary for these persons to obtain medical or dental care described in Section 213(d) of the Code;

(D)   The need to prevent the eviction of the Member from such Member's principal residence or foreclosure on the mortgage of the Member's principal residence;

(E)   Payments for burial or funeral expenses for the Member's deceased parent or parents, spouse, child or children, or dependents (as defined in Section 152 of the Code, and, for taxable years beginning on or after January 1, 2005, without regard to Section 152(d)(1)(B) of the Code);

(F)   Expenses for the repair of damage to the Member's principal residence that would qualify for the casualty deduction under Section 165 of the Code (determined without regard to Section 165(h)(5) and whether the loss exceeds 10% of the Member's adjusted gross income); or

(G)   Such other reason as the Commissioner of the Internal Revenue Service shall approve through communications of general applicability; provided such reason is expressly included by the Plan Administrator as a certifiable reason for the Hardship Withdrawal.

(d)   Hardship Withdrawals shall be considered only to the extent that the amount requested is not in excess of the amount required to relieve the hardship, or to the extent that such need may not be satisfied from other resources that are reasonably available to the Member, including assets of such Member's spouse and minor dependents. The amount requested may include amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the Hardship Withdrawal.  The Member shall certify in his application for a Hardship Withdrawal:

(1)   the amount needed to meet the hardship,

(2)   that the hardship is of an immediate and heavy financial nature,

(3)   the amount of funds reasonably available to him, his spouse, and minor dependents, and

(4)   that he will in fact use such funds and the Hardship Withdrawal to meet the hardship.

The Member shall also represent in writing (or by electronic medium, if allowed by the Plan Administrator), and the Plan Administrator shall be entitled to rely upon the Member's representation unless the Plan Administrator has actual knowledge to the contrary, that the Member has insufficient cash or other liquid assets reasonably available to satisfy the financial need and the need cannot be relieved:

(5)   through reimbursement or compensation by insurance or otherwise;

Exhibit Q

       (6)     by reasonable liquidation of the Member's assets, to the extent such liquidation would not itself cause an immediate and heavy financial need; or

       (7)     by (A) other distributions under this Fund and any other plans maintained by the Employer, or (B) borrowing from commercial sources on reasonable commercial terms.

Notwithstanding the foregoing, the Plan Administrator shall require Members to first obtain all other distributions (other than hardship distributions) under this Fund and all other plans of deferred compensation of the Employer unless such distribution would itself increase the immediate and heavy financial need.

       (e)     A Member may be denied a Hardship Withdrawal if he has a loan outstanding under the Fund and the Plan Administrator determines such a Hardship Withdrawal would impair the security for such loan.

       (f)     Hardship Withdrawals will be distributions under the Fund.

       (g)     (Intentionally left blank)

       (h)     The amount of a Member's Hardship Withdrawal shall not exceed the sum of such Member's account balance in the following sources:

       (1)     Member Roth 401(k) Subaccount;

       (2)     Roth Conversion Member Pre-Tax Sources Subaccount;

       (3)     Member Pre-Tax Subaccount; and

       (4)     Member Catch-Up Subaccount.

The amount of a Member's Hardship Withdrawal shall be satisfied from such sources in the Member's Account in the order listed above.

       (i)     If a Member's application for a Hardship Withdrawal is denied in whole or in part, the claims procedure of Article 20 shall apply.

## ARTICLE 11

### LOANS

**11.1**    **Eligible Borrowers.**  Participants and Present Interest Beneficiaries who have an Account under this Fund shall be eligible to make a loan under the terms of these Regulations; *provided, however*, that loans to parties in interest may not discriminate in favor of Highly Compensated Employees.

**11.2**    **Requests for Loans to the Plan Administrator.**  The Plan Administrator will consider loan requests submitted in accordance with this Article 11.  Unless denied, a loan will be made effective on the date the loan request is actually received provided it is received on a Valuation Date before the New York Stock Exchange closes for trading; or on the Valuation Date next succeeding the day on which it is actually received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading.  During periods of extreme market conditions or market closures, a loan request shall be treated the way a withdrawal direction is treated under Section 10.1(d).

**11.3**    **Administration of the Loan Program.**  To ensure, among other things, that a Borrower's loan repayment is not reversed by a financial institution for non-sufficiency of funds, the Plan Administrator shall be entitled to

establish a time period during which a Borrower who has just repaid a loan may not apply for another loan. Otherwise, Borrowers may apply for loans under these Regulations subject to the following terms and conditions:

      (a)    With respect to each Account, the total amount of outstanding loans, including loans from other qualified plans of the Employer, shall not exceed the lesser of:

      (1)    Fifty Thousand Dollars ($50,000) reduced by the excess, if any, of (A) the highest outstanding balance of loans from the Fund (and all other qualified plans maintained by the Employer) during the one-year period ending on the day before the date on which such loan was made, over (B) the outstanding balance of loans from the Fund on the date on which such loan was made, or

      (2)    one-half the value of the Account, determined as of the last Valuation Date preceding the Borrower's request for a loan.

For any loan, including loans from other qualified plans of the Employer, that is deemed distributed as a result of a default that has not been repaid (such as by a plan loan offset), the unpaid amount of such loan including accrued interest will be considered outstanding for purposes of Section 11.3(a).

      (b)    Loans shall not be made for less than Five Hundred Dollars ($500.00).

      (c)    Loans shall meet the requirements of Section 4975(d)(1) of the Code.

      (d)    Loans shall be adequately secured by the value of the Member's Account.

      (e)    The rate of interest for loans shall be set by the Plan Administrator based on an annual rate equal to the prime index as quoted by Bloomberg L.P., *The Wall Street Journal*, or any other widely available, easily accessible source. The Plan Administrator shall be entitled to select a rate which discourages arbitrage and reflects the fact that payments generally are made via payroll deduction. The Plan Administrator shall not be required to charge different rates for different parts of the country and need not consider the creditworthiness of the Borrower nor the usury laws of any particular jurisdiction. The Plan Administrator will periodically review the loan rate and make adjustments when appropriate. However, the rate set for each loan shall remain the same during the term of the loan, except that the rate of interest may not exceed 6% per year during periods that the Borrower is on "**military service**," within the meaning of, and as required under, the Servicemembers Civil Relief Act. Principal and interest paid on a loan shall be credited and allocated in accordance with the current or last Contribution allocation.

      (f)    Loans, by their terms, shall be amortized in substantially level monthly or semi-monthly payments with the final payment or balance due upon the expiration of a fixed term of not more than five (5) years and of not less than six (6) months; *provided, however*, the Plan Administrator, to the extent permitted under applicable law, may approve a loan for up to a twenty-five-year term in the case of a loan used to acquire any dwelling unit which within a reasonable period of time is to be used (determined at the time the loan is made) as the principal residence of the Borrower based upon a certification made by the Borrower, and consistent with such certification.

      (g)    Loans shall be made pursuant to a loan agreement between the Borrower and the Fund, utilizing such methods and provisions as the Plan Administrator shall approve. Loan payments will be made in installments by payroll deductions, in the case of an Active Employee actively at work, and by direct payment (including payments through the use of the automatic clearing house method of debiting his account with a financial institution) in the case of any other Borrower, with minimum payments of Twenty-Five Dollars ($25) per month.

      (h)    A Borrower may not have more than two (2) loans under this Fund and any other qualified plan of the Employer outstanding at one time; *provided, however*, that a Borrower's loans under this Fund outstanding as of December 31, 2014, shall continue in accordance with their terms.

      (i)    The Plan Administrator shall be entitled to deny any loan where he has reasonable cause to believe that the Borrower is not making a bona fide loan as, for example, when the Borrower has no intention to repay it.

(j)    Loans shall meet such other requirements as the Plan Administrator may determine advisable or necessary to provide adequate security and to comply with all applicable laws.

(k)    A loan will be funded from a Borrower's Investment Offerings in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window. Subject to such procedures as established by the Plan Administrator, a Borrower may specify an Investment Offering from which the loan is to be made. Where by virtue of the summary plan description or otherwise, the Borrower is informed or otherwise aware that the Borrower has a right to specify an Investment Offering from which the loan is to be made subject to any hierarchy or other procedures established by the Plan Administrator and moreover, that failure to specify an Investment Offering shall result in the loan being funded in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window, then the Borrower's failure to specify properly an Investment Offering from which the loan is to be made shall be deemed an exercise of the Borrower's control and discretion to fund the loan in accordance with such procedures.

(*l*)    The entire unpaid principal balance and accrued interest of a loan shall become immediately due and payable upon the death of the Borrower. Notwithstanding the above, the preceding sentence shall not apply if a Beneficiary that is 18 years or older is the sole Beneficiary of a deceased Borrower's Account or Derivative Account, and such Beneficiary affirmatively elects to continue to repay the loan under its original terms, where such election is received by the Fund no later than the last day that a Borrower would have to cure a failure to pay an installment payment under Section 11.4(a), and the unpaid principal balance and accrued interest, together with the Account or Derivative Account balance equals more than One Thousand Dollars ($1,000).

(m)    A loan may be prepaid by a Borrower at any time without a penalty fee or charge. Such prepayments shall be applied towards the principal payment amounts due at the end of the term of the loan. Such prepayments will not relieve the Borrower from making subsequent installment payments under the terms of the loan, except to the extent that the outstanding principal balance is reduced to less than the amount of an installment payment.

(n)    Installment payments required under the terms of a loan may be suspended under these Regulations as permitted under Section 414(u)(4) of the Code for an Active Employee during periods of qualified military service; however, consistent with administrative practices, payroll deductions for installment payments will continue based upon the original installment amount during the period of qualified military service if the Active Employee receives sufficient compensation for this purpose and the Active Employee does not affirmatively elect to discontinue payroll deductions during the period of qualified military service. At the end of the suspension period permitted under this Section 11.3(n) and if a balance exists, the installment payments will resume at an amount required to pay the entire unpaid principal balance of the loan, including the interest that accrued during the suspension period and the interest that will accrue, by the end of the original term of the loan extended by the length of the suspension period permitted under this Section 11.3(n). Notwithstanding the preceding sentence, the amount of an installment payment due after the end of the suspension period under this Section 11.3(n) must not be less than the amount required under the terms of the original loan.

(o)    Installment payments required under the terms of a loan may be suspended not longer than one year under these Regulations as permitted under the applicable Department of Treasury regulations for an Active Employee that is on a bona fide leave of absence (other than a qualified military service leave under Section 11.3(n)), *provided* that such Member is not receiving Compensation. At the end of the suspension period permitted under this Section 11.3(o), the installment payments will resume at an amount required to pay the entire unpaid principal balance of the loan, including the interest that accrued during the suspension period and the interest that will accrue, by the end of the original term of the loan extended by the length of the suspension period permitted under this Section 11.3(o). Notwithstanding the preceding sentence, the amount of an installment payment due after the end of the suspension period under this Section 11.3(o) must not be less than the amount required under the terms of the original loan; and the term of the loan may not be extended beyond five years from the date the loan was issued for loans that were not used to acquire a principal residence.

(p)    Notwithstanding Sections 11.3(n), 11.3(o), and Section 11.4, if plan loans are to be transferred to the Fund for a Participant or Beneficiary in connection with a merger or asset transfer, then the terms and conditions of Sections 11.3 and 11.4 may be modified by the Plan Administrator to the extent necessary to

accommodate the administration of such loans, *provided* such loans meet the applicable requirements of ERISA and the Code.

(q)    Notwithstanding the foregoing requirements of this Section 11.3, the installment obligations for any loan requested on or after January 1, 2004, must be paid by payroll deduction if, at the time the loan is requested, the Borrower has a previous loan (including any loan from other qualified plans of the Employer) that resulted in a deemed distribution that has not been repaid (such as by plan loan offset); moreover, if at a later time, the installment obligations of such loan cannot be made by payroll deduction (other than during the periods permitted by Sections 11.3(n) or 11.3(o)), the amount then outstanding on the loan will be treated as a deemed distribution under Section 72(p) of the Code.

(r)    Installment payments required under the terms of a loan may be suspended as permitted under Section 103 of the Katrina Emergency Relief Act of 2005 provided that the Borrower is a qualified individual and makes a request to the Plan Administrator for such relief no later than December 27, 2005.  For purposes of this Section 11.3(r), a qualified individual is an individual whose principal place of abode on August 28, 2005, was located in the state of Louisiana, Mississippi, Alabama, or Florida and such individual sustained an economic loss by reason of Hurricane Katrina.  At the end of the suspension period permitted under this Section 11.3(r), the installment payments will resume at an increased amount required to pay the entire unpaid principal balance of the loan, including the interest that accrued during the suspension period, and the interest that will accrue, by the end of the original term of the loan extended by the length of the suspension period permitted under this Section 11.3(r).

(s)    Installment payments required under the terms of a loan may be suspended as permitted under Title II of the Gulf Opportunity Zone Act of 2005 provided that the Borrower is a qualified individual and makes a request to the Plan Administrator for such relief no later than February 28, 2006.  For purposes of this Section 11.3(s), a qualified individual is an individual whose principal place of abode on September 23, 2005, was located in an area with respect to which a major disaster has been declared by the President before October 6, 2005, under Section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act by reason of Hurricane Rita (or such other area that the Internal Revenue Service may specify), and such individual sustained an economic loss by reason of Hurricane Rita.  At the end of the suspension period permitted under this Section 11.3(s), the installment payments will resume at an increased amount required to pay the entire unpaid principal balance of the loan, including the interest that accrued during the suspension period, and the interest that will accrue, by the end of the original term of the loan extended by the length of the suspension period permitted under this Section 11.3(s).

### 11.4    Late or missed payments.

(a)    If a Borrower fails to repay any loan granted to him pursuant to this Article 11 in accordance with its terms and such failure continues for a period of at least thirty (30) days, the Plan Administrator shall notify the Borrower in writing in a timely manner that he has thirty (30) days from the date of the notice to cure the failure (the "**Cure Period**"), and that if the failure is not cured within the Cure Period, the Plan Administrator shall, without further notice to the Borrower, accelerate the balance due on the loan and treat the loan as in default.  If the Borrower is deceased, such notice may be given to the person who would be entitled to receive distribution of his Account under the terms of the Plan and who has elected to continue to repay the loan under its original terms as provided for in Section 11.3(*l*) above (hereinafter in this Article 11, referred to as "**Beneficiary Borrower"**).  If the failure is not cured within the Cure Period, and:

(1)    to the extent that one of the distributable events under these Regulations has occurred, then the Plan Administrator shall reduce the Account by the balance due on the loan and record and report the transaction as an offset distribution; or

(2)    to the extent that a distributable event under these Regulations has not occurred and the Borrower is not eligible for, or does not consent to, a distribution or withdrawal, then the Plan Administrator: (A) shall record and report the unpaid loan balance and any accrued but unpaid interest as a taxable deemed distribution; and (B) at the earliest time the Account can be distributed under these Regulations, may reduce the Account by the balance due on the loan, including any accrued but unpaid interest.

In any such event, the Fund will be completely discharged of all liability under the Fund for the balance of the Account up to the balance (including interest) due on any such loan.

(b)     Written notice to the Borrower (or to the Beneficiary Borrower if the Borrower is deceased) will conclusively be presumed to have been given under the terms of Section 11.4(a) when mailed (postage prepaid) to the last known address for the Borrower or the Beneficiary Borrower according to the Plan Administrator's records. If the Plan Administrator has no address for the Beneficiary Borrower to be notified if the Borrower is deceased, the written notice may be mailed to the Beneficiary Borrower at the Borrower's last known address and, in such event, such notice will conclusively be presumed to have been properly given to the Beneficiary Borrower.

(c)     Notwithstanding the above, the Plan Administrator may extend the Cure Period provided that the following conditions are met:

        (1)     the Cure Period is not extended by more than 30 days;

        (2)     it is demonstrated that the Borrower made a good faith effort to cure the failure by the end of the Cure Period; and

        (3)     the criteria above is applied by the Plan Administrator on a consistent basis for all Borrowers similarly situated.

In no event may the Cure Period for the failure to pay an installment payment when due continue beyond the last day of the calendar quarter following the calendar quarter in which the required installment payment was due.

**11.5**    **Status.**  If a Member receives a loan under this Article 11, his status as a Member in the Fund and his rights with respect to his benefits under these Regulations shall not be affected, except to the extent that the Member has used his Account as security for the loan, pursuant to this Article 11.

**11.6**    **Discontinued Payroll Deduction Due to Hardship.**  Notwithstanding the above, at the written request of a Borrower and upon the demonstration by such Borrower that continuation of loan payments via payroll deductions would cause undue financial hardship, the Plan Administrator may cease all future loan payments by payroll deduction and accelerate the entire unpaid principal balance due on the loan with accrued interest. In this event, the Borrower will be treated as having defaulted on the loan as of the day payroll deductions are terminated; in addition, such Borrower will be restricted from obtaining a new loan under these Regulations for a period extending at least through the due date of the last installment payment that would have been payable under the original terms of the loan which was declared in default.

## ARTICLE 12

### DISTRIBUTIONS AND DESIGNATION OF BENEFICIARY

**12.1**    **Beneficiary Designation.**  Subject to the provisions pertaining to certain married Members set out below, a Member may name an individual, estate, trust, or Qualified Charitable Organization as a beneficiary, or multiple or combination of individuals, trusts, and Qualified Charitable Organizations as beneficiaries (hereinafter referred to as "beneficiary," whether one or more) to receive all or any part of the amount standing to the Member's credit with the Fund in the event the Member dies before such amount is distributed. Subject to the provisions pertaining to certain married beneficiaries set out below, a Present Interest Beneficiary may name an individual, estate, trust or Qualified Charitable Organization to receive all or any part of the Derivative Account standing to his credit with the Fund in the event the Present Interest Beneficiary dies before all of such amount is distributed. A "**Qualified Charitable Organization**" for these purposes shall mean a charitable organization in existence at the time of the distribution that is either:

        (a)     an organization described in Section 170(c) of the Code and listed in the *IRS Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code* as

published by the Internal Revenue Service (currently published as *Publication 78*) at the time of distribution;

(b)     an organization which is a church or other church organization which qualifies as a charitable organization under Section 501(c)(3) of the Code; or

(c)     an educational organization which either qualifies as a charitable organization under Section 501(c)(3) of the Code or which otherwise constitutes an educational organization to which charitable contributions may be deducted under section 170 of the Code.

In order to be recognized as a Qualified Charitable Organization any organization designated hereunder must present clear and convincing evidence to the Plan Administrator that it meets the requirements described above. The Plan Administrator may rely on a listing of the designated organization in the current *IRS Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code* as published by the Internal Revenue Service (currently published as *Publication 78*) at the time of distribution in order to treat such organization as a Qualified Charitable Organization. In the event that an organization described in (b) or (c) is not listed in such publication and is otherwise unable to produce documentation to the satisfaction of the Plan Administrator that it is an organization described in Section 170(c) of the Code, or, if the Plan Administrator cannot locate such organization within a reasonable period of time, such designation will be of no force and effect and distribution of such interest which was to pass to the designated organization shall instead be paid in as provided in Section 12.3. Such determination shall be at the Plan Administrator's discretion and any decision by the Plan Administrator shall be final and binding.

**12.2**    **Effective Date of Beneficiary Designation.**  No designation or change of beneficiary shall be effective until it is properly accepted by the Plan Administrator or by its duly authorized agent, but when so accepted it shall be effective retroactively to the date of the instrument making the designation or change. A Member or Present Interest Beneficiary may from time to time cancel the designation of a beneficiary, but no such cancellation shall be effective until it is filed with the Trustees; provided, that if the Member or the Present Interest Beneficiary, respectively, dies after forwarding a cancellation to the Trustees, and if it is actually received by the Trustees prior to the time that the amount standing to his credit in the Fund is paid out, it shall be effective retroactively to the date of the instrument making the cancellation.

**12.3**    **Beneficiary Designation and Spousal Consent.**

(a)     After termination of service, amounts standing to the credit of a Member shall be payable to the Member, if he is living. Should any Participant or Present Interest Beneficiary die prior to the distribution of his Account or any portion thereof, the balance of his Account shall be payable to his surviving spouse unless he has a designation of beneficiary in effect which names a non-spouse beneficiary and such surviving spouse has properly consented to such designation, if applicable. Consent is proper if the designation is in writing and may not be changed without spousal consent and if the spouse acknowledges the effect of the designation in a notarized writing. Such spousal consent shall be irrevocable. Spousal consent shall not be required if it is established to the satisfaction of the Plan Administrator that there is no spouse, that the spouse cannot be located, or that other circumstances exist as set forth in regulations issued by the Secretary of the Treasury. Consent by a spouse shall be effective only with respect to such spouse.

(b)     Spousal consent is also not required for a Derivative Account of a Present Interest Beneficiary; however, for the sake of administrative convenience, the Plan Administrator, at his sole discretion, may require a Present Interest Beneficiary who is designating a non-spouse beneficiary to obtain spousal consent on electronic submissions or otherwise even when such consent is not legally required. No person shall have the discretion to change a Participant's or Present Interest Beneficiary's designation of beneficiary after his death; provided, however, any disclaimer by his surviving spouse or other beneficiary which is valid under applicable federal and state laws shall be recognized by the Plan Administrator and shall not be deemed to change a Participant's or Present Interest Beneficiary's designation of beneficiary after his death. Should any Participant or Present Interest Beneficiary die prior to the distribution of his Account or any portion thereof without a valid designation of beneficiary in effect, the balance of his Account shall be payable to his surviving spouse or, if none, to the estate of the Participant or Present Interest Beneficiary, respectively. Where a Derivative Account or a Member's Account, together with any unpaid principal balance and accrued interest from one or more Member Loans, is One Thousand Dollars ($1,000) or

less, distribution of the Account, together with any unpaid principal and accrued interest, shall be made with or without the recipient's consent.

**12.4**    **Distribution after Termination of Service.**    After a Member's termination of service, his Account shall be distributed subject to the following conditions:

(a)    Except as provided in Sections 12.4(b) and 12.6, Accounts shall be distributed to the proper person or persons under the provisions of these Regulations as soon as administratively feasible after the Member terminates service, but not later than the sixtieth (60th) day after the close of the Plan Year in which occurs the latest of the following events:  (1) the date the Member attains age 65, or (2) the date the Member terminates service with all Contributing Companies or (3) the date beyond age 65 specified in a valid deferral election.  Where a Member does not make a valid deferral election, the date under clause (3) above shall be the date the Member attains age 65.  Notwithstanding the preceding provisions of this Section 12.4(a), consistent with the provisions of Treasury Regulation section 1.401(a)-14(a), and subject to the provisions of Section 12.4(e), a Member must file a claim for benefits before payment of benefits will commence.

(b)    No distribution of any part of a Member's Account shall be made, without the Member's written consent, to a Member prior to age 65; *provided, however,* where a Former Member's Account, together with any unpaid principal balance and accrued interest from one or more Member Loans, is One Thousand Dollars ($1,000) or less, distribution of the Former Member's Account, together with any unpaid principal balance and accrued interest, shall be made to the Former Member with or without his written consent.  An automatic deferral effected under this provision shall be a "deferral" under the Fund.

(c)    Any deferral under the above provisions and the Account during such a deferral shall be subject to the terms and conditions set forth from Section 12.6(c) through Section 12.6(g).

(d)    If (1) a question should exist as to the person or persons entitled to any amounts, (2) the amount payable cannot be ascertained by the date distribution is scheduled to be made pursuant to the Regulations, or (3) the payee cannot be located by such date, distribution may be delayed not later than sixty (60) days after the earliest date such question is resolved, such amount is ascertained, or the payee is located.

(e)    Notwithstanding anything in these Regulations to the contrary, on and after January 1, 2003, a Member's Account shall be distributed consistent with Article 25.

**12.5**    **Normal Form of Benefit.**    The normal form of benefit shall be a single sum.

**12.6**    **Deferrals and VPOs.**    As an optional alternative means of deferring distributions to that provided under Section 12.4(b), and subject to the minimum distribution requirements of Section 12.4(e), distributions of all or a portion of an Account may be deferred by a Member who is terminating service, or, if there is no deferral in effect for the Account, by a deceased Member's Qualified Beneficiary (but not by a Present Interest Beneficiary who is not a Qualified Beneficiary), consistent with such administrative procedures as may be prescribed by the Plan Administrator and in accordance with the following terms and conditions:

(a)    An election to defer distribution of an Account, subject to the minimum distribution requirements of Section 12.4(e), shall be made by giving notice to the Plan Administrator: (1) at any time prior to the Participant's attainment of age 65, if made by a Participant or a Qualified Beneficiary who is an alternate payee, within the meaning of section 206(d)(3)(K) of ERISA, or, (2) within three (3) calendar months after the death of the Member (provided there is no deferral in effect), if made by any other Qualified Beneficiary.

(b)    If a Member's termination of service occurs by reason of death and such a Member is survived by a Qualified Beneficiary, such Qualified Beneficiary shall have the right to defer distribution to a date which could have been selected by the Member had termination of service occurred by reason other than the Member's death.

(c)    After December 31, 1990, a Former Member or a Qualified Beneficiary shall be entitled to request in writing a distribution of all or a part of his deferred Account balance—and a Present Interest Beneficiary shall be entitled to request in writing, a distribution of all or a part of his Derivative Account derived from a deferred Account—as of the Valuation Date coincident with or next following the receipt of such request. Payments shall be made as soon as administratively feasible following the applicable Valuation Date. Subject to the minimum distribution rules of section 401(a)(9) of the Code in the case of a non-spouse Qualified Beneficiary, on and after July 16, 1996, a Former Member or a Qualified Beneficiary shall be entitled to request a distribution of all or a part of his deferred Account balance:  (1) in single sum form; or (2) in the form of a series of substantially equal monthly, quarterly, semi-annual, or annual payments (x) for a term of years, or (y) for the life or life expectancy of the Former Member or of the Qualified Beneficiary, as the case may be, or, (z) in the case of a Former Member, for the joint lives of the Former Member and the Former Member's designated beneficiary; and any such distribution shall be made or shall commence, as the case may be, on the day on which it is actually received provided it is received on a Valuation Date before the New York Stock Exchange closes for trading; or on the Valuation Date next succeeding the day on which it is actually received, if it is not received on a Valuation Date or if it is received on a Valuation Date after the New York Stock Exchange closes for trading.  During periods of extreme market conditions or market closures, a withdrawal direction shall be treated the way a withdrawal direction is treated under Section 10.1(d).  In the case of a distribution in single sum form, a Former Member or Qualified Beneficiary may specify an Investment Offering from which the distribution is to be made.  If the Participant or Qualified Beneficiary does not specify an Investment Offering or if a further allocation of the dollar amount of a distribution request is necessary, the amount or remaining amount, as the case may be, shall be distributed from the Investment Offerings in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window.  In the case of any distribution other than a distribution in single sum form, allocation of the dollar amount of such a distribution request shall be made in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window.  Where by virtue of the summary plan description or otherwise, the Participant or Qualified Beneficiary is informed or otherwise aware that he or she has a right to specify an Investment Offering from which the withdrawal is to be made and moreover, that failure to specify an Investment Offering shall result in the withdrawal being funded in accordance with procedures established by the Plan Administrator which may contain rules specific to the Brokerage Window, then the Participant's or Qualified Beneficiary's failure to specify properly an Investment Offering from which the withdrawal is to be made shall be deemed an exercise of the Participant's or Qualified Beneficiary's control and discretion to fund the withdrawal in accordance with such procedures.  A Former Member or Qualified Beneficiary may direct at any time a total distribution of the deferred Account balance—and a Present Interest Beneficiary may direct at any time a total distribution of the Derivative Account derived from a deferred Account—as of the Valuation Date coincident with or next following the receipt of such request.

(d)    Any deferral shall be subject and subordinate to any conflicting terms of a qualified domestic relations order or valid property settlement agreement, but the fact that a portion of a Participant's Account has been partitioned under a qualified domestic relations order or valid property settlement agreement shall not prevent a Participant or a Qualified Beneficiary from exercising rights of deferral as to the Participant's portion of the Account.

(e)    If a Former Member whose Account has been deferred is reemployed by a Contributing Company, such deferral will be canceled, except as to distributions already made, and distribution of the remainder of the Account will be made under the terms of these Regulations as if the Former Member had not previously terminated service.

(f)    In the event distribution of the Account of a Former Member or a Qualified Beneficiary has been deferred under the provisions of these Regulations, and the Former Member or Qualified Beneficiary dies, distribution of the Account will be accelerated and the Account distributed to the person(s) entitled to the proceeds; provided, in the case of the death of a Former Member leaving a Qualified Beneficiary or a Present Interest Beneficiary who is at least 18 years of age, the deferral shall remain effective, but the Qualified Beneficiary will have the same rights of acceleration which the Former Member had at the time of death.

(g)    The rights and restrictions under the Fund applicable to a Member shall, during a period of deferral, be applicable to a Former Member or a Qualified Beneficiary or a Present Interest Beneficiary, except for rights under Articles 5, 6 and 7.  Further, as an exception, a Qualified Beneficiary who is not a Present Interest Beneficiary shall under no circumstances have the right given a Member under this Article 12 to name or change a beneficiary.

**12.7     QDROs.**  Notwithstanding any other provisions in these Regulations to the contrary, the Fund shall make distributions to an alternate payee (as defined by ERISA and the Code) pursuant to any final judgment, decree or order (including judicial approval of a property settlement agreement) which the Plan Administrator has determined to be a qualified domestic relations order as defined under ERISA and the Code.  Such distributions shall be made, if authorized by the qualified domestic relations order, within a reasonable time after the Plan Administrator has made the determination that the requirements for a qualified domestic relations order have been satisfied, notwithstanding the Member's continuing employment by a Contributing Company.

**12.8     Legal Disability.**  Whenever a Participant or Beneficiary entitled to receive any payment hereunder is under a legal disability or is legally incapacitated so as to be unable to manage his financial affairs, the Plan Administrator may direct that payments be held or made to such person or to his legal representative or to a relative of such person for the benefit of the Participant or Beneficiary, respectively, or the Plan Administrator may direct that the payment be applied for the benefit of such Participant or Beneficiary in such manner as the Plan Administrator, in the exercise of his fiduciary duty under ERISA, considers prudent.  Any payment in accordance with these provisions shall be a complete discharge of any liability for the making of such payment under the provisions of the Regulations.

# ARTICLE 13

## DIRECT ROLLOVERS

**13.1     Rollovers from the Fund.**

(a)     A Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution from the Fund paid directly to an Eligible Retirement Plan specified by the Distributee in a direct rollover.

(b)     A Non-Spousal Beneficiary may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution from the Fund paid directly to an Inherited IRA specified by the Non-Spousal Beneficiary in a direct rollover.

(c)     A Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution from the Fund paid directly to a Roth IRA specified by the Distributee in a direct rollover, as permitted by Section 408A of the Code, provided that such amount is included in the gross income of the Distributee to the extent that such amount would have been includible if the distribution was not part of a qualified rollover contribution pursuant to Section 408A(d)(3)(A) of the Code.  However, for calendar years before 2010, the Distributee may not make this type of rollover if, for the calendar year the Eligible Rollover Distribution is made, he or she has modified adjusted gross income exceeding $100,000 (as adjusted by Section 408A(c)(3) of the Code) or is a married individual filing a separate federal income tax return.

(d)     For calendar year beginning on and after January 1, 2009, a Non-Spousal Beneficiary may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution from the Fund paid directly to a Roth IRA that is also considered an Inherited IRA specified by the Non-Spousal Beneficiary in a direct rollover, as permitted by Section 408A of the Code, provided that such amount is included in the gross income of the Non-Spousal Beneficiary to the extent that such amount would have been includible if the distribution was not part of a qualified rollover contribution pursuant to Section 408A(d)(3)(A) of the Code.  However, for calendar years before 2010, the Non-Spousal Beneficiary may not make this type of rollover if, for the calendar year the Eligible Rollover Distribution is made, he or she has modified adjusted gross income exceeding $100,000 (as adjusted by Section 408A(c)(3) of the Code) or is a married individual filing a separate federal income tax return.

**13.2     Rollovers to the Fund.**

(a)     An Active Employee or former Employee who previously participated in the Fund may elect to have a Valid Direct Rollover Contribution made to the Fund in a direct rollover.  Any Valid Direct Rollover

Contribution made to the Fund that is attributable to a designated Roth account shall be credited to the Member's Roth Rollover Subaccount.

(b)      Members may at any time, notwithstanding the restrictions on Member withdrawals set forth in Article 10, withdraw any Valid Direct Rollover Contributions made directly to the Fund and any interest and earnings attributable thereon.

(c)      If the Plan Administrator determines at any time that a rollover contribution to the Fund was not a Valid Direct Rollover Contribution at the time it was made, the Plan Administrator shall distribute to the Participant as soon as practicable, the amount of the contribution, together with interest and earnings attributable thereto.

13.3    **Representations.**

(a)      The Participant shall represent, and the Plan Administrator shall be entitled to reasonably rely upon the Participant's representation, that the direct rollover to the Fund was a Valid Direct Rollover Contribution. The Participant must also provide any documentation that the Plan Administrator may require to substantiate that the direct rollover to the Fund was a Valid Direct Rollover Contribution.

(b)      The Plan Administrator may also rely upon the representation of the Distributee (or Non-Spousal Beneficiary) that any direct rollover made pursuant to Section 13.1 of the Regulations is to an Eligible Retirement Plan (or an Inherited IRA in the case of a direct rollover by a Non-Spousal Beneficiary).

(c)      The Plan Administrator is not responsible for assuring that the Distributee (or Non-Spouse Beneficiary) is eligible to make a rollover to a Roth IRA pursuant to either Section 13.1(c) or Section 13.1(d).

# ARTICLE 14

## TRANSFERRED ASSETS

14.1    **Right to Transfer Assets to this Fund.**  In the event of, a transfer of assets from, or a merger or consolidation of, a Qualified Plan into this Fund, the Trustees may direct the Plan Administrator to accept Transferred Assets on behalf of a Member.

14.2    **Transferred Asset Accounts.**  Except as otherwise provided in these Regulations, assets transferred from a Qualified Plan to this Fund shall be accounted for as follows:

(a)      pre-tax elective deferrals (and earnings thereon) shall be credited to the Member Pre-Tax Subaccount;

(b)      catch-up contributions derived from pre-tax elective deferrals (and earnings thereon) shall be credited to the Member Catch-Up Subaccount;

(c)      participant after-tax contributions (and earnings thereon) shall be credited to the Member After-Tax Subaccount;

(d)      company contributions (and earnings thereon) that are not eligible for in-service distributions before the participant attains $59\frac{1}{2}$ years of age shall be credited to the Company Contribution Subaccount;

(e)      company contributions (and earnings thereon) that are eligible for in-service distributions before the participant attains $59\frac{1}{2}$ years of age shall be credited to the Prior Plan Company Contribution Subaccount;

(f)     employer matching contributions (and earnings thereon) that are subject to a vesting schedule shall be credited to the Prior Plan Scheduled Vesting Match Subaccount;

(g)     employer matching contributions (and earnings thereon) that are not subject to a vesting schedule shall be credited to the Prior Plan Fully Vested Match Subaccount;

(h)     after-tax rollover contributions (and earnings thereon) shall be credited to the After-tax Rollover Subaccount;

(i)     pre-tax rollover contributions (and earnings thereon) shall be credited to the Pre-Tax Rollover Subaccount;

(j)     qualified non-elective contributions (and earnings thereon) shall be credited to the QNEC Subaccount;

(k)     Roth Elective Deferrals and catch-up contributions derived from Roth Elective Deferrals (and earnings thereon) shall be credited to the Member Roth 401(k) Subaccount; and

(l)     rollover amounts from a designated Roth account as defined in Section 402A of the Code (and earnings thereon) shall be credited to the Roth Rollover Subaccount.

## ARTICLE 15

### STATEMENT OF ACCOUNT

**15.1    Periodic Statements.**  Each Accountholder shall receive a statement periodically, but not less frequently than annually, showing the value of his interest in each Investment Offering in which he is invested as of the end of the preceding period.   Such statements shall be deemed to be accepted as correct if no written objection shall have been made to the Trustees within sixty (60) days after the date of rendering.

**15.2    Amounts Standing to the Credit of a Participant.**  Whenever reference is herein made to the amounts standing to the credit of a Participant or Beneficiary, or to the amounts standing to his credit in the Fund, each such reference shall, unless otherwise specified, be deemed to include the value of his interest in each Investment Offering in which he is invested.

## ARTICLE 16

### COMMUNICATIONS

The Plan Administrator, or his designated agent, shall prescribe the appropriate methods of communication as he may deem expedient in the administration of the Shell Provident Fund.  No application, designation of beneficiary, notice, direction, request or other communication by the Participant or Beneficiary that is provided for under the terms of the Regulations shall be valid unless performed in the prescribed manner.  Except for such communications specifically directed to be sent to other persons or entities under the Regulations, no communications concerning the Shell Provident Fund shall be effective for any purpose unless provided in the manner prescribed by the Plan Administrator and received by the Plan Administrator or his designated agent at the time and place he may designate.

## ARTICLE 17

### CESSATION OF MEMBER COMPANY PARTICIPATION

**17.1**     Any Contributing Company which has joined the Fund may cease to be a participant in the Fund as provided in the Trust Agreement and thereupon its right and obligation to make further contributions to the Fund with respect to periods subsequent to the cessation of its participation shall terminate.

**17.2**     In such case, each Member then in the employ of such Contributing Company shall be relieved of the right and the obligation to make further Member Contributions to the Fund; but the amount standing to the credit of such Member shall be paid to him or his Beneficiary after the termination of service as provided in these Regulations, or earlier, as determined by the Trustees in accordance with the Trust Agreement.

## ARTICLE 18

### AMENDMENTS TO TRUST AGREEMENT AND REGULATIONS

**18.1**     Subject to limitations therein, the Trust Agreement and these Regulations may be amended by Shell Oil Company upon notification in writing to the Trustees. Such an amendment may be substantial and may be retroactive in effect but shall not reduce the amount then standing to the credit of any Member nor, except as permitted by Treasury Regulations, shall any such amendment eliminate an optional form of benefit with respect to benefits attributable to service before any such amendment. In amending the Trust Agreement and the Regulations, Shell Oil Company shall act through its Board of Directors or such person or persons as have been directly or indirectly delegated the authority of the Board to so act on behalf of Shell Oil Company. Notice to the chairman of the Trustees or to the secretary shall constitute notification to all of the Trustees.

**18.2**     Written notice of any material amendment shall be provided to all Members.

## ARTICLE 19

### MEMBER'S NONFORFEITABLE INTEREST

**19.1**     Except as set forth in Schedule D to the Regulations, each Member and each Beneficiary shall have, at all times, a nonforfeitable interest in the amount standing to his credit in the Fund. No Member or Beneficiary shall have any right to receipt of the amount standing to his credit in the Fund, except according to the provisions of the Trust Agreement and these Regulations.

**19.2**     If the Plan Administrator cannot ascertain the whereabouts of any Member or Beneficiary to whom a payment is due, the Plan Administrator may, after reasonable efforts have been exercised to locate such Participant or Beneficiary, direct that the payment and all remaining payments otherwise due to the payee be canceled on the records of the Fund and the amount thereof applied as a forfeiture in accordance with Section 6.5 of the Regulations. If the Participant or Beneficiary later notifies the Plan Administrator of his whereabouts, Shell Oil Company or such other Contributing Company as the Plan Administrator shall designate shall contribute to the Fund an amount equal to the payment to be paid to the payee as soon as administratively feasible.

## ARTICLE 20

### CLAIMS PROCEDURE

**20.1**     **Claim for Benefits.** Any claim for benefits under the Fund shall be made in writing and submitted to the Plan Administrator. The Plan Administrator shall reach a decision as soon as reasonable under the circumstances and notify the claimant, or his duly authorized representative, thereof promptly in writing by mail addressed to the last known address of the claimant or such representative, as the case may be, appearing on the records of the Plan Administrator. Such notice shall be furnished within 90 days after the Plan Administrator receives the claim, unless the Plan Administrator

determines that special circumstances require an extension of time for processing the claim, in which case the Plan Administrator shall have up to an additional 90 days to respond provided he gives notice of the extension, the reasons therefor, and the expected date of response to the claimant prior to the end of the initial 90-day period. If the claim is denied, in whole or part, the notice thereof shall be by certified mail, return receipt requested, and shall set forth, in a manner reasonably calculated to be understood by the claimant:

    (a)    the specific reason or reasons for the denial;

    (b)    specific reference to pertinent Fund provisions on which the denial is based;

    (c)    a description of any additional material or information to be submitted by the claimant in order to perfect his claim and an explanation of why such material or information is necessary; and

    (d)    an explanation of the Fund's claim review procedure and the time limits applicable thereto, including a statement of the claimant's right to bring a civil lawsuit under ERISA if the claim is denied on review.

**20.2**    **Appeals.**  In the event of the denial of a claim by the Plan Administrator, in whole or in part, the claimant or his duly authorized representative may, within the period ending ninety (90) days from the date of receipt of the denial:

    (a)    request a review of the claim, by filing a written application with the Trustees or a committee thereof;

    (b)    upon request, review pertinent documents, records, and other information and obtain copies free of charge; and

    (c)    submit comments, documents, records, and other information relating to the claim in writing.

For this purpose, documents, records, and other information are "pertinent" if they were relied upon in making the determination on the claim or if they were submitted, considered, or generated in the course of making the benefit determination.

**20.3**    **Review Board.**  The Trustees or a committee thereof shall constitute the review board, which shall fully review such request, review all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination, hold any hearing deemed appropriate by such review board, and notify the claimant or his duly authorized representative, of the decision in writing as soon as practicable, but in no event later than sixty (60) days after receipt of the written request for review; *provided, however,* if a hearing is requested or if the Trustees determine that special circumstances exist, the Trustees shall have up to an additional sixty (60) days to respond provided that they give notice of the extension, the reasons therefor, and the expected date of response to the claimant prior to the end of the initial 60-day period. Notwithstanding the foregoing, if the Trustees have regularly scheduled quarterly meetings, their response date shall be up to five (5) days after the next regularly scheduled meeting which comes at least thirty (30) days after their receipt of the request for review.  This response date may be extended if required by special circumstances, but in no event shall the Trustees respond later than five (5) days following the third regularly scheduled meeting after the receipt of the request for review.  In the event the review board confirms the denial of the claim for benefits, in whole or in part, the notice of denial shall set forth, in a manner reasonably calculated to be understood by the claimant, the specific reasons for the decision; reference to the specific Plan provisions on which the decision is based; the claimant's right to receive, upon request and without charge, reasonable access to, and copies of, all documents, records and other information pertinent to the claim; and the claimant's right to bring a civil action under ERISA.

**20.4**    **Extension for Providing Necessary Information.**  In the event the Plan Administrator or the Trustees extend the time for response to a claim due to the claimant's failure to provide information necessary to decide the claim, the period for the benefit determination shall be tolled from the date notice of the extension is sent to the claimant until the claimant responds to the request for additional information.

**20.5**    **Validating Representative of Claimant.**    The Plan Administrator may implement reasonable procedures for ensuring that an individual has been authorized to act on behalf of a claimant.

**20.6**    **Mandatory Use of Claims Procedure; Waiver of Claims; Forum and Venue.**

(a)    The use of the claims procedure of this Article is mandatory in pursuing claims for benefits. Except as otherwise provided, failure to file a claim by the end of the Plan Year following the Plan Year in which the individual knew or should have known of the claim shall constitute an irrevocable waiver of the claim unless it shall be shown not to have been reasonably possible to furnish proof of the claim within the specified time period, and that proof was furnished as soon as was reasonably possible, in which case failure to furnish proof within the time specified shall not invalidate nor reduce the claim.  Failure to raise issues or present evidence at any stage in the claims procedure shall preclude those issues or evidence from being presented in a judicial review of the claim.

(b)    A claimant may not bring an action in law or equity unless the claimant timely files claims and appeals in accordance with the claims procedure and otherwise follows the requirements of the claims procedure.  Claimants who do not comply with each step of the claims procedure shall not be deemed to have exhausted their administrative remedies. The claimant shall have two years from the date the Trustees deny all or part of the claimant's appeal to bring an action at law or in equity with respect to the portion of the claim that was denied.

(c)    The exclusive forum and venue for any legal or equitable action arising under or relating to the Fund (an "Action") shall be the United States District Court for the Southern District of Texas, Houston Division, so long as the federal courts may assert subject matter jurisdiction over the claims asserted in the Action, and unless the parties to the Action have expressly agreed in writing to a different forum or venue.  In the event the claims asserted in an Action are not subject to the subject matter jurisdiction of the federal courts, the exclusive forum and venue for such Action shall be the district courts of Harris County, Texas, unless the parties to the Action have expressly agreed in writing to another forum or venue.  By becoming a Participant, Accountholder or Beneficiary under the Fund, a Participant, Accountholder or Beneficiary consents to the personal jurisdiction of the United States District Court for the Southern District of Texas, Houston Division, and district courts of Harris County, as applicable, and waives any objections to personal jurisdiction or inconvenience of the forum and venue dictated by this provision.

**20.7**    **Plan Administrator.**    For purposes of this Article 20, the term Plan Administrator shall not include agents of the Plan Administrator.

**ARTICLE 21**

**PLAN ADMINISTRATOR - APPOINTMENT & DUTIES**

**21.1**    **Trustees and Plan Administrator.**    The Fund shall be administered by the Trustees and a Plan Administrator.  The Plan Administrator may be such entity or entities or person or persons as may be appointed by the Trustees.  The Plan Administrator may or may not be the Company, or a Member, or an Employee of Shell Oil Company and may or may not be a member of a group of individuals serving as Trustees under the Fund.  The Trustees may at any time remove or replace the Plan Administrator.  The Plan Administrator shall serve without compensation from the Fund.  However, the expenses of the Plan Administrator, including attorneys' fees and other costs incurred by it in the prosecution or defense of any legal action or proceeding regarding the Fund or the administration thereof to which the Plan Administrator may be a party in interest, shall be paid from the Fund unless the Plan Administrator shall be finally adjudged in such action, suit, or proceeding to have been guilty of fraud or willful misconduct in the performance of his duties.  Notwithstanding the preceding sentence, Shell Oil Company shall be responsible for the aforementioned expenses where Shell Oil Company has entered into a contractual obligation prior to the incursion of those expenses.

**21.2**    **Allocation of Fiduciary Responsibilities.**    If more than one individual or entity is appointed Plan Administrator, the Trustees may allocate some or all of the responsibilities of the Plan Administrator to each individual or entity so appointed, and each such individual or entity shall be responsible only for the duties allocated to it and any duties of the Plan Administrator which are not allocated.  If more than one individual or entity is appointed Plan Administrator and the Trustees do not allocate Plan Administrator responsibilities to the individuals or entities so appointed, the individuals or entities appointed Plan Administrator may, by executing a written instrument, allocate some or all of the responsibilities of the Plan Administrator among themselves as indicated in such written instrument

and each individual or entity shall be responsible only for the duties allocated to it and any duties which are not allocated. To the extent the responsibilities of the Plan Administrator are not allocated pursuant to this Section 21.2 to the individuals or entities appointed as Plan Administrator, the action of the Plan Administrator shall be taken by majority vote, or if less than three individuals or entities are appointed Plan Administrator, by unanimous consent. The Plan Administrator may designate persons or entities other than the Plan Administrator to perform some or all of the responsibilities of the Plan Administrator.

**21.3    Powers and Duties of the Plan Administrator.**   The Plan Administrator shall have the following powers and duties in addition to those stated elsewhere in the Regulations:

(a)    To prescribe such procedures, rules, and regulations as it shall deem necessary or proper for the efficient administration of the Fund;

(b)    To determine all questions arising in its administration of the Fund, including the power to determine the rights of any Participants or Beneficiaries and to determine, without limitation, all questions of eligibility pursuant to the claims procedure stated herein;

(c)    To enforce the Fund in accordance with its terms and with the rules, regulations, and procedures prescribed by the Plan Administrator, and to consider and interpret the Regulations and Trust Agreement and settle and discharge disputes arising thereunder;

(d)    To determine the fair market value of assets of the Fund as often as required by these Regulations and at least annually; to keep the books and records of the Fund and to do all the clerical, bookkeeping, and accounting work in connection with the management and administration of the Fund; and to furnish to each Participant and Beneficiary, who is an Accountholder, within a reasonable time after the close of each Fund Year a statement of the amount standing to his credit in the Fund;

(e)    To prepare and distribute all reports required by law or the Fund;

(f)    To prepare and distribute, as required by law and in such manner as the Plan Administrator may determine to be appropriate, information concerning the Fund; and

(g)    To employ such agents, attorneys, accountants, and other individuals as deemed necessary or advisable for the administration of the Fund. The Plan Administrator shall consider the records of the Contributing Companies and Affiliated Companies as conclusive evidence in making determinations concerning eligibility or benefits under the Fund except in unusual circumstances.

**21.4    No Bond Required.**   No bond or other security shall be required of the Plan Administrator for the faithful performance of its duties hereunder, except as may be required by ERISA and the Code or by any other state or federal law or regulations.

**21.5    Delegation of Authorities.**   Further, it is the intent of these Regulations that the Plan Administrator be able to delegate certain ministerial functions within the framework of policies, interpretations, rules, practices, and procedures set by such Plan Administrator without delegating any power to the appointee to make any decisions as to such. Following are the types of administrative functions intended to be covered by this delegation:

(a)    Application of rules determining eligibility for participation or benefits;

(b)    Calculation of service for participation and Compensation for benefits;

(c)    Preparation of Participant and Beneficiary communications material;

(d)    Maintenance of Employees' service and employment records;

(e)     Preparation of reports required by government agencies;

(f)     Calculation of benefits;

(g)     Orientation of new Employees and advising Participants and Beneficiaries of their rights and options under the Fund;

(h)     Collection of Member Contributions and Company Contributions and applications of such Contributions as provided in the Fund (if any);

(i)     Preparation of reports concerning benefits of Members and Beneficiaries;

(j)     Processing of claims; and

(k)     Making recommendations to others for decisions with respect to plan administration.

**21.6    Authorities and Responsibilities of Shell Oil Company.**  Shell Oil Company shall have the authority and responsibility for:  (a) amending the Fund in accordance with Article 18 hereof; (b) designating the Trustees; and (c) the exercise of all non-delegable, non-allocable, fiduciary functions provided in the Fund or Trust Agreement required by law and necessary to the operation of the Fund.

**21.7    Authorities and Responsibilities of the Trustees.**  For a statement of the powers and responsibilities of the Trustees, reference is made to the Trust Agreement.  In case of any conflict or inconsistency between the Trust Agreement and these Regulations, the former shall govern as to everything except as to ministerial functions set forth above.

**21.8    Discretion with Respect to Awards and Settlements**.  Unless a court of law or governmental body shall direct otherwise, nothing contained herein shall require the Plan Administrator to allocate proceeds from the prosecution or settlement of class action, ERISA, shareholder, or securities litigation or enforcement activities among some or all Accountholders (including, for this purpose, Impacted Persons) where the costs and complexities of allocating proceeds among Accountholders outweighs the benefits.

**21.9    Scrivener's Error**.

If, due to errors in drafting, any provision of the Regulations does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent (including evidence in the records of the Contributing Companies), the provision shall be considered ambiguous and shall be interpreted by the Plan Administrator in the exercise of his discretion and authority under Section 21.3 and the Trustees in the exercise of their discretion and authority under Section XII of the Trust Agreement in a fashion consistent with its intended meaning.  The Company shall amend the Regulations to cure any such ambiguity, and any such amendment may be retroactive.  This Section 21.9 may not be invoked by any person to require the Regulations to be interpreted in a manner that is inconsistent with its interpretation by the Plan Administrator and the Trustees.

## ARTICLE 22

### TOP-HEAVY RULES

**22.1    Operation of Article.**  The requirements of this Article shall become operative only during a Plan Year beginning after December 31, 1983, for which the Plan should become Top-Heavy.  In addition, for Plan Years beginning after December 31, 2001, the provisions of Section 22.5 shall apply.

**22.2    Determination of Top-Heavy Status.**

(a)     The Plan is Top-Heavy with respect to any Plan Year if, as of the Determination Date applicable to such year, (1) the ratio of the aggregate of Accounts of Members who are Key Employees to the aggregate of Accounts of all Members exceeds 60%, or (2) the Plan is part of a Required Aggregation Group which is Top-Heavy.

Notwithstanding anything to the contrary, the Plan shall not be considered Top-Heavy for any Plan Year in which the Plan is a part of a Permissive Aggregation Group which is not Top-Heavy.

(b)     For purposes of testing for Top-Heavy status, (1) the Accounts and the present value of cumulative accrued benefits shall be determined as of the Valuation Date applicable to the Determination Date; (2) individuals who have not been employed by a Contributing Company at any time within the last five years shall not be included; and (3) the provisions of Section 416 of the Code and the Treasury Regulations thereunder shall be applied.

**22.3     Annual Compensation Limit.**     Compensation of any Member in excess of the Annual Compensation Limit shall not be taken into account.

**22.4     Top-Heavy Contribution.**     In the event that contributions by a Contributing Company to the Fund during the Plan Year on behalf of a Member who is a Non-Key Employee are less than three percent (3%) of such Member's 415 Compensation and provided that such Member has not separated from the service of the Employing Company on the last day of such Plan Year, the Employing Company shall contribute an amount equal to the difference between three percent (3%) of such Member's 415 Compensation, and the contributions by a Contributing Company which have been paid to the Fund on behalf of such Member for the Plan Year.

**22.5     Modification of Top-Heavy Rules.**

(a)     This Section 22.5 shall apply for purposes of determining whether the Plan is a Top-Heavy plan under Section 416(g) of the Code for Plan Years beginning after December 31, 2001, and whether the Plan satisfies the minimum benefits requirements of Section 416(c) of the Code for such Plan Years. This Section 22.5 amends the preceding provisions of this Article.

(b)     This Section 22.5(b) shall apply for purposes of determining the present values of accrued benefits and the amounts of Account balances of Employees as of the Determination Date.

(1)     The present values of accrued benefits and the amounts of Account balances of an Employee as of the Determination Date shall be increased by the distributions made with respect to the Employee under the Fund and any plan aggregated with the Fund under Section 416(g)(2) of the Code during the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Fund under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting 5-year period for 1-year period.

(2)     Employees not performing services during the Plan Year ending on the Determination Date. The accrued benefits and accounts of any individual who has not performed services for the Employer during the 1-year period ending on the Determination Date shall not be taken into account.

## ARTICLE 23

### NONDISCRIMINATION TEST FOR MEMBER CONTRIBUTIONS

**23.1     ADP Limit.**

(a)     The Average Actual Deferral Percentage for Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the greater of:

(1)     the Average Actual Deferral Percentage for Eligible Employees who are Nonhighly Compensated Employees for the Plan Year multiplied by 1.25; or

(2)     the lesser of: (A) the Average Actual Deferral Percentage for Eligible Employees who are Nonhighly Compensated Employees for the Plan Year multiplied by 2.00; or (B) the Average Actual Deferral Percentage for Eligible Employees who

are Nonhighly Compensated Employees for the Plan Year plus 2 percentage points.

(b) The Actual Deferral Percentage for any Eligible Employee who is a Highly Compensated Employee for the Plan Year and who is eligible to participate in two or more plans of the Employer to which elective deferrals are made, shall be determined by aggregating all such elective deferrals on behalf of such Highly Compensated Employee. If two or more plans of the Employer are permissively aggregated for purposes of Section 401(k) of the Code, the aggregated plans must also satisfy Section 401(a)(4) and 410(b) of the Code as though they were a single plan. If one or more plans of an Employer are aggregated with the Fund for purposes of satisfying the requirements of Section 401(a)(4) or 410(b) of the Code, the Actual Deferral Percentages under the Fund shall be calculated as if the Fund and such one or more other plans were a single plan.

(c) For purposes of applying the ADP Limit, Testing Compensation shall be computed on an entire Plan Year basis and with reference to the current Plan Year at the time the ADP Limit is applied. Reductions and increases made to satisfy such limit shall not affect persons who are not then Eligible Employees. Where limits are computed prior to the end of a Plan Year, the Plan Administrator may estimate or project Testing Compensation. The Plan Administrator may elect to include in a person's Testing Compensation only Compensation received while such person was an Eligible Employee, provided the election is applied uniformly to all Eligible Employees for the Plan Year.

(d) Except for purposes of determining Highly Compensated Employees and Nonhighly Compensated Employees, the portion of the Fund that benefits Employees who are included in a unit of employees covered by a collective bargaining agreement is treated as a separate plan from the portion of the Fund that benefits Employees who are not so covered.

**23.2** **Reduction of Member Elective Deferrals to Comply with ADP Limit.**

(a) The Plan Administrator shall monitor the amount of Member Elective Deferrals and shall effect whatever prospective reductions to the Actual Deferral Percentages of the Highly Compensated Employees are necessary or advisable to comply with the ADP Limit.

(b) If the Plan Administrator prospectively reduces the Actual Deferral Percentages of Highly Compensated Employees, he shall do so in the order of their Actual Deferral Percentages beginning with the highest of such percentages. If the Plan Administrator determines that the reduction in effect is no longer necessary or advisable, he may increase the Actual Deferral Percentages of all Highly Compensated Employees who had their Actual Deferral Percentages reduced, in the reverse order of their Actual Deferral Percentages beginning with the lowest of such percentages and continuing until the original Actual Deferral Percentages of all such Highly Compensated Employees have been restored or until he determines that no further increases are advisable, whichever occurs first. All reductions or increases of Actual Deferral Percentages hereunder shall be in multiples of 1%, and such reductions may result in Member Elective Deferrals of such Highly Compensated Employees being reduced to zero.

(c) When reducing or increasing the Actual Deferral Percentages of Highly Compensated Employees, the Plan Administrator shall treat all such Highly Compensated Employees having the same Actual Deferral Percentages in effect in the same manner.

(d) Any action taken by the Plan Administrator under this Section 23.2 may be taken without the consent of, or prior notice to, the affected Members, but such Members shall be promptly informed in writing of the Plan Administrator's action.

**23.3** **Distribution of Excess Contributions.**

(a) The determination of whether or not Excess Contributions exist shall be made after reductions, if any, under Section 23.2.

(b)    Excess Contributions, and any income allocable thereto, shall be distributed after the Plan Year in which the Excess Contributions arose and no later than March 15 of the following Plan Year to Highly Compensated Employees to whose Accounts Excess Contributions were made.

(c)    A distribution of Excess Contributions and income shall be made without the consent of the Participant or the spouse of the Participant.

(d)    The total amount of Excess Contributions for the Highly Compensated Employees for a Plan Year is determined as follows: Highly Compensated Employees with the largest Actual Deferral Percentage shall be identified and a determination shall be made as to how much their Actual Deferral Percentage must be reduced so that the Fund would satisfy the ADP Limit or such Highly Compensated Employees' Actual Deferral Percentage will be reduced to equal the Actual Deferral Percentage of the Highly Compensated Employees with the next highest Actual Deferral Percentage. The procedure described in the preceding sentence shall be repeated until the Fund would satisfy the ADP Limit.

(e)    The total amount of Excess Contributions for the Highly Compensated Employees for a Plan Year shall be distributed as follows:  The Member Elective Deferrals of the Highly Compensated Employees with the highest dollar amount shall be reduced by the amount required to cause their Member Elective Deferrals to equal the lesser of (1) the dollar amount of the Member Elective Deferrals of the Highly Compensated Employees with the next highest dollar amount of Member Elective Deferrals, or (2) the amount that, when added to the total dollar amount already distributed under this process, would equal the total amount of Excess Contributions.  This amount along with allocable income determined under Section 23.3(f) shall be distributed to the Highly Compensated Employees for which a reduction was applied.  The procedure described in the preceding sentence shall be repeated until the Fund distributes the total Excess Contributions of the Highly Compensated Employees, thereby satisfying the ADP Limit.

(f)    The income allocable to Excess Contributions for the Plan Year in which such Excess Contributions arose and for the period between the end of such Plan Year and the date of distribution, shall be determined in accordance with Department of Treasury Regulations 1.401(k)-2.

(g)    The Excess Contributions for the Plan Year which would otherwise be distributed to the Participant shall be reduced, in accordance with Department of Treasury Regulations, by the Excess Deferral Amounts previously distributed to the Participant for the taxable year ending in that Plan Year.  Also, the correction shall be satisfied from Member Roth 401(k) Contributions before any Member Pre-Tax Contributions.

**23.4    ACP Limit.**

(a)    The Average Actual Contribution Percentage for Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the greater of:

(1)    the Average Actual Contribution Percentage for Eligible Employees who are Nonhighly Compensated Employees for the Plan Year multiplied by 1.25; or

(2)    the lesser of: (A) the Average Actual Contribution Percentage for Eligible Employees who are Nonhighly Compensated Employees for the Plan Year multiplied by 2.00; or (B) the Average Actual Contribution Percentage for Eligible Employees who are Nonhighly Compensated Employees for the Plan Year plus 2 percentage points.

(b)    The Actual Contribution Percentage for any Eligible Employee who is a Highly Compensated Employee for the Plan Year and who is eligible to participate in two or more plans of the Employer to which matching employer contributions, employee after-tax contributions, or both, are made, shall be determined by aggregating all such contributions on behalf of such Highly Compensated Employee.  If two or more plans of the Employer are permissively aggregated for purposes of Section 401(m) of the Code, the aggregated plans must also satisfy Section 401(a)(4) and 410(b) of the Code as though they were a single plan.  If one or more plans of an

Employer are aggregated with the Fund for purposes of satisfying the requirements of Section 401(a)(4) or 410(b) of the Code, the Actual Contribution Percentages under the Fund shall be calculated as if the Fund and such one or more other plans were a single plan.

(c)     For purposes of applying the ACP Limit, Testing Compensation shall be computed on an entire Plan Year basis and Testing Compensation shall be with reference to the current Plan Year at the time the ACP Limit is applied. Reductions and increases made to satisfy such limits shall not affect persons who are not then Eligible Employees. Where limits are computed prior to the end of a Plan Year, the Plan Administrator may estimate or project Testing Compensation. The Plan Administrator may elect to include in a person's Testing Compensation only compensation received while such person was an Eligible Employee, provided the election is applied uniformly to all Eligible Employees for the Plan Year.

(d)     Except for purposes of determining Highly Compensated Employees and Nonhighly Compensated Employees, the portion of the Fund that benefits Employees who are included in a unit of employees covered by a collective bargaining agreement is treated as a separate plan from the portion of the Fund that benefits Employees who are not so covered.

**23.5     Reduction of Member After-Tax Contributions to Comply with ACP Limit.**

(a)     The Plan Administrator shall monitor the amount of Member After-Tax Contributions and shall effect whatever prospective reductions to the Actual Contribution Percentages of the Highly Compensated Employees are necessary or advisable to comply with the ACP Limit.

(b)     If the Plan Administrator prospectively reduces the Actual Contribution Percentages of Highly Compensated Employees, he shall do so in the order of their Actual Contribution Percentages beginning with the highest of such percentages. If the Plan Administrator determines that the reduction in effect is no longer necessary or advisable, he may increase the Actual Contribution Percentages of all Highly Compensated Employees who had their Actual Contribution Percentages reduced, in the reverse order of their Actual Contribution Percentages beginning with the lowest of such percentages and continuing until the original Actual Contribution Percentages of all such Highly Compensated Employees have been restored or until he determines that no further increases are advisable, whichever occurs first. All reductions or increases of Actual Contribution Percentages hereunder shall be in multiples of 1%. Member After-Tax Contributions of such Highly Compensated Employees may be reduced to zero.

(c)     When reducing or increasing the Actual Contribution Percentages of Highly Compensated Employees, the Plan Administrator shall treat all Highly Compensated Employees having the same Actual Contribution Percentages in effect in the same manner.

(d)     Any action taken by the Plan Administrator under this Section 23.5 may be taken without the consent of, or prior notice to, the affected Members, but such Members shall be promptly informed in writing of the Plan Administrator's action.

**23.6     Distribution of Excess Aggregate Contributions.**

(a)     The determination of whether or not Excess Aggregate Contributions exist shall be made after reductions, if any, under Section 23.5.

(b)     Excess Aggregate Contributions, and any income allocable thereto, shall be distributed after the Plan Year in which the Excess Aggregate Contributions arose and no later than March 15 of the following Plan Year to Highly Compensated Employees to whose Accounts Excess Aggregate Contributions were made.

(c)     A distribution of Excess Aggregate Contributions and income shall be made without the consent of the Participant or the spouse of the Participant.

(d)     The total amount of Excess Aggregate Contributions for the Highly Compensated Employees for a Plan Year is determined as follows: Highly Compensated Employees with the largest Actual

Contribution Percentage shall be identified and a determination shall be made as to how much their Actual Contribution Percentage must be reduced so that the Fund would satisfy the ACP Limit or such Highly Compensated Employees' Actual Contribution Percentage will be reduced to equal the Actual Contribution Percentage of the Highly Compensated Employees with the next highest Actual Contribution Percentage. The procedure described in the preceding sentence shall be repeated until the Fund would satisfy the ACP Limit.

(e)    The total amount of Excess Aggregate Contributions for the Highly Compensated Employees for a Plan Year shall be distributed as follows:  The Member After-Tax Contributions of the Highly Compensated Employees with the highest dollar amount shall be reduced by the amount required to cause their Member After-Tax Contributions to equal the lesser of (1) the dollar amount of the Member After-Tax Contributions of the Highly Compensated Employees with the next highest dollar amount of Member After-Tax Contributions, or (2) the amount that, when added to the total dollar amount already distributed under this process, would equal the total amount of Excess Aggregate Contributions.  This amount along with allocable income determined under Section 23.6(f) shall be distributed to the Highly Compensated Employees for which a reduction was applied.  The procedure described in the preceding sentence shall be repeated until the Fund distributes the total Excess Aggregate Contributions of the Highly Compensated Employees, thereby satisfying the ACP Limit.

(f)    The income allocable to Excess Aggregate Contributions for the Plan Year in which such Excess Aggregate Contributions arose and for the period between the end of such Plan Year and the date of distribution, shall be determined in accordance with Department of Treasury Regulation Section 1.401(m)-2.

**23.7    General 401(a)(4) Test.**  Where it has been determined by Shell Oil Company that Company Contributions do not satisfy the nondiscrimination requirements of Section 401(a)(4) of the Code and regulations issued thereunder for a Tested Plan Year, additional Company Contributions may be made until Company Contributions satisfy such requirements.  Where additional Company Contributions are credited to a Member's Account pursuant to this Section 23.7, earnings shall be credited at the greater of zero percent or the actual positive rate of return on the Member's Account for each of the Tested Plan Year and any subsequent Plan Year or any portion thereof in which the additional Company Contribution is made.  Any such additional Company Contributions, and any earnings thereon, shall be provided only for individuals who:

(a)    are Nonhighly Compensated Employees for such Tested Plan Year,

(b)    are Employees at the time such additional Company Contributions are made,

(c)    are in a Relevant Rate Group,

(d)    have the highest equivalent accrual rates of Nonhighly Compensated Employees, as determined by Shell Oil Company when testing the Fund for such Tested Plan Year under Treasury Regulations Section 1.401(a)(4)-8, in the order of such rates beginning with the highest, and

(e)    also have the highest performance code in such Relevant Rate Group at the time such additional Company Contributions are made, in order of such performance codes beginning with the highest, effective for a Tested Plan Year commencing on or after January 1, 2001, where the conditions set forth in subparagraphs (a) through (d) above result in an over-inclusion of Employees eligible for any additional Company Contributions.

## ARTICLE 24

### MILITARY SERVICE AND HEART ACT REQUIREMENTS

**24.1**    Notwithstanding any provision of these Regulations to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code, except for the optional provisions of Section 414(u)(9) of the Code.

**24.2**     Notwithstanding any provision of these Regulations to the contrary, in the case of a Member who dies while performing qualified military service as defined in Section 414(u) of the Code, the survivors of such Member shall be entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided for under these Regulations (if any) had the Member resumed employment and then terminated employment on account of death, as required by Section 401(a)(37) of the Code.

**24.3**     Notwithstanding any provision of these Regulations to the contrary, effective for plan years beginning on or after January 1, 2009, any "differential wage payment" as defined in Section 3401(h)(2) of the Code received by an Employee from an Employing Company shall be treated as Compensation and 415 Compensation (to the extent that the Plan does not already provide), and the Plan shall not be treated as failing to meet the requirements of any provision described in Section 414(u)(1)(A) of the Code by reason of any contribution or benefit which is based upon such "differential wage payment".

**24.4**     Notwithstanding any provision of these Regulations to the contrary, effective for plan years beginning on or after January 1, 2009, for purposes of Section 401(k)(2)(B)(i)(I) of the Code, a Member shall be treated as having severed from employment during any period the Member is performing service in the uniformed services described in Section 3401(h)(2)(A) of the Code.  However, in the event that the Member elects to receive a distribution by reason of the treatment afforded by this Section 24.4, such Member may not make any Member Contributions to the Fund for a period of at least 6 months beginning on the date of such distribution.

## ARTICLE 25

### MINIMUM DISTRIBUTION REQUIREMENTS

**25.1**     **General Rules.**

(a)     The provisions of this Article will apply for purposes of making required minimum distributions on and after January 1, 2003.

(b)     The requirements of this Article will take precedence over any inconsistent provisions of these Regulations.

(c)     All distributions required under this Article will be determined and made in accordance with the Treasury Regulations under Section 401(a)(9) of the Code.

(d)     Notwithstanding the other provisions of this Article , distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and the provisions of the Regulations that relate to Section 242(b)(2) of TEFRA.

**25.2**     **Time and Manner of Distribution.**

(a)     A Participant's entire interest will be distributed, or begin to be distributed, to such Participant no later than the Participant's Required Beginning Date.

(b)     If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(1)     If the Participant's surviving spouse is the Participant's sole Designated Beneficiary, then, except as provided in Section 25.6, distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70 1/2, if later.

(2)     If the Participant's surviving spouse is not the Participant's sole Designated Beneficiary, then, except as provided in Section 25.6, distributions to the Designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(3)    If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(4)    If the Participant's surviving spouse is the Participant's sole Designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, Section 25.2(b), other than Section 25.2(b)(1), will apply as if the surviving spouse were the Participant.

For purposes of this Section 25.2(b) and Section 25.4, unless Section 25.2(b)(4) applies, distributions are considered to begin on the Participant's Required Beginning Date. If Section 25.2(b)(4) applies, distributions are considered to begin on the date distributions are required to begin to the surviving spouse under Section 25.2(b)(1).

(c)    Unless the Participant's interest is distributed in a single sum on or before the Required Beginning Date, as of the first Distribution Calendar Year, distributions will be made in accordance with Section 25.3 and Section 25.4.

25.3    **Required Minimum Distributions During Participant's Lifetime.**

(a)    During the Participant's lifetime, the minimum amount that will be distributed for each Distribution Calendar Year is the lesser of:

(1)    the quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

(2)    if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the Distribution Calendar Year.

(b)    Required minimum distributions will be determined under this Section 25.3 beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

25.4    **Required Minimum Distributions After Participant's Death.**

(a)    The following rules apply in the event death occurs on or after the date distributions begin.

(1)    If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as follows:

(A)    The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)    If the Participant's surviving spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the surviving spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For Distribution Calendar Years after the year of the surviving spouse's death, the remaining Life Expectancy of the

surving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(C)    If the Participant's surviving spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(2)    No Designated Beneficiary. If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(b)    The following rules apply in the event death occurs before the date distributions begin.

(1)    If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in Section 25.4(a).

(2)    If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(3)    If the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole Designated Beneficiary, and the surviving spouse dies before distributions are required to begin to the surviving spouse under Section 25.2(b)(1), this Section 25.4(b) will apply as if the surviving spouse were the Participant.

**25.5    Required Minimum Distributions during Distribution Calendar Years.** The required minimum distribution for the Participant's first Distribution Calendar Year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that Distribution Calendar Year.

**25.6    Election to Allow Designated Beneficiaries to Elect 5-Year Rule.** Designated Beneficiaries may elect on an individual basis whether the 5-year rule or the life expectancy rule in Section 25.2(b) and Section 25.4(b) applies to distributions after the death of a Participant who has a Designated Beneficiary. The election must be made no later than September 30 of the calendar year in which distribution would be required to begin under Section 25.2(b). If the Designated Beneficiary does not make an election under this Section 25.6, distributions will be made in accordance with Section 25.2(b) and Section 25.4(b).

**25.7    Election to Allow Designated Beneficiary Receiving Distributions Under the 5-Year Rule to Elect Life Expectancy Distributions.** A Designated Beneficiary may make a new election to receive payments under the life expectancy rule until November 1, 2003, provided that all amounts that would have been required to be distributed under the life expectancy rule for all Distribution Calendar Years before 2004 are distributed by December 31, 2003.

**25.8    Special Rules for MRD Suspension in 2009.**

Notwithstanding any provision to the contrary, a Participant or Designated Beneficiary who would have been required to receive required minimum distributions for 2009 but for the enactment of section 401(a)(9)(H) of the Code will not receive those distributions for 2009 unless the Participant or Designated Beneficiary chooses to receive such distributions. Participants and Designated Beneficiaries described in the preceding sentence will be given the opportunity to elect to receive the distributions described in the preceding sentence, and such distributions will be

treated as eligible rollover distributions in 2009 for purposes of applying the direct rollover rules of Section 13.1 of the Regulations.

## ARTICLE 26

## RECOUPMENT

### 26.1    Mistakes in Calculation and/or Payment.

If a mistake is made in the calculation or payment of a benefit under the Regulations or the data on which such benefit is based, benefits shall be adjusted to correct such mistake, and the amount of any overpayment (or underpayment) made to, on behalf of, or with respect to the Participant or Present Interest Beneficiary shall be restored promptly or, to the extent of an overpayment that is not promptly restored, shall be deducted from such futures payments as the Trustees and the Plan Administrator shall direct or shall be otherwise recouped from money and assets in the hands of, or under the control of, any such direct or indirect recipient.

### 26.2    Obligation to Cooperate Fully.

If a mistake is made, the Participant, Present Interest Beneficiary, and/or such estate, legal representative, or other person as shall have directly or indirectly received any overpayment shall cooperate fully with the Trustees and Plan Administrator to correct any mistakes by, among other things, promptly restoring overpayments to the Fund and making arrangements to restore as soon as possible any overpayments which, in the judgment of the Trustees and Plan Administrator, cannot be restored right away.

### 26.3    Offset Authority.

The Plan Administrator may correct overpayments due to calculation, payment, and other mistakes by offsetting all or a part of the Account or one or more future payments by up to 100 percent of the future payment amount.  Where the Plan Administrator takes extraordinary steps to recover overpayments, the Participant, Present Interest Beneficiary, and/or other persons who directly or indirectly received the overpayment may also be required to restore to the Fund expenses incurred in connection with the Plan Administrator's recoupment efforts, including but not limited to costs of investigation, filing fees, court costs, and attorneys' fees.

### 26.4    Exceptions to Recoupment Efforts.

The Trustees and Plan Administrator need not pursue recoupment efforts to the extent an overpayment is small and not required to be recovered under the correction principles of the Employee Plans Compliance Resolution System (or similar subsequent guidance) or to the extent an overpayment is timely repaid or otherwise restored to the Fund.

## ARTICLE 27

## ROTH ELECTIVE DEFERRALS

### 27.1    General Application.

(a)    This Article will apply to assets transferred into the Fund in connection with the merger of the East Resources Retirement Savings Plan into the Fund on or about November 30, 2012, that were attributable to the "Roth Deferral Account" in the East Resources Retirement Savings Plan and credited to the Member Roth 401(k) Subaccount established under the Fund, and such Subaccount's allocable portion of net gains and losses.   Effective on and after January 1, 2015, this Article will also apply to Member Roth 401(k) Contributions which shall be credited to the Member Roth 401(k) Subaccount established under the Fund, and such Subaccount's allocable portion of net gains and losses.

(b)    Prior to January 1, 2015, the Fund will not accept Roth Elective Deferrals except for the amounts transferred into the Fund as indicated in Section 27.1(a) above. Effective on and after January 1, 2015, the

Fund will accept Roth 401(k) Contributions. The Member Roth 401(k) Subaccount will be maintained as a separate account as described in Section 27.2 below.

(c)     Unless specifically stated otherwise, amounts in the Member Roth 401(k) Subaccount will be treated as elective deferrals for all purposes under the Fund.

**27.2**     **Separate Accounting.**

(a)     Withdrawals of Roth Elective Deferrals will be debited to the Member Roth 401(k) Subaccount maintained for each Participant.

(b)     The Fund will maintain a record of the amount of Roth Elective Deferrals in each Participant's Account.

(c)     Gains, losses, and other credits or charges must be separately allocated on a reasonable and consistent basis to each Participant's Member Roth 401(k) Subaccount and the Participant's other Subaccounts under the Fund.

(d)     No contributions (other than Roth Elective Deferrals and properly attributable earnings) will be credited to each Participant's Member Roth 401(k) Subaccount.

## ARTICLE 28

### ROTH IN-PLAN CONVERSION

**28.1**     **Roth-In Plan Conversion in General.**

Effective on and after January 1, 2015, a Distributee shall be eligible to make a Roth In-Plan Conversion.

**28.2**     **Crediting of Roth-In Plan Conversion Amounts.**

Roth In-Plan Conversion amounts shall be credited pursuant to the following:

(a)     A Roth In-Plan Conversion from the following Subaccounts will be directly rolled into the Distributee's Roth Conversion Unrestricted Sources Subaccount:

(1)     Member After-Tax Subaccount;

(2)     Prior Plan Fully Vested Match Subaccount;

(3)     Prior Plan Company Contribution Subaccount;

(4)     After-Tax Rollover Subaccount; and

(5)     Pre-Tax Rollover Subaccount.

(b)     A Roth In-Plan Conversion from the following Subaccounts will be directly rolled into the Distributee's Roth Conversion Restricted Sources Subaccount:

(1)     Company Contribution Subaccount;

(2)     QNEC Subaccount; and

(3)     Prior Plan Scheduled Vesting Match Subaccount.

(c)      A Roth In-Plan Conversion from the following Subaccounts will be directly rolled into the Distributee's Roth Conversion Member Pre-Tax Sources Subaccount:

(1)      Member Pre-Tax Subaccount; and

(2)      Member Catch-Up Subaccount.

### 28.3    Separate Accounting.

(a)      Gains, losses, and other credits or charges must be separately allocated on a reasonable and consistent basis to each Distributee's Designated Roth Subaccounts under the Fund.

(b)      No contributions will be credited to a Distributee's Designated Roth Subaccounts (other than the Member Roth 401(k) Subaccount and the Roth Rollover Subaccount) except as provided by this Article 28.

### 28.4    Withdrawal Rights.

(a)      A Distributee may at any time, notwithstanding the restrictions on withdrawals set forth in Article 10, withdraw any Roth In-Plan Conversion amounts directly rolled into the Roth Conversion Unrestricted Sources Subaccount pursuant to this Article 28 and attributable to amounts from the Subaccounts identified under Section 28.2(a) of the Regulations.

(b)      Upon completion of a Roth In-Plan Conversion, a Distributee shall retain any optional forms of benefit as required under Section 411(d)(6) of the Code.  Such distribution rights are not eliminated solely as a result of a Roth In-Plan Conversion.

### 28.5    Investment of Roth In-Plan Conversion Amounts.

Roth In-Plan Conversion amounts shall be invested in the same Investment Offerings in which such amounts were invested immediately prior to the Roth In-Plan Conversion.

## SCHEDULE A

### CONTRIBUTING COMPANIES

SHELL OIL COMPANY
EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US
PECTEN MIDDLE EAST SERVICES COMPANY LIMITED
PECTEN PRODUCING COMPANY
PENNZOIL-QUAKER STATE COMPANY d/b/a SOPUS PRODUCTS
SHELL CATALYSTS & TECHNOLOGIES US LP
SHELL CHEMICAL LP
SHELL DOWNSTREAM INC.
SHELL ENERGY RESOURCES COMPANY
SHELL EXPATRIATE EMPLOYMENT US INC.
SHELL EXPLORATION & PRODUCTION COMPANY
SHELL GLOBAL SOLUTIONS (US) INC.
SHELL INFORMATION TECHNOLOGY INTERNATIONAL INC.
SHELL INTERNATIONAL EXPLORATION AND PRODUCTION INC.
SHELL MARINE PRODUCTS (US) COMPANY
SHELL NORTH AMERICA GAS & POWER SERVICES COMPANY
SHELL OFFSHORE INC.
SHELL OIL PRODUCTS COMPANY LLC
SHELL PIPELINE COMPANY LP
SHELL TRADEMARK MANAGEMENT INC.
SHELL TRADING NORTH AMERICA COMPANY
SHELL TRADING RISK MANAGEMENT, LLC
SHELL TRADING SERVICES COMPANY
SHELL TRADING (US) COMPANY
SHELL US GAS & POWER LLC
SHELL WINDENERGY SERVICES INC.
SOPC SOUTHEAST INC.
SWEPI LP

## SCHEDULE B

### SPECIAL RULES APPLICABLE TO CERTAIN GROUPS OF PARTICIPANTS

This Schedule sets forth special benefit and service rules applicable to certain groups of Participants and shall apply notwithstanding anything in the Plan to the contrary.  This Schedule includes the following parts:

B-1     Transfer of Funds from the Shell Employee Stock Ownership Plan

B-2     Rollover of Distributed Funds from Kernridge Savings Plan

B-3     Assets Transferred from the Siemens Savings Plan

B-4     Merger of CRI Group Savings and Profit Sharing Plans

B-5     Grant of Past Service Credit to Willow Island Employees

B-6     Grant of Past Service Credit to Alliance Company Employees

B-7     Assets Transferred from the Pennzoil-Quaker State Company Savings and Investment Plan and the Pennzoil-Quaker State Company Savings and Investment Plan for Hourly Employees

B-8     Merger of Shell Trading Savings Plan

B-9     Grant of Past Service Credit to PQS Company Employees and JLI Company Employees

B-10    Merger of Shell Pay Deferral Investment Fund

B-11    Merger of the Pennzoil-Quaker State Company Savings and Investment Plan

B-12    Grant of Past Service Credit to East Resources Management, LLC Employees

B-13    Merger of the East Resources Retirement Savings Plan

B-14    Grant of Past Service Credit to Chesapeake Exploration, L.L.C. Employees

B-15    BG Group plc Acquisition and Merger of the BG US Services, Inc. Savings and Investment Plan

B-16    Motiva Joint Venture Separation and Trust-to-Trust Transfer

## SCHEDULE B-1

### TRANSFER OF FUNDS FROM THE
### SHELL EMPLOYEE STOCK OWNERSHIP PLAN

Section 1.  Transfer of Undistributed Accounts.

In connection with the termination of the Shell Employee Stock Ownership Plan (the "SESOP"), the undistributed accounts thereunder of Members and former Members shall be transferred directly to the Fund, consistent with Article 11.9 of the SESOP regulations, including the six-month provision of such Article 11.9.

Section 2.  Mapping of Company and Member Contributions.

Cash and ordinary shares of Royal Dutch Petroleum Company attributable to contributing company contributions under the SESOP shall be initially transferred to the Royal Dutch Stock Fund hereunder and shall thereafter be subject to transfer to the other Optional Funds in accordance with the terms of the Regulations. Ordinary shares of Royal Dutch Petroleum Company attributable to member contributions under the SESOP shall be converted to cash and, together with all other amounts attributable to member contributions thereunder, shall be initially transferred to the Thrift Fund, and shall thereafter be subject to transfer to the other Optional Funds (with the exception of the Royal Dutch Stock Fund) in accordance with the terms of the Regulations.

Section 3.  Treatment of SESOP Member Contributions.

For purposes of Section 10.2 concerning the right to withdraw Member contributions, SESOP member contributions which are transferred to this Fund shall be treated as amounts paid into this Fund by the Member.

Section 4.  Governing Rules.

Amounts transferred to this Fund from the SESOP shall be governed by the terms of the Regulations and Trust Agreement and shall not be subject to the requirements of Sections 409 and 401(a)(28) of the Code or of the SESOP regulations and trust agreement.

Exhibit Q

## SCHEDULE B-2

### ROLLOVER OF DISTRIBUTED FUNDS FROM KERNRIDGE SAVINGS PLAN

Section 1.  Investment of Rollover Amounts.

The Fund may receive on behalf of participants in the Savings Plan for Covered Former Employees of Kernridge Oil Company (the "**Kernridge Savings Plan**") the entire amount of the December 31, 1990 distribution (excluding participant contributions) to such participants from such plan.  This amount initially shall be deposited to the Thrift Fund and thereafter shall be available for transfer to the other Optional Funds (with the exception of the Royal Dutch Stock Fund prior to November 24, 1997) in accordance with the terms of the Regulations.

Section 2.  Investment Restrictions.

(a)      Prior to November 24, 1997, each such participant can transfer to his Royal Dutch Stock Account from any other Optional Fund Accounts only when the combined value of the company contributions to his other Optional Fund Accounts plus the earnings thereon is at least equal to the value of such participant's rolled-over amount plus all earnings thereon as calculated in accordance with this paragraph. Prior to November 24, 1997, only that amount in the participant's other Optional Fund Accounts which is in excess of the value of the rolled-over amount plus earnings thereon (as calculated in accordance with this paragraph) may be transferred to the Royal Dutch Stock Fund.  For the purpose of determining the amount which cannot be transferred by such a participant from his other Optional Funds, earnings on the rolled-over amount shall be calculated prospectively, at least annually, as if the rolled-over amount were invested in the Thrift Fund.

(b)      The restriction on transfer described in Section 2(a) of this Schedule B-2 is to be used only to determine the amounts which may be transferred from a participant's other Optional Fund Accounts to his Royal Dutch Stock Account and is not intended to require the participant to maintain a minimum balance in his other Optional Fund Accounts.

Section 3.  Governing Rules.

Amounts rolled over to this Fund from the Kernridge Savings Plan shall be governed by the applicable terms of the Regulations and Trust Agreement for the Fund.

## SCHEDULE B-3

### ASSETS TRANSFERRED FROM THE SIEMENS SAVINGS PLAN

Section 1.  <u>Definitions</u>.

For purposes of this Schedule B-3, the following terms shall have the meanings given below:

(a)     "**Former Siemens Solar Employee**" shall mean any participant in the Siemens Savings Plan as of January 1, 2002, who was:

     (1)     an active employee of Siemens Solar Industries L.P. ("**SSI**") as of December 31, 2001,

     (2)     an employee of SSI as of the Closing Date of the Siemens Solar Transaction, including an employee on an employer authorized leave of absence or receiving short-term or long-term disability benefits, or

     (3)     a retired or vested terminated employee of SSI as of the Closing Date, and

     with respect to whom assets were transferred from the Siemens Savings Plan to the Fund.

(b)     "**Siemens Savings Plan**" shall mean the Siemens Savings Plan as sponsored by the Siemens Corporation as of the Closing Date.

(c)     "**Siemens Solar Transaction**" shall mean that transaction described in that Framework Agreement dated February 20, 2001, by and between Siemens Aktiengesellschaft, Shell Erneuerbare Energien GmbH, and E.ON Energie Ag.

(d)     "**Closing Date**" shall mean April 3, 2001.

Section 2.  <u>Account Crediting</u>.

(a)     Account balances transferred from the Siemens Savings Plan pursuant to the Siemens Solar Transaction, other than amounts attributable to salary reduction contributions made under such plan, shall be credited to the respective accounts established hereunder for the benefit of Former Siemens Solar Employees.  Such Former Siemens Solar Employees or their beneficiaries thereunder shall be fully vested in all amounts credited to their accounts in connection with such transfer.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

(b)     That portion of a Former Siemens Solar Employee's account balance under the Siemens Savings Plan as of December 31, 2001, attributable to employer matching contributions under the Siemens Savings Plan shall be credited to his Prior Plan Fully Vested Match Subaccount separate account hereunder on behalf of such Former Siemens Solar Employee (sometimes referred to herein as "Prior Plan Fully Vested Match Subaccount").  A Former Siemens Solar Employee's investment directions for his employer contributions account shall also be applicable to such special account.

Section 3.  <u>Service Crediting</u>.

Each Former Siemens Solar Employee shall be credited as of January 1, 2002, with Participation Service and Accredited Service equal to the amount of service credited to such Former Siemens Solar Employee for vesting purposes under the terms of the Siemens Savings Plan as of December 31, 2001.

## SCHEDULE B-4

### MERGER OF CRI GROUP SAVINGS AND PROFIT SHARING PLANS

Section 1.  Definitions.

For purposes of this Schedule B-4, the following terms shall have the meanings given below:

(a)     "**CRI Profit Sharing Account**" shall mean, for a given CRI Profit Sharing Participant, the amount, if any, accrued as of July 31, 2003, in his account in the CRI Group Profit Sharing Plan.

(b)     "**CRI Profit Sharing Participant**" shall mean a person participating in the CRI Group Profit Sharing Plan as of July 31, 2003.

(c)     "**CRI Savings Accounts**" shall mean, for a given CRI Savings Participant, the amount, if any, accrued as of December 31, 2002, in his matching, rollover, and post-tax accounts in the CRI Group Savings Plan.

(d)     "**CRI Savings Participant**" shall mean a person participating in the CRI Group Savings Plan as of December 31, 2002.

Section 2.  Transfer of Accounts.

(a)     A CRI Savings Participant shall have his CRI Savings Account transferred to the Fund as of January 1, 2003, by virtue of the merger of the accounts of all CRI Savings Participants into the Fund as of January 1, 2003.

(b)     A CRI Profit Sharing Participant shall have his CRI Profit Sharing Account transferred to the Fund as of August 1, 2003, by virtue of the merger of the accounts of all CRI Profit Sharing Participants into the Fund as of August 1, 2003.

Section 3.  Vesting of Matching Subaccount.

A CRI Savings Participant shall be fully vested in all amounts credited to the matching subaccount of his CRI Savings Account as of December 31, 2002, in connection with the plan merger.

## SCHEDULE B-5

### GRANT OF PAST SERVICE CREDIT TO WILLOW ISLAND EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-5, the following terms shall have the meanings given below:

(a)      "**Cytec Savings Plan**" shall mean the Cytec Employees' Savings and Profit Sharing Plan established and maintained by Cytec Industries Inc. for, among others, employees of its Willow Island Plant.

(b)      "**Option**" shall mean the option granted to CRI International, Inc. to acquire the Willow Island Plant from Cytec Industries Inc.

(c)      "**Willow Island Employee**" shall mean a person formerly employed by Cytec Industries Inc. at its Willow Island Plant who became an employee of a Contributing Company in connection with the exercise of the Option.

(d)      "**Willow Island Plant**" shall mean the manufacturing facility at Willow Island, West Virginia.

Section 2.  Grant of Past Service Credit.

As of September 1, 2003, each Willow Island Employee shall be credited with Participation Service and Accredited Service equal to the amount of service credited to such employee for purposes of vesting and eligibility to participate under the Cytec Savings Plan.

## SCHEDULE B-6

### GRANT OF PAST SERVICE CREDIT TO ALLIANCE COMPANY EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-6, the following terms shall have the meanings given below:

(a)     "**Alliance Companies**" shall mean Equilon Enterprises LLC, Motiva Enterprises LLC, Equiva Services LLC, Equiva Trading Company, or Shell Pipeline Company LP (formerly doing business as Equilon Pipeline Company LLC).

(b)     "**Alliance Savings Plan**" shall mean that certain defined contribution pension plan sponsored by the Alliance Companies for their employees from April 1, 1999, to July 11, 2003.

(c)     "**Alliance Company Employee**" means an employee of an Alliance Company for all or any part of the period between April 1, 1999, and December 31, 2002, (1) who was an employee of Equilon Enterprises LLC or Shell Pipeline Company LP on and immediately before January 1, 2003, the date on which each such company became a Contributing Company; or (2) who became an Employee of a Contributing Company immediately following such employee's termination of employment with an Alliance Company and on or before January 1, 2003.

Section 2.  Grant of Past Service Credit.

As of January 1, 2003 (or as of such earlier date that an Alliance Company Employee became an Employee of a Contributing Company), each Alliance Company Employee shall be credited with Participation Service and Accredited Service equal to the benefit service credited to such employee under the Alliance Savings Plan, but only to the extent such benefit service has not already been credited for such purposes under the Regulations.

## SCHEDULE B-7

### ASSETS TRANSFERRED FROM THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND INVESTMENT PLAN AND THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND INVESTMENT PLAN FOR HOURLY EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-7, the following terms shall have the meanings given below:

(a)    "**Former PQS Participant**" shall mean any individual who met each of the following characteristics:

    (1)    transferred employment directly from a company participating in one of the Relevant Plans to a Contributing Company  during the period October 1, 2002, to November 1, 2004, or was an employee of Pennzoil-Quaker State Company on and immediately before January 1, 2004, the day in which such company became a Contributing Company, and

    (2)    as of November 2, 2004, was not employed by  Jiffy Lube International, Inc., Q Lube, Inc., or Pennzoil-Quaker State International Corporation.

(b)    "**Relevant Plans**" means the Pennzoil-Quaker State Company Savings and Investment Plan  and  the Pennzoil-Quaker State Company Savings and Investment Plan for Hourly Employees.

Section 2.  Subaccounts Credited.

(a)    In connection with the transfer of assets from the Relevant Plans on or about December 23, 2004, account balances---other than amounts attributable to salary reduction contributions including catch-up contributions made under the Relevant Plans and other than assets in the form of loans transferred to the Shell Pay Deferral Investment Fund---shall be credited to the respective subaccounts established herein for the benefit of Former PQS Participants.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

(b)    Notwithstanding the above, assets transferred from the Relevant Plans that were separately accounted for in sources designated:

    (1)    as either the "**Company Match Account**" or the "**Company Match Vested Account**" in the PQS Administrative Manual as of November 2004, shall be credited to the Prior Plan Company Contribution Subaccount established under the Fund;

    (2)    as the "**Prior Employer Match Account**," the "**Prior Plan Match Account**," the "**Prior Plan P/S Account**," or the "**Prior Plan ESOP Account**" in the PQS Administrative Manual as of November 2004, shall be credited to the Pre-Tax Rollover Subaccount established under the Fund; or

    (3)    as either the "**Safe Harbor Match Account**" or the "**Prior Company Match Account**" in the PQS Administrative Manual as of November 2004, shall be credited to the Company Contribution Subaccount established under the Fund.

## SCHEDULE B-8

### MERGER OF SHELL TRADING SAVINGS PLAN

Section 1. <u>Subaccounts Credited</u>.

(a)     In connection with the merger and transfer of assets from the Shell Trading Savings Plan into the Fund on or about December 29, 2004, account balances---other than amounts attributable to salary reduction contributions including catch-up contributions made under the Shell Trading Savings Plan and other than assets in the form of loans transferred to the Shell Pay Deferral Investment Fund---shall be credited to the respective subaccounts established herein.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

(b)     Notwithstanding the above, assets transferred from the Shell Trading Savings Plan that were credited to

(1)     the "**Alliance Company Contribution Account**" in such plan shall be credited to the Prior Plan Company Contribution Subaccount established under the Fund;

(2)     the "**Matching Account**" in such plan shall be credited to the Company Match Account and shall be subject to the vesting schedule as described in Schedule D;

(3)     the "**LEDCO Account**" in such plan shall be credited to the Company Contribution Subaccount established under the Fund.

## SCHEDULE B-9

### GRANT OF PAST SERVICE CREDIT TO PQS COMPANY EMPLOYEES AND JLI COMPANY EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-9, the following terms shall have the meanings given below:

(a)  "**JLI**" means Jiffy Lube International, Inc.

(b)  "**JLI Company Employee**" means an employee of JLI, PQS International, or QLube who becomes an Employee of Pennzoil-Quaker State Company or another Contributing Company immediately following such employee's termination of employment with JLI, PQS International, or QLube after January 1, 2004.

(c)  "**PQS Company Employee**" means (1) an employee of Pennzoil-Quaker State Company on and immediately before January 1, 2004, the date on which such company became a Contributing Company; or (2) an employee of Pennzoil-Quaker State Company who, on or before January 1, 2004, became an Employee of a Contributing Company immediately following such employee's termination of employment with Pennzoil-Quaker State Company on or after October 1, 2002.

(d)  "**PQS International**" means Pennzoil-Quaker State International Corporation.

(e)  "**PQS Savings Plans**" means the Pennzoil-Quaker State Company Savings and Investment Plan (as amended and restated effective January 1, 2001, and as subsequently amended) and the Pennzoil-Quaker State Company Savings and Investment Plan for Hourly Employees (as amended and restated effective January 1, 2001, and as subsequently amended).  Such term shall include any tax-qualified employee benefit plan into which any of the foregoing is merged or any other tax-qualified successor plan.

(f)  "**QLube**" means Q Lube, Inc.

Section 2.  Service Credited.

Effective January 1, 2004, the date on which Pennzoil-Quaker State Company became a Contributing Company, (or as of such earlier date that a PQS Company Employee became an Employee of a Contributing Company), each PQS Company Employee shall be credited with Participation Service and Accredited Service equal to the service credited to such employee under the PQS Savings Plans, but only to the extent such service has not already been credited to him for such purposes under the Regulations of this Fund.  Effective as of the date on or after January 2, 2004, that a JLI Company Employee became an Employee of a Contributing Company, such JLI Company Employee shall be credited with Participation Service and Accredited Service equal to the service credited to such employee under the PQS Savings Plans, but only to the extent such service has not already been credited to him for such purposes under the Regulations.

## SCHEDULE B-10

### MERGER OF SHELL PAY DEFERRAL INVESTMENT FUND

Section 1.  Subaccounts Credited.

In connection with the merger of the Shell Pay Deferral Investment Fund into the Fund on or about June 18, 2007, account balances attributable to elective deferrals and qualified non-elective contributions and to catch-up contributions made under the Shell Pay Deferral Investment Fund shall be credited to the respective subaccounts in accordance with Section 14 of the Regulations.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

Section 2.  Interpretation of Amended and Restated Regulations and Trust Agreement.

Effective June 18, 2007, upon the merger of the Shell Pay Deferral Investment Fund into this Fund, the Regulations and Trust Agreement have been amended and restated to reflect: the merger; the addition of an automatic enrollment feature, Member Pre-Tax Contributions, Member Catch-Up Contributions, Hardship Withdrawals, new Tier III Investment Offerings, managed account, and the self-directed brokerage feature known as BrokerageLink; and the new Default Funds.  Except with respect to these changes, Shell Oil Company does not intend to alter the Contributions and benefits available hereunder, the rights and entitlements thereto, or the limitations thereon.  The Plan Administrator and the Trustees shall interpret the Regulations and Trust Agreement accordingly.  Shell Oil Company reserves the right to correct any scrivener's errors as permitted by applicable law.

## SCHEDULE B-11

### MERGER OF THE PENNZOIL-QUAKER STATE COMPANY SAVINGS AND INVESTMENT PLAN

Section 1.  Subaccounts Credited.

(a)     In connection with the merger and transfer of assets from the Pennzoil-Quaker State Company Savings and Investment Plan into the Fund on or about June 26, 2009, account balances shall be credited to the respective subaccounts in accordance with Section 14 of the Regulations.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

(b)     Notwithstanding the above, assets transferred from the Pennzoil-Quaker State Company Savings and Investment Plan that were credited to

    (1)     the "QNEC Account" in such plan shall be credited to the QNEC Subaccount established under the Fund;

    (2)     the "Company Match Account" in such plan shall be credited to the Prior Plan Company Contribution Subaccount established under the Fund;

    (3)     the "Employer Match Account" in such plan shall be credited to the Company Contribution Subaccount established under the Fund;

    (4)     the "Prior Plan ESOP Account" in such plan shall be credited to the Prior Plan Fully Vested Subaccount established under the Fund;

    (5)     the "Prior Plan Profit Sharing Account" in such plan shall be credited to the Prior Plan Fully Vested Subaccount established under the Fund;

    (6)     the "Hourly Match Account" in such plan shall be credited to the Prior Plan Company Contribution Subaccount established under the Fund; and

    (7)     the "Uncashed Checks Account" in such plan shall be credited to the Previously Distributed Subaccount established under the Fund.

## SCHEDULE B-12

### GRANT OF PAST SERVICE CREDIT TO EAST RESOURCES
### MANAGEMENT, LLC EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-12, the following terms shall have the meanings given below:

(a)     "**East Resources Retirement Savings Plan**" shall mean that certain defined contribution pension plan sponsored by the East Resources Management, LLC for their employees.

(b)     "**East Resources Management, LLC Employee**" means an employee of East Resources Management, LLC between July 29, 2010, and December 31, 2010, inclusive, who became an Employee of a Contributing Company on or before January 1, 2011, immediately following such employee's termination of employment with East Resources Management, LLC.

Section 2.  Grant of Past Service Credit.

As of January 1, 2011, each East Resources Management, LLC Employee shall be credited with Participation Service and Accredited Service equal to the benefit service credited to such employee under the East Resources Retirement Savings Plan between July 29, 2010, and December 31, 2010, inclusive, but only to the extent such benefit service has not already been credited for such purposes under the Regulations.  In addition, as of January 1, 2011, each East Resources Management, LLC Employee shall be credited with Participation Service equal to the benefit service credited to such employee under the East Resources Retirement Savings Plan before July 29, 2010, but only to the extent such benefit service has not already been credited for such purposes under the Regulations.

## SCHEDULE B-13

### MERGER OF THE EAST RESOURCES RETIREMENT SAVINGS PLAN

Section 1. <u>Subaccounts Credited</u>.

(a)     In connection with the merger and transfer of assets from the East Resources Retirement Savings Plan into the Fund on or about November 30, 2012, account balances shall be credited to the respective Subaccounts in accordance with Article 14 of the Regulations. The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

(b)     Notwithstanding the above, assets transferred from the East Resources Retirement Savings Plan that were credited to:

(1)     the "Employer Match Account" in such plan shall be credited to the Prior Plan Scheduled Vested Match Subaccount established under the Fund;  and

(2)     the "Roth Deferral Account" in such plan shall be credited to the Member Roth 401(k) Subaccount established under the Fund.

## SCHEDULE B-14

### GRANT OF PAST SERVICE CREDIT TO
### CHESAPEAKE EXPLORATION, L.L.C. EMPLOYEES

Section 1.  Definitions.

For purposes of this Schedule B-14, the following terms shall have the meanings given below:

(a)       "**Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan**" shall mean that certain defined contribution pension plan sponsored by Chesapeake Exploration, L.L.C. and its affiliates for their employees.

(b)       "**Chesapeake Exploration, L.L.C. Employee**" means an employee of Chesapeake Exploration, L.L.C. on or before January 31, 2013, who becomes an Employee of a Contributing Company on February 1, 2013, following such employee's termination of employment with Chesapeake Exploration, L.L.C.

Section 2.  Grant of Past Service Credit.

As of February 1, 2013, each Chesapeake Exploration, L.L.C. Employee shall be credited with Participation Service equal to the benefit service credited to such employee under the Chesapeake Energy Corporation Savings and Incentive Stock Bonus Plan before February 1, 2013, up to a maximum of one year of Participation Service, but only to the extent such benefit service has not already been credited for such purposes under the Regulations.

**SCHEDULE B-15**

**BG Group plc Acquisition and Merger of the BG US Services, Inc. Savings and Investment Plan**

1.  Acquisition.  On February 15, 2016, Royal Dutch Shell plc completed its acquisition of BG Group plc.  No prior service credit is granted hereunder in connection with such acquisition.

2.  Plan Merger.

    a.  Balance Crediting.  In connection with the merger and transfer of assets from the BG US Services, Inc. Savings and Investment Plan (for purposes of this Schedule B-15, the "BG Savings Plan") into the Fund on or about May 1, 2018, account balances shall be credited to the respective Subaccounts in accordance with Article 14 of the Regulations.  The Plan Administrator may establish such special transitional rules as he deems appropriate in connection with such transfer of assets.

    Notwithstanding the above, assets transferred from the BG Savings Plan that were credited to:

    (i)     the "Employer Profit Sharing Contributions" subaccount in such plan shall be credited to the Prior Plan Scheduled Vesting Match Subaccount established under the Fund, and such assets and any subsequent earnings thereon shall remain subject to the service crediting, vesting, forfeiture, restoration, and break-in-service rules of the BG Savings Plan as in effect on April 30, 2018 (subject to such modifications as may be required by law thereafter); and

    (ii)    the "Matching Contributions" subaccount in such plan shall be credited to the Company Contribution Subaccount.

    b.  Qualified Reservist Distributions.  A former participant in the BG Savings Plan shall be entitled to request a qualified reservist distribution.  A qualified reservist distribution means any distribution to such an individual where (i) such distribution is of amounts attributable to "Elective Deferrals" originally credited to such individual under the BG Savings Plan (which could include "Pre-Tax Elective Deferrals," "Roth Elective Deferrals," and "Catch-up Contributions" under the BG Savings Plan), (ii) such individual was ordered or called to active duty for a period in excess of 179 days or for an indefinite period, and (iii) such distribution is made during the period beginning on the date of such order or call and ending at the close of the active duty period. Such an individual must have been ordered or called to active duty after September 11, 2001.

    c.  BG Savings Plan Loans.  A loan outstanding under the BG Savings Plan on April 30, 2018, shall continue following the merger of the BG Savings Plan into the Fund, even if continuance of such a loan would cause the Borrower to have more than two (2) loans under the Fund upon the merger of the BG Savings Plan into the Fund on May 1, 2018.  In addition, for clarity, from and after May 1, 2018, a continued BG Savings Plan loan shall be counted in determining if a new loan under the Fund would cause the Borrower to exceed the two (2) loan limit set forth in Section 11.3(h) of the Regulations.

## SCHEDULE B-16

### Motiva Joint Venture Separation and Trust-to-Trust Transfer

SOPC Holdings East LLC, Saudi Refining, Inc. ("SRI"), and Aramco Financial Services Company, being all of the members of Motiva Enterprises LLC, entered into that certain Separation and Distribution Agreement (the "SDA"), pursuant to which a joint venture separation will occur. In connection with the SDA, Equilon Enterprises LLC (d/b/a Shell Oil Products US) and SRI, as the shareholders of Motiva Company, entered into that certain Employee Matters Agreement (the "EMA"). Pursuant to the EMA, certain employees of Motiva Company, a contributing company in the Shell Provident Fund, will transfer employment directly to a wholly-owned subsidiary of Motiva Company, and full ownership of that subsidiary will transfer to SRI.

Upon the closing of the joint venture separation contemplated by the SDA on May 1, 2017 (the "Closing Date"), and pursuant to the provisions of the EMA, the following assets shall be transferred from the Shell Provident Fund trust to the trust of the Motiva 401(k) and Savings Plan sponsored by Motiva Enterprises LLC: the assets underlying the Account balances (including any unvested balances, outstanding loan balances and forfeitures) held in the trust of the Shell Provident Fund with respect to employees of Motiva Company who transfer employment directly to a wholly-owned subsidiary of Motiva Company on the date of the Closing and who participate in the Shell Provident Fund (the "Motiva Transferred Employees"). Such transfer shall be in the form of cash or cash equivalents, except that (a) assets in the Royal Dutch Shell Stock Fund shall be transferred in-kind, (b) outstanding participant loan balances shall be transferred in-kind, and (c) reasonable efforts shall be taken to have Tier IV Fund assets transferred in-kind. Each Motiva Transferred Employee shall cease active participation hereunder on the Closing Date, and upon the completion of such transfer of assets with respect to a Motiva Transferred Employee, the Fund shall have no liability to such Motiva Transferred Employee with respect to his or her prior participation in the Fund. This transfer shall be implemented in accordance with the terms of the Fund, including Section XIX of the Trust Agreement, and applicable law.

Notwithstanding any provision hereof to the contrary, (a) consistent with past practice, a Motiva Transferred Employee may elect to have a Valid Direct Rollover Contribution made to the Fund in a direct rollover as provided in Section 13.2, and (b) in the event that a Motiva Transferred Employee is later reemployed as an Employee of a Contributing Company, the Fund shall recognize all Accredited Service credited to the Motiva Transferred Employee prior to the transfer of assets contemplated by this Schedule B-16.

**SCHEDULE C**

**[RESERVED]**

## SCHEDULE D

### SPECIAL VESTING PROVISIONS

1.     Vesting in Prior Plan Scheduled Vesting Match Subaccount.  A Member shall have a nonforfeitable right to his Prior Plan Scheduled Vesting Match Subaccount in accordance with the vesting schedule below, except that a Member who dies or who terminates his employment after attaining age 65 or qualifying for a disability pension under the Shell Pension Plan (but disregarding the condition that an employee have at least 15 years of accredited service) shall be 100% vested on such event:

| Completed Years of Participation Service | Nonforfeitable Percentage |
|---|---|
| Less than 1 year | 0% |
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 60% |
| 4 years | 80% |
| 5 years | 100% |

A Member who terminates employment prior to attaining a 100% nonforfeitable percentage shall forfeit the non-vested portion of his Prior Plan Scheduled Vesting Match Subaccount.  The amount forfeited shall be allocated as a forfeiture in accordance with Paragraph 2 below.

If a Member's account is restored as provided in Paragraph 3 below, and if such Member had received a distribution of his vested Prior Plan Scheduled Vesting Match Subaccount, and if such Member subsequently terminates employment prior to attaining a 100% nonforfeitable percentage in his Prior Plan Scheduled Vesting Match Subaccount, the vested portion of the Member's Prior Plan Scheduled Vesting Match Subaccount shall be determined in the following manner:

At any relevant time the Member's vested portion is not less than an amount ("X") determined by the formula:

$$X = P(AB + D) - D$$

where P is the nonforfeitable percentage at the relevant time; AB is the account balance at the relevant time; and D is the amount of the nonforfeitable percentage.

2.     Allocation of Forfeitures.  Any amounts forfeited by a Member from his Prior Plan Scheduled Vesting Match Subaccount shall be applied in the following order:

(a)     to restore forfeited amounts to individuals reemployed as an Employee;

(b)     to restore unclaimed benefits pursuant to Article 19; and

(c)     to reduce the Contributing Company Contribution under Article 6 to the extent of such contributions.

3.     Restoration of Forfeitures Upon Reemployment.  If a "Former Member," within the meaning of the Shell Trading Savings Plan, who has forfeited an amount under Paragraph 1 above is re-employed, a Contributing Company contribution of the amount forfeited shall be made and credited to the Member's Prior Plan Scheduled Vesting Match Subaccount on behalf of such Member. Notwithstanding Paragraph 1 above, a Former Member that

is re-employed by a Contributing Company with Service after December 31, 2007, shall be 100% vested in his Prior Plan Scheduled Vesting Match Subaccount after completing 3 years of Participation Service.

      4.      Special Vesting Provisions.  Notwithstanding Paragraph 1 above, the following special vesting provisions shall apply:

    (a)    Each Member who is an Enterprise Transferred Employee shall be fully vested, effective as of September 17, 1999, in his Prior Plan Scheduled Vesting Match Subaccount balance attributable to matching contributions made prior to his transfer to Enterprise Products Company. For purposes of this sub-paragraph, an "**Enterprise Transferred Employee**" means an individual who is employed by Enterprise Products Company under the terms of that Contribution Agreement, dated effective September 17, 1999, between Tejas Energy, LLC and others, including Enterprise Products Company, and who was an employee of a participating company under the Shell Trading Savings Plan immediately preceding his employment with Enterprise Products Company.

    (b)    Each Member who is employed by InterGen Services, Inc. on January 1, 2001, in connection with the formation of InterGen North America, LP, a joint venture by and between Shell Power GP Holding and Bechtel Enterprises Holdings, Inc., and who was an employee of a participating company under the Shell Trading Savings Plan immediately preceding his employment with InterGen Services, Inc., shall be fully vested, effective as of January 1, 2001, in his Prior Plan Scheduled Vesting Match Subaccount balance attributable to matching contributions made prior to January 1, 2001.

    (c)    Each Member who is employed by Enterprise Products Operating L.P. on April 1, 2001, in connection with that Purchase and Sale Agreement between Coral Energy, LLC and Enterprises Products Operating L.P. for the sale of Coral Energy, LLC's membership interests in Acadian Gas, LLC to Enterprise Products Operating L.P., and who is an employee of a participating company under the Shell Trading Savings Plan immediately preceding his employment with Enterprise Products Operating L.P. shall be fully vested in his Prior Plan Scheduled Vesting Match Subaccount balance attributable to matching contributions made prior to April 1, 2001.

    (d)    Special vesting rules in connection with the sale by InterGen (North America) Inc. of its equity interests in Tejas Gas, LLC and its subsidiaries to Kinder Morgan Energy Partners, L.P. as of February 28, 2002:

        (i)    An individual who on February 28, 2002, is either an employee under the Shell Trading Savings Plan or an employee of a "25% Affiliated Entity," within the meaning of the Shell Trading Savings Plan, who has an application for employment offer accepted by Kinder Morgan Energy Partners, L.P. and who performs services with Kinder Morgan Energy Partners, L.P. as an employee of Kinder Morgan Energy Partners, L.P. on March 1, 2002, shall be vested as of February 28, 2002 in his accrued benefit under the Shell Trading Savings Plan earned through February 28, 2002.

        (ii)    An individual who on March 14, 2002, is either an employee under the Shell Trading Savings Plan or an employee of a "25% Affiliated Entity," within the meaning of the Shell Trading Savings Plan, who has an application for employment offer accepted by Kinder Morgan Energy Partners, L.P., and who performs services with Kinder Morgan Energy Partners, L.P. as an employee of Kinder Morgan Energy Partners, L.P. on March 15, 2002, shall be vested as of March 14, 2002, in his accrued benefit under the Shell Trading Savings Plan earned through March 14, 2002.

5. Notwithstanding any foregoing provision of this Schedule D to the contrary, amounts in a Prior Plan Scheduled Vesting Match Subaccount derived from an "Employer Profit Sharing Contributions" subaccount under the BG US Services, Inc. Savings and Investment Plan shall be subject to the service crediting, vesting, forfeiture, restoration, and break-in-service rules referenced in Schedule B-15.

## SCHEDULE E

### SPECIAL COMPENSATION RULES

In addition to the amounts described in the definition of "**Compensation**" in Article 2 of the Plan, such term shall also include the following for certain specified groups of individuals to the extent provided below:

(a)     The amount of the reduction of a Member's Base Pay and Variable Pay solely as a result of a portion of such Member's base salary and variable pay not being subject to The Netherlands income and social insurance tax, if any;

(b)     The amount of U.S./pensionable base salary maintained in the records of a Member's Employing Company that is attributed to the Member for the period during which such Member is compensated under the International Mobility Policies, to the extent such amount is not otherwise included as Compensation; and

(c)     The amount of the U.S. hypothetical tax reduction a Contributing Company makes to a Member's variable pay solely as a result of such Member being compensated under the Long Term International Assignment Policies.

## SCHEDULE F

### Part One

Business Entity                                              Date of Adoption

Billiton Metals Inc.                                         January 1, 1993

### Part Two

Business Entity                                              Date of Acquisition

The Goodyear Tire & Rubber Company                          December 18, 1992

Hi-Tek Polymers, Inc.                                        April 1, 1993

Schering Berlin Polymers, Inc.                               April 2, 1993

## SCHEDULE G

### Part One

**Incentive Compensation Plans**

Incentive Compensation Plan (as adopted by Shell Oil Company and certain of its subsidiaries with effect from 1/1/94)

Shell Polypropylene Company 1995 Incentive Compensation Plan

Success Shares - CalResources Incentive Compensation Plan

**Part Two**

(Intentionally left blank)

# SHELL PROVIDENT FUND

## TRUST AGREEMENT

TRUST AGREEMENT, dated as of the 1st day of September 1939, and as amended through September 25, 2020, between the Contributing Companies listed on Schedule A to the Regulations and such other Affiliated Companies as may become parties hereto from time to time as hereinafter provided, and the individuals identified at the end of this instrument, as Trustees, and such other persons as may become Trustees hereunder from time to time as hereinafter provided,

## W I T N E S S E T H:

WHEREAS, each of the Contributing Companies named in Schedule A desired to adopt, for the exclusive benefit of its Employees and their Beneficiaries who become Beneficiaries of the Fund hereinafter described, a contributory plan to provide for such Employees upon their retirement from employment and, as part of the plan, to join in the creation of a trust of personal property to be known as the "Shell Provident Fund" to which contributions are to be made by said Employing Company and payments are to be made by said Employees for the purpose of distributing to said Employees the principal and earnings of the funds to be accumulated in the Fund arising from said Company Contributions and Member Contributions in accordance with the provisions of the Regulations;

WHEREAS, the plan and the trust fund to be created, are to be administered by Trustees as hereinafter and in the Regulations provided; and

WHEREAS, by the execution of this instrument, each of the Contributing Companies desires to evidence its adoption of the plan and its joining in the creation of such Fund, and the Trustees desire to evidence their acceptance of the Fund,

NOW, THEREFORE, in consideration of the premises and of the covenants hereinafter set forth, the Contributing Companies which are or become parties hereto and the Trustees hereby agree each with the other as follows:

## SECTION I

### ADOPTION OF THE PLAN, CREATION OF THE TRUST, AND DESIGNATION OF THE TRUSTEES

A.    Each of the Contributing Companies hereby adopts the plan as set forth herein and in the Regulations for the exclusive benefit of its Employees and their Beneficiaries and, as part of the plan, hereby joins in the creation of the Fund as a trust of personal property to which Contributions are to be made for the purpose of distributing to the Members the principal and earnings of the funds to be accumulated in the Fund arising from the Contributions in accordance with the Regulations and hereby designates the Trustees named above as the Trustees of the Fund. The Regulations hereto annexed are incorporated herein and made a part of the Trust Agreement.

B.    The signature of any of the Contributing Companies to any counterpart or copy of the Trust Agreement shall be sufficient evidence of its adoption of the Regulations and Trust Agreement and of its joining in the creation of the Fund and of its designation of the Trustees named above.

Exhibit Q

## SECTION II

### ACCEPTANCE OF THE TRUST

The Trustees hereby accept the trust and agree to hold, administer, and disburse all of the principal and earnings of the funds to be accumulated in the Fund in accordance with all the terms and provisions of the Trust Agreement including the Regulations. The signature of any Trustee to any counterpart or copy of the Trust Agreement shall be sufficient evidence of his acceptance and agreement as aforesaid.

## SECTION III

### ADMINISTRATION

A.    The Trustees may act by a majority of their number then in office either by vote at a meeting or in writing without a meeting.

B.    The Trustees may appoint a chairman and vice-chairman from among their number and a secretary and such other officers as they may deem advisable who need not be Trustees; may appoint an executive committee consisting of three or more Trustees with full authority to exercise any of the powers of the Trustees; may appoint such other committees, whose members need not be Trustees, with such powers as they may deem expedient; may provide that any such committee may act by a majority of its number then in office (but in no event less than two) either by a vote at a meeting or in writing without a meeting; may designate alternates for any members of any such committee; may adopt by-laws governing the transaction of their business and the duties of such officers; may remove any such officers, abolish any such committees, and alter or repeal any such by-laws; and may transact their business under the name "Shell Provident Fund."

C.    Any act of the Trustees or any such committee shall be sufficiently evidenced if certified by the secretary appointed by the Trustees or any Trustee or in accordance with the by-laws.

## SECTION IV

### CONTRIBUTIONS TO THE FUND

A.    Contributions to the Fund by each of the Contributing Companies and payments by the Members shall be made in accordance with the Regulations.

B.    Notwithstanding anything herein to the contrary, upon the Employing Company's request, a Company Contribution which was made by a mistake of fact or conditioned upon the initial qualification of the Fund or upon the deductibility of any Company Contribution to the Fund shall be returned to the contributor within one year after payment of the Company Contribution, the denial of the initial qualification or the disallowance of the deduction (to the extent disallowed), whichever is applicable.

## SECTION V

### DISPOSITION OF FUNDS

All funds received by the Trustees hereunder shall be held, managed, deposited, invested, reinvested, disbursed, and distributed to or for the benefit of the Members and Beneficiaries in accordance with the provisions hereof and of the Regulations.

## SECTION VI

## INVESTMENT OF FUNDS

A.     All funds received by the Trustees which, pursuant to the provisions of Article 9 of the Regulations, are subject to a direction to be invested in an Investment Offering, other than assets in a Brokerage Window, if any, shall be invested and reinvested by the Trustees and/or one or more Investment Managers or investment advisers in the classes and types of investments designated by the prospectus and/or other governing document for such Investment Offering. The Trustees' sole responsibility with respect to a Brokerage Window, if any, shall be the responsibility for depositing in such Brokerage Window such portion of an Account as the Member or Beneficiary who is the Accountholder for that Account shall direct in accordance with the Regulations.

B.     All funds received by the Trustees which, pursuant to the provisions of Article 9 of the Regulations, are subject to a direction to be invested in an Investment Offering (other than assets in a Brokerage Window, if any) shall be invested and reinvested by the Trustees and/or one or more Investment Managers or investment advisers in:

(1)     any "**security**," the same being any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing, and any other obligations or real or personal properties or participations or interests therein;

(2)     any insurance company group annuity investment contracts and agreements; and

(3)     any private equities or participations or interests therein,

as they may deem advisable in their discretion as though they were the beneficial owners thereof and as otherwise set forth in accordance with applicable governing documents. The Trustees shall have power to sell, transfer, or exchange assets held hereunder from time to time at such prices and upon such terms and conditions and in such manner as they may deem proper. The Trustees may lend securities held hereunder consistent with the fiduciary duty and prohibited transaction requirements of ERISA. The Trustees may exercise any voting powers appurtenant to any securities at the time held by them and may execute any proxies or powers of attorney (as to either discretionary or ministerial matters) and any agreements which they may deem necessary or advisable in connection with the investment, holding, or management of the assets in their custody and control, it being the intention hereof that the Trustees shall have full power, within the limitations of this Trust Agreement, to manage all assets held by them hereunder, as though the absolute owners thereof. The purchaser of any assets from the Trustees need not inquire into the application of the purchase money by the Trustees nor into the expediency or propriety of the Trustees to negotiate or make the same. Securities held by the Trustees may be registered in the name of the Fund, the Trustees or their agents or nominees, or other persons; or they may be unregistered.

C.     Each Investment Manager may invest in any single, collective, or common trust fund for employee benefit plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended, or any successor statute, maintained by a trust company. An investment in any collective or common trust fund shall not be prohibited even though such collective or common trust fund may hold securities issued by any of the Contributing or Affiliated Companies. Without limiting the generality of the foregoing, the agreement with the bank or trust company may authorize the bank or trust company to invest and reinvest the assets transferred to it in interests in any trust fund that has been or shall be created and maintained by the bank or trust company as trustee for the collective investment of funds of trusts for employee benefit plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended, or any successor statute, as amended, and to the extent required by Revenue Ruling 81-100 and further to the extent consistent with this Trust

Agreement the instrument creating such trust fund, together with any amendments is hereby incorporated in and made part of this Trust Agreement.

D.    In addition to any other investments proper under the Fund, the Trustees shall have the power to invest in one or more collective investment funds now existing or hereinafter established (including, without limitation, the Shell Savings Group Trust established effective January 1, 1996 between Shell Oil Company and the then Trustees) which contemplate the commingling for investment purposes of the funds therein with trust assets of other pension plans which are qualified under Section 401 of the Code. To the extent required by Revenue Ruling 81-100 and to the extent consistent with this Trust Agreement, the instrument creating any collective investment fund in which any part of the Fund is invested, as in force and effect at the time of the investment and as thereafter amended, is hereby incorporated in and made part of this Trust Agreement. Such collective investment fund shall be invested and reinvested by its trustees and/or investment managers in the classes and types of investments designated by the appropriate provisions of the Fund.

## SECTION VII

### DELEGATION OF POWERS

A.    The Trustees may appoint one or more Investment Managers and may delegate to one or more Investment Managers, all or any of the authority, powers, or duties conferred upon them by Paragraph B of Section VI hereof. In accordance with the directions of the Members or the Beneficiaries, the Trustees shall delegate to the investment advisors of the Investment Offerings (other than a Brokerage Window, if any), all or any of the authority, powers or duties conferred upon them by Paragraph B of Section VI hereof. The Trustees may deliver to such Investment Manager or Investment Managers any funds or securities held by the Trustees hereunder. Each Investment Manager shall be a bank, trust company, insurance company, investment company, investment advisor, or investment banker, satisfying the requirements of section 3(38) of ERISA. The bank or trust company or custodian of the Trust's funds and securities shall have a capital stock and surplus of not less than Fifty Million Dollars ($50,000,000) and be adequately insured or bonded. Each Investment Manager shall exercise all the authority, powers, and duties of an Investment Manager as provided in this Trust Agreement and in the Regulations. As to certain Plan assets, the Trustees may select a bank or trust company to act as custodian for same if the Investment Manager or other fiduciary managing such assets either does not perform such services or the Trustees believe it to be advantageous to have another party act as custodian. Subject to the provisions of the Regulations and this Trust Agreement, the appointment of an Investment Manager shall be upon such terms as the Trustees shall determine. The Trustees may remove an Investment Manager at any time, with or without cause, or an Investment Manager may resign at any time in such manner as the Trustees shall determine. In the event of such removal or in the event that an Investment Manager shall resign or cease to act, the Trustees may exercise the authority, powers, and duties previously exercised by such Investment Manager, pending delegation of such powers to another Investment Manager.

B.    No Trustee shall be liable for the acts or omissions of such Investment Manager or be under an obligation to invest or otherwise manage any asset of the Fund which is subject to the management of the Investment Manager.

C.    An Investment Manager shall keep such books of account and shall submit to such audits as the Trustees shall prescribe.

## SECTION VIII

### BORROWING MONEY

The Trustees may borrow money from time to time upon such terms and conditions as they may deem expedient, and for the loans thus made or in renewal thereof they may issue their promissory note or notes as Trustees and may secure the repayment thereof by pledging any of the assets then in their control.

Exhibit Q

## SECTION IX

### COMPENSATION AND EXPENSES

A.    The Trustees shall not receive any remuneration from the Fund for their services.

B.    Reasonable costs and expenses incurred for necessary services in the administration of the Fund and the investment of Fund assets, including those described in Article 8 of the Regulations, may be paid out of the assets of the Fund, including, but not limited to, payment of reasonable costs and expenses of the Plan from the Accounts of Accountholders or deduction of reasonable costs and expenses from the investment returns of Investment Offerings in which the Accounts are invested. Further, the Plan Administrator may establish procedures providing that certain costs and expenses incurred by an individual Accountholder for services related to his or her Account (including, for example, fees for loans or domestic relations order processing) may be deducted from the Account of such Accountholder. In the absence of directions from Investment Managers and service providers or guidance from prospectuses and other governing documents, the Plan Administrator shall establish procedures for the timing of payments and charges.

C.    The Contributing Companies shall pay such expenses and costs of the Fund as are not permitted by ERISA to be charged against assets of the Fund and may also share other expenses and costs incurred in the administration of the Fund.

D.    Forfeitures may be used to pay reasonable costs and expenses for necessary services incurred in the administration of the Fund, as directed by the Plan Administrator.

E.    Amounts, if any, derived from revenue sharing credits may be used to pay administrative expenses of the Fund that are otherwise eligible to be paid from assets of the Fund as provided in this Section IX of the Trust Agreement in accordance with such procedures as may be established by the Plan Administrator.

## SECTION X

### DISCHARGE OF DUTIES BY TRUSTEES

A.    The Trustees shall be the named Fiduciary under the Fund. The Trustees shall appoint a Plan Administrator who shall also be a named Fiduciary under the Fund. Solely for purposes of directing investments in their own Accounts and not for purposes of the operation or administration of the Fund, Members and Beneficiaries entitled under the terms of the Regulations to direct investments in their own Accounts, shall be named Fiduciaries under the Fund. The Trustees or the Plan Administrator may employ one or more persons to render advice with regard to any responsibility the Trustees have under the Plan and may employ counsel and agents and engage such clerical, financial, and accounting services as they or he deems expedient. The Trustees shall not be deemed imprudent by reason of their taking or refraining from taking action in accordance with the opinion of counsel. The Trustees or the Plan Administrator, as the case may be, shall have the power to remove and replace anyone they or he shall have appointed or employed. The Trustees shall discharge their respective duties set forth in the Fund:

(1)    solely in the interest of Members and Beneficiaries;

(2)    for the exclusive purpose of providing benefits to Members and Beneficiaries (and defraying reasonable expenses of administering the Fund);

(3)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(4)    by diversifying the investments of the Fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, or unless the Members or

Beneficiaries entitled under the terms of the Regulations to direct investments in their own Accounts, have otherwise directed; and

(5)     in accordance with the documents and instruments governing the Fund insofar as such documents and instruments are consistent with ERISA.

B.      The Trustees may rely upon any investment direction of a Member or Beneficiary entitled under the terms of the Regulations to direct investments in their own accounts, as long as any such direction is proper on its face and consistent with the Regulations and this Trust Agreement.  Furthermore, each Trustee may rely upon any direction, information, or action of another Trustee as being proper under this Fund and is not required under this Fund to inquire into the propriety of any such direction, information or action.  It is intended under this Fund that each Trustee shall be responsible for the proper exercise of his own powers, duties, responsibilities, and obligations under this Fund and shall not be responsible for any act or failure to act of another Trustee, except in the following circumstances:  (a) the Trustee knowingly participates in or knowingly attempts to conceal the act or omission of another Fiduciary, and the Trustee knows the act or omission is a breach of a Fiduciary responsibility by the other Fiduciary; or (b) the Trustee has knowledge of a breach by the other Fiduciary and does not make reasonable efforts to remedy the breach; or (c) the Trustee's breach of his own Fiduciary responsibility permits the other Fiduciary to commit a breach.  No Trustee guarantees the Fund in any manner against investment loss or depreciation in asset value.

C.      The Trustees shall jointly manage and control the assets of the Fund unless there is a specific allocation or delegation of specific responsibilities, obligations, and duties among the Trustees or the other Fiduciaries.  There may be an allocation and delegation of Fiduciary responsibilities other than Trustees' responsibilities to other Fiduciaries.  If such an allocation or delegation shall be made, the specified Trustee or Fiduciary shall then be responsible for the duties allocated or delegated, and the other Trustees or Fiduciaries shall not be liable for any breach of Fiduciary responsibility for the duties allocated or delegated except as set forth above.

D.      The Trustees shall have such due diligence responsibility as set forth in Section 1.4 of the Regulations.

E.      Notwithstanding anything in the Regulations or this Trust Agreement to the contrary, the Trustees shall have the right to resolve conflicting rights and claims in such a manner as is in the best interests of all participants and beneficiaries.

F.      The Contributing Companies, jointly and severally, shall indemnify each Fiduciary against all or any portion of any liability or costs and expenses reasonably incurred by him in connection with, arising out of, or resulting from any claim, action, suit or proceeding in which he may be involved by reason of his having been a Fiduciary, *provided, however*, that the Contributing Companies shall not be obligated to indemnify a Fiduciary against any such liability, costs, or expenses in connection with any action or omission to act in respect of which such Fiduciary shall be finally adjudged in any such action, suit, or proceeding to have been guilty of fraud or willful misconduct in the performance of his duties.

## SECTION XI

### COMPROMISE OF CLAIMS

The Trustees shall have power to settle or compromise any claims which they may have as Trustees or which may be made against them as Trustees.

## SECTION XII

### INTERPRETATION OF PROVISIONS:  DETERMINATION OF CONTROVERSIES

Except in those cases in which the power of determination is expressly reserved to Shell Oil Company, the Trustees shall have full power and authority to determine all matters arising in the interpretation and application of the Fund or the interpretation and application of the Trust Agreement and the Regulations, and the determination of any such matter by the Trustees shall be conclusive on all persons.  Whenever under the Regulations or the provisions of this Trust Agreement discretion is granted to the Trustees, which shall affect the benefits, rights, and privileges of a Participant, such discretion shall be exercised uniformly so that all individuals similarly situated shall be similarly treated.

## SECTION XIII

### ADDITIONAL COMPANIES

A.      Any Affiliated Company may, subject to the approval of the Trustees, become a party hereto at any time with like effect from such time as if it were one of the Contributing Companies hereinbefore named.

B.      The signature of any such Affiliated Company to any counterpart or copy of the Trust Agreement shall be sufficient evidence of its election to become a party hereto.

## SECTION XIV

### RESIGNATION OR REMOVAL OF TRUSTEES

A.      Any Trustee may resign at any time by giving written notice to the other Trustees or in accordance with the by-laws adopted by the Trustees.

B.      Any Trustee may be removed and the number of Trustees may be increased or decreased at any time by an instrument executed by Shell Oil Company.

C.      In case there shall be any vacancy among the Trustees, whether on account of an increase in the number thereof, resignation, removal, death, or otherwise, the vacancy shall be filled by appointment by Shell Oil Company.  If by reason of the discontinuance of the Plan or otherwise Shell Oil Company shall cease to be a Contributing Company, then vacancies shall be filled by appointment by a majority of the Trustees then in office.

D.      A Trustee shall not be liable or responsible in any way for any acts or omissions in the administration of the Fund prior to the date he became a Trustee or after the date he shall cease to be a Trustee.  A successor Trustee shall not have any duty to review the actions or accounts of any prior Trustee.

E.      The signature of any successor or additional Trustee on any counterpart or copy of the Trust Agreement shall be sufficient evidence of his acceptance of the trust.

F.      A certificate, executed by any Trustee or in accordance with the by-laws adopted by the Trustees, certifying who are or were Trustees hereunder or the number thereof at any given time shall be sufficient evidence thereof.

## SECTION XV

### TERMINATION OF PARTICIPATION IN THE FUND

A.    The participation of any of the Contributing Companies in the Fund (including the obligation to make further contributions to the Fund for the account of its employees who are Participants, with respect to periods subsequent to the cessation of its participation) shall terminate whenever (1) such Contributing Company is dissolved or liquidated or ceases for any reason to be an Affiliated Company of Shell Oil Company, (2) it withdraws from the Fund, or (3) its participation is terminated by Shell Oil Company.  For purposes of the preceding sentence, "Affiliated Company" shall be as defined in the first sentence of Section 2.2 of the Regulations.  The Contributing Company shall provide written notice of its cessation of participation to all of its Employees who are Members of the Fund.

B.    In the event of termination of participation in the Fund by any one or more of the Contributing Companies, the right and obligation of Members who are then in its or their employ to make further contributions to the Fund, with respect to periods subsequent to the cessation of the Contributing Company's or Companies' participation, shall cease.  In such event, the Trustees, upon advice of counsel, shall for the purposes of Article 12 of the Regulations, treat the service of such Members as having terminated at the time of such termination of participation.

C.    If, after the termination of participation in the Plan by all Contributing Companies and after the payment to the Participants and Beneficiaries of amounts standing to their credit as provided in the Regulations, any assets then remaining in the Fund, such assets shall be distributed by the Trustees to or for the exclusive benefit of such Participants and Beneficiaries in such equitable and nondiscriminatory manner as the Trustees may determine in the exercise of their fiduciary duty.  In no event shall the Contributing Companies receive any amounts from the Fund.

## SECTION XVI

### DISPOSITION OF CORPUS OR INCOME:  DURATION

No part of the corpus or income of the Fund shall, prior to the satisfaction of all liabilities with respect to Members under the Regulations, be used for or diverted to purposes other than the exclusive benefit of Members or Beneficiaries, and the Fund shall continue for such time as may be necessary to accomplish the purpose for which it is created.

## SECTION XVII

### AMENDMENT OF TRUST AGREEMENT AND REGULATIONS

Subject to the provisions of Section XVI, the Trust Agreement and the Regulations may be amended in accordance with the provisions of the Regulations.

## SECTION XVIII

### NON-ALIENATION OF RIGHTS

No sums or shares or any other securities standing to the credit of any Member under the provisions of the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge; and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; nor shall any such sums, shares or securities be in any manner liable for or subject to the debts, contracts, liabilities, engagements, or torts of any Member.  This provision shall not be applicable to a qualified domestic relations order as defined in Section 206(d) of ERISA and Section 414(p) of the Code which may direct payment or distribution of all or part of such sums, shares or securities to an Alternate Payee.  Any accrued benefit of a Participant or Beneficiary may be

apportioned between the Participant or Beneficiary and the Alternate Payee either through separate accounts or by providing the Alternate Payee a severable portion of the Participant's or Beneficiary's Account.

## SECTION XIX

### MERGER OR CONSOLIDATION OF FUND

A.      In the event of the dissolution, merger, consolidation, or reorganization of a Contributing Company, provision may be made by which the Fund will be continued by the successor; and, in that event, such successor shall be substituted for such Contributing Company under the Fund.  The substitution of the successor shall constitute an assumption of liabilities to the Fund by the successor and the successor shall have all the powers, duties, and responsibilities of such Contributing Company under the Fund.

B.      In the event of any merger or consolidation of the Fund, or transfer in whole or in part of the assets and liabilities of the Fund to another trust fund, or to any other plan of deferred compensation maintained or to be established by an employer for the exclusive benefit of all or some of its employees, the assets of the Fund applicable to such Members shall be transferred to the other trust fund or plan only if:

(1)      each Participant would (if either this Fund or the other plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if this Fund had then terminated);

(2)      the Trustees shall authorize such transfer of assets and, in the case of the new or successor employer of the affected Participants, its resolutions shall include an assumption of liabilities with respect to such Participants' inclusion in the new employer's plan; and

(3)      such other plan and trust are qualified under Sections 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended, or any successor statute.

## SECTION XX

### EXECUTION, DELIVERY, AND INVALIDITY

A.      To the extent not preempted by the Employee Retirement Income Security Act of 1974, as amended, the Trust Agreement (including the Regulations) shall be governed by the laws of the state of Texas.

B.      If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof and this Agreement shall be construed and enforced as if such provisions had not been included.

IN WITNESS WHEREOF, the respective Companies have caused their names to be signed and their corporate seals to be affixed by their proper officers, thereunto duly authorized, and the Trustees have hereunto set their respective hands and seals.

SHELL OIL COMPANY
EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US
PECTEN MIDDLE EAST SERVICES COMPANY LIMITED
PECTEN PRODUCING COMPANY
PENNZOIL-QUAKER STATE COMPANY d/b/a SOPUS PRODUCTS
SHELL CATALYSTS & TECHNOLOGIES US LP
SHELL CHEMICAL LP

SHELL DOWNSTREAM INC.
SHELL ENERGY RESOURCES COMPANY
SHELL EXPATRIATE EMPLOYMENT US INC.
SHELL EXPLORATION & PRODUCTION COMPANY
SHELL GLOBAL SOLUTIONS (US) INC.
SHELL INFORMATION TECHNOLOGY INTERNATIONAL INC.
SHELL INTERNATIONAL EXPLORATION AND PRODUCTION INC.
SHELL MARINE PRODUCTS (US) COMPANY
SHELL NORTH AMERICA GAS & POWER SERVICES COMPANY
SHELL OFFSHORE INC.
SHELL OIL PRODUCTS COMPANY LLC
SHELL PIPELINE COMPANY LP
SHELL TRADEMARK MANAGEMENT INC.
SHELL TRADING NORTH AMERICA COMPANY
SHELL TRADING RISK MANAGEMENT, LLC
SHELL TRADING SERVICES COMPANY
SHELL TRADING (US) COMPANY
SHELL US GAS & POWER LLC
SHELL WINDENERGY SERVICES INC.
SOPC SOUTHEAST INC.
SWEPI LP

Trustees:

Scott G. Ballard          Paul Goodfellow
Rhoman J. Hardy           Eileen M. Perillo
Christopher B. Rice       Glenn T. Wright

Exhibit Q

Exhibit Q



**PRIVATE AND CONFIDENTIAL**
[NAME]

**Royal Dutch Shell plc**

Shell Centre

London SE1 7NA

United Kingdom

18 February 2022

Dear, [NAME]

**Amendments to your Appointment**

On December 10, 2021, shareholders approved certain changes to the Royal Dutch Shell plc Articles of Association. The changes agreed by shareholders were to facilitate a simplification of the business, which entailed:

a. establishing a single line of shares to eliminate the complexity of Shell's A/B Share Structure; and

b. aligning Shell's tax residence with its country of incorporation in the UK by relocating Board and Executive Committee ("EC") meetings, and the CEO and CFO, to the UK; and consequently changing the Company's name from Royal Dutch Shell plc to Shell plc.

On December 20, 2021, the Board agreed to enact the simplification as proposed. As a result of this decision, certain terms of your appointment as a Non-executive director will need to be changed.

This letter amends the terms of your appointment as Non-executive Director of Royal Dutch Shell plc (the **'Company'**) as set out in the letter dated [ ] including its Annex (the **'Current Terms'**).

These amendments will become effective from December 31, 2021 upon the signature of this letter by both parties.

Unless varied by the terms agreed in this letter, the Current Terms remain in full force and effect.

**Remuneration**

Your current agreement states that you will be paid in EUR. Going forward you will be paid in GBP The fees payable to you will be adjusted to GBP and notified to you in writing. Fees will be paid to you subject to the relevant deduction of UK tax and, where applicable, social security contributions for your country of coverage.

Registered in England and Wales number 04366849
Registered office: Shell Centre London SE1 7NA, United Kingdom

Exhibit Q

The 30% ruling referenced within your current agreement (within the meaning of the Netherlands Wages and Salaries Tax Act (Wet op de loonbelasting)) will no longer be applicable to you. Therefore, your fee will not be reduced, and you will not receive a tax free reimbursement of extraterritorial costs equal to 30% of the fee. Any actual extraterritorial business related costs, such as hotel accommodation, will be paid or reimbursed by the Company and any tax due thereon will be paid by the Company.

**Location of Board Meetings**

Board meetings of the Company will usually take place in the United Kingdom and not the Netherlands.

If you have any questions regarding the above, please contact Linda Coulter, General Counsel Corporate and RDS Company Secretary.

Yours sincerely

**Andrew Mackenzie**
**Chair**

---

*I, [NAME] accept the terms of appointment as set out above.*

........................................……………………….

*(Signature)*

…………………………………………………..

*(Date)*

---

Registered in England and Wales number 04366849
Registered office: Shell Centre London SE1 7NA, United Kingdom

Exhibit Q

SHELL PLC[1]

Rules of the Shell Share Plan 2014

| | |
|---|---|
| Shareholders' Approval: | 20 May 2014 |
| Amended: | 24 January 2017 |
| Amended: | 17 January 2020 |
| Amended: | 29 January 2022 |
| Expiry Date: | 20 May 2024 |

Linklaters

One Silk Street
London EC2Y 8HQ

Telephone (44-20) 7456 2000
Facsimile (44-20) 7456 2222

---

[1] Previously Royal Dutch Shell plc

Exhibit Q

**Table of Contents**

| Contents | Page |
|---|---|
| 1 | Introduction ........................................................................................................................ 3 |
| 2 | Granting Awards ................................................................................................................ 3 |
| 3 | Terms of Awards to be set by Grantor ............................................................................. 4 |
| 4 | Form of Awards .................................................................................................................. 5 |
| 5 | No transfer of Awards ....................................................................................................... 5 |
| 6 | Individual limit ................................................................................................................... 6 |
| 7 | Limits on the use of newly issued shares and treasury shares ...................................... 6 |
| 8 | Variations in share capital, demergers and special distributions .................................... 6 |
| 9 | Voting, dividends and dividend equivalents ..................................................................... 7 |
| 10 | Vesting of Awards ............................................................................................................. 7 |
| 11 | Consequences of Vesting ................................................................................................ 7 |
| 12 | Cash alternative ................................................................................................................ 8 |
| 13 | Holding Period ................................................................................................................... 8 |
| 14 | Leaving employment ......................................................................................................... 9 |
| 15 | Death ................................................................................................................................ 11 |
| 16 | Clawback and malus ....................................................................................................... 11 |
| 17 | Takeovers and restructurings ......................................................................................... 12 |
| 18 | Withholding of tax ............................................................................................................ 14 |
| 19 | Relationship with terms of a Participant's employment ................................................. 14 |
| 20 | General .............................................................................................................................. 15 |
| 21 | Changing these Rules ...................................................................................................... 18 |
| 22 | Governing law and jurisdiction ........................................................................................ 19 |
| 23 | Language of the Rules ...................................................................................................... 19 |
| 24 | Section 409A of the US Internal Revenue Code ............................................................. 19 |
| 24 | Meaning of Words ............................................................................................................ 20 |

1    **Introduction**

1.1    **Types of Awards**

These Rules allow for the following types of Awards to be made to Eligible Employees:

1.1.1    **Long Term Incentive Awards** which are Awards granted to Directors, Executive Committee members (or former Executive Committee members) and Senior Executives which must be subject to a Performance Condition.

1.1.2    **Performance Share Awards** which are Awards granted to Participants who are not Directors which must be subject to a Performance Condition.

1.1.3    **Restricted Share Awards** which are Awards which are not subject to a Performance Condition.

1.1.4    **Deferred Bonus Awards** which are Awards under which the number of shares subject to the award will be related to the amount of bonus the Participant is required or allowed to defer. See Schedule 1.

2    **Granting Awards**

2.1    **Selection of Participants**

Not all Eligible Employees will be made an Award.  The Grantor will select which Eligible Employees will be made Awards and will determine the number of Shares subject to those Awards and the terms of those Awards.  The selection criteria, the size of the Awards made and the terms of the Awards made may change from time to time.

2.2    **Approval of Directors**

A Member of the Group (other than the Company) may only grant an Award with the approval of the Directors.

2.3    **Timing of grant**

Subject to any applicable Dealing Restrictions, Awards may only be granted within 42 days starting on any of the following:

2.3.1    the date of any general meeting of the Company;

2.3.2    the day after the announcement of the Company's results for any period;

2.3.3    any day on which the Directors resolve that exceptional circumstances exist which justify the grant of Awards;

2.3.4    any day on which changes to the legislation or regulations affecting employee share plans are announced, effected or made; or

2.3.5    the lifting of Dealing Restrictions which prevented the granting of Awards during any period specified above.

No awards may be granted after 20 May 2024.

3

3    **Terms of Awards to be set by Grantor**

3.1    **Performance Conditions**

3.1.1    When granting an Award, the Grantor may (and, in the case of a Long Term Incentive Award or a Performance Share Award, shall) make its Vesting conditional on the satisfaction of one or more conditions linked to performance. A Performance Condition must be specified at the Award Date and may provide that an Award will lapse to the extent that the Performance Condition is not satisfied.

3.1.2    The Grantor may change a Performance Condition in accordance with its terms or if anything happens which causes the Grantor, acting reasonably and in good faith, to consider it appropriate but not so as to make the Performance Condition materially more difficult to satisfy.

3.1.3    This rule 3.1.3 applies to Awards granted up to and including 16 January 2020. Notwithstanding the above, the Grantor, acting reasonably and in good faith, has discretion to reduce (including, for the avoidance of doubt, a reduction to zero) the extent to which any Award vests on the basis of the wider performance of the Company.

3.1.4    This rule 3.1.4 applies to Awards granted on or after 17 January 2020. Notwithstanding the above, the Grantor, acting reasonably and in good faith, has discretion to adjust (including, for the avoidance of doubt, a reduction to zero) the extent to which any Award Vests if it considers that:

(i)    such Vesting level does not reflect the wider financial or non-financial performance of the Company or the Participant over the Performance Period;

(ii)    such Vesting level is not appropriate in the context of circumstances that were unexpected or unforeseen at the Award Date; or

(iii)    there exists any other reason why an adjustment is appropriate,

taking into account such factors as the Grantor considers relevant.

3.2    **Other conditions**

The Grantor may impose other conditions when granting an Award. Any condition must be specified at the Award Date and may provide that an Award will lapse to the extent it is not satisfied.

The Grantor may change a condition in accordance with its terms or if anything happens which causes the Grantor, acting reasonably and in good faith, to consider it appropriate but not so as to make the condition materially more difficult to satisfy.

3.3    **Other terms to be set on grant**

When granting an Award, the Grantor will decide:

3.3.1    whether the Award is a Long Term Incentive Award, a Performance Share Award, a Restricted Share Award or a Deferred Bonus Award;

3.3.2    subject to rules 6 and 7, the number and class of Shares subject to the Award or the method for determining the number and class;

3.3.3    any Performance Condition or other condition;

4

3.3.4    the Qualifying Date;

3.3.5    the Award Date;

3.3.6    whether the Award will be subject to a Holding Period (see rule 13) and, if so, when it will end and the number or proportion of Shares received on Vesting which will be Holding Shares (or how that number or percentage will be determined);

3.3.7    any Adjustment Events which will apply to the Award (see rule 16); and

3.3.8    whether or not dividend equivalents will be payable (under rule 9) in respect of the Award and, if so, on what basis.

## 4    Form of Awards

### 4.1    Documentation of Awards

Awards will be granted by deed or in any other manner which is legally enforceable in the relevant jurisdiction.

Each Participant will be informed of the terms of the Award (to the extent that they are not set out in these rules) as soon as practicable after the Award Date. They may be informed of the terms by being given a copy of the deed referred to above or by any other means (including the updating of any personalised webpage or other electronic means).

A Participant may be required to enter into an agreement in writing with the Grantor which provides that he agrees to the Award being granted to him subject to the rules (and any other terms set by the Grantor). In such case, the Award will not be valid until the agreement has been signed.

### 4.2    No payment

A Participant is not required to pay any Member of the Group for the grant of any Award.

### 4.3    Rejection of Award

Any Participant may reject all or part of his Award within 90 days after the Award Date (or, if earlier, before the date on which the Award Vests) by notice in writing to any person nominated by the Grantor. If this happens, the Award, or such part of it, will be deemed never to have been granted. A Participant is not required to pay any Member of the Group for the rejection.

If the Participant does not reject his Award as described above he will (subject to rule 4.1) be deemed to have unconditionally accepted the Award as of the Award Date.

## 5    No transfer of Awards

An Award and any rights in respect of it are personal to the Participant and only the Participant may enforce those rights. No Award nor any rights in respect of it can be transferred, pledged, encumbered, assigned or otherwise disposed of.

A Participant must not create, buy or sell any derivative instrument involving an Award or any Shares subject to it. If an Award or any rights in respect of it are transferred or if such a derivative instrument is created, bought or sold or if the Participant otherwise ceases to be the sole beneficiary of the Award or any rights in respect of it (including by operation of law), the Award will lapse except to the extent that the Directors decide otherwise.

This rule 5 does not apply to the transmission of an Award on the death of a Participant to his personal representatives (or to or its subsequent enforcement by them).

6    **Individual limit**

No Award may be granted to any person which would be in breach of the limit specified in the last approved directors' remuneration policy under Chapter 9 of Part 15 of the Companies Act 2006 or a limit set by applicable law.

7    **Limits on the use of newly issued shares and treasury shares**

7.1    **10 % in 10 years limit**

The number of Shares which may be allocated under these Rules on any day must not exceed 10 per cent of the ordinary share capital of the Company in issue immediately before that day, when added to the total number of Shares which have been allocated in the previous 10 years under these Rules and any other employee share plan operated by the Company.

7.2    **5% in 10 years limit**

The number of Shares which may be allocated under these Rules on any day must not exceed 5 per cent of the ordinary share capital of the Company in issue immediately before that day when added to the total number of Shares which have been allocated, other than on an all-employee basis, in the previous 10 years under these Rules and any other employee share plan adopted by the Company.

7.3    **Exclusion**

Where the right to acquire Shares is released or lapses, the Shares concerned are ignored when calculating the limits in this rule 7.

7.4    **Definitions for this rule**

7.4.1    For the purposes of this rule, shares are allocated to employees of a Member of the Group on an "**all-employee basis**" if they are offered or allocated:

(i)    to all or substantially all employees of that Member of the Group on similar terms; or

(ii)    under an all-employee share plan.

For these purposes, shares may be allocated or offered on similar terms even though the terms on which they are offered or allocated may vary by reference to the employees' remuneration or length of service etc.

7.4.2    For the purposes of this rule, shares are **"allocated"** if they have been issued or must be issued for the purposes of satisfying an Award. For so long as the Directors consider that it is best practice to count treasury shares for the purposes of the limits in this rule 7, shares are also "allocated" if they have been or must be transferred out of treasury for the purposes of satisfying Awards.

8    **Variations in share capital, demergers and special distributions**

If there is:

6

(a)     a variation in the equity share capital of the Company, including a capitalisation, sub-division, consolidation or reduction of share capital; or

(b)     a rights issue; or

(c)     a demerger (in whatever form); or

(d)     a special dividend or distribution; or

(e)     any similar transaction which the Directors consider may affect the value of an Award;

the Directors may, acting reasonably and in good faith, adjust (retrospectively or otherwise) the number or class of shares or securities comprised in an Award or change the identity of the company or companies whose shares are subject to the Award.

## 9    Voting, dividends and dividend equivalents

A Participant shall not be entitled to vote, to receive dividends or to have any other rights of a shareholder in respect of Shares subject to an Award until the Shares are issued or transferred to the Participant or to another person to hold the shares for his benefit.

However, the Grantor, with the approval of the Directors, may grant an Award on the basis that, on Vesting, the Grantor shall procure that the Participant receives an amount equal to the amount per Share of all dividends the record date for which falls between the Award Date and the date of Vesting, multiplied by the number of Shares in respect of which the Award is Vesting assuming full dividend reinvestment. However, in the case of a Participant's death, the relevant period will be extended to the date of issue or transfer in respect of the Participant.

This amount may be paid in cash or in such whole number of Shares (rounded up) as has a Market Value (as at the date of Vesting) as nearly as practicable equal to that amount. The cash will be paid or Shares issued or transferred on the same date as cash is paid or Shares are issued or transferred with respect to the underlying Award and the payment, issue or transfer will be subject to rule 18 (Withholding of tax).

For the avoidance of doubt, the amount paid will be calculated on the basis of the dividend including any related tax credit.

## 10    Vesting of Awards

Except where any of rules 14 to 17 apply, an Award shall Vest on the latest of the following:

(a)     the date on which the extent to which any Performance Condition or other condition set under rule 3.2 is satisfied has been determined; or

(b)     the Qualifying Date.

To the extent that an Award has not lapsed or Vested on that date, it will lapse on that date.

## 11    Consequences of Vesting

Subject to rules 12 and 13, the Grantor will procure that Shares are issued or transferred (from treasury or otherwise) at the Grantor's discretion to the Participant or to a nominee, trustee or other entity designated by the Grantor for the Participant's benefit. Such issue or transfer will be made, subject to any Dealing Restriction which prevents such issue or

7

transfer, as soon as reasonably practicable and will normally be made within 45 days of the date of Vesting; provided, however, that such issue or transfer will be made not later than:

(a)     where rule 14.2.1 (only in the case of Restricted Share Awards), 14.3, 14.5, 15, 17.3 or 17.6 applies, March 15 of the calendar year following the calendar year in which the cessation or early vesting date (rule 14.2.1, 14.3, or rule 14.5), death (rule 15), date of obtaining Control or sanction (rule 17.3) or decision of the Directors (rule 17.6) occurs and

(b)     in all other cases, March 15 of the calendar year following the calendar year in which the relevant Qualifying Date occurs.

If, however, any Dealing Restriction would delay such issue or transfer beyond the relevant deadline set out in this rule, then the Vested Award will be paid in cash pursuant to Rule 12 not later than such relevant deadline.

## 12    **Cash alternative**

The Grantor may, with the approval of the Directors, satisfy an Award by paying (subject to rule 18 (Withholding of tax)) a cash amount equal to the Market Value of the Shares in respect of which the Award has Vested. This amount will be paid as provided in rule 11.

An Award may be granted on the basis that it will only ever be satisfied by paying a cash amount in the manner described in this rule 12.

## 13    **Holding Period**

This rule 13 will apply where the Grantor decides that an Award is subject to a Holding Period under rule 3.3 or one is imposed under rule 16.

### 13.1    **Consequences of Holding Period on Vesting**

Following Vesting, the Holding Shares will be issued or transferred to the Participant (or a nominee selected by the Grantor) in accordance with rule 11 but on the condition that they be held on the basis set out in this rule 13. The Grantor may require the Participant to take any actions as it considers necessary or desirable to give effect to this rule.

The balance of the Shares in respect of which the Award is Vesting will be issued or transferred as described in rule 11.

### 13.2    **Rights of Participant during the Holding Period**

13.2.1    During the Holding Period, the Participant will be a shareholder and will therefore be entitled to vote and, subject to rule 13.2.2, to receive dividends and have all other rights of a shareholder in respect of the Holding Shares.

13.2.2    However, the Participant may not transfer, assign or otherwise dispose of any of the Holding Shares or any interest in them, except in the case of the sale of sufficient entitlements nil-paid in relation to a Share to take up the balance of the entitlements under a rights issue.

### 13.3    **Rights of Participant at the end of the Holding Period**

Subject to rule 16, and to any contrary provision specified at the Award Date, the Holding Period will end on the earliest of the following:

13.3.1 the date set by the Grantor under rule 3.3;

13.3.2 the date on which the Directors decide that the number of Shares which are subject to the Holding Period is sufficiently small that the continuation of the Holding Period is not warranted;

13.3.3 the date on which the Participant ceases to be an employee of a Member of the Group;

13.3.4 the Participant's death;

13.3.5 the date on which rule 17 (takeovers and restructurings) applies;

13.3.6 the date on which the Directors decide, in any other circumstances, that the Holding Period should come to an end.

At the end of the Holding Period, the restrictions in rule 13.2 will cease to apply.

## 14    Leaving employment

### 14.1    General rule

If a Participant ceases to be an employee of a Member of the Group before the Qualifying Date, his Award will lapse on the date of cessation except as otherwise provided in this rule 14 or rule 15.

For the avoidance of doubt if a Participant ceases to be an employee of a Member of the Group after the Qualifying Date, the Award will continue.

This rule does not apply in relation to a Deferred Bonus Award.  If a Participant ceases to be an employee of a Member of the Group before the Qualifying Date, his Deferred Bonus Award will not lapse but will continue in effect and may Vest in accordance with rule 10.

### 14.2    Exceptions to the general rule

Subject to rules 14.3 and 14.4, if the Participant ceases to be an employee of a Member of the Group before the Qualifying Date because of:

14.2.1 disability, injury or ill-health;

14.2.2 retirement as determined by the Grantor (which determination may take into consideration, among other items, local laws, regulations or policies);

14.2.3 redundancy;

14.2.4 the completion of a fixed-term contract; or

14.2.5 any other reason, with the specific consent of the Grantor (given within 14 days after cessation of the Participant's employment),

his Award will continue and will Vest in accordance with rule 10, provided however, that the Directors may reduce the Award pro rata to reflect the time which has elapsed during the Performance Period or, if there is no Performance Period, between the Award Date and the date of cessation.  Any Holding Period will not apply.

Notwithstanding the foregoing, in the case of a Restricted Share Award, the Award will lapse on the date of cessation unless rule 14.2.1 applies, in which case the Award will Vest on the date of cessation as described above.

14.3   **Early Vesting**

Where rule 14.2 applies, the Grantor may decide that the Award will Vest on cessation or on a later date chosen by it, but not later than the latest of the dates set out in rules 10(a) or 10(b).

14.4   **Extent of Vesting**

Where rule 14.2 applies, the Directors will determine the extent to which any Performance Condition or other condition under rule 3.2 has been satisfied in the manner specified in the Performance Condition or other condition or, if this is not specified in the Performance Condition or other condition, in such manner as they consider reasonable.

The Directors may reduce the Award pro rata to reflect the time which has elapsed during the Performance Period or, if there is no Performance Period, between the Award Date and the date of cessation or later date of Vesting chosen under rule 14.3.

To the extent an Award does not Vest under this rule, it will lapse on the date of early Vesting chosen by the Grantor under rule 14.3, if applicable.

14.5   **Sale of employer**

14.5.1   Subject to rule 14.5.2, if a Participant ceases to be an employee of a Member of the Group by reason of:

(i)     the Participant's employing company ceasing to be under the Control of the Company or a Member of the Group; or

(ii)    a transfer of the undertaking, or the part of the undertaking, in which the Participant works to a person which is neither under the Control of the Company nor a Member of the Group,

his Award will Vest on the date of cessation to the extent to which the Directors determine that any Performance Condition or other condition under rule 3.2 has been satisfied in the manner specified in the Performance Condition or other condition or, if this is not specified in the Performance Condition or other condition, in such manner as they consider reasonable.   The Directors may reduce the Award pro rata to reflect the time which has elapsed during the Performance Period or, if there is no Performance Period, between the Award Date and the date of cessation or later date of Vesting chosen under rule 14.3.

14.5.2   Where this rule 14.5 applies and to the extent that the Directors determine that equivalent rights have been granted or offered to the Participants, then the Awards will not Vest under this rule to the extent that the Directors so determine. To the extent that the Directors determine that any Awards do not Vest under this rule then they will lapse.

14.6   **Meaning of "ceasing to be an employee"**

For the purposes of this rule 14 a Participant will be treated as continuing to be an employee of a Member of the Group:

14.6.1   if he is either an employee or a director of any Member of the Group; or

14.6.2   if he recommences employment with or becomes a director of a Member of the Group within 7 days.

15    **Death**

If a Participant dies before the Qualifying Date, his Award will Vest in full on the date of death or, if there is a target level set out in the Performance Condition, then at that target level subject to any other conditions set under rule 3.2.

However, if the Participant dies after the Qualifying Date but before the date on which the extent to which any Performance Condition or other condition set under rule 3.2 is satisfied has been determined, his Award will Vest to the extent only that the Performance Condition or other condition is satisfied.

16    **Clawback and malus**

16.1    **Effect of Adjustment Event**

If the Directors determine that an Adjustment Event has occurred, they may decide that one or more of the following will apply to one or more of a Participant's Awards:

16.1.1    The number of Shares in respect of which the Award would otherwise Vest will be reduced.

16.1.2    The Award will lapse wholly or in part.

16.1.3    If the Award is subject to a Holding Period, it will be extended or, if it is not, one will be imposed.

16.1.4    Additional Performance Conditions or other conditions specified by the Directors will be imposed on Vesting of the Award.

16.1.5    The Participant will be required to transfer some or all of the Shares received under the Award (including any Holding Shares) as directed by the Directors for no consideration or, to the extent that the Participant no longer holds those Shares, to pay to or to the order of the Company an amount equal to the Market Value of those Shares on the date of acquisition or disposal.

16.1.6    The Participant will be required to pay to or to the order of the Company the amount of any cash he has been paid in respect of an Award.

16.2    **Application of this rule**

16.2.1    For the avoidance of doubt, rule 16.1 can apply in relation to a Participant's Award:

(i)    before or after the Participant has ceased to be an employee of a Member of the Group;

(ii)    whether the Adjustment Event occurred before, after or while he was an employee;

(iii)    whether the Adjustment Event occurred before or after the grant or Vesting of the Award;

(iv)    (except where the Adjustment Event specifically refers to the Participant's conduct) whether or not the Participant was responsible for or accountable for the Adjustment Event;

(v)    whether or not Members of the Group have suffered a financial loss as a result of the Adjustment Event.

16.2.2    The Directors may decide that Rules 16.1.5 and 16.1.6 will only apply for a period of time, prescribed by the Directors from time to time, after the acquisition of the Shares by the Participant or the receipt of the cash amount in respect of the Award by the Participant.

Where rule 16.1.5 or 16.1.6 applies, the Directors may decide that the number of Shares to be transferred or the amount to be paid will be reduced by reference to any income tax or social security contributions paid by or withheld for the Participant in respect of the Award.

## 17    Takeovers and restructurings

### 17.1    Takeovers to which this rule 17 applies

This rule 17 applies where:

17.1.1    a person (or a group of persons acting in concert) obtains Control of the Company as a result of making an offer to acquire Shares; or

17.1.2    under section 895 of the Companies Act 2006 (or any equivalent non-UK procedure), a court sanctions a compromise or arrangement in connection with the acquisition of Shares.

### 17.2    Exchange of Awards with agreement of Acquiring Company

If rule 17.1 applies and any company who obtains Control as a result of the offer or the sanction (the "**Acquiring Company**") and the Directors agree, each Award will be automatically exchanged, in full, for a new award in accordance with this rule 17.2.

The new award:

17.2.1    must confer a right to acquire shares in the Acquiring Company or another body corporate determined by the Acquiring Company;

17.2.2    subject to the rest of this rule 17, will be governed by the same terms as applied to the existing Award immediately before exchange;

17.2.3    will be treated as having been acquired at the same time as the existing Award and, subject to rule 17.2.4, will Vest in the same manner and at the same time;

17.2.4    will, if the existing award was subject to a Performance Condition or other condition set under rule 3.2, be subject to an equivalent Performance Condition which gives rise to a substantial risk of forfeiture; and

17.2.5    will be governed by these Rules as if references to Shares were references to the shares over which the new award is granted and references to the Company were references to the Acquiring Company or the body corporate determined under rule 17.2.1.

### 17.3    Acquiring Company does not agree to exchange Awards

17.3.1    This rule 17.3.1 applies to Awards granted up to and including 16 January 2020. If rule 17.1 applies and the Acquiring Company or the Directors do not agree to an exchange in accordance with rule 17.2 (or if the person who obtains Control is not a company), each Award will Vest in full on the date on which the person obtains Control or the date of the sanction if there is no Performance Condition and otherwise

Exhibit Q

will Vest on that date only to the extent that any Performance Condition and any other condition set under rule 3.2 has been satisfied to the date of Vesting and will lapse as to the balance.

17.3.2 This rule 17.3.2 applies to Awards granted on or after 17 January 2020. If rule 17.1 applies and the Acquiring Company or the Directors do not agree to an exchange in accordance with rule 17.2 (or if the person who obtains Control is not a company), each Award will Vest on the date on which the person obtains Control or the date of the sanction:

(i)     in full, if there is no Performance Condition; or

(ii)    to the extent that any Performance Condition and any other condition set under rule 3.2 has been satisfied to the date of Vesting,

provided, however, that the Award will be reduced pro rata to reflect the time which has elapsed during the Performance Period or, if there is no Performance Period, between the Award Date and the date of the relevant event (unless the Directors determine otherwise) and will lapse as to the balance.

17.4    **Re-organisations**

If the Directors consider that the offer or sanction is an internal reconstruction or reorganisation which does not involve a significant change in the identity of the ultimate shareholders of the Company, each Award will be exchanged, as described in rule 17.2, (except for rule 17.2.4) whether or not the Acquiring Company agrees. The Award will be exchanged in full and any Performance Condition and/or other condition set under rule 3.2 which applied to the original Award will apply to the new award, subject to such adjustments as the Directors consider reasonable to take account of the reconstruction or reorganisation and the exchange of Awards.

17.5    **Determination of extent to which condition is satisfied**

The Directors will determine the extent to which any Performance Condition and any other condition set under rule 3.2 has been satisfied on the relevant date under this rule 17 in the manner specified in the Performance Condition or other condition set under rule 3.2 or, if this is not specified in the Performance Condition or other condition set under rule 3.2, in such manner as they consider reasonable.

17.6    **Other transactions**

If the Directors become aware that the Company is or is expected to be affected by any demerger, distribution (other than an ordinary dividend) or other transaction not falling within rule 17.1 which, in the opinion of the Directors, would affect the current or future value of any Award, the Directors may allow an Award to Vest but, if there is a Performance Condition and/or other condition set under rule 3.2, only to the extent that the Performance Condition and any other condition set under rule 3.2 has been satisfied and subject to any other conditions the Directors may decide to impose provided, however, in respect of Awards granted on or after 17 January 2020 that the Award will be reduced pro rata to reflect the time which has elapsed during the Performance Period or, if there is no Performance Period, between the Award Date and the date of the transaction (unless the Directors determine otherwise). The Award will lapse as to the balance.

13

18    **Withholding of tax**

The Company, the Grantor, any employing company or trustee of any employee benefit trust may withhold such amount and make such arrangements as it considers necessary to meet any liability to taxation or social security contributions in respect of an Award. These arrangements may include the sale of Shares on behalf of a Participant or a reduction in the number of Shares to which the Participant would otherwise be entitled.  Where applicable, the amount of an Award will be subject to deductions for hypothetical tax and/or social security consistent with Company or Grantor policies.

The Participant must enter into any elections required by the Grantor in relation to Shares subject to an Award or Holding Shares including elections under Part 7 of the Income Tax (Earnings and Pensions) Act 2003 or relevant local legislation.

19    **Relationship with terms of a Participant's employment**

(a)    For the purposes of this rule 19, "**Employee**" means any person who is or will be eligible to be a Participant or any other person including a person who may become entitled to a Deferred Bonus Award in respect of the current financial year but has not yet been granted a Deferred Bonus Award.

(b)    This rule 19 applies during an Employee's employment and after the termination of an Employee's employment, whatever the circumstances of such termination.

(c)    Nothing in the rules or in the terms of or the practice of granting Awards forms part of an Employee's contract of employment The rights and obligations arising from the employment relationship between the Employee and any Member of the Group are separate from, and are not affected by, the Rules or any Awards made. The grant of an Award does not create any right to, or expectation of, continued employment and does not create any right to or expectation of the grant of an Award on the same basis, or at all, in the future.

(d)    Any benefits received under these Rules are not pensionable and do not affect pension benefits or any other employee benefits in any way except as may be otherwise provided in the terms of any applicable pension or other benefit plan.

(e)    Without prejudice to an Employee's right in respect of an Award subject to and in accordance with the express terms of these Rules and the Performance Condition and/or any other condition set under rule 3.2, no Employee has any right to have any decision or discretion exercised in a particular manner (or at all).

(f)    Without prejudice to an Employee's right in respect of an Award subject to and in accordance with the express terms of these Rules, the Performance Condition and any other condition set under rule 3.2, no Employee has any right to compensation resulting from:

(i)    any loss or reduction of any rights or expectations under these Rules in any circumstances (including termination of employment whatever the circumstances of such termination);

(ii)    any exercise of a discretion or a decision taken under these Rules, or any failure to exercise a discretion or take a decision;

(iii)    the operation, suspension, termination or amendment of these Rules.

(g)     Any and all discretions, decisions or omissions relating to an Award may operate to the disadvantage of the Employee, even if this could be regarded as capricious or unreasonable, or could be regarded as in breach of any implied term between the Employee and his employer, including any implied duty of trust and confidence. Any such implied term is excluded and overridden by this rule 19.

(h)     Awards are granted only on the basis that the Participant accepts all the provisions of these Rules, including in particular this rule 19.

(i)     Nothing in these Rules confers any benefit, right or expectation on a person who is not an Employee. No such third party has any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of these Rules. This does not affect any other right or remedy of a third party which may exist.

## 20     General

### 20.1    Directors' decisions final and binding

The decision of the Directors, in their sole and absolute discretion, on the interpretation of these Rules or in any dispute relating to an Award or matter relating to these Rules or the terms of any Award will be final and conclusive.

### 20.2    Documents sent to shareholders

The Company may send to Participants copies of any documents or notices normally sent to the holders of its Shares at or around the same time as issuing them to the holders of its Shares.

### 20.3    Regulations

The Directors can make or vary regulations for the administration and operation of these Rules but these must be consistent with its rules.

### 20.4    Data protection

By accepting any benefit in respect of an Award, the Participant consents to the holding and processing of personal data provided by the Participant to any Member of the Group for all purposes relating to the operation of these Rules. These include, but are not limited to:

20.4.1    administering and maintaining Participant records;

20.4.2    providing information to trustees of any employee benefit trust, registrars, brokers or third party administrators;

20.4.3    providing information to future purchasers of any Member of the Group or the business in which the Participant works; and

20.4.4    transferring information about the Participant to a country or territory outside the European Economic Area.

### 20.5    Consents

All allotments, issues and transfers of Shares will be subject to any necessary consents under any relevant enactments or regulations for the time being in force. The Participant will be responsible for complying with any requirements he needs to fulfil in order to obtain or avoid the necessity for any such consent.

Exhibit Q

## 20.6 Consistency with directors' remuneration policy and regulatory requirements

Nothing in these rules or the terms of any Award will oblige the Grantor or any other person to issue or transfer any shares or make payment (including any remuneration payment or payment for loss of office) which would be inconsistent with:

20.6.1 the approved directors' remuneration policy of the Company and in breach of Chapter 4A of Part 10 of the Companies Act 2006; or

20.6.2 any law, regulation, guideline or rule book applicable to any Member of the Group or any remuneration policy adopted pursuant to such a law, regulation, guideline or rule book,

and to the extent that any Award is so inconsistent, the Directors may, acting reasonably and in good faith, adjust (retrospectively or otherwise) the number or class of shares or securities comprised in an Award and/or impose additional conditions on the Vesting of such Award.

No Member of the Group will be obliged to seek the approval of any regulator or of its members in general meeting for any such issue, transfer or payment but may make such changes as the Committee considers are necessary or desirable to the terms of the issue, transfer or payment to ensure that consistency.

## 20.7 Articles of association

Any Shares acquired under these Rules are subject to the articles of association of the Company from time to time in force.

## 20.8 Rights attaching to Shares

Shares issued pursuant to an Award will rank equally in all respects with the Shares in issue on the date of allotment. They will not rank for any rights attaching to Shares by reference to a record date preceding the date of allotment.

Where Shares are transferred, including transferred out of treasury, the Participant will be entitled to all rights attaching to the Shares by reference to a record date on or after the transfer date. The Participant will not be entitled to rights before that date.

## 20.9 Listing of Shares

If and so long as the Shares are listed on any stock exchange, the Company will apply for listing of any Shares issued under these Rules on any such exchange as soon as practicable.

## 20.10 Exchange rates

Where it is necessary to make any currency conversion under these rules, the exchange will be at such rate and at such time as the Company decides.

## 20.11 Unfunded Awards

Awards shall be unfunded and no Member of the Group shall be required to segregate any assets which may at any time be represented by an Award. Any liability of any Member of the Group to any person with respect to an Award shall be based solely upon any contractual obligations which may be created by these Rules. No such obligation shall be deemed to be secured by any pledge or other encumbrance on any property of any Member of the Group or funded or secured in any way.

20.12  **Indemnification**

The Company shall indemnify (or procure that any relevant Member of the Group indemnifies) each Indemnitee to the fullest extent permitted under applicable laws and under its constitution, against all or any portion of liability and/or costs and expenses reasonably incurred by such Indemnitee, in connection with, arising out of, or resulting from, any claim, suit or proceeding in which he may be involved by reason of having been an Indemnitee; provided however, no Member of the Group shall be obliged to indemnify any Indemnitee against any liability, costs or expenses in connection with any act or omission to act in respect of which the Indemnitee shall be finally adjudged in any action, suit or proceeding to have been guilty of fraud or wilful misconduct in the performance of his duties. "**Indemnitee**", for the purposes of this rule 20.12 means an individual who, while an employee or director of any Member of the Group and acting with respect to these Rules, acts as a fiduciary, agent, director of that or any other Member of the Group, or in any other capacity exercises administrative responsibility with respect to these Rules.

20.13  **Separate provisions**

Each of the provisions of these Rules is entirely separate and independent from each of the other provisions. If any provision of any rule is found to be invalid, illegal or unenforceable, in whole or in part, in relation to an Award or a Participant, the provision shall apply to that Award or Participant with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and, so far as reasonably practicable, gives effect to the commercial intention of the Grantor.

To the extent it is not possible to delete or modify the provision in whole or in part then such provision or part of it will be deemed, to the extent that it is illegal, invalid or unenforceable, never to have been part of these Rules in relation to that Award or that Participant and to the extent that it is possible to do so, this will not affect the validity or enforceability of any of the remaining provisions of that or any other rule.

20.14  **Notices**

Any notice or other document which has to be given to a person who is or will be eligible to be a Participant may be delivered or sent by post to him at his home address according to the records of his employing company; or sent by e-mail or fax to any e-mail address or fax number which according to the records of his employing company is used by him or in either case such other address which the Company considers appropriate.

Any notice or other document which has to be given to the Company or other duly appointed agent under or in connection with these Rules may be delivered or sent by post to it at its registered office (or such other place as the Directors or duly appointed agent may from time to time decide and notify to Participants) or sent by e-mail or fax to any e-mail address or fax number notified to the Participant.

Notices sent by post will be deemed to have been given on the second day after the date of posting. However, notices sent by or to a Participant who is working overseas will be deemed to have been given on the seventh day after the date of posting. Notices sent by e-mail or fax, in the absence of evidence to the contrary, will be deemed to have been received on the day after sending.

20.15 **Small Payments**

If for whatever reason a small payment would otherwise be due to a Participant, the Company may in its absolute discretion decide instead not to pay that amount and in such a case the Participant will lose any right to receive the relevant amount.

In this context a small payment is a payment of less than the value of one Share as at the date of the proposed payment or an amount which would be reduced to less than the value of one Share once any charges and foreign exchange costs had been taken into account.

## 21   **Changing these Rules**

21.1 **Directors' powers**

Except as described in the rest of this rule 21, the Directors may, at any time, change these Rules in any way, including retrospective amendments and amendments to the terms of Awards already made.

21.2 **Shareholder approval**

21.2.1   Except as described in rule 21.2.2, the Company in general meeting must approve in advance by ordinary resolution any proposed change to these Rules to the advantage of present or future Participants, which relates to the following:

(i)     the persons to or for whom Shares may be provided;

(ii)    the limitations on the number of Shares which may be issued;

(iii)   the individual limit for each Participant;

(iv)    any rights attaching to the Awards and the Shares;

(v)     the rights of a Participant in the event of a capitalisation issue, rights issue, sub-division or consolidation of shares or reduction or any other variation of capital of the Company;

(vi)    the terms of this rule 21.2.1.

21.2.2   The Directors can change these Rules and need not obtain the approval of the Company in general meeting for any changes to Performance Conditions or other conditions in accordance with rule 3.1 or 3.2 or for minor changes:

(i)     to benefit administration;

(ii)    to comply with or take account of the provisions of any proposed or existing legislation;

(iii)   to take account of any changes to legislation; or

(iv)    to obtain or maintain favourable (or avoid unfavourable) tax, exchange control or regulatory treatment of the Company, any Subsidiary or any present or future Participant.

21.3 **Notice**

The Directors may (but need not) give notice of any changes made to any Participant affected and the absence of any such notification will not affect the validity of any such change.

18

22 **Governing law and jurisdiction**

English law governs these Rules and all Awards and their construction. The English Courts have exclusive jurisdiction in respect of disputes arising under or in connection with these Rules or any Award.

23 **Language of the Rules**

The language of these Rules is English. In the event of any conflict, the English language version will prevail.

24 **Section 409A of the US Internal Revenue Code**

It is intended that these Rules comply with Section 409A of the US Internal Revenue Code of 1986, as amended (the "Code"), and the regulations thereunder as in effect from time to time ("Section 409A"), and all provisions of these Rules shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A.

For the avoidance of doubt, neither the Participant nor any creditor or beneficiary of the Participant shall, if the Participant is subject to tax in the United States, have the right to subject any deferred compensation (within the meaning of Section 409A) payable under these Rules to any anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment. Except as permitted under Section 409A, any deferred compensation (within the meaning of Section 409A) payable to or for the benefit of the Participant under these Rules may not be reduced by, or offset against, any amount owing by the Participant to the Company or any affiliate.

If, at the time of the Participant's separation from service (x) the Participant shall be a specified employee (within the meaning of Section 409A and using the identification methodology selected by the Company from time to time) and (y) the Company shall make a good faith determination that an amount payable (including Shares) under these Rules constitutes deferred compensation (within the meaning of Section 409A) the payment of which is required to be delayed pursuant to the six-month delay rule set forth in Section 409A in order to avoid taxes or penalties under Section 409A, then the Company (or an affiliate, as applicable) shall not pay such amount (or issue or transfer Shares) on the otherwise scheduled payment date but shall instead accumulate such amount and pay it (or issue or transfer Shares), without interest, during the seventh month following such separation from service. For the purposes of this paragraph, the term "separation from service" means, with respect to a Participant, the Participant's termination of employment with the service recipient due to death, retirement or otherwise as provided in US Treasury Regulation § 1.409A-1(h), subject to the following: (a) the service recipient shall be determined without substituting "at least 50 percent" for "at least 80 percent" each place it appears in Sections 1563(a)(1), (2) and (3) of the Code and in US Treasury Regulation § 1.414(c)-2 (i.e., the "at least 80 percent" standard shall apply in determining the businesses under common control/controlled group); and (b) if no action is taken to exercise the discretion under US Treasury Regulation § 1.409A-1(h)(4) to specify whether Participants have experienced a separation from service in connection with certain asset purchase transactions, a separation from service shall be treated as having occurred.

Notwithstanding any provision of these Rules to the contrary, in light of the uncertainty with respect to the proper application of Section 409A, the Company reserves the right to make

amendments to these Rules as the Company deems necessary or desirable to avoid the imposition of taxes or penalties under Section 409A.  In any case, the Participant is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or for the account of the Participant in connection with these Rules or any Award hereunder (including any taxes and penalties under Section 409A), and neither the Company nor any affiliate shall have any obligation to indemnify or otherwise hold the Participant harmless from any or all of such taxes or penalties.

## 24    Meaning of Words

In these rules:

"**Adjustment Event**" means an event by virtue of which rule 16 applies, which will be set, in relation to each Award, by the Grantor under rule 3.3;

"**Award**" means any award made under these Rules, including a Long Term Incentive Award, a Performance Share Award, a Restricted Share Award or a Deferred Bonus Award;

"**Award Date**" means the date which the Grantor sets for the grant of an Award;

"**Business Day**" means a day on which any stock exchange which is nominated by the Directors (for some or all purposes under these Rules) and on which the Shares are traded is open for the transaction of business;

"**Company**" means Shell plc;

"**Control**" has the meaning given to it by Section 995 of the Income Tax Act 2007;

"**Dealing Restrictions**" means restrictions imposed by any law, order, regulation or Government directive, the rules applying to any listing of the Company, any code adopted by the Company regulating dealings in shares by employees or directors or any restriction imposed by the Company's compliance officer;

"**Deferred Bonus Award**" means an Award as described in Schedule 1;

"**Directors**" means the board of directors of the Company or any committee of the board of directors or other person or body to whom the board of directors delegates any function under these rules or, where rule 17 applies, those people who were the Directors immediately before the event by virtue of which that rule applies;

"**Eligible Employee**" means any employee of any Member of the Group;

"**Grantor**" means, in relation to any Award, the Company or other Member of the Group which granted the Award under rule 2.1;

"**Long Term Incentive Award**" means an Award granted to a Director, a member (or former member) of the Executive Committee or a Senior Executive, designated by the Grantor as a Long Term Incentive Award, Vesting of which is subject to a Performance Condition;

"**Holding Shares**" means the Shares in respect of which an Award has Vested and which are subject to a Holding Period as determined under rule 3.3;

"**Holding Period**" means a period during which Shares received on Vesting of an Award must be held in accordance with rule 13;

"**Market Value**" means the price of a Share determined using any reasonable method selected by the Directors;

20

"**Member of the Group**" means:

(a)     the Company; and

(b)     its Subsidiaries from time to time;

(c)     any other company, partnership or limited liability company which is associated with the Company and is so designated by the Directors (for some or all purposes under these Rules);

"**Participant**" means a person holding an Award or his personal representatives;

"**Performance Condition**" means any performance condition imposed under rule 3.1;

"**Performance Period**" means the period in respect of which a Performance Condition is to be satisfied;

"**Performance Share Award**" means an Award, granted to a Participant who is not a Director, designated by the Grantor as a Performance Share Award, vesting of which is subject to a Performance Condition;

"**Qualifying Date**" means a date set by the Grantor which shall not normally be earlier than the third anniversary of the Award Date or, if there is a Performance Condition, of the start of the Performance Period.  However, the Grantor may, in its absolute discretion, determine that it shall be any other date.  If the Grantor does not set the Qualifying Date, it shall be the third anniversary of the Award Date;

"**Restricted Share Award**" means an Award, designated by the Grantor as a Restricted Share Award, vesting of which is not subject to any Performance Condition;

"**Regulatory Information Service**" means a service listed in Schedule 12 to the UK Listing Authority Listing Rules;

"**Rules**" means these rules (including any schedules) as amended from time to time;

"**Shares**" means, subject to rules 8 and 17, fully paid ordinary shares in the capital of the Company or American Depository Receipts representing those shares;

"**Subsidiary**" means a company which is a subsidiary of the Company within the meaning of Section 1159 of the Companies Act 2006;

"**Vesting**" means a Participant becoming entitled to have the Shares issued or transferred to him or to another person to hold  the shares for his benefit subject to these rules; and

Words of, or implying, one gender shall include the other gender.

## Schedule 1

### Deferred Bonus Awards

Deferred Bonus Awards are subject to these Rules, as varied by this Schedule.

1    **Eligibility**

The Grantor, with the approval of the Directors, may select any Eligible Employee to be eligible to be granted a Deferred Bonus Award in respect of any bonus payable to him.

2    **Size of Deferred Bonus Award**

At any time before the amount of the Participant's bonus is determined, the Grantor will decide the proportion of the relevant bonus which will be paid as a Deferred Bonus Award.

To the extent that the bonus is not to be paid as a Deferred Bonus Award, it will be paid in cash (or in any other form) in accordance with its terms.

3    **Grant of Deferred Bonus Award**

As soon as reasonably practicable after the amount of the relevant bonus has been determined, the Grantor will grant to the Participant a Deferred Bonus Award over a number of Shares equal to that proportion of the bonus which is to be paid as a Deferred Bonus Award divided by the Market Value of a Share on the Award Date (rounded down to the nearest whole share).

Subject to this Schedule, the Grantor shall set the terms of Deferred Bonus Awards in accordance with the rules.

If the Participant is not an employee or director of a Member of the Group on the Award Date, he will not be entitled to be granted a Deferred Bonus Award.

4    **Leaving employment**

If a Participant ceases to be an employee of a Member of the Group before the Qualifying Date, his Deferred Bonus Award will continue. For the avoidance of doubt if a Participant ceases to be an employee of a Member of the Group after the Qualifying Date, the Award will continue.

5    **Takeovers and restructurings**

For the avoidance of doubt, where rule 17 applies, Deferred Bonus Awards will continue to the extent that they are not exchanged under that rule and if Shares shall, directly or indirectly as a result of the takeover or restructuring, no longer be available for settlement of the Awards, the Directors shall modify the Awards to provide for payment in cash, in such amount as the Directors consider reasonable, and such payment shall be made at the time specified in paragraph 7 of this Schedule 1.

6    **Early Vesting; Sale of Employer**

Notwithstanding rules 14.2 to 14.5 above, Deferred Bonus Awards will not Vest on the date of cessation but shall continue.

7    **Consequences of Vesting**

Notwithstanding rule 11, but subject to rule 12, the Grantor will procure that Shares are issued or transferred (from treasury or otherwise) to or to the order of the Participant. Such

issue or transfer will be made, subject to any Dealing Restriction which prevents such issue or transfer, as soon as reasonably practicable and will normally be made within 45 days of the date of Vesting; provided, however, that such issue and transfer will be made (a) if rule 15 applies, within 90 days of the date of death and (b) in all other cases of Vesting, after the Qualifying Date but not later than the end of the calendar year in which the Qualifying Date occurs.

If, however, any Dealing Restriction would delay such issue or transfer beyond the relevant deadline set out in this rule, then the Vested Award will be paid in cash pursuant to Rule 12 not later than such relevant deadline.

Exhibit Q

Exhibit Q

**Free Share Schedule**

This Schedule 2 provides for the grant of awards of free shares to employees of Shell plc and its subsidiaries.

1. **Type of Awards**

   Eligible Employees may be granted Free Share Awards pursuant to this Schedule 2.

2. **Eligibility**

   Free Share Awards may only be granted to Eligible Employees who are not executive directors of the Company.

3. **Source of Shares**

   Free Share Awards may only be satisfied using existing Shares. No Shares may be issued or transferred from treasury to satisfy Free Share Awards.

4. **Terms of Free Share Awards**

4.1 Prior to the grant of a Free Share Award the Grantor will decide:

   4.1.1 the number and class of Shares subject to the Free Share Award or the method for determining the number and class;

   4.1.2 the Award Date;

   4.1.3 whether or not dividend equivalents will be payable (under Rule 9 of the Master Plan) in respect of the Free Share Award and, if so, on what basis; and

   4.1.4 any Adjustment Events which will apply to the Free Share Award (see Rule 16 of the Master Plan).

5. **Vesting of Free Share Awards**

5.1 Free Share Awards shall Vest on the Vesting Date, save where Rule 7 of this Schedule 2 or Rule 17 of the Master Plan applies.

5.2 If a Free Share Award does not Vest on or before the Vesting Date, it will lapse.

6. **Consequences of Vesting**

6.1 The Grantor will procure that Shares are transferred to the Participant or to a nominee, trustee or other entity designated by the Grantor for the Participant's benefit. Such transfer will be made, subject to any Dealing Restriction which prevents such transfer, as soon as reasonably practicable and will normally be made within 45 days of the date of Vesting; provided, however, that such issue or transfer will be made not later than:

   6.1.1 where Rule 7.2, 7.3, 7.4, 8, or Rules 17.3 or 17.6 of the Master Plan applies, March 15 of the calendar year following the calendar year in which the cessation or early vesting date (Rule 7.2, 7.3, 7.4), death (Rule 8), date of obtaining Control or sanction (Rule 17.3

Exhibit Q

of the Master Plan) or decision of the Directors (Rule 17.6 of the Master Plan) occurs; and

6.1.2    in all other cases, March 15 of the calendar year following the calendar year in which the Vesting Date occurs.

If, however, any Dealing Restriction would delay such issue or transfer beyond the relevant deadline set out in this rule, then the Vested Award will be paid in cash pursuant to Rule 12 of the Master Plan not later than such relevant deadline.

**7.    Leaving Employment**

7.1    General rule

If a Participant ceases to be an employee of a Member of the Group before the Vesting Date, their Free Share Award will lapse on the date of cessation except as otherwise provided in this Rule 7 or Rule 8. For the avoidance of doubt if a Participant ceases to be an employee of a Member of the Group after the Vesting Date, there will be no impact on their Free Share Award.

7.2    Exceptions to the general rule

Subject to Rules 7.3 and 7.4, if a Participant ceases to be an employee of a Member of the Group before the Vesting Date because of:

7.2.1    disability, injury or ill-health;

7.2.2    retirement as determined by the Grantor (which determination may take into consideration, among other items, local laws, regulations or policies);

7.2.3    redundancy;

7.2.4    the completion of a fixed-term contract; or

7.2.5    any other reason, with the specific consent of the Grantor (given within 14 days after cessation of the Participant's employment),

their Free Share Award will continue and will Vest in accordance with Rule 5, provided however, that the Directors may reduce the Award pro rata to reflect the time which has elapsed between the Award Date and the date of cessation.

7.3    Early Vesting

Where Rule 7.2 applies, the Grantor may decide that the Award will Vest on cessation or on a later date chosen by it, but not later than the Vesting Date.

7.4    Sale of employer

7.4.1    Subject to Rule 7.4.2, if a Participant ceases to be an employee of a Member of the Group by reason of:

(a)    the Participant's employing company ceasing to be under the Control of the Company or a Member of the Group; or

(b)    a transfer of the undertaking, or the part of the undertaking, in which the Participant works to a person which is neither under the Control of the Company nor a Member of the Group,

then, unless the Directors determine otherwise, their Free Share Award will continue and will Vest in accordance with Rule 5. The Directors may reduce the Award pro rata to reflect the time which has elapsed between the Award Date and the date of cessation.

2

7.4.2    Where this Rule 7.4 applies and to the extent that the Directors determine that equivalent rights have been granted or offered to Participants, then Free Share Awards will not Vest under this rule to the extent that the Directors so determine. To the extent that the Directors determine that any Free Share Awards do not Vest under this rule then they will lapse.

7.5    Meaning of "ceasing to be an employee"

For the purposes of this Rule 7 a Participant will be treated as continuing to be an employee of a Member of the Group:

7.5.1    if the Participant is an employee of any Member of the Group; or

7.5.2    if the Participant recommences employment with a Member of the Group within 7 days.

**8.    Death**

If a Participant dies before the Vesting Date, their Free Share Award will Vest in full on the date of death.

**9.    Data Protection**

The personal data of any Eligible Employee, Participant or former Participant may be processed in connection with the operation of the Plan in accordance with the Group's prevailing data protection policy and as notified to Eligible Employees in accordance with UK GDPR. By participating in the Plan, a Participant consents (otherwise than for the purposes of UK GDPR) to the processing of their personal data in connection with the operation of the Plan.

**10.    Meaning of Words**

In this Schedule 2:

"**Free Share Awards**" means a conditional right to receive Shares which is not subject to a Performance Condition;

"**Master Plan**" means the Shell Share Plan 2014;

"**UK GDPR**" means the Data Protection Act 2018 as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019, from time to time; and

"**Vesting Date**" means the first anniversary of the Award Date, which shall be construed as the "Qualifying Date" where appropriate for the purposes of construing the provisions of the Master Plan, as set out below.

**11.    Cross reference to Master Plan**

The following provisions of the Master Plan shall apply to Free Share Awards as if they had been granted under the Master Plan:

Rule 2    Granting Awards

Rule 3.2 Other conditions

Rule 4    Form of Awards

Rule 5    No Transfer of Awards

Rule 6    Individual limit

Rule 8    Variations in share capital, demergers and special distributions

Exhibit Q

Rule 9    Voting, dividends and dividend equivalents

Rule 12    Cash alternative

Rule 16    Clawback and malus

Rule 17    Takeovers and restructurings

Rule 18    Withholding of tax

Rule 19    Relationship with terms of a Participant's employment

Rule 20    General (other than Rule 20.4, Rule 20.6, and Rule 20.9)

Rule 21    Changing these rules (other than Rule 21.2)

Rule 22    Governing law and jurisdiction

Rule 23    Language of the Rules

Rule 24    Section 409A of the US Internal Revenue Code

Rule 24    Meaning of Words (unless defined in this Schedule 2, in which case the definition in this Schedule 2 will prevail)

**12.    Provisions Applicable to Participants Subject to Tax in the United States**

The following provisions shall apply to each Free Share Award held by a Participant who is subject to tax in the United States, notwithstanding any provision of this Schedule 2 or the Master Plan to the contrary:

12.1    Any delivery of Shares or other pay-out of such Free Share Award shall be made during the 45 day period beginning on the earliest to occur of the Vesting Date or the date of death of the Participant (Rule 8). In no event shall the recipient of Shares or other pay-out of any such Free Share Award be permitted to designate the taxable year of the payment.

12.2    Accordingly, Rule 7.3 of this Schedule 2 shall not apply to any such Free Share Award and accelerated delivery or other accelerated pay-out under this Schedule 2 or the Master Plan (including, without limitation, Rule 7.4 of this Schedule 2 or Rule 17 of the Master Plan) shall not apply to any such Award other than in the case of death of the Participant (Rule 8).

4

## Exhibit 8.1

**SIGNIFICANT SUBSIDIARIES AND OTHER RELATED UNDERTAKINGS (AUDITED)**

Significant subsidiaries and other related undertakings at December 31, 2021, are set out below. Significant subsidiaries are prefixed with [*] and each meets the threshold specified under Rule 1-02(w) of Regulation S-X. Shell's percentage of share capital is shown to the nearest whole number. All subsidiaries have been included in the "Consolidated Financial Statements" on pages 238-294, and those held directly by the Company are marked with the footnote [a]. A number of the entities listed are dormant or not yet operational. Entities that are proportionately consolidated are identified by the footnote [b]. Shell-owned shares are ordinary (voting) shares unless identified with one of the following annotations against the company name: [c] Membership interest; [d] Partnership capital; [e] Non-redeemable; [f] Ordinary, Partnership capital; [g] Ordinary, Redeemable; [h] Ordinary, Redeemable, Non-redeemable; and [i] Redeemable, Non-redeemable.

| Company by country of incorporation | Address of registered office | % |
|---|---|---|
| **ARGENTINA** | | |
| Banduria Sur Investments S.A. | Avenida Pte. Roque Sáenz Pena 788, 2nd Floor, Ciudad de Buenos Aires, 1035 | 50 |
| Shell Argentina S.A. | Avenida Pte. Roque Sáenz Pena 788, 2nd Floor, Ciudad de Buenos Aires, 1035 | 100 |
| **AUSTRALIA** | | |
| 1st Energy Pty Ltd | Level 4, 459 Little Collins Street, Melbourne, VIC 3000 | 30 |
| Alliance Automation Pty Ltd | c/o Alands Accountants, Level 1/293 Queen Street, Brisbane, QLD 4000 | 50 |
| Arrow Energy Holdings Pty Ltd | Level 39, 111 Eagle Street, Brisbane, QLD 4000 | 50 |
| Austen & Butta Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| BC 789 Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| BG CPS Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| BNG (Surat) Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| CCM Energy Solutions Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Condamine 1 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Condamine 2 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Condamine 3 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Condamine 4 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Condamine Power Station Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| E.R.M. Oakey Power Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Braemar 3 Power Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Braemar 3 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Employee Share Plan Administrator Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Energy Solutions Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Financial Services Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Gas Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Gas WA01 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Innovation Labs Pty Ltd | Level 52, 111 Eagle Street, Brisbane, QLD 4000 | 100 |
| ERM Land Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Neerabup Power Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Power International Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Power Investments Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Power Services Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Power Utility Systems Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ERM Wellington 1 Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| ESCO Pacific Holdings Pty Ltd | Level 4, 13 Cremorne Street, Richmond, VIC 3121 | 49 |
| Greensense Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Lumaled Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| New South Oil Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| NewGen Neerabup Pty Ltd [b] | Infrastructure Capital Group, Level 15 Martin Place, Sydney, NSW 2000 | 50 |
| NewGen Power Neerabup Pty Ltd [b] | Infrastructure Capital Group, Level 15 Martin Place, Sydney, NSW 2000 | 50 |
| North West Shelf LNG Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Oakey Power Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| OME Resources Australia Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| OVIDRIVE APPLABS PTY LTD | 5 TULLY ROAD, EAST PERTH, 6004 | 42 |
| Petroleum Resources (Thailand) Pty. Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Powermetric Metering Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Pure Energy Resources Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QCLNG Operating Company Pty Ltd [g] | Level 30, 275 George Street, Brisbane, QLD 4000 | 75 |
| QCLNG Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC (87) Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC (Exploration) Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |

Exhibit Q

| | | |
|---|---|---|
| QGC (Infrastructure) Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Common Facilities Company Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 2 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 3 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 4 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 5 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 6 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 7 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 8 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Holdings 9 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Midstream Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Midstream Investments Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Midstream Land Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Midstream Limited Partnership | Level 42, Bourke Place, 600 Bourke Street, Melbourne, VIC 3000 | 100 |
| QGC Midstream Services Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Northern Forestry Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Sales Qld Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 1 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 1 Tolling Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 1 UJV Manager Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 2 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 2 Tolling No.2 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 2 Tolling Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Train 2 UJV Manager Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Upstream Finance Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Upstream Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Upstream Investments Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| QGC Upstream Limited Partnership | Level 42, Bourke Place, 600 Bourke Street, Melbourne, VIC 3000 | 100 |
| Queensland Electricity Investors Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Queensland Gas Company Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Richmond Valley Solar Thermal Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Roma Petroleum Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| SASF Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Select Carbon Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| SGA (Queensland) Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| SGAI Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Australia FLNG Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Australia Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Australia Services Company Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Development (PSC19) Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Development (PSC20) Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Energy Australia Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy BESS 1 Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Certificate Trading Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Engineering Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Environmental Products Australia Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Holdings Australia Limited | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell Energy Neerabup Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Oakey Power Holdings Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Operations Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Power Developments Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Power Generation Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Projects Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Energy Retail Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Global Solutions Australia Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Shell New Energies Australia Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell QGC Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Shell Tankers Australia Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Solpod Pty Ltd | c/o Jeffery Zivin, Unit 4, 4 George Street, Camberwell, VIC 3124 | 24 |
| Sonnen Australia Pty Limited | Tenancy 6, Lionsgate Business Park, 180 Philip Highway, Elizabeth South, SA 5112 | 100 |
| Starzap Pty Ltd | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |

| | | |
|---|---|---|
| Sunshine 685 Pty Limited | Level 30, 275 George Street, Brisbane, QLD 4000 | 100 |
| Trident LNG Shipping Services Pty Ltd | Shell House, 562 Wellington Street, Perth, WA 6000 | 100 |
| Walloons Coal Seam Gas Company Pty Limited [g] | Level 30, 275 George Street, Brisbane, QLD 4000 | 75 |
| AUSTRIA | | |
| Next Kraftwerke AT GmbH | Franz-Josefs-Kai 27, Vienna, 1010 | 100 |
| Salzburg Fuelling GmbH | Innsbrucker Bundesstrasse 95, Salzburg, 5020 | 33 |
| Shell Austria Gesellschaft mbH | Tech Gate, Donau-City-Str. 1, Vienna, 1220 | 100 |
| Shell Brazil Holding GmbH | Tech Gate, Donau-City-Str. 1, Vienna, 1220 | 100 |
| Shell China Holding GmbH | Schulhof 6/1, Vienna, 1010 | 100 |
| TBG Tanklager Betriebsgesellschaft m.b.H. | Rettenlackstrasse 3, Salzburg, 5020 | 50 |
| Transalpine Ölleitung in Österreich GmbH | Kienburg 11, Matrei in Osttirol, 9971 | 19 |
| BAHAMAS | | |
| Shell Bahamas Power Company Inc. | P.O. Box N4805, St. Andrew's Court, Frederick Street Steps, Nassau | 100 |
| Shell Western Supply and Trading Limited | GTC Corporate Services Limited, Sassoon House, Shirley Street & Victoria Avenue, Nassau | 100 |
| BARBADOS | | |
| Shell Trinidad and Tobago Resources SRL | One Welches, Welches, St. Thomas, BB22025 | 100 |
| BELGIUM | | |
| Belgian Shell S.A. | Cantersteen 47, Brussels, 1000 | 100 |
| New Market Belgium S.A. | Cantersteen 47, Brussels, 1000 | 100 |
| Next Kraftwerke Belgium BVBA | Paleizenstraat 153 Rue des Palais, Gebouw/Bâtiment: Lustrerie, Brussels, 1030 | 100 |
| Shell Catalysts & Technologies Belgium N.V. | Pantserschipstraat 331, Gent, 9000 | 100 |
| Shell EV Charging Solutions Belgium BV | Borsbeeksebrug 34/1, Antwerpen, 2600 | 100 |
| BERMUDA | | |
| Egypt LNG Shipping Limited | Clarendon House, 2 Church Street, Hamilton, HM 11 | 25 |
| Gas Investments & Services Company Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 85 |
| Qatar Shell GTL Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Sakhalin Energy Investment Company Ltd | Clarendon House, 2 Church Street, Hamilton, HM 11 | 28 |
| Shell Australia Natural Gas Shipping Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Holdings (Bermuda) Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell International Trading Middle East Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Markets (Middle East) Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Oman Trading Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Petroleum (Malaysia) Ltd | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Saudi Arabia (Refining) Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Shell Trust (Bermuda) Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| Solen Life Insurance Limited | 3rd Floor Continental Building, 25 Church Street, Hamilton, HM 12 | 100 |
| BRAZIL | | |
| BG Comercio e Importacao Ltda. | Avenida das República do Chile 330, 23º Andar, Torre 2, Centro, Rio de Janeiro, 20031-170 | |
| BG Petroleo & Gas Brasil Ltda. | Avenida das República do Chile 330, 23º Andar (parte) - Torre 2, Centro, Rio de Janeiro, 20031-170 | 100 |
| Marlim Azul Energia S.A. | Avenida Paulista, 1274, 8º andar, Conjunto 23, Sala B, Bela Vista, São Paulo, 01310-100 | 30 |
| Neolubes Indústria DE Lubrificantes LTDA | Praia Interdente Bitencourt nº 2, E 8N, Ribeira, Rio de Janeiro, 21930-030 | 100 |
| Pecten do Brasil Servicos de Petroleo Ltda. | Avenida República do Chile nº 330, Bloco 2, Sala 2301, Centro, Rio de Janeiro, 20031-170 | 100 |
| Raizen S.A. | Avenida das Almirante Barroso, nº 81, 36º Andar, Sala 36A104, Rio de Janeiro, 20031-004 | 44 |
| Seapos Ltda. | Avenida República do Chile nº 330, Bloco 2, Sala 2401, Centro, Rio de Janeiro, 20031-170 | 100 |
| Shell Brasil Petroleo Ltda. | Avenida República do Chile nº 330, Bloco 2, Salas 2001, 2301, 2401, 2501, 3101, 3201, 3301 e 3401, Centro, Rio de Janeiro, 20031-170 | 100 |
| Shell Energy do Brasil Gás Ltda. | Avenida República do Chile nº 330, Bloco 2, Sala 2001, Centro, Rio de Janeiro, 20031-170 | 100 |
| Shell Energy do Brasil Ltda. | Avenida Brigadeiro Faria Lima nº 3.311, Conjunto 82, Itaim Bibi, São Paulo, 04538-133 | 100 |
| BRUNEI | | |
| Brunei LNG Sendirian Berhad | Lumut, Seria, KC2935 | 25 |
| Brunei Shell Marketing Company Sendirian Berhad | Brunei Shell Petroleum Company, Sendirian Berhad, Seria, KB2933 | 50 |
| Brunei Shell Petroleum Company Sendirian Berhad | Jalan Utara, Panaga, Seria, KB2933 | 50 |
| Brunei Shell Tankers Sendirian Berhad | Jalan Utara, Panaga, Seria, KB2933 | 25 |
| Shell Borneo Sendirian Berhad | c/o BSP Head Office, NDCO Block, Ground Floor, Jalan Utara, Panaga Seria, KB3534 | 100 |
| BULGARIA | | |
| Shell Bulgaria Ead | 48, Sitnyakovo Blvd., Serdika Offices, 8th floor, Sofia, 1505 | 100 |
| CANADA | | |
| 10084751 Canada Limited | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| 1745844 Alberta Ltd. | 2100, 855 - 2nd Street S.W., Calgary, Alberta, T2P 4J8 | 50 |
| 7026609 Canada Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| 7645929 Canada Limited | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Alberta Products Pipe Line Ltd. | 5305 McCall Way N.E., Calgary, Alberta, T2E 7N7 | 20 |
| Cansolv Technologies Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |

| | | |
|---|---|---|
| Coral Cibola Canada Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| FP Solutions Corporation | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 33 |
| LNG Canada Development Inc. [b] | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 40 |
| Sable Offshore Energy Inc. | 1701 Hollis Street, Suite 1400, Halifax, Nova Scotia, B3J 3M8 | 33 |
| SCL Pipeline Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| SFJ Inc. | 199 Bay Street, Suite 5300, Commerce Court West, Toronto, Ontario, M5L 1B9 | 50 |
| Shell Americas Funding (Canada) Limited | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada BROS Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada Energy [c] | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada Limited | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada OP Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada Products | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Canada Services Limited | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Catalysts & Technologies Canada Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Chemicals Canada [c] | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Energy North America (Canada) Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Global Solutions Canada Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Quebec Limitée | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Shell Trading Canada [c] | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| Sun-Canadian Pipe Line Company Limited | 830 Highway No. 6 North, Flamborough, Ontario, L0R 2H0 | 45 |
| Trans-Northern Pipelines Inc. | 45 Vogel Road, Suite 310, Richmond Hill, Ontario, L4B 3P6 | 33 |
| Zeco Systems (Canada) Inc. | 400 4th Avenue S.W., Calgary, Alberta, T2P 0J4 | 100 |
| CAYMAN ISLANDS | | |
| Beryl North Sea Limited | Sterling Trust (Cayman) Limited, Whitehall House, 238 North Church Street, P.O. Box 1043, George Town, Grand Cayman, KY1-1102 | 100 |
| BG Egypt S.A. | Piccadilly Centre, 28 Elgin Avenue, Suite 201, P.O. Box 2570, George Town, Grand Cayman, KY1-1103 | 100 |
| BG Exploration and Production India Limited | Campbells, Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, KY1-9010 | 100 |
| Gas Resources Limited | Piccadilly Centre, 28 Elgin Avenue, Suite 201, P.O. Box 2570, George Town, Grand Cayman, KY1-1103 | 100 |
| Schiehallion Oil & Gas Limited | Caledonian Trust (Cayman) Limited, Caledonian House, 69 Dr Roy's Drive P.O. Box 1043, George Town, Grand Cayman, KY1-1102 | 100 |
| Shell Bolivia Corporation | Piccadilly Centre, 28 Elgin Avenue, Suite 201, P.O. Box 2570, George Town, Grand Cayman, KY1-1103 | 100 |
| Shell North Sea Holdings Limited | Maples Corporate Services Limited, Ugland House, P.O. Box 309, George Town, Grand Cayman, KY1-1104 | 100 |
| CHILE | | |
| Shell Chile S.A. | c/o Carey y Cia Abogados, Miraflores 222, Piso 28, Santiago | 100 |
| CHINA | | |
| Anhui Shell Energy Company Limited | Room 2519-2522, 25/F, Greenland Center, Cross-area of Susong Rd and Changqin St, South Erhuan, Baohe District, Anhui, 230000 | 100 |
| Beijing Shell Petroleum Company Ltd. | Unit 1101-1104, level 11, Building 1, No. 19 Chaoyang Park Road, Chaoyang District, Beijing, 100125 | 49 |
| Chongqing Shell Energy Company Limited | No. 196, Shuang Yuan Street, Beibei Zone, Chongqing, 400700 | 100 |
| Climate Bridge (Shanghai) Ltd. | Room 609, building No. 1, No. 388 North Mu Hua Road, Fengxian Dist, Shanghai, 200120 | 49 |
| CNOOC and Shell Petrochemicals Company Limited | Dayawan Petrochemical Industrial Park, Huizhou, Guangdong, 516086 | 50 |
| Fujian Xiangyu and Shell Petroleum Company Limited | Unit 604, 6/F, Building C, No. 3 Yunan Fourth Road, FTPZ Xiamen Sub-zone (Tariff-free Zone), Xiamen, 361000 | 49 |
| Hubei Shell Energy Company Limited | No. 4, 5, 12/F, Unit A, Oceanwide International Center Office, 249 Huaihai Road, 187 Yunxia Road, 187 Yunxia Road, CBD, Jianhan District, Wuhan, 430000 | 100 |
| Hunan Shell Energy Company Limited | Room 2407-2409, Building 15, Fangmaoyuan (Phase II), No. 1177 Huanhu Road, Yuelu District, Changsha, 410006 | 100 |
| Infineum (China) Co. Ltd. | No. 1 Dongxin Road, Jiangsu Yangtze River International, Chemical Industry Park, Zhangjiagang, Jiangsu, 215600 | 50 |
| Jiangsu Shell Energy Company Limited | Room 1801, Building 1, International Finance Center, No. 347, Jiangdong Middle Road, Jianye District, Nanjing, Jiangsu, 210019 | 100 |
| Shell (Beijing) Real Estate Consulting Ltd. | Unit 01, 32/F, No. 16 Building, No. 1 Courtyard, Jian Guo Men Wai Avenue, Chaoyang District, Beijing, 100004 | 100 |
| Shell (China) Limited | 30/F Unit 01-02, No. 16 Building, No. 1 Courtyard, Jian Guo Men Wai Avenue, Chaoyang District, Beijing, 100004 | 100 |
| Shell (China) Projects & Technology Limited | Unit 01-08, Level 31, No. 16 Building, No. 1 Jian Guo Men Wai Avenue, Chaoyang District, Beijing, 100004 | 100 |
| Shell (Shanghai) Petroleum Company Limited | 8/F, No. 818 Shenchang Road, Minhang District, Shanghai, 201107 | 100 |
| Shell (Shanghai) Technology Limited | Building 4, Jin Chuang Building, No. 4560, Jin Ke Road, Pilot Free Trade Zone, Shanghai | 100 |
| Shell (Tianjin) Lubricants Company Limited | North to Gang Bei Road and East to Hai Gang Road, Nangang Industrial Zone, Tianjin Economic-Technological Development Area, Tianjin, 300280 | 100 |
| Shell (Tianjin) Oil and Petrochemical Company Limited | No. 286 Nansan Road, Tianjin Harbour Nanjiang Dev. Zone, Tanggu, Binhai NewDistrict, Tianjin, 300452 | 100 |
| Shell (Zhejiang) Petroleum Trading Limited | No. 1 Wangjiaba, Xinmiaozhi Village, Puyuan Town, Tongxiang, Jiaxing, Zhejiang, 314502 | 100 |
| Shell (Zhuhai) Lubricants Company Limited | Nanjin Wan, Gaolan Dao, Gaolan Harbour Economic Zone, Zhuhai, 519050 | 100 |
| Shell Energy (China) Limited | Room 530, 5th Floor, Building 1, No. 239 Gang'ao Road, China (Shanghai) Free Trade Zone, Shanghai, 200137 | 100 |
| Shell Management and Consulting Company Limited | 8/F, Building 1, No. 818 Shenchang Road, Minhang District, Shanghai, 201106 | 100 |
| Shell North China Petroleum Group Co., Ltd. | Room 518, 5th Floor, Office Building, Tianjin Food Group Company Ltd, No. 96, Qixiangtai Road, Hexi District, Tianjin, 300074 | 49 |

| | | |
|---|---|---|
| Shell Road Solutions (Zhenjiang) Co. Ltd | No. 68 Xianiejia, Dagang, Zhenjiang New District, Zhenjiang, 212132 | 100 |
| Shell Road Solutions Xinyue (Foshan) Co. Ltd. | Baisha, Hekou, Sanshui District, Foshan, Guangdong, 528133 | 60 |
| Shell Ventures Company Limited | 8/F, Building 1, No. 818 Shenchang Road, Minhang District, Shanghai, 201106 | 100 |
| Sinopec and Shell (Jiangsu) Petroleum Marketing Company Limited | No. 100, Xingang Dadao, Nanjing Economic and Technological Development Zone, Nanjing, Jiangsu, 210000 | 40 |
| Suzhou Liyuan Retail Site Management Co., Ltd. | No. 358 Zhuhui Road, Suzhou, 215000 | 50 |
| Suzhou Yiwei NewEnergy Technology Company Limited | Room 611,6th Floor, Building B, Vitality Business Square, 185 Jumao Street, Xiangcheng, Suzhou, 215100 | 100 |
| Yanchang and Shell (Guangdong) Petroleum Co., Ltd. | 39th Floor as Planning-designed (41st Floor as Self-designated), Leatop Plaza, No. 32 East Zhujiang Road, Zhujiang New Town, Tianhe District, Guangzhou, 510623 | 49 |
| Yanchang and Shell (Sichuan) Petroleum Company Limited | 23F, Yanlord Square, Section 2, Renmin South Road, Chengdu, Sichuan, 610016 | 45 |
| Yanchang and Shell Petroleum Company Limited | 18th Floor, Tower 1, Yongli International Finance Centre, Jinye No. 1 Road, High-tech District, Xi'an, 710075 | 45 |
| Zhangjiakou City Transport and Shell New Energy Co., Ltd | Building No. 2, Hebei Guokong Northern Silicon Valley High-tech New City, No. 28 East Zhanqian Street, Qiaodong District, Zhangjiakou, 075000 | 48 |
| Zhejiang Shell Energy Development Company Limited | Rm 1503, Building 2, Plaza of ZBA, No. 939 Minhe Road, Ningwei Street, Xiaoshan, Hangzhou, Zhejiang, 311215 | 100 |
| Zhejiang Shell Fuels Company Limited | Room 2103, North Tower, Yefeng Modern Center, No. 161, Shaoxing Road, Xiacheng District, Hangzhou, Zhejiang, 310004 | 49 |
| Zhejiang Shell Oil and Petrochemical Company Limited | The Port of Zhapu, Jiaxing Municipality, Zhejiang, 314201 | 100 |
| COLOMBIA | | |
| Shell Colombia S.A. | Calle 90 No. 19 - 41, Oficina 702- Edificio Quantum, Bogotá, 452 | 100 |
| CÔTE D'IVOIRE | | |
| Cote d'Ivoire GNL | 14, Blvd Carde, Imm. Les Heveas, Plateau, Abidjan, BP V 194 | 13 |
| CYPRUS | | |
| Rosneft-Shell Caspian Ventures Limited | Metochiou str, 37, Agios Andreas, Nicosia, CY-1101 | 49 |
| CZECH REPUBLIC | | |
| Shell Czech Republic a.s. | Antala Staška 2027/77, Praha 4, 140 00 | 100 |
| DENMARK | | |
| DCC & Shell Aviation Denmark A/S | Nærum Hovedgade 8, Nærum, 2850 | 49 |
| Shell EP Holdingselskab Danmark ApS | c/o Bjørnholm Law, Strandvejen 60, Copenhagen, Hellerup, 2900 | 100 |
| TetraSpar Demonstrator ApS | Bredgade 30, København K, 1260 | 66 |
| EGYPT | | |
| Burullus Gas Company S.A.E. [b] | 28 Road 270, Maadi, Cairo | 25 |
| El Behera Natural Gas Liquefaction Company S.A.E. | City of Rashid, El Behera Governorate | 36 |
| IDKU Natural Gas Liquefaction Company S.A.E. | City of Rashid, El Behera Governorate | 38 |
| Rashid Petroleum Company S.A.E. [b] | 38 Street No. 270, Maadi, Cairo | 50 |
| Shell Egypt Trading | Business View Building, No. 79, 90 Street (South), Fifth Settlement- New Cairo, Cairo, 11835 | 100 |
| Shell Lubricants Egypt | Business View Building, No. 79, 90 Street (South), Fifth Settlement- New Cairo, Cairo, 11835 | 100 |
| The Egyptian LNG Company S.A.E. | City of Rashid, El Behera Governorate | 36 |
| The Egyptian Operating Company for Natural Gas Liquefaction Projects S.A.E. | City of Rashid, El Behera Governorate | 36 |
| FINLAND | | |
| Shell Aviation Finland Oy | Teknobulevardi 3-5, Vantaa, 01530 | 100 |
| FRANCE | | |
| Aïrehol Energies | 10 place de Catalogne, Paris, 75014 | 67 |
| Aïrehol Energies 2 | 10 place de Catalogne, Paris, 75014 | 67 |
| Aïrehol Energies 8 | 10 place de Catalogne, Paris, 75014 | 67 |
| Aïrehol Energies 9 | 10 place de Catalogne, Paris, 75014 | 67 |
| Aviatx SAS | Tour Pacific, 11/13 Cours Valmy - La Défense, Puteaux, 92800 | 100 |
| Centrale Photovoltaïque Bouches-du-Rhône 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Centrale Photovoltaïque Haute-Vienne 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Centrale Photovoltaïque Landes 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Centrale Photovoltaïque Var 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Centrales Next S.A.S | 75 avenue Parmentier, 75544 | 100 |
| Eolfi Offshore France | 10 place de Catalogne, Paris, 75014 | 10 |
| Eolfi SAS | 10 place de Catalogne, Paris, 75014 | 100 |
| Ferme Eolienne Flottante de Groix & Belle-Ile | 10 place de Catalogne, Paris, 75014 | 30 |
| Ferme Eolienne Flottante Stenella Rhône | 10 place de Catalogne, Paris, 75014 | 100 |
| Groupement Pétrolier Aviation SNC | Aéroport Roissy Charles de Gaulle, Zone de Frêt 1, 3 Rue des Vignes, Tremblay-en-France, 93290 | 20 |
| Infineum France | Chemin départemental 54, Berre-L'Etang, 13130 | 50 |
| Parc Eolien Aisne 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Corrèze 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Côtes Armor 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien de la Vrine | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien De Mervent | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Haute-Saône 1 | 10 place de Catalogne, Paris, 75014 | 100 |

| | | |
|---|---|---|
| Parc Eolien HM1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Jura 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Marne 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Oise 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Oise 2 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Somme 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Somme 2 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Yonne 1 | 10 place de Catalogne, Paris, 75014 | 100 |
| Parc Eolien Yonne 2 | 10 place de Catalogne, Paris, 75014 | 100 |
| Service Aviation Paris SNC | Orly Sud No. 144 - Bat. 438, Orly Aerogares, 94541 | 33 |
| Shell Retraites SAS | Tour Pacific, 11/13 Cours Valmy - La Défense, Puteaux, 92800 | 100 |
| Société de Gestion Mobilière et Immobilière SAS | Tour Pacific, 11/13 Cours Valmy - La Défense, Puteaux, 92800 | 100 |
| Société des Pétroles Shell SAS | Tour Pacific, 11/13 Cours Valmy - La Défense, Puteaux, 92800 | 100 |
| Ste du Pipeline Sud Européen S.A. | route d'Arles, La Fenouillère, Fos-sur-Mer, 13270 | 22 |
| The New Motion France SAS | 92 Avenue Charles de Gaulle, CS 30082, Neuilly sur Seine, 92522 | 100 |
| GERMANY | | |
| AGES Maut System GmbH & Co. KG | Berghausener Straße 96, Langenfeld, 40764 | 25 |
| BEB Erdgas und Erdoel GmbH & Co. KG [b] | Riethorst 12, Hannover, 30659 | 50 |
| BEB Holding GmbH [b] | Caffamacherreihe 5, Hamburg, 20355 | 50 |
| Carissa Einzelhandel- und Tankstellenservice GmbH & Co. KG | Willinghusener Weg 5 D-E, Oststeinbek, 22113 | 100 |
| Carissa Verwaltungsgesellschaft mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| CRI Deutschland GmbH | Am Hauptor, Bau 8322, Leuna, 06237 | 100 |
| Deutsche Infineum GmbH & Co. KG | Neusser Landstraße 16, Köln, 50735 | 50 |
| Deutsche Shell Holding GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Deutsche Shell Verwaltungsgesellschaft mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Deutsche Transalpine Oelleitung GmbH | Paul Wassermann Str. 3, Munich, 81829 | 19 |
| Energeticum Energiesysteme GmbH | St.-Leonhard-Straße 26, Balzhausen, 86483 | 100 |
| Enertol GmbH | Einsteinstr. 47, Vaihingen an der Enz, 71665 | 100 |
| Erdoel-Raffinerie Deurag-Nerag GmbH | Riethorst 12, Hannover, 30659 | 50 |
| euroShell Deutschland GmbH & Co. KG | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| euroShell Deutschland Verwaltungsgesellschaft mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| H2 Mobility Deutschland GmbH and Co. KG | EUREF-Campus 10-11, Berlin, 10829 | 27 |
| Infineum Deutschland Verwaltungsgesellschaft mbH | Neusser Landstraße 16, Köln, 50735 | 50 |
| Mineraloelraffinerie Oberrhein Verwaltungs GmbH | DEA-Scholven-Str., Karlsruhe, 76187 | 32 |
| Next Kraftwerke GmbH | Lichtstraße 43g, Koeln, 50825 | 100 |
| Nord-West Oelleitung GmbH [b] | Zum Oelhafen 207, Wilhelmshaven, 26384 | 20 |
| Oberrheinische Mineraloelwerke GmbH [b] | DEA-Scholven-Str., Karlsruhe, 76187 | 42 |
| OLF Deutschland GmbH | WeWork Europapassage, Hermannstraße 13, Hamburg, 20095 | 100 |
| PCK Raffinerie GmbH [b] | Passower Chaussee 111, Schwedt/Oder, 16303 | 38 |
| Rheinland Kraftstoff GmbH | Auf dem Schollbruch 24-26, Gelsenkirchen, 45899 | 100 |
| Rhein-Main-Rohrleitungstransportgesellschaft mbH [b] | Godorfer Hauptstrasse 186, Köln, 50997 | 63 |
| Shell Catalysts & Technologies Leuna GmbH | Am Hauptor, Bau 8322, Leuna, 06237 | 100 |
| Shell Deutschland Additive GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Deutschland GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Energy Deutschland GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Energy Retail GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Erdgas Beteiligungsgesellschaft mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Erdgas Marketing GmbH & Co. KG | Suhrenkamp 71 - 77, Hamburg, 22335 | 75 |
| Shell Erdoel und Erdgas Exploration GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell EV Charging Solutions Germany GmbH | Wattstraße 11, Berlin, 13355 | 100 |
| Shell Exploration and Development Libya GmbH I | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Exploration and Production Colombia GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Exploration and Production Libya GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Exploration et Production du Maroc GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Exploration New Ventures One GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Global Solutions (Deutschland) GmbH | Hohe-Schaar-Straße 36, Hamburg, 21107 | 100 |
| Shell Hydrogen Deutschland GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Tunisia Offshore GmbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Shell Verwaltungsgesellschaft fuer Erdgasbeteiligungen mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Sonnen eServices Deutschland GmbH | Am Riedbach 1, Wildpoldsried, 87499 | 100 |
| Sonnen eServices GmbH | Am Riedbach 1, Wildpoldsried, 87499 | 100 |
| Sonnen GmbH | Am Riedbach 1, Wildpoldsried, 87499 | 100 |

| | | |
|---|---|---|
| Sonnen Holding GmbH | Am Riedbach 1, Wildpoldsried, 87499 | 100 |
| SPNV Deutschland Beteiligungsges. mbH | Suhrenkamp 71 - 77, Hamburg, 22335 | 100 |
| Toll4Europe GmbH | Französische Straße 33 a-c, Berlin, 10117 | 15 |
| Ubimeter GmbH | EUREF-Campus 7-8, Berlin, 10829 | 100 |
| Ubitricity Gesellschaft für verteilte Energiesysteme mbH | EUREF-Campus 7-8, Berlin, 10829 | 100 |
| Wasserbeschaffungsverband Wesseling-Hersel | Bruehler Str. 95, Wesseling, 50389 | 35 |
| GHANA | | |
| Shell Energy Ghana Limited | No 4 Momonne Avenue, Adabraka, Accra, GP 1632 | 100 |
| GIBRALTAR | | |
| Shell LNG Gibraltar Limited | 57/63 Line Wall Road, P.O. Box 199, Gibraltar | 51 |
| GREECE | | |
| Shell & MOH Aviation Fuels A.E. | 151 Kifisias Ave., Marousi, Athens, 15124 | 51 |
| GREENLAND | | |
| Shell Greenland A/S | P.O. Box 510, Issortarfimmut 6, 102, Nuussuaq, 3905 | 100 |
| GUAM | | |
| Shell Guam Inc. | 643 Chalan San Antonio, Suite 100, Tamuning, GU 96911 | 100 |
| HONG KONG | | |
| AFSC Operations Limited | 3 Scenic Road, Chek Lap Kok, Lantau | 11 |
| AFSC Refuelling Limited | 3 Scenic Road, Chek Lap Kok, Lantau | 11 |
| Fulmart Limited | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| Hong Kong Response Limited | Esso Tsing Yi Terminal, Lot 46 Tsing Yi Road, Tsing Yi Island, New Territories | 25 |
| Ocean Century TT Limited [g] | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| Shell Developments (HK) Limited [g] | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| Shell Hong Kong Limited | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| Shell Korea Limited | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| Shell Macau Limited | 35/F AIA Kowloon Tower, Landmark East, 100 How Ming Street, Kwun Tong, Kowloon | 100 |
| HUNGARY | | |
| Shell Hungary Trading close Company Limited by shares | Bocskai út 134-146., Budapest, 1113 | 100 |
| INDIA | | |
| BG India Energy Private Limited | 3-C World Trade Tower, New Barakhamba Lane, New Delhi, 110001 | 100 |
| BG India Energy Services Private Limited | 3-C World Trade Tower, New Barakhamba Lane, New Delhi, 110001 | 100 |
| BG India Energy Solutions Private Limited | 3-C World Trade Tower, New Barakhamba Lane, New Delhi, 110001 | 100 |
| BG LNG Regas India Private Limited | 3-C World Trade Tower, New Barakhamba Lane, New Delhi, 110001 | 100 |
| Greenlots Technology India LLP | Platina Tower MG Road, Near Sikandarpur Metro Station, Section, Haryana, Gurugram, 122001 | 100 |
| Hazira Port Private Limited | Office No 2008, Westgate - D Block, Nr YMCA Club, S.G.Highway, Makarba, Ahmedabad, Gujarat, 380051 | 100 |
| Shell Energy India Private Limited | Office No 2008, Westgate - D Block, Nr YMCA Club, S.G.Highway, Makarba, Ahmedabad, Gujarat, 380051 | 100 |
| Shell Energy Marketing and Trading India Private Limited | 2nd floor, Campus 4A, RMZ Millenia Business Park II, 143 Dr MGR Road, Kandhanchavady, Perungudi, Chennai, TN 600096 | 100 |
| Shell India Markets Private Limited | 2nd floor, Campus 4A, RMZ Millenia Business Park II, 143 Dr MGR Road, Kandhanchavady, Perungudi, Chennai, TN 600096 | 100 |
| Shell MRPL Aviation Fuels and Services Limited | 102, Prestige Sigma, Virtal Mallya Road, Bangalore, 560001 | 50 |
| Shell Pahal Social Welfare Association | 7, Bangalore Hardware Park, Devanahalli Industrial Park, Mahadeva-Kodigehalli, Bangalore, 562149 | 100 |
| Tiki Tar and Shell India Private Limited | Tiki Tar Industries Village Road, Near Bhandup village, Bhandup West Mumbai, Mumbai, MH 400078 | 45 |
| INDONESIA | | |
| PT Shell LNG Indonesia | Talavera Office Park 22-26th Floor, Jl. Letjen. TB Simatupang Kav. 22-26, Jakarta Selatan, Jakarta, 12430 | 100 |
| PT. Shell Indonesia | Talavera Office Park 22-26th Floor, Jl. Letjen. TB Simatupang Kav. 22-26, Jakarta Selatan, Jakarta, 12430 | 100 |
| PT. Shell Manufacturing Indonesia | Talavera Office Park 22-26th Floor, Jl. Letjen. TB Simatupang Kav. 22-26, Jakarta Selatan, Jakarta, 12430 | 100 |
| IRAQ | | |
| Basrah Gas Company | Khor Al Zubair, Basrah | 44 |
| IRELAND | | |
| Asiatic Petroleum Company (Dublin) Limited | 1st Floor, Temple Hall, Temple Road, Blackrock, Co. Dublin, A94 K3K0 | 100 |
| Emerald Offshore Wind Limited | Woodbine Hill, Youghal (County Cork), P36 NW52 | 51 |
| Irish Shell Trust Designated Activity Company | 1st Floor, Temple Hall, Temple Road, Blackrock, Co. Dublin, A94 K3K0 | 100 |
| Shell and Topaz Aviation Ireland Limited | Suite 7 Northwood House, Northwood Business Park, Santry, Dublin, 9 | 50 |
| Western Star Wind Limited | Woodbine Hill, Youghal, County Cork, P36 NW52 | 51 |
| ISLE OF MAN | | |
| Petrolon Europe Limited | First Names House, Victoria Road, Douglas, IM2 4DF | 100 |
| Petrolon International Limited | First Names House, Victoria Road, Douglas, IM2 4DF | 100 |
| Shell Marine Personnel (I.O.M.) Limited | Euromanx House, Freeport, Ballasalla, IM9 2AP | 100 |
| Shell Ship Management Limited | Euromanx House, Freeport, Ballasalla, IM9 2AP | 100 |
| ISRAEL | | |
| Ravin AI Ltd. | Derech Aba Hilel 16, Ramat Gan, 5250608 | 36 |
| ITALY | | |
| Alle S.R.L. | Via Vitor Pisani 16, Milano, 20124 | 100 |

# Exhibit Q

| Name | Address | % |
|---|---|---|
| Anagni S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Aquila S.p.A. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Barberio S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Baroni S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Baronissuovi S.r.l | Galleria Vintler 17, Bolzano, 39100 | 100 |
| BG Italia Power S.r.l | Via Tortona 25, Milano, 20144 | 100 |
| Bonacaro S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Carlucci S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Centrali Next Srl | Via Clelia Bertini Attii 34/D, Rome, 00137 | 100 |
| Colangelo S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Depalma S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Development S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Dimassa S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Guarini S.r.l. | Galleria Vintler 17, Bolzano, 39100 AVV | 100 |
| Infineum Italia S.R.L. | Strada di Scorrimento 2, Vado Ligure, Savona, 17047 | 50 |
| Marco Polo Solar 2 S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Marco Polo Solar S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Mesagne S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Natuzzi S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Ottobiano S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Paliano S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Ramacca Solar S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Ricchiuti S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Rotello S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Sanfrancesco S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Sasso S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Serracapriola S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Shell Energy Italia S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Shell Fleet Solutions Consorzio | Via Susa 40, Torino, 10138 | 100 |
| Shell International Exploration and Development Italia S.p.A. | Piazza San Silvestro 8, Rome, 00187 | 100 |
| Shell Italia E&P S.p.A. | Piazza San Silvestro 8, Rome, 00187 | 100 |
| Shell Italia Holding S.p.A. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Shell Italia Oil Products S.R.L. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Shell Mobility Italia S.r.l. | Via Vittor Pisani 16, Milano, 20124 | 100 |
| Sicilia S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Societa Italiana per l'Oleodotto Transalpino S.p.A. | Via Muggia #1, San Dorligo della Valle, Trieste, 34147 | 19 |
| Societa' Oleodotti Meridionali S.p.A. | Via Giorgio Ribotta 51, Rome, 00144 | 30 |
| Solar-Konzept Italia S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Sonnen eServices Italia S.R.L. | Via Autostrada 32, Bergamo, 24126 | 100 |
| Sonnen S.R.L. | Via Autostrada 32, Bergamo, 24126 | 100 |
| Teodoro S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Tuturano S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Vulci S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| Zamboni S.r.l. | Galleria Vintler 17, Bolzano, 39100 | 100 |
| JAPAN | | |
| CO2-free Hydrogen Energy Supply-chain TRA | 7F Kokuryu Shiba Koen Building 2-6-15, Shiba Koen, Minato-ku, Tokyo, 105-0011 | 25 |
| Fukuoka Offshore Wind Power No. 1 K.K | 2-1-13, Motoazabu, Minato-ku, Tokyo, 106-0046 | 50 |
| K.K. Red and Yellow | 13F Fukoku Seimei Building, 2-2-2 Uchisaiwai-cho, Chiyoda-ku, Tokyo, 100-0011 | 100 |
| K.K. SVC Tokyo | 4052-2 Nakatsu, Aikawa-cho, Aiko-gun, Kanagawa, 243-0303 | 100 |
| Next Kraftwerke Toshiba Corporation | 72-34, Horikawa-cho, Saiwai-ku, Kawasaki, Kawasaki, 212-8585 | 49 |
| Sakhalin LNG Services Company Ltd. | 2-3, Kanda, Awaji-cho, Chiyoda-ku, Tokyo, 101-0063 | 50 |
| Shell Japan Limited | 12F Pacific Century Place Marunouchi, 1-11-1, Marunouchi, Chiyoda-ku, Tokyo, 100-6212 | 100 |
| Shell Lubricants Japan K.K. | 12F Pacific Century Place Marunouchi, 1-11-1, Marunouchi, Chiyoda-ku, Tokyo, 100-6212 | 100 |
| Sonnen Japan Kabushiki Kaisha | 16F Pacific Century Place Marunouchi, 1-11-1, Marunouchi, Chiyoda-ku, Tokyo, 100-6216 | 100 |
| Y.K. Nishi-Kobe Bosai Center | 1-1-5 Wakamiya-cho, Suma-ku, Kobe-shi, Hyogo, 654-0049 | 33 |
| JERSEY | | |
| Shell Service Station Properties Limited | 13 Castle Street, St Helier, JE1 1ES | 100 |
| LUXEMBOURG | | |
| Denham International Power SCSp [d] | 412F, route d'Esch, Luxembourg, L-2086 | 32 |
| Shell Finance Luxembourg Sarl | 7, Rue de l'Industrie, Bertrange, Luxembourg, L-8069 | 100 |
| Shell Luxembourgeoise Sarl | 7, Rue de l'Industrie, Bertrange, Luxembourg, L-8005 | 100 |
| MACAU | | |

| | | |
|---|---|---|
| Shell Macau Petroleum Company Limited | 876 Avenida da Amizade, Edifício Marina Gardens, Room 310, 3rd Floor | 100 |
| **MALAYSIA** | | |
| Bonuskad Loyalty Sdn. Bhd. [g] | Level 8, Symphony House, Block D13, Pusat Dagangan Dana 1, Jalan PJU 1A/46, Petaling Jaya/Selangor Darul Ehsan, 47301 | 33 |
| IOT Management Sdn. Bhd. | Lot 7689 and Lot 7690, Section 64, Kuching Town Land District, Jalan Pending, Kuching, Sarawak, 93450 | 7 |
| Kebabangan Petroleum Operating Company Sdn. Bhd. [b] | Suite 13.03, 13 Floor, Menara Tan & Tan, 207 Tun Razak, Kuala Lumpur/Federal Territory, 50400 | 30 |
| P S Pipeline Sendirian Berhad | Level 30, Tower 1, Petronas Twin Towers, KLCC, Kuala Lumpur/Federal Territory, 50088 | 50 |
| P S Terminal Sendirian Berhad | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 35 |
| Pertini Vista Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Provista Ventures Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Sarawak Shell Berhad | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell Business Service Centre Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell Global Solutions (Malaysia) Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell Malaysia Trading Sendirian Berhad | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell MDS (Malaysia) Sendirian Berhad | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 72 |
| Shell New Ventures Malaysia Sdn. Bhd. [g] | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell People Services Asia Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell Sabah Selatan Sendirian Berhad | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 100 |
| Shell Timur Sdn. Bhd. | 12th Floor, Menara Symphony, No. 5, Jalan Prof. Khoo Kay Kim, Seksyen 13, Petaling Jaya/Selangor Darul Ehsan, 46200 | 70 |
| Shell Treasury Malaysia (L) Limited | Kensington Gardens, No. U1317, Lot 7616, Jalan Jumidar Buyong, Labuan F.T., 87000 | 100 |
| Tanjung Manis Oil Terminal Management Sdn. Bhd. | Lot 7689 and Lot 7690, Section 64, Kuching Town Land District, Jalan Pending, Kuching, Sarawak, 93450 | 14 |
| **MAURITIUS** | | |
| BG Mauritius LNG Holdings Ltd | 6th Floor, Tower A, 1 Cybercity, Ebene, 72201 | 100 |
| BG Mumbai Holdings Limited | 6th Floor, Tower A, 1 Cybercity, Ebene, 72201 | 100 |
| Pennzoil Products International Company | 33 Edith Cavell Street, Port Louis, 11324 | 100 |
| **MEXICO** | | |
| Comercial Importadora S.A. De C.V. | Guillermo González Camarena No. 400, Santa Fe, Ivaro Obregón, Ciudad de México, 1210 | 50 |
| Concilia Asesores y Servicios, S.A. de C.V. | Guillermo González Camarena No. 400, Santa Fe, Ivaro Obregón, Ciudad de México, 1210 | 50 |
| Gas Del Litoral, S. de R.L. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 75 |
| Mega Gasolineras SA de CV | Avenida Cerro Gordo del Campestre, number 201, interior 202, of Colonia Las Quintas, León, Guanajuato, 37125 | 50 |
| Shell Energy Mexico, S.A. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell Exploracion y Extraccion de Mexico, S.A. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell México Gas Natural, S. de R.L. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell México, S. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell Servicios México, S.A. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell Solutions Mexico S.A. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| Shell Trading México, S. de R.L. de C.V. | Avenida Paseo de las Palmas 340, 1st floor, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Ciudad de México, 11000 | 100 |
| **NETHERLANDS** | | |
| Amsterdam Schiphol Pijpleiding Beheer B.V. | Amsterdamseweg 55, 1182 GP Amstelveen, P.O. Box 75650, Luchthaven Schiphol, 1118 ZS | 40 |
| Attiki Gas B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| B.R.E. B.V. | Henri Berssenbruggestraat 9, Deventer, 7425 SB | 100 |
| B.V. Dordtsche Petroleum Maatschappij | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| B.V. Petroleum Assurantie Maatschappij | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas Brazil E&P 12 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas Brazil Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas International B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas International Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas Netherlands Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BG Gas Sao Paulo Investments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| BJS Oil Operations B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 80 |
| BJSA Exploration and Production B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Blaauwind II C.V. [d] | Weena 70, Rotterdam, 3012 CM | 20 |
| Blaauwind Management II B.V. | Weena 70, Rotterdam, 3012 CM | 20 |
| BlueAlp Holding B.V. | Voorstraat 67, Groot-Ammers, 2964 AJ | 21 |
| Bogstone Holding B.V. | Herikerbergweg 238, Amsterdam, 1101 CM | 51 |

# Exhibit Q

| | | |
|---|---|---|
| Caspi Meruerty Operating Company B.V. [b] | Muiderstraat 1, Amsterdam, 1011 PZ | 40 |
| Chosun Shell B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Cicerone Holding B.V. | Herikerbergweg 238, Amsterdam, 1101 CM | 51 |
| CrossWind Beheer B.V. [b] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 80 |
| Crosswind C.V. [b] [d] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 80 |
| Elba B.V. [b] | Vondelingenweg 601, Vondelingenplaat, Rotterdam, 3196 KK | 50 |
| Elba C.V. [b] [d] | Vondelingenweg 601, Vondelingenplaat, Rotterdam, 3196 KK | 50 |
| Energiepark Pottendijk B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Euroshell Cards B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Ganterra B.V. | P.O. Box 477, Groningen, 9700 AL | 25 |
| Geocombinatie Leeuwarden B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 30 |
| Guara B.V. | Weena 762, 9e verdieping, Rotterdam, 3014 DA | 30 |
| HKN LP 1 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| HKN LP 2 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| HKN LP 3 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| HKN LP 4 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| HKN LP 5 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| HKN LP 6 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Hkz Lp 18 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Hkz Lp 19 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Hkz Lp 20 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Hkz Lp 21 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Hkz Lp 22 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Iara B.V. | Weena 762, 9e verdieping, Rotterdam, 3014 DA | 4 |
| Infineum Holdings B.V. | Herikerbergweg 238, Amsterdam, 1101 CM | 50 |
| Integral Investments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Jordan Oil Shale Company B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Karachaganak Petroleum Operating B.V. [b] | Strawinskylaan 1345, Amsterdam, 1077 XX | 29 |
| KE STP Company B.V. | c/o Appleby Global Services (Cayman) Limited, 71 Fort Street, P.O. Box 500, George Town, Grand Cayman, KY1-1106 | 100 |
| KE Suriname B.V. | c/o Appleby Global Services (Cayman) Limited, 71 Fort Street, P.O. Box 500, George Town, Grand Cayman, KY1-1106 | 100 |
| Lapa Oil & Gas B.V. | Weena 762, 9e verdieping, Rotterdam, 3014 DA | 30 |
| Libra Oil & Gas B.V. | Weena 762, 9e verdieping, Rotterdam, 3014 DA | 20 |
| LNG Shipping Operation Services Netherlands B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Loyalty Management Netherlands B.V. | Polaris Avenue 81, P.O. Box 2047, 2130 GE, Hoofddorp, 2132 JH | 40 |
| Maasvlakte Olie Terminal C.V. [d] | Europaweg 975, Maasvlakte, Rotterdam, 3199 LC | 16 |
| MS Europe B.V. | Vormerlaan 5, Rijswijk, 2288 GC | 100 |
| Multi Tank Card B.V. | Antareslaan 39, P.O. Box 3068, 2130 KB, Hoofddorp, 2132 JE | 30 |
| N.V. Rotterdam-Rijn Pijpleiding Maatschappij [b] | Butaanweg 215, Vondelingplaat, Rotterdam, 3196 KC | 56 |
| Nederlandse Aardolie Maatschappij B.V. | Schepersmaat 2, Assen, 9405 TA | 50 |
| Netherlands Alng Holding Company B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Next Kraftwerke Benelux B.V. | Graaf Engelbertlaan 75, Breda, 4837DS | 100 |
| Noordzeewind B.V. | 2e Havenstraat 5b, Ijmuiden, 1976 CE | 100 |
| Noordzeewind C.V. [d] | 2e Havenstraat 5b, Ijmuiden, 1976 CE | 100 |
| North Caspian Operating Company N.V. [b] | Oostduinlaan 2, The Hague, 2596 JM | 17 |
| Paqell B.V. | Reactorweg 301, unit 1.3, Utrecht, 3542 AD | 50 |
| Portfolio Holdings B.V. | c/o Appleby Global Services (Cayman) Limited, 71 Fort Street, P.O. Box 500, George Town, Grand Cayman, KY1-1106 | 100 |
| Pottendijk Energie B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Pottendijk Wind B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Pottendijk Zon B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| PTC Kampen B.V. | Voorstraat 67, Groot-Ammers, 2964AJ | 80 |
| RESCO B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Rotterdam Hydrogen Company B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Salym Petroleum Development N.V. [b] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 50 |
| Shell & AMG Recycling B.V [d] | Strawinskylaan 1343, Amsterdam, 1077 XX | 50 |
| Shell Abu Dhabi B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Additives Holdings (I) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Additives Holdings (II) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Albania Block 4 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell and Vivo Lubricants B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 50 |
| Shell Brazil Holding B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Business Development Central Asia B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |

Exhibit Q

| | | |
|---|---|---|
| Shell Caspian B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Caspian Pipeline Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Chemicals Europe B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Shell China B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell China Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Deepwater Borneo B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Deepwater Tanzania B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Development Iran B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Downstream Services International B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Shell E and P Offshore Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Egypt N.V. [e] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Energy Europe B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Energy Retail B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Shell EP Holdings (EE&ME) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Middle East Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Oman B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Russia Investments (III) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Russia Investments (V) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Somalia B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EP Wells Equipment Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell EV Charging Solutions B.V. | Rijpkade 20, Amsterdam, 1013 BC | 100 |
| Shell Exploration and Production (100) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (101) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (102) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (103) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (106) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (107) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (82) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (84) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (89) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (90) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (91) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (92) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (93) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (94) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (96) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (99) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LI) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LVIII) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXI) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXII) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXV) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXVI) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXXI) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production (LXXV) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Brunei B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Investments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Mauritania (C10) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Mauritania (C19) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Services (RF) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production South Africa B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Ukraine I B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Ukraine Investments (I) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production Ukraine Investments (II) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration and Production West-Siberia B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration Company (RF) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration Company (West) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration Company B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Exploration Venture Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Finance (Netherlands) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |

Exhibit Q

| Name | Address | % |
|------|---------|---|
| Shell Gas & Power Developments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Gas (LPG) Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Gas B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Gas Iraq B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Gas Nigeria B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Gas Venezuela B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Generating (Holding) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Geothermal B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Global Solutions (Eastern Europe) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Global Solutions International B.V. | Lange Kleiweg 40, Rijswijk, 2288 GK | 100 |
| Shell Global Solutions Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Hydrogen Operations & Production BV | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Information Technology International B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Integrated Gas Oman B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell International B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell International Exploration and Production B.V. | Carel van Bylandtlaan 16, The Hague, 2596 HR | 100 |
| [*] Shell International Finance B.V. [a] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Internationale Research Maatschappij B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Internet Ventures B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Iraq Petroleum Development B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Iraq Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Kazakhstan B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Kazakhstan Development B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Kuwait Exploration and Production B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell LNG Bunkering B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell LNG Port Spain B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Lubricants Supply Company B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Shell Manufacturing Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Mozambique B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell MSPO 2 Holding B.V. | Vondelingenweg 601, Vondelingenplaat, Rotterdam, 3196 KK | 100 |
| Shell Namibia Upstream B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Nanhai B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Nederland B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Nederland Chemie B.V. [g] | Chemieweg 25, P.O. Box 6060, Moerdijk, 4780 LN | 100 |
| Shell Nederland Raffinaderij B.V. | Vondelingenweg 601, Vondelingenplaat, Rotterdam, 3196 KK | 100 |
| Shell Nederland Verkoopmaatschappij B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Shell Netherlands Canada Financing B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell New Energies Holding Europe B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell New Energies NL B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Offshore (Personnel) Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Offshore Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Offshore Upstream South Africa B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell OKLNG Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Olie OG Gas Holding B.V. [i] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Oman Exploration and Production B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Overseas Holdings (Oman) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Overseas Investments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| [*] Shell Petroleum N.V. [a] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Philippines Exploration B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Project Development (VIII) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell RDS Holding B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Sakhalin Holdings B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Sakhalin Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Salym Development B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Sao Tome and Principe B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Services Oman B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Shared Services (Asia) B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell South Syria Exploration B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell TapUp B.V. | Hofplein 20, Rotterdam, 3032 AC | 100 |
| Shell Technology Ventures Fund 1 B.V. | Herikerbergweg 88, Amsterdam, 1101 CM | 52 |
| Shell Trademark Management B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Trading Rotterdam B.V. | Weena 70, Rotterdam, 3012 CM | 100 |

| | | |
|---|---|---|
| Shell Trading Russia B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Upstream Albania B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Upstream Development B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Upstream Indonesia Services B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Upstream Turkey B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Ventures B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Ventures Investments B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Western LNG B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Windenergy Netherlands B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Shell Windenergy NZW I B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Snijders Olie B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| Solar-EP II B.V. | Carel van Bylandtlaan 30, The Hague, 2596HR | 100 |
| Solar-EW II B.V. | Carel van Bylandtlaan 30, Den Haag, 2596 HP | 100 |
| SolarNow B.V. | Zeelandsestraat 1, Millingen aan de Rijn, 6566 DE | 23 |
| Syria Shell Petroleum Development B.V. [h] | Carel van Bylandtlaan 30, The Hague, 2596 HR | 65 |
| Tamba B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 50 |
| Tankstation Exploitatie Maatschappij Holding B.V. | Weena 70, Rotterdam, 3012 CM | 100 |
| The Green Near Future 5 B.V. | Carel van Bylandtlaan 30, The Hague, 2596 HR | 100 |
| Travis Road Services International B.V. | Dr. Hub van Doorneweg 183, Tilburg, 5026 RD | 34 |
| Tupi B.V. | Weena 762, 9e verdieping, Rotterdam, 3014 DA | 23 |
| Waalbrug Exploitatie Maatschappij B.V. | Henri Berssenbruggestraat 9, Deventer, 7425 SB | 100 |
| Zeolyst C.V. | Oosterhorn 36, Farmsum, 9936 HD | 50 |
| NEW ZEALAND | | |
| Energy Finance NZ Limited | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| Energy Holdings Offshore Limited | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| Shell (Petroleum Mining) Company Limited | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| Shell Energy Asia Limited | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| Shell Investments NZ Limited | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| Shell New Zealand Pensions Limited | Mercer (N.Z.) Limited, Floor 2, 20 Customhouse Quay, Wellington, 6011 | 100 |
| Southern Petroleum No Liability | c/o Baker Tilly Staples Rodway Taranaki Limited, 109-113 Powderham Street, P.O. Box 146, New Plymouth, Taranaki, 4340 | 100 |
| NIGERIA | | |
| All on Partnerships for Energy Access Limited by Guarantee | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| BG Exploration and Production Nigeria Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| BG Upstream A Nigeria Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Delta Business Development Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Nigeria LNG Limited | Corporate Office, Intels Aba Road Estate, Km16 Aba Expressway, Port Harcourt, 500211 | 26 |
| NLNG Shipping Management Limited | Corporate Office, Intels Aba Road Estate, Km16 Aba Expressway, Port Harcourt, 500211 | 20 |
| Shell Exploration and Production Africa Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Business Operations Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Closed Pension Fund Administrator Ltd | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Exploration and Production Company Ltd | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Exploration Properties Charlie Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Gas Ltd (SNG) | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Infrastructure Development Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Oil Products Limited (SNOP) | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Ultra Deep Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Nigeria Upstream Ventures Limited | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 100 |
| Shell Thrift & Loan Fund Trustees Nig Ltd | Freeman House, 21/22 Marina, P.M.B. 2418, Lagos | 99 |
| The Shell Petroleum Development Company of Nigeria Limited | Shell Industrial Area, P.O. Box 263, Rivers State, Port Harcourt, 500272 | 100 |
| NORWAY | | |
| A/S Norske Shell | Tankvegen 1, Tananger, 4056 | 100 |
| Aviation Fuelling Services Norway AS | Kristian Augusts Gate 13, Oslo, 0164 | 50 |
| Enhanced Well Technologies Group AS | Kongsgårdbakken 1, Stavanger, 4005 | 22 |
| Northern Lights JV DA [d] | Byfjordparken 15, Stavanger, 4007 | 33 |
| Ormen Lange Eiendom DA | Nyhamna, Aukra, 6480 | 18 |
| Shell New Energies Norway AS | Karenslyst Allé 2, Oslo, 0278 | 100 |
| Technology Centre Mongstad DA | Mongstad 71A, Mongstad, 5954 | 9 |
| OMAN | | |
| Oman LNG LLC | P.O. Box 560, Mina Al Fahal, Muscat, 116 | 30 |
| Petroleum Development Oman LLC | P.O. Box 81, Mina Al Fahal, Muscat, 113 | 34 |

| | | |
|---|---|---|
| Shell Development Oman LLC | Bait Salam, Salam Square, P.O. Box 74, Muscat, P.C. 116 | 100 |
| Shell Oman Marketing Company SAOG | P.O. Box 38, Mina Al Fahal, Muscat, 116 | 49 |
| Sohar Solar Qabas (FZC) LLC | P.O. Box 398, Sohar Free Zone, North Al Batinah Governorate, Sohar, 322 | 100 |
| PAKISTAN | | |
| Pak Arab Pipeline Company Limited | Office no 8, Level 3, Ground Floor, Serena Business Complex, Khayaban-e-Suhrdwardy, G-5/1, Islamabad, 44000 | 20 |
| Pakistan Energy Gateway Limited | E110, Khayaban e Jinnah, Lahore Cantonement, Punjab, Cantonement, 54810 | 33 |
| Shell Energy Pakistan (Private) Limited | Shell House, 6 Ch. Khaliquzzaman Road, Karachi, 75530 | 100 |
| Shell Pakistan Limited | Shell House, 6 Ch. Khaliquzzaman Road, Karachi, 75530 | 77 |
| PERU | | |
| Shell GNL Peru S.A.C. | Calle Dean Valdivia 111, Oficina 802, San Isidro, Lima, Lima 27 | 100 |
| Shell Operaciones Peru S.A.C. | Calle Dean Valdivia 111, Oficina 802, San Isidro, Lima, Lima 27 | 100 |
| PHILIPPINES | | |
| Bonifacio Gas Corporation | 2nd Floor, Bonifacio Technology Center, 31st Street corner 2nd Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 24 |
| Kamayan Realty Corporation | NDC Bldg., 116 Tordesillas St., Salcedo Village, Makati City, Metro Manila, 1227 | 22 |
| Pilipinas Shell Petroleum Corporation | 41st Floor, The Finance Center, 26th Street corner 9th Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 55 |
| Shell Chemicals Philippines, Inc. | 41st Floor, The Finance Center, 26th Street corner 9th Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 100 |
| Shell Energy Philippines Inc | 41st Floor, The Finance Center, 26th Street corner 9th Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 100 |
| Shell Gas and Energy Philippines Corporation | 41st Floor, The Finance Center, 26th Street corner 9th Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 100 |
| Shell Gas Trading (Asia Pacific), Inc. | Subic Bay Free Port Zone, Olangapo City, 2200 | 100 |
| Shell Solar Philippines Corporation | 41st Floor, The Finance Center, 26th Street corner 9th Avenue, Bonifacio Global City, Taguig, Metro Manila, 1635 | 100 |
| Tabangao Realty, Inc. | Unit D 9th Floor Inoza Tower, 40th Street, North Bonifacio, Bonifacio Global City, Taguig, Metro Manila, 1634 | 40 |
| POLAND | | |
| Next Kraftwerke Sp. z o.o. | Astoria, Przeskok 2, Warsaw, 00-032 | 100 |
| Shell Energy Retail Poland Sp. z o.o. | ul. Pawia 21, Krakow, 31-154 | 100 |
| Shell Mobility Polska Sp. z o.o. | Ul. Bitwy Warszawskiej 1920r. 7a, Warszawa, 02-366 | 100 |
| Shell Polska Sp. z o.o. | ul. Bitwy Warszawskiej 1920 r. nr 7A, Warsaw, 02-366 | 100 |
| PUERTO RICO | | |
| Station Managers of Puerto Rico, Inc. | P.O. Box 186, Yabucoa, PR 00767-0186 | 100 |
| QATAR | | |
| Marine LNG Solutions LLC [b] | 1st Floor, Al-Mirqab Tower, Doha | 50 |
| Qatar Liquefied Gas Company Limited (4) | P.O. Box 22666, Doha | 30 |
| Qatar Shell Research & Technology Centre QSTP-LLC | Qatar Science & Technology Park Tech1, Office 101, P.O. Box 3747, Doha | 100 |
| Qatar Shell Service Company W.L.L. | Al Mirqab Tower, West Bay, P.O. Box 3747, Doha | 100 |
| ROMANIA | | |
| Shell Romania S.R.L. | Ing. George Constantinescu Street, no. 4B and 2-4, Building A, Floor 7, office 727, District 2, Bucharest, 20337 | 100 |
| RUSSIA | | |
| Gydan Energy LLC [b] | Sinopskaya Naberezhnaya, 22 A, office 811, Sankt-Peterburg, 191167 | 50 |
| Khanty-Mansiysk Petroleum Alliance Closed Joint Stock Company [b] | 24 A Yakubovicha ul., Saint Petersburg, 190000 | 50 |
| Limited Liability Company "Shell Neft" | 9 Lesnaya street, floor 3, Moscow, 125196 | 100 |
| Limited Liability Company "Shell Neftegaz Development (V)" | 9 Lesnaya street, floor 4, Moscow, 125196 | 100 |
| LLC Shell NefteGaz Development | 9 Lesnaya street, floor 4, Moscow, 125196 | 100 |
| Syriaga Nefegaz Development LLC | 9 Lesnaya street, floor 4, Moscow, 125196 | 100 |
| SAINT KITTS AND NEVIS | | |
| Shell Oil & Gas (Malaysia) LLC | Morning Star Holdings Limited, Main Street, Suite 556, Charlestown, Nevis, West Indies | 90 |
| SAINT LUCIA | | |
| BG Atlantic 2/3 Holdings Limited | Mercury Court, Choc Estate, Castries | 100 |
| SAUDI ARABIA | | |
| Al Jomaih and Shell Lubricating Oil Co.Ltd. | P.O. Box 41467, Riyadh, 11521 | 50 |
| SINGAPORE | | |
| BG Asia Pacific Holdings Pte. Limited | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| BG Asia Pacific Services Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| BG Exploration & Production Myanmar Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| BG Insurance Company (Singapore) Pte Ltd | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| BG Myanmar Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Changi Airport Fuel Hydrant Installation Pte. Ltd. | 15, Airline Road, Singapore, 819828 | 11 |
| Cleantech Renewable Assets Pte Ltd | 25 Church Street, 03-04 Capital Square three, Singapore, 049482 | 49 |
| Connected Freight Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 80 |
| Fueling Pte. Ltd [b] | 50 Gul Road, Singapore, 629351 | 50 |
| Infineum Singapore LLP | 1 Harbourfront Avenue, #08-01/08, Keppel Bay Tower, Singapore, 098632 | 50 |

| | | |
|---|---|---|
| Orb Energy Pte Ltd. | 50 Raffles Place #06-00, Singapore Land Tower, Singapore, 048623 | 24 |
| QPI and Shell Petrochemicals (Singapore) Pte Ltd | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 51 |
| Shell Catalysts & Technologies Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Chemicals Seraya Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Eastern Petroleum (Pte) Ltd [g] | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Eastern Trading (Pte) Ltd [g] | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Gas Marketing Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Integrated Gas Thailand Pte.Limited | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell International Shipping Services (Pte) Limited | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Myanmar Energy Pte. Ltd. | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Pulau Moa Pte Ltd | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Tankers (Singapore) Private Limited | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Shell Treasury Centre East (Pte) Ltd | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 100 |
| Singapore Lube Park Pte. Ltd. [h] | 160 Tuas South Avenue 5, Singapore, 637364 | 44 |
| Sirius Well Manufacturing Services Pte. Ltd. [h] | The Metropolis Tower 1, 9 North Buona Vista Drive, #07-01, Singapore, 138588 | 50 |
| Zeco Systems Pte. Ltd. | 1 Commonwealth Lane, #09-30, One Commonwealth, Singapore, 149544 | 99 |
| **SLOVAKIA** | | |
| SHELL Slovakia s.r.o. | Einsteinova 23, Bratislava, 851 01 | 100 |
| **SLOVENIA** | | |
| Shell Adria d.o.o. | Bravnicarjeva ulica 13, Ljubljana, 1000 | 100 |
| **SOUTH AFRICA** | | |
| Bituguard Southern Africa (Pty) Ltd | Twickenham, The Campus, 57 Sloan Street, Epsom Downs, Bryanston, 2021 | 36 |
| Blendcor (Pty) Ltd. [h] | Honshu Road, Durban, 4001 | 36 |
| Sekelo Oil Trading (Pty) Limited | 1st Floor Oxford Parks, 199 Oxford Road, Dunkeld, Gauteng, 2196 | 43 |
| Shell & BP South African Petroleum Refineries (Pty) Limited [h] | Reunion, Durban, 4001 | 36 |
| Shell Downstream South Africa (Pty) Ltd | Twickenham, The Campus, 57 Sloan Street, Epsom Downs, Bryanston, 2021 | 72 |
| Shell South Africa Energy (Pty) Ltd | Twickenham, The Campus, 57 Sloan Street, Epsom Downs, Bryanston, 2021 | 100 |
| Shell South Africa Exploration (Pty) Limited | Twickenham, The Campus, 57 Sloan Street, Epsom Downs, Bryanston, 2021 | 100 |
| Shell South Africa Holdings (Pty) Ltd | Twickenham, The Campus, 57 Sloan Street, Epsom Downs, Bryanston, 2021 | 100 |
| STISA (Pty) Limited | Suite OE/2, The Nautica, The Waterclub, Beach Road, Granger Bay, Cape Town, 8001 | 72 |
| **SOUTH KOREA** | | |
| Hankook Shell Oil Company | No. 250, Simun-ro, Nam-gu, Busan, 48561 | 54 |
| Hyundai and Shell Base Oil Co., Ltd | 640-6, Daejuk-ri, Daesan-eup, Seosan-shi, Chungchongnam-do, 356-713 | 40 |
| Korea Impact Carbon Corporation | #704-3, Tower B. Hyundai Knowledge Industrial Center, 70 Dusan-ro, Geumcheon-gu, Seoul, 08584 | 40 |
| MunmuBaram Co.,Ltd. | 903, 21, Centum 6-ro, HaeUnDae-Gu, Busan, 0 | 80 |
| **SPAIN** | | |
| BG Energy Iberian Holdings, S.L. | Paseo de la Castellana, 257-6°, Madrid, 28046 | 100 |
| Shell & Disa Aviation España, S.L. | Rio Bullaque, 2, Madrid, 28034 | 50 |
| Shell España, S.A. | Paseo de la Castellana, 257-6°, Madrid, 28046 | 100 |
| Shell Span LNG, S.A.U. | Paseo de la Castellana, 257-6°, Madrid, 28046 | 100 |
| **SWEDEN** | | |
| A Flygbränslehantering Aktiebolag | P.O. Box 135, Stockholm-Arlanda, 190 46 | 25 |
| BG International Services AB | Deloitte, P.O. Box 450, Östersund, 831 26 | 100 |
| Gothenburg Fuelling Company AB | P.O. Box 2154, Gothenburg, 438 14 | 33 |
| Malmö Fuelling Services AB | Sturup Flygplats, P.O. Box 22, Malmö, 230 32 | 33 |
| Shell Aviation Sweden AB | Gustavslundsvägen 22, Bromma, 16751 | 33 |
| Stockholm Fuelling Services AB | P.O. Box 85, Stockholm-Arlanda, 190 45 | 25 |
| **SWITZERLAND** | | |
| Saraco SA | Route de Pré-Bois 17, Cointrin, 1216 | 20 |
| Shell (Switzerland) AG | Baarermatte, Baar, 6340 | 100 |
| Shell Brands International AG | Baarermatte, Baar, 6340 | 100 |
| Shell Corporate Services Switzerland AG | Baarermatte, Baar, 6340 | 100 |
| Shell Finance Switzerland AG | Baarermatte, Baar, 6340 | 100 |
| Shell Holdings Switzerland AG | Baarermatte, Baar, 6340 | 100 |
| Shell Lubricants Switzerland AG | Steigerhubelstrasse 8, Bern, 3008 | 100 |
| Shell Trading Switzerland AG | Baarermatte, Baar, 6340 | 100 |
| Shell Treasury Company Switzerland AG | Baarermatte, Baar, 6340 | 100 |
| SOGEP Société Genevoise des Pétroles SA | Route de Vernier 132, Vernier, 1214 | 34 |
| Solen Versicherungen AG | Baarermatte, Baar, 6340 | 100 |
| Stazioni Autostradali Bellinzona SA | Autostrada A2 (direzione Gottardo), Hotel Bellinzona Sud, Monte Carasso, 6513 | 50 |
| Suisse Next GmbH | Bahnhofstr. 10, Zurich, 8001 | 100 |
| UBAG - Unterflurbetankungsanlage Flughafen Zürich AG | Zwischenbereich, Rümlang, 8153 | 20 |

| | | |
|---|---|---|
| SYRIA | | |
| Al Badiah Petroleum Company | Damascus New Sham Western Dummar, Island No. 1 - Property 2299, P.O. Box 7660, Damascus | 22 |
| Al Furat Petroleum Company | Damascus New Sham Western Dummar, Island No. 1 - Property 2299, P.O. Box 7660, Damascus | 20 |
| TAIWAN | | |
| CPC Shell Lubricants Co. Ltd | No. 2, Tso-Nan Road, Nan-Tze District, P.O. Box 25-30, Kaohsiung, 811 | 51 |
| Shell Taiwan Limited | International Trade Building, Room 2001, 20th Floor, 333, Keelung Road Section 1, Taipei, 110 | 100 |
| TANZANIA | | |
| Fahari Gas Marketing Company Limited | 1st Floor Kilwa House, Plot 369, Toure Drive, Oyster Bay, P.O. Box 105833, Dar es Salaam | 53 |
| Mzalendo Gas Processing Company Limited | 1st Floor Kilwa House, Plot 369, Toure Drive, Oyster Bay, P.O. Box 105833, Dar es Salaam | 53 |
| Ruvuma Pipeline Company Limited | 1st Floor Kilwa House, Plot 369, Toure Drive, Oyster Bay, P.O. Box 105833, Dar es Salaam | 53 |
| Tanzania LNG Limited | 1st Floor Kilwa House, Plot 369, Toure Drive, Oyster Bay, P.O. Box 105833, Dar es Salaam | 100 |
| THAILAND | | |
| Pattanadhorn Company Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 42 |
| Sahapanichkijphan Company Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 42 |
| Shell Global Solutions (Thailand) Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 100 |
| Shell Global Solutions Holdings (Thailand) Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 100 |
| Shell Global Solutions Service (Thailand) Company Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 100 |
| Thai Energy Company Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 100 |
| Unitas Company Limited | 10 Soonthornkosa Road, Klongtoey, Bangkok, 10110 | 42 |
| TRINIDAD AND TOBAGO | | |
| BG 2/3 Investments Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| Point Fortin LNG Exports Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 81 |
| Shell Gas Supply Trinidad Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| Shell LNG T&T Ltd | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| Shell Manatee Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| Shell Trinidad Central Block Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| Shell Trinidad Ltd | Shell Energy House, 5 St. Clair Avenue, Port of Spain | 100 |
| Shell Trinidad North Coast Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| The International School of Port of Spain Limited | 1 International Drive, Westmoorings | 25 |
| TRINLING Limited | 5 Saint Clair Avenue, Saint Clair, Port of Spain | 100 |
| TUNISIA | | |
| Amilcar Petroleum Operations S.A. | Immeuble Mezghenni, Rue du Lac Windermere, Les Berges du Lac, Tunis, 1053 - BP 36 | 50 |
| Shell Tunisia LPG S.A. | Immeuble Le Tanit du Lac, Rue du Lac Windermere, Les Berges du Lac, Tunis, 1053 | 100 |
| Tunisian Processing S.A. | Immeuble Le Tanit du Lac, Rue du Lac Windermere, Les Berges du Lac, Tunis, 1053 | 100 |
| TURKEY | | |
| Cekisan Depolama Hizmetleri Ltd. Sti. | Liman Mahallesi 60. Sokak No. 25, Konyaalti, Antalya, 07070 | 46 |
| Marmara Depoculuk Hizmetleri A.S. | Sultankoy Mahallesi Maltepe Sokak No:66, Marmara Ereglisi, Tekirdag, 59750 | 35 |
| Samsun Akaryakit VE Depolama A.S. | Dilovasi Organize Sanayi Bolgesi 1.Kisim, 1004 Sokak No:10, Dilovasi, Kocaeli | 35 |
| Shell & Turcas Petrol A.S. | Gulbahar Mah.Salih Tozan Sok., Karamancilar Is Merkezi B Blok No:18, Esentepe, Sisli, Istanbul, 34394 | 70 |
| Shell Enerji A.S. | Gulbahar Mah.Salih Tozan Sok., Karamancilar Is Merkezi B Blok No:18, Esentepe, Sisli, Istanbul, 34394 | 100 |
| Shell Petrol A.S. | Gulbahar Mah.Salih Tozan Sok., Karamancilar Is Merkezi B Blok No:18, Esentepe, Sisli, Istanbul, 34394 | 70 |
| UK | | |
| Applied Blockchain Ltd | Level 39, One Canada Square, London, E14 5AB | 22 |
| BG Central Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Cyprus Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Delta Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Energy Capital Plc | Shell Centre, London, SE1 7NA | 100 |
| BG Energy Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Energy Marketing Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Equatorial Guinea Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Gas Services Limited | Shell Centre, London, SE1 7NA | 100 |
| BG General Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Great Britain Limited | 50 Lothian Road, Festival Square, Edinburgh, EH3 9WJ | 100 |
| BG Group Employee Shares Trustees Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Group Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Group Pension Trustees Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Group Trustees Limited | Shell Centre, London, SE1 7NA | 100 |
| BG International Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Intellectual Property Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Karachaganak Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Kenya L10A Limited | Shell Centre, London, SE1 7NA | 100 |

Exhibit Q

| | | |
|---|---|---|
| BG Kenya L10B Limited | Shell Centre, London, SE1 7NA | 100 |
| BG LNG Investments Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Mongolia Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Netherlands Financing Unlimited | Shell Centre, London, SE1 7NA | 100 |
| BG Norge Limited | Shell Centre, London, SE1 7NA | 100 |
| BG North Sea Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG OKLNG Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Overseas Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Overseas Investments Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Overseas Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Rosetta Limited | Shell Centre, London, SE1 7NA | 100 |
| BG South East Asia Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Subsea Well Project Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Tanzania Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| BG Trinidad LNG Limited | Shell Centre, London, SE1 7NA | 100 |
| BG UK Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| Brazil Shipping I Limited | Shell Centre, London, SE1 7NA | 100 |
| British Pipeline Agency Limited | 5-7 Alexandra Road, Hemel Hempstead, Hertfordshire, HP2 5BS | 50 |
| CRI Catalyst Company Europe Limited | Shell Centre, London, SE1 7NA | 100 |
| Derivatives Trading Atlantic Limited | Shell Centre, London, SE1 7NA | 100 |
| Dragon LNG Group Limited [b] | Main Road, Waterston, Milford Haven, Pembrokeshire, SA73 1DR | 50 |
| Eastham Refinery Limited [b] | Shell Centre, London, SE1 7NA | 50 |
| Enterprise Oil Limited | Shell Centre, London, SE1 7NA | 100 |
| Enterprise Oil Middle East Limited | Shell Centre, London, SE1 7NA | 100 |
| Enterprise Oil Norge Limited | Shell Centre, London, SE1 7NA | 100 |
| Enterprise Oil U.K. Limited | Shell Centre, London, SE1 7NA | 100 |
| First Telecommunications Limited | Shell Energy House, Westwood Business Park, Westwood Way, Coventry, CV4 8HS | 100 |
| First Utility Limited | Shell Energy House, Westwood Business Park, Westwood Way, Coventry, CV4 8HS | 100 |
| Gainrace Limited | Shell Centre, London, SE1 7NA | 100 |
| Gatwick Airport Storage and Hydrant Company Limited | One Bartholomew Close, London, EC1A 7BL | 13 |
| GOGB Limited | Shell Centre, London, SE1 7NA | 100 |
| Heathrow Airport Fuel Company Limited | Building 1204, Sandringham Road, Heathrow Airport, Hounslow, Middlesex, TW6 3SH | 14 |
| Heathrow Hydrant Operating Company Limited | Building 1204, Sandringham Road, Heathrow Airport, Hounslow, Middlesex, TW6 3SH | 10 |
| Impello Limited | Shell Energy House, Westwood Business Park, Westwood Way, Coventry, CV4 8HS | 100 |
| Limejump Energy Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Intermediate 1 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Ltd | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 1 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 10 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 11 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 12 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 13 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 14 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 15 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 2 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 3 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 4 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 5 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 6 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 7 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Limejump Virtual 9 Limited | Canterbury Court, Kennington Park, 1-3 Brixton Road, London, SW9 6DE | 100 |
| Machine Max Limited | Shell Centre, London, SE1 7NA | 100 |
| Manchester Airport Storage and Hydrant Company Limited | One Bartholomew Close, London, EC1A 7BL | 25 |
| Methane Services Limited | Shell Centre, London, SE1 7NA | 100 |
| Murphy Schiehallion Limited | Shell Centre, London, SE1 7NA | 100 |
| Private Oil Holdings Oman Limited | Shell Centre, London, SE1 7NA | 85 |
| Sabah Shell Petroleum Company Limited | Shell Centre, London, SE1 7NA | 100 |
| Saxon Oil Limited | Shell Centre, London, SE1 7NA | 100 |
| Saxon Oil Miller Limited | Shell Centre, London, SE1 7NA | 100 |
| SELAP Limited | Shell Centre, London, SE1 7NA | 100 |

Exhibit Q

| | | |
|---|---|---|
| Shell Aircraft Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Aviation Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Business Development Middle East Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Caribbean Investments Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Catalysts & Technologies Limited | Shell Centre, York Road, London, SE1 7NA | 100 |
| Shell Chemical Company of Eastern Africa Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Chemicals (Hellas) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Chemicals Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Chemicals U.K. Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Clair UK Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Club Corringham Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Company (Hellas) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Company (Pacific Islands) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Corporate Director Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Corporate Secretary Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Distributor (Holdings) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Employee Benefits Trustee Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Energy Europe Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Energy Investments Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Energy Retail Limited | Shell Energy House, Westwood Business Park, Westwood Way, Coventry, CV4 8HS | 100 |
| Shell Energy Supply UK LTD. | Shell Centre, London, SE1 7NA | 100 |
| Shell Energy UK Limited | Shell Energy House, Westwood Business Park, Westwood Way, Coventry, CV4 8HS | 100 |
| Shell EP Offshore Ventures Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell EV Charging Solutions UK Ltd. | 3 Waterhouse Square, 138 - 142 Holborn, London, EC1N 2SW | 100 |
| Shell Exploration and Production Tanzania Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Finance GB Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Gas Holdings (Malaysia) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Gas Marketing U.K Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Global LNG Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Hasdrubal Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Holdings (U.K.) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Information Technology International Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell International Gas Limited | Shell Centre, London SE1 7NA | 100 |
| Shell International Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell International Petroleum Company Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell International Trading and Shipping Company Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Malaysia Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Marine Products Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell New Energies Holding Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell New Energies UK Ltd | Shell Centre, London, SE1 7NA | 100 |
| Shell Overseas Holdings Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Overseas Services Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Pension Reserve Company (SIPF) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Pension Reserve Company (SOCPF) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Pension Reserve Company (UK) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Pensions Trust Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Property Company Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell QGC Holdings Limited [g] | Shell Centre, London, SE1 7NA | 100 |
| Shell QGC Midstream 1 Limited [g] | Shell Centre, London, SE1 7NA | 100 |
| Shell QGC Midstream 2 Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell QGC Upstream 1 Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell QGC Upstream 2 Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Research Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Response Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell South Asia LNG Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Supplementary Pension Plan Trustees Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Tankers (U.K.) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Trading International Limited | Shell Centre, London, SE1 7NA | 100 |
| [*] Shell Treasury Centre Limited | Shell Centre, London, SE1 7NA | 100 |
| [*] Shell Treasury Dollar Company Limited | Shell Centre, London, SE1 7NA | 100 |

| Company | Address | % |
|---|---|---|
| Shell Treasury UK Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Trinidad 5(A) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Trinidad and Tobago Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Trinidad Block E Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Trustee Solutions Limited | 1 Altens Farm Road, Nigg, Aberdeen, AB12 3FY | 100 |
| Shell Tunisia Upstream Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell U.K. Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell U.K. North Atlantic Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell U.K. Oil Products Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Upstream Overseas Services (I) Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Ventures New Zealand Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell Ventures U.K. Limited | Shell Centre, London, SE1 7NA | 100 |
| Shell-Mex and B.P. Limited | Shell Centre, London, SE1 7NA | 60 |
| Steama Company Limited | Pannone Corporate LLP, 378-380 Deansgate, Castlefield, Manchester, M3 4LY | 33 |
| STT (Das Beneficiary) Limited [a] | Shell Centre, London, SE1 7NA | 100 |
| Synthetic Chemicals (Northern) Limited | Shell Centre, London, SE1 7NA | 100 |
| Telegraph Service Stations Limited | Shell Centre, London, SE1 7NA | 100 |
| The Anglo-Saxon Petroleum Company Limited | Shell Centre, London, SE1 7NA | 100 |
| The Asiatic Petroleum Company Limited | Shell Centre, London, SE1 7NA | 100 |
| The Consolidated Petroleum Company Limited | Shell Centre, London, SE1 7NA | 50 |
| The Mexican Eagle Oil Company Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company (W.I.) Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company of Hong Kong Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company of India Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company of Nigeria Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company of Thailand Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Company of The Philippines Limited | Shell Centre, London, SE1 7NA | 75 |
| The Shell Company of Turkey Limited | Shell Centre, London, SE1 7NA | 100 |
| The Shell Marketing Company of Borneo Limited | Shell Centre, London, SE1 7NA | 100 |
| [*] The Shell Petroleum Company Limited | Shell Centre, London, SE1 7NA | 100 |
| [*] The Shell Transport and Trading Company Limited | Shell Centre, London, SE1 7NA | 100 |
| Thermocomfort Limited | Shell Centre, London, SE1 7NA | 100 |
| Ubitricity Distributed Energy Systems UK Limited | 16 Great Queen Street, Covent Garden, London, WC2B 5AH | 100 |
| UK Shell Pension Plan Trust Limited | Shell Centre, London, SE1 7NA | 100 |
| United Kingdom Oil Pipelines Limited [b] | 5-7 Alexandra Road, Hemel Hempstead, Hertfordshire, HP2 5BS | 48 |
| Walton-Gatwick Pipeline Company Limited [b] | 5-7 Alexandra Road, Hemel Hempstead, Hertfordshire, HP2 5BS | 52 |
| West London Pipeline and Storage Limited [b] | 5-7 Alexandra Road, Hemel Hempstead, Hertfordshire, HP2 5BS | 38 |
| Wonderhill Limited | Shell Centre, London, SE1 7NA | 100 |
| UKRAINE | | |
| Alliance Holding LLC [d] | N. Grinchenko, 4, Kiev, 03038 | 51 |
| Invest-Region LLC [d] | N. Grinchenko, 4, Kiev, 03038 | 51 |
| UNITED ARAB EMIRATES | | |
| Abu Dhabi Gas Industries Limited (GASCO) | P.O. Box 665, Abu Dhabi | 15 |
| Emdad Aviation Fuel Storage FZCO | Emdad Aviation Fuel Storage FZCO, P.O. Box 261781, Jebel Ali, Dubai | 33 |
| URUGUAY | | |
| BG (Uruguay) S.A. | La Cumparsita, 1373 4th Floor, Montevideo, 11200 | 100 |
| Dinarel S.A. | La Cumparsita, 1373 4th Floor, Montevideo, 11200 | 50 |
| Gasoducto Cruz del Sur S.A. | La Cumparsita, 1373 4th Floor, Montevideo, 11200 | 40 |
| USA | | |
| Aera Energy LLC [b] | 10000 Ming Avenue, Bakersfield, CA 93311 | 52 |
| Aera Energy Services Company | 10000 Ming Avenue, Bakersfield, CA 93311 | 50 |
| Airbiquity Inc. | 1191 2nd Avenue, Suite 1900, Seattle, WA 98101 | 26 |
| Amberjack Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 43 |
| Arizona A1 LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Arizona B1 LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Atlantic 1 Holdings LLC [c] | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 46 |
| Atlantic 2/3 Holdings LLC [c] | RL & F Service Corp, 920 N King St Floor 2, New Castle, Wilmington, DE 19801 | 58 |
| Atlantic 4 Holdings LLC [c] | RL & F Service Corp, 920 N King St Floor 2, New Castle, Wilmington, DE 19801 | 51 |
| Atlantic Shores Offshore Wind, LLC [c] | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 50 |
| Au Energy, LLC | 41805 Albrae Street, Fremont, CA 94538 | 50 |
| Baconton Power LLC [c] | 2237 Hatcher Hill Road, Baconton, GA 31716 | 35 |
| Bengal Pipeline Company LLC | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 40 |

| | | |
|---|---|---|
| BG Brasilia, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG Energy Finance, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG Energy Merchants, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG Gulf Coast LNG, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG LNG Services, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG LNG Trading, LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG North America, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| BG US Services, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Bluware Headwave Ventures Inc. | 16285 Park Ten Place, Suit 300, Houston, TX 77084 | 20 |
| Brazil Crude Services, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Brazos Wind Ventures, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Caesar Oil Pipeline Company, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 15 |
| California Western Grid Development, LLC [c] | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 100 |
| Colbea Enterprises, LLC | 2050 Plainfield Pike, Cranston, RI 02921 | 50 |
| Colonial Pipeline Company | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 11 |
| Concha Chemical Pipeline LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Crestwood Permian Basin LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 34 |
| CRI Sales and Services Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| CRI Zeolites Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Cumulus Digital Systems, Inc. | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 30 |
| D.Light Design Inc. | 2100 Geng Road, Suite 210, Santa Clara, Palo Alto, CA 94303 | 34 |
| Deer Park Refining Limited Partnership [b] [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 50 |
| Diamond Energy, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 50 |
| Distributed Generation Solutions LLC | 2441 High Timbers Drive, Suite 220, The Woodlands, TX 77380 | 33 |
| Eleox LLC ERROR | 850 New Burton Road, Suite 201, Dover, Delaware, DE 19904 | 17 |
| Ellwood Land Holdings, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Endymion Oil Pipeline Company, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 7 |
| Enterprise Oil North America Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| EPP LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| Equilon Enterprises LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Explorer Pipeline Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 26 |
| Gaviota Terminal Company [d] | 150 N. Dairy Ashford, Houston, TX 77079 | 20 |
| GI Energy Storage LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Husk Power Systems, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 30 |
| Hyder PVS LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Infineum USA Inc. | 1900 East Linden Avenue, Linden, NJ 07036 | 50 |
| Infineum USA L.P. [f] | Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 | 50 |
| Inspire Digital Services California LLC [c] | 3402 Pico Boulevard, Suite 300, Santa Monica, CA 90405 | 100 |
| Inspire Digital Services PJM LLC [c] | 3402 Pico Boulevard, Suite 300, Santa Monica, CA 90405 | 100 |
| Inspire Digital Services USA LLC [c] | 3402 Pico Boulevard, Suite 300, Santa Monica, CA 90405 | 100 |
| Inspire Energy Capital, LLC | 160 Greentree, Suite 101, Dover, DE 19904 | 100 |
| Inspire Energy Holdings LLC [c] | 3402 Pico Boulevard, Suite 300, Santa Monica, CA 90405 | 100 |
| Inspire Energy Technologies LLC [c] | 3402 Pico Boulevard, Suite 300, Santa Monica, CA 90405 | 100 |
| J & J Lubrication, LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| Jiffy Lube International, Inc. | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| Lazlyng Real Estate Company, LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| LOCAP LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 28 |
| LOOP LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 46 |
| Maple Power Holdings LLC [b] | Bechtel Enterprises, 12011 Sunset Hills Road, Reston, VA 20190 | 68 |
| Mars Oil Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 49 |
| Mattox Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 54 |
| Mayflower Wind Energy LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 50 |
| MP2 Energy LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Energy NE LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Energy NY LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Energy Retail Holdings LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Energy Texas LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Generation LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MP2 Mesquite Creek Wind LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| Mpower2 LLC [c] | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| MSTS Payments, LLC [c] | 8595 WEST 110TH STREET, OVERLAND PARK, 66210 | 100 |
| Noble Assurance Company | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |

| | | |
|---|---|---|
| Odyssey Pipeline L.L.C. [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 49 |
| Oryx Caspian Pipeline, L.L.C. [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pacwest Energy, LLC. | 3450 E. Commercial Ct., Meridian, ID 83642 | 50 |
| Pecten Arabian Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Brazil Exploration Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Midstream LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| Pecten Orient Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Orient Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Producing Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Trading Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Victoria Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pecten Yemen Masila Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pennzoil-Quaker State Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pennzoil-Quaker State International Corporation | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Pennzoil-Quaker State Nominee Company | The Corporation Trust Company of Nevada, 311 South Division Street, Carson City, NV 89703 | 100 |
| Peru LNG Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 20 |
| Poseidon Oil Pipeline Company, LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 25 |
| Positive Energies, LLC [c] | CT Corporation System, 7700 E Arapahoe Rd, Ste 220, Centennial, CO 80112-1268 | 100 |
| Power Limited Partnership [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| PR Microgrids LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Premium Velocity Auto LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Promus Oil Pipeline Company, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 7 |
| Pulse Power, LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Quaker State Investment Corporation | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| RDK Ventures, LLC | 4080 West Jonathan Moore Pike, Columbus, IN 47201 | 50 |
| RK Caspian Shipping Company, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| S T Exchange, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Sand Dollar Pipeline LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| Savion LLC [c] | 422 Admiral Blvd, Kansas, MO 64106 | 100 |
| SCOGI GP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell & Whitmore Reliability Solutions, LLC [c] | 930 Whitmore Drive, Rockwall, 75087 | 50 |
| Shell (US) Gas & Power M&T Holdings, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell California Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts & Technologies Americas LP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts & Technologies Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts & Technologies Holdings Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts & Technologies LP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts & Technologies US LP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Catalysts Ventures Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Chemical Appalachia LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Chemical LP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Chemicals Arabia L.L.C. [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Communications, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Deepwater Royalties Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Downstream Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Energy Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Energy Holding GP LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Energy North America (US), L.P. [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Energy Resources Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Enterprises LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell EP Holdings Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Expatriate Employment US Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Exploration & Production Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Exploration Company Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Frontier Oil & Gas Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Gas Gathering Corp. #2 | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Global Solutions (US) Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell GOM Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Gulf of Mexico Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Information Technology International Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell International Exploration and Production Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Lake Charles Operations, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |

Exhibit Q

| Company | Address | % |
|---|---|---|
| Shell Leasing Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Legacy Holdings LLC | C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 | 100 |
| Shell Marine Products (US) Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Midstream LP Holdings LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Midstream Operating LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| Shell Midstream Partners GP LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Midstream Partners, L.P. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| Shell NA Gas & Power Holding Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell NA LNG LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell New Energies US LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell North America Gas & Power Services Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Offshore and Chemical Investments Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Offshore Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Offshore Response Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Oil Company Investments Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Oil Products Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Onshore Ventures Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| [*] Shell Petroleum Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Pipeline Company LP [d] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Pipeline GP LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Retail and Convenience Operations LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell RSC Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Thailand E&P Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Trademark Management Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Trading (US) Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Trading North America Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Trading Risk Management, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Trading Services Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Transportation Holdings LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Treasury Center (West) Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell US E&P Investments LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell US Gas & Power LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell US Hosting Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell US LNG, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| [*] Shell USA, Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell Ventures LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell WindEnergy Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Shell WindEnergy Services Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Ship Shoal Pipeline Company LLC [d] | 150 N. Dairy Ashford, Houston, TX 77079 | 43 |
| Silicon Ranch Corporation | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 47 |
| SOI Finance Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Sonnen Inc. | 2048 Weems Road, Bldg C, Tucker, GA 30084 | 100 |
| SOPC Holdings East LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| SOPC Holdings West LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| SOPC Southeast Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Studio X LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| SWEPI LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Tejas Coral GP, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Tejas Coral Holding, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Tejas Power Generation, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Texas Petroleum Group LLC | 11111 Wilcrest Green, Suite 100, Houston, TX 77042 | 50 |
| Texas-New Mexico Pipe Line Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| The Valley Camp Coal Company | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Three Wind Holdings, LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 50 |
| TMR Company LLC | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Tri Star Energy LLC | 1740 Ed Temple Blvd, Nashville, TN 37208 | 33 |
| Triton Diagnostics Inc. | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Triton Terminaling LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 100 |
| Triton West LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| True North Energy LLC | 10346 Brecksville Rd, Brecksville, OH 44141 | 50 |
| URSA Oil Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 45 |
| West Shore Pipe Line Company | Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 | 19 |

| | | |
|---|---|---|
| Zeco Holdings, Inc. | 1013 Centre Road, County of New Castle, Delaware, Wilmington, DE 19805 | 100 |
| Zeco Systems, Inc. | 1013 Centre Road, County of New Castle, Delaware, Wilmington, DE 19805 | 100 |
| Zeolyst International | 3333 Hwy 6 South, Houston, TX 77082 | 50 |
| Zydeco Pipeline Company LLC [c] | The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 69 |
| VENEZUELA | | |
| Shell Venezuela Productos, C.A. | Avenida Orinoco, Edificio Centro Empresarial Premium, Piso 2, Oficinas 2-A y 2-B, Urbanización Las Mercedes, Caracas, Distrito Capital, 1060 | 100 |
| Shell Venezuela, S.A. | Avenida Orinoco, Edificio Centro Empresarial Premium, Piso 2, Oficinas 2-A y 2-B, Urbanización Las Mercedes, Caracas, Distrito Capital, 1060 | 100 |
| Sucre Gas, S.A. | Avenida Leonardo Da Vinci, Edificio PDV Servicios, Caracas, Distrito Capital | 30 |
| VIETNAM | | |
| Shell Vietnam Ltd | Go Dau Industrial Zone, Phuoc Thai Commune, Long Thanh District, Dong Nai Province | 100 |
| ZIMBABWE | | |
| Central African Petroleum Refineries (Private) Limited | Block 1, Tendeseka Office Park, CNR Samora Machel Avenue, Renfrew Road, Harare | 21 |

Exhibit Q

# Exhibit 12.1

I, Ben van Beurden, certify that:

1.    I have reviewed this annual report on Form 20-F of Shell plc (the Company);

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.    The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)    Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.    The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's Board of Directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

/s/ Ben van Beurden

Ben van Beurden
Chief Executive Officer
March 9, 2022

## Exhibit 12.2

I, Jessica Uhl, certify that:

1.      I have reviewed this annual report on Form 20-F of Shell plc (the Company);

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.      The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)   Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)   Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's Board of Directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

/s/ Jessica Uhl

_____
Jessica Uhl
Chief Financial Officer
March 9, 2022

# Exhibit 13.1

In connection with this annual report on Form 20-F of Shell plc, a public limited company organized under the laws of England and Wales (the Company), for the year ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the Report), each of the undersigned officers of the Company certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to such officer's knowledge, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of, and for, the periods presented in the Report.

The foregoing certification is provided solely for purposes of complying with the provisions of Section 906 of the Sarbanes-Oxley Act of 2002 and is not intended to be used or relied upon for any other purpose.

/s/ Ben van Beurden

_____
Ben van Beurden
Chief Executive Officer

/s/ Jessica Uhl

_____
Jessica Uhl
Chief Financial Officer
March 9, 2022

Exhibit Q

Exhibit 99.1

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements on Form F-3 (333-254137 and 333-254137-001) and in the Registration Statement on Form S-8 (No. 333-262396) of Shell plc (formerly known as Royal Dutch Shell plc) of our reports dated March 9, 2022, with respect to the Consolidated Financial Statements and the effectiveness of internal control over financial reporting of Shell plc, included in the Form 20-F for the year ended December 31, 2021.

/s/ Ernst & Young LLP

_____

Ernst & Young LLP
London, United Kingdom
March 9, 2022

Exhibit 99.2

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements on Form F-3 (No. 333-254137 and 333-254137-001) and in the Registration Statement on Form S-8 (No. 333-262396) of Shell plc (formerly known as Royal Dutch Shell plc) of our reports dated March 9, 2022, with respect to the Royal Dutch Shell Dividend Access Trust Financial Statements and the effectiveness of internal control over financial reporting of the Royal Dutch Shell Dividend Access Trust, included in the Form 20-F for the year ended December 31, 2021.

/s/ Ernst & Young LLP

---

Ernst & Young LLP
London, United Kingdom
March 9, 2022

JULY 2018

SHELL PLC[1]

Rules of the Global Employee Share Purchase Plan

Approved by RDS plc board of directors: 25 July 2018
Amended on 29 January 2022

Expiry Date: 25 July 2028

---

[1] Previously Royal Dutch Shell plc

Exhibit Q

**Table of Contents**

**Contents**                                                                                                                              **Page**

1    Introduction ............................................................................................................................. 3

2    Terms of Invitation ................................................................................................................. 3

3    Form of Invitation .................................................................................................................. 3

4    No Transfer of Rights ............................................................................................................ 3

5    Variations in share capital, demergers and special distributions..................................... 4

6    Voting and dividends ............................................................................................................. 4

7    Savings.................................................................................................................................... 4

8    Purchase and transfer of Shares ......................................................................................... 5

9    Cash alternative .................................................................................................................... 5

10   Leaving employment ............................................................................................................. 5

11   Takeovers and restructurings .............................................................................................. 6

12   Withholding of tax ................................................................................................................. 7

13   Relationship with terms of a Participant's employment .................................................... 7

14   General ................................................................................................................................... 8

15   Changing these Rules ......................................................................................................... 11

16   Governing law and jurisdiction........................................................................................... 11

17   Language of the Rules......................................................................................................... 12

18   Meaning of Words ............................................................................................................... 12

1   **Introduction**

These are the Rules of the Shell Global Employee Share Purchase Plan (the "Plan").

These Rules set out the terms on which the Company may invite Eligible Employees to participate in a discounted share purchase plan using employee contributions. Participants will be invited to make Savings from Salary. On the Purchase Date these Savings will be used to purchase Shares at a discount. There is no holding period in relation to the Shares.

No invitations may be made after 25 July 2028.

2   **Terms of Invitation**

Invitations may be made by the Company to Eligible Employees. The Company will decide, in its absolute discretion, which Eligible Employees (if any) are to be invited to participate, when (if ever) invitations are to be made and the terms of such invitations. The selection criteria, the timing of invitations and the terms of invitations may change from time to time. When making an invitation the Company will specify:

a)  the Savings Limit;

b)  the Invitation Date;

c)  the Invitation Period; and

d)  the Discount.

3   **Form of Invitation**

Eligible Employees will be sent an invitation (which may be electronic) to participate which will set out the terms of the invitation. Eligible Employees will be able to choose whether to participate and, subject to the Savings Limit, the level of their Savings Amount.

An Eligible Employee must accept an invitation in such manner and by such time as may be specified in the invitation. If he does not, he will not be entitled to participate in the Plan for the relevant year.

4   **No Transfer of Rights**

Prior to the delivery or transfer of Shares to the Participants, rights under the Plan may not be transferred, pledged, encumbered, assigned or otherwise disposed of; provided that this prohibition shall not apply to the transmission of rights on the death of a Participant to his personal representatives.

A Participant must not create, buy or sell any derivative instrument involving rights under the Plan.

If any rights are transferred (other than in the event of death) or if such a derivative instrument is created, bought or sold, all rights will lapse, the Participant will be deemed to have withdrawn from the Plan, and his Savings will be returned (without interest) to him as soon as reasonably practicable and will in any event be returned within 45 days.

Subject to any Dealing Restrictions, once Shares have been delivered to Participants those Shares are not restricted.

5       **Variations in share capital, demergers and special distributions**

If there is:

(a)     a variation in the equity share capital of the Company, including a capitalisation, sub-division, consolidation or reduction of share capital; or

(b)     a rights issue; or

(c)     a demerger (in whatever form); or

(d)     a special dividend or distribution; or

(e)     any similar transaction which the Directors consider may affect the value of rights under the Plan;

the Directors may, acting reasonably and in good faith, adjust (retrospectively or otherwise) the rights subject to this Plan or change the identity of the company or companies whose shares are subject to the rights.

6       **Voting and dividends**

A Participant shall not be entitled to vote, to receive dividends or to have any other rights of a shareholder in respect of Shares subject to rights under this Plan until the Shares are transferred to the Participant.

7       **Savings**

Suspensions - Participants may suspend their contributions to the Plan at any time on or before October 15 of the applicable Plan Year.  Savings made prior to any suspension becoming effective will be used to purchase Shares on the Purchase Date.

Top Up Payments – A Participant may, at any time on or before 15 October of the applicable Plan Year, elect to make additional Savings in whole units of the relevant currency up to the Savings Limit.

Changed Amounts - Participants may change their Savings Amount on or before 15 October of the applicable Plan Year.

Changed Location – if an individual changes country of employment while participating in the Plan to another participating country then their participation shall continue.  In such a case the Savings Amount will continue at the same level as before expressed to the nearest whole unit in the appropriate currency. If an individual relocates to a country which, for whatever reason is not participating in the Plan, then the individual will be suspended from the Plan.  Savings made prior to any suspension may be used to purchase Shares on the Purchase Date.

Automatic Renewal – Generally, Participants will automatically continue to participate with the same Savings Amount from one Plan Year to the next.  However if, on or before 15 October of the applicable Plan Year, a Participant has withdrawn their Savings, has suspended their Savings or has set their Savings Amount to zero then the Participant will need to reenrol to rejoin the Plan.

Withdrawals - Withdrawals of Savings are not permitted other than in cases of financial hardship.  Partial withdrawals are not permitted.  Subject to these general rules, at any time

on or before 15 October in each Plan Year, a Participant can request the return of the Savings by citing financial hardship.  If the Participant requests the return of the Savings then they will, subject to the Company's consent, be returned (without interest) to the Participant as soon as reasonably practicable and will in any event be returned within 45 days of date of the request. If a Participant withdraws the Savings then the Participant will be deemed to have terminated their participation in the Plan.

The Savings made by Participants will be held by the administrator on behalf of the Participants in an escrow account with a bank chosen by the administrator.  No interest on the Savings will be paid to Participants.  The Company will in its absolute discretion decide when to exchange the funds into Euros, if applicable; provided that Savings withheld from a U.S. payroll for a person with the U.S. as his base country will be held in U.S. Dollars. Any foreign exchange risk or loss caused as a result of currency exchange or currency fluctuation will be for the account of the individual.

Instructions provided by a Participant under the Plan, including this Rule 7, shall only become effective once they have been processed in accordance with applicable administrative procedures.

8      **Purchase and transfer of Shares**

Unless the Company has agreed to a request from a Participant on or before 15 October in each Plan Year for the return of the Savings, the Savings will automatically be used to purchase Shares on the Purchase Date.

At the end of each Plan Year the Company will calculate the number of whole Shares which could be bought by each Participant using the Savings at the Purchase Price.  Subject to Rule 12, the Company will procure that such number of whole Shares are transferred to, or to the order of, the Participant or to a nominee selected by the Company for the benefit of the Participant. Such transfer will be made, subject to any Dealing Restriction which prevents such transfer, as soon as reasonably practicable and will normally be made within 14 days of the end of the Plan Year and will in all cases be made not later than 15 March of the calendar year following the applicable Plan Year.

9      **Cash alternative**

The Company may satisfy its obligation to deliver Shares by paying (subject to withholding of tax and any social contributions) a cash amount equal to the Market Value of the Shares, with such payment made to, or to the order of, the Participant. For this purpose, the Market Value shall be taken to be the Market Value on the first Business Day after the end of the relevant Plan Year.  This amount will be paid as soon as reasonably practicable and will normally be made within 45 days of the end of the relevant Plan Year and will in all cases be made not later than 15 March of the calendar year following the applicable Plan Year.

Rights may be granted on the basis that they will only ever be satisfied by paying a cash amount in the manner described in this rule.

10     **Leaving employment**

If a Participant ceases to be an employee of a Member of the Group (for whatever reason including death) then the Participant (or his representatives) may:

request the return of all Savings that have been contributed to the Plan (without interest); or

direct that the Savings will be used to purchase the Shares (on the Purchase Date and with the Discount).

If no request or direction has been received by the Company on or before 15 October of the relevant Plan Year (or if a request has been rejected) then the Savings will be used to purchase the Shares (on the Purchase Date and with the Discount).

For the purposes of this rule, a Participant will not be treated as ceasing to be an employee of a Member of the Group until he ceases to be an employee of all Members of the Group or if he recommences employment with a Member of the Group within 7 days.

## 11    Takeovers and restructurings

### 11.1    Takeovers to which this rule applies

This rule applies where:

    a)  a person (or a group of persons acting in concert) obtains Control of the Company as a result of making an offer to acquire Shares; or

    b)  under section 895 of the Companies Act 2006 (or any equivalent non-UK procedure), a court sanctions a compromise or arrangement in connection with the acquisition of Shares.

### 11.2    Exchange of rights with agreement of Acquiring Company

If rule 11.1 applies and any company which obtains Control of the Company as a result of the offer or when the compromise or arrangement becomes effective (the "**Acquiring Company**") and the Directors agree, all rights under the Plan will be automatically exchanged, in full, for new rights in accordance with this rule 11.2:

The new rights:

    a)  must confer a right to acquire shares in the Acquiring Company or another body corporate determined by the Acquiring Company;

    b)  subject to the rest of this rule 11, will be governed by the same terms as applied to the existing rights immediately before exchange;

    c)  will be treated as having been acquired at the same time as the existing rights;

    d)  will be governed by these Rules as if references to Shares were references to the shares over which the new rights applied and references to the Company were references to the Acquiring Company or the body corporate determined under rule 11.1.

### 11.3  Acquiring Company does not agree to exchange rights

If rule 11.1 applies and the Acquiring Company or the Directors do not agree to an exchange in accordance with rule 11.2 (or if the person who obtains Control is not a company), the Savings will be returned to the Participant as soon as reasonably practicable and will normally be returned within 45 days of the end of the relevant Plan Year and will in all cases be made not later than 15 March of the calendar year following the applicable Plan Year.

The Company will procure that, in lieu of the value of any discounted Share Purchase Price which might have benefited the Participant, an additional payment of cash equal to 15 per cent of the Savings will be made to the Participant.

### 11.4 Re-organisations

If the Directors consider that the offer or sanction is an internal reconstruction or reorganisation which does not involve a significant change in the identity of the ultimate shareholders of the Company, rights will be exchanged, as described in rule 11.2 whether or not the Acquiring Company agrees. The rights will be exchanged in full subject to such adjustments as the Directors consider reasonable to take account of the reconstruction or reorganisation.

### 11.5 Other transactions

If the Directors become aware that the Company is or is expected to be affected by any demerger, distribution (other than an ordinary dividend) or other transaction not falling within rule 11.1 which, in the opinion of the Directors, would adversely affect the current or future value of any right, the Directors may elect to return the Savings to the Participant as soon as reasonably practicable and in all cases such repayment will be made not later than 15 March of the calendar year following the applicable Plan Year.

The Company will procure that, in lieu of the value of any discounted Share Purchase Price which might have benefited the Participant, an additional payment of cash equal to 15 per cent of the Savings will be made to the Participant.

## 12 Withholding of tax

The Company, any employing company or trustee of any employee benefit trust may withhold such amount and make such arrangements as it considers necessary to meet any liability to taxation or social security contributions in respect of rights under the Plan. These arrangements may include deductions from the escrow account or any cash payment under the Plan, the sale of Shares on behalf of a Participant or a reduction in the number of Shares to which the Participant would otherwise be entitled.  Any taxes incurred as a result of the purchase of shares (or the delivery of cash, where applicable) under the Plan shall be the responsibility of the participant and no tax assistance shall be provided.

## 13 Relationship with terms of a Participant's employment

(a) For the purposes of this rule 13, "**Employee**" means any person who is or will be eligible to be a Participant in the Plan.

(b) This rule applies whether any Member of the Group has full discretion in relation to these Rules, or whether that Member of the Group could be regarded as being subject to any obligations in relation to these Rules, during an Employee's employment or employment relationship and, after the termination of an Employee's employment or employment relationship, whatever the circumstances of such termination and however such termination is categorised under applicable local law.

(c) Nothing in the rules or in the terms of or the practice of granting rights under the Plan forms part of the contract of employment or employment relationship of an Employee. Any and all rights and obligations arising from the employment relationship between the Employee and any Member of the Group are separate from,

7

and are not affected by, these Rules or any rights granted hereunder. The grant of rights does not create any right to, or expectation of, continued employment or a continued employment relationship.

(d)    Any benefits received under these Rules are not pensionable and do not affect pension benefits or any other employee benefits in any way except as may be otherwise provided in the terms of any applicable pension or other benefit plan.

(e)    The grant of rights on a particular basis in any year does not create any right to or expectation of the grant of rights on the same basis, or at all, in any future year.

(f)    No Employee is entitled to be made an invitation at a particular level or at all.

(g)    Without prejudice to an Employee's right under the Plan subject to and in accordance with the express terms of these Rules, no Employee has any rights in respect of the exercise or omission to exercise any discretion, or the making or omission to make any decision, relating to the right. Any and all discretions, decisions or omissions relating to the right may operate to the disadvantage of the Employee, even if this could be regarded as capricious or unreasonable, or could be regarded as in breach of any implied term between the Employee and his employer, including any implied duty of trust and confidence. Any such implied term is excluded and overridden by this rule.

(h)    Without prejudice to an Employee's right under the Plan subject to and in accordance with the express terms of these Rules, no Employee has any right to compensation resulting from:

(i)    any loss or reduction of any rights or expectations under these Rules in any circumstances or for any reason (including termination of employment or the employment relationship whatever the circumstances of such termination and however such termination is categorised under applicable local law);

(ii)    any exercise of a discretion or a decision taken under these Rules, or any failure to exercise a discretion or take a decision;

(iii)    the operation, suspension, termination or amendment of these Rules.

(i)    Rights are granted only on the basis that the Participant accepts all the provisions of these Rules, including in particular this rule. By accepting an invitation to participate in the Plan, an Employee waives all rights under these Rules, other than the right to request the return of the cash savings and the right to acquire shares subject to and in accordance with the express terms of these Rules, in consideration for, and as a condition of, the grant of rights under these Rules.

(j)    Nothing in these Rules confers any benefit, right or expectation on a person who is not an Employee. No such third party has any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of these Rules. This does not affect any other right or remedy of a third party which may exist.

## 14    **General**

### 14.1    **Directors' decisions final and binding**

The decision of the Directors, in their sole and absolute discretion, on the interpretation of these Rules or in any dispute relating to any matter relating to these Rules will be final and conclusive.

Exhibit Q

14.2 **Documents sent to shareholders**

The Company may send to Participants copies of any documents or notices normally sent to the holders of its Shares at or around the same time as issuing them to the holders of its Shares.

14.3 **Regulations**

The Directors can make or vary regulations for the administration and operation of these Rules but these must be consistent with these Rules.

14.4 **Consents**

All allotments, issues and transfers of Shares will be subject to any necessary consents under any relevant enactments or regulations for the time being in force. The Participant will be responsible for complying with any requirements he needs to fulfil in order to obtain or avoid the necessity for any such consent.

14.5 **Articles of association**

Any Shares acquired under these Rules are subject to the articles of association of the Company from time to time in force.

14.6 **Rights attaching to Shares**

The Participant will be entitled to all rights attaching to the Shares by reference to a record date on or after the transfer date. The Participant will not be entitled to rights before that date.

14.7 **Listing of Shares**

If and so long as the Shares are listed on any stock exchange, the Company will apply for listing of any Shares issued under these Rules on any such exchange as soon as practicable.

14.8 **Exchange rates**

Where it is necessary to make any currency conversion under these rules, the exchange will be at such rate and at such time as the Company decides. Any foreign exchange risk or loss caused as a result of currency exchange or currency fluctuation will be for the account of the individual.

14.9 **Unfunded Plan**

Rights shall be unfunded and no Member of the Group shall be required to segregate any assets which may at any time be represented by those rights. Any liability of any Member of the Group to any person with respect to this Plan shall be based solely upon any contractual obligations which may be created by these Rules. No such obligation shall be deemed to be secured by any pledge or other encumbrance on any property of any Member of the Group or funded or secured in any way. Notwithstanding the foregoing, the Savings held on behalf of a Participant are personal to that Participant and shall be held in an escrow account as provided in Rule 7.

14.10 **Indemnification**

The Company shall indemnify (or procure that any relevant Member of the Group indemnifies) each Indemnitee to the fullest extent permitted under applicable laws and under its constitution, against all or any portion of liability and/or costs and expenses reasonably incurred by such Indemnitee, in connection with, arising out of, or resulting from, any claim, suit or proceeding in which he may be involved by reason of having been an Indemnitee; provided however, no Member of the Group shall be obliged to indemnify any Indemnitee against any liability, costs or expenses in connection with any act or omission to act in respect of which the Indemnitee shall be finally adjudged in any action, suit or proceeding to have been guilty of fraud or wilful misconduct in the performance of his duties. "**Indemnitee**", for the purposes of this rule means an individual who, while an employee or director of any Member of the Group and acting with respect to these Rules, acts as a fiduciary, agent, director of that or any other Member of the Group, or in any other capacity exercises administrative responsibility with respect to these Rules.

14.11 **Separate provisions**

Each of the provisions of these Rules is entirely separate and independent from each of the other provisions. If any provision of any rule is found to be invalid, illegal or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and, so far as reasonably practicable, gives effect to the commercial intention of the Company.  To the extent it is not possible to delete or modify the provision in whole or in part, then such provision or part of it will be deemed never to have been part of these Rules and to the extent that it is possible to do so, this will not affect the validity or enforceability of any of the remaining provisions of that or any other rule.

14.12 **Notices**

Any notice or other document which has to be given to a person who is or will be eligible to be a Participant may be sent by e-mail to the e-mail address which is held by the Plan administrator.  A person who is or will be eligible to be a Participant may also contact the Plan administrator to make arrangements to receive such notice or other document by post. Neither the Company nor any Member of the Group will be liable for any loss resulting from the fact that the Participant did not keep his e-mail address, postal address or other personal information accurate and up to date with the Plan administrator.

Any notice or other document which has to be given to the Company or other duly appointed agent under or in connection with these Rules may be delivered or sent by post to it at its registered office (or such other place as the Directors or duly appointed agent may from time to time decide and notify to Participants) or sent by e-mail or fax to any e-mail address or fax number notified to the Participant.

Notices sent by post will be deemed to have been given on the second day after the date of posting. However, notices sent by or to a Participant who is working overseas will be deemed to have been given on the seventh day after the date of posting. Notices sent by e-mail or fax, in the absence of evidence to the contrary, will be deemed to have been received on the day after sending.

10

### 14.13  **Small Payments**

If, for whatever reason a small payment would otherwise be due to a Participant, the Company may in its absolute discretion decide instead to pay that amount to a charity of its choice.  In such a case the Participant will lose any right to receive the relevant amount.

In this context a small payment is a payment of a) €25 or less; b) less than the value of one Share as at the date of the proposed payment or c) an amount which would be reduced to zero once any charges and foreign exchange costs had been taken into account.

### 14.14  **Investment Risk**

The value of Shares can go down as well as up. The risks of fluctuation in the value of the Shares are borne by the Participant. Neither the Company, any Member of the Group, the Plan administrator, any third-party administrator, nor any depository or brokerage firm receiving a transfer of Shares under the Plan shall have any liability to the Participant for any market losses because of the fluctuation in value of Shares.

### 14.15  **Obligations of U.S. Employers**

By providing for participation in the Plan through its payroll, a U.S. Member of the Group shall be liable for satisfying Plan obligations with respect to its employees who become Participants.

## 15    **Changing these Rules**

### 15.1  **Directors' powers**

Except as described in the rest of this rule, the Directors may, at any time, change these Rules in any way, including retrospective amendments and amendments to the terms of rights already granted. The Directors may terminate the Plan at the end of any Plan Year in relation to future Plan Years.

### 15.2  **Participant approval**

No amendment to the terms of any rights already granted which would materially adversely affect the rights of any Participants shall be made without the consent of the Participants holding a majority (by number of Shares subject to the rights) of rights affected by the amendment.

### 15.3  **Notice**

The Directors may (but need not) give notice of any changes made to any Participant affected.  The absence of any such notification will not affect the validity of any such change.

## 16    **Governing law and jurisdiction**

English law governs these Rules and all rights and their construction. The English Courts have exclusive jurisdiction in respect of disputes arising under or in connection with these Rules or any rights under this Plan.

17    **Language of the Rules**

The language of these Rules is English. In the event of any conflict, the English language version will prevail.

**18    Meaning of Words**

In these rules:

"**Business Day**" means a day on which any stock exchange which is nominated by the Directors (for some or all purposes under these Rules) and on which the Shares are traded is open for the transaction of business.

"**Company**" means Shell plc.

"**Control**" has the meaning given to it by Section 840 of the Income and Corporation Taxes Act 1988.

"**Dealing Restrictions**" means restrictions imposed by any law, order, regulation or Government directive, the rules applying to any listing of the Company, any code adopted by the Company regulating dealings in shares by employees or directors or any restrictions imposed by the Company's compliance officer.

"**Directors**" means the board of directors of the Company or any committee of the board of directors or other person or body to whom the board of directors delegates any function under these rules or, where rule 11 applies, those people who were the Directors immediately before the event by virtue of which that rule applies.

"**Discount**" means the percentage discount at which the Participants may purchase the Shares. The Discount is set in relation to the lower of the Market Value on either:

a)    the first Business Day of each Plan Year and the first Business Day of the following calendar year; or

b)    such other dates, as determined by the Company and stated in the Invitation for a given Plan Year, provided that such dates shall be exactly one year apart.

"**Eligible Employee**" means any individual identified as an employee by a Member of the Group on the Invitation Date excluding any member of the board of directors of the Company.

"**Invitation Date**" means the dates on which Eligible Employees are invited to participate in the Plan.

"**Invitation Period**" means, with respect to an Eligible Employee, the period starting on the Invitation Date and ending on 15 October of the applicable Plan Year during which the Eligible Employee may choose to accept the invitation.

"**Market Value**" means the price of a Share determined using any reasonable method selected by the Directors.

"**Member of the Group**" means:

(a)    the Company;

(b)    its Subsidiaries from time to time; and

(c)    any other company in which the Company controls, either directly or indirectly, 50% of the shares.

"**Participant**" means a person who has accepted an invitation to participate in the Plan or his personal representatives.

**"Plan Year"** means the calendar year from 1 January to 31 December.

**"Purchase Date"** means the day on which the Shares are purchased using the Savings.

**"Purchase Price"** means the price at which the Shares are acquired by the Participant including the Discount.

"**Rules**" means these rules (including any schedules) as amended from time to time.

"**Salary**" means, with respect to a Participant, the available salary, wages or other compensation that has been identified by the Plan administrator as an eligible source for contributions to the Plan, subject to any applicable payroll withholding ordering/hierarchy.

"**Savings**" means the contributions to the Plan from a Participant's Salary.

**"Savings Amount"** means the amount to be saved per month.   The Savings Amount must be in whole units of the relevant currency.   The Company can (but need not) impose a minimum monthly Savings Amount for any given Plan Year and, if it does so, the minimum may be increased (or decreased) by the Company from time to time for the next Plan Year. If an individual is not paid monthly the Savings Amount will be pro rated across up to two payroll periods as determined by the administrator.

**"Savings Limit"** means the maximum amount (stated in Euros) which a Participant can save each year under the Plan.   This limit will be set by the Company in Euros each year and may be increased (or decreased) by the Company from time to time for the next Plan Year. An equivalent limit in other savings currencies will be set by the Company each year.

"**Shares**" means, subject to rule 11, fully paid ordinary shares in the capital of the Company or American Depositary Receipts representing those shares. The Shares will all be market purchase and not new issue shares.

"**Subsidiary**" means a company which is a subsidiary of the Company within the meaning of Section 1159 of the Companies Act 2006.

Exhibit Q