**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> EQUILON ENTERPRISES LLC (d/b/a SHELL OIL PRODUCTS US), SHELL OIL COMPANY, SHELL PETROLEUM, INC., SHELL TRADING (US) COMPANY, MOTIVA ENTERPRISES LLC, and TRITON TERMINALING LLC, <br><br> Defendants. | **Case No. 1:17-cv-00396** |

**MEMORANDUM OF LAW IN SUPPORT OF
AMERICAN PETROLEUM INSTITUTE'S MOTION TO QUASH
THIRD-PARTY SUBPOENA**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................3

STANDARD OF REVIEW ..............................................................................................9

ARGUMENT ..................................................................................................................10

I. The Subpoena Should Be Quashed... ........................................................................10

   A. The Subpoena is Facially Invalid............................................................................10

   B. The Subpoena Imposes an Undue Burden on API—as CLF Itself Has Already Admitted...14

   C. CLF Has Been Authorized to Obtain the Core Documents at Issue Directly From the Defendants. ..................................................................................................................15

   D. Many of the Requests are Overbroad and Span a Very Long Period of Time. ..............17

III. API Has Not Waived Its Ability to Object to, Respond to, or Otherwise Seek Relief From the Subpoena..........................................................................................................18

CONCLUSION................................................................................................................18

**INTRODUCTION**

In July of 2024, the Conservation Law Foundation, Inc. ("CLF") served a third-party document subpoena on American Petroleum Institute, Inc. ("API"), in connection with this matter ("Subpoena"). The Subpoena is extremely broad: it seeks 35 categories of documents (Ex. A at 19) that mostly span a 17-year period of time (*id.* at 5: "Unless otherwise stated, the applicable timeframe for these Requests is January 1, 2008 to present."). API spent more than 10 months working with CLF to negotiate a response that would be consistent with its status as a non-party to the litigation who is entitled to be free from undue burden or expense. API made clear from the start that it had no interest in restricting the topics on which CLF might seek discovery, but cared only about limiting the burden on API. API conveyed its view that a reasonable burden would amount to production and review of approximately 1,000 documents. *See* Ex. B at 26. CLF stated its own view—perhaps genuine, perhaps an overstated negotiating position—that "[f]our to five thousand documents is a more reasonable number" in terms of burden. Ex. B at 23.

CLF conveyed early in the negotiations that the documents it was most interested in were those concerning "the potential involvement of" Shell and Motiva (the defendants in the underlying litigation) in discussions about the drafting of an API publication known as "API 656." Ex. B at 26. After six months of work, the parties had arrived at search terms that resulted in a universe of 6,781 documents potentially reflecting communications by Shell and Motiva employees about API 656. Yet despite claiming *itself* that "four to five thousand documents" was a "reasonable" burden, CLF demanded review and production of all 6,781 documents—and stated it was *also* demanding review and production on other topics in its subpoena as well. Ex. C at 6; Ex. D at 1. CLF now insists it will accept nothing short of "full compliance" with the Subpoena. Ex. E at 1, 2.

CLF knows that the burden on API to review and produce on those other topics (i.e., those other than the ones concerning communications about API 656) would be catastrophic, because—at CLF's request—the parties had spent four months of their negotiations exploring search terms on six of those topics. And each iteration of those searches (the terms of which were always determined by CLF) returned no fewer than 15,000 hits and as many as 160,000 hits—on just *six* of CLF's 35 document requests. Ex. B at 8, 14-15.

CLF has rejected requests to continue negotiating the scope of API's compliance based on the API 656-related communications. The reason for that sudden change appears to be opportunistic: As the Court is aware, CLF was authorized to obtain *directly from Shell and Motiva* "all documents . . . referring to API 656." *Conservation Law Foundation, Inc.*, No. 1:17-cv-00396, ECF No. 186, Ex. A at 2; ECF No. 198 at 8. And, after several years, fact discovery in the underlying litigation is finally set to close. *Id.*, ECF No. 235 at 3 (setting deadlines of Sept. 15 for completion of document productions and Nov. 3 for close of fact discovery). CLF no longer seems to need from API the documents it said were most important to the Subpoena, and appears intent on trying to get whatever more peripheral documents that it can before time runs out.

