UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
CONSERVATION LAW FOUNDATION, INC., )
                               )
        Plaintiff,             )
                               )
    v.                         )    C.A. No. 17-396 WES
                               )
SHELL OIL PRODUCTS US, et al., )
                               )
                               )
        Defendants.            )
_____)
```

**<u>MEMORANDUM AND ORDER</u>**

WILLIAM E. SMITH, Senior District Judge.

Before the Court is Defendants' Motion for Partial Summary Judgment ("Defendants' Motion"), Dkt. No. 240.  In their motion, Defendants ask this Court to find that, as a matter of law, the terms in specific permits governing the conduct of Defendants at the Providence Terminal do not include the consideration of certain climate change factors, thereby requiring dismissal of Counts one through seven, nine, and ten in Plaintiff's Third Amended Complaint ("Complaint"), Dkt. No.45.  The Court finds that whether the terms of the permit required Defendants to consider climate change factors is a question of fact that must be decided at trial. Therefore, Defendants' Motion is denied.

## I.   BACKGROUND

### A. Permits

The federal Clean Water Act regulates the discharge of pollutants into navigable waters through the National Pollutant Discharge Elimination System ("NPDES"), which authorizes either facility-specific permits or coverage under statewide general permits.  33 U.S.C. § 1311, 1324(a)-(b).  Rhode Island, as an authorized NPDES state, issues various permits governing stormwater discharges from categories of industrial facilities, including petroleum bulk storage operations. See U.S. Envtl. Prot. Agency, *NPDES Permit Basics*, https://www.epa.gov/npdes/npdes-permit-basics (last updated June 3, 2025).  Facilities covered under these types of permits must implement structural and operational controls to prevent the release of contaminated stormwater, maintain systems capable of functioning under expected weather conditions, and comply with sector-specific requirements. See id.

### B. Providence Location

Within this regulatory framework, Triton Terminaling LLC, operated by Equilon Enterprises LLC d/b/a Shell Oil Products US, Defendants, own and operate the Providence Terminal, a bulk petroleum storage and distribution facility located at 520 Allens Avenue along the Providence River.  Defendants' Statement

2

Undisputed Facts ("DSUF") ¶¶ 1-4, Dkt. No. 241. The facility consists of bulk petroleum tanks, distribution infrastructure, and stormwater conveyance systems situated on the waterfront, where stored petroleum products be discharged into the environment through stormwater discharge. See DSUF ¶ 7.

As of February 14, 2011, the Providence Terminal was subject to the Rhode Island Department of Environmental Management ("RIDEM") Individual Rhode Island Pollutant Discharge Elimination System. DSUF ¶ 5. That permit was administratively continued until a new permit was issued on January 30, 2019, which became effective on March 1, 2019. DSUF ¶ 5. That March 2019 permit ("Operative Permit") is one of many permits regulating conduct at the Providence Terminal. DSUF ¶ 6. One requirement under the Current Individual Permit includes the creation of a Storm Water Pollution Prevention Plan ("SWPPP"). DSUF ¶ 6. Critically, the SWPPP's operative terms include concepts such as "Good Engineering Practices" and "Best Management Practices," some specifics of which must be interpreted in context and do not supply precise regulatory boundaries. DSUF ¶ 8.

## C. The Instant Litigation

The presence of these broad, undefined concepts referenced in the permit's terms are central to the dispute in this litigation. The Multi-Sector General Permit ("MSGP") requires facilities to

employ "Good Engineering Practices" and "Best Management Practices." The parties disagree sharply over whether those obligations implicitly require Defendants to consider various climate-change factors in the management and operation of the Providence Terminal. Def's Motion, 1; Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Plaintiff's Opposition"), 6-7, Dkt. No. 244. It is against that backdrop that the Conservation Law Foundation ("CLF"), Plaintiff, filed this civil enforcement action, alleging that Defendants violated the terms of the permit by failing to operate and maintain containment and stormwater controls to address foreseeable site conditions, including those driven by climate change. Compl. ¶¶ 126-246. These climate change factors include things such increased flooding and/or precipitation exacerbated by storms, storm surges, rising sea levels, and increasing sea surface temperatures. Compl. ¶¶ 126-127. Plaintiff asserts that Defendants were long aware — through internal assessments, public climate data, and industry information — of the vulnerabilities of coastal petroleum infrastructure, and that its failure to adapt the facility accordingly violated the SWPPP's "best management practices" and "good engineering practices." Compl. ¶¶ 274-329.