Even if all CLF were seeking was review and production of the 6,781 documents about API 656, that would still be nearly 2,000 documents above the top end of the range that CLF itself said would be reasonable. In now demanding "full compliance" with the Subpoena, CLF seeks to impose an astronomical burden on API, for documents that are even less important to its case. The burden to API would be manifestly undue and not at all proportional to CLF's needs. API therefore respectfully requests that this Court quash the Subpoena under Rule 45.

2

4915-5681-1366, v. 1

**BACKGROUND**

API is a trade association that, among other things, issues publications relating to best practices in the oil and gas industry. Its members range "from the largest major oil company to the smallest of independents" and "come from all sectors of the industry."[1] While some of its members are large corporations, API itself is not.

As noted above, the underlying litigation in this matter has been pending since August 2017. CLF served API the Subpoena in late July of 2024. The subpoena demands compliance by electronic means at CLF's office in Providence, Rhode Island. *See* Ex. A at 1. API is headquartered in the District of Columbia. *See* Ex. G (Declaration of Shannon DiBari) at 1.

As also noted above, the Subpoena is incredibly broad, especially given API's status as a nonparty. In-house counsel for API asked CLF for an extension of API's response deadline to August 29 while he searched for outside counsel, and CLF agreed. On August 27 outside counsel then asked for a two-week extension of his own due to illness. Ex. B at 30. CLF agreed and the parties spoke about the scope of the Subpoena on August 30. Counsel for CLF indicated that the documents CLF was most interested in were communications about "the potential involvement of" the entities "listed in RFP 26" (which included any Shell and Motiva employees) in discussions about API 656. Ex. B at 26. Counsel for API agreed to ask API to run searches to that end, and asked if the two-week extension of API's response deadline could specifically be two weeks and one day (to Friday, September 13), since he was scheduled to be in New Jersey for a settlement conference in federal court on September 10 and 11 and would be flying directly from there to Salt Lake City later on September 12. Ex. B at 27.

---

[1]     *See* https://www.api.org/membership/members.

The parties agreed on September 13 to indefinitely stay API's response deadline as they worked to determine a reasonable universe of documents that best suited CLF's needs. *Id.* They spoke on the phone that day and API conveyed to CLF the results of its first round of electronic searches, which resulted in several thousand hits. *Id.* at 25-26. Counsel for API "expressed the view that reviewing more than 1,000 documents was pushing the limit of what would be an acceptable burden on API given its third-party status" but that API was "open to letting CLF choose which buckets of documents to use to fit within that number." *Id.* at 26. API cared only about avoiding undue burden, as is its right under the rules as a non-party. The parties "then discussed two ways to refine the searches API had done to date" to avoid an undue burden on API, and counsel for API said he would ask API to run those refined searches. *Id.*

Four days later, API sent CLF the refined search results, which totaled just under 1,200 hits. *Id.* at 24. CLF didn't respond until eight days later. Counsel for CLF said it had just "a few remaining concerns that I hope we can address together." *Id.* at 23. He stated CLF's view that "[f]our to five thousand documents is a more reasonable number" in terms of burden. *Id.* He proposed to send API "a spreadsheet with proposed search terms for each document request" that he hoped would be "more targeted" than the requests themselves. *Id.* He noted in particular that six requests—RFPs 10, 24, 29, 33, 34 and 35—wouldn't overlap with the searches that, to that point, had focused on communications about API 656. *Id.*

CLF sent API the spreadsheet on September 27, and counsel for API responded that "4000+ [documents] is well above what amounts to a reasonable burden here." *Id.* at 22. He stated in mid-October that he would begin by asking API to run the spreadsheet search terms just for the six requests that did not overlap with the "API 656" searches. *Id.* at 21. CLF did not object.

4

The search for RFP 10 resulted an incredible number of hits – approximately 88,000. *Id.* at 20. The other searches contained syntax errors or otherwise resulted in almost no hits at all. *Id.* API so informed CLF. Nine days later, CLF responded by proposing ways to further refine those six searches, *id.* at 18-19, and asked to discuss the results by November 20, *id.* at 18. The refinements did nothing more than halve the number of results for RFP 10, and furthermore resulted in an additional 160,000 hits. *Id.* at 14-15.

After getting those results, CLF didn't contact API for almost an entire month. On January 16, 2025, counsel for CLF asked API to run newly refined searches for three of those six requests. *Id.* at 13. Those searches still yielded approximately 30,000 hits just for those three requests. *Id.* at 8-9.