Defendants dispute these allegations and maintain that they have been in continuous compliance with the terms of the Current

4

Individual Permit, specifically the SWPPP.  Defendants' Answer to Plaintiff's Third Amended Complaint ("Answer") ¶¶ 274-329, Dkt. No. 57.  Defendants argue that the terms of the permit as written do not impose any duty to redesign or harden infrastructure based on climate-change factors, and that Plaintiff seeks to impose obligations nowhere found in the permit's text.  See Def's Mot. 9. Defendants further emphasize that the terms of the permit did not impose a generalized obligation to perform climate-change assessments like Plaintiff claims.  See Def's Mot. 20.

### D. New DHS Grant Conditions

In 2024, RIDEM issued a new Multi-Sector General Permit for Stormwater Discharge Associated with Industrial Activity ("New Permit"), effective in 2025, which, although it does not apply to the Providence Terminal, includes several provisions directly addressing climate-related risks.  DSUF ¶ 16-20.  The updated permit requires facilities to evaluate and implement the necessary changes to accommodate and minimize stormwater discharge from major storm events.  DSUF ¶ 19.  The New Permit also requires that SWPPPs be updated to account for various climate-change vulnerabilities.  DSUF ¶ 20.  These measures ("Climate Change Measures") are closely aligned with the conditions Plaintiff argue were implied in the original general permit.

Factual discovery has focused on Defendants' knowledge of

flood and storm risks, its internal evaluations of terminal vulnerabilities, its operational decision-making concerning containment and stormwater controls, and whether Shell historically implemented measures consistent with industry best practices.  The parties continue to dispute the extent to which Defendants' corporate climate-risk materials, and its practices at other terminals, bear on its conduct at the Providence Terminal. Def's Mot. 19-30, Pl's Obj. 27-34.

### E. Summary Judgment Motion

Defendants filed their Motion for Partial Summary Judgment on July 1, 2025, on the grounds that the New Permit demonstrates — by its own "new" terms — that climate-adaptation obligations were not part of the prior permit under which CLF brings its claims.  Def's Mot. 2-4.  Defendants argue that because the revised permit now expressly requires facilities to assess extreme weather, storm surge, and sea-level rise, the regulator has affirmatively imposed "new" duties that did not previously exist. Id.  According to Defendants, the fact that RIDEM chose to add explicit climate-risk language this year confirms that earlier iterations of permit terms did not require facilities to implement climate-adaptation measures or redesign containment structures in anticipation of long-range climate-change projections, otherwise, they would not be characterized as "new."  Id.  On this basis,

Defendants contend that no violation of the prior permit can exist as a matter of law, and that the New Permit language resolves the interpretive dispute in its favor.  Id.

Plaintiff instead argues that Defendants' position does not satisfy the threshold summary-judgment burden.  Pls. Opp. 22-23. Instead, Plaintiff maintains that the New Permit does not establish the absence of a violation but instead underscores a central factual dispute, namely, whether Defendants' stormwater controls were adequately designed, maintained, and operated to address conditions that were reasonably expected under the earlier permit.  Id. 2-8.  Moreover, Plaintiff argues that the new permit merely makes explicit what was already implicit and that Defendants' interpretation represents a contested inference about regulatory intent rather than an undisputed fact.  See id. 9-10. More critically, Plaintiff points out that the adequacy of Defendants' stormwater controls, its knowledge of site-specific vulnerabilities, its assessment of flood risks, and the availability of industry best practices all remain in dispute and go to the factual issue of what was implied in "Good Engineering Practices" and "Best Management Practices" in the Operative Permit, thereby precluding summary judgment.  Id. 22-34.  Because Defendant, as the movant, bears the initial burden of showing that no genuine dispute of material fact exists, Plaintiff argues

7

that any unresolved factual questions — particularly those relating to Shell's operational decisions, internal climate-risk assessments, historical flooding patterns, and the practicability of mitigation measures—preclude judgment as a matter of law.  Id.

Thus, although Defendants rely on the New Permit to argue that the legal debate is resolved in its favor, Plaintiff emphasizes that the relevance and meaning of the New Permit terms themselves involve factual and interpretive disputes that cannot be decided on summary judgment.  Under the governing standard, Plaintiff argues that Defendants have not met their burden, because whether the earlier terms required Defendants to account for foreseeable risks related to climate change remains materially disputed on the record.  Id. 13-14.