CLF didn't respond until two weeks later. On February 14 it abandoned those six searches that had been the focus of discussions for the past four months. It asked instead "if we could move forward by focusing on CLF's communications related requests"—specifically, "RFPs 26, 27, 28, 29, 30 and 32." *Id.* at 6. CLF asked for hit counts on those requests for "documents received from or sent to a @shell.com or @motiva.com email." *Id.* The parties spoke by phone in March, *id.* at 5, where counsel for API agreed to the change in direction but reiterated API's view that an appropriate burden would be around 1,000 documents. Counsel for CLF stated on March 26 that, "[g]iven the parameters that you've expressed to me, I believe we are very close to reaching agreeable terms." *Id.*

API responded on March 31 that the refined hit counts CLF had most recently requested still turned up more than 15,000 hits. *Id.* at 3. CLF requested still further refinements on April 2, stating that it was "presently trying to accommodate API's 1000 document limitation." *Id.* at 2. On April 4, counsel for API asked to set up a call to discuss how to move forward. Ex. F at 1-2.

5

Counsel for CLF asked to do the call on April 15 or 16. *Id.* at 1. Counsel for API reported that CLF's latest searches resulted in approximately 4,200 hits, and the parties spoke as planned on April 16. Ex. B at 1.

Nine days later—and just three weeks after stating it was trying to limit API's burden to 1,000 documents—CLF stated that it "d[id] not believe that producing more than 1000 documents would pose an undue burden on API" and said it would "seek judicial intervention and move to compel compliance." Ex. C at 18. API responded that it would agree to upload those approximately 4,200 hits to a review platform to see if de-duping them significantly reduced the number such that review and production would not be unduly burdensome, but asked CLF to "try to think of ways to further refine the search terms in case we are still significantly north of 1000 documents after de-duping." *Id.* at 17. Counsel for API also suggested an agreement where API would produce all of the 929 underlying emails in the hits and then allow CLF to choose some predetermined number of attachments after it reviewed the underlying emails. *Id.* at 5. The number of attachments would be agreed to before production of the emails, but CLF would have complete discretion in choosing *which* attachments to have API review and produce. *Id.* API, again, cared only about avoiding undue burden.

CLF responded on May 1 by asking API to upload and produce the 4,200 documents after de-duping, but did not expressly commit that doing so would resolve API's compliance with the Subpoena. *Id.* at 15-16. API vetted vendors, uploaded the documents, and reached out to CLF on May 20 to set up a call, which took place the next day. *Id.* at 11-12. The 4,200 documents were mostly emails, many of which had attachments that were not reflected in the hit count. The total number of unique documents API had uploaded, therefore, was actually around 12,000. After de-duping and de-threading those documents, however, there remained 6,781 documents. API

6

conveyed all of that to CLF. *Id.* at 9. API again asked CLF on that call to further limit its request, such as by identifying specific individuals at Shell and Motiva whose communications it was most interested in. *Id.* at 7. CLF's counsel agreed to discuss that proposal with her client. *Id.*

Unbeknownst to API, on February 14, 2025, this Court granted in part and denied in part four motions to compel filed by CLF against the defendants here, Shell and Motiva. *See Conservation Law Foundation, Inc. v. Shell Oil Products U.S.,* et al., No. 1:17-cv-00396 (D.R.I. August 28, 2017), ECF No. 198. Among the documents the Court ordered Shell and Motiva to give to CLF were those responsive to CLF's Request 79, which sought "all documents in your possession, custody or control referring to API 656," **which would necessarily include the communications CLF had wanted from API**. *Id.* at 8 (granting CLF's motion as to "Requests 68, 78, 79, and 85"); ECF No. 186, Ex. A at 2 (reproducing Request 79). API does not know when or if CLF ultimately received those documents from Shell and Motiva, but it may be what explains the sudden and unexplained shift in CLF's negotiations with API.

On May 23 (two days after CLF and API discussed the uploaded documents), CLF demanded production of the entire set of 6,781 documents. Counsel for CLF said she "d[id] not believe" that the burden on API "will be extraordinary," Ex. C at 9, even though it was nearly 2,000 documents above the upper limit that CLF itself had said would be reasonable, Ex. B at 23. CLF again refused to say that producing those documents would satisfy API's compliance with the Subpoena. In fact, in a follow-up email on June 3, CLF claimed that the parties' extended efforts to negotiate a reasonable universe of API 656-related documents "by no means locks us into only discovering that information alone." Ex. C at 6. Counsel for CLF denied having stated that she would ask CLF to consider limiting the search by specific Shell or Motiva employees and demanded production of the 6,781 documents by June 9. *Id.*