## II.  LEGAL STANDARD

The Court must grant summary judgment to Defendants if they show "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] dispute is genuine when the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.'"  Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 7 (1st Cir. 2025) (quoting Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)).  A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law.'"  Id.

(quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)).  In making its analysis, the Court must view "'the entire record in the light most hospitable to the [nonmoving party],'" drawing "'all reasonable inferences in that party's favor.'"  Id. (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).  Notably, the moving party bears the burden of demonstrating that "no genuine dispute as to any material fact" remains and that the "movant is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. DISCUSSION

The central issue here on partial summary judgment is whether the earlier version of the SWPPP terms still in effect under the Operative Permit implicitly required operators to consider climate-related risks when evaluating the adequacy of their containment and stormwater systems.  Those terms imposed broad, performance-based obligations—such as maintaining controls adequate for "expected" conditions and properly operating and maintaining those systems, while the 2024/2025 revisions expressly required facilities to evaluate "Climate Change Measures" such as extreme precipitation, storm surge, and flood events.  DSUF ¶¶18-22.

Thus, the summary-judgment analysis turns on how to characterize the relationship between the terms of the Operative

Permit and the and New Permit.  Determining whether the revised terms clarified a preexisting obligation or instead introduced an entirely new requirement is not a strictly legal exercise; on the contrary, it depends on facts surrounding regulatory practice, industry expectations, and what conditions were reasonably understood to fall within expected operational parameters of "Good Engineering Practices" and "Best Management Practices" at the time.  Those matters cannot be resolved solely by reading the text of the permit itself.  Instead, that analysis requires evaluating evidence — expert views on best practices, Defendants' internal understanding of climate-related risks, industry responses to emerging climate data, and perhaps even the regulator's historical approach to performance-based stormwater obligations.

That determination is inherently factual.  Defendants, as the moving party, bear the initial burden of demonstrating that no genuine dispute of material fact existed on the question of whether climate-related considerations were part of the prior MSGP's implied requirements.  See Celotex Corp., 477 U.S. at 322-23.  To meet that burden, Defendants need to show that the only reasonable inference from the record was that climate-related obligations were not understood to be part of the earlier permit.  Based on the number of factual disputes that require resolution, Defendants have failed to meet their burden.  See Greenburg v. Puerto Rico

10

Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987) ("The precincts patrolled by Rule 56 admit of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record.").

Plaintiff, in turn, must only point to evidence that creates a genuine dispute - such as expert testimony that coastal facilities were already expected to consider climate-driven flooding risks, documents showing Shell internally evaluated those risks, or industry materials suggesting that best practices had begun to shift during the relevant period. See Celotex Corp., 477 U.S. at 324. Therefore, the Court finds there is sufficient evidence to this effect in the record, when viewed in the light most favorable to the non-moving party, to prohibit partial summary judgment at this time.[1]

Defendants have not carried their burden. The dispute over

---

[1] A similar case is pending in the United States District Court of the District of Connecticut. See Conservation Law Foundation, Inc. v. Shell Oil Products US, et al., No. 3:21-CV-933 (D. Conn. filed July 7, 2021). The Court there came to a similar conclusion when deciding on a motion for summary judgment, explaining that, the permit in question in that case "unambiguously imposes a minimization duty that in turn references and

whether the climate-change factors were implied in the Operative Permit SWPPP terms cannot be resolved in one direction as a matter of law; it remains a live factual controversy.  For the reasons explained above, the Court finds that this factual dispute is sufficient to preclude summary judgment.

**IV.  CONCLUSION**

For the reasons explained above, Defendants' Motion for Partial Summary Judgment, Dkt. No. 240, is DENIED.


IT IS SO ORDERED.

William E. Smith
Senior District Judge
Date: December 23, 2025

---

incorporates best industry practice." <u>Id.</u> Text Order Denying Motion for Partial Summary Judgment, Dkt. No. 302 (D. Conn. Oct. 12, 2023).  "If the best industry practice [] require[s] consideration of climate change factors, [] the permit includes this requirement despite the absence of more explicit language [] about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that the Court cannot resolve at this time . . ." <u>Id.</u>