4915-5681-1366, v. 1

Counsel for API responded on June 9 that CLF's counsel did in fact agree to discuss limiting the production by specific recipients. *Id.* at 4. He reiterated—as he'd said "in [his] last email"—that he'd surveyed a selection of the almost 6,000 attachments and was again offering to discuss that. *Id.* And he offered—similar to what he'd suggested on the May 21st call—to ask API to produce the 929 underlying emails and up to 1,000 attachments, which CLF could select in its discretion after reviewing the underlying emails, to ensure it got the most relevant attachments. *Id.* CLF rejected the offer the next day and said it "will be moving to enforce API's compliance in full." *Id.* at 3-4.

On June 18, CLF asked to set up a call with counsel for API to discuss scheduling an informal discovery conference with the magistrate judge in this case. *Id.* at 2. Counsel for each side spoke on June 23. Counsel for CLF claimed on the call that, "until recently," it would have "agree[d] to resolve API's subpoena compliance with production of the 656-related documents, which at this point number 6,700+ documents," but that "recently it had changed its position on that." Ex. D at 1. Counsel for CLF claimed that the reason for the change was the length of time the negotiations had taken. But when asked *when* CLF's position had supposedly changed, counsel for CLF was unable to say. *Id.* When asked if it had been "in the last month," CLF's counsel said it would be "hard to identify a date." *Id.* When asked if it had been "more than 3 months ago," he said he "would not be able to provide information on this." *Id.* Counsel for API said he would talk to API about whether to request an informal discovery conference. *Id.* He also memorialized that call in an email to CLF's counsel that same day and asked them to "let [him] know if you disagree with any part of this." *Id.* CLF's counsel never responded. Counsel for API began preparing the motion to quash that API would eventually file in the United States District Court for the District of Columbia in the event CLF declared negotiations to be over.

8

On July 9, outside counsel for CLF informed counsel for API that CLF intended to file a motion to compel the following Monday (July 14) unless API "fully complies with the subpoena beforehand." Ex. E at 2. Counsel for API responded that API "remains willing to negotiate a resolution centered on the documents we've uploaded to the review platform, or a similar number of other documents that is consistent with a reasonable burden on API." Counsel for API asked if CLF would accept anything "short of full compliance" and said that, if not, API would "consider negotiations to be closed." *Id.* He stated that if negotiations were indeed closed, "we will plan to file a motion to quash the subpoena." *Id.* Counsel for CLF responded that CLF "intend[s] to seek full compliance and will file a motion to compel Monday." *Id.* Given that negotiations had closed, API served its objections to the Subpoena on CLF on Friday, July 11.

That same day, API moved in the United States District Court for the District of Columbia to quash the subpoena. *See In re Subpoena Issued to American Petroleum Institute, Inc.*, No. 1:25-mc-116-JDB, ECF #1 (D.D.C. July 11, 2025). When CLF asked for an extension of its deadline to respond to the motion, *see id.* at ECF #3, the parties conferred and CLF acknowledged it did not have a motion to compel ready to file. On August 19 the district court in D.C. dismissed API's motion on jurisdictional grounds, holding that the motion had to be brought in this Court even if it turned out that the place of compliance identified in the subpoena were invalid. *Id.*, ECF #8 at 6. In the intervening 20 days, CLF has not filed a motion to compel in this Court. CLF nevertheless confirmed to counsel for API, on September 4, that CLF's position on API's response to the Subpoena has not changed.

## STANDARD OF REVIEW

Courts must quash or modify a subpoena if it subjects a non-party to an "undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). An evaluation of undue burden requires the Court to weigh the

9

burden to the subpoenaed party against the value of the subpoenaed information to the requesting party. *See, e.g.*, *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 42 (1st Cir. 2003) (affirming district court's decision to quash subpoena on undue burden grounds because of the "apparent imbalance between TKS's need and the imposition on Heidelberg"). "'[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.'" *Id.* (quoting *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)). Accordingly, "[a] more burdensome subpoena should be justified by a somewhat higher degree of probable relevance than a subpoena that imposes a minimal or nonexistent burden." *FEDEQ DV004, LLC v. City of Portland*, No. 2:21-CV-00327-GZS, 2022 WL 17082083, at *2 (D. Me. Nov. 18, 2022) (citing *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 304, 111 S. Ct. 722, 729, 112 L. Ed. 2d 795 (1991) (J. Stevens, concurring)).

**ARGUMENT**

**I.    THE SUBPOENA SHOULD BE QUASHED.**

The Subpoena should be quashed for at least four reasons.

**A.    The Subpoena Is Facially Invalid.**

First, the Subpoena is facially invalid because it "purports to compel compliance beyond the geographical limits specified in Rule 45(c)." Fed. R. Civ. P. 45(c), Advisory Committee Notes, 2013 Amendment. Federal Rule of Civil Procedure 45(c)(2) says unequivocally that a subpoena may command production of documents only "at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person." And Rule 45(d)(3)(ii) states that when a subpoena "requires a person to comply beyond the geographical limits specified in Rule 45(c)," then "the court for the district where compliance is required must quash or modify" it.

10

That is the case here. The face of the Subpoena purports to compel compliance at CLF's offices in Providence, Rhode Island. *See* Ex. A at 1. But API does not "reside[]" or "regularly transact[] business" within 100 miles of that location. Fed. R. Civ. P. 45(c)(2)(A). As explained in Exhibit G, API is headquartered in the District of Columbia. *See* Ex. G at 1. And when a nonparty recipient is a corporation, the place of compliance—that is, the place where the corporation "resides" or "regularly transacts business in person," Fed. R. Civ. P. 45(c)(2)(A)—is the place where the corporation is headquartered. In *Europlay Capital Advisors, LLC v. Does*, for example, the plaintiffs moved to compel Google to comply with a non-party subpoena in the Central District of California, where Google had an office. *Europlay Capital Advisors, LLC v. Does*, 323 F.R.D. 628, 629 (C.D. Cal. 2018). The Court, however, held that the Northern District of California was the district in which the plaintiffs had to so move, because "despite Google having an office in Venice, the proper district to hear a motion to compel is where Google is headquartered." *Id.* (citing cases). It went on to note, among other things, that the Advisory Committee's notes to the 2013 amendment of Rule 45 stated that "'[t]he prime concern should be avoiding burdens on local nonparties subject to subpoenas." *Id.* (quoting Advisory Committee notes to Rule 45(f)).

Likewise in *Marshall Project, Inc. v. City of Cleveland*, the subpoena recipient had "a small handful of staff in Ohio," and the City of Cleveland argued it should be permitted to enforce a nonparty subpoena in the Northern District of Ohio. *Marshall Project, Inc. v. City of Cleveland*, No. 24-MC-309 (VEC), 2024 WL 4589667, at *3 (S.D.N.Y. Oct. 28, 2024). But the Southern District of New York granted the recipient's motion to quash in that court, because "[c]ourts within th[at] Circuit have fairly consistently held that, under Rule 45, the party issuing a subpoena to a non-party entity can require compliance only in the district in which the entity is *headquartered* or at a place within 100 miles of the entity's *headquarters*." *Id.* (emphasis added, citing *Tapjets*

11

4915-5681-1366, v. 1

*Inc. v. United Payment Servs., Inc.*, No. 19-CV-3740, 2020 WL 13581674, at *9 (E.D.N.Y. Sept. 17, 2020) and *In re Smerling Litig.*, No. 21-CV-2552, 2022 WL 684148, at *2 (S.D.N.Y. Mar. 8, 2022)). Many other courts have held the same.[2]

A party cannot do an end-run around the rule by requesting production through "electronic means" at some distant location. *See id.* ("Rule 45(d)(3)(A)(ii) directs the court to quash any subpoena that purports to compel compliance beyond the geographical limits specified in Rule 45(c)."). That flies in the face of both the text and purpose of the rule. The text of the rule explicitly ties compliance to the residence or business of the recipient. Section (c) of Rule 45 is expressly titled "Place of Compliance," and subsection (c)(2) defines that for purposes of "production of documents" as "a place within 100 miles of where the person resides, is employed, or regularly transacts business[.]" Fed. R. Civ. P. 45(c)(2); *see also Raap*, 2017 WL 2462823 at *3 (because "Rule 45(c) requires that the subpoena command production within 100 miles of where the person resides, . . . the court in which compliance is required under Rule 45(c) is the court in the district within 100 miles of where the subpoenaed person resides"). Rule 45 makes no exceptions for electronic transmission of documents, or anything else for that matter. *See Agincourt*, 2014 WL 4079555 at *4 ("The text of the Rule does not provide for an alternative basis for the Court to find that the place of compliance is not tethered to the subpoenaed person's location."). Indeed, the notes to the 2013 amendment of Rule 45—which produced the current formulations of Rules 45(c)

---

[2]    *See, e.g.*, *Crews v. Tanpri Media & Arts Inc.*, No. CV-23-01236-PHX-JJT, 2024 WL 1976060, at *1 (D. Ariz. May 1, 2024) ("the place of an entity's compliance with the subpoenas must be within 100 miles of where (1) each entity is headquartered, or (2) its custodian of record resides, is employed, or regularly transacts business in person"); *Moore v. Pooches of Alrgo, Inc.*, No. 8:20-CV-2184-MSS-SPF, 2023 WL 2584466, at *2 (M.D. Fla. Mar. 21, 2023) ("The district of compliance for a nonparty corporation is where the corporation is headquartered."); *Ortiz v. Harrell*, No. 21-14219-CIV, 2022 WL 457856, at *4 (S.D. Fla. Feb. 14, 2022) ("For non-party corporations, courts find that 'the place of compliance' is where a corporation is headquartered.").

12

and 45(d)—show that the drafters of the rule were aware of the widespread use of electronic production, yet refused to write any kind of exception into the rule for it. *See* Fed. R. Civ. P. 45(c), Advisory Committee Notes, 2013 Amendment (acknowledging the reality that "parties often agree that production . . . be transmitted by electronic means" and that "[s]uch arrangements facilitate discovery").

Holding that "electronic transmission" allows a subpoenaing party to ignore the text of Rule 45 would also eviscerate the drafters' stated purpose in formulating the rule: to "protect local nonparties" from having to litigate disputes in distant courts. *See* Fed. R. Civ. P. 45(f), Advisory Committee Notes, 2013 Amendment ("***To protect local nonparties***, local resolution of disputes about subpoenas is ***assured*** by the limitations of Rule 45(c) and the requirements in Rules 45(d) and (e) that motions be made in the court in which compliance is required under Rule 45(c).") (emphasis added); *see also Dennis*, WL 62919, at *6 (purpose of rule is "protecting local non-parties and resolving dispute locally"). If an issuing party could designate compliance in a distant court that is more convenient for *it*, and thereby guarantee that any disputes about the subpoena would have to be resolved there (as CLF has done here), Rule 45 would be gutted. As one court has put it, "The purpose of protecting nonparties is defeated if a party could demand compliance in a location more than 100 miles from where the nonparty resides, is employed, or regularly transacts business in person and still require the nonparty to adjudicate a dispute over that subpoena in a distant forum." *Raap*, 2017 WL 2462823, at *3. That is because even where distant production (by electronic means) does not increase a non-party's burden, distant resolution still does. *HI.Q, Inc. v. ZeetoGroup, LLC*, No. MC 22CV1440-LL-MDD, 2022 WL 17345784, at *8 (S.D. Cal. Nov. 29, 2022) ("Even if the parties can manage the electronic production of documents and a remote deposition, the burden on Zeeto is reduced by litigating here instead of in a Delaware

13

court."). The only way to prevent that is for the courts to let parties know that if they try to rig jurisdiction in that way, their subpoenas will be declared invalid and they will have to start again from scratch. *Cf. Cornelius v. Rollins Ranches, LLC*, No. 6:21-MC-167-WWB-DCI, 2022 WL 376048 (M.D. Fla. Feb. 8, 2022) ("If Defendant's lawyers were permitted to manufacture jurisdiction [by requiring production at their offices], then any party could pick their venue for discovery litigation simply by requiring a non-party to produce documents at a particular location."). That is what both the text and the purpose of the rule requires.

**B.      The Subpoena Imposes an Undue Burden on API—As CLF Itself Has Already Admitted.**

Second, even if the Subpoena were not facially invalid, it should still be quashed because it "subjects [API] to an undue burden." Fed. R. Civ. P. 45(d)(3)(iv). And the analysis in that regard is unusually straightforward given CLF's own admissions. CLF's own position was that an appropriate burden on API would be to review and produce "[f]our to five thousand documents." Ex. B at 23. As an early negotiating position, that number likely *overstated* what CLF thought might actually be an appropriate burden, in the hopes that the ultimate number the parties agreed to would be as high as possible. Indeed, as late as March 26, counsel for CLF stated she "believe[s] we are very close" to reaching an agreement along the lines API had long pushed for, Ex. B at 5, and on April 2 CLF was still trying to reach that 1,000-document target, *id.* at 2.

But even if taken at face value, "four to five thousand documents" is still thousands of documents lower than the 6,781 documents CLF ultimately demanded, and which it *additionally* said would not satisfy API's compliance with the Subpoena. Ex. C at 3-4. And every iteration of searches that CLF asked API to run for documents beyond the defendants' communications about API 656 returned at least 15,000 hits, with one returning as many as 160,000 hits. Ex. A at 8, 14-15. And those searches spanned only *six* of CLF's RFPs. "Full compliance" would likely result in

14

hundreds of thousands more. All of that is known to CLF from the history of the parties' negotiations. Yet CLF now insists on nothing short of it.

Compounding this concern is the fact that a portion of the documents will have to be reviewed and withheld or redacted for privilege. Membership organizations have an associational privilege under the First Amendment to protect information about their members. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 605-07 (2021). During negotiations, counsel for API reviewed a selection of the email attachments in order to give CLF a sense of what they involved (a conversation that CLF repeatedly turned down, as noted above), and confirmed that a non-trivial percentage of the documents contain personal and identifying information about its members. Redacting that information will only add to API's burden.

The Sourt doesn't need to delve into the specifics of the underlying litigation to know that the resulting burden to API, a nonparty, is undue. The burden would dwarf what CLF itself admitted would be a reasonable burden.  That alone merits quashing the Subpoena. *See Raap*, 2017 WL 2462823, at *3-4 (choosing to quash, rather than modify, facially invalid subpoena "because the subpoena also imposes an undue burden").

    **C.**    **CLF Has Been Authorized to Obtain the Core Documents at Issue Directly From the Defendants.**

The Subpoena should also be quashed because CLF has already been authorized to obtain, from the defendants (Shell and Motiva), the most relevant documents that it sought from API.[3] As explained above, CLF indicated early on that "the potential involvement of" Shell, Motiva and

---

[3]    *See, e.g.*, *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 16 (D.D.C. 2012) (denying motion to compel and ordering plaintiff to first seek the same discovery from defendant); *In re Motion to Compel Compliance with Subpoena Direct[ed] to Dep't of Veterans Affairs*, 257 F.R.D. 12, 19 (D.D.C. 2009) (requiring plaintiff to first seek discovery from defendant, rather than third party, otherwise "any subpoena to [the third party], no matter how limited, is still unduly burdensome").

4915-5681-1366, v. 1

others in discussions about API 656 were what CLF was most interested in. Ex. B at 26. Negotiations therefore were quickly focused on API 656. Ex. B at 23. At CLF's request, negotiations then took a four-month detour to explore other areas. *See supra* at 4-5. But they returned to documents about API 656 five months ago, again at CLF's request, Ex. B at 6, and remained there until CLF ended negotiations. CLF's actions and words both prove that those are the core documents sought by the Subpoena—and Shell and Motiva have themselves been ordered to produce those documents to CLF.

The 6,781 documents that the parties had been negotiating about were communications about API 656 in which a person with an @shell.com or an @motiva.com email domain was in the "to" or "from" line of the communication. As explained above, the Court ordered Shell and Motiva to produce "all documents in your possession, custody or control referring to API 656." *See supra at* 7. Employee communications about API 656 are merely a subset of "all documents in [the defendants'] possession, custody or control referring to API 656." As this Court has already recognized, when a nonparty's subpoena "overlap[s] with the Document Requests served directly on Defendants," that is a reason to block the nonparty discovery. *Conservation Law Foundation, Inc. v. Shell Oil Products U.S.*, 2025 WL 509351, at *3 (D.R.I. Feb. 14, 2025); *see also Buzzfeed, Inc.*, 318 F. Supp. 3d at 358 ("whether the discovery sought is 'unreasonably cumulative or duplicative'" is factor in determining undue burden).

Because CLF has requested—and been given access to—the core documents it sought from API, discovery from API on other topics would be even less proportional to the needs of the case. *See, e.g.*, *Buzzfeed, Inc.*, 318 F. Supp. 358 (whether discovery is "proportional" takes into account "the importance of the issues at stake"). That is especially true given the extremely large number of hits that CLF's search terms on topics other than API 656 turned up. *See id.* ("proportional"

16

analysis also considers "whether the burden or expense of the proposed discovery outweighs its likely benefit"). When one "balances the burden of compliance against the benefits of the requested production" in this case, *Raap*, 2017 WL 2462823, at \*4, it weighs strongly in favor of quashing the Subpoena. The fact that CLF would negotiate the Subpoena's scope for 10 months, at times leisurely, further reflects the relative lack of importance this discovery seems to have to its overall case.

### D. Many of the Requests are Overbroad and Span a Very Long Time Period of Time.

Fourth and finally, many of CLF's document requests are facially overbroad—which perhaps explains why narrowing them by search terms *still* resulted in 160,000 hits for just six of those requests. Ex. A at 14-15. Many of CLF's requests seek every document or communication in a given category. *See* Ex. A, Requests 1-5, 7, 9, 11, 13, 25-30, 35. They also, by stated default, seek documents that span a period of more than 17 years. *Id.* at 5 (requests seek documents from January 1, 2008 through the present unless otherwise specified). The First Circuit has held that overbreadth of that nature weighs in favor of quashing. *See Heidelberg Americas, Inc.*, 333 F.3d at 42 (affirming district court's quashing of subpoena because "[t]he subpoena encompasses a decade's worth of materials and asks for '*all* documents received, *reviewed* or generated by Heidelberg . . . relating to . . .any . . . type of business affiliation with Goss") (emphases in original). Other courts have held the same. *See, e.g.*, *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (quashing subpoena because the "requests are overbroad on their face and exceed the bounds of fair discovery in that they seek [] information over a ten year or greater period") (internal citations and quotations omitted); *Pebble Limited Partnership v. Environmental Protection Agency*, 310 F.R.D. 575, 582 (D. Ala. 2015) (subpoena quashed that requested a third party to produce everything it had ever received from the EPA over an 11-year period). Counsel for API

17

asked CLF more than once to consider narrowing the date range of various requests and was repeatedly denied. *See* Ex. B at 1, 3; Ex. C at 16.

**III.    API Has Not Waived Its Ability to Object to, Respond to, or Otherwise Seek Relief From the Subpoena.**

Based on statements made by CLF near the end of negotiations, API expects that CLF will try to argue that API has waived its right to object to or otherwise oppose the Subpoena. *See* Ex. C at 9-10. CLF claimed that API's response deadline was only ever extended to September 12, 2024, not to September 13. But that is false. As explained above, when counsel for API and CLF spoke on the phone regarding API's requested two-week extension, counsel for API specified he was seeking an extension until Friday, Sept. 13 (two weeks and one day), because of pre-existing work travel to New Jersey on Sept. 10-11 and Salt Lake City on Sept. 12. Ex. B at 27. Counsel for CLF simply did not recall that. *Id.* at 28 (referring to it as a "discrepancy" in counsels' recollections). But even if CLF were right that API had missed a deadline, CLF cannot credibly claim prejudice from it after then agreeing to indefinitely stay the deadline and continuing to negotiate the scope of the subpoena with API for *nine* additional months. *See, e.g.*, *Conservation Law Foundation, Inc. v. Shell Oil Products US*, 2025 WL 509351, at *2 (D.R.I. Feb. 14, 2025) ("Plaintiff has shown no prejudice in the travel of this dispute or prejudice from any delay in tendering formal objections. Finding a waiver by a non-party under these particular circumstances would not serve the interests of justice."); *Caudle v. D.C.*, 263 F.R.D. 29, 33 (D.D.C. 2009) ("The court may also reject a waiver where the opposing party will not suffer prejudice and the delinquent party has not demonstrated a pattern of misconduct.").

## CONCLUSION

For the foregoing reasons, API respectfully asks this Court to quash the Subpoena.

18

Respectfully submitted,

*Attorneys for American Petroleum Institute, Inc.*


*/s/ Aaron L. Weisman*
Aaron L. Weisman (#4438)
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215N
Johnston, RI  02919
(401) 824-5100
(401) 824-5123 fax
aweisman@pldolaw.com

/s/ *Christopher C. Muha*
Christopher C. Muha (DC Bar #987116)
(*pro hac vice forthcoming*)
DILLON PLLC
1717 K Street, Suite 900
Washington, DC 20005
T: (202) 787-5851
cmuha@dillonpllc.com

DATED: September 8, 2025


## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, the foregoing was filed through the Court's electronic filing system ("ECF"), by which means the document is available for viewing and downloading from the ECF system and a copy of the filing will be sent electronically to all parties registered with the ECF system.


*/s/ Aaron L. Weisman*


19

4915-5681-1366, v. 1